**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC, *et al.*,[1] | Case No. 25-10006 (__) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY**
**OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN**
**POSTPETITION FINANCING AND (B) USE CASH**
**COLLATERAL; (II) GRANTING LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING**
**ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY;**
**(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") respectfully state

as follows in support of this motion (the "Motion"):

**Preliminary Statement**

1.      The Debtors commence these chapter 11 cases prepared to execute on their

restructuring strategy and consummate a value-maximizing transaction with AST & Science, LLC

("AST").  Prior to the Petition Date, the Debtors entered into a restructuring support agreement

(the "RSA") with the support of holders of approximately 88% of their prepetition funded

indebtedness, including the Consenting First Lien Group Creditors and Consenting Crossholder

Group Creditors (together, the "Consenting Lenders"), which, collectively, hold obligations

throughout the Debtors' capital structure.  The RSA contemplates that the Debtors will effectuate

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as
applicable, are:  Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc.
(N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A);
Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks
Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).  The Debtors' headquarters
is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

a commercial access rights transaction with AST and, subject to the terms of a confirmed plan of reorganization, subsequently equitize their remaining debt obligations, other than the obligations under the proposed debtor-in-possession financing facility (the "<u>DIP Facility</u>"), which shall be converted into loans under a first lien multi-draw term loan exit facility.

2.      The RSA and the DIP Facility are the culmination of years of negotiations between the Debtors and the Consenting Lenders and are carefully crafted to navigate several unique difficulties presented by these chapter 11 cases.  As detailed in the First Day Declaration, the Debtors have faced substantial challenges over the last few years—particularly as it relates to the actions of the U.S. Government and Viasat.  *See Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, In Support Of The Chapter 11 Petitions and First Day Pleadings* ("<u>First Day Declaration</u>"), Section IV(d).  The transactions implemented through the RSA and supported by the DIP Lenders will allow the Debtors to (a) derive profit through a commercial access rights transaction with AST, (b) continue to vigorously prosecute their rights against the U.S. Government and Viasat, and (c) subject to the terms of the Plan, equitize the remaining outstanding debt obligations.

3.      While the Debtors were pursuing their lawsuit against the U.S. Government and negotiating with Viasat with respect to the Cooperation Agreement (as discussed in the First Day Declaration), it became clear that the Debtors required access to bridge financing to maintain operations and—if necessary—facilitate an organized chapter 11.  In order to support these initiatives, through a series of amendments to the Prepetition First Lien Loan Facility and Prepetition 1.5 Lien Facility between April 2023 and November 2023, certain of the Consenting Lenders provided additional liquidity to the Debtors in the form of Prepetition First Out Term Loans.  In connection with the RSA, the Debtors secured commitments from certain of the

Consenting Lenders to provide the proposed DIP Facility, which consists of (a) following entry of the Interim Order (as defined below), up to $12,000,000 of new money to be made immediately available to the Debtors and (b) following entry of the Final Order (as defined below), up to (i) approximately $326,000,000 to be made available to repay the Prepetition First Out Term Loans that were incurred to provide the Company with bridge financing, in full in cash, (ii) $23,000,000 of new money to be made immediately available to the Debtors, and (iii) up to $80,000,000 of new money to be made available to the Debtors in subsequent draws.

4.    The Debtors, with the assistance of Perella Weinberg Partners LP ("PWP"), solicited interest from the market for other DIP financing proposals, but no alternatives materialized.    Accordingly, the Debtors seek approval of the DIP Facility to fund the administration of these chapter 11 cases and to finalize the terms of the proposed commercial transaction with AST.  The DIP Facility provides invaluable certainty to the Debtors and their stakeholders at the outset of these chapter 11 cases that they will have the liquidity necessary to finalize the AST transaction in a thorough, organized fashion, continue prosecuting their litigation claims, and ultimately effectuate a reorganization of the Debtors' estates in an orderly and predictable manner through a chapter 11 plan.

5.    Through the DIP Facility, the Debtors seek to provide the following forms of adequate protection to the Prepetition Secured Parties:  (a) replacement liens on DIP Collateral and Prepetition Collateral; (b) superpriority administrative expense claims; (c) payment of certain fees and expenses; (d) financial reporting and covenants; and (e) subject to the entry of the Final Order, waivers of certain of the Debtors' statutory and equity claims with respect to the DIP Collateral and the Prepetition Collateral.  The Debtors submit that the proposed forms of adequate protection are appropriate under the circumstances of these chapter 11 cases.

6.     Further, the DIP Facility and the Interim Order (defined below) contain various fees expressly required by the DIP Lenders as a condition to provide financing.  As detailed in greater detail below, the proposed DIP Facility contemplates (a) a backstop fee to encourage participation, (b) closing and first funding fees to compensate the DIP Lenders participating in the initial funding as of the entry of the Interim Order, and (c) second funding, DDTL, and unused commitment fees to further incentivize participation in the DIP Facility.  Each of the fees is carefully calibrated to achieve their intent, were the subject of arms' length and good-faith negotiations between the Debtors and the DIP Lenders, are an integral component of the overall terms of the DIP Facility, and are required by the DIP Lenders as consideration for the extension of postpetition financing and consensual use of Cash Collateral.  The DIP Lenders have been funding the business on their own for several years and want to invite and effectively incentivize the rest of the Debtors' capital structure to participate in the funding of these chapter 11 cases.

7.     As described below and in the Mendelsohn Declaration (as defined below), the Debtors' proposed DIP Facility is the product of hard-fought, good-faith, arms' length negotiations with certain of their existing lenders.  The Debtors sought postpetition financing proposals from outside their existing capital structure and were unable to generate interest in third-party postpetition financing.  In the Debtors' case, obtaining access to postpetition financing was difficult because substantially all the Debtors' material assets are encumbered by valid and perfected first-priority liens.  To avoid a protracted and expensive priming fight, the Debtors would need to either (a) obtain consent of the Prepetition Secured Parties or (b) locate a third-party lender willing to provide postpetition financing on a junior secured or unsecured basis.  Because neither option was available, the Debtors, in an exercise of their business judgment, negotiated extensively with the DIP Lenders for the terms of the DIP Facility in parallel with the negotiation of the RSA.

8.      Overall, The DIP Facility is a fundamental component of these chapter 11 cases--indeed, finalizing the definitive documentation for and ultimately effectuating the AST transaction contemplated under the RSA would be impossible without it.  Further, the DIP Facility is the culmination of extensive prepetition negotiations between the Debtors and the DIP Lenders and is the only actionable proposal that the Debtors received.  Access to the proposed DIP Facility will:  (a) ensure that the Debtors have sufficient funding to complete the proposed commercial transaction with AST and consummate the prearranged plan contemplated by the RSA, (b) provide the liquidity to operate uninterrupted during these chapter 11 cases, and (c) send a clear signal to the Debtors' stakeholders that the Debtors' business is on the path to addressing its liquidity issues. Further, as set forth in the Mendelsohn Declaration, the terms of the DIP Facility are reasonable under the circumstances and were the product of extensive good faith, arm's-length negotiations. *See* Mendelsohn Decl. ¶ 26.

9.      Thus, for the reasons set forth herein, in the First Day Declaration and the Mendelsohn Declaration (as defined below), the Debtors believe that approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the relief requested herein and enter an interim order substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>").

## **<u>Background</u>**

10.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>").  The Debtors are authorized to continue operating their

business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     Concurrently with the filing of this Motion, the Debtors filed a motion requesting that their cases be consolidated for procedural purposes only and administered jointly pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"). No request for the appointment of a trustee or examiner has been made in these cases, and no committees have yet been appointed or designated.

12.     The Debtors are a mobile communications company that operates a satellite network across North America that has been providing mobile satellite services ("MSS")[2] to government and commercial customers for over 25 years.  Ligado is licensed as an MSS operator in the "L-Band," which is located in the highly attractive one- to two-gigahertz ("GHz") spectrum category, known as the lower mid-band, in the U.S. and Canadian parts of ITU Region 2.  Ligado has fully coordinated its satellite system with all other North American Region 2 L-Band operators and maintains access to over 40 megahertz ("MHz") of MSS spectrum[3] in the United States and Canada.

13.     The Debtors spent years working to develop and obtain approval from the United States Federal Communications Commission ("FCC") to operate an ancillary terrestrial

---

[2]     "Mobile Satellite Service" or "MSS" is:

> A radiocommunication service:
> – between mobile earth stations and one or more space stations, or between space stations used by this service; or
> – between mobile earth stations by means of one or more space stations.

Int'l Telecomm. Union [ITU], *Radio Regulations: Articles*, art. 1.25 (2016) (emphasis removed).

[3]     "Spectrum" refers to the radio spectrum, which is the part of the electromagnetic spectrum with frequencies from 30 hertz to 300 GHz, and whose radio waves are widely used in modern technology, particularly in telecommunication.

component ("ATC")[4] to their MSS licenses and have invested billions of dollars in connection therewith. In April 2020, the commissioners for the FCC issued a unanimous and bipartisan order granting the Debtors an exclusive nationwide ATC authorization for 30 MHz of their MSS licensed L-Band spectrum. The Debtors also have access to five MHz of spectrum at 1670-1675 MHz.[5] In total, the Debtors have access to 35 MHz of terrestrial spectrum in the United States.

14.    A detailed description of the Debtors' business, capital structure, and the events leading to these chapter 11 cases is set forth in the *Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.[6]

## Jurisdiction and Venue

15.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.

16.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors consent, pursuant to rule 9013-1(f) of the Local Bankruptcy Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot

---

[4]    An "ancillary terrestrial component" or "ATC" system consists of terrestrial base stations and mobile terminals licensed to the operator of an MSS system, which allows an MSS licensee to integrate terrestrial capabilities into its MSS networks for purposes of filling in gaps in its MSS coverage area, particularly in urban areas and inside buildings.

[5]    From July 2007 to the present, the Debtors, through their wholly owned subsidiary One Dot Six LLC, have leased five MHz of spectrum in the 1670-1675 MHz spectrum band through agreements with Crown Castle MM Holding LLC and OP LLC, the entity which holds the underlying United States nationwide spectrum license.

[6]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Day Declaration.

enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

17.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

18.    The bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, 503(b), 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 6004 and Local Bankruptcy Rules 2002-1(b), 4001-2, and 9013-1(m).

### **Relief Requested**

19.    By this Motion, the Debtors seek entry of the interim order, which is substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order", and, collectively with the Interim Order, the "DIP Orders")[7]:

(a)    authority to enter into that certain *Senior Secured Super-Priority Debtor-In-Possession Loan Agreement* (as it may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Loan Agreement") among Ligado Networks LLC (in this capacity, the "Borrower"), the other Debtors as guarantors (in such capacities, the "Guarantors" and, together with the Borrower, the "Loan Parties"), the lenders party thereto from time to time (the "DIP Lenders"), and U.S. Bank Trust Company, National Association, as administrative agent (in this capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), and related documents (together with the DIP Loan Agreement, the "DIP Loan Documents"), providing for a superpriority senior secured term loan credit facility (the "DIP Facility");

(b)    authority for the Borrower to borrow, and for the Guarantors to guarantee, on the terms and subject to the conditions set forth in the DIP Loan Documents, term loans in an amount of up to $939,133,507 (loans borrowed or deemed to be borrowed under the DIP Facility, the "DIP Loans");

(c)    granting, on the terms and subject to the conditions set forth herein and in the DIP Loan Documents, (i) claims with priority over all claims having administrative priority status (the "DIP Superpriority Claims") other than the AST Break-Up Fee (as defined in the DIP Loan Agreement) (if any), the Carve Out, and the Administration Charge and (ii) first-priority, automatically perfected, priming liens (the "DIP Liens") on all prepetition

---

[7]    The Debtors will file the proposed Final Order in connection with the hearing for approval thereof.

and postpetition assets of each Debtor's estate and all proceeds thereof other than any Excluded Property (as defined in the DIP Loan Agreement) (collectively, the "DIP Collateral");

(d)    authorizing the use of the prepetition secured parties' cash collateral within the meaning of sections 363(a) and 363(c) of the Bankruptcy Code (the "Cash Collateral");

(e)    approving adequate protection to be provided to the Prepetition Secured Parties (as defined below);

(f)    subject to and effective upon entry of the Final Order, authorizing the Loan Parties to waive (a) their right to surcharge the DIP Collateral and/or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(g)    subject to and effective upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties and (b) the Prepetition Collateral, for the benefit of any party other than the Prepetition Secured Parties, subject to the Carve Out and the AST Break-Up Fee (if any);

(h)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders;

(i)    waiving any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

(j)    scheduling a date for a hearing on this Motion to consider entry of the Final Order (the "Final Hearing").

20.    In support of this Motion, the Debtors rely on (a) the First Day Declaration and (b) the *Declaration of Bruce Mendelsohn in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "Mendelsohn Declaration"), filed contemporaneously herewith and incorporated herein by reference.

## I.        The Proposed Financing.

21.      As of the Petition Date, the Debtors estimate that they have approximately $9.6 million of cash on hand.  *See* Mendelsohn Decl. ¶ 6.  The Debtors use cash on hand and cash flow from operations to fund their working-capital needs and other general corporate purposes.  During these chapter 11 cases, the Debtors will need current liquidity to satisfy payroll, meet overhead obligations, satisfy the costs, fees, and expenses (including all professional fees and expenses) of administering these cases and for the continued management, operation, and preservation of their business.  The ability to satisfy these expenses as and when due is essential to the Debtors' successful operation of their business during these cases.

22.      In consultation with their advisors, the Debtors reviewed and analyzed the Debtors' projected cash flows to determine the requisite amount of debtor-in-possession financing.  Based on management's cash-flow forecast, the Debtors, in consultation with their advisors and the management team, compiled the Initial Budget.  Based on the forecasted funding requirements reflected in the Initial Budget, the liquidity provided under the proposed DIP Facility will enable the Debtors to preserve their value as a going concern, provide the Debtors with sufficient liquidity to meet their ongoing day-to-day obligations, fund the operational and administrative costs of these chapter 11 cases, and satisfy working capital requirements and other operational expenses, all of which will preserve the value of the Debtors' estates for the benefit of their stakeholders.  *See* Mendelsohn Decl. ¶ 8.

23.      The DIP Facility includes: (a) the DIP New Money Loans, which are superpriority senior secured multiple draw debtor-in-possession term loans to the Borrower in a total aggregate principal amount not to exceed $441,999,891 and (b) a Roll-Up (as defined below) of $441,999,891 to $497,133,616 of 1L Debt Obligations (other than 1L First Out Loan Obligations),

on a cashless, dollar-for-dollar basis, into DIP Loans. All holders of Prepetition First Lien Debt have been or will be given the opportunity to provide the DIP Facility on a pro rata basis.

24.    Through the DIP Facility, the Debtors will obtain access to (in addition to Cash Collateral) the DIP New Money Loans over multiple draws as follows: (x) the DIP First Funding Loans in an amount not to exceed $12,000,000, which shall be made available to the Borrower following the entry of the Interim Order, (y) the DIP Second Funding Loans in an amount not to exceed $326,999,891, which shall be made available to the Borrower following the entry of the Final Order and used to repay in full in cash the 1L First Out Loan Obligations, and (z) the DIP Delayed Draw Term Loans in an amount not to exceed $103,000,000, which shall be made available to the Borrower in three draws following the entry of the Final Order, in each case in accordance with the terms and conditions of the DIP Loan Documents.

25.    The DIP Facility also provides for a Roll-Up of $441,999,891 to $497,133,616 of 1L Debt Obligations (other than 1L First Out Loan Obligations). The Roll-Up shall be deemed to occur upon entry of the Final Order. The Roll-Up and the Refinancing (as defined below) constitute key components of the DIP Facility, and the DIP Lenders have represented to the Debtors that they would not agree to provide the DIP Facility absent the Roll-Up and the Refinancing. Under the circumstances, given the lack of any actionable alternative financing offers and the fact that the DIP Lenders, in their capacities as the Debtors' prepetition lenders, are willing to provide the Debtors with continued access to their Cash Collateral, the Debtors believe that the Roll-Up and the Refinancing are reasonable and appropriate.

26.    Immediate access to the DIP Facility and Cash Collateral is essential to the Debtors' ability to meet working capital and operational needs and fund expenses associated with these cases. *See* Mendelsohn Decl. ¶ 7. Access to the DIP Facility and Cash Collateral will ensure that

the Debtors have sufficient funds to preserve and maximize the value of their estates and responsibly administer these chapter 11 cases. *Id.* Without prompt access to the DIP Facility and Cash Collateral, the Debtors may be unable to pay employee wages, pay the fees and expenses necessary to administer these cases, and otherwise preserve and maximize the value of their estates, thereby causing harm to the Debtors' estates to the detriment of all stakeholders. In other words, absent the immediate relief requested by the Motion, the Debtors face a risk of substantial and ongoing harm.

27. The Debtors require postpetition financing and access to Cash Collateral to fund the administration of these chapter 11 cases and continue their operations during the course of these chapter 11 cases. To assess such financing requirements and options, Perella Weinberg Partners LP ("PWP"), the Debtors' proposed investment banker, analyzed the cash needs of the Debtors in connection with the postpetition financing, engaged with critical stakeholders, and led a robust marketing process to identify parties that were interested in providing postpetition financing to the Debtors. *See* Mendelsohn Decl. ¶¶ 8; 13. In addition to engaging with the DIP Lenders, this process also included reaching out to parties outside the existing capital structure. As part of this process, PWP reached out to approximately eleven third-party financial institutions and other capital sources to assess interest in providing debtor-in-possession financing. *See* Mendelsohn Decl. ¶¶ 13–14. As more fully set forth in the Mendelsohn Declaration, through this process the Debtors did not receive any interest from a third-party source and, in consultation with their advisors, focused their efforts on engaging with the DIP Lenders to seek postpetition financing on the best possible terms as well as ensuring that the financing was appropriately sized and timed to meet the Debtors' cash and liquidity needs. *See* Mendelsohn Decl. ¶¶ 13–17. The Debtors and their advisors continued to engage in extensive, hard-fought, arm's-length,

negotiations with the DIP Lenders, and were ultimately able to secure meaningful concessions from the DIP Lenders and agree on the proposed DIP Facility set forth in the proposed Interim Order and the DIP Loan Agreement attached as <u>Exhibit 1</u> to the proposed Interim Order.  This represents the best and only available debtor-in-possession financing facility that the Debtors were able to obtain.

28.     In addition to the DIP Loans, the DIP Lenders have consented to the Debtors' use of Cash Collateral on the terms set forth in the Interim Order.  As set forth in the Mendelsohn Declaration, the Debtors would be unable to finance these chapter 11 cases and maintain their operations with Cash Collateral use alone.  Accordingly, accessing the DIP Facility provided by the DIP Lenders is critical to maximize the value of these estates.

29.     Along with the DIP Facility, the Debtors will provide adequate protection to the Prepetition Secured Parties consisting of (i) replacement liens on all DIP Collateral (subject to the priorities set forth the Interim Order), (ii) superpriority administrative expense claims, and (iii) payment of reasonable and documented professional fees, as further described below and in the Interim Order (the "<u>Adequate Protection</u>").

30.     The DIP Facility (including each of the terms thereunder, as also set forth in the Interim Order) and access to Cash Collateral is the culmination of arm's-length, good faith negotiations between the DIP Lenders and the Debtors.  *See* Mendelsohn Decl. ¶ 26.

31.     As further described in the Mendelsohn Declaration, the terms and provisions of the DIP Facility are fair and reasonable under the circumstances.  *Id*.  The proposed DIP Facility, after PWP's marketing process and the hard fought negotiations between the Company and the DIP Lenders, represents the Debtors' best (and only) available option to acquire postpetition funding.  As further described in the First Day Declaration and the Mendelsohn Declaration, the

Debtors enter these cases in a compromised liquidity position and require access to Cash Collateral and the proceeds of the DIP Facility (including, in the immediate term, the DIP First Funding Loans) to fund these chapter 11 cases.  Specifically, access to the DIP First Funding Loans will permit the Debtors to meet near-term obligations, which will maximize the value of the estates and allow the Debtors to maintain their current operations and continue to pursue a value maximizing transaction during these chapter 11 cases.

32.     Critically, and as further set forth in the First Day Declaration and the Mendelsohn Declaration, the DIP Facility is an essential element of the RSA (as defined in the First Day Declaration), which contemplates the conversion of the DIP Facility into an exit facility upon the effective date of an acceptable plan pursuant to the DIP Facility.  All DIP Lenders will be party to the RSA and bound by the terms set forth therein.

33.     The proposed DIP Facility is in the best interests of the Debtors, is necessary to avoid irreparable harm to the Debtors and their estates, and should be approved.

## II.     Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2.

34.     The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Summary of Material Terms[8] | |
| --- | --- |
| **Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Ligado Networks LLC<br><br>DIP Loan Agreement, Recitals. |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each subsidiary of the Borrower that is a Debtor.<br><br>DIP Loan Agreement, § 1.01, "Guarantors". |

---

[8]     The summaries contained in this table are qualified in their entirety by the provisions of the DIP Loan Agreement and the proposed Interim Order, as applicable.  To the extent of any inconsistency, the terms of the DIP Loan Agreement or the Interim Order shall control, as applicable.

| Summary of Material Terms[8] | |
|---|---|
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | U.S. Bank Trust Company, National Association, as administrative agent.<br><br>DIP Loan Agreement, Recitals. |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Certain Prepetition Secured Parties or their affiliates.<br><br>DIP Loan Agreement, § 1.01, "Lenders". |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), (a)(ii) | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable 120 calendar days after the Petition Date.  The Debtors may receive five additional extensions of up to 120 calendar days each with the consent of the Required Ad Hoc Holders.<br><br>DIP Loan Agreement, § 1.01, "Maturity Date". |
| **Commitments**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A), (a)(ii) | The DIP New Money Loans will be available in multiple draws in an aggregate principal amount of up to $441,999,891.  Subject to the conditions set forth in "Conditions to Effectiveness," "Conditions to the DIP First Funding Date" and "Conditions to Each DIP DDTL Funding Date" in the DIP Loan Agreement, (i) the amount of the DIP New Money Loans to be available following entry of the Interim Order by the Court shall be $12 million and (ii) subject to the entry of the Final Order, the balance of the DIP New Money Loans will be made available to the Borrower in multiple draws.<br><br>DIP Loan Agreement, §§ 4.01, 4.02, 4.03. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | The availability of the DIP Facility shall be conditioned upon satisfaction of customary closing conditions for facilities of this type and purpose, including but not limited to:<br><br>(i)   Receipt by the DIP Agent of executed counterparts of the DIP Loan Agreement and the Perfection Certificate (as defined in the DIP Loan Agreement).<br>(ii)   Delivery of customary organizational documents and an officer's certificate.<br>DIP Loan Agreement § 4.01.<br><br>The funding of each draw under the DIP Term Loan shall be subject to the following conditions:<br><br>(i)   Entry of the Final Order.<br>(ii)   Receipt by the DIP Agent of an executed borrowing request.<br>(iii)   Delivery of a customary officer's certificate.<br>DIP Loan Agreement § 4.03. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), (a)(ii) | Interest will be payable on the unpaid principal amount of all outstanding DIP Loans at a rate per annum equal to 17.5%, payable in kind (or 15.5 per annum to the extent a cash interest election is made).<br><br>DIP Loan Agreement § 2.06. |
| **Use of DIP Facility**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The proceeds of the DIP New Money Loans shall be used solely in accordance with the terms and conditions of the DIP Orders and the DIP Loan Documents and solely to the extent in compliance with the Approved Budget (subject to Permitted Variances), and for no other purpose.<br><br>Interim Order ¶ J(d); DIP Loan Agreement § 3.12. |

| Summary of Material Terms[8] | |
|---|---|
| **"Roll-Up" Provisions**<br><br>Local Rule 4001-2(a)(i)(O) | The DIP Facility shall also include a superpriority senior secured term loan credit facility (the loans issued thereunder, the "Roll-Up Loans") in the aggregate initial principal amount of $441,999,891 to $497,133,616, whereby the relevant 1L Debt Obligations (other than 1L First Out Loan Obligations) shall be deemed fully funded and converted into and exchanged for Roll-Up Loans upon entry of and subject to the Final Order and subject to the challenge rights set forth in paragraph 27 of the DIP Order, in each case in accordance with the terms and conditions set forth in the DIP Loan Agreement and all other terms and conditions of the DIP Loan Documents.<br><br>Interim Order ¶ (1)(b); DIP Loan Agreement § 2.01(d). |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | In exchange for the consent of the Prepetition Secured Parties for the use of cash collateral and the priming DIP Loans, the Prepetition Secured Parties shall receive, subject to the challenge rights set forth in paragraph 27 of the Interim Order and the Carve Out: (i) adequate protection claims entitled to superpriority expense status; (ii) adequate protection liens on the DIP Collateral in the priorities set forth in the Interim Order; (iii) payment of certain reasonable and documented fees and expenses of the Prepetition Secured Parties; and (iv) payment to the 1L Secured Parties of PIK interest at the default rate under the 1L Debt Documents.<br><br>Interim Order ¶ 9. |
| **Mandatory Prepayments**<br><br>Local Rule 4001-2(a)(i)(E) | Subject to the Carve Out and the AST Break-Up Fee (if any), the Debtors shall immediately pay or prepay the DIP Loans and all other DIP Obligations until such obligations are paid in full as follows:<br><br>(i)   Prepay the DIP Loans with net proceeds of the incurrence of Indebtedness, other than Indebtedness permitted to be incurred pursuant to the terms of the DIP Loan Agreement.<br><br>(ii)  Prepay the DIP Loans with net proceeds of any Asset Sale (as defined in the DIP Loan Agreement) or any Event of Loss (as defined in the DIP Loan Agreement).<br><br>(iii) Prepay the outstanding balance of the DIP Loans upon the occurrence of a Change in Control (as defined in the DIP Loan Agreement).<br><br>(iv) Prepay the DIP Loans with Extraordinary Receipts (as defined in the DIP Loan Agreement) upon receipt thereof.<br><br>(v)  Prepay the DIP Loans with the proceeds received by the Borrower in connection with a capital contribution to, or the issuance of any capital stock of, the Borrower or any of its subsidiaries.<br><br>DIP Loan Agreement § 2.10. |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), (a)(ii) | DIP Agent Fee:  The Borrower will pay to the DIP Agent, for its own account, an initial acceptance fee of $20,000 and an annual agency fee of $80,000.<br><br>Backstop Fee:  12.5%, payable in kind on Commitments as of the Closing Date<br><br>Commitment Fee:  5%, payable in kind on Commitments as of the Closing Date<br><br>DIP First Funding Discount Fee:  5%, payable in kind on the aggregate amount of DIP First Funding Loans made on the DIP First Funding Date<br><br>DIP Second Funding Discount Fee:  5%, payable in kind on the aggregate amount of DIP Second Funding Loans made on the DIP Second Funding Date (other than any Excess DIP Second Funding Loan Proceeds returned to DIP Lenders on the DIP Second Funding Date) |

| Summary of Material Terms[8] | |
|---|---|
| | DIP DDTL Funding Discount Fee:  5%, payable in kind on the aggregate amount of DIP Delayed Draw Term Loans made on the DIP DDTL Funding Date<br><br>DIP Unused Commitment Fee:  DIP Unused Commitment Fee of 3% per annum, payable in kind on unused DIP DDTL Commitments and DIP Second Funding Commitments<br><br>DIP Loan Agreement § 2.05. |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E), (a)(ii) | Attached to the Interim Order as Exhibit 2 is a 13-week Approved Budget, which sets forth, among other things, projected cash receipts and cash disbursements.  On the third Thursday following the Petition Date and on every other Thursday thereafter, the Loan Parties will furnish to the DIP Agent for distribution to each DIP Lender (a) a Cash Flow Forecast for the upcoming thirteen week period and (b) a Cash Flow Certificate, each in form satisfactory to the Required Lenders.  The most recently delivered (in accordance with the previous sentence) Cash Flow Forecast shall become the "Budget" for the purposes of the DIP Facility upon the Required Ad Hoc Holders' written acknowledgement (delivered to the Administrative Agent) that the Cash Flow Forecast is in form and substance satisfactory to the Required Ad Hoc Holders and is consistent with the form of the Initial Budget; *provided* that, until a new Budget has been approved by the Required Ad Hoc Holders, the most recently approved (in accordance with Section 5.01(f)(i) of the DIP Loan Agreement) Budget (or if no such approved Budget exists, the Initial Budget) shall govern. Commencing on the third Thursday following the Petition Date and on every other Thursday thereafter, the Loan Parties will furnish to the DIP Agent for distribution to each DIP Lender a Variance Report in respect of the most recently ended Testing Period, in form satisfactory to the Required Lenders, together with a certification from a Responsible Officer of the Borrower as to the accuracy and completeness thereof.<br><br>Interim Order ¶ J(m); DIP Loan Agreement § 5.01(f). |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(E), (a)(ii) | The DIP Loan Agreement includes a covenant providing that in any Testing Period (as defined in the DIP Loan Agreement), the Borrower shall not permit (or otherwise allow to exist) any Variance (as defined in the DIP Loan Agreement) that is not a Permitted Variance (as defined in the DIP Loan Agreement).<br><br>DIP Loan Agreement § 6.13. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i)(M), (a)(ii) | Each of the following shall constitute an "Event of Default":<br><br>(i)   Default by the Borrower in the payment of (i) principal or premium of any DIP Loan or (ii) interest of any DIP Loan or any fee or any other amount due under the DIP Loan Agreement.<br><br>(ii)   Failure to comply with affirmative and negative covenants, subject to customary grace periods.<br><br>(iii)   Failure to pay principal or interest, or failure to observe or perform any other term or condition in respect of, material indebtedness.<br><br>(iv)   Any DIP Loan Document shall be rendered unenforceable, or any lien securing obligations under the DIP Loan Documents shall cease to be in full force and effect.<br><br>(v)   Other customary events of default.<br><br>DIP Loan Agreement § 8.01. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Subject to and upon entry of a Final Order, the Borrower shall indemnify the DIP Lenders in accordance with indemnity provisions customary for transactions of this type and as set forth in the DIP Loan Agreement.<br><br>Interim Order ¶ 23; DIP Loan Agreement. |

| Summary of Material Terms[8] |
|---|

| | |
|---|---|
| **Milestones**<br>Bankruptcy Rule<br>4001(c)(1)(B)<br><br>Local Rule<br>4001-2(a)(i)(H), (a)(ii) | Milestones in respect of the chapter 11 cases under the DIP Facility are listed below (as any such time and date may be extended with the written consent of the Required Ad Hoc Holders): |

|  | (i) | the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court no later than 11:59 p.m. New York City time on the Petition Date, which shall be no later than 11:59 p.m. New York City time on January 5, 2025; |
|---|---|---|
|  | (ii) | no later than one (1) day after the Petition Date, the Company (x) shall have filed the Break-Up Fee Motion (as defined in the Restructuring Support Agreement), in form and substance acceptable to the Required Ad Hoc Holders, and (2) will seek to have the Break Up Fee Motion heard no later than twenty one (21) days after the Petition Date; |
|  | (iii) | no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order in form and substance acceptable to the Required Ad Hoc Holders; |
|  | (iv) | no later than ten (10) Business Days after the Petition Date, the CCAA Court shall have issued the Initial CCAA Recognition Order and Interim DIP Recognition Order; |
|  | (v) | no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Required Ad Hoc Holders, granting the relief requested in the Break-Up Fee Motion; |
|  | (vi) | no later than thirty-five (35) days after the Petition Date (and no earlier than the Syndication Consummation Date), the Bankruptcy Court shall have entered the Final DIP Order, in form and substance acceptable to the Required Ad Hoc Holders; |
|  | (vii) | no later than ten (10) Business Days after entry of the Final DIP Order, the CCAA Court shall have issued the Final DIP Recognition Order, in form and substance acceptable to the Required Ad Hoc Holders; |
|  | (viii) | no later than seventy-five (75) days after the Petition Date, the Company shall have executed the AST Definitive Agreements (as defined in the Restructuring Support Agreement); |
|  | (ix) | no later than seventy-five (75) days after the Petition Date, the Company shall have filed the AST Definitive Agreements Motion (as defined in the Restructuring Support Agreement); |
|  | (x) | no later than seventy-five (75) days after the Petition Date, the Company shall have filed (x) an Acceptable Plan, (y) the Disclosure Statement, and the motion seeking approval of the Solicitation Materials (each term in the foregoing subclause (y), as defined in the Restructuring Support Agreement and in form and substance satisfactory to the Required Ad Hoc Holders); |
|  | (xi) | no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order (as defined in the Restructuring Support Agreement); |
|  | (xii) | no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the AST Definitive Agreements Order (as defined in the Restructuring Support Agreement); |
|  | (xiii) | no later than one hundred and forty-five (145) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; |
|  | (xiv) | no later than ten (10) days after the entry of the Confirmation Order, the CCAA Court shall have issued an order recognizing the Confirmation Order; |
|  | (xv) | no later than forty (40) months after the Petition Date, the effective date of the Acceptable Plan shall have occurred. |

| | |
|---|---|
|  | DIP Loan Agreement § 5.16. |
| **Carve Out; AST Break-Up Fee**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Each of the DIP Liens, the DIP Superiority Claims, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens, and the Prepetition Secured Obligations shall be subject and subordinate to payment of the Carve Out and the AST Break-Up Fee (if any).<br><br>The "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, together with interest, |

| **Summary of Material Terms**[8] |
|---|

| | |
|---|---|
| Local Rule 4001-2(a)(i)(F) | if any, under section 3717 of title 31 of the United States Code (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred by a trustee appointed under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before, or on the first business day following, delivery by the DIP Agent (acting at the direction of the Required Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (the "<u>Allowed Professional Fees</u>"); and (iv) Allowed Professional Fees of Debtor Professionals, in an aggregate amount not to exceed $2,000,000 *plus* the amount of any transaction or similar fee approved by the Court in connection with an order authorizing the Debtors' retention of their investment banker, incurred after the first business day following delivery by the DIP Agent (acting at the direction of the Required Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (iv), the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, the "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (acting at the direction of the Required Lenders) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and the lead restructuring counsel to the Committee (if any), delivered following the occurrence and during the continuation of a Termination Event, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>Interim Order ¶ 25. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D), (G), (U), 4001-2(a)(ii) | All DIP Obligations, in all cases subject to (a) the "Carve Out", (b) the AST Break-Up Fee (if any), (c) the Administration Charge, and (d) the Prepetition Permitted Prior Liens, shall be pursuant to:<br><br>(i)   section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status against each of the Debtors (the "<u>DIP Superpriority Claims</u>") which DIP Superpriority Claims shall have priority over any and all administrative expenses and claims of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code;<br><br>(ii)  section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority senior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is unencumbered and not subject to any liens;<br><br>(iii) section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected junior security interest in and lien upon all DIP Collateral that, as of the Petition Date, is subject to a Prepetition Permitted Prior Lien, which security interest and lien shall be junior and subordinate only to the Carve Out, the AST Break-Up Fee (if any), and any such Prepetition Permitted Prior Lien; and<br><br>(iv)  section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable and fully and automatically perfected first priority priming security interest in and lien upon all DIP Collateral that is subject to a Prepetition Lien, which security interest and lien shall be junior and subordinate only to the Carve Out, the AST Break-Up Fee (if any), and any Prepetition Liens; *provided* that the DIP Liens shall attach to all proceeds of Avoidance Actions only subject to entry of the Final Order.<br><br>The DIP Liens shall not be made *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject, in each case, only to the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, and Prepetition Permitted Prior Liens.<br><br>Interim Order ¶ 6. |
| **506(c) Waiver; Section 552(b)** Bankruptcy Rule | <u>Limitation on Charging Expenses</u>.  Except to the extent of the Carve Out, the AST Break-Up Fee (if any), and the Administration Charge, subject to and effective upon entry of the Final Order, no costs or expenses of administration of these chapter 11 cases or any Successor Cases at any time, |

| Summary of Material Terms[8] | |
|---|---|
| 4001(c)(l)(B)(x);<br>4001(c)(1)(B)<br><br>Local Rule<br>4001-2(a)(i)(V), (W),<br>(X) | including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be), shall be charged against or recovered from (a) the Loan Parties or the DIP Collateral (including in respect of the Adequate Protection Liens), or any of the DIP Obligations or (b) the Prepetition Secured Parties, the Prepetition Collateral, or any of the Prepetition Secured Obligations, in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, without the prior express written consent of the Required Lenders or the affected Prepetition Secured Party, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, or the approval of any budget hereunder).<br><br>**No Marshaling; Section 552(b) Waiver**.  Subject to and effective upon entry of the Final Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations, as applicable, and all proceeds shall be received and applied in accordance with the Interim Order, the DIP Loan Documents, and the Prepetition Loan/Notes Documents, as applicable, including, for the avoidance of doubt, to the funding of the Carve Out or the AST Break-Up Fee (if any), if applicable.  Further, except to the extent of the Carve Out and the AST Break-Up Fee (if any), subject to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Secured Parties, the Prepetition Secured Party Representatives or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any DIP Collateral or Prepetition Collateral.<br><br>See Interim Order ¶ 28-29. |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule<br>4001(c)(1)(B)(iii)<br><br>Local Rule<br>4001-2(a)(i)(Q) | Without prejudice to the rights of any party other than the Debtors (but subject to the rights and limitations contained in paragraph 27 of the Interim Order) the Debtors admit, stipulate, acknowledge, and agree as follows:<br><br>(a)    **1L Notes.**<br><br>(i)    **1L Notes Indenture**.  Pursuant to that certain Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>1L Notes Indenture</u>" and, collectively with all other First Lien Notes Documents (as defined in the 1L Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "<u>1L Notes Documents</u>") among Ligado Networks LLC ("<u>Ligado</u>"), as issuer (in such capacity, the "<u>1L Notes Issuer</u>"), the guarantors party thereto the guarantors party thereto (in such capacities, the "<u>1L Notes Guarantors</u>" and, together with the 1L Notes Issuer, the "<u>1L Notes Obligors</u>"), and U.S. Bank National Association, as trustee (in such capacity, the "<u>1L Notes Trustee</u>"), Ligado issued $2.85 billion aggregate principal amount of 15.5% PIK Senior Secured First Lien Notes due 2023 (the "<u>1L Notes</u>" and the holders of the 1L Notes, the "<u>1L Noteholders</u>");<br><br>(ii)    **1L Notes Obligations**.  As of the Petition Date, the 1L Notes Obligors were justly and lawfully indebted and liable to the 1L Notes Secured Parties (as defined below) in an aggregate principal amount of $5,491,770,702 (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1L Lien Notes Obligors to the 1L Notes Secured Parties that have accrued as of the Petition Date in connection with the 1L Notes Documents, the "<u>1L Notes Obligations</u>");<br><br>(iii)    **1L Notes Liens**.  As more fully set forth in the 1L Notes Documents, prior to the Petition Date, the 1L Notes Obligors granted to U.S. Bank National Association, in its capacity as collateral trustee (in such capacity, the "<u>1L Notes Collateral Trustee</u>" and, collectively with the 1L Noteholders and the 1L Notes Trustee, the "<u>1L Notes Secured Parties</u>"), for the benefit of itself and the other 1L Notes Secured Parties, security interests in and continuing liens (the "<u>1L Notes Liens</u>") in all Collateral (as defined in the 1L Notes Documents but, for purposes of the Interim Order, the |

| Summary of Material Terms[8] |
| --- |

"1L Notes Collateral");

(iv)     **Validity, Perfection, and Priority of 1L Notes Obligations**. The Debtors acknowledge and agree that, as of the Petition Date, (a) the 1L Notes Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 1L Notes Collateral granted to, or for the benefit of, the 1L Notes Secured Parties for fair consideration and reasonably equivalent value, (b) the 1L Notes Liens were senior in priority over any and all other liens on the 1L Notes Collateral, subject only to (i) the 1L Loan Liens (as defined below), which are secured on a pari passu basis with the 1L Notes Liens (provided that, for the avoidance of doubt, the 1L First Out Loan Obligations are senior with respect to payment priority in accordance with the First Lien Intercreditor Agreement) and (ii) certain liens senior by operation of law or otherwise permitted by the 1L Notes Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 1L Notes Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in this clause (ii), the "1L Notes Permitted Prior Liens"), (c) the 1L Notes Obligations constitutes legal, valid, binding, and non-avoidable obligations of the 1L Notes Obligors enforceable in accordance with the terms of the applicable 1L Notes Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 1L Notes Liens or 1L Notes Obligations exist, and no portion of the 1L Notes Liens or 1L Notes Obligations are subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge any of the 1L Notes Obligations, the priority of the 1L Notes Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 1L Notes Liens.

(b)     **1L Loans.**

(i)     **1L Loan Agreement**. Pursuant to that certain 1L Loan Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1L Loan Agreement", collectively with all other Loan Documents (as defined in the 1L Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1L Loan Documents", and the 1L Loan Documents together with the 1L Notes Documents, the "1L Debt Documents") among Ligado, as borrower (in such capacity, the "1L Loan Borrower"), the guarantors party thereto (in such capacities, the "1L Loan Guarantors" and, together with the 1L Loan Borrower, the "1L Loan Obligors"), the lenders party thereto (in such capacities, the "1L Loan Lenders"), U.S. Bank Trust Company, National Association, as administrative agent (in such capacity, the "1L Loan Administrative Agent"), and U.S. Bank Trust Company, National Association, as collateral agent (in such capacity, the "1L Loan Collateral Agent" and, together with the 1L Loan Administrative Agent, the "1L Loan Agents", and the 1L Loan Agents together with the 1L Loan Lenders, the "1L Loan Secured Parties", and the 1L Loan Secured Parties together with the 1L Notes Secured Parties, the "1L Secured Parties"), the 1L Loan Lenders provided term loans to Ligado pursuant to the 1L Loan Documents;

(ii)     **1L Loan Obligations**. As of the Petition Date, the 1L Loan Obligors were justly and lawfully indebted and liable to the 1L Loan Secured Parties in an aggregate principal amount of (i) $122,303,734 in term loans that are secured on a pari passu basis with the 1L Notes (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1L Loan Obligors to the applicable 1L Loan Secured Parties that have accrued as of the Petition Date in connection with the 1L Loan Documents, the "1L Pari Loan Obligations") and (ii) $319,471,010 in term loans that are secured on a pari passu basis with the 1L Notes but are "first out" in payment priority pursuant to the First Lien Intercreditor Agreement (as defined below) (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1L Loan Obligors to the applicable 1L Loan Secured Parties that have accrued as of the Petition Date in connection with the 1L Loan Documents, the "1L First Out Loan Obligations", together with the 1L Pari Loan Obligations, the "1L Loan Obligations", and, together with the 1L Notes Obligations and the 1L Pari Loan Obligations, the "1L Debt Obligations");

(iii)     **1L Loan Liens**. As more fully set forth in the 1L Loan Documents, prior to the Petition

| Summary of Material Terms[8] |
|---|
| Date, the 1L Loan Obligors granted to the 1L Collateral Agent, for the benefit of itself and the other 1L Loan Secured Parties, security interests and continuing liens (the "1L Loan Liens") in all Collateral (as defined in the 1L Loan Documents but, for purposes of the Interim Order, the "1L Loan Collateral"); and |

(iv)    **Validity, Perfection, and Priority of 1L Loan Liens and 1L Loan Obligations**. The Debtors acknowledge and agree that, as of the Petition Date, (a) the 1L Loan Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 1L Loan Collateral granted to, or for the benefit of, the 1L Loan Secured Parties for fair consideration and reasonably equivalent value, (b) the 1L Loan Liens were senior in priority over any and all other liens on the 1L Loan Collateral, subject only to the (i) 1L Notes Liens, which are secured on a pari passu basis with the 1L Loan Liens (provided that, for the avoidance of doubt, the 1L First Out Loan Obligations are senior with respect to payment priority in accordance with the First Lien Intercreditor Agreement) and (ii) certain liens senior by operation of law or otherwise permitted by the 1L Loan Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 1L Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, this clause (ii), the "1L Loan Permitted Prior Liens"), (c) the 1L Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the 1L Loan Obligors enforceable in accordance with the terms of the applicable 1L Loan Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 1L Loan Liens or 1L Loan Obligations exist, and no portion of the 1L Loan Liens or 1L Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge any of the 1L Loan Obligations, the priority of the 1L Loan Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 1L Loan Liens.

(c)    **1.5L Loans.**

(i)    **1.5L Loan Agreement**. Pursuant to that certain 1.5 Lien Loan Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1.5L Loan Agreement" and, collectively with all other Loan Documents (as defined in the 1.5L Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1.5L Loan Documents") among Ligado, as borrower (in such capacity, the "1.5L Loan Borrower"), the guarantors party thereto (in such capacities, the "1.5L Loan Guarantors" and, together with the 1.5L Loan Borrower, the "1.5L Loan Obligors"), the lenders party thereto (in such capacities, the "1.5L Loan Lenders"), Jefferies Finance LLC, as administrative agent (in such capacity, the "1.5L Loan Administrative Agent"), and U.S. Bank Trust Company, National Association, as successor collateral agent (in such capacity, the "1.5L Loan Collateral Agent" and, together with the 1.5L Loan Administrative Agent, the "1.5L Loan Agents" and the 1.5L Loan Agents together with the 1.5L Loan Lenders, the "1.5L Loan Secured Parties"), the 1.5L Loan Lenders provided term loans to Ligado pursuant to the 1.5L Loan Documents;

(ii)    **1.5L Loan Obligations**. As of the Petition Date, the 1.5L Loan Obligors were justly and lawfully indebted and liable to the 1.5L Loan Secured Parties in an aggregate principal amount of $591,504,126 (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1.5L Loan Obligors to the 1.5L Loan Secured Parties that have accrued as of the Petition Date in connection with the 1.5L Loan Documents, the "1.5L Loan Obligations");

(iii)    **1.5L Loan Liens**. As more fully set forth in the 1.5L Loan Documents, prior to the Petition Date, the 1.5 Lien Obligors granted to the 1.5 Lien Collateral Agent, for the benefit of itself and the other 1.5L Loan Secured Parties, security interests in and continuing liens (the "1.5L Loan Liens") in all Collateral (as defined in the 1.5L Loan Documents but, for purposes of the Interim Order, the "1.5L Loan Collateral"); and

(iv)    **Validity, Perfection, and Priority of 1.5L Loan Liens and 1.5L Loan Obligations**. The Debtors acknowledge and agree that, as of the Petition Date, (a) the 1.5L Loan Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 1.5L Loan Collateral

| Summary of Material Terms[8] |
|---|
| granted to, or for the benefit of, the 1.5 Lien Secured Parties for fair consideration and reasonably equivalent value, (b) the 1.5L Loan Liens were senior in priority over any and all other liens on the 1.5L Loan Collateral, subject only to (i) the 1L Notes Permitted Prior Liens (if any), the 1L Loan Permitted Prior Liens (if any), the 1L Notes Liens, the 1L Loan Liens, and (ii) certain liens senior by operation of law or otherwise permitted by the 1.5L Loan Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 1.5L Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, this clause (ii), the "1.5L Loan Permitted Prior Liens"), (c) the 1.5L Loan Obligations constitutes legal, valid, binding, and non-avoidable obligations of the 1.5L Loan Obligations enforceable in accordance with the terms of the applicable 1.5L Loan Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 1.5L Loan Liens or 1.5L Loan Obligations exist, and no portion of the 1.5L Loan Liens or 1.5L Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or, except as set forth in the Prepetition Intercreditor Agreements (as defined below), subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge any of the 1.5L Loan Obligations, the priority of the 1.5 Lien Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 1.5L Loan Liens. |

(d)    **2L Notes.**

(i)    **2L Notes Indenture.**  Pursuant to that certain Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "2L Notes Indenture" and, collectively with all other Second Lien Documents (as defined in the 2L Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "2L Notes Documents" and, collectively with the 1L Notes Documents, the 1L Loan Documents and the Prepetition 1.5 Lien Documents, the "Prepetition Loan/Notes Documents") among Ligado, as issuer (in such capacity, the "2L Notes Issuer"), the guarantors party thereto (in such capacities, the "2L Notes Guarantors" and, together with the 2L Notes Issuer, the ""), and Wilmington Savings 2L Notes Obligors Fund Society, FSB, as trustee (as successor in interest to U.S. Bank National Association) (in such capacity, the "2L Notes Trustee" and, together with the 1L Notes Trustee, the 1L Loan Agents, and the 1.5L Loan Agents, the "Prepetition Secured Party Representatives"), Ligado issued $1.0 billion aggregate principal amount of 17.5% PIK Senior Secured Second Lien Notes due 2024 at an issue price of 75% of par value (the "2L Notes" and the holders of the 2L Notes, the "2L Noteholders");

(ii)    **2L Notes Obligations.**  As of the Petition Date, the 2L Notes Obligors were justly and lawfully indebted and liable to the 2L Notes Secured Parties (as defined below) in an aggregate principal amount of $2,050,029,494 (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 2L Notes Obligors to the 2L Notes Secured Parties that have accrued as of the Petition Date in connection with the 2L Notes Documents, the "2L Notes Obligations" and, collectively with the 1L Notes Obligations, the 1L Loan Obligations and the 1.5L Loan Obligations, the "Prepetition Secured Obligations");

(iii)    **2L Notes Liens.**  As more fully set forth in the 2L Notes Documents, prior to the Petition Date, the 2L Notes Obligors granted to U.S. Bank National Association, in its capacity as collateral trustee (in such capacity, the "2L Notes Collateral Trustee" and, collectively with the 2L Noteholders and the 2L Notes Trustee, the "2L Notes Secured Parties" and, collectively with the 1L Notes Secured Parties, the 1L Loan Secured Parties, and the 1.5L Loan Secured Parties, the "Prepetition Secured Parties"), for the benefit of itself and the other 2L Notes Secured Parties, security interests in and continuing liens (the "2L Notes Liens" and, collectively with the 1L Notes Liens, the 1L Loan Liens and the 1.5L Loan Liens, the "Prepetition Liens") in all Collateral (as defined in the 2L Notes Documents but, for purposes of the Interim Order, the "2L Notes Collateral," and together with the 1L Loan Collateral, the 1L Notes Collateral, and the 1.5L Loan Collateral, the "Prepetition Collateral"); and

(iv)    **Validity, Perfection, and Priority of 2L Notes Liens and 2L Notes Obligations.**  The Debtors acknowledge and agree that, as of the Petition Date, (a) the 2L Notes Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 2L Notes Collateral granted to, or for the benefit of, the 2L Notes Secured Parties for fair consideration and reasonably

| Summary of Material Terms[8] |
|---|
| equivalent value, (b) the 2L Notes Liens were senior in priority over any and all other liens on the 2L Notes Collateral, subject only to the (i) 1L Notes Permitted Prior Liens (if any), the 1L Loan Permitted Prior Liens (if any), the 1L Notes Liens, the 1L Loan Liens, the 1.5L Loan Permitted Prior Liens (if any), the 1.5L Loan Liens, and (ii) certain liens senior by operation of law or otherwise permitted by the 2L Notes Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 2L Notes Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, this clause (ii), the "2L Notes Permitted Prior Liens" and, collectively with the 1L Notes Permitted Prior Liens, the 1L Loan Permitted Prior Liens and the 1.5L Loan Permitted Prior Liens, the "Prepetition Permitted Prior Liens"), (c) the 2L Notes Obligations constitutes legal, valid, binding, and non-avoidable obligations of the 2L Notes Obligors enforceable in accordance with the terms of the applicable 2L Notes Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 2L Notes Liens or 2L Notes Obligations exist, and no portion of the 2L Notes Liens or 2L Notes Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or, except as set forth in the Prepetition Intercreditor Agreements, subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge any of the 2L Notes Obligations, the priority of the 2L Notes Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 2L Notes Liens securing the 2L Notes Obligations. |

(e)    **Intercreditor Agreements**.  That certain First Lien Intercreditor Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "First Lien Intercreditor Agreement"), by and among Ligado, the other grantors from time to time party thereto, U.S. Bank National Association, as Authorized Representative for the Notes Secured Parties (as defined therein), U.S. Bank Trust Company, National Association, as Initial Additional Authorized Representative (as defined therein) and each additional Authorized Representative from time to time party thereto, that certain Senior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Senior Intercreditor Agreement"), by and among, Ligado, the other pledgors from time to time party thereto, U.S. Bank National Association, as First Lien Representative (as defined therein), U.S. Bank Trust Company, National Association, as a First Lien Representative, Jefferies Finance LLC, as a Junior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative and each additional First Lien Representative and Junior Lien Representative from time to time party thereto, and that certain Junior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Junior Intercreditor Agreement" and, together with the First Lien Intercreditor Agreement and the Senior Intercreditor Agreement, the "Intercreditor Agreements"), by and among, Ligado, the other pledgors from time to time party thereto, Jefferies Finance LLC, as a Senior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative (as defined therein) and each additional Senior Lien Representative and Junior Lien Representative from time to time party thereto:  (a) are valid and enforceable "subordination agreements" under section 510(a) of the Bankruptcy Code; (b)(1) provide the 1L Loan Lenders of 1L First Out Loan Obligations with payment priority, in each case, relative to the 1L Notes Secured Parties of the 1L Notes Obligations and the 1L Loan Lenders of the 1L Pari Loan Obligations, (2) provide the 1L Secured Parties with, among other things, senior liens with respect to the Prepetition Collateral and the proceeds thereof and payment priorities, in each case, relative to the 1.5L Loan Secured Parties and the 2L Notes Secured Parties and (3) provide the 1.5L Loan Secured Parties with, among other things, senior liens with respect to the Prepetition Collateral and the proceeds thereof and payment priorities, in each case, relative to the 2L Notes Secured Parties; (c) shall remain in full force and effect; (d) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the Adequate Protection Liens and Adequate Protection Claims (each as defined below) granted under the Interim Order); and (e) shall not be deemed to be amended, altered, or modified by the terms of the Interim Order.

(f)    **No Control**.  None of the DIP Secured Parties nor the Prepetition Secured Parties control the Loan Parties or their properties or operations, have the authority to determine the manner in

| **Summary of Material Terms**[8] | |
|---|---|
| | which any of the Loan Parties' operations are conducted, or is a control person or insider under the Bankruptcy Code of the Loan Parties or any of their affiliates by virtue of any prepetition actions or holdings, including any of the prepetition acts, rights, or investments taken with respect to, in connection with, related to, or arising from the DIP Orders, the DIP Facility, the DIP Loan Documents, the 1L Loan Obligations, the 1L Notes Obligations, the 1.5L Loan Obligations, the 2L Notes Obligations, or the Prepetition Loan/Notes Documents. |
| | (g)      **Release.**  Effective upon entry of the Final Order, each of the Debtors, on behalf of themselves and their respective estates, forever and irrevocably release and forever discharge the DIP Secured Parties (solely in their capacity as such) and each of their respective former, current and future officers, directors, employees, shareholders, owners, members, managers, partners, subsidiaries, affiliates, funds or managed accounts, agents, advisors, attorneys, accountants, investment bankers, consultants and other representatives, together with each of their predecessors and successors in interest (collectively, the "<u>Released Parties</u>") from any and all claims, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, reimbursement obligations (including, attorneys' fees) costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, fixed or contingent, pending or threatened, of any kind or nature whatsoever, whether arising at law or in equity (including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, recharacterization, subordination, avoidance, any claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law or any other claim or cause of action arising under the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection with, or related to the Debtors or their estates, the extent, amount, validity, enforceability, priority, security and perfection of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deals reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the entry of the Interim Order; provided that the release set forth in paragraph G(g) of the Interim Order shall not limit or release the obligations of any DIP Secured Party under the DIP Loan Documents. |
| | (h)      **Cash Collateral.**  All of the Debtors' cash and cash equivalents, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash on deposit or maintained by the Debtors in any account or accounts), constitutes or will constitute "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").  All Cash Collateral, all proceeds of the Prepetition Collateral, and the DIP Collateral, including proceeds realized from any sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses payable under the Interim Order or the Final Order, as applicable) shall be used or applied in accordance with the terms and conditions of the Interim Order, the Approved Budget (subject to Permitted Variances in accordance with the DIP Loan Agreement), and the DIP Loan Documents and for no other purpose unless otherwise agreed to between the Loan Parties and the DIP Lenders. |
| | Interim Order ¶ G. |
| **Challenge Period**<br>**Bankruptcy Rule**<br>**4001(c)(l)(B)**<br><br>Local Rule<br>4001-2(a)(i)(Q) | (a)      The stipulations, admissions, agreements, and releases contained in the Interim Order, including, without limitation, in paragraph G of the Interim Order (collectively, the "Stipulations"), shall be binding upon the Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Loan Parties in these chapter 11 cases or any Successor Cases) in all circumstances and for all purposes; provided that any chapter 7 or chapter 11 trustee appointed or elected for any of the Loan Parties in these chapter 11 cases or any Successor Cases before the Challenge Deadline shall not be bound by the Stipulations until the Court orders otherwise.  The Stipulations shall be binding upon all other parties in interest, (including without limitation, the Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the Loan Parties' estates, in all circumstances and for all purposes, unless (i) the Committee(if appointed) or a party in interest (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline), has timely and duly filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "Challenge Proceeding") by the Challenge Deadline, objecting to or challenging |

| Summary of Material Terms[8] |
| --- |

the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan/Notes Documents, or otherwise asserting or prosecuting any Avoidance Action or any other claim, counterclaim, cause of action, objection, contest, defense, or other challenge (a "Challenge") against any of the Prepetition Secured Parties or any of their respective affiliates, subsidiaries, officers, directors, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and the respective successors and assigns thereof (in each case, in their respective capacities as such), arising under, in connection with or related to the Debtors, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan/Notes Documents, and (2) there is entered a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding; provided that (i) as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date and (ii) any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released, and barred).  Notwithstanding anything to the contrary in the Interim Order, if, on or before the Challenge Deadline, the Committee (if appointed) or any other party in interest files a motion seeking standing to file a Challenge with a draft complaint identifying and describing all bases for such Challenge, the Challenge Deadline shall be tolled solely with respect to the bases asserted in such draft complaint and solely with respect to the moving party until the earlier of:  (i) two (2) business days subsequent to the date of entry of an order granting standing to file such Challenge; and (ii) entry of an order denying such motion; provided that such extension shall only apply to the bases for a Challenge asserted in the draft complaint that the Court has specifically found that the moving party has standing to assert.

(b)      If no such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, then, without further notice to any person or entity or order of the Court, (a) the Stipulations shall be binding on all parties in interest (including, without limitation, the Committee, if appointed); (b) the Prepetition Secured Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, disgorgement, offset, avoidance, for all purposes in these chapter 11 cases and any Successor Cases; (c) the Prepetition Loan/Notes Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the Loan Parties in these chapter 11 cases and any Successor Cases; (d) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense; and (e) the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Loan/Notes Documents shall not be subject to any other or further claim or Challenge by the Committee (if appointed), any non-statutory committees appointed or formed in these chapter 11 cases or any Successor Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates.

(c)      If any such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, the Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 27(b) of the Interim Order) on the Committee (if appointed) and on any other person or entity, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

(d)      The "Challenge Deadline" shall mean the date that is, for any party in interest or the Committee (if appointed), 75 calendar days after entry of the Interim Order, as such deadline may be extended, (x) subject to the terms of the Interim Order, in writing prior to the expiration of the deadline to commence a Challenge, by, with respect to the 1L Loans, the 1L Notes, the 1.5L Loans, or the 2L Notes, the Prepetition Secured Party Representative (as applicable, acting in accordance with the respective Prepetition Loan/Notes Documents) or (y) by this Court for good cause shown upon an application for an extension filed and served by a party in interest, pursuant to an order entered before the expiration of the Challenge Deadline; provided that an extension pursuant to the foregoing clause (y) shall only be applicable as to such party in interest and the particular Challenge set forth in such application; provided, further, that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Challenge Deadline, which attaches a draft complaint setting forth the sufficiently specific legal and factual bases of the proposed Challenge, shall toll the Challenge Deadline only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Court.  Failure of the Committee (if appointed) or any other party

| Summary of Material Terms[8] | |
|---|---|
| | in interest to file such a pleading with the Court shall forever bar such party from making such a challenge. |
| | (e)      Nothing in the Interim Order vests or confers on any entity (as defined in the Bankruptcy Code), including the Committee (if appointed) or any non-statutory committees appointed or formed in the chapter 11 cases, standing or authority to pursue any Claim (as such term is defined in section 101(5) of the Bankruptcy Code) or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Stipulations, and all rights to object to such standing are expressly reserved. |
| | Interim Order ¶ 27. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order includes a customary waiver/modification of the automatic stay to permit the Debtors to take all actions as are necessary or appropriate to implement the terms of the Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Lenders and the Prepetition Secured Parties to take any action authorized by the Interim Order. |
| | Interim Order ¶ 13. |

## III.   Explanation for Inclusion of Significant Provisions Pursuant to Local Rule 4001-2(a)(i).

### A.   The Significant Provisions Are Appropriate and Justified Under the Circumstances of These Chapter 11 Cases

35.   Local Rule 4001-2(a)(i) requires that the Debtors explain the reason for including certain significant provisions described in Local Rules 4001-2(a)(i)(N)–(X) (collectively, the "Significant Provisions").  The Debtors believe that each of the Significant Provisions and the Carve Out are justified and necessary in the context and circumstances of these chapter 11 cases.

#### a.   The Roll-Up Is Appropriate.

36.   Local Rule 4001-2(a)(i)(O) requires explicit disclosure of provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.  *See* Local Rule 4001-2(a)(i)(O).  Here, the proceeds of the Roll-Up Loans will be used to repay in full in cash the 1L First Out Loan Obligations upon entry of and subject to entry of the Final Order.

37.   As discussed in further detail below, the Roll-Up is a key condition for the DIP Lenders to provide the DIP Facility.  The Consenting Lenders provided emergency short-term funding to the Debtors several times, which kept the Company operational for several years while

it negotiated with Viasat and pursued its litigation claims. The Consenting Lenders required the Roll-Up as an integral term of the DIP Facility and the Debtors understand that the DIP Lenders would not have extended new money financing to the Debtors otherwise. Without agreeing to the Roll-Up, the Debtors also would not have been able to secure the support of the Consenting Lenders for the comprehensive restructuring contemplated in the RSA, which is a crucial step towards ensuring a smooth transition into these chapter 11 cases. Given these circumstances, the Roll-Up is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and the Debtors submit that it should be approved.

> **b.    The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate.**

38.    Local Rule 4001-2(a)(i)(Q) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order to investigate such matters. *See* Local Rule 4001-2(a)(i)(Q). Here, the Interim Order complies with this requirement by providing any statutory committee appointed in these chapter 11 cases, and all parties in interest in each case, with requisite standing to file an adversary proceeding challenging the validity, extent, perfection, or priority of the Prepetition Liens on the Prepetition Collateral, the validity, allowability, priority, or amount of the Prepetition Secured Obligations, or the Stipulations by seventy-five (75) days after the entry of the Interim Order. *See* Interim Order ¶ 27(d).

> **c.    The Provisions Immediately Approving All Terms and Conditions of the DIP Facility Are Appropriate.**

39.    Local Rule 4001-2(a)(i)(R) requires explicit disclosure of provisions that immediately approve all terms and conditions of the underlying loan agreement. *See* Local Rule 4001-2(a)(i)(R). Here, the Interim Order provides that upon entry, the parties to the DIP

Facility are authorized to enter into their respective obligations and that, upon execution, the DIP Documents shall constitute valid and binding obligations of the Debtors. Moreover, to the extent the DIP Documents conflict with the Interim Order, the Interim Order controls. *See* Interim Order ¶ 42. This provision is necessary and appropriate for the Debtors to access the DIP Facility and to provide all parties with the assurances that the Debtors' postpetition entry into the DIP Facility is valid. Without this provision, the Debtors would be unable to access the DIP Facility or use Cash Collateral on an interim basis.

> d. **The Provisions Modifying the Automatic Stay, Providing for a Remedies Notice Period, and Providing for a Default Notice Hearing Are Appropriate.**

40.     Local Rules 4001-2(a)(i)(S) and (T) require explicit disclosure of provisions that modify the automatic stay upon a termination of the DIP Facility without a remedies notice period of at least five (5) days and provisions that seek to limit what parties in interest may raise at an emergency hearing scheduled during the remedies notice period. See Local Rules 4001-2(a)(i)(S) and (T). Here, the Interim Order provides for a five (5)-day DIP Remedies Notice Period for all DIP Termination Events. See Interim Order ¶ 21(a).

41.     During the DIP Remedies Notice Period, notwithstanding anything to the contrary in paragraph 21 of the Interim Order, (i) the DIP Secured Parties may not exercise any rights or remedies to satisfy the DIP Obligations, including any rights and remedies against the DIP Collateral, (ii) the Prepetition Secured Parties may not exercise any rights or remedies to satisfy the Prepetition Secured Obligations and the Adequate Protection Obligations, including any rights or remedies against the Prepetition Collateral, and (iii) the Debtors will continue to have the right to use Cash Collateral solely to pay *only* the following amounts and expenses: (i) the Carve Out, (ii) the Administration Charge, and (iii) amounts that the Debtors have determined in good faith are in the ordinary course, are critical to the preservation of the Debtors and their estates, and are

in compliance with the Approved Budget (subject to Permitted Variances). At the end of the DIP Remedies Notice Period, unless the Court has entered an order to the contrary, the Debtors' right to use Cash Collateral will immediately cease, unless otherwise provided in the Interim Order, and Prepetition Secured Parties, the DIP Agent and DIP Lenders will have the rights set forth in paragraph 21 of the Interim Order, without the necessity of seeking relief from the automatic stay.

42.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Interim Order should be approved.

## IV.     The Debtors' Prepetition Capital Structure and Need for the DIP Facility

### B.     Prepetition Capital Structure

43.     As of the Petition Date, the Debtors' capital structure includes approximately $8.6 billion in principal amount of Prepetition Secured Obligations. A summary of Ligado's funded debt is set forth below:

| Obligation | Maturity / Redemption | Approximate Principal Amount Outstanding |
|---|---|---|
| **Funded Debt Obligations[9]** | | |
| Prepetition First Out Term Loans | November 1, 2023[10] | $319.5 |
| Prepetition First Lien Notes | November 1, 2023 | $5,491.8 |
| Prepetition First Lien Senior Pari Term Loans | November 1, 2023 | $122.3 |
| Prepetition 1.5 Lien Facility | February 2, 2024 | $591.5 |
| Prepetition Second Lien Notes | May 1, 2024 | $2,050.0 |

---

[9]     Amounts reflected in millions of dollars.

[10]     All loans issued after this date pursuant to the Prepetition First Out Term Loans are payable on demand.

### C.      Prepetition First Lien Notes

44.      On October 23, 2020, Ligado originally issued $2.85 billion in aggregate principal amount of 15.5% PIK Senior Secured First Lien Notes due 2023 (the "Prepetition First Lien Notes" and, the holders of the Prepetition First Lien Notes, the "Prepetition First Lien Noteholders") at an issue price of 100.0% of par value pursuant to that certain indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Indenture" and, collectively with all other First Lien Documents (as defined in the Prepetition First Lien Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Notes Documents"), by and among Ligado, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee (in such capacity, the "Prepetition First Lien Notes Trustee" and, U.S. Bank National Association, in its capacity as collateral trustee under the Prepetition First Lien Notes Documents, the "Prepetition First Lien Notes Collateral Trustee" and, the Prepetition First Lien Noteholders, the Prepetition First Lien Notes Trustee, and the Prepetition First Lien Notes Collateral Trustee collectively, the "Prepetition First Lien Notes Secured Parties").

45.      On December 23, 2022, the First Lien Indenture was amended to, among other things, permit the incurrence of the Prepetition First Lien Loans (as defined below), and in connection with the amendments, the Debtors paid the holders of the Prepetition First Lien Notes a consent fee represented by an increase in the aggregate principal amount of the Prepetition First Lien Notes of $25.1 million.  On March 31, 2023, the Prepetition First Lien Indenture was further amended to, among other things, permit the incurrence of the incremental Prepetition First Out Term Loans (as defined below).  On May 24, 2024, the Prepetition First Lien Indenture was further

amended to, among other things, permit the incurrence of term loans in an aggregate principal amount not exceeding $75,000,000.

46.     On October 20, 2023, the Debtors entered into a forbearance agreement (the "1L Notes Forbearance Agreement") with holders of more than a majority of the outstanding principal amount of the Prepetition First Lien Notes (collectively, the "1L Consenting Holders"). Pursuant to the 1L Notes Forbearance Agreement, the 1L Consenting Holders agreed to forbear until November 15, 2023—which forbearance date was further extended to, among other things, the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "1L Notes Forbearance Period")—the exercise of their respective rights and remedies under the First Lien Indenture and the related security documents, as a result of the Debtors' anticipated failure to timely pay principal and accrued interest, if applicable, on the Prepetition First Lien Notes at maturity on November 1, 2023. Under the 1L Notes Forbearance Agreement, until November 1, 2023, the Prepetition First Lien Notes bore interest at a rate of 15.5% per annum, payable in kind. Starting from the date of maturity on November 1, 2023, and during the 1L Notes Forbearance Period, Ligado pays interest at the default rate of 17.5% per annum payable in kind, in accordance with the terms of the Prepetition First Lien Notes Documents.

47.     The Prepetition First Lien Notes are guaranteed by Ligado's subsidiaries and secured by perfected first-priority liens on and security interests in (to the extent legally permissible) substantially all of the Debtors' assets, other than certain "excluded property" (the "Prepetition Collateral").

48.    The Debtors also entered into waivers with respect to the Prepetition 1.5 Lien Facility and Prepetition Second Lien Notes for anticipated cross defaults arising from the Payment Default.

49.    As of the Petition Date, an aggregate amount of approximately $5.5 billion in principal and accrued interest was outstanding under the Prepetition First Lien Notes.

**D.    Prepetition First Lien Loan Facility**

50.    Ligado is the borrower under that certain First Lien Loan Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Loan Agreement" and, collectively with all other Loan Documents (as defined in the Prepetition First Lien Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents," and the facility made available thereunder, the "Prepetition First Lien Loan Facility" and, the Prepetition First Lien Loan Documents together with the Prepetition First Lien Notes Documents, the "Prepetition First Lien Documents"), by and among, Ligado, as the borrower, the guarantors party thereto, the lenders party thereto (collectively in such capacities, the "Prepetition First Lien Lenders"), and U.S. Bank Trust Company, National Association, as administrative agent (as successor in interest to U.S. Bank National Association, as administrative agent) (in such capacity, the "Prepetition First Lien Loan Administrative Agent," and U.S. Bank Trust Company, National Association in its capacity as collateral agent under the Prepetition First Lien Loan Documents (as successor in interest to U.S. Bank National Association), the "Prepetition First Lien Loan Collateral Agent," and the Prepetition First Lien Loan Collateral Agent, the Prepetition First Lien Loan Administrative Agent, and the Prepetition First Lien Lenders collectively, the "Prepetition

First Lien Loan Secured Parties," and the Prepetition First Lien Loan Secured Parties together with the Prepetition First Lien Notes Secured Parties, the "Prepetition First Lien Secured Parties").

51.     The Prepetition First Lien Loan Agreement was amended on April 3, 2023, July 17, 2023, November 18, 2023, January 22, 2024, June 4, 2024, October 2, 2024, and December 23, 2024, to, among other things, permit incremental loans to the Debtors under the Prepetition First Lien Loan Agreement.

52.     The Prepetition First Lien Loan Facility provides for up to approximately (i) $122.3 million in term loans that are secured on a pari passu basis with the Prepetition First Lien Notes (the "Prepetition First Lien Senior Pari Term Loans") and (ii) $141.0 million in term loans that are secured on a pari passu basis with the Prepetition First Lien Notes but are "first out" in payment priority pursuant to the First Lien Intercreditor Agreement (as defined below) (the "Prepetition First Out Term Loans" and, the Prepetition First Out Term Loans together with the Prepetition First Lien Senior Pari Term Loans, the "Prepetition First Lien Term Loans," and the Prepetition First Lien Term Loans together with the Prepetition First Lien Notes, the "Prepetition First Lien Debt").  The Prepetition First Out Term Loans rank senior in right of repayment to all of the Debtors' existing debt, including all other Prepetition First Lien Debt.  The Prepetition First Out Term Loans also bear interest at a default rate of 17.5% per annum, payable in kind, in accordance with the terms of the Prepetition First Lien Loan Agreement.

53.     On October 20, 2023, the Debtors entered into a forbearance agreement (the "1L Loan Forbearance Agreement") with holders of more than a majority of the outstanding principal amount of the Prepetition First Lien Term Loans (collectively, the "1L Consenting Lenders").  Pursuant to the 1L Loan Forbearance Agreement, the 1L Consenting Lenders agreed to forbear until November 15, 2023—which forbearance date was further extended to, among other things,

the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "1L Loan Forbearance Period")–the exercise of their respective rights and remedies under the Prepetition First Lien Loan Agreement and the related security documents, as a result of the Debtors' anticipated failure to timely pay principal and accrued interest, if applicable, on the Prepetition First Lien Term Loans at maturity on November 1, 2023.  Under the 1L Loan Forbearance Agreement, until November 1, 2023, Ligado paid interest on the Prepetition First Lien Facility at a rate of 15.5% per annum, payable in kind. Starting from the date of maturity on November 1, 2023, and during the 1L Loan Forbearance Period, Ligado pays interest at the default rate of 17.5% per annum payable in kind, in accordance with the terms of the Prepetition First Lien Loan Agreement.

54.     The Prepetition First Lien Loan Facility is secured by perfected first-priority liens on and security interests in (to the extent legally permissible) the Prepetition Collateral on a pari passu basis with the Prepetition First Lien Notes and is guaranteed by Ligado's subsidiaries on a pari passu basis with the Prepetition First Lien Notes.

55.     The Debtors also entered into waivers with respect to the Prepetition 1.5 Lien Facility and Prepetition Second Lien Notes (each, as defined below) for anticipated cross defaults arising from the Payment Default.

56.     As of the Petition Date, an aggregate amount of approximately $441.8 million in principal and accrued interest was outstanding under the Prepetition First Lien Loan Facility.

E.     **Prepetition 1.5 Lien Facility**

57.     Ligado is the borrower under that certain 1.5 Lien Loan Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition 1.5 Lien Loan Agreement" and, collectively with all other Loan Documents (as defined in the Prepetition 1.5 Lien Loan Agreement) and any other

agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition 1.5 Lien Loan Documents," and the facility made available thereunder, the "Prepetition 1.5 Lien Facility") by and among Ligado, as the borrower, the guarantors party thereto, the lenders party thereto (collectively in such capacities, the "Prepetition 1.5 Lien Lenders"), Jefferies Finance LLC, as administrative agent (in such capacity, the "Prepetition 1.5 Lien Administrative Agent"), and U.S. Bank Trust Company, National Association, as successor collateral agent (in such capacity, the "Prepetition 1.5 Lien Collateral Agent" and, the Prepetition 1.5 Lien Collateral Agent, the Prepetition 1.5 Lien Administrative Agent, and the Prepetition 1.5 Lien Lenders, collectively, the "Prepetition 1.5 Lien Secured Parties").

58.    The Prepetition 1.5 Lien Loan Agreement was amended on October 23, 2020, February 24, 2021, August 10, 2022, and December 23, 2022, to among other things, permit incremental commitment increases to the Debtors under the Prepetition 1.5 Lien Loan Agreement.

59.    On August 10, 2022, the Debtors entered into an agreement to borrow up to an additional $88.0 million (the "Incremental 1.5 Lien Loans") under the Prepetition 1.5 Lien Facility that resulted in available proceeds of $36.0 million after accounting for the original issue discount and other paid-in-kind fees.  The Incremental 1.5 Lien Loans were structured as three separate draws of $12.0 million each in net cash proceeds to the Debtors.  The three draws of $12.0 million each occurred on August 10, 2022, September 9, 2022, and October 14, 2022, respectively.  The Incremental 1.5 Lien Loans bore interest at the greater of (i) SOFR and (ii) 1.00% plus the applicable margin (20.0% plus 15 bps)  The maturity date of the Incremental 1.5 Lien Loans was May 1, 2024.

60.     On December 23, 2022, the Debtors entered into an agreement to borrow up to an additional $68.3 million (the "Additional Incremental 1.5 Lien Loans") under the Prepetition 1.5 Lien Facility.  The Additional Incremental 1.5 Lien Loans were funded on a non-cash basis on four separate funding dates:  (i) the first funding date on December 27, 2022, on which date $28.3 million of the Additional Incremental 1.5 Lien Loans were funded; (ii) the second funding date on January 4, 2023, on which date $13.3 million of the Additional Incremental 1.5 Lien Loans were funded; (iii) the third funding date on February 1, 2023, on which date $13.3 million of the Additional Incremental 1.5 Lien Loans were funded; and (iv) the fourth funding date on March 1, 2023, on which date $13.325 million of the Additional Incremental 1.5 Lien Loans were funded. The proceeds of the Additional Incremental 1.5 Lien Loans were used solely to pay an incentive fee to each lender of the Incremental First Lien Loans.

61.     The Additional Incremental 1.5 Lien Loans bore interest at the greater of (i) SOFR and (ii) 1.00% plus the applicable margin (20.0% plus 15 bps) until the maturity date of May 1, 2024.

62.     On January 19, 2024, the Debtors entered into a forbearance agreement (the "1.5L Forbearance Agreement") with the consenting 1.5 Prepetition Lien Lenders (the "1.5L Consenting Lenders"), pursuant to which the 1.5L Consenting Lenders (a) agreed to forbear until June 7, 2024, the exercise of their respective rights and remedies under the Prepetition 1.5L Lien Facility, as a result of the Debtors' anticipated failure to timely pay principal and unpaid interest, if applicable, at maturity (the "Anticipated 1.5L Payment Default") and any related cross-defaults, which forbearance date was further extended to, among other things, the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "1.5L Forbearance Period"), and (b) directed the Administrative Agent and

Collateral Agent (as defined in the 1.5L Forbearance Agreement) to forbear from exercising rights and remedies under the Prepetition 1.5L Lien Facility, with respect to the Anticipated 1.5L Payment Default.  Under the 1.5L Forbearance Agreement, starting from the date of maturity on May 1, 2024, and during the 1.5L Forbearance Period, Ligado pays interest on the Prepetition 1.5 Lien Loan, the Incremental 1.5 Lien Loans and the Additional Incremental 1.5L Lien Loans as described above plus 2.00%, in each case, to account for the default interest rate, in accordance with the terms of the Prepetition 1.5 Lien Loan Documents.

63.     The Prepetition 1.5 Lien Facility is secured by perfected 1.5 priority liens on and security interests in (to the extent legally permissible) the Prepetition Collateral and is guaranteed by Ligado's subsidiaries on a 1.5 priority basis.

64.     The Prepetition 1.5 Lien Lenders of more than a majority of the loans under the Prepetition 1.5 Lien Facility provided cross-default waivers as a result of the Anticipated 1.5L Payment Default.

65.     As of the Petition Date, an aggregate amount of approximately $591.5 million in principal and accrued interest was outstanding under the Prepetition 1.5 Lien Facility.

### F.     Prepetition Second Lien Notes

66.     On October 23, 2020, Ligado originally issued $1.0 billion aggregate principal amount of 17.5% PIK Senior Secured Second Lien Notes due 2024 (the "Prepetition Second Lien Notes," and the holders of the Prepetition Second Lien Notes, the "Prepetition Second Lien Noteholders") at an issue price of 75.0% of par value pursuant to that certain indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Second Lien Indenture," and collectively with all other Second Lien Documents (as defined in the Prepetition Second Lien Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may

be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Second Lien Documents" and, the Prepetition Second Lien Documents, the Prepetition First Lien Documents, and the Prepetition 1.5 Lien Documents, collectively, the "Prepetition Secured Documents"), by and among Ligado, as issuer, the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee (as successor in interest to U.S. Bank National Association, as trustee) (in such capacity, the "Prepetition Second Lien Trustee," and U.S. Bank National Association in its capacity as collateral trustee under the Prepetition Second Lien Documents, the "Prepetition Second Lien Collateral Trustee," and the Prepetition Second Lien Noteholders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Collateral Trustee collectively, the "Prepetition Second Lien Secured Parties," and the Prepetition Second Lien Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition 1.5 Lien Secured Parties collectively, the "Prepetition Secured Parties").

67.    On January 19, 2024, the Debtors entered into a forbearance agreement (the "2L Forbearance Agreement") with the consenting Prepetition Second Lien Noteholders (the "2L Consenting Holders"), pursuant to which the 2L Consenting Holders (A) agreed to forbear until June 7, 2024 the exercise of their respective rights and remedies under the Prepetition Second Lien Documents, as a result of the Debtors' anticipated failure to timely pay principal and unpaid interest, if applicable, at maturity (the "Anticipated 2L Payment Default") and any related cross-defaults, which forbearance date was further extended to, among other things, the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "2L Forbearance Period"), and (B) directed the Trustee (as defined in the 2L Forbearance Agreement) to forbear from exercising rights and remedies under the Prepetition Second Lien Documents, with respect to the Anticipated 2L Payment Default.

Under the 2L Forbearance Agreement, until May 1, 2024, the Prepetition Second Lien Notes bore interest at a rate of 17.5% per annum, payable in kind.  Starting from the date of maturity on May 1, 2024, and during the 2L Forbearance Period, Ligado pays interest at the default rate of 19.5% per annum payable in kind, in accordance with the terms of the Prepetition Second Lien Documents.

68.     The Prepetition Second Lien Notes are secured by perfected second-priority liens on and security interests in (to the extent legally permissible) the Prepetition Collateral and are guaranteed on a second lien priority basis by the same Ligado subsidiaries that guarantee the Prepetition First Lien Notes and the Prepetition 1.5 Lien Facility.

69.     The holders of more than a majority of the outstanding principal amount of the Prepetition Second Lien Notes provided cross-default waivers as a result of the Anticipated 2L Payment Default.

70.     As of the Petition Date, an aggregate amount of approximately $2.0 billion in principal and accrued interest was outstanding under the Prepetition Second Lien Notes.

**G.     Intercreditor Agreements**

71.     Pursuant to the First Lien Intercreditor Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "First Lien Intercreditor Agreement"), by and among Ligado, the other grantors from time to time party thereto, U.S. Bank National Association, as collateral trustee (in such capacity, the "First Lien Collateral Trustee"), U.S. Bank National Association, as Authorized Representative for the Notes Secured Parties (each as defined therein), U.S. Bank National Association, as Initial Additional Pari Collateral Agent and Initial Additional Authorized Representative (each as defined therein), and each additional Authorized Representative from time to time party thereto, the liens and security interests securing the Prepetition First Lien Notes rank

equal in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition First Lien Loan Facility, the Prepetition First Out Term Loans rank senior in right of payment to the Prepetition First Lien Notes and the Prepetition First Lien Senior Pari Term Loans, and the Prepetition First Lien Notes rank equal in right of payment to the Prepetition First Lien Senior Pari Term Loans.

72.     Pursuant to the Senior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Senior Intercreditor Agreement"), by and among Ligado, the other pledgors from time to time party thereto, U.S. Bank National Association, as First Lien Representative (as defined therein), Jefferies Finance LLC, as a Junior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative, each additional First Lien Representative and Junior Lien Representative from time to time party thereto, and U.S. Bank National Association, as collateral trustee (in such capacity, the "Senior Collateral Trustee"), the liens and security interests securing the Prepetition First Lien Debt ranks senior in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition 1.5 Lien Facility and the Prepetition Second Lien Notes, and the Prepetition First Lien Debt ranks senior in right of payment to the Prepetition 1.5 Lien Facility and the Prepetition Second Lien Notes.

73.     Pursuant to the Senior Intercreditor Agreement and the Junior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Junior Intercreditor Agreement" and, the Junior Intercreditor Agreement, the First Lien Intercreditor Agreement, and the Senior Intercreditor Agreement, collectively, the "Intercreditor Agreements"), by and among,

Ligado, the other pledgors from time to time party thereto, Jefferies Finance LLC, as a Senior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative (as defined therein), each additional First Lien Representative and Junior Lien Representative from time to time party thereto, and U.S. Bank National Association, as collateral trustee (in such capacity, the "Junior Collateral Trustee," and the Junior Collateral Trustee, the First Lien Collateral Trustee, the Senior Collateral Trustee, the Prepetition First Lien Secured Parties, the Prepetition 1.5 Lien Secured Parties, and the Prepetition Second Lien Secured Parties collectively, the "Prepetition Secured Parties"), the liens and security interests securing the Prepetition 1.5 Lien Facility rank junior in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition First Lien Debt and rank senior in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition Second Lien Notes, and the Prepetition 1.5 Lien Facility ranks junior in right of payment to the Prepetition First Lien Debt and senior in right of payment to the Prepetition Second Lien Notes.

74.      Pursuant to the Intercreditor Agreements, the liens and security interests securing the Prepetition Second Lien Notes rank junior in priority to all liens on and security interests in the Prepetition Collateral granted to secure the Prepetition First Lien Debt and the Prepetition 1.5 Lien Facility, and the Prepetition Second Lien Notes rank junior in right of payment to the Prepetition First Lien Debt and the Prepetition 1.5 Lien Facility.

## V.      Alternative Sources of Financing Are Not Available.

75.      As further described in the Mendelsohn Declaration, other than the proposed DIP Facility offered by the DIP Lenders, no other financing alternative exists.  The Debtors and their advisors engaged with numerous parties regarding funding for these chapter 11 cases.  PWP contacted approximately eleven parties outside the existing capital structure in regards to providing

debtor-in-possession financing to determine whether any of these parties would be willing to provide postpetition financing to the Debtors.  Despite this outreach by PWP, no third parties submitted a proposal.  *See* Mendelsohn Decl. ¶ 18.  Ultimately, the offer from the DIP Lenders was the only actionable financing proposal that the Debtors received.

76.     The DIP Facility is the product of good-faith, robust, competitive, hard-fought, arm's-length negotiations between the DIP Lenders and the Debtors, and the terms of the DIP Facility are fair and reasonable.  The DIP Facility will provide vital liquidity for the Debtors to smoothly transition into chapter 11 and administer the chapter 11 cases in a manner designed to maximize value.  *See id.* ¶¶ 6–8.  Accordingly, approval of the Debtors' entry into the DIP Facility is in the best interests of the estates and constitutes a sound exercise of the Debtors' business judgment.  Further, access to both the proceeds of the DIP Facility and the use of Cash Collateral is integral because neither is sufficient to fund the estate on its own.

## Basis for Relief

**I.     The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

### A.     Entry into the DIP Loan Documents Is a Sound Exercise of the Debtors' Business Judgment.

77.     The Court should authorize the Debtors, as a sound exercise of their business judgment, to enter into the DIP Facility.  Section 364 of the Bankruptcy Code authorizes the Debtors to obtain secured or superpriority postpetition financing. Courts grant a debtor's business judgment considerable deference in obtaining postpetition secured credit, so long as the arrangements for such credit do not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D.

Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

78.     To determine whether the business judgment standard is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). The Court should evaluate the soundness of a debtor's business judgment, "in context, and considering the relative circumstances of the parties." *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable. Certainly, many of them favor the DIP [l]ender. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Elingsen McLean Oil Co.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

79.     The Debtors and the DIP Lenders negotiated the DIP Loan Documents in good faith, at arm's-length, and with the assistance of their respective advisors.  The postpetition

financing made available by the DIP Facility will provide the Debtors with adequate liquidity to smoothly transition into chapter 11 and administer the chapter 11 cases.   The interest rates, premiums, and the Roll-Up Loans are integral components of the overall package demanded by the DIP Lenders as consideration for the extension of the Commitments.   The Debtors, in consultation with their advisors, have determined that the proposed DIP Facility presents the best (and only) financing proposal currently available to the Debtors.   *See* Mendelsohn Decl. ¶ 18. Simply put, the Debtors do not have other viable alternatives to the DIP Facility.   Absent access to the DIP Facility, the Debtors would be forced to liquidate imminently pursuant to chapter 7 of the Bankruptcy Code, which would have a detrimental impact on the value of the Debtors' assets and preclude the Debtors from consummating a chapter 11 plan that will benefit stakeholders. Thus, the terms of the DIP Facility reflect a sound exercise of the Debtors' business judgment, and the Debtors should be authorized to enter into the DIP Loan Documents, obtain the DIP Loans, and continue using Cash Collateral, all on the terms set forth herein and in the proposed DIP Orders.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

80.     The Debtors propose to grant superpriority claims and liens described herein and in the proposed Interim Order pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. More specifically, the Debtors propose to provide to the DIP Lenders, subject to the Carve Out and the AST Break-Up Fee (if any), continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in, and liens upon, all tangible and intangible prepetition and postpetition property of the Debtors, other than the Excluded

Property.  The prepetition liens with respect to the Prepetition Secured Obligations shall be primed by and made subject and subordinate to the DIP Liens.

81.     In the event a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C § 364(c).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

A.  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.*, by allowing a lender only an administrative claim;

B.  the credit transaction is necessary to preserve the assets of the estate; and

C.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

82.     As described above and in the Mendelsohn Declaration, the Debtors are unable to obtain junior, let alone unsecured, credit.  Indeed, the Debtors did not receive ***any*** DIP financing proposals other than that from the DIP Lenders, which was offered on a secured basis.  *See* Mendelsohn Decl. ¶ 18.

83.     Absent the DIP Facility, which will provide sufficient liquidity to administer these chapter 11 cases and effectuate a chapter 11 plan, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' dire circumstances,

the Debtors believe that the terms of the DIP Facility, including the Roll-Up Loans and other economic provisions of the DIP Facility, as set forth in the DIP Loan Agreement and the proposed Interim Order, are fair and reasonable.  For these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

84.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  The Court may authorize the "priming" liens proposed in the Motion if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in their respective collateral are adequately protected. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

85.     Here, each of the Prepetition Secured Parties whose liens will be primed has consented or is deemed to have consented to the priming of their respective liens on the terms described herein and set forth in the proposed Interim Order.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     Alternatives to the DIP Facility Do Not Exist.**

86.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).  If only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such

an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

87.     The Debtors' prepetition marketing process demonstrated that actionable alternative sources of financing are not available. *See* Mendelsohn Decl. ¶¶ 13–18.  The Debtors and PWP have canvassed the distressed financing market for alternative postpetition financing proposals.  Yet, no party other than the DIP Lenders came forward with a potentially actionable financing proposal to fund these chapter 11 cases.  Besides the proposed DIP Facility, the Debtors did not receive any additional proposals for financing in these chapter 11 cases.  Accordingly, the DIP Facility offered by the DIP Lenders represents the Debtors' best and only available option to meet the Debtors' urgent liquidity needs and to successfully finance these cases. *See id*.  The DIP Facility will allow the Debtors to smoothly transition into chapter 11, wherein they and their advisors will seek to consummate a chapter 11 plan, as contemplated by the Restructuring Support Agreement.  *See* Mendelsohn Decl. ¶ 13.  Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

D.     **The Roll-Up Loans and Refinancing of the 1L First Out Loan Obligations Are Appropriate.**

88.     The DIP Loan Agreement provides for, upon the entry of the Final Order, (i) the roll-up of the 1L Debt Obligations into DIP Obligations, which amount may be increased to the extent that any DIP Lenders fund greater than their *pro rata* share of the DIP New Money Loans (the "Roll-Up") and (ii) the proceeds of the DIP Second Funding Loans to be used to repay in full in cash the 1L First Out Loan Obligations (the "Refinancing").

89.     The proposed Roll-Up and Refinancing are in the exercise of the Debtors' sound business judgment.  Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

90.     DIP facilities commonly include provisions whereby prepetition debt is refinanced into the DIP facility (often referred to as a "roll-up").  The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to that requested herein.  *See, e.g., In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Jul. 31, 2023) (authorizing an approximately $63 million DIP Facility, including an approximately $43 million roll-up); *In re SiO2 Medical Prods., Inc.*, No. 23-10366

(JTD) (Bankr. D. Del. Apr. 26, 2023) (authorizing an approximately $120 million DIP facility, including a $60 million roll-up of the prepetition term loan); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jul. 20, 2020) (authorizing an approximately $50 million DIP facility including a $22 million roll-up); *In re Blackhawk Mining LLC*, No. 19 11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) (authorizing an approximately $240 million DIP facility, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re ATD Corp.*, No. 18 12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order).

91.     As demonstrated in the First Day Declaration and the Mendelsohn Declaration, the Debtors cannot fund these cases and consummate a chapter 11 plan without the liquidity provided by the DIP Facility.  The Debtors received no actionable alternative financing proposals. Accordingly, the Debtors believe that obtaining credit under the DIP Facility, and effectuating the Roll-Up and the Refinancing, constitutes a sound exercise of their business judgment and is in the best interest of their estates and creditors.

92.     Further, the Roll-Up and the Refinancing are material components of the consideration required by the DIP Lenders as part of their commitment to provide postpetition financing.  *See* Mendelsohn Decl. ¶¶ 21, 24.  The Roll-Up and the Refinancing were the subjects of hard-fought, arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See id*. at ¶ 22.  Each of the Roll-Up and the Refinancing is reasonable, appropriate, a sound exercise of the Debtors'

business judgment, and ultimately in the best interest of all stakeholders given the alternatives. *See id.* at ¶ 27.

      **E.**      **The Debtors Should Be Authorized to Use the Cash Collateral and Provide Adequate Protection.**

93.      Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Here, the DIP Lenders and Prepetition Secured Parties have consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, including the forms of adequate protection provided thereunder.

94.      Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del.

Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

95.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with certain forms of Adequate Protection to protect against the postpetition diminution in value of their Prepetition Collateral.  These protections are set forth in the Interim Order, which provides that Prepetition Secured Parties are granted: (i) Adequate Protection Liens on all DIP Collateral; (ii) Adequate Protection Claims (subject and subordinate only to the Carve-Out, the AST Break-Up Fee (if any), the Administration Charge and the DIP Superpriority Claims); (iii) payment of the reasonable and documented fees and expenses of certain professionals of the Prepetition Secured Parties; and (iv) payment of PIK interest at the default rate to the 1L Secured Parties when due under the 1L Debt Documents.

96.     The Debtors submit that the proposed Adequate Protection is sufficient to protect the Prepetition Secured Parties from any potential diminution in value to their respective Prepetition Collateral (including Cash Collateral).  In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties agree, that the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.  Thus, the Debtors' provision of the Adequate Protection is fair and appropriate under the circumstances of these chapter 11 cases to ensure that the Debtors are able to continue using Prepetition Collateral, including Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and the Debtors' estates.

**F.      The Carve Out Is Appropriate.**

97.      The DIP Facility subjects the DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve Out and the AST Break-Up Fee (if any).[11]  Without the Carve Out, the Debtors' estates or other parties-in-interest could be harmed because the services that professionals might otherwise provide in these chapter 11 cases could be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that courts insist on carve outs for professionals representing parties in interest because, "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").    Additionally, the Carve Out protects against administrative insolvency during the pendency of these chapter 11 cases by ensuring that assets are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory committee.  Accordingly, the Debtors submit that the Carve Out is appropriate.

**II.      The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders Under the DIP Loan Documents.**

98.      Under the DIP Loan Documents, the Debtors will, subject to Bankruptcy Court approval, pay certain fees (the "DIP Fees") to the DIP Lenders, including the Backstop Fee, the DIP First Funding Fee, the DIP Second Funding Fee, the DIP DDTL Fee, and the DIP Unused Commitment Fee.  The Fees are reasonable under the circumstances and for the same reasons as set forth above with respect to the incurrence of the Roll-Up Loans.  The DIP Lenders, representing the Debtors' best, and only, available source of postpetition financing, would not have extended the DIP Facility but for the economics (including the DIP Fees) contained therein.  *See* Mendelsohn Decl. ¶ 22.  These economics and DIP Fees were the subject of hard-fought negotiations between

---

[11]    The AST Break-Up Fee is described in the *Debtors' Motion for Entry of an Order Authorizing Payment of the AST Transaction Break-Up Fee*, filed substantially contemporaneously with this Motion.

the Debtors and the DIP Lenders.  Thus, the DIP Fees should not be viewed separately but rather as a part of the overall, substantial benefits provided under the DIP Facility.  Moreover, the Backstop Fee enabled the Debtors to obtain the backstop commitments, which, among other things ensure that the Debtors have access to the entire proposed DIP Facility and may effectuate a value-maximizing chapter 11 plan.

The proposed DIP Fees are as follows:

| **DIP Fees** | **Fee Amount** | **Fee Payment** |
|---|---|---|
| Backstop Fee | 12.5% | Payable in kind on Commitments as of the Closing Date |
| Commitment Fee | 5% | Payable in kind on commitments as of the Closing Date |
| DIP First Funding Discount Fee | 5% | Payable in kind on the aggregate amount of DIP First Funding Loans made on the DIP First Funding Date |
| DIP Second Funding Discount Fee | 5% | Payable in kind on the aggregate amount of DIP Second Funding Loans made on the DIP Second Funding Date (other than any Excess DIP Second Funding Loan Proceeds returned to DIP Lenders on the DIP Second Funding Date) |
| DIP DDTL Funding Discount Fee | 5% | Payable in kind on the aggregate amount of DIP Delayed Draw Term Loans made on the DIP DDTL Funding Date |
| DIP Unused Commitment Fee | 3% per annum | Payable in kind on unused DIP DDTL Commitments and DIP Second Funding Commitments |

### III.   **The DIP Lender(s) Should Be Deemed Good-Faith Lenders Under Section 364(e) of the Bankruptcy Code.**

99.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

100.    As explained herein and the First Day Declaration, and in the Mendelsohn Declaration, the DIP Loan Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the best available terms on which to obtain vital postpetition financing, and (b) arm's-length, good-faith negotiations between the Debtors, DIP Agent, and DIP Lenders. The DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and the DIP Loan Documents. Furthermore, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.

101.    Accordingly, the Court should find that the DIP Lendes are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded therein.

## IV.    **The Automatic Stay Should Be Modified on a Limited Basis.**

102.    The proposed Interim Order provides that the automatic stay in effect under section 362 of the Bankruptcy Code will be modified to (i) implement the terms of the Interim Order and (ii) allow the DIP Lenders and Prepetition Secured Parties to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to perfect the respective liens granted to them under the DIP Loan Documents. In addition, the proposed Interim Order

provides that the automatic stay will be modified to the extent necessary to permit the DIP Lenders to exercise certain remedies upon the occurrence of an event of default under the DIP Loan Documents—subject to the procedures set forth in the Interim Order.  The Debtors believe that these provisions were required for the Debtors to obtain the DIP Facility and use Cash Collateral as provided in the Interim Order.

103.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g., In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Town Sports Int'l., LLC*, No. 12 12168 (CTG) (Bankr. D. Del. Oct. 2, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20 11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).

## V.    Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.

104.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

105.    For the reasons noted above, in the First Day Declaration, and in the Mendelsohn Declaration, the Debtors have a critical and immediate need for the liquidity provided by the DIP Facility and access to Cash Collateral.  *See* Mendelsohn Decl. ¶ 7.  The DIP Facility and Cash

Collateral are necessary to fund the Debtors' operations during these chapter 11 cases and to effectuate a value-maximizing chapter 11 plan. *See id.* ¶ 8. Cash Collateral will supplement the cash infused by the DIP Facility to ensure that these chapter 11 cases are sufficiently funded. The Debtors will continue their operations in compliance with the Approved Budget and for the purpose of exiting chapter 11 pursuant to a plan of reorganization, as contemplated by the Restructuring Support Agreement. *See id.* ¶ 23,

106. The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order to ensure that the Debtors can receive the DIP First Funding Loans and continue operating their business during the initial phase of the chapter 11 cases before entry of the Final Order. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Expedited Consideration

107. Bankruptcy Rule 6003 allows a bankruptcy court to grant relief within the first 21 days of a case "to the extent that relief is necessary to avoid immediate and irreparable harm." Pursuant to that Bankruptcy Rule and Local Rule 9013-1(m), the Debtors request emergency consideration of this Motion to avoid immediate and irreparable harm to the Debtors' operations, going concern value, and their efforts to pursue a resolution of these chapter 11 cases. For these reasons, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003, and the Motion should be granted immediately on an interim basis to the extent set forth in the Interim Order.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

108. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As set forth above, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtors' operations, going concern value, and their efforts to pursue a resolution to these chapter 11 cases.

### Notice

109.   The Debtors will provide notice of this Motion to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iii) Foley & Lardner LLP, as counsel to U.S. Bank National Association, in its capacities as Prepetition First Lien Notes Trustee, Prepetition First Lien Notes Collateral Trustee, First Lien Collateral Trustee, First Lien Representative, Prepetition First Lien Loan Administrative Agent, Prepetition First Lien Loan Collateral Agent, Prepetition 1.5 Lien Collateral Agent, Initial Additional Pari Collateral Agent, Initial Additional Authorized Representative for the Notes Secured Parties, Senior Collateral Trustee, Junior Lien Representative, and Junior Collateral Trustee; (iv) Seward & Kissel LLP, as counsel to Wilmington Savings Fund Society, in its capacity as Prepetition Second Lien Trustee and Prepetition Second Lien Collateral Trustee; (v) Jones Day LLP, as counsel to Jefferies Finance LLC, in its capacity as Prepetition 1.5 Lien Administrative Agent, Senior Lien Representative, and Junior Lien Representative; (vi) Sidley Austin LLP, as counsel to the Ad Hoc First Lien Group; (vii) Kirkland & Ellis LLP, as counsel to an Ad Hoc Cross-Holder Group; (viii) the Federal Communication Commission; (ix) the United States Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) the state attorneys general for all states in which the Debtors conduct business; (xii) the United States Attorney's Office for the District of Delaware; (xiii) the Financial Institutions; and (xiv) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief

requested herein, the Debtors respectfully submit that such notice is sufficient, and no other or further notice is required or necessary.

## **No Prior Request**

110.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Interim Order, granting this Motion on an interim basis and scheduling a hearing to consider the Motion on a final basis, (ii) at that hearing, enter the Final Order granting this Motion on a final basis, and (iii) grant such other relief as is just and proper.

Dated January 6, 2025
Wilmington, Delaware

*/s/ Michael J. Merchant*
Mark D. Collins, Esq. (Bar No. 2981)
Michael J. Merchant, Esq. (Bar No. 3854)
Amanda R. Steele, Esq. (Bar No. 5530)
Emily R. Mathews, Esq. (Bar No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
Email:          collins@rlf.com
                   merchant@rlf.com
                   steele@rlf.com
                   mathews@rlf.com

-and-

Dennis F. Dunne, Esq. (*pro hac vice* pending)
Matthew L. Brod, Esq. (*pro hac vice* pending)
Lauren C. Doyle, Esq.  (*pro hac vice* pending)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219
Email:          ddunne@milbank.com
                   mbrod@milbank.com
                   ldoyle@milbank.com

Andrew M. Leblanc, Esq. (*pro hac vice* pending)
**MILBANK LLP**
1850 K Street, NW,
Suite 1100
Washington DC 20006
Telephone:      (202) 835-7500
Facsimile:  (202) 263-7586
Email:          aleblanc@milbank.com

*Proposed Co-Counsel for Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIGADO NETWORKS LLC, *et al.*,[1] | ) | Case No. 25-10006 |
|  | ) |  |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) |  |
|  | ) | **Re: Docket No. ____** |

### INTERIM ORDER (I) AUTHORIZING
### THE DEBTORS TO (A) OBTAIN POSTPETITION
### FINANCING AND (B) USE CASH COLLATERAL;
### (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
### EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION;
### (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING
### A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "DIP Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases and pursuant to sections 105, 361, 362, 363, 364, 365, 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 4001-1(b), 4001-2, 9006-1, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an interim order (together with all annexes, schedules, and exhibits hereto, this "Interim Order," and

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

[2]   Capitalized terms used but not immediately defined herein shall have the meanings ascribed to such terms elsewhere in this Interim Order or in the DIP Loan Agreement, as applicable.

together with a final order the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"):

(1) authorizing Ligado Networks LLC, in its capacity as borrower (the "<u>Borrower</u>") to obtain postpetition financing through a superpriority senior secured term loan credit facility (the "<u>DIP Facility</u>") in the aggregate initial principal amount of up to $939,133,507 (the "<u>DIP Loans</u>") (which may be increased by the payment of fees, interest, and other amounts in kind and additional DIP New Money Loans provided by DIP Lenders that provided (or whose affiliate or Approved Fund provided) greater than their pro rata share of the DIP New Money Loans as more fully set forth in Section 2.01(d) of the DIP Loan Agreement), consisting of:

a) ***DIP New Money Loans***. A new money superpriority senior secured multiple draw term loan credit facility in the aggregate initial principal amount of up to $441,999,891 (which may be increased by the payment of fees, interest, and other amounts in kind) (the "<u>Commitments</u>," and the loans issued thereunder, the "<u>DIP New Money Loans</u>"), of which (i) up to $12,000,000 of such Commitments (the "<u>DIP First Funding Commitments</u>," and the DIP New Money Loans issued thereunder, the "<u>DIP First Funding Loans</u>") shall be made available to the Borrower on the DIP First Funding Date, following the entry of this Interim Order, (ii) up to $326,999,891 of such Commitments (the "<u>DIP Second Funding Commitments</u>," and the DIP New Money Loans issued thereunder, the "<u>DIP Second Funding Loans</u>") shall be made available to the Borrower on the DIP Second Funding Date, following the entry of the Final Order, which shall be used to repay in full in cash on the DIP Second Funding Date, in accordance with the Approved Budget and the DIP Loan Documents, the 1L First Out Loan Obligations, with any Excess DIP Second Funding Loan Proceeds returned to the Lenders providing such DIP Second Funding Loans on a pro rata basis), and (iii) up to $103,000,000 of such Commitments (the "<u>DIP DDTL Commitments</u>," and the DIP New Money Loans issued thereunder, the "<u>DIP Delayed Draw Term Loans</u>") shall be made available to the Borrower in three draws on the applicable DIP DDTL Funding Date, following the entry of, and subject to, the Final Order, in each case in accordance with the terms and conditions set forth in the DIP Loan Agreement and all other terms and conditions of the DIP Loan Documents; and

b) ***Roll-Up Loans***. A superpriority senior secured term loan credit facility (the loans issued thereunder, the "<u>Roll-Up Loans</u>") in the aggregate initial principal amount of at least $441,999,891 (which may be increased to up to an aggregate initial principal amount of $497,133,616 by additional Roll-Up Loans provided by DIP Lenders that provided (or whose affiliate or Approved Fund provided) greater than their pro rata share of the DIP New Money Loans as more fully set forth in Section 2.01(d) of the DIP Loan Agreement), whereby the relevant 1L Debt Obligations (other than 1L First Out Loan Obligations) shall be deemed fully funded and converted into and exchanged for Roll-Up Loans upon entry of and subject to the Final Order, and subject to the challenge rights set forth in paragraph 27 hereof, in each case in accordance with the terms and conditions set forth in the DIP Loan Agreement and all other terms and conditions of the DIP Loan Documents;

(2) authorizing the Borrower and the guarantors party thereto (the "Guarantors," and together with the Borrower, the "Loan Parties") to execute, deliver, and perform under that certain Senior Secured Super-Priority Debtor-In-Possession Loan Agreement dated as of January 5, 2025, by and among the Borrower, each of the Guarantors, each of the lenders (the "DIP Lenders") party thereto, and U.S. Bank Trust Company, National Association, as administrative agent (the "DIP Agent," and together with the DIP Lenders, the "DIP Secured Parties") substantially in the form attached to this Interim Order as **Exhibit 1** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and of the DIP Orders, the "DIP Loan Agreement"), along with any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in connection therewith (each as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof and of the DIP Orders, and collectively with the DIP Loan Agreement, the "DIP Loan Documents");

(3) authorizing the Borrower to incur, and for the Guarantors to guarantee on an unconditional joint and several basis, the principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise) and all other amounts (including, without limitation, all Obligations (as defined in the DIP Loan Agreement)), as and when due and payable under the DIP Loan Documents (the "DIP Obligations");

(4) authorizing the Loan Parties to perform such other and further acts as may be necessary or desirable in connection with the DIP Orders, the DIP Loan Documents, and the transactions contemplated hereby and thereby;

(5) granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Loan Parties to incur, the DIP Liens, as applicable, on all DIP Collateral, in each case, subject to the relative priorities set forth herein and on the terms hereof;

(6) granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Loan Parties to incur, allowed superpriority administrative expense claims against each of the Loan Parties, on a joint and several basis, in respect of all Obligations, in each case, in accordance with and subject to the Carve Out, the AST Break-Up Fee (if any), and the Administration Charge[3] and the terms hereof;

(7) authorizing the Loan Parties' use of Prepetition Collateral, including Cash Collateral, as well as the proceeds of the DIP New Money Loans (the "DIP Proceeds"), in each case subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents;

---

[3]    "Administration Charge" means the superpriority charge over Canadian Collateral granted by the CCAA Court to secure payment of the fees and disbursements of Canadian counsel to the Debtors, the Information Officer and the Information Officer's counsel, the quantum of which shall be satisfactory to the Administrative Agent.

(8) granting adequate protection as set forth herein to the Prepetition Secured Parties to the extent of any Diminution in Value of their interests in the Prepetition Collateral, including Cash Collateral;

(9) modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the DIP Loan Documents;

(10)   waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order;

(11)   subject to and effective upon entry of the Final Order, authorizing the Loan Parties to waive (a) their right to surcharge the DIP Collateral and/or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(12)   subject to and effective upon entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties and (b) the Prepetition Collateral, for the benefit of any party other than the Prepetition Secured Parties, subject to the Carve Out and the AST Break-Up Fee (if any);

(13)   providing for the immediate effectiveness of this Interim Order;

(14)   scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing; and

(15)   granting related relief.

The interim hearing on the DIP Motion (the "Interim Hearing"), pursuant to Bankruptcy Rule 4001, having been held by this Court on January [●], 2025, and the Court having considered the DIP Motion, the DIP Loan Documents, the *Declaration of Bruce Mendelsohn in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. [●], Ex. [●]] (the "DIP Declaration"), the *Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. [●]]

4

(the "First Day Declaration"), and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by this Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Loan Agreement and the other DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.    **Petition Date**.  On January 5, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "Court") commencing these chapter 11 cases. On January [●], 2025, this Court entered an order approving the joint administration of these chapter 11 cases.

---

[4]    The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.**     **Debtors-in-Possession**.    The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of these chapter 11 cases.

**C.**     **Committee Formation**.    As of the date hereof, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in the chapter 11 cases (a "Committee") pursuant to section 1102 of the Bankruptcy Code.

**D.**     **Jurisdiction and Venue**.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for the chapter 11 cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**E.**     **Bases for Relief**.    The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 365, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-1(b), 4001-2, 9006-1, and 9013-1.

**F.**     **Notice**.    Notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

**G.**     **Debtors' Stipulations**.    Without prejudice to the rights of any party other than the Debtors (but subject to the rights and limitations contained in Paragraph 27 below) the Debtors admit, stipulate, acknowledge, and agree as follows:

      **(a)**     **1L Notes**.

           **(i)** **1L Notes Indenture**.  Pursuant to that certain Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time,

the "1L Notes Indenture" and, collectively with all other First Lien Notes Documents (as defined in the 1L Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1L Notes Documents") among Ligado Networks LLC ("Ligado"), as issuer (in such capacity, the "1L Notes Issuer"), the guarantors party thereto the guarantors party thereto (in such capacities, the "1L Notes Guarantors" and, together with the 1L Notes Issuer, the "1L Notes Obligors"), and U.S. Bank National Association, as trustee (in such capacity, the "1L Notes Trustee"), Ligado issued $2.85 billion aggregate principal amount of 15.5% PIK Senior Secured First Lien Notes due 2023 (the "1L Notes" and the holders of the 1L Notes, the "1L Noteholders");

(ii) **1L Notes Obligations**. As of the Petition Date, the 1L Notes Obligors were justly and lawfully indebted and liable to the 1L Notes Secured Parties (as defined below) in an aggregate principal amount of $5,491,770,702 (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1L Lien Notes Obligors to the 1L Notes Secured Parties that have accrued as of the Petition Date in connection with the 1L Notes Documents, the "1L Notes Obligations");

(iii) **1L Notes Liens**. As more fully set forth in the 1L Notes Documents, prior to the Petition Date, the 1L Notes Obligors granted to U.S. Bank National Association, in its capacity as collateral trustee (in such capacity, the "1L Notes Collateral Trustee" and, collectively with the 1L Noteholders and the 1L Notes Trustee, the "1L Notes Secured Parties"), for the benefit of itself and the other 1L Notes Secured Parties, security interests in and continuing liens (the "1L Notes Liens") in all Collateral (as defined in the 1L Notes Documents but, for purposes of this Interim Order, the "1L Notes Collateral");

(iv) **Validity, Perfection, and Priority of 1L Notes Obligations.** The Debtors acknowledge and agree that, as of the Petition Date, (a) the 1L Notes Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 1L Notes Collateral granted to, or for the benefit of, the 1L Notes Secured Parties for fair consideration and reasonably equivalent value, (b) the 1L Notes Liens were senior in priority over any and all other liens on the 1L Notes Collateral, subject only to (i) the 1L Loan Liens (as defined below), which are secured on a *pari passu* basis with the 1L Notes Liens (*provided* that, for the avoidance of doubt, the 1L First Out Loan Obligations are senior with respect to payment priority in accordance with the First Lien Intercreditor Agreement) and (ii) certain liens senior by operation of law

or otherwise permitted by the 1L Notes Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 1L Notes Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, in this clause (ii), the "1L Notes Permitted Prior Liens"), (c) the 1L Notes Obligations constitutes legal, valid, binding, and non-avoidable obligations of the 1L Notes Obligors enforceable in accordance with the terms of the applicable 1L Notes Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 1L Notes Liens or 1L Notes Obligations exist, and no portion of the 1L Notes Liens or 1L Notes Obligations are subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge any of the 1L Notes Obligations, the priority of the 1L Notes Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 1L Notes Liens.

(b)     **1L Loans**.

(i)     **1L Loan Agreement.** Pursuant to that certain 1L Loan Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1L Loan Agreement", collectively with all other Loan Documents (as defined in the 1L Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1L Loan Documents", and the 1L Loan Documents together with the 1L Notes Documents, the "1L Debt Documents") among Ligado, as borrower (in such capacity, the "1L Loan Borrower"), the guarantors party thereto (in such capacities, the "1L Loan Guarantors" and, together with the 1L Loan Borrower, the "1L Loan Obligors"), the lenders party thereto (in such capacities, the "1L Loan Lenders"), U.S. Bank Trust Company, National Association, as administrative agent (in such capacity, the "1L Loan Administrative Agent"), and U.S. Bank Trust Company, National Association, as collateral agent (in such capacity, the "1L Loan Collateral Agent" and, together with the 1L Loan Administrative Agent, the "1L Loan Agents", and the 1L Loan Agents together with the 1L Loan Lenders, the "1L Loan Secured Parties", and the 1L Loan Secured Parties together with the 1L Notes Secured Parties, the "1L Secured Parties"), the 1L Loan Lenders provided term loans to Ligado pursuant to the 1L Loan Documents;

(ii) **1L Loan Obligations.** As of the Petition Date, the 1L Loan Obligors were justly and lawfully indebted and liable to the 1L Loan Secured Parties in an aggregate principal amount of (i) $122,303,734 in term loans that are secured on a *pari passu* basis with the 1L Notes (together with accrued and unpaid interest thereon, including capitalized interest,

plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1L Loan Obligors to the applicable 1L Loan Secured Parties that have accrued as of the Petition Date in connection with the 1L Loan Documents, the "1L Pari Loan Obligations") and (ii) $319,471,010 in term loans that are secured on a *pari passu* basis with the 1L Notes but are "first out" in payment priority pursuant to the First Lien Intercreditor Agreement (as defined below) (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1L Loan Obligors to the applicable 1L Loan Secured Parties that have accrued as of the Petition Date in connection with the 1L Loan Documents, the "1L First Out Loan Obligations", together with the 1L Pari Loan Obligations, the "1L Loan Obligations", and, together with the 1L Notes Obligations and the 1L Pari Loan Obligations, the "1L Debt Obligations");

(iii) **1L Loan Liens**.  As more fully set forth in the 1L Loan Documents, prior to the Petition Date, the 1L Loan Obligors granted to the 1L Collateral Agent, for the benefit of itself and the other 1L Loan Secured Parties, security interests in and continuing liens (the "1L Loan Liens") in all Collateral (as defined in the 1L Loan Documents but, for purposes of this Interim Order, the "1L Loan Collateral"); and

(iv) **Validity, Perfection, and Priority of 1L Loan Liens and 1L Loan Obligations.**  The Debtors acknowledge and agree that, as of the Petition Date, (a) the 1L Loan Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 1L Loan Collateral granted to, or for the benefit of, the 1L Loan Secured Parties for fair consideration and reasonably equivalent value, (b) the 1L Loan Liens were senior in priority over any and all other liens on the 1L Loan Collateral, subject only to the (i) 1L Notes Liens, which are secured on a *pari passu* basis with the 1L Loan Liens (*provided* that, for the avoidance of doubt, the 1L First Out Loan Obligations are senior with respect to payment priority in accordance with the First Lien Intercreditor Agreement) and (ii) certain liens senior by operation of law or otherwise permitted by the 1L Loan Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 1L Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, this clause (ii), the "1L Loan Permitted Prior Liens"), (c) the 1L Loan Obligations constitute legal, valid, binding, and non-avoidable obligations of the 1L Loan Obligors enforceable in accordance with the terms of the applicable 1L Loan Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 1L Loan Liens or 1L Loan Obligations exist, and no portion

9

of the 1L Loan Liens or 1L Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge any of the 1L Loan Obligations, the priority of the 1L Loan Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 1L Loan Liens.

(c)     **1.5L Loans**.

(i)     **1.5L Loan Agreement**.  Pursuant to that certain 1.5 Lien Loan Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1.5L Loan Agreement" and, collectively with all other Loan Documents (as defined in the 1.5L Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "1.5L Loan Documents") among Ligado, as borrower (in such capacity, the "1.5L Loan Borrower"), the guarantors party thereto (in such capacities, the "1.5L Loan Guarantors" and, together with the 1.5L Loan Borrower, the "1.5L Loan Obligors"), the lenders party thereto (in such capacities, the "1.5L Loan Lenders"), Jefferies Finance LLC, as administrative agent (in such capacity, the "1.5L Loan Administrative Agent"), and U.S. Bank Trust Company, National Association, as successor collateral agent (in such capacity, the "1.5L Loan Collateral Agent" and, together with the 1.5L Loan Administrative Agent, the "1.5L Loan Agents" and the 1.5L Loan Agents together with the 1.5L Loan Lenders, the "1.5L Loan Secured Parties"), the 1.5L Loan Lenders provided term loans to Ligado pursuant to the 1.5L Loan Documents;

(ii)     **1.5L Loan Obligations**.  As of the Petition Date, the 1.5L Loan Obligors were justly and lawfully indebted and liable to the 1.5L Loan Secured Parties in an aggregate principal amount of $591,504,126 (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 1.5L Loan Obligors to the 1.5L Loan Secured Parties that have accrued as of the Petition Date in connection with the 1.5L Loan Documents, the "1.5L Loan Obligations");

(iii) **1.5L Loan Liens**.  As more fully set forth in the 1.5L Loan Documents, prior to the Petition Date, the 1.5 Lien Obligors granted to the 1.5 Lien Collateral Agent, for the benefit of itself and the other 1.5L Loan Secured Parties, security interests in and continuing liens (the "1.5L Loan Liens") in all Collateral (as defined in the 1.5L Loan Documents but, for purposes of this Interim Order, the "1.5L Loan Collateral"); and

(iv) **Validity, Perfection, and Priority of 1.5L Loan Liens and 1.5L Loan Obligations.**   The Debtors acknowledge and agree that, as of the Petition Date, (a) the 1.5L Loan Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 1.5L Loan Collateral

granted to, or for the benefit of, the 1.5 Lien Secured Parties for fair consideration and reasonably equivalent value, (b) the 1.5L Loan Liens were senior in priority over any and all other liens on the 1.5L Loan Collateral, subject only to (i) the 1L Notes Permitted Prior Liens (if any), the 1L Loan Permitted Prior Liens (if any), the 1L Notes Liens, the 1L Loan Liens, and (ii) certain liens senior by operation of law or otherwise permitted by the 1.5L Loan Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 1.5L Loan Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, this clause (ii), the "1.5L Loan Permitted Prior Liens"), (c) the 1.5L Loan Obligations constitutes legal, valid, binding, and non-avoidable obligations of the 1.5L Loan Obligations enforceable in accordance with the terms of the applicable 1.5L Loan Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 1.5L Loan Liens or 1.5L Loan Obligations exist, and no portion of the 1.5L Loan Liens or 1.5L Loan Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or, except as forth in the Prepetition Intercreditor Agreements (as defined below), subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge any of the 1.5L Loan Obligations, the priority of the 1.5 Lien Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 1.5L Loan Liens.

**(d)**    **2L Notes**.

**(i)**    **2L Notes Indenture**.  Pursuant to that certain Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "2L Notes Indenture" and, collectively with all other Second Lien Documents (as defined in the 2L Notes Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "2L Notes Documents" and, collectively with the 1L Notes Documents, the 1L Loan Documents and the Prepetition 1.5 Lien Documents, the "Prepetition Loan/Notes Documents") among Ligado, as issuer (in such capacity, the "2L Notes Issuer"), the guarantors party thereto (in such capacities, the "2L Notes Guarantors" and, together with the 2L Notes Issuer, the "2L Notes Obligors"), and Wilmington Savings Fund Society, FSB, as trustee (as successor in interest to U.S. Bank National Association) (in such capacity, the "2L Notes Trustee" and, together with the 1L Notes Trustee, the 1L Loan Agents, and the 1.5L Loan Agents, the "Prepetition Secured Party Representatives"), Ligado issued $1.0 billion aggregate principal amount of 17.5% PIK Senior Secured Second Lien Notes due 2024 at an issue price of 75% of par value (the "2L Notes" and the holders of the 2L Notes, the "2L Noteholders");

(ii)     **2L Notes Obligations**.  As of the Petition Date, the 2L Notes Obligors were justly and lawfully indebted and liable to the 2L Notes Secured Parties (as defined below) in an aggregate principal amount of $2,050,029,494 (together with accrued and unpaid interest thereon, including capitalized interest, plus, as applicable, all other fees, costs, and expenses, indemnification obligations, guarantee obligations, and other obligations of the 2L Notes Obligors to the 2L Notes Secured Parties that have accrued as of the Petition Date in connection with the 2L Notes Documents, the "2L Notes Obligations" and, collectively with the 1L Notes Obligations, the 1L Loan Obligations and the 1.5L Loan Obligations, the "Prepetition Secured Obligations");

(iii)     **2L Notes Liens**.  As more fully set forth in the 2L Notes Documents, prior to the Petition Date, the 2L Notes Obligors granted to U.S. Bank National Association, in its capacity as collateral trustee (in such capacity, the "2L Notes Collateral Trustee" and, collectively with the 2L Noteholders and the 2L Notes Trustee, the "2L Notes Secured Parties" and, collectively with the 1L Notes Secured Parties, the 1L Loan Secured Parties, and the 1.5L Loan Secured Parties, the "Prepetition Secured Parties"), for the benefit of itself and the other 2L Notes Secured Parties, security interests in and continuing liens (the "2L Notes Liens" and, collectively with the 1L Notes Liens, the 1L Loan Liens and the 1.5L Loan Liens, the "Prepetition Liens") in all Collateral (as defined in the 2L Notes Documents but, for purposes of this Interim Order, the "2L Notes Collateral," and together with the 1L Loan Collateral, the 1L Notes Collateral, and the 1.5L Loan Collateral, the "Prepetition Collateral"); and

(iv)     **Validity, Perfection, and Priority of 2L Notes Liens and 2L Notes Obligations**.  The Debtors acknowledge and agree that, as of the Petition Date, (a) the 2L Notes Liens were valid, binding, enforceable, non-avoidable, and properly perfected liens on the 2L Notes Collateral granted to, or for the benefit of, the 2L Notes Secured Parties for fair consideration and reasonably equivalent value, (b) the 2L Notes Liens were senior in priority over any and all other liens on the 2L Notes Collateral, subject only to the (i) 1L Notes Permitted Prior Liens (if any), the 1L Loan Permitted Prior Liens (if any), the 1L Notes Liens, the 1L Loan Liens, the 1.5L Loan Permitted Prior Liens (if any), the 1.5L Loan Liens, and (ii) certain liens senior by operation of law or otherwise permitted by the 2L Notes Documents (solely to the extent any such liens were valid, non-avoidable, and senior in priority to the 2L Notes Liens as of the Petition Date and properly perfected prior to the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, this clause (ii), the "2L Notes Permitted Prior Liens" and, collectively with the 1L Notes Permitted Prior Liens, the 1L Loan Permitted Prior Liens and the 1.5L Loan Permitted Prior Liens, the "Prepetition Permitted Prior Liens"), (c) the 2L Notes Obligations constitutes legal, valid, binding, and non-avoidable obligations of the 2L Notes Obligors enforceable in accordance with the terms of the applicable 2L Notes Documents, (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the 2L Notes Liens or 2L Notes Obligations exist, and no portion of the 2L Notes Liens or 2L Notes Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or, except as set forth in the Prepetition Intercreditor Agreements, subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (e) the Debtors waive, discharge, and release any right to challenge

12

any of the 2L Notes Obligations, the priority of the 2L Notes Obligors' obligations thereunder, and the validity, priority, enforceability, seniority, perfection, or extent of the 2L Notes Liens securing the 2L Notes Obligations.

   **(e)**  **Intercreditor Agreements.**  That certain First Lien Intercreditor Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "First Lien Intercreditor Agreement"), by and among Ligado, the other grantors from time to time party thereto, U.S. Bank National Association, as Authorized Representative for the Notes Secured Parties (as defined therein), U.S. Bank Trust Company, National Association, as Initial Additional Authorized Representative (as defined therein) and each additional Authorized Representative from time to time party thereto, that certain Senior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Senior Intercreditor Agreement"), by and among, Ligado, the other pledgors from time to time party thereto, U.S. Bank National Association, as First Lien Representative (as defined therein), U.S. Bank Trust Company, National Association, as a First Lien Representative, Jefferies Finance LLC, as a Junior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative and each additional First Lien Representative and Junior Lien Representative from time to time party thereto, and that certain Junior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Junior Intercreditor Agreement" and, together with the First Lien Intercreditor Agreement and the Senior Intercreditor Agreement, the "Intercreditor Agreements"), by and among, Ligado, the other pledgors from time to time party thereto, Jefferies Finance LLC, as a Senior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative (as defined therein) and each additional Senior Lien Representative and Junior Lien Representative from time to time party thereto:  (a) are valid and enforceable "subordination agreements" under section 510(a) of the Bankruptcy Code; (b)(1) provide the 1L Loan Lenders of 1L First Out Loan Obligations with payment priority, in each case, relative to the 1L Notes Secured Parties of the 1L Notes Obligations and the 1L Loan Lenders of the 1L Pari Loan Obligations, (2) provide the 1L Secured Parties with, among other things, senior liens with respect to the Prepetition Collateral and the proceeds thereof and payment priorities, in each case, relative to the 1.5L Loan Secured Parties and the 2L Notes Secured Parties and (3) provide the 1.5L Loan Secured Parties with, among other things, senior liens with respect to the Prepetition Collateral and the proceeds thereof and payment priorities, in each case, relative to the 2L Notes Secured Parties; (c) shall remain in full force and effect; (d) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the Adequate Protection Liens and Adequate Protection Claims (each as defined below) granted under this Interim Order); and (e) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order.

   **(f)**  **No Control**.  None of the DIP Secured Parties nor the Prepetition Secured Parties control the Loan Parties or their properties or operations, have the authority to determine the manner in which any of the Loan Parties' operations are conducted, or is a control person or insider under the Bankruptcy Code of the Loan Parties or any of their affiliates by virtue of any prepetition actions or holdings, including any of the prepetition acts, rights, or investments taken with respect to, in connection with, related to, or arising from the DIP Orders, the DIP Facility, the

DIP Loan Documents, the 1L Loan Obligations, the 1L Notes Obligations, the 1.5L Loan Obligations, the 2L Notes Obligations, or the Prepetition Loan/Notes Documents.

(g) **Release**. Effective upon entry of the Final Order, each of the Debtors, on behalf of themselves and their respective estates, forever and irrevocably release and forever discharge the DIP Secured Parties (solely in their capacity as such) and each of their respective former, current and future officers, directors, employees, shareholders, owners, members, managers, partners, subsidiaries, affiliates, funds or managed accounts, agents, advisors, attorneys, accountants, investment bankers, consultants and other representatives, together with each of their predecessors and successors in interest (collectively, the "Released Parties") from any and all claims, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action and/or choses in action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, reimbursement obligations (including, attorneys' fees), costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, fixed or contingent, pending or threatened, of any kind or nature whatsoever, whether arising at law or in equity (including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, recharacterization, subordination, avoidance, any claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law or any other claim or cause of action arising under the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection with, or related to the Debtors or their estates, the extent, amount, validity, enforceability, priority, security and perfection of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deals reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the entry of this Interim Order; *provided* that the release set forth in this paragraph G(g) shall not limit or release the obligations of any DIP Secured Party under the DIP Loan Documents.

(h) **Cash Collateral**. All of the Debtors' cash and cash equivalents, whether existing as of the Petition Date or thereafter, wherever located (including, without limitation, all cash on deposit or maintained by the Debtors in any account or accounts), constitutes or will constitute "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"). All Cash Collateral, all proceeds of the Prepetition Collateral, and the DIP Collateral, including proceeds realized from any sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses payable under this Interim Order or the Final Order, as applicable) shall be used or applied in accordance with the terms and conditions of this Interim Order, the Approved Budget (subject to Permitted Variances in accordance with the DIP Loan Agreement), and the DIP Loan Documents and for no other purpose unless otherwise agreed to between the Loan Parties and the DIP Lenders.

H. **Prepetition Permitted Prior Liens**. Nothing herein shall constitute a finding or

ruling by this Court that any alleged Prepetition Permitted Prior Lien is valid, senior, enforceable,

prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, non-avoidability, perfection, or extent of any alleged Prepetition Permitted Prior Lien and/or any other purportedly prior security interests.

**I.**     **Findings Regarding Corporate Authority**.  Upon entry of this Interim Order, each Loan Party has all requisite power and authority to execute and deliver, and each Loan Party is directed to execute and deliver, the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

**J.**     **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

**(a)**     **Good Cause**.  Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Facility and the DIP Loan Documents.

**(b)**     **Immediate Need for Postpetition Financing and Use of Cash Collateral**. The Debtors' need to use the Prepetition Collateral (including Cash Collateral) and to obtain credit pursuant to the DIP Facility as provided for herein is critical to avoid serious and irreparable harm to the Debtors, their estates, their creditors, and other parties in interest.  The Debtors have a need to obtain the DIP Loans and other financial accommodations and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things:  (i) avoid the liquidation of their estates; (ii) permit the orderly continuation of the operation of their businesses; (iii) maintain business relationships with customers, vendors, and suppliers, including purchasing necessary materials and services to maintain compliance with all applicable regulatory and safety requirements; (iv) make payroll; (v) satisfy other working capital, capital improvement, and operational needs; (vi) pay professional fees, expenses, and obligations benefitting from the Carve

Out and Administration Charge; and (vii) pay costs, fees, and expenses associated with or payable under the DIP Facility, subject to the terms of the DIP Orders, DIP Recognition Orders, and the DIP Loan Documents.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the pendency of these chapter 11 cases.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Loan Documents, and other financial accommodations provided under the DIP Loan Documents are necessary and vital to avoid an immediate liquidation and for the preservation and maintenance of the going concern values of the Debtors' estates.  The extensions of credit under the DIP Facility, pursuant to the DIP Loan Documents and the DIP Orders, are fair and reasonable, reflect each Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

        **(c)**        **No Credit Available on More Favorable Terms**.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors have also been unable to obtain:  (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) other than as set forth herein, credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  The Debtors assert in the Motion, the First Day Declaration, and in the DIP Declaration, and demonstrated at the Interim Hearing, that they have been unable to procure the necessary financing on terms more favorable, taken as a whole, than the financing offered by the DIP Lenders pursuant to the DIP Loan Documents.  In light of the foregoing, and considering all alternatives, the Debtors

have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors, their Estates, and all of their stakeholders.

(d)      **Use of Proceeds of the DIP Facility and Cash Collateral**.  As a condition to entry into the DIP Loan Documents, the extension of credit and other financial accommodations made under the DIP Facility, and the consent to use Cash Collateral and the proceeds of the DIP Facility, each of the DIP Secured Parties require, and the Debtors have agreed, that Cash Collateral, the proceeds of the DIP Facility, and all other cash or funds of the Debtors shall be used solely in accordance with the terms and conditions of the DIP Orders and the DIP Loan Documents and solely to the extent in compliance with the Approved Budget (subject to variances permitted under the DIP Loan Agreement ("Permitted Variances")), and for no other purpose.

(e)      **The Roll-Up Loans**.  Based on the record presented to the Court, including the DIP Declaration, a roll-up of the DIP Loans subject to entry of the Final Order is necessary and beneficial to the Debtors and their estates.  Moreover, the DIP Secured Parties were unable or unwilling to provide the DIP Facility absent the protections provided pursuant to the DIP Loan Documents and this Interim Order, as more fully set forth in the DIP Declaration and the DIP Loan Documents.  Accordingly, subject to (i) entry of the Final Order, (ii) the Carve Out, and (iii) the challenge rights set forth in paragraph 27 hereof, without any further action by the Debtors or any other party, the Roll-Up Loans shall be converted into DIP Obligations.  Such conversion shall be authorized as compensation for, in consideration for, and solely on account of, those holders of 1L Debt Obligations (or their affiliates or Approved Funds) (other than 1L First Out Loan Obligations) that are also DIP Lenders or affiliates thereof to fund the DIP New Money Loans and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Secured

Obligations.  The Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the DIP Lenders would not be willing to provide the DIP New Money Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans in the DIP Obligations.

   **(f)** **Adequate Protection for Prepetition Secured Parties**.  Subject to the challenge rights set forth in paragraph 27 hereof and subject to the Carve Out, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 502, and 507 of the Bankruptcy Code, to adequate protection, as and to the extent set forth in this Interim Order, of their interests in all Prepetition Collateral, including Cash Collateral, in an amount equal to the diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the use, sale, or lease by the Loan Parties of the Prepetition Collateral, the imposition of the DIP Liens, the payment of any amounts under the Carve Out, the AST Break-Up Fee (if any), or the Administration Charge, and the imposition of the automatic stay (the "Diminution in Value").  Based on the DIP Motion, the DIP Declaration, and the First Day Declaration, and the record presented to the Court at the Interim Hearing, the terms of the adequate protection arrangements and of the use of Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

   **(g)** **Consent**.  To the extent such consent is required, the Prepetition Secured Parties have, or shall be deemed to have, consented to the Debtors' use of Prepetition Collateral (including Cash Collateral) and the Loan Parties' entry into the DIP Facility and the DIP Loan

18

Documents, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents.

(h)     **Limitation on Charging Expenses Against Collateral**.  Subject to and effective upon entry of the Final Order, no costs or expenses of administration of these chapter 11 cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) and/or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Secured Parties, and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral or Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

(i)     **No Marshaling**.  Subject to and effective upon entry of the Final Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the Prepetition Collateral, the DIP Obligations, or the Prepetition Secured Obligations.  Further, subject to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any Prepetition Collateral.

(j)     **Business Judgment and Good Faith Pursuant to Section 364(e)**.  Based on the DIP Motion, the DIP Declarations, the First Day Declaration, and the record presented to the Court at the Interim Hearing, (i) the extension of credit and other financial accommodations

made under the DIP Facility and the DIP Loan Documents, (ii) the fees and other amounts paid and to be paid thereunder, (iii) the terms of adequate protection granted to the Prepetition Secured Parties, (iv) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral), and (v) the Cash Collateral arrangements described therein and herein, in each case, pursuant to this Interim Order and the DIP Loan Documents, (a) are fair, reasonable, and appropriate for secured financing to a debtor-in-possession; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably equivalent value and fair consideration; and (d) represent the best financing available to the Debtors.  The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties.  The use of Prepetition Collateral (including Cash Collateral) and the credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Secured Parties and the Prepetition Secured Parties are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

(k)     **Good Faith of DIP Secured Parties**.  The DIP Facility, the adequate protection granted to the Prepetition Secured Parties, and the use of Prepetition Collateral (including Cash Collateral) hereunder have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents, including, without limitation, all loans and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan

Documents and any Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the claims, security interests and liens, and other rights, benefits, and protections granted to the DIP Secured Parties (and the successors and assigns thereof) pursuant to this Interim Order, and the DIP Loan Documents shall each be entitled to the full protection of section 364(e) of the Bankruptcy Code and paragraphs 37 and 39 hereof in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(l)      **Good Faith of Prepetition Secured Parties**.  The Prepetition Secured Parties have acted in good faith regarding the DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof, and the adequate protection claims, security interests and liens, and other rights, benefits and protections granted to the Prepetition Secured Parties (and their successors and assigns thereof) pursuant to this Interim Order, and the DIP Loan Documents shall each be entitled to the full protection of section 364(e) of the Bankruptcy Code and paragraphs 37 and 39 hereof in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(m)      **Initial Budget**.  The Debtors have prepared and delivered to the DIP Lenders an initial budget (the "Initial Budget"), a copy of which is attached hereto as **Exhibit 2**. The Initial Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the

thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved in accordance with the DIP Loan Agreement, an "<u>Approved Budget</u>").   The Debtors believe that the Initial Budget is reasonable under the facts and circumstances.   The DIP Lenders are relying upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances), the DIP Loan Agreement and the other DIP Loan Documents and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein.   The Prepetition Secured Parties are relying upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) and this Interim Order in determining to consent to the use of Cash Collateral and entering into the postpetition financing arrangements provided for herein.

(n)    **Credit Bid Rights.**   The Debtors hereby acknowledge and agree that, subject to and effective upon entry of the Final Order, they shall not object, or support any objection, to the DIP Agent's (at the direction of the Required Lenders) and the Prepetition Secured Party Representatives' (at the direction of the applicable required Prepetition Secured Parties) right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the underlying parties' respective claims, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral effectuated through section 363 of the Bankruptcy Code, whether in a chapter 11 or chapter 7 proceeding, to the extent that such credit bid complies with the terms of the applicable DIP Loan Documents or Prepetition Loan/Notes Documents; *provided* that so long as the Restructuring Support Agreement remains in effect with respect to AST, the DIP Agent's and the Prepetition Secured Party Representatives' right to credit bid shall be subject to the rights and limitations set forth in the Restructuring Support Agreement, and the DIP Agent and

the Prepetition Secured Party Representatives shall not credit bid their respective claims against the AST Transaction.

**(o)** **Relief Essential; Best Interests of the Debtors' Estates**. The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

**NOW THEREFORE,** based upon the foregoing findings and conclusions, the DIP Motion, the DIP Declarations, the First Day Declaration, and the record before this Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1. **DIP Motion Approved**. The DIP Motion is granted on an interim basis in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents. Any objections to the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby overruled on the merits.

2. **Authorization of DIP Facility**.

**(a)** Subject to the terms and conditions of this Interim Order, each of the Loan Parties is hereby authorized and empowered to execute, enter into, guarantee (as applicable), and perform all obligations under the DIP Facility and the DIP Loan Documents. The DIP Loan Documents and this Interim Order govern the financial and credit accommodations to be provided to the Loan Parties by the DIP Lenders in connection with the DIP Facility.

**(b)** From the entry of this Interim Order through the earliest to occur of (i) entry of the Final Order or (ii) the DIP Termination Date, the Borrower is authorized and empowered to incur, and the Guarantors are hereby authorized and empowered to unconditionally guarantee, on a joint and several basis, DIP Obligations on account of such incurrence under the DIP Facility up to an aggregate principal amount of $12,000,000 in DIP New Money Loans on an interim basis, together with applicable interest, protective advances, expenses, fees, and other charges payable in connection with the DIP Facility, as applicable, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

**(c)** Without limiting the foregoing, and without the need for further approval of this Court, each Loan Party is authorized to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of pledge and security agreements, deeds of trust, and financing statements), and to pay all fees that may be required, necessary, or desirable for the Loan Parties to implement the terms of, performance of their obligations under or effectuate the purposes of and transactions contemplated by this Interim Order, the DIP Facility, and the DIP Loan Documents (as applicable), including, without limitation:

**(i)** the execution and delivery of, and performance under, the DIP Loan Documents;

**(ii)** the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents, in each case, as the Loan Parties and the requisite DIP Secured Parties (in accordance with and subject to the terms of the applicable DIP Loan Documents) may agree, it being understood that no further approval of the Court shall be required for non-

material authorizations, amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any fees and other expenses (including any attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder;

(iii)    the non-refundable and, upon entry of this Interim Order, irrevocable payment to the DIP Secured Parties of all fees, costs and expenses, including, without limitation, (a) any Backstop Fee, Commitment Fee, DIP First Funding Discount Fee, DIP Second Funding Discount Fee, DIP DDTL Funding Discount Fee, DIP Unused Commitment Fee, closing fee, upfront fee, exit fee, prepayment fee, unused line fees, arrangement fees, structuring fees, duration fees, commitment fees, servicing fees, audit fees, appraisal fees, servicing fees, liquidator fees, agency fees, prepayment premiums, or similar amounts (which fees, in each case, were, and were deemed to have been, approved upon entry of this Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Loan Documents and (b) the reasonable and documented fees, costs, and expenses as may be due from time to time of the DIP Agent and the DIP Lenders, including, without limitation, the reasonable and documented fees and expenses of the following professionals (whether or not such fees

arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated):  (i) Kirkland & Ellis LLP and Kirkland & Ellis International LLP (collectively, "Kirkland"), in Kirkland's capacity as counsel to the Ad Hoc Cross-Holder Group, (ii) Sidley Austin LLP ("Sidley"), and Guggenheim Securities, LLC ("Guggenheim"), as counsel and financial advisor to the Ad Hoc First Lien Group, respectively, (iii) any local or foreign legal counsel retained by, or on behalf of, the DIP Lenders (including, for the avoidance of doubt, any local or foreign legal counsel retained by the Ad Hoc Cross-Holder Group or the Ad Hoc First Lien Group, respectively), (iv) Foley & Lardner LLP, as counsel to the DIP Agent, and (v) any local legal counsel retained by, or on behalf of, the DIP Agent (collectively, each of the fees and expenses described in parts (a) and (b) of this paragraph 2(c)(iii), the "DIP Fees and Expenses"), in each case, without the need to provide notice to any party or obtain further Court approval, or, as applicable, without the need to file retention or fee applications with respect thereto; *provided* that the DIP Fees and Expenses shall be subject to, and only to, the review, objection, and approval process set forth in paragraph 22;

  **(iv)** the granting of the DIP Liens and the Adequate Protection Liens, the perfection of the DIP Liens and the Adequate Protection Liens, the granting of the DIP Superpriority Claims and the Adequate Protection Claims, and the granting of the DIP Protections, in each case, as set forth herein and in the DIP Loan Documents; and

  **(v)** the performance of all other acts necessary, required, or desirable to implement the DIP Facility and to facilitate the transactions contemplated by the DIP Loan Documents and this Interim Order.

(d)      Subject to (i) entry of the Final Order, (ii) the Carve Out, and (iii) the challenge rights set forth in paragraph 27 hereof, the relevant 1L Notes Obligations and 1L Loan Obligations (other than 1L First Out Loan Obligations) shall be deemed fully funded and converted into and exchanged for Roll-Up Loans, in each case in accordance with the terms and conditions set forth in the DIP Loan Agreement and all other terms and conditions of the DIP Loan Documents.

(e)      No DIP Secured Party shall have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and each DIP Secured Party may rely upon each Loan Party's representations that the amount of the DIP Facility requested at any time and the use thereof are in accordance with the requirements of this Interim Order and the DIP Loan Documents.

3.      **DIP Obligations**.  Upon entry of this Interim Order, the DIP Loan Documents and the DIP Obligations constitute valid, binding, enforceable, and non-avoidable obligations of each of the Loan Parties, and are fully enforceable against each of the Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of these chapter 11 cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of these chapter 11 cases or any such successor cases (collectively, the "Successor Cases"), and their creditors and other parties in interest, in each case, in accordance with the terms thereof and the DIP Orders, as applicable.  The DIP Obligations include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by any of the Loan Parties to any of the DIP Agent or DIP Lenders, in each case, under, or secured by, the DIP Loan Documents or the DIP Orders, including all principal, interest, costs, fees,

expenses, and other amounts under the DIP Loan Documents (including this Interim Order).  Upon

entry of this Interim Order, the Loan Parties are jointly and severally liable for the DIP Obligations.

No obligation, payment, transfer, or grant of security under the DIP Loan Documents or the DIP

Orders to the DIP Secured Parties shall be stayed, restrained, voidable, or recoverable under the

Bankruptcy Code or under any applicable law (including, without limitation, under sections

502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer

Act, Uniform Fraudulent Conveyance Act, or other state statute or common law), or subject to any

defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment,

cross-claim, claim, counterclaim, offset, or any other challenge under the Bankruptcy Code or any

applicable law.

     **4.**      <u>**No Obligation to Extend Credit**</u>.  The DIP Secured Parties shall have no

obligation to make any loan or advance under the applicable DIP Loan Documents unless all of

the conditions precedent to the making of such extension of credit by the applicable DIP Secured

Parties under the applicable DIP Loan Documents and this Interim Order and/or the Final Order,

as applicable, have been satisfied in full or waived by the Required Ad Hoc Holders (as defined in

the DIP Loan Agreement) in accordance with the terms of the applicable DIP Loan Documents.

     **5.**      <u>**DIP Liens**</u>.

     **(a)**      As security for the DIP Obligations, effective and perfected upon the date

of this Interim Order, and without the necessity of the execution, recordation of filings by the

Debtors of mortgages, security agreements, control agreements, pledge agreements, financing

statements, or other similar documents, or the possession or control by the DIP Agent or any DIP

Lender of, or over, any DIP Collateral, the following security interests and liens are hereby granted

by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified

in clauses (i) and (ii) below being collectively referred to as the "DIP Collateral"), subject only to (w) the AST Break-Up Fee (if any), (x) the Carve Out, (y) the Administration Charge, and (z) the Prepetition Permitted Prior Liens (if any) (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"):

    **(i)**    Subject only to the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, and the Prepetition Permitted Prior Liens (if any), pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically, and properly perfected super-priority senior security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter acquired, other than any Excluded Property (as defined in the DIP Loan Agreement), that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) including, without limitation (in each case, to the extent not subject to valid, perfected, and non-avoidable liens): all unencumbered assets of the Debtors; all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agent or otherwise); all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date); all insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment,

all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements of the Debtors; all owned real estate, real property leaseholds and fixtures of the Debtors; patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property of the Debtors; all claims and causes of action of the Debtors; any and all proceeds, products, rents, and profits of the foregoing; and, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any ("Avoidance Actions"); *provided*, that for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted herein shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing, subject to entry of the Final Order; and

   **(ii)**  Subject only to the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, and the Prepetition Permitted Prior Liens (if any), pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected super-priority senior priming security interest in and lien upon all property of the Debtors that is subject to the Prepetition Liens, including, without limitation, the Prepetition Collateral and Cash Collateral; *provided*, for the avoidance of doubt, and notwithstanding anything to the contrary contained herein, to the extent a lien cannot attach to any of the foregoing pursuant to applicable law, the liens granted pursuant to this Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of the foregoing.

(b)      In respect of the DIP Collateral, the DIP Liens shall be subject and subordinate solely to the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, and the Prepetition Permitted Prior Liens.

(c)      For the avoidance of doubt, and subject to the relative priorities set forth in herein and on the terms hereof, the term "DIP Collateral" shall include all assets and properties of each of the Loan Parties of any kind or nature whatsoever, other than (i) any Excluded Property (as defined in the DIP Loan Agreement) and (ii) pending entry of the Final Order, Avoidance Actions and the proceeds thereof, whether tangible or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, any of the Loan Parties, whether prior to or after the Petition Date, whether owned or consigned by or to, or leased from or to, the Loan Parties, solely to the extent of any Loan Party's interest in such assets or properties, and wherever located, in each case, to the extent such assets and property constitute (i) Prepetition Collateral or (ii) "Collateral" as defined in the DIP Loan Documents, and all proceeds, products, offspring, and profits of each of the foregoing and all accessions to, substitutions and replacements for, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any Debtor from time to time with respect to any of the foregoing.

(d)      Notwithstanding anything contained herein or in any of the DIP Loan Documents to the contrary, but subject to the Carve Out, the AST Break-Up Fee (if any), and the Administration Charge, the DIP Liens and the DIP Superpriority Claims (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of the Loan Parties' chapter 11 cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, or (C) any intercompany or affiliate lien or claim; (ii) shall be valid

and enforceable against the Loan Parties, their estates, any trustee, or any other estate representative appointed or elected in the Loan Parties' chapter 11 cases or any Successor Cases and/or upon the dismissal of any of the Loan Parties' chapter 11 cases or any Successor Cases; and (iii) shall not be subject to sections 506(c) (subject to and effective upon entry of the Final Order), 510, 549, 550, or 551 of the Bankruptcy Code.

(e)    Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent of any governmental entity or non-governmental entity in order for the Loan Parties to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or DIP Collateral, is and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens or Adequate Protection Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any of the Loan Parties, in accordance with the terms of the DIP Loan Documents and this Interim Order.

6.    **DIP Superpriority Claims**.  Effective as of entry of this Interim Order, the DIP Agent (on behalf of the DIP Secured Parties) is granted, pursuant to section 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Loan Parties' chapter 11 cases and any Successor Cases thereof on account of the DIP Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the Loan Parties (the "DIP Superpriority Claims"), subject only to, and subordinated in all respects to, payment of the Carve Out and the AST Break-Up Fee (if any).  The DIP Superpriority

Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.   The DIP Superpriority Claims shall exist against each of the Loan Parties, on a joint and several basis. Notwithstanding anything contained herein or in any of the DIP Loan Documents to the contrary, the DIP Superpriority Claims shall, at all times be senior to any and all other administrative expense claims or other claims against the Loan Parties or their estates, including the Adequate Protection Claims, in the Loan Parties' chapter 11 cases and any Successor Cases, subject only to, and subordinated in all respects to, payment of the Carve Out and the AST Break-Up Fee (if any).

      7.    **Use of Proceeds of the DIP Facility and Cash Collateral**.  The use of Prepetition Collateral (including Cash Collateral) and the proceeds of the DIP Facility is authorized and approved on an interim basis, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, as applicable.  From and after the Closing Date and until the earlier of the DIP Termination Date or the Cash Collateral Termination Date, the Loan Parties shall be authorized to use Prepetition Collateral (including Cash Collateral), and shall be permitted to draw upon the DIP Facility and the proceeds thereof, subject, in each case, to the terms and conditions of the DIP Orders and the DIP Loan Documents, and solely to the extent in compliance with the Approved Budget (subject to Permitted Variances).  For the avoidance of doubt, none of the Debtors will use any DIP Loans, the proceeds of the DIP Facility, or Cash Collateral in a manner or for a purpose other than those consistent with the Approved Budget, the DIP Loan Documents, and this Interim Order.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Interim Order, the DIP Loan Documents, and the Approved

Budget.  All collections and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.

8.      **Disposition of DIP Collateral.**      The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) without the prior written consent of the Required Ad Hoc Holders (and no such consent shall be implied from any other action, inaction, or acquiescence by the Required Ad Hoc Holders), except as otherwise permitted by the DIP Loan Documents or as ordered by the Court.

9.      **Adequate Protection**.

(a)      **Adequate Protection for Prepetition Secured Parties**.  Subject to the challenge rights set forth in paragraph 27 hereof, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including any Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral.  As adequate protection, the Prepetition Secured Parties are hereby granted the following, in each case subject to the challenge rights set forth in paragraph 27 hereof, the Carve Out, the AST Break-Up Fee (if any), and the Administration Charge:

(i)      **Adequate Protection Lien**.  Each of the Prepetition Secured Party Representatives, as applicable, on behalf of the applicable Prepetition Secured Parties, is granted, pursuant to this Interim Order, a valid, binding, enforceable, and automatically perfected postpetition lien on all assets of the Debtors, other than (i) any Excluded Property and (ii) pending entry of the Final Order, Avoidance Actions and the proceeds thereof, to

the extent of any Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (except as specified in the proviso below) (the "<u>Adequate Protection Liens</u>"), which Prepetition Secured Parties' Adequate Protection Liens shall be subject to the relative priorities set forth in the Prepetition Intercreditor Agreements in all cases and (x) with respect to the DIP Collateral, shall be subject and subordinate only to (A) the AST Break-Up Fee (if any), (B) the Carve Out, (C) the Administration Charge, (D) the DIP Liens, and (E) the Prepetition Permitted Prior Liens (if any).

(ii)     **Adequate Protection Claim**.  Each of the Prepetition Secured Party Representatives, respectively, on behalf of the Prepetition Secured Parties, is hereby granted an allowed superpriority administrative expense claim, to the extent of any Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral), as provided for in section 507(b) of the Bankruptcy Code (the "<u>Adequate Protection Claims</u>"), in each of these chapter 11 cases, which Prepetition Secured Parties' Adequate Protection Claims shall be subject to the relative priorities set forth in the Prepetition Intercreditor Agreements in all cases and which shall be (A) junior to the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, and the DIP Facility, and (B) otherwise senior to any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code.  Except to the extent expressly set forth in this Interim Order, or the DIP Loan Documents, the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Secured Parties' Adequate Protection Claims from the DIP Collateral unless and until the Carve Out, the AST Break-Up Fee (if any), the

Administration Charge, the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full and all DIP Loans have been terminated.

(b)    **Additional Adequate Protection for Prepetition Secured Parties**. Subject to the challenge rights set forth in paragraph 27 hereof, as additional adequate protection of the Prepetition Secured Parties' security interests in the Prepetition Collateral, including the Cash Collateral, the Debtors are authorized to provide adequate protection in the form of the following:

(i)    **Fees and Expenses**.  Pursuant to sections 361, 363(e), 364(d), and 507 of the Bankruptcy Code, as additional adequate protection, the Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees, costs, expenses, and disbursements (the "Prepetition Secured Parties Adequate Protection Fees and Expenses") payable to (collectively, the "Prepetition Secured Party Advisors") (A) Kirkland, in Kirkland's capacity as counsel to the Ad Hoc Cross-Holder Group, (B) Sidley and Guggenheim, in their respective capacities as counsel and financial advisor to the Ad Hoc First Lien Group, (C) any local or foreign legal counsel retained by, or on behalf of, the Ad Hoc Cross-Holder Group and/or the Ad Hoc First Lien Group, (D) Foley & Lardner LLP, as counsel to the 1L Loan Agents and the 1L Notes Trustee, (E) Jones Day LLP, as counsel to the 1.5L Loan Administrative Agent, (F) Seward & Kissel LLP, as counsel to the 2L Notes Trustee, and (G) any local legal counsel retained by, or on behalf of, the Prepetition Secured Party Representatives, each subject to, and only to, the review procedures set forth in paragraph 10 of this Interim Order.

(ii)      **Financial Reporting**.  The Debtors shall provide the Prepetition Secured Parties (including the Ad Hoc Cross-Holder Group and the Ad Hoc First Lien Group) with (i) copies of the DIP Reporting and (ii) a copy of the Approved Budget, contemporaneously with delivery thereof to the DIP Secured Parties (each, on a confidential basis), and in each case, in accordance with paragraph 12 hereof.

(iii)     **Adequate Protection Payments**.  The Debtors are authorized and directed to pay to the 1L Secured Parties adequate protection payments in the form of postpetition interest payable in-kind (PIK) at the default rate on the date such interest would be otherwise due under the terms of the 1L Debt Documents, in an amount equal to all accrued and unpaid interest due and payable under the applicable 1L Debt Documents.

10.     <u>**Review and Payment of Adequate Protection Fees and Expenses**</u>.  Subject to the review procedures set forth in this paragraph 10, fee, cost and expense statements or invoices seeking payment of Prepetition Secured Parties Adequate Protection Fees and Expenses may be in summary form only, but shall include a reasonably detailed description of the nature of the matters for which services were performed, shall not be required to contain time entries, may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.  Such fee and expense statements or invoices shall be provided to counsel to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee (the "<u>Fee Notice Parties</u>").  If the payment of the requested Prepetition Secured Parties Adequate Protection Fees and Expenses is not disputed, in writing, by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "<u>AP</u>

Fee Objection Period"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors.  The Fee Notice Parties may dispute the payment of any portion of the Prepetition Secured Parties Adequate Protection Fees and Expenses (the "Disputed AP Fees") if, within the AP Fee Objection Period, a Fee Notice Party notifies the submitting party in writing setting forth the specific objections (which objections shall be limited to the issue of the reasonableness of such Prepetition Secured Parties Adequate Protection Fees and Expenses) to any Prepetition Secured Parties Adequate Protection Fees and Expenses.  If an objection is timely raised, such objection shall be subject to resolution by the Court; *provided* that payment of the requested Prepetition Secured Parties Adequate Protection Fees and Expenses, other than the Disputed AP Fees, shall not be delayed based on any such objections.  For avoidance of doubt, the Debtors shall promptly pay in full all Prepetition Secured Parties Adequate Protection Fees and Expenses, other than the Disputed AP Fees, following the AP Fee Objection Period.  Subject to the challenge rights set forth in paragraph 27 hereof, Payments of any amounts set forth in this paragraph 10 shall not be subject to disgorgement.  For the avoidance of doubt, the Debtors are hereby authorized and directed, without further notice or hearing, to pay all Prepetition Secured Parties Adequate Protection Fees and Expenses incurred on or prior to the date of entry of this Interim Order on the date on which the DIP First Funding Loans are funded without the need for any Prepetition Secured Party Advisor to first deliver a copy of its invoice to the Fee Notice Parties as provided for herein.  No Prepetition Secured Party Advisor shall be required to file an interim or final application seeking compensation for services or reimbursement of expenses with the Court.

11.     <u>**Reservation of Rights of Prepetition Secured Parties**</u>.

**(a)**     Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  However, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to any Prepetition Secured Party hereunder is insufficient to compensate for any Diminution in Value of their respective interests in the Prepetition Collateral during these chapter 11 cases or any Successor Cases.  The receipt by any Prepetition Secured Party of the adequate protection provided herein shall not be deemed an admission that the interests of such Prepetition Secured Party are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of any Prepetition Secured Party to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection, subject in all respects to the terms and limitations of the Prepetition Intercreditor Agreements.

**(b)**     For all adequate protection and stay relief granted in this Interim Order, the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date.  For the avoidance of doubt, such request will survive termination of this Interim Order.

12.     <u>**Approved Budget**</u>.  All borrowings under the DIP Facility, and the use of Cash Collateral, shall at all times comply with the Approved Budget (subject to Permitted Variances) and the DIP Loan Documents.  The Debtors shall provide copies of the reporting required under the DIP Loan Agreement as and when required under the DIP Loan Agreement (the "<u>DIP Reporting</u>").

13.     **<u>Modification of Automatic Stay</u>**.  Subject to paragraph 21 hereof, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may request, to assure the perfection and priority of the DIP Liens and the DIP Superpriority Claims; (b) the Loan Parties to incur all liabilities and obligations, including all the DIP Obligations, to the DIP Secured Parties as contemplated under the this Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements, and documents which may be required, necessary, or prudent for the performance by the applicable Loan Parties under the DIP Loan Documents and any transactions contemplated therein or pursuant to this Interim Order, as applicable; (c) the Loan Parties to take all appropriate action to grant the Adequate Protection Liens and the Adequate Protection Claims set forth herein, and to take all appropriate action (including such action as the Prepetition Secured Parties may reasonably request) to ensure that the Adequate Protection Liens granted thereunder are perfected upon entry of this Interim Order and maintain the priority set forth herein and therein; (d) the Loan Parties to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order, as applicable; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order, as applicable; (f) subject to paragraphs 20 and 21 hereof, the DIP Secured Parties and Prepetition Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event or Cash Collateral Termination Event, as applicable, all rights and remedies provided for in the DIP Loan Documents and this Interim Order and take any or all actions provided therein and herein; and (g) the implementation and exercise of all of the terms, rights, benefits, privileges, remedies, and

provisions of this Interim Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of this Court.

14. **Perfection of DIP Liens and Adequate Protection Liens**.  This Interim Order is sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of execution, filing, or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent and the Prepetition Secured Party Representatives, without any further consent of any party are hereby authorized to execute, file, or record (and the DIP Agent and the Prepetition Secured Party Representatives may require the execution, filing or recording), as each, in its sole discretion deems necessary or advisable, such financing statements, notices of lien, and other similar documents to enable the DIP Agent and the Prepetition Secured Party Representatives to further validate, perfect, preserve, evidence and enforce the applicable DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the applicable DIP Liens and/or the applicable Adequate Protection Liens, as applicable, and all such financing statements, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided* that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtors are hereby authorized to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Secured Party

Representatives all such financing statements, notices, and other documents as the DIP Agent and the Prepetition Secured Party Representatives may reasonably request. The DIP Agent and the Prepetition Secured Party Representatives, each in its sole discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments. To the extent that any Prepetition Secured Party Representative is a secured party under any account control agreement, listed as an additional insured or loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to validate, attach, perfect or prioritize liens (any such instrument or document, a "<u>Security Document</u>"), the DIP Agent shall also be deemed to be a secured party under each such Security Document, and shall have all the rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received subject to the Carve Out, the AST Break-Up Fee (if any), and the Administration Charge and in accordance with the terms of this Interim Order, as applicable, and the other DIP Loan Documents. The Prepetition Secured Party Representatives, as applicable, shall serve as agents for the DIP Agent solely for the purposes of perfecting its security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein (but for the entry of this Interim Order) may be accomplished only by possession or control by a secured party.

15. **<u>Protection of Lenders' Rights</u>**. Except as otherwise expressly provided herein, so long as there are any DIP Obligations outstanding under the DIP Loan Documents or the DIP Secured Parties have any outstanding Commitments or Loans (each, as defined in the DIP Loan

Documents), the Prepetition Secured Parties (with respect to the DIP Collateral):  (a) shall have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan/Notes Documents and/or this Interim Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan/Notes Documents or the Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any event of default under any of the Prepetition Loan/Notes Documents, (b) shall be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, and (c) shall not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral.

16.    **Proceeds of Subsequent Financing**.  If at any time prior to the indefeasible payment in full in cash of all of the DIP Obligations, the termination of the DIP Secured Parties' obligations to extend credit under the DIP Facility and this Interim Order (including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates), and the complete satisfaction of the DIP Superpriority Claims and the Adequate Protection Claims, either the Loan Parties, the Loan Parties' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Loan Parties' chapter 11 cases or any Successor Cases thereof, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Loan Documents, then, unless otherwise agreed by the Required Lenders in their sole discretion, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent for further

distribution to the applicable DIP Secured Party on account of their applicable DIP Obligations pursuant to the applicable DIP Loan Documents.

17.     [Reserved.]

18.     **Milestones**.  It is a condition to the DIP Facility and to the use of Cash Collateral that the Debtors shall comply with those certain case milestones set forth in section 5.16 of the DIP Loan Agreement (the "Milestones").  The Debtors' failure to comply with any Milestone shall constitute an "Event of Default" in accordance with the terms of the DIP Loan Agreement and this Interim Order.

19.     **Maintenance of DIP Collateral**.  Until the indefeasible payment in full of all Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Facility or the Prepetition Loans/Notes Documents, as applicable and (b) maintain their cash management system in effect as of the Petition Date, as modified by any order entered by this Court.

20.     **Termination Events.**

(a)     The occurrence of (a) any "Event of Default" as that term is defined in the DIP Loan Agreement, (b) any failure to meet or satisfy any Milestone as defined in, and in accordance with, the DIP Loan Agreement, (c) the Maturity Date under the DIP Loan Agreement, or (d) any material violation, breach, or default by the Debtors with respect to any of their obligations under this Interim Order or any other DIP Loan Document, shall constitute a "DIP Termination Event" under this Interim Order (each, a "DIP Termination Event," and the date upon which such DIP Termination Event occurs, the "DIP Termination Date"), unless waived in writing by the Required Lenders, as applicable, in each case, in accordance with the DIP Loan Agreement. Subject to paragraphs 21(d) through 21(f), the Debtors' authorization to use Cash Collateral under

this Interim Order shall terminate (the "Cash Collateral Termination Date") upon the earliest to occur of (each of the following, a "Cash Collateral Termination Event"):

> **(i)**    the use of Prepetition Collateral, including Cash Collateral for any purpose not authorized by this Interim Order;

> **(ii)**    the appointment of a chapter 11 trustee or an examiner, receiver, interim receiver or manager, or responsible officer with expanded powers;

> **(iii)**    the conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code;

> **(iv)**    the failure of the Debtors to comply with any of the Milestones, subject to any modification or waiver thereof in accordance with the DIP Loan Agreement;

> **(v)**    an Approved Budget ceases to be in effect;

> **(vi)**    the expenditure by any of the Debtors of Cash Collateral (A) in a manner or for a purpose other than those consistent with the Approved Budget (including but not limited to payment of any expense or making any disbursement, in each case other than as set forth in the Approved Budget), or (B) in amounts that exceed the Permitted Variances, in each case other than as agreed or waived by the Required Lenders in accordance with the DIP Loan Agreement;

> **(vii)**    the failure of the Debtors to provide any of the reporting to the Prepetition Secured Parties set forth in paragraph 9(b)(ii) of this Interim Order within five (5) business days following written notice from the applicable Prepetition Secured Parties of such failure;

> **(viii)**    the Court enters an order (or the Debtors seek entry of an order) invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of

45

the Prepetition Secured Obligations, the liens securing the Prepetition Secured Obligations or the Adequate Protection Liens without the consent of (a) the applicable Prepetition Secured Party Representatives (on behalf of the applicable required Prepetition Secured Parties) and (b) the Required Lenders;

(ix)     the DIP Obligations have been accelerated in accordance with the terms of the DIP Loan Agreement;

(x)     the entry of an order of this or any other court of competent jurisdiction reversing, staying, vacating, or otherwise modifying in any material respect the terms of this Interim Order without the consent of the applicable Prepetition Secured Party Representatives (on behalf of the applicable required Prepetition Secured Parties); or

(xi)     the Restructuring Support Agreement has been terminated by either of the Ad Hoc Cross-Holder Group or the Ad Hoc First Lien Group.

21.    **Exercise of Remedies**.

(a)     Immediately upon the occurrence and during the continuation of a DIP Termination Event, the DIP Agent, at the direction of the Required Lenders, shall (in the case of a DIP Termination Event) be permitted to, and any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to deliver written notice (which may include electronic mail) to the DIP Remedies Notice Parties (as defined herein) of its intent to:  (i) declare all Obligations owing under the applicable DIP Facility to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend credit to the Loan Parties under the DIP Facility (to the extent any such commitment remains); (iii) terminate the DIP Facility and the DIP Loan Documents as to any future liability or obligation

thereunder, but without affecting, in any way, the DIP Liens or the DIP Obligations; (iv) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the DIP Loan Documents to use any Cash Collateral (subject to paragraphs 21(b) and 21(c)); (v) invoke the right to charge interest at the default rate under the DIP Facility; (vi) freeze any monies or balances in the Loan Parties' accounts; (vii) otherwise enforce any and all rights against the DIP Collateral in the possession of the DIP Agent, including, without limitation, disposition of the DIP Collateral solely for application towards the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, and the DIP Obligations in accordance with their respective priorities; and/or (viii) take any other actions or exercise any other rights or remedies with respect to the DIP Collateral permitted under this Interim Order, the DIP Loan Documents, or applicable law; *provided* that prior to the exercise of any right in clauses (i) through (viii) of this paragraph, the DIP Agent shall be required to provide five (5) calendar days' prior written notice to counsel to the Debtors, counsel to the Prepetition Secured Party Representatives, counsel to the Committee (if appointed), and the U.S. Trustee (the "<u>DIP Remedies Notice Parties</u>") of the DIP Agent's intent to exercise such rights and remedies (the "<u>DIP Remedies Notice Period</u>").

**(b)**    Unless during such DIP Remedies Notice Period the Court orders otherwise, the DIP Agent shall be deemed to have received relief from the automatic stay, and may exercise all rights and remedies available against the DIP Collateral set forth in paragraph 21(a) hereof, at the direction of the Required Lenders, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise (in each case, subject to paragraph 21(c) hereof); *provided* that, in the event that a party challenges the DIP Agent's right to exercise such rights and remedies and

the Court is unavailable for a hearing during the DIP Remedies Notice Period, the automatic stay shall remain in effect until the Court has an opportunity to rule on such challenge.

(c)     The Debtors (i) shall reasonably cooperate with the DIP Agent in its exercise of rights and remedies, whether against DIP Collateral or otherwise, to the extent that such exercise is in compliance with the DIP Loan Documents, and (ii) unless the Court orders otherwise, may not contest or challenge the exercise of any such rights or remedies other than to dispute whether a DIP Termination Event has in fact occurred; *provided* that the DIP Agent shall not object to a request by the Debtors for an expedited hearing before the Court to contest whether a DIP Termination Event has in fact occurred.  Notwithstanding anything to the contrary set forth in this paragraph 21, during the DIP Remedies Notice Period, the Debtors may use Cash Collateral to pay *only* the following amounts and expenses: (i) the Carve Out, (ii) the AST Break-Up Fee (if any), (iii) the Administration Charge, and (iv) amounts that the Debtors have determined in good faith are in the ordinary course, are critical to the preservation of the Debtors and their estates, and are in compliance with the Approved Budget (subject to Permitted Variances).

(d)     Immediately upon the occurrence and during the continuation of a Cash Collateral Termination Event, the Prepetition Secured Party Representatives shall (in the case of a Cash Collateral Termination Event) be permitted to, and any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise, is, by this Interim Order, modified without further notice to, hearing of, or order from this Court, to the extent necessary, to permit such Prepetition Secured Party Representative to deliver written notice (which may include electronic mail) to the Cash Collateral Remedies Notice Parties (as defined herein) of its intent to terminate and/or revoke the Debtors' right, if any, under this Interim Order to use any Cash Collateral (subject to paragraph 21(e)); *provided* that, prior to such termination and/or revocation, the

Prepetition Secured Party Representative shall be required to provide five (5) calendar days' prior written notice (which shall run concurrently with any notice required in paragraph 19 above) to counsel to the Debtors, counsel to the DIP Lenders, counsel to each Prepetition Secured Party Representative, counsel to the Committee (if appointed), and the U.S. Trustee (the "<u>Cash Collateral Remedies Notice Parties</u>") of such Prepetition Secured Party Representative's intent to exercise this right (the "<u>Cash Collateral Remedies Notice Period</u>").

(e)     Unless during such Cash Collateral Remedies Notice Period the Court determines otherwise, such Prepetition Secured Party Representative shall be deemed to have received relief from the automatic stay, and may terminate and/or revoke the Debtors' right, if any, under this Interim Order to use any Cash Collateral; *provided* that, in the event that a party challenges such Prepetition Secured Party Representative's assertion that a Cash Collateral Termination Event has occurred and the Court is unavailable for a hearing during the Cash Collateral Remedies Notice Period, the automatic stay shall remain in effect until the Court has an opportunity to rule on such challenge.

(f)     Notwithstanding anything to the contrary set forth in this paragraph (i), during the Cash Collateral Remedies Notice Period, the Debtors may use Cash Collateral to pay *only* the following amounts and expenses: (i) the Carve Out, (ii) the AST Break-Up Fee (if any), (iii) the Administration Charge, and (iv) amounts that the Debtors have determined in good faith are in the ordinary course, are critical to the preservation of the Debtors and their estates, and are in compliance with the Approved Budget (subject to Permitted Variances).

22.     **<u>DIP Fees and Expenses</u>**.  The Borrower is, by this Interim Order, authorized and directed to pay, in cash and on a current basis, all DIP Fees and Expenses, as and when due under the DIP Loan Documents and this Interim Order, whether or not the transactions contemplated

hereby are consummated.  The invoices for such DIP Fees and Expenses may be in summary form only, but shall include a reasonably detailed description of the nature of the matters for which services were performed, shall not be required to comply with the U.S. Trustee fee guidelines or contain time entries, may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine.  The DIP Fees and Expenses shall be provided to the Fee Notice Parties.  If the payment of the requested DIP Fees and Expenses is not disputed, in writing, by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "DIP Fee Objection Period"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors.  The Fee Notice Parties may dispute the payment of any portion of the DIP Fees and Expenses (the "Disputed DIP Fees") if, within the DIP Fee Objection Period, a Fee Notice Party notifies the submitting party in writing setting forth the specific objections (which objections shall be limited to the issue of reasonableness of such DIP Fees and Expenses) to any DIP Fees and Expenses.  If an objection is timely raised, such objection shall be subject to resolution by the Court; *provided* that payment of the requested DIP Fees and Expenses, other than the Disputed DIP Fees, shall not be delayed based on any such objections.  For avoidance of doubt, the Debtors shall promptly pay in full all DIP Fees and Expenses, other than the Disputed DIP Fees, following the DIP Fee Objection Period.  Payments of any amounts set forth in this paragraph 21 shall not be subject to recharacterization, subordination, or disgorgement.  For the avoidance of doubt, the Debtors are hereby authorized and directed, without further notice or hearing, to pay all DIP Fees and Expenses incurred on or prior to the date of entry

of this Interim Order on the date on which the DIP First Funding Loans are funded without the need for any submitting party to first deliver a copy of its invoice to the Fee Notice Parties as provided for herein.  No submitting party shall be required to file an interim or final application seeking compensation for services or reimbursement of expenses with the Court.

23.     **Indemnification**.  Subject to and upon entry of a Final Order, the Loan Parties shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Secured Party, and each of their respective officers, directors, employees, parents, subsidiaries, affiliates, agents, advisors, attorneys and representatives, in each case, in their respective capacities as such, as and to the extent provided in the DIP Loan Documents.

24.     **Proofs of Claim**.  The DIP Agent, the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition Secured Party Representatives shall not be required to file proofs of claim in any of these chapter 11 cases or any of the Successor Cases for any claim allowed herein or therein in respect of the Prepetition Secured Obligations.  Any order entered by the Court establishing a bar date in any of these chapter 11 cases or any Successor Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties; *provided* that, notwithstanding any order entered by the Court establishing a bar date in any of these chapter 11 cases or any Successor Cases to the contrary, the DIP Agent, on behalf of the DIP Lenders, and the Prepetition Secured Party Representatives, on behalf of the Prepetition Secured Parties, may (but are not required), in their sole discretion, file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of these chapter 11 cases or any Successor Cases for any claim allowed herein, and any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor.

25. <u>**Carve Out**</u>.

(a) <u>**Definition**</u>. As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code, together with interest, if any, under section 3717 of title 31 of the United States Code (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred by a trustee appointed under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all fees and expenses incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee (if any) pursuant to sections 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before, or on the first business day following, delivery by the DIP Agent (acting at the direction of the Required Lenders) of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (the "<u>Allowed Professional Fees</u>"); and (iv) Allowed Professional Fees of Debtor Professionals, in an aggregate amount not to exceed $2,000,000 *plus* the amount of any transaction or similar fee approved by the Court in connection with an order authorizing the Debtors' retention of their investment banker, incurred after the first business day following delivery by the DIP Agent (acting at the direction of the Required Lenders) of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (iv), the "<u>Post-Carve Out Trigger Notice Cap</u>"). For purposes of the foregoing, the "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (acting at the direction of

the Required Lenders) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and the lead restructuring counsel to the Committee (if any), delivered following the occurrence and during the continuation of a Termination Event, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

        **(b)**      **Priority of Carve Out**.  Subject to the terms and conditions contained in this Paragraph 25, each of the Prepetition Liens, the Prepetition Secured Obligations, the Adequate Protection Liens, the Adequate Protection Claims, the DIP Liens, and the DIP Superpriority Claims shall be subject and subordinate to the payment of the Carve Out.

        **(c)**      **Carve Out Reserves**.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent (the "Carve Out Trigger Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund, with cash, a segregated account not subject to the control of the Prepetition Secured Parties or the DIP Secured Parties (the "Carve Out Account") (i) first, in an amount equal to the then unpaid amounts of the Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") and (ii) after funding the Pre-Carve Out Trigger Notice Reserve, in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves").  The Debtors shall deposit and hold the Carve Out Reserves in the Carve Out Account in trust for the Professional Persons, and the Allowed Professional Fees shall be paid out of the Carve Out Reserves before any and all other claims are paid.  Notwithstanding anything to the contrary in this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on the Debtors' cash (including cash received as a result of the sale or other disposition of any assets) until the Carve Out Reserves have been fully funded; provided that

if any Carve Out Reserves remain after all Allowed Professional Fees that are subject to the Carve Out have been paid in full pursuant to a final order, such funds shall constitute DIP Collateral and Cash Collateral of the Prepetition Secured Parties.  Further, notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out and (ii) in no way shall the Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Account, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or in any Prepetition Secured Document or DIP Loan Document, (x) funds transferred to the Carve Out Account shall not be subject to any liens or claims of the Prepetition Secured Parties or the DIP Secured Parties and shall not constitute Cash Collateral (or Collateral) or DIP Collateral, and (y) the Carve Out shall be senior to all liens and claims securing the Prepetition Secured Obligations, the Adequate Protection Claims, and the DIP Obligations, as well as any and all other forms of adequate protection, liens, or claims securing the Prepetition Secured Obligations or the DIP Obligations.

(d)     **Payment of Allowed Professional Fees Prior to the Carve Out Trigger Declaration Date**.  So long as the Carve Out Trigger Notice has not been delivered in accordance with this Interim Order, the Debtors shall be permitted to pay Allowed Professional Fees as the same may become due and payable, including on an interim basis, consistent and in accordance with any applicable orders.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     **No Obligation to Pay Allowed Professional Fees**.  None of the Prepetition Secured Parties shall be responsible for, and nothing in this Interim Order shall be construed to obligate them to pay, any Professional Fees incurred in connection with these chapter 11 cases or any Successor Case or to guarantee that the Debtors have sufficient funds to pay such Allowed Professional Fees.

26.     **Limitations on the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, the Carve Out, and Other Funds**.  Notwithstanding anything contained in the DIP Loan Documents, this Interim Order, or any other order of the Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, the Committee (if appointed), or any trustee or other estate representative appointed in these chapter 11 cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):  (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, once a DIP Termination Event or Cash Collateral Termination Event occurs, other than to challenge the assertion that any DIP Termination Event or Cash Collateral Event has occurred in accordance with paragraphs 20 and 21 hereof; (b) except to the extent expressly permitted by the terms of the DIP Loan Documents and this Interim Order, to use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the Required Lenders and the requisite Prepetition Secured Parties under the Prepetition Loan/Notes Documents, as applicable; or (c) to investigate (including by way of examinations or discovery proceedings,

whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Released Parties with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with or related to this Interim Order, the DIP Facility, the DIP Loan Documents, the DIP Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Loan/Notes Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan/Notes Documents, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Claims, or the Prepetition Secured Obligations, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Prepetition Collateral, the Prepetition Secured Obligations, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) without the consent of the Required Lenders or the applicable required Prepetition Secured Parties, as applicable, any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties under any of the Prepetition Loan/Notes Documents (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Secured Parties, or the Prepetition

Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents or Prepetition Loan/Notes Documents and this Interim Order (as applicable)); *provided* that no more than $25,000 may be used for allowed fees and expenses incurred solely by the Committee (if appointed) in investigating, but not objecting to, challenging, litigating (including by way of discovery), opposing, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Loan/Notes Documents prior to the Challenge Deadline; *provided*, *further*, that nothing contained in this paragraph 26 shall prohibit the Debtors from responding to or complying with discovery requests of the Committee (if appointed), in whatever form, made in connection with such investigation or the payment from the DIP Collateral of professional fees related thereto.

27.     **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**.

(a)     The stipulations, admissions, agreements, and releases contained in this Interim Order, including, without limitation, in paragraph G of this Interim Order (collectively, the "Stipulations"), shall be binding upon the Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Loan Parties in these chapter 11 cases or any Successor Cases) in all circumstances and for all purposes; *provided* that any chapter 7 or chapter 11 trustee appointed or elected for any of the Loan Parties in these chapter 11 cases or any Successor Cases before the Challenge Deadline shall not be bound by the Stipulations until the Court orders otherwise. The Stipulations shall be binding upon all other parties in interest, (including without limitation, the Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the Loan Parties' estates, in all circumstances and for all purposes, unless (i) the Committee(if appointed) or a party in interest (in each case, to

the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline), has timely and duly filed an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "Challenge Proceeding") by the Challenge Deadline, objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan/Notes Documents, or otherwise asserting or prosecuting any Avoidance Action or any other claim, counterclaim, cause of action, objection, contest, defense, or other challenge (a "Challenge") against any of the Prepetition Secured Parties or any of their respective affiliates, subsidiaries, officers, directors, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and the respective successors and assigns thereof (in each case, in their respective capacities as such), arising under, in connection with or related to the Debtors, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan/Notes Documents, and (2) there is entered a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding; *provided* that (i) as to the Debtors, any and all such Challenges are hereby irrevocably waived and relinquished as of the Petition Date and (ii) any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released, and barred).  Notwithstanding anything to the contrary in this Interim Order, if, on or before the Challenge Deadline, the Committee (if appointed) or any other party in interest files a motion seeking standing to file a Challenge with a draft complaint identifying and describing all bases for such Challenge, the Challenge Deadline shall be tolled solely with respect to the bases asserted in such draft complaint and solely with respect to the moving party until the earlier of:  (i) two (2) business days subsequent to the date of entry of an

order granting standing to file such Challenge; and (ii) entry of an order denying such motion; *provided* that such extension shall only apply to the bases for a Challenge asserted in the draft complaint that the Court has specifically found that the moving party has standing to assert.

**(b)**      If no such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, then, without further notice to any person or entity or order of the Court, (a) the Stipulations shall be binding on all parties in interest (including, without limitation, the Committee, if appointed); (b) the Prepetition Secured Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, disgorgement, offset, avoidance, for all purposes in these chapter 11 cases and any Successor Cases; (c) the Prepetition Loan/Notes Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the Loan Parties in these chapter 11 cases and any Successor Cases; (d) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense; and (e) the Prepetition Secured Obligations, the Prepetition Liens and the Prepetition Loan/Notes Documents shall not be subject to any other or further claim or Challenge by the Committee (if appointed), any non-statutory committees appointed or formed in these chapter 11 cases or any Successor Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates.

**(c)**      If any such Challenge Proceeding is timely and properly filed prior to the Challenge Deadline, the Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 27(b) hereof) on the Committee (if appointed) and on any other person or entity, except to the extent that such Stipulations were expressly and successfully challenged in such

Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

      **(d)**     The "<u>Challenge Deadline</u>" shall mean the date that is, for any party in interest or the Committee (if appointed), 75 calendar days after entry of this Interim Order, as such deadline may be extended, (x) subject to the terms of this Interim Order, in writing prior to the expiration of the deadline to commence a Challenge, by, with respect to the 1L Loans, the 1L Notes, the 1.5L Loans, or the 2L Notes, the Prepetition Secured Party Representative (as applicable, acting in accordance with the respective Prepetition Loan/Notes Documents) or (y) by this Court for good cause shown upon an application for an extension filed and served by a party in interest, pursuant to an order entered before the expiration of the Challenge Deadline; *provided* that an extension pursuant to the foregoing clause (y) shall only be applicable as to such party in interest and the particular Challenge set forth in such application; *provided*, *further*, that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Challenge Deadline, which attaches a draft complaint setting forth the sufficiently specific legal and factual bases of the proposed Challenge, shall toll the Challenge Deadline only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Court.  Failure of the Committee (if appointed) or any other party in interest to file such a pleading with the Court shall forever bar such party from making such a challenge.

      **(e)**     Nothing in this Interim Order vests or confers on any entity (as defined in the Bankruptcy Code), including the Committee (if appointed) or any non-statutory committees appointed or formed in the chapter 11 cases, standing or authority to pursue any Claim (as such term is defined in section 101(5) of the Bankruptcy Code) or cause of action belonging to the

Debtors or their estates, including, without limitation, Challenges with respect to the Stipulations, and all rights to object to such standing are expressly reserved.

28.     **Limitations on Charging Expenses**.  Except to the extent of the Carve Out, the AST Break-Up Fee (if any), and the Administration Charge, subject to and effective upon entry of the Final Order, no costs or expenses of administration of these chapter 11 cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be), shall be charged against or recovered from (a) the Loan Parties or the DIP Collateral (including in respect of the Adequate Protection Liens), or any of the DIP Obligations or (b) the Prepetition Secured Parties, the Prepetition Collateral, or any of the Prepetition Secured Obligations, in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, without the prior express written consent of the Required Lenders or the affected Prepetition Secured Party, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out, the AST Break-Up Fee (if any), the Administration Charge, or the approval of any budget hereunder).

29.     **No Marshaling**.  Subject to and effective upon entry of the Final Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order, the DIP Loan Documents, and

the Prepetition Loan/Notes Documents, as applicable, including, for the avoidance of doubt, to the funding of the Carve Out or the AST Break-Up Fee (if any), if applicable.  Further, except to the extent of the Carve Out and the AST Break-Up Fee (if any), subject to and effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Secured Parties, the Prepetition Secured Party Representatives, or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any DIP Collateral or Prepetition Collateral.

30.     **Payments Free and Clear**.  Any and all payments or proceeds remitted to the DIP Agent or the other DIP Secured Parties pursuant to the provisions of this Interim Order, the DIP Loan Documents (including, without limitation, the Approved Budget (subject to Permitted Variances)) or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors.

31.     **Joint and Several Liability**.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Loan Parties shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

32.     **Right to Credit Bid**.  Subject to the rights and limitations set forth in the Restructuring Support Agreement, the DIP Agent (at the direction of the Required Lenders) and, subject to section 363(k) of the Bankruptcy Code, the Prepetition Secured Party Representatives (at the direction of the applicable required Prepetition Secured Parties) shall have the right to credit bid (either directly or through one or more acquisition vehicles) following termination of the

Restructuring Support Agreement, up to the full amount of the underlying parties' respective claims, including, for the avoidance of doubt, Adequate Protection Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

33.    **Rights Preserved**.  Subject in all cases to the Carve Out, notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the rights of the DIP Lenders or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Lenders or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Loan/Notes Documents, the Prepetition Intercreditor Agreements, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of these chapter 11 cases, conversion of any or all of these chapter 11 cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) except as expressly provided in this Interim Order, any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders or the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order.

34.     **Intercreditor Agreements**.  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreements and any other applicable intercreditor or subordination provisions contained in the Prepetition Loan/Notes Documents (a) shall remain in full force and effect, (b) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties, and (c) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order.

35.     **No Waiver by Failure to Seek Relief**.  The failure of any of the DIP Lenders or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan/Notes Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder by any of the DIP Lenders or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Lenders or the Prepetition Secured Parties.

36.     **Binding Effect of this Interim Order**.  Immediately upon entry of this Interim Order by the Court, this Interim Order shall inure to the benefit of the Debtors, the DIP Lenders, and the Prepetition Secured Parties, and the provisions of this Interim Order (including all findings and conclusions of law herein) shall be valid and binding upon the Debtors, the DIP Lenders the Prepetition Secured Parties, any and all other creditors of the Debtors, the Committee

(if appointed) or non-statutory committees appointed or formed in these chapter 11 cases, any and all other parties in interest and the respective successors and assigns of each of the foregoing, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of these chapter 11 cases or any Successor Cases, or upon dismissal of any of these chapter 11 cases; *provided* that (a) nothing in this paragraph 36 shall confer final status on this Interim Order and (b) the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed for the estates of the Debtors.

37.   **Survival**.   The terms and provisions of this Interim Order, including, without limitation, (a) the Carve Out and (b) all of the rights, privileges, benefits, and protections afforded herein and in the DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and any other claims, liens, security interests, and other protections (as applicable)) granted to the DIP Lenders and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Loan Documents (collectively, the "DIP Protections"), and any actions taken pursuant hereto or thereto, shall survive, shall continue in full force and effect, shall remain binding on all parties in interest and shall maintain their priorities, and shall not be modified, impaired, or discharged by, entry of any order that may be entered (i) confirming any plan of reorganization in any of these chapter 11 cases, (ii) converting any or all of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any or all of these chapter 11 cases, or (iv) pursuant to which the Court abstains from hearing any of these chapter 11 cases, in each case, until (x) in respect of the DIP Facility, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim

Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facility which survive such discharge by their terms) and all commitments to extend credit under the DIP Facility are terminated, and (y) in respect of the Prepetition Secured Obligations, all of the Prepetition Secured Obligations have been indefeasibly paid in full in cash (or, in respect of outstanding letters of credit (if any), cash collateralized).  This Court shall retain jurisdiction, notwithstanding any such confirmation, conversion, or dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' adequate protection.  Notwithstanding anything to the contrary in this Interim Order, the DIP Protections afforded to the Prepetition Secured Parties under this Interim Order are subject to the challenge rights set forth in paragraph 27 hereof in all respects.

38.     **Discharge Waiver/Release**.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of these chapter 11 cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, (i) unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or (ii) the DIP Lenders have otherwise agreed in writing in respect of the applicable obligations owed to each of them (including the agreement reflected in Section 10.24 of the DIP Loan Agreement).

39.     **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**.  The DIP Secured Parties have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, and this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Secured Parties and the Prepetition Secured Parties are entitled to the protections provided

in section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Loan Documents.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacation, or stay shall not affect: (i) the validity, priority, or enforceability of any DIP Obligations or adequate protection obligations incurred prior to the actual receipt of written notice by the DIP Agent and the Prepetition Secured Parties' Representatives of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority, or enforceability of the DIP Obligations, the DIP Liens, the Adequate Protection Liens, the Prepetition Liens, or the Prepetition Secured Obligations.  Notwithstanding any such reversal, modification, vacatur, or stay of this Interim Order, any DIP Obligations, DIP Liens, or Adequate Protection Liens incurred by the Loan Parties to the DIP Lenders or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Secured Party Representatives of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order.

40.    **No Modification of Interim Order**.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the Required Lenders in respect of the DIP Obligations, (i) any modification, stay, vacatur, or amendment to this Interim Order or (ii) a priority claim for any administrative expense or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in these chapter 11 cases, equal or superior to the DIP Superpriority Claims, other than the Carve Out, the AST Break-Up Fee (if any), and the

Administration Charge; (b) without the prior written consent of the DIP Agent (at the direction of the Required Lenders) or the Prepetition Secured Party Representatives (as applicable, acting in accordance with the respective Prepetition Loan/Notes Documents), any order authorizing the use of Cash Collateral resulting from the DIP Collateral or the Prepetition Collateral that is inconsistent with this Interim Order; (c) without the prior written consent of the Required Lenders, grant of any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as expressly provided in the DIP Loan Documents or this Interim Order; or (d) without the prior written consent of the Prepetition Secured Party Representatives (as applicable, acting in accordance with the respective Prepetition Loan/Notes Documents), grant of any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Liens or the Adequate Protection Liens, except to the extent expressly provided in this Interim Order.

41.     **Limitation of Liability.**  Nothing in this Interim Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders (in each case, in their capacities as such) of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Lenders comply with their obligations under the DIP Loan Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian,

forwarding agency, or other person and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Loan Parties.

42.    **Interim Order Controls**.  In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order or any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control. In the event of any inconsistency between or among the terms or provisions of this Interim Order and any order entered in connection with the *Debtors' Motion for Entry of an Order Authorizing Payment of the AST Transaction Break-Up Fee*, filed substantially contemporaneously with the Motion (such order, the "Break-Up Fee Order"), the terms and provisions of the Break-Up Fee Order shall govern and control.

43.    **No Third-Party Rights**.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

44.    ***Nunc Pro Tunc* Effect of This Interim Order**.  This Interim Order shall take effect and shall be enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), and 7062 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

45.    **Bankruptcy Rules**.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

46.  **<u>Necessary Action</u>**.  The Debtors are authorized to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

47.  **<u>Headings</u>**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

48.  **<u>Notice of Entry of This Interim Order</u>**.  The Debtors' counsel shall serve a copy of this Interim Order or a suitable notice respecting same on the Notice Parties.

49.  **<u>Retention of Jurisdiction</u>**.  The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

# Exhibit 1

**DIP Loan Agreement**

*Execution Version*

**SENIOR SECURED SUPER-PRIORITY**
**DEBTOR-IN-POSSESSION**
**LOAN AGREEMENT**

**among**

**LIGADO NETWORKS LLC,**
**as the Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the**
**Bankruptcy Code,**

**and**

**THE GUARANTORS PARTY HERETO,**
**as Guarantors, Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy**
**Code,**

**THE LENDERS PARTY HERETO,**

**and**

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
**as Administrative Agent**

## TABLE OF CONTENTS

**Page**

**ARTICLE 1**
**DEFINITIONS**

Section 1.01   Defined Terms ...........................................................................................2
Section 1.02   Terms Generally........................................................................................50
Section 1.03   Accounting Terms; GAAP........................................................................50
Section 1.04   Resolution of Drafting Ambiguities.........................................................51
Section 1.05   Permitted Liens .........................................................................................51
Section 1.06   Divisions ...................................................................................................51
Section 1.07   Discretion..................................................................................................51

**ARTICLE 2**
**THE LOANS**

Section 2.01   Commitments.............................................................................................51
Section 2.02   Loans.........................................................................................................58
Section 2.03   Borrowing Procedure ...............................................................................58
Section 2.04   Evidence of Debt; Repayment of Loans ...................................................59
Section 2.05   Fees; Additional Payment .........................................................................60
Section 2.06   Interest on Loans.......................................................................................61
Section 2.07   [Reserved].................................................................................................63
Section 2.08   [Reserved].................................................................................................63
Section 2.09   Repayment of Loans..................................................................................63
Section 2.10   Optional and Mandatory Prepayments of Loans ......................................63
Section 2.11   [Reserved].................................................................................................64
Section 2.12   Yield Protection .......................................................................................65
Section 2.13   [Reserved].................................................................................................66
Section 2.14   Payments Generally; Pro Rata Treatment; Sharing of Setoffs..............66
Section 2.15   Taxes.........................................................................................................67
Section 2.16   Mitigation Obligations .............................................................................72
Section 2.17   Currency Indemnity ..................................................................................72
Section 2.18   Incremental Loan Facilities ......................................................................73
Section 2.19   Certain Bankruptcy Matters .....................................................................75

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

Section 3.01   Organization; Powers................................................................................77
Section 3.02   Authorization; Enforceability ..................................................................77
Section 3.03   No Conflicts...............................................................................................77
Section 3.04   Financial Statements; Projections ............................................................78
Section 3.05   Properties ..................................................................................................78
Section 3.06   Intellectual Property..................................................................................80
Section 3.07   Equity Interests and Subsidiaries .............................................................80
Section 3.08   Litigation; Compliance with Laws............................................................81

i

Section 3.09   Agreements .................................................................................................81
Section 3.10   Federal Reserve Regulations ........................................................................82
Section 3.11   Investment Company Act ..............................................................................82
Section 3.12   Use of Proceeds.............................................................................................82
Section 3.13   Taxes .............................................................................................................83
Section 3.14   No Material Misstatements ...........................................................................83
Section 3.15   Labor Matters ................................................................................................83
Section 3.16   [Reserved] .....................................................................................................83
Section 3.17   Employee Benefit Plans ................................................................................84
Section 3.18   Environmental Matters ..................................................................................85
Section 3.19   Insurance .......................................................................................................87
Section 3.20   Loan Security Documents .............................................................................87
Section 3.21   Intercompany Indebtedness; Affiliate Indebtedness ....................................88
Section 3.22   Anti-Terrorism Laws; Anti-Corruption Laws ..............................................89
Section 3.23   Communications Licenses and Regulatory Matters ......................................89
Section 3.24   License Subsidiaries; Other Subsidiaries .....................................................90
Section 3.25   Cases; Orders ................................................................................................91

### ARTICLE 4
### CONDITIONS

Section 4.01   Conditions to Effectiveness ..........................................................................92
Section 4.02   Conditions to the DIP First Funding Date ....................................................94
Section 4.03   Conditions to Each DIP DDTL Funding Date ..............................................98

### ARTICLE 5
### AFFIRMATIVE COVENANTS

Section 5.01   Financial Statements, Reports, etc ..............................................................101
Section 5.02   Litigation and Other Notices.......................................................................103
Section 5.03   Existence; Businesses and Properties .........................................................104
Section 5.04   Insurance .....................................................................................................105
Section 5.05   Obligations and Taxes .................................................................................105
Section 5.06   Employee Benefits ......................................................................................105
Section 5.07   Maintaining Records; Access to Properties and Inspections; Meetings .............106
Section 5.08   [Reserved] ...................................................................................................107
Section 5.09   Compliance with Laws; Compliance with Environmental Laws;
              Environmental Reports .................................................................................107
Section 5.10   Communications Licenses ...........................................................................107
Section 5.11   Additional Collateral; Additional Guarantors.............................................107
Section 5.12   Security Interests; Further Assurances ........................................................108
Section 5.13   Information Regarding Collateral ................................................................109
Section 5.14   Post-Closing Collateral Matters ..................................................................109
Section 5.15   License Subsidiaries; Other Subsidiaries ...................................................109
Section 5.16   Certain Case Milestones .............................................................................109
Section 5.17   Certain Bankruptcy Matters ........................................................................111
Section 5.18   Prepetition First Out Obligations Payoff Letter ..........................................111
Section 5.19   Bankruptcy Notices.....................................................................................111
Section 5.20   Reorganization Efforts ................................................................................112

ii

Section 5.21    Interim DIP Order Entry Date..................................................................112
Section 5.22    Prepetition First Out Obligations Refinancing ......................................112

## ARTICLE 6
## NEGATIVE COVENANTS

Section 6.01    Indebtedness..............................................................................................112
Section 6.02    Liens...........................................................................................................114
Section 6.03    Sale and Leaseback Transactions.............................................................114
Section 6.04    Viasat Proceedings...................................................................................114
Section 6.05    Mergers and Consolidations .....................................................................115
Section 6.06    Asset Sales ................................................................................................115
Section 6.07    Restricted Payments.................................................................................115
Section 6.08    Transactions with Affiliates .....................................................................116
Section 6.09    Use of Proceeds........................................................................................117
Section 6.10    Limitation on Certain Restrictions on Subsidiaries .................................117
Section 6.11    Limitation on Issuance of Capital Stock ..................................................117
Section 6.12    Business ....................................................................................................117
Section 6.13    Budget Variance.......................................................................................117
Section 6.14    Communications Licenses ........................................................................118
Section 6.15    Deposit Accounts; DIP Loan Proceeds Account ......................................118
Section 6.16    No Non-Loan Party Subsidiaries ..............................................................118
Section 6.17    Additional Bankruptcy Matters.................................................................118
Section 6.18    Compliance with Budget...........................................................................120
Section 6.19    Use of Collateral ......................................................................................120
Section 6.20    Use of Property; Rejection and Assumption of Contracts; Post-Filing
                Pleadings....................................................................................................121
Section 6.21    Restructuring Support Agreement ............................................................121

## ARTICLE 7
## GUARANTEE

Section 7.01    The Guarantee ...........................................................................................121
Section 7.02    Obligations Unconditional........................................................................122
Section 7.03    Reinstatement............................................................................................123
Section 7.04    Subrogation; Subordination .....................................................................123
Section 7.05    Remedies...................................................................................................123
Section 7.06    Instrument for the Payment of Money ......................................................124
Section 7.07    Continuing Guarantee ..............................................................................124
Section 7.08    General Limitation on Guarantee Obligations..........................................124
Section 7.09    Release of Guarantors...............................................................................124
Section 7.10    Right of Contribution ...............................................................................125
Section 7.11    Post-Petition Savings Clause ...................................................................125

## ARTICLE 8
## EVENTS OF DEFAULT

Section 8.01    Events of Default ......................................................................................125
Section 8.02    Application of Proceeds............................................................................131
Section 8.03    Government Approval ...............................................................................132

iii

**ARTICLE 9**
**THE ADMINISTRATIVE AGENT**

Section 9.01   Appointment and Authority ....................................................................133
Section 9.02   Rights of a Lender.................................................................................133
Section 9.03   Exculpatory Provisions .........................................................................134
Section 9.04   Reliance by Agent.................................................................................135
Section 9.05   Delegation of Duties .............................................................................135
Section 9.06   Resignation of the Agent .......................................................................136
Section 9.07   Non-Reliance on Agent and Other Lenders............................................136
Section 9.08   Agent May File Proofs of Claim ............................................................136
Section 9.09   Collateral and Guarantee Matters ..........................................................137
Section 9.10   Not Partners or Co-Venturers; Administrative Agent as Representative of
               the Secured Parties..............................................................................138
Section 9.11   Erroneous Payments..............................................................................138

**ARTICLE 10**
**MISCELLANEOUS**

Section 10.01   Notices ...............................................................................................139
Section 10.02   Waivers; Amendment ..........................................................................142
Section 10.03   Expenses; Indemnity; Damage Waiver..................................................145
Section 10.04   Successors and Assigns........................................................................147
Section 10.05   Survival of Agreement .........................................................................151
Section 10.06   Counterparts; Integration; Effectiveness................................................151
Section 10.07   Severability .........................................................................................152
Section 10.08   Right of Setoff.....................................................................................152
Section 10.09   Governing Law; Jurisdiction; Consent to Service of Process...................152
Section 10.10   Waiver of Jury Trial .............................................................................153
Section 10.11   Headings .............................................................................................153
Section 10.12   Treatment of Certain Information; Confidentiality....................................153
Section 10.13   Material Non-Public Information ...........................................................154
Section 10.14   Authorization to Distribute Certain Materials to Public-Siders.................155
Section 10.15   USA PATRIOT Act Notice and Customer Verification.................................155
Section 10.16   Interest Rate Limitation .......................................................................156
Section 10.17   Obligations Absolute ...........................................................................156
Section 10.18   AML Legislation..................................................................................156
Section 10.19   [Reserved]...........................................................................................157
Section 10.20   Acknowledgement and Consent to Bail-In of Affected Financial
                Institutions .........................................................................................157
Section 10.21   Acknowledgement Regarding Any Supported QFCs .................................158
Section 10.22   DIP Secured Party Advisors .................................................................159
Section 10.23   Validity of Loan Documents .................................................................159
Section 10.24   Acceptable Plan ..................................................................................159
Section 10.25   Financial Accommodation Acknowledgement.........................................159

<u>SCHEDULES</u>

Schedule 1.01(b)      Subsidiary Guarantors
Schedule 1.01(c)      Investments
Schedule 1.01(d)      Liens
Schedule 2.01         Commitments
Schedule 3.03         Governmental Approvals; Compliance with Laws
Schedule 3.06(c)      Violations or Proceedings
Schedule 3.07(c)      Organizational Chart
Schedule 3.08         Litigation and Government Proceedings
Schedule 3.09         Material Agreements
Schedule 3.18         Environmental Matters
Schedule 3.19         Insurance
Schedule 3.23(a)      Communications Licenses
Schedule 3.23(b)      FCC Proceedings
Schedule 3.24(a)      Assets and Liabilities of One Dot Six LLC and Ligado Networks Inc. of Virginia
Schedule 5.14         Post-Closing Matters
Schedule 6.01(b)      Indebtedness
Schedule 6.08(d)      Transactions with Affiliates

<u>EXHIBITS</u>

Exhibit A        Form of Administrative Questionnaire
Exhibit B-1      Form of Assignment and Assumption
Exhibit C        [Reserved]
Exhibit D        Form of Joinder Agreement
Exhibit E        Form of Note
Exhibit F-1      Form of Perfection Certificate
Exhibit F-2      Form of Perfection Certificate Supplement
Exhibit G        Form of Borrowing Request
Exhibit H-1      Form of Tax Compliance Certificate
Exhibit H-2      Form of Tax Compliance Certificate
Exhibit H-3      Form of Tax Compliance Certificate
Exhibit H-4      Form of Tax Compliance Certificate
Exhibit I        [Reserved]
Exhibit J        Form of Initial Budget
Exhibit K        Form of Election Joinder
Exhibit L        Form of Cash Flow Certificate
Exhibit M        Form of Canadian Security Agreement
Exhibit N        Form of Intercompany Note
Exhibit O        Form of Loan Security Agreement
Exhibit P        Form of Reaffirmation Agreement

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AGREEMENT**

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "**Agreement**"), dated as of January 5, 2025, among Ligado Networks LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article 1), each as a Guarantor hereunder and a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code, the Lenders from time to time party hereto and U.S. Bank Trust Company, National Association ("**U.S. Bank**"), as administrative agent for the Lenders (including its successors and assigns, in such capacities, the "**Administrative Agent**").

**WITNESSETH:**

WHEREAS, the Borrower and the Subsidiary Guarantors (each, a "**Debtor**" and collectively, the "**Debtors**") intend to file voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Case**" and collectively, the "**Cases**") and continued to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (the date upon which the Cases are filed, the "**Petition Date**");

WHEREAS, prior to the Closing Date, the Lenders party hereto (or Affiliates thereof) provided secured financing to the Borrower pursuant to the Prepetition Debt Documents (in such capacity, the "**Prepetition Lenders and Holders**"), which secured financing was guaranteed by each of the Subsidiary Guarantors;

WHEREAS, Ligado Networks LLC, in its capacity as foreign representative of the Debtors, intends to seek recognition of the Cases under Part IV of the *Companies Creditors Arrangement Act* (Canada) (the "**CCAA**") from the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**");

WHEREAS, the Borrower has requested that the Lenders provide a senior secured super-priority debtor-in-possession term loan credit facility in an aggregate initial principal amount of up to $939,151,166 (together with any applicable Capitalized Amount and Roll-Up Loans) (the "**DIP Facility**") comprised of: (i) a new money term loan facility in an aggregate initial principal amount of up to $441,999,891 (together with any applicable Capitalized Amount and Roll-Up Loans) and (ii) the roll up of the Prepetition Roll-Up Indebtedness into Roll-Up Loans hereunder in an aggregate minimum initial principal amount of $497,151,275 (together with any applicable Capitalized Amount), and, with all of the Borrower's Obligations under the DIP Facility to be guaranteed by each Guarantor and all of the Borrower's and the Guarantors' Obligations under the DIP Facility to be secured by the Collateral,

WHEREAS, the Lenders are willing to make available to Borrower the DIP Facility (and U.S. Bank is willing to serve as Administrative Agent and Collateral Agent in respect of the DIP

Facility) on the terms and subject to the conditions set forth herein, in the other Loan Documents and in the DIP Orders;

WHEREAS, the relative priority of the DIP Facility with respect to the Collateral granted as security for the payment and performance of the Obligations shall be as set forth in the Interim DIP Order and the Final DIP Order, and solely with respect to the Canadian Collateral, shall be as set forth in the Interim DIP Recognition Order and Final DIP Recognition Order, in each case, upon entry thereof by the Bankruptcy Court or CCAA Court (as applicable) and in the Loan Security Documents;

WHEREAS, all of the claims and the Liens granted under the DIP Orders, DIP Recognition Orders and the Loan Documents to the Collateral Agent, the Lenders and the other Secured Parties in respect of the DIP Facility shall be subject to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge; and

WHEREAS, the Borrower and the Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the extensions of credit to the Borrower under this Agreement.

NOW, THEREFORE, subject to the satisfaction of the conditions set forth herein, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01   Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"**1L Loan Agreement**" means the First Lien Loan Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto, the lenders party thereto and U.S. Bank Trust Company, National Association, as administrative agent (as successor in interest to U.S. Bank National Association) (the "**1L Loan Administrative Agent**").

"**1L Loan Security Agreement**" means the First Lien Security Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank Trust Company, National Association, as collateral agent (as successor in interest to U.S. Bank National Association).

"**1L Notes Indenture**" means the Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank National Association, as trustee, governing the first lien Notes (as defined therein).

"**1L Notes Security Agreement**" means the First Lien Security Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise

modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank National Association, as collateral trustee.

"**1.5L Loan Agreement**" means the 1.5 Lien Loan Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto, the lenders party thereto, and Jefferies Finance LLC, as administrative agent.

"**1.5L Loan Security Agreement**" means the Security Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and Jefferies Finance LLC, as collateral agent.

"**2L Notes Indenture**" means the Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and Wilmington Savings Fund Society, FSB, as trustee (as successor in interest to U.S. Bank National Association), governing the second lien Notes (as defined therein).

"**2L Notes Security Agreement**" means the Second Lien Security Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank National Association, as collateral trustee.

"**Acceptable Plan**" means a Plan that is satisfactory to the Required Ad Hoc Holders in their sole discretion, containing, among other things, (i) a release in favor of the Administrative Agent and the Lenders, as well as their respective Affiliates, representatives, counsel, and advisors (including in connection with the Obligations and any Prepetition Secured Obligations), and (ii) provisions with respect to the settlement or discharge of all claims and other debts and liabilities, as such Plan may be modified, altered, amended, or otherwise changed or supplemented with the prior written consent of the Required Ad Hoc Holders (which consent the Required Ad Hoc Holders may direct the Agent to communicate).

"**Acceptable Plan Definitive Documentation**" means any definitive documentation, that is in form and substance satisfactory to the Required Ad Hoc Holders, which effectuates an Acceptable Plan.

"**Account Control Agreements**" has the meaning assigned to such term in the Loan Security Agreement.

"**Acquired Indebtedness**" means, with respect to any specified Person:

(1)     Indebtedness of any other Person existing at the time such other Person is merged with or into or becomes a consolidated Subsidiary of such specified Person, and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person in each case, other than Indebtedness incurred as consideration in, in contemplation of, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction

3

or series of related transactions pursuant to which such consolidated Subsidiary became a consolidated Subsidiary or was otherwise acquired by such Person, or such asset was acquired by such Person, as applicable.

"**Ad Hoc Cross-Holder Group**" means that certain ad hoc group of Lenders hereunder and Prepetition Lenders and Holders, including certain Fortress Entities and Cerberus Entities, and other holders of the Borrower's debt and equity, in each case, represented by Kirkland & Ellis LLP.

"**Ad Hoc First Lien Group**" means that certain ad hoc group of Lenders hereunder and Prepetition Lenders and Holders represented by Sidley Austin LLP.

"**Administration Charge**" means the superpriority charge over Canadian Collateral granted by the CCAA Court to secure payment of the fees and disbursements of Canadian counsel to the Debtors, the Information Officer and the Information Officer's counsel, the quantum of which shall be satisfactory to the Administrative Agent.

"**Administrative Agent**" has the meaning assigned to such term in the recitals hereto and includes each other Person appointed as a successor pursuant to Article 10.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit A or such other form as may be supplied from time to time by the Administrative Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that notwithstanding the foregoing, in no event shall any Cerberus Entity, Fortress Entity or any of their affiliated funds or accounts be deemed to be an Affiliate of the Loan Parties for any purpose. Notwithstanding the foregoing, [redacted] and members of the [redacted] shall not be deemed Affiliates of [redacted] or of its Affiliates.

"**Affiliate Lender**" means each Lender that is an Affiliate of the Borrower. For the avoidance of doubt, in no event shall any Cerberus Entity, any Fortress Entity, or any of their affiliated funds or accounts be deemed to be an Affiliate of the Loan Parties for any purpose.

"**Agent**" means each of Administrative Agent and Collateral Agent and any other Person appointed under the Loan Documents to serve in an agent or similar capacity for the benefit of the Secured Parties.

"**Agent Parties**" has the meaning assigned to such term in Section 10.01(d)(ii).

4

"**Agreement**" has the meaning assigned to such term in the recitals hereto.

"**AML Legislation**" has the meaning assigned to such term in Section 10.18.

"**Anti-Terrorism Laws**" means any Requirement of Law related to terrorism financing, money laundering or economic sanctions, including, but not limited to, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("**USA PATRIOT Act**") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-1706, as amended), the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and Executive Order 13224 (effective September 24, 2001). This definition also includes Canadian Requirements of Law related to terrorism financing, money laundering or economic sanctions, including, but not limited to: Part II.1 of the Criminal Code, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act, the Special Economic Measures Act (Canada), the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations.

"**Applicable Margin**" means a rate per annum equal to 17.5%; *provided* that, with respect to any Interest Period for which the Borrower has made a Cash Interest Election in accordance with clause (i) of the proviso to Section 2.06(c), the Applicable Margin for interest accruing during such Interest Period, so long as on the applicable Interest Payment Date no Default or Event of Default has occurred or is continuing, shall be deemed to have been a rate per annum equal to 15.5% upon (but not before) the cash payment of such interest on the applicable Interest Payment Date.

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage represented by the ratio of the amount of such Lender's Loans to the aggregate Loans of all Lenders outstanding at such time.

"**Approved Bankruptcy Court Order**" means (a) each of the DIP Orders and DIP Recognition Orders, as such orders are amended and in effect from time to time in accordance with this Agreement, (b) any other order entered by the Bankruptcy Court or CCAA Court regarding, relating to or in any way impacting (i) any rights or remedies of any Secured Party, (ii) the Loan Documents (including the Loan Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any superpriority claims (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or superpriority claims), (iv) use of Cash Collateral, (v) debtor-in-possession financing, (vi) adequate protection or otherwise relating to any Prepetition Secured Obligations (vii) any chapter 11 plan, or (viii) any disclosure statement, in the case of each of the foregoing clauses (i) through (viii), that (x) is in form and substance satisfactory to the Administrative Agent and the Required Lenders, (y) has not been vacated, reversed or stayed and (z) has not been amended or modified in a manner adverse to the rights of the Administrative Agent or the Lenders except as agreed in writing by the Administrative Agent and the Required Lenders in their sole discretion, and (c) any other order entered by the Bankruptcy Court or CCAA Court that (i) is in form and substance satisfactory to the Administrative Agent and the Required

Lenders, (ii) has not been vacated, reversed or stayed and (iii) has not been amended or modified except in a manner satisfactory to the Administrative Agent and the Required Lenders.

"**Approved Fund**" means, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor; *provided*, that, none of the Borrower, its Subsidiaries or any Affiliate of the Borrower shall be considered an "Approved Fund".

"**Asset Sale**" means:

(1) any one or a series of conveyance, sale, lease, sublease, assignment, exchange, transfer or other disposition (including by way of exclusive license (as licensor or sub-licensor), merger or consolidation and including any Sale and Leaseback Transaction) of any property (whether real, personal or mixed, and whether tangible or intangible including rights under the Inmarsat Agreement), but excluding (x) leases (and subleases) of capacity on any satellite in the ordinary course of business (including under the AST Transaction (as defined in the Restructuring Support Agreement)) and (y) dispositions of cash and Cash Equivalents in the ordinary course of business and, in each case of the foregoing clauses (x) and (y), in accordance with the Budget, by the Borrower or any of its Subsidiaries (each referred to in this definition as a "disposition"); or

(2) the issuance or sale of Equity Interests (other than directors' qualifying shares or shares or interests required to be held by foreign nationals) of any Guarantor (other than to the Borrower or another Guarantor) or any Subsidiary that is not a Guarantor (other than to a Loan Party or another Subsidiary of the Borrower) (whether in a single transaction or a series of related transactions),

in each case other than:

(i) a disposition of Cash Equivalents or Investment Grade Securities;

(ii) a disposition of used, worn out, obsolete or surplus tangible personal property (other than any satellite) by the Borrower or any of its Subsidiaries in the ordinary course of business and the abandonment or other disposition of intellectual property that is, in each case, in the reasonable judgment of the Borrower, no longer economically practicable to maintain or useful in the conduct of the business or potential business of the Borrower and its Subsidiaries taken as a whole;

(iii) [reserved];

(iv) any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 6.07; and

(v) any disposition of property or assets or the issuance of securities by a Guarantor to the Borrower or by the Borrower (solely with respect to a disposition of property or assets) or a Guarantor to a Guarantor.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B-1, or any other form approved by the Administrative Agent.

"**Assumed Commitment**" has the meaning assigned to such term in Section 2.01(f)(iii)(A).

"**AST**" means AST & Science, LLC.

"**AST Break-Up Fee**" means the "Break-Up Fee" as defined in the Restructuring Support Agreement, pursuant to Section 15 thereof, which fee is subject to Bankruptcy Court approval in the Break-Up Fee Order (as defined in the Restructuring Support Agreement), and, if and when payable and subject to the Restructuring Support Agreement and such Break-Up Fee Order, shall have the status of an allowed superpriority administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expense claims of the kind specified in section 503(b) of the Bankruptcy Code, subject only to the Carve-Out.

"**AST Transaction Milestone**" has the meaning assigned to such term in Section 5.16(h).

"**Attributable Indebtedness**" means, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction; *provided* that if a Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligations".

"**Backstop Fee**" has the meaning assigned to such term in Section 2.05(b).

"**Backstop Lenders**" has the meaning assigned to such term in Section 2.01(f)(i).

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**"  means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"**Beneficial Ownership Regulation**" has the meaning assigned to such term in Section 10.15.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" means, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers of such Person, (iii) in the case of any partnership, the Board of Directors of the general partner of such Person, (iv) in any other case, the functional equivalent of the foregoing and (v) any committee of any such board duly authorized to act on behalf of such board.

"**Boeing**" means Boeing Satellite Systems, Inc.

"**Boeing Agreement**" means the Amended and Restated Contract (for the MSV L-band Space-Based Network) between certain Loan Parties and Boeing as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"**Borrower**" has the meaning assigned to such term in the recitals hereto.

"**Borrowing**" means a borrowing hereunder of Loans of the same Class on the same date (it being understood and agreed that any interest that is Paid In Kind shall not constitute a Borrowing).

"**Borrowing Request**" means a request by the Borrower in accordance with the terms of Section 2.03, and substantially in the form of Exhibit G, or such other form as shall be approved by the Administrative Agent.

"**Budget**" means the Initial Budget, as amended, supplemented, replaced or otherwise modified by any Cash Flow Forecast delivered in accordance with Section 5.01(f)(i).

"**Business Day**" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City.

"**Canadian Collateral**" means collateral of the Debtors located or situate in Canada, including any intangibles located or deemed located in Canada pursuant to applicable law;

"**Canadian Income Tax Act**" means the *Income Tax Act* (Canada), and the regulations thereunder, as amended from time to time.

"**Canadian Law**" means the federal laws and regulations of Canada or the laws and regulations of any province or territory thereof.

"**Canadian Loan Party**" means any Loan Party that is organized or existing under the laws of Canada or any province or territory thereof.

8

"**Canadian Pension Plan**" means a "**registered pension plan**", as that term is defined in subsection 248(1) of the Canadian Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to by, any Loan Party or under which any Loan Party has any actual or potential liability.

"**Canadian Radiocommunication Act**" means the *Radiocommunication Act*, R.S.C. 1985, c. R-2, as amended.

"**Canadian Security Agreement**" means the Senior Secured Super-Priority Debtor-in-Possession Canadian Security Agreement, dated as of the Interim DIP Order Entry Date, among the Canadian Subsidiaries party thereto and the Collateral Agent for the benefit of the Secured Parties, and as amended, supplemented or otherwise modified from time to time, which Canadian Security Agreement shall originally be in the form attached hereto as Exhibit M (with such changes as the Required Lenders consent to in writing).

"**Canadian Security Documents**" means (a) the Canadian Security Agreement and (b) each security agreement, pledge agreement, account control agreement, landlord access agreement, mortgage and each other document, agreement or instrument governed by Canadian Law delivered to the Collateral Agent for the purpose of granting a valid Lien on or security interest in any property as collateral to secure any Obligations, and each PPSA and other financing statement or instrument of perfection and any other document, agreement or instrument governed by Canadian Law filed or to be filed in respect of the Liens on and security interests in property or fixtures created or purported to be created pursuant thereto and any other document, agreement or instrument governed by Canadian Law utilized to pledge or grant or purport to pledge or grant a Lien on or security interest in any property as collateral to secure any Obligations, in each case as amended, restated, amended and restated, extended, renewed, replaced, converted, supplemented or otherwise modified from time to time in accordance with its terms.

"**Canadian Subsidiary**" means any Subsidiary that is organized or existing under the laws of Canada or any province or territory thereof.

"**Canadian Telecommunications Act**" means the *Telecommunications Act*, S.C. 1993, c. 38, as amended.

"**Capex and Other Non-Operating Disbursement Line Items**" means, collectively, each Disbursement Line Item in respect of capital expenditures and other non-operating disbursements (without duplication) in the Budget, excluding any Professional Fee Disbursement Line Items. For avoidance of doubt, the Initial Budget contains one Capex and Other Non-Operating Disbursement Line Item, which is titled "Capex & Other Non-Operating Disbursements".

"**Capital Asset**s" means, with respect to any Person, any equipment, fixed assets and Real Property or improvements of such Person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP have been or should be reflected as additions to property, plant or equipment on the balance sheet of such Person.

"**Capital Expenditures**" means, for any period, without duplication, all expenditures made directly or indirectly by the Borrower and its Subsidiaries during such period for Capital Assets

(in each case, whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability).

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP, in each case, as in effect prior to December 31, 2018.

"**Capital Stock**" means:

(1)      in the case of a corporation or a company, corporate stock or shares;

(2)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)      in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Capitalized Amount**" has the meaning assigned to it in the definition of "Paid in Kind".

"**Carve-Out**" has the meaning assigned to it in the Interim DIP Order or the Final DIP Order, as applicable.

"**Cases**" has the meaning assigned to such term in the recitals hereto.

"**Cash Collateral**" shall have the meaning assigned to such term in section 363(a) of the Bankruptcy Code.

"**Cash Equivalents**" means, as to any Person, (a) securities issued, or fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in

each case maturing not more than one year after the date of acquisition by such Person; and (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above.

"**Cash Interest Election**" has the meaning assigned to such term in Section 2.06(c).

"**Cash Management Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Required Lenders, (i) approving and authorizing, on an interim or final basis, the Loan Parties to use their existing cash management system, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code and (v) authorizing the Loan Parties to use existing bank accounts and existing business forms.

"**Cash Flow Certificate**" means a certificate in the form of Exhibit L accompanying each Cash Flow Forecast, pursuant to which a Responsible Officer of the Borrower shall certify that such Cash Flow Forecast is based on good faith estimates and assumptions made by the management of Borrower believed to be reasonable and attainable over the periods shown therein.

"**Cash Flow Forecast**" means a cash flow forecast for the upcoming thirteen-week period, which shall include the Projected Information on a line-by-line (and aggregate) basis for each week therein that is consistent in form with the Initial Budget and otherwise in a form and substance satisfactory to the Administrative Agent and the Required Lenders.

"**Casualty Event**" means any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower or any of its Subsidiaries. "**Casualty Event**" shall include but not be limited to any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CCAA**" has the meaning assigned to such term in the recitals hereto.

"**CCAA Court**" has the meaning assigned to such term in the recitals hereto.

"**Cerberus Entities**" means [redacted] and funds and/or accounts managed by [redacted] or any of its Affiliates that directly or indirectly own Equity Interests of the Borrower; and "**Cerberus Entity**" means any one of them.

"**Cerberus Lender**" means each Cerberus Entity that is a Lender.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(1)      at any time a change of control occurs under any Material Indebtedness;

(2)      a plan relating to the liquidation or dissolution of the Borrower is adopted;

(3)      any "Person" or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act) other than any (x) Permitted Holders or (y) group consisting of Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) of Voting Stock of the Borrower representing a majority of the voting power of the total outstanding Voting Stock of the Borrower.

For purposes of this definition, a Person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" has the meaning assigned to such term in Section 10.16.

"**CIPO**" means the Canadian Intellectual Property Office.

"**Class**" when used with respect to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing are DIP First Funding Loans, DIP Second Funding Loans, DIP Delayed Draw Term Loans, Roll-Up Loans or Incremental Loans, (b) any Commitment, refers to whether such Commitment is a DIP First Funding Commitment, a DIP Second Funding Commitment, a DIP DDTL Commitment or an Incremental Commitment and (c) any Lender, refers to whether such Lender has a Loan or Commitment of a particular Class; *provided* that once funded (or, with respect to any amounts Paid In Kind, once capitalized as Loans), (x) the DIP First Funding Loans, the DIP Second Funding Loans and the DIP Delayed Draw Term Loans shall all be deemed to be part of the same Class of Loans for all purposes under this Agreement, (y) Incremental Loans shall be deemed to be of the same Class of Loans as the DIP First Funding Loans, the DIP Second Funding Loans and the DIP Delayed Draw Term Loans to the extent so specified in the applicable Increase Joinder and (z) the Roll-Up Loans shall be deemed to be a separate Class of Loans from any Class of DIP New Money Loans for all purposes under this Agreement.

"**Closing Date**" means the first date on which the conditions precedent set forth in Section 4.01 have been satisfied or waived, which for the avoidance of doubt shall be January 5, 2025.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all assets over which a Lien is granted in favor of any Secured Party to secure the Obligations, whether pursuant to the Interim DIP Order, Final DIP Order, any Loan Security Document (including the "Pledged Collateral" as set forth in the applicable Loan Security Document), any Loan Document or any other agreement or order.

"**Collateral Agent**" has the meaning set forth in the Loan Security Agreement.

"**Commitment Assigning Lender**" has the meaning assigned to such term in Section 2.01(f)(iii)(A).

"**Commitment Fee**" has the meaning assigned to such term in Section 2.05(c).

"**Commitments**" means the DIP First Funding Commitments, the DIP Second Funding Commitments, the DIP DDTL Commitments and/or the Incremental Commitments (if any), as the context requires.  The aggregate amount of the Lenders' Commitments on the Closing Date is $441,999,891.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Communications**" has the meaning assigned to such term in Section 10.01(d)(ii).

"**Communications Act**" means the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations, orders and published policies of the FCC thereunder, all as the same may be in effect from time to time.

"**Communications Laws**" means the Communications Act, the Canadian Telecommunications Act, the Canadian Radiocommunication Act, and all other laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services applicable to the Companies.

"**Communications License**" means any authorization, license, permit, certificate, approval, registration, order and franchise and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, ISED and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"**Companies**" means the Borrower and its Subsidiaries; and "Company" means any one of them.

"**Confirmation Order**" means an order by the Bankruptcy Court confirming an Acceptable Plan.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" means, as to any Person, any obligation, agreement, understanding or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" have meanings correlative thereto. Without limiting the generality of the foregoing, for purposes of Section 6.08, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the Voting Stock of such other Person.

"**Covered Party**" has the meaning assigned to such term in Section 10.21(a).

"**CRTC**" means the Canadian Radio-television and Telecommunications Commission, or any successor agency administering, among other things, the Canadian Telecommunications Act, including its staff acting under delegated authority.

"**Cumulative Testing Disbursement Line Item**" means each Disbursement Line Item, other than Capex and Other Non-Operating Disbursement Line Items and Professional Fee Disbursement Line Items.

"**Currency Due**" has the meaning assigned to such term in Section 2.17.

"**Debtor**" or "**Debtors**" has the meaning assigned to such term in the recitals hereto.

14

"**Debtor Relief Laws**" means the Bankruptcy Code, the CCAA and all other liquidation, conservatorship, bankruptcy, judicial management, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief statute, law, ordinance, rule or regulation from time to time in effect in the United States of America, any State thereof, the District of Columbia, Canada, any province or territory thereof or any other applicable jurisdiction in which the Borrower or any Subsidiary thereof may be organized, hold assets or conduct business.

"**Declining Lender**" as defined in Section 2.01(f)(i).

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Default Rate**" as defined in Section 2.06(b).

"**Designated Roll-Up Beneficiary**" as defined in the definition of "Roll-Up Designation Notice".

"**DIP Charge**" means the superpriority charge on Canadian Collateral only, granted by the CCAA Court in favor of the Administrative Agent and Lenders pursuant to the Interim DIP Recognition Order which DIP Charge shall be subordinate to the Administration Charge.

"**DIP DDTL Commitments**" means with respect to each Lender, the commitment of such Lender to make DIP Delayed Draw Term Loans on any DIP DDTL Funding Date, in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the heading "DIP DDTL Commitment", as such commitment may be (a) terminated pursuant to Article 8 or the DIP Order, (b) terminated pursuant to Section 2.01(c) or (c) modified from time to time to reflect any assignments permitted by Section 10.04. The aggregate amount of the DIP DDTL Commitments on the Closing Date is $103,000,000.

"**DIP DDTL Commitment Lender**" means, at any time and for any period, any Lender that has a DIP DDTL Commitment at such time or at any point during such period.

"**DIP DDTL Funding Discount Fee**" has the meaning assigned to such term in Section 2.05(f).

"**DIP DDTL Funding Date**" means each date on which the conditions set forth in Section 4.03 are satisfied (or waived in accordance with Section 10.02) and a Borrowing of DIP Delayed Draw Term Loans is extended to the Borrower hereunder.

"**DIP Delayed Draw Term Loan**" means any Borrowing hereunder of Loans in respect of the DIP DDTL Commitments or any fees thereon being Paid in Kind (it being understood that the DIP Delayed Draw Term Loans shall include any Capitalized Amount in respect thereof).

"**DIP Facility**" has the meaning assigned to such term in the recitals hereto.

"**DIP First Funding Commitments**" means with respect to each Lender, the commitment of such Lender to make the DIP First Funding Loans on the DIP First Funding Date, in an

aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the heading "DIP First Funding Commitment", as such commitment may be (a) terminated pursuant to Section 8.01 or the DIP Order, (b) terminated pursuant to Section 2.01(c) or (c) modified from time to time to reflect any assignments permitted by Section 10.04. The aggregate amount of the DIP First Funding Commitments on the DIP First Funding Date (immediately prior to the Borrowing of the DIP First Funding Loans on such date) is $12,000,000.

"**DIP First Funding Date**" means the first date on which the conditions set forth in Section 4.02 are satisfied (or waived in accordance with Section 10.02).

"**DIP First Funding Discount Fee**" has the meaning assigned to such term in Section 2.05(d).

"**DIP First Funding Loans**" means any Borrowing hereunder of Loans in respect of the DIP First Funding Commitments or any fees thereon being Paid in Kind (it being understood that the DIP First Funding Loans shall include any Capitalized Amount in respect thereof).

"**DIP Liens**" has the meaning given to such term in the DIP Orders.

"**DIP Loan Proceeds Account**" means a deposit account of the Borrower that is reasonably acceptable to the Administrative Agent and that is subject to an Account Control Agreement entered into in accordance with Section 5.14.

"**DIP New Money Loans**" means DIP First Funding Loans, DIP Second Funding Loans, DIP Delayed Draw Term Loans and/or Incremental Loans, as the context requires.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Portion**" has the meaning assigned to such term in Section 2.01(f)(i).

"**DIP Pro Rata Allocation Amount**" means, with respect to any Lender, Syndication Eligible Prepetition Lender or Electing Lender, the amount equal to the result of (1) the proportion of (A) the Prepetition First Lien Secured Obligations (other than Prepetition First Out Obligations) under each of the 1L Loan Agreement and the 1L Notes Indenture owed to such Lender, Syndication Eligible Prepetition Lender or Electing Lender (or, in each case, Affiliate thereof to the extent also not a Lender, Syndication Eligible Prepetition Lender or Electing Lender, as applicable), as applicable, as of the Petition Date to (B) all Prepetition First Lien Secured Obligations (other than Prepetition First Out Obligations) outstanding as of the Petition Date (this clause (1), with respect to any Lender, Syndication Eligible Prepetition Lender or Electing Lender, its "**DIP Pro Rata Allocation Percentage**") *multiplied by* (2) the aggregate amount of Loans and/or Commitments hereunder, excluding any Capitalized Amounts as a result of any interest, fee or other amount that was Paid in Kind pursuant to the terms of this Agreement. For the avoidance of doubt, (x) such principal Prepetition First Lien Secured Obligations shall be calculated to include accrued and unpaid interest and fees and any amounts thereon that were actually paid-in-kind as of the applicable calculation date and (y) to the extent multiple Lenders have the same Affiliate (that is not a Lender) that holds applicable Prepetition First Lien Secured Obligations, such Lenders shall allocate such Affiliate's holdings of Prepetition First Lien Secured Obligations amongst themselves pursuant to written notice to the Administrative Agent. Notwithstanding

anything herein to the contrary [redacted]'s DIP Pro Rata Allocation Amount (and DIP Pro Rata Allocation Percentage) shall be based on the Prepetition First Lien Secured Obligations (other than Prepetition First Out Obligations) that are held by [redacted], [redacted], [redacted], [redacted], [redacted], [redacted] and any other holder of such Prepetition First Lien Secured Obligations that is a Fortress Entity.

"**DIP Pro Rata Allocation Percentage**" has the meaning assigned to such term in the definition of "DIP Pro Rata Allocation Amount".

"**DIP Recognition Orders**" means, collectively, the Interim DIP Recognition Order and Final DIP Recognition Order.

"**DIP Second Funding Commitment Lender**" means, at any time and for any period, any Lender that has a DIP Second Funding Commitment at such time or at any point during such period.

"**DIP Second Funding Commitments**" means with respect to each Lender, the commitment of such Lender to make the DIP Second Funding Loans on the DIP Second Funding Date, in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the heading "DIP Second Funding Commitment", as such commitment may be (a) terminated pursuant to Section 8.01 or the DIP Order, (b) terminated pursuant to Section 2.01(b) or (c) modified from time to time to reflect any assignments permitted by Section 2.01(f) or 10.04.  The aggregate amount of the DIP Second Funding Commitments on the Closing Date is $326,999,891.

"**DIP Second Funding Discount Fee**" has the meaning assigned to such term in Section 2.05(e).

"**DIP Second Funding Loans**" means any Borrowing hereunder of Loans in respect of the DIP Second Funding Commitments or any fees thereon being Paid in Kind (it being understood that the DIP Second Funding Loans shall include any Capitalized Amount in respect thereof).

"**DIP Second Funding Date**" means the third (3rd) Business Day after the Final DIP Order Entry Date.

"**DIP Second Funding Lender**" means any Lender that holds a DIP Second Funding Commitment and/or a DIP Second Funding Loan outstanding hereunder.

"**DIP Secured Party Advisors**" means, with respect to the Agent, Foley & Lardner LLP, and with respect to the Lenders, (a) Kirkland & Ellis LLP, as counsel to the Ad Hoc Cross-Holder Group (in such capacity, the "**Ad Hoc Cross-Holder Group Primary Advisors**"), (b) Sidley Austin LLP, as counsel to the Ad Hoc First Lien Group (in such capacity, the "**Ad Hoc First Lien Group Primary Advisors**"), (c) Guggenheim Securities, LLC, as financial advisor to the Ad Hoc First Lien Group, (d) Foley & Lardner LLP, as counsel to the Administrative Agent, (e) Wiley Rein LLP, as regulatory counsel, (f) local counsel in each material relevant jurisdiction (which may be a single counsel for multiple jurisdictions), including, for the avoidance of doubt, Blake, Cassels & Graydon LLP, (*provided* that in the case of an actual or perceived conflict of interest, such expense reimbursement shall include the reasonable, actual and documented fees and

expenses of an additional outside counsel, an additional regulatory counsel and an additional local counsel in each material relevant jurisdiction (which may be a single counsel for multiple jurisdictions) for each group of similarly situated Lenders), and (g) tax, accounting, and other professionals and advisors retained by the Lenders.

"**DIP Superpriority Claims**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**DIP Unused Commitment Fee**" has the meaning assigned to such term in Section 2.05(g).

"**DIP Unused Commitment Fee Payment Date**" means (x) the last Business Day of each calendar month, commencing on January 31, 2025 and (y) the Maturity Date.

"**DIP Unused Commitment Fee Period**" means (x) initially the period commencing on the Closing Date and ending on the immediately succeeding DIP Unused Commitment Fee Payment Date and (y) thereafter, each period commencing on a DIP Unused Commitment Fee Payment Date and ending on the immediately succeeding DIP Unused Commitment Fee Payment Date.

"**Disbursement Line Items**" means, collectively, each disbursement line item (without duplication) in the Budget, including "Employee", "Network", "General & Administrative", "Capex & Other Non-Operating Disbursements", and "Total Professional Fees" (or words of like import).

"**Disqualified Capital Stock**" means any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 180 days after the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the date that is 180 days after the Maturity Date or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided*, *however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the date that is 180 days after the Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Dividend**" with respect to any Person means that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property or cash (in each case, other than any such dividend, distribution, payment or delivery of property consisting of Qualified Capital Stock of

such Person, and excluding, for the avoidance of doubt, consent fees or payments) to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration (other than Qualified Capital Stock of such Person) any of the outstanding Equity Interests of such Person (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration (other than outstanding Qualified Capital Stock of such Person) any of the outstanding Equity Interests of such Person (or any options or warrants issued by such person with respect to its Equity Interests). "Dividends" with respect to any Person shall also include all payments made by such Person with respect to any stock appreciation rights or equity incentive plans or setting aside of any funds for the foregoing purposes, but, for the avoidance of doubt, (x) any payments under cash incentive and bonus plans and (y) any dividend, distribution, payment or delivery of property consisting solely of Qualified Capital Stock of such Person, in each case, shall not be considered a "Dividend".

"**dollars**" or "**$**" means lawful money of the United States.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electing Lenders**" has the meaning assigned to such term in Section 2.01(f)(i).

"**Election Joinder**" as defined in Section 2.01(f)(i).

"**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"**Electronic System**" means any electronic system, including e-mail, e-fax, Intralinks®, ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its respective Affiliates or any other Person, providing for access to data protected by passcodes or other security system.

"**Eligible Assignee**" means (a) any Lender, any Affiliate of a Lender and any Approved Fund or (b) any commercial bank, insurance company, investment or mutual fund or other entity that extends credit or buys loans or debt securities in the ordinary course of its business; *provided* that "Eligible Assignee" shall not include (i) any natural Person (or a holding company, investment

19

vehicle or trust for, or owned and operated for the primary benefit of a natural Person), (ii) any Affiliate of the Borrower, (iii) the Borrower or any of its Subsidiaries or (iv) any Person which is not party to, or has not agreed in writing to be bound by the terms and obligations of, (or substantially concurrently with becoming a Lender hereunder will not become party to, or will not agree in writing to be bound by the terms and obligations of) the Restructuring Support Agreement; *provided*, that any Person described in the foregoing clause (iv) may be an Eligible Assignee if the Required Ad Hoc Holders provide their written consent to such Person becoming an Eligible Assignee.

"**Embargoed Person**" means any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons," or any other sanctions list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), or is owned 50 percent or more, directly or indirectly, by one or more party included on any such list, (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of OFAC sanctions or embargo programs, or (iii) is otherwise the target of U.S. economic sanctions.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA but excluding Canadian Pension Plans) which is sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower or any Company or with respect to which, the Borrower or any Company has or could reasonably be expected to have liability, contingent or otherwise.

"**Environment**" means ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" means any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and in the case of each of (i) and (ii) shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" means any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health, safety or the Environment, the Release or threatened Release of any Hazardous Material, natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" means any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equity Interest**" means, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the Closing Date or issued thereafter, but excluding debt securities convertible or exchangeable into such equity.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" means, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414 of the Code. For the avoidance of doubt, when any provision of this Agreement relates to a past event or period of time, the term "ERISA Affiliate" includes any Person who was, as to the time of such past event or period of time, an "ERISA Affiliate" within the meaning of the preceding sentence.

"**ERISA Event**" means the occurrence of any one or more of the following: (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Single Employer Plan (other than an event for which the 30-day notice period is waived by regulation); (b) any failure by a Single Employer Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan; (d) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than any required contributions to any Employee Benefit Plans and non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA); (e) the receipt by the Borrower, any Company or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan; (f) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability with respect to the withdrawal from any Single Employer Plan or Multiemployer Plan; (g) the receipt by the Borrower, any Company or any of their ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (i) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (j) the imposition of a lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Single Employer Plan; (k) the cessation of operations at a facility of the Companies or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA; or (l) any other event or condition with respect to a Single Employer Plan or Multiemployer Plan that would result in liability of the Companies.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" has the meaning assigned to such term in Section 8.01.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property or (c) any other Casualty Event.

"**Excess DIP Second Funding Loans Proceeds**" as defined in Section 2.02(b).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Property**" means any intent-to-use trademark application to the extent and for so long as creation by a pledgor of a security interest therein would result in the loss by such pledgor of any material rights therein.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Subsidiary Guarantor hereunder, (a) Taxes imposed on or measured by its net income or profits (however denominated), franchise taxes imposed on it (in lieu of net income taxes), and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of the recipient being organized under the laws of or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, United States federal withholding Taxes imposed on payments pursuant to any Requirements of Law that are in effect on the date on which (i) such Lender becomes a party hereto, except to the extent that such Lender's assignor, if any, was entitled, immediately prior to such assignment, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15; *provided* that this subclause (b)(i) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender acquired pursuant to Section 2.16(b), or (ii) such Lender designates a new lending office, except to the extent that such Lender was entitled, immediately prior to such change in lending office, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15, (c) any withholding Tax that is attributable to such Lender's failure to comply with Section 2.15(e), (d) any U.S. federal withholding Taxes imposed under FATCA, or (e) Canadian withholding Taxes payable under Part XIII of the Canadian Income Tax Act which arise as a result of such Administrative Agent, Lender or other recipient (i) not dealing at arm's length with the Borrower, any partner of the Borrower or the Guarantors or (ii) the Administrative Agent, Lender or other recipient being, or not dealing at arm's length for the purposes of the Canadian Income Tax Act with, a "specified shareholder" (as defined in subsection 18(5) of the Canadian Income Tax Act) of any direct or indirect partner of the Borrower or Guarantors (other than, in the case of (i) and (ii) arising as a result of such person having executed, delivered, become party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement).

"**Extraordinary Receipts**" means any cash received by the Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.10(a), (b), (c), (d) or (f) hereof), including, without limitation, (a) foreign, United States, state or local Tax refunds, (b) Employee Benefit Plan or Canadian Pension Plan reversions, (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (including, without limitation, proceeds of any avoidance action, infringement proceeds, breach of contract claims, damages (including treble damages), settlement amounts and other payments) received by the Borrower or any of its Subsidiaries, (d) condemnation awards (and payments in lieu thereof), (e) indemnity payments not received in the ordinary course of business, and (f) any purchase price adjustment received in connection with any purchase agreement entered into in connection with the acquisition by a Loan Party of (i) any Capital Stock of another Person or (ii) all or substantially all of the assets of another Person.

"**Fair Market Value**" means, with respect to any asset or property, the price which could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction, which, in the case of an Asset Sale, shall be determined either at the time of the Asset Sale or as of the date of the definitive agreement with respect to such Asset Sale. Unless otherwise specified, any determination of Fair Market Value shall be made by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any applicable intergovernmental agreements between a non-U.S. jurisdiction and the United States with respect thereto and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" means the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**Federal Funds Effective Rate**" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions, as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time, and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the effective federal funds rate, *provided* that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**Financial Officer**" of any Person means the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**Financial Statements**" means the financial statements to be furnished pursuant to Section 5.01(a) or (b).

"**Final DIP Order**" means a Final Order of the Bankruptcy Court in substantially the form of the Interim DIP Order, with only such modifications thereto as are reasonably necessary to

convert the Interim DIP Order to a Final Order and such other modifications as are satisfactory in form and substance to the Administrative Agent and the Required Lenders.

"**Final DIP Order Entry Date**" means the date on which the Bankruptcy Court enters the Final DIP Order in the Cases.

"**Final DIP Recognition Order**" means an order of the CCAA Court in form and substance satisfactory to the Administrative Agent and the Required Lenders recognizing the Final DIP Order and giving it full force and effect in Canada.

"**Final Order**" means an order, ruling, or judgment of the Bankruptcy Court or CCAA Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided*, *however*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First DIP DDTL Borrowing**" means the initial Borrowing of DIP Delayed Draw Term Loans.

"**First Round Electing Lender**" as defined in Section 2.01(f)(i).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Loan Security Document, that such Lien is senior in priority to any other Lien to which such Collateral is subject, other than the Carve-Out, the AST Break-Up Fee (if any), the Administration Charge and Prepetition Permitted Prior Liens applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Loan Security Document.

"**Fitch**" means Fitch Ratings Inc. or any successor to the rating agency business thereof.

"**Flood Insurance Requirements**" means, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors), the following documents:  (A) a completed standard "life of loan" flood hazard determination form, (B) if any improvements to the applicable real property are located in a special flood hazard area, a notification to the Borrower (the "**Borrower Notice**") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("**NFIP**") is not available because the community does not participate in the NFIP, (C) documentation evidencing the Borrower's receipt of the Borrower Notice, and (D) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of one of the following:  the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page

confirming that flood insurance has been issued, or such other evidence of flood insurance reasonably satisfactory to the Administrative Agent.

"**Foreign Lender**" means any Lender that is not, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more U.S. Persons have the authority to control all substantial decisions of such trust.  In addition, solely for purposes of clauses (b) and (c) of the definition of Excluded Taxes (for the avoidance of doubt, excluding for purposes of Section 2.15(e)(ii)(C)), a Foreign Lender shall include a partnership or other entity treated as a partnership created or organized in or under the laws of the United States, or any political subdivision thereof but only to the extent the partners of such partnership (including indirect partners if the direct partners are partnerships or other entities treated as partnerships for U.S. federal income tax purposes created or organized in or under the laws of the United States or any political subdivision thereof) are treated as Foreign Lenders under the preceding sentence (in which event, the determination of whether a U.S. federal withholding Tax on payments was imposed pursuant to any Requirements of Law in effect at the time such Foreign Lender became a party hereto will be made by reference to the time when the applicable direct or indirect partner became a direct or indirect partner of such Foreign Lender, but only if such date is later than the date on which such Foreign Lender became a party hereto).

"**Foreign Plan**" means any employee benefit plan, program, policy, arrangement or agreement (other than a Canadian Pension Plan) sponsored, maintained or contributed to or required to be contributed to by any Company or with respect to which any Company has or could reasonably be expected to have liability, contingent or otherwise, with respect to employees employed outside the United States (including for greater certainty any employee benefit plan, program policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed in Canada, other than a Canadian Pension Plan).

"**Foreign Subsidiary**" means a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"**Fortress Entities**" means funds and/or accounts managed by [redacted] or any of their respective Affiliates that directly or indirectly own Equity Interests of the Borrower as of the Closing Date, including [redacted]; and "**Fortress Entity**" means any one of them.

"**Fortress Lender**" means each Fortress Entity that is a Lender.

"**Funding Date**" means, with respect to any Loan, the date on which such Loan is made.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Closing Date.

"**Governmental Authority**" means the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency (including the FCC, ISED and the CRTC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Governmental Real Property Disclosure Requirements**" means any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, from, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 7.01.

"**Guarantees**" means the guarantees issued pursuant to Article 7 by the Subsidiary Guarantors.

"**Guarantors**" means the Subsidiary Guarantors.

"**[redacted]**" means [redacted].

"**[redacted] Entity**" means [redacted] and any Affiliate thereof.

"**[redacted] Proxy**" has the meaning assigned thereto and be subject to the restrictions set forth in the Operating Agreement.

"**Hazardous Materials**" means the following:  hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or hazardous or toxic chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Requirement of Law pertaining to the Environment.

"**Hedging Agreement**" means any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" means obligations under or with respect to Hedging Agreements.

"**Incentive Payments**" means the orbital performance incentives and liquidated damages that may become due and payable under the Boeing Agreement.

"**Incur**" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be incurred by such Person at the time it becomes a Subsidiary.

"**Increase Effective Date**" has the meaning assigned to such term in Section 2.18(b).

"**Increase Joinder**" has the meaning assigned to such term in Section 2.18(a).

"**Incremental Commitments**" has the meaning assigned to such term in Section 2.18(a).

"**Incremental Loan Facility**" has the meaning assigned to such term in Section 2.18(a).

"**Incremental Loan Lender**" any Lender that holds an Incremental Commitment and/or an Incremental Loan outstanding hereunder.

"**Incremental Loans**" has the meaning assigned to such term in Section 2.18(c) (it being understood that the Incremental Loans shall include any Capitalized Amount in respect thereof).

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person; (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness of others secured by any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but limited to the lesser of the fair market value of such property and the amount of the obligation so secured; (f) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such Person; (g) all Hedging Obligations to the extent required to be reflected on a balance sheet of such Person; (h) all Attributable Indebtedness of such Person; (i) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (j) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such Person is not liable therefor.  For the avoidance of doubt the Incentive Payments shall not be considered Indebtedness.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" has the meaning assigned to such term in Section 10.03(b).

"**Information**" has the meaning assigned to such term in Section 10.12.

"**Information Officer**" means the licensed insolvency trustee appointed by the CCAA Court to act as information officer in the Recognition Proceedings.

"**Initial Assumed DIP Portions**" as defined in Section 2.01(f)(i).

"**Initial Budget**" shall mean a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, including the line item details for and anticipated weekly uses of the proceeds of the Loans for such period (and draws under this Agreement), which shall include, among other things, operating receipts, available cash, cash flow, trade payables and ordinary course expenses, employment related expenses, capital expenditures and other non-operating disbursements, fees and expenses relating to this Agreement, fees and expenses related to the Cases (including professional fees), working capital and other general corporate needs and proposed Borrowings (subject to the satisfaction (or waiver) of the applicable conditions precedent in Article 4) under the DIP Facility, which forecast shall be in form and substance satisfactory to the Required Ad Hoc Holders. Such Initial Budget shall be in the form set forth in Exhibit J hereto and also attached as an exhibit to the Interim DIP Order. Until supplemented, replaced or modified pursuant to Section 5.01(f) and approved by the Required Ad Hoc Holders in accordance hereof, the Initial Budget shall constitute the Budget.

"**Initial CCAA Recognition Order**" means an order of the CCAA Court recognizing the Cases of the Debtors.

"**Initial Election Deadline**" means 5:00 p.m. New York City time on January 13, 2025 (or such other date to the extent consented to in writing by the Required Ad Hoc Holders).

"**Initial Test Date**" has the meaning assigned to such term in the definition of "**Testing Period**".

"**Inmarsat**" means Inmarsat Global Limited.

"**Inmarsat Agreement**" means the Amended and Restated Cooperation Agreement, dated as of August 6, 2010, by and among the Borrower, Ligado Networks (Canada) Inc. and Inmarsat (and its successor or assignee from time to time), as amended, supplemented or otherwise modified from time to time to the extent permitted thereunder and hereunder.

"**Intellectual Property**" has the meaning assigned to such term in Section 3.06(a).

"**Intercompany Note**" means that certain Second Amended and Restated Intercompany Note, dated as of the Interim DIP Order Entry Date, between the Borrower and all of its Subsidiaries, as amended, restated, amended and restated, supplemented or otherwise modified, in each case reasonably acceptable in form and substance to the Collateral Agent and the Required Lenders and which contains or is otherwise subordinated to the Obligations pursuant to subordination provisions reasonably acceptable in form and substance to the Collateral Agent and the Required Lenders, which Intercompany Note shall originally be in the form attached hereto as Exhibit M (with such changes as the Required Lenders consent to in writing).

"**Interest Payment Date**" means (x) the last Business Day of each calendar month, commencing on January 31, 2025 (including, for the avoidance of doubt, after any Maturity Date to the extent any payment Obligations are still outstanding) and (y) the Maturity Date.

"**Interest Period**" means (x) initially the period commencing on the Interim DIP Order Entry Date and ending on the immediately succeeding Interest Payment Date and (y) thereafter, each period commencing on an Interest Payment Date and ending on the immediately succeeding Interest Payment Date.

"**Interim DIP Order**" means the interim order entered by the Bankruptcy Court in the Cases (as the same may be amended, supplemented, or modified form time to time after entry thereof in a manner satisfactory to the Required Lenders in their sole discretion) authorizing and approving, among other things, the DIP Facility, use of Cash Collateral, prepayment of the Prepetition First Out Obligations from the proceeds of the DIP Second Funding Loans and the Transactions, which interim order is in form and substance satisfactory to the Required Lenders in their sole discretion.

"**Interim DIP Order Entry Date**" means the date on which the Bankruptcy Court enters the Interim DIP Order in the Cases.

"**Interim DIP Recognition Order**" means an order of the CCAA Court in form and substance satisfactory to the Agent and the Required Lenders recognizing the Interim DIP Order and giving it full force and effect in Canada and granting the DIP Charge, which order for greater certainty may be the supplemental recognition order granted by the CCAA Court concurrently with the Initial CCAA Recognition Order.

"**Investments**" means, with respect to any Person, directly or indirectly, (i) lending money or credit (by way of guarantee or otherwise) or making advances to any Person (other than to customers in the ordinary course of business), or purchasing or acquiring any Equity Interests, bonds, notes, debentures, guarantees or other obligations or securities of, or any other interest in, or making any capital contribution to, any other Person, or purchasing or owning a futures contract or otherwise becoming liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (ii) purchasing or acquiring (in one transaction or a series of transactions) any other assets not set forth in clause (i) above.

"**Investment Grade Rating**" means a rating equal to or higher Baa3 (or equivalent) by Moody's, or BBB- (or equivalent) by S&P or Fitch, or an equivalent rating by any other rating agency.

"**Investment Grade Securities**" means:

(1)        securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)        securities that have an Investment Grade Rating, but excluding any debt securities or loans or advances between and among the Borrower and its Subsidiaries,

(3)     investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/ or distribution, and

(4)     corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"**ISED**" means the Canadian federal government Department of Innovation, Science and Economic Development or any successor department or agency administering the Canadian Radiocommunication Act, among other statutes, including its staff acting under delegated authority.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Exhibit D.

"**Joint Venture**" means any Person, other than an individual or a Subsidiary of the Borrower, (i) in which the Borrower or a Guarantor holds or acquires an ownership interest (whether by way of Capital Stock or otherwise) and (ii) which is engaged in a Similar Business.

"**Judgment Currency**" has the meaning assigned to such term in Section 2.17.

"**Junior Indebtedness**" means, collectively, (i) Indebtedness for borrowed money which is (x) unsecured or (y) Subordinated Indebtedness or (z) secured only by Collateral on a junior lien basis to the Liens securing the Obligations, and (ii) Prepetition Indebtedness.

"**Leases**" means any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lenders**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that has or holds Loans and/or Commitments and becomes a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"**License Subsidiary**" means each single purpose Wholly Owned Subsidiary of the Borrower that is not a Foreign Subsidiary and that is created solely to hold or lease Communications Licenses issued by the FCC for one or more of its businesses (for the avoidance of doubt, License Subsidiary shall not include One Dot Six LLC or Ligado Networks Inc. of Virginia).

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, hypothecation, deemed trust or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any other agreement to give a security interest and any filing of or agreement to give any financing statement (or equivalent

document) under the UCC or PPSA (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"**Loan Assigning Lender**" as defined in Section 2.01(f)(iii)(B).

"**Loan Documents**" means this Agreement, including all related exhibits and schedules, the Promissory Notes (if any), the Loan Security Documents, the U.S. Bank Fee Letter and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"**Loan Parties**" means the Borrower and the Guarantors.

"**Loan Secured Parties**" means the Lenders, the Administrative Agent, the Collateral Agent and any Indemnitee; and "**Loan Secured Party**" means any one of them.

"**Loan Security Agreement**" means the Senior Secured Super-Priority Debtor-in-Possession Security Agreement, dated as of the Interim DIP Order Entry Date, among the Loan Parties party thereto and the Collateral Agent for the benefit of the Loan Secured Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, which Loan Security Agreement shall originally be in the form attached hereto as Exhibit O (with such changes as the Required Lenders consent to in writing).

"**Loan Security Documents**" means (a) each Canadian Security Document, (b) the Loan Security Agreement, (c) the DIP Orders and DIP Recognition Orders (to the extent related to the granting of Liens over any assets or guaranties of the Obligations) and (d) each other security agreement, pledge agreement, account control agreement, landlord access agreement, mortgage and each other document, agreement or instrument governed by applicable local, state, provincial, territorial or federal law delivered to the Collateral Agent for the purpose of granting a valid Lien on or security interest in any property as collateral to secure any Obligations, and each UCC, PPSA and other financing statement or instrument of perfection and any other document, agreement or instrument governed by applicable local, state, provincial, territorial or federal law filed or to be filed in respect of the Liens on and security interests in property or fixtures created or purported to be created pursuant thereto and any other document, agreement or instrument governed by local, state, provincial, territorial or federal law utilized to pledge or grant or purport to pledge or grant a Lien on or security interest in any property as collateral to secure any Obligations, in each case as amended, restated, amended and restated, extended, renewed, replaced, converted, supplemented or otherwise modified from time to time in accordance with its terms.

"**Loans**" means the DIP First Funding Loans, the DIP Second Funding Loans, the DIP Delayed Draw Term Loans, the Roll-Up Loans and/or the Incremental Loans (if any), as the context requires (it being understood that the Loans shall include any Capitalized Amount in respect thereof).

"**Margin Stock**" has the meaning assigned to such term in Regulation U of the Board of Governors.

"**Material Adverse Effect**" means the occurrence of any event, effect, change, circumstance, condition or matter which has, or could reasonably be expected to have, a material

adverse effect on (a) the business, assets, property, operations or condition, financial or otherwise, of the Borrower and its Subsidiaries, taken as a whole; (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the Interim DIP Order, the Final DIP Order, the Interim DIP Recognition Order or the Final DIP Recognition Order, or on the rights and remedies of the Administrative Agent or the Lenders hereunder or thereunder; or (c) the ability of the Loan Parties to perform their obligations under the Loan Documents, taken as a whole; *provided* that "Material Adverse Effect" shall expressly exclude (i) the effect of the filing of the Cases and the Recognition Proceedings and (ii) any action required to be taken under the Loan Documents or the DIP Orders or the DIP Recognition Orders.

"**Material Contract**" means (a) each Material Lease, (b) the Boeing Agreement, (c) the Restructuring Support Agreement and (d) each other agreement entered into by the Borrower or any Subsidiary after the Closing Date (other than any agreement in respect of Indebtedness for borrowed money) with respect to which the Companies will, in the aggregate, pay or receive more than $10,000,000 thereunder in any fiscal year; *provided*, that, the Required Ad Hoc Holders may remove any of the foregoing as a "Material Contract" by providing written notice of such removal to the Administrative Agent and the Borrower.

"**Material Indebtedness**" means any Indebtedness (other than the Loans) or Hedging Obligations of the Borrower or any of its Subsidiaries in an aggregate outstanding principal amount exceeding $10,000,000.  For purposes of determining Material Indebtedness, the "**principal amount**" in respect of any Hedging Obligations of the Borrower or any Subsidiary at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if the related Hedging Agreement were terminated at such time.

"**Material Lease**" means each of (a) the One Dot Six Lease, (b) the Inmarsat Agreement and (c) each other lease requiring an aggregate payment of more than $10,000,000 by the Companies in total in any fiscal year.

"**Material License**" means, at any time, a Communications License that either individually or in the aggregate is material to the business of the Companies.

"**Material Regulatory Request**" means any or all of the following:  (a) collectively, those certain applications filed by the Borrower and/or certain of the Guarantors with the FCC on or about December 31, 2015, seeking to modify various of the Communications Licenses and any amendments, orders, and petitions related thereto; and (b) the pending petition for rulemaking in RM-11681.

"**Maturity Date**" means the earliest to occur of (a) the date that is 120 days after the Petition Date (the "**Initial Stated Maturity Date**"); *provided* that the Maturity Date may be extended by five additional consecutive periods of 120 days (any such additional period (if it occurs in accordance with this proviso) a "**Maturity Date Extension Period**") following delivery by the Borrower of a written request for such applicable additional period to the Required Lenders (with a copy to the Administrative Agent), subject to the prior written consent of the Required Ad Hoc Holders (delivered in writing to the Borrower and the Administrative Agent) to such additional period (such written consent, a "**Maturity Date Extension Approval**") which may be

given, conditioned or withheld in their sole discretion (and shall only be in respect of the single applicable 120 day period then requested by the Borrower); (b) the date on which all the Loans shall become due and payable in full hereunder, whether by acceleration or otherwise in accordance with Article 8 or the applicable DIP Order; (c) if applicable, the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (d) the date a sale of all or substantially all of the Debtors' assets is consummated under Section 363 of the Bankruptcy Code; (e) the date on which the Bankruptcy Court orders any Case dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (f) January 10, 2025, if either the Petition Date or the DIP First Funding Date have not occurred on or prior to such date; and (g) the date that is thirty-five (35) days after the Petition Date, if the Final Order has not been entered prior to the expiration of such 35-day period, unless otherwise extended in writing by the Required Ad Hoc Holders (which extension may be given, conditioned or withheld in their sole discretion).

"**Maximum Rate**" has the meaning assigned to such term in Section 10.16.

"**Milestones**" has the meaning assigned to such term in Section 5.16.

"**Moody's**" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"**[redacted]**" means [redacted].

"**[redacted]**" means any Person controlling, controlled by or under common control with [redacted] or any other owner of [redacted], that is not also controlled by [redacted] and is not [redacted] or a member of [redacted].  For purposes of this definition, "control" means the power, through ownership of securities, contract or otherwise, to direct the policies of the applicable person or entity.

"**Multiemployer Plan**" means a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA to which any of the Companies or any of their respective ERISA Affiliates has, or at any time has ever had, an obligation to contribute.

"**Net Cash Flow**" means, with respect to any Testing Period, an amount equal to (a) the aggregate cash receipts of the Loan Parties during such period (excluding proceeds of any Loans) less (b) the aggregate cash disbursements of the Loan Parties during such Testing Period (other than any repayments of Loans).

"**Net Cash Flow Line Items**" means the net cash flow line item in the Budget under the heading "Net Cash Flow" (or words of like import).

"**Net Cash Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making an Asset Sale, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss, net of: (a) in the event of an Asset Sale (i) the direct costs relating to such Asset Sale excluding amounts payable to any Loan Party or any Affiliate or Subsidiary thereof, (ii) sales, use or other transaction Taxes paid or payable as a result thereof (including a reasonable reserve

for income taxes payable as a result of such Asset Sale) (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), (iii) [reserved] and (iv) any deduction of appropriate amounts to be provided by the Borrower as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrower after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction and (b) in the event of an Event of Loss, (i) any actual and reasonable costs incurred by Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Borrower or such Subsidiary in respect thereof and (ii) any bona fide direct costs and expenses incurred by Borrower or any of its Subsidiaries in connection with the collection of such proceeds, award or other payments.  After netting out items in clauses (a) and (b) of the foregoing definition, if the amount of Net Cash Proceeds would be less than zero, such amount shall be deemed to equal zero.

"**Net Issuance Proceeds**" means, in respect of any issuance or incurrence of Indebtedness, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of customary underwriting discounts and out-of-pocket costs and expenses paid or incurred, in each case, in cash, in connection therewith, in each case, in favor of any Person that is not a Loan Party or an Affiliate or Subsidiary thereof.

"**Network**" means the terrestrial wireless broadband network being developed by the Companies as of the Closing Date, which network is intended to provide terrestrial wireless services in the contiguous United States.

"**Obligations**" means all debts, liabilities and obligations (whether now existing or hereafter arising, absolute or contingent, joint, several or independent) of every nature of Borrower, each other Loan Party and/or its Subsidiaries from time to time owed to the Agents (including former Agents), the Lenders, any Indemnitee or any of them, under any Loan Document or the DIP Orders and DIP Recognition Orders, including in respect of the principal or any Loan, premium, interest (including interest and premium which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise, and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance) and any such obligations that arise after the filing of a petition by or against any Loan Party under the Bankruptcy Code or under Debtor Relief Laws, regardless of whether allowed as a claim in the resulting proceeding, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 (or under any other Debtor Relief Laws) or otherwise.

"**OFAC**" has the meaning assigned to such term in the definition of "**Embargoed Person**."

"**Officer's Certificate**" means a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president, one of the Financial Officers, or, in the case of a Canadian Subsidiary, the secretary or assistant secretary, each in his or her official (and not individual) capacity.

"**One Dot Six Lease**" means the Amended and Restated Long-Term De Facto Transfer Lease Agreement entered into as of December 2, 2022 between OP LLC and One Dot Six LLC as amended, supplemented or otherwise modified from time to time to the extent permitted thereunder and hereunder.

"**One Dot Six Lease Authorization**" means the FCC consent to the One Dot Six Lease reflected in the FCC's records under Lease ID L000017865, or another FCC consent substantially replicating that consent without the imposition of material adverse conditions on any Company.

"**One Dot Six License**" means the license initially granted on October 1, 2003 by the FCC under FCC Registration Number 0008617136 for certain nationwide spectrum rights for 5 MHz in the 1670-1675 MHz band under call sign WPYQ831, a renewal or extension of that license, or another FCC license substantially replicating that initial license without the imposition of any new conditions that are material and adverse to any Company.

"**Operating Agreement**" means the amended and restated operating agreement of the Borrower dated October 23, 2020, as such agreement may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Operating Receipts Line Items**" means the operating receipts line item in the Budget under the heading "Receipts" (or words of like import).

"**Organizational Documents**" means, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) and any shareholder(s) agreements (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person, (e) in the case of the Borrower, the Operating Agreement and any other ancillary or supplemental document in relation thereto and (f) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower or any Subsidiary Guarantor hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp or documentary Taxes or any other excise, property, filing or similar Taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16).

"**Paid in Kind**" means, with respect to any applicable accrued and unpaid (or otherwise due) interest, fee or other amount, that such interest, fee or other amount (rounded up to the nearest $1.00) is added to the unpaid principal amount of the applicable Loans on the applicable Interest Payment Date or other applicable date of payment required pursuant to this Agreement (whereupon from and after such date such interest, fee or other amount shall be treated as part of the principal of the applicable Loans for all purposes of this Agreement and constitute Obligations). Any interest, fee or other amount that is Paid in Kind is referred to herein as a "**Capitalized Amount**" and the obligation of the Borrower to pay all Capitalized Amounts shall be automatically evidenced by this Agreement, and, if applicable, any applicable Promissory Notes.

"**Parent**" means, with respect to any Person, any other Person of which such Person is a direct or indirect Subsidiary.

"**Participant**" has the meaning assigned to such term in Section 10.04(c).

"**Participant Register**" has the meaning assigned to such term in Section 10.04(c).

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor statute).

"**Perfection Certificate**" means a certificate in the form of Exhibit F-1 or any other form approved by the Administrative Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" means a certificate supplement in the form of Exhibit F-2 or any other form approved by the Administrative Agent.

"**Permitted Business**" means any business, service or activity that is the same as, not substantially different from, or reasonably related, incidental, ancillary, complementary or similar to, or that is a reasonable extension or development of, any of the businesses, services or activities in which the Borrower or the Guarantors are engaged, or proposed to be in engaged, on the Closing Date.

"**Permitted Debt**" has the meaning assigned to such term in Section 6.01.

"**Permitted Holders**" means any Cerberus Entity, any Fortress Entity, any [redacted] Entity (so long as all Equity Interests in the Borrower that are held by any [redacted] Entity are subject to the [redacted] Proxy pursuant to the terms of the Operating Agreement as in effect on the Closing Date), Credit Markets Investment Corporation and any Person that is an equityholder of Credit Markets Investment Corporation as of the Closing Date, any Affiliates of any of the foregoing (other than the Borrower and its Subsidiaries and subject to the other limitations described herein).

"**Permitted Investments**" means:

(1)      [reserved];

(2)      Investments existing on the Closing Date to the extent set forth on Schedule 1.01(c) hereto;

(3)      Investments made by the Borrower and its Subsidiaries involving (i) the acquisition and holding of accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) the investment in, acquisition of and holding of cash and Cash Equivalents, (iii) the prepayment of expenses and endorsement of negotiable instruments held for collection in the ordinary course of business or (iv) the making of lease, utility and other similar deposits in the ordinary course of business;

(4)      Investments made by the Borrower in any Guarantor and by any Subsidiary in any Guarantor; *provided* that if such Investment constitutes Indebtedness, such Investment is subject to the Intercompany Note and pledged by such Person as Collateral pursuant to the Loan Security Documents;

(5)      [reserved];

(6)      Investments in securities or obligations of trade creditors or customers in the ordinary course of business received in settlement of debts, satisfaction of judgments or upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(7)      [reserved];

(8)      Investments resulting from the receipt of non-cash consideration in a sale of assets or property that does not constitute an Asset Sale;

(9)      to the extent constituting Investments in Collateral, Capital Expenditures made in accordance with the Budget by the Borrower or any Subsidiary in the ordinary course of business;

(10)     purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business or as required by Governmental Authorities, including in order to maintain or renew Communication Licenses, in each case, in accordance with the Budget;

(11)     [reserved];

(12)     the Specified Investments;

(13)     [reserved];

(14)     Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business and are in accordance with the Budget;

(15)     [reserved];

(16)     other Investments in an aggregate amount not to exceed $5.0 million at any time outstanding, in each case, solely to the extent made (and maintained) as expressly set forth in the Budget;

(17)     other Investments explicitly consented to in writing by the Required Ad Hoc Holders;

(18)     any Investment in Cash Equivalents or Investment Grade Securities;

(19)     [reserved]; and

(20)     guarantees of the Obligations and other guarantees expressly permitted by Section 6.01(g); *provided* that the proceeds of the Indebtedness being guaranteed would be applied in a manner that would otherwise be permitted by this Agreement.

"**Permitted Liens**" means, with respect to any Person:

(1)     inchoate Liens for taxes (including Taxes), assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes (including Taxes), assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP and the nonpayment of which is permitted or required by the Bankruptcy Code, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(2)     Liens in respect of property of the Borrower or any Subsidiary imposed by Requirements of Law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP and the nonpayment of which is permitted or required by the Bankruptcy Code, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(3)     any Lien in existence on the Closing Date to the extent set forth on Schedule 1.01(d) hereto;

(4)     easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Borrower or its Subsidiaries at such Real Property;

(5)     Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which the Borrower or its Subsidiaries shall in good faith be prosecuting an appeal

38

or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(6)     Liens (other than any Lien imposed by ERISA) (x) imposed by Requirements of Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) [reserved] or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that with respect to clauses (x), (y) and (z) of this paragraph (6), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP and the nonpayment of which is permitted or required by the Bankruptcy Code;

(7)     leases and subleases of Real Property of the Borrower or any Subsidiary granted by the Borrower or such Subsidiary, as applicable, to third parties that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or its Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the Real Property subject thereto;

(8)     [reserved];

(9)     Liens securing Indebtedness incurred pursuant to Section 6.01(e); *provided* such Liens do not extend beyond the assets being financed or refinanced in connection with such Purchase Money Obligations and Capital Lease Obligations;

(10)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(11)     (a) Liens securing Indebtedness permitted by Section 6.01(g) (to the extent the Indebtedness underlying such Contingent Obligation is secured by a Permitted Lien), and (b) Liens securing Indebtedness permitted by Section 6.01(f);

(12)     non-exclusive licenses of intellectual property granted by the Borrower or any Subsidiary in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Borrower and its Subsidiaries;

(13)     the filing of UCC and PPSA financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(14)     [reserved];

(15)    other Liens so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $5.0 million at any time outstanding and does not secure Indebtedness for borrowed money;

(16)    Liens securing the Prepetition Secured Obligations (other than the Prepetition Roll-Up Indebtedness after giving effect to the Roll-Up), subject to the DIP Orders and the subordination set forth therein;

(17)    the Administration Charge;

(18)    Liens securing the Carve-Out; and

(19)    Liens securing the AST Break-Up Fee (if any).

"**Potential DIP Portion**" as defined in Section 2.01(f)(i).

"**Permitted Variance**" means a Variance from the Budget for the applicable Testing Period, which Variance is not (i) with respect to the Operating Receipts Line Item, more than 20.0% less than the amount in the Budget for such Operating Receipts Line Item for such Testing Period,  (ii) with respect to the Net Cash Flow Line Item, more than 10.0% less than the amount in the Budget for such Net Cash Flow Line Item for such Testing Period, (iii) with respect to all Cumulative Testing Disbursement Line Items, on a cumulative basis for all such Cumulative Testing Disbursement Line Items for such Testing Period, more than 10.0% greater than the amount in the Budget for such Cumulative Testing Disbursement Like Items (on a cumulative basis) for such Testing Period, as applicable, (iv) with respect to all Capex and Other Non-Operating Disbursement Line Items, on a cumulative basis to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items, more than 10.0% greater than the amount in the Budget for such Capex and Other Non-Operating Disbursement Line Items (on a cumulative basis to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items) for such Testing Period, as applicable, and (v) with respect to any Professional Fee Disbursement Line Item, on an individual line item basis, more than 15.0% greater than the amount in the Budget for each such Professional Fee Disbursement Line Item for such Testing Period, as applicable.

"**Person**" means any individual, corporation, partnership, limited liability company, unlimited liability company, limited company, Joint Venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**Petition Date**" has the meaning assigned to such term in the recitals hereto.

"**Plan**" means of a plan of reorganization or plan of liquidation under Chapter 11 of the Bankruptcy Code of the Debtors (including all related schedules, supplements, exhibits and orders, as applicable).

"**PPSA**" means the Personal Property Security Act (Ontario), as amended from time to time, together with all regulations made thereunder; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (i) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario,

40

or (ii) the Civil Code of Quebec, "**PPSA**" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"**Prepetition Facilities**" means, collectively, the loan and notes facilities provided under the Prepetition Debt Documents.

"**Prepetition Lenders and Holders**" has the meaning assigned to such term in the recitals hereto.

"**Prepetition Debt Documents**" means, collectively, the 1L Loan Agreement, 1L Notes Indenture, 1.5L Loan Agreement and 2L Notes Indenture.

"**Prepetition First Lien Secured Obligations**" means, collectively, the "Obligations" under and as defined in each of the 1L Loan Agreement and the 1L Notes Indenture.

"**Prepetition First Out Obligations**" as defined in Section 3.12(b).

"**Prepetition Indebtedness**" means the extensions of credit outstanding under the Prepetition Debt Documents as of the Petition Date.

"**Prepetition Permitted Prior Liens**" has the meaning given to such term in the DIP Orders.

"**Prepetition Roll-Up Indebtedness**" means, with respect to any Lender on the Final DIP Order Entry Date, Prepetition First Lien Secured Obligations (other than Prepetition First Out Obligations) under the applicable Prepetition Debt Documents owing to such Lender (or, if elected by such Lender, its Affiliates and/or Approved Funds) on the Final DIP Order Entry Date in an calculated based on the aggregate principal amount of Loans and unused Commitments of such Lender hereunder on the Final DIP Order Entry Date in the applicable amount set forth in Section 2.01(d)(ii); *provided* that (x) if such Lender is owed Prepetition First Lien Secured Obligations under multiple facilities, the allocation of Prepetition Roll-Up Indebtedness among facilities shall be determined by the applicable Lender pursuant to a written notice delivered to the Administrative Agent (and absent such notice, shall be pro rata across such facilities) and (y) to the extent the foregoing amount exceeds such aggregate Prepetition First Lien Secured Obligations of such Lender (or its Affiliate and/or Approved Fund), then the applicable Prepetition Roll-Up Indebtedness shall be comprised first of accrued and unpaid interest and fees that constitute Prepetition First Lien Secured Obligations, second of outstanding principal loans or notes, as applicable, and third all other outstanding Prepetition First Lien Secured Obligations. Notwithstanding anything to the contrary set forth herein, the Prepetition First Out Obligations shall not be Prepetition Roll-Up Indebtedness.

"**Prepetition Secured Obligations**" means, collectively, the "Obligations" under and as defined in each of the Prepetition Debt Documents.

"**Prepetition Secured Parties**" means, collectively, the "Secured Parties" under and as defined in each of the Prepetition Debt Documents.

"**Prepetition Security Agreements**" means, collectively, the 1L Loan Security Agreement, 1L Notes Security Agreement, 1.5L Loan Security Agreement and 2L Notes Security Agreement.

"**Primary Obligations**" has the meaning assigned to such term in the definition of "Contingent Obligations".

"**Primary Obligor**" has the meaning assigned to such term in the definition of "Contingent Obligations".

"**Professional Fee Disbursement Line Items**" means, collectively, each Disbursement Line Item in respect of professional, advisor, consultant or investment banking fees and expenses (without duplication) in the Budget, including for the avoidance of doubt in respect of fees and expenses of counsel and restructuring and financial advisors. For the avoidance of doubt, the Initial Budget contains one Professional Fee Disbursement Line Item, which is titled "Total Professional Fees".

"**Projected Information**" means (i) the projected weekly operating cash receipts for each week, (ii) the projected weekly disbursements for each week, (iii) the projected net weekly cash flow for each week, (iv) the projected weekly cash balance, (v) the projected professional fees and expenses for each week, and (vi) such other information that the Required Ad Hoc Holders may request from time to time.

"**Promissory Notes**" means any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit E.

"**Property**" means any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"**Public-Sider**" means any representative of a Lender that does not want to receive material non-public information with the meaning of the federal and state securities laws.

"**Purchase Money Obligation**" means, for any Person, the obligations of such Person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of, or the cost of installation, lease or construction of, any improvements or additions to the Network; *provided*, *however*, that (i) such Indebtedness is incurred substantially contemporaneously with such acquisition, installation, lease or construction of such improvements or additions by such Person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, lease, or construction, as the case may be.

"**Purchased Interest and Fees**" as defined in Section 2.01(f)(iii)(C).

"**Purchased Loans**" as defined in Section 2.01(f)(iii)(B).

"**Purchased Obligations**" as defined in Section 2.01(f)(iii)(C).

"**QFC Credit Support**" has the meaning assigned to such term in Section 10.21.

"**Qualified Capital Stock**" of any Person means any Equity Interests of such Person that are not Disqualified Capital Stock.

"**Reaffirmation Agreement**" means a reaffirmation of this Agreement, the Obligations arising hereunder and the Guarantees hereunder, dated as of the Interim DIP Order Entry Date, by the Loan Parties party thereto for the benefit of the Loan Secured Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, which Reaffirmation Agreement shall originally be in the form attached hereto as Exhibit P (with such changes as the Required Ad Hoc Holders consent to in writing).

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof, but excluding, for the avoidance of doubt, any spectrum-related assets.

"**Recognition Proceedings**" means the proceedings commenced before the CCAA Court recognizing the Cases of the Debtors in Canada under Part IV of the CCAA.

"**Register**" has the meaning assigned to such term in Section 10.04(b)(iv).

"**Regulation D**" means Regulation D of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" means Regulation S-X promulgated under the Securities Act.

"**Regulation T**" means Regulation T of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, counsel and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Remaining Subscription Amounts**" as defined in Section 2.01(f)(i).

"**Required Ad Hoc Holders**" means, at any time, collectively, (a) members of the Ad Hoc First Lien Group holding more than 50% of the then-outstanding principal amount of Loans held by the Ad Hoc First Lien Group in the aggregate, (b) all members (including their funds and/or accounts managed by such funds and any Affiliates) of the Ad Hoc First Lien Group holding more than $100,000,000 in then-outstanding aggregate principal amount of Prepetition First Lien Secured Obligations, Loans and/or unused Commitments, (c) each Fortress Lender and each Cerberus Lender and (d) members of the Ad Hoc Crossholder Group (including the Fortress Lenders and the Cerberus Lenders) holding more than 50% of the then-outstanding principal amount of Loans and unused Commitments held by the Ad Hoc Crossholder Group in the aggregate; *provided* that, for purposes of any covenant, term or other provision herein in respect of which any written approval or written consent of the Required Ad Hoc Holders is required, any of the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors may provide any such approval or consent via email on behalf of the portion of the Required Ad Hoc Holders that they represent.

"**Required Lenders**" means, at any time, collectively, (i) the Required Ad Hoc Holders and (ii) Lenders (including the Required Ad Hoc Holders) having Loans or unused Commitments representing more than fifty per cent (50%) of the sum of all Loans and unused Commitments outstanding at such time; *provided* that, without limiting the provisions of Section 10.04 prohibiting assignments of Loans or Commitments to the Borrower, any Subsidiary or any Affiliate of the Borrower, Loans held or deemed to be held by an Affiliate Lender shall be excluded from both the numerator and the denominator for purposes of making a determination of Required Lenders.

"**Requirements of Law**" means, collectively, any and all applicable requirements of any Governmental Authority including any and all laws (including common law), codes, ordinances, treaties, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or case law (including, for the avoidance of doubt, FATCA); the singular of which, "**Requirement of Law**".

"**Resignation Effective Date**" has the meaning assigned to such term in Section 9.06.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Response**" means (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any Person means any executive officer or Financial Officer of such Person and any other officer or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of January 5, 2025, by and among, inter alios, the Debtors and the Consenting Stakeholders (as defined therein) party thereto from time to time, and AST, as may be amended, restated, amended and restated, supplemented and/or otherwise modified with the written consent of the Required Ad Hoc Holders.

"**Roll-Up**" as defined in Section 2.01(d).

"**Roll-Up Designation Notice**" means a written notice delivered by a Lender to the Administrative Agent, which written notice shall (a) designate an Affiliate or Approved Fund of such Lender that is a Prepetition Lender and Holder under the 1L Loan Agreement and/or 1L Notes Indenture to be the beneficiary of the amount of Roll-Up Loans specified therein (a "**Designated Roll-Up Beneficiary**") (for the avoidance of doubt, not to exceed the aggregate amount of Roll-Up Loans to which such Lender is entitled as of the Final DIP Order Entry Date pursuant to Section 2.01(d)) and (b) attach a signature page to this Agreement duly executed by such Designated Roll-Up Beneficiary (which the Administrative Agent may thereafter affix to this Agreement upon the consummation of the Roll-Up without any further action by any other party hereto) and upon the consummation of the Roll-Up such Designated Roll-Up Beneficiary shall be a Lender hereunder holding outstanding Roll-Up Loans.  Notwithstanding anything in this Agreement to the contrary, [redacted] has delivered a Roll-Up Designation Notice on or about the Closing Date designating each of [redacted], [redacted], [redacted], [redacted], [redacted] and [redacted] to be its Designated Roll-Up Beneficiaries (with allocations among them separately communicated in writing to the Administrative Agent by [redacted]), and each such Designated Roll-Up Beneficiary's signature page attached to this Agreement shall become effective on (but not before) the consummation of the Roll-Up (it being understood that each such Designated Roll-Up Beneficiary shall not be considered party to this Agreement as a Lender until such consummation).

"**Roll-Up Loans**" as defined in Section 2.01(d) (it being understood that the Roll-Up Loans shall include any Capitalized Amount in respect thereof).

"**S&P**" means Standard & Poor's Ratings Services or any successor to the rating agency business thereof.

"**Sale and Leaseback Transaction**" has the meaning assigned to such term in Section 6.03.

"**Satellite**" means any satellite owned by the Borrower or any Guarantor and any satellite purchased by the Borrower or any Guarantor pursuant to the terms of a Satellite Purchase Agreement, whether such satellite is in the process of manufacture, has been delivered for launch or is in orbit (whether or not in operational service).

"**Satellite Manufacturer**" means, with respect to any Satellite, the prime contractor and manufacturer of such Satellite.

"**Satellite Purchase Agreement**" means, with respect to any Satellite, the agreement between the applicable Satellite Purchaser and the applicable Satellite Manufacturer relating to the manufacture, testing and delivery of such Satellite.

45

"**Satellite Purchaser**" means the Borrower or Guarantor that is a party to a Satellite Purchase Agreement.

"**Second DIP DDTL Borrowing**" means the second Borrowing of DIP Delayed Draw Term Loans.

"**Second Round Electing Lender**" as defined in Section 2.01(f)(i).

"**Second Satellite**" means the Boeing-GEM-F2 (Serial #7984010-103-002) satellite, together with the related ground-based beam formers and related calibration equipment.

"**Secured Parties**" means the Loan Secured Parties; and "**Secured Party**" means any one of them.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Selling Lender**" as defined in Section 2.01(f)(iii)(B).

"**Similar Business**" means any business or activity of the Borrower or any of its Subsidiaries currently conducted or proposed as of the Closing Date, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof, or is complementary, incidental, ancillary or related thereto.

"**Single Employer Plan**" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is covered by Section 4021 of ERISA, and in respect of which the Borrower, any of the Borrower's Subsidiaries or any of their respective ERISA Affiliates is or, if such plan were terminated, would under Section 4069 of ERISA would be, deemed to be an "employer" as defined in Section 3(5) of ERISA.

"**Skyterra-1**" means that certain satellite known as Skyterra-1.

"**Skyterra-2**" means that certain satellite known as Skyterra-2.

"**Specified Investments**" means, to the extent construed as "Investments," (i) the expenditure or contribution of funds to facilitate (A) the acquisition of spectrum rights in the 1675-1680 MHz band and the relocation of current users to clear the spectrum, (B) the relocation of facilities from the 1675-1680 MHz band as necessary to satisfy any FCC condition in connection with relief granted to the Borrower or a Subsidiary in response to a Material Regulatory Request or substantially similar or related request, including but not limited to expenditures or contributions to facilitate required trials and purchases of equipment necessary for testing or conducting same or (C) the acquisition of a Communications License with respect to the use of spectrum at 1670-1675 MHz pursuant to the Borrower's purchase option under the One Dot Six Lease; and (ii) in connection with any Material Regulatory Request or substantially similar or related request, any action, transaction or series of related actions or transactions in connection with the Borrower's or any Guarantor's voluntary relinquishment of spectrum rights or consent to restrictions, in each case, imposed by the FCC on its Communications Licenses.

"**Stated Maturity**" means, with respect to any loan or security, the date specified in such loan or security as the fixed date on which the final payment of principal of such loan or security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such loan or security at the option of the holder or lender thereof upon the happening of any contingency beyond the control of the issuer or borrower, as applicable, unless such contingency has occurred).

"**Subordinated Indebtedness**" means (a) with respect to the Borrower, any Indebtedness of the Borrower which is by its terms subordinated in right of payment to the Loans and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to its Guarantee.

"**Subsequent Assumed DIP Portion**" as defined in Section 2.01(f)(i).

"**Subsequent Election Deadline**" means 5:00 p.m. New York City time on January 17, 2025 (or such other date as may be consented to in writing by the Required Ad Hoc Holders).

"**Subsidiary**" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof, (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any consolidated Subsidiary of such Person is a controlling general partner or otherwise controls such entity and (3) any Person that is consolidated in the consolidated financial statements of the specified Person in accordance with GAAP.  Unless the context requires otherwise, "**Subsidiary**" refers to a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" means each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that guarantees the Obligations, grants a Lien over its assets to secure the Obligations and becomes a party to this Agreement pursuant to Section 5.11(b) unless and until such Subsidiary has been released from its Guaranteed Obligations in accordance with this Agreement.

"**Supported QFC**" has the meaning assigned to such term in Section 10.21.

"**Syndication Consummation Date**" as defined in Section 2.01(f)(iii).

"**Syndication DIP First Funding Loans**" as defined in Section 2.01(f)(i).

"**Syndication Eligible Prepetition Lenders**" as defined in Section 2.01(f)(i).

"**Syndication Transactions**" as defined in Section 2.01(f)(iii).

"**Tax Return**" means all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Testing Period**" means, (a) initially, the period commencing (and including) the Petition Date and ending on the third Sunday thereafter (the "**Initial Test Date**") and (b) thereafter, each consecutive four-week period ending on each second Sunday after the Initial Test Date.

"**Third DIP DDTL Borrowing**" means the third Borrowing of DIP Delayed Draw Term Loans.

"**Title Company**" means any title insurance company as shall be retained by the Borrower and reasonably acceptable to the Administrative Agent.

"**Transactions**" means the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the creation of the Liens provided for in the Loan Security Documents and, in the case of the Borrower, the borrowing of Loans and the use of the proceeds thereof and the payment of interest, fees and expenses in connection therewith.

"**Transfer**" of, or with respect to, Loans, means, (i) any change in the direct or indirect beneficial ownership of Loans, whether or not for value and whether voluntary, involuntary, by operation of law or otherwise and (ii) any direct or indirect sale, assignment, transfer, exchange, issuing of participation rights, or other disposition of voting or economic rights in such Loans. For the avoidance of doubt, all Transfers of Loans (and rights therein) must be made in accordance with, and subject to the limitations of, Section 10.04.

"**Transferred Guarantor**" has the meaning assigned to such term in Section 7.09.

"**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**United States**" means the United States of America.

"**U.S. Bank Fee Letter**" means that certain U.S. Bank Fee Proposal (DIP Agent), dated as of January 5, 2025, by and between the Borrower and the Administrative Agent.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**USA PATRIOT Act**" has the meaning assigned to such term in the definition of "**Anti-Terrorism Laws**".

"**Variance**" means a difference in the amount contained in the Budget with respect to any of the Loan Parties' (x) Operating Receipts Line Item, Capex and Other Non-Operating Disbursement Line Item (to the extent there is only one Capex and Other Non-Operating Disbursement Line Item) or Net Cash Flow Line Item, on a line item basis, compared to the Loan Parties' actual corresponding Operating Receipts Line Item, Capex and Other Non-Operating Disbursement Line Item (to the extent there is only one Capex and Other Non-Operating Disbursement Line Item) or Net Cash Flow Line Item, as applicable, for the applicable Testing Period, (y) Cumulative Testing Disbursement Line Items or Capex and Other Non-Operating Disbursement Line Items (to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items), on a cumulative basis, compared to the Loan Parties' actual corresponding Cumulative Disbursement Line Items or Capex and Other Non-Operating Disbursement Line Items (to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items), on a cumulative basis, for the applicable Testing Period or (z) Professional Fee Disbursement Line Items, on a line item basis, compared to any of the Loan Parties' actual corresponding Professional Fee Disbursement Line Items, on a line item basis, for the applicable Testing Period.

"**Variance Report**" means a detailed variance report, in form and substance reasonably satisfactory to the Required Lenders, that (i) reconciles the Loan Parties' actual performance for the applicable Testing Period with the Loan Parties' projected performance for such Testing Period pursuant to the Budget, which report shall include, without limitation, a detailed calculation of the variances (including Variances), on a line-item and aggregate basis, between the actual amount set forth for such Testing Period as compared to the Budget for such Testing Period and (ii) includes a report from the Loan Parties' management setting forth detailed explanations for variances in actual results (on a line by line basis) as compared to forecasted performance for such Testing Period under the Budget to the extent in excess of 10.0% with respect to receipts, disbursements and Net Cash Flow projections (on a line by line basis), including any Variance that is not a Permitted Variance.

"**Viasat**" means Viasat, Inc., a Delaware corporation.

"**Voting Stock**" means, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to vote in elections for the Board of Directors of such Person.

"**Wholly Owned Subsidiary**" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares or interests required to be held by foreign nationals) shall at the time

be owned by such Person and/or by one or more Wholly Owned Subsidiaries of such Person and one or more Wholly Owned Subsidiaries of such Person.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02  <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument, plan, court order or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights (and for the avoidance of doubt any reference solely to "Real Property" shall not include Communications Licenses).

Section 1.03  <u>Accounting Terms; GAAP</u>.  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the Closing Date unless otherwise agreed to by the Borrower and the Required Lenders.

Section 1.04  <u>Resolution of Drafting Ambiguities</u>.  Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan

Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

Section 1.05   <u>Permitted Liens</u>.  Any reference in this Agreement or any of the other Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by this Agreement or any of the other Loan Documents to any Permitted Lien.

Section 1.06   <u>Divisions</u>.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.07   <u>Discretion</u>.  For the avoidance of doubt any reference in this Agreement to the "consent", "discretion", "satisfaction", "agreement" or "approval" of any Lender, the Required Lenders, Required Ad Hoc Holders, any Fortress Lender, any Cerberus Lender or all Lenders shall be deemed to mean (i) that such consent, agreement, satisfaction or approval may be given, conditioned or withheld in their respective sole discretion, unless the applicable provision is explicitly qualified by a reasonableness standard in the text thereof, and (ii) that they are not required to exercise any standard of reasonableness in exercising their discretion, unless the applicable provision is explicitly qualified by a reasonableness standard in the text thereof.

## ARTICLE 2
## THE LOANS

Section 2.01   <u>Commitments</u>.

(a)   *DIP First Funding Loans*.  Subject to the terms and conditions hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, each Lender with a DIP First Funding Commitment severally, and not jointly, agrees to make DIP First Funding Loans denominated in Dollars to the Borrower on the DIP First Funding Date in an aggregate principal amount not to exceed its DIP First Funding Commitments.  The DIP First Funding Commitments of the Lenders shall automatically and permanently terminate upon the making of the DIP First Funding Loans on the DIP First Funding Date (or, if earlier, on the Maturity Date).  DIP First Funding Loans borrowed and repaid or prepaid may not be reborrowed.

(b)   *DIP Second Funding Loans*.  Subject to the terms and conditions hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, each Lender with a DIP Second Funding Commitment severally, and not jointly, agrees to make DIP Second Funding Loans denominated in Dollars to the Borrower on the DIP Second Funding

Date in an aggregate principal amount not to exceed its DIP Second Funding Commitments. The DIP Second Funding Commitments of the Lenders shall automatically and permanently terminate upon the making of the DIP Second Funding Loans on the DIP Second Funding Date (or, if earlier, on the Maturity Date). DIP Second Funding Loans borrowed and repaid or prepaid may not be reborrowed.

(c)     *DIP Delayed Draw Term Loans*.  Subject to the terms and conditions hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, each Lender with a DIP DDTL Commitment severally, and not jointly, agrees to make DIP Delayed Draw Term Loans denominated in Dollars to the Borrower from time to time (but in no more than three (3) Borrowings) on any DIP DDTL Funding Date in an aggregate principal amount not to exceed its DIP DDTL Commitments. The DIP DDTL Commitments of each Lender shall automatically and permanently terminate on a dollar for dollar basis upon the making of any DIP Delayed Draw Term Loans by such Lender; *provided* that any unused DIP DDTL Commitments shall automatically terminate on the Maturity Date. DIP Delayed Draw Term Loans borrowed and repaid or prepaid may not be reborrowed.

(d)     *Roll-Up Loans*.

(i)     Subject to the terms hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, on the Final DIP Order Entry Date and notwithstanding anything to the contrary contained in the applicable Prepetition Debt Documents (including in respect of pro rata sharing, sharing of payment or any waterfall), each Lender (as of the Final DIP Order Entry Date) (or its Designated Roll-Up Beneficiary, as applicable) shall automatically, and without further action or order of the Bankruptcy Court, CCAA Court or any other Person, be deemed on such date to have "rolled-up" and refinanced on a cashless basis the Prepetition Roll-Up Indebtedness held by such Lender (or its Designated Roll-Up Beneficiary, as applicable) immediately prior to the Final DIP Order Entry Date for an aggregate amount of loans under the DIP Facility calculated in accordance with Section 2.01(d)(ii) (such loans, the "**Roll-Up Loans**"; the refinancing of the Prepetition Roll-Up Indebtedness with Roll-Up Loans on the Final DIP Order Entry Date, the "**Roll-Up**"), and for the avoidance of doubt, such Roll-Up Loans shall constitute "Obligations" and "Loans" outstanding hereunder on the Final DIP Order Entry Date. Roll-Up Loans borrowed and repaid or prepaid may not be reborrowed. For the avoidance of doubt, and notwithstanding anything to the contrary herein, (i) there shall be no conditions precedent to the automatic issuance of the Roll-Up Loans hereunder, (ii) the amount of Prepetition Secured Obligations outstanding under the Prepetition Debt Documents after giving effect to the Roll-Up shall not be reduced by any Capitalized Amount and (iii) the Prepetition Secured Obligations outstanding under the Prepetition Debt Documents after giving effect to the Roll-Up shall continue to remain outstanding in accordance with the terms thereof upon the issuance of the Roll-Up Loans hereunder.

(ii)     Each applicable Lender's Roll-Up amount shall be calculated as follows:

(A)     For each $1.00 of Loans and/or Commitments held by such Lender as of the Final DIP Order Entry Date, excluding any Capitalized Amounts as a result of any interest, fee or other amount that was Paid in Kind pursuant to the terms of this Agreement, in an aggregate amount not to exceed such Lender's DIP Pro Rata Allocation Amount, such Lender (or its Designated Roll-Up Beneficiary, as applicable) shall be entitled to, and deemed to have funded in accordance with Section 2.01(d)(i), $1.00 of Roll-Up Loans; and

(B)     For each $1.00 of Loans and/or Commitments held by such Lender as of the Final DIP Order Entry Date, excluding any Capitalized Amounts as a result of any interest, fee or other amount that was Paid in Kind pursuant to the terms of this Agreement, in excess of such Lender's DIP Pro Rata Allocation Amount, such Lender (or its Designated Roll-Up Beneficiary, as applicable) shall be entitled to, and deemed to have funded in accordance with Section 2.01(d)(i), $2.00 of Roll-Up Loans.

(iii)     Notwithstanding anything to the contrary in Section 10.02, the Required Lenders may, following the funding of the Roll-Up Loans in accordance with this Section 2.01(d), revise Schedule 2.01 in consultation with the Borrower and the Administrative Agent to reflect the Roll-Up Loans held by each Lender on the Final Order Entry Date upon consummation of the Roll-Up, without further action by any other party hereto.

(e)     *Incremental Commitments*.   Subject to the terms and conditions hereof (including, without limitation, prior written approval from Required Lenders) and of the DIP Orders and DIP Recognition Orders (and any other applicable order of the Bankruptcy Court or CCAA Court), and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders (and any other applicable order for the Bankruptcy Court), each Lender that becomes an Incremental Loan Lender pursuant to an Increase Joinder agrees to extend credit to the Borrower in the form of Incremental Loans on each applicable Funding Date in the principal amount set forth opposite such Incremental Loan Lender's name in the applicable Increase Joinder with respect to such Funding Date with respect to the Incremental Commitments.   The Borrower shall also be deemed to borrow additional Incremental Loans in an amount equal to the applicable fees to be Paid In Kind or taken as original issue discount as set forth in the applicable Increase Joinder (and in accordance with Section 2.05 as revised for such Increase Joinder).   Incremental Loans borrowed and repaid or prepaid may not be reborrowed.

(f)     *Syndication*.

(i)     Each Lender as of the Closing Date (collectively, the "**Backstop Lenders**") and the Borrower hereby acknowledge and agree that each Prepetition Lender and Holder under the 1L Loan Agreement and/or the 1L Notes Indenture as

of the Petition Date that is an Eligible Assignee, does not exclusively hold Prepetition First Out Obligations and is not a Backstop Lender (or an Affiliate or Approved Fund of a Backstop Lender) (collectively, the "**Syndication Eligible Prepetition Lenders**") may participate to provide (via assignment) its DIP Pro Rata Allocation Amount of the DIP First Funding Loans (other than DIP First Funding Loans that represent the Backstop Fee that was Paid In Kind on the DIP First Funding Date) (the "**Syndication DIP First Funding Loans**"), the DIP Second Funding Commitments and the DIP DDTL Commitments (such Syndication Eligible Prepetition Lenders' DIP Pro Rata Allocation Amount of any such Class, its "**Potential DIP Portion**") in accordance with this clause (f), in each case, by delivering (x) an executed election joinder in the form of Exhibit K (an "**Election Joinder**") in respect thereof to the Administrative Agent by no later than the Initial Election Deadline and (y) a joinder agreement (or acknowledgement and acceptance) to the Restructuring Support Agreement (pursuant to which such Syndication Eligible Prepetition Lender shall become party thereto, or otherwise agrees to be bound by the terms and obligations thereof), in form and substance reasonably acceptable to the Required Ad Hoc Holders (any such Syndication Eligible Prepetition Lender that so delivers an Election Joinder in respect thereof and such joinder agreement or acknowledgment and acceptance to the Restructuring Support Agreement, a "**First Round Electing Lender**"; any such Syndication Eligible Prepetition Lender that does not so deliver an Election Joinder and such joinder agreement or acknowledgement and acceptance to the Restructuring Support Agreement, a "**Declining Lender**"; the Potential DIP Portions of the First Round Electing Lenders, the "**Initial Assumed DIP Portions**"). To the extent that not all Syndication Eligible Prepetition Lenders submit Election Joinders in respect of their Potential DIP Portion on or prior to the Initial Election Deadline, the Administrative Agent (in consultation with the Required Ad Hoc Holders) shall deliver written notice on the Business Day immediately following the Initial Election Deadline to each First Round Electing Lender and each Backstop Lender of the aggregate amount of Potential DIP Portions of the Syndication DIP First Funding Loans, the DIP Second Funding Commitments and the DIP DDTL Commitments of the Declining Lenders (such amounts, the "**Remaining Subscription Amounts**") and each Backstop Lender and each First Round Electing Lender may elect to participate to provide (via assignment) all or any portion of the Remaining Subscription Amount in accordance with this clause (f), in each case, by delivering an Election Joinder in respect thereof to the Administrative Agent by no later than the Subsequent Election Deadline (any Backstop Lender or First Round Electing Lender that so delivers such Election Joinder in respect of the Remaining Subscription Amounts on or prior to the Subsequent Election Deadline, a "**Second Round Electing Lender**", and together with any First Round Electing Lender, the "**Electing Lenders**"; the portion of the Remaining Subscription Amount elected to be provided by any Second Round Electing Lender (subject to the proviso below), such Second Round Electing Lender's "**Subsequent Assumed DIP Portion**"; any Electing Lender's Initial Assumed DIP Portion and Subsequent Assumed DIP Portion is collectively referred to as such Electing Lender's "**DIP Portion**");

*provided*, that, (x) such election in respect of Remaining Subscription Amounts must be for an equal percentage of each Class of the DIP Facility comprising the Remaining Subscription Amount and (y) to the extent the aggregate amount of elections in respect of the Remaining Subscription Amount exceeds the aggregate Remaining Subscription Amount, such Remaining Subscription Amount shall be allocated among the Second Round Electing Lenders on a pro rata basis based on their DIP Pro Rata Allocation Percentage.

(ii)     [Reserved].

(iii)     Subject to the satisfaction of the conditions and terms set forth in the following subclauses (iv), (v) and (vi) and delivery of the applicable Election Joinders in accordance with subclause (i) and the making (for the benefit of the Selling Lenders and the Administrative Agent) of the representations and warranties set forth therein, on January 24, 2025 (or such other date as may be consented to in writing by the Required Ad Hoc Holders) (the "**Syndication Consummation Date**") (each of the following transactions, the "**Syndication Transactions**"):

(A)     each Electing Lender shall assume its DIP Portion of each of the DIP Second Funding Commitments and the DIP DDTL Commitments as of the Syndication Consummation Date, with such assumption being effectuated by an automatic assignment, by each existing Lender (as of such date) of such Class (each a "**Commitment Assigning Lender**") of unused Commitments of such Class in an individual amount equal to (x) the applicable DIP Portion of such Class of such Electing Lender multiplied by (y)(1) the aggregate amount of unused Commitments of such Class held by such Commitment Assigning Lender as of such date divided by (2) the aggregate amount of unused Commitments of such Class as of such date (each such Commitment assigned and assumed, an "**Assumed Commitment**");

(B)     each Electing Lender shall purchase its applicable DIP Portion of the Syndication DIP First Funding Loans as of the Syndication Consummation Date, with such purchase being effectuated by an automatic assignment, by each existing Lender (as of such date) of such Class (each a "**Loan Assigning Lender**", and together with each Commitment Assigning Lender, a "**Selling Lender**"), of outstanding Syndication DIP First Funding Loans in an individual amount equal to (x) the applicable DIP Portion of the Syndication DIP First Funding Loans of such Electing Lender multiplied by (y)(1) the aggregate amount of outstanding Syndication DIP First Funding Loans held by such Loan Assigning Lender as of such date divided by (2) the aggregate amount of outstanding Syndication DIP First Funding Loans as of such date (each such purchased Loan, a "**Purchased Loan**"); and

(C)      each Electing Lender shall purchase, and each applicable Selling Lender shall sell, (x) all accrued and unpaid DIP Unused Commitment Fees on the applicable Assumed Commitments (it being understood that no DIP Unused Commitment Fees that have been Paid in Kind shall be considered unpaid for purposes of this subclause (x)) and (y) all accrued and unpaid interest on the Purchased Loans (it being understood that no interest that has been Paid in Kind shall be considered unpaid for purposes of this subclause (y)) (such purchased interest and DIP Unused Commitment Fees, "**Purchased Interest and Fees**", and together with the Purchased Loans and Assumed Commitments, the "**Purchased Obligations**").

(iv)      No consideration (other than the opportunity to participate in the syndication provided by this clause (f)) shall be payable by any party in connection with the assignment and assumption of the Assumed Commitments.  The purchase price payable by each Electing Lender to the Administrative Agent for the benefit of each Loan Assigning Lender in respect of the Purchased Loans shall equal (A) the amount of Purchased Loans of the applicable Loan Assigning Lender sold to such Electing Lender, <u>minus</u> (B) the amount of such Purchased Loans that represents the Commitment Fee and/or the DIP First Funding Discount Fee that was Paid In Kind on the Interim DIP Order Entry Date or DIP First Funding Date, as applicable.  The purchase price payable by each Electing Lender to the Administrative Agent for the benefit of each Selling Lender in respect of the Purchased Interest and Fees shall equal the amount of Purchased Interest and Fees sold by such Selling Lender.  The calculation of the foregoing consideration (as well as the amounts of the applicable Purchased Obligations) shall be determined by the Administrative Agent no later than three (3) Business Days prior to the Syndication Consummation Date and shall control in the absence of manifest error (it being understood and agreed that the Administrative Agent shall deliver notice to the Electing Lenders and Selling Lenders of such amounts no later than two (2) Business Days prior to the Syndication Consummation Date).

(v)      Each Electing Lender shall make available to the Administrative Agent, for the account of the applicable Selling Lenders, in Dollars and immediately available funds, the consideration set forth in clause (iv) in respect of the Purchased Obligations of the Selling Lenders no later than one (1) Business Day prior to the Syndication Consummation Date, and the Administrative Agent shall transfer such consideration to each applicable Selling Lender on the Syndication Consummation Date pursuant to the wire instructions most recently provided by such Selling Lender to the Administrative Agent.

(vi)      Each Electing Lender (that is not an existing Lender at such time) shall make available to the Administrative Agent, concurrently with the delivery of its Election Joinder, a completed Administrative Questionnaire and any applicable tax forms.

(vii)    Subject to the satisfaction of the conditions and terms set forth in the foregoing subclauses (iv), (v) and (vi) and delivery of the applicable Election Joinder in accordance with subclause (i) and making (for the benefit of the Selling Lenders and the Administrative Agent) of the representations and warranties set forth therein, and notwithstanding anything to the contrary contained in Section 10.04, the Syndication Transactions shall automatically and without any further action by any party occur on the Syndication Consummation Date.

(viii)    Each Electing Lender hereby acknowledges and agrees that the sale, assignment and assumption of the Purchased Obligations are without any representation or warranty by any Selling Lender, and no Electing Lender shall have any recourse against any Selling Lender in connection with the Syndication Transactions.

(ix)    Notwithstanding anything to the contrary contained in Section 10.02, (A) the Required Lenders (in consultation with the Administrative Agent, the Borrower and the applicable Selling Lender) may modify Schedule 2.01, and direct the Administrative Agent to update the Register, to evidence the consummation of the Syndication Transactions on the Syndication Consummation Date, and (B) the Required Lenders and the Administrative Agent may modify this clause (f) (other than the following subclause (x) hereof) without the consent of the Borrower.

(x)    From the period commencing with the Closing Date and ending on the Syndication Consummation Date, the Borrower shall use commercially reasonable efforts to facilitate the syndication contemplated by this clause (f), including (A) obtaining a true and correct copy of the Register (including holding amounts and contact information) for the 1L Loan Agreement and the 1L Notes Indenture and (B) to the extent requested in writing by the Required Lenders, instructing its financial advisor to assist in such syndication, preparing customary marketing materials in respect thereof and directing any prepetition agent or trustee in respect of the 1L Loan Agreement and/or 1L Notes Indenture; *provided* that the foregoing shall not require any officer or director of the Borrower to violate any applicable fiduciary duty.

(xi)    For the avoidance of doubt, each Backstop Lender agrees to consummate the transactions pursuant to this Section 2.01(f).

(g)    Payment in Kind of Certain Fees.  In addition to the Borrowings set forth in clauses (a), (b), (c), (d) and (e) of this Section 2.01, the Borrower shall also be deemed to Borrow additional Loans (of the applicable Class) in an amount equal to the Backstop Fee, Commitment Fee, DIP First Funding Discount Fee, DIP Second Funding Discount Fee, DIP DDTL Funding Discount Fee and DIP Unused Commitment Fee, as applicable, in accordance with Section 2.05.

Section 2.02   Loans.

(a)     The failure of any applicable Lender to make any DIP First Funding Loan, DIP Second Funding Loan, DIP Delayed Draw Term Loan and/or Incremental Loan required to be made by it pursuant to Section 2.01, as applicable, shall not relieve any other Lender of its obligation to make any DIP First Funding Loan, DIP Second Funding Loan, DIP Delayed Draw Term Loan and/or Incremental Loan required to be made by it pursuant to Section 2.01, as applicable. Each Lender shall be responsible solely to the extent of its applicable Commitments and no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made hereunder by such other Lender.

(b)     Each Lender shall make any Loans (other than Roll-Up Loans or fees being Paid In Kind) required to be made by it hereunder on the applicable Funding Date by wire transfer of immediately available funds, in an amount equal to the principal amount of such Loan, as applicable, with respect to such Loan, to such account as the Administrative Agent may designate by not later than 1:00 p.m., New York City time on each such Funding Date, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by the Borrower in the Borrowing Request maintained with the Administrative Agent; *provided* that, if any applicable Lender funds its pro rata portion of the requested Class of Loans prior to the conditions precedent being met for any applicable Funding Date and a borrowing of such requested Class of Loans shall not occur on such Funding Date because such conditions precedent have not been met, the Administrative Agent shall promptly return the amounts so received to the respective Lenders; *provided*, further, that the Administrative Agent shall promptly apply the amounts received in respect of the DIP Second Funding Loans to repay in full in cash all Prepetition First Out Obligations pursuant to written instructions provided by the 1L Loan Administrative Agent in consultation with the Required Ad Hoc Group and the Borrower (and if any excess amounts in respect of the DIP Second Funding Loans remain after the repayment of the Prepetition First Out Obligations (such excess, the "**Excess DIP Second Funding Loans Proceeds**"), the Administrative Agent shall promptly return such Excess DIP Second Funding Loans Proceeds to the DIP Second Funding Lenders on a pro rata basis, with such return being deemed to have been a prepayment by the Borrower of DIP Second Funding Loans on the DIP Second Funding Date in an amount equal to such Excess DIP Second Funding Loans Proceeds (and with any interest on such deemed prepaid DIP Second Funding Loans automatically cancelled)). For the avoidance of doubt, the Borrower may not borrow any DIP Delayed Draw Term Loans (other than the First DIP DDTL Borrowing) or Incremental Loans unless such Borrowing is approved by the Required Lenders in writing, in their sole discretion.

(c)     For the avoidance of doubt, once funded, the DIP First Funding Loans, DIP Second Funding Loans and the DIP Delayed Draw Term Loans (and any applicable Incremental Loans) shall be deemed to be part of the same Class of Loans for all purposes under this Agreement.

Section 2.03   Borrowing Procedure. To request Loans of any Class from the applicable Lenders, the Borrower shall deliver, by electronic transmission, a duly completed and executed Borrowing Request to the Administrative Agent not later than 1:00 p.m., New York City time, three (3) Business Days before the date of the proposed Borrowing (or such shorter period as may be acceptable to Administrative Agent); *provided*, that with (i) respect to the DIP First Funding Loans, such Borrowing Request may be delivered one (1) Business Day prior to the DIP First Funding Date and (ii) the Borrower shall not be required to deliver a Borrowing Request in respect

of the DIP Second Funding Loans or the Roll-Up Loans and by its execution and delivery of this Agreement it shall have requested (x) that the Lenders with a DIP Second Funding Commitment on the DIP Second Funding Date make DIP Second Funding Loans on the DIP Second Funding Date pursuant to Section 2.01(b) and (y) the deemed issuance of the Roll-Up Loans hereunder on the Final DIP Order Entry Date pursuant to Section 2.01(d). The Borrowing Request shall specify the following information:

(a)     the aggregate amount and Class of such Borrowing;

(b)     the date of such Borrowing, which shall be a Business Day; and

(c)     the location and number of Borrower's account to which funds are to be disbursed, which for any Borrowing of DIP Delayed Draw Term Loans or Incremental Loans shall be the DIP Loan Proceeds Account.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each applicable Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing. In addition, promptly upon the occurrence of the Final DIP Order Entry Date, the Administrative Agent shall advise each applicable Lender of the occurrence thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing of the DIP Second Funding Loans set forth in the second proviso of the first paragraph of this Section 2.03.

Section 2.04   Evidence of Debt; Repayment of Loans.

(a)     *Promise to Repay*. The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the principal amount of each Loan of such Lender as provided in Section 2.09.

(b)     *Lender and Administrative Agent Records*. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal (including Capitalized Amount) and interest payable and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain records including (i) the amount of each Loan made hereunder; (ii) the amount of any principal (including Capitalized Amount) or interest due and payable or to become due and payable from the Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the records maintained by the Administrative Agent and each Lender pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms. In the event of any conflict between the records maintained by any Lender and the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(c)     *Promissory Notes*. Any Lender by written notice to the Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a Promissory

Note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns in the form of Exhibit E.  Thereafter, the Loans evidenced by such Promissory Note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more Promissory Notes in such form payable to such payee and its registered assigns and the Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations to such Promissory Note of, among other things, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to, the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the records referenced above, be conclusive and binding on each Loan Party absent manifest error; *provided* that the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Loan Party.

Section 2.05    Fees; Additional Payment.

(a)    The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative and other fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)    The Borrower agrees to pay, on the earlier of the Interim DIP Order Entry Date and the Maturity Date, to the Administrative Agent, for the account of each Lender on the Closing Date, a nonrefundable backstop fee (the "**Backstop Fee**") in an amount equal to 12.5% of the aggregate amount of Commitments of such Lender on the Closing Date (for the avoidance of doubt prior to the Borrowing of any Loans), which Backstop Fee (x) will be fully earned, due and payable on the earlier of the Interim DIP Order Entry Date and the Maturity Date and (y) for the avoidance of doubt, shall be Paid In Kind on such date by capitalizing on the outstanding principal amount of Loans then held by such Lender on such date (or, if such Lender does not have any outstanding Loans on such date then such Backstop Fee shall be Paid In Kind pursuant to a deemed issuance on such date of DIP First Funding Loans owing to such lender); *provided*, that if such Backstop Fee is due and payable on (or after) the Maturity Date such Backstop Fee shall be paid in cash.

(c)    The Borrower agrees to pay, on the Interim DIP Order Entry Date, to the Administrative Agent, for the account of each Lender on the Closing Date, a nonrefundable commitment fee (the "**Commitment Fee**") in an amount equal to 5.0% of the aggregate amount of Commitments of such Lender on the Closing Date (for the avoidance of doubt prior to the Borrowing of any Loans), which Commitment Fee (x) will be fully earned, due and payable on the earlier of the Interim DIP Order Entry Date and the Maturity Date and (y) for the avoidance of doubt, shall be Paid In Kind on such date by capitalizing on the outstanding principal amount of Loans then held by such Lender on such date (or, if such Lender does not have any outstanding Loans on such date then such Commitment Fee shall be Paid In Kind pursuant to a deemed issuance on such date of DIP First Funding Loans owing to such lender); *provided*, that if such Commitment Fee is due and payable on (or after) the Maturity Date such Commitment Fee shall be paid in cash.

(d)    The Borrower agrees to pay, on the DIP First Funding Date, to the Administrative Agent, for the account of each Lender with a DIP First Funding Commitment on

the DIP First Funding Date, a nonrefundable funding fee (the "**DIP First Funding Discount Fee**") in an amount equal to 5.0% of the aggregate amount of DIP First Funding Loans made by such Lender on the DIP First Funding Date, which DIP First Funding Discount Fee (x) will be fully earned, due and payable on the DIP First Funding Date and (y) for the avoidance of doubt, shall be Paid in Kind on the DIP First Funding Date by capitalizing on the outstanding principal amount of Loans then held by such Lender immediately after the funding of the DIP First Funding Loans on the DIP First Funding Date.

(e)    The Borrower agrees to pay, on the DIP Second Funding Date, to the Administrative Agent, for the account of each Lender with a DIP Second Funding Commitment on the DIP Second Funding Date, a nonrefundable funding fee (the "**DIP Second Funding Discount Fee**") in an amount equal to 5.0% of the aggregate amount of DIP Second Funding Loans (other than Excess DIP Second Funding Loans Proceeds to the extent returned to such Lender on the DIP Second Funding Date) made by such Lender on the DIP Second Funding Date, which DIP Second Funding Discount Fee (x) will be fully earned, due and payable on the DIP Second Funding Date and (y) for the avoidance of doubt, shall be Paid in Kind on the DIP Second Funding Date by capitalizing on the outstanding principal amount of DIP Second Funding Loans then held by such Lender immediately after the funding of the DIP Second Funding Loans on the DIP Second Funding Date.

(f)    The Borrower agrees to pay, on each DIP DDTL Funding Date, to the Administrative Agent, for the account of each Lender with a DIP DDTL Commitment on such DIP DDTL Funding Date, a nonrefundable funding fee (each, a "**DIP DDTL Funding Discount Fee**") in an amount equal to 5.0% of the aggregate amount of DIP Delayed Draw Term Loans made by such Lender on such DIP DDTL Funding Date, which DIP DDTL Funding Discount Fee (x) will be fully earned, due and payable on the applicable DIP DDTL Funding Date and (y) for the avoidance of doubt, shall be Paid in Kind by capitalizing such DIP DDTL Fee on the outstanding principal amount of Loans then held by such Lender immediately after the funding of the DIP Delayed Draw Term Loans on the applicable DIP DDTL Funding Date.

(g)    The Borrower agrees to pay on each DIP Unused Commitment Fee Payment Date, an unused commitment fee to each DIP DDTL Commitment Lender and each DIP Second Funding Commitment Lender in an amount equal to the average daily balance of the unused DIP DDTL Commitments of such DIP DDTL Commitment Lender and unused DIP Second Funding Commitments of such DIP Second Funding Commitment Lender, as applicable, during the applicable DIP Unused Commitment Fee Period, multiplied by 3.0% *per annum* (the "**DIP Unused Commitment Fee**").  The DIP Unused Commitment Fee shall accrue at all times from and after the Closing Date, shall be calculated in accordance with Section 2.06(d) and shall (x) be Paid in Kind by capitalizing on the outstanding principal amount of Loans then held by such Lender (or if such Lender does not have any Loans of such date shall be Paid In Kind pursuant to a deemed issuance of Loans owing to such Lender).  For the avoidance of doubt, all DIP Unused Commitment Fees that are paid in cash shall be paid to the Administrative Agent for the account of the applicable Lender.

Section 2.06    Interest on Loans.

(a)     *Interest*.  Subject to the provisions of Section 2.06(b), the Loans shall bear interest on the outstanding principal amount thereof (including, for the avoidance of doubt, any Capitalized Amount) at the Applicable Margin.

(b)     *Default Rate*.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, or if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, then the outstanding principal amount of the Loans hereunder, and any overdue interest, fees and other amounts, shall automatically (unless the Required Lenders provide written notice to the contrary), to the fullest extent permitted by applicable law, after as well as before judgment, bear interest at a rate per annum equal to 19.5% (the "**Default Rate**").

(c)     *Interest Payment Dates*.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan (and at such other times as may be specified herein) and shall be Paid In Kind; *provided* that (i) the Borrower may elect with respect to any Interest Period ending prior to the Maturity Date to pay the interest accrued during such Interest Period in cash by delivering to the Administrative Agent irrevocable written notice of the election thereof, which written election must be received by the Administrative Agent no earlier than five (5) Business Days, and not later than three (3) Business Days, prior to the applicable Interest Payment Date (such election, a "**Cash Interest Election**"; it being understood and agreed that upon delivery of such Cash Interest Election the Borrower shall be obligated to pay such interest in cash on such Interest Payment Date), (ii) interest accruing at the Default Rate pursuant to Section 2.06(b), or otherwise while an Event of Default has occurred and is continuing, shall be due and payable upon demand and shall be payable in cash, (iii) interest (and all other amounts hereunder) due on the Maturity Date shall be payable in cash and (iv) in the event of any repayment or prepayment, whether voluntary or mandatory (including as a result of an acceleration), of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and shall be payable in cash in dollars.

(d)     *Interest, DIP Unused Commitment Fee Calculations*.  All interest and DIP Unused Commitment Fees hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)     *Interest Act (Canada)*.  For the purposes of the *Interest Act* (Canada) and disclosure thereunder, in any case in which an interest or fee rate is stated in this Agreement to be calculated on the basis of a number of days that is other than the number in a calendar year, the yearly rate to which such interest or fee rate is equivalent is equal to such interest or fee rate multiplied by the actual number of days in the year in which the relevant interest or fee payment accrues and divided by the number of days used as the basis for such calculation; *provided* that this clause (e) shall not modify the interest owed by the Borrower pursuant to clauses (a) or (b) above.

(f)     *No Criminal Rate of Interest*.  If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Secured Party of "interest" at a "criminal rate" (as such

terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted (solely with respect to the Obligations of such Canadian Loan Party) with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

> (i)    first, by reducing the amount or rate of interest required to be paid to the affected Secured Party; and

> (ii)    thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

Section 2.07    [Reserved]

Section 2.08    [Reserved]

Section 2.09    Repayment of Loans.  To the extent not previously paid, the Borrower shall pay to the Administrative Agent, in cash, for the account of the Lenders, on the Maturity Date, the entire principal amount of the Loans then outstanding, together with accrued and unpaid interest thereon and all fees, expenses and other amounts payable under the terms of the Loan Documents or the DIP Orders, and all other Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted).

Section 2.10    Optional and Mandatory Prepayments of Loans.

(a)    *Optional Prepayments*.  The Borrower shall have the right at any time (and from time to time) to prepay the Loans, in whole or in part in cash, subject to the requirements of Sections 2.10(g) and (h); *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans*; provided further* that no prepayment of Roll-Up Loans may be made pursuant to this Section 2.10(a) prior to the payment in full in cash of the DIP New Money Loans.

(b)    *Incurrence of Debt*.  Concurrently upon the incurrence or the issuance by any Loan Party or any Subsidiary of any Loan Party of Indebtedness (other than Net Issuance Proceeds from the incurrence of Indebtedness permitted under Section 6.01), the Borrower shall prepay the Loans in an aggregate amount equal to the Net Issuance Proceeds of such Indebtedness in accordance with Section 2.10(h).  Nothing in this Section 2.10(b) shall be construed to permit or waive any Default or Event of Default arising from any incurrence or issuance of Indebtedness not permitted under the terms of this Agreement.

(c)    *Asset Sales; Events of Loss*.  No later than the first Business Day following the date of receipt by Borrower or any of its Subsidiaries of any Net Cash Proceeds of any Asset Sale or Event of Loss, Borrower shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of such Net Cash Proceeds, in accordance with Section 2.10(h); *provided*, that Borrower shall not be required to make any such prepayment with the first $100,000 of such

Net Cash Proceeds (in aggregate) received after the Closing Date. Nothing in this Section 2.10(c) shall be construed to permit or waive any Default or Event of Default arising from any Asset Sale not permitted under the terms of this Agreement.

(d)     *Change in Control*.  Immediately following any Change in Control, the Borrower shall prepay the outstanding Loans in an amount equal to 100% of the principal amount thereof (plus accrued and unpaid interest thereon, if any) in accordance with Section 2.10(h). Nothing in this Section 2.10(d) shall be construed to permit or waive any Default or Event of Default arising from the occurrence of any Change in Control.

(e)     *Extraordinary Receipts*.  On the date of receipt by the Borrower or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay on such date the outstanding Loans in the amount of such Extraordinary Receipts.

(f)     *Issuance of Equity Securities*.  On the date of receipt by the Borrower of any cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, the Borrower or, without limiting Section 6.11, any of its Subsidiaries, the Borrower shall prepay on such date the outstanding Loans in the aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable and documented and actually paid cash costs and cash expenses associated therewith, in each case, paid to non-Affiliates.

(g)     *Notice of Prepayment*.  The Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable; *provided* that a notice of prepayment so delivered, if delivered with respect to the entire outstanding principal amount of the Obligations, may state that such notice is conditioned upon the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to 2:00 p.m., New York City time on the specified prepayment date) if such condition is not satisfied. Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

(h)     *Application of Payments*.  Each prepayment of Loans pursuant to this Section 2.10 shall be allocated first, ratably among the DIP New Money Loans (treated, for the avoidance of doubt, as a single Class) based on the outstanding principal amounts thereof and thereafter to the Roll-Up Loans; *provided* that, solely for the purpose of the calculation of purchase price in connection with Section 2.01(f)(iv) in respect of Purchased Loans, prepayments shall be applied first to the portion of Loans comprised of principal not arising from any interest, fees or other amounts that were Paid In Kind.  Prepayments shall be accompanied by accrued interest as more fully set forth in Section 2.06.

(i)     *Voluntary Termination of Commitments*.  For the avoidance of doubt, the Borrower shall not be permitted to voluntarily terminate any Commitments hereunder.

Section 2.11     [Reserved]

Section 2.12    <u>Yield Protection</u>.

(a)    *Increased Costs Generally*.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge, liquidity or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender; or

(ii)    subject any Lender to any Taxes of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (in each case, except for (i) Indemnified Taxes indemnifiable under Section 2.15, (ii) Taxes described in clauses (b) through (e) of the definition of Excluded Taxes payable by such Lender and (iii) Connection Income Taxes);

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting into, continuing or maintaining any Loans or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, the Borrower will pay, without duplication, to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)    *Capital Requirements*.  If any Lender reasonably determines in good faith that any Change in Law affecting such Lender or any lending office of such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or its holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered.

(c)    *Certificates for Reimbursement*.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)    *Delay in Requests*.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or

reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.13    [Reserved]

Section 2.14    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)    *Payments Generally*.  The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, premium or fees, or of amounts payable under Sections 2.12, 2.15 or 10.03, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices, except that payments pursuant to Sections 2.12, 2.15 or 10.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest (and/or in respect of a commitment and/or unused fee), interest thereon (and/or additional commitment and/or unused fee) shall be payable for the period of such extension.  All payments under each Loan Document (including repayments and prepayments of the Loans and payments of any interest, fees, indemnification amounts or expense reimbursements) shall be made in dollars.

(b)    *Pro Rata Treatment*.

(i)    Except as provided in Section 2.12(b), each payment by the Borrower of interest, fees, premiums, and other payments in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then due and owing to the Lenders.

(ii)    Except as provided in Section 2.12(b), each payment on account of principal of the Loans shall be allocated among the Lenders pro rata based on the principal amount of the Loans held by the Lenders.

(c)    *Insufficient Funds*.  Subject to Section 8.02, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premium and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and premium then due hereunder, ratably in accordance with Section 2.10(h) (as if such payment was a prepayment) among the parties entitled thereto in accordance with the amounts of principal and premium then due to such parties.

66

(d)      *Sharing of Set-Off.*  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans (including all amounts Paid in Kind that have been added to the principal amount) and accrued interest thereon or other Obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) make adjustments as shall be equitable with the consent of the Required Lenders, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal (including all amounts Paid in Kind that have been added to the principal amount) of and accrued interest on their respective Loans and other amounts owing them, *provided* that the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for any Transfer of its Loans to an Eligible Assignee.

Each Loan Party agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.  If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(d) to share in the benefits of the recovery of such secured claim.

(e)      *The Borrower Default.*   Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.15   <u>Taxes</u>.

(a)      *Payments Free of Taxes.*  Any and all payments by or at the direction of (or on behalf of) the Loan Parties on account of any obligation hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes, unless required by applicable Requirements of Law.  Subject to Section 2.15(i), if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes, the sum payable shall be increased by the Loan Parties as necessary so that after all required deductions have been made (including

deductions applicable to additional sums payable under this Section 2.15) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)     *Payment of Other Taxes by Loan Parties*.  Without limiting the provisions of paragraph (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)     *Indemnification by Loan Parties*.  The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable by, paid by, or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis and computation of such payment or liability, shall be conclusive absent manifest error; *provided* that, upon the Borrower's timely written request, the Administrative Agent or Lender may, in its sole discretion, after consultation with the Borrower, and at the Borrower's expense, contest the validity, applicability or amount of such Taxes by (i) resisting payment thereof, (ii) not paying the same except under protest, if protest is necessary and proper, or (iii) if payment is made, using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings; *provided* that (y) the Administrative Agent or such Lender will not be required to take any action or continue to pursue an action (or inaction) hereunder which, in its sole discretion, could cause the Administrative Agent or such Lender to suffer any disadvantage, and (z) on written demand from the Administrative Agent or the Lender, as the case may be, the Borrower agrees to pay, and shall timely pay, to the Administrative Agent or such Lender all reasonable costs and expenses that the Administrative Agent or such Lender actually incurs in connection with and reasonably allocable to contesting such claim (including reasonable legal and accounting fees, penalties, interest, and additions to Tax) and any Indemnified Taxes that are paid by the Administrative Agent or the Lender.

(d)     *Evidence of Payments*.  As soon as practicable after any payment of Indemnified Taxes (or any Taxes otherwise withheld or deducted from any payments to the Administrative Agent, the Lenders, or any other recipient under the Loan Documents) by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     *Status of Lenders*.  Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to the Borrower and to the

Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding (including any withholding under FATCA).  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the above two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(C) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any unreimbursed cost or expense or would be disadvantageous to such Lender in any material respect.

(i)        Without limiting the generality of the foregoing,

(A)        any Foreign Lender shall, to the extent it may lawfully do so deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(1)        duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any applicable successor forms of either), as applicable, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(2)        duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(3)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit H-1, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any successor forms), as applicable,

(4)     to the extent a Foreign Lender is not the beneficial owner executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E (or any successor forms), as applicable, a certificate in substantially the form of Exhibit H-2 or Exhibit H-3, Form W-9 (or any successor form), and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of Exhibit H-4, on behalf of such direct and indirect partner or

(5)     any other form prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as a basis for claiming exemption from or a reduction in United States federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(B)     Each Foreign Lender shall, to the extent it is legally entitled to do so, from time to time after the initial delivery by such Foreign Lender of the forms described above, whenever a lapse in time or change in such Foreign Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Foreign Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Foreign Lender's status or that such Foreign Lender is entitled to an exemption from or reduction in withholding Tax or (2) notify Administrative Agent and the Borrower of its legal inability to deliver any such forms, certificates or other evidence.

(C)     Any Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the reasonable request of the Borrower or the Administrative Agent), duly executed and properly completed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that it is not subject to U.S. federal backup withholding.

(D)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if

such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     *Treatment of Certain Refunds*.  If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.15, it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.15 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.  Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to a Loan Party if such payment would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Indemnified Taxes giving rise to such refund had never been imposed in the first instance and the indemnification payments or additional amounts with respect to the Indemnified Taxes had never been paid.

(g)     *Payments*.  For purposes of this Section 2.15, (i) any payments by the Administrative Agent to a Lender of any amounts received by the Administrative Agent from the Borrower on behalf of such Lender shall be treated as a payment from the Borrower to such Lender and (ii) if a Lender is treated as a partnership for United States federal income tax purposes, any withholding or payment of such United States federal income tax that is an Indemnified Tax by

the Lender in respect of any of such Lender's partners shall be considered a withholding or payment of such Indemnified Tax by the Borrower.

(h)     *Survival*.  Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction, or discharge of all obligations under any Loan Document.

(i)     *Tax Treatment*.  For U.S. federal income tax purposes, the Borrower and the Lenders intend that (i) the DIP Facility is treated as debt and (ii) the Backstop Fee shall not be treated as a fee (collectively, the "**Intended Tax Treatment**").  Each of the Borrower and the Lenders agree not to file any tax return, report or declaration inconsistent with the Intended Tax Treatment, except as otherwise required due to a determination within the meaning of Section 1313(a) of the Code or due to a change in applicable law after the date hereof.

Section 2.16   Mitigation Obligations.  If any Lender requests compensation under Section 2.12, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.  A certificate setting forth such costs and expenses submitted by such Lender to the Borrower shall be conclusive absent manifest error.

Section 2.17   Currency Indemnity.  If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "**Judgment Currency**") any amount due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given.  For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office.  In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrower will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due.  If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrower shall indemnify and save the Administrative Agent and the Lenders harmless from and against all loss or damage arising as a result of such

deficiency. This indemnity shall constitute a secured obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

Section 2.18    <u>Incremental Loan Facilities</u>.

(a)    *Borrower Request*.  Subject to obtaining prior approval from the Required Lenders in writing (in their sole discretion) for the applicable Incremental Loan Facility, the Borrower may, by written notice to the Administrative Agent at any time and from time to time, elect to incur additional Loans or request the establishment of one or more new term loan facilities (the "**Incremental Loan Facility**"; the commitments in respect thereof, the "**Incremental Commitments**"), in an aggregate original principal amount for all Incremental Loan Facilities that may be agreed in writing by the Required Lenders; *provided* that the Borrower (and no other Loan Party) shall only be entitled to request or borrow under the Incremental Loan Facility if the Required Lenders have consented in writing in their sole discretion to the request for or borrowing under such Incremental Loan Facility.  Such notice shall specify (A) the amount of Incremental Loans being requested and (B) the date on which the Borrower proposes as the applicable Funding Date(s) on which the Borrower proposes that the Incremental Loan Facility shall be available to be funded.  For the avoidance of doubt, the Required Lenders shall not be obligated to consent to the Incremental Loan Facility and may withhold consent for any reason.

Any Incremental Loan Facility shall be effected by a joinder agreement in form and substance acceptable to the Required Lenders (an "**Increase Joinder**") executed by the Borrower, the Administrative Agent and each Lender providing the Incremental Loan Facility.

(b)    *Conditions*.  The Incremental Commitments shall become effective as of the Business Day upon which each of the conditions precedent set forth below is satisfied (or waived by the Required Ad Hoc Holders in their sole discretion) (each such date, an "**Increase Effective Date**"):

(i)    Each of the representations and warranties made by any Loan Party set forth in Article 3 hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the applicable Increase Effective Date, except to the extent such representations and warranties expressly relate to an earlier date;

(ii)    The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after the Increase Effective Date, no Default or Event of Default shall have occurred and be continuing or would immediately result from such Borrowing on such date;

(iii)    Each of the Material Contracts shall be in full force and effect and shall not have been terminated;

(iv)    The Administrative Agent shall have received, with respect to the Increase Joinder and other Loan Documents and any other matters as the Administrative Agent shall reasonably request, certificates and documents substantially equivalent to those required under Section 4.01(b)(i) and (b)(ii);

(v)    The Administrative Agent shall have received a certificate, dated the Increase Effective Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in Sections 2.18(b)(i) through 2.18(b)(iv) as of such Increase Effective Date;

(vi)    The Administrative Agent shall have received evidence in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders of the Bankruptcy Court's approval of such Incremental Loan Facility;

(vii)    The Required Lenders shall have consented to the Borrower's incurrence of the Incremental Commitments under such Increase Joinder; and

(viii)    Without limiting the foregoing requirement to receive the written consent of the Required Lenders, the satisfaction of each other condition required by the Required Lenders in respect thereof.

(c)    *Terms of New Loans and Commitments*.  The terms and conditions of the Loans made pursuant to the Incremental Loan Facility ("**Incremental Loans**"), shall be as mutually agreed between the Borrower, the Administrative Agent, the Required Lenders, and each Lender providing the Incremental Loan Facility; *provided* that:

(i)    the Incremental Loan Facility will rank *pari passu* in right of payment and *pari passu* with respect to security with the then existing Loans, shall not be secured by any assets that do not constitute Collateral, shall be incurred by the Borrower and shall not be guaranteed by any Person that is not a Loan Party;

(ii)    [reserved]; and

(iii)    except as otherwise agreed with the Required Lenders, (A) the Incremental Loan Facility will be subject to the same terms and conditions as the Loans except those conditions to borrowing explicitly set forth in this Section 2.18, (B) the Incremental Loans, once funded, shall be considered a part of the same Class as all other Loans outstanding at such time (unless otherwise specified in the applicable Increase Joinder), (C) the final maturity of any Incremental Loan Facility will be the Maturity Date and (D) no Incremental Loan Facility shall amortize or have mandatory prepayments other than those applicable to the existing Loans.

(d)    *Equal and Ratable Benefit*.  The Loans and Commitments established pursuant to this Section 2.18 shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without

limiting the foregoing, benefit equally and ratably from the Guarantees and the security interests created by the Loan Security Documents. The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Lien and security interests granted by the Loan Security Documents continue to be perfected under the UCC, the PPSA or otherwise after giving effect to the establishment of any such Loans or any such new Commitments.

(e)     This Section 2.18 shall supersede any provisions in Section 2.14 or Section 10.02 to the contrary.

Section 2.19    Certain Bankruptcy Matters.

(a)     The Loan Parties hereby agree that, subject only to the Carve-Out, the AST Break-Up Fee (if any) and Administration Charge, the Obligations shall (i) constitute DIP Superpriority Claims with priority over all administrative expense claims and any and all other claims against the Borrower and the other Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person, the establishment of which superpriority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured as provided in, and be deemed valid and perfected by entry of any of, the DIP Orders pursuant to the applicable provisions of the Bankruptcy Code.

(b)     In the event of a conflict between, or inconsistency among, the Interim DIP Order or the Final DIP Order, on the one hand, and any other Loan Document, on the other hand, the Interim DIP Order or the Final DIP Order, as the case may be, shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     No Agent or Lender shall be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the DIP Orders, the DIP Recognition Orders or any other Loan Document. If the Collateral Agent (at the Required Lenders' direction, which shall be in their sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim DIP Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.22(c) or of the perfection of any other Liens in favor of the Collateral

Agent, for the benefit of the Lenders and the other Secured Parties, on the Collateral.

(ii)     Except as otherwise expressly agreed to by each of the Secured Parties in writing, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Collateral Agent, the Lenders and the other Secured Parties pursuant to this Agreement, the DIP Orders, the DIP Recognition Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Cases, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     subject only to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Secured Party or any Agent against the Borrower or any other Loan Parties in respect of any Obligations;

(ii)     the Collateral Agent's Liens on the Collateral shall constitute valid, enforceable and perfected First Priority Liens, and, other than as expressly provided in the DIP Orders, DIP Recognition Orders or the Loan Documents, shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)     the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for any Agent or any other Secured Party to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable non-bankruptcy law.

In connection with any Asset Sale or other disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Collateral Agent, in accordance with applicable law and, with respect to any credit bid, section 363(k) of the Bankruptcy Code, the Borrower and each other Loan Party hereby gives the Collateral Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to

"credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and each of the Lenders that:

Section 3.01   Organization; Powers.  Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority (x) to carry on its business as now conducted, subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, and (y) to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  There is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

Section 3.02   Authorization; Enforceability.  Subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, the Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party.  This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03   No Conflicts.  Except as set forth on Schedule 3.03 and subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which would not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any material Requirement of Law, (d) will not violate or result in a default or require any consent or approval that has not been obtained under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company (other than (i) with respect to the Prepetition Facilities that are stayed as a result of the Cases and (ii) violations arising solely and directly as a result of the commencement of the Cases and Recognition Proceedings and except as otherwise excused by the Bankruptcy

Court), and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

Section 3.04    Financial Statements; Projections.

(a)     *Historical Balance Sheets; Forecasted Cash Flows*.  The Borrower has heretofore delivered to the Administrative Agent and the Lenders (i) an unaudited consolidated balance sheet as of and for the fiscal quarter ending September 30, 2024, and (ii) the audited financial statements of the Borrower as of and for the year ending December 31, 2023.  The financial statements delivered pursuant to Sections 5.01(a) and (b) have been prepared in accordance with GAAP and present fairly and accurately the financial condition and, if applicable, the results of operations and cash flows, of the Borrower as of the dates and for the periods to which they relate.

(b)     *No Liabilities; No Material Adverse Effect*.  Except as set forth in the financial statements referred to in Section 3.04(a) (or, after the Closing Date, as set forth in the financial statements referred to in Section 5.01(a)), there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which would reasonably be expected to result in a Material Adverse Effect.  Since the Petition Date, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to result in a Material Adverse Effect.

(c)     *Budget*.  A true and complete copy of the Initial Budget, as agreed to with the Required Lenders as of the Closing Date, is attached as Exhibit J hereto.  The Initial Budget and each Cash Flow Forecast delivered thereafter pursuant to Section 5.01(f) hereof are based on good faith estimates and assumptions made by the management of the Borrower and believed by such management to be reasonable and attainable as of the date delivered to the Administrative Agent (it being understood that any projections contained therein are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material).

Section 3.05    Properties.

(a)     *Generally*.  Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for, in the case of Collateral, Permitted Liens and, in the case of all other material property, Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.  The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)     *Real Property*.  Schedules 7(a) and 7(b) to the Perfection Certificate dated the Closing Date contain a true and complete list of each interest in Real Property, other than Real Property located in Canada, and each interest in Real Property located in Canada material to the business, assets, property, operations or condition of the Borrower or any Loan Party, in each case

(i) owned by the Borrower or any of its Subsidiaries as of the date hereof and describes the type of interest therein held and whether such owned Real Property is leased and if leased whether the underlying Lease contains any option to purchase all or any portion of such Real Property or any interest therein or contains any right of first refusal relating to any sale of such Real Property or any portion thereof or interest therein and (ii) leased, subleased or otherwise occupied or utilized by the Borrower or any of its Subsidiaries, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Company and, in each of the cases described in clauses (i) and (ii) of this Section 3.05(b), whether any Lease requires the consent of the landlord or tenant thereunder, or other party thereto, to the Transactions.

(c)     *No Casualty Event*.   Except in respect of Skyterra-1 and Skyterra-2 as described in Schedule 3.08, no Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any material portion of its property.  No mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.04.

(d)     *Collateral*.   Subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, each Loan Party owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Loan Party's business as currently conducted.  The use by each Loan Party of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any Person other than such infringement which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)     *Material Contracts*.   Each Material Contract and Material Lease is in full force and effect and no defaults giving any party thereto the right to terminate such Material Contract or Material Lease currently exist thereunder (other than as a result of the Cases or the Recognition Proceedings).  Each Material Contract and Material Lease is a legal, valid and binding obligation of the Borrower and its Subsidiaries party thereto and, to the knowledge of the Borrower, each other party thereto, is enforceable in accordance with its terms and is in full force and effect, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights (including the Cases) and to general equity principles.  Neither the Borrower nor its Subsidiaries, nor to the knowledge of the Responsible Officers of the Borrower or its Subsidiaries, any other party to any Material Contract or Material Lease, is or was in material breach or default, under the terms of any Material Contract or Material Lease, and no condition existed or exists which, with the giving of notice or the lapse of time or both, could constitute a material breach or default by the Borrower or any of its Subsidiaries thereunder (in each case, other than as a result of the Cases or the Recognition Proceedings).  Each Company enjoys peaceful and undisturbed possession under each Material Lease to which it is a party (in each case, other than as a result of the Cases or the Recognition Proceedings).

Section 3.06    <u>Intellectual Property</u>.

(a)    *Ownership/No Claims*.  Each Company owns, or is licensed to use, all patents, industrial designs, trademarks, trade names, service marks, copyrights (and all registrations and applications for registration of any of the foregoing), technology, trade secrets, proprietary information, domain names, know-how and processes (collectively, the "**Intellectual Property**") material to the conduct of its business as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof).  No claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that any Company is infringing, misappropriating or otherwise violating the Intellectual Property rights of any Person, nor does any Company know of any valid basis for any such claim that in each case would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  The conduct of the business of each Company as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof) does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any Person, except as will not have a Material Adverse Effect.

(b)    *Registrations*.  Except pursuant to licenses and other user agreements entered into by the Borrower and its Subsidiaries in the ordinary course of business that are listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date, on and as of the date hereof (i) the Borrower or its Subsidiaries, as indicated in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date, owns and possesses the right to use, and has not licensed any other Person to use, any copyright, patent, trademark or service mark (or any application for registration of any of the foregoing listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date) and (ii) to each Loan Party's knowledge, all registrations listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date are valid and in full force and effect.

(c)    *No Violations or Proceedings*.  To each Loan Party's knowledge, on and as of the date hereof, there is no material violation by others of any right of the Borrower or its Subsidiaries with respect to any copyright, patent, industrial design, trademark or service mark listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date, pledged by it under the name of such Loan Party except as may be set forth on Schedule 3.06(c).

Section 3.07    <u>Equity Interests and Subsidiaries</u>.

(a)    *Equity Interests*.  Schedules 1(a) and 9(a) to the Perfection Certificate dated the Closing Date set forth a list of (i) each Subsidiary of the Borrower and its jurisdiction of organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date.  All Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of the Borrower, are owned by the Borrower, directly or indirectly through Wholly Owned Subsidiaries.  Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under

the Loan Security Agreement or the Canadian Security Agreement, as applicable, free of any and all Liens, rights or claims of other Persons, except the security interest created by the Loan Security Agreement, the Canadian Security Agreement or the Prepetition Security Agreements, as applicable.  As of the Closing Date, there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)     *No Consent of Third Parties Required*.  Subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the Administrative Agent for the benefit of the Secured Parties under the Loan Security Agreement or the Canadian Security Agreement, as applicable, or the exercise by the Administrative Agent of the voting or other rights provided for in the Loan Security Agreement or the Canadian Security Agreement, or the exercise of remedies in respect thereof, except for such FCC, ISED or CRTC consents as may be required under the Communications Laws in connection with the exercise of such remedies.

(c)     *Organizational Chart*.  An accurate organizational chart, showing the ownership structure of the Borrower and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(c).

Section 3.08   Litigation; Compliance with Laws.  Except for the Cases and as set forth in Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company as to which, in any case, there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  No Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

Section 3.09   Agreements.  As of the Petition Date, no Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or would reasonably be expected to result in a Material Adverse Effect.  No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound (other than the Prepetition Facilities that are stayed as a result of the Cases), where such default would reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.  Schedule 3.09 accurately and completely lists all material agreements (other than leases of Real Property set forth on Schedule 7(a) or 7(b) to the Perfection

Certificate dated the Closing Date) to which any Company is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

Section 3.10   <u>Federal Reserve Regulations</u>.  No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.  No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors, including Regulation T, U or X.  The pledge of the Securities Collateral (as defined in the Loan Security Agreement) pursuant to the Loan Security Agreement does not violate such regulations.

Section 3.11   <u>Investment Company Act</u>.  No Company is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12   <u>Use of Proceeds</u>.  Subject to the Budget and any additional restrictions on the use of proceeds provided herein and in accordance with the DIP Orders and DIP Recognition Orders, the Borrower will use the proceeds of the Loans hereunder for the following purposes:

(a)     With respect to Loans other than the DIP Second Funding Loans, (i) for working capital and general corporate purposes as approved in the Budget; (ii) to consummate the Roll-Up in accordance with Section 2.02; (iii) to pay professional fees in connection with the Cases and for other post-petition general corporate purposes, in each case, as approved in the Budget; (iv) to make adequate protection payments to the Prepetition Secured Parties as set forth in the DIP Orders; (v) to fund the Carve-Out and amounts secured by the Administration Charge; (v) to pay interest, fees and expenses due hereunder; and (vi) as otherwise agreed in writing between the Borrower and the Required Lenders; and

(b)     With respect to the DIP Second Funding Loans, to repay in full in cash all outstanding Obligations (as defined in the 1L Loan Agreement) in respect of the First Out Loans (as defined in the 1L Loan Agreement) (such Obligations, the "**Prepetition First Out Obligations**");

*provided* that, except as otherwise set forth hereunder, in no event shall the proceeds of the Loans be used to make payments in regards to the Debtors' obligations under the Prepetition Facilities (other than pursuant to the Roll-Up or, in the case of the DIP Second Funding Loans, the Prepetition First Out Obligations) or to fund expenses or other amounts not otherwise set forth in this Section 3.12.  No portion of the proceeds of any Loan shall be used in any manner that causes or might cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

Section 3.13   Taxes.  Each Company has (a) timely filed or caused to be timely filed all material federal Tax Returns and all material state, provincial, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves (after the Closing Date, in accordance with GAAP), (ii) which would not, individually or in the aggregate, have a Material Adverse Effect or (iii) to the extent payment of such Tax is excluded by, or is otherwise prohibited by, the provisions of the Bankruptcy Code or order of the Bankruptcy Court and (c) satisfied all of its withholding tax obligations except for failures that would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  Each Company has made adequate provision (after the Closing Date, in accordance with GAAP) for all material Taxes not yet due and payable.  Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that would be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  Except as would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect, no Company has ever "**participated**" in a "**listed transaction**" within the meaning of Treasury Regulation Section 1.6011-4.

Section 3.14   No Material Misstatements.  No information, reports, financial statements, certificates, Borrowing Requests, exhibits or schedules furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

Section 3.15   Labor Matters.  There are no strikes, stoppages, lockouts, slowdowns or other labor disputes against any Company pending or, to the knowledge of any Company, threatened except as would not individually or in the aggregate be expected to result in a Material Adverse Effect, (i) the hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, the Canada Labour Code, as amended, or any other applicable Requirements of Law dealing with such matters and (ii) all payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company (except to the extent such payments have been stayed by the commencement of the Cases and, where applicable, the recognition thereof by the CCAA Court).  The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

Section 3.16   [Reserved].

Section 3.17   Employee Benefit Plans.   With respect to each Employee Benefit Plan, Single Employer Plan and Multiemployer Plan, each Company and its ERISA Affiliates is in compliance in all material respects with the applicable Requirements of Law, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, except where noncompliance would not, either individually, or taken together with all other exceptions to the representations set forth in this Section 3.17 reasonably be expected to result in a Material Adverse Effect.   Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and to the knowledge of each Company, nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.   No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan, Single Employer Plan or Multiemployer Plan (other than in the ordinary course) or any trust established under Title IV of ERISA has been or is expected to be incurred by any Company or any of its ERISA Affiliates with respect to any Employee Benefit Plan, Single Employer Plan or Multiemployer Plan, except where such liability, either individually, or taken together with all other exceptions to the representations set forth in this Section 3.17, would not reasonably be expected to result in a Material Adverse Effect.   No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, would reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any of the property of any Company or any of its ERISA Affiliates.   The present value of all accrued benefits under each Single Employer Plan or similar Foreign Plan (based on those assumptions used to fund such plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such plan allocable to such accrued benefit by a material amount.   As of the most recent valuation date for each Multiemployer Plan, the potential liability of each Company and its ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is not material.   The Companies and their respective ERISA Affiliates have complied with the requirements of Section 515 of ERISA in all material respects with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.   Neither any Company nor any of its ERISA Affiliates has any contingent liability with respect to any post-retirement welfare benefit under an Employee Benefit Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA or other applicable law, except where such liability, either individually, or taken together with all other exceptions to the representations set forth in this Section 3.17, would not reasonably be expected to result in a Material Adverse Effect.

To the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities.   No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan.   Except as would not reasonably be expected to result in a Material Adverse Effect, the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is fully or partially funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan by any material

amount, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued and reported.

No Foreign Plan that is not a Canadian Pension Plan is subject to federal or provincial pension standards legislation.

The Canadian Pension Plans are duly registered under the Canadian Income Tax Act and any other applicable laws which require registration, have been administered in all material respects in accordance with the Canadian Income Tax Act and such other applicable laws, and no event has occurred and no condition exists that has resulted in or which would reasonably be expected to cause the loss of such registered status, except to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect.  The Canadian Pension Plans are in substantial compliance with all Requirements of Law applicable thereto, and, without limiting the generality of the foregoing, all material obligations of each of the Loan Parties (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis, except to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect.  All contributions or premiums required to be made or paid by each of the Loan Parties to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans, their funding agreements and all applicable laws. There have been no material improper withdrawals or applications of the assets of the Canadian Pension Plans.  None of the Canadian Pension Plans contain or have ever contained a "defined benefit provision", as that term is defined in subsection 147.1(1) of the Canadian Income Tax Act. No Canadian Pension Plan is a "multi-employer pension plan" as defined under the *Pension Benefits Standards Act*, 1985 (Canada) or under similar provincial pension standards legislation. No event has occurred and no condition exists that would reasonably be expected to result in an order to terminate any Canadian Pension Plan in whole or in part.  No Person has ordered or given notice of the termination or wind up of a Canadian Pension Plan in whole or in part.

Section 3.18   Environmental Matters.

(a)   Except as set forth in Schedule 3.18 and except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect:

(i)   The Companies and their businesses, operations and Real Property have been and are in compliance with, and the Companies have no liability under, any applicable Environmental Law; and under the business plan of the Companies, no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws during the next five years;

(ii)   The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii)    To the knowledge of the Loan Parties, there has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that would result in liability of or by the Companies under any applicable Environmental Law;

(iv)    There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that would reasonably form the basis of such an Environmental Claim; and

(v)    No Person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)    Except as set forth in Schedule 3.18:

(i)    No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)    No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)    No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of the Companies;

(iv)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(v)    The Companies have made available to the Lenders all material records and files in the possession, custody or control of the Companies concerning compliance with or liability under Environmental Law, including those concerning

the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

Section 3.19   Insurance.  Schedule 3.19 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date.  All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, no Company has received notice of violation or cancellation thereof, the premises, and the use, occupancy and operation thereof, comply in all material respects with all insurance requirements, and there exists no default under any insurance requirement.  Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

Section 3.20   Loan Security Documents.

(a)   *Loan Security Agreement.*  The Loan Security Agreement, taken together with the Interim DIP Order and/or the Final DIP Order, is effective to create in favor of the Collateral Agent, for the benefit of the Lenders and the other Secured Parties, legal, valid, and enforceable continuing First Priority Liens on, and automatically perfected security interests in, the Collateral pledged hereunder or thereunder, in each case, subject to no Liens other than Permitted Liens, the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge. Pursuant to the terms of the Interim DIP Order and/or Final DIP Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.  Pursuant to and to the extent provided in the Interim DIP Order and/or the Final DIP Order, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject only to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.  Notwithstanding anything to the contrary herein, the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Collateral Agent and the other Secured Parties.  The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of Collateral Agent, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.

(b)   *Canadian Security Agreement.*  The Canadian Security Agreement, taken together with the Interim DIP Recognition Order and Final DIP Recognition Order, are effective

to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Canadian Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate dated the Closing Date and (ii) upon the taking of possession or control by the Collateral Agent of the Canadian Collateral with respect to which a security interest may be perfected by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Loan Security Document), the Liens created by the Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Canadian Collateral (other than such Canadian Collateral in which a security interest cannot be perfected under the PPSA as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Liens, including the Administration Charge.

(c)     *Intellectual Property*.  When the financing statements referred to in Section 3.20(b) (i) have been filed, the Liens created by such Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents, Copyrights and Trademarks (as each such term is defined in the Canadian Security Agreement) registered or applied for with CIPO, in each case subject to no Liens other than Permitted Liens, including the Administration Charge.

(d)     *Copyright Office Filing*.  When the Loan Security Agreement or a short form thereof is filed in the United States Copyright Office, the Liens created by such Loan Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in all Copyrights (as defined in the Loan Security Agreement) registered or applied for with the United States Copyright Office, subject to no Liens other than Permitted Liens.

(e)     *Unencumbered Assets*.  (i) The Collateral constitutes all of the material assets of the Companies (for the avoidance of doubt, excluding the Second Satellite until such time as the Companies take title to the Second Satellite), and (ii) no Company has granted a Lien on Collateral in respect of Indebtedness permitted under Section 6.01(l) which has not been granted to secure the Obligations.

(f)     *Valid Liens*.  Each Loan Security Document delivered pursuant to Sections 5.11 and 5.12 will, upon execution and delivery thereof and taken together with the Interim DIP Order and/or the Final DIP Order, and the DIP Recognition Orders, be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder, and such Loan Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens, including the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.

Section 3.21   Intercompany Indebtedness; Affiliate Indebtedness.

(a)     Except for Indebtedness owed by any Canadian Subsidiary to the Borrower the proceeds of which were used to fund operations in the ordinary course of business, no Company

has outstanding any Indebtedness owing to an Affiliate of such Company (except Indebtedness that is permitted under Section 6.01).

(b)     Neither the Borrower nor any of its Subsidiaries is party to or otherwise bound by any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets (except for Indebtedness permitted under Section 6.01, so long as such Indebtedness does not prohibit Liens on the Collateral in favor of the Collateral Agent and the Lenders), or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary.

Section 3.22   Anti-Terrorism Laws; Anti-Corruption Laws.

(a)     No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, employees, brokers or agents of such Loan Party, such Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws, or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)     No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, employees, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person or (ii) has violated or is in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c)     No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of Anti-Terrorism Laws or other applicable laws, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.23   Communications Licenses and Regulatory Matters.

(a)     Schedule 3.23(a) accurately and completely lists all Communications Licenses, including a separate designation of Communications Licenses deemed to be Material Licenses as of the date hereof.  The Companies hold, or have applied for (and have no reason to believe that any such application will not be granted), all authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or

telecommunications services and spectrum leases required in connection with the conduct of the businesses of the Companies as presently conducted.  All Material Licenses identified on Schedule 3.23(a) are validly held and in full force and effect and, except for the One Dot Six License, are duly issued in the name of, or validly assigned to, the applicable Company.

(b)     The Companies are in compliance in all material respects with all Communications Laws.  No Company has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Company (other than proceedings relating to the wireless communications industry generally, FCC proceedings described in Schedule 3.23(b), or proceedings that cannot reasonably be expected to have a Material Adverse Effect).  Except as described in Schedule 3.23(b), no event has occurred that has resulted in, or after notice or lapse of time or both would be reasonably expected to result in, revocation, suspension, adverse modifications, impairment, restriction or termination of, or order of forfeiture with respect to, any Communications License or the One Dot Six Lease, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)     Each Company and each of its Subsidiaries has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws and the terms and conditions of its Communications Licenses and the One Dot Six Lease, including substantial service showings and renewal applications, and all such filings were when made, and (to the extent the Communications Laws impose upon any Company a duty to update) remain, true, correct and complete in all material respects.

(d)     Except as described in Schedule 3.23(a), no material consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws in connection with the execution or consummation of the Transactions.

(e)     Except as provided in Schedule 3.23(b), *provided* that network facilities sufficient to support substantial service in a manner consistent with each Communications License are constructed, no Loan Party knows of any reason why any of the Communications Licenses should not be renewed or otherwise extended, or the rights thereunder substantially replicated, in the ordinary course without any materially adverse conditions, or the One Dot Six Lease should not be renewed in the ordinary course without any materially adverse conditions.

Section 3.24   License Subsidiaries; Other Subsidiaries.

(a)     No License Subsidiary holds any significant assets (other than the Communications Licenses held by it) or has incurred any liabilities (other than any Contingent Obligations incurred under the Loan Documents or the Prepetition Debt Documents to which it is a party, and other *de minimis* liabilities).  Neither One Dot Six LLC nor Ligado Networks Inc. of Virginia holds any significant assets (other than the Communications Licenses held by it or as otherwise described on Schedule 3.24(a)) or has incurred any liabilities (other than Contingent Obligations incurred under the Loan Documents or the Prepetition Debt Documents, as otherwise described on Schedule 3.24(a) or other *de minimis* liabilities).  Other than the License Subsidiaries, One Dot Six LLC, and Ligado Networks Inc. of Virginia, none of the Companies holds any U.S.

authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises or similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases.  As of the Closing Date, Ligado Networks Subsidiary LLC is the only License Subsidiary.

(b)     Except as set forth on Schedule 3.09 and 3.23(a), other than the Loan Parties, no Subsidiary of the Borrower has any claim to, ownership of, right to or interest in any Material Lease, Material License, Intellectual Property or satellites of the Companies.

Section 3.25     <u>Cases; Orders</u>.

(a)     The Cases were (or with respect to any making of this representation prior to the Petition Date, will be) commenced on the Petition Date, duly authorized in accordance with applicable laws, and proper notice thereof has been or will be given of (i) the motion seeking approval of the Loan Documents, the entry of the Interim DIP Order and the Final DIP Order, and (ii) the hearing for the entry of the Final DIP Order.  Proper notices of the motions for entry of the Interim DIP Order and the hearings thereon were given.

(b)     The Initial CCAA Recognition Order and Interim DIP Recognition Order will be obtained within five (5) Business Days of the entry of the Interim DIP Order and proper notice thereof under the circumstances will be given of (i) the application seeking the issuance of each of the Interim DIP Recognition Order and Final DIP Recognition Order, and (ii) the motion seeking the issuance of the Interim DIP Recognition Order and Final DIP Recognition Order.

(c)     With respect to each Loan Party that is a Debtor, subject to and upon entry of the Interim DIP Order, and solely with respect to any Canadian Collateral upon issuance of the Interim DIP Recognition Order and the Final DIP Recognition Order, as the case may be, the Loan Security Agreement and the other Loan Security Documents are legally binding on such Loan Party, and the Collateral shall be subject to a legal, valid, enforceable and perfected security interest and Liens in favor of the Collateral Agent for the benefit of the Secured Parties with the priority set forth in the DIP Orders (or DIP Recognition Orders as the case may be), to the fullest extent permissible under applicable law.

(d)     The Loan Parties are in compliance in all material respects with the terms and conditions of the DIP Orders and DIP Recognition Orders.  Each of the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) and the Final DIP Order (from and after the date on which the Final DIP Order is entered), and solely with respect to the Canadian Collateral, each of the Interim DIP Recognition Order and Final DIP Recognition Order, is in full force and effect, is a Final Order and has not been modified, amended, vacated or stayed other than as acceptable to the Required Lenders (pursuant to a consent executed by them).

(e)     From and after the entry of the Interim DIP Order, and solely with respect to the Canadian Collateral upon issuance of the Interim DIP Recognition Order, pursuant to and to the extent permitted in the Interim DIP Order or Interim DIP Recognition Order and applicable law, the Obligations (i) will constitute allowed joint and several superpriority claims and (ii) will be secured by a valid, binding, continuing, enforceable, fully perfected Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, subject only to the Carve-

Out, the AST Break-Up Fee (if any) and the Administration Charge and the priorities set forth in the DIP Orders and, solely in relation to the Canadian Collateral, the DIP Recognition Orders.

(f)     The entry of the Interim DIP Order (and, when applicable, the Final DIP Order and DIP Recognition Orders solely in relation to the Canadian Collateral) is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, the DIP Superpriority Claims and Liens described in Section 2.19, without the necessity of the execution (or recordation or filing) of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents, to the extent permissible under applicable law.

## ARTICLE 4
## CONDITIONS

Section 4.01   <u>Conditions to Effectiveness</u>.  This Agreement shall be effective on the date on which each of the conditions precedent set forth below is satisfied or waived (by the Required Ad Hoc Holders in their sole discretion).

(a)     *Loan Documents*.  There shall have been delivered to the Administrative Agent executed counterparts (from each of the Loan Parties) to each of the following Loan Documents:

(i)     this Agreement; and

(ii)     the Perfection Certificate.

(b)     *Corporate Documents*.  The Administrative Agent shall have received:

(i)     a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (in the case of a Loan Party that is not a Foreign Subsidiary) as of a recent date by the Secretary of State of the jurisdiction of organization of the applicable Loan Party, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and the filing of the Cases, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer or a director (or if there is no such other officer or director of such Loan Party, an officer or director of the general partner, sole member or majority shareholder of such Loan Party) as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i)); and

(ii)     a certificate as to the good standing of each Loan Party as of a recent date, from the Secretary of State of the jurisdiction of organization of the applicable Loan Party (or other applicable Governmental Authority).

(c)     *Officer's Certificate*.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, attesting to the satisfaction of the conditions precedent set forth in this Section 4.01.

(d)     *Requirements of Law*.  The Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulations T, U and X of the Board of Governors.

(e)     *USA PATRIOT Act; Beneficial Ownership Certification*.  The Administrative Agent shall have received the information required under Section 10.15 (including, to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, a customary certification for the Borrower regarding beneficial ownership in relation to the Borrower, in form and substance satisfactory to Administrative Agent and the Lenders), in each case, prior to the Closing Date provided and to the extent that such information is requested prior to the Closing Date.

(f)     *License Subsidiaries*.  All Communications Licenses issued by the FCC to the Borrower or its Subsidiaries shall be held in one or more License Subsidiaries, except that the One Dot Six Lease Authorization and the other Communications Licenses issued by the FCC to the Borrower or its Subsidiaries authorizing the use of the 1670-1675 MHz band may be held in One Dot Six LLC.

(g)     *Spectrum Leases*.  All Material Leases to which any Loan Party is a party shall be in full force and effect and shall not (i) have been terminated or (ii) be currently subject to termination.

(h)     *No Default or Event of Default*.  The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after the Closing Date, no Default or Event of Default shall have occurred and be continuing on such date.

(i)     *Representations and Warranties*.  Each of the representations and warranties made by any Loan Party herein or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified by "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct as of such date).

(j)     *Expenses*.  The Borrower shall have paid all expenses payable pursuant to Section 10.03 (or otherwise pursuant to this Agreement) to the extent invoiced at least one (1) Business Day prior to the Closing Date, including, for the avoidance of doubt, those of (i) each Agent (including fees, costs, disbursements and expenses of their outside counsel and their regulatory counsel), including for avoidance of doubt, pursuant to the U.S. Bank Fee Letter, and (ii) the Lenders (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors).

93

(k)      *Other Agreements*.  Each of the Material Contracts shall be in full force and effect and shall not have been terminated.

(l)      *Consents*.  Other than the DIP Recognition Orders, all necessary approval and consents of any Governmental Authority or any third party necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Required Lenders) and shall remain in effect; and no law or regulation shall be applicable that restrains, prevents, or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

Section 4.02    Conditions to the DIP First Funding Date.  The obligation of each Lender to make the DIP First Funding Loans on the DIP First Funding Date, shall be subject to the satisfaction or waiver (by the Required Ad Hoc Holders in their sole discretion) of each of the conditions precedent set forth below.

(a)      *Loan Documents*.  There shall have been delivered to the Administrative Agent executed counterparts (from each of the Loan Parties) to each of the following Loan Documents:

(i)      the Loan Security Agreement;

(ii)      the Canadian Security Agreement;

(iii)      the Intercompany Note, accompanied by appropriate instruments of transfer undated and endorsed in blank; and

(iv)      the Reaffirmation Agreement;

(b)      *Borrowing Request*.  The Administrative Agent shall have received a fully completed and duly executed Borrowing Request from the Borrower with respect to the DIP First Funding Loans in accordance with the terms of Section 2.03, and such proposed Borrowing of DIP First Funding Loans shall not occur on a date prior to the second (2nd) Business Day following entry of the Interim DIP Order in accordance with the terms of this Agreement.

(c)      *Officer's Certificate*.  The Administrative Agent shall have received a certificate, dated the DIP First Funding Date and signed by a Responsible Officer of the Borrower, which certificate shall (i) attest to the satisfaction of the conditions precedent set forth in this Section 4.02, (ii) certify that the Organizational Documents and resolutions delivered to the Administrative Agent pursuant to Section 4.01(b)(i), in each case, have not been modified, rescinded or amended and are in full force and effect as of the DIP First Funding Date and (iii) certify that the disclosures set forth in the Perfection Certificate delivered to the Administrative Agent pursuant to Section 4.01(a)(ii) remain complete and accurate as of the DIP First Funding Date.

(d)      *Requirements of Law*.  The Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulations T, U and X of the Board of Governors.

(e)    *Material Adverse Effect*.  Since the Closing Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(f)    *Collateral*.  The Administrative Agent shall have received:

(i)    to the extent not already in the possession of the Collateral Agent (including in its capacity as collateral agent under the 1L Loan Security Agreement and/or collateral trustee under the 1L Notes Security Agreement), except as specified on Schedule 5.14, all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers undated and endorsed in blank;

(ii)    UCC and PPSA financing statements in appropriate form for filing under the UCC and PPSA, as applicable, and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Collateral Agent, desirable to perfect the Liens created, or purported to be created, by the Loan Security Documents;

(iii)    certified copies of UCC, PPSA, Bank Act (Canada), United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches, execution searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party or Subsidiary as debtor and that are filed in those federal, state, provincial, territorial and county jurisdictions in which any Loan Party or Subsidiary is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate or that the Collateral Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Loan Security Documents (other than Permitted Liens, Liens released on or prior to the Petition Date or any other Liens acceptable to the Collateral Agent), or in the case of PPSA filings, any asset of any Canadian Subsidiary; and

(iv)    evidence acceptable to the Collateral Agent of payment or arrangements for payment by the Loan Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Loan Security Documents.

(g)    *No Litigation*.  Other than the Cases and the Recognition Proceedings (and any litigation filed directly in response to the filing of the Cases or the Recognition Proceedings), there shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, singly or in the aggregate, could have a Material Adverse Effect on, or that restrains, prevents or purports (in a non-frivolous and good faith manner) to affect materially adversely the legality, validity or enforceability of the Loan Documents or the consummation of the transactions contemplated hereby or thereby.

(h)      *License Subsidiaries*.  All Communications Licenses issued by the FCC to the Borrower or its Subsidiaries shall be held in one or more License Subsidiaries, except that the One Dot Six Lease Authorization and the other Communications Licenses issued by the FCC to the Borrower or its Subsidiaries authorizing the use of the 1670-1675 MHz band may be held in One Dot Six LLC.

(i)      *Spectrum Leases*.  All Material Leases to which any Loan Party is a party shall be in full force and effect and shall not (i) have been terminated or (ii) be currently subject to termination.

(j)      *No Default or Event of Default*.  The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document and the Interim DIP Order on its part to be observed or performed, and, at the time of and immediately after the DIP First Funding Date, no Default or Event of Default shall have occurred and be continuing on such date.

(k)      *Representations and Warranties; DIP Order Stipulations*.  (i) Each of the representations and warranties made by any Loan Party herein or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified by "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the DIP First Funding Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct as of such date) and (ii) each of the stipulations of the Loan Parties in each of the DIP Orders shall be true, complete and correct in all material respects on and as of the DIP First Funding Date.

(l)      *No Conflict*.  (i) The making of the DIP First Funding Loans shall not violate any requirement of law, after giving effect to the Interim DIP Order, and shall not be enjoined, temporarily, preliminarily or permanently and (ii) the Loan Parties shall be in compliance with the Interim DIP Order.

(m)      *No Legal Bar*.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it.  No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(n)      *Consents*.  All necessary approval and consents of any Governmental Authority or any third party necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Required Lenders) and shall remain in effect; and no law or regulation shall be applicable that restrains, prevents, or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

(o)      *Other Agreements*.  Each of the Material Contracts shall be in full force and effect and shall not have been terminated (other than as a direct result of the filing of the Cases or the Recognition Proceedings).

(p)      *Motions and Documents*.  All material motions, orders, and other material documents to be filed with and submitted to the Bankruptcy Court (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance satisfactory to the Required Ad Hoc Holders (which satisfaction may be communicated via an email direction of the Required Ad Hoc Holders)

(q)      *First Day Orders*.  All orders entered by the Bankruptcy Court relating to the relief sought in the motions described in Section 4.02(p) hereof shall not, without the Required Ad Hoc Holders' prior written consent, (i) authorize any Loan Party to (A) use any of the material properties or assets of the Loan Parties outside of the ordinary course of business (except as contemplated by the DIP Orders), (B) satisfy prepetition claims of the Loan Parties or (C) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Budget), (ii) reject or assume any contract, agreement, lease or other agreement to which any Loan Party is a party, or (iii) otherwise be inconsistent with this Agreement, the Interim DIP Order, or the Budget.

(r)      *Interim DIP Order*.  The Bankruptcy Court shall have entered the Interim DIP Order within five (5) days following the Petition Date, which Interim DIP Order shall include, without limitation, copies of this Agreement and the Initial Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the Required Ad Hoc Holders, (i) authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the super priority claim status, security interests and priming liens, and the payment of all fees, referred to herein and therein; (ii) authorizing the lifting or modification of the automatic stay to permit the Borrowers and the Guarantors to perform their obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of Cash Collateral and providing for adequate protection in favor of the Prepetition Lenders and Holders, as and to the extent provided herein and therein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Required Lenders and the Loan Parties, in their respective discretion in each case, which Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(s)      *No Trustee*.  No trustee or examiner with expanded powers shall have been appointed with respect to any Loan Party or any of the Loan Parties' respective properties pursuant to sections 1104, 1106(a)(3) and (4) of the Bankruptcy Code.

(t)      *Liens*.  The Interim DIP Order shall provide that the Collateral Agent, for the benefit of the Secured Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(u)      *Budget*.  Administrative Agent shall have received the Initial Budget, which shall be in form and substance satisfactory to the Required Ad Hoc Holders.  The funding of the DIP First Funding Loans shall be in compliance with the Initial Budget.

(v)     *Amount*.   The making of the DIP First Funding Loans (x) shall be on or before the second Business Day after the Interim DIP Order Entry Date and (b) shall not result in the aggregate principal amount of the Loans outstanding hereunder to exceed the amount of loans authorized by the Interim DIP Order to be funded on the DIP First Funding Date.

(w)     *Cases*.   The Cases of any of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(x)     *Cash Management Order*.   The Cash Management Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Required Ad Hoc Holders.

(y)     *Fees and Expenses*.   The Borrower shall have paid (or substantially concurrently will pay) to each Agent the fees payable on or before the DIP First Funding Date referred to in Section 2.05 (or otherwise pursuant to this Agreement) and all expenses payable pursuant to Section 10.03 (or otherwise pursuant to this Agreement) to the extent invoiced at least two (2) Business Days prior to the DIP First Funding Date, including, for the avoidance of doubt, those of (i) each Agent (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors) and (ii) the Lenders (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors).

(z)     *Waiver of the Equities*.   The Lenders shall have received (i) a waiver of any "equities of the case" under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code (it being understood and agreed by the Borrower, on behalf of itself and its Subsidiaries, that in no event shall any of the Lenders be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral).

Section 4.03   Conditions to Each DIP DDTL Funding Date.   The obligation of each DIP DDTL Commitment Lender to make DIP Delayed Draw Term Loans on any DIP DDTL Funding Date shall be subject to the satisfaction or waiver (by the Required Ad Hoc Holders in their sole discretion) of each of the conditions precedent set forth below on such DIP DDTL Funding Date.

(a)     *Closing Date; DIP First Funding Date; Prior Borrowings*.   Each of the Closing Date and the DIP First Funding Date shall have occurred and the DIP First Funding Loans, Roll-Up Loans and the DIP Second Funding Loans shall have been made.

(b)     *Final DIP Order*.   The Final DIP Order, which shall be consistent with the Interim DIP Order and otherwise in form and substance satisfactory to the Required Ad Hoc Holders, shall have been entered within thirty-five (35) days after the Petition Date and shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect (to the extent applicable as of the date of such Borrowing).

(c)     *Borrowing Request*.   The Administrative Agent shall have received a fully completed and duly executed Borrowing Request from the Borrower with respect to such DIP Delayed Draw Term Loans in accordance with the terms of Section 2.03, which Borrowing Request shall have been submitted no earlier than the Final DIP Order Entry Date.

(d)  *Representations and Warranties; DIP Orders*.   (i) Each of the representations and warranties made by any Loan Party herein or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified by "materiality" or "Material Adverse Effect"  shall be true and correct in all respects) on and as of such DIP DDTL Funding Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct as of such date) and (ii) each of the stipulations of the Loan Parties in each of the DIP Orders shall be true, complete and correct in all material respects on and as of such DIP DDTL Funding Date.

(e)  *Officer's Certificate*.   The Administrative Agent shall have received a certificate, dated the DIP DDTL Funding Date and signed by a Responsible Officer of the Borrower, which certificate shall (i) attest to the satisfaction of the conditions precedent set forth in this Section 4.03, (ii) certify that the Organizational Documents and resolutions delivered to the Administrative Agent pursuant to Section 4.01(b)(i), in each case, have not been modified, rescinded or amended and are in full force and effect as of such DIP DDTL Funding Date and (iii) certify that the disclosures set forth in the Perfection Certificate delivered to the Administrative Agent pursuant to Section 4.01(a)(ii) remain complete and accurate as of such DIP DDTL Funding Date.

(f)  *Fees and Expenses*.   The Borrower shall have paid (or substantially concurrently will pay) to each Agent the fees payable on or before the applicable DIP DDTL Funding Date referred to in Section 2.05 (or otherwise pursuant to this Agreement) and all expenses payable pursuant to Section 10.03 (or otherwise pursuant to this Agreement) to the extent invoiced at least two (2) Business Days prior to the DIP DDTL Funding Date, including, for the avoidance of doubt, those of (i) each Agent (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors) and (ii) the Lenders (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors).

(g)  *Material Adverse Effect*.   Since the Closing Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(h)  *Default or Event of Default*.   The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document and the Final DIP Order on its part to be observed or performed, and, at the time of and immediately after the DIP DDTL Funding Date, no Default or Event of Default shall have occurred and be continuing on such date.

(i)  *No Litigation*.   Other than the Cases and the Recognition Proceedings (and any litigation filed directly in response to the filing of the Cases or the Recognition Proceedings), there shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, singly or in the aggregate, could have a Material Adverse Effect or that restrains, prevents or purports (in a non-frivolous and good faith manner) to affect materially adversely the legality, validity or enforceability of the Loan Documents or the consummation of the transactions contemplated hereby or thereby.

(j)     *No Trustee*.  No trustee or examiner with expanded powers shall have been appointed with respect to any Loan Party or any of the Loan Parties' respective properties pursuant to sections 1106(a)(3) and (4) of the Bankruptcy Code.

(k)     *Cases*.  The Cases of any of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(l)     *Orders*.  No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders).

(m)     *Budget*.  The funding of such DIP Delayed Draw Term Loans shall be in compliance with the Budget.

(n)     *No Conflict*.  (i) The making of such DIP Delayed Draw Term Loans shall not violate any requirement of law, after giving effect to the Final DIP Order, and shall not be enjoined, temporarily, preliminarily or permanently and (ii) the Loan Parties shall be in compliance with the Final DIP Order.

(o)     *Amount*.  (i) The making, and deemed making, of such DIP Delayed Draw Term Loans shall not result in the aggregate principal amount of Loans outstanding hereunder to exceed the amount of Loans authorized by the Final DIP Order and (ii)(x) in the case of the First DIP DDTL Borrowing, shall be in an amount that is equal to or less than $23,000,000, and (y) in the case of any other Borrowing of DIP Delayed Draw Term Loans, shall not be in excess of the applicable amount set forth in the Budget for the applicable Borrowing.

(p)     *Milestones*.  The Borrower shall be in compliance with the Milestones set forth in Section 5.16 as of the date of such Borrowing.

(q)     *Liens*.  The Final DIP Order shall provide that the Collateral Agent, for the benefit of the Secured Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(r)     *Cash Management Order*.  The Cash Management Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(s)     *Cadence*.  There shall have been no more than two (2) prior Borrowings of DIP Delayed Draw Term Loans.

(t)     *Borrowing Periods*.  (i) In the case of the First DIP DDTL Borrowing, such Borrowing shall occur during the period commencing on the Final DIP Order Entry Date and ending on the date immediately preceding the Initial Stated Maturity Date and (ii) in the case of the Second DIP DDTL Borrowing and the Third DIP DDTL Borrowing, (x) such Borrowing shall occur during a Maturity Date Extension Period, (y) a Maturity Date Extension Approval shall have

been given in respect of such Maturity Date Extension Period prior to the date of Borrowing and (z) no other Borrowing shall have occurred during the applicable Maturity Date Extension Period in which the applicable Borrowing will occur.

(u)     *Approved Budget.*  The Agent and the Required Lenders shall have received and approved the applicable Budget pursuant to section 5.01(f) hereof.

(v)     *Required Ad Hoc Holder Consent.*  Except in the case of the First DIP DDTL Borrowing, the Required Ad Hoc Holders shall have provided their prior written consent to such Borrowing of DIP Delayed Draw Term Loans, in their sole discretion.

(w)     *Certain Additional Conditions.*  The conditions precedent set forth in Sections 4.02(d), (h), (i), (m), (n), (o), (p), (q), (r) and (s) shall be true and correct as of such DIP DDTL Funding Date.

Each of the delivery of a Borrowing Request and the acceptance by Borrower of the proceeds of any DIP Delayed Draw Term Loans shall constitute a representation and warranty by Borrower and each other Loan Party that on such date of Borrowing (both immediately before and after giving effect to such Borrowing and the application of the proceeds thereof) the conditions contained in Sections 4.03(d), 4.03(g), and 4.03(h) through (and including) 4.03(r) will be satisfied on such date of Borrowing.

Notwithstanding the foregoing, if the Required Ad Hoc Holders determine in their sole discretion that the Borrower has failed to satisfy any of the conditions precedent set forth in this Section 4.03 and so advise the Administrative Agent in writing, the Administrative Agent shall decline to fund such DIP Delayed Draw Term Loans.

# ARTICLE 5
# AFFIRMATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will, and will cause each of its Subsidiaries to:

Section 5.01   Financial Statements, Reports, etc.  Furnish to the Administrative Agent for distribution to each Lender:

(a)     *Annual Reports.*  As soon as available and in any event within 90 days after the end of each fiscal year, beginning with the fiscal year ending December 31, 2024, the consolidated balance sheet, consolidated income statement and consolidated cash flow of the Borrower and its Subsidiaries as of and for the fiscal year then ended, setting forth in each case in comparative form the corresponding figures from the corresponding period from the previous fiscal year, and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" substantially equivalent to that which would be required to be included in an Annual Report on Form 10-K of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The filing by the Borrower of its Form 10-K or any

successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal year reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such year;

(b)     *Quarterly Reports*.  As soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year, beginning with the fiscal quarter ending March 31, 2025, the consolidated balance sheet, consolidated income statement and consolidated cash flow of the Borrower and its Subsidiaries as of and for the fiscal quarter (and for the portion of the fiscal year) then ended, setting forth in each case in comparative form the corresponding figures from the corresponding period from the previous fiscal year, and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" substantially equivalent to that which would be required to be included in a Quarterly Report on Form 10-Q of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act.  The filing by the Borrower of its Form 10-Q or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal quarter reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such quarter;

(c)     *Financial Officer's Certificate*.  Concurrently with any delivery of financial statements under Section 5.01(a) above, beginning with the fiscal year ending December 31, 2024, a report of the accounting firm opining on or certifying such financial statements (which shall be unqualified as to scope of audit and shall state that such financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP);

(d)     *Management Letters*.  Promptly after the receipt thereof by any Company, a copy of any "management letter" received by any such Person from its certified public accountants and the management's responses thereto; and

(e)     *Public Reports*.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange.

(f)     *Budget and Variance Reporting*.

(i)     On the third Thursday following the Petition Date and on every other Thursday thereafter, (a) a Cash Flow Forecast for the upcoming thirteen week period and (b) a Cash Flow Certificate, each in form satisfactory to the Required Lenders.  The most recently delivered (in accordance with the previous sentence) Cash Flow Forecast shall become the "Budget" for the purposes of the DIP Facility upon the Required Ad Hoc Holders' written acknowledgement (delivered to the Administrative Agent) that the Cash Flow Forecast is in form and substance satisfactory to the Required Ad Hoc Holders and is consistent with the form of the Initial Budget; *provided* that, until a new Budget has been approved by the Required Ad Hoc Holders, the most recently approved (in accordance with this Section

5.01(f)(i)) Budget (or if no such approved Budget exists, the Initial Budget) shall govern; and

(ii)     Commencing on the third Thursday following the Petition Date and on every other Thursday thereafter, a Variance Report in respect of the most recently ended Testing Period, in form satisfactory to the Required Lenders, together with a certification from a Responsible Officer of the Borrower as to the accuracy and completeness thereof.

Section 5.02   Litigation and Other Notices.  Furnish to the Administrative Agent and each Lender written notice of any of the following promptly (and, in any event (subject to Section 5.02(h)), within three (3) Business Days of knowledge of a Responsible Officer of the Borrower thereof):

(a)     the filing or commencement of, or any threat or written notice of intention of any Person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that would reasonably be expected to be materially adverse to such Company or Affiliate or (ii) with respect to any Loan Document;

(b)     the occurrence of a Casualty Event;

(c)     the receipt by any Loan Party of notice of (i) the commencement of any proceedings by or before any Governmental Authority seeking cancelation, termination (including by means of non-renewal), revocation, limitation, adverse modification or adverse conditioning of any Material License or other material consent or authorization issued by a Governmental Authority, including the One Dot Six Lease Authorization and the Inmarsat Agreement, (ii) any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in connection with the One Dot Six Lease and/or the Inmarsat Agreement, (iii) any default, event of default, termination or material breach of contract with respect to any Material Contract, or any amendment, restatement, modification, waiver or consent thereunder (it being understood and agreed that such notice shall attach a true and complete copy of such amendment, restatement, modification, waiver or consent), (iv) any filing before or notice from any Governmental Authority asserting any failure by the Loan Parties or any Subsidiary to be in compliance with Communications Laws in any material respect (together with a copy of such notice) and any notice from the FCC, ISED, the CRTC or any other Governmental Authority denying, postponing or revoking any application filed by any Company or (v) any material written correspondence with the FCC or ISED; *provided* that in relation to the notices required to be delivered under this Section 5.02(c), the Administrative Agent and the Lenders acknowledge that they have received notice of the matters listed on Schedule 3.23(b) attached hereto (but not of any change in the status thereof);

(d)     any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(e)     any default (other than directly as a result of the commencement of the Cases and the Recognition Proceedings) under any Indebtedness of a Loan Party in excess of

$12,000,000, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(f)     any development that has resulted in, or would reasonably be expected to result in a Material Adverse Effect; or

(g)     the occurrence of a Change in Control.

Section 5.03   <u>Existence; Businesses and Properties</u>.

(a)     Do or cause to be done all things reasonably necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  Notwithstanding anything to the contrary contained in this Section 5.03, any of the Borrower and the Subsidiary Guarantors may change its partnership, corporate or other existence to another form of existence so long as the perfection and priority of the Liens of the Administrative Agent created by the Loan Security Documents are not adversely affected.

(b)     Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks, service marks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Loan Documents, except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property material to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this Section 5.03(b) shall prevent (i) sales of property, consolidations, amalgamations or mergers by or involving any Company in accordance with Section 6.05 or Section 6.06; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; (iii) the abandonment by any Company of any rights, franchises, licenses (other than the One Dot Six Lease or any Material License, unless as contemplated by Schedule 6.06(g)), trademarks, trade names, copyrights or patents that such Person reasonably determines are not useful to its business or no longer commercially desirable, or (iv) the relinquishment of spectrum rights as contemplated by Schedule 6.06(g).

(c)      Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect all Material Licenses (or the substantive rights conferred upon the Companies thereunder), the One Dot Six Lease and the Inmarsat Agreement; *provided* that the Borrower may enter into transactions as contemplated by Schedule 6.06(g) and take actions required in furtherance of the objective underlying any Material Regulatory Request.

(d)      From and after the Interim DIP Order Entry Date (but subject to Section 5.14), the Borrower shall ensure that the DIP Loan Proceeds Account shall be subject to an Account Control Agreement.

Section 5.04    Insurance.   The Borrower and each of its Subsidiaries shall keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to properties material to the business of the Borrower and its Subsidiaries against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations.

Section 5.05    Obligations and Taxes.

(a)      *Payment of Obligations*.   Subject to the Bankruptcy Code, the terms of the applicable DIP Order and the DIP Recognition Order and any required approval by the Bankruptcy Court or the CCAA Court, but without limiting any other restriction or obligation herein, pay its material obligations (other than Indebtedness) promptly and in accordance with their terms, and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

(b)      *Filing of Returns*.   Subject to the limitations and exceptions set forth in the introductory paragraph to this Article 5, the Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that it will, and will cause each of its Subsidiaries to: (i) timely and correctly file all material Tax Returns required to be filed by it and (ii) withhold, collect and remit all material Taxes that it is required to collect, withhold or remit.

Section 5.06    Employee Benefits.

(a)      Comply in all material respects with the applicable provisions of ERISA and the Code (and any Requirements of Law applicable to any Foreign Plan or Canadian Pension Plan) and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within 15 days after any Company or any of its ERISA Affiliates knows or has reason to know

that, (i) any ERISA Event, or any similar event with respect to a Foreign Plan or Canadian Pension Plan has occurred, (ii) the imposition of a Lien with respect to any Employee Benefit Plan, a Single Employer Plan, Canadian Pension Plan, or a Multiemployer Plan other than statutory liens arising in the ordinary course of business, (iii) the adoption of any new Single Employer Plan or Canadian Pension Plan, or the entering into of any obligation to contribute to any Multiemployer Plan by any Companies or its ERISA Affiliates, (iv) the adoption of an amendment to a Single Employer Plan, Multiemployer Plan (or agreement pursuant to which any Company or its ERISA Affiliates contributes to a Multiemployer Plan), Foreign Plan or Canadian Pension Plan if such amendment results in a material increase in benefits or unfunded liabilities, or (v) the commencement of contributions by any Company or any of its ERISA Affiliates to a Multiemployer Plan, Single Employer Plan, Foreign Plan or Canadian Pension Plan, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event or any similar event with respect to a Foreign Plan or Canadian Pension Plan and the action, if any, that the Companies propose to take with respect thereto; (y) as soon as practicable following any request by the Administrative Agent, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any of its ERISA Affiliates with the Internal Revenue Service with respect to each Single Employer Plan or each annual information report for any Canadian Pension Plan and Foreign Plan; (ii) the most recent actuarial valuation report for each Employee Benefit Plan, Canadian Pension Plan, Single Employer Plan, Foreign Plan and Multiemployer Plan; (iii) all notices received by any Company or any of its ERISA Affiliate from a Canadian Pension Plan or Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event or Canadian Pension Plan; (iv) the aggregate amount of payments made under any employee welfare benefit plan (as defined in Section 3(l) of ERISA) to any retired employees of any Company or any of its Affiliates (or any dependents thereof) during the most recently completed fiscal year; and (v) such other documents or governmental reports or filings relating to any Employee Benefit Plan, Single Employer Plan, Multiemployer Plan, Foreign Plan or Canadian Pension Plan (or employee benefit plan sponsored or contributed to by any Company or its ERISA Affiliates) as the Administrative Agent shall reasonably request and (z) as soon as practicable following any request therefor, copies of (i) any documents described in Section 101(k) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan; *provided* that, with respect to the notices described in (i) and (ii) above, if any Company or any of its ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, such Company or such ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

Section 5.07   Maintaining Records; Access to Properties and Inspections; Meetings.

(a)   Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities.  The Borrower and each of its Subsidiaries will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the property of such Company at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs,

finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants).

(b)    Upon the request of the Administrative Agent or the Required Lenders, participate in a telephonic meeting of the Administrative Agent and the Lenders no more frequently than once during each week (unless a Default or an Event of Default has occurred and is continuing, in which case, such calls shall be held more frequently if so requested by the Administrative Agent or the Required Lenders) at such time as may be agreed to by Borrower and Required Lenders regarding, without limitation, a comprehensive update on the Cases (including negotiations with any reluctant stakeholder), variances with respect to the Budget, and any other material information relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of any of the Loan Parties or their Subsidiaries and any other information that may be requested by the Administrative Agent or any Lender.

Section 5.08    [Reserved].

Section 5.09    Compliance with Laws; Compliance with Environmental Laws; Environmental Reports.

(a)    Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; *provided* that the Loan Parties and their Subsidiaries shall comply at all times with all orders related to the Cases, including the Cash Management Order and the DIP Orders.

(b)    Comply, and undertake all commercially reasonable efforts to cause all of its employees occupying Real Property owned, operated or leased by the Borrower or any of its Subsidiaries to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws, in each case, except where the failure to comply, undertake, obtain, renew or conduct individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; *provided* that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.10    Communications Licenses.  Neither the Borrower nor any Subsidiary shall operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease, except for instances of non-compliance that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Borrower and its Subsidiaries and their businesses.

Section 5.11    Additional Collateral; Additional Guarantors.

(a)    Subject to this Section 5.11, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Loan Security Documents but is not so subject (including, for the avoidance of doubt,

Communications Licenses acquired after the Closing Date to the maximum extent permitted by law and any proceeds and right to receive proceeds from such Communications Licenses), promptly (and in any event within 30 days after the acquisition thereof) (i) execute and deliver to the Collateral Agent such amendments or supplements to the relevant Loan Security Documents or such other documents as the Collateral Agent shall deem necessary or advisable to grant the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than Permitted Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Loan Security Document in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Collateral Agent. The Borrower shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Collateral Agent shall require to confirm the validity, perfection and priority of the Lien of the Loan Security Documents on such after-acquired properties.

(b)     With respect to any Person that is or becomes a Subsidiary after the Closing Date, promptly (and in any event within 30 days after such Person becomes a Subsidiary) (i) deliver to the Collateral Agent the certificates, if any, representing all of the Equity Interests of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to the Borrower or any Subsidiary Guarantor together with instruments of transfer executed and delivered in blank by a duly authorized officer of the Borrower or such Subsidiary Guarantor and (ii) cause such new Subsidiary (A) to execute a Joinder Agreement or such comparable documentation to become a Subsidiary Guarantor and a joinder agreement to the Loan Security Agreement or the Canadian Security Agreement, as applicable, substantially in the form annexed thereto, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent to cause the Lien created by the Loan Security Agreement or the Canadian Security Agreement, as applicable, to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent.

Section 5.12   Security Interests; Further Assurances.   Promptly, upon the reasonable request of the Administrative Agent or any Lender, at the Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument (including, without limitation, mortgages) supplemental to or confirmatory of the Loan Security Documents or otherwise deemed by the Required Lenders reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except as permitted by the applicable Loan Security Document, or obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Required Lenders as the Required Lenders shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Loan Security Documents. Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all

applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may reasonably require. If the Administrative Agent or the Required Lenders determine that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of the Borrower or any Subsidiary Guarantor constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA or otherwise in form and substance satisfactory to the Required Lenders.

Section 5.13   <u>Information Regarding Collateral</u>. Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, amalgamating, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent and Collateral Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Required Lenders to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Loan Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent and Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

Section 5.14   <u>Post-Closing Collateral Matters</u>. Execute and deliver the documents and complete the tasks set forth on Schedule 5.14, in each case within the time limits specified on such schedule.

Section 5.15   <u>License Subsidiaries; Other Subsidiaries</u>. Hold and retain, or cause to be held or retained, as applicable, (i) all Material Licenses (other than the One Dot Six Lease Authorization and other Communications Licenses issued by the FCC authorizing the use of the 1670-1675 MHz band) issued by the FCC to any Company in one or more License Subsidiaries; and (ii) the One Dot Six Lease Authorization and the other Communications Licenses authorizing the use of the 1670-1675 MHz band issued by the FCC to any Company in One Dot Six LLC.

Section 5.16   <u>Certain Case Milestones</u>. Ensure that each of the milestones set forth below (the "**Milestones**"), each of which may be extended or waived in writing (with email from counsel being sufficient) by the Required Ad Hoc Holders (in their sole discretion), is achieved in accordance with the applicable timing referred to below:

(a)   the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court no later than 11:59 p.m. New York City time on the Petition Date, which shall be no later than 11:59 p.m. New York City time on January 5, 2025;

(b)   no later than one (1) day after the Petition Date, the Company (x) shall have filed the Break-Up Fee Motion (as defined in the Restructuring Support Agreement), in form and

substance acceptable to the Required Ad Hoc Holders, and (2) will seek to have the Break Up Fee Motion heard no later than twenty one (21) days after the Petition Date;

        (c)     no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order in form and substance acceptable to the Required Ad Hoc Holders;

        (d)     no later than ten (10) Business Days after the Petition Date, the CCAA Court shall have issued the Initial CCAA Recognition Order and Interim DIP Recognition Order;

        (e)     no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Required Ad Hoc Holders, granting the relief requested in the Break-Up Fee Motion;

        (f)     no later than thirty-five (35) days after the Petition Date (and no earlier than the Syndication Consummation Date), the Bankruptcy Court shall have entered the Final DIP Order, in form and substance acceptable to the Required Ad Hoc Holders;

        (g)     no later than ten (10) Business Days after entry of the Final DIP Order, the CCAA Court shall have issued the Final DIP Recognition Order, in form and substance acceptable to the Required Ad Hoc Holders;

        (h)     no later than seventy-five (75) days after the Petition Date, the Company shall have executed the AST Definitive Agreements (as defined in the Restructuring Support Agreement);

        (i)     no later than seventy-five (75) days after the Petition Date, the Company shall have filed the AST Definitive Agreements Motion (as defined in the Restructuring Support Agreement);

        (j)     no later than seventy-five (75) days after the Petition Date, the Company shall have filed (x) an Acceptable Plan, (y) the Disclosure Statement, and the motion seeking approval of the Solicitation Materials (each term in the foregoing subclause (y), as defined in the Restructuring Support Agreement and in form and substance satisfactory to the Required Ad Hoc Holders);

        (k)     no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order (as defined in the Restructuring Support Agreement);

        (l)     no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the AST Definitive Agreements Order (as defined in the Restructuring Support Agreement);

        (m)     no later than one hundred and forty-five (145) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order;

(n)     no later than ten (10) days after the entry of the Confirmation Order, the CCAA Court shall have issued an order recognizing the Confirmation Order;

(o)     no later than forty (40) months after the Petition Date, the effective date of the Acceptable Plan shall have occurred.

Section 5.17   Certain Bankruptcy Matters.  Comply in all material respects (a) after entry thereof, with each order of the type referred to in clause (b) of the definition of "Approved Bankruptcy Court Order", as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (b) of the definition of "Approved Bankruptcy Court Order"); *provided* that any actions taken to enforce any rights or remedies arising from a breach of this Section 5.17 shall be subject to any requirements in the DIP Orders or DIP Recognition Orders, as applicable, requiring a ruling or entry of an order of the Bankruptcy Court or CCAA Court, as applicable and (b) with their obligations and responsibilities as debtors in possession under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Final DIP Order, and any other order of the Bankruptcy Court.

Section 5.18   Prepetition First Out Obligations Payoff Letter.  On or prior to the Final DIP Order Entry Date, furnish to the Administrative Agent, for distribution to the Lenders, a customary payoff letter in respect of the Prepetition First Out Obligations to be prepaid on the DIP Second Funding Loans that has been validly executed and delivered by the 1L Loan Administrative Agent and is in form and substance reasonably satisfactory to the Fortress Lenders and Cerberus Lenders.

Section 5.19   Bankruptcy Notices.

(a)     Furnish to the Administrative Agent, the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors, to the extent reasonably practicable (or, if impracticable, as soon as reasonably practicable prior to such filing), at least three (3) Business Days prior to filing with the Bankruptcy Court or CCAA Court, as applicable, notice and copies of the Final DIP Order, Final DIP Recognition Order, and any motion in respect of an order that would constitute an "Approved Bankruptcy Court Order" and all other proposed orders, pleadings and other documents related to the Loans and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, having a value in excess of $200,000, cash management, adequate protection, any chapter 11 plan and/or any disclosure statement or supplemental document related thereto, which shall, in each case, have been prepared in good faith.

(b)     Furnish to the Administrative Agent, the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors, to the extent reasonably practicable, no later than three (3) Business Days (or such shorter period as Administrative Agent, at the direction of the Required Lenders, may agree) prior to filing with the Bankruptcy Court or CCAA Court all other filings, motions, pleadings, other papers or material notices to be filed with the Bankruptcy Court or CCAA relating to any request (x) to approve any compromise and settlement of claims whether under Rule 9019 of the Federal Rules of Bankruptcy Procedure or otherwise, or (y) for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code.

Section 5.20   <u>Reorganization Efforts</u>.   The Borrower shall promptly provide the Administrative Agent and the Lenders, upon request by the Administrative Agent or any Lender, with updates of any material developments in connection with the Loan Parties' reorganization efforts under the Cases, whether in connection with the sale of all or substantially all of the Borrower's or any of the Loan Parties' assets, the marketing of any Loan Parties' assets outside the ordinary course, the formulation of bidding procedures, and auction plan, or documents related thereto, any negotiations with respect to the Prepetition Facilities, or otherwise.   Without limiting the foregoing, promptly upon request and upon any such information becoming available to the Loan Parties, each Loan Party shall provide the Administrative Agent and the Lenders with copies of any informational packages provided to any potential bidders, a status report (upon request of the Administrative Agent, a Lender or the advisors to the Lenders) and updated information relating to any sale of assets, and copies of all drafts of proposed sale documentation, any such bids and any updates, modifications or supplements to such information and materials.

Section 5.21   <u>Interim DIP Order Entry Date</u>.   On the Interim DIP Order Entry Date, each Loan Party (or, in the case of the Canadian Security Agreement, each Canadian Subsidiaries) shall (i) execute and deliver to the Administrative Agent and/or the Collateral Agent (as applicable) the Canadian Security Agreement, the Intercompany Note, the Loan Security Agreement and the Reaffirmation Agreement and (ii) cause to be delivered to the Administrative Agent each of the items set forth in Section 4.02(f).

Section 5.22   <u>Prepetition First Out Obligations Refinancing</u>.   The Borrower shall cause all outstanding Prepetition First Out Obligations to be repaid in full by no later than the third (3rd) Business Day after the Final DIP Order Entry Date.

# ARTICLE 6
## NEGATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document have been paid in full in cash, it will not, nor will it cause or permit any Subsidiaries to:

Section 6.01   <u>Indebtedness</u>.   Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness), except (as set forth below, the "**Permitted Debt**"):

(a)   Indebtedness under the Prepetition Facilities as in effect on the Closing Date (other than the Prepetition Roll-Up Indebtedness after giving effect to the Roll-Up);

(b)   Indebtedness of the Borrower or any Subsidiary outstanding on the Closing Date to the extent set forth on Schedule 6.01(b) hereto;

(c)   Unsecured Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary; *provided* such Indebtedness is subject to an

Intercompany Note and pledged by such party as Collateral pursuant to the Loan Security Documents;

(d)     [reserved];

(e)     Indebtedness of the Borrower or any Subsidiary in respect of Purchase Money Obligations and Capital Lease Obligations in a combined aggregate principal amount not to exceed $10.0 million;

(f)     Indebtedness and obligations of the Borrower or any Subsidiary in respect of letters of credit, bank guarantees and cash management obligations, including without limitation, letters of credit in respect of bid, performance or surety bonds, workers' compensation claims, health, disability or other benefits to former employees or their families or property, casualty or liability or self-insurance obligations and completion guarantees and bankers acceptances issued for the account of the Borrower or any Subsidiary in the ordinary course of business, provided that the aggregate principal amount of Indebtedness pursuant to this Section 6.01(f) outstanding at any time shall not exceed $5.0 million;

(g)     Contingent Obligations of (A) the Borrower or any Guarantor in respect of Indebtedness of the Borrower or any Subsidiary Guarantor, or (B) any Subsidiary that is not a Guarantor in respect of Indebtedness of any Subsidiary that is not a Guarantor, in each case so long as such Indebtedness is otherwise permitted under this covenant; *provided*, that if the applicable primary obligations are unsecured and/or subordinated to the Obligations, the applicable Contingent Obligations shall be unsecured and/or subordinated, as applicable, to the Obligations;

(h)     Indebtedness of the Borrower or any Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(i)     Indebtedness of the Borrower or any Subsidiary representing the financing of installments of insurance premiums in the ordinary course of business, *provided* that the amount of such Indebtedness shall not exceed the amount of the unpaid cost of such insurance; and

(j)     Indebtedness of the Borrower or any Subsidiary arising in connection with endorsement of instruments for deposit in the ordinary course of business.

For purposes of determining compliance with this Section 6.01, in the event that an item of Indebtedness (including, for the avoidance of doubt, any portion thereof) meets the criteria of one or more of the categories of Permitted Debt described in Section 6.01(c) through 6.01(j), the Borrower may not divide, classify or reclassify or later divide, classify or reclassify (as if Incurred at such later time), such item of Indebtedness (including, for the avoidance of doubt, any portion thereof) in any manner. Accrual of interest, the accretion of accreted value, amortization of original issue discount, the payment of a paid-in-kind fee in connection with any Incurrences of Indebtedness under this Agreement, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an Incurrence of Indebtedness for purposes of this Section

6.01. Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 6.01.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this Section 6.01, the maximum amount of Indebtedness that the Borrower and the Guarantors may Incur pursuant to this Section 6.01 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies.

Section 6.02   Liens.   Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), create, Incur, assume or permit or suffer to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except for Permitted Liens.

Section 6.03   Sale and Leaseback Transactions.   Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

Section 6.04   Viasat Proceedings.   Without the prior written consent of the Required Ad Hoc Holders (in their sole discretion), file or commence any action, suit, litigation or proceeding, or make any material filing or take any material action in respect of (or during the pendency of) the foregoing (including any settlement in respect thereof), whether at law or in equity by or before any Governmental Authority, or otherwise pursuant to the Cases, against Viasat or any Affiliate thereof; *provided* that, without limiting the foregoing, it is understood and agreed that, for purposes of this Section 6.04, (i) the Required Ad Hoc Holders have consented to the filing by the Borrower of a civil complaint against Viasat, which complaint shall be substantially in the form of the draft complaint delivered by the Borrower to the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors on January 2, 2025 and (ii) the Borrower shall share drafts of material pleadings in respect of the litigation relating to such civil complaint with

the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors prior to the filing thereof and shall afford them a reasonable opportunity under the circumstances to comment on such pleadings and shall incorporate such reasonable comments in good faith.

Section 6.05  <u>Mergers and Consolidations</u>.  (x) With respect to the Borrower, wind up, liquidate or dissolve its affairs (or suffer any liquidation or dissolution), directly or indirectly sell all or substantially all of its assets and the Subsidiary Guarantors' assets (on a consolidated basis) or enter into any transaction of merger, amalgamation or consolidation or (y) with respect to any Subsidiary of the Borrower, wind up, liquidate or dissolve its affairs (or suffer any liquidation or dissolution), sell all or substantially all of its assets or enter into any transaction of merger, amalgamation or consolidation, except that the following shall be permitted subject to any provisions of the Bankruptcy Code and any orders of the Bankruptcy Court:

(a)  [reserved];

(b)  any Guarantor may merge, amalgamate or consolidate with or into, or sell all or substantially all of its assets to, the Borrower or any Guarantor (as long as the Borrower is the Surviving Person in the case of any such merger, consolidation or sale involving the Borrower and otherwise a Guarantor is the Surviving Person);

(c)  any Subsidiary may dissolve, liquidate or wind up its affairs at any time; *provided* that such dissolution, liquidation or winding up, as applicable, would not reasonably be expected to have a Material Adverse Effect and such Subsidiary contributes all of its assets (but not debts) to a Loan Party; and

(d)  any Subsidiary that is not a Guarantor may amalgamate, merge or consolidate with or into, or sell all or substantially all of its assets to, the Borrower, any Guarantor, or any Subsidiary that is not a Guarantor so long as the Borrower or applicable Guarantor, in the case of a merger or consolidation with or into a Loan Party, is the surviving Person (and no debt is sold, assumed or otherwise Incurred by any Loan Party in connection therewith).

Section 6.06  <u>Asset Sales</u>.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), neither the Borrower nor any Subsidiary shall cause or make an Asset Sale.

Section 6.07  <u>Restricted Payments</u>.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), (x) authorize, make, declare or pay, directly or indirectly, any Dividends with respect to the Borrower or any of its Subsidiaries, (y) make any payment of principal on or redemption or acquisition for value of, or any payment of principal or redemption as a result of any asset sale, change of control or similar event of, any Junior Indebtedness (other than the Roll-Up or the prepayment of the Prepetition First Out Obligations from the proceeds of the DIP Second Funding Loans), or (z) make any Restricted Investment (all such payments and other actions set forth in Section 6.07(x) through 6.07(z) above being collectively referred to as "**Restricted Payments**"), except those Restricted Payments of the type described in the foregoing clause (y) consisting of adequate protection payments in respect of the Prepetition Secured Obligations that are expressly permitted pursuant

to the DIP Orders, except that dividends by any Subsidiary to the Borrower or any Wholly Owned Subsidiary of the Borrower that is a Loan Party shall be permitted.

Section 6.08    Transactions with Affiliates.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "**Affiliate Transaction**"), involving aggregate consideration in excess of $100,000; *provided* that the foregoing restrictions shall not apply to:

(i)    Affiliate Transactions on fair and reasonable terms that are not materially less favorable to the Borrower or the relevant Subsidiary than those that would have been obtained in a comparable transaction by the Borrower or such Subsidiary with a Person that is not an Affiliate;

(ii)    transactions between or among the Borrower and/or any Guarantor (or, for the avoidance of doubt, an entity that becomes a Guarantor as a result of such transaction);

(iii)    (x) Restricted Payments permitted by Section 6.07 and (y) Investments in Subsidiaries that are not Loan Parties permitted by the definition of "Permitted Investments";

(iv)    the payment of reasonable and customary fees and reimbursements of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Borrower or any Subsidiary or any Parent of the Borrower to the extent in accordance with the Budget as approved by the Bankruptcy Court;

(v)    any agreement existing on the Closing Date to the extent set forth on Schedule 6.08(d) hereto;

(vi)    payments or loans (or cancellation of loans) to officers, directors, employees or consultants that are (x) approved by a majority of the Board of Directors of the Borrower in good faith, (y) approved by an order of the Bankruptcy Court and (z) in accordance with the Budget;

(vii)    the issuance of Equity Interests (other than Disqualified Capital Stock) of the Borrower to any Person that is a Loan Party;

(viii)    the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans (x) approved by the Board of Directors of the Borrower or any Parent of the Borrower or of a Guarantor, as appropriate, in good faith, (y) approved by an order of the Bankruptcy Court and (z) in accordance with the Budget;

(ix)    any contribution to the capital of the Borrower;

(x)     transactions permitted by, and complying with, the provisions of Section 6.05; and

(xi)    any customary employment agreements entered into by the Borrower or any Guarantor in the ordinary course of business and consistent with the Budget.

Section 6.09   Use of Proceeds.  Directly or indirectly, use the proceeds of any Loan in a manner that would not comply with Section 3.12 or any other provision of this Agreement.

Section 6.10   Limitation on Certain Restrictions on Subsidiaries.  Directly or indirectly, create or otherwise cause or suffer to exist or become effective any contractual encumbrance or contractual restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its Capital Stock or any other interest or participation in its profits owned by the Borrower or any Subsidiary, or pay any Indebtedness owed to the Borrower or a Subsidiary, (b) make loans or advances to the Borrower or any Subsidiary or (c) transfer any of its properties to the Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement, the Loan Documents, and the Prepetition Debt Documents as in effect on the Closing Date and to the extent rendered ineffective as a result of the Cases; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any commercial agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted under this Agreement restricting the transfer of the property subject thereto; (vi) [reserved]; (vii) [reserved]; (viii) [reserved]; or (ix) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business.

Section 6.11   Limitation on Issuance of Capital Stock.  Issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest in any Subsidiary.  This Section 6.11 shall not prohibit:

(a)     issuances of Equity Interests for stock splits, stock dividends, and additional issuances of Equity Interests that do not decrease the percentage ownership of the Borrower or any of its Subsidiaries in any class of the Equity Interests of such Subsidiary;

(b)     issuances of Equity Interests by Subsidiaries of the Borrower formed or that become Subsidiaries after the Closing Date in accordance with this Agreement (including Section 6.06 and Section 6.05) to the Borrower or any Subsidiary of the Borrower that is to own such Equity Interests;

(c)     [reserved]; and

(d)     issuances of Equity Interests to the Borrower or any of its Guarantors.

Section 6.12   Business.  With respect to the Borrower and the Subsidiaries, engage in any business other than a Permitted Business.

Section 6.13   Budget Variance.  In any Testing Period, permit (or otherwise allow to exist) any Variance that is not a Permitted Variance.

Section 6.14   Communications Licenses.  Operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease, except for instances of non-compliance that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Borrower and its Subsidiaries and their businesses.

Section 6.15   Deposit Accounts; DIP Loan Proceeds Account.  Establish or maintain a Deposit Account or Securities Account in contravention of the Cash Management Orders, or hold any proceeds of the Loans in any account other than the DIP Loan Proceeds Account, pending application thereof in accordance with this agreement.

Section 6.16   No Non-Loan Party Subsidiaries.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), form, acquire or otherwise permit to exist any Subsidiary that is not a Subsidiary Guarantor.

Section 6.17   Additional Bankruptcy Matters.

(a)      assert, join, support or prosecute any claim or cause of action against any of the Lenders or other Secured Parties in their capacities as such, unless such claim or cause of action is in connection with the enforcement of explicit rights under this Agreement;

(b)      object to, contest, delay, prevent or interfere with in any manner the exercise of rights and remedies by the Agents or the Lenders with respect to the Collateral following the occurrence, and during the continuance, of an Event of Default; *provided*, that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Orders;

(c)      until payment in full in cash of the Obligations under this Agreement (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted), except for and to the extent permitted under the Carve-Out, the AST Break-Up Fee (if any) or the Administration Charge, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Collateral Agent and the other Secured Parties against the Loan Parties hereunder or under the DIP Orders or DIP Recognition Orders, or apply to the Bankruptcy Court or CCAA Court for authority to do so;

(d)      directly or indirectly (i) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim DIP Order or the Final DIP Order or the Cash Management Order or the DIP Recognition Orders except for any modifications and amendments agreed to in writing by the Required Lenders in their sole discretion, (ii) apply to (or support, directly or indirectly, any application by any other party to) the Bankruptcy Court or CCAA Court for authority to take any action prohibited by this Section 6.17 (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Required Lenders and such consent is provided) or (iii) seek authorization for or permit the existence of, any claims other than that of the Lenders entitled to a superpriority claim under Section 364(c)(1) of the Bankruptcy Code that is senior or pari passu with the Lenders' Section 364(c)(1) claim;

(e)      make or commit to make payments to holders of "claims" (as defined in section 101(5) of the Bankruptcy Code) against a Loan Party in respect of prepetition amounts in excess of the line item amount for such claims included in the Approved Budget (within Permitted Variances), other than the Roll-Up, adequate protection, and payments of such claims that are approved in writing by the Required Lenders;

(f)      return any inventory or other property to any vendor pursuant to section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with section 546(g) of the Bankruptcy Code upon prior notice to the Administrative Agent or unless otherwise consented to by the Required Lenders;

(g)      (i) make payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court after notice and hearing, (B) are expressly permitted by the terms of the Loan Documents and in accordance with the Budget, and (C) as approved in writing by the Administrative Agent or otherwise consented to by the Required Lenders, and/or (ii)(A) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (B) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business and in accordance with the Budget or otherwise permitted or consented to in accordance with the terms of the Loan Documents;

(h)      propose to the Bankruptcy Court a sale of all or substantially all of the Collateral, without the prior written consent of the Required Lenders;

(i)      assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)      avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders or DIP Recognition Orders), disallowing, or otherwise challenging (under sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, the Obligations, the Liens granted under any Loan Document, the Prepetition Secured Obligations or the Prepetition Debt Documents; or reversing, modifying, amending, staying or vacating the DIP Orders or DIP Recognition Orders, without the prior written consent of the Required Lenders;

(ii)      granting priority for any administrative expense, secured claim or unsecured claim against Borrower or any of the Guarantors (now existing or

hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of Administrative Agent and the Lenders in respect of the Obligations, except as provided under the Carve-Out, the AST Break-Up Fee (if any) or the Administration Charge or to the extent expressly permitted under the DIP Orders or DIP Recognition Orders; or

(iii)   permitting the use of cash collateral as defined in section 363 of the Bankruptcy Code, except as expressly permitted by the (x) DIP Orders, (y) the Budget or (z) this Agreement; or

(j)   without the prior written consent of the Required Lenders, seek or consent to any order (i) dismissing the Cases under sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting the Cases to a case under chapter 7 of the Bankruptcy Code; (iii) appointing a chapter 11 trustee in the Case; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in the Cases; or (v) granting a change of venue with respect to the Cases or any related adversary proceeding.

Section 6.18   Compliance with Budget.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Orders and the Budget (subject to the Permitted Variance), (ii) permit a disbursement causing any Variance other than a Permitted Variance without the prior written consent of the Required Ad Hoc Holders, (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and consented to by the Required Ad Hoc Holders or (iv) incur any expense or make any disbursement, in each case other than as set forth in the Budget.

Section 6.19   Use of Collateral.  Use Collateral, proceeds of Loans, any portion of the Carve-Out or any other amounts directly or indirectly:

(a)   to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Obligations in "full" in cash;

(b)   to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, against any Agent, the Lenders, the other Secured Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including

formal discovery proceedings in anticipation thereof), including, without limitation, (i) any avoidance actions or causes of action under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the Prepetition Debt Documents, the Prepetition Secured Obligations or the Liens securing, or guarantees in respect of, the Prepetition Secured Obligations; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations or the Prepetition Secured Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) any Agent or the Lenders hereunder or under any of the other Loan Documents or (B) the Prepetition Lenders and Holders (in each case, as applicable, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the DIP Orders and DIP Recognition Order); or (vi) objecting to, contesting, or interfering with, in any way, any Agent's and the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; or

(c)      in any manner that causes or might cause any Borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

Section 6.20   <u>Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings</u>.  On or after the Petition Date, without the Required Ad Hoc Holders' prior written consent, file any motions or pleadings with the Bankruptcy Court (a) seeking authority for any Loan Party to (i) use any of the material properties or assets of the Loan Parties outside the ordinary course of business, (ii) satisfy prepetition claims of the Loan Parties or (iii) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Budget, subject to Permitted Variances), (b) seeking to reject or assume any contract, agreement, lease or other agreement to which any Loan Party is a party, or (c) seeking relief that is otherwise inconsistent with this Agreement or the DIP Orders or the DIP Recognition Orders.

Section 6.21   <u>Restructuring Support Agreement</u>.  Without the prior written consent of the Required Ad Hoc Holders, (i) amend, restate, amend and restate or otherwise modify the Restructuring Support Agreement, (ii) waive any of its rights thereunder or (iii) consent to any deviation from the terms thereof.

**ARTICLE 7**
**GUARANTEE**

Section 7.01   <u>The Guarantee</u>.  The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Loan Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of any Debtor Relief Law after the filing of the Cases or any other bankruptcy or insolvency petition under such

121

Debtor Relief Law) the Loans made by the Lenders to, and the Promissory Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Loan Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by required prepayment, declaration, demand, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 7.02    Obligations Unconditional.    The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Promissory Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full in cash).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to any Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Promissory Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)    the release of any other Guarantor pursuant to Section 7.09.

The Guarantors hereby, to the fullest extent permitted by applicable Requirements of Law, expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Loan Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Promissory Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Loan Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Loan Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Loan Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Loan Secured Parties or any other Person at any time of any right or remedy against the Borrower or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto and each Guarantor hereby expressly renounces all benefit of division or discussion. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 7.03    Reinstatement.  The obligations of the Guarantors under this Article 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of the Cases or any other proceedings in bankruptcy or reorganization or otherwise.

Section 7.04    Subrogation; Subordination.  Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  Any Indebtedness of any Loan Party permitted pursuant to Section 6.01(c) shall be subordinated to such Loan Party's Obligations in the manner set forth in the Intercompany Note.

Section 7.05    Remedies.  The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Promissory Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically

due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

Section 7.06    Instrument for the Payment of Money.    Each Guarantor hereby acknowledges that the guarantee in this Article 7 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 7.07    Continuing Guarantee.    The guarantee in this Article 7 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08    General Limitation on Guarantee Obligations.    In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, the Cases or any other federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 7.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.    Without limiting the generality of the foregoing, to the extent that Section 2.06(f) or Section 10.16 shall operate to adjust any amount or rate payable by any Canadian Loan Party to any Secured Party to the maximum permissible amount or rate, as the case may be, to ensure that the Obligations of the Canadian Loan Parties do not include any amount or rate that would result in a receipt by such Secured Party of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), the Guaranteed Obligations of such Canadian Loan Party shall be deemed to be automatically limited and reduced with retroactive effect by a corresponding amount or rate, as the case may be, equal to such adjustment.

Section 7.09    Release of Guarantors.    If, in compliance with the terms and provisions of the Loan Documents and the DIP Orders, all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a Person or Persons, none of which is the Borrower or a Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.03 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Loan Security Document and the pledge of such Equity Interests to the Administrative Agent pursuant to the Loan Security Agreement or the Canadian Security Agreement, as applicable, shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are necessary to effect each release described in this Section 7.09 in accordance with the relevant provisions of the Loan Security Documents.

Section 7.10    Right of Contribution. Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04. The provisions of this Section 7.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

Section 7.11    Post-Petition Savings Clause. Notwithstanding anything herein to the contrary, to the extent the guaranty of the Guaranteed Obligations set forth in this Article 7 is interpreted in any Case to solely be a prepetition obligation, then such guaranty shall automatically be deemed to have been given on the Petition Date immediately after the filing of the applicable Cases.

## ARTICLE 8
## EVENTS OF DEFAULT

Section 8.01    Events of Default. Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)    the Borrower defaults in the payment of (i) principal or premium, if any, of any Loan when due at its Stated Maturity, upon optional prepayment, upon required repayment, upon declaration of acceleration or otherwise or (ii) interest on any Loan or any fee or any other amount due hereunder or due and payable pursuant to the DIP Orders when the same becomes due and payable;

(b)    any Loan Party shall fail to perform or comply with any term or condition contained in Section 5.01, Section 5.02, Section 5.03, Section 5.07, Section 5.11, Section 5.12, Section 5.14, Section 5.16, Section 5.17, Section 5.18, Section 5.19, Section 5.20, Section 5.21, Article 6 or Section 10.03 and in the case of the failure to perform or comply with any term or condition contained in Section 5.07, such failure shall continue for a period of five (5) calendar days;

(c)    the Borrower or any Guarantor shall fail to perform or comply with any term or condition contained herein or in any Loan Document or the Restructuring Support Agreement or any DIP Order or DIP Recognition Order (other than (x) those referred to in clauses (a) or (b) above and (y) the New MIP Milestone (as defined in the Restructuring Support Agreement)) beyond any applicable cure period provided therein, and such failure shall continue unremedied for a period of five (5) Business Days after the earlier of (i) receipt by the Borrower of notice from the Administrative Agent of such default and (ii) knowledge of a Responsible Officer of any Loan Party of such default;

(d)    the Borrower or any Guarantor shall (i) fail to pay any principal or interest due in respect of any Indebtedness (other than the Obligations), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other

term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this Section 8.01(d)(ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its Stated Maturity or become subject to a mandatory offer purchase by the obligor; *provided* that it shall not constitute an Event of Default pursuant to this Section 8.01(d) unless the aggregate amount of all payments on such Indebtedness referred to in clause (i) and the aggregate amount of Indebtedness referred to in clause (ii) exceeds $10 million at any one time; *provided* that, notwithstanding the foregoing, this clause (b) shall not apply to any Prepetition Indebtedness that is stayed as a result of the Cases;

(e)     Any representation, warranty, stipulation, certification or other statement made or deemed made by any Loan Party (or Responsible Officer thereof) in any Loan Document or any DIP Order or any statement, report or certificate delivered in connection with any Loan Document or any DIP Order shall be false in any material respects (except that such materiality qualifier shall not be applicable to any representation, warranty, stipulation, certification or other statement that is already qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof);

(f)     except for any order fixing the amount of any claim in the Cases, one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $15.0 million shall be rendered against the Borrower or any Guarantor or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of the Borrower or any Guarantor to enforce any such judgment;

(g)     any Guarantee of a Subsidiary ceases to be in full force and effect (except as contemplated by the terms thereof) or any Guarantor that qualifies as a Subsidiary denies or disaffirms its obligations under this Agreement or any Guarantee;

(h)     following the entry of the Interim DIP Order or the Final DIP Order, as applicable, any security interest and Lien created or purported to be created by any Loan Security Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Loan Secured Parties, the Liens, rights, powers and privileges created or purported to be created and granted under such Loan Security Document (including a perfected Lien with the priority set forth in the Interim DIP Order or Final DIP Order (as applicable)) on all of the Collateral thereunder (except as otherwise expressly provided in such Loan Security Document and, solely with respect to priority, other than Permitted Liens (including the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge) which by operation of law are senior) in favor of the Collateral Agent, or shall be asserted by the Borrower or any Guarantor not to be a valid, perfected, Lien with the priority set forth in the Interim DIP Order or Final DIP Order (as applicable) (except as otherwise expressly provided in this Agreement or such Loan Security Document) on the Collateral covered thereby;

(i)     any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding

shall be commenced by the Borrower or any Guarantor or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or the Borrower or any Guarantor shall repudiate or deny any portion of its liability or obligation for the Obligations;

(j)     commencement of ancillary insolvency proceedings, other than the Recognition Proceedings, in applicable foreign jurisdictions with respect to any Loan Party and the entry of applicable recognition, administrative, and substantive orders by the applicable court, in each case without prior consent of the Required Lenders or on terms not satisfactory to the Required Lenders; *provided* that no Event of Default shall occur under this Section 8.01(j) if such proceeding would not reasonably be expected to have a Material Adverse Effect or cause a material delay of the Cases;

(k)     actual or asserted (by any Loan Party) invalidity or impairment of any Loan Document (including the failure of any Liens purported to be created by any Loan Security Document or the DIP Orders or the DIP Recognition Orders on any material portion of the Collateral to remain or otherwise become perfected);

(l)     any of the following shall occur:

(i)     any of the Loan Parties shall file a pleading seeking to stay, reverse, amend, supplement, vacate or otherwise modify any of the DIP Orders or DIP Recognition Orders, unless otherwise consented to by the Required Lenders;

(ii)     the entry of an order by the Bankruptcy Court appointing an interim or permanent Chapter 11 trustee or a receiver or an examiner with enlarged powers (other than a fee or other similar examiner) or any similar or analogous order granted by the CCAA Court or any Loan Party (or any Subsidiary thereof) applies for, consents to or fails to contest in any such appointment or the Bankruptcy Court or CCAA Court shall have entered an order providing for such appointment;

(iii)     dismissal of any of the Cases or conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or dismissal of the Recognition Proceedings, or the filing of a motion or other pleading seeking such dismissal or conversion of the Cases or dismissal of the Recognition Proceedings;

(iv)     appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of any Loan Party or any Loan Party (or any Subsidiary thereof) applies for, consents to or fails to contest in any such appointment or the Bankruptcy Court or CCAA Court shall have entered an order providing for such appointment;

(v)     the entry of an order in any of the Cases denying or terminating use of Cash Collateral by the Loan Parties or imposing any additional conditions thereon;

(vi)     filing of a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the

automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any Loan Party in excess of $250,000 in the aggregate, or to permit other actions that would have a Material Adverse Effect on the Debtors and their estates or any similar or analogous relief being sought or obtained in the Recognition Proceedings;

(vii)   the failure by the Debtors to object to any administrative claim filed in the Cases over $750,000, or the settlement by the Debtors of any claim in any amount over $100,000, without the prior written consent of the Required Ad Hoc Holders;

(viii)   entry of an order without the prior consent of Required Lenders amending, supplementing or otherwise modifying any DIP Order or DIP Recognition Order or any Loan Document, in each case in a manner adverse to any of the Agents or Lenders;

(ix)   reversal, vacation or stay of the effectiveness of any DIP Order or DIP Recognition Order;

(x)   [reserved];

(xi)   the entry of an order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders;

(xii)   the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the lenders under the Prepetition Facilities, the Agents, the Lenders or their respective rights and remedies under or related to the DIP Facility or the Prepetition Facilities in any of the Cases or inconsistent with the Loan Documents;

(xiii)   without the prior written consent of the Required Lenders, the entry of an order in any of the Cases seeking authority to use Cash Collateral or to obtain financing under Section 364 of the Bankruptcy Code;

(xiv)   [reserved];

(xv)   the consummation of any sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, or the use of cash collateral under Section 363(c) of the Bankruptcy Code, in each case unless otherwise consented to by the Required Lenders;

(xvi)   the Loan Parties' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with the Lenders' claims under the Loan Documents, the Prepetition Debt Documents and the transactions contemplated thereby;

(xvii) payment of or granting adequate protection with respect to prepetition debt, other than as expressly set forth in the Budget;

(xviii) except as otherwise provided in the Interim DIP Order or the Final DIP Order, any of the Loan Parties seek or if there is entered, an order under Section 365 of the Bankruptcy Code rejecting a material lease (i) to which any Loan Party is a party, and (ii) that is part of (or whose premises contain any of) the Collateral;

(xix) cessation of the Liens or the DIP Superpriority Claims to be valid, perfected and enforceable in all respects;

(xx) the filing of any Plan, or any amendment, modification or supplement to such Plan, by any Debtor, other than an Acceptable Plan;

(xxi) the termination or expiration of Borrower's exclusive right to file and solicit acceptances of a Plan;

(xxii) the entry of an order confirming a Plan other than an Acceptable Plan;

(xxiii) any Loan Party or any of its Subsidiaries shall file, seek, support (including by filing a pleading seeking or in support thereof), or otherwise consent to, or fail to contest in good faith any of the matters set forth in clauses (i) through (xxi) above; or

(xxiv) a Change of Control shall occur;

(m)     any of the Loan Parties shall (i) use Cash Collateral or Loans for any item other than those set forth in, and in accordance with, the Budget or prepay any pre-petition debt (other than to the extent explicitly permitted herein or with the express prior written consent of the Required Ad Hoc Holders), (ii) assert any right of subrogation or contribution against any other Loan Party prior to the payment in full in cash of the Obligations and the Prepetition Secured Obligations, or (iii) permit (or otherwise allow to exist) any Variance in any Testing Period that is not a Permitted Variances (other than as approved in writing by the Required Lenders);

(n)     failure to pay, when due, any adequate protection payments to the Prepetition Lenders and Holders, to the extent approved by the Bankruptcy Court;

(o)     if a Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole;

(p)     the Loan Parties or any of their Subsidiaries shall fail to comply with the terms of the Interim DIP Order or the Final DIP Order or Interim DIP Recognition Order or Final DIP Recognition Order or any "Event of Default" thereunder shall have occurred and be continuing;

        (q)      the Borrower shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Loan Parties (unless (i) in connection with an Acceptable Plan to the extent explicitly provided for in such Acceptable Plan or (ii) such sale would result in the repayment in full in cash of all Obligations and all Prepetition Secured Obligations upon consummation thereof, except as otherwise agreed to by the Required Lenders);

        (r)      any of the following shall occur with respect to any Property of any Loan Party or any of their respective Subsidiaries with a fair market value in excess of $15.0 million in aggregate: (a) any loss, destruction or damage of such Property or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property; or

        (s)      the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Loan Security Documents and the Collateral (other than as may be provided for in the Recognition Proceedings);

then, and in every such event and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate forthwith the Commitments and (ii) declare the Loans and other Obligations then outstanding to be forthwith due and payable in whole or in part, whereupon the principal amount of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees, and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, notwithstanding anything contained herein or in any other Loan Document or in the DIP Orders or DIP Recognition Orders to the contrary.

Without further notice, application or order of the Bankruptcy Court, and unless otherwise ordered by the Bankruptcy Court, upon the occurrence and during the continuance of an Event of Default, and after providing not less than two (2) Business Days' advance written notice thereof, which notice may be by electronic mail, to counsel to the Debtors, the U.S. Trustee, counsel to the Information Officer, and counsel to any official committee of unsecured creditors appointed in the Cases pursuant to section 1102 of the Bankruptcy Code (the "**Committee**"), the Collateral Agent (at the direction of the Required Lenders) for the benefit of itself and the Lenders shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim DIP Order, the Final DIP Order, the DIP Recognition Orders, this Agreement or any other Loan Document, or applicable law as the Collateral Agent (at the direction of the Required Lenders) may deem appropriate in their sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of the Debtors' estates upon which the Collateral Agent, for the benefit of itself and the Lenders, has been or may hereafter be granted liens or security interests to obtain the payment in full of the Obligations.

Neither the Loan Parties, the Committee, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the DIP Orders, DIP Recognition Orders and the

Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Loan Parties shall cooperate fully with the Agents and the Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise. The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Agents and the Lenders set forth in the DIP Orders, DIP Recognition Orders and in the Loan Documents.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Agents or any Lender may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document. Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The Agents and any Lender acting pursuant to this paragraph shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with Section 10.03.

Notwithstanding the foregoing, the Required Ad Hoc Holders in their sole discretion may waive (in writing) the occurrence and continuance of any Event of Default on a retroactive basis, including interest accruing at the Default Rate.

    Section 8.02    <u>Application of Proceeds</u>.  The proceeds received by the Administrative Agent or Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent or Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Administrative Agent or Collateral Agent pursuant to this Agreement, promptly by the Administrative Agent or Collateral Agent as follows:

        (a)    *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent and the Collateral Agent and their respective agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent or the Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent are entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

        (b)    *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Loan Secured Parties and their agents and counsel (including Kirkland & Ellis LLP, Sidley Austin LLP, Blake, Cassels & Graydon LLP, Foley & Lardner LLP and Wiley Rein LLP) and all costs, liabilities and advances made or incurred by the other Loan Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)      *Third*, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, pro rata, of interest and other amounts constituting Obligations (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)      *Fourth*, to the indefeasible payment in full in cash, pro rata, of the amount of the Obligations constituting principal on the Loans; *provided*, that such prepayment shall be allocated between the DIP New Money Loans and the Roll-Up Loans in accordance with Section 2.10(h) (as if such payment was a prepayment); and

(e)      *Fifth*, the balance, if any, to the Person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 8.02, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

Section 8.03    Government Approval.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Loan Party or affect the ownership of the Communications Licenses, the One Dot Six Lease or any company holding the Communications Licenses or the One Dot Six Lease shall be pursuant to the Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC, ISED, the CRTC or any other applicable Governmental Authority.  Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of the Communications Licenses or the One Dot Six Lease or transfer of control or voting rights of any Loan Party or any company holding the Communications Licenses or One Dot Six Lease if such assignment or transfer of control or voting rights would require, under then-existing law (including Communications Laws), the prior approval of the FCC, ISED, the CRTC or any other applicable Governmental Authority, without first obtaining such approval of the FCC, ISED, the CRTC or such other Governmental Authority.  Each Loan Party agrees to take any lawful action which the Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Loan Secured Parties by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Loan Party's best efforts to assist in obtaining any approval of the FCC, ISED, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including, without limitation, the sale or transfer of Collateral.  Such efforts shall include, to the extent permitted by the Communications Laws, sharing with Administrative Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system, as well as any account numbers, user names and passwords for ISED's Spectrum Management System and for the CRTC's Industry Data Collection System, and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, ISED, the CRTC or any other applicable Governmental Authority any portion of any application or applications for

consent to the assignment of the Communications Licenses or transfer of control of any Loan Party required to be filed under Communications Laws for approval of any sale or transfer of Collateral and/or the Communications Licenses.

## ARTICLE 9
## THE ADMINISTRATIVE AGENT

Section 9.01   <u>Appointment and Authority</u>.  Each Lender hereby irrevocably appoints the Administrative Agent and Collateral Agent (together, for purposes of this Article 9, the "**Agent**") its agent, and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Interim DIP Order and the Final DIP Order (so long as such Interim DIP Order and Final DIP Order have been approved in writing (which approval may be via email) by the Required Lenders (or their counsel(s) on their behalf) as of the applicable date), each to be negotiated between the Loan Parties, the Agent, the Lenders, certain other parties and the statutory committees appointed pursuant to sections 327 and 1103 of the Bankruptcy Code.  The provisions of this Article 9 are solely for the benefit of the Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have any rights as a third-party beneficiary of any such provisions.  In performing its functions and duties hereunder, the Agent shall act solely as an agent of Lenders (or applicable Secured Party) and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Loan Party.  It is understood and agreed that the use of the term "Agent" or "agent" herein or in any other Loan Documents (or any other similar term) with reference to an Agent, is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between the contracting parties.  Without limiting the generality of the foregoing, the Agent is hereby expressly authorized to (a) execute any and all documents (including releases) with respect to the Collateral and the rights of the Loan Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Loan Security Documents and (b) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

Section 9.02   <u>Rights of a Lender</u>.  The institution serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender, and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.  The Lenders acknowledge that, pursuant to such activities, any Agent (acting in capacities other than as Agent) or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent (acting in capacities other than as Agent) shall be under any obligation to provide such information to them.

Section 9.03   <u>Exculpatory Provisions</u>.  The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be solely administrative in nature.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is instructed in writing to exercise as directed in writing by the Required Lenders or the Required Ad Hoc Holders, as applicable (or such other number, percentage or composition of the Lenders as shall be necessary under the circumstances as provided in Section 10.02), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of any automatic stay under any Debtor Relief Law or any other aspect of any applicable Debtor Relief Law and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders, or such other number or percentage of the Lenders as shall be necessary or as such Agent shall in good faith believe to be necessary under the circumstances as provided in Section 10.02, or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender in accordance with Section 10.01 hereof, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, recital, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection, or priority of Liens on the Collateral or the existence of the Collateral (for the avoidance of doubt, other than inquiries as to Collateral in an Agent's possession), or (vi) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.  The Agent will not be responsible or liable for any action taken or omitted to be taken by it hereunder or under any Loan Document, except for its own gross negligence or willful misconduct, in ease case as determined by a final, non-appealable order by a court of competent jurisdiction.  Without limiting the foregoing, except for action expressly required of the Agent hereunder or under any Loan Document, the Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive indemnity and security satisfactory to it against any and all liability or expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake in act or law, or for anything which it may do or refrain from doing in connection herewith, in each case except for its own gross negligence or willful misconduct.  The Agent will not be required to take any action (including any action at the direction of the Required Lenders), to advance or

expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its power or rights hereunder unless it has been provided with security or indemnity reasonably satisfactory to it against any and all liability or expense which may be incurred by it by reason of taking or continuing to take such action.  For purposes of clarity, and without limiting any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this Article 9), phrases such as "satisfactory to the Agent," "approved by the Agent," "acceptable to the Agent," "as determined by the Agent," "in the Agent's discretion," "selected by the Agent," "elected by the Agent," "requested by the Agent," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders or the Required Ad Hoc Holders, as applicable (or such other number, percentage or composition of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

Section 9.04    <u>Reliance by Agent</u>.  The Agent shall be entitled to seek and rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Whenever in the administration of this Agreement, the Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Agent may conclusively rely upon instructions from the Required Lenders.

The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders or the Required Ad Hoc Holders, as applicable (or such greater number or different composition of Lenders as may be expressly required hereby in any instance).

Section 9.05    <u>Delegation of Duties</u>.  The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more subagents, attorneys, accountants, appraisers or other experts or advisors selected by it in good faith as it may reasonably require and will not be responsible for any misconduct or gross negligence on the part of any of them.  The Agent and any such subagent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such subagent and to the Related Parties of each Agent and any such subagent, and shall apply to their respective activities in connection with the syndication of the facilities hereunder as well as activities as Agent.  Notwithstanding anything herein to the contrary, with respect to each sub agent appointed by an Agent, such sub agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including

exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary.

Section 9.06    Resignation of the Agent.  Subject to the appointment and acceptance of a successor Agent as provided below, the Agent may resign at any time by notifying the Lenders and the Borrower, and the Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and the Agent and signed by the Required Lenders.  Upon any such resignation or removal, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation or receives notice of its removal, (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent which shall be a bank (or another Person (other than the Loan Parties or any Affiliate thereof) that in its ordinary course of business serves as administrative agent and collateral agent for credit facilities of this type) with an office in New York, New York, or an Affiliate of any such bank.  If no successor Agent has been appointed pursuant to the immediately preceding sentence by the Resignation Effective Date, such Agent's resignation or removal shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent, as the case may be.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The Administrative Agent fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation or removal hereunder, the provisions of this Article 9 and Section 10.03 shall continue in effect for the benefit of such retiring Agent, its subagents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Section 9.07    Non-Reliance on Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Section 9.08    Agent May File Proofs of Claim.

(a)    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any of the Debtors, the Agent (irrespective of whether the principal of any Loan or Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)    to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(ii)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under Sections 2.05 and 10.03) allowed in such judicial proceeding; and

(iii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.05 and 10.03.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Agent and its respective agents and counsel, and any other amounts due to Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or any plan of reorganization or arrangement or otherwise.

(b)    Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding (unless such Lender explicitly directs in writing the Administrative Agent to so vote its claim).

Section 9.09    <u>Collateral and Guarantee Matters</u>.

(a)    The Lenders irrevocably authorize the Agent, at its option and in its sole discretion:

(i)    to release any Lien on any property granted to, or held by, the Agent under any Loan Document (x) on or after the date that the Obligations (other than contingent indemnity and expense reimbursement obligations as to which no claim has been made) have been indefeasibly paid in full in cash and the Commitments have been terminated, (y) with respect to any property that is sold or otherwise

disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents and the DIP Orders or (z), if approved, authorized or ratified in writing by the Required Lenders (or such other number of Lenders as shall be required hereunder); and

(ii)     to release any Subsidiary from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents and the DIP Orders.

(b)     Upon request by the Agent at any time, the Required Lenders will confirm in writing, the Agent's authority to release its interest in particular types or items of property, or to release any Subsidiary from its obligations under the Loan Documents pursuant to this Section 9.09.

(c)     The Agent shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral, the existence, priority or perfection of the Collateral or the Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 9.10   Not Partners or Co-Venturers; Administrative Agent as Representative of the Secured Parties.

(a)     The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Administrative Agent) authorized to act for, any other Lender.  In its capacity, the Administrative Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the New York Uniform Commercial Code. Each Lender authorizes the Administrative Agent to enter into each of the Collateral Documents to which it is a party and to take all action contemplated by such documents.  To the extent there is an Administrative Agent and a Collateral Agent at such time, each Lender agrees that no Secured Party (other than the Administrative Agent and the Collateral Agent) shall have the right individually to seek to realize upon the security granted by any Collateral Document, it being understood and agreed that such rights and remedies may be exercised solely by the Administrative Agent and the Collateral Agent for the benefit of the Secured Parties upon the terms herein and the other applicable Loan Documents; *provided*, that the Administrative Agent and the Collateral Agent shall follow the written direction of the Required Lenders in respect of such rights and remedies.  In the event that any Collateral is hereafter pledged by any Person as collateral security for the Secured Obligations, the Collateral Agent is hereby authorized to execute and deliver for the benefit of the Secured Parties any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Collateral Agent for the benefit of the Secured Parties.

Section 9.11   Erroneous Payments.

(a)     If the Administrative Agent notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "**Payment Recipient**")

that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof) (provided that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a) with respect to an Erroneous Payment unless such demand is made within five Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including such second Business Day until the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from or on behalf of any Borrower or any other Loan Party (including from the proceeds of any Collateral) for the purpose of making such Erroneous Payment.

### ARTICLE 10
### MISCELLANEOUS

Section 10.01  Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)      if to the Borrower, to it at Ligado Networks LLC, 10802 Parkridge Boulevard, Reston, VA 20191, Attention of General Counsel (E-mail: legal@ligado.com), with a copy (which shall not constitute notice) to Milbank LLP, 55 Hudson Yards, New York, NY, 10001-2163, Attention of Maya Grant and Matt Brod (E-mail: mgrant@milbank.com; mbrod@milbank.com);

(ii)    if to the Administrative Agent or Collateral Agent, to U.S. Bank Trust Company, National Association, to it at its address: U.S. Bank Trust Company, National Association Charlotte DCS Office, 214 N Tryon Street, Attn Loan Agency – 27th Floor, Charlotte, NC 28202-1078; with a copy (which shall not constitute notice) to:

(A)    the Ad Hoc Cross-Holder Group Primary Advisors;

(B)    Foley & Lardner LLP, 90 Park Avenue, 35th Floor, New York, NY 10016, Attention of Matthew An (E-mail: Matthew.an@foley.com); and

(C)    Foley & Lardner LLP, 500 Woodward Avenue, Suite 2700, Detroit, MI 48226, Attention of Jake Gordon (E-mail: jake.gordon@foley.com),

(iii)    if to the Ad Hoc Cross-Holder Group Primary Advisors to:

(A)    Kirkland & Ellis LLP, 4550 Travis Street, Dallas, TX 75205, Attention of David M. Nemecek, P.C. and H.T. Flanagan, P.C. (E-mail: david.nemecek@kirkland.com; ht.flanagan@kirkland.com),

(B)    Kirkland & Ellis LLP, 333 W. Wolf Point Plaza, Chicago, IL, 60654, Attention of Patrick J. Nash, Jr., P.C. (E-mail: patrick.nash@kirkland.com),

(C)    Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY, 10022, Attention of Brian Schartz, P.C., Derek Hunter and Alan McCormick (E-mail: brian.schartz@kirkland.com; derek.hunter@kirkland.com; alan.mccormick@kirkland.com), and

(D)    Kirkland & Ellis LLP, 555 California Street, San Francisco, CA 94104, Attention of Katie Taylor (E-mail: katie.taylor@kirkland.com),

(iv)    if to the Ad Hoc First Lien Group Primary Advisors to:

(A)    Sidley & Austin LLP, 787 Seventh Avenue, New York, NY 10019, Attention of Mark Adler (E-mail: mark.adler.com),

(B)    Sidley & Austin LLP, One South Dearborn, Chicago, IL 60603, Attention of Dennis M Twomey and Jason L. Hufendick (E-mail: dtwomey@sidley.com; jhufendick@sidley.com), and

(C)    Sidley & Austin LLP, 1999 Avenue of the Stars, 17th Floor, Los Angeles, CA 90067, Attention of Shayona Schiely (E-mail: sschiely@sidley.com),

(v)    if to Fortress Lender or Cerberus Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire, with a copy (which shall not constitute notice) to:

(A)    Kirkland & Ellis LLP, 4550 Travis Street, Dallas, TX 75205, Attention of David M. Nemecek, P.C. and H.T. Flanagan, P.C. (E-mail: david.nemecek@kirkland.com; ht.flanagan@kirkland.com),

(B)    Kirkland & Ellis LLP, 333 W. Wolf Point Plaza, Chicago, IL, 60654, Attention of Patrick J. Nash, Jr., P.C. (E-mail: patrick.nash@kirkland.com),

(C)    Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY, 10022, Attention of Brian Schartz, P.C., Derek Hunter, and Alan McCormick        (E-mail:        brian.schartz@kirkland.com; derek.hunter@kirkland.com; alan.mccormick@kirkland.com), and

(D)    Kirkland & Ellis LLP, 555 California Street, San Francisco, CA 94104, Attention of Katie Taylor (E-mail: katie.taylor@kirkland.com),

(vi)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through Electronic Systems, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or

communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)     Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)     *Electronic Systems*.

(i)     The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System.

(ii)     Any Electronic System used by the Administrative Agent is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through an Electronic System. "**Communications**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System.

Section 10.02  Waivers; Amendment.

(a)     *Generally*.  No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)      *Required Consents*.  Subject to Sections 2.01(d)(iii), 2.01(f)(ix), 10.02(c), (d) and (e), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Guarantors and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall be effective if the effect thereof would:

(i)      extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase or extension in the Commitment of any Lender);

(ii)      except as set forth in Section 2.06(f), reduce the principal amount or premium, if any, of any Loan or reduce the rate of interest thereon (other than reduction of Default Rate pursuant to Section 2.06(b)), or reduce any fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby;

(iii)      (A) change the scheduled final maturity of any Loan (other than as set forth in the definition of "Maturity Date"), (B) postpone the date for payment or capitalization of any interest, premium or fees payable hereunder or (C) reduce the amount of, waive or excuse any such payment or accrual (other than waiver of any increase in the interest rate pursuant to Section 2.06(b)), in any case, without the written consent of each Lender directly affected thereby; *provided* that waiving or excusing, in whole or in part, any prepayment or repayment pursuant to Section 2.10(c) shall not be subject to this clause (iii);

(iv)      permit the assignment or delegation by the Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender (such consent not to be unreasonably withheld, conditioned or delayed);

(v)      [reserved];

(vi)      change Sections 2.10(h), 2.14(b), (c) or (d) or 8.02 in a manner that would alter the pro rata sharing of payments or setoffs or application of proceeds required thereby or any other provision in a manner that would alter the pro rata allocation or application of proceeds among the Lenders of payments in respect of the Loans, without the written consent of each Lender;

(vii)      change any provision of this Section 10.02(b) or Section 10.02(c) or (d) or any of the defined terms used in such Sections in a manner that would have the effect of changing the provisions of such Sections, without the written consent of each Lender directly affected thereby;

143

(viii)   change the percentage or any exclusion or restriction set forth in (x)(A) the definition of "Required Lenders" without the written consent of each Lender, (B) the definition of "Required Ad Hoc Holders" without the written consent of the Ad Hoc First Lien Group and the Ad Hoc Cross-Holder Group, (C) the definition of "Cerberus Lenders" without the written consent of all Cerberus Lenders (but no other Person), (D) the definition of "Fortress Lenders" without the written consent of all Fortress Lenders (but no other Person) or (y) any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders (including without limitation the Required Lenders and the Required Ad Hoc Holders) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender;

(ix)     [reserved];

(x)      [reserved];

(xi)     modify Section 2.10(g) or (h), without the written consent of each Lender adversely affected thereunder;

(xii)    change or waive any provision of Article 9 as the same applies to the Administrative Agent, or any other provision hereof as the same applies to the rights or obligations of the Administrative Agent, in each case without the written consent of the Administrative Agent; or

(xiii)   change or waive the definition of Permitted Holders, without the written consent of each Permitted Holder that is a party hereto.

Notwithstanding anything to the contrary herein, any Loan Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent (without the consent of any Lender) solely to cure any manifest mistake, defect or error or to grant a new Lien for the benefit of the Loan Secured Parties or extend an existing Lien over additional property.

(c)      *Collateral*.  Without the consent of any other Person, the applicable Loan Party or Loan Parties, the Administrative Agent and/or the Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Loan Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Loan Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)      *Incremental Amendments*.  Notwithstanding anything in this Agreement or any other Loan Document to the contrary (including, without limitation, the foregoing provisions of this Section 10.02), with the written consent of the Required Lenders this Agreement and the other Loan Documents may be amended to effect an Increase Joinder (and the corresponding

144

Incremental Facility) pursuant to Section 2.18 (and the Required Lenders and the Borrower may effect such amendments to this Agreement and the other Loan Documents without the consent of any other party, as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms of any such Increase Joinder (and the corresponding Incremental Facility)).

Section 10.03  <u>Expenses; Indemnity; Damage Waiver</u>.

(a)     The Borrower and each Guarantor agrees to jointly and severally pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Collateral Agent and/or any Lenders (including for any DIP Secured Party Advisors) in connection with (i) the negotiation, preparation, execution, delivery and administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made, (ii) the creation, perfection or protection of the Liens under the Loan Documents (including all reasonable search, filings and recording fees, expenses, stamp, documentary or similar taxes, and title insurance premiums) and (iii) the Cases and any other legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the Loan Documents.  The Borrower shall pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and the Collateral Agent and the Lenders in connection with the enforcement or protection of its rights in connection with this Agreement, including enforcement of this Section 10.03, and the Loans hereunder, including all reasonable and documented out-of-pocket expenses incurred by each of the Administrative Agent, the Collateral Agent and the Lenders during any workout, restructuring or negotiations in respect of such Loans in connection with such enforcement or protection of rights (but excluding fees and expenses of financial advisors and other similar professionals); *provided* that the reimbursement of any fees, charges or disbursements of counsel shall be limited to one counsel to the Administrative Agent, one counsel to the Collateral Agent and no more than two firms of counsel to the Lenders (which counsel shall be designated by the Administrative Agent or the Required Lenders, as applicable (and in the case of the Lenders shall initially be Kirkland & Ellis LLP and Sidley Austin LLP)) (and (x) appropriate local counsel in applicable local jurisdictions, but limited to one local counsel for the Administrative Agent, one local counsel for the Collateral Agent and one counsel to the Lenders, in each such jurisdiction (which counsel shall be designated by the Administrative Agent or the Required Lenders, as applicable), (y) regulatory counsel, limited to one local counsel for the Administrative Agent, one local counsel for the Collateral Agent and one counsel to the Lenders, in each such jurisdiction (which counsel shall be designated by the Administrative Agent or the Required Lenders, as applicable) and (z) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction or regulatory counsel for the Administrative Agent and one additional counsel in each relevant jurisdiction or regulatory counsel for each group of similarly situated Lenders).

(b)     The Borrower and each Guarantor shall jointly and severally indemnify the Administrative Agent, Collateral Agent and each Lender, each Backstop Lender (including, other than in the case of subclause (v) below, as a Prepetition Lender and Holder) and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and

hold each Indemnitee harmless from, any and all actual losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of one counsel for all Indemnitees, taken as a whole (which counsel shall be designated by Indemnitees holding a majority of the aggregate principal amount of Loans held by all Indemnitees) (and one additional counsel for each of the Administrative Agent and the Collateral Agent) (and solely in the case of a conflict of interest, one additional counsel for all similarly situated Indemnitees, taken as a whole (which counsel shall be selected by similarly situated Indemnitees holding a majority of the aggregate principal amount of Loans held by all similarly situated Indemnitees)), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, including enforcement of this Section 10.03, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, at, in or from any property owned, leased, licensed or operated by the Borrower or any of its Subsidiaries, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto or (v) the Cases, the Recognition Proceedings, or any related cases in any other jurisdiction; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith, willful misconduct or a material breach of the obligations under Section 2.01 or Section 2.02 by such Indemnitee and (y) to the extent arising from any dispute solely among Indemnitees other than (i) any claims against the Administrative Agent and/or the Collateral Agent acting in such capacity or in fulfilling such role or any similar role under this Agreement and (ii) any claims arising out of any act or omission on the part of the Borrower or its Subsidiaries.  This Section 10.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or Collateral Agent, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or Collateral Agent in its capacity as such.

(d)     To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided* that, nothing in this clause (d) shall relieve the Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)    All amounts due under this Section 10.03 shall be payable promptly after written demand therefor.

Section 10.04    <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower or any other Loan Party without such consent shall be null and void) and (ii) no Lender may consummate any Transfer of Loans or any of its rights or obligations hereunder except in accordance with this Section 10.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)  Subject to the conditions set forth in Section 10.04(b)(ii), any Lender may assign to a Lender, an Affiliate of a Lender, a Participant or any other Person that is an Eligible Assignee (and any attempted assignment or transfer to a Person that is not an Eligible Assignee shall be null and void) all or a portion of its rights and obligations under this Agreement as a Lender (including all or a portion of its Commitments and Loans at the time owing to it), in each case (other than any assignment consummated pursuant to the Syndication Transactions), with the prior written consent of:

(A)    [reserved]; and

(B)    the Administrative Agent, which consent shall not be unreasonably withheld, conditioned or delayed; *provided* that with respect to any assignment by a Lender to an Affiliate of such Lender or an Approved Fund of such Lender, such consent shall be deemed given so long as both parties to the assignment have complied with the other provisions set forth herein and the Administrative Agent has completed "know-your-customer" and other verifications required by law with respect to the assignee.

(ii)    Any such assignments (which, for the avoidance of doubt, shall not include any assignment consummated pursuant to the Syndication Transactions) shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's applicable Commitment or Loans, the amount of the applicable Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000; *provided* that

147

simultaneous assignments by, or to, two or more Approved Funds shall be combined for purposes of determining whether the minimum assignment requirement is met;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall (A) execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, in each case, together with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent);

(D)     the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire in which the assignee designates one or more contacts (as defined in the Administrative Questionnaire) to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws and all applicable tax forms;

(E)     the Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee;

(F)     no assignment may be made prior to the DIP Second Funding Date other than an assignment by a Lender to an Affiliate of such Lender or an Approved Fund of such Lender unless waived by the Required Ad Hoc Holders in their sole discretion;

(G)     [reserved]; and

(H)     for the avoidance of doubt, no Loans or Commitments may be assigned to the Borrower or any of its Subsidiaries, any Affiliate of the Borrower, or to any natural Person (or a holding company, investment vehicle or trust for, owned and operated for the primary benefit of a natural Person).

Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender or any Participant or potential Participant is an Eligible Assignee, the Administrative Agent shall have no liability with respect to any assignment made to a Person

that is not an Eligible Assignee and the Administrative Agent shall have no responsibility or obligation with respect to provisions concerning Affiliate Lenders, including without limitation Section 10.04(b)(ii)(F).  Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default has occurred and is continuing.

(iii)    Subject to acceptance and recording thereof pursuant to Section 10.04(b)(iv), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.15 and Section 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Any assignment or transfer by a Lender of rights or obligations under this Agreement as a Lender that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(c), to the extent such participation is permitted by Section 10.04(c).

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b) and any applicable tax forms, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to, Section 2.02(b), Section 2.14(d) or Section 10.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register

unless and until such payment shall have been made in full, together with all accrued interest thereon; *provided*, further, that in the case of any assignment consummated pursuant to the Syndication Transactions the Administrative Agent shall accept such assignments, and record the applicable information in respect thereof, upon the consummation thereof in accordance with Section 2.01(f). No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     Any Lender may sell participations to one or more banks or other entities that are Eligible Assignees and not the Borrower, Subsidiaries or other Affiliates of the Borrower (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement with respect to Loans and/or related Commitments; (B) such Lender's obligations under this Agreement shall remain unchanged; (C) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; (D) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement; and (E) no participations may be sold or otherwise transferred to any Person that is not an Eligible Assignee. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement, in each case, to the extent provided for herein; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant (such consent not to be unreasonably withheld, conditioned or delayed), agree to any amendment, modification or waiver (1) described in clause (i), (ii), (iii) or (v) of the first proviso to Section 10.02(b) and (2) that directly affects such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.12 and Section 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant (A) agrees to be subject to the provisions of Section 2.16 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.12 or Section 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.14(d) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States

Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to any Person (other than a natural Person) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Without limiting the prohibitions in this Agreement on the Borrower, Subsidiaries or Affiliates of a Borrower becoming a Lender hereunder, Affiliate Lenders shall be excluded from (a) attending (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender and (b) receiving any information or material prepared by Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders.

Section 10.05  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of (including all amounts Paid in Kind that have been added to the principal amount) or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 2.12, Section 2.15 and Section 10.03 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06  Counterparts; Integration; Effectiveness.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken

together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf.  or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.07  Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08  Right of Setoff.

Subject to the DIP Orders and solely with respect to the Canadian Collateral, the DIP Recognition Orders, if an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.09  Governing Law; Jurisdiction; Consent to Service of Process.

(a)     This Agreement shall be construed in accordance with and governed by the law of the State of New York and, to the extent applicable, the Bankruptcy Code, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)     The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court

does not have, or abstains from jurisdiction, the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan, and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document in the manner provided for notices in Section 10.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.10  Waiver of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12  Treatment of Certain Information; Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential

nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, or otherwise relating to the Cases, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of, or any prospective assignee of, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower or (i) on a confidential basis to (x) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans hereunder or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the facilities or any market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent in connection with the administration, settlement and management of this Agreement and the Loan Documents.  For the purposes of this Section, "**Information**" means all information received from the Borrower or any of its Subsidiaries, the Borrower or any of its Subsidiaries or of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.13  Material Non-Public Information.

(a)    EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 10.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED

IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.14  Authorization to Distribute Certain Materials to Public-Siders.

(a)    None of the Loan Parties currently has any publicly traded securities outstanding (including, but not limited to, 144A Securities, commercial paper notes or American Depositary Receipts); *provided* that the Borrower agrees that if any of the Loan Parties issues any publicly traded securities at a future date, any of the information in the Loan Documents and the Financial Statements to be furnished pursuant to Section 5.01(a) or (b), to the extent then material, will be publicly disclosed or set forth in the related prospectus or other offering document for such issuance.

(b)    The Borrower hereby authorizes the Administrative Agent to distribute the execution versions of the Loan Documents to the Lenders and Financial Statements to all Lenders, including their Public-Siders who indicate that they would not wish to receive information that would be deemed to be material non-public information within the meaning of the United States federal and state securities laws if the Companies had publicly-traded securities outstanding.

(c)    If the Borrower issues any 144A Securities during the term of this Agreement and its Financial Statements are not filed with the Securities and Exchange Commission, the Borrower (i) agrees to deliver to the Administrative Agent, and authorizes their posting by the Administrative Agent to the public-side view site of any applicable agency website, the Financial Statements and (ii) represents, warrants and agrees that the Financial Statements will not constitute information that, upon disclosure to Public-Siders, would restrict them or their firms from purchasing or selling any of the 144A Securities under United States federal and state securities laws.  The Borrower further agrees to clearly label such Financial Statements with a notice stating: "Confidential Financial Statements provided to 144A Holders" before delivering them to the Administrative Agent.

(d)    The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Loan Parties' respective securities while in possession of the materials, documents and information distributed to them pursuant to the authorizations made herein.

Section 10.15  USA PATRIOT Act Notice and Customer Verification.  Each Lender that is subject to the requirements of the USA PATRIOT Act and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the Act and/or the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide (a) to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), a customary certification for the Borrower regarding beneficial ownership in relation to the Borrower, in form and substance satisfactory to Administrative Agent and the Lenders and (b) all other documentation and other information that the Administrative

Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 10.16 <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, subject to sections 2.06(f) and 7.08, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.17 <u>Obligations Absolute</u>.  To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)    any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)    any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)    any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)    any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.18 <u>AML Legislation</u>.

(a)    The Borrower acknowledges that, pursuant to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws, whether within Canada or else-where (collectively, including any guidelines or orders thereunder, "**AML**

**Legislation**"), the Loan Secured Parties or any future assignee of a Loan Secured Party may be required, now or hereafter, to obtain, verify and record information regarding the Borrower, its directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Borrower, and the transactions contemplated hereby.  The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Loan Secured Party or the Administrative Agent, or any prospective or future assign or participant of a Loan Secured Party, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)     If the Administrative Agent has ascertained the identity of the Borrower or any authorized signatories of the Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

(i)     shall be deemed to have done so as an agent for each Loan Secured Party (or any future assignee of a Loan Secured Party), and this Agreement shall constitute a "written agreement" in such regard between each Loan Secured Party (or any future assignee of a Loan Secured Party) and the Administrative Agent within the meaning of applicable AML Legislation; and

(ii)     shall provide to each Loan Secured Party (or any future assignee of a Loan Secured Party) copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Loan Secured Parties agrees that the Administrative Agent has no obligation to ascertain the identity of the Borrower or any authorized signatories of the Borrower on behalf of any Loan Secured Party or any future assignee of a Loan Secured Party, or to confirm the completeness or accuracy of any information it obtains from the Borrower or any such authorized signatory in doing so.

Section 10.19  [Reserved].

Section 10.20  Acknowledgement and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)       a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 10.21  Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for hedge agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)        In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a defaulting lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)        As used in this Section 10.21, the following terms have the following meanings:

(i)        "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(ii)    "Covered Entity" means any of the following:

(A)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(B)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(C)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(iii)    "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(iv)    "QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 10.22  <u>DIP Secured Party Advisors</u>.  The Loan Parties acknowledge and agree that (i) Administrative Agent and the Lenders shall each be entitled to retain or continue to retain the DIP Secured Party Advisors and (ii) the Loan Parties shall pay all reasonable and documented fees and expenses of such DIP Secured Party Advisors and all such fees and expenses shall constitute Obligations and be secured by the Collateral.

Section 10.23  <u>Validity of Loan Documents</u>.  The provisions of this Agreement, the other Loan Documents, and all Liens and DIP Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in any Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative Agent and the Lenders and their respective assigns, transferees and endorsees.  The Liens and DIP Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens or DIP Liens under applicable law.

Section 10.24  <u>Acceptable Plan</u>.    Notwithstanding anything to the contrary herein (including in Section 10.02), (i) no Lender shall object to the treatment of their Obligations upon emergence by the Loan Parties from the Cases to the extent such treatment is in accordance with an Acceptable Plan and each Lender hereby agrees to accept such treatment and (ii) each Lender shall execute and deliver (and direct the Administrative Agent and Collateral Agent to execute and deliver) any applicable Acceptable Plan Definitive Documentation in accordance with the applicable Acceptable Plan.

Section 10.25  <u>Financial Accommodation Acknowledgement</u>.  The Borrower and each other Loan Party hereby acknowledges and agrees that this Agreement, the other Loan Documents

and any certificate, document or other agreement delivered in connection therewith, constitute "financial accommodations" (as such term is used in Section 365(c) of the Bankruptcy Code) to or for the benefit of the Loan Parties as debtors in possession.

*[Signature Pages Follow]*

[Signature pages on file with Administrative Agent]

Schedules on File with Loan Parties

**EXHIBIT A**

**[FORM OF]**
**ADMINISTRATIVE QUESTIONNAIRE**

**[attached]**

**<u>Entity Name</u>:**
**<u>Entity Tax ID</u>: If Applicable**

**<u>Operations/Administrative Contacts (for drawdowns, repayments, rate setting, payment notices etc.):</u>**

        **Article I.**
        **Article II.   Notice Contact(s):**
        **Name:**
        **Attn:**
        **Address:**
        **Telephone:**
        **Direct Fax:**
        **Email:**

        **Name:**
        **Attn:**
        **Address:**
        **Telephone:**
        **Direct Fax:**
        **Email:**

**<u>Wire Instructions:</u>**

        Bank Name:
        ABA:
        Account Name:
        Account Number:
        SWIFT:
        FFC:

**<u>Credit & Trade Closer (Loans):</u>**

        **Name:**
        **Attn:**
        **Address:**
        **Telephone:**
        **Direct Fax:**
        **Email:**

**<u>Please forward Amendments, Waivers, and Compliance to:</u>**
        **Name:**
        **Attn:**
        **Address:**
        **Telephone:**

**Direct Fax:**
**Email:**

**<u>Closing Documentation Forwarded to:</u>**

    **Name:**
    **Attn:**
    **Address:**
    **Telephone:**
    **Direct Fax:**
    **Email:**

**<u>Name as to Appear on Assignment Agreement</u>**:

**EXHIBIT B-1**

**[FORM OF]**
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Loan Agreement defined below, receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any person, whether known or unknown, arising under or in connection with the Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.  Assignor: _____

2.  Assignee: _____
    [and is an Affiliate/Approved Fund of [*identify Lender*][1]]

3.  Borrower: LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code

4.  Administrative Agent: U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as the administrative agent under the Loan Agreement

---

[1] Select as applicable.

5.    Loan Agreement:    Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") among Borrower and the Subsidiary Guarantors, each as a Guarantor under the Loan Agreement and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, and, in each case, the Lenders party thereto from time to time and Administrative Agent.

6.    Assigned Interest:    [DIP First Funding] [DIP Second Funding] [DIP Delayed Draw Term] [Roll-Up] Loans

| Facility Assigned | Aggregate Amount of [Commitments][Loans] for all Lenders | Amount of [Commitments][Loans] Assigned | Percentage Assigned of [Commitments][Loans][2] | CUSIP Number |
|---|---|---|---|---|
| [DIP First Funding] [DIP Second Funding] [DIP Delayed Draw Term] [Roll-Up] Loans | $ | $ | % | |

---

[2] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.][3]

The Assignee agrees to deliver to the Administrative Agent a completed Administrative Questionnaire in which the Assignee designates one or more contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws and all applicable tax forms.

The Administrative Agent shall not be responsible for any misrepresentation contained herein.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]


By: _____
      Name:
      Title:


ASSIGNEE
[NAME OF ASSIGNEE]


By: _____
      Name:
      Title:

---

[3] This date may not be fewer than 5 Business days after the date of assignment unless the Administrative Agent otherwise agrees.

Consented to and Accepted:

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as
Administrative Agent

By: _____
      Name:
      Title:

ANNEX 1 to Assignment and Assumption

LIGADO NETWORKS LLC
SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      Representations and Warranties.

1.1      Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other person of any of their respective obligations under any Loan Document.

1.2      Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, (ii) it meets all requirements of and is an Eligible Assignee under the Loan Agreement (subject to receipt of such consents as may be required under the Loan Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Loan Agreement, together with copies of the most recent financial statements delivered pursuant to Sections 3.04(a) or 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (vi) attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Loan Agreement, including without limitation an Administrative Questionnaire in the form of Exhibit A to the Loan Agreement duly completed and executed by the Assignee if it is not already a Lender under the Loan Agreement, (vii) it has paid to the Administrative Agent a processing and recordation fee of $3,500 as of the Effective Date, (viii) [reserved], (ix) it has complied with Section 10.04 of the Loan Agreement (including, for the avoidance of doubt, that this Assignment and Assumption is not consummated pursuant to the Syndication Transactions), (x) [reserved], and (xi) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to Section 2.15 of the Loan Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own

credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations that by the terms of the Loan Documents are required to be performed by it as a Lender.  Assignee acknowledges that it is not an Initial Lender as defined under the Loan Agreement.

2.      <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Effective Date and to the Assignee for amounts that have accrued from and after the Effective Date.

3.      <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.   This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.   Acceptance and adoption of the terms of this Assignment and Assumption by the Assignee and the Assignor by Electronic Signature or delivery of an executed counterpart of a signature page of this Assignment and Assumption by any Electronic System shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**EXHIBIT C**

**[RESERVED]**

**EXHIBIT D**

**[FORM OF]**
**JOINDER AGREEMENT**

Reference is made to the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article 1 of the Loan Agreement), each as a Guarantor under the Loan Agreement and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent (in such capacity, "**Administrative Agent**") for the Lenders.

W I T N E S S E T H :

WHEREAS, the Subsidiary Guarantors have entered into the Loan Agreement in order to induce the Lenders to make the Loans to or for the benefit of Borrower;

WHEREAS, pursuant to Section 5.11(b) of the Loan Agreement and subject to the terms thereof, each Subsidiary that was not in existence on the Closing Date is required to become a Guarantor under the Loan Agreement by executing a Joinder Agreement. The undersigned Subsidiary (the "**New Guarantor**") is executing this joinder agreement ("**Joinder Agreement**") to the Loan Agreement as consideration for the Loans previously made.

NOW, THEREFORE, the Administrative Agent and the New Guarantor hereby agree as follows:

1.      **Guarantee**.  In accordance with Section 5.11(b) of the Loan Agreement, the New Guarantor by its signature below becomes a Guarantor under the Loan Agreement with the same force and effect as if originally named therein as a Guarantor. Each reference to a Guarantor in the Loan Agreement shall be deemed to include the New Guarantor and, as of the date hereof, New Guarantor shall have all the rights and obligations of a Guarantor under the Loan Agreement. The New Guarantor hereby attaches supplements to the schedules to the Loan Agreement applicable to it.

2.      **Representations and Warranties**.  The New Guarantor hereby (a) agrees to all the terms and provisions of the Loan Agreement applicable to it as a Guarantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Guarantor thereunder are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date hereof.

3.      **Severability**.  Any provision of this Joinder Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such

prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

       **4.**    **Counterparts**.  This Joinder Agreement may be executed in counterparts, each of which shall constitute an original.  Delivery of an executed signature page to this Joinder Agreement by facsimile transmission shall be as effective as delivery of a manually executed counterpart of this Joinder Agreement.

       **5.**    **No Waiver**.  Except as expressly supplemented hereby, the Loan Agreement shall remain in full force and effect.

       **6.**    **Notices**.  All notices, requests and demands to or upon the New Guarantor, any Agent or any Lender shall be governed by the terms of Section 10.01 of the Loan Agreement.

       **7.**    **Governing Law**.   THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned have caused this Joinder Agreement to be duly executed and delivered by heir duly authorized officers as of the day and year first above written.

[NEW GUARANTOR]

By: _____
    Name:
    Title:

Address for Notices:

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Administrative Agent

By: _____
    Name:
    Title:

**EXHIBIT E**

**[FORM OF]**
**NOTE**

$[         ]                                                               [         ], 20[ ]
New York, New York

FOR VALUE RECEIVED, LIGADO NETWORKS LLC, a Delaware limited liability company, as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), hereby promises to pay to [         ] (the "Lender"), at such of the offices of [__], as shall be notified to the Borrower from time to time, the principal sum of [         ] dollars, in lawful money of the United States of America and in immediately available funds, on the dates and in the principal amounts provided in the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as modified and supplemented and in effect from time to time, the "Loan Agreement") between the Borrower, the Subsidiary Guarantors party thereto, each as a Guarantor under the Loan Agreement and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, the lenders party thereto from time to time (including the Lender) and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Administrative Agent, and to pay interest on the unpaid principal amount of such Loans, at such office, in like money and funds, for the period commencing on the date of such Loans until such Loans shall be paid in full, at the rates per annum and on the dates provided in the Loan Agreement. This Note evidences $[_____] in aggregate principal amount of Loans made by the Lender under the Loan Agreement.  Terms used but not defined in this Note have the respective meanings assigned to them in the Loan Agreement.

The date, amount and interest rate of such Loans made by the Lender to the Borrower, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof and the Borrower irrevocably authorizes the Lender to make (or cause to made) appropriate notations to this Note of, among other things, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to, the Loans evidenced thereby (such notations shall, to the extent not inconsistent with the Administrative Agent records referenced in Section 2.04 of the Loan Agreement, be conclusive and binding on each Loan Party absent manifest error), provided that the failure of the Lender to make any such recordation, notation or endorsement shall not affect the obligations of the Borrower to make a payment when due of any amount owing under the Loan Agreement or hereunder in respect of the Loans made by the Lender.

The Loan Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events and for prepayments of Loans upon the terms and conditions specified therein.

Except as permitted by Section 2.01(f) or Section 10.04 of the Loan Agreement, this Note may not be assigned by the Lender to any other Person.

This Note shall be governed by, and construed in accordance with, the law of the State of New York.

LIGADO NETWORKS LLC

By: _____
Name:
Title:

SCHEDULE TO NOTE

This Note evidences Loans made, continued or converted under the Loan Agreement to the Borrower, on the dates, in the principal amounts and bearing interest at the rates set forth below, subject to the continuations, conversions and payments and prepayments of principal set forth below:

| Date | Principal Amount of Loans | Type of Loan | Interest Rate | Duration of Interest Period (if any) | Amount Paid, Prepaid, Continued or Converted | Notation Made by |
|------|---------------------------|--------------|---------------|--------------------------------------|----------------------------------------------|------------------|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

*Execution Version*

**EXHIBIT F-1**

**[FORM OF]**
**PERFECTION CERTIFICATE**

[_____], 20[  ]

Reference is hereby made to (i) that certain Senior Secured Super-Priority Debtor-In-Possession Loan Agreement dated as of January 5, 2025 (the "<u>Credit Agreement</u>"), by and among LIGADO NETWORKS LLC, a Delaware limited liability company (the "<u>Borrower</u>"), the guarantors party thereto, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the lenders party thereto and U.S. BANK TRUST, COMPANY NATIONAL ASSOCIATION, in its capacity as administrative agent for the secured lenders and (ii) that certain Senior Secured Super-Priority Debtor-In-Possession Security Agreement to be dated on or around the Interim DIP Order Entry Date (the "<u>Security Agreement</u>"), among the Borrower, the guarantors party thereto, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code and the U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, in its capacity as collateral agent, pledgee, assignee and secured party (the "<u>Collateral Agent</u>"). Capitalized terms used but not defined herein have the meanings assigned in the Credit Agreement and Security Agreement, as applicable.

The undersigned hereby certify to the Collateral Agent as follows:

1.     <u>Names</u>.
The exact legal name of each Pledgor, as such name appears in its respective certificate of incorporation or any other organizational document, is set forth in **Schedule 1(a)**. Each Pledgor is

(i) the type of entity disclosed next to its name in **Schedule 1(a)** and (ii) a registered organization (to the extent such concept applies to it) except to the extent disclosed in **Schedule 1(a)**. Also set forth in **Schedule 1(a)** is the organizational or corporation identification number, if any, of each Pledgor that is a registered organization or corporation, the Federal Taxpayer Identification Number of each Pledgor (if applicable) and the jurisdiction of formation of each Pledgor.

Set forth in **Schedule 1(b)** hereto is any other corporate or organizational names each Pledgor has had in the past five years, together with the date of the relevant change.

Set forth in **Schedule 1(c)** is a list of all other names used by each Pledgor, or any other business or organization to which each Pledgor became the successor by merger, amalgamation, statutory arrangement, bankruptcy proposal, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, including on any filings with the Internal Revenue Service (if applicable) at any time between December 23, 2022 and the date hereof. Except as set forth in **Schedule 1(c)**, no Pledgor has changed its jurisdiction of organization at any time during the past four months.

2.     <u>Current Locations</u>. The chief executive office of each Pledgor is located at the address set forth in **Schedule 2(a)** hereto. **Schedule 2(b)** sets forth all locations where each Pledgor maintains any books or records relating to any material portion of accounts receivable (with each location at which chattel paper, if any, is kept being indicated by an "*"). **Schedule 2(c)** sets forth all the locations where any Pledgor maintains any material portion of Equipment or other Collateral

not identified above.

3.    <u>Extraordinary Transactions</u>. Except for those purchases, acquisitions and other transactions described on **Schedule 3** attached hereto, all of the Collateral originated or acquired by the Borrower and each Guarantor at any time between December 23, 2022 and the date hereof has been originated by the Borrower and each Guarantor in the ordinary course of business or consists of goods which have been acquired by the Borrower or such Guarantor in the ordinary course of business from a person in the business of selling goods of that kind. All jurisdictions in which any Collateral acquired pursuant to any such transaction was located at the time of such transactions are listed on **Schedule 3**.

4.    <u>File Search Reports</u>. Attached hereto as **Schedule 4** is a true and accurate summary of file search reports from (A) the Uniform Commercial Code, Personal Property Security Act (or comparable foreign) filing offices (i) in each jurisdiction identified in Section 1(a) or Section 2 with respect to each legal name set forth in Section 1 and (ii) in each jurisdiction described in **Schedule 1(c)** or **Schedule 3** relating to any of the transactions described in **Schedule (1)(c)** or **Schedule 3** with respect to each legal name of the person or entity from which the Borrower and each of the Guarantors purchased or otherwise acquired any of the Collateral and (B) each filing officer, registrar or similar official in each real estate recording office identified on **Schedule 7** with respect to real estate on which Collateral consisting of fixtures is or is to be located. A true copy of each financing statement, including judgment and tax liens, bankruptcy and pending lawsuits or other filing identified in such file search reports has been delivered to the Collateral Agent for each Pledgor that is not a Canadian Subsidiary; provided that, notwithstanding anything to the contrary in this paragraph, the summary file search reports not included on the date hereof shall be provided on or before the date set forth in Schedule 5.14 of the Credit Agreement.

5.    <u>UCC and Comparable Foreign Filings</u>. The financing statements (including fixtures filings or comparable foreign filings or authorizations to register comparable foreign filings) (in each case duly authorized by each Pledgor constituting the debtor therein), including the indications of the collateral, attached as **Schedule 5** relating to, as applicable, the Security Agreement, the Canadian Security Agreement or the applicable Mortgage, are in the appropriate forms for filing in the filing offices in the jurisdictions identified in **Schedule 6** hereof.

6.    <u>Schedule of Filings</u>. Attached hereto as **Schedule 6** is a schedule of (i) the appropriate filing or registration offices for the financing statements (or comparable foreign filings) attached hereto as or otherwise referred to in **Schedule 5** and (ii) the appropriate filing offices for the filings described in **Schedule 11(c)** and (iii) any other actions required to create, preserve, protect and perfect the security interests in the Pledged Collateral (as defined in the Security Agreement and Canadian Security Agreement) granted to the Collateral Agent pursuant to the Loan Security Documents. No other filings, registrations or actions are required to create, preserve, protect and perfect the security interests in the Pledged Collateral granted to the Collateral Agent pursuant to the Loan Security Documents, other than the registration of any applicable Mortgage in the relevant land registry office.

7.    <u>Real Property</u>. (a) Attached hereto as **Schedule 7(a)** is a list of all (i) real property owned in fee by the Borrower and each of the Guarantors and that, together with any improvements thereon, individually has a fair market value of at least $1,000,000 (all of which, in the case of such property located in the United States or Canada, referred to as "<u>Mortgaged Property</u>") as of the Closing Date, (ii) filing offices for mortgages relating to the Mortgaged Property as of the

Closing Date, (iii) common names, addresses and uses of each Mortgaged Property (stating improvements located thereon) and (iv) other information relating thereto required by such Schedule. Except as described on **Schedule 7(b)** attached hereto: (i) neither the Borrower nor any of the Guarantors has entered into any leases, subleases, tenancies, franchise agreements, licenses or other occupancy arrangements as owner, lessor, sublessor, licensor, franchisor or grantor with respect to any of the real property described on **Schedule 7(a)** and (ii) neither the Borrower nor any of the Guarantors has any Leases which require the consent of the landlord, tenant or other party thereto to the Transactions.

8.   <u>Termination Statements</u>. Attached hereto as **Schedule 8(a)** are the duly authorized termination statements, financing change statements (or comparable foreign filings or authorizations to register such comparable foreign filings) in the appropriate form for filing in each applicable jurisdiction identified in **Schedule 8(b)** hereto with respect to each Lien described therein.

9.   <u>Stock Ownership and Other Equity Interests</u>. Attached hereto as **Schedule 9(a)** is a true and correct list of each of all of the authorized, and the issued and outstanding, stock, partnership interests, limited liability company membership interests or other equity interest of the Borrower and each of the Guarantors and the record and beneficial owners of such stock, partnership interests, membership interests or other equity interests.

10.   <u>Instruments and Tangible Chattel Paper</u>. Attached hereto as **Schedule 10** is a true and correct list of all promissory notes, instruments (other than checks to be deposited in the ordinary course of business), tangible chattel paper, electronic chattel paper and other evidence of indebtedness held by each Pledgor in connection with the Pledged Collateral that exceeds
$250,000 in the aggregate for all Pledgors (as defined in the Security Agreement) as of the Closing Date, including all intercompany notes between or among any two or more Companies.

11.   <u>Intellectual Property</u>. (a) Attached hereto as **Schedule 11(a)** is a schedule setting forth all of each Pledgor's Patents, Patent Licenses, Trademarks and Trademark Licenses (each as defined in the Security Agreement and the Canadian Security Agreement) registered with the United States Patent and Trademark Office or with the Canadian Intellectual Property Office, and all other Patents, Patent Licenses, Trademarks and Trademark Licenses, including the name of the registered owner and the registration number of each Patent, Patent License, Trademark and Trademark License owned by each Pledgor. Attached hereto as **Schedule 11(b)** is a schedule setting forth all of each Pledgor's United States Copyrights and Copyright Licenses (each as defined in the Security Agreement and the Canadian Security Agreement), and all other Copyrights and Copyright Licenses, including the name of the registered owner and the registration number of each Copyright or Copyright License owned by each Pledgor.

12.   <u>Commercial Tort Claims</u>. Attached hereto as **Schedule 12** is a true and correct list of all Commercial Tort Claims (as defined in the Security Agreement) held by the Borrower and each Guarantor that exceeds $250,000 in the aggregate for all Pledgors, including a brief description thereof.

13.    <u>Deposit Accounts, Securities Accounts, Commodity Accounts and Futures Accounts</u>. Attached hereto as **<u>Schedule 13</u>** is a true and complete list of all Deposit Accounts, Securities Accounts and Commodity Accounts, including the DIP Loan Proceeds Account (each as defined in the Security Agreement) and all Securities Accounts and Futures Accounts (as defined in the Canadian Security Agreement) maintained by the Borrower and each of the Guarantors, including the name of each institution where each such account is held, the name of each such account and the name of each entity that holds each account.

14.    <u>Letter-of-Credit Rights</u>. Attached hereto as **<u>Schedule 14</u>** is a true and correct list of all Letters of Credit issued in favor of the Borrower and each Guarantor that exceeds $250,000 in the aggregate for all Pledgors, as beneficiary thereunder.

15.    <u>Motor Vehicles</u>. Attached hereto as **<u>Schedule 15</u>** is a true and correct list of all motor vehicles and other goods (covered by certificates of title or ownership) valued at over
$50,000 and owned by the Borrower and each Guarantor (provided that the aggregate value of all motor vehicles as to which any Pledgor has not delivered a certificate of title or ownership is less than $200,000), and the serial or vehicle identification number, owner and approximate value of such motor vehicles.

16.    <u>Communications Licenses</u>. Attached hereto as **<u>Schedule 16</u>** is a true and correct list of all licenses and authorizations issued to the Borrower or any of the Guarantors by the Federal Communications Commission, the Canadian Radio and Telecommunications Commission or Industry Canada or for which the Borrower or any of the Guarantors intends to apply.

17.    <u>Satellites</u>. Attached hereto as **<u>Schedule 17</u>** is a true and correct list of all satellites owned by the Borrower and each Guarantor and all material contracts related thereto (including leases or rentals thereof and all contractual rights relating to the geostationary position of any Satellites).

[The Remainder of this Page has been intentionally left blank]

**IN WITNESS WHEREOF**, we have hereunto signed this Perfection Certificate as of the date first above written.

**LIGADO NETWORKS LLC**

By:    _____
       Name:
       Title:

**ATC TECHNOLOGIES, LLC,**
**LIGADO NETWORKS INC. OF VIRGINIA,**
**LIGADO NETWORKS FINANCE LLC,**
**LIGADO NETWORKS BUILD LLC,**
**LIGADO NETWORKS SUBSIDIARY LLC,**
**ONE DOT SIX LLC,**
**ONE DOT SIX TVCC LLC,**
**LIGADO NETWORKS CORP.,**
**LIGADO NETWORKS (CANADA) INC.,**
**LIGADO NETWORKS HOLDINGS**
**(CANADA) INC.,** each as a Subsidiary Guarantor
By:    _____
       Name:
       Title:

## Schedule 1(a)

## Legal Names, Etc.

| Legal Name | Type of Entity | Registered Organization (Yes/No) | Organizational Number[4] | Federal Taxpayer Identification Number | Jurisdiction of Formation |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

---

[4] If none, so state.

**Schedule 1(b)**

**Prior Organizational Names**

| Company/Subsidiary | Prior Name | Date of Change |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Schedule 1(c)**

**Changes in Corporate Identity; Other Names**

| Company/Subsidiary | Corporate Name of Entity | Action | Date of Action | State of Formation | List of All Other Names Used on Any Filings with the Internal Revenue Service During Past Five Years |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

[Add Information required by Section 1 to the extent required by Section 1(c) of the Perfection Certificate]

## Schedule 2

### (a) Chief Executive Offices

| Company/Subsidiary | Address | County | Jurisdiction |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### (b) Location of Books and Records Related to Accounts Receivable (If Different from Above)

| Company/Subsidiary | Address | County | Jurisdiction |
|---|---|---|---|
|  |  |  |  |

### (c) Location of Equipment or Other Collateral (If Different from Above)

| Company/Subsidiary | Address | County | Jurisdiction |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**<u>Schedule 3</u>**

**<u>Transactions Other Than in the Ordinary Course of Business</u>**

**[__]**

**Schedule 4**

**File Search Reports**

**See attached.**

## **Schedule 5**

### **Copies of Financing Statements To Be Filed**

**See attached.**

## Schedule 6

## Filings/Filing Offices

| Type of Filing[5] | Entity | Applicable Loan Security Document [Loan Security Agreement, Canadian Security Agreement or Other] | Jurisdictions |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

---

[5] UCC-1 financing statement, fixture filing, mortgage, intellectual property filing or other necessary filing.

## Schedule 7(a)

## Real Property

| Entity of Record | Common Name and Address | Owned, Leased or Other Interest | Landlord / Owner if Leased or Other Interest | Description of Lease or Other Documents Evidencing Interest | Purpose/ Use | Improvements Located on Real Property | Legal Description | Option to Purchase/Right of First Refusal |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

## Schedule 7(b)

## Required Consents; Company Held Landlord's/ Grantor's Interests

### I.  Landlord's / Grantor's Consent Required

1.      [LIST EACH LEASE OR OTHER INSTRUMENT WHERE LANDLORD'S / GRANTOR'S CONSENT IS REQUIRED].

## Schedule 8(a)

**Attached hereto is a true copy of each termination statement filing (or equivalent foreign filing or authorization to file such equivalent foreign filing) duly acknowledged or otherwise identified by the filing officer.**

**Schedule 8(b)**

**Termination Statement Filings**

**See attached.**

**Schedule 9**

**(a) Equity Interests of Companies and Subsidiaries**

| Current Legal Entities Owned | Record Owner | Certificate No. | No. Shares/Interest | Percent Pledged |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**(b) Other Equity Interests**

| Current Legal Entities Owned | Record Owner | Certificate No. | No. Shares/Interest | Percent Pledged |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

F-16

**Schedule 10**

**Instruments and Tangible Chattel Paper**

1.      Promissory Notes:   [          ].

2.      Chattel Paper:   [          ].

## Schedule 11(a)

## Patents and Trademarks

**UNITED STATES PATENTS AND OTHER PATENTS:**

### U.S. Patents

| Title | Owner | Patent No. | Issue Date |
|-------|-------|------------|------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### U.S. Patent Applications

| Title | Owner | Application No. | Filing Date |
|-------|-------|-----------------|-------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### Canadian Patents

| Title | Owner | Patent No. | Issue Date |
|-------|-------|------------|------------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Canadian Patent Applications**

| Title | Owner | Application No. | Filing Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## UNITED STATES TRADEMARKS:

U.S. Registrations:

| Owner | Registration Number | Trademark |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

U.S. Applications:

| Owner | Application Number | Trademark |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## OTHER TRADEMARKS:

Foreign Registrations:

| Owner | Registration No. | Country | Trademark |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Foreign Applications:

| Owner | Registration No. | Country | Trademark |
|-------|------------------|---------|-----------|
|       |                  |         |           |
|       |                  |         |           |
|       |                  |         |           |
|       |                  |         |           |

**Intellectual Property Licenses:**

**<u>Schedule 11(b)</u>**

**<u>Copyrights</u>**

**[__]**

## Schedule 11(c)

## Intellectual Property Filings

Copies of each of the Patent Security Agreement, Trademark Security Agreement and Copyright Security Agreement, as applicable, are attached.

Patent and Trademark Schedules to accompany United States Patent and Trademark Office filings:

| U.S. Patents | | | | |
|---|---|---|---|---|
| | **Title** | **Owner** | **Patent No.** | **Issue Date** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Patent Schedules to accompany Canadian Intellectual Property Office filings:

| Canadian Patents | | | | |
|---|---|---|---|---|
| | **Title** | **Owner** | **Patent No.** | **Issue Date** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Canadian Patents Applications | | | | |
|---|---|---|---|---|
| | **Title** | **Owner** | **Patent No.** | **Issue Date** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Schedule 12**

**Commercial Tort Claims**

**[__]**

## Schedule 13

## Deposit Accounts, Securities Accounts, Commodity Accounts and Futures Accounts

| Owner | Type of Account | Bank | Account Number |
|-------|-----------------|------|----------------|
| Owner | Type of Account | Bank | Account Number |

**Schedule 14**

**Letter of Credit Rights**

**[__]**

## **Schedule 15**

## **Motor Vehicles**

**[__]**

## Schedule 16

## Communications Licenses

## U.S. Licenses (FCC)

(a)    Section 214 Authorizations

| Authorization Holder | File Numbers |
|---|---|
| | |
| | |

(a)    Space Station Licenses

| Licensee | Call Signs | File Numbers |
|---|---|---|
| | | |
| | | |

(b)    Transmit/Receive Earth Station Licenses

| Licensee | Call Signs | Fixed/Mobile |
|---|---|---|
| | | |
| | | |

(c)    Wireless Authorizations

| Licensee | Call Signs | Description |
|---|---|---|
| | | |
| | | |
| | | |

## PENDING FCC APPLICATIONS

| Licensee | Call Sign | File No. | Date Filed | Purpose |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

## Canada Licenses (ISED and CRTC)

[]

## Pending Filings

F-27

**Schedule 17**

**Satellites**

| Company/Subsidiary | Satellite | Description of Material Contracts Related to Satellite |
|---|---|---|
|  |  |  |
|  |  |  |

EXHIBIT F-2

## PERFECTION CERTIFICATE SUPPLEMENT

This Perfection Certificate Supplement, dated as of [          ], 20[ ] is delivered pursuant to that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement") among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Borrower"), the Guarantors party thereto, each as a Guarantor and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, certain other parties thereto and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent (in such capacity, the "Administrative Agent").  Reference is made to (i) that certain Senior Secured Super-Priority Debtor-in-Possession Security Agreement, dated as of January [ ], 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), among Borrower, the Subsidiary Guarantors party thereto, each as a Guarantor and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as collateral agent (in such capacity, the "Collateral Agent") and (ii) that certain [Canadian Super Priority Agreement], dated as of January [  ], 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Canadian Security Agreement"), among the Canadian Subsidiaries party thereto and the Collateral Agent.  Capitalized terms used but not defined herein have the meanings assigned in the Loan Agreement, the Security Agreement and the Canadian Security Agreement, as applicable.

The undersigned, the [          ] of the Borrower, hereby certify (in my capacity as [          ] and not in my individual capacity) to Administrative Agent and the Collateral Agent and each of the other Secured Parties that, as of the date hereof, there has been no change in the information described in the Perfection Certificate delivered on the Closing Date (as supplemented by any perfection certificate supplements delivered prior to the date hereof, the "Prior Perfection Certificate"), other than as follows:

1.    Names.  (a) Except as listed on **Schedule 1(a)** attached hereto and made a part hereof, (x) **Schedule 1(a)** to the Prior Perfection Certificate sets forth the exact legal name of each Pledgor, as such name appears in its respective certificate of incorporation or any other organizational document; (y) each Pledgor is (i) the type of entity disclosed next to its name in **Schedule 1(a)** to the Prior Perfection Certificate and (ii) a registered organization (to the extent such concept applies to it) except to the extent disclosed in **Schedule 1(a)** to the Prior Perfection Certificate and (z) set forth in **Schedule 1(a)** to the Prior Perfection Certificate is the organizational or corporation identification number, if any, of each Pledgor that is a registered organization or corporation, the Federal Taxpayer Identification Number of each Pledgor (if applicable) and the jurisdiction of formation of each Pledgor.

(b)    Except as listed on **Schedule 1(b)** attached hereto and made a part hereof, set forth in **Schedule 1(b)** of the Prior Perfection Certificate is any other corporate or organizational names each Pledgor has had in the past five years, together with the date of the relevant change.

(c)     Except as listed on **Schedule 1(c)** attached hereto and made a part hereof, set forth in **Schedule 1(c)** of the Prior Perfection Certificate is the list of all other names used by each Pledgor, or any other business or organization to which each Pledgor became a successor by merger, amalgamation, statutory arrangement, bankruptcy proposal, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, including on any filings with the Internal Revenue Service (if applicable) at any time between [_____], 20[____]ª and the date hereof. Except as listed in **Schedule 1(c)** attached hereto and made a part hereof, no Pledgor has changed its jurisdiction of organization at any time during the past four months.

2.     <u>Current Locations</u>.  Except as listed on **Schedule 2(a)** attached hereto and made a part hereof, the chief executive office of each Pledgor is located at the address set forth in **Schedule 2(a)** of the Prior Perfection Certificate.  Except as listed on **Schedule 2(b)** attached hereto and made a part hereof, each location where each Pledgor maintains any books or records relating to any material portion of accounts receivable (with each location at which chattel paper, if any, is kept being indicated by an "*") is set forth in **Schedule 2(b)** of the Prior Perfection Certificate. Except as listed on **Schedule 2(c)** attached hereto and made a part hereof, each location where each Pledgor maintains any material portion of Equipment or other Collateral not identified above is set forth in **Schedule 2(c)** of the Prior Perfection Certificate.

3.     <u>Extraordinary Transactions</u>.   Except for those purchases, acquisitions and other transactions described on **Schedule 3** attached hereto and on **Schedule 3** to the Prior Perfection Certificate, all of the Collateral originated or acquired by the Borrower and each Subsidiary Guarantor at any time between [_____], 20[____]ª and the date hereof has been originated by the Borrower and each Subsidiary in the ordinary course of business or consists of goods which have been acquired by the Borrower or such Subsidiary in the ordinary course of business from a person in the business of selling goods of that kind.

4.     [Intentionally omitted].

5.     <u>UCC and Comparable Foreign Filings</u>.  Except as listed on **Schedule 5** attached hereto and made a part hereof, the financing statements (including fixture filings or comparable foreign filings or authorizations to register comparable foreign filings) (in each case duly authorized by each Pledgor constituting the debtor therein), including the indications of the collateral relating to, as applicable, the Security Agreement or the Canadian Security Agreement, are set forth in **Schedule 5** of the Prior Perfection Certificate and are in the appropriate forms for filing in the filing offices in the jurisdictions identified in **Schedule 6** hereto and thereto.

6.     <u>Schedule of Filings</u>.  Except as listed on **Schedule 6** attached hereto and made a part hereof, attached to the Prior Perfection Certificate as **Schedule 6** is a schedule of (i) the appropriate filing or registration offices for the financing statements (or comparable foreign filings) attached hereto and thereto as or otherwise referred to in **Schedule 5** and (ii) the appropriate filing offices for the filings described in **Schedule 11(c)** hereto and thereto and (iii) any other actions required to create, preserve, protect and perfect the security interests in the Pledged Collateral (as defined in the Security Agreement and the Canadian Security Agreement) granted

---

ª Date of Prior Perfection Certificate.
ª Date of Prior Perfection Certificate.

to the Collateral Agent pursuant to the Loan Security Documents. No other filings, registrations or actions are required to create, preserve, protect and perfect the security interests in the Pledged Collateral granted to the Collateral Agent pursuant to the Loan Security Documents.

7.      <u>Real Property</u>.  Except as listed on **Schedule 7(a)** attached hereto and made a part hereof, **Schedule 7(a)** to the Prior Perfection Certificate is a list of all (i) real property owned in fee by the Borrower and each of the Guarantors and that, together with any improvements thereon, individually has a fair market value of at least $1,000,000 (all of which, in the case of such property located in the United States or Canada, referred to as "<u>Mortgaged Property</u>") as of the date hereof, (ii) filing offices for mortgages relating to the Mortgaged Property as of the date hereof, (iii) common names, addresses and uses of each Mortgaged Property (stating improvements located thereon) and (iv) other information relating thereto required by such Schedule. Except as described on **Schedule 7(b)** attached hereto: (i) neither the Borrower nor any of the Guarantors has entered into any leases, subleases, tenancies, franchise agreements, licenses or other occupancy arrangements as owner, lessor, sublessor, licensor, franchisor or grantor with respect to any of the real property described on **Schedule 7(a)** and (ii) neither the Borrower nor any of the Guarantors has any Leases which require the consent of the landlord, tenant or other party thereto to the Transactions.

8.      <u>Termination Statements</u>.  Except as listed on **Schedule 8(a)** attached hereto and made a part hereof, **Schedule 8(a)** to the Prior Perfection Certificate sets forth the duly authorized termination statements, financing change statements (or comparable foreign filings or authorizations to register such comparable foreign filings) in the appropriate form for filing in each applicable jurisdiction identified in **Schedule 8(b)** hereto and thereto with respect to each Lien described therein.

9.      <u>Stock Ownership and Other Equity Interests</u>.  Except as listed on **Schedule 9(a)** attached hereto and made a part hereof, **Schedule 9(a)** to the Prior Perfection Certificate is a true and correct list of each of all of the authorized, and the issued and outstanding, stock, partnership interests, limited liability company membership interests or other equity interest of the Borrower and each Subsidiary Guarantor and the record and beneficial owners of such stock, partnership interests, membership interests or other equity interests.

10.     <u>Instruments and Tangible Chattel Paper</u>.  Except as listed on **Schedule 10** attached hereto and made a part hereof, **Schedule 10** to the Prior Perfection Certificate is a true and correct list of all promissory notes, instruments (other than checks to be deposited in the ordinary course of business), tangible chattel paper, electronic chattel paper and other evidence of indebtedness held by each Pledgor in connection with the Pledged Collateral that exceeds $250,000 in the aggregate for all Pledgors (as defined in the Security Agreement) as of the date hereof, including all intercompany notes between or among any two or more Companies.

11.     <u>Intellectual Property</u>.  (a) Except as listed on **Schedule 11(a)** attached hereto and made a part hereof, **Schedule 11(a)** to the Prior Perfection Certificate is a schedule setting forth all of each Pledgor's Patents, Patent licenses, Trademarks and Trademark licenses (each as defined in the Security Agreement and the Canadian Security Agreement) registered with the United States Patent and Trademark Office or with the Canadian Intellectual Property Office, and all other Patents, Patent licenses, Trademarks and Trademark licenses, including the name of the registered

owner and the registration number of each Patent, Patent license, Trademark and Trademark license owned by each Pledgor. Except as listed on **Schedule 11(b)** attached hereto and made a part hereof, **Schedule 11(b)** to the Prior Perfection Certificate is a schedule setting forth all of each Pledgor's United States Copyrights and Copyright Licenses (each as defined in the Security Agreement), and all other Copyrights and Copyright Licenses, including the name of the registered owner and the registration number of each Copyright or Copyright license owned by each Pledgor.

12.     <u>Commercial Tort Claims</u>.  Except as listed on **Schedule 12** attached hereto and made a part hereof, attached to the Prior Perfection Certificate as **Schedule 12** is a true and correct list of all Commercial Tort Claims (as defined in the Security Agreement and Canadian Security Agreement) held by the Borrower and each Subsidiary Guarantor that exceeds $250,000 in the aggregate for all Pledgors, including a brief description thereof.

13.     <u>Deposit Accounts, Securities Accounts, Commodity Accounts and Futures Accounts</u>. Except as listed on **Schedule 13** attached hereto and made a part hereof, attached to the Prior Perfection Certificate as **Schedule 13** is a true and complete list of all Deposit Accounts, Securities Accounts, and Commodity Accounts, including the DIP Loan Proceeds Account (each as defined in the Security Agreement) and all Securities Accounts and Futures Accounts (as defined in the Canadian Security Agreement) maintained by the Borrower and each of the Guarantors, including the name of each institution where each such account is held, the name of each such account and the name of each entity that holds each account.

14.     <u>Letter-of-Credit Rights</u>.  Except as listed on **Schedule 14** attached hereto and made a part hereof, attached to the Prior Perfection Certificate as **Schedule 14** is a true and correct list of all Letters of Credit issued in favor of the Borrower and each Subsidiary Guarantor that exceeds $250,000 in the aggregate for all Pledgors, as beneficiary thereunder.

15.     <u>Motor Vehicles</u>.  Except as listed on **Schedule 15** attached hereto and made a part hereof, attached to the Prior Perfection Certificate as **Schedule 15** is a true and correct list of all motor vehicles and other goods (covered by certificates of title or ownership) valued at over $50,000 and owned by the Borrower and each Subsidiary Guarantor (provided that the aggregate value of all motor vehicles as to which any Pledgor has not delivered a certificate of title or ownership is less than $200,000), and the serial or vehicle identification number, owner and approximate value of such motor vehicles.

16.     <u>Communications Licenses</u>.  Except as listed on **Schedule 16** attached hereto and made a part hereof, attached to the Prior Perfection Certificate as **Schedule 16** is a true and correct list of all licenses and authorizations issued to the Borrower or any Subsidiary Guarantor by the Federal Communications Commission, the Canadian Radio and Telecommunications Commission or Industry Canada or for which the Borrower or any Subsidiary Guarantor intends to apply.

17.     <u>Satellites</u>.  Except as listed on **Schedule 17** attached hereto and made a part hereof, attached to the Prior Perfection Certificate as **Schedule 17** is a true and correct list of all satellites owned by the Borrower and each Subsidiary Guarantor and all material contracts related thereto (including leases or rentals thereof and all contractual rights relating to the geostationary position of any Satellites).

[The Remainder of this Page has been intentionally left blank]

**IN WITNESS WHEREOF**, we have hereunto signed this Perfection Certificate Supplement as of the date first above written.

**LIGADO NETWORKS LLC**

By: _____

    Name:
    Title:

**ATC TECHNOLOGIES, LLC,**
**LIGADO NETWORKS INC. OF VIRGINIA,**
**LIGADO NETWORKS BUILD LLC,**
**LIGADO NETWORKS FINANCE LLC,**
**LIGADO NETWORKS SUBSIDIARY LLC,**
**ONE DOT SIX LLC,**
**ONE DOT SIX TVCC LLC,**
**LIGADO NETWORKS CORP.,**
**LIGADO NETWORKS (CANADA) INC.,**
**LIGADO NETWORKS HOLDINGS**
**(CANADA) INC.,**
**[EACH OTHER SUBSIDIARY GUARANTOR],**
each as a Subsidiary Guarantor

By: _____

    Name:
    Title:

**Schedule 1(a)**

**Legal Names, Etc.**

| Legal Name | Type of Entity | Registered Organization (Yes/No) | Organizational Number[a] | Federal Taxpayer Identification Number | Jurisdiction of Formation |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

---

[a] If none, so state.

**Schedule 1(b)**

**Prior Organizational Names**

| Company/Subsidiary | Prior Name | Date of Change |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Schedule 1(c)**

**Changes in Corporate Identity; Other Names**

| Company/Subsidiary | Corporate Name of Entity | Action | Date of Action | State of Formation | List of All Other Names Used on Any Filings with the Internal Revenue Service During Past Five Years |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## Schedule 2

### (a) Chief Executive Offices

| Company/Subsidiary | Address | County | Jurisdiction |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### (b) Location of Books and Records Related to Accounts Receivable (If Different from Above)

| Company/Subsidiary | Address | County | Jurisdiction |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### (c) Location of Equipment or Other Collateral (If Different from Above)

| Company/Subsidiary | Address | County | Jurisdiction |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## Schedule 3

## Transactions Other Than in the Ordinary Course of Business

| Company/Subsidiary | Description of Transaction Including Parties Thereto | Jurisdiction in Which Collateral Was Located at the Time of Transaction | Date of Transaction |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## **Schedule 5**

**Copies of Financing Statements or Authorizations to File Financing Statements To Be Filed**

**See attached.**

**Schedule 6**

**Filings/Filing Offices**

| Type of Filing[a] | Entity | Applicable Loan Security Document [Loan Security Agreement, Canadian Security Agreement or Other] | Jurisdictions |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

---

[a] UCC-1 financing statement, fixture filing, mortgage, intellectual property filing or other necessary filing.

**<u>Schedule 7(a)</u>**

**<u>Real Property</u>**

| <u>Entity of Record</u> | <u>Common Name and Address</u> | <u>Owned, Leased or Other Interest</u> | <u>Landlord / Owner if Leased or Other Interest</u> | <u>Description of Lease or Other Documents Evidencing Interest</u> | <u>Purpose/Use</u> | <u>Improvements Located on Real Property</u> | <u>Legal Description</u> | <u>Option to Purchase/Right of First Refusal</u> |
|---|---|---|---|---|---|---|---|---|
| [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [SEE EXHIBIT A-[ ] ATTACHED HERETO] | [YES/NO] |
| | | | | | | | | |

**Schedule 7(b)**

**Required Consents; Company Held Landlord's/ Grantor's Interests**

**I. Landlord's / Grantor's Consent Required**

1.      [LIST EACH LEASE OR OTHER INSTRUMENT WHERE LANDLORD'S / GRANTOR'S CONSENT IS REQUIRED].

**<u>Schedule 8(a)</u>**

**Attached hereto is a true copy of each termination statement filing (or equivalent foreign filing or authorization to file such equivalent foreign filing) duly acknowledged or otherwise identified by the filing officer.**

## Schedule 8(b)

## Termination Statement Filings

| Debtor | Jurisdiction | Secured Party | Type of Collateral | UCC-1 File Date | UCC-1 File Number |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## Schedule 9

### (a) Equity Interests of the Borrower and the Subsidiary Guarantors

| Current Legal Entities Owned | Record Owner | Certificate No. | No. Shares/Interest | Percent Pledged |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

### (b) Other Equity Interests

**Schedule 10**

**Instruments and Tangible Chattel Paper**

1.      Promissory Notes:

| Entity | Principal Amount | Date of Issuance | Interest Rate | Maturity Date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

2.      Chattel Paper:

## Schedule 11(a)

## Patents and Trademarks

**UNITED STATES PATENTS:**

Registrations:

| OWNER | REGISTRATION NUMBER | DESCRIPTION |
|---|---|---|
|  |  |  |

Applications:

| OWNER | APPLICATION NUMBER | DESCRIPTION |
|---|---|---|
|  |  |  |

Licenses:

| LICENSEE | LICENSOR | REGISTRATION/ APPLICATION NUMBER | DESCRIPTION |
|---|---|---|---|
|  |  |  |  |

**OTHER PATENTS:**

Registrations:

| OWNER | REGISTRATION NUMBER | COUNTRY/STATE | DESCRIPTION |
|---|---|---|---|
|  |  |  |  |

Applications:

| OWNER | APPLICATION NUMBER | COUNTRY/STATE | DESCRIPTION |
|---|---|---|---|
|  |  |  |  |

Licenses:

| LICENSEE | LICENSOR | COUNTRY/STATE | REGISTRATION/ APPLICATION NUMBER | DESCRIPTION |
|---|---|---|---|---|
| | | | | |

## UNITED STATES TRADEMARKS:

Registrations:

| OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
| | | |

Applications:

| OWNER | APPLICATION NUMBER | TRADEMARK |
|---|---|---|
| | | |

Licenses:

| LICENSEE | LICENSOR | REGISTRATION/ APPLICATION NUMBER | TRADEMARK |
|---|---|---|---|
| | | | |

## OTHER TRADEMARK:

Registrations:

| OWNER | REGISTRATION NUMBER | COUNTRY/STATE | TRADEMARK |
|---|---|---|---|
| | | | |

Applications:

| OWNER | APPLICATION NUMBER | COUNTRY/STATE | TRADEMARK |
| --- | --- | --- | --- |

Licenses:

| LICENSEE | LICENSOR | COUNTRY/STATE | REGISTRATION/ APPLICATION NUMBER | TRADEMARK |
| --- | --- | --- | --- | --- |

**Schedule 11(b)**

**Copyrights**

**UNITED STATES COPYRIGHTS**

Registrations:

| OWNER | TITLE | REGISTRATION NUMBER |
|---|---|---|
| | | |

Applications:

| OWNER | APPLICATION |
|---|---|
| | |

Licenses:

| LICENSEE | LICENSOR | REGISTRATION/ APPLICATION NUMBER | DESCRIPTION |
|---|---|---|---|
| | | | |

**OTHER COPYRIGHTS**

Registrations:

| OWNER | COUNTRY/STATE | TITLE | REGISTRATION NUMBER |
|---|---|---|---|
| | | | |

Applications:

| OWNER | COUNTRY/STATE | APPLICATION NUMBER |
|---|---|---|
| | | |

Licenses:

| LICENSEE | LICENSOR | COUNTRY/STATE | REGISTRATION/ APPLICATION NUMBER | DESCRIPTION |
|---|---|---|---|---|

**Schedule 11(c)**

**Intellectual Property Filings**

**<u>Schedule 12</u>**

**<u>Commercial Tort Claims</u>**

## **Schedule 13**

## **Deposit Accounts, Securities Accounts, Commodity Accounts and Futures Accounts**

| OWNER | TYPE OF ACCOUNT | BANK OR INTERMEDIARY | ACCOUNT NUMBERS |
|-------|-----------------|----------------------|-----------------|

## **Schedule 14**

## **Letter of Credit Rights**

**<u>Schedule 15</u>**

**<u>Motor Vehicles</u>**

**Schedule 16**

**Communications Licenses**

**U.S. Licenses (FCC)**

(a)    Section 214 Authorizations

| Authorization Holder | File Numbers |
|---|---|
| | |
| | |

(a)    Space Station Licenses

| Licensee | Call Signs | File Numbers |
|---|---|---|
| | | |
| | | |

(b)    Transmit/Receive Earth Station Licenses

| Licensee | Call Signs | Fixed/Mobile |
|---|---|---|
| | | |
| | | |

(c)    Wireless Authorizations

| Licensee | Call Signs | Description |
|---|---|---|
| | | |
| | | |
| | | |

**PENDING FCC APPLICATIONS**

| Licensee | Call Sign | File No. | Date Filed | Purpose |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Canada Licenses (ISED and CRTC)**

[]

**Pending Filings**

F-58

**Schedule 17**

**Satellites**

| Company/Subsidiary | Satellite | Description of Material Contracts Related to Satellite |
|---|---|---|
|  |  |  |
|  |  |  |

**EXHIBIT G**

**[FORM OF]**
**BORROWING REQUEST**

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Administrative Agent
Charlotte DCS Office
214 N Tryon Street
Attn Loan Agency – 27th Floor
Charlotte, NC 28202-1078

Re:   LIGADO NETWORKS LLC

[__]

Ladies and Gentlemen:

Reference is made to the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given it in Article 1 of the Loan Agreement), each as a Guarantor under the Loan Agreement and as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent and collateral agent for the Lenders.  Borrower hereby gives you notice pursuant to Section 2.03 of the Loan Agreement that it requests a Loan under the Loan Agreement, and in that connection sets forth below the terms on which such Loan is requested to be made:

(A)   Principal aggregate amount of                    $[   ]
       [DIP First Funding] / [DIP Delayed
       Draw Term] Loan to be borrowed

(B)   Date of Borrowing (which is a Business Day)    [__]

(C)   Funds are requested to be disbursed to
       Borrower's account as follows:


Borrower hereby represents and warrants that the conditions to lending specified in Sections [4.02(j) and (k)][6][4.03(d) and (h)][7] of the Loan Agreement are satisfied as of the date hereof.

---

[6] For Borrowings of DIP First Funding Loans.
[7] For Borrowings of DIP Delayed Term Loans.

[Signature Page Follows]

LIGADO NETWORKS LLC

By: _____
     Name:
     Title:

**EXHIBIT H-1**

### FORM OF
### U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the other loan parties party thereto from time to time, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent and collateral agent for the Lenders.

Pursuant to the provisions of Section 2.15 of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

[NAME OF LENDER]

By: _____

Name:

Title:

Date: _____, 20[ ]

**EXHIBIT H-2**

## FORM OF
## U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby to the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the other loan parties party thereto from time to time, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent and collateral agent for the Lenders.

Pursuant to the provisions of Section 2.15 of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.


[NAME OF PARTICIPANT]


By: _____

Name:

Title:

Date:    _____, 20[  ]

**EXHIBIT H-3**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the other loan parties party thereto from time to time, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent and collateral agent for the Lenders.

Pursuant to the provisions of Section 2.15 of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

[NAME OF PARTICIPANT]

By: _____

Name:

Title:

Date:    _____, 20[  ]

**EXHIBIT H-4**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**
(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**") by and among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the other loan parties party thereto from time to time, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent and collateral agent for the Lenders.

Pursuant to the provisions of Section 2.15 of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN- E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Agreement and used herein shall have the meanings given to them in the Agreement.

[NAME OF LENDER]

By: _____

Name:
Title:
Date:    _____, 20[  ]

**EXHIBIT I**

**[RESERVED]**

**EXHIBIT J**

**FORM OF INITIAL BUDGET**


(see attached)

Subject to Material Revision
Privileged and Confidential
Subject to Common Interest Privilege
Subject to FRE408 and All Equivalents

# 13 Week DIP Budget

JANUARY 2025





Making
Stronger
Connections

Subject to Material Revision
Privileged and Confidential
Subject to Common Interest Privilege
Subject to FRE408 and All Equivalents

# 13 Week DIP Budget

US$ 000s

| 13 Week - Cumul | Week 0 | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning Date | Dec-30 | Jan-6 | Jan-13 | Jan-20 | Jan-27 | Feb-3 | Feb-10 | Feb-17 | Feb-24 | Mar-3 | Mar-10 | Mar-17 | Mar-24 | Mar-31 | 13 Week |
| Week Ending Date | Jan-3 | Jan-10 | Jan-17 | Jan-24 | Jan-31 | Feb-7 | Feb-14 | Feb-21 | Feb-28 | Mar-7 | Mar-14 | Mar-21 | Mar-28 | Apr-4 | Total |
| **Receipts** | | $ 239 | $ 239 | $ 239 | $ 239 | $ 219 | $ 219 | $ 219 | $ 219 | $ 217 | $ 217 | $ 217 | $ 217 | $ 214 | $ 2,912 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Employee Related | | 105 | - | 686 | - | 689 | - | 689 | - | 675 | - | 675 | - | 2,058 | 5,577 |
| Network | | 9,997 | 62 | 206 | - | 205 | 210 | 62 | 206 | 200 | 212 | 62 | 206 | 2,090 | 13,718 |
| General & Administrative | | 572 | - | 8 | - | 551 | 657 | - | 14 | 720 | 277 | - | 156 | 505 | 3,459 |
| **Total Operating Disbursements** | | $ 10,674 | $ 62 | $ 899 | $ - | $ 1,445 | $ 867 | $ 751 | $ 220 | $ 1,595 | $ 489 | $ 737 | $ 362 | $ 4,652 | $ 22,754 |
| **Operating Cash Flow** | | $ (10,435) | $ 177 | $ (661) | $ 239 | $ (1,226) | $ (649) | $ (532) | $ (1) | $ (1,378) | $ (272) | $ (520) | $ (145) | $ (4,438) | $ (19,841) |
| **Capex & Other Non-Operating Disbursements** | | 3,000 | - | - | - | - | 304 | - | - | 66 | - | - | - | 2,030 | 5,400 |
| **Total Financing** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Professional Fees** | | - | - | - | - | 2,651 | - | - | 5,476 | 1,909 | - | - | 4,754 | - | 14,790 |
| **Net Cash Flow** | | $ (13,435) | $ 177 | $ (661) | $ 239 | $ (3,877) | $ (953) | $ (532) | $ (5,478) | $ (3,353) | $ (272) | $ (520) | $ (4,898) | $ (6,468) | $ (40,031) |
| Beginning Unrestricted Cash | | 9,626 | 8,191 | 8,367 | 7,706 | 30,945 | 27,068 | 26,115 | 25,583 | 20,105 | 16,752 | 16,481 | 15,961 | 11,063 | 9,626 |
| Net Cash Flow | | (13,435) | 177 | (661) | 239 | (3,877) | (953) | (532) | (5,478) | (3,353) | (272) | (520) | (4,898) | (6,468) | (40,031) |
| DIP Draw / (Repayment) | | 12,000 | - | - | 23,000 | - | - | - | - | - | - | - | - | - | 35,000 |
| **Ending Unrestricted Cash** | $ 9,626 | $ 8,191 | $ 8,367 | $ 7,706 | $ 30,945 | $ 27,068 | $ 26,115 | $ 25,583 | $ 20,105 | $ 16,752 | $ 16,481 | $ 15,961 | $ 11,063 | $ 4,595 | $ 4,595 |
| **Minimum Cash - Test** | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 |
| **Memo: Cash Surplus / (Deficit)** | $ (374) | $ (1,809) | $ (1,633) | $ (2,294) | $ 20,945 | $ 17,068 | $ 16,115 | $ 15,583 | $ 10,105 | $ 6,752 | $ 6,481 | $ 5,961 | $ 1,063 | $ (5,405) | $ (5,405) |



*Subject to Material Revision*
*Privileged and Confidential*
*Subject to Common Interest Privilege*
*Subject to FRE408 and All Equivalents*

# Disclaimer

This presentation is for informational purposes only and contains general information about the activities of Ligado Networks LLC (the "Company") that does not purport to be complete. This presentation does not constitute or form part of, and should not be construed as, an offer or invitation to subscribe for or purchase any securities. Each recipient, by accepting a copy of this presentation, acknowledges that it is receiving confidential information and agrees with the Company that it shall keep such information confidential, will not disclose any such information to any person or entity other than those representatives of such recipient who are directly involved in the analysis of the Company and will use such information only in connection with its evaluation of the Company, provided that such recipient shall be permitted to disclose such information in the event that it is required to do so by law or regulation or requested to do so by any governmental agency or other regulatory authority having jurisdiction over it or is required to disclose such information in connection with any legal proceedings.

Certain statements contained in this presentation are "forward-looking statements". Matters discussed in this presentation that relate to events or developments that are expected to occur in the future are forward looking statements. Forward-looking statements are based on management's beliefs, assumptions and expectations of future events, considering the information currently available to management. These statements are not statements of historical fact and are typically identified by terms and phrases such as "anticipate," "believe," "intend," "estimate," "expect," "continue," "should," "could," "may," "plan," "project," "predict," "will" and similar expressions. As with any projection or forecast, these statements are inherently susceptible to uncertainty and changes in circumstances. Such forward looking statements are subject to risks and uncertainties and investors are cautioned that outcomes and results may vary materially from those projected due to various factors beyond the Company's control. Forward-looking statements speak only as of the date in which they are made. The Company disclaims any obligation or undertaking to provide any updates or revisions to any information and opinions or forward-looking statement to reflect any change in the Company's expectations or any change in events, conditions or circumstances on which the forward-looking statement is based.

The information and opinions in these materials are provided as of the date of this presentation. The Company is under no obligation to update or keep current the information contained in this document. No representation or warranty, express or implied, is made as to, and no reliance should be placed on, the fairness, accuracy, completeness or correctness of the information or opinions contained herein and any reliance you place on them will be at your sole risk. The Company, its affiliates and advisors do not accept any liability whatsoever for any loss howsoever arising, directly or indirectly, from the use of this document or its contents, or otherwise arising in connection with this document.

The information contained herein does not constitute investment, legal, accounting, regulatory, taxation or other advice and the information does not take into account your investment objectives or legal, accounting, regulatory, taxation or financial situation or particular needs. You are solely responsible for forming your own opinions and conclusions on such matters and the market and for making your own independent assessment of the information.

Actual spectrum capacity, supply, demand, efficiency gains and value may differ from those assumed as a result of many risks and uncertainties, including those based on management's beliefs assumptions and expectations of future events as described in the preceding paragraph. Accordingly, the actual performance and cash flows of the Company for any future period, as well as the forecasts regarding deployment of the Company's spectrum and the development of 5G networks, may differ significantly from the estimates included in the respective Reports or this presentation. You are cautioned not to place undue reliance on the Reports or this presentation and should make your own independent assessment of the Company's future results of operations, cash flows and financial condition. See the preliminary offering memorandum related to the Company's offering of notes described in this presentation for further information, including with respect to how to access the Reports.

None of the Company, the Company's members or their respective managers, directors, the Company's shareholders or their respective directors, officers, employees, agents and consultants, make any representation or warranty, whether express or implied, as to the accuracy, completeness or suitability of the information found or offered in this presentation for any particular purpose, and no responsibility shall be accepted for any loss or damages occasioned by any party acting or relying on the contents of this presentation. This presentation also includes information obtained from publicly available sources and from third party sources considered to be reliable. To the extent available, the industry, market and competitive position data contained in this presentation come from official or third party sources. Third party industry publications, studies and surveys generally state that the data contained therein have been obtained from sources believed to be reliable, but that there is no guarantee of the accuracy or completeness of such data. While the Company believes that each of these publications, studies and surveys has been prepared by a reputable source, the Company has not independently verified the data contained therein. In addition, certain of the industry, market and competitive position data contained in this presentation come from the Company's own internal estimates based on the knowledge and experience of the Company's management in the market in which the Company operates. While the Company believes that such estimates are reasonable and reliable, they, and their underlying methodology and assumptions, have not been verified by any independent source for accuracy or completeness and are subject to change without notice. Accordingly, undue reliance should not be placed on any of the industry, market or competitive position data contained in this presentation. While this presentation is provided in good faith, it does not purport to be comprehensive and has not been independently verified. This presentation is for information and convenient reference only and does not constitute or form part of an offer or invitation to sell or a solicitation of an offer to buy or subscribe for or otherwise acquire any securities in any jurisdiction or an inducement to engage in investment activity. The matters described in this presentation are subject to discussion and amendment.

The securities of the Company have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "U.S. Securities Act"), or under the laws of any state of the United States. This document does not constitute or form a part of any offer or solicitation to purchase or subscribe for securities in the United States and is not for distribution, directly or indirectly, in or into the United States (including its territories and possessions, any state of the United States and the District of Columbia). The securities of the Company will only be offered or sold a) in the United States solely to qualified institutional buyers within meaning of Rule 144A under the U.S. Securities Act pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act or b) outside the United States in offshore transactions in reliance on Regulation S under the U.S. Securities Act. There will be no public offer of the Company's securities in the United States.



**EXHIBIT K**

**FORM OF ELECTION JOINDER**

(see attached)

**EXHIBIT K**

**[FORM OF]**
**ELECTION JOINDER**

This Election Joinder (the "**Election Joinder**") is delivered by the Electing Lender dated as of the Effective Date set forth below (for the avoidance of doubt, to be dated and delivered no later than the Election Deadline) and is entered into by [*Insert name of Electing Lender*] (the "**Electing Lender**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Loan Agreement defined below, receipt of a copy of which is hereby acknowledged by the Electing Lender. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Election Joinder as if set forth herein in full.

The Electing Lender hereby (a) confirms that (i) the Electing Lender is a [Backstop Lender][1][Syndication Eligible Prepetition Lender][with outstanding prepetition loans (other than the Prepetition First Out Obligations) under the 1L Loan Agreement and/or notes under the 1L Notes Indenture as of the Petition Date in the principal amount specified below], (ii) the [Initial Assumed DIP Portion][Subsequent Assumed DIP Portion][2] of such Electing Lender with respect to each of the DIP First Funding Loans, the DIP Second Funding Commitments and the DIP DDTL Commitments, calculated in accordance with Section 2.01(f) of the Loan Agreement, is set forth in (5) below, and (iii) it agrees to comply with the conditions and terms set forth in Sections 2.01(f)(iv), 2.01(f)(v) and 2.01(f)(vi) of the Loan Agreement on or prior to the dates set forth therein and (b) acknowledges and agrees that (i) the Electing Lender will be a "Lender" for all purposes under the Loan Agreement following the Syndication Transactions and (ii) the Electing Lender shall not have any recourse against any Seller Lender or Commitment Assigning Lender in connection with the Syndication Transactions as set forth in Section 2.01(f)(viii) of the Loan Agreement.

For an agreed consideration calculated as set forth in Section 2.01(f)(iv) of the Loan Agreement, the Electing Lender hereby agrees to irrevocably purchase and assume from each applicable Selling Lender and Commitment Assigning Lender, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the rights and obligations (including the Purchased Obligations) of each applicable Selling Lender and Commitment Assigning Lender related to the Electing Lender's [Initial Assumed DIP Portion][Subsequent Assumed DIP Portion] as identified below with respect to each of the DIP First Funding Loans, the DIP Second Funding Commitments and the DIP DDTL Commitments (including the Purchased Interest and Fees) in accordance with the terms of Sections 2.01(f) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of each applicable Selling Lender and Commitment Assigning Lender (in each such Selling Lender's and Commitment Assigning Lender's capacity as a Lender) against any person, whether known or unknown, arising under or in connection with the Loan Agreement, any other documents or

---

[1]Note: Backstop Lenders are only required to deliver an Election Notice if participating in the second round of the syndication process as set forth in Section 2.01(f)(i).
[2] Note: For initial syndication, all references should be to Initial Assumed DIP Portion. For subsequent syndication. all references should be to Subsequent Assumed CIP Portion.

instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as, the "**Purchased Interest**").  Such sale and assignment is without recourse to any Selling Lender or Commitment Assigning Lender and the Electing Lender shall have no recourse against any Selling Lender or Commitment Assigning Lender in connection with the Syndication Transactions.

1.     Electing Lender: _____ [3]

2.     Borrower:            LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code

3.     Administrative Agent:   U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as the administrative agent under the Loan Agreement

4.     Loan Agreement:     Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January [5], 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") among Borrower and the Subsidiary Guarantors, each as a Guarantor under the Loan Agreement and a debtor and a debtor-in-possession under Chapter 11 of the Bankruptcy Code, and, in each case, the Lenders party thereto from time to time and Administrative Agent.

5.     Prepetition loans and/or notes held as of the Petition Date Syndication Eligible Prepetition Lender:

| Entity[4] | Principal Amount of Loans under 1L Loan Agreement (other than Prepetition First Out Obligations) | Principal Amount of Notes under 1L Notes Indenture |
|---|---|---|
| [__] | $ | $ |
| [__] | $ | $ |
| [__] | $ | $ |

---

[3] Note: Please prepare a separate Item 1 for each entity which will be party to the Loan Agreement.
[4] Note: To add additional rows as needed.

6.      Subject to Section 2.01(f)(i) (including the proviso to the last sentence thereof), [Initial Assumed DIP Portion][Subsequent Assumed DIP Portion] of such Electing Lender with respect to each of the DIP First Funding Loans, the DIP Second Funding Commitments and the DIP DDTL Commitments:

| Entity[5] | DIP First Funding Loans | DIP Second Funding Commitments | DIP DDTL Commitments |
|---|---|---|---|
| [__] | $ | $ | $ |
| [__] | $ | $ | $ |
| [__] | $ | $ | $ |

---

[5] Note: To add additional rows as needed.

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.][6]

The Electing Lender (to the extent not an existing Lender) delivers to the Administrative Agent attached hereto:

(i)      the IRS Form W-9 or W-8 of the Electing Lender;

(ii)     the Electing Lender's:

     a.   Recorded Articles of Organization (if an LLC),

     b.   the Certificate of Limited Partnership (if an LP) or

     c.   the Recorded Articles of Incorporation (if a Corporation);

(iii)    a completed Administrative Questionnaire for each Electing Lender on the form attached as Annex 2 hereto in which the Electing Lender designates one or more contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with each applicable Selling Lender's and Commitment Assigning Lender's compliance procedures and applicable laws, including Federal and state securities laws and all applicable tax forms.

The Administrative Agent shall not be responsible for any misrepresentation contained herein.

[Remainder of page intentionally left blank]

---

[6] To be delivered no later than the Election Deadline.

The terms set forth in this Election Notice are hereby agreed to:

ELECTING LENDER
[NAME OF ELECTING LENDER]


By: _____
      Name:
      Title:

Consented to and Accepted:


U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as
Administrative Agent


By: _____
        Name:
        Title:

ANNEX 1 to Election Notice

LIGADO NETWORKS LLC
SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

STANDARD TERMS AND CONDITIONS FOR
ELECTION NOTICE

1.      <u>Representations and Warranties</u>.

1.1      <u>Electing Lender</u>.  The Electing Lender (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Election Notice and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, (ii) it meets all requirements of and is an Eligible Assignee under the Loan Agreement (subject to receipt of such consents as may be required under the Loan Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the Purchased Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Purchased Interest and either it, or the Person exercising discretion in making its decision to acquire the Purchased Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Loan Agreement, together with copies of the most recent financial statements delivered pursuant to Sections 3.04(a) or 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Election Notice and to purchase the Purchased Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (vi) attached to the Election Notice is any documentation required to be delivered by it pursuant to the terms of the Loan Agreement, including without limitation an Administrative Questionnaire in the form of <u>Exhibit A</u> to the Loan Agreement duly completed and executed by the Electing Lender if it is not already a Lender under the Loan Agreement, (vii) [reserved], (viii) [reserved], (ix) it has complied with Section 2.01(f) of the Loan Agreement, (x) [reserved], and (xi) if it is a Foreign Lender, attached to the Election Notice is any documentation required to be delivered by it pursuant to Section 2.15 of the Loan Agreement, duly completed and executed by the Electing Lender; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent or any Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations that by the terms of the Loan Documents are required to be performed by it as a Lender.

2.      <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Purchased Interest (including payments of principal, interest, fees and other amounts) to the applicable Electing Lender for amounts that have accrued but are unpaid from and after the Closing Date.

3.      <u>General Provisions</u>.  This Election Notice shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Election Notice may be executed in any number of counterparts, which together shall constitute one instrument. Acceptance and adoption of the terms of this Election Notice by the Electing Lender by Electronic Signature or delivery of an executed counterpart of a signature page of this Election Notice by any Electronic System shall be effective as delivery of a manually executed

counterpart of this Election Notice.  This Election Notice shall be governed by, and construed in accordance with, the law of the State of New York.

4.     <u>Loan Agreement Controls</u>.     Notwithstanding anything herein to the contrary, in the case of any conflict between this Election Joinder and the Loan Agreement (including Section 2.01(f)), the Loan Agreement shall control and govern.

ANNEX 2 to Election Notice

**[FORM OF]**
**ADMINISTRATIVE QUESTIONNAIRE**

**Entity Name:**
**Entity Tax ID**: **If Applicable**

**Operations/Administrative Contacts (for drawdowns, repayments, rate setting, payment notices etc.):**

    **Notice Contact(s):**
    **Name:**
    **Attn:**
    **Address:**
    **Telephone:**
    **Direct Fax:**
    **Email:**

    **Name:**
    **Attn:**
    **Address:**
    **Telephone:**
    **Direct Fax:**
    **Email:**

**Wire Instructions:**

    Bank Name:
    ABA:
    Account Name:
    Account Number:
    SWIFT:
    FFC:

**Credit & Trade Closer (Loans):**

    **Name:**
    **Attn:**
    **Address:**
    **Telephone:**
    **Direct Fax:**
    **Email:**

**Please forward Amendments, Waivers, and Compliance to:**

    **Name:**
    **Attn:**
    **Address:**
    **Telephone:**
    **Direct Fax:**

      **Email:**

**<u>Closing Documentation Forwarded to:</u>**

      **Name:**
      **Attn:**
      **Address:**
      **Telephone:**
      **Direct Fax:**
      **Email:**

**<u>Name as to Appear on Assignment Agreement</u>:**

**EXHIBIT L**

[FORM OF]

**CASH FLOW CERTIFICATE**

[__], 20[__]

This cash flow certificate (this "**Certificate**") is delivered to pursuant to <u>Section 5.01(f)(i)</u> of the Senior Secured Super-Priority Debtor-in-Possession Loan Agreement dated as of January 5, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**") by and among LIGADO NETWORKS LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), the other loan parties party thereto from time to time, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as administrative agent and collateral agent for the Lenders.  Unless otherwise defined herein, capitalized terms used herein shall have the meanings assigned to such terms in the Loan Agreement.

As of the date hereof, I certify, not in my individual capacity, but in my capacity as an officer as follows:

      1.     I am the duly elected, qualified and acting Responsible Officer of the Borrower.

      2.     I have reviewed and am familiar with the contents of this Certificate.

      3.     Attached hereto as <u>Attachment 1</u> is the Cash Flow Forecast for the period commencing [_____], 20[__] and ending [_____], 20[__] (the "**Subject Cash Flow Forecast**")

      4.     The Subject Cash Flow Forecast is based on good faith estimates and assumptions made by the management of the Borrower believed to be reasonable and attainable over the period set forth above.

[Remainder of this Page has been intentionally left blank]

      **IN WITNESS WHEREOF**, I have hereunto signed this Certificate as of the date first above written.

**LIGADO NETWORKS LLC**,
as the Borrower

By: _____
    Name:
    Title:

ATTACHMENT 1

TO

CASH FLOW CERTIFICATE

**Subject Cash Flow Forecast**

(see attached)

**EXHIBIT M**

## FORM OF CANADIAN SECURITY AGREEMENT

(see attached)

*Execution Version*

---

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CANADIAN SECURITY AGREEMENT**

**By**

**LIGADO NETWORKS CORP., LIGADO NETWORKS (CANADA) INC. AND
LIGADO NETWORKS HOLDINGS (CANADA) INC.**
**as Pledgors and as Debtors-in-Possession under Chapter 11 of the Bankruptcy Code,**

**and**

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
**as Collateral Agent**

**Dated as of [●], 2025**

---

## TABLE OF CONTENTS

**Pages**

R E C I T A L S: ..................................................................................................... 5

A G R E E M E N T: .............................................................................................. 6

### ARTICLE I
### DEFINITIONS AND INTERPRETATION

Section 1.1    Definitions ................................................................................... 6

Section 1.2    Interpretation ..............................................................................13

Section 1.3    Resolution of Drafting Ambiguities ...........................................13

Section 1.4    Perfection Certificate .................................................................13

### ARTICLE II
### GRANT OF SECURITY AND SECURED OBLIGATIONS

Section 2.1    Grant of Security Interest ..........................................................13

Section 2.2    Filings ........................................................................................15

### ARTICLE III
### PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
### USE OF PLEDGED COLLATERAL

Section 3.1    Delivery of Certificated Securities Collateral..............................16

Section 3.2    Perfection of Uncertificated Securities Collateral.......................17

Section 3.3    Financing Statements and Other Filings; Maintenance of Perfected Security Interest............................................................................17

Section 3.4    Other Actions .............................................................................17

Section 3.5    Joinder of Additional Guarantors ...............................................19

Section 3.6    Supplements; Further Assurances .............................................20

### ARTICLE IV
### REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 4.1    Title...........................................................................................21

Section 4.2    Validity of Security Interest.................................................................21

Section 4.3    Defence of Claims; Transferability of Pledged Collateral....................21

Section 4.4    Other Financing Statements ...............................................................21

Section 4.5    Location of Inventory and Equipment. ................................................22

Section 4.6    Due Authorization and Issuance .........................................................22

Section 4.7    Consents, etc.......................................................................................22

Section 4.8    Pledged Collateral...............................................................................23

Section 4.9    Insurance .............................................................................................23

Section 4.10   Permitted Liens ....................................................................................23

Section 4.11   No Consumer Goods ...........................................................................23

### ARTICLE V
### CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

Section 5.1    Pledge of Additional Securities Collateral.............................................23

Section 5.2    Voting Rights; Distributions; etc. .........................................................24

Section 5.3    Defaults, etc.........................................................................................25

Section 5.4    Certain Agreements of Pledgors as Pledge Issuers and Holders of Equity
               Interests...............................................................................................26

Section 5.5    ULC ......................................................................................................26

### ARTICLE VI
### CERTAIN PROVISIONS CONCERNING INTELLECTUAL
### PROPERTY COLLATERAL

Section 6.1    Grant of Intellectual Property Licence .................................................27

Section 6.2    Protection of Collateral Agent's Security .............................................27

Section 6.3    After-Acquired Property........................................................................28

Section 6.4    Litigation ..............................................................................................28

### ARTICLE VII
### CERTAIN PROVISIONS CONCERNING RECEIVABLES

Section 7.1    Maintenance of Records ...................................................................................29

Section 7.2    Legend...........................................................................................................29

Section 7.3    Modification of Terms, etc. ...........................................................................29

Section 7.4    Collection .......................................................................................................30

ARTICLE VIII
TRANSFERS

Section 8.1    Transfers of Pledged Collateral....................................................................30

ARTICLE IX
REMEDIES

Section 9.1    Remedies .......................................................................................................30

Section 9.2    Receiver's Rights ...........................................................................................33

Section 9.3    Notice of Sale ................................................................................................34

Section 9.4    Waiver of Notice and Claims ........................................................................34

Section 9.5    Certain Sales of Pledged Collateral .............................................................34

Section 9.6    No Waiver; Cumulative Remedies .................................................................36

Section 9.7    Certain Additional Actions Regarding Intellectual Property................................37

Section 9.8    Actions Requiring Regulatory Approval...............................................................37

ARTICLE X
APPLICATION OF PROCEEDS

Section 10.1    Application of Proceeds .................................................................................38

ARTICLE XI
MISCELLANEOUS

Section 11.1    Concerning Collateral Agent .............................................................................38

Section 11.2    Collateral Agent May Perform; Collateral Agent Appointed Attorney-in-Fact ......39

Section 11.3    Continuing Security Interest; Assignment.........................................................40

Section 11.4    Termination; Release .........................................................................................40

Section 11.5   Modification in Writing .......................................................................40

Section 11.6   Notices .................................................................................................41

Section 11.7   Governing Law, Consent to Jurisdiction and Service of Process; Waiver of Jury Trial............................................................................................................41

Section 11.8   Severability of Provisions ....................................................................41

Section 11.9   Execution in Counterparts ...................................................................42

Section 11.10  Business Days .....................................................................................42

Section 11.11  No Credit for Payment of Taxes or Imposition.....................................42

Section 11.12  No Claims Against Collateral Agent ....................................................42

Section 11.13  No Release ..........................................................................................42

Section 11.14  Obligations Absolute ...........................................................................43

Section 11.15  Amalgamation ......................................................................................43

Section 11.16  Acknowledgment of Receipt................................................................44

Section 11.17  Disclosure ............................................................................................44

Section 11.18  Limitations Act .....................................................................................44

Section 11.19  English Language .................................................................................44

EXHIBIT 1
[FORM OF]
ISSUER'S ACKNOWLEDGMENT ...............................................................................48

EXHIBIT 2
[FORM OF]
SECURITIES PLEDGE AMENDMENT .........................................................................49

EXHIBIT 3
[FORM OF]
JOINDER AGREEMENT................................................................................................52

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CANADIAN SECURITY AGREEMENT

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CANADIAN SECURITY AGREEMENT dated as of [●], 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**") made by LIGADO NETWORKS CORP., a Nova Scotia unlimited liability company, LIGADO NETWORKS (CANADA) INC., an Ontario Corporation, LIGADO NETWORKS HOLDINGS (CANADA) INC., an Ontario corporation and the other Canadian Subsidiary Guarantors from to time to time party hereto, each as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (collectively, the "**Subsidiary Guarantors**"), as pledgors, assignors and debtors (in such capacities and together with any successors in such capacities, the "**Pledgors**", and each, a "**Pledgor**") in favour of U.S. Bank Trust Company, National Association, in its capacity as collateral agent, pledgee, assignee and secured party hereunder (in such capacities and together with any successors and assigns in such capacities, the "**Collateral Agent**").

## R E C I T A L S:

A.    Ligado Networks LLC (the "**Borrower**"), the Subsidiary Guarantors and the Collateral Agent have, in connection with the execution and delivery of this Agreement, entered into that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of [●], 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**").

B.    To supplement the DIP Orders and DIP Recognition Orders without in any way diminishing or limiting the effect of the DIP Orders and DIP Recognition Orders or the grant of security interest in the Pledged Collateral, the parties hereto desire to more fully set forth their respective rights in connection with such grant of security interest in the Pledged Collateral and First Priority Liens as set forth herein.

C.    Each Subsidiary Guarantor has, pursuant to the Credit Agreement, unconditionally guaranteed the Secured Obligations.

D.    Each Subsidiary Guarantor will receive substantial benefits from the execution, delivery and performance of the obligations under the Credit Agreement and the other Loan Documents and each is, therefore, willing to enter into this Agreement in order to induce the Lenders to make, or be deemed to make, the Loans pursuant to the Credit Agreement.

E.    This Agreement is given by each Pledgor in favour of the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of all of the Secured Obligations.

1397-8864-3601.10

- 6 -

F.      It is a condition to the obligations of the Lenders to make or be deemed to make the Loans under the Credit Agreement that each Pledgor execute and deliver the applicable Loan Documents, including this Agreement.

G.      The execution, delivery and performance of this Agreement and the grant of a security interest, pledge and Lien on all of the Pledged Collateral (as hereinafter defined) of the Pledgors and the proceeds thereof to secure the Obligations have been authorized pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code by the Interim DIP Order and the DIP Recognition Orders.

H.      To supplement the DIP Orders and DIP Recognition Orders without in any way diminishing or limiting the effect of the DIP Orders and DIP Recognition Orders or the security interest, pledge and Lien granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interest, pledge and Lien as set forth herein, in each case in accordance with the DIP Orders and DIP Recognition Orders in all respects and any applicable rights and protections that the Pledgors may have under the Bankruptcy Code.

A G R E E M E N T:

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Pledgor and the Collateral Agent hereby agree as follows:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**Section 1.1    Definitions**

(a)     Unless otherwise defined herein or in the Credit Agreement, capitalized terms used herein the uncapitalized forms of which are defined in the PPSA shall have the meanings assigned to the uncapitalized forms of them in the PPSA; provided that in any event, the following terms shall have the meanings assigned to the uncapitalized forms of them in the PPSA:

"Account"; "Chattel Paper"; "Consumer Goods"; "Documents of Title"; "Electronic Chattel Paper"; "Equipment"; "Financial Asset"; "Futures Account"; "Futures Contract"; "Futures Intermediary"; "Goods"; "Inventory"; "Money"; "Proceeds"; "Securities Account"; "Securities Intermediary"; "Security Entitlement"; and "Tangible Chattel Paper";.

(b)     The following terms shall have the following meanings:

"Account Control Agreements" shall mean agreements substantially in forms that are reasonably satisfactory to the Collateral Agent and the Required Lenders establishing the Collateral Agent's Control with respect to any Futures Account or Securities Account, as applicable.

"Account Debtor" shall mean each person who is obligated on a Receivable.

"Agreement" shall have the meaning assigned to such term in the Preamble hereof.

"Borrower" shall have the meaning assigned to such term in the Preamble hereof.

"Collateral Agent" shall have the meaning assigned to such term in the Preamble hereof.

"Collateral Support" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Pledged Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Communications Licences" shall mean all authorizations, licences, permits, certificates, approvals, registrations and franchises and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, ISED and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"Contracts" shall mean, collectively, with respect to each Pledgor, all sale, service, performance, equipment or property lease contracts, agreements and grants and all other contracts, agreements or grants (in each case, whether written or oral, or third party or intercompany), between such Pledgor and any third party, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof.

"Control" shall mean "control" as such term is defined in Section 1(2) of the *Personal Property Security Act* (Ontario).

"Copyrights" shall mean, collectively, with respect to each Pledgor, all copyrights (whether statutory or common law, whether established or registered in Canada or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications made by such Pledgor, in each case, whether now owned or hereafter created or acquired by or assigned to such Pledgor, together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of such copyrights, (ii) renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Credit Agreement" shall have the meaning assigned to such term in Recital A hereof.

"Deposit Accounts" shall mean, collectively, with respect to each Pledgor, (i) all deposit, savings, chequing, current and other accounts maintained by a Pledgor with a bank, trust company, credit union or other financial institution and in any event shall include all accounts and sub-accounts relating to any of the foregoing accounts and (ii) all cash, funds, cheques, notes

and instruments from time to time on deposit in any of the accounts or sub-accounts described in clause (i) of this definition.

"Designs" shall mean, collectively, with respect to any Pledgor, all industrial designs and (whether statutory or common law, whether established or registered in Canada or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all registrations thereof and applications therefor in each case, whether now owned or hereafter created or acquired by or assigned to such Pledgor, together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of such industrial designs, (ii) renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Distributions" shall mean, collectively, with respect to each Pledgor, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Pledged Securities, from time to time received, receivable or otherwise distributed to such Pledgor in respect of or in exchange for any or all of the Pledged Securities or Intercompany Notes.

"Excluded Property" shall have the meaning assigned to such term in the Credit Agreement.

"Fixtures" means, with respect to any Pledgor, goods of such Pledgor which have been affixed to real or immoveable property to such an extent that it is regarded under applicable law as part of that real or immoveable property.

"Futures Account Control Agreement" shall mean a control agreement in a form that is reasonably satisfactory to the Collateral Agent and the Required Lenders establishing the Collateral Agent's Control with respect to any Futures Account.

"Goodwill" shall mean, collectively, with respect to each Pledgor, the goodwill connected with such Pledgor's business including all goodwill connected with (i) the use of and symbolized by any Trademark or Intellectual Property Licence with respect to any Trademark in which such Pledgor has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill and (iii) all product lines of such Pledgor's business.

"Instruments" shall mean, collectively with respect to each Pledgor, all "instruments", as such term is defined in the PPSA, and shall include all promissory notes, drafts and bills of exchange or acceptances.

"Intangibles" shall mean, collectively, with respect to each Pledgor, all "intangibles", as such term is defined in the PPSA, of such Pledgor and, in any event, shall include (i) all of such Pledgor's rights, title and interest in, to and under all Contracts and insurance policies (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract), (ii) all know-how and warranties relating to any of the Pledged Collateral or the Mortgaged Property, (iii) any and all other rights, claims, choses-in-action and causes of action of such Pledgor against any other person and the benefits of any and all collateral or other security given by any other person in connection therewith, (iv) all guarantees, endorsements and indemnifications on, or of, any of the Pledged Collateral or any of the Mortgaged Property, (v) all lists, books, records, correspondence, ledgers, printouts, files (whether in printed form or stored electronically), tapes and other papers or materials containing information relating to any of the Pledged Collateral or any of the Mortgaged Property, including all customer or tenant lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, appraisals, recorded knowledge, surveys, studies, engineering reports, test reports, manuals, standards, processing standards, performance standards, catalogs, research data, computer and automatic machinery software and programs and the like, field repair data, accounting information pertaining to such Pledgor's operations or any of the Pledged Collateral or any of the Mortgaged Property and all media in which or on which any of the information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data, (vi) all licences, consents, permits, variances, certifications, authorizations and approvals, however characterized, now or hereafter acquired or held by such Pledgor, including building permits, certificates of occupancy, environmental certificates, industrial permits or licences and certificates of operation, (vii) all rights to reserves, deferred payments, deposits, refunds, indemnification of claims and claims for tax or other refunds against any Governmental Authority and (viii) any Equity Interests in other persons that do not constitute Investment Property.

"Intellectual Property Collateral" shall mean, collectively, the Patents, Trademarks, Copyrights, Designs, Intellectual Property Licences and Goodwill.

"Intellectual Property Licences" shall mean, collectively, with respect to each Pledgor, all licence and distribution agreements with, and covenants not to sue, any other party with respect to any Patent, Trademark, Copyright or Design or any other patent, trademark, copyright or industrial design, whether such Pledgor is a licensor or licensee, distributor or distributee under any such licence or distribution agreement, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) rights to receive income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements or violations thereof, (iii) rights to sue for past, present and future infringements or violations thereof and (iv) other

rights to use, exploit or practice any or all of the Patents, Trademarks, Copyrights or Designs or any other patent, trademark, copyright or industrial design.

"Intercompany Notes" shall mean, with respect to each Pledgor, all intercompany notes described in Schedule 10 to the Perfection Certificate and intercompany notes hereafter acquired by such Pledgor and all certificates, instruments or agreements evidencing such intercompany notes, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof to the extent permitted pursuant to the terms hereof.

"Investment Property" shall mean a security, whether certificated or uncertificated, Security Entitlement, Securities Account, Futures Contract or Futures Account, excluding, however, the Securities Collateral.

"Joinder Agreement" shall mean an agreement substantially in the form of Exhibit 3 hereto.

"Material Intellectual Property Collateral" shall mean any Intellectual Property Collateral that is material (i) to the use and operation of the Pledged Collateral or Mortgaged Property or (ii) to the business, results of operations, prospects or condition, financial or otherwise, of any Pledgor.

"Mortgaged Property" shall have the meaning assigned to such term in the Mortgages (if any).  As of the Interim DIP Order Entry Date, there are no Mortgages.

"Patents" shall mean, collectively, with respect to each Pledgor, all patents issued or assigned to, and all patent applications and registrations made by, such Pledgor (whether registered or recorded in Canada or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Perfection Certificate" shall mean that certain perfection certificate dated as of the date hereof, executed and delivered on the Interim DIP Order Entry Date by each Pledgor in favour of the Collateral Agent for the benefit of the Secured Parties, and each other Perfection Certificate (which shall be in form and substance reasonably acceptable to the Collateral Agent) executed and delivered by the applicable Pledgor in favour of the Collateral Agent for the benefit of the Secured Parties contemporaneously with the execution and delivery of each Joinder Agreement executed in accordance with Section 3.5 hereof, in each case, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the Credit Agreement or upon the request of the Collateral Agent.

"Pledge Amendment" shall have the meaning assigned to such term in Section 5.1 hereof.

"Pledge Issuer" shall mean "Issuer" as defined in the STA.

"Pledged Collateral" shall have the meaning assigned to such term in Section 2.1 hereof.

"Pledged Securities" shall mean, collectively, with respect to each Pledgor, (i) all issued and outstanding Equity Interests of each Pledge Issuer set forth on Schedules 9(a) and 9(b) to the Perfection Certificate as being owned by such Pledgor and all options, warrants, rights, agreements and additional Equity Interests of whatever class of any such Pledge Issuer acquired by such Pledgor (including by issuance), together with all rights, privileges, authority and powers of such Pledgor relating to such Equity Interests in each such Pledge Issuer or under any Organizational Document of each such Pledge Issuer, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such Equity Interests, (ii) all Equity Interests of any Pledge Issuer, which Equity Interests are hereafter acquired by such Pledgor (including by issuance) and all options, warrants, rights, agreements and additional Equity Interests of whatever class of any such Pledge Issuer acquired by such Pledgor (including by issuance), together with all rights, privileges, authority and powers of such Pledgor relating to such Equity Interests or under any Organizational Document of any such Pledge Issuer, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such Equity Interests, from time to time acquired by such Pledgor in any manner, and (iii) all Equity Interests issued in respect of the Equity Interests referred to in clause (i) or (ii) upon any consolidation, amalgamation or merger of any Pledge Issuer of such Equity Interests.

"Pledgor" shall have the meaning assigned to such term in the Preamble hereof.

"PPSA" means the *Personal Property Security Act* in effect from time to time in the Province of Ontario; provided that, at any time, if by reason of mandatory provisions of law, any or all of the validity, perfection or priority of the Collateral Agent's security interest in any item or portion of the Pledged Collateral is governed by the Personal Property Security Act as in effect in a Canadian jurisdiction other than the Province of Ontario, the term "PPSA" shall mean the Personal Property Security Act as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such validity, perfection or priority and for purposes of definitions relating to such provisions.

"Receivables" shall mean all (i) Accounts, (ii) Chattel Paper, (iii) payment obligations comprised in Intangibles, (iv) Instruments and (v) all other rights to payment, whether or not earned by performance, for goods or other property sold, leased, licenced, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the PPSA together with all of Pledgors' rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support related thereto and all Records relating thereto.

"Receiver" means any interim receiver, receiver or receiver and manager for the Pledged Collateral or any of the business, undertakings, property and assets of any Pledgor appointed by

the Collateral Agent pursuant to this Security Agreement or by a court on application by the Collateral Agent.

"Secured Obligations" shall mean the "Obligations" (as defined in the Credit Agreement).

"Secured Parties" shall have the meaning assigned to such term in the Credit Agreement.

"Securities Act" means the Securities Act in effect from time to time in the Province of Ontario.

"Securities Collateral" shall mean, collectively, the Pledged Securities, the Intercompany Notes and the Distributions.

"STA" means the *Securities Transfer Act, 2006* (Ontario) as in effect from time to time; provided that, at any time, if by reason of mandatory provisions of law, any or all of the validity, perfection or priority of the Collateral Agent's security interest in any item or portion of the Pledged Collateral is governed by the Personal Property Security Act as in effect in a Canadian jurisdiction other than the Province of Ontario and such jurisdiction has enacted a Securities Transfer Act which is in force, the term "STA" shall mean the Securities Transfer Act as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such validity, perfection or priority and for purposes of definitions relating to such provisions.

"Subsidiary Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Trademarks" shall mean, collectively, with respect to each Pledgor, all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locations (URL's), domain names, corporate names and trade names, whether registered or unregistered, owned by or assigned to such Pledgor and all registrations and applications for the foregoing (whether statutory or common law and whether established or registered in Canada or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

"ULC" shall mean an issuer that is an unlimited company or unlimited liability company.

"ULC Laws" shall mean the *Companies Act* (Nova Scotia), the *Business Corporations Act* (Alberta), the *Business Corporations Act* (British Columbia), and any other present or future laws governing ULCs.

"ULC Shares" shall mean shares or other equity interests in the capital stock of a ULC.

### Section 1.2    Interpretation

The rules of interpretation specified in the Credit Agreement (including Section 1.02 thereof) shall be applicable to this Agreement.

### Section 1.3    Resolution of Drafting Ambiguities

Each Pledgor acknowledges and agrees that it was represented by counsel in connection with the execution and delivery hereof, that it and its counsel reviewed and participated in the preparation and negotiation hereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof.

### Section 1.4    Perfection Certificate

The Collateral Agent and each Secured Party agree that the Perfection Certificate and all descriptions of Pledged Collateral, schedules, amendments and supplements thereto are and shall at all times remain a part of this Agreement.

## ARTICLE II
## GRANT OF SECURITY AND SECURED OBLIGATIONS

### Section 2.1    Grant of Security Interest

As collateral security for the payment and performance in full of all the Secured Obligations, subject to the terms of the DIP Orders and DIP Recognition Orders, each Pledgor hereby collaterally assigns, mortgages, charges, hypothecates, pledges and grants to the Collateral Agent for the benefit of the Secured Parties, a continuing First Priority lien on and security interest in all of the right, title and interest of such Pledgor in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time including any such property in which a First Priority Lien is granted to the Collateral Agent pursuant to, as applicable, the Security Documents, the DIP Orders, the DIP Recognition Orders or any other order of the Bankruptcy Court or CCAA Court to secure the Obligations (collectively, the "Pledged Collateral"):

      (i)      all Accounts;

      (ii)      all Equipment, Goods, Inventory and Fixtures including, without limitation, each satellite owned by or leased to any Pledgor and all ground segment equipment for the tracking, telemetry, control and/or monitoring of any satellite;

      (iii)      all Documents of Title, Instruments and Chattel Paper;

      (iv)      all Securities Collateral;

      (v)      all Investment Property and Financial Assets;

(vi)     all Intellectual Property Collateral;

(vii)    all Intangibles;

(viii)   all Money and all Deposit Accounts;

(ix)     all Material Leases;

(x)      all books and records relating to the Pledged Collateral;

(xi)     all present and future claims, rights, interests, assets and properties recovered by or on behalf of Pledgors or any trustee of any Pledgor (whether in the Chapter 11 Cases or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all such property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to, inter alia, Sections 542, 544, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code, in each case, subject to the terms of the DIP Orders;

(xii)    all rights of such Pledgor under or relating to all Communications Licences and the proceeds of any Communications Licences; *provided* that such security interest does not include at any time any Communications Licences to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest therein pursuant to the terms of such Communications Licences or any Requirement of Law applicable thereto, but such security interest does include, to the maximum extent permitted by law, all rights incident or appurtenant to the Communications Licences and the right to receive all proceeds derived from or in connection with the sale, lease, assignment, transfer or other disposition of the Communications Licences;

(xiii)   all Proceeds, substitutions or replacements of any Excluded Property, unless such Proceeds, substitutions or replacements would constitute Excluded Property, including (i) the Proceeds and the rights to receive the Proceeds of all Communications Licences and (ii) both the Communications Licences and all of Pledgors' other rights with respect to each Communications Licence, in each case, to the maximum extent permitted by Requirements of Law at any time;

(xiv)    to the extent not covered by clauses (i) through (xiii) of this sentence, all other personal property of such Pledgor, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all Proceeds of any insurance, indemnity,

warranty or guaranty payable to such Pledgor from time to time with respect to any of the foregoing;

(xv)    to the extent not covered by clauses (i) through (xiv) of this sentence, all DIP Collateral (as defined in the DIP Orders).

Each of the Pledgors acknowledges that (i) value has been given, (ii) it has rights in the Pledged Collateral (other than, until acquired, after-acquired Pledged Collateral), and (iii) it has not agreed to postpone the time of attachment of the Liens and security interests granted herein.

Notwithstanding anything to the contrary contained in clauses (i) through (xiii) above, the security interest created by this Agreement shall not extend to, and the term "Pledged Collateral" shall not include, any Excluded Property and (i) the Pledgors shall from time to time at the request of the Collateral Agent give written notice to the Collateral Agent identifying in reasonable detail the Excluded Property and shall provide to the Collateral Agent such other information regarding the Excluded Property as the Collateral Agent may reasonably request and (ii) from and after the Interim DIP Order Entry Date, no Pledgor shall permit to become effective in any Material Contract a provision that would prohibit the creation of a First Priority Lien on such Material Contract in favour of the Collateral Agent unless the Collateral Agent determines, in its reasonable judgment, that such prohibition is usual and customary in transactions of such type.

For the avoidance of doubt the First Priority Liens and security interests granted herein are granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or transfer or in any way affect or modify, any obligation or liability of any Pledgor with respect to any of the Pledged Collateral or any transaction in connection therewith.

**Section 2.2    Filings**

(a)    Each Pledgor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings) and financing change statements that contain the information required by the PPSA of each applicable jurisdiction for the filing of any financing statement or financing change statement relating to the Pledged Collateral, including (i) any financing or financing change statements or other documents without the signature of such Pledgor where permitted by law, including the filing of a financing statement describing or having the effect of describing the Pledged Collateral as "all assets now owned or hereafter acquired by the Pledgor or in which Pledgor otherwise has rights" or "all present and after-acquired personal property" and (ii) in the case of a financing statement filed as a fixture filing or covering Pledged Collateral constituting minerals or the like to be extracted or timber to be cut, a sufficient description of the real property to which such Pledged Collateral relates.   Each Pledgor agrees to provide all information described in the immediately preceding sentence to the Collateral Agent promptly upon request by the Collateral Agent.   Notwithstanding the foregoing, in no event

shall the Collateral Agent  have any responsibility for filing any financing statement or financing change statement.

(b)      Each Pledgor hereby ratifies its authorization for the Collateral Agent to file in any relevant jurisdiction any financing statements relating to the Pledged Collateral if filed prior to the date hereof.

(c)      It is the intention of the parties that if the Collateral Agent shall fail to have a perfected DIP Lien in any particular property or assets of any Pledgor for any reason whatsoever, the provisions of this Agreement and/or of the other Loan Security Documents, together with all financing statements and other public filings relating to Liens filed or recorded by the Collateral Agent against the Pledgors and, with respect to all Pledgors the DIP Orders, the DIP Recognition Orders and any other order entered by the Bankruptcy Court or CCAA Court to secure the Secured Obligations, would be sufficient to create a perfected DIP Lien in any property or assets that such Pledgor may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the Pledged Collateral.

**ARTICLE III**
**PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;**
**USE OF PLEDGED COLLATERAL**

**Section 3.1    Delivery of Certificated Securities Collateral**

Each Pledgor represents and warrants that all certificates, agreements or instruments representing or evidencing Securities Collateral constituting a "certificated security" under the PPSA that are in existence on the date hereof have been delivered to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank and that the Collateral Agent has a perfected First Priority security interest therein.  Each Pledgor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral constituting a "certificated security" under the PPSA acquired by such Pledgor after the date hereof shall promptly (but in any event within ten (10) days after receipt thereof by such Pledgor) be delivered to and held by or on behalf of the Collateral Agent pursuant hereto. All certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Collateral Agent. The Collateral Agent, acting at the direction of the Required Lenders shall have the right, at any time upon the occurrence and during the continuance of any Event of Default, to endorse, assign or otherwise transfer to or to register in the name of the Collateral Agent  or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder. In addition, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent, acting at the direction of the Required Lenders, shall have

the right at any time to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations.

### Section 3.2    Perfection of Uncertificated Securities Collateral

Each Pledgor represents and warrants that the Collateral Agent has a perfected First Priority security interest in all uncertificated Pledged Securities pledged by it hereunder that are in existence on the date hereof (whether or not constituting an "uncertificated security" under the PPSA).  Each Pledgor hereby agrees that if any of the Pledged Securities are at any time not evidenced by certificates of ownership but constitute an "uncertificated security" under the PPSA, then each applicable Pledgor shall, to the extent permitted by applicable law, (i) cause the issuer to execute and deliver to the Collateral Agent an acknowledgment of the pledge of such Pledged Securities substantially in the form of Exhibit 1 hereto or such other form that is reasonably satisfactory to the Collateral Agent, (ii) if necessary or desirable to perfect a security interest in such Pledged Securities, cause such pledge to be recorded on the equityholder register or the books of the issuer, execute any customary pledge forms or other documents necessary or appropriate to complete the pledge and give the Collateral Agent the right to transfer such Pledged Securities under the terms hereof and (iii) after the occurrence and during the continuance of any Event of Default, upon request by the Collateral Agent, acting at the direction of the Required Lenders, (A) cause the Organizational Documents of each such issuer that is a Subsidiary of a Pledgor to be amended to provide that such Pledged Securities shall be treated as "securities" for purposes of the STA and (B) cause such Pledged Securities to become certificated and delivered to the Collateral Agent in accordance with the provisions of Section 3.1.

### Section 3.3    Financing Statements and Other Filings; Maintenance of Perfected Security Interest

Each Pledgor represents and warrants that all financing statements, agreements, instruments and other documents necessary to perfect the security interest granted by it to the Collateral Agent in respect of the Pledged Collateral have been delivered to the Collateral Agent and filed by the Pledgor (or its designee) in each governmental, municipal or other office specified in Schedule 6 to the Perfection Certificate. Each Pledgor agrees that at the sole cost and expense of the Pledgors, such Pledgor will maintain the security interest created by this Agreement in the Pledged Collateral as a perfected First Priority security interest subject to Permitted Liens, except to the extent such security interest is not perfected pursuant to minimum thresholds provided for in Section 3.4 and such security interest cannot be perfected by filing of financing statements.

### Section 3.4    Other Actions

In order to further ensure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Collateral Agent's security interest in the Pledged Collateral, each Pledgor represents and warrants (as to itself) as follows and agrees, in each case subject to and in accordance with the terms of the DIP Orders and DIP Recognition Orders, in each case at such Pledgor's own expense, to take the following actions with respect to the following Pledged Collateral:

- 18 -

(a) <u>Instruments and Tangible Chattel Paper</u>.  As of the date hereof, no amounts payable under or in connection with any of the Pledged Collateral are evidenced by any Instrument or Tangible Chattel Paper other than such Instruments and Tangible Chattel Paper listed in <u>Schedule 10</u> to the Perfection Certificate.  Each Instrument and each item of Tangible Chattel Paper listed in <u>Schedule 10</u> to the Perfection Certificate has been properly endorsed, assigned and delivered to the Collateral Agent, accompanied by instruments of transfer or assignment duly executed in blank.  If any amount then payable under or in connection with any of the Pledged Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, and such amount, together with all amounts payable evidenced by any Instrument or Tangible Chattel Paper not previously delivered to the Collateral Agent exceeds $250,000 in the aggregate for all Pledgors, the Pledgor acquiring such Instrument or Tangible Chattel Paper shall promptly (but in any event within ten (10) days after receipt thereof) endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time specify.

(b) <u>Deposit Accounts</u>.  As of the date hereof, no Pledgor has any Deposit Accounts other than the accounts listed in <u>Schedule 13</u> to the Perfection Certificate.  No Pledgor shall hereafter establish and maintain any Deposit Account unless (1) it shall have given the Collateral Agent ten (10) days' prior written notice of its intention to establish such new Deposit Account with a Bank and (2) such Bank shall be reasonably acceptable to the Collateral Agent and the Required Lenders.

(c) <u>Securities Accounts and Futures Accounts</u>.  As of the date hereof, no Pledgor has any Securities Accounts or Futures Accounts other than those listed in <u>Schedule 13</u> to the Perfection Certificate.  No Pledgor shall hereafter establish and maintain any Securities Account or Futures Account with any Securities Intermediary or Futures Intermediary unless (1) it shall have given the Collateral Agent ten days' prior written notice of its intention to establish such new Securities Account or Futures Account with such Securities Intermediary or Futures Intermediary and (2) such Securities Intermediary or Futures Intermediary shall be reasonably acceptable to the Collateral Agent and the Required Lenders.  Each Pledgor shall accept any cash and Investment Property in trust for the benefit of the Collateral Agent.

(d) <u>Electronic Chattel Paper</u>.  As of the date hereof, no amount under or in connection with any of the Pledged Collateral is evidenced by any Electronic Chattel Paper other than such Electronic Chattel Paper listed in Schedule 10 to the Perfection Certificate.  If any amount payable under or in connection with any of the Pledged Collateral shall be evidenced by any Electronic Chattel Paper, the Pledgor acquiring such Electronic Chattel Paper shall promptly notify the Collateral Agent thereof and shall take such action as the Collateral Agent may reasonably request to vest in the Collateral Agent Control of such Electronic Chattel Paper. The requirement in the preceding sentence shall not apply to the extent that such

amount, together with all amounts payable evidenced by Electronic Chattel Paper does not exceed $250,000 in the aggregate for all Pledgors.  The Collateral Agent agrees with such Pledgor that the Collateral Agent will arrange, pursuant to procedures satisfactory to the Collateral Agent and so long as such procedures will not result in the Collateral Agent's loss of Control, for the Pledgor to make alterations to the Electronic Chattel Paper, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by such Pledgor with respect to such Electronic Chattel Paper.

(e)     Investment Risk.  As between the Collateral Agent  and the Pledgors, the Pledgors shall bear the investment risk with respect to the Investment Property and Pledged Securities, and the risk of loss of, damage to, or the destruction of the Investment Property and Pledged Securities, whether in the possession of, or maintained as a Security Entitlement or deposit by, or subject to the Control of, the Collateral Agent , a Securities Intermediary, a Futures Intermediary, any Pledgor or any other person

(f)     Communications Licences.  Each Pledgor agrees that, in the event of any change in law occurring after the date hereof that affects in any manner the Collateral Agent's rights with respect to the Communications Licences or related to the Collateral Agent obtaining or enforcing such rights, each Pledgor shall amend this Agreement and the other Loan Documents to provide the Secured Parties with such rights to the greatest extent possible consistent with then-applicable Law.  No Pledgor shall permit, or take any action that would permit, any person to have a First Priority Lien on any Communications Licence or in or upon any of the rights appurtenant thereto (including but not limited to the rights of access, use or sale or the right to receive money, consideration or proceeds from any sale or transfer of any Communications Licence) that is superior to that of the Collateral Agent and the Secured Parties, regardless of whether applicable law permits the Collateral Agent or the Lenders to hold such a Lien.

(g)     [Reserved].

(h)     [Reserved].

**Section 3.5     Joinder of Additional Guarantors**

The Pledgors shall cause each Subsidiary of the Borrower over which they have Control which, from time to time, after the date hereof shall be required to pledge any assets to the Collateral Agent for the benefit of the Secured Parties pursuant to the provisions of the Credit Agreement, to execute and deliver to the Collateral Agent (i) a Joinder Agreement substantially in the form of Exhibit 3 hereto and (ii) a Perfection Certificate, in each case, within ten (10) days of the date on which it was acquired or created, and upon such execution and delivery, such Subsidiary shall constitute a "Guarantor" and a "Pledgor" for all purposes hereunder with the same force and effect as if originally named as a Guarantor and Pledgor herein.  The execution

and delivery of such Joinder Agreement shall not require the consent of any Pledgor hereunder. The rights and obligations of each Pledgor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor and Pledgor as a party to this Agreement.

**Section 3.6    Supplements; Further Assurances**

Each Pledgor shall take such further actions, and execute and/or deliver to the Collateral Agent such additional financing statements, financing change statements, amendments, assignments, agreements, supplements, powers and instruments, as may be necessary or as the Collateral Agent and/or the Required Lenders, as applicable, shall request in order to create, perfect, preserve and protect the security interest in the Pledged Collateral as provided herein and the rights and interests granted to the Collateral Agent hereunder, to carry into effect the purposes hereof or better to assure and confirm the validity, enforceability and priority of the Collateral Agent's security interest in the Pledged Collateral or permit the Collateral Agent (acting at the direction of the Required Lenders) to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral, including the filing of financing statements, financing change statements and other documents (including this Agreement) under the PPSA in effect in any jurisdiction with respect to the security interest created hereby and the Cape Town Convention on Mobile Goods, all in form reasonably satisfactory to the Collateral Agent and in such offices (including the Canadian Intellectual Property Office) wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest in the Pledged Collateral as provided herein and to preserve the other rights and interests granted to the Collateral Agent hereunder, as against third parties, with respect to the Pledged Collateral. Without limiting the generality of the foregoing, each Pledgor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Collateral Agent  from time to time as necessary or upon reasonable request by the Collateral Agent and/or the Required Lenders, lists, schedules, descriptions and designations of the Pledged Collateral, copies of warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments.  If an Event of Default has occurred and is continuing, the Collateral Agent, acting at the direction of the Required Lenders, may institute and maintain, in its own name or in the name of any Pledgor, such suits and proceedings as the Collateral Agent and/or the Required Lenders may be advised by their respective counsel as being necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Pledged Collateral.  All of the foregoing shall be at the sole cost and expense of the Pledgors. Notwithstanding any failure on the part of any Pledgor, Secured Party or any other Person to take any action to perfect, maintain, protect or enforce the First Priority Liens and Security Interests in the Pledged Collateral granted hereunder, the DIP Orders and DIP Recognition Orders shall automatically and without further action by any Person, perfect such Liens and Security Interests against the Pledged Collateral.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Pledgor represents, warrants and covenants as follows:

### Section 4.1    Title

Subject to the DIP Orders and DIP Recognition Orders, except for the security interest granted to the Collateral Agent for the benefit of the Secured Parties pursuant to this Agreement and Permitted Liens, such Pledgor owns and has rights and, as to Pledged Collateral acquired by it from time to time after the date hereof, will own and have rights in each item of Pledged Collateral pledged by it hereunder, free and clear of any and all Liens or claims of others.  In addition, no Liens or claims exist on the Securities Collateral, other than as permitted by clauses (6), (8), (9) and (12) of the defined term "Permitted Liens" in the Credit Agreement.

### Section 4.2    Validity of Security Interest

Subject to the DIP Orders and DIP Recognition Orders, the security interest in and First Priority Lien on the Pledged Collateral granted to the Collateral Agent for the benefit of the Secured Parties hereunder constitutes (a) a legal, valid, enforceable and continuing security interest in and First Priority Lien on all the Pledged Collateral securing the payment and performance of the Secured Obligations, and (b) an automatically perfected security interest in all the Pledged Collateral. Subject to the DIP Orders and DIP Recognition Orders, the Collateral Agent's security interest in the Pledged Collateral is and shall be a First Priority Lien on all of the Pledged Collateral subject to no other Liens other than Permitted Liens, the Administration Charge and the Carve-Out and pursuant to the terms of the DIP Orders and DIP Recognition Orders, no filing or other action will be necessary to perfect or protect such First Priority Liens and security interests.

### Section 4.3    Defence of Claims; Transferability of Pledged Collateral

Subject to Section 10.03 of the Credit Agreement and the DIP Orders and DIP Recognition Orders, each Pledgor shall, at its own cost and expense, defend title to the Pledged Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Collateral Agent and the priority thereof against all claims and demands of all persons, at its own cost and expense, at any time claiming any interest therein adverse to the Collateral Agent or any other Secured Party other than Permitted Liens.  Except with respect to Material Leases as set forth on the Perfection Certificate, there is no agreement, order, judgment or decree, and no Pledgor shall enter into any agreement or take any other action, that would restrict the transferability of any of the Pledged Collateral or otherwise impair or conflict with such Pledgor's obligations or the rights of the Collateral Agent hereunder.

### Section 4.4    Other Financing Statements

It has not filed, nor authorized any third party to file (nor will there be), any valid or effective financing statement (or similar statement, instrument of registration or public notice under the law

of any jurisdiction) covering or purporting to cover any interest of any kind in the Pledged Collateral, except such as have been filed in favour of the Collateral Agent pursuant to this Agreement or in favour of any holder of a Permitted Lien under Clauses (8), (9) or (14) of the defined term "Permitted Liens" in the Credit Agreement with respect to such Permitted Lien or financing statements or public notices relating to the termination statements or financing change statements listed on Schedule 8 to the Perfection Certificate.  Subject to the DIP Orders and DIP Recognition Orders, no Pledgor shall execute, authorize or permit to be filed in any public office any financing statement (or similar statement, instrument of registration or public notice under the law of any jurisdiction) relating to any Pledged Collateral, except financing statements and other statements and instruments filed or to be filed in respect of and covering the security interests granted by such Pledgor to the holder of the Permitted Liens.

### Section 4.5   Location of Inventory and Equipment.

Subject to the DIP Orders and DIP Recognition Orders, it shall not move any Equipment or Inventory that (A) constitutes Pledged Collateral and (B)  has an aggregate fair market value of greater than or equal to $100,000 other than to any other location that is listed in Schedules 2(a), (b) or (c) of the Perfection Certificate, unless it shall have given the Collateral Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate) of its intention to do so, clearly describing such new location and providing such other information in connection therewith as the Collateral Agent may request; provided that in no event shall any Equipment or Inventory be moved to any location outside of Canada or the continental United States.

### Section 4.6   Due Authorization and Issuance

All of the Pledged Securities existing on the date hereof have been, and to the extent any Pledged Securities are hereafter issued, such Pledged Securities will be, upon such issuance, duly authorized, validly issued and fully paid and non-assessable to the extent applicable.  There is no amount or other obligation owing by any Pledgor to any issuer of the Pledged Securities in exchange for or in connection with the issuance of the Pledged Securities or any Pledgor's status as a partner or a member of any issuer of the Pledged Securities.

### Section 4.7   Consents, etc.

In the event that the Collateral Agent (acting at the direction of the Required Lenders) desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other person therefor, other than the Bankruptcy Court, then, upon the reasonable request of the Collateral Agent, such Pledgor agrees, subject to the DIP Orders and DIP Recognition Orders, to use its best efforts to assist and aid the Collateral Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

### Section 4.8    Pledged Collateral

All information set forth herein, including the schedules hereto, and all information contained in any documents, schedules and lists heretofore delivered to any Secured Party, including the Perfection Certificate and the schedules thereto, in connection with this Agreement, in each case, relating to the Pledged Collateral, is accurate and complete in all material respects. The Pledged Collateral described on the schedules to the Perfection Certificate constitutes all of the property of such type of Pledged Collateral owned or held by the Pledgors.

### Section 4.9    Insurance

Subject to the DIP Orders and DIP Recognition Orders, in the event that the proceeds of any insurance claim are paid to any Pledgor after the Collateral Agent has exercised its right to foreclose after an Event of Default, such Net Cash Proceeds shall be held in trust for the benefit of the Collateral Agent and immediately after receipt thereof shall be paid to the Collateral Agent for application in accordance with the Credit Agreement.

### Section 4.10   Permitted Liens

Subject to the DIP Orders and DIP Recognition Orders, nothing herein or in the Credit Agreement (including the definition and use of the term "Permitted Liens") is intended or shall be deemed to subordinate the First Priority Liens and security interests granted herein to any Permitted Lien or any other Lien or security interests affecting all or any portion of the Collateral.

### Section 4.11   No Consumer Goods

Such Pledgor does not own any Consumer Goods which are material in value or which are material to the business, operations, property, condition or prospects (financial or otherwise) of such Pledgor.

## ARTICLE V
## CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

### Section 5.1    Pledge of Additional Securities Collateral

Subject to Section 5.11 and Section 5.12 of the Credit Agreement, and the DIP Orders and DIP Recognition Orders, each Pledgor shall, upon obtaining any Pledged Securities or Intercompany Notes of any person, accept the same in trust for the benefit of the Collateral Agent and promptly (but in any event within ten (10) days after receipt thereof) deliver to the Collateral Agent a pledge amendment, duly executed by such Pledgor, in substantially the form of Exhibit 2 hereto (each, a "Pledge Amendment"), and the certificates and other documents required under Section 3.1 and Section 3.2 hereof in respect of the additional Pledged Securities or Intercompany Notes which are to be pledged pursuant to this Agreement, and confirming the attachment of the First Priority Lien hereby created on and in respect of such additional Pledged Securities or Intercompany Notes.  Each Pledgor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Agreement and agrees that all Pledged Securities or Intercompany Notes

listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder be considered Pledged Collateral.

**Section 5.2    Voting Rights; Distributions; etc.**

In each of the below cases, subject to and in accordance with the DIP Orders, DIP Recognition Orders and any requirements, restrictions or limitations imposed by the Bankruptcy Court or otherwise under the Bankruptcy Code or CCAA:

(a)    So long as no Event of Default shall have occurred and be continuing:

(i)    Each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, or any DIP Orders, DIP Recognition Orders or the Credit Agreement; provided, however, that no Pledgor shall in any event exercise such rights in any manner which could reasonably be expected to have a Material Adverse Effect.

(ii)    Each Pledgor shall be entitled to receive and retain, and to utilize free and clear of the First Priority Lien hereof, any and all Distributions, but only if and to the extent made in accordance with the provisions of the Credit Agreement; provided, however, that any and all such Distributions consisting of rights or interests in the form of securities shall be forthwith delivered to the Collateral Agent  to hold as Pledged Collateral and shall, if received by any Pledgor, be received in trust for the benefit of the Collateral Agent, be segregated from the other property or funds of such Pledgor and be promptly (but in any event within ten (10) days after receipt thereof) delivered to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

(b)    So long as no Event of Default shall have occurred and be continuing, the Collateral Agent shall be deemed without further action or formality to have granted to each Pledgor all necessary consents relating to voting rights and shall, if necessary, upon written request of any Pledgor and at the sole cost and expense of the Pledgors, from time to time execute and deliver (or cause to be executed and delivered) to such Pledgor all such instruments as such Pledgor may reasonably request in order to permit such Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to Section 5.2(a)(i) hereof and to receive the Distributions which it is authorized to receive and retain pursuant to Section 5.2(a)(ii) hereof.

(c)    Upon the occurrence and during the continuance of any Event of Default:

(i)    All rights of each Pledgor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 5.2(a)(i)

Case 25-10006-TMH   Doc 4   Filed 01/06/25   Page 433 of 530
- 25 -

hereof shall immediately cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to exercise such voting and other consensual rights.

(ii)     All rights of each Pledgor to receive Distributions which it would otherwise be authorized to receive and retain pursuant to Section 5.2(a)(ii) hereof shall immediately cease and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to receive and hold as Pledged Collateral such Distributions.

The Collateral Agent shall endeavour to provide notice to the Pledgors of any cessation of rights as described in this Section 5.2(c) within a reasonable time after such cessation; provided, however, that failure of the Collateral Agent to furnish any such notice shall in no way impede the application of subclauses (i) and (ii) of this Section 5.2(c).

(d)     Each Pledgor shall, at its sole cost and expense, from time to time execute and deliver to the Collateral Agent appropriate instruments as the Collateral Agent may request in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise pursuant to Section 5.2(c)(i) hereof and to receive all Distributions which it may be entitled to receive under Section 5.2(c)(ii) hereof.

(e)     All Distributions which are received by any Pledgor contrary to the provisions of Section 5.2(a)(ii) hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of such Pledgor and shall immediately be paid over to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

**Section 5.3     Defaults, etc.**

Each Pledgor hereby represents and warrants that (i) such Pledgor is not in default in the payment of any portion of any mandatory capital contribution, if any, required to be made under any agreement to which such Pledgor is a party relating to the Pledged Securities pledged by it, and such Pledgor is not in violation of any other provisions of any such agreement to which such Pledgor is a party, or otherwise in default or violation thereunder, (ii) no Securities Collateral pledged by such Pledgor is subject to any defence, offset or counterclaim, nor have any of the foregoing been asserted or alleged against such Pledgor by any person with respect thereto, and (iii) as of the date hereof, there are no certificates, instruments, documents or other writings (other than the Organizational Documents and certificates representing such Pledged Securities that have been delivered to the Collateral Agent) which evidence any Pledged Securities of such Pledgor.

**Section 5.4    Certain Agreements of Pledgors as Pledge Issuers and Holders of Equity Interests**

(a)     In the case of each Pledgor which is a Pledge Issuer of Securities Collateral, such Pledgor agrees to be bound by the terms of this Agreement relating to the Securities Collateral issued by it and will comply with such terms insofar as such terms are applicable to it.

(b)     In the case of each Pledgor which is a partner, shareholder or member, as the case may be, in a partnership, limited liability company or other entity, such Pledgor hereby consents to the extent required by the applicable Organizational Document to the pledge by each other Pledgor, pursuant to the terms hereof, of the Pledged Securities in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default, to the transfer of such Pledged Securities to the Collateral Agent or its nominee and to the substitution of the Collateral Agent or its nominee as a substituted partner, shareholder or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner, limited partner, shareholder or member, as the case may be.

**Section 5.5    ULC**

Each Pledgor acknowledges that certain Pledged Securities may now or in the future consist of ULC Shares, and that it is the intention of the Collateral Agent and each Pledgor that the Collateral Agent should not under any circumstances prior to realization thereon be held to be a "member" or a "shareholder", as applicable, of a ULC for the purposes of any ULC Laws. Therefore, notwithstanding any provisions to the contrary contained in this Agreement, the Credit Agreement or any other Loan Document, where a Pledgor is the registered owner of ULC Shares that are Pledged Securities, such Pledgor will remain the sole registered owner of such ULC Shares until such time as such ULC Shares are effectively transferred into the name of the Collateral Agent or any other person on the books and records of the applicable ULC. Accordingly, such Pledgor shall be entitled to receive and retain for its own account any dividend on or other distribution, if any, in respect of such ULC Shares (other than any dividend or distribution comprised of additional ULC Shares of such issuer, which shall be delivered to the Collateral Agent to hold hereunder) and shall have the right to vote such ULC Shares and to control the direction, management and policies of the applicable ULC to the same extent as such Pledgor would if such ULC Shares were not pledged to the Collateral Agent hereunder.  Nothing in this Agreement, the Credit Agreement or any other Loan Document is intended to, and nothing in this Agreement, the Credit Agreement or any other Loan Document shall, constitute the Collateral Agent or any person other than such Pledgor as a member or shareholder of a ULC for the purposes of any ULC Laws (whether listed or unlisted, registered or beneficial), until, upon the occurrence and during the continuance of an Event of Default, further steps are taken pursuant hereto or thereto to register the Collateral Agent or such other person, as specified in such notice, as the holder of the ULC Shares.  To the extent any provision hereof would have the effect of constituting the Collateral Agent as a member or a shareholder, as applicable, of any ULC prior

to such time, such provision shall be severed herefrom and shall be ineffective with respect to ULC Shares that are Pledged Securities without otherwise invalidating or rendering unenforceable this Agreement or invalidating or rendering unenforceable such provision insofar as it relates to Pledged Securities that are not ULC Shares.  Except upon the exercise of rights of the Collateral Agent to sell, transfer or otherwise dispose of ULC Shares in accordance with this Agreement, such Pledgor shall not cause or permit, or enable an issuer that is a ULC to cause or permit, the Collateral Agent to: (a) be registered as a shareholder or member of such issuer; (b) have any notation entered in its favour in the share register of such issuer; (c) be held out as a shareholder or member of such issuer; (d) receive, directly or indirectly, any dividends, property or other distributions from such issuer by reason of the Collateral Agent holding a security interest in the ULC Shares; or (e) act as a shareholder of such issuer, or exercise any rights of a shareholder, including the right to attend a meeting of shareholders of such issuer or to vote the ULC Shares.

## ARTICLE VI
## CERTAIN PROVISIONS CONCERNING INTELLECTUAL
## PROPERTY COLLATERAL

### Section 6.1    Grant of Intellectual Property Licence

For the purpose of enabling the Collateral Agent, during the continuance of an Event of Default, to exercise rights and remedies under Article IX hereof at such time as the Collateral Agent  shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, subject to the DIP Orders and DIP Recognition Orders, each Pledgor hereby grants to the Collateral Agent, an irrevocable, non-exclusive licence to use, assign, license or sublicense any of the Intellectual Property Collateral of such Pledgor, wherever the same may be located.  Such licence shall include access to all media in which any of the licenced items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

### Section 6.2    Protection of Collateral Agent's Security

On a continuing basis, each Pledgor shall, subject to the DIP Orders and DIP Recognition Orders and at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Collateral Agent of any adverse determination in any proceeding or the institution of any proceeding in any federal, provincial or territorial court or administrative body or in the Canadian Intellectual Property Office regarding any Material Intellectual Property Collateral, including such Pledgor's right to register such Material Intellectual Property Collateral or its right to keep and maintain such registration in full force and effect, (ii) maintain all Material Intellectual Property Collateral, (iii) not permit to lapse or become abandoned any Material Intellectual Property Collateral, and not settle or compromise any pending or future litigation or administrative proceeding with respect to any such Material Intellectual Property Collateral, in either case except as shall be consistent with commercially reasonable business judgment, (iv) upon such Pledgor obtaining knowledge thereof, promptly notify the Collateral Agent in writing of any event which may be reasonably expected to materially and adversely affect the value or utility of any Material Intellectual Property Collateral or the rights and remedies of the Collateral Agent in relation thereto including a levy or threat of levy or any legal process against any Material Intellectual Property

- 28 -

Collateral, (v) not license any Intellectual Property Collateral other than non-exclusive licences entered into by such Pledgor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the Intellectual Property Licences in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of any Intellectual Property Collateral or the First Priority Lien on and security interest in the Intellectual Property Collateral created therein hereby, without the consent of the Collateral Agent, (vi) diligently keep adequate records respecting all Intellectual Property Collateral and (vii) furnish to the Collateral Agent from time to time upon the Collateral Agent's request therefor reasonably detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to any Intellectual Property Collateral as the Collateral Agent may from time to time request.

### Section 6.3    After-Acquired Property

If any Pledgor shall at any time after the date hereof (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, or if any trademark or intent to use trademark application is no longer Excluded Property, the provisions hereof shall automatically apply thereto and any such item enumerated in the preceding clause (i) or (ii) shall automatically constitute Intellectual Property Collateral as if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the First Priority Lien and security interest created by this Agreement without further action by any party.  Each Pledgor shall promptly provide to the Collateral Agent  written notice of any of the foregoing and confirm the attachment of the First Priority Lien and security interest created by this Agreement to any rights described in clauses (i) and (ii) above by execution of an instrument in form reasonably acceptable to the Collateral Agent and the filing of any instruments or statements as shall be reasonably necessary to create, preserve, protect or perfect the Collateral Agent's security interest in such Intellectual Property Collateral.  Further, each Pledgor authorizes the Collateral Agent to modify this Agreement by amending Schedules 11(a) and 11(b) to the Perfection Certificate to include any Intellectual Property Collateral of such Pledgor acquired or arising after the date hereof.

### Section 6.4    Litigation

Unless there shall occur and be continuing any Event of Default, each Pledgor shall have the right to commence and prosecute in its own name, as the party in interest, for its own benefit and at the sole cost and expense of the Pledgors, such applications for protection of the Intellectual Property Collateral and suits, proceedings or other actions to prevent the infringement, counterfeiting, unfair competition, misappropriation, dilution, diminution in value or other damage as are necessary to protect the Intellectual Property Collateral.  Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall have the right, but shall in no way be obligated to file and prosecute applications for protection of the Intellectual Property Collateral and/or bring suit in the name of any Pledgor, the Collateral Agent or the Secured Parties

to enforce the Intellectual Property Collateral and any Intellectual Property Licence thereunder. In the event of such suit, each Pledgor shall, at the reasonable request of the Collateral Agent, do any and all lawful acts and execute any and all documents requested by the Collateral Agent in aid of such enforcement and the Pledgors shall promptly reimburse and indemnify the Collateral Agent for all costs and expenses incurred by the Collateral Agent in the exercise of its rights under this Section 6.4. In the event that the Collateral Agent shall elect not to bring suit to enforce the Intellectual Property Collateral, each Pledgor agrees, at the reasonable request of the Collateral Agent, to take all commercially reasonable actions necessary, whether by suit, proceeding or other action, to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value of or other damage to any of the Intellectual Property Collateral by any person.

## ARTICLE VII
## CERTAIN PROVISIONS CONCERNING RECEIVABLES

### Section 7.1    Maintenance of Records

Each Pledgor shall keep and maintain at its own cost and expense complete records of each Receivable, in a manner consistent with prudent business practice, including records of all payments received, all credits granted thereon, all merchandise returned and all other documentation relating thereto.  Each Pledgor shall, at such Pledgor's sole cost and expense, upon the Collateral Agent's demand made at any time after the occurrence and during the continuance of any Event of Default, deliver all tangible evidence of Receivables, including all documents evidencing Receivables and any books and records relating thereto to the Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Pledgor).  Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent may transfer a full and complete copy of any Pledgor's books, records, credit information, reports, memoranda and all other writings relating to the Receivables to and for the use by any person that has acquired or is contemplating acquisition of an interest in the Receivables or the Collateral Agent's security interest therein without the consent of any Pledgor.

### Section 7.2    Legend

Each Pledgor shall legend, at the request of the Collateral Agent and in form and manner satisfactory to the Collateral Agent, the Receivables (to the extent capable of having such legend) and the other books, records and documents of such Pledgor evidencing or pertaining to the Receivables with an appropriate reference to the fact that the Receivables have been assigned to the Collateral Agent for the benefit of the Secured Parties and that the Collateral Agent has a security interest therein.

### Section 7.3    Modification of Terms, etc.

No Pledgor shall rescind or cancel any obligations evidenced by any Receivable or modify any term thereof or make any adjustment with respect thereto except in the ordinary course of business consistent with prudent business practice, or extend or renew any such obligations except in the ordinary course of business consistent with prudent business practice or

compromise or settle any dispute, claim, suit or legal proceeding relating thereto or sell any Receivable or interest therein except in the ordinary course of business consistent with prudent business practice without the prior written consent of the Collateral Agent . Each Pledgor shall timely fulfill all obligations on its part to be fulfilled under or in connection with the Receivables.

### Section 7.4    Collection

Each Pledgor shall cause to be collected from the Account Debtor of each of the Receivables, as and when due in the ordinary course of business and consistent with prudent business practice (including Receivables that are delinquent, such Receivables to be collected in accordance with generally accepted commercial collection procedures), any and all amounts owing under or on account of such Receivable, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Receivable, except that any Pledgor may, with respect to a Receivable, allow in the ordinary course of business (i) a refund or credit due as a result of returned or damaged or defective merchandise and (ii) such extensions of time to pay amounts due in respect of Receivables and such other modifications of payment terms or settlements in respect of Receivables as shall be commercially reasonable in the circumstances, all in accordance with such Pledgor's ordinary course of business consistent with its collection practices as in effect from time to time.  The costs and expenses (including legal fees) of collection, in any case, whether incurred by any Pledgor, the Collateral Agent or any Secured Party, shall be paid by the Pledgors.

### ARTICLE VIII
### TRANSFERS

### Section 8.1    Transfers of Pledged Collateral

No Pledgor shall sell, convey, assign or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral pledged by it hereunder except as permitted by the Credit Agreement.

### ARTICLE IX
### REMEDIES

### Section 9.1    Remedies

Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall, at the direction of the Required Lenders, exercise in respect of the Pledged Collateral, in addition to the other rights and remedies provided under the applicable law or otherwise available to it (subject, in each case, to the DIP Orders and DIP Recognition Orders) the following remedies:

> (i)    Personally, or by agents or legal counsel, immediately take possession of the Pledged Collateral or any part thereof, from any Pledgor or any other person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon any Pledgor's

premises where any of the Pledged Collateral is located, remove such Pledged Collateral, remain present at such premises to receive copies of all communications and remittances relating to the Pledged Collateral and use in connection with such removal and possession any and all services, supplies, aids and other facilities of any Pledgor;

(ii)     Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Pledged Collateral including instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Pledged Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Collateral Agent, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to any Pledgor, prior to receipt by any such obligor of such instruction, such Pledgor shall segregate all amounts received pursuant thereto in trust for the benefit of the Collateral Agent and shall promptly (but in no event later than one (1) Business Day after receipt thereof) pay such amounts to the Collateral Agent;

(iii)    Sell, assign, grant a licence to use or otherwise liquidate, or direct any Pledgor to sell, assign, grant a licence to use or otherwise liquidate, any and all investments made in whole or in part with the Pledged Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, licence or liquidation;

(iv)     Take possession of the Pledged Collateral or any part thereof, by directing any Pledgor in writing to deliver the same to the Collateral Agent at any place or places so designated by the Collateral Agent, in which event such Pledgor shall at its own expense: (A) forthwith cause the same to be moved to the place or places designated by the Collateral Agent and therewith delivered to the Collateral Agent, (B) store and keep any Pledged Collateral so delivered to the Collateral Agent  at such place or places pending further action by the Collateral Agent and (C) while the Pledged Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition. Each Pledgor's obligation to deliver the Pledged Collateral as contemplated in this Section 9.1(iv) is of the essence hereof. Upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by any Pledgor of such obligation;

(v)      Withdraw all moneys, instruments, securities and other property in any bank, financial securities, deposit or other account of any Pledgor

constituting Pledged Collateral for application to the Secured Obligations as provided in <u>Article X</u> hereof;

(vi)    Retain and apply the Distributions to the Secured Obligations as provided in <u>Article X</u> hereof or as otherwise provided for in the DIP Orders or DIP Recognition Orders;

(vii)    Exercise any and all rights as beneficial and legal owner of the Pledged Collateral, including perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Pledged Collateral;

(viii)    Exercise all the rights and remedies of a secured party under the PPSA (whether or not the PPSA has been enacted in the location where the action is taken), and the Collateral Agent, acting at the direction of the Required Lenders, shall, without notice except as specified in <u>Section 9.2</u> hereof or as required by mandatory provisions of law, sell, assign or grant a licence to use the Pledged Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such time or times, at such price or prices and upon such other terms as the Collateral Agent, acting at the direction of the Required Lenders, may deem commercially reasonable irrespective of the impact of any such sales on the market price of the Pledged Collateral. The Collateral Agent or any other Secured Party or any of their respective Affiliates may be the purchaser, licensee, assignee or recipient of the Pledged Collateral or any part thereof at any such sale and shall be entitled (with the consent of the Collateral Agent , which may be withheld in its discretion), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Pledged Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations owed to such person as a credit on account of the purchase price of the Pledged Collateral or any part thereof payable by such person at such sale.  Upon any sale of the Pledged Collateral by the Collateral Agent (including pursuant to a power of sale granted by statue or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be sufficient discharge to the purchaser or purchasers of the Pledged Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.  Each purchaser, assignee, licensee or recipient at any such sale shall acquire the property sold, assigned or licensed absolutely free from any claim or right on the part of any Pledgor, and each Pledgor hereby waives, to the fullest extent permitted by law, all rights of redemption, stay and/or appraisal which it now has or may at any time in

the future have under any rule of law or statute now existing or hereafter enacted.  The Collateral Agent shall not be obligated to make any sale of the Pledged Collateral or any part thereof regardless of notice of sale having been given.  The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Pledgor hereby waives, to the fullest extent permitted by law, any claims against the Collateral Agent arising by reason of the fact that the price at which the Pledged Collateral or any part thereof may have been sold, assigned or licensed at such a private sale was less than the price which might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Pledged Collateral to more than one offeree.  The Collateral Agent may disclaim any warranty, as to time or as to any other matter, in connection with such sale or other disposition, and its doing so shall not be considered adversely to affect the commercial reasonableness of such sale or other disposition; and

(ix)     Appoint or apply to a court of competent jurisdiction to appoint a Receiver.  Any Receiver of any Pledged Collateral of any Pledgor appointed by the Collateral Agent shall act as and for all purposes shall be deemed to be the agent of such Pledgor and no Secured Party shall be responsible for any act or default of any Receiver.  The Collateral Agent may remove any Receiver appointed by it and appoint another from time to time.   No Receiver appointed by the Collateral Agent need be appointed by, nor need its appointment be ratified by, or its actions in any way supervised by, a court.  The appointment of any Receiver or anything done by a Receiver or the removal or termination of any Receiver shall not have the effect of constituting any Secured Party a mortgagee in possession in respect of the Pledged Collateral.  The Collateral Agent, in appointing or refraining from appointing any Receiver or applying to a court of competent jurisdiction for the appointment of a court appointed Receiver, does not incur liability to the Receiver, the Pledgors or otherwise.

**Section 9.2    Receiver's Rights**

Any Receiver appointed pursuant to Section 9.1(ix) shall, have any rights, powers and remedies to which the Collateral Agent is entitled hereunder, under the PPSA or otherwise at law or in equity or the court shall grant to such Receiver in the instrument appointing such Receiver, save that only the Collateral Agent, and not the Receiver, shall have the right to exercise any rights or remedies with respect to ULC Shares as the Collateral Agent.

### Section 9.3    Notice of Sale

Each Pledgor acknowledges and agrees that, to the extent notice of sale or other disposition of the Pledged Collateral or any part thereof shall be required by law and unless the Pledged Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which case the Collateral Agent shall endeavour to provide notice; provided that failure to provide such notice shall not affect the validity of any  sale or other disposition), ten (10) days' prior notice to such Pledgor of the time and place of any public sale or of the time after which any private sale or other intended disposition is to take place shall be commercially reasonable notification of such matters.  No notification need be given to any Pledgor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying any right to notification of sale or other intended disposition.

### Section 9.4    Waiver of Notice and Claims

Each Pledgor hereby waives, to the fullest extent permitted by applicable law, notice or judicial hearing in connection with the Collateral Agent's taking possession or the Collateral Agent's disposition of the Pledged Collateral or any part thereof, including any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which such Pledgor would otherwise have under law, and each Pledgor hereby further waives, to the fullest extent permitted by applicable law: (i) all damages occasioned by such taking of possession, (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Collateral Agent's rights hereunder and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable law.  The Collateral Agent shall not be liable for any incorrect or improper payment made pursuant to this Article IX in the absence of gross negligence or willful misconduct on the part of the Collateral Agent as determined by a court of competent jurisdiction in a final and non-appealable decision. Any sale of, or the grant of options to purchase, or any other realization upon, any Pledged Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the applicable Pledgor therein and thereto, and shall be a perpetual bar both at law and in equity against such Pledgor and against any and all persons claiming or attempting to claim the Pledged Collateral so sold, optioned or realized upon, or any part thereof, from, through or under such Pledgor.

### Section 9.5    Certain Sales of Pledged Collateral

(a)      Each Pledgor recognizes that, by reason of certain prohibitions contained in law, rules, regulations or orders of any Governmental Authority, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Pledged Collateral, to limit purchasers to those who meet the requirements of such Governmental Authority.  Each Pledgor acknowledges that any such sales may be at prices and on terms less favourable to the Collateral Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that, except as may be

required by applicable law, the Collateral Agent shall have no obligation to engage in public sales.

(b)     Each Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act, and applicable provincial and territorial securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Securities Collateral and Investment Property, to limit purchasers to persons who will agree, among other things, to acquire such Securities Collateral or Investment Property for their own account, for investment and not with a view to the distribution or resale thereof.  Each Pledgor acknowledges that any such private sales may be at prices and on terms less favourable to the Collateral Agent than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a prospectus), and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Securities Collateral or Investment Property for the period of time necessary to permit the issuer thereof to file a prospectus under the applicable provincial or territorial securities laws, even if such issuer would agree to do so.

(c)     Notwithstanding the foregoing, each Pledgor shall, upon the occurrence and during the continuance of any Event of Default, at the reasonable request of the Collateral Agent and the Secured Parties, for the benefit of the Collateral Agent and the Secured Parties, cause any registration, qualification under or compliance with any provincial or territorial securities law or laws to be effected with respect to all or any part of the Securities Collateral as soon as practicable and at the sole cost and expense of the Pledgors.  Each Pledgor will use its best efforts to cause such registration to be effected (and be kept effective) and will use its best efforts to cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Securities Collateral including filing a prospectus under the Securities Act (or any similar statute then in effect), appropriate qualifications under applicable provincial or territorial securities laws and appropriate compliance with all other requirements of any Governmental Authority.  Each Pledgor shall cause the Collateral Agent to be kept advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, shall furnish to the Collateral Agent such number of prospectuses, offering circulars or other documents incident thereto as the Collateral Agent from time to time may request, and shall indemnify and shall cause the issuer of the Securities Collateral to indemnify the Collateral Agent and all others participating in the distribution of such Securities Collateral against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related

registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading.

(d)     If the Collateral Agent determines to exercise its right to sell any or all of the Securities Collateral or Investment Property, upon written request, the applicable Pledgor shall from time to time furnish to the Collateral Agent all such information as the Collateral Agent may request in order to determine the number of securities included in the Securities Collateral or Investment Property which may be sold by the Collateral Agent as exempt transactions under the Securities Act, any other applicable securities laws and the rules of all applicable stock exchanges, as the same are from time to time in effect.

(e)     Each Pledgor further agrees that a breach of any of the covenants contained in this Section 9.5 will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 9.5 shall be specifically enforceable against such Pledgor, and such Pledgor hereby waives and agrees not to assert any defences against an action for specific performance of such covenants except for a defence that no Event of Default has occurred and is continuing.

**Section 9.6     No Waiver; Cumulative Remedies**

(a)     No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties.  All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law or otherwise available.

(b)     In the event that the Collateral Agent shall have instituted any proceeding to enforce any right, power, privilege or remedy under this Agreement or any other Loan Document by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Collateral Agent, then and in every such case, the Pledgors, the Collateral Agent and each other Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Pledged Collateral, and all rights, remedies, privileges and powers of the Collateral Agent and the other Secured Parties shall continue as if no such proceeding had been instituted.

### Section 9.7    Certain Additional Actions Regarding Intellectual Property

If any Event of Default shall have occurred and be continuing, in addition to the irrevocable license granted to the Collateral Agent pursuant to Section 6.1 hereof, upon the written demand of the Collateral Agent, each Pledgor shall execute and deliver to the Collateral Agent an assignment or assignments of the Intellectual Property Collateral and such other documents as are necessary or appropriate to carry out the intent and purposes hereof.  Within five (5) Business Days of written notice thereafter from the Collateral Agent, each Pledgor shall make available to the Collateral Agent, to the extent within such Pledgor' s power and authority, such personnel in such Pledgor's employ on the date of the Event of Default as the Collateral Agent may reasonably designate to permit such Pledgor to continue, directly or indirectly, to produce, advertise and sell the products and services sold by such Pledgor under the registered Patents, Trademarks, Copyrights and/or Designs, and such persons shall be available to perform their prior functions on the Collateral Agent's behalf.

### Section 9.8    Actions Requiring Regulatory Approval

Notwithstanding anything to the contrary contained herein, the Secured Parties shall not take any action that would constitute or result in any assignment of the Communications Licences or transfer of control or voting rights of any Pledgor or of any entity the Equity Interests of which are owned by any Pledgor if such assignment or transfer of control or voting rights would require, under then existing law (including Communications Laws), the prior approval of the FCC, ISED, the CRTC or any other applicable Governmental Authority, without first obtaining such approval of the FCC, ISED, the CRTC or such other Governmental Authority.  Each Pledgor agrees to take any lawful action which the Collateral Agent may reasonably request in order to obtain from the FCC, ISED, the CRTC or any other relevant Governmental Authority such approval as may be necessary to enable the Collateral Agent to enjoy the full rights and benefits granted to the Collateral Agent and the Secured Parties by this Agreement and the other Loan Documents, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Pledgor's best efforts to assist in obtaining any required approval of the FCC, ISED, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement and the other Loan Documents, including without limitation, sharing with the Collateral Agent  any FCC registration numbers and preparing, certifying and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, ISED, the CRTC or any other Governmental Authority any portion of any application or applications for consent to the assignment of any Pledged Collateral that is a Communications Licence or transfer of control of any Pledgor or of any entity the Equity Interests of which are owned by any Pledgor, in each case required to be filed under Communications Laws for approval of any sale or transfer of Pledged Collateral and/or the Communications Licences.  Each Pledgor further agrees that, because of the unique nature of its undertaking in this Section 9.8, the same may be specifically enforced, and it hereby waives, and agrees to waive, any claim or defence that the Collateral Agent or the Secured Parties would have an adequate remedy at law for the breach of this undertaking and any requirement for the posting of bond or other security.  This Section 9.8 shall not be deemed to limit any other rights of the Collateral Agent and the Lenders available under applicable law and consistent with the

Communications Act, *Radiocommunication Act* (Canada), *Telecommunications Act* (Canada) or other Communications Law.

## ARTICLE X
## APPLICATION OF PROCEEDS

### Section 10.1  Application of Proceeds

The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Pledged Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, subject to and in accordance with the Credit Agreement and the terms of the DIP Orders and DIP Recognition Orders.

## ARTICLE XI
## MISCELLANEOUS

### Section 11.1  Concerning Collateral Agent

(a)     (a)     The actions of the Collateral Agent hereunder are subject to the provisions of the Credit Agreement and the terms of the DIP Orders and DIP Recognition Orders. The Collateral Agent shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including the release or substitution of the Pledged Collateral), in accordance with this Agreement and the Credit Agreement.  The Collateral Agent may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.  The Collateral Agent may resign and a successor Collateral Agent may be appointed in the manner provided in the Credit Agreement.  Upon the acceptance of any appointment as the Collateral Agent by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent under this Agreement, and the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under this Agreement.  After any retiring Collateral Agent's resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement while it was the Collateral Agent.

(b)     Beyond the exercise of reasonable care in the custody and preservation thereof, the Collateral Agent will have no duty as to any Pledged Collateral in its possession or control or in the possession or control of any subagent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if such Pledged Collateral is accorded treatment substantially

equivalent to that which the Collateral Agent, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Collateral Agent nor any of the Secured Parties shall have responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Securities Collateral, whether or not the Collateral Agent or any other Secured Party has or is deemed to have knowledge of such matters or (ii) taking any necessary steps to preserve rights against any person with respect to any Pledged Collateral.

(c)     The Collateral Agent shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person, and, with respect to all matters pertaining to this Agreement and its duties hereunder and thereunder, upon advice of counsel selected by it.

**Section 11.2   Collateral Agent May Perform; Collateral Agent Appointed Attorney-in-Fact**

In all cases subject to and in accordance with the terms of the DIP Orders and DIP Recognition Orders, if any Pledgor shall fail to perform any covenants contained in this Agreement (including such Pledgor's covenants to (i) pay the premiums in respect of all required insurance policies hereunder, (ii) pay and discharge any taxes, assessments and special assessments, levies, fees and governmental charges imposed upon or assessed against, and landlords', carriers', mechanics', workmen's, repairmen's, labourers', materialmen's, suppliers' and warehousemen's Liens and other claims arising by operation of law against, all or any portion of the Pledged Collateral, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any obligations of such Pledgor under any Pledged Collateral) or if any representation or warranty on the part of any Pledgor contained herein shall be breached, the Collateral Agent may (but shall not be obligated to) do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that the Collateral Agent shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which such Pledgor fails to pay or perform as and when required hereby and which such Pledgor does not contest in accordance with the provisions of the Credit Agreement.  Any and all amounts so expended by the Collateral Agent shall be paid by the Pledgors, subject to the DIP Orders, DIP Recognition Orders, the Cash Management Order and any other order of the Bankruptcy Court entered in connection with the Cases.  Neither the provisions of this Section 11.2 nor any action taken by the Collateral Agent pursuant to the provisions of this Section 11.2 shall prevent any such failure to observe any covenant contained in this Agreement nor any breach of representation or warranty from constituting an Event of Default.  Subject to and in accordance with the terms of the DIP Orders and DIP Recognition Orders, each Pledgor hereby appoints the Collateral Agent as its attorney-in-fact, with full power and authority in the place and stead of such Pledgor and in the name of such Pledgor, or otherwise, from time to time in the Collateral Agent's discretion to take any action and to execute any instrument consistent with the terms of this Agreement and the other Security Documents which the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof (but the Collateral Agent shall not be obligated to and shall have

no liability to such Pledgor or any third party for failure to so do or take action).  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof.  Each Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

### Section 11.3   Continuing Security Interest; Assignment

This Agreement shall create a continuing security interest in the Pledged Collateral and shall, subject to the DIP Orders and DIP Recognition Orders, (i) be binding upon the Pledgors, their respective successors and assigns and (ii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and the other Secured Parties and each of their respective successors, transferees and assigns.  No other persons (including any other creditor of any Pledgor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), any Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party, herein or otherwise, subject however, to the provisions of the Credit Agreement and any order of the Bankruptcy Court or the CCAA Court. Subject to the DIP Orders and DIP Recognition Orders, each of the Pledgors agrees that its obligations hereunder and the security interest created hereunder shall continue to be effective or be reinstated, as applicable, if at any time payment, or any part thereof, of all or any part of the Secured Obligations is rescinded or must otherwise be restored by the Secured Party upon the bankruptcy or reorganization of any Pledgor or otherwise.

### Section 11.4   Termination; Release

When all the Secured Obligations have been paid in full and the Commitments of the Lenders to make any Loan under the Credit Agreement shall have expired or been terminated for any reason, the Pledged Collateral shall be released from the First Priority Lien of this Agreement. Upon such release or any release of Pledged Collateral or any part thereof, the Collateral Agent shall, upon the written request and at the sole cost and expense of the Pledgors, assign, transfer and deliver to Pledgor, against receipt and without recourse to or warranty by the Collateral Agent except as to the fact that the Collateral Agent has not encumbered the released assets, such of the Pledged Collateral or any part thereof to be released (in the case of a release) as may be in possession of the Collateral Agent and as shall not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Pledged Collateral, proper documents and instruments (including discharge financing change statements or releases) acknowledging the termination hereof or the release of such Pledged Collateral, as the case may be.

### Section 11.5   Modification in Writing

No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by any Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Credit Agreement, the DIP Orders and the DIP Recognition Orders or as otherwise provided herein and unless in writing and signed by the

Collateral Agent.  Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by any Pledgor from the terms of any provision hereof in each case shall be effective only in the specific instance and for the specific purpose for which made or given.  Except where notice is specifically required by this Agreement, no notice to or demand on any Pledgor in any case shall entitle any Pledgor to any other or further notice or demand in similar or other circumstances.

### Section 11.6   Notices

Any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in Section 10.01 of the Credit Agreement.

### Section 11.7   Governing Law, Consent to Jurisdiction and Service of Process; Waiver of Jury Trial

(a)     This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

(b)     Each of the Pledgors hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the CCAA Court, and, if the CCAA Court does not have, or abstains from jurisdiction, the courts of the Province of Ontario, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Ontario court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Collateral Agent may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Pledgors or their respective properties in the courts of any jurisdiction.

(c)     Each of the Pledgors hereby irrevocably and unconditionally waives, to the fullest extent they may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defence of an inconvenient forum to the maintenance of such action or proceeding in any such court.

### Section 11.8   Severability of Provisions

Any provision hereof which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

### Section 11.9  Execution in Counterparts

This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement.  Section 10.06 of the Credit Agreement is incorporated herein, *mutatis mutandis,* as if a part hereof.

### Section 11.10 Business Days

In the event any time period or any date provided in this Agreement ends or falls on a day other than a Business Day, then such time period shall be deemed to end and such date shall be deemed to fall on the next succeeding Business Day, and performance herein may be made on such Business Day, with the same force and effect as if made on such other day.

### Section 11.11 No Credit for Payment of Taxes or Imposition

Such Pledgor shall not be entitled to any credit against the principal, premium, if any, or interest payable under the Credit Agreement and such Pledgor shall not be entitled to any credit against any other sums which may become payable under the terms thereof or hereof, by reason of the payment of any Tax on the Pledged Collateral or any part thereof.

### Section 11.12 No Claims Against Collateral Agent

Nothing contained in this Agreement shall constitute any consent or request by the Collateral Agent, express or implied, for the performance of any labour or services or the furnishing of any materials or other property in respect of the Pledged Collateral or any part thereof, nor as giving any Pledgor any right, power or authority to contract for or permit the performance of any labour or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against the Collateral Agent in respect thereof or any claim that any Lien based on the performance of such labour or services or the furnishing of any such materials or other property is prior to the First Priority Lien hereof.

### Section 11.13 No Release

Nothing set forth in this Agreement or any other Loan Document, nor the exercise by the Collateral Agent of any of the rights or remedies hereunder, shall relieve any Pledgor from the performance of any term, covenant, condition or agreement on such Pledgor's part to be performed or observed under or in respect of any of the Pledged Collateral or from any liability to any person under or in respect of any of the Pledged Collateral or shall impose any obligation on the Collateral Agent or any other Secured Party to perform or observe any such term, covenant, condition or agreement on such Pledgor's part to be so performed or observed or shall impose any liability on the Collateral Agent or any other Secured Party for any act or omission on the part of such Pledgor relating thereto or for any breach of any representation or warranty on the part of such Pledgor contained in this Agreement, the Credit Agreement or the other Loan Documents, or under or in respect of the Pledged Collateral or made in connection herewith or therewith.

1397-8864-3601.10

Anything herein to the contrary notwithstanding, neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any contracts, agreements and other documents included in the Pledged Collateral by reason of this Agreement, nor shall the Collateral Agent or any other Secured Party be obligated to perform any of the obligations or duties of any Pledgor thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Pledged Collateral hereunder.  The obligations of each Pledgor contained in this <u>Section 11.13</u> shall survive the termination hereof and the discharge of such Pledgor's other obligations under this Agreement, the Credit Agreement and the other Loan Documents.

**Section 11.14 Obligations Absolute**

Subject to the entry by the Bankruptcy Court of the DIP Orders and by the CCAA Court of the DIP Recognition Orders, all obligations of each Pledgor hereunder shall be absolute and unconditional irrespective of::

(a)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Pledgor;

(b)     any lack of validity or enforceability of the Credit Agreement or any other Loan Document, or any other agreement or instrument relating thereto;

(c)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement or any other Loan Document or any other agreement or instrument relating thereto;

(d)     any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(e)     any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, the Credit Agreement or any other Loan Document except as specifically set forth in a waiver granted pursuant to the provisions of <u>Section 11.5</u> hereof; or

(f)     any other circumstances which might otherwise constitute a defence available to, or a discharge of, any Pledgor.

**Section 11.15 Amalgamation**

The Pledgors acknowledge and agree that, in the event any Pledgor amalgamates with any other corporation or corporations, it is the intention of the parties hereto that the term "Pledgor", when used herein with respect to such Pledgor, shall apply to the amalgamated corporation, such that the First Priority Liens and security interests created hereby:

(a)     shall extend to Pledged Collateral owned by each of the amalgamating corporations immediately before the time of amalgamation and to any Pledged Collateral owned or acquired by the amalgamated corporation at the time of amalgamation and thereafter, and

(b)     shall secure all Secured Obligations of each of the amalgamating corporations to the Secured Parties in effect immediately before the time of amalgamation and all Secured Obligations of the amalgamated corporation to the Secured Parties in effect at the time of amalgamation and thereafter.  The First Priority Liens and security interests created hereby shall attach to all Pledged Collateral owned by each corporation amalgamating with any Pledgor, and shall attach to all Pledged Collateral thereafter owned or acquired by the amalgamated corporation when such becomes owned or is acquired.

### Section 11.16 Acknowledgment of Receipt

Each Pledgor acknowledges receipt of a copy of this Agreement and copies of the verification statements pertaining to the financing statements filed under the Ontario PPSA by the Collateral Agent in respect of this Agreement.  To the extent permitted by applicable law, each Pledgor irrevocably waives the right to receive a copy of each such financing statement or financing change statement (or verification statement pertaining thereto) filed under any PPSA by the Collateral Agent in respect of this Agreement or any other security agreement and releases any and all claims or causes of action it may have against the Collateral Agent or any Secured Party for failure to provide a copy of such financing statement or financing change statement to such Pledgor.

### Section 11.17 Disclosure

At any time the Collateral Agent may provide to a copy of this Agreement or information about it or about the Pledged Collateral or the Secured Obligations to the parties entitled to receive such documentation or information pursuant to section 18 of the Ontario PPSA (and any equivalent section in any other PPSA in a jurisdiction in which the Collateral Agent has filed a financing statement against the Pledgor) and to the extent provided for in section 18 of the Ontario PPSA (and any equivalent section in any other PPSA in a jurisdiction in which the Collateral Agent has filed a financing statement against the Pledgor).

### Section 11.18 Limitations Act

The parties hereto agree to extend the limitation period under the Limitations Act, 2002 (Ontario) other than the one established by section 15 of that act, applicable to this Agreement, and each provision hereof and any claim thereunder, to six (6) years.

### Section 11.19 English Language

The parties to this Agreement have agreed that this Agreement as well as any document or instrument relating to it be drawn up in English only but without prejudice to any such document

or instrument which may from time to time be drawn up in French only or in both French and English.  Les parties aux présentes ont convenu que la présente Convention ainsi que tous autres actes ou documents s'y rattachant soient rédigés en anglais seulement mais sans préjudice a tous tels actes ou documents qui pourraient a l'occasion être rédigés en français seulement ou à la fois en anglais et en français.

**SECTION 11.15.        Bankruptcy Court Orders and Bankruptcy Code Control**

In the event of a conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement, the DIP Orders, the DIP Recognition Orders, the CCAA and/or the Bankruptcy Code, the terms and provisions of the Credit Agreement, the DIP Orders, the DIP Recognition Orders, the CCAA and/or the Bankruptcy Code, shall supersede and control the terms and provisions of this Agreement.   In the event of a conflict between any terms and provisions set forth in the Credit Agreement and those set forth in the DIP Orders, DIP Recognition Orders, CCAA and/or the Bankruptcy Code, the terms and provisions of the DIP Orders, DIP Recognition Orders, CCAA and/or the Bankruptcy Code shall supersede and control the terms and provisions of the Credit Agreement, and this Agreement.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

      IN WITNESS WHEREOF, each Pledgor and the Collateral Agent have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

**LIGADO NETWORKS CORP.,**
as Pledgor

By: _____
     Name:
     Title:

**LIGADO NETWORKS (CANADA) INC.,**
as Pledgor

By: _____
     Name:
     Title:

**LIGADO NETWORKS HOLDINGS (CANADA) INC.,**
as Pledgor

By: _____
     Name:
     Title:

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
as Collateral Agent

By: _____
    Name:
    Title:

**EXHIBIT 1**
**[FORM OF]**
**ISSUER'S ACKNOWLEDGMENT**

The undersigned hereby (i) acknowledges receipt of the Senior Secured Super-Priority Debtor-in-Possession Canadian Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement;</u>" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of [●], 2025, made by Ligado Networks Corp., a Nova Scotia unlimited liability company, Ligado Networks (Canada) Inc., an Ontario Corporation, Ligado Networks Holdings (Canada) Inc., an Ontario corporation and the other Canadian Subsidiary Guarantors from time to time party thereto, each as a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code and U.S. Bank Trust Company, National Association, as Collateral Agent  (in such capacity and together with any successors in such capacity, the "<u>Collateral Agent</u>"), (ii) agrees promptly to note on its books the security interests granted to the Collateral Agent and confirmed under the Security Agreement, (iii) agrees that it will comply with instructions of the Collateral Agent with respect to the applicable Securities Collateral (including all Equity Interests of the undersigned) without further consent by the applicable Pledgor, (iv) agrees to notify the Collateral Agent upon obtaining knowledge of any interest in favour of any person in the applicable Securities Collateral that is adverse to the interest of the Collateral Agent therein and (v) waives any right or requirement at any time hereafter to receive a copy of the Security Agreement in connection with the registration of any Securities Collateral thereunder in the name of the Collateral Agent or its nominee or the exercise of voting rights by the Collateral Agent or its nominee.

[                                                      ]

By: _____
          Name:
          Title:

**EXHIBIT 2**
**[FORM OF]**
**SECURITIES PLEDGE AMENDMENT**

This Securities Pledge Amendment, dated as of [   ] is delivered pursuant to Section 5.1 of the Senior Secured Super-Priority Debtor-in-Possession Canadian Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of [●], 2025 made by Ligado Networks Corp., a Nova Scotia unlimited liability company, Ligado Networks (Canada) Inc., an Ontario Corporation, Ligado Networks Holdings (Canada) Inc., an Ontario corporation and the other Canadian Subsidiary Guarantors from time to time party thereto, each as a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code and U.S. Bank Trust Company, National Association, as Collateral Agent (in such capacity and together with any successors in such capacity, the "Collateral Agent").  The undersigned hereby agrees that this Securities Pledge Amendment may be attached to the Security Agreement and that the Pledged Securities and/or Intercompany Notes listed on this Securities Pledge Amendment shall be deemed to be and shall become part of the Pledged Collateral and shall secure all Secured Obligations.

**PLEDGED SECURITIES**

| ISSUER | CLASS OF STOCK OR INTERESTS | PAR VALUE | CERTIFICATE NO(S) | NUMBER OF SHARES OR INTERESTS | PERCENTAGE OF ALL ISSUED CAPITAL OR OTHER EQUITY INTERESTS OF ISSUER |
|---|---|---|---|---|---|
| | | | | | |

**INTERCOMPANY NOTES**

| ISSUER | PRINCIPAL AMOUNT | DATE OF ISSUANCE | INTEREST RATE | MATURITY DATE |
|---|---|---|---|---|
| | | | | |

[                                        ]

By: _____
        Name:
        Title:

AGREED TO AND ACCEPTED:

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, as Collateral
Agent

By: _____

Name:

Title:

**EXHIBIT 3**
**[FORM OF]**
**JOINDER AGREEMENT**

[Name of New Pledgor]
[Address of New Pledgor]

[Date]

_____

_____

_____

_____

Ladies and Gentlemen:

Reference is made to the Senior Secured Super-Priority Debtor-in-Possession Canadian Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of [●], 2025, made by Ligado Networks Corp., a Nova Scotia unlimited liability company, Ligado Networks (Canada) Inc., an Ontario Corporation, Ligado Networks Holdings (Canada) Inc., an Ontario corporation and the other Canadian Subsidiary Guarantors from time to time party thereto, each as a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code and U.S. Bank Trust Company, National Association, as Collateral Agent (in such capacity and together with any successors in such capacity, the "Collateral Agent").

This Joinder Agreement supplements the Security Agreement and is delivered by the undersigned, [_____] (the "New Pledgor"), pursuant to Section 3.5 of the Security Agreement.  The New Pledgor hereby agrees to be bound as a Subsidiary Guarantor and as a Pledgor party to the Security Agreement by all of the terms, covenants and conditions set forth in the Security Agreement to the same extent that it would have been bound if it had been a signatory to the Security Agreement on the date of the Security Agreement.  The New Pledgor also hereby agrees to be bound as a party by all of the terms, covenants and conditions applicable to it set forth in Articles 5, 6 and 7 of the Credit Agreement to the same extent that it would have been bound if it had been a signatory to the Credit Agreement on the execution date of the Credit Agreement.  Without limiting the generality of the foregoing, the New Pledgor hereby grants and pledges to the Collateral Agent, as collateral security for the full, prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, a First Priority Lien on and security interest in, all of its right, title and interest in, to and under the Pledged Collateral and expressly assumes all obligations and liabilities of a Guarantor and Pledgor thereunder.  The New Pledgor hereby makes each of the representations

and warranties and agrees to each of the covenants applicable to the Pledgors contained in the Security Agreement and the terms of the Credit Agreement.

Annexed hereto are supplements to each of the schedules to the Security Agreement and the Credit Agreement, as applicable, with respect to the New Pledgor.  Such supplements shall be deemed to be part of the Security Agreement or the Credit Agreement, as applicable.

This Joinder Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement.

This Joinder Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

IN WITNESS WHEREOF, the New Pledgor has caused this Joinder Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**[NEW PLEDGOR]**

By: _____

    Name:

    Title:

AGREED TO AND ACCEPTED:

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Collateral Agent

By: _____

Name:

Title:

[Schedules to be attached]

**EXHIBIT N**

## FORM OF INTERCOMPANY NOTE

(see attached)

**SECOND AMENDED AND RESTATED INTERCOMPANY NOTE**

New York, New York
January [\_\_], 2024

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other entity listed on the signature page hereto (each, in such capacity, a "**Payor**"), hereby promises to pay on demand to the order of such other entity listed below (each, in such capacity, a "**Payee**"), in lawful money of the United States of America in immediately available funds, at such location in the United States of America as a Payee shall from time to time designate, the unpaid principal amount of all loans and advances (including trade payables) made by such Payee to such Payor. Each Payor promises also to pay interest on the unpaid principal amount of all such loans and advances in like money at said location from the date of such loans and advances until paid at such rate per annum as shall be agreed upon from time to time by such Payor and such Payee.

This second amended and restated intercompany note (this "**Note**") amends, restates and supersedes in its entirety that certain Amended and Restated Intercompany Note, dated as of January 17, 2023, by and among the Payors and Payees party thereto.

This Note is an Intercompany Note referred to in each of (i) that certain Senior Secured Super-Priority Debtor-In-Possession Loan Agreement dated as of January 5, 2025 (the "**DIP Loan Agreement**"), by and among Ligado Networks LLC, a Delaware limited liability company ("**Ligado**") as the borrower, the guarantors party thereto, each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, the lenders from time to time party thereto and U.S. Bank Trust Company, National Association, in its capacity as administrative agent for such lenders and collateral agent for the secured parties therein, (ii), that certain First Lien Loan Agreement dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**1L Loan Agreement**") among Ligado as the borrower, the subsidiary guarantors from time to time party thereto, the lenders party thereto and U.S. Bank Trust Company, National Association as administrative agent, (iii) that certain Indenture dated as of October 23, 2020, providing for the issuance of 15.5% PIK Senior Secured First Lien Notes due 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**1L Indenture**") among the Ligado as the issuer, the guarantors from time to time party thereto and U.S. Bank National Association as trustee, (iv) that certain 1.5 Lien Loan Agreement dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**1.5L Loan Agreement**") among Ligado, as the borrower, the subsidiary guarantors from time to time party thereto, the lenders party thereto and Jefferies Finance LLC as administrative agent and (v) that certain Indenture dated as of October 23, 2020, providing for the issuance of 17.5% PIK Senior Secured Second Lien Notes due 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**2L Indenture**") among the Ligado as the issuer, the guarantors from time to time party thereto and Wilmington Savings Fund Society, FSB as trustee.

Reference is made to (i) the Interim DIP Order, the Final DIP Order and, solely with respect to the Canadian Collateral, the Interim DIP Recognition Order and Final DIP

Recognition Order (in each case, as defined in the DIP Loan Agreement and collectively, the "**Orders**"), (ii) the First Lien Intercreditor Agreement dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Pari Passu Intercreditor Agreement**") among Ligado, the other grantors from time to time party thereto, U.S. Bank National Association as collateral trustee for the Notes Secured Parties (as defined therein), U.S. Bank National Association as authorized representative for the Notes Secured Parties (as defined therein), U.S. Bank Trust Company, National Association as Initial Additional Pari Collateral Agent (as defined therein) and Initial Additional Authorized Representative (as defined therein) and each additional authorized representative from time to time party thereto, (iii) the Senior Collateral Trust and Intercreditor Agreement dated as of October 23, 2020 (as amended by that certain Amendment No. 1 to Senior Collateral Trust and Intercreditor Agreement, dated as of December 23, 2022, as supplemented by that certain Joinder to Senior Collateral Trust and Intercreditor Agreement Additional Secured Debt, dated as of December 23, 2022, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Senior Collateral Trust and Intercreditor Agreement**") among Ligado, the other pledgors from time to time party thereto, U.S. Bank National Association as Existing First Lien Trustee (as defined therein) in its capacity as a First Lien Representative (as defined therein), U.S. Bank Trust Company, National Association, as a First Lien Representative (as defined therein), Jefferies Finance LLC, as Existing 1.5 Lien Loan Administrative Agent (as defined therein) in its capacity as a Junior Lien Representative (as defined therein), U.S. Bank National Association, as Existing Junior Lien Trustee (as defined therein) in its capacity as a Junior Lien Representative (as defined therein) and the other parties from time to time party thereto and (iv) Junior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Junior Intercreditor Agreement**" and, together with the Pari Passu Intercreditor Agreement and the Senior Collateral Trust and Intercreditor Agreement, each an "**Intercreditor Agreement**" and collectively, the "**Intercreditor Agreements**"), by and among, Ligado, the other pledgors from time to time party thereto, Jefferies Finance LLC, as a Senior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative (as defined therein) and the other parties from time to time party thereto.

This Note is subject to the terms of each of the Orders, the DIP Loan Agreement, the 1L Loan Agreement, the 1L Indenture, the 1.5L Loan Agreement and the 2L Indenture, and shall be pledged by each Payee pursuant to the Loan Security Documents (as defined in the DIP Loan Agreement), the Loan Security Documents (as defined in the 1L Loan Agreement), the Security Documents (as defined in the 1.5L Loan Agreement), the Notes Security Documents (as defined in the 1L Indenture) or the Notes Security Documents (as defined in the 2L Indenture), as the case may be, to the extent required pursuant to the terms thereof.

Subject to the Orders and each Intercreditor Agreement, each Payee hereby acknowledges and agrees that the Collateral Agent (as defined in each of the DIP Loan Agreement, the 1L Loan Agreement and the 1.5L Loan Agreement, as applicable) and the Collateral Trustee (as defined in each of the 1L Indenture and 2L Indenture, as applicable) may exercise all rights provided in the Loan Security Documents (as defined in the DIP Loan Agreement), the Loan Security Documents (as defined in the 1L Loan Agreement), the Security Documents (as defined in the 1.5L Loan Agreement), the Notes Security Documents (as defined

in the 1L Indenture) or the Notes Security Documents (as defined in the 2L Indenture), as applicable, with respect to this Note.

Subject to the Orders and each Intercreditor Agreement, anything in this Note to the contrary notwithstanding, any and all indebtedness owed by any Payor to any Payee (all of which shall be evidenced by this Note) shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to all Obligations (as defined in each of the DIP Loan Agreement, 1L Loan Agreement, the 1L Indenture, the 1.5L Loan Agreement or the 2L Indenture, as applicable) of such Payor under the DIP Loan Agreement, the 1L Loan Agreement, the 1L Indenture, 1.5L Loan Agreement and the 2L Indenture, including, without limitation, where applicable, under such Payor's guarantee of the Obligations (as defined in each of the DIP Loan Agreement, 1L Loan Agreement, the 1L Indenture, the 1.5L Loan Agreement or the 2L Indenture, as applicable) under the DIP Loan Agreement, the 1L Loan Agreement, the 1L Indenture, the 1.5L Loan Agreement and the 2L Indenture (such Obligations (as defined in each of the DIP Loan Agreement, 1L Loan Agreement, the 1L Indenture, the 1.5L Loan Agreement or the 2L Indenture, as applicable) and other indebtedness and obligations in connection with any renewal, refunding, restructuring or refinancing thereof, including interest thereon accruing after the commencement of any proceedings referred to in clause (i) below, whether or not such interest is an allowed claim in such proceeding, being hereinafter collectively referred to as "**Senior Indebtedness**"):

(i)     In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization or other similar proceedings in connection therewith, relative to any Payor or to its creditors, as such, or to its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of such Payor, whether or not involving insolvency or bankruptcy, then (x) the holders of Senior Indebtedness shall be paid in full in cash in respect of all amounts constituting Senior Indebtedness before any Payee is entitled to receive (whether directly or indirectly), or make any demands for, any payment on account of this Note and (y) until the holders of Senior Indebtedness are paid in full in cash in respect of all amounts constituting Senior Indebtedness, any payment or distribution to which such Payee would otherwise be entitled (other than debt securities of such Payor that are subordinated, to at least the same extent as this Note, to the payment of all Senior Indebtedness then outstanding (such securities being hereinafter referred to as "**Restructured Debt Securities**")) shall be made to the holders of Senior Indebtedness;

(ii)     if any default occurs and is continuing with respect to any Senior Indebtedness (including any default under the DIP Loan Agreement, the 1L Loan Agreement, the 1L Indenture, the 1.5L Loan Agreement or the 2L Indenture, as applicable), then no payment or distribution of any kind or character shall be made by or on behalf of the Payor or any other person on its behalf with respect to this Note; and

(iii)     if any payment or distribution of any character, whether in cash, securities or other property (other than Restructured Debt Securities), in respect of this Note shall (despite these subordination provisions) be received by any Payee in violation of clause (i) or (ii) before all Senior Indebtedness shall have been paid in full in cash, such payment or distribution shall be held in trust for the benefit of, and shall be paid over or

delivered to, the holders of Senior Indebtedness (or their representatives), ratably according to the respective aggregate amounts remaining unpaid thereon, to the extent necessary to pay all Senior Indebtedness in full in cash.

To the fullest extent permitted by law, no present or future holder of Senior Indebtedness shall be prejudiced in its right to enforce the subordination of this Note by any act or failure to act on the part of any Payor or by any act or failure to act on the part of such holder or any trustee or agent for such holder.  Subject to the Orders and each Intercreditor Agreement, each Payee and each Payor hereby agrees that the subordination of this Note is for the benefit of the Collateral Agent (as defined in each of the DIP Loan Agreement, the 1L Loan Agreement and the 1.5L Loan Agreement, as applicable), the Collateral Trustee (as defined in each of the 1L Indenture and 2L Indenture, as applicable) and the Secured Parties (as defined in each of the DIP Loan Agreement, the 1L Loan Agreement, 1L Indenture and the 2L Indenture). Each Payee and each Payor hereby further acknowledges and agrees that the Collateral Agent (as defined in each of the DIP Loan Agreement, the 1L Loan Agreement and the 1.5L Loan Agreement, as applicable), the Collateral Trustee (as defined in each of the 1L Indenture and 2L Indenture, as applicable) and the Secured Parties (as defined in each of the DIP Loan Agreement, the 1L Loan Agreement, 1L Indenture and the 2L Indenture) are obligees under this Note to the same extent as if their names were written herein as such. Subject to the Orders and each Intercreditor Agreement, Collateral Agent (as defined in each of the DIP Loan Agreement, the 1L Loan Agreement and the 1.5L Loan Agreement, as applicable), the Collateral Trustee (as defined in each of the 1L Indenture and 2L Indenture, as applicable) and the Secured Parties (as defined in each of the DIP Loan Agreement, the 1L Loan Agreement, 1L Indenture and the 2L Indenture), proceed to enforce the subordination provisions herein.

Notwithstanding anything to the contrary herein or in any other promissory note or other instrument, this Note replaces and supersedes any and all promissory notes or other instruments which create or evidence any loans or advances made on, before or after the date hereof by any Payee to any Payor.

Nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Payor and each Payee, the obligations of such Payor, which are absolute and unconditional, to pay to such Payee the principal of and interest on this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Payee and other creditors of such Payor other than the holders of Senior Indebtedness.

Each Payee is hereby authorized to record all loans and advances made by it to any Payor (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein.

Each Payor hereby waives presentment, demand, protest or notice of any kind in connection with this Note. All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

Notwithstanding anything herein to the contrary, in the event of any conflict between the terms of the Orders, the Pari Passu Intercreditor Agreement, the Senior Collateral Trust and

Intercreditor Agreement and this Note, the terms of the Orders, the Pari Passu Intercreditor Agreement and the Senior Collateral Trust and Intercreditor Agreement shall govern and control.

This Note may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

*[Signature Page Follows]*

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF.

**LIGADO NETWORKS LLC**

By: _____
Name: Douglas Smith
Title:   Chief Executive Officer


**ATC TECHNOLOGIES, LLC**
**LIGADO NETWORKS BUILD LLC**
**LIGADO NETWORKS FINANCE LLC**
**LIGADO NETWORKS INC. OF VIRGINIA**
**LIGADO NETWORKS SUBSIDIARY LLC**
**ONE DOT SIX LLC**
**ONE DOT SIX TVCC LLC**
**LIGADO NETWORKS CORP.**
**LIGADO NETWORKS (CANADA) INC.**
**LIGADO      NETWORKS      HOLDINGS**
  **(CANADA)                              INC.**

By: _____
Name: Douglas Smith
Title:   Chief Executive Officer

-Signature Page-
Intercompany Note

**NOTE POWER**

FOR VALUE RECEIVED, each of the undersigned does hereby sell, assign and transfer to

_____ all of its right, title and interest in that certain Second

Amended and Restated Intercompany Note, dated January [__], 2025 made by the Payors listed

therein in favor of the Payees listed therein, subject to the limitations set forth therein.

Dated: _____, _____.

[Signature Page Follows]

**LIGADO NETWORKS LLC**

By: _____
Name:  Douglas Smith
Title:   Chief Executive Officer


**ATC TECHNOLOGIES, LLC**
**LIGADO NETWORKS BUILD LLC**
**LIGADO NETWORKS FINANCE LLC**
**LIGADO NETWORKS INC. OF VIRGINIA**
**LIGADO NETWORKS SUBSIDIARY LLC**
**ONE DOT SIX LLC**
**ONE DOT SIX TVCC LLC**
**LIGADO NETWORKS CORP.**
**LIGADO NETWORKS (CANADA) INC.**
**LIGADO         NETWORKS         HOLDINGS**
   **(CANADA)                                               INC.**

By: _____
Name:  Douglas Smith
Title:   Chief Executive Officer

**FORM OF LOAN SECURITY AGREEMENT**

(see attached)

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION SECURITY
AGREEMENT

By

LIGADO NETWORKS LLC,
as Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the
Bankruptcy Code,

and

THE GUARANTORS PARTY HERETO
as Pledgors, Debtors, and Debtors-in-Possession under Chapter 11 of the Bankruptcy
Code

and

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Collateral Agent

———————————

Dated as of January [●], 2025

TABLE OF CONTENTS

Page

PREAMBLE ......................................................................................................................1

RECITALS ........................................................................................................................1

AGREEMENT ...................................................................................................................2

ARTICLE I

DEFINITIONS AND INTERPRETATION

SECTION 1.1.   DEFINITIONS ....................................................................................2
SECTION 1.2.   INTERPRETATION ...........................................................................8
SECTION 1.3.   RESOLUTION OF DRAFTING AMBIGUITIES ..............................8
SECTION 1.4.   PERFECTION CERTIFICATE ...........................................................8

ARTICLE II

GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1.   GRANT OF SECURITY INTEREST ..................................................8
SECTION 2.2.   FILINGS ............................................................................................10

ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF PLEDGED COLLATERAL

SECTION 3.1.   DELIVERY OF CERTIFICATED SECURITIES COLLATERAL ...............11
SECTION 3.2.   PERFECTION OF UNCERTIFICATED SECURITIES COLLATERAL ......11
SECTION 3.3.   FINANCING STATEMENTS AND OTHER FILINGS;
               MAINTENANCE OF PERFECTED SECURITY INTEREST ......................12
SECTION 3.4.   OTHER ACTIONS .............................................................................12
SECTION 3.5.   JOINDER OF ADDITIONAL GUARANTORS ...................................15
SECTION 3.6.   SUPPLEMENTS; FURTHER ASSURANCES ...................................15

ARTICLE IV

REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 4.1.   TITLE ................................................................................................16
SECTION 4.2.   VALIDITY OF SECURITY INTEREST ...........................................16
SECTION 4.3.   DEFENSE OF CLAIMS; TRANSFERABILITY OF PLEDGED
               COLLATERAL ...............................................................................16
SECTION 4.4.   OTHER FINANCING STATEMENTS .............................................16

-i-

SECTION 4.5.   LOCATION OF INVENTORY AND EQUIPMENT ......................................17
SECTION 4.6.   DUE AUTHORIZATION AND ISSUANCE ..............................................17
SECTION 4.7.   CONSENTS, ETC ...........................................................................17
SECTION 4.8.   PLEDGED COLLATERAL .................................................................17
SECTION 4.9.   INSURANCE .................................................................................17
SECTION 4.10.  PERMITTED LIENS .........................................................................18
SECTION 4.11.  COLLATERAL ...............................................................................18
SECTION 4.12.  POST-CLOSING OBLIGATIONS ........................................................18

## ARTICLE V

### CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.   PLEDGE OF ADDITIONAL SECURITIES COLLATERAL .........................18
SECTION 5.2.   VOTING RIGHTS; DISTRIBUTIONS; ETC ...............................................19
SECTION 5.3.   DEFAULTS, ETC .............................................................................20
SECTION 5.4.   CERTAIN AGREEMENTS OF PLEDGORS AS ISSUERS AND
               HOLDERS OF EQUITY INTERESTS .............................................20
SECTION 5.5.   ULC ...........................................................................................21

## ARTICLE VI

### CERTAIN PROVISIONS CONCERNING INTELLECTUAL PROPERTY COLLATERAL

SECTION 6.1.   GRANT OF INTELLECTUAL PROPERTY LICENSE ...............................21
SECTION 6.2.   PROTECTION OF COLLATERAL AGENT'S SECURITY .........................22
SECTION 6.3.   AFTER-ACQUIRED PROPERTY ....................................................22
SECTION 6.4.   LITIGATION .................................................................................23

## ARTICLE VII

### CERTAIN PROVISIONS CONCERNING RECEIVABLES

SECTION 7.1.   MAINTENANCE OF RECORDS ......................................................23
SECTION 7.2.   LEGEND ....................................................................................24
SECTION 7.3.   MODIFICATION OF TERMS, ETC .................................................24
SECTION 7.4.   COLLECTION .............................................................................24

## ARTICLE VIII

### TRANSFERS

SECTION 8.1.   TRANSFERS OF PLEDGED COLLATERAL .................................................24

Page

ARTICLE IX

REMEDIES

SECTION 9.1.    REMEDIES ............................................................................25
SECTION 9.2.    NOTICE OF SALE .................................................................27
SECTION 9.3.    WAIVER OF NOTICE AND CLAIMS .................................27
SECTION 9.4.    CERTAIN SALES OF PLEDGED COLLATERAL ...............27
SECTION 9.5.    NO WAIVER; CUMULATIVE REMEDIES .........................29
SECTION 9.6.    CERTAIN ADDITIONAL ACTIONS REGARDING INTELLECTUAL
                PROPERTY .............................................................................29
SECTION 9.7.    ACTIONS REQUIRING REGULATORY APPROVAL ...............29

ARTICLE X

APPLICATION OF PROCEEDS

SECTION 10.1.   APPLICATION OF PROCEEDS .........................................30

ARTICLE XI

MISCELLANEOUS

SECTION 11.1.   CONCERNING COLLATERAL AGENT ...........................30
SECTION 11.2.   COLLATERAL AGENT MAY PERFORM; COLLATERAL AGENT
                APPOINTED ATTORNEY-IN-FACT .....................................31
SECTION 11.3.   CONTINUING SECURITY INTEREST; ASSIGNMENT .............32
SECTION 11.4.   TERMINATION; RELEASE ..................................................32
SECTION 11.5.   MODIFICATION IN WRITING ............................................33
SECTION 11.6.   NOTICES ..............................................................................33
SECTION 11.7.   GOVERNING LAW, CONSENT TO JURISDICTION AND SERVICE
                OF PROCESS; WAIVER OF JURY TRIAL .....................33
SECTION 11.8.   SEVERABILITY OF PROVISIONS .....................................33
SECTION 11.9.   EXECUTION IN COUNTERPARTS .....................................33
SECTION 11.10.  BUSINESS DAYS .................................................................33
SECTION 11.11.  NO CREDIT FOR PAYMENT OF TAXES OR IMPOSITION .............33
SECTION 11.12.  NO CLAIMS AGAINST COLLATERAL AGENT .....................34
SECTION 11.13.  NO RELEASE .......................................................................34
SECTION 11.14.  OBLIGATIONS ABSOLUTE .................................................34
SECTION 11.15.  BANKRUPTCY COURT ORDERS AND BANKRUPTCY CODE
                CONTROL .............................................................................35

Schedule 4.12 Post-Closing Obligations

EXHIBIT 1    Form of Borrower's Acknowledgment
EXHIBIT 2    Form of Securities Pledge Amendment
EXHIBIT 3    Form of Joinder Agreement

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION SECURITY
AGREEMENT

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
SECURITY AGREEMENT dated as of January [●], 2025 (as amended, restated, amended and
restated, supplemented or otherwise modified from time to time in accordance with the provisions
hereof, this "Agreement") made by Ligado Networks LLC, a Delaware limited liability company,
as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "Borrower")
and the guarantors from to time to time party hereto, each as a debtor and debtor in possession
under Chapter 11 of the Bankruptcy Code (the "Guarantors"), as pledgors, assignors and debtors
(the Borrower, together with the Guarantors, in such capacities and together with any successors
in such capacities, the "Pledgors", and each, a "Pledgor"), in favor of U.S. Bank Trust Company,
National Association, in its capacity as collateral agent, pledgee, assignee and secured party
hereunder (in such capacities and together with any successors and assigns in such capacities, the
"Collateral Agent").

R E C I T A L S:

A.      The Borrower, the Guarantors and the Collateral Agent have, in connection
with the execution and delivery of this Agreement, entered into that certain Senior Secured Super-
Priority Debtor-in-Possession Loan Agreement, dated as of January 5, 2025 (as amended, restated,
amended and restated, supplemented or otherwise modified from time to time, the "Credit
Agreement").

B.      To supplement the DIP Orders without in any way diminishing or limiting
the effect of the DIP Orders or the grant of security interest in the Pledged Collateral, the parties
hereto desire to more fully set forth their respective rights in connection with such grant of security
interest in the Pledged Collateral and the First Priority Liens as set forth herein.

C.      Each Guarantor has, pursuant to the Credit Agreement, unconditionally
guaranteed the Secured Obligations.

D.      The Borrower and each Guarantor will receive substantial benefits from the
execution, delivery and performance of the obligations under the Credit Agreement and the other
Loan Documents and each is, therefore, willing to enter into this Agreement in order to induce the
Lenders to make, or be deemed to make, the Loans pursuant to the Credit Agreement.

E.      This Agreement is given by each Pledgor in favor of the Collateral Agent
for the benefit of the Secured Parties to secure the payment and performance of all of the Secured
Obligations.

F.      It is a condition to the obligations of the Lenders to make, or be deemed to
make the Loans under the Credit Agreement that each Pledgor execute and deliver the applicable
Loan Documents, including this Agreement.

G.      The execution, delivery and performance of this Agreement and the grant
of a security interest, pledge and Lien on all of the Pledged Collateral (as hereinafter defined) of

-2-

the Pledgors and the proceeds thereof to secure the Obligations have been authorized pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code by the Interim DIP Order.

H.      To supplement the DIP Orders without in any way diminishing or limiting the effect of the DIP Orders or the security interest, pledge and Lien granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interest, pledge and Lien as set forth herein, in each case in accordance with the DIP Orders in all respects and any applicable rights and protections that the Pledgors may have under the Bankruptcy Code.

A G R E E M E N T :

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Pledgor and the Collateral Agent hereby agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

SECTION 1.1.     Definitions.

(a)      Unless otherwise defined herein or in the Credit Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC; *provided* that in any event, the following terms shall have the meanings assigned to them in the UCC:

"Accounts"; "Bank"; "Chattel Paper"; "Commercial Tort Claim"; "Commodity Account"; "Commodity Contract"; "Commodity Intermediary"; "Documents"; "Electronic Chattel Paper"; "Entitlement Order"; "Equipment"; "Financial Asset"; "Fixtures"; "Goods", "Inventory"; "Letter-of-Credit Rights"; "Letters of Credit"; "Money"; "Payment Intangibles"; "Proceeds"; " Records"; "Securities Account"; "Securities Intermediary"; "Security Entitlement"; "Supporting Obligations"; and "Tangible Chattel Paper."

(b)      Terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement.  Sections 1.01 and 1.02 of the Credit Agreement shall apply herein *mutatis mutandis*.

(c)      The following terms shall have the following meanings:

"Account Control Agreements" shall mean agreements substantially in forms that are reasonably satisfactory to the Collateral Agent and the Required Lenders establishing the Collateral Agent's Control with respect to any Deposit Account, Commodity Account or Securities Account, as applicable.

"Account Debtor" shall mean each person who is obligated on a Receivable or Supporting Obligation related thereto.

"Agreement" shall have the meaning assigned to such term in the Preamble hereof.

"Borrower" shall have the meaning assigned to such term in the Preamble hereof.

"CIPO" shall mean the Canadian Intellectual Property Office.

"Collateral Agent" shall have the meaning assigned to such term in the Preamble hereof.

"Collateral Support" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Pledged Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Communications Licenses" shall mean (i) the One Dot Six License and (ii) all authorizations, licenses, permits, certificates, approvals, registrations and franchises and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, ISED and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"Contracts" shall mean, collectively, with respect to each Pledgor, all sale, service, performance, equipment or property lease contracts, agreements and grants and all other contracts, agreements or grants (in each case, whether written or oral, or third party or intercompany), between such Pledgor and any third party, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof.

"Control" shall mean (i) in the case of each Deposit Account, "control," as such term is defined in Section 9-104 of the UCC, (ii) in the case of any Security Entitlement, "control," as such term is defined in Section 8-106 of the UCC, and (iii) in the case of any Commodity Contract, "control," as such term is defined in Section 9-106 of the UCC.

"Copyrights" shall mean, collectively, with respect to each Pledgor, all copyrights (whether statutory or common law, whether established or registered or applied for in the United States, Canada or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications owned by or registered to such Pledgor, in each case, whether now owned or hereafter created or acquired by or assigned to such Pledgor, together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of such copyrights, (ii) reissues, renewals, continuations and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Credit Agreement" shall have the meaning assigned to such term in Recital A hereof.

"Deposit Accounts" shall mean, collectively, with respect to each Pledgor, (i) all "deposit accounts" as such term is defined in the UCC and in any event shall include all accounts and sub-accounts relating to any of the foregoing accounts and (ii) all cash, funds, checks, notes

and instruments from time to time on deposit in any of the accounts or sub-accounts described in clause (i) of this definition.

"Distributions" shall mean, collectively, with respect to each Pledgor, all dividends, cash, options, warrants, rights, instruments, distributions, returns of capital or principal, income, interest, profits and other property, interests (debt or equity) or proceeds, including as a result of a split, revision, reclassification or other like change of the Pledged Securities, from time to time received, receivable or otherwise distributed to such Pledgor in respect of or in exchange for any or all of the Pledged Securities or Intercompany Notes.

"Excluded Property" shall have the meaning assigned to such term in the Credit Agreement.

"General Intangibles" shall mean, collectively, with respect to each Pledgor, all "general intangibles," as such term is defined in the UCC, of such Pledgor and, in any event, shall include (i) all of such Pledgor's rights, title and interest in, to and under all Contracts and insurance policies (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract), (ii) all know-how and warranties relating to any of the Pledged Collateral or the Mortgaged Property, (iii) any and all other rights, claims, choses-in-action and causes of action of such Pledgor against any other person and the benefits of any and all collateral or other security given by any other person in connection therewith, (iv) all guarantees, endorsements and indemnifications on, or of, any of the Pledged Collateral or any of the Mortgaged Property, (v) all lists, books, records, correspondence, ledgers, printouts, files (whether in printed form or stored electronically), tapes and other papers or materials containing information relating to any of the Pledged Collateral or any of the Mortgaged Property, including all customer or tenant lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, appraisals, recorded knowledge, surveys, studies, engineering reports, test reports, manuals, standards, processing standards, performance standards, catalogs, research data, computer and automatic machinery software and programs and the like, field repair data, accounting information pertaining to such Pledgor's operations or any of the Pledged Collateral or any of the Mortgaged Property and all media in which or on which any of the information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data, (vi) all licenses, consents, permits, variances, certifications, authorizations and approvals, however characterized, now or hereafter acquired or held by such Pledgor, including building permits, certificates of occupancy, environmental certificates, industrial permits or licenses and certificates of operation, (vii) all rights to reserves, deferred payments, deposits, refunds, indemnification of claims and claims for tax or other refunds against any Governmental Authority and (viii) any Equity Interests in other person that do not constitute Investment Property.

"Goodwill" shall mean, collectively, with respect to each Pledgor, the goodwill connected with such Pledgor's business including all goodwill connected with (i) the use of and symbolized by any Trademark or Intellectual Property License with respect to any Trademark in which such Pledgor has any interest, (ii) all know-how, trade secrets, customer and supplier lists, proprietary information, inventions, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the

right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, consulting agreements, engineering contracts and such other assets which relate to such goodwill ("Trade Secrets") and (iii) all product lines of such Pledgor's business.

"Guarantors" shall have the meaning assigned to such term in the Preamble hereof.

"Instruments" shall mean, collectively, with respect to each Pledgor, all "instruments," as such term is defined in Article 9, rather than Article 3, of the UCC, and shall include all promissory notes, drafts, bills of exchange or acceptances.

"Intellectual Property Collateral" shall mean, collectively, the Patents, Trademarks, Copyrights, Intellectual Property Licenses, Trade Secrets and Goodwill.

"Intellectual Property Licenses" shall mean, collectively, with respect to each Pledgor, all license and distribution agreements with, and covenants not to sue, any other party with respect to any Patent, Trademark, Copyright, Trade Secret, or other intellectual property right, or any other patent, trademark, copyright, trade secret, or other intellectual property right whether such Pledgor is a licensor or licensee, distributor or distributee under any such license or distribution agreement, or grants or receives a covenant not to sue under such agreement, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) rights to receive income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future violations thereof, (iii) rights to sue for past, present and future or violations thereof and (iv) other rights to use, exploit or practice any or all of the Patents, Trademarks or Copyrights or any other patent, trademark or copyright thereunder.

"Intercompany Notes" shall mean, with respect to each Pledgor, all intercompany notes described in Schedule 10 to the Perfection Certificate and intercompany notes hereafter acquired by such Pledgor and all certificates, instruments or agreements evidencing such intercompany notes, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereof to the extent permitted pursuant to the terms hereof.

"Investment Property" shall mean a security, whether certificated or uncertificated, Security Entitlement, Securities Account, Commodity Contract or Commodity Account, excluding, however, the Securities Collateral.

"Joinder Agreement" shall mean an agreement substantially in the form of Exhibit 3 hereto.

"Material Intellectual Property Collateral" shall mean any Intellectual Property Collateral that is material (i) to the use and operation of the Pledged Collateral or Mortgaged Property or (ii) to the business, results of operations, prospects or condition, financial or otherwise, of any Pledgor.

"Mortgaged Property" shall have the meaning assigned to such term in the Mortgages (if any). As of the Interim DIP Order Entry Date, there are no Mortgages.

"Patents" shall mean, collectively, with respect to each Pledgor, all patents and patent applications owned by or registered to such Pledgor (whether established or issued or applied for in the United States, Canada or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Perfection Certificate" shall mean that certain perfection certificate dated as of the date hereof, executed and delivered on the Interim DIP Order Entry Date by each Pledgor in favor of the Collateral Agent for the benefit of the Secured Parties, and each other Perfection Certificate (which shall be in form and substance reasonably acceptable to the Collateral Agent) executed and delivered by the applicable Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties contemporaneously with the execution and delivery of each Joinder Agreement executed in accordance with Section 3.5 hereof, in each case, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the Credit Agreement or upon the request of the Collateral Agent.

"Pledge Amendment" shall have the meaning assigned to such term in Section 5.1 hereof.

"Pledged Collateral" shall have the meaning assigned to such term in Section 2.1 hereof.

"Pledged Securities" shall mean, collectively, with respect to each Pledgor, (i) all issued and outstanding Equity Interests of each issuer set forth on Schedules 9(a) and 9(b) to the Perfection Certificate as being owned by such Pledgor and all options, warrants, rights, agreements and additional Equity Interests of whatever class of any such issuer acquired by such Pledgor (including by issuance), together with all rights, privileges, authority and powers of such Pledgor relating to such Equity Interests in each such issuer or under any Organizational Document of each such issuer, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such Equity Interests, (ii) all Equity Interests of any issuer, which Equity Interests are hereafter acquired by such Pledgor (including by issuance) and all options, warrants, rights, agreements and additional Equity Interests of whatever class of any such issuer acquired by such Pledgor (including by issuance), together with all rights, privileges, authority and powers of such Pledgor relating to such Equity Interests or under any Organizational Document of any such issuer, and the certificates, instruments and agreements representing such Equity Interests and any and all interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such Equity Interests, from time to time acquired by such Pledgor in any manner, and (iii) all Equity Interests issued in respect of the Equity Interests referred to in clause (i) or (ii) upon any consolidation or merger of any issuer of such Equity Interests.

"Pledgor" shall have the meaning assigned to such term in the Preamble hereof.

-7-

"Receivables" shall mean all (i) Accounts, (ii) Chattel Paper, (iii) Payment Intangibles, (iv) General Intangibles, (v) Instruments and (vi) all other rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the UCC together with all of Pledgors' rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Records relating thereto.

"Secured Obligations" shall mean the "Obligations" (as defined in the Credit Agreement).

"Secured Parties" shall have the meaning assigned to such term in the Credit Agreement.

"Securities Collateral" shall mean, collectively, the Pledged Securities, the Intercompany Notes and the Distributions.

"Trademarks" shall mean, collectively, with respect to each Pledgor, all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locations (URL's), domain names, corporate names and trade names, and other indicia of origin, whether registered or unregistered, in each case that are owned by or registered to such Pledgor, and all issuances and applications for the foregoing (whether statutory or common law and whether established or issued or applied for in the United States, Canada or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to such Pledgor's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements thereof.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's and the Secured Parties' security interest in any item or portion of the Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"ULC" shall mean an issuer that is an unlimited company or unlimited liability company.

"ULC Laws" shall mean the *Companies Act* (Nova Scotia), the *Business Corporations Act* (Alberta), the *Business Corporations Act* (British Columbia), and any other present or future laws governing ULCs.

"ULC Shares" shall mean shares or other equity interests in the capital stock of a ULC.

SECTION 1.2.    Interpretation.  The rules of interpretation specified in the Credit Agreement (including Section 1.02 thereof) shall be applicable to this Agreement.

SECTION 1.3.    Resolution of Drafting Ambiguities.  Each Pledgor acknowledges and agrees that it was represented by counsel in connection with the execution and delivery hereof, that it and its counsel reviewed and participated in the preparation and negotiation hereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof.

SECTION 1.4.    Perfection Certificate.  The Collateral Agent and each Secured Party agree that the Perfection Certificate and all descriptions of Pledged Collateral, schedules, amendments and supplements thereto are and shall at all times remain a part of this Agreement.

ARTICLE II

GRANT OF SECURITY AND SECURED OBLIGATIONS

SECTION 2.1.    Grant of Security Interest.  As collateral security for the payment and performance in full of all the Secured Obligations, subject to the terms of the DIP Orders, each Pledgor hereby pledges and grants to the Collateral Agent for the benefit of the Secured Parties, a continuing First Priority lien on and security interest in all of the right, title and interest of such Pledgor in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time, including any such property in which a First Priority Lien is granted to the Collateral Agent pursuant to, as applicable, the Security Documents, the DIP Orders, or any other order of the Bankruptcy Court to secure the Obligations (collectively, the "Pledged Collateral"):

(i)    all Accounts;

(ii)    all Equipment, Goods, Inventory and Fixtures including, without limitation, each satellite owned by or leased to any Pledgor and all ground segment equipment for the tracking, telemetry, control and/or monitoring of any satellite;

(iii)    all Documents, Instruments and Chattel Paper;

(iv)    all Letters of Credit and Letter-of-Credit Rights;

(v)    all Securities Collateral;

(vi)    all Investment Property and Financial Assets;

(vii)    all Intellectual Property Collateral;

(viii)    the Commercial Tort Claims described on Schedule 12 to the Perfection Certificate or otherwise described in writing from time to time pursuant to Section 3.4(f);

(ix)     all General Intangibles;

(x)      all Money and all Deposit Accounts;

(xi)     with respect to each right to payment or performance included in the Pledged Collateral from time to time, all Supporting Obligations that support such payment or performance and any Lien that (x) secures such right to payment or performance or (y) secures any such Supporting Obligation;

(xii)    all Material Leases;

(xiii)   all books and records relating to the Pledged Collateral;

(xiv)    all present and future claims, rights, interests, assets and properties recovered by or on behalf of Pledgors or any trustee of any Pledgor (whether in the Chapter 11 Cases or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all such property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to, inter alia, Sections 542, 544, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code, in each case, subject to the terms of the DIP Orders;

(xv)     all rights of such Pledgor under or relating to all Communication Licenses and the proceeds of any Communication Licenses; *provided* that such security interest does not include at any time any Communication Licenses to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest therein pursuant to the Communications Act of 1934, as amended, and the regulations promulgated thereunder, as in effect as such time, but such security interest does include, to the maximum extent permitted by law, all rights incident or appurtenant to the Communication Licenses and the right to receive all proceeds derived from or in connection with the sale, lease, assignment, transfer or other disposition of the Communication Licenses;

(xvi)    all Proceeds, substitutions or replacements of any Excluded Property unless such Proceeds, substitutions or replacements would constitute Excluded Property, including (i) the Proceeds and the rights to receive the Proceeds of all Communications Licenses and (ii) both the Communications Licenses and all of Pledgors' other rights with respect to each Communications License, in each case, to the maximum extent permitted by Requirements of Law at any time;

(xvii)   to the extent not covered by clauses (i) through (xvi) of this sentence, all other personal property of such Pledgor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Pledgor from time to time with respect to any of the foregoing; and

(xviii)  to the extent not covered by clauses (i) through (xvii) of this sentence, all DIP Collateral (as defined in the DIP Orders).

-10-

Notwithstanding anything to the contrary contained in clauses (i) through (xvii) above, the security interest created by this Agreement shall not extend to, and the term "Pledged Collateral" shall not include, any Excluded Property and (i) the Pledgors shall from time to time at the request of the Collateral Agent give written notice to the Collateral Agent identifying in reasonable detail the Excluded Property and shall provide to the Collateral Agent such other information regarding the Excluded Property as the Collateral Agent may reasonably request and (ii) from and after the Interim DIP Order Entry Date, no Pledgor shall permit to become effective in any Material Contract a provision that would prohibit the creation of a First Priority Lien on such Material Contract in favor of the Collateral Agent unless the Collateral Agent determines, in its reasonable judgment, that such prohibition is usual and customary in transactions of such type.

For the avoidance of doubt the First Priority Liens and security interests granted herein are granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or transfer or in any way affect or modify, any obligation or liability of any Pledgor with respect to any of the Pledged Collateral or any transaction in connection therewith.

SECTION 2.2.    Filings.    (a) Each Pledgor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Pledged Collateral, including (i) whether such Pledgor is an organization, the type of organization and any organizational identification number issued to such Pledgor, (ii) any financing or continuation statements or other documents without the signature of such Pledgor where permitted by law, including the filing of a financing statement describing the Pledged Collateral as "all assets now owned or hereafter acquired by the Pledgor or in which Pledgor otherwise has rights" and (iii) in the case of a financing statement filed as a fixture filing or covering Pledged Collateral constituting minerals or the like to be extracted or timber to be cut, a sufficient description of the real property to which such Pledged Collateral relates.  Each Pledgor agrees to provide all information described in the immediately preceding sentence to the Collateral Agent promptly upon request by the Collateral Agent.  Notwithstanding the foregoing, in no event shall the Collateral Agent have any responsibility for filing any financing statements or amendments thereto.

(b)    Each Pledgor hereby ratifies its authorization for the Collateral Agent to file in any relevant jurisdiction any financing statements relating to the Pledged Collateral if filed prior to the date hereof.

(c)    It is the intention of the parties that if the Collateral Agent shall fail to have a perfected DIP Lien in any particular property or assets of any Pledgor for any reason whatsoever, the provisions of this Agreement and/or of the other Loan Security Documents, together with all financing statements and other public filings relating to Liens filed or recorded by the Collateral Agent against the Pledgors and, with respect to all Pledgors the DIP Orders and any other order entered by the Bankruptcy Court to secure the Secured Obligations, would be sufficient to create a perfected DIP Lien in any property or assets that such Pledgor may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the Pledged Collateral.

-11-

ARTICLE III

PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES;
USE OF PLEDGED COLLATERAL

SECTION 3.1.     Delivery of Certificated Securities Collateral.  Each Pledgor represents and warrants that all certificates, agreements or instruments representing or evidencing Securities Collateral constituting "certificated securities" under the UCC that are in existence on the date hereof have been delivered to the Collateral Agent in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank and that the Collateral Agent has a perfected First Priority security interest therein.  Each Pledgor hereby agrees that all certificates, agreements or instruments representing or evidencing Securities Collateral constituting "certificated securities" under the UCC acquired by such Pledgor after the date hereof shall promptly (but in any event within ten (10) days after receipt thereof by such Pledgor) be delivered to and held by or on behalf of the Collateral Agent pursuant hereto.  All certificated Securities Collateral shall be in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Collateral Agent.  The Collateral Agent, acting at the direction of the Required Lenders, shall have the right, at any time upon the occurrence and during the continuance of any Event of Default, to endorse, assign or otherwise transfer to or to register in the name of the Collateral Agent or any of its nominees or endorse for negotiation any or all of the Securities Collateral, without any indication that such Securities Collateral is subject to the security interest hereunder.  In addition, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent, acting at the direction of the Required Lenders, shall have the right at any time to exchange certificates representing or evidencing Securities Collateral for certificates of smaller or larger denominations.

SECTION 3.2.     Perfection of Uncertificated Securities Collateral. Each Pledgor represents and warrants that the Collateral Agent has a perfected First Priority security interest in all uncertificated Pledged Securities pledged by it hereunder that are in existence on the date hereof (whether or not constituting "uncertificated securities" under the UCC).  Each Pledgor hereby agrees that if any of the Pledged Securities are at any time not evidenced by certificates of ownership but constitute "uncertificated securities" under the UCC, then each applicable Pledgor shall, to the extent permitted by applicable law, (i) cause the issuer to execute and deliver to the Collateral Agent  an acknowledgment of the pledge of such Pledged Securities substantially in the form of Exhibit 1 hereto or such other form that is reasonably satisfactory to the Collateral Agent, (ii) if necessary or desirable to perfect a security interest in such Pledged Securities, cause such pledge to be recorded on the equityholder register or the books of the issuer, execute any customary pledge forms or other documents necessary or appropriate to complete the pledge and give the Collateral Agent the right to transfer such Pledged Securities under the terms hereof and (iii) after the occurrence and during the continuance of any Event of Default, upon request by the Collateral Agent, acting at the direction of the Required Lenders, (A) cause the Organizational Documents of each such issuer that is a Subsidiary of the Borrower to be amended to provide that such Pledged Securities shall be treated as "securities" for purposes of the UCC and (B) cause such Pledged Securities to become certificated and delivered to the Collateral Agent in accordance with the provisions of Section 3.1.

-12-

SECTION 3.3.    Financing Statements and Other Filings; Maintenance of Perfected Security Interest. Each Pledgor represents and warrants that all financing statements, agreements, instruments and other documents necessary to perfect the security interest granted by it to the Collateral Agent in respect of the Pledged Collateral have been delivered to the Collateral Agent and filed by the Pledgor (or its designee) in each governmental, municipal or other office specified in Schedule 6 to the Perfection Certificate. Each Pledgor agrees that at the sole cost and expense of the Pledgors, such Pledgor will maintain the security interest created by this Agreement in the Pledged Collateral as a perfected First Priority security interest subject to Permitted Liens, except to the extent such security interest is not perfected pursuant to minimum thresholds provided for in Section 3.4 and such security interest cannot be perfected by filing of financing statements.

SECTION 3.4.    Other Actions.    In order to further ensure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Collateral Agent's security interest in the Pledged Collateral, each Pledgor represents and warrants (as to itself) as follows and agrees, in each case subject to and in accordance with the terms of the DIP Orders, in each case at such Pledgor's own expense, to take the following actions with respect to the following Pledged Collateral:

(a)    Instruments and Tangible Chattel Paper.  As of the date hereof, no amounts payable under or in connection with any of the Pledged Collateral are evidenced by any Instrument or Tangible Chattel Paper other than such Instruments and Tangible Chattel Paper listed in Schedule 10 to the Perfection Certificate.  Each Instrument and each item of Tangible Chattel Paper listed in Schedule 10 to the Perfection Certificate has been properly endorsed, assigned and delivered to the Collateral Agent, accompanied by instruments of transfer or assignment duly executed in blank.  If any amount then payable under or in connection with any of the Pledged Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, and such amount, together with all amounts payable evidenced by any Instrument or Tangible Chattel Paper not previously delivered to the Collateral Agent exceeds $250,000 in the aggregate for all Pledgors, the Pledgor acquiring such Instrument or Tangible Chattel Paper shall promptly (but in any event within ten (10) days after receipt thereof) endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent may from time to time specify.

(b)    Deposit Accounts and DIP Loan Proceeds Account.  As of the date hereof, no Pledgor has any Deposit Accounts other than the accounts listed in Schedule 13 to the Perfection Certificate.  No Pledgor shall hereafter establish and maintain any Deposit Account unless (1) it shall have given the Collateral Agent ten (10) days' prior written notice of its intention to establish such new Deposit Account with a Bank and (2) such Bank shall be reasonably acceptable to the Collateral Agent and the Required Lenders.  The Borrower shall, and shall cause the applicable Bank to, duly execute and deliver to the Collateral Agent an Account Control Agreement with respect to the DIP Loan Proceeds Account as set forth in Section 5.14 of the Credit Agreement.  The Collateral Agent agrees with the Borrower that the Collateral Agent shall not give any instructions directing the disposition of funds from time to time credited to the DIP Loan Proceeds Account or withhold any withdrawal rights from the Borrower with respect to funds from time to time

credited to the DIP Loan Proceeds Account unless an Event of Default has occurred and is continuing.

(c)    Securities Accounts and Commodity Accounts. (i) As of the date hereof, no Pledgor has any Securities Accounts or Commodity Accounts other than those listed in Schedule 13 to the Perfection Certificate. No Pledgor shall hereafter establish and maintain any Securities Account or Commodity Account with any Securities Intermediary or Commodity Intermediary unless (1) it shall have given the Collateral Agent ten days' prior written notice of its intention to establish such new Securities Account or Commodity Account with such Securities Intermediary or Commodity Intermediary and (2) such Securities Intermediary or Commodity Intermediary shall be reasonably acceptable to the Collateral Agent and the Required Lenders. Each Pledgor shall accept any cash and Investment Property in trust for the benefit of the Collateral Agent.

(ii)    As between the Collateral Agent and the Pledgors, the Pledgors shall bear the investment risk with respect to the Investment Property and Pledged Securities, and the risk of loss of, damage to, or the destruction of the Investment Property and Pledged Securities, whether in the possession of, or maintained as a Security Entitlement or deposit by, or subject to the Control of, the Collateral Agent, a Securities Intermediary, a Commodity Intermediary, any Pledgor or any other person.

(d)    Electronic Chattel Paper and Transferable Records. As of the date hereof, no amount under or in connection with any of the Pledged Collateral is evidenced by any Electronic Chattel Paper or any "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction) other than such Electronic Chattel Paper and transferable records listed in Schedule 10 to the Perfection Certificate. If any amount payable under or in connection with any of the Pledged Collateral shall be evidenced by any Electronic Chattel Paper or any transferable record, the Pledgor acquiring such Electronic Chattel Paper or transferable record shall promptly notify the Collateral Agent thereof and shall take such action as necessary or as the Collateral Agent may reasonably request to vest in the Collateral Agent control of such Electronic Chattel Paper under Section 9-105 of the UCC or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The requirement in the preceding sentence shall not apply to the extent that such amount, together with all amounts payable evidenced by Electronic Chattel Paper or any transferable record in which the Collateral Agent has not been vested control within the meaning of the statutes described in the immediately preceding sentence, does not exceed $250,000 in the aggregate for all Pledgors. The Collateral Agent agrees with such Pledgor that the Collateral Agent will arrange, pursuant to procedures satisfactory to the Collateral Agent and so long as such procedures will not result in the Collateral Agent's loss of control, for the Pledgor to make alterations to the Electronic Chattel Paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to allow without loss of control, unless an Event of Default has occurred

-14-

and is continuing or would occur after taking into account any action by such Pledgor with respect to such Electronic Chattel Paper or transferable record.

(e)     <u>Letter-of-Credit Rights</u>.  If any Pledgor is at any time a beneficiary under a Letter of Credit now or hereafter issued, such Pledgor shall promptly notify the Collateral Agent thereof and such Pledgor shall pursuant to an agreement in form and substance reasonably satisfactory to the Collateral Agent, either (i) arrange for the issuer and any confirmer of such Letter of Credit to consent to an assignment to the Collateral Agent of the proceeds of any drawing under the Letter of Credit or (ii) arrange for the Collateral Agent to become the transferee beneficiary of such Letter of Credit, with the Collateral Agent agreeing, in each case, that the proceeds of any drawing under the Letter of Credit are to be applied as provided herein.  The actions in the preceding sentence shall not be required to the extent that the amount of any such Letter of Credit, together with the aggregate amount of all other Letters of Credit for which the actions described above in clause (i) and (ii) have not been taken, does not exceed $250,000 in the aggregate for all Pledgors.

(f)     <u>Commercial Tort Claims</u>.  As of the date hereof, each Pledgor hereby represents and warrants that it holds no Commercial Tort Claims other than those listed in <u>Schedule 12</u> to the Perfection Certificate.  If any Pledgor shall at any time hold or acquire a Commercial Tort Claim, such Pledgor shall immediately notify the Collateral Agent in writing signed by such Pledgor of the brief details thereof and grant to the Collateral Agent in such writing a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Collateral Agent. The requirement in the preceding sentence shall not apply to the extent that the amount of such Commercial Tort Claim, together with the amount of all other Commercial Tort Claims held by any Pledgor in which the Collateral Agent does not have a security interest, does not exceed $250,000 in the aggregate for all Pledgors.

(g)     [Reserved].

(h)     [Reserved].

(i)     <u>Communications Licenses</u>.  Each Pledgor agrees that, in the event of any change in law occurring after the date hereof that affects in any manner the Collateral Agent's rights with respect to the Communications Licenses or related to the Collateral Agent obtaining or enforcing such rights, each Pledgor shall amend this Agreement and the other Loan Documents to provide the Secured Parties with such rights to the greatest extent possible consistent with then-applicable Law.  No Pledgor shall permit, or take any action that would permit, any person to have a First Priority Lien on any Communications License or in or upon any of the rights appurtenant thereto (including but not limited to the rights of access, use or sale or the right to receive money, consideration or proceeds from any sale or transfer of any Communications License) that is superior to that of the Collateral Agent and the Secured Parties, regardless of whether applicable law permits the Collateral Agent or the Lenders to hold such a Lien.

(j)     [Reserved].

-15-

SECTION 3.5.   Joinder of Additional Guarantors.  The Pledgors shall cause each Subsidiary of the Borrower  which, from time to time, after the date hereof shall be required to pledge any assets to the Collateral Agent for the benefit of the Secured Parties pursuant to the provisions of the Credit Agreement, to execute and deliver to the Collateral Agent (i) a Joinder Agreement substantially in the form of Exhibit 3 hereto and (ii) a Perfection Certificate, in each case, within ten (10) days of the date on which it was acquired or created, and upon such execution and delivery, such Subsidiary shall constitute a "Guarantor" and a "Pledgor" for all purposes hereunder with the same force and effect as if originally named as a Guarantor and Pledgor herein. The execution and delivery of such Joinder Agreement shall not require the consent of any Pledgor hereunder.  The rights and obligations of each Pledgor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor and Pledgor as a party to this Agreement.

SECTION 3.6.   Supplements; Further Assurances.  Each Pledgor shall take such further actions, and execute and/or deliver to the Collateral Agent such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as may be necessary or as the Collateral Agent and/or the Required Lenders, as applicable, shall request in order to create, perfect, preserve and protect the security interest in the Pledged Collateral as provided herein and the rights and interests granted to the Collateral Agent hereunder, to carry into effect the purposes hereof or better to assure and confirm the validity, enforceability and priority of the Collateral Agent's security interest in the Pledged Collateral or permit the Collateral Agent (acting at the direction of the Required Lenders) to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral, including the filing of financing statements, continuation statements and other documents (including this Agreement) under the Uniform Commercial Code in effect in any jurisdiction with respect to the security interest created hereby and the Cape Town Convention on Mobile Goods and the execution and delivery of the Account Control Agreement in respect of the DIP Loan Proceeds Account, all in form reasonably satisfactory to the Collateral Agent and in such offices (including the United States Patent and Trademark Office, the United States Copyright Office and the Canadian Intellectual Property Office) wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest in the Pledged Collateral as provided herein and to preserve the other rights and interests granted to the Collateral Agent hereunder, as against third parties, with respect to the Pledged Collateral.  Without limiting the generality of the foregoing, each Pledgor shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Collateral Agent from time to time as necessary or upon reasonable request by the Collateral Agent and/or the Required Lenders, lists, schedules, descriptions and designations of the Pledged Collateral, copies of warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments.  If an Event of Default has occurred and is continuing, the Collateral Agent, acting at the direction of the Required Lenders, may institute and maintain, in its own name or in the name of any Pledgor, such suits and proceedings as the Collateral Agent and/or the Required Lenders may be advised by their respective counsel as being necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Pledged Collateral.  All of the foregoing shall be at the sole cost and expense of the Pledgors. Notwithstanding any failure on the part of any Pledgor, Secured Party or any other Person to take any action to perfect, maintain, protect or enforce the First Priority Liens and Security Interests in the Pledged Collateral granted hereunder, the DIP Orders shall automatically

and without further action by any Person, perfect such Liens and Security Interests against the Pledged Collateral.

ARTICLE IV

REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Pledgor represents, warrants and covenants as follows:

SECTION 4.1.    Title.  Subject to the DIP Orders, except for the security interest granted to the Collateral Agent for the benefit of the Secured Parties pursuant to this Agreement and Permitted Liens, such Pledgor owns and has rights and, as to Pledged Collateral acquired by it from time to time after the date hereof, will own and have rights in each item of Pledged Collateral pledged by it hereunder, free and clear of any and all Liens or claims of others.  In addition, no Liens or claims exist on the Securities Collateral, other than as permitted by clauses (6), (8), (9) and (12) of the defined term "Permitted Liens" in the Credit Agreement.

SECTION 4.2.    Validity of Security Interest.  Subject to the DIP Orders, the security interest in and First Priority Lien on the Pledged Collateral granted to the Collateral Agent for the benefit of the Secured Parties hereunder constitutes (a) a legal, valid, enforceable and continuing security interest in and First Priority Lien on all the Pledged Collateral securing the payment and performance of the Secured Obligations, and (b) an automatically perfected security interest in all the Pledged Collateral. Subject to the DIP Orders, the Collateral Agent's security interest in the Pledged Collateral is and shall be a First Priority Lien on all of the Pledged Collateral subject to no other Liens other than Permitted Liens and the Carve-Out and, pursuant to the terms of the DIP Orders, no filing or other action will be necessary to perfect or protect such First Priority Liens and security interests.

SECTION 4.3.    Defense of Claims; Transferability of Pledged Collateral. Subject to Section 10.03 of the Credit Agreement and the DIP Orders, each Pledgor shall, at its own cost and expense, defend title to the Pledged Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Collateral Agent and the priority thereof against all claims and demands of all persons, at its own cost and expense, at any time claiming any interest therein adverse to the Collateral Agent or any other Secured Party other than Permitted Liens.  Except with respect to Material Leases as set forth on the Perfection Certificate, there is no agreement, order, judgment or decree, and no Pledgor shall enter into any agreement or take any other action, that would restrict the transferability of any of the Pledged Collateral or otherwise impair or conflict with such Pledgor's obligations or the rights of the Collateral Agent hereunder.

SECTION 4.4.    Other Financing Statements.  It has not filed, nor authorized any third party to file (nor will there be), any valid or effective financing statement (or similar statement, instrument of registration or public notice under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Pledged Collateral, except such as have been filed in favor of the Collateral Agent pursuant to this Agreement or in favor of any holder of a Permitted Lien under clauses (8), (9) or (14) of the defined term "Permitted Liens" in the Credit Agreement with respect to such Permitted Lien or financing statements or public notices relating to the termination statements listed on Schedule 8 to the Perfection Certificate.  Subject to the DIP

Orders, no Pledgor shall execute, authorize or permit to be filed in any public office any financing statement (or similar statement, instrument of registration or public notice under the law of any jurisdiction) relating to any Pledged Collateral, except financing statements and other statements and instruments filed or to be filed in respect of and covering the security interests granted by such Pledgor to the holder of the Permitted Liens.

SECTION 4.5.    Location of Inventory and Equipment.   Subject to the DIP Orders, it shall not move any Equipment or Inventory that (A) constitutes Pledged Collateral and (B) has an aggregate fair market value of greater than or equal to $100,000 other than to any other location that is listed in Schedules 2(a), (b) or (c) of the Perfection Certificate, unless it shall have given the Collateral Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate) of its intention to do so, clearly describing such new location and providing such other information in connection therewith as the Collateral Agent may request; *provided* that in no event shall any Equipment or Inventory be moved to any location outside of the continental United States.

SECTION 4.6.    Due Authorization and Issuance.   All of the Pledged Securities existing on the date hereof have been, and to the extent any Pledged Securities are hereafter issued, such Pledged Securities will be, upon such issuance, duly authorized, validly issued and fully paid and non-assessable to the extent applicable.   There is no amount or other obligation owing by any Pledgor to any issuer of the Pledged Securities in exchange for or in connection with the issuance of the Pledged Securities or any Pledgor's status as a partner or a member of any issuer of the Pledged Securities.

SECTION 4.7.    Consents, etc.   In the event that the Collateral Agent (acting at the direction of the Required Lenders) desires to exercise any remedies, voting or consensual rights or attorney-in-fact powers set forth in this Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other person therefor, other than the Bankruptcy Court, then, upon the reasonable request of the Collateral Agent, such Pledgor agrees, subject to the DIP Orders, to use its best efforts to assist and aid the Collateral Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

SECTION 4.8.    Pledged Collateral.   All information set forth herein, including the schedules hereto, and all information contained in any documents, schedules and lists heretofore delivered to any Secured Party, including the Perfection Certificate and the schedules thereto, in connection with this Agreement, in each case, relating to the Pledged Collateral, is accurate and complete in all material respects.   The Pledged Collateral described on the schedules to the Perfection Certificate constitutes all of the property of such type of Pledged Collateral owned or held by the Pledgors.

SECTION 4.9.    Insurance.   Subject to the DIP Orders, in the event that the proceeds of any insurance claim are paid to any Pledgor after the Collateral Agent has exercised its right to foreclose after an Event of Default, such Net Cash Proceeds shall be held in trust for the benefit of the Collateral Agent and immediately after receipt thereof shall be paid to the Collateral Agent for application in accordance with the Credit Agreement.

SECTION 4.10.   Permitted Liens.  Subject to the DIP Orders, nothing herein or in the Credit Agreement (including the definition and use of the term "Permitted Liens") is intended or shall be deemed to subordinate the First Priority Liens and security interests granted herein to any Permitted Lien or any other Lien or security interests affecting all or any portion of the Collateral.

SECTION 4.11.   Collateral.  The Collateral Agent shall have received on the Interim DIP Order Entry Date:

(a)   a complete and correct copy of each of the executed Loan Security Documents and the Perfection Certificate;

(b)   all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers undated and endorsed in blank;

(c)   the Intercompany Note executed by and among the Borrower and all of its Subsidiaries, accompanied by appropriate instruments of transfer undated and endorsed in blank;

(d)   except as specified on Schedule 4.12, all other certificates, agreements or instruments necessary to perfect the Collateral Agent's security interest in all Chattel Paper, all Instruments and all Investment Property of the Borrower and each Guarantor; and

(e)   UCC and PPSA financing statements in appropriate form for filing under the UCC and PPSA, as applicable.

SECTION 4.12.   Post-Closing Obligations.  The Pledgors shall execute and deliver the documents and complete the tasks set forth on Schedule 4.12, in each case within the time limits specified on such schedule.

ARTICLE V

CERTAIN PROVISIONS CONCERNING SECURITIES COLLATERAL

SECTION 5.1.   Pledge of Additional Securities Collateral.  Subject to Section 5.11 and Section 5.12 of the Credit Agreement, and the DIP Orders, each Pledgor shall, upon obtaining any Pledged Securities or Intercompany Notes of any person, accept the same in trust for the benefit of the Collateral Agent and promptly (but in any event within ten (10) days after receipt thereof) deliver to the Collateral Agent a pledge amendment, duly executed by such Pledgor, in substantially the form of Exhibit 2 hereto (each, a "Pledge Amendment"), and the certificates and other documents required under Section 3.1 and Section 3.2 hereof in respect of the additional Pledged Securities or Intercompany Notes which are to be pledged pursuant to this Agreement, and confirming the attachment of the First Priority Lien hereby created on and in respect of such additional Pledged Securities or Intercompany Notes.  Each Pledgor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Agreement and agrees

that all Pledged Securities or Intercompany Notes listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder be considered Pledged Collateral.

SECTION 5.2.    Voting Rights; Distributions; etc.

In each of the below cases, subject to and in accordance with the DIP Orders and any requirements, restrictions or limitations imposed by the Bankruptcy Court or otherwise under the Bankruptcy Code:

(a)    So long as no Event of Default shall have occurred and be continuing:

(i)    Each Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Securities Collateral or any part thereof for any purpose not inconsistent with the terms or purposes hereof, or any DIP Orders, or the Credit Agreement; provided, however, that no Pledgor shall in any event exercise such rights in any manner which could reasonably be expected to have a Material Adverse Effect.

(ii)    Each Pledgor shall be entitled to receive and retain, and to utilize free and clear of the First Priority Lien hereof, any and all Distributions, but only if and to the extent made in accordance with the provisions of the Credit Agreement; provided, however, that any and all such Distributions consisting of rights or interests in the form of securities shall be forthwith delivered to the Collateral Agent to hold as Pledged Collateral and shall, if received by any Pledgor, be received in trust for the benefit of the Collateral Agent, be segregated from the other property or funds of such Pledgor and be promptly (but in any event within ten (10) days after receipt thereof) delivered to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

(b)    So long as no Event of Default shall have occurred and be continuing, the Collateral Agent shall be deemed without further action or formality to have granted to each Pledgor all necessary consents relating to voting rights and shall, if necessary, upon written request of any Pledgor and at the sole cost and expense of the Pledgors, from time to time execute and deliver (or cause to be executed and delivered) to such Pledgor all such instruments as such Pledgor may reasonably request in order to permit such Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to Section 5.2(a)(i) hereof and to receive the Distributions which it is authorized to receive and retain pursuant to Section 5.2(a)(ii) hereof.

(c)    Upon the occurrence and during the continuance of any Event of Default:

(i)    All rights of each Pledgor to exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to Section 5.2(a)(i) hereof shall immediately cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to exercise such voting and other consensual rights.

(ii)    All rights of each Pledgor to receive Distributions which it would otherwise be authorized to receive and retain pursuant to Section 5.2(a)(ii) hereof shall immediately cease and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to receive and hold as Pledged Collateral such Distributions.

-20-

The Collateral Agent shall endeavor to provide notice to the Pledgors of any cessation of rights as described in this <u>Section 5.2(c)</u> within a reasonable time after such cessation; <u>provided</u>, <u>however</u>, that failure of the Collateral Agent to furnish any such notice shall in no way impede the application of subclauses (i) and (ii) of this <u>Section 5.2(c)</u>.

(d)     Each Pledgor shall, at its sole cost and expense, from time to time execute and deliver to the Collateral Agent appropriate instruments as the Collateral Agent may request in order to permit the Collateral Agent to exercise the voting and other rights which it may be entitled to exercise pursuant to <u>Section 5.2(c)(i)</u> hereof and to receive all Distributions which it may be entitled to receive under <u>Section 5.2(c)(ii)</u> hereof.

(e)     All Distributions which are received by any Pledgor contrary to the provisions of <u>Section 5.2(a)(ii)</u> hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of such Pledgor and shall immediately be paid over to the Collateral Agent as Pledged Collateral in the same form as so received (with any necessary endorsement).

SECTION 5.3.     <u>Defaults, etc.</u>  Each Pledgor hereby represents and warrants that (i) such Pledgor is not in default in the payment of any portion of any mandatory capital contribution, if any, required to be made under any agreement to which such Pledgor is a party relating to the Pledged Securities pledged by it, and such Pledgor is not in violation of any other provisions of any such agreement to which such Pledgor is a party, or otherwise in default or violation thereunder, (ii) no Securities Collateral pledged by such Pledgor is subject to any defense, offset or counterclaim, nor have any of the foregoing been asserted or alleged against such Pledgor by any person with respect thereto, and (iii) as of the date hereof, there are no certificates, instruments, documents or other writings (other than the Organizational Documents and certificates representing such Pledged Securities that have been delivered to the Collateral Agent) which evidence any Pledged Securities of such Pledgor.

SECTION 5.4.     <u>Certain Agreements of Pledgors As Issuers and Holders of Equity Interests</u>.

(a)     In the case of each Pledgor which is an issuer of Securities Collateral, such Pledgor agrees to be bound by the terms of this Agreement relating to the Securities Collateral issued by it and will comply with such terms insofar as such terms are applicable to it.

(b)     In the case of each Pledgor which is a partner, shareholder or member, as the case may be, in a partnership, limited liability company or other entity, such Pledgor hereby consents to the extent required by the applicable Organizational Document to the pledge by each other Pledgor, pursuant to the terms hereof, of the Pledged Securities in such partnership, limited liability company or other entity and, upon the occurrence and during the continuance of an Event of Default, to the transfer of such Pledged Securities to the Collateral Agent or its nominee and to the substitution of the Collateral Agent or its nominee as a substituted partner, shareholder or member in such partnership, limited liability company or other entity with all the rights, powers and duties of a general partner, limited partner, shareholder or member, as the case may be.

-21-

SECTION 5.5.    <u>ULC</u>.    Each Pledgor acknowledges that certain Pledged Securities may now or in the future consist of ULC Shares, and that it is the intention of the Collateral Agent and each Pledgor that the Collateral Agent should not under any circumstances prior to realization thereon be held to be a "member" or a "shareholder", as applicable, of a ULC for the purposes of any ULC Laws.    Therefore, notwithstanding any provisions to the contrary contained in this Agreement, the Credit Agreement or any other Loan Document, where a Pledgor is the registered owner of ULC Shares that are Pledged Securities, such Pledgor will remain the sole registered owner of such ULC Shares until such time as such ULC Shares are effectively transferred into the name of the Collateral Agent or any other person on the books and records of the applicable ULC.    Accordingly, such Pledgor shall be entitled to receive and retain for its own account any dividend on or other distribution, if any, in respect of such ULC Shares (other than any dividend or distribution comprised of additional ULC Shares of such issuer, which shall be delivered to the Collateral Agent to hold hereunder) and shall have the right to vote such ULC Shares and to control the direction, management and policies of the applicable ULC to the same extent as such Pledgor would if such ULC Shares were not pledged to the Collateral Agent hereunder.    Nothing in this Agreement, the Credit Agreement or any other Loan Document is intended to, and nothing in this Agreement, the Credit Agreement or any other Loan Document shall, constitute the Collateral Agent or any person other than such Pledgor as a member or shareholder of a ULC for the purposes of any ULC Laws (whether listed or unlisted, registered or beneficial), until, upon the occurrence and during the continuance of an Event of Default, further steps are taken pursuant hereto or thereto to register the Collateral Agent or such other person, as specified in such notice, as the holder of the ULC Shares.    To the extent any provision hereof would have the effect of constituting the Collateral Agent as a member or a shareholder, as applicable, of any ULC prior to such time, such provision shall be severed herefrom and shall be ineffective with respect to ULC Shares that are Pledged Securities without otherwise invalidating or rendering unenforceable this Agreement or invalidating or rendering unenforceable such provision insofar as it relates to Pledged Securities that are not ULC Shares.    Except upon the exercise of rights of the Collateral Agent to sell, transfer or otherwise dispose of ULC Shares in accordance with this Agreement, such Pledgor shall not cause or permit, or enable an issuer that is a ULC to cause or permit, the Collateral Agent to: (a) be registered as a shareholder or member of such issuer; (b) have any notation entered in its favor in the share register of such issuer; (c) be held out as a shareholder or member of such issuer; (d) receive, directly or indirectly, any dividends, property or other distributions from such issuer by reason of the Collateral Agent holding a security interest in the ULC Shares; or (e) act as a shareholder of such issuer, or exercise any rights of a shareholder, including the right to attend a meeting of shareholders of such issuer or to vote the ULC Shares.

ARTICLE VI

CERTAIN PROVISIONS CONCERNING INTELLECTUAL
PROPERTY COLLATERAL

SECTION 6.1.    <u>Grant of Intellectual Property License</u>.    For the purpose of enabling the Collateral Agent, during the continuance of an Event of Default, to exercise rights and remedies under <u>Article IX</u> hereof at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, subject to the DIP Orders, each

-22-

Pledgor hereby grants to the Collateral Agent, an irrevocable, non-exclusive license to use, assign, license or sublicense any of the Intellectual Property Collateral of such Pledgor, wherever the same may be located. Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

SECTION 6.2.   Protection of Collateral Agent's Security.   On a continuing basis, each Pledgor shall, subject to the DIP Orders and at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Collateral Agent of any adverse determination in any proceeding or the institution of any proceeding in any federal, state, provincial, territorial or local court or administrative body or in the United States Patent and Trademark Office, the United States Copyright Office or the Canadian Intellectual Property Office regarding any Material Intellectual Property Collateral, including such Pledgor's right to register such Material Intellectual Property Collateral or its right to keep and maintain such registration in full force and effect, (ii) maintain all Material Intellectual Property Collateral, (iii) not permit to lapse or become abandoned any Material Intellectual Property Collateral, and not settle or compromise any pending or future litigation or administrative proceeding with respect to any such Material Intellectual Property Collateral except as shall be consistent with commercially reasonable business judgment, (iv) upon such Pledgor obtaining knowledge thereof, promptly notify the Collateral Agent in writing of any event which may be reasonably expected to materially and adversely affect the value or utility of any Material Intellectual Property Collateral or the rights and remedies of the Collateral Agent in relation thereto including a levy or threat of levy or any legal process against any Material Intellectual Property Collateral, (v) not license any Intellectual Property Collateral other than non-exclusive licenses entered into by such Pledgor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the Intellectual Property Licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of any Intellectual Property Collateral or the First Priority Lien on and security interest in the Intellectual Property Collateral created therein hereby, without the consent of the Collateral Agent, (vi) diligently keep adequate records respecting all Intellectual Property Collateral and (vii) furnish to the Collateral Agent from time to time upon the Collateral Agent's request therefor reasonably detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to any Intellectual Property Collateral as the Collateral Agent may from time to time request.

SECTION 6.3.   After-Acquired Property.   If any Pledgor shall at any time after the date hereof (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, or if any intent-to use trademark application is no longer Excluded Property, the provisions hereof shall automatically apply thereto and any such item enumerated in the preceding clause (i) or (ii) shall automatically constitute Intellectual Property Collateral as if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the First Priority Lien and security interest created by this Agreement without further action by any party. Each Pledgor shall promptly provide to the Collateral Agent written notice of any of the foregoing and confirm the attachment of the First Priority Lien and security interest created by this Agreement

to any rights described in clauses (i) and (ii) above by execution of an instrument in form reasonably acceptable to the Collateral Agent and the filing of any instruments or statements as shall be reasonably necessary to create, preserve, protect or perfect the Collateral Agent's security interest in such Intellectual Property Collateral.  Further, each Pledgor authorizes the Collateral Agent to modify this Agreement by amending Schedules 11(a) and 11(b) to the Perfection Certificate to include any Intellectual Property Collateral of such Pledgor acquired or arising after the date hereof.

SECTION 6.4.     Litigation.  Unless there shall occur and be continuing any Event of Default, each Pledgor shall have the right to commence and prosecute in its own name, as the party in interest, for its own benefit and at the sole cost and expense of the Pledgors, such applications for protection of the Intellectual Property Collateral and suits, proceedings or other actions to prevent the infringement, counterfeiting, unfair competition, misappropriation, dilution, diminution in value or other damage as are necessary to protect the Intellectual Property Collateral. Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall have the right but shall in no way be obligated to file and prosecute applications for protection of the Intellectual Property Collateral and/or bring suit in the name of any Pledgor, the Collateral Agent or the Secured Parties to enforce the Intellectual Property Collateral and any Intellectual Property License.  In the event of such suit, each Pledgor shall, at the reasonable request of the Collateral Agent, do any and all lawful acts and execute any and all documents requested by the Collateral Agent in aid of such enforcement and the Pledgors shall promptly reimburse and indemnify the Collateral Agent for all costs and expenses incurred by the Collateral Agent in the exercise of its rights under this Section 6.4.  In the event that the Collateral Agent shall elect not to bring suit to enforce the Intellectual Property Collateral, each Pledgor agrees, at the reasonable request of the Collateral Agent, to take all commercially reasonable actions necessary, whether by suit, proceeding or other action, to prevent the infringement, counterfeiting, unfair competition, dilution, diminution in value of or other damage to any of the Intellectual Property Collateral by any person.

ARTICLE VII

CERTAIN PROVISIONS CONCERNING RECEIVABLES

SECTION 7.1.     Maintenance of Records.  Each Pledgor shall keep and maintain at its own cost and expense complete records of each Receivable, in a manner consistent with prudent business practice, including records of all payments received, all credits granted thereon, all merchandise returned and all other documentation relating thereto.  Each Pledgor shall, at such Pledgor's sole cost and expense, upon the Collateral Agent's demand made at any time after the occurrence and during the continuance of any Event of Default, deliver all tangible evidence of Receivables, including all documents evidencing Receivables and any books and records relating thereto to the Collateral Agent or to its representatives (copies of which evidence and books and records may be retained by such Pledgor).  Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent may transfer a full and complete copy of any Pledgor's books, records, credit information, reports, memoranda and all other writings relating to the Receivables to and for the use by any person that has acquired or is contemplating acquisition of

-24-

an interest in the Receivables or the Collateral Agent's security interest therein without the consent of any Pledgor.

SECTION 7.2.    Legend.    Each Pledgor shall legend, at the request of the Collateral Agent and in form and manner satisfactory to the Collateral Agent, the Receivables and the other books, records and documents of such Pledgor evidencing or pertaining to the Receivables with an appropriate reference to the fact that the Receivables have been assigned to the Collateral Agent for the benefit of the Secured Parties and that the Collateral Agent has a security interest therein.

SECTION 7.3.    Modification of Terms, etc.    No Pledgor shall rescind or cancel any obligations evidenced by any Receivable or modify any term thereof or make any adjustment with respect thereto except in the ordinary course of business consistent with prudent business practice, or extend or renew any such obligations except in the ordinary course of business consistent with prudent business practice or compromise or settle any dispute, claim, suit or legal proceeding relating thereto or sell any Receivable or interest therein except in the ordinary course of business consistent with prudent business practice without the prior written consent of the Collateral Agent.    Each Pledgor shall timely fulfill all obligations on its part to be fulfilled under or in connection with the Receivables.

SECTION 7.4.    Collection.    Each Pledgor shall cause to be collected from the Account Debtor of each of the Receivables, as and when due in the ordinary course of business and consistent with prudent business practice (including Receivables that are delinquent, such Receivables to be collected in accordance with generally accepted commercial collection procedures), any and all amounts owing under or on account of such Receivable, and apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Receivable, except that any Pledgor may, with respect to a Receivable, allow in the ordinary course of business (i) a refund or credit due as a result of returned or damaged or defective merchandise and (ii) such extensions of time to pay amounts due in respect of Receivables and such other modifications of payment terms or settlements in respect of Receivables as shall be commercially reasonable in the circumstances, all in accordance with such Pledgor's ordinary course of business consistent with its collection practices as in effect from time to time.    The costs and expenses (including attorneys' fees) of collection, in any case, whether incurred by any Pledgor, the Collateral Agent or any Secured Party, shall be paid by the Pledgors.

ARTICLE VIII

TRANSFERS

SECTION 8.1.    Transfers of Pledged Collateral.    No Pledgor shall sell, convey, assign or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral pledged by it hereunder except as permitted by the Credit Agreement.

-25-

ARTICLE IX

REMEDIES

SECTION 9.1.    <u>Remedies</u>.  Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent shall, at the direction of the Required Lenders, exercise in respect of the Pledged Collateral, in addition to the other rights and remedies provided under the applicable law or otherwise available to it (subject, in each case, to the DIP Orders), the following remedies:

(i)    Personally, or by agents or attorneys, immediately take possession of the Pledged Collateral or any part thereof, from any Pledgor or any other person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon any Pledgor's premises where any of the Pledged Collateral is located, remove such Pledged Collateral, remain present at such premises to receive copies of all communications and remittances relating to the Pledged Collateral and use in connection with such removal and possession any and all services, supplies, aids and other facilities of any Pledgor;

(ii)    Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Pledged Collateral including instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Pledged Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Collateral Agent, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; <u>provided</u>, <u>however</u>, that in the event that any such payments are made directly to any Pledgor, prior to receipt by any such obligor of such instruction, such Pledgor shall segregate all amounts received pursuant thereto in trust for the benefit of the Collateral Agent and shall promptly (but in no event later than one (1) Business Day after receipt thereof) pay such amounts to the Collateral Agent;

(iii)    Sell, assign, grant a license to use or otherwise liquidate, or direct any Pledgor to sell, assign, grant a license to use or otherwise liquidate, any and all investments made in whole or in part with the Pledged Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, license or liquidation;

(iv)    Take possession of the Pledged Collateral or any part thereof, by directing any Pledgor in writing to deliver the same to the Collateral Agent at any place or places so designated by the Collateral Agent, in which event such Pledgor shall at its own expense: (A) forthwith cause the same to be moved to the place or places designated by the Collateral Agent and therewith delivered to the Collateral Agent, (B) store and keep any Pledged Collateral so delivered to the Collateral Agent at such place or places pending further action by the Collateral Agent and (C) while the Pledged Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition.  Each Pledgor's obligation to deliver the Pledged Collateral as contemplated in this <u>Section 9.1(iv)</u> is of the essence hereof.

Upon application to a court of equity having jurisdiction, the Collateral Agent shall be entitled to a decree requiring specific performance by any Pledgor of such obligation;

(v)     Withdraw all moneys, instruments, securities and other property in any bank, financial securities, deposit or other account of any Pledgor constituting Pledged Collateral for application to the Secured Obligations as provided in Article X hereof;

(vi)     Retain and apply the Distributions to the Secured Obligations as provided in Article X hereof or as otherwise provided for in the DIP Orders;

(vii)     Exercise any and all rights as beneficial and legal owner of the Pledged Collateral, including perfecting assignment of and exercising any and all voting, consensual and other rights and powers with respect to any Pledged Collateral; and

(viii)     Exercise all the rights and remedies of a secured party under the UCC (whether or not the UCC has been enacted in the location where the action is taken), and the Collateral Agent, acting at the direction of the Required Lenders, shall without notice except as specified in Section 9.2 hereof or as required by mandatory provisions of law, sell, assign or grant a license to use the Pledged Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such time or times, at such price or prices and upon such other terms as the Collateral Agent, acting at the direction of the Required Lenders, may deem commercially reasonable irrespective of the impact of any such sales on the market price of the Pledged Collateral. The Collateral Agent or any other Secured Party or any of their respective Affiliates may be the purchaser, licensee, assignee or recipient of the Pledged Collateral or any part thereof at any such sale and shall be entitled (with the consent of the Collateral Agent, which may be withheld in its discretion), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Pledged Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations owed to such person as a credit on account of the purchase price of the Pledged Collateral or any part thereof payable by such person at such sale.  Upon any sale of the Pledged Collateral by the Collateral Agent (including pursuant to a power of sale granted by statue or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be sufficient discharge to the purchaser or purchasers of the Pledged Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.  Each purchaser, assignee, licensee or recipient at any such sale shall acquire the property sold, assigned or licensed absolutely free from any claim or right on the part of any Pledgor, and each Pledgor hereby waives, to the fullest extent permitted by law, all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.  The Collateral Agent shall not be obligated to make any sale of the Pledged Collateral or any part thereof regardless of notice of sale having been given.  The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Pledgor hereby waives, to the fullest

extent permitted by law, any claims against the Collateral Agent arising by reason of the fact that the price at which the Pledged Collateral or any part thereof may have been sold, assigned or licensed at such a private sale was less than the price which might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Pledged Collateral to more than one offeree.  The Collateral Agent may disclaim any warranty, as to time or as to any other matter, in connection with such sale or other disposition, and its doing so shall not be considered adversely to affect the commercial reasonableness of such sale or other disposition.

SECTION 9.2.    Notice of Sale.  Each Pledgor acknowledges and agrees that, to the extent notice of sale or other disposition of the Pledged Collateral or any part thereof shall be required by law and unless the Pledged Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which case the Collateral Agent shall endeavor to provide notice; *provided* that failure to provide such notice shall not affect the validity of any sale or other disposition), ten (10) days' prior notice to such Pledgor of the time and place of any public sale or of the time after which any private sale or other intended disposition is to take place shall be commercially reasonable notification of such matters.  No notification need be given to any Pledgor if it has signed, after the occurrence of an Event of Default, a statement renouncing or modifying any right to notification of sale or other intended disposition.

SECTION 9.3.    Waiver of Notice and Claims.  Each Pledgor hereby waives, to the fullest extent permitted by applicable law, notice or judicial hearing in connection with the Collateral Agent's taking possession or the Collateral Agent's disposition of the Pledged Collateral or any part thereof, including any and all prior notice and hearing for any prejudgment remedy or remedies and any such right which such Pledgor would otherwise have under law, and each Pledgor hereby further waives, to the fullest extent permitted by applicable law: (i) all damages occasioned by such taking of possession, (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Collateral Agent's rights hereunder and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable law.  The Collateral Agent shall not be liable for any incorrect or improper payment made pursuant to this Article IX in the absence of gross negligence or willful misconduct on the part of the Collateral Agent as determined by a court of competent jurisdiction in a final and non-appealable decision.  Any sale of, or the grant of options to purchase, or any other realization upon, any Pledged Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the applicable Pledgor therein and thereto, and shall be a perpetual bar both at law and in equity against such Pledgor and against any and all persons claiming or attempting to claim the Pledged Collateral so sold, optioned or realized upon, or any part thereof, from, through or under such Pledgor.

SECTION 9.4.    Certain Sales of Pledged Collateral.

(a)      Each Pledgor recognizes that, by reason of certain prohibitions contained in law, rules, regulations or orders of any Governmental Authority, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Pledged Collateral, to limit purchasers to those who meet the requirements of such Governmental Authority. Each Pledgor acknowledges that any such sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable   through   a   public   sale   without   such   restrictions,   and,   notwithstanding   such

circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that, except as may be required by applicable law, the Collateral Agent shall have no obligation to engage in public sales.

(b)      Each Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act, and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Securities Collateral and Investment Property, to limit purchasers to persons who will agree, among other things, to acquire such Securities Collateral or Investment Property for their own account, for investment and not with a view to the distribution or resale thereof.  Each Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act), and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Securities Collateral or Investment Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would agree to do so.

(c)      Notwithstanding the foregoing, each Pledgor shall, upon the occurrence and during the continuance of any Event of Default, at the reasonable request of the Collateral Agent and the Secured Parties, for the benefit of the Collateral Agent and the Secured Parties, cause any registration, qualification under or compliance with any Federal or state securities law or laws to be effected with respect to all or any part of the Securities Collateral as soon as practicable and at the sole cost and expense of the Pledgors.  Each Pledgor will use its best efforts to cause such registration to be effected (and be kept effective) and will use its best efforts to cause such qualification and compliance to be effected (and be kept effective) as may be so requested and as would permit or facilitate the sale and distribution of such Securities Collateral including registration under the Securities Act (or any similar statute then in effect), appropriate qualifications under applicable blue sky or other state securities laws and appropriate compliance with all other requirements of any Governmental Authority.  Each Pledgor shall cause the Collateral Agent to be kept advised in writing as to the progress of each such registration, qualification or compliance and as to the completion thereof, shall furnish to the Collateral Agent such number of prospectuses, offering circulars or other documents incident thereto as the Collateral Agent from time to time may request, and shall indemnify and shall cause the issuer of the Securities Collateral to indemnify the Collateral Agent and all others participating in the distribution of such Securities Collateral against all claims, losses, damages and liabilities caused by any untrue statement (or alleged untrue statement) of a material fact contained therein (or in any related registration statement, notification or the like) or by any omission (or alleged omission) to state therein (or in any related registration statement, notification or the like) a material fact required to be stated therein or necessary to make the statements therein not misleading.

(d)      If the Collateral Agent determines to exercise its right to sell any or all of the Securities Collateral or Investment Property, upon written request, the applicable Pledgor shall from time to time furnish to the Collateral Agent all such information as the Collateral Agent may request in order to determine the number of securities included in the Securities Collateral or Investment Property which may be sold by the Collateral Agent as exempt transactions under the

Securities Act and the rules of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(e)     Each Pledgor further agrees that a breach of any of the covenants contained in this Section 9.4 will cause irreparable injury to the Collateral Agent and the other Secured Parties, that the Collateral Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 9.4 shall be specifically enforceable against such Pledgor, and such Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred and is continuing.

SECTION 9.5.     No Waiver; Cumulative Remedies.

(a)     No failure on the part of the Collateral Agent to exercise, no course of dealing with respect to, and no delay on the part of the Collateral Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Collateral Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties.  All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law or otherwise available.

(b)     In the event that the Collateral Agent shall have instituted any proceeding to enforce any right, power, privilege or remedy under this Agreement or any other Loan Document by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Collateral Agent, then and in every such case, the Pledgors, the Collateral Agent and each other Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Pledged Collateral, and all rights, remedies, privileges and powers of the Collateral Agent and the other Secured Parties shall continue as if no such proceeding had been instituted.

SECTION 9.6.     Certain Additional Actions Regarding Intellectual Property.  If any Event of Default shall have occurred and be continuing, in addition to the irrevocable license granted to the Collateral Agent pursuant to Section 6.1 hereof, upon the written demand of the Collateral Agent, each Pledgor shall execute and deliver to the Collateral Agent an assignment or assignments of the Intellectual Property Collateral and such other documents as are necessary or appropriate to carry out the intent and purposes hereof.  Within five (5) Business Days of written notice thereafter from the Collateral Agent, each Pledgor shall make available to the Collateral Agent, to the extent within such Pledgor's power and authority, such personnel in such Pledgor's employ on the date of the Event of Default as the Collateral Agent may reasonably designate to permit such Pledgor to continue, directly or indirectly, to produce, advertise and sell the products and services sold by such Pledgor, and such persons shall be available to perform their prior functions on the Collateral Agent's behalf.

SECTION 9.7.     Actions Requiring Regulatory Approval.  Notwithstanding anything to the contrary contained herein, the Secured Parties shall not take any action that would constitute or result in any assignment of the Communications Licenses or transfer of control or

-30-

voting rights of any Pledgor or of any entity the Equity Interests of which are owned by any Pledgor if such assignment or transfer of control or voting rights would require, under then existing law (including Communications Laws), the prior approval of the FCC, ISED, the CRTC or any other applicable Governmental Authority, without first obtaining such approval of the FCC, ISED, the CRTC or such other Governmental Authority.  Each Pledgor agrees to take any lawful action which the Collateral Agent may reasonably request in order to obtain from the FCC, ISED, the CRTC or any other relevant Governmental Authority such approval as may be necessary to enable the Collateral Agent to enjoy the full rights and benefits granted to the Collateral Agent and the Secured Parties by this Agreement and the other Loan Documents, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Pledgor's best efforts to assist in obtaining any required approval of the FCC, ISED, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement and the other Loan Documents, including without limitation, sharing with the Collateral Agent any FCC registration numbers and preparing, certifying and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, ISED, the CRTC or any other Governmental Authority any portion of any application or applications for consent to the assignment of any Pledged Collateral that is a Communications License or transfer of control of any Pledgor or of any entity the Equity Interests of which are owned by any Pledgor, in each case required to be filed under Communications Laws for approval of any sale or transfer of Pledged Collateral and/or the Communications Licenses. Each Pledgor further agrees that, because of the unique nature of its undertaking in this <u>Section 9.7</u>, the same may be specifically enforced, and it hereby waives, and agrees to waive, any claim or defense that the Collateral Agent or the Secured Parties would have an adequate remedy at law for the breach of this undertaking and any requirement for the posting of bond or other security. This <u>Section 9.7</u> shall not be deemed to limit any other rights of the Collateral Agent and the Lenders available under applicable law and consistent with the Communications Act or other Communications Law.

## ARTICLE X

## APPLICATION OF PROCEEDS

SECTION 10.1.   <u>Application of Proceeds</u>.   The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Pledged Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, together with any other sums then held by the Collateral Agent pursuant to this Agreement, subject to and in accordance with the Credit Agreement and the terms of the DIP Orders.

## ARTICLE XI

## MISCELLANEOUS

SECTION 11.1.   <u>Concerning Collateral Agent</u>.

(a)    The actions of the Collateral Agent hereunder are subject to the provisions of the Credit Agreement and the terms of the DIP Orders.  The Collateral Agent shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including the release or substitution of the Pledged Collateral), in accordance with this Agreement and the Credit Agreement. The Collateral Agent may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.  The Collateral Agent may resign and a successor Collateral Agent may be appointed in the manner provided in the Credit Agreement.  Upon the acceptance of any appointment as the Collateral Agent by a successor Collateral Agent, that successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent under this Agreement, and the retiring Collateral Agent shall thereupon be discharged from its duties and obligations under this Agreement.  After any retiring Collateral Agent's resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement while it was the Collateral Agent.

(b)    Beyond the exercise of reasonable care in the custody and preservation thereof, the Collateral Agent will have no duty as to any Pledged Collateral in its possession or control or in the possession or control of any subagent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto.  The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if such Pledged Collateral is accorded treatment substantially equivalent to that which the Collateral Agent, in its individual capacity, accords its own property consisting of similar instruments or interests, it being understood that neither the Collateral Agent nor any of the Secured Parties shall have responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Securities Collateral, whether or not the Collateral Agent or any other Secured Party has or is deemed to have knowledge of such matters or (ii) taking any necessary steps to preserve rights against any person with respect to any Pledged Collateral.

(c)    The Collateral Agent shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person, and, with respect to all matters pertaining to this Agreement and its duties hereunder and thereunder, upon advice of counsel selected by it.

SECTION 11.2.    Collateral Agent May Perform; Collateral Agent Appointed Attorney-in-Fact.  In all cases subject to and in accordance with the terms of the DIP Orders, if any Pledgor shall fail to perform any covenants contained in this Agreement (including such Pledgor's covenants to (i) pay the premiums in respect of all required insurance policies hereunder, (ii) pay and discharge any taxes, assessments and special assessments, levies, fees and governmental charges imposed upon or assessed against, and landlords', carriers', mechanics', workmen's, repairmen's, laborers', materialmen's, suppliers' and ware-housemen's Liens and other claims arising by operation of law against, all or any portion of the Pledged Collateral, (iii) make repairs, (iv) discharge Liens or (v) pay or perform any obligations of such Pledgor under any Pledged Collateral) or if any representation or warranty on the part of any Pledgor contained herein shall be breached, the Collateral Agent may (but shall not be obligated to) do the same or cause it

-32-

to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that the Collateral Agent shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation which such Pledgor fails to pay or perform as and when required hereby and which such Pledgor does not contest in accordance with the provisions of the Credit Agreement.  Any and all amounts so expended by the Collateral Agent shall be paid by the Pledgors, subject to the DIP Orders, the Cash Management Order and any other order of the Bankruptcy Court entered in connection with the Cases.  Neither the provisions of this Section 11.2 nor any action taken by the Collateral Agent pursuant to the provisions of this Section 11.2 shall prevent any such failure to observe any covenant contained in this Agreement nor any breach of representation or warranty from constituting an Event of Default.  Subject to and in accordance with the terms of the DIP Orders, each Pledgor hereby appoints the Collateral Agent its attorney-in-fact, with full power and authority in the place and stead of such Pledgor and in the name of such Pledgor, or otherwise, from time to time in the Collateral Agent's discretion to take any action and to execute any instrument consistent with the terms of this Agreement and the other Security Documents which the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof (but the Collateral Agent shall not be obligated to and shall have no liability to such Pledgor or any third party for failure to so do or take action).  The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof.  Each Pledgor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof.

SECTION 11.3.    Continuing Security Interest; Assignment.    This Agreement shall create a continuing security interest in the Pledged Collateral and shall, subject to the DIP Orders, (i) be binding upon the Pledgors, their respective successors and assigns and (ii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and the other Secured Parties and each of their respective successors, transferees and assigns.  No other persons (including any other creditor of any Pledgor) shall have any interest herein or any right or benefit with respect hereto.  Without limiting the generality of the foregoing clause (ii), any Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party, herein or otherwise, subject however, to the provisions of the Credit Agreement and any order of the Bankruptcy Court. Subject to the DIP Orders, each of the Pledgors agrees that its obligations hereunder and the security interest created hereunder shall continue to be effective or be reinstated, as applicable, if at any time payment, or any part thereof, of all or any part of the Secured Obligations is rescinded or must otherwise be restored by the Secured Party upon the bankruptcy or reorganization of any Pledgor or otherwise.

SECTION 11.4.    Termination; Release.    When all the Secured Obligations have been paid in full and the Commitments of the Lenders to make any Loan under the Credit Agreement shall have expired or been terminated for any reason, the Pledged Collateral shall be released from the First Priority Lien of this Agreement. Upon such release or any release of Pledged Collateral or any part thereof the Collateral Agent shall, upon the written request and at the sole cost and expense of the Pledgors, assign, transfer and deliver to Pledgor, against receipt and without recourse to or warranty by the Collateral Agent except as to the fact that the Collateral Agent has not encumbered the released assets, such of the Pledged Collateral or any part thereof to be released (in the case of a release) as may be in possession of the Collateral Agent and as shall

not have been sold or otherwise applied pursuant to the terms hereof, and, with respect to any other Pledged Collateral, proper documents and instruments (including UCC-3 termination financing statements or releases) acknowledging the termination hereof or the release of such Pledged Collateral, as the case may be.

SECTION 11.5.   <u>Modification in Writing</u>.   No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by any Pledgor therefrom, shall be effective unless the same shall be made in accordance with the terms of the Credit Agreement and the DIP Orders or as otherwise provided herein and unless in writing and signed by the Collateral Agent. Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by any Pledgor from the terms of any provision hereof in each case shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Agreement, no notice to or demand on any Pledgor in any case shall entitle any Pledgor to any other or further notice or demand in similar or other circumstances.

SECTION 11.6.   <u>Notices</u>.   Any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in Section 10.01 of the Credit Agreement.

SECTION 11.7.   <u>Governing Law, Consent to Jurisdiction and Service of Process; Waiver of Jury Trial</u>.   Sections 10.09 and 10.10 of the Credit Agreement is incorporated herein, *mutatis mutandis*, as if a part hereof.

SECTION 11.8.   <u>Severability of Provisions</u>.   Any provision hereof which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

SECTION 11.9.   <u>Execution in Counterparts</u>.   This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement. Section 10.06 of the Credit Agreement is incorporated herein, *mutatis mutandis*, as if a part hereof.

SECTION 11.10.   <u>Business Days</u>.   In the event any time period or any date provided in this Agreement ends or falls on a day other than a Business Day, then such time period shall be deemed to end and such date shall be deemed to fall on the next succeeding Business Day, and performance herein may be made on such Business Day, with the same force and effect as if made on such other day.

SECTION 11.11.   <u>No Credit for Payment of Taxes or Imposition</u>. Such Pledgor shall not be entitled to any credit against the principal, premium, if any, or interest payable under the Credit Agreement, and such Pledgor shall not be entitled to any credit against any other sums

which may become payable under the terms thereof or hereof, by reason of the payment of any Tax on the Pledged Collateral or any part thereof.

SECTION 11.12.  <u>No Claims Against Collateral Agent</u>.  Nothing contained in this Agreement shall constitute any consent or request by the Collateral Agent, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Pledged Collateral or any part thereof, nor as giving any Pledgor any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against the Collateral Agent in respect thereof or any claim that any Lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the First Priority Lien hereof.

SECTION 11.13.  <u>No Release</u>.  Nothing set forth in this Agreement or any other Loan Document, nor the exercise by the Collateral Agent of any of the rights or remedies hereunder, shall relieve any Pledgor from the performance of any term, covenant, condition or agreement on such Pledgor's part to be performed or observed under or in respect of any of the Pledged Collateral or from any liability to any person under or in respect of any of the Pledged Collateral or shall impose any obligation on the Collateral Agent or any other Secured Party to perform or observe any such term, covenant, condition or agreement on such Pledgor's part to be so performed or observed or shall impose any liability on the Collateral Agent or any other Secured Party for any act or omission on the part of such Pledgor relating thereto or for any breach of any representation or warranty on the part of such Pledgor contained in this Agreement, the Credit Agreement or the other Loan Documents, or under or in respect of the Pledged Collateral or made in connection herewith or therewith.  Anything herein to the contrary notwithstanding, neither the Collateral Agent nor any other Secured Party shall have any obligation or liability under any contracts, agreements and other documents included in the Pledged Collateral by reason of this Agreement, nor shall the Collateral Agent or any other Secured Party be obligated to perform any of the obligations or duties of any Pledgor thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Pledged Collateral hereunder.  The obligations of each Pledgor contained in this <u>Section 11.13</u> shall survive the termination hereof and the discharge of such Pledgor's other obligations under this Agreement, the Credit Agreement and the other Loan Documents.

SECTION 11.14.  <u>Obligations Absolute</u>.  Subject to the entry by the Bankruptcy Court of the DIP Orders, all obligations of each Pledgor hereunder shall be absolute and unconditional irrespective of:

(i)      any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any other Pledgor;

(ii)      any lack of validity or enforceability of the Credit Agreement or any other Loan Document, or any other agreement or instrument relating thereto;

(iii)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any

consent to any departure from the Credit Agreement or any other Loan Document or any other agreement or instrument relating thereto;

(iv)     any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Secured Obligations;

(v)     any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, the Credit Agreement or any other Loan Document except as specifically set forth in a waiver granted pursuant to the provisions of Section 11.5 hereof; or

(vi)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, any Pledgor.

SECTION 11.15.  <u>Bankruptcy Court Orders and Bankruptcy Code Control</u>. In the event of a conflict between any terms and provisions set forth in this Agreement and those set forth in the Credit Agreement, the DIP Orders and/or the Bankruptcy Code, the terms and provisions of the Credit Agreement, the DIP Orders and/or the Bankruptcy Code, shall supersede and control the terms and provisions of this Agreement.  In the event of a conflict between any terms and provisions set forth in the Credit Agreement and those set forth in the DIP Orders and/or the Bankruptcy Code, the terms and provisions of the DIP Orders and/or the Bankruptcy Code shall supersede and control the terms and provisions of the Credit Agreement, and this Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, each Pledgor and the Collateral Agent have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

LIGADO NETWORKS LLC,
as Pledgor


By:    _____
        Name:
        Title:

ATC TECHNOLOGIES, LLC
LIGADO NETWORKS INC. OF VIRGINIA
LIGADO NETWORKS BUILD LLC
LIGADO NETWORKS SUBSIDIARY LLC
ONE DOT SIX LLC
ONE DOT SIX TVCC LLC
LIGADO NETWORKS FINANCE LLC
each as a Pledgor

By: _____

    Name:
    Title:

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
as Collateral Agent


By: _____
     Name:
     Title:

Schedule 4.12
Post-Closing Obligations

1.  Within the earlier of (x) thirty (30) days following the Closing Date and (y) the Final DIP Order Entry Date (as defined in the Credit Agreement), or such later date as the Collateral Agent may agree in its reasonable discretion, the Borrower shall deliver the Account Control Agreement in respect of the DIP Loan Proceeds Account, duly executed by the applicable Pledgor, the applicable Bank and the Collateral Agent, in form and substance reasonably acceptable to the Collateral Agent (which may, for the avoidance of doubt, be effectuated by an amendment to that certain Blocked Account Control Agreement, dated as of September 5, 2023, by and among Ligado Networks, LLC, the agents party thereto and JPMorgan Chase Bank, N.A. in respect of the DIP Loan Proceeds Account, in form and substance reasonably acceptable to the Collateral Agent).

EXHIBIT 1

[Form of]

BORROWER'S ACKNOWLEDGMENT

The undersigned hereby (i) acknowledges receipt of the Senior Secured Super-Priority Debtor-in-Possession Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of January [●], 2025, made by Ligado Networks LLC, a Delaware limited liability company, as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the Guarantors party thereto, each as a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code and U.S. Bank Trust Company, National Association, as Collateral Agent (in such capacity and together with any successors in such capacity, the "Collateral Agent"), (ii) agrees promptly to note on its books the security interests granted to the Collateral Agent and confirmed under the Security Agreement, (iii) agrees that it will comply with instructions of the Collateral Agent with respect to the applicable Securities Collateral (including all Equity Interests of the undersigned) without further consent by the applicable Pledgor, (iv) agrees to notify the Collateral Agent upon obtaining knowledge of any interest in favor of any person in the applicable Securities Collateral that is adverse to the interest of the Collateral Agent therein and (v) waives any right or requirement at any time hereafter to receive a copy of the Security Agreement in connection with the registration of any Securities Collateral thereunder in the name of the Collateral Agent or its nominee or the exercise of voting rights by the Collateral Agent or its nominee.

[                    ]

By: _____
    Name:
    Title:

EXHIBIT 2

[Form of]

## SECURITIES PLEDGE AMENDMENT

This Securities Pledge Amendment, dated as of [        ], is delivered pursuant to <u>Section 5.1</u> of the Senior Secured Super-Priority Debtor-in-Possession Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Security Agreement</u>;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of January [●], 2025, made by Ligado Networks LLC, a Delaware limited liability company, as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "<u>Borrower</u>"), the Guarantors party thereto, each as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code and U.S. Bank Trust Company, National Association, as Collateral Agent (in such capacity and together with any successors in such capacity, the "<u>Collateral Agent</u>").  The undersigned hereby agrees that this Securities Pledge Amendment may be attached to the Security Agreement and that the Pledged Securities and/or Intercompany Notes listed on this Securities Pledge Amendment shall be deemed to be and shall become part of the Pledged Collateral and shall secure all Secured Obligations.

### PLEDGED SECURITIES

| ISSUER | CLASS OF STOCK OR INTERESTS | PAR VALUE | CERTIFICATE NO(S). | NUMBER OF SHARES OR INTERESTS | PERCENTAGE OF ALL ISSUED CAPITAL OR OTHER EQUITY INTERESTS OF ISSUER |
|---|---|---|---|---|---|
| | | | | | |

### INTERCOMPANY NOTES

| ISSUER | PRINCIPAL AMOUNT | DATE OF ISSUANCE | INTEREST RATE | MATURITY DATE |
|---|---|---|---|---|
| | | | | |

[                              ],
as Pledgor


By:  _____
       Name:
       Title:

-2-

AGREED TO AND ACCEPTED:

U.S. BANK TRUST COMPANY,
NATIONAL ASSOCIATION,
as Collateral Agent

By: _____
       Name:
       Title:

EXHIBIT 3

[Form of]

JOINDER AGREEMENT

[Name of New Pledgor]
[Address of New Pledgor]

[Date]

_____
_____
_____

Ladies and Gentlemen:

        Reference is made to the Senior Secured Super-Priority Debtor-in-Possession Security Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement;" capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), dated as of January [●], 2025, made by Ligado Networks LLC, a Delaware limited liability company, as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the Guarantors party thereto, each as a debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, and U.S. Bank Trust Company, National Association, as Collateral Agent (in such capacity and together with any successors in such capacity, the "Collateral Agent").

        This Joinder Agreement supplements the Security Agreement and is delivered by the undersigned, [        ] (the "New Pledgor"), pursuant to Section 3.5 of the Security Agreement. The New Pledgor hereby agrees to be bound as a Guarantor and as a Pledgor party to the Security Agreement by all of the terms, covenants and conditions set forth in the Security Agreement to the same extent that it would have been bound if it had been a signatory to the Security Agreement on the date of the Security Agreement. The New Pledgor also hereby agrees to be bound as a party by all of the terms, covenants and conditions applicable to it set forth in Articles 5, 6 and 7 of the Credit Agreement to the same extent that it would have been bound if it had been a signatory to the Credit Agreement on the execution date of the Credit Agreement. Without limiting the generality of the foregoing, the New Pledgor hereby grants and pledges to the Collateral Agent, as collateral security for the full, prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, a First Priority Lien on and security interest in, all of its right, title and interest in, to and under the Pledged Collateral and expressly assumes all obligations and liabilities of a Guarantor and Pledgor thereunder. The New Pledgor hereby makes each of the representations and warranties and agrees to each of the covenants applicable to the Pledgors contained in the Security Agreement and the terms of the Credit Agreement.

Annexed hereto are supplements to each of the schedules to the Security Agreement and the Credit Agreement, as applicable, with respect to the New Pledgor. Such supplements shall be deemed to be part of the Security Agreement or the Credit Agreement, as applicable.

This Joinder Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement.

THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the New Pledgor has caused this Joinder Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

[NEW PLEDGOR]

By: _____
        Name:
        Title:

AGREED TO AND ACCEPTED:

U.S. Bank Trust Company, National
Association,
as Collateral Agent

By: _____
     Name:
     Title:

[Schedules to be attached]

**EXHIBIT P**

**FORM OF REAFFIRMATION AGREEMENT**

(see attached)

## REAFFIRMATION AGREEMENT

This REAFFIRMATION AGREEMENT, dated as of [●], 2025 (this "**Agreement**"), is entered into by and among LIGADO NETWORKS LLC, a Delaware limited liability company, as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), ATC TECHNOLOGIES, LLC, a Delaware limited liability company, LIGADO NETWORKS SUBSIDIARY LLC, a Delaware limited liability company, ONE DOT SIX LLC, a Delaware limited liability company, ONE DOT SIX TVCC LLC, a Delaware limited liability company, LIGADO NETWORKS FINANCE LLC, a Delaware limited liability company, LIGADO NETWORKS BUILD LLC, a Delaware limited liability company, LIGADO NETWORKS INC. OF VIRGINIA, a Virginia corporation (each of the foregoing, together with the Borrower, a "**US Loan Party**", and collectively the "**US Loan Parties**"), LIGADO NETWORKS CORP., a Nova Scotia unlimited liability company, LIGADO NETWORKS (CANADA) INC., an Ontario corporation, LIGADO NETWORKS HOLDINGS (CANADA) INC., an Ontario corporation (each of the foregoing a "**Canadian Loan Party**", and collectively, the "**Canadian Loan Parties**", and together with the US Loan Parties, each a "**Reaffirming Party**", and collectively the "**Reaffirming Parties**"), and U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION ("**US Bank**"), in its capacity as administrative agent for the Lenders (in such capacity, together with any successor and assigns in such capacity, the "**Administrative Agent**") under the Loan Agreement (as defined below).

## RECITALS

A.    The Reaffirming Parties, each Guarantor from time to time party thereto, each Lender from time to time party thereto, US Bank, as Administrative Agent, have previously entered into that certain Senior Secured Super Priority Debtor-In-Possession Loan Agreement, dated as of January 5, 2025 (as amended, supplemented or modified prior to the date hereof, the "**Loan Agreement**").

B.    Pursuant to the terms and conditions of the Loan Agreement, the US Loan Parties, and US Bank, in its capacity as collateral agent for the Secured Parties (in such capacity, together with any successor and assigns in such capacity, the "**Collateral Agent**") will enter into that certain Senior Secured Super-Priority Debtor-In-Possession Security Agreement, dated on or around the date hereof (the "**US Security Agreement**") and the Canadian Loan Parties and US Bank, in its capacity as Collateral Agent for the Secured Parties will enter into that certain Senior Secured Super-Priority Debtor-In-Possession Canadian Security Agreement, dated on or around the date hereof (the "**Canadian Security Agreement**", and together with the US Security Agreement and any other Loan Security Documents entered into by the Reaffirming Parties party thereto, on or before the date hereof, the "**Security Documents**").

C.    Each Reaffirming Party expects to realize, or has realized, substantial direct and/or indirect benefits as a result of the Loan Agreement becoming effective and the consummation of the transactions contemplated thereby.

D.     The execution and delivery of this Agreement is a condition precedent to the Lenders making the extensions of credit and certain other financial accommodations set forth in the Loan Agreement.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.   DEFINITIONS AND RULES OF INTERPRETATION.   All capitalized terms used but not otherwise defined herein shall have the meanings provided in the Loan Agreement.  The rules of interpretation contained in the Loan Agreement shall apply to this Agreement.

SECTION 2.   REAFFIRMATION.

2.1     Reaffirmation.  Each of the Reaffirming Parties expressly acknowledges the terms of the Loan Agreement and hereby ratifies, confirms and reaffirms:

(a) that all Obligations, the Guaranteed Obligations set forth in Article 7 of the Loan Agreement and the Guarantees in respect of the Loan Agreement constitute valid and existing Obligations, Guaranteed Obligations and Guarantees under the Loan Agreement and that to the extent any Obligations, the Guaranteed Obligations or the Guarantees in respect of the Loan Agreement are interpreted in any Case to solely be a prepetition obligation or guarantee, then such guarantee shall automatically be deemed to have been given on the Petition Date immediately after the filing of the applicable Cases;

(b) that the Loan Agreement is intended to be a post-petition contract with respect to any Case and to the extent that any Obligations pursuant to the Loan Agreement and the other Loan Documents and the Guaranteed Obligation set forth in Article 7 of the Loan Agreement are interpreted in any Case to solely be prepetition obligations, then such Obligations shall automatically be deemed to have been given on the Petition Date immediately after filing of the applicable Cases; and

(c) that (i) any and all Security Documents to which it is a party and (ii) its respective guarantees, pledges, grants of security interests or other similar rights or obligations, as applicable, under each of the Security Documents to which it is party remain in full force and effect.

SECTION 3.   MISCELLANEOUS.

3.1     Loan Document.  This Agreement is a Loan Document executed pursuant to the Loan Agreement and shall (unless otherwise expressly indicated herein) be construed, administered and applied in accordance with the terms and provisions thereof.

3.2     Amendments; Counterparts.  This Agreement may not be amended, nor may any provision hereof be waived, except in each case pursuant to a writing signed by each of

2

the parties hereto.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one agreement.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

       3.3   <u>No Novation</u>.  This Agreement shall not extinguish the obligations for the payment of any amounts due under the Loan Agreement or discharge or release the performance of any party or the priority of any security under any Security Documents.  Nothing herein contained shall be construed as a substitution, novation, release or discharge of any of the Obligations outstanding under the Loan Agreement or the Security Documents or instruments regarding the same, each of which shall remain in full force and effect.

       **3.4**   **<u>GOVERNING LAW, CONSENT TO JURISDICTION AND SERVICES OF PROCESS.</u>**  Sections 10.09 and 10.10 of the Loan Agreement is incorporated herein *mutatis mutandis*, as if a part hereof.

[SIGNATURE PAGES FOLLOW]

3

IN WITNESS WHEREOF, each Reaffirming Party and the Administrative Agent have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**REAFFIRMING PARTIES:**

[●]

By:_____
Name:
Title:

[SIGNATURE PAGE TO REAFFIRMATION AGREEMENT]

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION**, as Administrative Agent

By:_____
Name:
Title:

## Exhibit 2

**Initial Budget**

# 13 Week DIP Budget

**US$ 000s**

| 13 Week - Cumul | Week 0 | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning Date | Dec-30 | Jan-6 | Jan-13 | Jan-20 | Jan-27 | Feb-3 | Feb-10 | Feb-17 | Feb-24 | Mar-3 | Mar-10 | Mar-17 | Mar-24 | Mar-31 | 13 Week |
| Week Ending Date | Jan-3 | Jan-10 | Jan-17 | Jan-24 | Jan-31 | Feb-7 | Feb-14 | Feb-21 | Feb-28 | Mar-7 | Mar-14 | Mar-21 | Mar-28 | Apr-4 | Total |
| **Receipts** | | $ 239 | $ 239 | $ 239 | $ 239 | $ 219 | $ 219 | $ 219 | $ 219 | $ 217 | $ 217 | $ 217 | $ 217 | $ 214 | $ 2,912 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Employee Related | | 105 | - | 686 | - | 689 | - | 689 | - | 675 | - | 675 | - | 2,058 | 5,577 |
| Network | | 9,997 | 62 | 206 | - | 205 | 210 | 62 | 206 | 200 | 212 | 62 | 206 | 2,090 | 13,718 |
| General & Administrative | | 572 | - | 8 | - | 551 | 657 | - | 14 | 720 | 277 | - | 156 | 505 | 3,459 |
| **Total Operating Disbursements** | | $ 10,674 | $ 62 | $ 899 | $ - | $ 1,445 | $ 867 | $ 751 | $ 220 | $ 1,595 | $ 489 | $ 737 | $ 362 | $ 4,652 | $ 22,754 |
| **Operating Cash Flow** | | $ (10,435) | $ 177 | $ (661) | $ 239 | $ (1,226) | $ (649) | $ (532) | $ (1) | $ (1,378) | $ (272) | $ (520) | $ (145) | $ (4,438) | $ (19,841) |
| **Capex & Other Non-Operating Disbursements** | | 3,000 | - | - | - | - | 304 | - | - | 66 | - | - | - | 2,030 | 5,400 |
| **Total Financing** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Professional Fees** | | - | - | - | - | 2,651 | - | - | 5,476 | 1,909 | - | - | 4,754 | - | 14,790 |
| **Net Cash Flow** | | $ (13,435) | $ 177 | $ (661) | $ 239 | $ (3,877) | $ (953) | $ (532) | $ (5,478) | $ (3,353) | $ (272) | $ (520) | $ (4,898) | $ (6,468) | $ (40,031) |
| Beginning Unrestricted Cash | | 9,626 | 8,191 | 8,367 | 7,706 | 30,945 | 27,068 | 26,115 | 25,583 | 20,105 | 16,752 | 16,481 | 15,961 | 11,063 | 9,626 |
| Net Cash Flow | | (13,435) | 177 | (661) | 239 | (3,877) | (953) | (532) | (5,478) | (3,353) | (272) | (520) | (4,898) | (6,468) | (40,031) |
| DIP Draw / (Repayment) | | 12,000 | - | - | 23,000 | - | - | - | - | - | - | - | - | - | 35,000 |
| **Ending Unrestricted Cash** | $ 9,626 | $ 8,191 | $ 8,367 | $ 7,706 | $ 30,945 | $ 27,068 | $ 26,115 | $ 25,583 | $ 20,105 | $ 16,752 | $ 16,481 | $ 15,961 | $ 11,063 | $ 4,595 | $ 4,595 |
| **Minimum Cash - Test** | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 | $ 10,000 |
| *Memo: Cash Surplus / (Deficit)* | $ (374) | $ (1,809) | $ (1,633) | $ (2,294) | $ 20,945 | $ 17,068 | $ 16,115 | $ 15,583 | $ 10,105 | $ 6,752 | $ 6,481 | $ 5,961 | $ 1,063 | $ (5,405) | $ (5,405) |

