IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>LIGADO NETWORKS LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 25-10006 (TMH)<br>Jointly Administered<br><br>Re: D.I. 61<br><br>Hearing Date: Jan. 27, 2025, at 1:00 p.m.<br>Obj. Deadline: Jan. 21, 2025, at 4:00 p.m.<br>**(extended for UST to Jan. 23 at noon)** |

**OBJECTION OF THE UNITED STATES TRUSTEE
TO DEBTORS' MOTION TO PAY BREAK-UP FEE**

Andrew R. Vara, the United States Trustee for Region 3 (the "U.S. Trustee"), through his undersigned counsel, objects to the *Debtors' Motion for Entry of an Order Authorizing Payment of the AST Transaction Break-Up Fee and Break-Up Reimbursements* [D.I. 61] (the "Motion"), and in support of his objection respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Motion asks the Court to approve a $200,000,000 break-up fee associated with a long-term transaction to use the Debtors' satellite spectrum. The Court should deny the Motion unless (i) the break-up fee is not payable if the transaction is not consummated for regulatory reasons; (ii) the break-up fee is payable only if a higher and better

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

alternative transaction is consummated; (iii) the break-up fee receives administrative expense status (not superpriority status); (iv) the order clarifies that a second, $450,000,000 break-up fee related to the Debtors' Takings Clause litigation is not being approved now; and (v) the Debtors make a record that a $200,000,000 break-up fee is market for the proposed transaction.

2.  The U.S. Trustee has raised these issues with Debtors' proposed counsel informally and will endeavor to resolve as many of them as possible before the hearing.

## JURISDICTION & STANDING

3.  Pursuant to 28 U.S.C. § 1334, applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and resolve this limited objection.

4.  Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that 11 U.S.C. § 307 gives the U.S. Trustee "public interest standing"); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

5.  The U.S. Trustee has standing to be heard on the Motion pursuant to 11 U.S.C. § 307.

## BACKGROUND

6.  On January 5, 2025, the above-captioned debtors (the "<u>Debtors</u>") filed chapter 11 petitions in this Court.

7. The Debtors are a mobile communications company that operates a voice and data satellite network in North America.

8. On January 6, 2025, the Debtors filed the Motion. The Motion asks the Court to approve break-up fee protections for a long-term commercial transaction with AST & Science, LLC ("<u>AST</u>"). The requested break-up fee is $200,000,000. The Debtors would owe the break-up fee if, among other conditions, the Debtors consummate an "Alternative Commercial Transaction." *See* Motion Ex. B-1 § 15.01(c)(ii).

9. Attached to the Motion is the "AST Term Sheet." Page 6 of that document refers to a second break-up fee—which could total $450,000,000—if resolution of the Debtors' Takings Clause litigation thwarts AST's use of the Debtors' spectrum.

10. The U.S. Trustee has not appointed an official committee of unsecured creditors. *See* D.I. 123.

## **ARGUMENT**

11. The Court should deny the Motion unless several aspects of the break-up fee are clarified.

12. Bid protections such as break-up fees and expense reimbursements must be sought and analyzed under Section 503(b). *See Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999)).

13. The analysis of break-up fees and expense reimbursements under Section 503(b) "must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the

3

value of the estate." *O'Brien*, 181 F.3d at 535; *see also In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) ("*EFH I*") ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]").

14. An administrative expense's benefit to the estate "must be *actual*, not hypothetical." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 742 (3d Cir. 2021) ("*EFH II*") (citing *In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992)).

15. A break-up fee or expense reimbursement can provide a benefit to the estate where (1) assurance of the bid protection promotes more competitive bidding, such as by inducing a bid that otherwise would not have been made, (2) availability of the bid protection induces a buyer to perform diligence and set a floor price; or (3) the bid protection induces a bidder adhere to its bid through an auction process. *See EFH I* at 313-14.

