**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGADO NETWORKS LLC, *et. al.*[1] | ) | Case No. 25-10006-TMH |
| | ) | |
| *Debtors*. | ) | Jointly Administered |

**INMARSAT GLOBAL LIMITED'S OBJECTION TO**
**LIGADO'S DIP FINANCING MOTION**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ....................................................................................................................... 4

        A.     Ligado and Inmarsat ...................................................................................... 4

        B.     Ligado's Takings Litigation ........................................................................... 4

        C.     Ligado's Proposed Restructuring.................................................................... 5

        D.     The Proposed DIP Financing ......................................................................... 6

ARGUMENT ............................................................................................................................ 7

        I.      Standard for Approval of Post-Petition Financing........................................ 7

        II.     The Proposed Fees and Interest Rate Are Excessive .................................... 9

        III.    The DIP Loan's Maturity Date and Numerous DIP Milestones All But Ensure Inevitable Defaults and Resulting Debtor Concessions, or Even Foreclosure ...... 10

        IV.    The "Roll-Up" of Approximately $800 Million of Prepetition Obligations into Superpriority Administrative Claims Is Not Justified............................................. 11

        V.     The Proposed DIP Financing Contains Other Overreaching Terms ...................... 14

        VI.    The Challenge Period Should Be Extended and Inmarsat Should Be Given Standing and Funding to Investigate the DIP Loan Further ................................. 15

CONCLUSION......................................................................................................................... 16

Inmarsat Global Limited ("**Inmarsat**") hereby objects to the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief [ECF 4] (the "**DIP Financing Motion**")[2] filed by Ligado Networks LLC and its debtor affiliates in these chapter 11 cases (collectively, "**Ligado**" or the "**Debtors**") seeking approval of debtor-in-possession financing ("**DIP Financing**").

### INTRODUCTION

Ligado seeks the Court's approval for DIP Financing from its longtime secured lenders who, through their control of Ligado, propose to help themselves to nearly ***$100 million in fees*** while providing only $115 million of new money, at an exorbitant 17.5% interest rate. They further propose a loan structure that will have Ligado needing to plead for a maturity extension every few months to avoid a default—at which point the DIP Lenders can extract terms that are even worse for the estate. These and other provisions are highly objectionable, to the detriment of the Ligado estate and creditors like Inmarsat, which is owed more than $500 million under its Cooperation Agreement with Ligado. In the absence of an official committee of unsecured creditors in these cases, it is incumbent on Inmarsat—which, absent lawful assumption and cure of the Cooperation Agreement may be Ligado's largest unsecured creditor—to fill the roll of estate watchdog and ensure some adversarial process is effectuated to ensure that any DIP Financing is in the estate's best interest.

---

[2] Capitalized terms used but not defined herein have the meanings given to them in the DIP Financing Motion.

It is Ligado's burden to establish that the financing terms are fair and reasonable and not designed for the benefit of the DIP Lenders to the detriment of the estate as a whole.  The proposed DIP Financing here fails in several respects, and should be rejected, at least in its current form.

**Excessive Fees and Interest**.  Under the proposal before the Court, Ligado would receive $115 million of new money, but would pay nearly $100 in fees million and interest of 17.5%—all while providing the DIP Lenders a first-position priming lien on all assets, including what Ligado characterizes as its "most important" asset, a $39 billion takings lawsuit against the U.S. Government.  These sweetheart terms are as lopsided in favor of the lenders as they are unfair to other creditors like Inmarsat.

