## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LIGADO NETWORKS LLC, *et al.*,[1] | ) | Case No. 25-10006 (TMH) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) | **Re:  Docket Nos. 4, 104, 150** |

### DEBTORS' REPLY TO INMARSAT'S DIP OBJECTION

The above-captioned debtors and debtors in possession (the "<u>Debtors</u>" and, together with their non-Debtor affiliates, "<u>Ligado</u>") submit this reply (the "<u>Reply</u>") to *Inmarsat Global Limited's Objection to Ligado's DIP Financing Motion* [Docket No. 150] (the "<u>Inmarsat Objection</u>") filed by Inmarsat Global Limited ("<u>Inmarsat</u>") and in further support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 4] (the "<u>DIP Motion</u>"),[2] and respectfully state as follows:

### PRELIMINARY STATEMENT

1.      Inmarsat's objection is a disingenuous and destructive tactic by a lone creditor and litigation **adversary** of the Debtors to derail a restructuring that is **supported by significant**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).  The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Motion.

*majorities of stakeholders across the Debtors' capital structure*.[3]   The fortunate reality is that these cases are supported by the RSA, which contemplates a plan (the "Plan") with a rare outcome for most chapter 11 cases:  the existing waterfall will be preserved – including existing preferred and common equity – and allowed unsecured claims will ride through unaffected, and thus, *unimpaired*.  The RSA also sets forth the terms of a long-term, value-maximizing commercial transaction between the Debtors and AST & Science, LLC (the "AST Transaction").  The DIP Facility is an indispensable component of both the RSA and AST Transaction and necessary to implement the Plan by refinancing certain funded indebtedness, in addition to providing the Debtors with $115 million in incremental liquidity needed to support the Debtors' operations and the administration of these cases.  Upon consummation of the restructuring contemplated in the RSA and the Plan, the DIP Facility will convert into an exit facility and become Ligado's only funded indebtedness.  All prepetition funded indebtedness – *over $7.8 billion* – will be converted to different classes of preferred equity.  In light of the expected beneficial outcome for the Debtors' entire capital structure, and for the reasons detailed herein (including Inmarsat's true motivations), the Inmarsat Objection should be overruled.

2.       Inmarsat's self-proclaimed role of "estate watchdog" on behalf of general unsecured creditors is nothing short of delusional.  Inmarsat would have this Court see it as a fiduciary of the parties allegedly affected by the DIP Facility.  This is misleading.  In truth, the Prepetition Secured Parties – who hold the vast majority of debt that will be primed by the DIP Facility – are best positioned to protect such interests.  Furthermore, Inmarsat's campaign to block the DIP Facility (and thus jeopardize the Debtors' restructuring) is puzzling given that the AST

---

3    The RSA is supported by 88% of the holders of the Debtors' funded debt and by significant percentages of the holders of preferred and common equity interests.

Transaction ensures payments to Inmarsat on a go-forward basis.  Thus, the Inmarsat Objection can only be attributed to other motives that have nothing to do with Inmarsat's status as a potential unsecured creditor.

3.      The Inmarsat Objection is a continuation of Inmarsat's on-going improper conduct, which was one of the forces that propelled the Debtors into bankruptcy.  As discussed at length in Ligado's adversary complaint [Docket No. 74; Adv. Pro. 25-50000, Docket No. 3], Inmarsat owes the Debtors significant amounts in damages on account of, among other things, its continued breaches of the Cooperation Agreement.[4]  This coupled with Inmarsat's desire to gain access to the Debtors' spectrum for its own commercial gains, are the true motivating forces behind the Inmarsat Objection.  Inmarsat, the sole objecting party, is not acting as an "estate watchdog" – Inmarsat has only its own parochial interests in mind, which include destruction of the Debtors' business to its own advantage.[5]

4.      Meanwhile, Inmarsat argues that the DIP Lenders used uneven bargaining leverage to extort off-market terms.  Not so.  *First*, with the help of some of the most highly qualified restructuring advisors in the world, the Debtors conducted an extensive marketing process for DIP financing, where Perella Weinberg Partners ("PWP") contacted eleven potential lenders.  All of those contacted declined to submit proposals for an alternative DIP facility, and Ligado has not received any offers for alternative financing since the filing of the DIP Motion.  The DIP Facility

---

[4]     The agreement between the Debtors and Inmarsat dated August 6, 2010 (as further amended and restated from time to time, the "Cooperation Agreement").

