## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIGADO NETWORKS LLC *et al.*,[1] | ) | Case No. 25-10006 (TMH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Obj. Deadline: April 7, 2025 at 4:00 p.m. (ET)** |
| | ) | **Hearing Date: April 17, 2025 at 10:00 a.m. (ET)** |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING THE DEBTORS TO ENTER INTO THE
### AST DEFINITIVE DOCUMENTS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

### Background

1.     On January 5, 2025 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtors are authorized to continue operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these cases, and no committees have been appointed or designated.

2.     Further information regarding the Debtors' business, capital structure, and the facts and circumstances leading to the commencement of the Chapter 11 Cases is set forth in the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

*Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "<u>First Day Declaration</u>").[2]

**<u>Jurisdiction and Venue</u>**

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

4.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Debtors consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the U.S. Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.

**<u>Relief Requested</u>**

7.      By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **<u>Exhibit A</u>**, (i) approving the Debtors' entry into and performance under (a) the framework agreement with AST SpaceMobile, Inc., AST & Science, LLC, and Spectrum USA I, LLC (collectively, "<u>AST</u>"), substantially in the form attached hereto as **<u>Exhibit B</u>** (as it may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>Framework

---

[2]     Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the First Day Declaration.

Agreement"), (b) all exhibits, supplements, and other documentation in connection with the Framework Agreement, including, but not limited to, the Collaboration Agreement and the CCI Agreement (each as defined in the Framework Agreement), and (c) any additional documents in connection with the Framework Agreement or the AST Transaction (as defined below) (all of the foregoing, collectively, the "AST Definitive Documents"), and (ii) granting related relief.

8.      In support of the requested relief, the Debtors submit the *Declaration of Douglas Smith in Support of Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into the AST Definitive Documents and (II) Granting Related Relief* (the "Smith Declaration"), attached hereto as **Exhibit C** and incorporated herein by reference.

### AST Transaction Background

9.      As described in the First Day Declaration, the Debtors and the holders of their prepetition funded debt were able to successfully negotiate a balance sheet restructuring transaction for the Debtors, as documented in the restructuring support agreement executed on January 5, 2025, which is attached as Exhibit B to the First Day Declaration (the "RSA").  The restructuring contemplated by the RSA includes, among other things, a prearranged chapter 11 plan, recognition proceedings under the Canadian Companies' Creditors Arrangement Act, "debtor-in-possession" financing (and the conversion of such financing into an exit facility upon the effective date of an acceptable chapter 11 plan), the equitization of the Debtors' prepetition funded indebtedness, and the preservation of preferred and common equity interests in the Debtors with the existing relative priority among the current holders of such interests.  *See* First Day Decl. ¶ 14.

10.      Another key component of the RSA and the restructuring contemplated thereunder is a long-term commercial transaction between the Debtors and AST (the "AST Transaction"), on

the terms set forth in a binding term (the "AST Term Sheet"), attached as Exhibit B to the RSA.
The RSA required the Debtors and AST to work expeditiously to reach a final agreement on the
definitive documentation with respect to the AST Transaction and secure its approval.
Specifically, the RSA required the Debtors to execute the AST Definitive Documents and file this
Motion and certain other documents on an expedited timeline. The RSA also set one hundred and
ten calendar days—April 25, 2025—as a deadline for obtaining an order granting the relief
requested in this Motion. Since the execution of the RSA and the AST Term Sheet and after the
filing of these Chapter 11 Cases, the Debtors and AST continued to work collaboratively and in
good faith to finalize the terms of the AST Transaction, execute the AST Definitive Documents,
and file this Motion.[3] *See* Smith Decl. ¶ 3.

11.     As set forth in the AST Term Sheet, the Debtors will, among other things, provide
AST with usage rights with respect to certain of the Debtors' spectrum rights and related assets
and collaborate with AST to commercialize the Debtors' spectrum rights. *See* First Day Decl. ¶
15. In exchange AST will provide to Ligado a number of payments and financial obligations,
including: (i) contributing certain warrants, convertible notes, and/or cash to the Debtors, (ii)
making certain annual usage-right payments to the Debtors designed to cover the Debtors' costs
of gaining access to and maintaining the relevant spectrum rights, and (iii) paying the Debtors a
certain percentage of revenues derived from AST's use of the Debtors' spectrum rights.

