## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC, *et al.*[1] | Case No. 25-10006-TMH |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. 359** |

### INMARSAT GLOBAL LIMITED'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO THE AST DEFINITIVE DOCUMENTS

Inmarsat Global Limited ("Inmarsat") hereby objects to *Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to Enter Into the AST Definitive Documents and (II) Granting Related Relief* [ECF 359] (the "Motion" or "Mot."), and respectfully states as follows:

### I.    PRELIMINARY STATEMENT[2]

1.    The Motion seeks approval of a transaction that contravenes Inmarsat's rights under the Cooperation Agreement and violates multiple sections of the Bankruptcy Code.  And even if the AST Transaction were lawful (it is not), it all but guarantees that Ligado will be unable to satisfy its cure obligations to Inmarsat.  Consequently, the transaction is not feasible.  The Motion should be denied.

2.    ***The Motion seeks improper partial assignment***.  Ligado improperly seeks to partially assign and delegate its rights and obligations under the Cooperation Agreement in

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

[2]    Capitalized terms not otherwise defined herein have the meanings given to them below or in the Motion. All emphasis herein is added, unless otherwise indicated.

violation of that agreement's express terms and the Bankruptcy Code. With these rights, "AST intends to design, procure satellites for, launch, and operate a non-GEO orbit satellite system utilizing . . . the L-Band MSS Spectrum." Mot. ¶ 14.

3.      Critically, Ligado does not seek to assign the entirety of the Cooperation Agreement to AST but rather only "certain rights" and "economic benefits" thereunder.[3] In other words, Inmarsat would remain in privity solely with Ligado while being forced to cooperate extensively with third-party AST and its contemplated satellite system. This is prohibited by both the Cooperation Agreement and the Bankruptcy Code. The Cooperation Agreement expressly prohibits Ligado from assigning *any* of its rights or delegating *any* of its obligations thereunder without Inmarsat's consent, and it renders any such impermissible assignment or delegation "null and void."[4] The Bankruptcy Code similarly does not permit a partial assignment of rights and obligations; rather, an agreement must be assumed in its entirety and assigned in its entirety.

4.      Put simply, Ligado asks the Court to approve a transaction that cannot be consummated without Inmarsat's consent. Inmarsat has not consented to Ligado's attempted partial assignment. And it will not do so until it is assured that Ligado and/or AST will promptly satisfy all obligations—monetary and otherwise—under the Cooperation Agreement. But therein lies a second fundamental problem with the proposed AST Transaction—it is premised on Ligado's proposed assumption and cure of the Cooperation Agreement far in the future. This violates Bankruptcy Code section 365.

5.      ***The Motion seeks approval of a transaction that violates the Bankruptcy Code.*** Bankruptcy Code sections 365(d)(2) and 1123(b)(2) require a debtor to assume or reject an

---

[3]    Collaboration Agreement, Recital D [ECF 359-3]. The Collaboration Agreement begins at page 34 of 136 of ECF 359-3.

[4]    Cooperation Agreement, § 9.3 [ECF 194-4].

executory contract ***no later than plan confirmation***, and section 365(b)(1)(A) requires a debtor "at the time of assumption" to cure defaults or "provide adequate assurance that [it] will ***promptly*** cure." But the AST Transaction expressly requires Ligado to contest assumption of the Cooperation Agreement or payment of any cure amounts thereunder at any time prior to Ligado and AST obtaining all requisite regulatory approvals for the AST Transaction.[5] Ligado anticipates that it will take as many as three years after plan confirmation or even longer to obtain such approvals.[6] The Court should not approve a transaction that squarely violates the Code.

