## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC *et al.*,[1] | Case No. 25-10006 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 349, 350, & 463** |

## DEBTORS' REPLY TO THE U.S. TRUSTEE'S OBJECTION TO THE DISCLOSURE STATEMENT MOTION AND IN FURTHER SUPPORT THEREOF

The above-captioned debtors and debtors in possession (the "Debtors") submit this reply (the "Reply") to the objection to the *Motion of Debtors for Entry of Order (I) Approving Proposed Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation, and (V) Granting Related Relief* [D.I. 350] (the "Motion")[2] filed by the Office of the United States Trustee for the District of Delaware [D.I. 463] (the "U.S. Trustee" and such objection, the "Objection") and in further support of the relief sought in the Motion.  For the reasons set forth herein, the Objection should be overruled and the Motion should be granted.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

[2] Capitalized terms used but not otherwise defined herein have the respective meanings ascribed to them in the Motion or the Disclosure Statement (as defined below), as applicable.

**<u>Preliminary Statement</u>**

1.      The Debtors filed these chapter 11 cases having secured a Restructuring Support Agreement that contemplates a comprehensive restructuring through a prearranged chapter 11 plan that provides for: (i) conversion of the DIP Facility into an exit facility on the effective date of the Plan, (ii) equitization of all of the Debtors' prepetition funded indebtedness (except for debt repaid or rolled up through the DIP Facility), (iii) unimpairment of the General Unsecured Claims, (iv) retention of preferred and common equity interests and their relative priority, and (v) consummation of the AST Transaction.  The Plan is the product of intense, hard-fought, arm's-length negotiations among the key parties in interest in these cases and has the widespread support of the Debtors' key constituencies.

2.      Given the broad consensus on the terms of the Plan, it comes as no surprise that no party with an economic interest in these cases has objected to the Disclosure Statement. Nonetheless, as the lone objector to the approval of the Disclosure Statement with no economic interests in the outcome, the U.S. Trustee asks the Court to deny the Motion because the proposed Plan is allegedly "patently unconfirmable." However, each of the objections put forward by the U.S. Trustee with respect to the Plan fails for the reasons set forth below and in no circumstances rises to the level of rendering the Plan unconfirmable.

3.      First, the U.S. Trustee alleges that the Plan "hinges on the outcome of speculative litigation" and that the Debtors have not shown that they have a viable go-forward business. However, the Plan is not affected by the outcome of any litigation (speculative or otherwise) and the support of the proposed Plan by the Debtors and by the economic stakeholders in the Chapter 11 Cases is a clear indication of the business's viability.  What the Objection refers to as "litigation" is the requests made by certain parties to the Federal Communications Commission (the "<u>FCC</u>") for reconsideration of the April 2020 FCC Order.  It is black letter communications

law that such commonplace requests do not have any effect on the Debtors' rights to use the licensed spectrum. Moreover, any action by the FCC related to these requests would not impact the Debtors' go-forward satellite business. There is nothing in these requests that would prevent the Debtors from operating as contemplated in the Plan and the AST Transaction. The Debtors have demonstrated, and will continue to demonstrate, that the Plan and the AST Transaction underpinning it are built upon a viable go-forward business.

4.      Second, despite the U.S. Trustee's attempt to establish a new and unfounded *per se* rule that a plan effective date must occur within some undefined (but short) window following confirmation of the plan, the potential gap between these two dates, which is described in the Disclosure Statement and is necessary for obtaining regulatory approval of the transactions contemplated by the Plan, does not render the Plan unconfirmable or violate section 1129(a)(9) of the Bankruptcy Code. Extended periods between confirmation and the effective date of a chapter 11 plan are not uncommon in complex chapter 11 restructurings, particularly where regulatory or other third-party approvals are required for the plan to become effective. Illogically, the U.S. Trustee's argument asks the Court to penalize the Debtors for proactively including the required temporal flexibility in the RSA and the Plan.

5.      Third, the U.S. Trustee alleges that the Third-Party Release is not consensual—because consents are obtained through an opt-out (rather than opt-in) mechanism—and thus violates the Supreme Court's recent decision in *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204 (2024). However, the U.S. Trustee's position misreads the Supreme Court's holding in *Purdue* and has been soundly rejected by dozens of post-*Purdue* decisions of bankruptcy courts across the

country, including in this District, that found opt-out mechanisms, like the one set forth in the Plan, sufficient to deliver a consensual third-party release.[3]

6.      Accordingly, and as demonstrated below, the Objection should be overruled.

## Reply

## I.      Confirmation Issues Should Be Left for Confirmation

7.      In an attempt to pull forward confirmation issues under the pretense of an objection to the Disclosure Statement, the U.S. Trustee alleges that several of the issues raised in the Objection render the Plan "patently unconfirmable."  The U.S. Trustee has failed to demonstrate that such conclusion is appropriate, and, in any event, the Debtors will demonstrate at the Confirmation Hearing that the Plan is plainly confirmable.

8.      In the Third Circuit, for a proposed plan to be "patently unconfirmable[,]" it must be "obvious at the disclosure statement stage that a later confirmation hearing would be futile." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). Because dismissing a plan at the disclosure statement approval stage is such an extreme measure, doing so may only be appropriate where "(1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id.* at 154-55 (internal quotations and citation omitted).