16. But even if a break-up fee or expense reimbursement would benefit the estate, the Court is not required to approve it. *See id.* at 314 ("We have never held that bankruptcy courts must allow fees whenever they find that [a break-up fee confers a benefit on the estate.]"). The Court must determine, based on the totality of the circumstances of the case, "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate." *Id.* (citing *O'Brien*, 181 F.3d at 535) (quotation marks omitted).

17. The Court cannot award bid protections simply because no one objects. *See In re Reliant Energy Channelview LP*, 594 F.3d at 208-09 ("Clearly, section 503(b) does not give the Bankruptcy Court the authority to award [break-up] fees solely because there is no objection to them from a party-in-interest. That section requires that for fees to be awarded they must be part of 'the actual, necessary costs and expenses of preserving the estate,' and

does not suggest that that standard is met merely because there is no objection to the application for the fees.").

18.  In addition, Section 105(a) is not a basis to award an administrative expense. *See In re Women First Healthcare, Inc.*, 332 B.R. 115, 120-21 (Bankr. D. Del. 2005).

19.  The party requesting a break-up fee has the burden of showing that the fee is actually necessary to preserve the value of the estate. *See O'Brien*, 181 F.3d at 535.

20.  In *EFH II*, the United States Court of Appeals for the Third Circuit considered, in the context of a motion to dismiss based upon the sufficiency of the pleading, an unsuccessful bidder's administrative expense application. Initially, the unsuccessful bidder argued that the lower courts had erred in measuring whether its bid had conferred a benefit using hindsight (as opposed to measuring the benefit at the time the bid was submitted). *See EFH II* at 743-44. The Third Circuit rejected that argument and concluded that, consistent with the well-established Bankruptcy Code policy of limiting administrative expenses, it was "entirely appropriate to consider" the asserted benefit "through the rearview mirror." *Id.*

21.  The unsuccessful bidder in *EFH II* also asserted two potential benefits to the process: that it served as a "stalking horse" bidder, and that its unsuccessful efforts provided a "roadmap" for other viable bids that were later submitted, including the successful bid. *Id.* at 744. The Third Circuit rejected the argument that the unsuccessful bidder had stated a plausible argument for allowance of an administrative expense on a theory that its bid served as a catalyst for the submission of other bids, as it was the only bid at the time it was submitted. *Id.* While the bid did not technically establish a "floor" because the estates ultimately accepted a substantially lower offer after the unsuccessful bid fell through, the Third Circuit found that the argument that the bid had provided a "roadmap" for other bids post-termination was a plausible argument in favor of benefit to the estate. *Id.* at 744-45. The Third

Circuit remanded so that a sufficient record could be developed to enable the Bankruptcy Court to determine, in hindsight, the extent to which the unsuccessful bidder's participation had actually benefitted the estate more than it had harmed the estate. *Id.* at 747-48.

22. The U.S. Trustee objects to the Motion for five reasons.

23. First, there is no basis in the Bankruptcy Code to give the break-up fee superpriority status. "[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]" *EFH I* at 313. Section 503(b) does not provide for superpriority status. Superpriority status is provided for only in Sections 364(c)(1) and 507(b). Those sections are addressed exclusively to (a) parties providing post-petition financing, and (b) secured creditors who have received insufficient "adequate protection" for the post-petition diminution in the value of their collateral. Neither is at play here. "[C]ourts do not have the authority to create a right to recover from [a] bankruptcy estate where no such right exists under the Bankruptcy Code." *Id.* at 313 (quoting *O'Brien*, 181 F.3d at 532) (quotation marks omitted). To give superpriority status to a $200,000,000 break-up fee is inconsistent with Third Circuit case law, has no basis in the Bankruptcy Code, and should be denied. If the DIP lenders agree to subordinate their DIP claims to the break-up fee, then the U.S. Trustee takes no position about that arrangement.