**Loan Timeframe and Default-Triggering Milestones**.  Ligado is proposing a lengthy delay of up to 35 months between Plan confirmation and its effective date, a period that is 40 months from the Petition Date, to allow time for regulatory approval of the commercial transaction with AST & Science, LLC ("**AST**") that is at the heart of its proposed path forward.  But the DIP Financing's scheduled Maturity Date is a mere *four months* from the Petition Date, and can be extended for only up to 20 months beyond the initial period and only with approval of certain DIP Lenders.  This is a recipe for the lenders to extract even stiffer terms from Ligado as soon as three months from today, and every additional 120 days thereafter, when Ligado will have zero leverage to resist.  The terms will only worsen (if an extension is even offered) when the Maturity Date arrives in 20 months and Ligado needs an additional 20 months for the Plan to become effective. Any financing should be on a timetable commensurate with the time needed for a Plan to go effective when any incremental assets should properly benefit the estate as a whole, not just certain secured lenders.

Moreover, the DIP terms provide the lenders with several all-too-easy means to call a default, especially if Ligado does not strictly meet various "milestones" for the progress of the case. One immediately impending milestone is the 75-day deadline to finalize the documentation for the AST transaction—a milestone that depends on AST's cooperation and that is not solely in Ligado's control. F ailure to strictly meet such milestones should not cause a default.

**Debt Roll-Up**. Ligado is proposing to pay down or roll up more than $800 million in prepetition debt, with new post-petition debt secured by *all* of Ligado's property. While the lenders started off with broad security interests, the roll-up and expansion of collateral effectively fill the gaps, and ensure the DIP Lenders' super-priority position for prepetition debt, completely outside the Bankruptcy Code's otherwise applicable priority provisions—all to the detriment of other creditors. Particularly problematic is the proposal to add avoidance actions to the collateral, when those assets should properly benefit the estate as a whole, not just the secured lenders.

**Waivers of Core Protections for Other Creditors**. The DIP Financing terms improperly waive important rights set forth in the Bankruptcy Code or in settled bankruptcy doctrines to protect other creditors, such as the right to surcharge collateral. These waivers were obviously included to prioritize the DIP Lenders at the expense of the estate. Allowing these waivers will prejudice creditors like Inmarsat, which is owed significant sums that are nowhere accounted for in the DIP budget, and which should not have lawful debt recovery tools stripped away from the start.

Finally, in the absence of an unsecured creditors' committee, more time is needed to examine Ligado's prepetition debt. The challenge period should be extended, and Inmarsat should be granted immediate standing to investigate and pursue any available challenge to any of the prepetition secured party's claims, liens, or interests.

## BACKGROUND

### A.    Ligado and Inmarsat

Ligado is a mobile communications company that operates a satellite network across North America. *See* DIP Fin. Mot. ¶ 12. Ligado has spent years and invested billions of dollars to develop and gain FCC approval for a next-generation "ATC" communications system that would augment communications via "base stations" (cell towers) on land with satellite signals. *See* Smith Decl. [ECF 2] ¶¶ 5-6. A critical portion of the satellite spectrum necessary for the contemplated ATC network is made available to Ligado by Inmarsat via the parties' Cooperation Agreement. *Id*. ¶ 25. Under the Cooperation Agreement, Ligado agreed to pay Inmarsat "substantial sums for this spectrum over a period of 99 years." *Id*. The Cooperation Agreement has been amended numerous times to (among other things) defer Ligado's payment obligations. *Id*. ¶ 30.

As of Ligado's commencement of these chapter 11 cases on January 6, 2025, Ligado owed Inmarsat more than $500 million. *Id*. ¶ 32. Inmarsat is Ligado's largest unsecured creditor. *See* Petition [ECF 1] at 6. It appears Ligado paid off all but a handful of unsecured creditors to avoid the appointment of an official committee of unsecured creditors. In fact, no such committee has been appointed in these chapter 11 cases.