[5]     Inmarsat complains that "[i]t appears Ligado paid off all but a handful of unsecured creditors to avoid the appointment of an official committee of unsecured creditors."  Obj. at 4.  This is wrong.  Prior to the bankruptcy filing, Ligado paid undisputed amounts owed to general unsecured creditors, as it always has done.  The Debtors' goal is to ensure that their business continues to run smoothly to the benefit of all of its stakeholders.  Inmarsat's insinuations to the contrary merely reflect its displeasure with the fact that, had there been a creditors' committee, Inmarsat could have attempted to have its litigation efforts funded by the estates.

is the **only** option that has emerged.  *Second*, the DIP Lenders' course of conduct demonstrates their desire to assist the Debtors in their reorganization efforts.  The DIP Lenders are the same prepetition lenders (the Prepetition Secured Parties) that have been funding the Debtors on a month-to-month basis for years and continued to fund the Debtors even after the underlying debt facilities had matured.  Any of the Prepetition Secured Parties could have sought to enforce their rights post-maturity, but instead, those lenders banded together to finance Ligado time and time again.  This lengthy pattern of history demonstrates the true intentions of these institutions, who are now, as DIP Lenders, subjecting themselves to the protections provided by this Court and the Bankruptcy Code.  Although Inmarsat may wish that the economics of the DIP Facility were different, the primary stakeholders affected by its terms are the Prepetition Secured Parties that have continually funded Ligado at their own expense without the benefit of receiving cash pay interest, which Inmarsat has benefited from for years in the form of payments and access to the Debtors' spectrum.

5.       Whatever complaints Inmarsat may have about the terms of the DIP Facility cannot overcome the Debtors' business judgment.  In any event, Inmarsat's protestations make little sense.  Inmarsat challenges terms that are standard in DIP facilities, like section 506(c) and 552(b) waivers, the waiver of marshaling, liens on avoidance action proceeds, and the length of the challenge period.  Indeed, Inmarsat does not stand to benefit from any of the terms it objects to under the current Plan, and Inmarsat should not have standing to raise any of these objections.  To add insult to injury, Inmarsat is also seeking (wholly unprecedented) *prospective* allowance of a substantial contribution claim without any evidence that substantial contribution is even possible under the circumstances of these cases, let alone that Inmarsat has established a claim.

6.      At this juncture, the DIP Facility is the best and *only* option available to fund the Debtors' restructuring.  If Inmarsat is aware of a better financing option, the Debtors welcome Inmarsat to provide evidence of such proposal or for Inmarsat (a multibillion-dollar company) to make a proposal itself.  In any case, Inmarsat's challenge to the Debtors' business judgment must be rejected.  Inmarsat should not be allowed to jeopardize the Debtors' largely consensual restructuring only to pursue its improper goals as a litigation counterparty.  The Inmarsat Objection should be overruled, and the DIP Facility should be approved.

## **BACKGROUND**

7.      Prior to commencement of these chapter 11 cases, certain of the Prepetition Secured Parties provided funding for the Debtors through senior first-out term loans – effectively a "pre-DIP DIP".  *See* Jan. 7, 2025 Hr'g Tr. at 47:12-19.  This funding aided Ligado in a time when liquidity ran low due to complications in harnessing the full power of Ligado's business because of the government's uncompensated taking of its spectrum.  This prepetition financing allowed the Debtors to operate their business and build the commercial relationships necessary to deploy their licensed and leased spectrum.  *See Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") [Docket No. 2] ¶¶ 130-136.

8.      As a chapter 11 filing became more and more likely, and in the face of the ever-increasing pressure Inmarsat was placing on the Debtors, the Debtors engaged in a several weeks-long process to negotiate in good-faith the terms of potential DIP financing with the Prepetition Secured Parties, resulting in the DIP Facility before the Court.  *Id.*

9.      Prior to the commencement of these chapter 11 cases, the Debtors sought to identify other potential sources of DIP financing with the assistance of their investment banker.  PWP, on

behalf of the Debtors, contacted eleven possible lenders that PWP thought might consider providing DIP financing in these cases. *See* Mendelsohn Decl. ¶ 13. However, none of those potential lenders submitted a proposal. *Id.* ¶ 14. The Debtors and their advisors, including PWP, determined that the DIP Facility was the only financing alternative available to the Debtors under the circumstances. *Id.*

10.     On January 5, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

11.     On January 6, 2025, the Debtors filed the DIP Motion. On January 7, 2025, the Debtors presented the DIP Motion to the Court seeking interim approval of the DIP Facility, which was granted on January 8, 2025. *See Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 104] (the "Interim DIP Order"). Among other things, the Interim DIP Order approved payment of the DIP Lenders' fees, certain of which have already been paid upon the entry of the Interim DIP Order. Interim DIP Order ¶ 2(c)(iii).

12.     While Inmarsat was present at the January 7, 2025 hearing, it failed to object or otherwise comment on the DIP Motion or the interim relief requested by the Debtors. *See* Jan. 7, 2025 Hr'g Tr. at 38-39.