---

[3]     The RSA also required approval of a break-up fee in connection with the AST Transaction. On January 6, 2025,
the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Payment of the AST Transaction Break-
Up Fee and Break-Up Reimbursements* [Docket No. 61] (the "Break-Up Fee Motion"). After the Debtors reached
agreement on a revised form of order which resolved the objection of the U.S. Trustee [Docket No. 136] and
submitted the *Supplemental Declaration of Bruce Mendelsohn in Support of Debtors' Motion for Entry of an
Order Authorizing Payment of the AST Transaction Break-Up Fee and Break-Up Reimbursements* [Docket No.
142], the Court entered an order on January 27, 2025 granting the Break-Up Fee Motion [Docket No. 144].

12.     The AST Transaction has the potential to expand mobile connectivity across the United States and Canada and will provide significant commercial benefits to the Debtors estates and their stakeholders. *See* Smith Decl. ¶ 4. Through the AST Transaction, the Debtors and AST will help to enable space-based broadband network connectivity by standard smartphones at 4G/5G speeds. *Id.* The parties' collaborative use of the Debtors' spectrum rights will significantly enhance its utility by supporting broadband service throughout the United States and Canada. *Id.* Thus, by allowing for this use, the AST Transaction has the potential to materially expand space-based broadband coverage and provides the Debtors with significant financial benefits in exchange. *See id.*

### AST Definitive Documents

13.     The AST Definitive Documents set forth the primary terms and conditions of the AST Transaction. Smith Decl. ¶ 5. The Framework Agreement requires AST to provide to the Debtors a warrant to purchase AST shares, as well as certain deferred usage obligation payments, each as further described herein. Under the Framework Agreement, the Debtors make certain representations and warranties to AST, and vice versa, and the Framework Agreement also includes certain covenants, conditions, and provisions for termination.

14.     In addition, the Debtors and AST have entered into the Collaboration Agreement. *See* Smith Decl. ¶ 5. The Debtors are licensed by both the Federal Communications Commission (the "FCC") and the Innovation, Science and Economic Development Canada ("ISED") to use L-band mobile satellite service ("MSS") spectrum (the "L-Band MSS Spectrum"), and have coordinated access to this spectrum with other satellite operators in the L-band.[4] *Id.* Pursuant to

---

[4]     The Debtors have fully coordinated the use of the L-Band MSS Spectrum and agreed to certain parameters with Inmarsat pursuant to the Cooperation Agreement.

the Collaboration Agreement, the Debtors agreed to grant to AST certain rights to use and receive

many of the economic benefits of Ligado's L-Band MSS Spectrum and related L-band MSS assets

in exchange for AST providing certain payments and contributions to the Debtors and agreeing to

collaborate on plans to commercialize the Debtors' L-Band MSS Spectrum.  *Id.*  Subject to the

Debtors' ultimate control of its spectrum licenses and with significant input from the Debtors on

these activities, AST intends to design, procure satellites for, launch, and operate a non-GEO orbit

satellite system (the "AST NGSO System") utilizing the L-Band MSS Spectrum to enable a space-

based broadband network for direct-to-device ("D2D")[5] and Internet of Things ("IoT")[6] services.

*Id.*  The Debtors and AST, as applicable, will procure FCC as well as any other required regulatory

approvals to launch and operate the AST NGSO System that will communicate with L-band

enabled devices, with AST bearing the costs associated with the AST NGSO System and any

necessary regulatory approvals, and with the Debtors retaining ownership of Ligado's L-Band

MSS Spectrum and certain rights with respect to the operation of such AST NGSO System,

consistent with applicable regulatory requirements.  *Id.*

15.    The Debtors and AST have also negotiated and entered into the CCI Agreement.

The Debtors are the lessees of certain nationwide spectrum rights for the 5 MHz that is in the 1670

– 1675 MHz band (the "Leased Spectrum") from OP LLC, an affiliate of Crown Castle Investment

Corp. (together with OP LLC, "CCI").  *See* Smith Decl. ¶ 6.  In accordance with the CCI

Agreement, the Debtors agree to, among other things, grant to AST the right to use the Leased

Spectrum to provide certain satellite-based services upon the FCC granting applicable regulatory

---

[5]    Direct-to-device communications services refers to the provision of communications connectivity directly from satellites to terrestrial devices (e.g., cellular phones).