6.     ***The Motion seeks approval of a transaction that is not feasible and will leave Ligado with insufficient funds to cure***. Ligado's sole source of repayment for its cure obligations is $550 million to be provided by AST under the AST Definitive Documents.[7] But Ligado proposes (unlawfully) to delay its cure by up to three years or more. Even if the proposed delay of assumption and cure were permissible under the Bankruptcy Code, interest accruing under the Cooperation Agreement will increase the amount of Ligado's cure obligation under section 365(b) from $550 million to $1 billion or more assuming an effective date three years after plan confirmation.[8] Ligado has shown absolutely no ability to pay any cure on its own, let alone a $1 billion cure payment, and AST's obligation is capped at $550 million under the AST Definitive Documents. This leaves Ligado with no reasonable prospect of curing unless the cure payment is

---

[5]     *See* Framework Agreement, § 5.6 [ECF 359-3]. The Framework Agreement begins at page 1 of 136 of ECF 359-3.

[6]     *See* RSA, § 4.04(n) [ECF 61-4]; Disclosure Statement Ex. C (Financial Projections), at 3 n.2 [ECF 424-1]; *See* Hg. Tr. (Jan. 7, 2025), at 32–33 [ECF 109].

[7]     *See* Framework Agreement, §§ 2.2(a)(i), (ii).

[8]     *See* Cooperation Agreement, § 4.9 (interest accrues on all past due amounts at a rate of 1% per month (12% per year)).

made at the time of the scheduled confirmation hearing, where Ligado is required under the AST Transaction to oppose making such payment.

7.      ***The Motion seeks approval of an additional exorbitant break-up fee without justification***.  Though not even discussed in the Motion, the AST Definitive Documents for which Ligado seeks approval contain a break up fee of up to $450 million or more in favor of AST that is entirely separate from the $200 million break-up fee the Court previously approved.[9]  *See* Order Authorizing Payment Of The AST Transaction Break-Up Fee And Break-Up Reimbursements [ECF 144].  The Motion provides no explanation or justification for this additional break-up fee or how it might be triggered.

8.      ***The Motion improperly seeks approval over future agreements and documents without any further notice, opportunity to object, or order of the Court***.  The Debtors ask the Court to approve the "AST Definitive Documents," which include not only the Framework Agreement, Collaboration Agreement, and CCI Agreement (collectively, the "<u>Primary Agreements</u>") but also "any additional documents in connection with the Framework Agreement or the AST Transaction."  Mot. ¶ 7.  The Court is thus being asked to approve unknown documents or documents that may not even exist yet.  Worse, the Proposed Order would allow the Debtors, AST, and the requisite RSA parties to "amend, supplement, or modify the AST Definitive Documents ***without further order of the Court***."  Proposed Order ¶ 4.  The Court should not blindly approve "any additional documents" or future amendments, supplements, or modifications relating to the AST Transaction.

9.      At bottom, while the Motion does not seek approval of the Debtors' assumption of the Cooperation Agreement, it does seek relief that is inextricably intertwined with the Cooperation

---

[9]   *See* Framework Agreement, § 7.3.

Agreement and Inmarsat's rights thereunder. In fact, the Framework Agreement and the Collaboration Agreement refer to Inmarsat and Viasat more than 60 times, underscoring the interconnectedness of the Cooperation Agreement and the AST Definitive Documents.

10. Unfortunately, the Debtors agreed to an RSA that set a milestone for the Debtors' entry into the AST Definitive Documentation (RSA, § 4.04) that is entirely untethered to proceedings regarding Ligado's assumption of the Cooperation Agreement. Inmarsat's rights should not be prejudiced by the arbitrary timeline imposed by the Debtors' secured lenders and AST. Indeed, that arbitrarily compressed timeline was likely intended to predestine the Court's rulings on the Debtors' anticipated future request to assume the Cooperation Agreement, where they will need to provide adequate assurance of future performance and prompt cure.

## II.    OBJECTION

### A.    Ligado Seeks The Court's Approval Of An Impermissible Partial Assignment Of The Cooperation Agreement That Would Require Inmarsat's Consent

11. The AST Transaction requires that Ligado immediately assign and delegate to AST certain—but not all—of its rights and obligations under the Cooperation Agreement. But the Cooperation Agreement precludes any such partial assignment without Inmarsat's consent (which Inmarsat has not given). Ligado has not cited any authority that overrides the Cooperation Agreement's requirements. Indeed, Ligado is not even seeking to assume and assign the Cooperation Agreement at this time. Even if Ligado were seeking such relief, section 365(f) does not permit partial assignments, and thus Ligado cannot do so without Inmarsat's consent.