---

[3] Prior to the filing of the Objection, the U.S. Trustee provided comments to the Plan, the Disclosure Statement, and the proposed order approving the Motion (the "Proposed Disclosure Statement Order").  The Debtors and the U.S. Trustee were able to consensually resolve many of the U.S. Trustee's concerns, which resolutions will be reflected in the revised versions of the Plan, the Disclosure Statement, and the Proposed Disclosure Statement Order filed prior to the Disclosure Statement hearing.  In addition, changes made to address certain issues raised by the U.S. Trustee in the Objection are described in the chart attached hereto as **Exhibit 1**.  To the extent the U.S. Trustee raises any additional objections not contained in the Objection (including with respect to the release, injunction, or exculpation provisions in the Plan), the Debtors reserve all rights with respect thereto.

9. Courts consistently caution that taking the drastic measure of dismissing a plan at the disclosure statement approval stage "must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing." *In re Monroe Well Serv.*, 80 B.R. 324, 332–33 (Bankr. E.D. Pa. 1987); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("Only where the disclosure statement *on its face* relates to a plan that cannot be confirmed" may it be appropriate to dismiss a proposed plan prior to the solicitation of votes; "confirmation issues are left for later consideration.").

10. Other courts agree that, unless the disclosure statement "describes a plan of reorganization which is so fatally flawed that confirmation is impossible," a disclosure statement that otherwise adequately describes the proposed plan should be approved. *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990); *see also In re Unichem Corp.*, 72 B.R. 95, 98 (Bankr. N.D. Ill. ), *aff'd*, 80 B.R. 448 (N.D. Ill. 1987) (courts should only deny approval of a disclosure statement on non-confirmability grounds "where it is readily apparent that the plan accompanying the disclosure statement could never legally be confirmed").

11. Clearly, there are no such fundamental flaws in the Plan. Nevertheless, although the Debtors believe that most of the objections raised by the U.S. Trustee with respect to the Disclosure Statement are more appropriately addressed at confirmation, the Debtors will address the merits of each of the arguments made in the Objection in this Reply.

## II. The Plan is Feasible

12. The U.S. Trustee asserts that the Plan is not feasible because the Debtors have failed to demonstrate that their MSS and terrestrial businesses are viable or that a favorable outcome in certain non-existent "litigation" with respect to their FCC licenses is "reasonably likely." Objection ¶¶ 33-36. These assertions misstate the facts and misapply the law.

13.     Section 1129(a)(11) of the Bankruptcy Code requires only that a plan is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11).  A "relatively low threshold of proof will satisfy § 1129(a)(11)." *In re Trenton Ridge Invs., LLC*, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (finding that "[t]he [Bankruptcy] Code does not require the debtor to prove that success is inevitable"). "Feasibility does not require that success be guaranteed but rather only a 'reasonable assurance of compliance with plan terms.'" *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011) (quoting *In re Orlando Investors LP*, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989)); *see also In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (noting that "[j]ust as speculative prospects of success cannot sustain feasibility, speculative prospects of failure will not ***defeat*** feasibility") (emphasis added).  Third Circuit precedent requires only that a plan present "a realistic and workable framework."  *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (internal quotation omitted).

14.     When addressing regulatory contingencies specifically, courts in this district approach the question of feasibility pragmatically, acknowledging that the economic stakeholders are the best judges of the debtor's prospects post-emergence. In *Indianapolis Downs*, for instance, the court confirmed a plan that required gaming commission approvals, finding it "almost inconceivable that . . . stakeholders in these cases would have headed down this path unless they were confident" that such approvals would be forthcoming. 486 B.R. at 299.  The *Indianapolis Downs* court recognized that "[t]he first, best indicator of feasibility is the position of the creditors whose economic interests are at stake.  The support or opposition of creditors with skin in the game and an opportunity to study a debtor's proposal is more illuminating to the Court than any expert report or accountant's projections."  *Id.* at 298; *see also In re S B Bldg. Assocs. Ltd. P'ship*, 621

B.R. 330, 360 (Bankr. D.N.J. 2020) (finding that overwhelming creditor support "is the best evidence of a Plan's feasibility").

15.     But even apart from the creditors' support for the Plan, the feasibility objection must fail because the U.S. Trustee offers nothing but speculation in its support.  And speculation is not sufficient as matter of law.  In *Tribune*, for example, the court rejected feasibility objections based on "nothing more than speculation" about future regulatory hurdles.  *In re Tribune Co.*, 464 B.R. at 185.  *See also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("[M]ere potential for failure of the plan is insufficient to disprove feasibility.") (internal quotation omitted).

16.     The U.S. Trustee has asserted that the "Debtors have not shown that a favorable outcome in the FCC litigation is reasonably likely versus merely possible."  Objection ¶ 34.  In addition to the lack of legal support for its assertion, the U.S. Trustee is also factually incorrect because ***there is no FCC litigation***. What the U.S. Trustee appears to be referring to (and mischaracterizing in the process) is certain petitions for reconsideration of the April 2020 FCC Order that authorizes the Debtors to utilize power levels on their L-Band Spectrum assets necessary for terrestrial operations. However, these petitions request reconsideration of the FCC Order providing authorization for the Debtors' use of the L-Band Spectrum for the Ancillary Terrestrial Components ("ATC"), which is the subject of the Takings Litigation and not actively used by the Debtors as a result.  *See* First Day Declaration, ¶ 110; Disclosure Statement § [IX.D]. These petitions have no bearing on the Mobile Satellite Services ("MSS") uses or the AST Transaction and thus have no impact on the feasibility of the Plan.  Any action by the FCC related to these petitions would not impact the Debtors' license for the MSS use of the L-Band Spectrum or its utilization contemplated by the AST Transaction.