24. Second, the break-up fee should not be payable if the AST transaction is not consummated for regulatory reasons. In *EFH I*, the Third Circuit observed that gambling on regulatory approval is a "significant potential harm[.]" *EFH I* at 314. The Third Circuit wrote that the termination fee sought there was problematic for two reasons. First, in the event that the regulatory approval condition was not satisfied, there is no deal, and the Debtors would be returned to "square one:"

6

> With an accurate view of the facts, one would have seen that, by inducing NextEra's bid, the Termination Fee *might eventually* maximize the value of the estates—assuming the deal closed. This the Bankruptcy Court recognized at the outset. But the Fee also created substantial financial risk if the PUCT did not approve the transaction and, as a result, closing did not take place. When it initially approved the Fee, the Bankruptcy Court did not fully appreciate this risk.

*EFH I* at 315.

25. The second problem with the termination fee in *EFH I* was a perverse incentive: the structuring of the fee was not tied to a specific deadline for regulatory approval to be obtained, which meant the counterparty could simply wait until the debtors terminated the agreement and collect its termination fee then. The Court wrote this arrangement was "detrimental: not only would the estates be out $275 million, but Debtors would be back to square one and, with the passage of time, in a worse off position—desperate to accept an alternative transaction." *Id.* The Third Circuit wrote that although the termination fee had the potential to provide a large benefit to the estates if the deal closed, it also "had the possibility to be disastrous." *Id.* at 315. The Third Circuit held that the bankruptcy court had not abused its discretion in disallowing the termination fee in the event the regulator declined to approve the transaction. *See id.*

26. Here, to a degree, the Debtors do not control the regulatory approval process. If regulatory approval is not obtained, it may have nothing to do with any act or omission of the Debtors. In that scenario, the Debtors should not be put back at square one in a worse-off position, desperate to accept an alternative transaction—and out $200,000,000. *See EFH I* at 314. The Court should deny the Motion unless the Debtors and AST agree that the

break-up fee will not be payable if the proposed transaction cannot be consummated for regulatory reasons.

27. Third, the AST break-up fee should be payable only if the Debtors consummate a <u>higher and better</u> alternative transaction—not simply <u>any</u> alternative transaction. *See* Motion Ex. B-1 §§ 15.01(c)(ii) (consummation of "Alternative Commercial Transaction" is necessary condition to payment of break-up fee) & 12.05(a) (defining "Alternative Commercial Transaction" as "any sale of a material portion of assets, plan proposal or other transaction of similar effect (in each case, outside of the ordinary course of business), other than in accordance with or in furtherance of the AST Transaction."). Without this clarification, the AST transaction is not setting a floor price for the Debtors' MSS business.

28. Fourth, the documents attached to the Motion provide for a second break-up fee—which could reach $450,000,000—if resolution of the Takings Clause litigation thwarts AST's use of the Debtors' spectrum. *See* AST Term Sheet at 6. The form of order should clarify that this second break-up fee is not being approved now.

29. Fifth, the Debtors have not demonstrated that a break-up fee totaling $200,000,000 is market. While the U.S. Trustee appreciates the Debtors' view that the AST transaction is complex and long-term, *see* Motion ¶ 26, the requested break-up fee is massive. There should be a record that it is market.

## **CONCLUSION**

30. The U.S. Trustee reserves any and all rights, remedies and obligations to complement, supplement, augment, alter and/or modify this objection, file an appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required, and to object on such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the Motion and grant such other relief as the Court deems appropriate and just.

Dated:  January 23, 2025  
Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**  
**UNITED STATES TRUSTEE,**  
**REGIONS 3 & 9**

By: /s/ *Benjamin Hackman*  
Benjamin A. Hackman  
Trial Attorney  
Department of Justice  
Office of the United States Trustee  
J. Caleb Boggs Federal Building  
844 King Street, Suite 2207, Lockbox 35  
Wilmington, DE 19801  
(302) 573-6491 (Phone)  
(302) 573-6497 (Fax)  
benjamin.a.hackman@usdoj.gov