### B.    Ligado's Takings Litigation

The FCC approved Ligado's ATC license in April 2020, but Ligado claims that its ability to move forward has been "thwarted by the actions of the United States government." Smith Decl. [ECF 2] ¶¶ 7-8. These events are the subject of a multibillion-dollar takings lawsuit that Ligado filed in October 2023 against the federal government for allegedly sabotaging Ligado's deployment of the ATC network. *See* Complaint, *Ligado Networks LLC v. United States*, No. 23-1797-L, ECF 1 (Fed. Ct. Cl. Oct. 12, 2023). Ligado describes its case as the "largest

4

uncompensated taking of private property by our nation's government in modern times," and claims that its spectrum rights are "worth as much as $39 billion." *Id*. ¶¶ 1, 121.

On November 18, 2024, the Court of Federal Claims largely denied the government's motion to dismiss. *See* Opinion and Order, *Ligado Networks LLC v. United States*, No. 23-1797L, ECF 31 (Fed. Ct. Cl. Nov. 18, 2024). Ligado's counsel told this Court that the lawsuit was "the company's most important asset." *See* Transcript, Jan. 7, 2025 [ECF 109] at 30.

### C.    Ligado's Proposed Restructuring

The centerpiece of Ligado's proposed restructuring is a commercial agreement with AST, which is currently reflected in a binding term sheet. *See* Smith Decl. [ECF 2] Ex. B at Ex. B (the "**AST Term Sheet**"). In lieu of building the long-planned ATC network, Ligado would provide AST usage rights over Inmarsat's spectrum through the term of the Cooperation Agreement ending in 2107, in exchange for certain cash payments and revenue sharing. *Id*.

Ligado and its secured lenders have entered into a "Restructuring Support Agreement" (the "**RSA**") (attached as Ex. B to the Smith Decl. [ECF 2]) which sets forth various "milestones" mapping out how they expect the bankruptcy to proceed:

- a definitive AST contract to be executed within 75 days of the petition;

- Ligado to issue a disclosure statement 35 days after that, *i.e.*, 110 days from the petition); and

- Ligado to have its plan confirmed within 35 days after the disclosure statement is approved, *i.e.*, 145 days from the petition.

*See* RSA § 4.04; *see also* Transcript, Jan. 7, 2025 [ECF 109] at 32. Under the proposed restructuring, the secured debt will be converted to equity, placing all of Ligado's "upside" with the lenders. *See* Smith Decl. [ECF 2], at Ex. B (RSA) at Ex. A (Restructuring Term Sheet) at 6-8.

Notably, the final milestone, a Plan Effective Date, is ***40 months*** from the Petition Date, or in May 2028—which can be extended even further if sufficient DIP Lenders consent. *See* RSA

§ 4.04(p).  Counsel for Ligado told the Court that the extended timeframe was necessary because of "regulatory preconditions" to the effective date.  Transcript, Jan. 7, 2025 [ECF 109] at 32; *see also* Smith Decl. [ECF 2], at Ex. B (RSA) at Ex. A (Restructuring Term Sheet) at 10 (requiring all necessary government approvals or consents by the Plan Effective Date).

**D.      The Proposed DIP Financing**

In support of the DIP Financing Motion, Ligado submitted a declaration from one of its investment bankers explaining that during the "the days leading up" to Ligado filing for bankruptcy, the company "contacted eleven potential lenders" to seek DIP financing but that none submitted proposals.  Mendelsohn Dec. [ECF 6] ¶¶ 13-14.  No details are provided as to who was contacted or what terms they required to come to the table.  The banker concludes—without elaboration—that the "the best and only financing alternative available" is the DIP Financing currently before the Court.  *Id*. ¶ 18.  Not surprisingly, the "days"-long process controlled by Ligado's existing lenders produced terms that tilt heavily in their favor.

Under the proposal, the DIP Lenders would (i) provide up to $115 million in new money, (ii) pay down approximately $326 million of their own prepetition debt, and (iii) roll up another $440-500 million of their prepetition debt into the new facility.  *See* DIP Financing Motion [ECF 4] ¶¶ 19-25.  The new debt carries an interest rate of 17.5% when paid in kind or 15.5% to the extent the lenders elect to receive cash.  *See* DIP Loan Agreement [ECF 4 Ex. 1] § 2.06.