13.    On January 29, 2025, Inmarsat filed the Inmarsat Objection, opposing approval of the DIP Facility and requesting the Court to "grant Inmarsat and other creditors additional time to review the DIP Loans and further challenge the terms and conditions therein," as well as "grant Inmarsat a superpriority administrative expense claim under Bankruptcy Code section 503(b)(9) [sic 503(b)(3)(D)] for reviewing and challenging the DIP Financing Motion and the lenders' prepetition liens."  Obj. at 16.

## REPLY

14.    Absent bad faith or conflicts of interest, courts generally defer to the business judgment of a debtor with respect to postpetition financing.  *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l, AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting prior approval of a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing.") (collecting cases); *In re Love Culture Inc.*, No. 14-24508-NLW, 2016 WL 11908916, at *5 (Bankr. D.N.J. Dec. 2, 2016) (approving financing under section 364 that "reflect[ed] the Debtor's exercise of prudent business judgment").

15.    Inmarsat does not assert bad faith or any self-dealing on the part of the Debtors in connection with negotiating the DIP Facility, nor could it.  As such, the only question before the Court is whether the Debtors have properly exercised their business judgment.  It is undisputed that the DIP Facility is the only – and thus the best – financing proposal available to the Debtors. Given that undisputed fact, the DIP Facility should be approved, particularly under the deferential standard of review applicable here.

16.     None of Inmarsat's objections have any merit.  If Inmarsat believes a different or better DIP financing is available, notwithstanding the undisputed fact that none emerged during the robust marketing process, it should provide that evidence or make its own proposal.  Inmarsat's failure to do either puts the lie to its complaints and only further proves that the DIP Facility is necessary to preserve the value of the estates because it is the ***only*** option available.

I.    **The DIP Facility economics and milestones are reasonable and supported across the entire capital structure.**

17.     Inmarsat through its objection, would have this Court believe that its actions are altruistic and value enhancing – they are not.  Removing disfavored provisions (that are common and reasonable under the circumstances) while cherry-picking those that Inmarsat approves of would be value and case destructive.  The DIP Facility was extensively negotiated as a part of a comprehensive financing agreement, and the RSA, without which the Debtors would be unable to administer these cases, consummate the AST Transaction, or satisfy allowed unsecured creditors in full.  Indeed, the RSA and the Plan contemplate that unsecured creditors will remain unimpaired, so none of the terms that Inmarsat complains of actually affect the interests of the class that Inmarsat is purporting to champion. The DIP Facility economics are reasonable under the circumstances and Inmarsat's objections should be overruled.

A. The DIP Milestones and maturity terms are reasonable given the unique nature of the Debtors' business.

A.    **The DIP Facility economics are reasonable in the Debtors' chapter 11 cases.**

18.     The DIP Fees were already approved by the Bankruptcy Court upon entry of the Interim DIP Order, which provides that the DIP Fees "shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature

under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise." Interim DIP Order ¶ 2(c)(iii). Inmarsat (improperly) asks for reconsideration of the Interim DIP Order with respect to the DIP Fees, even though Inmarsat participated in the Interim Hearing and at no time raised this (or any other) issue with the Court's approval of the DIP Fees in the Interim DIP Order.[6] Raising the issue of the DIP Fees now, rather than at the Interim Hearing, prejudices the Debtors and their estates. The Debtors negotiated a holistic DIP financing package with the DIP Lenders, which was conditioned on approval of the DIP Fees upon entry of the Interim DIP Order. The DIP Lenders were, unsurprisingly, unwilling to commit to fund (and backstop) $442 million into the Debtors' estates without the Court's approval of the fees associated with such commitments. Reconsideration of the DIP Fees at this time, especially those that the Debtors have already paid in reliance upon the Interim DIP Order,[7] risks upending the holistic deal reached between the DIP Lenders and the Debtors, which would result in substantial and irreparable harm to the Debtors' estates.

19.     While borrowers would prefer to pay less in fees and interest, the fees and interest rate associated with the DIP Facility are reasonable given the Debtors' circumstances prior to the Petition Date. Moreover, Inmarsat fails to cite any evidence as to what fees and interest rate would be appropriate in the instant circumstances. Inmarsat essentially asserts that, because the DIP Facility is being provided by prepetition lenders, the DIP Fees are automatically unreasonable. Obj. at 9. This argument completely ignores that the DIP Lenders are providing new capital to the Debtors and that no other party was willing to provide such financing. Mendelsohn Decl. ¶ 18.

---

[6]  Inmarsat does not, and cannot, suggest that the DIP Fees were not adequately disclosed by the Debtors as part of the interim approval of the DIP Facility. The DIP Fees were clearly described in the DIP Motion filed over 24 hours before the Interim Hearing. *See* DIP Motion ¶ 98.

[7]  In accordance with the Interim DIP Order, the Debtors have paid the Backstop Fee, the Commitment Fee, the DIP First Funding Discount Fee, and a portion of the DIP Unused Commitment Fee.