[6]    Internet of Things or IoT refers to the network of devices, vehicles, household appliances, and other physical objects that are connected to the Internet.

RLF1 32619971v.1

approvals, in exchange for AST paying certain fees and providing other financial incentives to the

Debtors (as further detailed below).  *See id.*  The Debtors and AST have agreed to cooperate and

use commercially reasonable efforts to work with CCI to obtain the required regulatory approvals

to allow AST to provide satellite-based services using the Leased Spectrum.  *Id.*

16.     The AST Transaction will generate significant business and revenue for the

Debtors' estates.  *See* Smith Decl. ¶ 7.  Specifically, AST will, among other things, and subject to

certain conditions and requirements set forth in the AST Definitive Documents:

- issue to the Debtors a warrant to purchase up to 4,714,226 shares of AST common stock at a purchase price of $0.01 per share;

- make certain deferred use obligation payments in the form of (i) $350,000,000 in cash and (ii) (a) a convertible note in an aggregate principal amount of $200,000,000 or (b) $200,000,000 in cash (upon prior written notice to the Debtors);

- pay the Debtors a quarterly usage-right payment for AST's usage of the L-Band MSS Spectrum in the amount that is, for each calendar year, the greater of (i) $80,000,000 and (ii) the fees the Debtors must pay under the Cooperation Agreement for such calendar year or the pro rata portion thereof;

- pay the Debtors a net revenue share amount with respect to any Revenue Reporting Period (as defined in the Collaboration Agreement) equal to the greater of (i) seventeen and one-half percent (17.5%) of AST L-band Net Revenue (as defined in the Collaboration Agreement) or more (depending on the satisfaction of certain conditions and occurrence of certain events), and (ii) $3 million multiplied by the number of days in the relevant Revenue Reporting Period and divided by the number of days in the year;[7]

- pay to the Debtors (i) a usage fee in an amount equal to the Annual Lease Fee (as that term is used in the CCI Agreement) required under the lease of the Leased Spectrum, in cash and (ii) shares of AST common stock equal to (a) thirty percent (30%) of the cash value of the Annual Lease Fee divided by (b) the average of the volume weighted averages of the trading price of "Parent Common Stock" (as

---

[7]    The Debtors are similarly obligated to pay to AST seventeen and one-half percent (17.5%) of revenue associated with any monetization of the Debtors' ancillary terrestrial component authorization for each Revenue Reporting Period under the Collaboration Agreement.

defined in the Framework Agreement) on each of the thirty consecutive trading days ending on the last trading day prior to the payment date.[8]

17.     The terms included in the AST Definitive Documents are the result of hard-fought, arm's-length negotiations conducted in good faith between the Debtors and AST.  Smith Decl. ¶ 7. While the Debtors engaged in numerous prepetition conversations with respect to strategic transactions with third parties, and the RSA, subject to certain limitations, gave the Debtors the right to engage with third parties with respect to an Alternative Commercial Transaction Proposal (as defined in the RSA) if one was submitted, none of these efforts resulted in proposals that the Debtors believe represent a superior opportunity than the AST Transaction, and indeed, no such Alternative Commercial Transaction Proposal has been submitted by any party.  *Id.*

18.     Accordingly, the Debtors believe that the AST Transaction represents a value maximizing transaction that benefits all stakeholders and should be approved.

### Basis for Relief

I.      **The Debtors' Entry into the AST Definitive Documents Should Be Authorized as a Sound Exercise of the Debtors' Business Judgment.**

19.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property.  *The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *see also Meyers v. Martin (In re Martin)*, 91

---

[8]     The Debtors are also obligated to pay to AST, following consummation of any direct or indirect disposal of the Debtors' interest in the Leased Spectrum and/or Terrestrial Rights, a portion of revenues generated from each such sale, calculated as follows (in aggregate with any other sales), (i) fifty percent (50%) of any proceeds in excess of $1.25 billion but less than or equal to $1.75 billion, and (ii) seventy-five percent (75%) of any proceeds in excess of $1.75 billion.