12. Pursuant to the AST Transaction, Ligado purports to assign to AST "***certain*** rights to use and receive ***many of*** the economic benefits of the Ligado L-band MSS Spectrum, subject to the provisions, conditions, and limitations of the Cooperation Agreement." Collaboration Agreement, Recital D. However, the Cooperation Agreement expressly prohibits such assignment

of Ligado's rights thereunder without Inmarsat's prior written consent. *See* Cooperation Agreement, § 9.3. Specifically, section 9.3 provides, in relevant part, that "none of the Lightsquared Parties may assign this Agreement, ***or assign any of its rights or delegate any of its obligations hereunder***, without the prior written consent of Inmarsat." *Id.*

13.     Under New York law, which governs the Cooperation Agreement (*see id.* § 9.6), "[a]n assignment is a transfer or setting over of a property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, or chattel, or other thing." *In re Est. of Stralem*, 303 A.D.2d 120, 122 (2d Dep't 2003) (citation omitted). While the AST Definitive Documents use the term "grant" rather than "assign"—*e.g.*, "Ligado shall **grant** to [AST] the exclusive right to use the Ligado L-band MSS Spectrum"[10]—the "substance, not the form prevails in determining whether a particular contract constitutes an assignment." *Aini v. Sun Taiyang Co.*, 964 F. Supp. 762, 778 (S.D.N.Y. 1997) (applying New York law); *see also Property Asset Mgmt., Inc. v. Chi. Tit. Ins. Co.*, 173 F.3d 84, 87 (2d Cir. 1999) ("[A]lthough no particular formula is needed to create an assignment under New York law, there is a need for some 'act or words' that manifest an intent to assign."). The AST Transaction, which requires Ligado to transfer to AST the "exclusive right to use" the "spectrum Ligado has access to pursuant to . . . the Cooperation Agreement" (Collaboration Agreement, §§ 1.1, 2.1), is undoubtedly, in substance, an assignment.

14.     Similarly, under the AST Definitive Documents, Ligado purports to delegate to AST the performance of certain of its duties under the Cooperation Agreement. Specifically, AST's right to use the L-band MSS Spectrum is "subject to [its] observance of the measures and

---

[10]   Collaboration Agreement, § 2.1. "Ligado L-band MSS Spectrum" is defined as "the fully coordinated L-band MSS spectrum Ligado has access to pursuant to the Ligado L-band Licenses ***and the Cooperation Agreement***." *Id.* § 1.1.

actions deemed necessary by Ligado to . . . ensure Ligado remains in compliance with the Ligado L-band Licenses and the Cooperation Agreement." *Id.* § 2.1. This reflects a delegation by Ligado of certain aspects of its performance under the Cooperation Agreement, including maintaining compliance with the terms and restrictions of the Cooperation Agreement.

15.     The AST Transaction thus requires Ligado to assign to AST certain rights to use and economic benefits of the Ligado L-band MSS Spectrum, and certain obligations associated therewith, in each case in violation of the Cooperation Agreement. Ligado cites no authority allowing it to do so. Indeed, Ligado is not even purporting to assume and assign the Cooperation Agreement under section 365 at this time. But even if Ligado were seeking such approval, nothing in the Bankruptcy Code permits such relief.