- 7 -

17.     Moreover, these pending petitions for reconsideration that the U.S. Trustee has mischaracterized as "FCC litigation" are merely administrative requests—routinely filed by interested parties, with no timeline for FCC action one way or another—and, critically, with no effect on the Debtors' rights.  The Communications Act explicitly provides that filing petitions for reconsideration does not "operate in any manner to stay or postpone the enforcement" of the existing orders.  47 U.S.C. § 405(a).  As in *Tribune*, the U.S. Trustee's concerns amount to "nothing more than speculation."  464 B.R. at 185.  Under the U.S. Trustee's flawed standard, virtually no holder of an FCC license, routinely subject to petitions for reconsideration, could ever satisfy section 1129(a)(11)'s "relatively low threshold of proof."  *TCI 2 Holdings*, 428 B.R. at 148. The U.S. Trustee's position effectively demands a level of certainty that exceeds the "reasonable assurance" standard established in *Tribune*.  *Tribune*, 464 B.R. at 185.  Far from relying on "speculative litigation winnings," *Am. Cap. Equip.*, 688 F.3d at 156, the Plan relies on existing and effective FCC authorization.

18.     The U.S. Trustee also contends that the Debtors have not demonstrated the viability of either their MSS or ATC businesses.  *See* Objection ¶¶ 35-36.  While the Debtors acknowledge current limitations on their ability to deploy ATC operations in their L-Band Spectrum (and will continue to pursue the Takings Litigation), these limitations are irrelevant to the feasibility of the Plan, as the Plan does not depend upon a specific outcome of the Takings Litigation or the reorganized Debtors' ability to use the ATC operations in the L-Band Spectrum.

19.     As to the viability of the MSS business, as stated above, the Consenting Stakeholders, who are the economic stakeholders in these cases, overwhelmingly support this Plan. While the Debtors acknowledge that the reorganized Debtors are expected to incur net losses and generate negative cash flow in the near-to-medium term (*i.e.*, the 2025-2028 period), the business

- 8 -

is projected to begin generating significant positive cash flow starting in 2029, as the reorganized Debtors will begin to benefit in a material way from the revenue sharing provisions in the AST Transaction.

20.    The U.S. Trustee also raises a question of the status of the Debtors' two satellite assets—Skyterra-1 and Skyterra-2.   Any company operating in the satellite industry would recognize that risks are inherent in owning and operating satellites, and none of the risks alleged by the U.S. Trustee are of a different nature or scope than what one would typically see with respect to an MSS-based business. As in *Indianapolis Downs*, it would be "almost inconceivable" that sophisticated stakeholders like AST and the Consenting Stakeholders would support the Plan without confidence in its feasibility.  486 B.R. at 299.  As recognized by the *Indianapolis Downs* court, such informed stakeholder support provides far more persuasive evidence of feasibility than speculative concerns raised by parties without economic interest.

21.    Despite the U.S. Trustee's efforts to paint a different picture, the facts show that the Plan is clearly feasible.  The Plan does not depend on uncertain litigation outcomes but is built on the existing rights and regulatory authorizations. As courts have consistently recognized, "[g]uaranteed success in the stiff winds of commerce without the protections of the Code is not the standard under [section 1129(a)(11)] . . . . All that is required is that there be a reasonable assurance of commercial viability." *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000) (quoting *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986)).  Thus, the U.S. Trustee's feasibility objection should be overruled.

### III.    An Extended Period Between Confirmation and the Effective Date Does Not Preclude Confirmation of the Plan

22.    Next, the Objection alleges that the Plan does not satisfy section 1129(a)(9) of the Bankruptcy Code because its effective date is "indefinite and uncertain."  However, in addition to

being an issue for confirmation, all that section 1129(a)(9) requires is that certain payments be made on the effective date, and that is precisely what the Plan provides for.  What the U.S. Trustee attempts to establish is a *per se* rule that a plan cannot be confirmed where it contemplates an effective date that does not occur soon after confirmation. Nothing in the Bankruptcy Code provides for such a draconian rule that would prevent confirmation where a time gap is expected prior to the effective date.  Indeed, accepting the U.S. Trustee's position would mean that a court could never grant a stay of a confirmation order pending an appeal, as that would inherently create potentially significant delay between confirmation of a plan and its effective date.

23.    A *per se* rule limiting the time between confirmation and the effective date of a chapter 11 plan would be non-sensical in the context of a complex restructuring such as the one contemplated here.  Extended periods between confirmation and the effective date are a frequent feature of complex chapter 11 restructurings, particularly where regulatory approvals are required for the plan's effectiveness.  "Although plans usually become effective shortly after confirmation, there can be a delay of months or longer in cases where, for example, the debtor must wait for regulators to approve the plan or investors to finalize financing." *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 227 (3d Cir. 2021) (citing *In re Venoco LLC*, 998 F.3d 94, 107 n.14 (3d Cir. 2021); *In re Worldcom, Inc.*, 401 B.R. 637, 640 (Bankr. S.D.N.Y. 2009)).