The vast majority of the $115 million in new money would be eaten up in fees (albeit fees payable in kind) totaling nearly $100 million, as follows:

| Fee | Calculation | Amount |
|---|---|---|
| **Backstop Fee** (§ 2.05(b); § 1.01 pg. 13 (defining amount of Commitments)) | 12.5% of Commitments at Closing (12.5% x $441,999,891) | $55,249,986 |
| **Commitment Fee** (§ 2.05(c); § 1.01 pg. 13 (defining Commitments")) | 5% of Commitments at Closing (5% x $441,999,891) | $22,099,995 |
| **Second Funding Discount Fee** (§ 2.05(e); § 1.01 pg. 17 (defining DIP Second Funding Commitments)) | 5% of DIP Second Funding Loans (5% x $326,999,891) | $16,349,994 |
| **DIP DDTL Funding Discount Fee** (§ 2.05(f); § 1.01 pg. 15 (defining aggregate DIP DDTL Commitments)) | 5% of DIP Delayed Draw Term Loans (5% x $103,000,000) | $5,150,000 |
| **DIP First Funding Discount Fee** (§ 2.05(d); § 1.01 pp. 15-16 (defining DIP First Funding Commitments)) | 5% of DIP First Funding Loans (5% of $12,000,000) | $600,000 |
| ***Total*** *(assuming full loan drawn)* | | **$99,449,975** |

Notwithstanding that the Plan Effective Date may be forty months away, the DIP Loan, if approved, would mature 120 days from the Petition Date and could only be extended through a series of five extensions for a total period of two years—not long enough under the RSA to effectuate the Plan. *See* DIP Loan Agreement [ECF 4 Ex. 1] § 1.01 pp. 32-33 (defining Maturity Date). Several other provisions, discussed more fully below, are also highly problematic, including that the DIP Loan would be secured by "all assets" of Ligado, including avoidance actions, and that critical protections otherwise available to the estate, Inmarsat, and/or other creditors would be waived. DIP Financing Motion [ECF 4] ¶ 19(c), (f) and (g); Interim DIP Order [ECF 104] ¶¶ 28-29.

<u>**ARGUMENT**</u>

**I.    Standard for Approval of Post-Petition Financing**

"Debtors in possession generally enjoy little negotiating power with a proposed lender," and, as a result, "lenders often exact favorable terms that harm the estate and creditors." *In re*

*Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992).  The Court has an independent duty to safeguard against this risk, and ensure that proposed financing is appropriate, especially where no creditors' committee has been appointed.   This requires the debtor to prove to the Court's satisfaction that: (1) it was "unable to obtain unsecured credit"; (2) the financing is "necessary to preserve the assets of the estate"; and (3) the proposed terms are "fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender."  *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (debtors' failure to attempt to obtain unsecured financing precluded court's approval of the proposed financing).  With respect to the first element, while a debtor is not required to seek credit from every possible source, a debtor "must show that it has made a reasonable effort to seek other sources of credit available[.]"  *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

Courts examining DIP financing proposals must assess whether "the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets so as to unduly prejudice the rights of other parties in interest."  *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("While certain favorable financing terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender."); *see also In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. N.H. 1989) (debtor in possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the secured creditor").  A DIP financing should not be approved when "a creditor leverages a debtor in possession into

making a concession unauthorized by, or in conflict with, the Bankruptcy Code as a condition for the requested credit." *General Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine)*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992).

As discussed, the DIP Loan terms were procured through an abbreviated process where the die was cast from the start to favor Ligado's lenders. The terms they now want the Court to endorse are highly objectionable, as detailed below.