Inmarsat similarly ignores the fact that the interest rate charged under the DIP Facility is the same as the rate under the Prepetition First Lien Loan Facility in effect at the time of the Company's chapter 11 filing under the Prepetition Secured Documents and that the DIP interest is payable entirely in-kind.  Under these circumstances, the interest rate under the DIP Facility is reasonable, is consistent with the pre-petition interest rate, and can hardly be called "obscene" or "especially excessive."  Obj. at 9.

20.    Inmarsat also argues that the Debtors are extending the DIP Lenders an unnecessary roll-up at the detriment of other creditors.  Obj. at 3.  But Inmarsat fails to consider the Roll-Up and the Refinancing in the context of the Debtors' circumstances.  As described in the DIP Motion, the Debtors needed the DIP Facility to fund these cases, which is in the best interest of all stakeholders, and received no other actionable financing proposals.  DIP Motion ¶ 91.  And although Inmarsat, with no evidence, contends otherwise, the Debtors could not have obtained the DIP Facility without the Roll-Up and the Refinancing.  *See* Mendelsohn Decl. ¶¶ 22, 24.

21.    Further, the Inmarsat Objection improperly conflates the Roll-Up and the Refinancing.  On the one hand, the Roll-Up, which is subject to the Challenge Period, rolls up Prepetition First Lien Debt on just slightly over a one-to-one basis with the DIP New Money Loans.  *See* DIP Motion ¶ 23.  On the other hand, the Refinancing separately pays the 1L First Out Loan Obligations in cash, as contemplated by the Prepetition First Lien Documents.  As described in the First Day Declaration, the Prepetition First Lien Lenders provided the Prepetition First Out Term Loans in the two years leading up to the Petition Date to provide liquidity to the Debtors as they attempted to negotiate a comprehensive restructuring solution with Inmarsat, and the Debtors used some of the proceeds of Prepetition First Out Term Loans to fund payments to Inmarsat during that time period.  First Day Declaration ¶ 135.  In other words, the Prepetition First Out

Term Loans served as a "pre-DIP DIP" with the expectation of the parties that they would be refinanced as part of a bankruptcy process.

22.     DIP facilities commonly include such provisions whereby prepetition debt is refinanced into the DIP facility. *See, e.g., In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023) [Docket No. 332] (authorizing an approximately $63 million DIP Facility, including an approximately $43 million roll-up); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) [Docket No. 216] (authorizing an approximately $120 million DIP facility, including a $60 million roll-up of the prepetition term loan); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jul. 20, 2020) [Docket No. 303] (authorizing an approximately $50 million DIP facility including a $22 million roll-up); *In re Blackhawk Mining LLC*, No. 19 11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) [Docket No. 185] (authorizing an approximately $240 million DIP facility, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) [Docket No. 249] (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order).   Under these circumstances, both the Roll-Up and the Refinancing are reasonable and reflect appropriate exercise of the Debtors' business judgment.

**B.      The DIP Milestones and maturity terms are reasonable given the unique nature of the Debtors' business.**

23.     As is customary in DIP financing, the parties have negotiated key checkpoints along the way that, in the Debtors' business judgment, are not only fair, but entirely achievable milestones.  There is no basis to Inmarsat's assertion that the DIP Lenders will use the negotiated milestones and Maturity Date to take unfair advantage of the Debtors.  Obj. at 10-11.  The history

of dealing between the Debtors and the DIP Lenders paints a different picture.  The DIP Lenders are the same parties that have been funding Ligado prepetition despite the fact they have not received a single cash interest payment since the Company's October 2020 recapitalization and continued to forbear from exercising any remedies, let alone their foreclosure rights prepetition, on a post-maturity basis.  By contrast, Inmarsat has continuously failed to work with the Debtors and their stakeholders cooperatively and repeatedly acted to derail the Debtors' restructuring efforts.

24.    Similar to Inmarsat's other objections, their concerns regarding the Maturity Date and negotiated milestones ring hollow.  It is the DIP Lenders that bear all of the economic risks while the parties work to finalize the terms of the AST Transaction and, thereafter, await regulatory approval.  They cannot be expected (let alone required) to sit idly by without periodic checkpoints.  As is typical in such circumstances, the DIP Lenders have required certain protections to ensure they retain an appropriate say with respect to how their funds are being used to accomplish a consensual restructuring that benefits all stakeholders.  The Debtors and the DIP Lenders had extensive arm's length negotiations over these checkpoints and ultimately reached the resolutions embodied in the DIP Facility.