F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to the debtor's judgment concerning the proposed use of estate property under section 363(b) when there is a legitimate business justification); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business purpose" standard for transactions under section 363).

20.     In addition, section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

21.     Generally, courts in the Third Circuit have applied the following test in determining whether a transaction out of the ordinary course should be approved: (i) whether a sound business reason exists for the proposed transaction, (ii) whether fair and reasonable notice has been provided to interested persons, (iii) whether the debtor has obtained a fair and reasonable price, and (iv) whether the transaction has been proposed and negotiated in good faith. *Titusville Country Club v. Pennbank* (*In re Titusville Country Club*), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *Delaware & Hudson Ry.*, 124 B.R. at 176. The Debtors submit that the AST Transaction satisfies each of these factors, as further described below.

22.     Under this test, the debtor has the initial burden of establishing that a valid business purpose exists for the use of estate property. *See Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). Once the debtor articulates a valid business justification for the proposed transaction, courts will generally presume that the decision was made "on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*,

9

488 A.2d 858, 872 (Del. 1985)).  Thus, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task"); *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that "directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets").

23.    Here, the Debtors respectfully submit that the above test supports their decision to enter into the AST Definitive Documents.

24.    *First*, there is a sound business reason for the Debtors to enter into the AST Definitive Documents.  The Debtors engaged with numerous third parties prior to executing the RSA, and the AST Transaction represents the best commercial opportunity available to the Debtors.  *See* Smith Decl. ¶ 7.  Since entering into the RSA, no transaction proposals have emerged. *Id.*  Entry into the AST Definitive Documents and consummating the transactions contemplated thereunder will enable the Debtors and AST to collaborate in commercializing the L-Band MSS Spectrum and Leased Spectrum, thereby increasing revenue for the Debtors' estates.  *Id.* ¶ 8.  By enabling a space-based broadband network for D2D and IoT services, the AST Transaction has great commercial potential for the Debtors and their estates.  *See id.* ¶ 5.  Thus, the Debtors submit that their decision to enter into the AST Definitive Documents is supported by sound business reasons.

25.     *Second*, the Debtors provided fair and reasonable notice of the AST Transaction to all parties in interest.  The AST Transaction was described in the First Day Declaration which was filed at the outset of these Chapter 11 Cases and included the RSA and the AST Term Sheet.  The Debtors also filed the Break-Up Fee Motion, which was granted by the Court on January 27, 2025 [Docket No. 144].

26.     *Third*, the Debtors submit that the terms and provisions of the AST Definitive Documents are fair and reasonable.  The AST Transaction will allow the Debtors and AST to collaborate in commercializing the L-Band MSS Spectrum and the Leased Spectrum.  Smith Decl. ¶ 8.  This will generate significant business and revenue for the Debtors' estates.  *Id.* ¶¶ 7-8. Among other things, as described above, under the AST Definitive Documents, AST will (i) provide the Debtors with warrants to purchase AST common stock, (ii) make certain deferred use obligation payments, (iii) make annual usage-right payments and pay net revenue share amounts for AST's usage of the Debtors' L-Band MSS Spectrum, and (iv) make certain usage fee payments in exchange for AST's use of the Leased Spectrum.  Thus, given the significant benefits that the AST Transaction will generate for the Debtors' estates and creditors, the Debtors submit that the terms and provisions of the AST Definitive Documents are fair and reasonable.

27.     *Fourth*, the AST Transaction and the AST Definitive Documents are the result of hard-fought, arm's-length, and good faith negotiations between the Debtors and AST.  *See* Smith Decl. ¶ 7.  The Debtors and AST finalized the terms of the AST Term Sheet prior to the Petition Date.  Thereafter, the Debtors and AST have continued to work expeditiously to negotiate the terms of the AST Definitive Documents in good faith and at arms' length.