16.     Ligado cannot invoke section 365(f) of the Bankruptcy Code to evade Inmarsat's consent rights because section 365(f) contemplates the assignment of a contract "***in whole, not in part***." *Anytime Fitness, L.L.C. v. Thornhill Bros. Fitness, L.L.C. (In re Thornhill Bros. Fitness, L.L.C.)*, 85 F.4th 321, 326 (5th Cir. 2023). Section 365(f) refers to "an executory contract" and uses the phrase "such contract"—as opposed to certain provisions of a contract—no less than five times. *Id.*; *see also* 11 U.S.C. § 365(f). The words "an" and "such" in section 365(f) "suggest the whole, not the part." *Thornhill Bros.*, 85 F.4th at 326. This makes sense: "If a debtor could strategically divide up its executory contracts via partial § 365(f) assignments, then the debtor could both change the nature of the contracts' obligations and evade [the] requirement that it take any retained executory contracts '*cum onere*,'[11] with all their benefits and burdens." *Id.*; *see also id.* at 327–28 (reversing bankruptcy court where it "applied § 365(f) to authorize something the

---

[11]     *See Cum Onere*, Black's Law Dictionary (12th ed. 2024) ("With the burden. An item acquired *cum onere* is taken subject to existing burdens and charges.").

Code forbids—the partial assignment of an executory contract").[12]  Indeed, it is axiomatic that a debtor must assume a contract with all of its benefits and attendant burdens.  And here, another way of looking at the AST Transaction is that Ligado is attempting to assume the Cooperation Agreement but without the burdens of the prohibition on assigning and delegating any rights or any duties without Inmarsat's consent.  Such an attempt, however, violates the Bankruptcy Code. *See In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) ("The trustee, however, may not blow hot and cold.  If he accepts the contract he accepts it cum onere.  If he receives the benefits he must adopt the burdens.  He cannot accept one and reject the other.").

### B.    In Violation Of The Bankruptcy Code, The AST Transaction Requires Ligado To Fight Assumption And Cure Of The Cooperation Agreement Prior To The Plan Effective Date

17.    The AST Transaction requires Ligado to defer any assumption or cure of the Cooperation Agreement until Ligado and AST obtain regulatory approvals for the AST transaction.  Such approvals are a condition to the plan's effective date, and indeed, Ligado has used the potential delay of such approval to attempt to justify a delay of the effective date of potentially three years or more.  This violates Bankruptcy Code sections 365 and 1123 and is another basis for the Court to deny the Motion.

18.    Sections 365(d)(2) and 1123(b)(2) require a debtor to assume or reject executory contracts or leases ***no later than confirmation***.  As the Supreme Court has repeatedly confirmed,

---

[12]  This is not to say that a trustee or debtor in possession may never partially assign a contract it has assumed under section 365.  If such assignment is ***not*** prohibited under the contract or applicable non-bankruptcy law, the debtor can make a partial assignment, but it will not enjoy the protections from liability afforded under section 365(k).  *See Univ. of Health Scis. v. Nat'l Union of Hosp. & Health Care Emps. (In re Allegheny Health, Educ., & Rsch. Found.)*, 383 F.3d 169, 177 (3d Cir. 2004) ("[I]n order to effect a novation by operation of law under 11 U.S.C. § 365(k), a bankruptcy debtor-in-possession must assign the old contract *cum onere*, with all rights and obligations intact.  A partial assignment does not suffice to effect a novation, releasing the original obligor from its duties under the contract." (citation omitted)).

a "debtor-in-possession has until a reorganization plan is confirmed to decide whether to accept or reject an executory contract." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 529 (1984); *see also Fla. Dep't of Revenue v. Piccadilly Cafeterias*, *Inc.*, 554 U.S. 33, 45–46 (2008) ("We agree with *Bildisco's* commonsense observation that the decision whether to reject a contract or lease ***must be made before confirmation***.").[13]   Similarly, the Bankruptcy Code prohibits Ligado from assuming the Cooperation Agreement unless "***at the time of assumption***" Ligado "cures, or provides adequate assurance that [it] will promptly cure," its defaults under the agreement.   11 U.S.C. § 365(b)(1)(A).