24.    Indeed, such gaps are commonplace in cases where the plan requires approval of the FCC or another regulatory agency.  In such cases, it is sufficient that the disclosure statement discloses that receipt of regulatory approval is a condition to the effectiveness of the plan and informs the parties voting on the plan of the risks associated with the need for such approval, including the delay in the plan's effectiveness that may occur as a result.  And this is exactly what the Debtors have done here. *See Disclosure Statement for the Joint Chapter 11 Plan of Ligado*

*Networks LLC and its Affiliated Debtors and Debtors in Possession* [D.I. 349], Article IX(A) ("*The Effective Date May Not Occur*" - "Given the nature of the Plan and the required regulatory approvals for implementation, the Effective Date of the Plan is not likely to occur shortly after the Confirmation Date . . . ."). *See also, e.g., In re GTT Communications, Inc.*, No. 21-118880 (MEW) (Bankr. S.D.N.Y. Oct. 31, 2021) [D.I. 20] ("The Debtors can provide no assurance that the required regulatory and government consents will be obtained in connection with the [transactions contemplated under the plan]" nor assurance as to the terms, conditions, and timing of the approvals or clearances); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. Aug. 24, 2021) [D.I. 2693] (same); *In re OneWeb Global Ltd.*, No. 20-22437 (RDD) (Bankr. S.D.N.Y. Sept. 1, 2020) [D.I. 534] (same); *In re Frontier Communications Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 30, 2020) [D.I. 648] ("there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur, including due to those risks outlined as part of the regulatory process."); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 14, 2020) [D.I. 1813] ("The Debtors can provide no assurance that the required regulatory and government consents will be obtained in connection with the Restructuring Transactions."); *In re iHeartMedia Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Sept. 20, 2018) [D.I. 1484] ("No assurances can be made…that certain conditions precedent to the Effective Date (including receipt of FCC Approval or any required private letter ruling from the [IRS]) will have occurred by the outside date under the Restructuring Support Agreement."); *In re LightSquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y. Jan. 20, 2015) [D.I. 2035] ("There is no guaranty that such [regulatory] approvals would be obtained in a timely manner or, possibly, at all."). Instead, the U.S. Trustee effectively seeks to penalize the Debtors for proactively negotiating a transaction that allows for the timing flexibility required in the Debtors' industry.

- 11 -

25.     Seeking confirmation of the Plan now, prior to receiving FCC authorization, is what the economic stakeholders in these cases negotiated for.  The Consenting Stakeholders and AST want the certainty provided by a confirmed Plan and this is the restructuring construct they have agreed to support.  It is actually the U.S. Trustee's approach—not the Plan—that would inject unacceptable uncertainty into the process.  Waiting for regulatory approval before confirming the Plan would cause a default under the RSA and the DIP Facility, triggering the Consenting Stakeholders' and AST's termination rights, and upending the AST Transaction, thus jeopardizing the broadly supported pre-arranged Plan.  By contrast, confirming the Plan now, prior to obtaining the FCC approval, complies with the RSA and would automatically extend the maturity of the DIP Facility, thus avoiding the litany of defaults the U.S. Trustee's approach would immediately create. *See Final Order (I) Authorizing The Debtors to (A) Obtain Postpetition Financing and (b) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [D.I. 188] ("Notwithstanding anything to the contrary in the DIP Loan Agreement: (a) upon entry of the Confirmation Order, the Maturity Date Extension Period then in effect shall automatically be extended to the effective date of an Acceptable Plan…").

26.     In *In re AMR Corporation,* No. 11-15463 (SHL) (Bankr. S.D.N.Y.), certain parties objected to the feasibility of the debtors' plan on the grounds that the proposed merger of the debtors with another airline depended on the favorable outcome of a pending antitrust lawsuit. Like in this case, the vast majority of economic stakeholders supported the plan and wanted the plan confirmed as intended, with the effectiveness remaining subject to resolution of the antitrust lawsuit and the proposed merger moving forward.  In overruling the objection and confirming the proposed plan, the *AMR* court noted that "it is not uncommon for plans of reorganization to be

approved in large Chapter 11 cases, where effectiveness is contingent on regulatory approval . . ..

In these cases . . . the usual way of handling that issue, is to include language providing that in the

event of the failure to substantially consummate the confirmed plan, then the confirmation order

may be vacated and the plan becomes null and void." *See* Hr'g Tr. 27:20-28:8, *In re AMR Corp.*,

No. 11-15463 (Bankr. S.D.N.Y. Sept. 12, 2013) [D.I. 10205] (citations omitted).  The court further

pointed out that "failure of the effective date and the withdrawal of the confirmation order will

leave creditors no worse off than if the confirmation order never had been entered."  Hr'g Tr.

32:15-18.  Similarly, in this case, the Plan should proceed on the agreed upon timeline and the

Court should not countenance the U.S. Trustee's extreme position.

27.    The cases cited by the U.S. Trustee are distinguishable and none involves

circumstances where the occurrence of the effective dates depended on ensuring sufficient time to

obtain necessary regulatory approvals.  *See In re Potomac Iron Works, Inc.*, 217 B.R. 170 (Bankr.

D. Md. 1997) (plan setting effective date one year from confirmation to allow additional time to

collect accounts receivable); *In re Krueger*, 66 B.R. 463, 465 (Bankr. S.D. Fl.  1986) (plan setting

effective date four-months post-confirmation to allow individual debtor to continue trying to sell

property at a higher price); *In re Yates Development, Inc.*, 258 B.R. 36, 42 (Bankr. M.D. Fla. 2000)

(making effective date contingent on a future appellate ruling reducing claim amount); *In re

Premier Network Services,* No. 04-33402-HDH-11, 2005 WL 6443624 (Bankr. N.D. Tex. July 1,

2005) (occurrence of the effective date depended upon sufficient funds existing to allow the debtor

to pay administrative claims).  Here, the Debtors are not trying to "buy time" to obtain sufficient

funds to pay administrative claims or to comply with other provisions of section 1129.  Obtaining

regulatory approvals is plainly unavoidable.  Due to the Debtors' operation in a highly regulated

industry and the nature of the transactions contemplated by the Plan, the Debtors have no choice

but to wait until they receive the necessary regulatory approvals and need to ensure the Plan contemplates sufficient time to obtain those approvals prior to substantial consummation of the Plan.