## II.    The Proposed Fees and Interest Rate Are Excessive

The requirement that the debtor show the proposed terms are "fair, reasonable, and adequate," *Dodgers*, 457 B.R. at 312, includes, of course, the burden to show that any proposed fees assessed against the estate are reasonable in light of the benefit conferred. *See*, *e.g.*, *In re Philadelphia Newspapers, LLC*, 445 B.R. 450, 467 (Bankr. E.D. Pa. 2010) (reducing requested DIP-related fees as unreasonable); *In re Latshaw Drilling, LLC.*, 481 B.R. 765, 815 (Bankr. N.D. Okla. 2012) (same). By any measure, the fees at issue here—nearly $100 million in exchange for only $115 million of "new money"—are unreasonable. This is especially true when the proposed DIP financing comes from Ligado's existing lenders who are seeking to enhance and maintain their existing position. Certainly, Ligado has yet to provide the Court with any evidence to meet its burden of showing how these enormous fees possibly could be appropriate.

Compounding the problem is the obscene interest rate of 17.5% (or 15.5% per annum if paid in cash). *See* DIP Loan Agreement [ECF 4 Ex. 1] § 2.06. The rate is especially excessive considering the DIP Lenders' super-priority administrative expense claim status, and their blanket first priority lien on all assets—including the $39 billion takings litigation. If the takings case is worth even a fraction of the demanded amount, the lenders are adequately secured and cannot credibly demand such an excessive interest rate.

III.    **The DIP Loan's Maturity Date and Numerous DIP Milestones All But Ensure Inevitable Defaults and Resulting Debtor Concessions, or Even Foreclosure**

The DIP Loan's Maturity Date, as well as its onerous milestones, all but guarantee that the Debtors will default, and, as a result, will be in an even more precarious negotiating position with respect to the DIP Lenders.

Under the DIP Loan Agreement, the scheduled Maturity Date is initially set at 120 days from the Petition Date, but may be extended with the consent of certain DIP Lenders by five additional 120-day periods, for a total period of two years.  *See* DIP Loan Agreement [ECF 4 Ex. 1] § 1.01 pp. 32-33 (defining Maturity Date).  The obvious problem with this timetable is that, as discussed, the exit plan is premised on a period of more than three years (40 months) from the Petition Date to obtain regulatory approval and for the Plan to be effective.  *See* RSA § 4.04(p); DIP Loan Agreement [Ex. 4 Ex. 1] § 5.16(o); Transcript, Jan. 7, 2025 [ECF 109] at 32.

The upshot is that Ligado will inevitably need to approach the DIP Lenders in as little as three months, hat in hand, for more time.  Yet when Ligado does so, it will have little to no leverage, and the DIP Lenders will be in a position to make their lopsided loan terms even worse for Ligado or perhaps even to foreclose.  The Court can and should prevent this mismatch, and only approve debt on a timetable coextensive with a Plan becoming effective.

Separately, the DIP Loan provides that failure to satisfy any of the numerous "milestones" is an event of default.  DIP Loan Agreement [ECF 4 Ex. 1] § 8.01.  One milestone of immediate concern is the deadline for Ligado to execute a definitive agreement with AST within 75 days of the Petition Date, *i.e.*, by March 21, 2025. *Id*. § 5.16(h).  Other milestones depend on the Court having entered various orders. *Id*. § 5.16(j)-(m).  These events are not within the control of Ligado and appear designed to give the DIP Lenders multiple junctures in the coming months to threaten or declare defaults that will, in turn, only result in the loan terms being worse than they already

are, or setting the Debtors up for foreclosure.[3]   In *In re Tamarack Resort, LLC*, the court rejected a proposed DIP loan because (among other reasons) it similarly contained "milestones" that were "all weighty and on short fuses," meaning that the "the "DIP Loan would appear headed for default." 2010 WL 4117459, at *13 (Bankr. D. Id. Oct. 19, 2010).  The same problem exists here. Accordingly, the Court should reject the DIP Financing so long as it allows for defaults to be triggered by "milestones" and other matters not reasonably in Ligado's control.