25.    The milestones contained in Sections 5.16(a)-(e) of the DIP Credit Agreement have already been achieved.  The remaining milestones include entry of the DIP Order, execution of the AST Definitive Agreements, filing of a Plan and Disclosure Statement, entry of orders with respect to the foregoing, and, eventually, reaching the Plan's effective date.  The Debtors are actively negotiating and moving to consummate complicated transaction documents at the expected pace.  Once the immediate transaction milestones have been met, however, the regulatory approval timeline is uncertain given the nature of the Debtors' business.  The DIP Lenders, who have

provided extensive capital on a pre- and post- petition basis should have the right to assess and determine whether to further extend the maturity of the DIP Facility, at various points in the regulatory approval process based on, among other things, the progress achieved, macro- and micro-economic events, and other circumstances beyond the control of the Debtors and the DIP Lenders.

26.     Similarly, the initial 120-day maturity date is simply another way for the DIP Lenders to manage risks in the current uncertain economic and regulatory environment.  Given the consensual and accelerated path contemplated here, the Debtors believe this initial maturity date – which the DIP Lenders are expected to extend should the anticipated goals be accomplished – is appropriate, and, contrary to Inmarsat's assertion, there is no reason to believe that the DIP Lenders (as discussed, who have continued to fund the Debtors time and time again, during the year plus period following the maturity on the prepetition debt) will suddenly pull the rug out from under them.  Additionally, the fact that the DIP Facility is expected to convert into an exit facility attests to the DIP Lenders' long-term intentions and their belief in the proposed restructuring.

27.     Furthermore, as explained above, the DIP Facility is the only financing available to the Debtors, and its terms are the only terms on which the DIP Lenders were willing to provide it. Surely Inmarsat cannot possibly argue that the Debtors should have either: (i) not proceeded with any DIP financing if they could not obtain one that extended the full forty months; or (ii) that the time allotted to obtaining regulatory approval should have been shortened, resulting in less flexibility for the unchartered and highly regulated approval path.  Without a viable alternative to propose, the Inmarsat Objection falls flat on this point.

## II.     The other DIP terms are standard in chapter 11 cases and warranted here.

28.     Inmarsat argues that the DIP Facility includes "overreaching" terms that waive certain rights intended to protect unsecured creditors.  *See* Obj. at 14.  But the terms challenged by

Inmarsat – the waivers of the section 552(b) "equities of the case" exception, the ability to surcharge the lenders' collateral under section 506(c), and the right to marshal assets under section 544(a), as well as granting liens on avoidance action proceeds – are routinely granted to DIP lenders. Given the circumstances of these cases, these terms are appropriate.

29.    In addition, Inmarsat's objections presuppose that there are unencumbered assets in the estates that may somehow inure to the interests of unsecured creditors. But there is no evidence – nor does Inmarsat offer any – that any such unencumbered assets exist. More importantly, even if there were unencumbered assets to protect, as unsecured claims are expected to ride through these cases unaffected, it is not clear whose interests Inmarsat is purporting to champion by asserting these objections.

**A.     Waiver of the section 552(b) exception is appropriate and commonplace.**

30.    Despite Inmarsat's contention that the Debtors do not have authority to waive the "equities of the case" exception under section 552(b) of the Bankruptcy Code (Obj. at 15), it is common practice for secured lenders to request, and for courts to approve, such a waiver as part of DIP financing terms, especially where the DIP lender has agreed to subordinate their liens and claims to a carve-out. *See e.g.*, *In re Never Slip Holdings, Inc.*, No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) [Docket No. 133] (approving waiver of section 552(b) "equities of the case" exception upon entry of the final order); *In re JoAnn Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) [Docket No. 224] (same); *In re Lucky Bucks, LLC*, No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [Docket No. 169] (same); *In re DeCurtis Holdings LLC*, No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) [Docket No. 285] (same); *In re Plastiq Inc.*, No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) [Docket No. 138] (same).

31.    The "equities of the case" waiver is narrow and the Debtors and all parties in interest retain the right to dispute what constitutes prepetition collateral. This narrow waiver is

entirely appropriate here, where the DIP Facility imposes additional risks on the prepetition secured lenders who are providing the DIP Facility by priming their prepetition liens. It is common and reasonable for DIP lenders to receive assurances, in the form of a limited waiver of the "equities of the case" exception, that they will be compensated for such additional risks. *See In re Verity Health Sys. Of Cal.*, Case No. 18-10675 (RGK), 2019 U.S. Dist. LEXIS 129797, at *14-15 (C.D. Cal. Aug. 2, 2019) (bankruptcy court did not err in finding that a waiver of § 552(b) was necessary to induce secured creditors to consent to priming of their lien and use of their cash collateral). Inmarsat's objection is legally incorrect and should be denied.