28.     Given the benefits and revenue opportunities the Debtors stand to realize, entering into the AST Definitive Documents and consummating the AST Transaction will enhance the

value of the Debtors' estates for the benefit of all stakeholders.   Accordingly, the Debtors respectfully submit that they have satisfied the "sound business purpose" test under section 363(b) of the Bankruptcy Code and request that the Court authorize them to enter into the AST Definitive Documents and take such other steps as are necessary or desirable to consummate the AST Transaction without further order of the Court.

### Waiver of Bankruptcy Rule 6004(h)

29.    To implement the foregoing successfully, the Debtors seek a waiver of the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As set forth above, entry into the AST Definitive Documents will allow the Debtors to generate significant revenue for their estates, thereby benefitting all creditors.  As such, the Debtors submit that the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6004(h).

### Notice

30.    The Debtors will provide notice of this Motion to:  (i) the Office of the U.S. Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iii) Foley & Lardner LLP, as counsel to U.S. Bank National Association, in its capacities as Prepetition First Lien Notes Trustee, Prepetition First Lien Notes Collateral Trustee, First Lien Collateral Trustee, First Lien Representative, Prepetition First Lien Loan Administrative Agent, Prepetition First Lien Loan Collateral Agent, Prepetition 1.5 Lien Collateral Agent, Initial Additional Pari Collateral Agent, Initial Additional Authorized Representative for the Notes Secured Parties, Senior Collateral Trustee, Junior Lien Representative, Junior Collateral Trustee, and DIP Agent; (iv) Seward & Kissel LLP, as counsel to Wilmington Savings Fund Society, in its capacity as Prepetition Second Lien Trustee and Prepetition Second Lien Collateral Trustee; (v) Jones Day LLP, as counsel to Jefferies Finance

12

LLC, in its capacity as Prepetition 1.5 Lien Administrative Agent, Senior Lien Representative, and Junior Lien Representative; (vi) Sidley Austin LLP, as counsel to the Ad Hoc First Lien Group; (vii) Kirkland & Ellis LLP, as counsel to an Ad Hoc Cross-Holder Group; (viii) the Federal Communication Commission; (ix) the United States Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) the state attorneys general for all states in which the Debtors conduct business; (xii) the United States Attorney's Office for the District of Delaware; (xiii) AST; and (xiii) any party that has requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors submit that that the motion notice requirements have been satisfied, and that no further notice is required under the circumstances.

## No Prior Request

31.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto, and grant such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated March 22, 2025<br>Wilmington, Delaware | */s/ Michael J. Merchant* |
| | Mark D. Collins, Esq. (Bar No. 2981) |
| | Michael J. Merchant, Esq. (Bar No. 3854) |
| | Amanda R. Steele, Esq. (Bar No. 5530) |
| | Emily R. Mathews, Esq. (Bar No. 6866) |
| | **RICHARDS, LAYTON & FINGER, P.A.** |
| | One Rodney Square |
| | 920 North King Street |
| | Wilmington, DE 19801 |
| | Telephone:    (302) 651-7700 |
| | Facsimile:    (302) 651-7701 |
| | Email:    collins@rlf.com |
| | merchant@rlf.com |
| | steele@rlf.com |
| | mathews@rlf.com |
| | -and- |
| | Dennis F. Dunne, Esq. (admitted *pro hac vice*) |
| | Matthew L. Brod, Esq. (admitted *pro hac vice*) |
| | Lauren C. Doyle, Esq. (admitted *pro hac vice*) |
| | **MILBANK LLP** |
| | 55 Hudson Yards |
| | New York, New York 10001 |
| | Telephone:    (212) 530-5000 |
| | Facsimile:    (212) 530-5219 |
| | Email:    ddunne@milbank.com |
| | mbrod@milbank.com |
| | ldoyle@milbank.com |
| | Andrew M. Leblanc, Esq. (admitted *pro hac vice*) |
| | **MILBANK LLP** |
| | 1850 K Street, NW, Suite 1100 |
| | Washington DC 20006 |
| | Telephone:    (202) 835-7500 |
| | Facsimile:    (202) 263-7586 |
| | Email:    aleblanc@milbank.com |
| | *Co-Counsel for Debtors in Possession* |