19.   The AST Transaction and Ligado's Plan violate these fundamental requirements.[14] The Plan expressly authorizes Ligado to file motions and modify schedules to assume or reject executory contracts or unexpired leases after confirmation and, indeed, at any time up to the Plan's effective date.[15]   This may not be a significant issue in cases where the effective date of a plan occurs shortly after confirmation.   But here, Ligado's Plan contains no express deadline for the effective date, and Ligado's RSA contemplates that the effective date may occur as many as ***three years after confirmation*** or later.   *See* RSA, §§ 4.04(n), (p); *see also* Disclosure Statement Ex. C

---

[13]   *See also In re Physician Health Corp.*, 262 B.R. 290, 292 (Bankr. D. Del. 2001) ("Section 365(d)(2) permits a debtor to assume or reject an executory contract *at any time before confirmation of a plan of reorganization*.   Permitting the debtor to make its decision as late as the plan confirmation date enables the debtor to carefully evaluate the possible benefits and burdens of an [executory contract]." (alteration in original) (citation omitted)).

[14]   "Plan" means the *Joint Chapter 11 Plan Of Ligado Networks LLC And Its Affiliated Debtors And Debtors in Possession* [ECF 348].

[15]   *See* Plan Art. IV.A ("[E]ach Executory Contract and Unexpired Lease . . . shall be deemed assumed . . . as of the Effective Date, . . . unless such Executory Contract or Unexpired Lease . . . (3) is the subject of a motion to reject, assume, or assume and assign that is . . . (ii) otherwise filed so as to be decided upon notice and a hearing *prior to the Effective Date*; or (4) is designated specifically as an Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases (if any)."). The Schedule of Rejected Executory Contracts and Unexpired Leases is part of the Plan Supplement and can be modified or amended prior to the Effective Date.   *Id.* Art. I.A.

(Financial Projections), at 3 n.2 [ECF 424-1] ("Projections assume . . . Bankruptcy Emergence and Regulatory Approval in May 2028."). Similarly, in the AST Definitive Documents, Ligado agrees to contest any attempt by Inmarsat to collect cure payments before satisfaction of the "Approval Condition" (i.e., when Ligado and AST obtain certain regulatory approvals). *See* Framework Agreement, §§ 1.1, 5.6. Obtaining those regulatory approvals is a condition to the Plan's effective date.[16] As Ligado itself has said, it may take up to three years after confirmation to obtain those approvals and, thus, for the plan to go effective (or even longer if sufficient stakeholders agree). *See* Hg. Tr. (Jan. 7, 2025), at 32–33 [ECF 109]; RSA, § 4.04(p) (establishing 40-month "milestone" for Plan effective date).

20.    Ligado's reasons for this extensive delay are transparent. Ligado wants to put off making a significant cure payment to Inmarsat until a time of its choosing, hold onto the significant benefits of Inmarsat's "beachfront property" in the meantime, and, all the while, preserve an option to ultimately reject the Cooperation Agreement depending on the outcome of the regulatory approval process for the AST Transaction and Ligado's takings litigation against the government. But the Bankruptcy Code prohibits a debtor from retaining such an option to assume or reject that may extend for years after confirmation. Ligado cannot force Inmarsat to provide it a free option by waiting years after Plan confirmation to decide whether to assume or reject the Cooperation Agreement.[17]

---

[16]    *See* Plan Art. IX(A)(17) (conditions to Plan effective date include that "all governmental and third-party approvals and consents, including FCC and ISED approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained").

[17]    Any such option, however, is ***not free*** for Inmarsat. Inmarsat will be unable to use its exceptionally valuable spectrum while Ligado decides whether to assume or reject the Cooperation Agreement.

C.      **The AST Transaction Is Not Feasible Because Ligado Will Not Have Sufficient Funds To Cure**

21.      Ligado's improper delay of assumption creates another, equally fundamental problem. By the time Ligado proposes to assume the Cooperation Agreement, it will not have enough money to do so. If Ligado delays its assumption of the Cooperation Agreement for three years as it is attempting to do, Ligado's cure obligation to Inmarsat would grow to nearly $1 billion. That is because interest is accruing on Ligado's past-due payments at a rate of 1% per month. *See* Cooperation Agreement, § 4.9 ("In the event that any payments due hereunder are made to Inmarsat later than two (2) business days following the due date hereunder, the Lightsquared parties [Ligado] shall owe Inmarsat interest from the date such payments were due on such overdue amounts at a monthly rate of one (1) percent."). Such interest is likewise accruing on Ligado's postpetition quarterly payments.