## IV.    The Third-Party Release in the Plan Does Not Render the Plan Unconfirmable

28.    The U.S. Trustee also contends that the Plan is unconfirmable due to the inclusion of a standard opt-out mechanism for obtaining consensual third-party releases.  Like in other cases (where identical objections by the U.S. Trustee have been overruled), the U.S. Trustee argues that opt-out releases are categorically prohibited.  Despite the U.S. Trustee's strenuous objections, such a categorical rule is not supported by caselaw and, rather than adopt such a rule, the Court should follow the case-by-case approach that this Court and others have endorsed, and approve the proposed opt-out mechanism.

### A.    Federal Law, Not State Contract Law, Governs Whether Third-Party Releases in a Chapter 11 Plan Are Consensual

29.    The U.S. Trustee observes that the "Bankruptcy Code does not define a 'consensual release'" and "contains no provision that addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor."  Obj. ¶ 48.   However, from these unremarkable observations, the U.S. Trustee makes the leap to assert that "[a]ccordingly, any authority to include third-party releases in a plan" must derive from state law.  *Id.*  Nothing in the Objection supports such a conclusion, and federal law—not state contract law—should govern whether the Third-Party Release in the Plan is consensual.

30.    The U.S. Trustee argues that a third-party release within a chapter 11 plan is its own individual contract that is separate and distinct from the chapter 11 plan and therefore must be evaluated under state contract law.  However, viewing a chapter 11 plan and third-party releases contained therein as separate contracts is contrary to the very purpose of a chapter 11 plan.

31.     A chapter 11 plan is not a series of individual contracts, but rather an integrated package of bargained-for consideration of which third-party releases form an essential piece. Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any . . . appropriate provision not inconsistent with the applicable provisions of this title[,]" and nothing in the Bankruptcy Code prohibits the inclusion of consensual third-party releases or requires that such releases be deemed separate agreements.  A key element of the integrated Plan is the releases among the parties supporting the Plan, and the opportunity for other parties to give those releases or to decline to do so through an opt-out mechanism.  Here, the very foundation of the Plan is based on the significant compromises and settlements agreed to by the Released Parties that enable other stakeholders to receive meaningful recoveries, including unimpairment of the General Unsecured Claims and retention of preferred and common equity interests.

32.     Though courts may call upon and incorporate state law contract interpretation canons to analyze the effect of a confirmed chapter 11 plan, such plan is scrutinized, confirmed, and ordered by a federal court, and binds all affected parties whether or not they have accepted the plan.  *See* 11 U.S.C. § 1141(a).  The court issuing an order confirming the plan is imbued with authority flowing from the Constitution, and places its imprimatur on the plan, in its entirety.  *See* U.S. Const. art. I, § 8, cl. 4.  Chapter 11 plans should therefore be considered as a whole and evaluated similarly to other forms of judicial relief granted in a duly-noticed proceeding based on well-defined standards.

33.     For example, in a federal lawsuit, a plaintiff will serve a complaint on a defendant under Federal Rule of Civil Procedure rule 4.  After being properly served, a defendant must answer or move to dismiss the complaint within the relevant period or risk consequences.  If the defendant files nothing, the court may enter a default judgment for the plaintiff; if the defendant

fails to timely raise certain defenses, it may be deemed to waive them. *See* Fed. R. Civ. P. 12(h), 55(a); *e.g., Como v. Com. Oil Co.*, 607 F. Supp. 335, 342 (S.D.N.Y. 1985) (explaining that "if a party fails to raise a venue objection promptly, he waives it"). The authority for this result does not emanate from state contract law; it emanates from the authority and jurisdiction vested in the federal courts.

34.     The same is true for chapter 11 plans. Creditors must be served with a solicitation package containing adequate information to enable them to evaluate the proposed plan. *See* 11 U.S.C. § 1125; Fed. R. Bankr. P. 3017(d). Upon adequate service, creditors are obligated to act based on the solicitation materials or risk consequences: the court may confirm the plan in a creditor's absence, and a creditor may be deemed to waive any objection to the plan. *See In re Teligent, Inc.*, 282 B.R. 765, 772 (Bankr. S.D.N.Y. 2002) (discussing failure to object to treatment of administrative claims and observing that "one's general right to remain silent in the face of an offer should be subject to question and reconsideration where passivity will threaten the fundamental goals of bankruptcy—rehabilitation, saving jobs and equality of distribution."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 259-63 (Bankr. S.D.N.Y. 2007) (classes where no creditors voted could be deemed to accept the plan where the plan expressly so provides). Failure to act may extinguish a creditor's claim or may reduce the amount the creditor will recover on its claim. Similarly, failure to act may release debtor-related claims the creditor might hold against third parties where the creditor is given the opportunity to opt-out of granting such a release. Just as in a federal civil action, the creditor may act to preserve its rights (including by opting out of a third-party release) but failing to respond at all carries consequences. *See Mallinckrodt*, 639 B.R. at 879 (likening failure to respond to bar date notice to failure to respond to properly noticed releases).