IV.    **The "Roll-Up" of Approximately $800 Million of Prepetition Obligations into Superpriority Administrative Claims Is Not Justified**

The DIP Financing Motion asks the Court to approve the "roll-up" of prepetition debt into post-petition, superpriority administrative expense claims.  Specifically, in exchange for $115 million of new money provided to Ligado (which, as noted, will mostly be used to pay fees), the DIP Lenders are proposing to pay down approximately $326 million of their own prepetition debt and to roll up between approximately $440 and $500 million more into the new facility.  *See* DIP Financing Motion [ECF 4] ¶¶ 19-25.  The DIP Loan would be secured by "all property of [Ligado], whether existing on the Petition Date or thereafter acquired" subject only to limited carve outs.  *Id.* ¶ 5(a)(i).  By swapping their prepetition debt for post-petition debt that is more firmly secured, the DIP Lenders would be able to shore up any weaknesses in their prepetition security interests.

As an initial matter, the permissibility of roll-ups under the Bankruptcy Code is, at best, uncertain.  As observed by the Court of Appeals for the Eleventh Circuit, "[b]y their express terms, sections 364(c) and (d) apply only to future—*i.e.*, post-petition—extensions of credit.  They do not authorize the granting of liens to secure [or awarding administrative expense status to] prepetition loans." *Shapiro v. Saybrook Mfg. Co., Inc. (In re Saybrook Mfg. Co., Inc.)*, 963 F.2d

---

[3] The automatic stay would not prevent foreclosure.  *See* Interim DIP Order [ECF 104] ¶ 13 (authorizing DIP lenders to exercise default remedies).

1490, 1495 (11th Cir. 1992); *see also In re Oxford Mgmt., Inc.*, 4 F.3d 1329, 1334 (5th Cir. 1993) (noting that no Bankruptcy Code provision authorizes the payment of post-petition funds to satisfy prepetition claims); *cf. Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code.).

Lower courts, in certain circumstances, have authorized the post-petition payment of prepetition obligations, but, critically, only "where necessary to protect and preserve the estate." *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to the "doctrine of necessity"); *In re Equalnet Comm'ns Corp.*, 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation)); *Berry Good*, 400 B.R. at 747 ("A clean line must be drawn between pre- and post-petition debt, and it is unlawful to blur those lines, *except in rare and exceptional circumstances*, such as with wage claimants.") (emphasis added); *cf. Czyzewski v. Jevic Holding Corp.*, -- U.S. --, 137 S. Ct. 973, 985 (2017) (noting that courts that have approved roll-ups have found that "the distributions at issue *would enable* a successful reorganization and make even the disfavored creditors better off") (emphasis added and internal quotation marks omitted).  As a corollary to the doctrine of necessity, a proposed roll-up must leave "even the disfavored creditors better off." *Jevic*, 137 S. Ct. at 985.  Ultimately, "[r]oll-ups are generally disfavored[.]" *In re: Wildcat Met Mining, Inc.*, 2024 WL 1025002, at *11 (Bankr. S.D. W.Va. Mar. 8, 2024).

Ligado barely attempts to justify the roll-up, arguing only that "the DIP Lenders would not have extended new money financing to the Debtors otherwise."  DIP Financing Motion ¶ 37.  But the DIP Lenders are the longtime secured lenders of Ligado who, unless they were prepared to

walk away from the takings litigation and billions of dollars they invested in Ligado over the years, needed to provide continued funding to have any prospect of recovering their investment.  The suggestion that they "would not have extended new money" absent the roll-up simply is not credible.  They had little alternative but to ensure new money was available.  Ligado has failed to establish that the roll-up is necessary, and that it does not harm "disfavored creditors".

Furthermore, even when roll-ups are approved, they usually involve new money that exceeds or is at least in line with the roll-up amount.  *See*, *e.g.*, *In re Caccamise*, No. 09–17165, 2009 WL 5205980, at \*3 (Bankr. E.D. Va. Dec. 22, 2009) (noting that roll-ups are "not favored" but approving roll-up that was "small in relation to the" new credit being extended).