**B.    Waiver of section 506(c) is appropriate and commonplace.**

32.     Inmarsat's contention that the Debtors have no basis to waive the ability to surcharge the lenders' collateral under section 506(c) (Obj. at 15) is similarly misguided. The Debtors' waiver of their ability to surcharge collateral under section 506(c) to cover the costs of preserving such collateral is squarely within the Debtors' business judgement and is in accord with voluminous precedent. Courts routinely find that section 506(c) waivers are appropriate consideration in a negotiated compromise where, as here, (i) prepetition lenders permit debtors to use their cash collateral, (ii) a party to whom the waiver is given provides debtor in possession financing, and (iii) the prepetition or DIP lenders agree to subordinate their liens and claims to a carve-out. *See, e.g.*, *In re Never Slip Holdings, Inc.*, No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024) [Docket No. 133] (approving waiver of section 506(c) in the final DIP order); *In re JoAnn Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) [Docket No. 224] (same); *In re Lucky Bucks, LLC*, No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [Docket No. 169] (same); *In re DeCurtis Holdings LLC*, No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) [Docket No. 285] (same); *In re Plastiq Inc.*, No. 23 10671 (BLS) (Bankr. D. Del. June 22, 2023) [Docket No. 138]

(same).  Each of these factors is present here and the terms of the waiver reflect the Debtors'

business judgment.  Inmarsat's objection is misplaced and should be denied.

**C.      Inmarsat has no standing to challenge the waiver of marshaling.**

33.     Inmarsat has no standing to object to the waiver of marshaling.  Obj. at 15.  The

doctrine of marshaling operates only for the benefit of junior secured creditors and unsecured

creditors do not have standing to invoke it.  *See In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421,

427 (Bankr, D. Del. 2007) ("[U]nsecured creditors cannot invoke the equitable doctrine of

marshaling." (citation omitted)); *In re Arlco, Inc.*, 239 B.R. 261, 274 (Bankr. S.D.N.Y. 1999)

(noting that an unsecured creditor has no standing to invoke the doctrine of marshaling).  In fact,

the only case cited by Inmarsat confirms that.  *See In re High Strength Steel*, 269 B.R. 560, 573

(Bankr. D. Del. 2001) ("Courts which have allowed trustees to bring actions for marshaling have

done so based upon section 544(a) which gives a trustee the status ***of a secured creditor*** as of the

petition date.") (emphasis added).

34.     Regardless, waivers of marshaling are commonplace as consideration for the

lenders' subordination of their liens to a carve out and consent to the debtors' use of cash collateral.

*See, e.g.*, *In re Never Slip Holdings, Inc*., No. 24-10663 (LSS) (Bankr. D. Del. Apr. 26, 2024)

[Docket No. 133] (approving marshaling waiver in the final DIP order); *In re JoAnn Inc.*, No. 24-

10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) [Docket No. 224] (same); *In re Lucky Bucks, LLC*,

No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [Docket No. 169] (same); *In re DeCurtis*

*Holdings LLC*, No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) [Docket No. 285] (same); *In*

*re Plastiq Inc.*, No. 23 10671 (BLS) (Bankr. D. Del. June 22, 2023) [Docket No. 138] (same).

**D.      Liens on avoidance action proceeds are appropriate and necessary.**

35.     Inmarsat also objects to the granting of liens on the proceeds of avoidance actions,

asserting that avoidance actions are intended to benefit solely unsecured creditors.  Obj. at 14.  But

the weight of authority cuts against this narrow view of the world.  Indeed, avoidance actions are intended to maximize the value of the estate for the benefit of ***all*** creditors.  *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 568 (3d Cir. 2003) (cited Obj. at 14 n.4) (noting Congress intended for avoidance actions to "maximiz[e] the value of the estate and allow[] ***creditors*** to recover their claims") (emphasis added); *In re Trans World Airlines,* 163 B.R. at 972 ("Section 550(a) requires a benefit to the estate, not to creditors.  Estate is a broader term than creditors.  There is no requirement that an avoidance action recovery be distributed (or committed) in whole or in part to creditors.") (internal quotations omitted).

36.    Inmarsat cites no authority that supports the position that a debtor cannot grant a lien on avoidance actions proceeds to the DIP Lenders.[8]  Indeed, this is plainly permissible:  section 541(a)(3) makes the proceeds of avoidance actions "property of the estate," and section 364(c)(2) expressly permits a debtor to grant DIP lenders a lien on "property of the estate."  *See In re Trans World Airlines*, 163 B.R. at 972 ("under § 541(a)(3) property of the estate includes property recovered in avoidance actions"); *Official Unsecured Creditors' Committee v. Northern Trust Co. (In re Ellingsen MacLean Oil Co.)*, 98 B.R. 284, 291 (Bankr. W.D. Mich. 1989) ("Property of the estate includes preferences recovered by the trustee.").