22.      This presents an insurmountable problem for Ligado and the AST Transaction. AST is Ligado's source of funds for paying its cure obligations to Inmarsat, but AST's obligation to provide such funds is capped at $550 million. *See* Framework Agreement, §§ 2.2(a)-(b) (calling for AST to provide Ligado up to $550 million to Ligado upon an order requiring cure payments to Inmarsat and the satisfaction of certain conditions). In the AST Transaction, Ligado agrees to obtain backstop financing to "refund" AST for the up to $550 million cure if certain events occur (such as failure to obtain necessary regulatory approvals). *See id.* § 5.5(a) (providing for the Backstop Commitment and Backstop Financing); § 5.5(c) (providing for a refund payment to AST of amounts paid by AST if there is an "Approval Condition Failure").[18]    But again, that

---

[18]    An "Approval Condition Failure" includes any of the following events: "(A) Ligado does not submit or consent to [AST's] submission of any NGSO Regulatory Application to the FCC requested by [AST] within six (6) months after the date of this Agreement; (B) Ligado does not submit or consent to [AST's] submission of any NGSO Regulatory Application to ISED requested by [AST] within a reasonable time

commitment is capped at $550 million and is a refund to AST.  This leaves a shortfall of hundreds

of millions of dollars, and Ligado will not be able to meet its cure obligations.  Ligado's own

disclosures show that it does not have substantial balance sheet cash, and that its projected cash

flow will not even come close to being enough to meet its cure obligations if cure is delayed beyond

the scheduled confirmation hearing.  *See* Disclosure Statement Ex. C (Financial Projections), at 3

[ECF 424-1] (reflecting "Net Cash Flow" of $9 million in 2028); *see also* Disclosure Statement

Ex. D (Liquidation Analysis), at 6 [ECF 424-2] (reflecting cash on balance sheet as of February

2025 of $33.3 million).

23.    Ligado, therefore, seeks approval for a transaction that forces it to unlawfully delay

assumption and cure and then leaves it with no ability to actually cure because of that delay.  There

is no justification to approve such a transaction.

### D.    Ligado Fails To Justify The Exorbitant New Break-Up Fee

24.    Although the Motion seeks broad approval for Ligado's entry into and performance

under the AST Definitive Documents, it is entirely silent on an important matter—the Framework

Agreement provides for a break-up fee of up to *$450 million or more* (the "New Break-Up Fee").

*See* Framework Agreement, § 7.3(b).  The exorbitant New Break-Up Fee is entirely separate from

the $200 million AST Transaction break-up fee that the Court approved in January.  *See* Order

Authorizing Payment Of The AST Transaction Break-Up Fee And Break-Up Reimbursements

[ECF 144].  This New Break-Up Fee would be payable in the event of an "Adverse Impact

Determination."    Framework Agreement, §§ 7.1(f), 7.3.    An Adverse Impact Determination

---

period after the date of this Agreement; (C) the Parties fail to obtain the NGSO Regulatory Approvals
within twenty-four (24) months after submission of the FCC NGSO Regulatory Applications; or (D)
within nine (9) months after receiving the FCC NGSO Regulatory Approvals, any U.S. governmental,
legislative, or other regulatory action, court order, or applicable law results in [AST's] use of the Ligado
L-band MSS Spectrum at the NGSO Power Levels being prohibited or materially adversely impacted
. . . ."  *See* Collaboration Agreement, § 2.1.2(d)(ii).

includes "any final resolution . . . of the Takings Litigation [that] results in [AST's] intended exercise of the SpectrumCo Usage Right being materially adversely impacted." Collaboration Agreement, § 7.2.4. The meaning of that provision is unclear. For instance, what type of resolution of the Takings Litigation would materially impact AST's usage rights?