35.     Both before and after *Purdue*, bankruptcy courts have evaluated consent to third-party releases under these principles.  "Within the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim.  Additionally, if a claim objection is filed and the claimant fails to respond, the claim is disallowed.  There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022).  *See also* Confirmation Hr'g Tr. 105:4–12, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024) [D.I. 2502] ("A sues B.  B gets served.  B doesn't respond.  B is ordered to pay money to A.  That's what courts do.  Here the obligation to opt out was sent out.  It was sent out to everybody.  Those that it didn't get sent to appropriately will be excluded because [of] the due process clause.  There's simply nothing forbidden or inconsistent about that.  Do we need to comply with state law?  There's no requirement we comply with state law.  Federal law can allow for consequences as a result of default.").

36.     Additionally, viewing a chapter 11 plan or individual provisions thereof through a state contract law lens presents a number of challenges.  These include: which state law should apply; how fully must that law be incorporated into the analysis of whether consent has been obtained (for example, must consideration be exchanged in connection with granting a release?); do the releasing parties in fact receive an "offer" from the non-debtor parties being released that they may determine whether to accept?  *See In re LaVie Care Centers, LLC*, No. 24-55507 (PMB), 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024) (while recognizing certain problems with application of federal law, noting that "assessing [third-party releases] based on state contract law is no better").  Indeed, the difficulty in identifying which state law should apply has led

advocates of this position to rely, instead of on any particular state's law, on principles set out in the Restatement of Contracts—which "itself is not the law anywhere." *LaVie*, 2024 WL 4988600, at \*14 (noting that, like here, the U.S. Trustee's objection made "numerous cites to the Restatement of Contracts"). State law, accordingly, should not apply. *See* Confirmation Hr'g Tr. 105:10–11, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) ("Do we need to comply with state law? There's no requirement we comply with state law.") (approving opt-out mechanism for third-party release).

37.    There are other clear distinctions between a contract and a chapter 11 plan. When forming a contract, parties are free to engage with other parties or to refrain from doing so, without consequence. That is not the case in bankruptcy generally and with respect to a chapter 11 plan in particular—creditors are forced into the bankruptcy proceeding where their rights are being restructured, with or without their consent. Additionally, when determining whether a contract has been formed, courts look to whether there was a binding offer, acceptance, and consideration to support it. *Restatement (Second) of Contracts* § 17 (1981) (formation of contract requires manifestation of mutual assent). This is not the case in bankruptcy. Instead, the bankruptcy court determines whether all Congressionally-mandated confirmation requirements are met and then orders the appropriate relief. *See Purdue,* 603 U.S. at 214 ("Under Chapter 11, the debtor can work with its creditors to develop a reorganization plan governing the distribution of the estate's assets; it must then present that plan to the bankruptcy court and win its approval." (citing 11 U.S.C. §§ 1121, 1123, 1129, 1141)). The plan itself is not an offer that any single stakeholder may unilaterally reject or accept. Instead, a chapter 11 plan is either approved or rejected based on a class-wide vote, which binds minority creditors to a plan to which they did not consent. Although a plan may provide for individual creditor choices—as is the case with opt-out third-party

releases—it is not an individualized contract but rather part of an integrated deal that is collectively accepted or rejected. "Bankruptcy provides a way to make . . . diverse individuals act as one, by imposing a *collective* and *compulsory* proceeding on them." THOMAS H. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 12–13 (Beard Books 2001) (1986).[4]   Creditors may forfeit their rights if they refuse to engage in these collective and compulsory proceedings. And often, a chapter 11 plan provides no consideration to the parties that it binds—this absence of consideration, alone, would put an end to an enforceable contract at common law. A chapter 11 plan might not be "binding" under a state contract law analysis, but it is beyond dispute that a court's confirmation order is binding on all parties in interest.

38.     Accordingly, the issue of consent to a third-party release contained within a chapter 11 plan should be evaluated under federal law.

### B.     Opt-Outs Continue to Be Valid and Were Not Affected by *Purdue*

39.     In urging this Court to reject the use of the opt-out release construct, the U.S. Trustee continues to incorrectly assert that *Purdue* modified what constitutes consent in the context of third-party releases. That is not the case. In fact, the overwhelming weight of authority on this issue, counsels in favor of finding that providing parties with an opportunity to opt-out of a third-party release in a chapter 11 plan remains a valid basis upon which to render such releases consensual.

40.     Faced with this issue and a nearly identical objection from the U.S. Trustee in *In re Fisker*, this Court made its view clear that, post-*Purdue*, "there is no prohibition on the use of opt-

---

[4] Further, a bankruptcy case may not be limited solely to matters between the debtor and its creditors. A court sitting in bankruptcy has jurisdiction over matters that are "related to" the debtor or that "touch on the administration of the estate" (subject to enumerated exceptions), including disputes among non-debtors that relate to the debtors or their estates. *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 572 (5th Cir. 2025), as revised (Jan. 21, 2025) (vacating order dismissing claims brought by one creditor group against another creditor group for prepetition misconduct and remanding back to the bankruptcy court for further proceedings).