At bottom, given the staggering size of the roll-up in proportion to the new liquidity being offered, and given such a feeble and conclusory justification, the Court should reject any proposed roll-up.

In the alternative, at a bare minimum, the Court should limit the rolled-up debt collateral to the lenders' prepetition security, *see* Transcript, *In re NEC Holdings Cop.*, No. 10-11890-FJW, ECF 224, at 87 (D. Del. July 13, 2010) (noting, "I'm going to make it clear in any order I approve that the collateral that would be involved in any rollup would be limited to the collateral on the prepetition basis," so as to address "[o]ne of the mischiefs" of roll-ups), or should authorize the roll-up to be unwound if it is later shown that the DIP Lenders increased their collateral position or were otherwise "unduly advantaged."  S.D.N.Y. Loc. Bankr. R. R. 4001-2(g)(5) (mandating this term); *see also*, *e.g.*, *In re Saint Vincents Catholic Med. Centers of New York*, No. 10-11963, 2010 WL 6982724, at \*15 (Bankr. S.D.N.Y. Apr. 4, 2010) (allowing rollup to be "un-rolled pursuant to an order of this Court").  The limitation to prepetition collateral is especially important

here where the DIP Lenders' prepetition security interests are untested and the "new money" is proportionally small.

## V. The Proposed DIP Financing Contains Other Overreaching Terms

In the event that the Court approves the DIP Financing (it should not), it should be stripped of the numerous provisions that not only forfeit valuable estate rights but that are also designed to disarm the creditors from challenging the claims and liens of the Prepetition Secured Parties. *See, e.g., In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) ("The debtor and its secured creditor do not constitute a legislature. Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to statutory rights of third parties.").

Among these overreaching terms (in addition to the improper roll-up, as discussed above) are:

- ***Encumbrance on Avoidance Action Proceeds.*** The DIP Lenders' superpriority liens should not include avoidance actions or the proceeds thereof. Avoidance actions and their proceeds are intended to benefit ***unsecured*** creditors and therefore should not be pledged for the benefit of ***secured*** creditors.[4]

---

[4] *See* DIP Financing Motion ¶ 19(c); Interim DIP Order [ECF 104] ¶ 5(a)(i). Avoidance actions under chapter 5 of the Bankruptcy Code are intended to benefit unsecured creditors and facilitate distributions among them, and therefore should not be consumed by secured creditors. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 573 (3d Cir. 2000) ("avoidance actions are designed to protect" the interests of "unsecured creditors"). In fact, granting a lien on avoidance actions conscripts the avoidance power—which is supposed to be for benefit of the estate as a whole—to instead "benefit certain creditors exclusively," thereby "frustrate[ing] the policy" of the Bankruptcy Code. *Mellon Bank v. Glick*, 69 B.R. 901, 905 (D.N.J. 1987). For these reasons, courts generally disapprove of proposed financing that, like here, would purport to grant security interests in avoidance actions. *See, e.g., Official Comm. of Unsecured Creditors v. Goold Elec. Corp.*, No. 93 C 4196, 1993 WL 408366, at *4 (N.D. Ill. Sept. 22, 1993) ("The financing order is invalid to the extent that the order assigns to the bank a security interest in the debtor's preference actions."). The Court should do the same here.

Even if the DIP Lenders limited their grab to the "proceeds" of avoidance actions (rather than the actions themselves) that should not alter the analysis. Indeed, the Third Circuit has repeatedly refused to "elevate form over substance" when ruling on issues of bankruptcy law. *See, e.g., In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 308-09 (3d Cir. 2010); *In re Schick*, 418 F.3d 321, 328 (3d Cir. 2005).