37.    Thus, DIP liens on avoidance action proceeds are commonplace and have been granted in many financing orders entered in this District.  *See, e.g.*, *In re JoAnn Inc.*, Case No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024) [Docket No. 224] (approving grant of DIP lien on proceeds of avoidance actions); *In re Mackeyser Holdings, LLC*, No. 14-11550 (CSS), 2014 WL

---

[8]    Inmarsat cites *Official Comm. of Unsecured Creditors v. Goold Elec. Corp.*, No. 93 C 4196, 1993 WL 408366, at *4 (N.D. Ill. Sept. 22, 1993) for the proposition that courts generally disapprove of liens on avoidance action proceeds.  But *Goold* is inapposite, holding that a financing agreement used to fund an involuntary chapter 11 was invalid to the extent it granted a postpetition lien to secure prepetition debt.  And, as demonstrated infra ¶ 37, liens on avoidance action proceeds are commonplace.

5480301, at *2 (Bankr. D. Del. Oct. 17, 2014) (same); *In re Altegrity, Inc.*, No. 15-10226-LSS, 2011 WL 13500115, at *8 (Bankr. D. Del. May 9, 2011) (same); *In re Broadstripe, LLC*, No. 09-10006 (CSS), 2009 WL 8188913, at *6 (Bankr. D. Del. Jan. 2, 2009) (granting DIP lien on avoidance action and any proceeds thereof); *In re Gottschalks Inc.*, No. 09-10157 (KJC), 2009 Bankr. LEXIS 4874, at *32-33 (Bankr. D. Del. Feb. 13, 2009) (same).

38.     Furthermore, the liens on avoidance action proceeds are but one component of a holistic deal that enticed the DIP Lenders to provide the DIP Facility.  Congress designed section 364 of the Bankruptcy Code to provide that a debtor may offer, with court approval, a series of "incentives" and "inducements" to attract postpetition credit.  *See Tully Constr. Co. v. Cannonsburg Env't. Assocs., Ltd. (In re Cannonsburg Env't. Assocs., Ltd.)*, 72 F.3d 1260, 1267 (6th Cir. 1996).  Eliminating such incentives and inducements "undercuts the goals of bankruptcy and would cause a chilling effect on DIP lending." *In re Silver Cinemas Int'l, Inc.*, Memorandum Order, No. 00-1978, Dkt. No. 277 at 4 (Bankr. D. Del. Aug. 11, 2000); *In re Fla. W. Gateway, Inc.*, 147 B.R. 817, 820 (Bankr. S.D. Fla. 1992) (same).  There is no basis to deny the DIP Lenders liens on avoidance action proceeds.

**III.     The challenge period is standard, and Inmarsat fails to articulate any reason why it is necessary to extend such period in these cases.**

39.     Inmarsat asserts that the 75-day challenge period is insufficient but fails to identify one reason why this otherwise standard period should be extended.  Obj. at 15.  A 75-day challenge period matches or exceeds the challenge periods that are routinely approved by courts overseeing complex financial restructurings.  *See, e.g.*, *In re Franchise Group, Inc*., 24-12480 (JTD) (Bankr. D. Del, Dec. 11, 2024) [Docket No. 414] (approving 75-day after interim order challenge period); *In re Reverse Mortgage Investment Trust Inc.*, 22-11225 (MFW) (Bankr. D. Del, Feb. 23, 2023) [Docket No. 500] (approving 75-day after interim order challenge period over objections); *In re*

*Fluid Market, Inc.*, 24-12363 (CTG) (Bankr. D. Del, Nov. 19, 2024) [Docket No. 158] (approving 75-day after interim order challenge period over U.S. Trustee objection); *In re Jevic Holding Corp.*, No. 08-11006 (BLS), 2021 WL 1812665 (Bankr. D. Del. May 5, 2021) (approving 75-day after petition date challenge period over objections); *In re MACH Gen, LLC*, No. 14-10461 (MFW), 2014 WL 1884109, at \*15, \*18 (Bankr. D. Del. July 25, 2014) (approving challenge period of 60 days after the committee's formation or the day on which objections are due); *In re Distrib. Energy Sys. Corp.*, No. 08-11101 (KG), 2008 WL 8153630, at \*4 (Bankr. D. Del. June 27, 2008) (granting committee 60 days after the petition date to investigate and bring any claims against prepetition liens); *In re Simplexity*, *LLC*, No. 14-10569 (KG), 2011 WL 13503139, at \*9 (Bankr. D. Del. May 20, 2011) (approving challenge period of 60 days after committee's formation).  Indeed, the rules of this Court identify 75 days as an appropriate amount of time to commence a challenge.  *See* Local Rule 4001-2(a)(i)(Q).