25.     It is inappropriate for the Motion to simply ignore the break-up fee altogether and provide no justification for it or explain under what scenarios it might be triggered.

### E.    The Motion Improperly Seeks Blanket Court Approval Of Other Unnamed Agreements Relating To The AST Transaction And Even Future Modifications to the AST Transaction Itself

26.     In addition to the objectionable substantive aspects of the AST Transaction, the Debtors' Proposed Order also improperly seeks blanket Court approval of other unnamed and undisclosed agreements relating to the AST Transaction without any further Court action. Indeed, the Debtors even seek unfettered authority to modify the terms of the *AST Transaction itself* without any subsequent Court review. The Debtors' requested relief includes not only Court approval of the Debtors' entry into and performance under the Primary Agreements, but also "any additional"—unidentified—"documents in connection with the Framework Agreement and the AST Transaction (as defined below) (all of the foregoing, collectively, the 'AST Definitive Documents')." Mot. ¶ 7. The Debtors do not describe the nature or number of any such "additional documents."

27.     Moreover, the Proposed Order would allow the Debtors, "with the written consent of AST and, as required pursuant to the RSA, the consent of the Required Consenting Creditors . . . to amend, supplement, or modify the AST Definitive Documents *without further order of the Court*." Proposed Order ¶ 4. The Debtors thus seek to secure, through this Proposed Order, free rein to modify the AST Transaction without any Court oversight and without any notice or opportunity for affected parties like Inmarsat to object. Such sweeping pre-emptive Court approval

for future related transactions and modifications to the AST Definitive Documents fails to provide accurate and reasonable notice of the transaction, and thus fails the "sound business purpose" test that Ligado itself cites.  Mot. ¶ 21 (citing *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) ("sound business purpose" test requires "accurate and reasonable notice")).  Similarly, such broad pre-emptive Court approval would prevent the Court from carrying out its gate-keeping role in these chapter 11 cases.  The Court should not grant such open-ended, sweeping relief.

### III.   RESERVATION OF RIGHTS

28.     For the avoidance of doubt, to the extent the Court grants the Motion, Inmarsat fully reserves its rights to object to Ligado's future assumption of the Cooperation Agreement on any and all grounds, including Ligado's inability to provide adequate assurance of prompt cure and future performance under the Cooperation Agreement as required under Bankruptcy Code section 365(b)(1).  *See* 11 U.S.C. §§ 365(b)(1)(A), (C).  The Motion and supporting documentation provide absolutely no basis to predict that Ligado will be able to make that showing.  *See* Sections III.A (Ligado will be in breach of section 9.3), III.B (cure not contemplated until up to three years after confirmation).  Nor does the Motion or supporting documentation provide any basis to conclude that AST has the financial wherewithal to fund the necessary cure payment at any time, let alone promptly, and to make payments to Ligado sufficient to cover future amounts due under the Cooperation Agreement.  Inmarsat similarly reserves its right to seek to shorten Ligado's time to assume or reject the Cooperation Agreement.

### IV.   CONCLUSION

WHEREFORE, for the foregoing reasons, Inmarsat respectfully requests that this Court deny the Motion.

Dated: April 25, 2025
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone
Matthew Scheck
Kate Scherling
295 5th Avenue
New York, NY  10016
Telephone: (212) 849-7000
Email: benjaminfinestone@quinnemanuel.com
        matthewscheck@quinnemanuel.com
        katescherling@quinnemanuel.com

-and-

**STEPTOE LLP**
Jeffrey M. Reisner
Charles Michael
1114 Avenue of the Americas
New York, NY  10036
Telephone: (212) 506-3900
Email: jreisner@steptoe.com
        cmichael@steptoe.com

Alfred M. Mamlet
Joshua R. Taylor
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone: (202) 429-3000
Email: amamlet@steptoe.com
        jrtaylor@steptoe.com

*Counsel to Inmarsat Global Limited*