out releases, and that . . . whether an opt-out is appropriate is subject to a case-by-case analysis." *See* Hr'g Tr., Oct. 11, 2024, 44:17–25, 45: 1–18, *In re Fisker, Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) [D.I. 706] (approving the use opt-out releases as a sufficient manifestation of consent for unsecured creditors).   Numerous other post-*Purdue* decisions have similarly found that *Purdue* does not prohibit opt-out releases and use of an opt-out mechanism remains a valid method for ascertaining consent to a third-party release.   *See e.g.*, Confirmation Hr'g Tr. 93:17-23, *In re CareMax, Inc.*, No. 24-80093 (MVL) (Bankr. N.D. Tex. Jan. 28, 2025) [D.I. 572] (explaining ballots and opt-outs were designed to admonish recipients of "a duty to act"); Confirmation Hr'g Tr. 27:15-16, *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) [D.I. 1733] (holding opt-out releases were "consensual"); Confirmation Hr'g Tr. 43:3-7, *In re The Container Store Grp., Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) [D.I. 181], (same); *see also* Confirmation Hr'g Tr. 20:17-21, *In re Digital Media Solutions, Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Jan. 15, 2025) [D.I. 663] (same); *In re Fisker, Inc.*, [D.I. 706] Hr'g Tr., Oct. 11, 2024, 44:17–25, 45: 1–18 (same); *In re Gigamonster*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024) [D.I. 888], Hr'g Tr., Aug. 27, 2024, 64:19–22 ("the Supreme Court declined to express a view on what constitutes a consensual release or the procedural mechanism to obtain a consensual release."); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Oct. 8, 2024); *In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (Bankr D.N.J. Aug. 15, 2024); *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024); *In re Bowflex Inc.*, No. 24-12364 (ABA) (Bankr. D. N.J. Aug. 18, 2024).

41.     Despite the multitude of post-*Purdue* decisions which have held that opt-out releases are permissible, the U.S. Trustee focuses on the handful of decisions declining to approve opt-out releases and, in particular, on *In re Smallhold, Inc.*, 24-10267 (CTG), 2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024). *See* Obj. ¶¶ 55–59.  In *Smallhold*, the court refused to accept opt-out releases that were not supported by an affirmative action, stating that after *Purdue* "the third-party release is no longer a potentially permissible plan provision" and "such releases cannot be described as 'consensual' on the ground that the creditor's failure to assert an objection effectively allowed the release to be imposed . . . . [I]n the absence of some sort of affirmative expression of consent . . . the creditor's silence in the face of a plan and form of ballot [is not] sufficient." *Smallhold* at *10-11.

*42.*     However, the U.S. Trustee's insistence that the Court follow the decision in *Smallhold* should be rejected for two key reasons.  First, *Smallhold* overreads the ruling in *Purdue* in finding that the landscape with respect to opt-out releases has changed and that plan provisions with respect to opt-out releases are no longer permissible.  As the *Purdue* Court itself noted, "[n]othing in what we have said should be construed to call into question consensual third-party releases offering in connection with a bankruptcy reorganization plan . . . ." *Purdue* 503 U.S. at 226 (2024).  And as this Court determined in *Fisker*, "in light of *Purdue* there is no prohibition on the use of opt-out releases."  *See* Hr'g Tr., Oct. 11, 2024, 44:20–21, *In re Fisker, Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) [D.I. 706]; *see also* Disclosure Statement Hr'g Tr. 24:1–4, *In re Lumio Holdings, Inc.*, No. 24-11916 (JKS) (Bankr. D. Del. Jan. 3, 2025) [D.I. 428] ("in light of [*Purdue*], there's no prohibition on the use of opt-out releases, but . . . whether an opt-out is appropriate is subject to ca case-by-case analysis.").  Second, the *Smallhold* decision also assumed that express consent is required in chapter 11 cases and failed to consider the acceptance

- 21 -

and endorsement of the "implied consent" concept under federal law in bankruptcy cases like *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). In *Sharif*, the Supreme Court found that a party waives its right to have non-core claims heard by an Article III court when it fails to object. *Sharif*, 575 U.S. at 683. In so doing, the Supreme Court determined that in bankruptcy, "implied" consent—rather than only "express" consent—accords with constitutional standards. *Id.*

43.     Contrary to the court's determination in *Smallhold,* nothing about the Supreme Court's decision in *Purdue* affected the viability of opt-out releases or the endorsement of implied consent in bankruptcy, and it continues to be well-settled law that an opt-out third-party release is a consensual release, appropriate for inclusion in a chapter 11 plan.

### C.     An Opt-Out Mechanism Here Produces Consensual Releases

44.     Notwithstanding the U.S. Trustee's attempt to portray the Plan's Third-Party Release as "problematic," it is clear that these releases are consensual and well within the ambit of what courts in this district have routinely determined to be appropriate. All releasing parties will receive comprehensive and detailed notice of the Third-Party Release and an opportunity to opt out or object. The Disclosure Statement, the Ballots, and the Notice of Non-Voting Status all clearly and prominently detail the terms of the Third-Paty Release in bold font. And, consistent with this Court's ruling in *Fisker*, each of the 15 classes of claims and interests that is being asked to grant the Third-Party Release or opt out is receiving consideration under the Plan.

### D.     The U.S. Trustee's Additional Objections to the Releases Should be Overruled

45.     The Objection raises certain other concerns with respect to the Third-Party Release. *Objection* ¶ 73. Each of these additional concerns has either already been addressed by the Debtors or is a standard feature of a consensual third-party release and being taken out of context in the Objection. First, the U.S. Trustee expresses a concern that the definition of "Releasing Parties" in

- 22 -

the Plan could be read to provide that parties holding unclassified claims (who are not being sent either ballots or opt-out forms) are deemed to grant releases.  *Id.*  It is not the Debtors' intent to have such parties grant releases, nor do the Debtors believe the language could be interpreted in such a way.  Nonetheless, as set forth in **Exhibit 1**, the Debtors have made a modification to the definition of "Released Parties" to address this concern.