- ***Section 552(b) Waiver.***  The Debtors, as debtors in possession, do not have the authority to waive the so-called "equities of the case" exception under section 552(b) of the Bankruptcy Code, which permits "***the court***" to deny a lien on post-petition "proceeds, products, offspring, or profits" of prepetition collateral based on the "equities of the case."  11 U.S.C. § 552(b) (emphasis added).  Where "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted) ("Here, the statute appears quite plain in specifying who may use § 506(c)—'[t]he trustee.'").

- ***Section 506(c) Waiver.***  The DIP Financing Motion provides no basis upon which the Debtors should waive the ability to surcharge the lenders' collateral.  *See In re Colad Grp.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (court could "discern no basis to allow a secured creditor to ignore [the] application" of section 506(c)).  Allowing a secured lender to "immunize [itself] from the surcharge expenses" would "operate as a windfall to the secured creditor at the expense of administrative claimants," and so should not be permitted.  *In re Lockwood Corp.*, 223 B.R. 170, 176 (8th Cir. BAP 1998) (refusing to enforce 506(c) waiver) (citation omitted).

- ***Marshaling Waiver.***  The Debtors also should not be permitted to waive any rights to marshal assets pursuant to section 544(a) of the Bankruptcy Code.  *See High Strength Steel*, 269 B.R. 560, 573–74 (Bankr. D. Del. 2001) ("[T]he majority of decisions which have addressed the issue have held that a trustee has standing under section 544(a) to bring an action to compel marshaling. . . .  We agree with the majority view.").

**VI.     The Challenge Period Should Be Extended and Inmarsat Should Be Given Standing and Funding to Investigate the DIP Loan Further**

The 75-day challenge period should be extended to allow any creditor to examine the DIP Lenders' prepetition loans and to determine whether the loans were properly secured and perfected, or, among other things, whether there exist any avoidance actions against the prepetition lenders.  Inmarsat submits that the challenge period should be no less than 120 days from entry of any final order approving the DIP Financing and that Inmarsat should be granted immediate standing to investigate and pursue any available challenge to the Prepetition Secured Parties' claims, liens or interests.

15

Moreover, the period should include an ability to challenge and undo any payoff or roll-up of prepetition loans, and to challenge any collateral increases. Otherwise, the investigation period will be meaningless as to approximately $800 million of prepetition debt that, through the roll-up and pay-down, is effectively immunized. Since no creditors' committee has been appointed, the work must be undertaken by others—in this case unsecured creditors such as Inmarsat—which should be given immediate standing to investigate and bring any challenges. This work should be given superpriority status under Bankruptcy Code section 503(b)(9) as a "substantial contribution" in these cases.

### CONCLUSION

**WHEREFORE**, Inmarsat respectfully requests that this Court (i) deny the DIP Financing Motion, (ii) grant Inmarsat and other creditors additional time to review the DIP Loans and, if appropriate, further challenge the terms and conditions therein, and (iii) grant Inmarsat a superpriority administrative expense claim under Bankruptcy Code section 503(b)(9) for reviewing and challenging the DIP Financing Motion and the lenders' prepetition liens.

16

Dated: January 29, 2025
Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES
LLP

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier
19801)
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com
-and-

STEPTOE LLP
Jeffrey M. Reisner
Charles Michael
1114 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 506-3900
Email: jreisner@steptoe.com
        cmichael@steptoe.com

Alfred M. Mamlet
Joshua R. Taylor
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone:  (202) 429-3000
Email: amamlet@steptoe.com
        jrtaylor@steptoe.com

-and-

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Benjamin Finestone
295 5th Avenue,
New York, NY  10016
Telephone: (212) 849-7000
Email:
benjaminfinestone@quinnemanuel.com

Matthew Scheck
300 West 6th St., Suite 2010
Austin, TX  78701
Telephone: (737) 667-6100
Email: matthewscheck@quinnemanuel.com

*Counsel to Inmarsat Global Limited*

18