40.     Inmarsat has not identified a single claim that needs to be investigated, nor a single fact that would suggest that such investigation would be more complex or difficult than in other cases.  The Debtors' cases have none of the hallmarks suggesting any need to extend the challenge period beyond the period provided for in Local Rule 4001-2(a)(i)(Q), such as the need to analyze complex mortgages or unencumbered assets.  Given the nature of the Debtors' business and assets, it is difficult to imagine why a challenge period greater than 75 days might be necessary.  In the event Inmarsat identifies any specific need for such an extension (and it has not), the proposed DIP Order provides that the Court, upon the application of a party in interest demonstrating good cause, may extend the challenge period.  *See* DIP Motion at 26.  Thus, the challenge period may be extended if Inmarsat demonstrates the requisite cause to the Court's satisfaction.

41.     Inmarsat also requests immediate standing to investigate and bring challenges, without citing to any facts or caselaw in support of this extraordinary request.  Obj. at 15.  There exist procedures to seek standing, as well as standards for granting it.  Seeking automatic standing in an objection, rather than proceeding by motion and demonstrating that colorable claims exist that the Debtors have refused to pursue, is procedurally improper.  Inmarsat is a sophisticated party that must follow the proper procedures to obtain standing.  Because there is no reason to grant Inmarsat standing, this request should be denied.

## IV.     Inmarsat's request for a substantial contribution claim is at best premature.

42.     Lastly, Inmarsat's request for a "superpriority" substantial contribution claim for "reviewing and challenging the DIP Financing Motion and the lenders' prepetition liens" is truly perplexing.  Obj. at 16.  Seeking a claim for substantial contribution at this juncture is at best premature as Inmarsat cannot possibly demonstrate that it has actually provided any benefit to the estates.  *See In re KiOR, Inc.*, 567 B.R. 451, 458 (D. Del. 2017) ("The substantial contribution test is applied in hindsight and scrutinizes the actual benefit to the case.") (citations omitted).

43.     Further, a substantial contribution award "is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate."  *Id*. at 459.  The benefit to the estate "must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *Lebron v. Mechem Fin. Inc.,* 27 F.3d 937, 944 (3d Cir. 1994); *see also In re Tropicana Ent. LLC*, 498 F. App'x 150, 152 (3d Cir. Aug. 31, 2012) (unpublished) (although applicant made a substantial contribution by inducing settlement among parties and resignation of officer, applicant acted out of self-interest and therefore did not satisfy substantial contribution test).  Claimholders are presumed to act out of self-interest.  *Lebron,* 27 F.3d at 944.  A party acts self-interestedly where it undertakes activities that "would have been undertaken absent an expectation of reimbursement from the

estate." *Id.* (there can be no claim for "reimbursement in connection with activities of creditors and other interested parties which are designed primarily to serve their own interests and which, accordingly, would have been undertaken absent an expectation of reimbursement from the estate."). *See also In re U.S. Lines, Inc.*, 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989) ("Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own self-interest. Attorneys must generally look to their own clients for payment.").

44.     As previously discussed, given the preservation of the prepetition waterfall and the unimpairment of unsecured creditors, it is hard to imagine a scenario in which Inmarsat substantially contributes to "enhancing the administration" of the Debtors' estates. The Court should flatly reject this request. Inmarsat will be free to file a motion for allowance of a substantial contribution claim at an appropriate time.

Dated: February 3, 2025          /s/ Michael J. Merchant
Wilmington, Delaware             Mark D. Collins, Esq. (Bar No. 2981)
                                 Michael J. Merchant, Esq. (Bar No. 3854)
                                 Amanda R. Steele, Esq. (Bar No. 5530)
                                 Emily R. Mathews, Esq. (Bar No. 6866)
                                 **RICHARDS, LAYTON & FINGER, P.A.**
                                 One Rodney Square
                                 920 North King Street
                                 Wilmington, DE 19801
                                 Telephone: (302) 651-7700
                                 Facsimile:  (302) 651-7701
                                 Email:          collins@rlf.com
                                                 merchant@rlf.com
                                                 steele@rlf.com
                                                 mathews@rlf.com

                                 -and-

                                 Dennis F. Dunne, Esq. (admitted *pro hac vice*)
                                 Matthew L. Brod, Esq. (admitted *pro hac vice*)
                                 Lauren C. Doyle, Esq.  (admitted *pro hac vice*)
                                 **MILBANK LLP**
                                 55 Hudson Yards
                                 New York, New York 10001
                                 Telephone: (212) 530-5000
                                 Facsimile:  (212) 530-5219
                                 Email:          ddunne@milbank.com
                                                 mbrod@milbank.com
                                                 ldoyle@milbank.com

                                 Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
                                 **MILBANK LLP**
                                 1850 K Street, NW,
                                 Suite 1100
                                 Washington DC 20006
                                 Telephone: (202) 835-7500
                                 Facsimile:  (202) 263-7586
                                 Email:          aleblanc@milbank.com

                                 *Proposed Co-Counsel for Debtors in Possession*