46.     Next, the U.S. Trustee argues that the Plan releases should be denied as "prospective" because "the claims being released could accrue up to the effective date, which could occur as late as May 2028."  *Id.*  Of course, the Objection ignores the fact that this is a construct that can be found in every single chapter 11 plan that contains releases.  The determination to grant a release is always made by a claimholder as of the voting deadline but becomes effective as of the effective date.  There is nothing unique about this construct here, nor does the U.S. Trustee cite a single case to the contrary.  To the extent any party is concerned about the potential length of the period between the voting deadline and the potential effective date, there is a very simple solution: opt out.  Further, to the extent it provides any additional comfort, the Debtors are amenable to including language in the ballots and opt-out forms further highlighting that failure to opt out of the Third-Party Release will release claims through the effective date of the Plan—even if such effective date occurs years later.

47.     Finally, the U.S. Trustee raises an issue that because the Plan releases do not contain carveouts for willful misconduct or gross negligence, they could impermissibly expand the Plan's exculpation provisions.  As a preliminary matter, the release provisions already contain language that makes clear that the releases cannot exceed the scope of what is permitted by law.  Additionally, the Debtors have already accepted most of the language clarifications previously requested by the U.S. Trustee and are happy to do so with respect to this additional request.  To

- 23 -

that effect, the Debtors have amended the language in the Plan to include the requested carveouts as set forth in **Exhibit 1**.

## V.    The Plan's Injunction Provision Does Not Render the Plan Unconfirmable

48.    In addition, the U.S. Trustee's objection to the injunction provision meant to enforce the release and exculpation provisions of the Plan should similarly be overruled.  Obj. ¶ 78.  The U.S. Trustee argues that an injunction cannot be granted to enforce impermissible releases nor is an injunction needed to enforce a permissible release.  The Debtors agree that if the releases or exculpations are impermissible, an injunction enforcing them is inappropriate (and meaningless).  Rather, this issue rises or falls with the validity of the releases and exculpations and, to the extent the releases and exculpations are appropriate, the injunction serves as an additional practical layer of enforcing the protections granted thereby.  In *Gigamonster*, where the U.S. Trustee raised a nearly identical objection, the court, in approving the injunction, noted that in the event the third-party release is deemed to be valid and consensual, the injunction is a form of "belts and suspenders" and merely provides practical support for the release.  *See*  Hr'g Tr., Aug. 27, 2024, 38: 12-14; 67: 12-15 *In re Gigamonster*, [D.I. 888], No. 23-10051 (JKS) ("With respect to the injunction, as proposed the injunction provision simply reinforces the third-party release.  So, I will overrule the United States Trustees' objection.").  In other recent cases, courts have reached the same conclusion and approved chapter 11 plans with similar injunction provisions over objections from the U.S. Trustee.  *See e.g.* Confirmation Hr'g Tr. 27:16-20, *In re Number Holdings, Inc.*, [D.I. 1756], No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) ("And I also will overrule the United States Trustee's objection with respect to the inunction argument, as the injunction being consistent with the release provisions.  I see that as a belt-and-suspenders, so to speak."); *In re Wheel Pros*, LLC, [D.I. 255], No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (approving plan containing injunction preventing actions against "Released Parties" over the

objection of the U.S. Trustee); *In re Fisker, Inc.*, [D.I. 722], No. 24-11390 (TMH) (Bankr. D. Del. Oct. 16, 2024) (same).  Likewise, the Court here should overrule this objection and approve the injunction.

## **Conclusion**

49.     For the reasons stated above, the Debtors respectfully request that the Court overrule the Objection, approve the Disclosure Statement, and grant such other and further relief as is just and proper.

*[Remainder of page intentionally left blank.]*

- 25 -

Dated May 19, 2025          /s/ Michael J. Merchant
Wilmington, Delaware        Mark D. Collins, Esq. (Bar No. 2981)
                            Michael J. Merchant, Esq. (Bar No. 3854)
                            Amanda R. Steele, Esq. (Bar No. 5530)
                            Emily R. Mathews, Esq. (Bar No. 6866)
                            **RICHARDS, LAYTON & FINGER, P.A.**
                            One Rodney Square
                            920 North King Street
                            Wilmington, DE 19801
                            Telephone: (302) 651-7700
                            Facsimile:  (302) 651-7701
                            Email:        collins@rlf.com
                                          merchant@rlf.com
                                          steele@rlf.com
                                          mathews@rlf.com

                            -and-

                            Dennis F. Dunne, Esq. (admitted *pro hac vice*)
                            Matthew L. Brod, Esq. (admitted *pro hac vice*)
                            Lauren C. Doyle, Esq. (admitted *pro hac vice*)
                            **MILBANK LLP**
                            55 Hudson Yards
                            New York, New York 10001
                            Telephone: (212) 530-5000
                            Facsimile:  (212) 530-5219
                            Email:        ddunne@milbank.com
                                          mbrod@milbank.com
                                          ldoyle@milbank.com

                            Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
                            **MILBANK LLP**
                            1850 K Street, NW, Suite 1100
                            Washington DC 20006
                            Telephone: (202) 835-7500
                            Facsimile:  (202) 263-7586
                            Email:        aleblanc@milbank.com

                            *Co-Counsel for Debtors in Possession*

RLF1 33005045v.1