Solicitation Version

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LIGADO NETWORKS LLC, *et al.*,[1] | ) Case No. 25-10006 (TMH) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

## DISCLOSURE STATEMENT FOR THE
## JOINT CHAPTER 11 PLAN OF LIGADO NETWORKS LLC
## AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

**MILBANK LLP**

Dennis F. Dunne, Esq. (*pro hac vice*)
Matthew L. Brod, Esq. (*pro hac vice*)
Lauren C. Doyle, Esq.  (*pro hac vice*)
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

Andrew M. Leblanc (*pro hac vice*)
1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone:    (202) 835-7500
Facsimile:    (202) 263-7586

*Counsel for Debtors in Possession*

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins, Esq. (Bar No. 2981)
Michael J. Merchant, Esq. (Bar No. 3854)
Amanda R. Steele, Esq. (Bar No. 5530)
920 North King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701

*Co-Counsel for Debtors in Possession*

Dated: June 24, 2025

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

THIS SOLICITATION IS BEING CONDUCTED BY LIGADO NETWORKS LLC; ATC TECHNOLOGIES, LLC; LIGADO NETWORKS (CANADA) INC.; LIGADO NETWORKS BUILD LLC; LIGADO NETWORKS CORP.; LIGADO NETWORKS FINANCE LLC; LIGADO NETWORKS HOLDINGS (CANADA) INC.; LIGADO NETWORKS INC. OF VIRGINIA; LIGADO NETWORKS SUBSIDIARY LLC; ONE DOT SIX LLC; AND ONE DOT SIX TVCC LLC TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT CHAPTER 11 PLAN.

EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY THE COMPANY, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE CLASS 3, CLASS 4, AND CLASS 5 CLAIMS, AND THE CLASS 9 AND CLASS 10 INTERESTS IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), INCLUDING SECTION 4(A)(2) THEREOF, AND APPLICABLE UNITED STATES STATE SECURITIES LAWS AND SIMILAR LAWS OF ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE.

---

**DELIVERY OF BALLOTS**

For your vote to be counted, Ballots (as defined herein) reflecting your vote must be actually received by the Voting Agent (as defined herein) before **4:00p.m. (prevailing Eastern Time), on July 24, 2025** (the "Voting Deadline") unless extended by the Company.  You should refer to the enclosed Ballot(s) for instructions on how to vote on the Plan.

---

PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES.  IN THE CASE OF ANY INCONSISTENCY BETWEEN THE SUMMARY IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, THE PLAN WILL GOVERN.

A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS EXHIBIT A.

IMPORTANT INFORMATION FOR YOU TO READ

UNDER THE PLAN, HOLDERS OF "GENERAL UNSECURED CLAIMS" (AS DEFINED IN THE PLAN) ARE ANTICIPATED TO BE PAID IN FULL, SUBJECT TO BANKRUPTCY COURT APPROVAL, ON THE EFFECTIVE DATE OF THE PLAN (OR AS SOON AS REASONABLY PRACTICABLE THEREAFTER) OR THEREAFTER IN ACCORDANCE WITH THEIR TERMS, OR TO RECEIVE SUCH OTHER TREATMENT TO RENDER HOLDERS OF SUCH CLAIMS UNIMPAIRED UNDER THE BANKRUPTCY CODE.

The Company has prepared this disclosure statement (this "Disclosure Statement") for use in connection with the solicitation of votes on, and confirmation of, the *Joint Chapter 11 Plan of*

*Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession*, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"),[2] and the information set forth herein may not be relied upon for any other purpose. The Company has not authorized any entity to provide any information about, or concerning, the Plan, other than the information contained in this Disclosure Statement. In addition, the Company has not authorized any entity to make any representations concerning the Company or the value of its property, other than as set forth in this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Company's operations, its financial history and forecasts, the need to seek chapter 11 protection, significant events that have or are expected to occur during its chapter 11 cases, and the anticipated organization, operations, and liquidity of the Company upon its successful emergence from chapter 11. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims or Interests entitled to vote under the Plan must follow in order for their votes to be counted.

The Company does not presently have the resources to pay all of its existing long-term debt obligations in full and in cash. However, the Company has entered into a Restructuring Support Agreement (attached as Exhibit B to the First Day Declaration (as defined herein)) with the Consenting Stakeholders (as defined below) in order to effectuate a balance sheet recapitalization of the Company pursuant to the terms of the Plan. The proposed restructuring will eliminate all existing funded indebtedness other than the DIP Loans from the Company's balance sheet and thereby improve the Company's financial condition and overall creditworthiness and help ensure the Company's continued operations.

**The Company therefore recommends, with the support of the Consenting Stakeholders, that all holders of Claims or Interests who are entitled to vote on the Plan, after having reviewed all of the information contained in this Disclosure Statement, Plan, and other documents incorporated by reference thereto, vote to accept the Plan.**

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE, AND THE COMPANY URGES ANY HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS FOR ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN IS ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. PLAN SUMMARIES AND STATEMENTS

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.

UNLESS OTHERWISE STATED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT OR ACCURATE AT ANY TIME AFTER THAT DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE, REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.  CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COMPLETE COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED HEREIN, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE COMPANY'S MANAGEMENT PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT.  WHILE THE COMPANY HAS PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, IT HAS NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE COMPANY CAUTIONS THAT IT CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES.  ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED AND, THUS, MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO DESCRIPTIONS OF LITIGATION OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER

AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE COMPANY OR THE REORGANIZED DEBTORS.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any comparable state authority. The Plan, and the securities issued pursuant to the Plan, have not been approved or disapproved by the SEC or any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any state securities commission or authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act, or any securities regulatory authority of any state under the applicable state securities law or similar public, governmental, or regulatory authority. The Company intends to rely on, to the extent each is available, (i) section 1145(a) of the Bankruptcy Code ("Section 1145"), (ii) section 4(a)(2) of the Securities Act, or Regulation D promulgated thereunder (and in each case, equivalent state law registration exemptions) to exempt from registration under the Securities Act the new securities of the Reorganized Debtors in connection with the Plan.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, OR ANY OTHER APPLICABLE EXEMPTION FROM SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology, such as "may," "expect," "anticipate," "estimate," "continue," or the negatives of such terminology, as well as any similar or comparable language. All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained in and attached to this Disclosure Statement are only estimates, and are subject to assumptions, risks, and uncertainties, many of which are beyond the control of the Company. Any analyses, estimates, or recovery projections may or may not turn out to be accurate. Important assumptions and other factors that could cause actual results to differ materially include, but are not limited to, those risks and uncertainties described under the heading "Risk Factors." All forward-looking statements are as of the date made, are based on the Company's beliefs, intentions, and expectations as of such date, and are not guarantees of future performance, and the

timing and amount of actual distributions to holders of Allowed Claims And Interests, among other things, may be affected by many factors that cannot be predicted.  Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and the Company and Reorganized Debtors undertake no duty to update any such statements.

Each recipient of this Disclosure Statement, by its acceptance hereof, acknowledges that (i) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (ii) it is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated under the Securities Exchange Act, and agrees that it will not use, or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential or material information in contravention of the Securities Exchange Act or any of its rules and regulations, including Section 10(b) and Rule 10b-5.

This Disclosure Statement is provided solely to assist holders of Allowed Claims and Interests to determine whether to vote to accept or reject the plan (where applicable), whether to object to confirmation of the plan, and whether to grant Third-Party Releases.  Nothing in the Disclosure Statement may be used by any person for any other purpose.

*MILBANK DRAFT 3/21/2025*
*PRIVILEGED & CONFIDENTIAL*
*SUBJECT TO FRE 408 AND ITS EQUIVALENTS*

## TABLE OF CONTENTS

SECTION I. INTRODUCTION AND OVERVIEW ..................................................................4

    A.    Overview of Proposed Restructuring ..........................................................5
    B.    Summary of Classification and Estimated Recoveries of Claims and
        Interests Under Plan ...................................................................................8
    C.    Plan Solicitation.......................................................................................12
    D.    Anticipated Timetable ..............................................................................13

SECTION II. HISTORICAL INFORMATION ....................................................................14

    A.    Overview of the Debtors' Business ..........................................................18
    B.    Corporate and Capital Structure ..............................................................26
    C.    Events Leading to Commencement of Chapter 11 Cases.........................36

SECTION III. MATERIAL DEVELOPMENTS AND ANTICIPATED
DEVELOPMENTS OF THE CHAPTER 11 CASES .......................................................50

    A.    Overview of Chapter 11 ...........................................................................50
    B.    Summary of Key Developments in the Chapter 11 Cases........................50
    C.    First-Day Relief and Other Case Matters ................................................51
    D.    DIP Financing...........................................................................................53
    E.    AST Break-Up Fee Motion ......................................................................54
    F.    Other Procedural and Administrative Motions.........................................54
    G.    Schedules And Statements .......................................................................55
    H.    Cooperation Agreement Litigation...........................................................55
    I.    Inmarsat Motion to Compel Payment......................................................55

SECTION IV. SUMMARY OF JOINT CHAPTER 11 PLAN .........................................58

    A.    Administrative Claims and Other Unclassified Claims...........................58
    B.    Classification and Treatment of Claims and Interests .............................61
    C.    Acceptance or Rejection of the Plan.........................................................69
    D.    Means for Implementation of the Plan .....................................................70
    E.    Provisions Governing Distributions .........................................................81
    F.    Settlement, Release, Injunction and Related Provisions..........................89
    G.    Conditions to the Effective Date ..............................................................94
    H.    Retention of Jurisdiction..........................................................................97

SECTION V. VOTING PROCEDURES AND REQUIREMENTS .................................99

    A.    Voting Deadline......................................................................................100
    B.    Voting Record Date ................................................................................100
    C.    Parties Entitled to Vote...........................................................................100
    D.    Ballots.....................................................................................................101
    E.    Agreements upon Furnishing Ballots .....................................................101

F.    Withdrawal or Change of Votes on Plan .............................................................. 102
G.    Fiduciaries and Other Representatives ............................................................... 102
H.    Waivers of Defects, Irregularities, etc. .............................................................. 102
I.    Further Information, Additional Copies ............................................................. 103
J.    Requirements for Acceptance by Impaired Class of Claims or Interests ............ 103

SECTION VI. CONFIRMATION OF PLAN ............................................................................. 103

A.    Confirmation Hearing ......................................................................................... 103
B.    Requirements for Confirmation of Plan – Consensual Confirmation ................ 104
C.    Requirements for Confirmation of Plan – Non-Consensual Confirmation ........ 106

SECTION VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ........................................................................................................................................ 107

A.    Certain United States Federal Income Tax Consequences of Plan to the
Company ............................................................................................................. 109
B.    Certain United States Federal Income Tax Consequences to Holders of
Claims and Holders of Equity Interests under the Plan ..................................... 110

SECTION VIII. CERTAIN FEDERAL AND STATE SECURITIES LAW
CONSIDERATIONS ................................................................................................................ 115

A.    Section 1145 of the Bankruptcy Code ............................................................... 115
B.    Private Placement Securities .............................................................................. 116

SECTION IX. RISK FACTORS ............................................................................................... 119

A.    Certain Bankruptcy Law Considerations ........................................................... 119
B.    Risks Associated with the Company's Existing MSS Business and the
Business Contemplated by the AST Transaction ............................................... 125
C.    Risks Associated with Regulatory, Legislative matters, and Litigation ............. 135
D.    Risk Factors Associated with the Deployment of ATC ...................................... 144
E.    Risk Factors to the 1670-1675 MHz Spectrum Bnd business ............................ 147
F.    Risks Related to the Collateral and Existing First Lien Notes, First Lien
Loan, 1.5 Lien Loan, and Existing Second Lien Loans (collectively, the
"Secured Debt") .................................................................................................. 148
G.    Risks Related to the New Preferred Units .......................................................... 149
H.    Other Risks ......................................................................................................... 151

SECTION X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
PLAN ........................................................................................................................................ 153

A.    Liquidation Under Chapter 7 or Chapter 11 ...................................................... 153
B.    Alternative Plans of Reorganization .................................................................. 154

SECTION XI. CONCLUSION AND RECOMMENDATION ...................................................154

EXHIBIT A          Joint Chapter 11 Plan

EXHIBIT B          Corporate Organizational Chart

EXHIBIT C          Projections

EXHIBIT D          Liquidation Analysis

## SECTION I.
## INTRODUCTION AND OVERVIEW

Ligado Networks LLC; ATC Technologies, LLC; Ligado Networks (Canada) Inc.; Ligado Networks Build LLC; Ligado Networks Corp.; Ligado Networks Finance LLC; Ligado Networks Holdings (Canada) Inc.; Ligado Networks Inc. of Virginia; Ligado Networks Subsidiary LLC; One Dot Six LLC; and One Dot Six TVCC LLC, as debtors and debtors in possession (collectively, the "Company," "Ligado," or the "Debtors") submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") for use in the solicitation of votes on the *Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession*, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"). A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference. In the event of any inconsistency between the terms of the Plan and the description of such terms in this Disclosure Statement, the terms of the Plan shall control.

This Disclosure Statement is part of the "Solicitation Package" distributed to all Holders of Claims and Interests in the voting Classes, and contains the following:

- this Disclosure Statement and all attachments hereto, and

- if you are entitled to vote to accept or reject the Plan, one or more ballots (each, a "Ballot"), as applicable, which shall include instructions describing the two acceptable methods to submit your Ballot (via Omni Agent Solutions, Inc.'s online "E-Ballot" portal or via first class mail, overnight courier, or hand delivery) along with a postage-paid, pre-addressed return envelope to be used by voters who opt to submit their Ballot to Omni Agent Solutions, Inc. by mail.

If you are a holder of a Claim or Interest entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact Omni Agent Solutions ("Omni" or the "Voting Agent") by e-mail at ligadoinquiries@omniagnt.com or by phone at (866) 956-2139 (US Toll-Free) or (747) 288-6137 (International).

For your vote to be counted, your Ballot(s) reflecting your vote must be **actually received** by the Voting Agent no later than 4:00 p.m., prevailing Eastern Time, on July 24, 2025. To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered to the Voting Agent in accordance with the instructions set forth on the applicable Ballot such that it is actually received by the Voting Agent before the Voting Deadline.

Copies, faxes, and e-mails will not be accepted or counted as votes. Each Ballot has been coded to reflect the Class of the Claim(s) or Interest(s) it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot(s) sent to you with this Disclosure Statement.

On January 5, 2025 (the "Petition Date"), the Debtors commenced cases under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") and is seeking confirmation of the Plan by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court [Docket No. 89].

A.    *Overview of Proposed Restructuring*

The Plan provides for a restructuring of the Debtors capital structure (the "Restructuring") that will eliminate all existing funded indebtedness other than the DIP Loans from its balance sheet. As a result, the Debtors will emerge from the Chapter 11 Cases (as the "Reorganized Debtors") a stronger company, with a sustainable capital structure that is better aligned with the Debtors' present and future operating prospects.

The Debtors commenced these Chapter 11 Cases following extensive discussions with certain of its key stakeholders. On January 5, 2025, the Company, and certain holders and lenders of approximately (i) 93.3% of Prepetition First Out Term Loans, (ii) 86.9% of Prepetition First Lien Notes, (iii) 99.5% of the Prepetition First Lien Senior Pari Term Loans, (iv) 96.9% of the Prepetition 1.5 Lien Facility, (v) 85.1% of Prepetition Second Lien Notes, (vi) 87.3% of Series A-0 Preferred Units, (vii) 9.7% of Series A-1 Preferred Units, (viii) 56.8% of Series A-2 Preferred Units, (ix) 68.6% of Series B Preferred Units, (x) 43.8% of Series C Preferred Units, and (xi) 35.4% of Series A Common Unites (collectively, the "Consenting Stakeholders") entered into an agreement (together with all exhibits, annexes and schedules thereto and as subsequently amended, the "Restructuring Support Agreement" or "RSA") whereby the Consenting Stakeholders have agreed, subject to the terms and conditions of the Restructuring Support Agreement, to (i) support the Restructuring and (ii) vote to accept the Plan pursuant to the Restructuring Support Agreement.

The Restructuring Support Agreement which was attached as Exhibit B to the First Day Declaration is incorporated herein by reference. In the event of any inconsistency between the terms of the Restructuring Support Agreement and the description of such terms in this Disclosure Statement, the terms of the Restructuring Support Agreement shall control.

Contemporaneously with the Restructuring, the Company shall effectuate a transaction (the "AST Transaction") with AST SpaceMobile, Inc. ("AST Parent") and its wholly owned subsidiaries AST & Science, LLC ("AST Sub") and Spectrum USA I, LLC (together with AST Parent and AST Sub, collectively "AST"). The AST Transaction involves, among other things, the Debtors providing to AST certain usage rights with respect to Debtors' L-band MSS spectrum and related assets in exchange for AST (i) contributing certain warrants, convertible notes and/or cash to the Debtors, (ii) making certain annual usage-right payments to the Debtors and (iii) paying the Debtors a certain percentage of revenues derived from AST's use of the L-band MSS spectrum and related assets. AST Sub is also a party to the Restructuring Support Agreement.

In accordance with the Restructuring Support Agreement, the outstanding indebtedness of, and equity interests in, the Company will be Restructured through the Plan and these Bankruptcy Cases consistent with the terms and conditions described in the Restructuring Term Sheet and the Restructuring Support Agreement. The Restructuring will be supported by the parties that are signatories to the Restructuring Support Agreement, including, the Consenting Stakeholders.

As a result of the Restructuring provided in the Plan:

- ***DIP Claims***.  Except to the extent any holder agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, DIP Claims (if any) shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange therefor, convert into loans under a first-lien multi-draw term loan exit facility;

- ***First Lien Claims***.  Except to the extent any holder agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed First Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed First Lien Claim, its Pro Rata share of the New Series A-1 Preferred Units;

- ***1.5 Lien Claims***.  Except to the extent any holder agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed 1.5 Lien Term Loan Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed 1.5 Lien Term Loan Claim, its Pro Rata share of the New Series A-2 Preferred Units;

- ***Second Lien Notes Claims***.  Except to the extent any holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Second Lien Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Second Lien Notes Claim, its Pro Rata share of the New Series A-3 Preferred Units;

- ***Existing Series A-0 Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series A-0 Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series A-0 Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series B-0 Preferred Units and shall remain outstanding in this form;

- ***Existing Series A-1 Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series A-1 Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series A-1 Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series B-1 Preferred Units and shall remain outstanding in this form;

- ***Existing Series A-2 Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series A-2 Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series A-2 Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series B-2 Preferred Units and shall remain outstanding in this form;

- ***Existing Series B Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series B Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series B Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series C Preferred Units and shall remain outstanding in this form;

- ***Existing Series C Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series C Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series C Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series D Preferred Units and shall remain outstanding in this form;

- ***Existing Series A Common Units***.  Except to the extent that a holder of an Allowed Existing Series A Common Unit agrees to less favorable treatment, all holders of Allowed Existing Series A Common Units shall, in full and final satisfaction of their Interests, retain its Existing Series A Common Unit;

- ***Existing Series B Common Units***.  Except to the extent that a holder of an Allowed Existing Series B Common Unit agrees to less favorable treatment, all holders of Allowed Existing Series B Common Units shall, in full and final satisfaction of their Interests, retain its Existing Series B Common Unit; and

- all other Allowed Claims, including all Allowed General Unsecured Claims and all Allowed Other Secured Claims, will be paid in full or otherwise rendered Unimpaired.

The Plan contemplates an Exit First Lien Facility to be governed by the Exit First Lien Facility Documents consisting of a cashless roll-up of the DIP New Money Loans and the Roll-Up Loans,  in an amount of approximately $2.7 billion (or an amount otherwise agreed to by the Debtors and the Required Ad Hoc Holders) based on the Outside Date.[3]

The Company, with the support of the Consenting Stakeholders, believes that consummation of the proposed Restructuring under the Plan will provide the Company with the capital structure and liquidity necessary to continue operating as a going concern—an outcome that benefits all of its stakeholders.  The Company currently is significantly overleveraged and facing severe liquidity constraints.  The proposed Restructuring addresses these problems through an equitization of all of the Company's prepetition funded debt obligations (except for debt that was repaid or rolled up through the DIP Facility).

In connection with developing the Plan, the Company conducted a careful review of its current business operations and compared its projected value as an ongoing business enterprise with its potential value in a liquidation scenario, as well as the estimated recoveries to holders of Allowed Claims and Interests thereunder.  The Company concluded that the potential recoveries to holders of Allowed Claims and Interests would be maximized by continuing to operate as a going concern.  The Company believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  **For additional information on estimated recoveries under the Plan as compared to estimated recoveries in liquidation, please refer to the discussion in Section VI.B.2 herein entitled, "Best Interests Test."**  Accordingly, the Company, with the support of the Consenting Stakeholders, strongly recommends that you vote to **__accept__** the Plan, if you are entitled to vote.

---

[3] "Outside Date" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

B.    *Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan*

The following table summarizes the classification and estimated recoveries to holders of Allowed Claims and Interests under the Plan. Although every reasonable effort was made to be accurate, the projections of recoveries are only estimates. The final amounts of Claims or Interests allowed by the Bankruptcy Court may vary from the estimates in this Disclosure Statement. As a result of the foregoing and other uncertainties inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries realized. In addition, the ability to receive distributions under the Plan depends upon, among other things, the ability of the Company to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. **For additional explanation regarding the terms of the Plan and treatment of Allowed Claims and Interests thereunder, please refer to the discussion in Section IV herein entitled, "Summary of Joint Chapter 11 Plan" as well as the Plan itself, attached hereto as <u>Exhibit A</u>.**

| Class | Claims / Interests | Allowance and Treatment of Claim/Interest | Status and Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim, if any, will, at the option of the Debtors or the Reorganized Debtors, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired<br><br>Deemed to Accept | 100% |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, (i) each such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such holder's Allowed Other Secured Claim will be reinstated, or (iii) such holder will receive such other treatment so as to | Unimpaired<br><br>Deemed to Accept | 100% |

| Class | Claims / Interests | Allowance and Treatment of Claim/Interest | Status and Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| | | render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | | |
| 3 | First Lien Claims | The First Lien Claims shall be Allowed (i) for the First Lien Term Loan Claims, in the aggregate principal amount of approximately $75,994,962 (including First Lien Loan PIK Interest), plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First Lien Credit Agreement or related documents on account of the First Lien Term Loan Claims as of the Effective Date (including amounts accrued through the Effective Date); and (ii) for the First Lien Notes Claims, in the aggregate principal amount of approximately $5,071,730,423 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First Lien Indenture or related documents on account of the First Lien Notes Claims as of the Effective Date (including amounts accrued through the Effective Date). <br><br> Except to the extent such holder agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed First Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed First Lien Claim, its Pro Rata share of the New Series A-1 Preferred Units. | Impaired <br><br> Entitled to Vote | $1,000 New Series A-1 Preferred Units w/ 1.25x liquidation preference per $1,000 in First Lien Claims |
| 4 | 1.5 Lien Claims | The 1.5 Lien Term Loan Claims shall be Allowed in the aggregate principal amount of approximately $591,504,126 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the 1.5 Lien Credit Agreement or related documents on account of the 1.5 Lien Term Loan Claims as of the Effective Date. | Impaired <br><br> Entitled to Vote | $1,000 New Series A-2 Preferred Units per $1,000 in First Lien Claims |

| Class | Claims / Interests | Allowance and Treatment of Claim/Interest | Status and Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| | | Except to the extent such holder agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed 1.5 Lien Term Loan Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed 1.5 Lien Term Loan Claim, its Pro Rata share of the New Series A-2 Preferred Units. | | |
| 5 | Second Lien Notes Claims | The Second Lien Notes Claims shall be Allowed in the aggregate principal amount of approximately $2,050,029,494 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the Second Lien Indenture or related documents on account of the Second Lien Notes Claims as of the Effective Date.<br><br>Except to the extent such holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Second Lien Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Second Lien Notes Claim, its Pro Rata share of the New Series A-3 Preferred Units. | Impaired<br><br>Entitled to Vote | $1,000 New Series A-3 Preferred Units per $1,000 in First Lien Claims |
| 6 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim and the Debtor entity against which such Allowed General Unsecured Claim is asserted agree to less favorable treatment for such holder, in full satisfaction of its Allowed General Unsecured Claim, the holder thereof shall receive payment in Cash in an amount equal to such Allowed General Unsecured Claim plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing thereunder, if any, (i) on the Effective Date (or as soon as reasonably practicable thereafter) to the extent such Claim is due and payable on the Effective Date or (ii) to the extent such Claim is not due and payable on the Effective Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such General Unsecured Claim. | Unimpaired<br><br>Deemed to Accept | 100% |

| Class | Claims / Interests | Allowance and Treatment of Claim/Interest | Status and Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| 7 | Intercompany Claims | On the Effective Date, all Allowed Intercompany Claims, if any, will be adjusted, reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors subject to the consent of the Required Consenting Creditors and in accordance with the Restructuring Transactions Memorandum. | Impaired / Unimpaired<br><br>Deemed to Reject / Deemed to Accept | 0% or 100% |
| 8 | Intercompany Interests | On the Effective Date, all Intercompany Interests, if any, will be adjusted, reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors subject to the consent of the Required Consenting Creditors and in accordance with the Restructuring Transactions Memorandum. | Impaired / Unimpaired<br><br>Deemed to Reject / Deemed to Accept | 0% or 100% |
| 9 | Existing Series A-0 Preferred Units | Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A-0 Preferred Units shall retain its Existing Series A-0 Preferred Units, as amended by the Second Amended and Restated Operating Agreement, in the form of the New Series B-0 Preferred Units. | Impaired<br><br>Entitled to Vote | 100% |
| 10 | Existing Series A-1 Preferred Units | Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A-1 Preferred Units shall retain its Existing Series A-1 Preferred Units, as amended by the Second Amended and Restated Operating Agreement, in the form of the New Series B-1 Preferred Units. | Impaired<br><br>Entitled to Vote | 100% |
| 11 | Existing Series A-2 Preferred Units | Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A-2 Preferred Units shall retain its Existing Series A-2 Preferred Units in the form of the New Series B-2 Preferred Units. | Unimpaired<br><br>Deemed to Accept | 100% |
| 12 | Existing Series B Preferred Units | Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series B Preferred Units shall retain its Existing Series B Preferred Units in the form of the New Series C Preferred Units. | Unimpaired<br><br>Deemed to Accept | 100% |

| Class | Claims / Interests | Allowance and Treatment of Claim/Interest | Status and Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| **13** | Existing Series C Preferred Units | Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series C Preferred Units shall retain its Existing Series C Preferred Units in the form of the New Series D Preferred Units. | Unimpaired<br><br>Deemed to Accept | 100% |
| **14** | Existing Series A Common Units | Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A Common Units shall retain its current Existing Series A Common Units. | Unimpaired<br><br>Deemed to Accept | 100% |
| **15** | Existing Series B Common Units | Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series B Common Units shall retain its Existing Series B Common Units. | Unimpaired<br><br>Deemed to Accept | 100% |

C.    *Plan Solicitation*

As indicated above, the Company intends to implement the Restructuring through these Chapter 11 Cases and confirmation of the Plan by the Bankruptcy Court.  The solicitation is being conducted at this time in order to obtain sufficient votes accepting the Plan to permit the Plan to be confirmed by the Bankruptcy Court.  **For further information and instructions on voting on the Plan, please refer to Section V herein entitled, "Voting Procedures and Requirements."**

1.    **Parties Entitled to Vote on Plan**

Under the Bankruptcy Code, only holders of Claims or Interests that are "<u>Impaired</u>" under the Plan are entitled to vote to accept or reject the Plan.  Holders of Claims or Interests that are not Impaired under the Plan (<u>i.e.</u>, "<u>Unimpaired</u>") are, in accordance with section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan, and the solicitation with respect to such holders is not required.  The Company is therefore soliciting votes only from holders of Impaired Claims or Interests (to the extent eligible to vote, as described below) and not from any holders of Unimpaired Claims or Interests.

Holders of Claims or Interests, as applicable, in Classes 3 (First Lien Claims), 4 (1.5 Lien Term Loan Claims), 5 (Second Lien Notes Claims), 9 (Existing Series A-0 Preferred Units), and 10 (Existing Series A-1 Preferred Units) are Impaired under the Plan; therefore, holders of such Claims and Interests are entitled to vote to accept or reject the Plan.

Holders of Claims or Interests, as applicable, in Classes 1 (Priority Non-Tax Claims), 2 (Other Secured Claims), 6 (General Unsecured Claims), Class 7 (Intercompany Claims), and Class 8 (Intercompany Interests), 11 (Existing Series A-2 Preferred Units), 12 (Existing Series B Preferred Units), 13 (Existing Series C Preferred Units), 14 (Existing Series A Common Units),

and 15 (Existing Series B Common Units) are Unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan.

2.    **Voting Procedures, Ballots, and Voting Deadline**

If you have received a Ballot and are entitled to vote on the Plan, you should read the materials supplied to you in the Solicitation Package in their entirety, including the instructions set forth in the Ballot(s).  These documents contain important information concerning how Claims and Interests are classified for voting purposes and how votes will be tabulated.  After carefully reviewing the Solicitation Package, please indicate your acceptance or rejection of the Plan on the Ballot by voting for or against the Plan.  The Company will not count any executed Ballot that (i) does not indicate either acceptance or rejection of the Plan or (ii) indicates both acceptance and rejection of the Plan.  The Ballots being sent to the Classes entitled to vote explicitly provide holders with the ability to opt-out of the third-party releases set forth in the Plan.

For your vote to be counted, your Ballot(s) must be **actually received** by the Voting Agent no later than the Voting Deadline.  Any Ballot received after the Voting Deadline will be counted only in the discretion of the Company.  To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered in accordance with the instructions set forth on the applicable Ballot, such that it is actually received before the Voting Deadline by the Voting Agent.  Copies, faxes, and e-mails will not be accepted or counted as votes.  Each Ballot has been coded to reflect the Class of the Claim(s) or Interest(s) it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot(s) sent to you with this Disclosure Statement and follow the instructions included on the applicable Ballot.  Do not return any debt instruments or equity securities with your Ballot(s).

If you have any questions about the procedure for voting your Claim(s) or Interest(s), the packet of materials that you have received, or the amount of your Claim(s) or Interest(s), or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its exhibits, please contact the Voting Agent, by e-mail at ligadoinquiries@omniagnt.com or by phone at (866) 956-2139 (US Toll-Free) or (747) 288-6375 (International).

D.    *Anticipated Timetable*

The Company anticipates scheduling a hearing (the "Confirmation Hearing") to consider confirmation of the Plan.  The Company expects that notice of the Confirmation Hearing will be published in the *New York Times* and *USA Today*, and will be mailed to all known holders of Claims and Interests as soon as practicable after entry of an order approving the Disclosure Statement, but in no event more than five (5) business days thereafter.  **For additional information regarding the Confirmation Hearing, please refer to Section VI.A herein, entitled "Confirmation Hearing."**

To the extent the Plan is confirmed within the expected timeframe, the Company currently intends to consummate the Plan as soon as practicable thereafter.  **For additional information regarding the Chapter 11 Cases, please refer to Section III herein, entitled "Material Developments and Anticipated Developments of the Chapter 11 cases."**

## SECTION II.
## HISTORICAL INFORMATION

The Debtors are a mobile communications company that operates a satellite network in North America that has been providing mobile satellite services ("MSS")[4] to government and commercial customers for over 25 years. In the near term, Ligado is planning to evolve its satellite services to easily integrate with terrestrial networks and to communicate directly to standard mobile devices. In addition, Ligado has the authority to develop terrestrial-based solutions for both Fifth Generation ("5G") public and private networks using its coordinated licensed and leased spectrum[5] in the "L-Band," located in the highly attractive one- to two-gigahertz ("GHz") spectrum category, known as the lower mid-band. Ligado is licensed as an MSS operator in the L-Band in the U.S. and Canadian parts of ITU Region 2. Ligado has fully coordinated its satellite system with all other North American Region 2 L-band operators and maintains access to over 40-megahertz ("MHz") of MSS spectrum in the United States and Canada.

The Debtors spent years working to develop and obtain approval from the United States Federal Communications Commission ("FCC") to operate an ancillary terrestrial component ("ATC")[6] to their MSS licenses and have invested billions of dollars in connection therewith. In April 2020, the commissioners for the FCC issued a unanimous and bipartisan order granting the Debtors an exclusive nationwide ATC authorization for 30 MHz of their MSS licensed L-Band spectrum. The Debtors also have access to five MHz of spectrum at 1670-1675 MHz.[7] In total, the Debtors have access to 35 MHz of terrestrial spectrum in the United States.

Despite the FCC's approval of the Debtors' L-Band spectrum plan, the Debtors' efforts to develop nationwide terrestrial wireless services to complement their existing satellite infrastructure have been thwarted by the actions of the United States government, acting through the Department of Defense ("DOD"), the Department of Commerce ("DOC"), the National

---

[4] "Mobile Satellite Service" or "MSS" is:
A radiocommunication service:
– between mobile earth stations and one or more space stations, or between space stations used by this service; or
– between mobile earth stations by means of one or more space stations.
Int'l Telecomm. Union [ITU], Radio Regulations: Articles, art. 1.25 (2016) (emphasis removed).

[5] "Spectrum" refers to the radio spectrum, which is the part of the electromagnetic spectrum with frequencies from 30 hertz to 300 GHz, and whose radio waves are widely used in modern technology, particularly in telecommunication.

[6] An "ancillary terrestrial component" or "ATC" system consists of terrestrial base stations and mobile terminals licensed to the operator of an MSS system, which allows an MSS licensee to integrate terrestrial capabilities into its MSS networks for purposes of filling in gaps in its MSS coverage area, particularly in urban areas and inside buildings.

[7] From July 2007 to the present, the Debtors, through their wholly owned subsidiary One Dot Six LLC, have leased five MHz of spectrum in the 1670-1675 MHz spectrum band through agreements with Crown Castle MM Holding LLC and OP LLC, the entity which holds the underlying United States nationwide spectrum license.

Telecommunications and Information Administration ("NTIA")—an agency within DOC[8]—and the United States Congress (collectively, the "U.S. Government").

These governmental actors have unlawfully prevented the Debtors from using or otherwise operating within the portion of spectrum that the FCC exclusively licensed to the Debtors for terrestrial communications services. Indeed, DOD has gone further: it has taken the Debtors' spectrum for the agency's *own* use, operating previously undisclosed systems that use or depend on the Debtors' allocated spectrum without compensating the Debtors. To facilitate and cover up its previously undisclosed use of the Debtors' property and prevent the Debtors from using their spectrum and FCC license for terrestrial services, DOD (with DOC's assistance) made unfounded claims—to the FCC, Congress, the White House, other federal agencies, and the public—about the effects of the Debtors' proposed 5G terrestrial services. Because of this, and as further described below, the Debtors commenced a lawsuit on October 12, 2023 against the United States of America, DOD, DOC, and NTIA in the United States Court of Federal Claims seeking, among other things, compensation for the U.S. Government's physical, categorical, regulatory, and legislative takings—which, as of the date of this filing, have deprived the Debtors of tens of billions of dollars in lost revenues.[9] On November 18, 2024, the Court of Federal Claims denied the U.S. Government's motion to dismiss in substantial part, ruling that Ligado has alleged a physical, regulatory, categorical, but not a legislative taking. The Court of Federal Claims found that a property interest does exist in Ligado's FCC license vis-à-vis the Department of Defense but not vis-à-vis the FCC.

On January 16, 2025, the Government filed a motion seeking certification of an interlocutory appeal of the Court's order denying the Government's Motion to Dismiss and a stay of all discovery pending resolution of the government's request for interlocutory appeal and, if granted, the Federal Circuit's decision on that appeal. Ligado filed an opposition to the Government's motion on January 30, 2025. The Government's reply to Ligado's opposition was filed on February 12, 2025. On February 28, 2025, the Court issued an order (1) granting the U.S. Government's motion to certify its November Opinion and Order for interlocutory appeal, and (2) staying the case pending this appeal to Federal Circuit Court of Appeals. In granting the motion, the Court found that the November Opinion and Order "involves a controlling question of law with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." The Government applied to the Federal Circuit for leave to appeal on March 10, 2025[10] and the Company filed its opposition and conditional cross petition on March 20, 2025.[11] The Government filed an answer to the Company's opposition and conditional cross petition on March 27, 2025.

---

[8]     Unless stated otherwise, references to DOC include NTIA.

[9]     *See* Complaint, *Ligado Networks LLC v. United States*, No. 23-1797-L (Fed. Cl. Oct. 12, 2023).

[10]    *See Petition for Permission to Appeal an Interlocutory Order of the Court of Federal Claims Dated November 18, 2024, in Case No. 23-CV-1797, Pursuant to 28 U.S.C. § 1292(D)*, No. 25-120 (Fed. Cir. Mar. 11, 2025).

[11]    *See Ligado Networks LLC's Opposition to Petition for Leave to Appeal and Conditional Cross-Petition for Leave to Appeal Pursuant to 28 U.S.C. § 1292(D)*, No. 25-120 (Fed. Cir. Mar. 20, 2025).

On May 20, 2025, the Federal Circuit Court of Appeals granted the Government's petition to appeal and denied the Company's cross-petition.

The actions of the U.S. Government have prevented the Debtors' full use of their L-Band license, costing the Debtors significant time and billions of dollars in sunk costs and lost profits. Further, these actions continue to harm the Debtors' future revenue potential by creating substantial uncertainties and pressure on the Debtors' business model and prospects to timely implement their business plans and, ultimately, the value of the Debtors' L-Band spectrum. As a result, the Debtors do not yet generate adequate cash flows from operations to fund their operating expenses and capital expenditures.

Separately, the Debtors' capital structure is premised on a business that is entitled to the full benefits of the Cooperation Agreement with Inmarsat (each, as defined below) whereby Inmarsat and Ligado (together with its predecessor entities) agreed to cooperatively coordinate their licensed spectrum in the L-band into contiguous spectrum blocks within the spectrum and at the power levels agreed upon by the parties and set forth in the Cooperation Agreement. The Debtors are obligated to pay Inmarsat under the Cooperation Agreement for these coordinated spectrum rights. Over the course of the year prior to these Chapter 11 Cases, the Debtors engaged in extensive discussions with Viasat (which, as described below, acquired Inmarsat in 2023) and Inmarsat around a comprehensive resolution of the Cooperation Agreement to restructure the Debtors' significant payment obligations thereunder. Viasat, however, raised a purported tax issue while the parties were working to finalize the contours of a commercial agreement, which suddenly upended the entire framework the parties had been discussing.

After the breakdown in negotiations on account of the purported tax issue, Viasat expressed to the Debtors that it was focused on receiving payments under the Cooperation Agreement. Accordingly—as Viasat is aware—the Debtors then engaged in conversations with third parties regarding alternative options. In some instances, the conversations were among Viasat, interested third parties, and the Debtors; in other instances, the conversations were held directly between Viasat and interested third parties. Based on the feedback from these conversations, the Debtors discussed potential transactions with Viasat that could have led to a commercial resolution of Viasat's stated objective. Viasat rejected such alternative options and revealed that its true intent is to access the Debtors' spectrum in order to implement Viasat's commercial goals. In other words, without the Debtors' spectrum, Viasat cannot execute on its business plan.

Despite the Debtors' good faith efforts to negotiate with Viasat to resolve the ongoing issues regarding the Cooperation Agreement and work together to seek a commercial arrangement with a third-party to better monetize the value of the parties' contiguous spectrum blocks, it became clear in the weeks leading up to the commencement of these Chapter 11 Cases that, in reality, Viasat was not interested in reaching a workable commercial resolution with the Debtors.

Notwithstanding Viasat's refusal to work constructively towards a commercial resolution, the Debtors and their key stakeholders were able to successfully negotiate (i) a restructuring transaction to recapitalize the Debtors' balance sheet and (ii) a binding term sheet with AST setting forth the terms of a long-term commercial transaction between the Debtors and AST, which culminated in the signing of the Restructuring Support Agreement on January 5, 2025.

The RSA contemplates a restructuring of the Debtors through (i) a prearranged chapter 11 plan and recognition proceedings pursuant to Canada's Part IV of the Companies' Creditors Arrangement Act, (ii) the DIP Facility to provide the Debtors with the liquidity necessary to fund the Chapter 11 Cases, (iii) the equitization of all of the Debtors' prepetition funded indebtedness (except for debt that is repaid or rolled up through the DIP Facility), (iv) the retention of preferred and common equity interests and relative priority amongst current equity holders, (v) entry into the AST Transaction, and (vi) the conversion of the DIP Facility into an exit facility upon the effective date of an acceptable plan pursuant to the DIP facility.

The AST Transaction involves, among other things, the provision by the Debtors to AST of certain usage rights with respect to Debtors' L-band MSS spectrum and related assets  in exchange for AST (i) contributing certain warrants, convertible notes and/or cash to the Debtors, (ii) making certain annual usage-right payments to the Debtors and (iii) paying the Debtors a certain percentage of revenues derived from AST's use of the L-band MSS spectrum and related assets.  As set forth herein, since the commencing these Chapter 11 Cases, the Debtors and AST have negotiated with respect to the terms of the AST Definitive Agreements and on March 22, 2025, the Debtors filed *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into the AST Definitive Documents and (II) Granting Related Relief* [Docket No. 352] (the "AST Approval Motion") under seal.  A redacted version of the AST Approval Motion was filed on March 26, 2025 [Docket No. 359].

The Debtors and the Consenting Stakeholders believe that the AST Transaction, together with the recapitalization provided for in the RSA, represents a value maximizing transaction that benefits all stakeholders.   Consenting stakeholders who executed the RSA prior to the commencement of these Chapter 11 Cases included:

| Obligation | % of Support for RSA |
|---|---|
| ***Funded Debt Obligations*** | |
| Prepetition First Out Term Loans | 93.3% |
| Prepetition First Lien Notes | 86.9% |
| Prepetition First Lien Senior Pari Term Loans | 99.5% |
| Prepetition 1.5 Lien Facility | 96.9% |
| Prepetition Second Lien Notes | 85.1% |
| ***Preferred Equity*** | |
| Series A-0 Preferred Units | 87.3% |
| Series A-1 Preferred Units | 9.7% |
| Series A-2 Preferred Units | 56.8% |
| Series B Preferred Units | 68.6% |
| Series C Preferred Units | 43.8% |
| ***Common Equity*** | |

| Obligation | % of Support for RSA |
|---|---|
| Series A Common Units | 35.4% |
| Series B Common Units | -% |

The Debtors filed these Chapter 11 Cases to take advantage of the breathing spell afforded by chapter 11 to (i) pursue their lawsuit against the U.S. Government to obtain just compensation for the taking of the spectrum that the FCC granted exclusively to them for terrestrial use, (ii) vigorously prosecute their rights against Inmarsat, (iii) continue their efforts to develop the technology and commercial ecosystem necessary to fully deploy their spectrum assets, and (iv) execute definitive documentation for and consummate the AST Transaction.

A.    *Overview of the Debtors' Business*

The Debtors currently support a range of MSS products and services in the United States, Canada, and Mexico on their MSS network. The Debtors are developing technical and commercial plans to enhance their current MSS network. They also have been planning to deploy 35 MHz of their coordinated licensed and leased spectrum in the L-Band[12] for new and innovative communication services. To support this, the Debtors are developing a technology ecosystem for their MSS spectrum and their coordinated licensed and leased spectrum for communication services. Direct-to-device satellite communications and terrestrial 5G private networks using the 1670-1675 MHz band are among the solutions that are being developed by the Debtors to serve the mobile consumer market and the enterprise sector. However, as discussed herein, the U.S. Government has prevented the Debtors from deploying terrestrial communications services in 30 MHz of this spectrum as set forth in the Debtors' lawsuit against the U.S. Government.

The Debtors believe that their access to spectrum for terrestrial wireless use, in addition to their satellite capabilities, support new 5G market opportunities. The Debtors have done what they could, but for the actions of the U.S. Government, to prepare to deploy their terrestrial services in their exclusively licensed spectrum, including making significant investments to develop 4G and 5G products to enable deployment of the L-Band. For instance, in reliance on the FCC Order, the Debtors engaged in a twelve-month successful project in the Third Generation Partnership Project ("3GPP"), the wireless industry's global standard-setting body, to standardize the L-Band and thereby enable infrastructure vendors to develop 4G and 5G products compatible with the Debtors' lower mid-band spectrum. Throughout 2021 and 2022, the Debtors took significant steps to invest in the L-Band ecosystem and develop the technology necessary to integrate their potential 4G and 5G services into consumer and industrial telecommunications products. Since the entry of the FCC Order, the Debtors have invested substantial time, energy, and capital into creating base stations and mobile chipsets compatible with their authorized spectrum and positioning themselves to serve critical spectrum infrastructure needs.

This successful preparatory work had been conducted with the goal of advancing the value and potential of the Debtors' FCC-authorized terrestrial spectrum and services to play a

---

[12]    This 35 MHz is inclusive of the 5 MHz of spectrum licensed for terrestrial use in the 1670-1675 MHz spectrum band that the Debtors lease pursuant to the One Dot Six Lease.

meaningful role in accelerating 5G in the United States.  But all of this preparatory work and economic investment has been lost and will continue to go to waste so long as the DOD and DOC continue to prevent the Debtors' use of their authorized spectrum.

      1.     **The Debtors' Spectrum Assets, Licenses, and Related Agreements**

The Debtors hold licenses from the FCC and Innovation, Science & Economic Development Canada ("ISED") to operate mobile satellites using lower mid-band spectrum that support MSS throughout North America, as well as an authorization from the FCC for ATC operations within the United States.  More specifically, the Debtors are authorized to provide MSS in the 1525-1559 MHz and 1626.5-1660.5 MHz portions of the L-Band, with the lower band (1525-1559 MHz) allocated for downlink transmissions (from MSS satellites to mobile earth stations) and the upper band (1626.5-1660.5 MHz) allocated for uplink transmissions (from mobile earth stations to MSS satellites).  With the issuance of the FCC Order, the Debtors have an ATC authorization for the following sub-bands:  1526-1536 MHz (Lower Downlink); 1627.5-1637.5 MHz (Lower Uplink); and 1646.5-1656.5 MHz (Upper Uplink).  In addition, the Debtors have access to 5 MHz of spectrum licensed for terrestrial use in the 1670-1675 MHz spectrum band pursuant to the One Dot Six Lease (as defined below).  Set forth below is a visual depiction of the Debtors' spectrum authorized by the FCC and through coordination for MSS and terrestrial use.



The Debtors' spectrum holdings are subject to the following additional licenses and authorizations granted by the FCC or ISED to Ligado Networks Subsidiary LLC or Ligado Networks (Canada) Inc., respectively, each a wholly owned direct or indirect subsidiary of Ligado:

-    a license to operate SkyTerra-1, a second-generation L-Band MSS satellite, which operates at the 101.3 West Longitude orbital position;

-    licenses to launch and operate SkyTerra-2, a second-generation L-Band MSS satellite which will be operational at the 107.5 West Longitude orbital position,

which have an ISED launch milestone of March 31, 2029, and an International Telecommunications Union[13] "Bring Into Use" ("BIU") date of March 28, 2030;

- an ITU filing for a satellite at 106.5 West Longitude to be BIU prior to February 19, 2031; and

- multiple spectrum licenses and authorizations to make use of the 12.75-13.25 GHz (Uplink) and 10.7-10.95, 11.2-11.45 GHz (Downlink) Ku-band FSS spectrum for feeder links in the provision of MSS in Canada and the United States via the SkyTerra-1 and SkyTerra-2 satellites.

### a. Multilateral Spectrum Coordination.

The Debtors' use of their licensed L-Band spectrum is subject to United States and Canadian treaty commitments to the ITU and the terms of multilateral and bilateral coordination agreements entered into pursuant to the ITU Radio Regulations. Five national administrations (i.e., the United States, Canada, the United Kingdom, Russia, and Mexico) are party to the Memorandum of Understanding for Intersystem Coordination of Certain Geostationary Mobile Satellite Systems Operating in the Bands 1525-1544/1545-1559 MHz and 1626.5-1645.5/1646.5-1660.5 MHz, agreed to in Mexico City (the "Mexico City MoU"), a coordination framework agreement developed in 1996 for satellites that were operational or soon-to-be-launched, providing for their shared use of MSS L-Band in ITU Region 2, which covers North America pursuant to the ITU Radio Regulations. The Mexico City MoU established terms for coexistence among the administrations by providing for annual assignments of spectrum to each of their operators for specified beams based on coordination and demonstrated need.

### b. 5 MHz One Dot Six Lease.

From July 2007 to the present, the Debtors, through their wholly owned subsidiary One Dot Six LLC, have leased 5 MHz of spectrum in the 1670-1675 MHz spectrum band through agreements with Crown Castle MM Holding LLC and OP LLC, the entity which holds the underlying U.S. nationwide spectrum license (such agreements collectively, the "One Dot Six Lease"). In December 2022, the One Dot Six Lease was amended to provide the Debtors the option to purchase the spectrum license from OP LLC on January 1, 2025 for a purchase price of $196.1 million and thereafter every two years at an increased purchase price based on an agreed upon CPI inflation formula.

The FCC granted a ten-year license renewal for the 1670-1675 MHz spectrum in April 2024 for an additional term through October 1, 2033. The One Dot Six Lease is effective through October 1, 2033, and subject to FCC approvals and grants, will be renewed for a further term through December 31, 2034. The December 2022 amendment harmonized the balance of payments due under the initial term, and the Debtors paid $3.6 million upon executing the amendment, an additional $3.6 million on December 31, 2022, and made a final payment of $7.2

---

[13]   The International Telecommunication Union ("ITU") is the United Nations specialized agency for information and communication technologies that allocates global radio spectrum and satellite orbits and develops the technical standards to ensure networks and technologies seamlessly interconnect.

million on April 1, 2023, for the balance of the initial term. In October 2023, the Debtors paid an additional $3.6 million for the remainder of 2023. Then, beginning in 2024, the Debtors began making annual payments of $14.9 million, subject to a 4% increase each year of the renewal term, in two equal installments on January 1 and July 1. The Debtors will also continue to incur additional operating and maintenance costs associated with the operation of a DVB-H (Digital Video Broadcasting-Handheld) network in this spectrum band.

### c.      Inmarsat Cooperation Agreement.

In 2007, the Debtors and Inmarsat Global Limited ("Inmarsat"), which was acquired by Viasat Inc. ("Viasat") on May 30, 2023, entered into a cooperation agreement, and they entered into an Amended and Restated Cooperation Agreement on August 6, 2010 (as further amended and restated from time to time, the "Cooperation Agreement"). The Cooperation Agreement has been amended numerous times and addresses a number of regulatory, technological, and spectrum coordination matters involving L-band spectrum and its use over North America. The purpose of the Cooperation Agreement was to coordinate the MSS L-Band spectrum to provide the Debtors with sufficient contiguous spectrum blocks free from interference to help the Debtors' obtain the ability to provide mobile services to the North American market consisting of an MSS network and a terrestrial wireless service (i.e., an ATC).[14] To that end, the agreement involves Inmarsat moving its operations and reallocating its customers' use from identified portions of its coordinated spectrum in the MSS L-Band and upgrading some of its equipment so that the spectrum could be delivered to the Debtors without the possibility of interference to or from Inmarsat's customers' satellite terminals. The term of the Cooperation Agreement runs until December 31, 2107, and the agreement requires the Debtors to pay Inmarsat substantial sums for this spectrum over a period of 99 years.[15] As of the Petition Date, the Debtors have paid Inmarsat over $1.7 billion.

In return, Inmarsat is required to facilitate the necessary FCC license authorization. The parties understood that FCC approval of the Debtors' license application was critical to achieving the purpose of the Cooperation Agreement, and both parties pledged to use their best commercial efforts to support approval from the relevant regulatory authorities, including the FCC specifically, and to remedy the situation in the event of any indication of objection or disapproval.

In addition, Inmarsat is required to implement the so-called "Spectrum Plans" contemplated in the Cooperation Agreement to create sufficient contiguous spectrum blocks and use its best commercial efforts to ensure that Ligado received the full anticipated benefit of the spectrum, including in or near airports and waterways. Inmarsat has taken steps to create the contiguous spectrum blocks, but it has failed to perform other obligations. Specifically, in addition to creating contiguous spectrum blocks the Cooperation Agreement requires Inmarsat to address interference that might arise in the particular use case of Inmarsat satellite terminals operating on Inmarsat's system on airplanes and water vessels and the Debtors' planned ATC services.

---

[14]      Historically, Inmarsat and the Debtors' predecessors in interest each held the rights to thin slivers of MSS L-Band spectrum. Inmarsat used that spectrum to provide MSS, including aeronautical and maritime communications and navigation services. The Debtors used that spectrum to provide MSS to government and commercial customers for emergency response, remote monitoring, and numerous other mission-critical applications.

[15]      Approximately 83 years remain under the current term of the Cooperation Agreement.

Inmarsat's resolution of these terminal interference issues was contractually bargained and paid for by the Debtors. Specifically, aviation and maritime customers of Inmarsat use systems provided by Inmarsat for communications and operate near to the spectrum the Cooperation Agreement specifies is for the Debtors' use for their terrestrial communication and MSS services. The potential for interference between Inmarsat's customers' terminals in or near airports and waterways and the Debtors' communication services in the vicinity of same should have been remedied by Inmarsat through replacement of the Inmarsat terminals or through modification (with the use of filters or otherwise) of the Inmarsat terminals. This is known as "terminal resilience." Achieving this terminal resilience so that Ligado could operate anywhere in the country (including in or near airports and waterways) was a material obligation of Inmarsat to provide the Debtors under the Cooperation Agreement.

To address the terminal resilience issues in those specific geographic areas, Inmarsat and the Debtors agreed on the need to develop a plan to replace or modify those terminals. Because those terminals were Inmarsat terminals provided to Inmarsat customers to enable them to receive signals over the Inmarsat system, the parties' understanding, as reflected in the Cooperation Agreement and the parties' course of conduct, was that Inmarsat would be responsible for ensuring the design, development, approval, manufacture, distribution, and installation of the equipment needed to achieve terminal resilience, *and* all costs in connection with that transition. Inmarsat was also responsible for implementing that plan through modifications in all contracts and relationships with its customers. These terms were agreed to by the parties and are clearly set out in technical exhibits to the Cooperation Agreement.

To resolve the terminal interference issues, the Cooperation Agreement requires that "appropriate modifications" be made to "***all*** terminals operating on the Inmarsat system" that might receive or cause interference, or that Inmarsat, in its discretion, could otherwise address such interference by discontinuance or replacement of any affected service or terminal.[16] In part to offset the costs of that transition, the Debtors paid Inmarsat a $250.0 million transition payment. To date, Inmarsat has still not completed the required work to effect the required terminal resilience as required under the Cooperation Agreement.

Over the years, the Cooperation Agreement has been amended twenty-one times to address issues relating to plans for the delivery of spectrum and payments due thereunder, to alter certain transition options and notifications relating to them, to delay and defer payments during the Debtors' prior bankruptcy, to meet coordination obligations with the other North American L-Band operator, Telecomunicaciones de Mexico, to allow for a large prepayment of the future annual payment obligations, and to reduce the amount of the overall payment obligations going forward. In the wake of the FCC's April 2020 Order authorizing ATC deployment and in connection with the recapitalization, in 2020, the Debtors made a lump sum payment of $700.0 million to Inmarsat in two installments of approximately $35.5 million on October 13, 2020, and $664.5 million on October 23, 2020 (collectively, the "Inmarsat 2020 Prepayment"), which prepaid 60% of all future payment obligations. The Debtors have the right until October 15, 2025, to exercise a further call option to prepay the remainder of the payment obligations on certain terms and conditions described in the Cooperation Agreement.

---

[16]     Cooperation Agreement § 3.2(g).

On December 20, 2022, the Debtors and Inmarsat amended the Cooperation Agreement ("Amendment No. 7") to extend a portion of the approximately $395.8 million payment to Inmarsat under the Cooperation Agreement (the "Inmarsat 2023 Payment") that was coming due in January 2023. Under this amendment, the Debtors paid $30.0 million on December 28, 2022, with proceeds from the Prepetition First Lien Loan Facility (as defined below), and agreed to pay the remaining balance on April 6, 2023, after the expiration of the grace period, with interest. As part of that amendment, Inmarsat agreed to dismiss its complaint alleging an anticipatory breach of the Inmarsat 2023 Payment, which was filed on December 15, 2022, in the Supreme Court of the State of New York, County of New York, against Ligado and its affiliate, Ligado Networks (Canada) Inc. The complaint was dismissed without prejudice on December 29, 2022.

The Debtors and Inmarsat further amended the Cooperation Agreement five more times in 2023 and nine more times in 2024 to, among other things, delay payment of additional amounts owed by the Debtors to Inmarsat thereunder. As part of the twenty-first and latest amendment to the Cooperation Agreement, Inmarsat agreed to defer payment until January 13, 2025 (after the applicable grace period) of (i) a $16.7 million quarterly payment originally due in March 2023, (ii) a $393.2 million payment originally due on July 1, 2023, (iii) $16.9 million quarterly payment originally due in June 2023, (iv) a $16.5 million quarterly payment due in September 2023, (v) a $16.2 million payment due in December 2023, (vi) a $15.9 million payment due in March 2024, (vii) a $16 million payment due in June 2024, and (viii) a $15.7 million payment due in September 2024.

In March 2016, the Debtors provided Inmarsat with the "Additional Phase 2 Recommencement Notice" electing delivery of 30 MHz of spectrum under the terms of the Cooperation Agreement. Through the amendments following that election, Inmarsat and the Debtors agreed to a spectrum transition plan that would require delivery of all spectrum to complete the 30 MHz plan by December 31, 2021. Inmarsat has represented that it has delivered the spectrum required to give effect to the 30 MHz plan. The Debtors disagree that such delivery conforms to all of the terms of the Cooperation Agreement.

As further described below, the Debtors submit that Inmarsat has materially breached its obligations under the Cooperation Agreement by failing to resolve the terminal interference issues around airports and waterways and addressing concerns raised to the FCC by Inmarsat's own customers about those terminal interference issues. These failures directly contributed to, among other things, a prolonged regulatory approval process with respect to the Debtors' license modification applications and thereby forced the Debtors to spend significant time and resources during such process.

### d.  Boeing Agreement.

On January 9, 2006, the Debtors entered into an agreement with Boeing Satellite Systems International, Inc. ("Boeing") for the construction of the Debtors' next-generation space-based network ("SBN"), which was amended and restated on November 10, 2010, and subsequently amended by multiple contract changes (the "Boeing Agreement"). The Boeing Agreement provides for the design, delivery, and testing of the Debtors' two SBNs, initial operational performance support, launch mission and launch support services, and related warranty and support. The agreement also provides for option pricing for additional satellites, extended

warranties, and for a portion of the satellite price to be payable as an in-orbit performance incentive ("OPI").  The Boeing Agreement also provides for payment of liquidated damages earnbacks ("LDE") to Boeing to the extent earned.

The initial term of the Boeing Agreement is from January 9, 2006, through twenty years following the Debtors' acceptance of the last SBN to be delivered, unless otherwise terminated. Boeing may terminate this agreement upon written notice to the Debtors for their failure to cure payment defaults.

The Debtors' SkyTerra-1 satellite was launched on November 14, 2010, and successfully completed in-orbit testing in February 2011.  Boeing has completed construction of the Debtors' SkyTerra-2 satellite, which was placed into on-ground storage in 2011.  Under the Boeing Agreement, Boeing was entitled to payment of all outstanding milestone payments, OPI amounts, and LDE amounts, less all work yet to be completed, after the SkyTerra-2 satellite was in storage for a period of three years.  In connection with the resolution of certain outstanding contractual issues, the Debtors agreed to make a payment to Boeing for outstanding amounts of $42.6 million during August 2016, with additional payments aggregating approximately $6.0 million over the next three years, of which $1.0 million was paid during 2017, $2.0 million was paid during 2018, and $3.0 million was paid during 2019.  The Debtors do not owe any additional payments of OPI or LDE amounts for the SkyTerra-2 satellite.  The Debtors and Boeing continue to work toward reaching an agreement on a refurbishment contract for the SkyTerra-2 satellite.  The Debtors always intended to refurbish the SkyTerra-2 satellite and, over the years, have attempted to negotiate a contract.  However, Boeing and its subcontractor have failed to honor their contractual obligations with respect to this refurbishment effort.  In addition, the Debtors face challenges with certain suppliers on the SkyTerra-2 program and within the satellite industry at large, including recent satellite failures experienced by other operators, supply chain constraints related to increased demand, and delays in reconditioning or replacing of aged-out parts.  These contractual issues and wider trends have resulted in an increase in the time Boeing has estimated to refurbish the SkyTerra-2 satellite and higher than expected costs.

In May 2024, the Debtors initiated the dispute resolution process under the Boeing Agreement to resolve these contractual disputes related to the refurbishment and storage of the SkyTerra-2 satellite.  Boeing responded by initiating a dispute related to its assertion that it has continued to earn payments for OPIs and LDEs for the SkyTerra-1 satellite following an anomaly that occurred in April 2023.  Due to the degradation in performance of the SkyTerra-1 satellite following the anomaly, the Debtors filed an insurance claim and Boeing no longer satisfies the performance metrics set forth in the Boeing Agreement despite its assertions to the contrary.  The Debtors continued to engage proactively with Boeing to reach a resolution that addresses the SkyTerra-1 satellite and SkyTerra-2 satellite disputes.  Post-petition developments on these disputes are described below in Section III.  The terms for the storage of SkyTerra-2 has been extended through September 30, 2025.  If the Debtors do not reach an agreement with Boeing on the refurbishment program or terms for additional storage, the Debtors must (i) take title to the SkyTerra-2 satellite and find suitable storage for the satellite or (ii) receive injunctive relief preventing Boeing from disposing of the satellite, in each case, after Boeing provides 30 days' notice to the Debtors of its intention to dispose of the SkyTerra-2 satellite.  Ligado has not been able to find a suitable facility to store the satellite going forward.  If Boeing provides notice of its intent to dispose of the SkyTerra-2 satellite, the Debtors will pursue all remedies to maintain the

satellite at the Boeing storage facility until the parties' dispute concerning the refurbishment of the SkyTerra-2 satellite is resolved.

2.    **Existing Mobile Satellite Business**

The Debtors operate a highly sophisticated geostationary satellite network that provides fixed and mobile communications in North America. In the United States, the Debtors operate SkyTerra-1. In Canada, the Debtors are authorized to provide service using the SkyTerra-1 satellite. As described above, the Debtors are authorized in principle by ISED to operate the SkyTerra-2 satellite, which is constructed and stored in preparation for launch into a Canadian orbital location.

The Debtors' satellites (SkyTerra-1 and SkyTerra-2) are two of the most powerful mobile satellites ever constructed. Each is equipped with a 22-meter diameter antenna, which is capable of ten times better performance than that provided by the Debtors' prior satellites. The satellites have the capability of forming up to 1,500 beams over North America and can operate with devices that are as small as standard IoT devices, mobile hotspots, and consumer smartphones. The SkyTerra-1 and SkyTerra-2 satellite systems utilize state-of-the-art ground-based beam forming, which allows flexibility in altering beam shapes, number of beams, bandwidth allocation, and power allocation, all occurring from the ground. This capability is unprecedented in prior mobile satellite systems where beams were pre-formed onboard the spacecraft prior to launch and incapable of change once in orbit. Below is a visual depiction of the coverage capability of the Debtors' satellite system.



The Debtors' customers in government and industry include end users (among others) in the public safety, utilities, and transportation segments who use the Debtors' current satellite network for emergency response, remote monitoring, asset tracking, and numerous other mission-critical applications.  An important component of the Debtors' current satellite business is the Mobile Satellite Communications Push-to-Talk and Telephony Voice service, which provides access to national and regional "SMART<sup>tm</sup> Talk Groups."  Such talk groups enable critical interoperable communications among officials from homeland security, law enforcement, emergency response, and public safety from various departments and agencies in the United States.

In 2022, 3GPP designated the L-band as one of only two bands included for standardization as part of the first 3GPP Release 17 for Non-Terrestrial Networks ("NTN").  With the emergence of these standards for satellite networks in the L-band, and an in-orbit satellite network that can readily support the next generation of consumer devices, Ligado is developing technology and partnerships that will serve the growing demand for Direct-to-Device satellite connectivity.

B.    *Corporate and Capital Structure*

1.    **The Debtors' Corporate Structure**

Ligado owns, directly or indirectly, ten domestic and foreign subsidiaries in two jurisdictions in the United States (Delaware and Virginia) and two jurisdictions in Canada (Ontario and Nova Scotia).  Ligado and all of its U.S. and Canadian subsidiaries are the Debtors in these Chapter 11 Cases.  A corporate organization chart is attached hereto as **Exhibit B**.

2.    **The Debtors' Capital Structure**

Set forth below is a summary of the Debtors' capital structure as of the Petition Date.

| Obligation | Maturity / Redemption | Approximate Principal Amount Outstanding / Liquidation Preference |
|---|---|---|
| *Funded Debt Obligations*[17] | | |
| Prepetition First Out Term Loans | November 1, 2023[18] | $319.5 |
| Prepetition First Lien Notes | November 1, 2023 | $5,491.8 |
| Prepetition First Lien Senior Pari Term Loans | November 1, 2023 | $122.3 |
| Prepetition 1.5 Lien Facility | February 2, 2024 | $591.5 |
| Prepetition Second Lien Notes | May 1, 2024 | $2,050.0 |
| *Preferred Equity* | | |

---

[17]    Amounts reflected in millions of dollars.

[18]    All loans issued after this date pursuant to the Prepetition First Out Term Loans are payable on demand.

| Obligation | Maturity / Redemption | Approximate Principal Amount Outstanding / Liquidation Preference |
|---|---|---|
| Series A-0 Preferred Units | N/A | $6,230,714,260 |
| Series A-1 Preferred Units | N/A | $1,672,843,762 |
| Series A-2 Preferred Units | N/A | $326,915,279 |
| Series B Preferred Units | N/A | $294,170,575 |
| Series C Preferred Units | N/A | $658,128,799 |
| *Common Equity* | | |
| Series A Common Units | N/A | N/A |
| Series B Common Units | N/A | N/A |

      **a.**       **Prepetition Indebtedness**

As of the Petition Date, the Debtors' capital structure includes approximately $8.6 billion in funded debt.

           **i.**       Prepetition First Lien Notes.

On October 23, 2020, Ligado originally issued $2.85 billion in aggregate principal amount of 15.5% PIK Senior Secured First Lien Notes due 2023 (the "Prepetition First Lien Notes" and, the holders of the Prepetition First Lien Notes, the "Prepetition First Lien Noteholders") at an issue price of 100.0% of par value pursuant to that certain indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Indenture" and, collectively with all other First Lien Documents (as defined in the Prepetition First Lien Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Notes Documents"), by and among Ligado, as issuer, the guarantors party thereto, and U.S. Bank National Association, as trustee (in such capacity, the "Prepetition First Lien Notes Trustee" and, U.S. Bank National Association, in its capacity as collateral trustee under the Prepetition First Lien Notes Documents, the "Prepetition First Lien Notes Collateral Trustee" and, the Prepetition First Lien Noteholders, the Prepetition First Lien Notes Trustee, and the Prepetition First Lien Notes Collateral Trustee collectively, the "Prepetition First Lien Notes Secured Parties").

On December 23, 2022, the First Lien Indenture was amended to, among other things, permit the incurrence of the Prepetition First Lien Loans (as defined below), and in connection with the amendments, the Debtors paid the holders of the Prepetition First Lien Notes a consent fee represented by an increase in the aggregate principal amount of the Prepetition First Lien Notes of $25.1 million.  On March 31, 2023, the Prepetition First Lien Indenture was further amended to, among other things, permit the incurrence of the incremental Prepetition First Out Term Loans (as defined below).  On May 24, 2024, the Prepetition First Lien Indenture was further amended

to, among other things, permit the incurrence of term loans in an aggregate principal amount not exceeding $75,000,000.

On October 20, 2023, the Debtors entered into a forbearance agreement (the "1L Notes Forbearance Agreement") with holders of more than a majority of the outstanding principal amount of the Prepetition First Lien Notes (collectively, the "1L Consenting Holders"). Pursuant to the 1L Notes Forbearance Agreement, the 1L Consenting Holders (A) agreed to forbear until November 15, 2023—which forbearance date was further extended to, among other things, the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "1L Notes Forbearance Period")—the exercise of their respective rights and remedies under the Prepetition First Lien Notes Documents, as a result of the Debtors' anticipated failure to timely pay principal and accrued and unpaid interest, if applicable, at maturity on November 1, 2023 (the "Anticipated 1L Payment Default") and any related cross-defaults and (B) directed the Trustee (as defined in the 1L Notes Forbearance Agreement) to forbear from exercising rights and remedies under the Prepetition First Lien Documents, with respect to the Anticipated 1L Payment Default. Under the 1L Notes Forbearance Agreement, until November 1, 2023, the Prepetition First Lien Notes bore interest at a rate of 15.5% per annum, payable in kind. Starting from the date of maturity on November 1, 2023, and during the 1L Notes Forbearance Period, Ligado pays interest at the default rate of 17.5% per annum payable in kind, in accordance with the terms of the Prepetition First Lien Notes Documents.

The Prepetition First Lien Notes are guaranteed by Ligado's material subsidiaries and secured by perfected first-priority liens on and security interests in (to the extent legally permissible) substantially all of the Debtors' assets, other than certain "excluded property" (the "Prepetition Collateral").

The Debtors also entered into waivers with respect to the Prepetition 1.5 Lien Facility and Prepetition Second Lien Notes for anticipated cross defaults arising from the Payment Default.

As of the Petition Date, an aggregate amount of approximately $5.5 billion in principal and accrued interest was outstanding under the Prepetition First Lien Notes.

ii.    Prepetition First Lien Loan Facility.

Ligado is the borrower under that certain First Lien Loan Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Loan Agreement" and, collectively with all other Loan Documents (as defined in the Prepetition First Lien Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents," and the facility made available thereunder, the "Prepetition First Lien Loan Facility" and, the Prepetition First Lien Loan Documents together with the Prepetition First Lien Notes Documents, the "Prepetition First Lien Documents"), by and among, Ligado, as the borrower, the guarantors party thereto, the lenders party thereto (collectively in such capacities, the "Prepetition First Lien Lenders"), and U.S. Bank Trust Company, National Association, as administrative agent (as successor in interest to U.S. Bank National Association,

as administrative agent) (in such capacity, the "<u>Prepetition First Lien Loan Administrative Agent</u>," and U.S. Bank Trust Company, National Association in its capacity as collateral agent under the Prepetition First Lien Loan Documents (as successor in interest to U.S. Bank National Association), the "<u>Prepetition First Lien Loan Collateral Agent</u>," and the Prepetition First Lien Loan Collateral Agent, the Prepetition First Lien Loan Administrative Agent, and the Prepetition First Lien Lenders collectively, the "<u>Prepetition First Lien Loan Secured Parties</u>," and the Prepetition First Lien Loan Secured Parties together with the Prepetition First Lien Notes Secured Parties, the "<u>Prepetition First Lien Secured Parties</u>").

The Prepetition First Lien Loan Agreement was amended on April 3, 2023, July 17, 2023, November 18, 2023, January 22, 2024, June 4, 2024, October 2, 2024, and December 23, 2024, to, among other things, permit incremental loans to the Debtors under the Prepetition First Lien Loan Agreement.

Prepetition First Lien Loan Facility provides for up to approximately (i) $122.3 million in term loans that are secured on a *pari passu* basis with the Prepetition First Lien Notes (the "<u>Prepetition First Lien Senior Pari Term Loans</u>") and (ii) $141.0 million in term loans that are secured on a *pari passu* basis with the Prepetition First Lien Notes but are "first out" in payment priority pursuant to the First Lien Intercreditor Agreement (as defined below) (the "<u>Prepetition First Out Term Loans</u>" and, the Prepetition First Out Term Loans together with the Prepetition First Lien Senior Pari Term Loans, the "<u>Prepetition First Lien Term Loans</u>," and the Prepetition First Lien Term Loans together with the Prepetition First Lien Notes, the "<u>Prepetition First Lien Debt</u>"). Prior to being repaid with proceeds of the DIP Facility, the Prepetition First Out Term Loans ranked senior in right of repayment to all of the Debtors' existing debt, including all other Prepetition First Lien Debt. The Prepetition First Out Term Loans also accrued interest at a default rate of 17.5% *per annum*, payable in kind, in accordance with the terms of the Prepetition First Lien Loan Agreement.

On October 20, 2023, the Debtors entered into a forbearance agreement (the "<u>1L Loan Forbearance Agreement</u>") with holders of more than a majority of the outstanding principal amount of the Prepetition First Lien Term Loans (collectively, the "<u>1L Consenting Lenders</u>"). Pursuant to the 1L Loan Forbearance Agreement, the 1L Consenting Lenders agreed to forbear until November 15, 2023—which forbearance date was further extended to, among other things, the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "<u>1L Loan Forbearance Period</u>")–the exercise of their respective rights and remedies under the Prepetition First Lien Loan Agreement and the related security documents, as a result of the Debtors' anticipated failure to timely pay principal and accrued interest, if applicable, on the Prepetition First Lien Term Loans at maturity on November 1, 2023. Under the 1L Loan Forbearance Agreement, until November 1, 2023, Ligado paid interest on the Prepetition First Lien Facility at a rate of 15.5% *per annum*, payable in kind. Starting from the date of maturity on November 1, 2023, and during the 1L Loan Forbearance Period, Ligado pays interest at the default rate of 17.5% *per annum* payable in kind, in accordance with the terms of the Prepetition First Lien Loan Agreement.

The Prepetition First Lien Loan Facility is secured by perfected first-priority liens on and security interests in (to the extent legally permissible) the Prepetition Collateral on a *pari passu*

basis with the Prepetition First Lien Notes and is guaranteed by Ligado's material subsidiaries on a *pari passu* basis with the Prepetition First Lien Notes.

The Debtors also entered into waivers with respect to the Prepetition 1.5 Lien Facility and Prepetition Second Lien Notes (each, as defined below) for anticipated cross defaults arising from the Payment Default.

As of the Petition Date, an aggregate amount of approximately $441.8 million in principal and accrued interest was outstanding under the Prepetition First Lien Loan Facility.

iii.     Prepetition 1.5 Lien Term Loan Facility.

Ligado is the borrower under that certain 1.5 Lien Loan Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition 1.5 Lien Loan Agreement" and, collectively with all other Loan Documents (as defined in the Prepetition 1.5 Lien Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition 1.5 Lien Loan Documents," and the facility made available thereunder, the "Prepetition 1.5 Lien Facility"), by and among Ligado, as the borrower, the guarantors party thereto, the lenders party thereto (collectively in such capacities, the "Prepetition 1.5 Lien Lenders"), Jefferies Finance LLC, as administrative agent (in such capacity, the "Prepetition 1.5 Lien Administrative Agent"), and U.S. Bank Trust Company, National Association, as successor collateral agent (in such capacity, the "Prepetition 1.5 Lien Collateral Agent" and, the Prepetition 1.5 Lien Collateral Agent, the Prepetition 1.5 Lien Administrative Agent, and the Prepetition 1.5 Lien Lenders, collectively, the "Prepetition 1.5 Lien Secured Parties").

The Prepetition 1.5 Lien Loan Agreement was amended on October 23, 2020, February 24, 2021, August 10, 2022, and December 23, 2022, to among other things, permit incremental commitment increases to the Debtors under the Prepetition 1.5 Lien Loan Agreement.

On August 10, 2022, the Debtors entered into an agreement to borrow up to an additional $88.0 million (the "Incremental 1.5 Lien Loans") under the Prepetition 1.5 Lien Facility that resulted in available proceeds of $36.0 million after accounting for the original issue discount and other paid-in-kind fees. The Incremental 1.5 Lien Loans were structured as three separate draws of $12.0 million each in net cash proceeds to the Debtors. The three draws of $12.0 million each occurred on August 10, 2022, September 9, 2022, and October 14, 2022, respectively. The Incremental 1.5 Lien Loans bore interest at the greater of (i) SOFR and (ii) 1.00% *plus* the applicable margin (20.0% *plus* 15 bps). The maturity date of the Incremental 1.5 Lien Loans was May 1, 2024.

On December 23, 2022, the Debtors entered into an agreement to borrow up to an additional $68.3 million (the "Additional Incremental 1.5 Lien Loans") under the Prepetition 1.5 Lien Facility. The Additional Incremental 1.5 Lien Loans were funded on a non-cash basis on four separate funding dates: (i) the first funding date on December 27, 2022, on which date $28.3 million of the Additional Incremental 1.5 Lien Loans were funded; (ii) the second funding date on January 4, 2023, on which date $13.3 million of the Additional Incremental 1.5 Lien Loans were

funded; (iii) the third funding date on February 1, 2023, on which date $13.3 million of the Additional Incremental 1.5 Lien Loans were funded; and (iv) the fourth funding date on March 1, 2023, on which date $13.325 million of the Additional Incremental 1.5 Lien Loans were funded.  The proceeds of the Additional Incremental 1.5 Lien Loans were used solely to pay an incentive fee to each lender of the Incremental First Lien Loans.

The Additional Incremental 1.5 Lien Loans bore interest at the greater of (i) SOFR and (ii) 1.00% *plus* the applicable margin (20.0% *plus* 15 bps) until the maturity date of May 1, 2024.

On January 19, 2024, the Debtors entered into a forbearance agreement (the "1.5L Forbearance Agreement") with the consenting 1.5 Prepetition Lien Lenders (the "1.5L Consenting Lenders"), pursuant to which the 1.5L Consenting Lenders (a) agreed to forbear until June 7, 2024, the exercise of their respective rights and remedies under the Prepetition 1.5L Lien Facility, as a result of the Debtors' anticipated failure to timely pay principal and unpaid interest, if applicable, at maturity (the "Anticipated 1.5L Payment Default") and any related cross-defaults, which forbearance date was further extended to, among other things, the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "1.5L Forbearance Period"), and (b) directed the Administrative Agent and Collateral Agent (as defined in the 1.5L Forbearance Agreement) to forbear from exercising rights and remedies under the Prepetition 1.5L Lien Facility, with respect to the Anticipated 1.5L Payment Default.  Under the 1.5L Forbearance Agreement, starting from the date of maturity on May 1, 2024, and during the 1.5L Forbearance Period, Ligado pays interest on the Prepetition 1.5 Lien Loan, the Incremental 1.5 Lien Loans and the Additional Incremental 1.5L Lien Loans as described above plus 2.00%, in each case, to account for the default interest rate, in accordance with the terms of the Prepetition 1.5 Lien Loan Documents.

The Prepetition 1.5 Lien Facility is secured by perfected 1.5 priority liens on and security interests in (to the extent legally permissible) the Prepetition Collateral and is guaranteed by Ligado's material subsidiaries on a 1.5 priority basis.

The Prepetition 1.5 Lien Lenders of more than a majority of the loans under the Prepetition 1.5 Lien Facility provided cross-default waivers as a result of the Anticipated 1.5L Payment Default.

As of the Petition Date, an aggregate amount of approximately $591.5 million in principal and accrued interest was outstanding under the Prepetition 1.5 Lien Facility.

       iv.     Prepetition Second Lien Notes.

On October 23, 2020, Ligado originally issued $1.0 billion in aggregate principal amount of 17.5% PIK Senior Secured Second Lien Notes due 2024 (the "Prepetition Second Lien Notes," and the holders of the Prepetition Second Lien Notes, the "Prepetition Second Lien Noteholders") at an issue price of 75.0% of par value pursuant to that certain indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Second Lien Indenture," and collectively with all other Second Lien Documents (as defined in the Prepetition Second Lien Indenture) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated,

amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Second Lien Documents" and, the Prepetition Second Lien Documents, the Prepetition First Lien Documents, and the Prepetition 1.5 Lien Documents, collectively, the "Prepetition Secured Documents"), by and among Ligado, as issuer, the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee (as successor in interest to U.S. Bank National Association, as trustee) (in such capacity, the "Prepetition Second Lien Trustee," and U.S. Bank National Association in its capacity as collateral trustee under the Prepetition Second Lien Documents, the "Prepetition Second Lien Collateral Trustee," and the Prepetition Second Lien Noteholders, the Prepetition Second Lien Trustee, and the Prepetition Second Lien Collateral Trustee collectively, the "Prepetition Second Lien Secured Parties," and the Prepetition Second Lien Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition 1.5 Lien Secured Parties collectively, the "Prepetition Secured Parties").

On January 19, 2024, the Debtors entered into a forbearance agreement (the "2L Notes Forbearance Agreement") with holders of more than a majority of the outstanding principal amount of the Prepetition Second Lien Notes (the "2L Consenting Holders"). Pursuant to the 2L Notes Forbearance Agreement, the 2L Consenting Holders (A) agreed to forbear until June 7, 2024—which forbearance date was further extended to, among other things, the earlier of February 7, 2025 or seven days following the extended date for the deferred payments as set forth in the Cooperation Agreement (the "2L Notes Forbearance Period")—the exercise of their respective rights and remedies under the Prepetition Second Lien Documents, as a result of the Debtors' anticipated failure to timely pay principal and accrued and unpaid interest, if applicable, at maturity on May 1, 2024 (the "Anticipated 2L Payment Default") and any related cross-defaults, and (B) directed the Trustee (as defined in the 2L Notes Forbearance Agreement) to forbear from exercising rights and remedies under the Prepetition Second Lien Documents, with respect to the Anticipated 2L Payment Default.  Under the 2L Notes Forbearance Agreement, until May 1, 2024, the Prepetition Second Lien Notes bore interest at a rate of 17.5% *per annum*, payable in kind. Starting from the date of maturity on May 1, 2024, and during the 2L Forbearance Period, Ligado pays interest at the default rate of 19.5% *per annum* payable in kind, in accordance with the terms of the Prepetition Second Lien Documents.

The Prepetition Second Lien Notes are guaranteed on a second lien priority basis by the same Ligado subsidiaries that guarantee the Prepetition First Lien Notes and the Prepetition 1.5 Lien Facility and secured by perfected second-priority liens on and security interests in (to the extent legally permissible) the Prepetition Collateral.

The holders of more than a majority of the outstanding principal amount of the Prepetition Second Lien Notes provided cross-default waivers as a result of the Anticipated 2L Payment Default.

As of the Petition Date, an aggregate amount of approximately $2.0 billion in principal and accrued interest was outstanding under the Prepetition Second Lien Notes.

v.    Intercreditor Agreements

Pursuant to the First Lien Intercreditor Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time

to time, the "First Lien Intercreditor Agreement"), by and among Ligado, the other grantors from time to time party thereto, U.S. Bank National Association, as collateral trustee (in such capacity, the "First Lien Collateral Trustee"), U.S. Bank National Association, as Authorized Representative for the Notes Secured Parties (each as defined therein), U.S. Bank National Association, as Initial Additional Pari Collateral Agent and Initial Additional Authorized Representative (each as defined therein), and each additional Authorized Representative from time to time party thereto, the liens and security interests securing the Prepetition First Lien Notes rank equal in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition First Lien Loan Facility, the Prepetition First Out Term Loans ranked senior in right of payment to the Prepetition First Lien Notes and the Prepetition First Lien Senior Pari Term Loans, and the Prepetition First Lien Notes rank equal in right of payment to the Prepetition First Lien Senior Pari Term Loans.

Pursuant to the Senior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Senior Intercreditor Agreement"), by and among Ligado, the other pledgors from time to time party thereto, U.S. Bank National Association, as First Lien Representative (as defined therein), Jefferies Finance LLC, as a Junior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative, each additional First Lien Representative and Junior Lien Representative from time to time party thereto, and U.S. Bank National Association, as collateral trustee (in such capacity, the "Senior Collateral Trustee"), the liens and security interests securing the Prepetition First Lien Debt ranks senior in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition 1.5 Lien Facility and the Prepetition Second Lien Notes, and the Prepetition First Lien Debt ranks senior in right of payment to the Prepetition 1.5 Lien Facility and the Prepetition Second Lien Notes.

Pursuant to the Senior Intercreditor Agreement and the Junior Collateral Trust and Intercreditor Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Junior Intercreditor Agreement" and, the Junior Intercreditor Agreement, the First Lien Intercreditor Agreement, and the Senior Intercreditor Agreement, collectively, the "Intercreditor Agreements"), by and among, Ligado, the other pledgors from time to time party thereto, Jefferies Finance LLC, as a Senior Lien Representative (as defined therein), U.S. Bank National Association, as a Junior Lien Representative (as defined therein), each additional First Lien Representative and Junior Lien Representative from time to time party thereto, and U.S. Bank National Association, as collateral trustee (in such capacity, the "Junior Collateral Trustee," and the Junior Collateral Trustee, the First Lien Collateral Trustee, the Senior Collateral Trustee, the Prepetition First Lien Secured Parties, the Prepetition 1.5 Lien Secured Parties, and the Prepetition Second Lien Secured Parties collectively, the "Prepetition Secured Parties"), the liens and security interests securing the Prepetition 1.5 Lien Facility rank junior in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition First Lien Debt and rank senior in priority to the liens on and security interests in the Prepetition Collateral granted to secure the Prepetition Second Lien Notes, and the Prepetition 1.5 Lien Facility ranks junior in right of payment to the Prepetition First Lien Debt and senior in right of payment to the Prepetition Second Lien Notes.

Pursuant to the Intercreditor Agreements, the liens and security interests securing the Prepetition Second Lien Notes rank junior in priority to all liens on and security interests in the Prepetition Collateral granted to secure the Prepetition First Lien Debt and the Prepetition 1.5 Lien Facility, and the Prepetition Second Lien Notes rank junior in right of payment to the Prepetition First Lien Debt and the Prepetition 1.5 Lien Facility.

vi.   Unsecured Obligations.

The Debtors generally have and intend to continue to pay undisputed trade obligations as they come due.

vii.   Interests

(1)   Series A-0 Preferred Units.

Ligado has issued 20,000,000 (out of an authorized 20,000,000) Series A-0 Preferred Units (the "Series A-0 Preferred Units"). The Series A-0 Preferred Units are entitled to distributions in accordance with the waterfall (the "Distribution Waterfall") set forth in that certain Amended and Restated Operating Agreement of Ligado Networks, dated as of October 23, 2020 (the "Operating Agreement") (as amended from time to time and when those distributions are approved by Ligado's board of managers, the "Board") and generally have priority over the Series A-1 Preferred Units, the Series A-2 Preferred Units, the Series B Preferred Units, the Series C Preferred Units, and the Common Units (each as defined below) under the Distribution Waterfall. The Series A-0 Preferred Units have preemptive rights for 90% of any new issuances by Ligado of preferred units which would rank senior to the Series A-0 Preferred Units (the "Super Senior Preferred Units").

(2)   Series A-1 and A-2 Preferred Units.

Ligado has issued 20,000,000 (out of an authorized 20,000,000) Series A-1 Preferred Units (the "Series A-1 Preferred Units") and 20,000,000 (out of an authorized 20,000,000) Series A-2 Preferred Units (the "Series A-2 Preferred Units"). The Series A-1 Preferred Units have preemptive rights for 10% of any new issuances by Ligado of Super Senior Preferred Units. The Series A-1 Preferred Units have a liquidation preference equal to $1,672,843,762, and the Series A-2 Preferred Units have a liquidation preference equal to $326,915,279. As set forth in the Operating Agreement, the Series A-1 Preferred Units generally have priority over the Series A-2 Preferred Units, the Series B Preferred Units, the Series C Preferred Units, and the Common Units under the Distribution Waterfall. However, under the Distribution Waterfall, after a certain amount of distributions have been paid out to the Series A-0 Preferred Units and the Series A-1 Preferred Units, the Series A-1 Preferred Units and the Series A-2 Preferred Units share *pro rata* (based on their respective liquidation preferences) with the Series B Preferred Units and the Series C Preferred Units (based on their respective liquidation preferences).

(3)   Series B Preferred Units.

Ligado has issued 20,000,000 (out of an authorized 20,000,000) Series B Preferred Units (the "Series B Preferred Units"). The Series B Preferred Units have a liquidation preference equal to $294,170,575. As set forth in the Operating Agreement, the Series B Preferred Units generally

have priority over the Common Units. Under the Distribution Waterfall, after a certain amount of distributions have been paid out to the Series A-0 Preferred Units and the Series A-1 Preferred Units, the Series B Preferred Units share *pro rata* (based on the Series B liquidation preference) with the Series A-1 Preferred Units, the Series A-2 Preferred Units, and the Series C Preferred Units (based on their respective liquidation preferences).

(4)     Series C Preferred Units.

Ligado has issued 20,000,000 (out of an authorized 20,000,000) Series C Preferred Units (the "Series C Preferred Units" and, collectively with the Series A-0 Preferred Units, Series A-1 Preferred Units, Series A-2 Preferred Units, and the Series B Preferred Units, the "Preferred Units"). The Series C Preferred Units have a liquidation preference equal to $658,128,799. As set forth in the Operating Agreement, the Series C Preferred Units generally have priority over the Common Units under the Distribution Waterfall. Under the Distribution Waterfall, after a certain amount of distributions have been paid out to the Series A-0 Preferred Units and the Series A-1 Preferred Units, the Series C Preferred Units share *pro rata* (based on the Series C liquidation preference) with the Series A-1 Preferred Units, the Series A-2 Preferred Units, and the Series B Preferred Units (based on their respective liquidation preferences).

(5)     Common Units.

Ligado has issued 9,700,000 Series A Common Units (out of 19,400,000 authorized) (the "Series A Common Units") and 300,000 Series B Common Units (out of 600,000 authorized) (the "Series B Common Units" and, together with the Series A Common Units, the "Common Units"). The Series A Common Units rank *pari passu* with the Series B Common Units in liquidation and distributions, and both series of Common Units have certain limited voting rights. With respect to distributions of available cash and distributions upon liquidation, the Common Units are subordinated to the Series A-0 Preferred Units, the Series A-1 Preferred Units, the Series A-2 Preferred Units, the Series B Preferred Units, and the Series C Preferred Units.

(6)     Distribution Waterfall

Pursuant to the Operating Agreement, if Ligado's Board authorizes a cash distribution, the distributions will be made as follows:

- First, (x) 94.75% to all holders of outstanding Series A-0 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-0 Preferred Units held by each such holder) and (y) 5.25% to all holders of outstanding Series A-1 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-1 Preferred Units held by each such holder), until certain distributed amount valuation thresholds are met.

- Second, (x) 70% to all holders of outstanding Series A-0 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-0 Preferred Units held by each such holder) and (y) 30% to all holders of outstanding Series A-1 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-1

Preferred Units held by each such holder), until certain distributed amount valuation thresholds are met.

- Third, (x) 30% to all holders of outstanding Series A-0 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-0 Preferred Units held by each such holder) and (y) 70% to all holders of outstanding Series A-1 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-1 Preferred Units held by each such holder), until certain distributed amount valuation thresholds are met.

- Fourth, (x) 35% to all holders of outstanding Series A-0 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-0 Preferred Units held by each such holder) and (y) 65% to all holders of outstanding Series A-1 Preferred Units, Series A-2 Preferred Units, Series B Preferred Units, and Series C Preferred Units (such distribution to be made (A) as to each such series of Preferred Units, based on the Sharing Percentage[19] of such series of Preferred Units and (B) as to each holder within each such series of Preferred Units, *pro rata* in proportion to the Preferred Units of such series held by each such holder), until certain distributed amount valuation thresholds are met.

- Fifth, 100% to holders of Common Units and vested Incentive Rights (as defined in the Operating Agreement).

Once the holders of Preferred Units have received all distributions to which they are entitled in accordance with the Operating Agreement, such holders will no longer have the right to participate in any future distributions, and the Preferred Units will be considered fully redeemed.

C.      *Events Leading to Commencement of Chapter 11 Cases*

For approximately 20 years, the Debtors have been working to develop terrestrial wireless capabilities that would augment their satellite network.  The Debtors finally obtained FCC approval in April 2020 to use their ATC authority to provide 5G terrestrial communication services (the "FCC Order").  For approximately 10 years prior to the issuance of the FCC Order, however, the Debtors were mired in a contentious, protracted regulatory process that prevented them from utilizing their ATC authorizations.  This process not only compelled the Debtors to take on massive amounts of debt (to make payments to Inmarsat and to meet the FCC's initial build-out requirements discussed below), but also drained their liquidity as they were not able to deploy and commercialize their ATC by providing terrestrial communication services, which caused them to file for chapter 11 protection in 2012 and consummate an out-of-court recapitalization and restructuring in October 2020.

---

[19]      "Sharing Percentage" means, as to each of the Series A-1 Preferred Units, Series A-2 Preferred Units, Series B Preferred Units, and Series C Preferred Units, as of any date of determination, a percentage equal to (a) the amount of the liquidation preference for such series of Preferred Units as of such date, *divided by* (b) the sum total of the liquidation preferences of the Series A-1 Preferred Units, Series A-2 Preferred Units, Series B Preferred Units, and Series C Preferred Units as of such date.

In direct reliance on the FCC Order, in October 2020 the Debtors recapitalized their capital structure (i) to make the $700.0 million Inmarsat 2020 Prepayment and (ii) to begin developing the technological and commercial ecosystem as well as the partnerships necessary to fully deploy their coordinated licensed and leased spectrum. Notwithstanding the issuance of the FCC Order, however, the Debtors' ability to fully develop and implement their business plans continues to be hampered by the U.S. Government's use of the Debtors' spectrum and continued opposition to the FCC Order. Because of such actions, the Debtors do not yet generate sufficient cash to fund their business and are facing a precarious liquidity situation, which has necessitated the filing of the Chapter 11 Cases.

1.      **Events Leading to Commencement of Prior Chapter 11 Cases**

On May 14, 2012, the Debtors' predecessors in interest filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code ("Prior Chapter 11 Cases").

a.      **Development of Terrestrial Communication Services**

In 2001, convinced that adding an ATC to their existing satellite operations would optimize the use of their MSS spectrum and enable the Debtors to provide wholesale terrestrial communication services with superior reliability and coverage, the Debtors were the first to apply to the FCC for authority to implement a new and innovative ground-based wireless service to be operated in conjunction with the MSS they already provided. As the FCC began adopting rules in 2003 to encourage and permit other MSS licensees to offer these superior ground-based mobile services using spectrum already allocated for MSS, the Debtors submitted a new application (in compliance with such rules) requesting authorization to provide terrestrial communication services (ATC authority). In 2004, the FCC granted the Debtors such authority, and they became the first MSS licensee authorized to deploy and operate, side-by-side, with their satellite lines of business, a terrestrial network.

In reliance on these regulatory approvals, the Debtors commissioned the manufacture and launch of two, state-of-the-art, next-generation satellites, SkyTerra-1 and SkyTerra-2, and the related ground structure for operations, and invested significant funds in furtherance of their new business. From 2001 to date, the Debtors invested billions of dollars in their wireless business plan from moneys borrowed from their lenders and/or capital contributed by their shareholders. During such period, the Debtors worked closely with numerous public and federal agencies as they moved toward deployment and entered into agreements with customers.

In 2010, the FCC approved (in connection with a change of equity ownership) a "change of control" as to the Debtor entity holding the underlying license but conditioned its approval on the Debtors satisfying an aggressive terrestrial network build-out schedule that required coverage of at least 100 million people by December 31, 2012, 145 million people by December 31, 2013, and 260 million people by December 31, 2015. To ensure that they satisfied the FCC's conditions to approval in full and, in reliance on such approval, the Debtors continued investing billions of dollars and entered into various agreements to aid in the deployment of their nationwide terrestrial communication services.

### b.   Barriers to Full Utilization of Company's FCC License and Authorization

As the Debtors invested billions of dollars after the FCC's 2010 approval to build out their terrestrial communication services, technical objections to the Debtors' then-existing spectrum plan began to emerge.  The Global Positioning System ("GPS") industry and the United States GPS Industry Council (the "USGIC"), a trade association that represents the interests of certain members of the GPS industry, raised concerns that the Debtors' transmissions at the then-proposed power levels could potentially interfere with GPS, and that the Debtors' terrestrial base stations might cause "overload interference" to GPS receivers and other GPS devices.  At each stage of the FCC approval process, the Debtors worked cooperatively with public and federal agencies, including the GPS industry and the USGIC, to alleviate and protect against such potentially harmful out-of-band emissions and overload interference.  Indeed, the Debtors, among other things, consented to reducing power levels and other technical modifications of their license, which cost the Debtors hundreds of millions of dollars to implement, along with burdensome testing requirements, which the FCC directed the Debtors to undertake.

However, in February 2012, following several studies concerning the impacts of the then-proposed terrestrial use of the L-band on GPS services, which the Debtors vigorously disputed, the NTIA sent a letter to the FCC stating that NTIA could not support at that time the deployment of the terrestrial communication services then proposed by the Debtors.  Immediately following the NTIA's letter, the FCC issued a Public Notice that proposed to suspend indefinitely the Debtors' ATC authority.

The years of disputes, delay, and uncertainty with respect to final regulatory approval had begun to take their toll.  Recognizing that they would need additional time to resolve the issues with the FCC and the GPS industry and to preserve resources on hand, the Debtors undertook several corporate initiatives and reached out to their major creditor constituencies to avert a looming financial collapse.  Ultimately, however—and despite their best efforts—the Debtors could not reach a mutually satisfactory agreement with their prepetition secured lenders or Inmarsat.  The Debtors were thus forced to seek chapter 11 protection to preserve the value of their assets while they continued to pursue a resolution of the GPS-related concerns with the use of their spectrum assets.

After having commenced the Prior Chapter 11 Cases in 2012, in December 2014, following months of mediation and negotiations with the key parties in interest, the Debtors proposed a plan of reorganization, which was confirmed on March 26, 2015.

### 2.   Continued Regulatory Efforts Post-Emergence from Prior Chapter 11 Cases

The Debtors emerged from the Prior Chapter 11 Cases on December 7, 2015, with the expectation that an FCC decision to resolve GPS interference issues would be made within a reasonable period thereafter.

### a.   GPS Settlement Agreements

Within days of emergence, the Debtors entered into settlement and cooperation agreements with various GPS manufacturers that resolved their concerns about interference and pursuant to

which the Debtors accepted dramatically reduced power and out-of-band emissions limits and agreed to relinquish the Debtors' existing authorization to provide ATC at 1545-1555 MHz (i.e., the frequency band closest to the band allocated for GPS devices). The GPS manufacturers agreed that they would not object to the Debtors' new spectrum plan and the deployment of terrestrial communication services meeting the limits set forth in the GPS settlement agreements that were to be codified by the FCC as part of the Debtors' new spectrum plan.

### b.     Omnibus Filing

On December 31, 2015, the Debtors made a new set of filings with the FCC (together with supplemental filings in relation and in addition thereto, the "Omnibus Filing") that requested modifications of the Debtors' terrestrial license and codification of the reduced operational levels agreed to in the GPS settlement agreements. More specifically, the Omnibus Filing requested that the FCC take the following actions: (i) incorporate the reduced power and out-of-band emissions limits outlined in the GPS settlement agreements into the Debtors' license; (ii) unconditionally remove the Debtors' authorization to provide terrestrial communication services at 1545-1555 MHz; and (iii) add a condition to the Debtors' license requiring their terrestrial communication services in the 1526-1536 MHz channel be compatible with current and future standards mandated by the Federal Aviation Administration (the "FAA") for certified aviation GPS receivers.

In support of the Omnibus Filing, the Debtors worked with the FAA (which is part of the Department of Transportation ("DOT")), the aviation industry, and RTCA, Inc. (a standards-setting organization for the aviation industry) to determine the power levels for the lower downlink that would render the spectrum plan compatible with the FAA's standards for certified aviation devices. In 2017, the Debtors and the FAA completed these discussions and identified the appropriate power level range that would protect certified aviation devices. Prior to and during this process, the DOT conducted a study of the impact of adjacent-band LTE signals on GPS certified aviation devices. On April 26, 2018, the DOT released its final report, which addressed multiple issues and with respect to certified aviation receivers the DOT report concluded that the appropriate power level with respect to protecting certified aviation receivers should be 9.8 dBW—a specific power level within the range identified by the FAA and Debtors in 2017. That report also proposed a revised standard for future certified aviation receivers that when fully implemented throughout all airships would be compatible with higher power levels.

The Debtors then filed, on May 31, 2018, an amendment to the Omnibus Filing that established the power level for the lower downlink at 9.8 dBW. This submission also proposed additional mitigation measures applicable to all GPS devices, including continuous monitoring of the transmit power for each base station site, the maintenance of a toll-free telephone number for the public to report apparent incidences of interference from the Debtors' operations on GPS, and other safeguards. The Debtors also committed, in an August 2019 filing, to repair or replace, as needed, U.S. Government GPS devices that experience or are likely to experience harmful interference from the Debtors' operations. All of these actions were taken in the good-faith belief that once the Debtors resolved all potential concerns about harmful interference to GPS, if any, the Debtors would be allowed to develop and deploy their spectrum assets free from disruption by the U.S. Government and others.

To help facilitate the outcome and at the specific request of DOD, the Debtors also arranged for the testing of the power levels proposed in the Omnibus Filing. One test was conducted pursuant to an April 2016 Cooperative Research and Development Agreement (the "CRADA") the Debtors entered into with the National Advanced Spectrum and Communications Test Network (the "NASCTN"), a joint initiative of the National Institute of Standards and Technology (which is part of DOC), DOD, and NTIA. NASCTN evaluated the impact of LTE signals on GPS devices in the L-Band and released a report on the results of this study on February 15, 2017. These results were submitted to the FCC and support the Debtors' position that their terrestrial communication services will not cause harmful interference to GPS. This data is also consistent with testing performed in 2016 at the Debtors' direction by Roberson and Associates, an engineering consulting firm retained by the Debtors' outside counsel, and submitted to the FCC.

### 3.   Inmarsat's Customers' Opposition

In summer 2016, several Inmarsat customers and/or their representatives submitted comments to the FCC on the Debtors' Omnibus Filing, stating their view that the terminal resilience issues needed to be addressed before the FCC could approve the Debtors' plan. For example, two influential parties—Boeing and Aviation Spectrum Resources Inc. ("ASRI")—requested that the FCC determine how Inmarsat terminals would be replaced *before* acting on the Debtors' application.

At that time, the Debtors asked Inmarsat to help them address the concerns raised by Boeing and ASRI. Inmarsat's CEO noted that Boeing's request was "the most challenging" to address. Inmarsat then filed a letter with the FCC stating only that it was "working with manufacturers, customers, and Ligado to reduce potential interference from Inmarsat users." Of course, this statement fell short of Inmarsat's contractual obligation to fully address (not simply reduce) terminal interference on *all* terminals. Inmarsat provided no information about when manufacturers would make filters or other terminal modifications available, it said nothing about when standards would be adopted or approvals obtained by the FCC, and it said nothing about the timing of terminal replacements, or who would pay for those terminal modifications or replacements. As a result, this response also failed to satisfy Inmarsat's obligation to help the Debtors secure the FCC approval they were seeking.

Not surprisingly, Inmarsat's vague letter did not assuage the concerns of these powerful aviation industry stakeholders. A year later, on June 20, 2017, representatives of ASRI filed another comment letter with the FCC noting that Inmarsat continues providing services in the L-Band, and specifically referencing that Inmarsat had never explained the technical or operational basis for the cooperation arrangement between Inmarsat and the Debtors as a basis for their objection. ASRI noted that Inmarsat, in a filing with Ofcom, Inmarsat's UK regulator, had expressed concerns about the compatibility with the Debtors' system. ASRI also highlighted a statement made by Inmarsat in September 2016 that its "interference mitigation strategy [with the Debtors] may not be successful."

Despite the persistence of those concerns by Inmarsat's customers about the details of Inmarsat's terminal resilience plan, and notwithstanding its obligations in the Cooperation Agreement, Inmarsat took no action to directly address these concerns, to develop and implement the plan needed to modify or replace the terminals, or to otherwise address the terminal interference

issues. Nor did it explain to its customers, the complaining entities, or the FCC its plan to address the interference issues in a level of detail sufficient to assuage their concerns. In fact, the little bit of information Inmarsat provided had the opposite effect—it contributed to increasing concern by creating confusion and uncertainty among its customers. As a result, Inmarsat wholly failed to use its best commercial efforts to assist Ligado in obtaining the necessary approvals.

Inmarsat's continued inaction fostered additional calls for delay of the FCC approval. Boeing again expressed concern about the potential for interference with Inmarsat terminals. Inmarsat should have responded to address those concerns with concrete information about how terminal interference would be resolved to assure both the FCC and Inmarsat's customers that such interference would not be an issue.

Inmarsat was not able to do so because it had failed to develop (let alone implement) a plan in accordance with the Cooperation Agreement sufficient to address those interference issues and to ensure that the Debtors receive the full value of the spectrum in a timely manner. The Debtors sent Inmarsat a letter setting forth their views regarding the impact of Inmarsat's lack of action on the Debtors' regulatory approval. Inmarsat took no actions to remedy the situation.

### 4. DoD and DoC's Pretextual Claims for Harmful Interference to GPS

Prior to the issuance of the FCC Order, and in an effort to prevent the Debtors from obtaining revised ATC authority and to protect DOD's ability to operate previously undisclosed systems that use the Debtors' exclusively licensed spectrum without compensation, DOD (and its ally, DOC) adopted a strategy of deceit and misinformation. Both agencies had previously recognized that the Debtors' proposed terrestrial services would not cause harmful interference to GPS receivers. But as the Debtors inched closer to receiving FCC approval to use their ATC authority to provide 5G terrestrial communications services, DOD and DOC abruptly changed positions and began actively campaigning against the Debtors to officials across the U.S. Government based solely on the false claim that the Debtors' services would cause widespread harmful interference to GPS. Despite support for the Debtors' license modification application (including from officials in DOD and DOC) and despite the scientific studies concluding that the Debtors' intended use of the spectrum would not harmfully interfere with GPS receivers (including the NASCTN testing overseen by DOD and DOC), DOD and DOC changed course in 2018 and opposed the Debtors' plans—all without notifying the FCC or the Debtors of the real reason behind their objections.

DOD and DOC leveled unsubstantiated claims painting the Debtors as a threat to GPS in order to protect and to mask DOD's own use of the Debtors' authorized spectrum. Moreover, DOD and DOC propagated—and continue to propagate to this day—these misleading and scientifically meritless arguments about harmful GPS interference with impunity to sister agencies, the White House, and Congress.

### 5. FCC Approval.

On April 22, 2020, the FCC unanimously approved the Debtors' license modification applications and modified the Debtors' exclusive license and ATC authority to enable them to operate 5G terrestrial communication services within the 1526 to 1536 MHz, 1627.5 to 1637.5

MHz, and 1646.5 to 1656.5 MHz bands, in addition to their existing satellite network (the "Order").[20]   In doing so, the FCC explicitly rejected DOD and DOC's assertions about harmful interference to GPS.

The FCC Order approved the proposed power level of 9.8 dBW for the 1526-1536 MHz downlink band and allows the Debtors to use 30 MHz of their licensed MSS spectrum in the L-Band to provide 5G terrestrial communication services.  This decision added 30 MHz of terrestrial (ATC) spectrum to the 5 MHz of spectrum that the Debtors lease pursuant to the One Dot Six Lease, which is already fully authorized for use on a terrestrial basis.  Based on the extensive record before it, the FCC concluded that the Omnibus Filing and related technical documents addressed the GPS industry's harmful interference concerns, and that "it is in the public interest to grant the modification applications to facilitate the deployment of a low power terrestrial-based network in [their] licensed MSS spectrum."[21]

Under the FCC Order's conditions, the Debtors are required to take various precautions and actions to ensure that their operations will not cause harmful interference to nearby spectrum users.  Specifically, the FCC Order requires the Debtors to, among other things:  not engage in terrestrial communication services in the 1536-1559 MHz band, thus creating a 23-MHz guard band for GPS; adhere to the reduced power levels and emissions limits consistent with the Debtors' commitments in the Omnibus Filing as amended and in supporting documents filed in the FCC record; monitor the power levels of their base stations; provide notice to federal agency GPS users and GPS device manufacturers of their base station locations' technical operating parameters prior to launching operations; provide prompt responses to credible reports of harmful interference; work directly with any federal agency with concerns about the potential for harmful interference to their GPS devices; develop and maintain a database of base station information for use by the aviation community; conduct drive testing to ensure compliance with power prescribed limits; and repair or replace any U.S. Government device shown to be susceptible to harmful interference.

6. **Continued Opposition to FCC Order**

Since the release of the FCC Order, several non-government and government entities, including DOD and DOC, have publicly stated their ongoing opposition to the FCC's decision.  In addition, eight parties, including NTIA, filed petitions for reconsideration with the FCC seeking reversal of virtually every conclusion in the FCC Order.  NTIA also asked the FCC for a stay of the effectiveness of the FCC Order.  The Debtors filed answers to those petitions, and the petitioners filed replies.  The FCC issued an order denying NTIA's position to stay the FCC Order on January 19, 2021.  The Debtors do not know when, or how, the FCC will rule on any of the pending petitions for reconsideration.  The FCC Order continues to be in full force and effect, and the Debtors remain confident that the science and the technology are sound and that the unanimous FCC Order protects GPS from harmful interference from the Debtors' terrestrial communication services.

---

[20]   *See* Order and Authorization, *In re LightSquared Technical Working Group Report*, FCC, IB Docket No. 11-109 (Released April 22, 2020).

[21]   *See id*.

In addition, some members of the U.S. House of Representatives and Senate have publicly stated their opposition to the FCC Order. This opposition was orchestrated by DOD's efforts to continue its unlawful use of the Debtors' exclusively licensed spectrum. As a result of DOD's efforts, the 2021 National Defense Authorization Act (the "2021 NDAA") included several provisions targeting the Debtors, including prohibiting DOD from contracting with any entity using the Debtors' spectrum for commercial terrestrial operations without the Secretary of Defense first certifying to the Congressional Defense Committees that these operations do not cause harmful interference to DOD GPS devices. The 2021 NDAA also included a provision directing the National Academy of Sciences ("NAS") to conduct an independent technical review of the FCC Order. NAS began its review in September 2021 and released its report on September 9, 2022.[22]

Importantly, the NAS report did not assess the legal or technical conclusions in the FCC Order. The NAS report makes clear that the NAS panel did not undertake a review of whether the FCC Order was correct in light of applicable FCC spectrum rules and the requirements of the Administrative Procedures Act. Instead, the NAS panel took an academic approach and set aside established FCC rules and the agency's definition of "Harmful Interference" and used their own metric to assess the relationship between GPS devices and the proposed spectrum use. The NAS panel's methodology caused confusion about the import of the report to the FCC Order, which DOD and DOC sought to exploit by issuing press releases stating that the NAS report confirmed their view that the FCC erred in entering the FCC Order. This behavior prompted NAS to issue an unusual addendum on November 8, 2022: *"As detailed in the committee's report and in the comments made verbally during the public briefing at which this slide deck was used, the committee makes an explicit distinction between the FCC-defined regulatory term 'Harmful Interference' and the committee's use of the term 'harmful interference' in describing its task and in its conclusions. To avoid any confusion that might come from only looking at the slide deck and not having access to the verbal delivery, these slides have been annotated to clearly indicate which term is being used in each circumstance."*

The 2022 National Defense Authorization Act (the "2022 NDAA") includes a provision requiring a briefing on potential harmful interference to GPS, MSS, or other tactical or strategic systems of DOD from commercial terrestrial operations and MSS no later than thirty days after

---

[22]     Section 1663 of the 2021 NDAA mandates that DOD engage NAS within thirty days of the enactment of the 2021 NDAA and that NAS return a report 270 days after that. If DOD had acted in a timely manner, the full report would have been submitted to Congress by the end of October 2021. Instead, NAS did not hold its first meeting of the study team until September 20, 2021, merely five weeks before Congress asked for the study to be completed. Because of DOD's delay, the NAS report was not published until September 9, 2022, nearly a year after the timeline Congress established.

Section 1664 requires DOD to estimate and certify the costs of complying with the FCC Order before taking any steps to implement it. DOD has not yet issued that certification and has provided no indication that it plans to do so. Most tellingly, DOD has refused the Debtors' attempts to assist in identifying potentially affected GPS receivers. In fact, neither DOD nor DOC has ever provided even a single example of a GPS receiver that would be harmed by the Debtors' terrestrial services, even though Section 1661 explicitly provides that DOD may spend funds to "conduct [] technical or information exchanges with" the Debtors regarding harmful interference to GPS devices. Given that DOD studied the impacts of the Debtors' proposals for more than twenty years, the agency's failure to develop a cost estimate more than two years after the FCC Order is inexcusable.

the enactment of this legislation.  Under the 2022 NDAA, the Secretary of Defense was required to provide that briefing to the National Security Council, the Secretary of Commerce, and the Commissioners of the FCC, as well as the Congressional Defense Committees, the House Energy and Commerce Committee, and the Senate Commerce Committee early in 2022.  On information and belief, DOD did not provide these required briefings within thirty days of the passage of the 2022 NDAA (i.e., January 26, 2022), continuing its pattern of strategic delay.

### 7.     **2020 Recapitalization and Inmarsat Payment**

At the time of the issuance of the FCC Order in April 2020, the Debtors were faced with $8.9 billion of maturing funded debt obligations and the desire to make the Inmarsat 2020 Prepayment under the Cooperation Agreement.  The FCC Order provided the Debtors with an opportunity to position themselves for long-term financial stability and commercial success.  So, beginning in May 2020, and in good-faith reliance on the FCC Order's authorization for the Debtors to provide 5G terrestrial communication services within their coordinated licensed and leased spectrum, the Debtors began a process that included negotiating a restructuring of their (i) contractual obligations under the Cooperation Agreement and (ii) over-levered balance sheet.

In June 2020, the Debtors negotiated and executed Amendment No. 5 to the Cooperation Agreement with Inmarsat.  This amendment provides for:

- making the $700.0 million Inmarsat 2020 Prepayment, which prepaid approximately 20% of the then-outstanding future payments balance and resulted in a reduction in quarterly payments due to Inmarsat by 60% and decreased future cash payment obligations;

- a call option, enabling the Debtors to prepay the remaining portions to be paid pursuant to the Cooperation Agreement;

- multiple year deferral of quarterly payments and previously deferred amounts; and

- significant net present value savings after making the $700.0 million Inmarsat 2020 Prepayment.

The effectiveness of Amendment No. 5, however, was conditioned on the Debtors obtaining the necessary funds to make the $700.0 million Inmarsat 2020 Prepayment.  Recognizing the importance of making this payment and resolving their balance sheet issues, the Debtors embarked on a two-prong path.  First, the Debtors commenced efforts to raise approximately $3.6 billion of financing, which would enable the Debtors to make the Inmarsat 2020 Prepayment, refinance their then-existing first lien term loan facility, and provide a multi-year runway in which the Debtors could work to deploy their spectrum assets (the "2020 Financing Transactions").  Second, the Debtors needed to restructure the junior portion of their capital structure, including the approximately $6.0 billion of maturing debt under their then-existing second lien term loan facility, without which they would be unable to raise the financing necessary to pay Inmarsat and refinance their senior debt obligations (the "2020 Restructuring Transactions" and, together with the 2020 Financing Transactions, the "2020 Recapitalization").

In September 2020, following several weeks of arms-length negotiations, the Debtors, an *ad hoc* group of second lien lenders, and an *ad hoc* group of holders of the Series A-1 Preferred Units reached an agreement on the principal terms of the 2020 Recapitalization, which was documented in a restructuring support agreement and related term sheet that was executed by the parties on September 25, 2020 (the "2020 RSA").  Ultimately, 100% of the second lien lenders, 100% of the holders of the Preferred Units, and 100% of the holders of the Common Units executed the 2020 RSA and committed to support the 2020 Recapitalization.

The 2020 Financing Transactions consisted of the Debtors issuing $2.85 billion in aggregate principal amount of the Prepetition First Lien Notes and $1.0 billion in aggregate principal amount of the Prepetition Second Liens Notes at a price of 75% of par value.  In addition, the Debtors amended and restated their Prepetition 1.5 Lien Facility to, among other things, (i) extend the maturity date of the facility to February 2, 2024, (ii) subordinate the loans under the facility in right of payment to the Prepetition First Lien Notes, and (iii) borrow an additional $11.8 million under the facility that resulted in proceeds of approximately $10 million after taking into account the original issue discount.  The proceeds from the 2020 Financing Transactions were used to repay in full the amounts outstanding under the Debtors' then-existing first lien term loan facility, to pay the final $664.5 million of the $700.0 million Inmarsat 2020 Prepayment, to provide working capital, and for general corporate purposes.

The 2020 Restructuring Transactions consisted of the Debtors (i) exchanging all amounts outstanding under their then-existing second lien term loan facility for the Series A-0 Preferred Units and (ii) amending and restating their Operating Agreement to provide, among other things, for the issuance of the Series A-0 Preferred Units (with all outstanding Preferred Units and Common Units remaining outstanding), as well as for the amendments to the Distribution Waterfall described above.

8.      **2023 Takings Lawsuit Against U.S. Government**

As described above, in September 2012, Ligado filed an application to modify its existing MSS license to obtain the authorizations needed to enable the development of nationwide terrestrial services to complement its existing satellite infrastructure.  The Debtors then filed a modification to that application on December 31, 2015 (the "2015 FCC Application").  The DOD and DOC initially supported Ligado's 2015 FCC Application.  That support aligned with the position of GPS manufacturers themselves, who had worked with Ligado and other stakeholders operating in nearby spectrum bands to mitigate potential interference risks.  It also comported with data from testing arranged by Ligado and performed at a lab sponsored by DOD and DOC, the results of which had demonstrated that Ligado's terrestrial services would not harmfully interfere with the vast majority of GPS receivers.

In 2018, however, the DOD and DOC suddenly reversed their position and leveled unfounded claims against the Debtors and the effect their terrestrial-based services would have on GPS systems.  Unbeknownst to the Debtors and (upon information and belief) the FCC, DOD had taken the Ligado's exclusively licensed spectrum by operating previously undisclosed systems that use—and indeed, depend on—that spectrum.  According to government officials, these previously undisclosed systems depend on the entirety of the Debtors' spectrum authorized for wireless terrestrial 5G services and are needed by DOD on a permanent basis.   Notwithstanding DOD's

45

and DOC's position, in April 2020 the FCC unanimously rejected the agencies' unsupported claims of GPS interference and granted the Debtors' application to provide ATC services.

Rather than compensating the Debtors for DOD's appropriation of the Debtors' licensed spectrum, DOD, acting in concert with DOC, improperly took steps to interfere with implementation of the FCC Order and to prevent the Debtors from using their own authorized spectrum for terrestrial services, from realizing the value of their FCC license and newly modified ATC authority, from securing a return on its immense investments, and from discovering DOD's use of their property. DOD and DOC have forced the Debtors' terrestrial airwaves to remain quiet—rendering the Debtors' valuable spectrum a quiet zone within which the Debtors' terrestrial commercial services cannot be deployed—both through physical occupation and by preventing the Debtors from using its FCC license to provide terrestrial services in their spectrum.

DOD and DOC effectuated this taking by, among other things, physically occupying the spectrum, preventing Ligado from using its spectrum, and refusing to implement the FCC Order granting Ligado ATC authority. DOD's refusal to cooperate with Ligado to address spectrum interference concerns, as contemplated by the FCC Order, began upon the Order's issuance and continues through the present. That refusal has prevented Ligado from commencing ATC operations. In addition, DOD and DOC have engaged in a number of subsidiary efforts to further their overarching goal of preventing Ligado from using its FCC-granted ATC authority. Those efforts include threatening the Debtors' potential business partners by warning them that they would not be eligible for lucrative government contracts if they worked with the Debtors; refusing to work with the Debtors and share information necessary for Debtors to use their spectrum; and publicly spreading false and harmful information about the Debtors' planned services. Representatives of DOD gave incomplete and misleading testimony to Congress that caused Congress to pass legislation facilitating DOD's efforts to block the Debtors' use of the spectrum. As a result, DOD and DOC have excluded the Debtors from their own spectrum and deprived the Debtors of the value of their FCC license and, in particular, the ATC authority conveyed by that license. DOD and DOC continued their taking of the Debtors' exclusive property without paying just compensation to the Debtors, threatening to destroy the Debtors' company in the process. In addition, the United States, by enacting the 2021 NDAA, has effected a legislative taking of the Debtors' property rights. The 2021 NDAA targeted the Debtors with precision, destroying the value of the Debtors' exclusively licensed spectrum, and rendering worthless the Debtors' 5G ATC authority.

As a result of those actions, among others, on October 12, 2023, Ligado filed *Ligado Networks LLC v. United States, et al.,* C.A. No. 23-cv-01797 (Fed. Cl.) (the "USG Lawsuit"), in the U.S. Court of Federal Claims against the United States of America, the DOD, the DOC and the National Telecommunications and Information Administration (collectively, the "Government"), seeking just compensation for the U.S. Government's physical, categorical, regulatory and legislative takings of Ligado's property. The Government filed a motion to dismiss on January 25, 2024. On February 9, 2024, Iridium Communications, Inc., Aireon LLC, the Air Line Pilots Association, International, Airlines for America, and the International Air Transport Association filed a motion for leave to file a brief as *amici curiae* in support of the Government's motion to dismiss (the "Amicus Motion"). The Debtors filed an opposition to the Amicus Motion on February 23, 2024. The court granted the Amicus Motion on April 24, 2024, and ordered the Government and the Debtors to file briefs responding to a limited question concerning judicial

reviewability of FCC orders, raised in the Amicus Motion. The parties filed those briefs on May 1, 2024 as ordered by the Court. The Debtors filed their opposition to the Government's motion to dismiss on March 25, 2024, and the Department of Justice filed its reply in support of the motion to dismiss on May 6, 2024. On July 29, 2024, the court ordered the parties to file supplemental briefs in response to the court's questions. The parties filed supplemental brief responses on September 9, 2024. On November 18, 2024, the Court of Federal Claims denied the U.S. Government's motion to dismiss in part, ruling that Ligado has alleged a physical, regulatory, categorical, but not a legislative taking. The Court of Federal Claims found that a property interest does exist in Ligado's FCC license vis-à-vis the Department of Defense but not vis-à-vis the FCC.

On January 16, 2025, the Government filed a motion seeking certification of an interlocutory appeal of the Court's order denying the Government's Motion to Dismiss and a stay of all discovery pending resolution of the government's request for interlocutory appeal and, if granted, the Federal Circuit's decision on that appeal. Ligado filed an opposition to the Government's motion on January 30, 2025. The Government's reply to Ligado's opposition was filed on February 12, 2025. On February 28, 2025, the Court issued an order (1) granting the U.S. Government's motion to certify its November Opinion and Order for interlocutory appeal, and (2) staying the case pending this appeal to Federal Circuit Court of Appeals. In granting the motion, the Court found that the November Opinion and Order "involves a controlling question of law with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." The Government applied to the Federal Circuit for leave to appeal on March 10, 2025 and the Company filed its opposition and conditional cross petition on March 20, 2025. The Government filed an answer to the Company's opposition and conditional cross petition on March 27, 2025. On May 20, 2025, the Federal Circuit Court of Appeals granted the Government's petition to appeal and denied the Company's cross-petition.

### 9.     **Inmarsat's Breach of Cooperation Agreement**

As described above, pursuant to the Cooperation Agreement, Inmarsat and the Debtors agreed to cooperatively allocate their collective licensed MSS spectrum in the L-band into contiguous spectrum blocks within the spectrum and at the power levels agreed upon by the parties and set forth in the Cooperation Agreement. Inmarsat intended to use its spectrum for MSS, and the Debtors intended to use their spectrum to offer nationwide terrestrial services and MSS, all as defined in parameters specified by the parties and set out in detail in the Cooperation Agreement.

The Parties agreed that Inmarsat would help Ligado obtain the necessary FCC license authorization and any other necessary government approvals. Further, the Cooperation Agreement requires resolution of certain interference issues between the Debtors' planned terrestrial wireless service and Inmarsat's operations in or near airports and waterways. Thus, Inmarsat was also obligated to implement the so-called "Spectrum Plans" contemplated in the Cooperation Agreement and to use its best commercial efforts to ensure that Ligado received the full anticipated benefit of the coordinated spectrum.

Inmarsat, however, failed to, among other things, adequately resolve the interference issues with respect to its aviation and maritime customer terminals operating on the Inmarsat system. Shortly after entry of the FCC Order and after the Debtors made the Inmarsat 2020 Prepayment,

and 10 years after assuming the obligations under the Cooperation Agreement, Inmarsat disclosed that it was likely years away from resolving those issues. To make matters worse, Inmarsat's customers continued to raise concerns with both Ligado and the relevant government regulators, all while Inmarsat sat idle despite its contractual obligations. As a result of Inmarsat's failures, Ligado did not receive material benefits owed to it by Inmarsat under the Cooperation Agreement.

Moreover, unbeknownst to Ligado, the DOD has for some time been operating systems that use or depend on Ligado's authorized spectrum. The DOD's reliance on that spectrum led the DOD to oppose Ligado's FCC modification application, and to prevent Ligado's use of that spectrum even after the company obtained FCC approval. Based on its work with the DOD, Inmarsat knew that the DOD would oppose Ligado's deployment of its terrestrial wireless service regardless of FCC approval. Notwithstanding that knowledge and obligation to assist Ligado in securing necessary regulatory approvals, Inmarsat continued to accept Ligado's payments and induced Ligado into making additional and accelerated payments.

Inmarsat has received a windfall of over $1.7 billion, including a $250.0 million payment intended in part to compensate for the cost of resolving terminal interference issues.

10.    **2022 – 2024 Liquidity Issues and Financing Efforts**

As described above, the Debtors have been working to create the technology and commercial ecosystem of chipset, device, and equipment suppliers necessary for the deployment of their coordinated licensed and leased spectrum. Despite making significant progress, the Debtors have been thwarted by DOD and DOC's uncompensated taking of the Debtors' spectrum and continued opposition to the FCC Order and the Debtors' integration of an ATC into their MSS. These actions have resulted in significant uncertainty surrounding the Debtors' business prospects and, ultimately, the value of their spectrum. As a result, the Debtors do not yet generate sufficient cash flows from operations to finance their business and, beginning in 2022, their liquidity started running low. Indeed, as of March 31, 2022, the Debtors had cash, cash equivalents, and short-term investments of approximately $44.9 million, and by June 30, 2022, their liquidity had dropped to $21.2 million.

In response to their liquidity issues, the Debtors sought incremental financing from certain of the Prepetition Secured Parties to extend the Debtors' runway and enable them to continue to build the commercial partnerships necessary to deploy their coordinated licensed and leased spectrum, as well as negotiate an agreement to resolve their disputes and avoid commencing the lawsuit against the U.S. Government. As discussed above, in August 2022, the Debtors obtained the initial draw of the Incremental 1.5 Lien Loans. Also in August 2022, the Debtors retained Perella Weinberg Partners LP ("PWP") as their investment banker to assist with their restructuring efforts generally.

By November 2022, the Debtors' liquidity was once again approaching low levels, and the Debtors sought to raise additional financing to bridge to a more holistic solution to their liquidity needs and capital structure. To that end, in December 2022, the Debtors engaged in negotiations with certain of the Prepetition Secured Parties to provide bridge financing and launched a consent solicitation seeking the requisite consents to amend the Prepetition Secured Documents to incur such financing.

During this time, the Debtors also engaged in negotiations with Inmarsat with respect to modifications to certain terms of the Cooperation Agreement. While these negotiations were ongoing, Inmarsat commenced a lawsuit against the Debtors in New York state court alleging that the Debtors had anticipatorily beached the Cooperation Agreement. Inmarsat sought money damages, a judicial determination that the parties should move to a particular "Default Spectrum Plan" that is more favorable to Inmarsat, and a judicial determination that the Debtors' claims against Inmarsat for failing to resolve the terminal interference issues are meritless. The Debtors vehemently deny this allegation.

In December 2022, the Debtors were able to obtain the initial draw under the Prepetition First Lien Loan Facility and negotiate Amendment No. 7 to the Cooperation Agreement. Pursuant to Amendment No. 7 to the Cooperation Agreement, a portion of the $395.8 million payment due to Inmarsat was deferred and Inmarsat agreed to dismiss its complaint without prejudice in exchange for a $30.0 million payment to Inmarsat.

In April 2023 and then again in July 2023 and November 2023, the Debtors entered into amendments to the Prepetition First Lien Loan Agreement to provide additional liquidity in the form of Prepetition First Lien Out Term Loans. The Debtors used this additional runway to fund an additional payment to Inmarsat and continue negotiating with Inmarsat and certain of the Prepetition Secured Parties around a comprehensive solution to the Debtors' recurring liquidity issues and unsustainable capital structure.

By January 2024, however, no commercial resolution with Viasat and Inmarsat had been reached and the Debtors' liquidity position had once again deteriorated. As a result, throughout 2024, the parties entered into numerous amendments to the Cooperation Agreement to further delay the payments to Inmarsat until January 13, 2025 (after application of the grace period). At the same time, the Debtors engaged with their key stakeholders to reach a consensus with respect to a comprehensive recapitalization transaction, which ultimately resulted in an agreement in principle premised on an acceptable commercial resolution with Inmarsat.

Over the course of 2024, the Debtors engaged in extensive discussions with Viasat and Inmarsat around a comprehensive resolution of the Cooperation Agreement to restructure the Debtors' significant payment obligations thereunder. The parties determined a framework for a commercial agreement and agreed to work towards definitive documentation for the transaction contemplated thereby. Unfortunately, in September 2024, Viasat suddenly raised a purported tax issue that upended the viability of the entire transaction that the parties had been pursuing. Viasat proposed a new, alternative structure in October 2024, but the Debtors determined that Viasat's proposal did not provide a fair value exchange and was not in the best interests of the Debtors. Since that time, the Debtors have endeavored to negotiate with Viasat to reach a comprehensive resolution of the Cooperation Agreement. However, Viasat ultimately refused to provide additional payment extensions—which would allow the parties more time to reach an out-of-court solution—unless the Debtors made a substantial payment to Inmarsat for an extension, knowing full well that the Debtors did not have the liquidity to make such payment.

Without an extension and facing an obligation to make significant payments to Inmarsat under the Cooperation Agreement, and insufficient liquidity to meet these obligations due to the U.S. Government's uncompensated taking, the Debtors were forced to seek bankruptcy protection.

**SECTION III.**
**MATERIAL DEVELOPMENTS AND ANTICIPATED DEVELOPMENTS OF THE**
**CHAPTER 11 CASES**

A.    *Overview of Chapter 11*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and estates. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets. In furtherance of these two goals, section 362 of the Bankruptcy Code generally provides for, upon the filing of a petition for relief under chapter 11, an automatic stay of substantially all acts and proceedings against a debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's chapter 11 case.

The commencement of a case under chapter 11 creates an estate comprising all of the debtor's legal and equitable interests as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding, subject to the occurrence of an effective date, upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions and the terms of the plan, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

Certain holders of claims against, or interests in, a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require a plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.

B.    *Summary of Key Developments in the Chapter 11 Cases*

As the Company proceeded with the initiatives described above, it became evident that a restructuring though chapter 11 would best position Ligado for long-term success. To ensure that the Debtors' Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation, the Debtors committed to certain case milestones under the RSA and the DIP Facility. Subject to Court approval, the Debtors intend to solicit votes to accept or reject the Plan and proceed in accordance with the following timeline.

| Event | Date |
|---|---|

| Voting record Date | **June 20, 2025** |
|---|---|
| Solicitation Mailing Deadline | **As soon as practicable after entry of the Order, but in no event more than three (3) business days thereafter** |
| Publication Deadline | **As soon as practicable after entry of the Order, but in no event more than three (3) business days thereafter** |
| Plan Supplement Filing Deadline | **The date that is seven (7) days before the Voting Deadline (expected to be July 17, 2025)** |
| Voting Deadline | **July 24, 2025 at 4:00 p.m. (prevailing Eastern Time)** |
| Plan Objection Deadline | **July 24, 2025 at 4:00 p.m. (prevailing Eastern Time)** |
| Deadline to file Voting Report | **Three business-days prior to the confirmation hearing, at 4:00 p.m. (prevailing Eastern Time)** |
| Confirmation Hearing Date | **August 7, 2025, at 2:00 p.m. (prevailing Eastern Time), subject to the Court's availability** |

C.      *First-Day Relief and Other Case Matters*

On the Petition Date, the Debtors filed several motions (the "<u>First Day Motions</u>") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  At a hearing on January 7, 2025, (the "<u>First Day Hearing</u>") the Bankruptcy Court granted certain of the relief initially requested in the First Day Motions on an interim and final basis, as applicable.  As of the date hereof, the Bankruptcy Court has granted all of the First Day Motions on a final basis, as specified below.[23]

- **Joint Administration Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 89] approving the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 3] on a final basis.

---

[23]      The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/ligado.

- **Cash Management Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 90] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Utilize Their Credit Cards, and (C) Engage in Intercompany Transactions, (II) Granting a Waiver of the Requirements of Section 345(B) of the Bankruptcy Code and U.S. Trustee Guidelines, and (III) Granting Related Relief* [Docket No. 7] (the "Cash Management Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Cash Management Motion on a final basis on February 3, 2025 [Docket No. 161].

- **Taxes Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 91] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 11] (the "Taxes Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Taxes Motion on a final basis on January 31, 2025 [Docket No. 156].

- **Utilities Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 92] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Proposed Adequate Assurance of Payment for Future Utility Services and Related Procedures, (II) Prohibiting Utility Companies to Alter, Refuse, or Discontinue Services, and (III) Granting Related Relief* [Docket No. 13] (the "Utilities Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Utilities Motion on a final basis on February 3, 2025 [Docket No. 162].

- **Insurance Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 93] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Policies and Surety Bond Program and Honor Obligations Thereunder, and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies and Surety Bonds, and (II) Granting Related Relief* [Docket No. 14] (the "Insurance Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Insurance Motion on a final basis on February 3, 2025 [Docket No. 163].

- **Employee Wages Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 94] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Satisfy Prepetition Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs, and (II) Granting Related Relief* [Docket No. 15] (the "Employee Wages Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Employee Wages Motion on a final basis on February 3, 2025 [Docket No. 164].

- **Redaction Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 95] approving the *Debtors' Motion for Entry of an Order*

*(I) Authorizing the Debtors to Redact Certain Personal Identification Information and (II) Granting Related Relief* [Docket No. 16] on a final basis.

- **Foreign Representative Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 96] approving the *Debtors' Motion for Entry of an Order Authorizing Ligado Networks LLC to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505* [Docket No. 17] on a final basis.

- **Omni Retention Application**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 97] approving the *Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent and (II) Granting Related Relief* [Docket No. 18] on a final basis.

D.   *DIP Financing*

On January 6, 2025, the Debtors filed Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; And (VI) Granting Related Relief [Docket No. 4] (the "DIP Motion").  On January 8, 2025, the Bankruptcy Court entered an order [Docket No. 104] approving the DIP Motion on an interim basis (the "Interim DIP Order").  The Bankruptcy Court entered an order approving the DIP Motion on a final basis (the "Final DIP Order") on February 5, 2025 [Docket No. 188] authorizing Ligado Networks LLC, as borrower, to obtain postpetition financing through a superpriority senior secured term loan credit facility in the aggregate principal amount of up to $939,133,507. Following entry of the Final Order, the Debtors repaid the 1L First Out Loan Obligations in full.

In addition, the Debtors intend to shortly file a motion seeking approval of entry into an amendment to the DIP Credit Agreement that provides for the lesser of the Refund Amount (as defined in the AST Definitive Agreements) and $550 million in principal amount of incremental DIP Loans (as well as applicable interest, fees or other amounts in connection with such principal that will be included in the DIP Facility as Capitalized Amounts) in order to obtain (on or before the 60th day following entry of the AST Definitive Agreements Order) the Backstop Commitment (as defined in the AST Definitive Agreements).  The Backstop Commitment will provide for payment of cash proceeds to Ligado in an amount sufficient for it to pay the Refund Amount (as defined in the AST Definitive Agreements) upon the occurrence of certain conditions set forth in the AST Definitive Agreements.  Such Refund Amount is intended to reimburse AST for funds it advanced under the Framework Agreement in respect of payment obligations owed to Inmarsat under the Cooperation Agreement prior to the occurrence of such conditions.  For the avoidance of doubt, the approximately $2.7 billion Exit First Lien Facility described herein accounts for such incremental DIP loans through the cashless conversion of all outstanding DIP Loans as of the Outside Date.

E.     *AST Break-Up Fee Motion*

On January 27, 2025, the Bankruptcy Court entered an order [Docket No. 144] approving the *Debtors' Motion for Entry of an Order Authorizing Payment of the AST Transaction Break-Up Fee and Break-Up Reimbursements* [Docket No. 61].

F.     *Other Procedural and Administrative Motions*

1.     Ordinary Course Professionals

On February 4, 2025, the Bankruptcy Court entered an order [Docket No. 176] approving the *Debtors' Motion for Entry of an Order (I) Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business, and (II) Granting Related Relief* [Docket No. 126].

2.     Interim Compensation Motion

On February 7, 2025, the Bankruptcy Court entered an order [Docket No. 195] approving the *Debtors' Motion for Entry of an Order Establishing Procedures for Compensation and Reimbursement of Professionals* [Docket No. 134].

3.     Retention Applications

The Debtors obtained authority from the Bankruptcy Court to retain various professionals, including, without limitation:

- Milbank LLP, as lead bankruptcy counsel [Docket No. 249];

- Richards, Layton & Finger, P.A. as co-counsel [Docket No. 250]

- FTI Consulting, Inc. as financial advisors [Docket No. 251];

- Mayer Brown LLP as special counsel in the Inmarsat Adversary Proceeding (as defined below) [Docket No. 252];

- Omni Agent Solutions, Inc. as administrative agent [Docket No. 253];

- Paul, Weiss, Rifkind, Wharton & Garrison LLP as special litigation counsel in connection with the USG Lawsuit [Docket No. 254];

- Perella Weinberg Partners LP as investment banker to the Debtors [Docket No.255];

- Selendy Gay PLLC as special litigation counsel in connection with the USG Lawsuit [Docket No. 256];

- Ernst & Young LLP as provider of audit and tax services [Docket No. 260]; and

- PwC US Business Advisory LLP as a bankruptcy transaction advisory services provider [Docket No. 371].

G.    *Schedules And Statements*

On February 14, 2025, the Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs for each Debtor entity. *See generally*, [Docket Nos. 212–33].

H.    *Cooperation Agreement Litigation*

Certain of the Debtors have asserted claims against Inmarsat arising in connection with the Inmarsat Cooperation Agreement (the "Cooperation Agreement Litigation"). Immediately after commencing these Chapter 11 Cases, on January 7, 2025, the Company commenced an adversary proceeding under case number 25-50000 (the "Inmarsat Adversary Proceeding") against Inmarsat, captioned *Ligado Networks LLC, et al., v. Inmarsat Global Limited* in the United States Bankruptcy Court for the District of Delaware asserting several causes of action against Inmarsat in connection with Inmarsat's failures to honor its obligations under the Inmarsat Cooperation Agreement between Inmarsat and the Company. In the Inmarsat Adversary Proceeding, the Company asserts that Inmarsat failed to fulfill its contractual obligations under the Inmarsat Cooperation Agreement, depriving the Company of the full benefits for which it has bargained and paid. The Company alleges that Inmarsat breached the Inmarsat Cooperation Agreement, among other reasons, by failing to (i) modify or replace user terminals to eliminate interference, (ii) provide spectrum at agreed power levels, (iii) sufficiently support Ligado's license application; and (iv) act in good faith. The Company also alleged certain equitable claims as well as a claim for fraudulent inducement and for fraudulent conveyance. The Company seeks more than $1.7 billion in damages. On February 27, 2025, Inmarsat filed a motion seeking to dismiss the complaint filed in the Cooperation Agreement Litigation.

On March 19, 2025, the Debtors dismissed the Inmarsat Adversary Proceeding from the Bankruptcy Court without prejudice. On the same day shortly after, the Debtors refiled the complaint against Inmarsat in the Supreme Court of the State of New York. This complaint asserts similar state law contract claims, but does not include a claim of fraudulent inducement or fraudulent conveyance. On April 4, 2025, Inmarsat removed the case to the U.S. District Court for the Southern District of New York and filed on April 14, 2025 to transfer the case to the Delaware Bankruptcy Court. On April 21, 2025, the Debtors moved to remand the action to New York state court and filed a Brief in Opposition to the Motion to Transfer on April 30, 2025. On May 9, 2025, Inmarsat filed a combined brief both in opposition to Ligado's motion to remand and in further support of its motion to transfer. Ligado filed its reply brief in further support of its motion to remand on May 21, 2025. Both the motion to remand and the motion to transfer have been fully briefed and are pending before the United States Bankruptcy Court for the Southern District of New York. As provided in the proposed revised form of order granting the AST Approval Motion, the parties have agreed to the tolling of the Cooperation Agreement Litigation.

I.    *Inmarsat Motion to Compel Payment*

On February 6, 2025, Inmarsat filed a motion, captioned *Inmarsat Global Limited's Motion to Compel Ligado Networks LLC and Ligado Networks (Canada)'s Compliance with 11 U.S.C.*

*§§ 365(d)(5) and 503(b)* (the "Inmarsat Motion to Compel") [Docket No. 193], seeking entry of an order (i) compelling the Debtors to pay to Inmarsat all amounts arising on and after March 7, 2025 under the Cooperation Agreement, or, in the alternative, (ii) compelling such payments as and when they come due as administrative expenses in the same amount.  On February 20, 2025, the Debtors filed the *Debtors' Objection to Inmarsat's Motion to Compel* [Docket No. 257].  On February 27, 2025, Inmarsat filed the *Inmarsat Global Limited's Reply in Further Support of Motion to Compel Ligado Networks LLC and Ligado Networks (Canada)'s Compliance with 11 U.S.C. §§ 365(d)(5) and 503(b)* [Docket No. 274].  On March 4, 2024, the Bankruptcy Court held a hearing on the Inmarsat Motion to Compel at the conclusion of which the Bankruptcy Court took the matter under advisement.

J.    *Bar Date Order*

On March 10, 2025, the Debtors filed *Debtors' Motion for an Order Establishing (I) Various Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving Notices of Bar Dates, and (IV) Granting Related Relief*, [Docket No. 324].  On March 19, 2025, the Court entered the *Order Establishing (I) Various Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving Notices of Bar Dates, and (IV) Granting Related Relief* [Docket No. 340] (the "Bar Date Order").  As further set forth therein, the Bar Date Order establishes several bar dates including a General Bar Date of April 17, 2025, and a Governmental Bar Date of July 7, 2025.

K.    *AST Definitive Agreements Motion*

On March 22, 2025, the Debtors filed the AST Approval Motion under seal.  A redacted version of the AST Approval Motion was filed on March 26, 2025 [Docket No. 359].  On April 25, 2025, Inmarsat filed *Inmarsat Global Limited's Objection to Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the AST Definitive Documents* (the "Inmarsat AST Transaction Objection") [Docket No. 462].  On June 13, 2025, the Debtors filed a *Notice of Revised Form of An Order (I) Authorizing the Debtors to Enter Into the AST Definitive Documents and (II) Granting Related Relief* (the "Noticed of Revised Form of AST Approval Order").  On June 23, 2025, the Court granted the AST Approval Motion and entered the *Order Authorizing the Debtors to Enter Into the AST Definitive Documents and (II) Granting Related Relief* (including the Mediated Agreement, attached as Exhibit 1 thereto, the "AST Definitive Agreements Order") [Docket No. 692].

L.    *Mediation*

On March 31, 2025, the Debtors filed the *Certification of Counsel Regarding Agreement to Mediate and Order (I) Appointing a Mediator and (II) Granting Related Relief* [Docket No. 383].  On March 31, 2025, the Court entered *Order (I) Appointing a Mediator and (II) Granting Related Relief*  [Docket No. 384].  On April 1, 2025, the Court entered an *Order Assigning Adversary Proceeding to Mediation and Setting Mediation Deadlines* [Docket No. 391].  The Debtors, the Ad Hoc First Lien Group, the Ad Hoc Crossholder Group, AST & Science, LLC, and Inmarsat Global Limited (collectively, the "Mediation Parties") actively engaged in mediation with respect to the issues to be addressed in the Mediation.  On June 13, the Debtors filed the

Noticed of Revised Form of AST Approval Order which included the principle terms of the mediated resolution.

M.     *KEIP Order*

On April 11, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Implementation of a Key Employee Incentive Program* [Docket No. 422]. On April 29, 2025, the Court entered the *Order Authorizing the Implementation of a Key Employee Incentive Program* [Docket No. 473].

N.     *Motion to Extend Period to Assume or Reject Unexpired Leases of Non-Residential real Property*

On May 2, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 504]. On May 19, 2025, the Court entered the *Order (I) Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 557] extending the applicable the time by which the Debtors may assume or reject any Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code through and including the earlier of (i) August 4, 2025, and (ii) the date of entry of an order confirming the Debtors' chapter 11 plan.

O.     *Exclusivity Extension Motion*

On May 5, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 509]. On May 19, 2025, the Court entered the *Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 558] extending the Exclusive Filing Period through and including August 4, 2025, and the Exclusive Solicitation Period through and including October 2, 2025.

P.     *Boeing Motion to Compel Assumption or Rejection*

On June 4, 2025, Boeing filed a *Motion to Compel the Debtors to Make a Final Determination Whether to Assume or Reject the SkyTerra Contract* [Docket No. 627] (the "Boeing Motion"). Th Boeing Motion seeks to compel the Debtors to make a final and irrevocable determination as of the plan supplement filing date with respect to whether the Debtors will assume, assume and assign, or reject the SkyTerra Contract (as defined in the Boeing Motion) and, if a decision to assume such contract is made, seeks to require a deposit of the alleged cure amounts within five days of entry of an order confirming the Plan. On June 16, 2025, the Debtors filed an objection to the Boeing Motion [Docket No. 659]. At a hearing on the Boeing Motion held on June 23, 2025, the Court determined to continue the Boeing Motion to the Confirmation Hearing.

Q.     *Boeing and L3 Harris Litigation*

On June 13, 2025, certain of the Debtors filed a complaint against Boeing and L3Harris Technologies, Inc. ("L3 Harris"), in the Supreme Court of the State of New York under case number 653593/2025 (the "Boeing Litigation"). In the Boeing Litigation, Ligado Networks LLC,

asserts several causes of action against Boeing and its subcontractor, L3Harris, in connection with failures to honor and fulfill contractual obligations concerning the SkyTerra-2 Satellite under the Boeing Agreement.

### SECTION IV.
### SUMMARY OF JOINT CHAPTER 11 PLAN

THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN, ON THE OTHER HAND, THE TERMS OF THE PLAN CONTROL.

HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

A.   *Administrative Claims and Other Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, General Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.   **General Administrative Claims**

Each holder of an Allowed General Administrative Claim, to the extent such Allowed General Administrative Claim has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Claim, Cash equal to the Allowed amount of such General Administrative Claim on the Effective Date (or, if payment is not then due, when such payment otherwise becomes due in the applicable Debtor's ordinary course of business without further notice to or order of the Bankruptcy Court) or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, unless otherwise agreed by the holder of such General Administrative Claim and the applicable Debtor.  For the avoidance of doubt, holders of a General Administrative Claim shall not be required to file a request for payment of a claim with the Bankruptcy Court.  Further, pursuant to Local Rule 3002-1, notwithstanding anything to the

contrary contained in this Plan, the government shall not be required to file any proof of claim or application for allowance for any claims covered by section 503(b)(1)(B), (C), or (D).

2.    **Professional Fee Claims**

   a.    **Final Fee Applications**

All final requests for payment of Professional Fee Claims incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors, the U.S. Trustee, and all other parties that have requested notice in these Chapter 11 Cases by no later than forty-five (45) days after the Effective Date, unless the Reorganized Debtors agree otherwise in writing.  Objections to Professional Fee Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the applicable Professional within twenty-one (21) days after the filing of the final fee application with respect to the applicable Professional Fees.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Professional Fee Escrow Account; *provided*, *however*, that if the funds in the Professional Fee Escrow Account are insufficient to pay the full Allowed amounts of the Professional Fee Claims, the Reorganized Debtors shall promptly pay any remaining Allowed amounts from their Cash on hand.  Following the Effective Date, any provision of the Interim Compensation Order requiring Professionals to file an Interim Fee Application shall be waived.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Debtors are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Bankruptcy Court authorizing the payment of such professionals providing ordinary course services), which payments may continue notwithstanding the occurrence of Confirmation and Consummation.  Upon the Effective Date, the DIP Agent shall have no further obligations with respect to the Carve Out under and as defined in the DIP Orders.

   b.    **Professional Fee Escrow Account**

As soon as practicable following the Confirmation Date, the Debtors shall fund the Professional Fee Escrow Account in an amount equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  No funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Reorganized Debtors.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall be

remitted to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity being required.

Professionals shall reasonably and in good faith estimate their unpaid Professional Fee Claims incurred in rendering services to the Debtors, or their Estates, as applicable, before and as of the Confirmation Date projected to be outstanding as of the anticipated Confirmation Date and shall deliver such estimate to counsel for the Debtors no later than ten (10) Business Days before the anticipated Confirmation Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional in order for such Professional to be entitled to payment from the Professional Fee Escrow Account. The total aggregate amount so estimated to be outstanding as of the anticipated Confirmation Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

### c.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors on and after the Effective Date. On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.    DIP Claims

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (1) the principal amount outstanding under the DIP Facility on such date, (2) all interest accrued and unpaid thereon to the date of payment (including interest accrued through the Effective Date), and (3) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

On the Effective Date, except to the extent a holder has agreed to alternative treatment, in full and final satisfaction of each Allowed DIP Claim, the DIP Loans giving rise to such Allowed DIP Claim shall be converted on a dollar-for-dollar basis into an Exit First Lien Loan in accordance with the DIP Documents and the Exit First Lien Facility Documents, and all Liens that secure the Obligations (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall be reaffirmed, ratified, and shall automatically secure all Obligations (as defined in the Exit First Lien Facility Credit Agreement) under the Exit First Lien Facility Credit Agreement, subject to the priorities of liens and payments set forth in the Exit First Lien Facility Documents.

4.      **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of sections 511 and 1129(a)(9) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim also is secured, such Claim shall, to the extent it is Allowed, be treated as an Allowed Other Secured Claim if such Claim is not otherwise paid or satisfied in full.

B.      *Classification and Treatment of Claims and Interests*

1.      **Classification of Claims and Interests**

Claims and Interests, except for General Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class.  To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

| Class | Claims or Interests | Status | Voting Rights |
|-------|--------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | First Lien Claims | Impaired | Entitled to vote |
| 4 | 1.5 Lien Term Loan Claims | Impaired | Entitled to vote |
| 5 | Second Lien Notes Claims | Impaired | Entitled to vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to accept |
| 7 | Intercompany Claims | Either (i) Unimpaired or (ii) Impaired | Either (i) conclusively presumed to accept/not entitled to vote or (ii) deemed to have |

| **Class** | **Claims or Interests** | **Status** | **Voting Rights** |
|---|---|---|---|
| | | | rejected/not entitled to vote |
| 8 | Intercompany Interests | Either (i) Unimpaired or (ii) Impaired | Either (i) conclusively presumed to accept/not entitled to vote or (ii) deemed to have rejected/not entitled to vote |
| 9 | Existing Series A-0 Preferred Units | Impaired | Entitled to vote |
| 10 | Existing Series A-1 Preferred Units | Impaired | Entitled to vote |
| 11 | Existing Series A-2 Preferred Units | Unimpaired | Deemed to accept |
| 12 | Existing Series B Preferred Units | Unimpaired | Deemed to accept |
| 13 | Existing Series C Preferred Units | Unimpaired | Deemed to accept |
| 14 | Existing Series A Common Units | Unimpaired | Deemed to accept |
| 15 | Existing Series B Common Units | Unimpaired | Deemed to accept |

2.    **Treatment of Claims and Interests**

a.    **Class 1 – Priority Non-Tax Claims**

   i.    *Classification*:  Class 1 consists of all Allowed Priority Non-Tax Claims.

   ii.    *Treatment*:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim, if any, will, at the option of the Debtors or the Reorganized Debtors, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter.

   iii.    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Priority Non-Tax Claims, if any, are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy

Code and, therefore, are not entitled to vote to accept or reject the Plan.

**b.** **Class 2 – Other Secured Claims**

    i.    *Classification*:   Class 2 consists of all Allowed Other Secured Claims.

    ii.    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, (i) each such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such holder's Allowed Other Secured Claim will be reinstated, or (iii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

    iii.    *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**c.** **Class 3 – First Lien Claims**

    i.    *Classification*:  Class 3 consists of all Allowed First Lien Claims.

    ii.    *Allowance*:  The First Lien Claims shall be Allowed (i) for the First Lien Term Loan Claims, in the aggregate principal amount of approximately $75,994,962 (including First Lien Loan PIK Interest), plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First Lien Credit Agreement or related documents on account of the First Lien Term Loan Claims as of the Effective Date (including amounts accrued through the Effective Date); and (ii) for the First Lien Notes Claims, in the aggregate principal amount of approximately $5,071,730,423 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First Lien Indenture or related documents on account of the First Lien Notes Claims as of the Effective Date (including amounts accrued through the Effective Date).

    iii.    *Treatment*:  Except to the extent such holder agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable

thereafter, each holder of an Allowed First Lien Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed First Lien Claim, its Pro Rata share of the New Series A-1 Preferred Units.

iv. *Voting*: Class 3 is Impaired under the Plan. Therefore, holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

**d.** **Class 4 – 1.5 Lien Term Loan Claims**

i. *Classification*: Class 4 consists of all Allowed 1.5 Lien Term Loan Claims.

ii. *Allowance*: The 1.5 Lien Term Loan Claims shall be Allowed in the aggregate principal amount of approximately $591,504,126 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the 1.5 Lien Credit Agreement or related documents on account of the 1.5 Lien Term Loan Claims as of the Effective Date.

iii. *Treatment*: Except to the extent such holder agrees to less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed 1.5 Lien Term Loan Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed 1.5 Lien Term Loan Claim, its Pro Rata share of the New Series A-2 Preferred Units.

iv. *Voting*: Class 4 is Impaired under the Plan. Therefore, holders of Allowed 1.5 Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

**e.** **Class 5 – Second Lien Notes Claims**

i. *Classification*: Class 5 consists of all Allowed Second Lien Notes Claims.

ii. *Allowance*: The Second Lien Notes Claims shall be Allowed in the aggregate principal amount of approximately $2,050,029,494 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the Second Lien Indenture or related documents on account of the Second Lien Notes Claims as of the Effective Date.

iii. *Treatment*: Except to the extent such holder agrees to less favorable treatment, on the Effective Date, each holder of an Allowed Second Lien Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its

Allowed Second Lien Notes Claim, its Pro Rata share of the New Series A-3 Preferred Units.

iv.     *Voting*:  Class 5 is Impaired under the Plan.  Therefore, holders of Allowed Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

**f.     Class 6 – General Unsecured Claims**

i.     *Classification*:  Class 6 consists of all Allowed General Unsecured Claims.

ii.     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Claim and the Debtor entity against which such Allowed General Unsecured Claim is asserted agree to less favorable treatment for such holder, in full satisfaction of its Allowed General Unsecured Claim, the holder thereof shall receive payment in Cash in an amount equal to such Allowed General Unsecured Claim plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing thereunder, if any, (i) on the Effective Date (or as soon as reasonably practicable thereafter) to the extent such Claim is due and payable on the Effective Date or (ii) to the extent such Claim is not due and payable on the Effective Date, in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such General Unsecured Claim.

iii.     *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**g.     Class 7 – Intercompany Claims**

i.     *Classification*:   Class 7 consists of all Allowed Intercompany Claims.

ii.     *Treatment*:   On the Effective Date, all Allowed Intercompany Claims, if any, will be adjusted, reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors subject to the consent of the Required Consenting Creditors and in accordance with the Restructuring Transactions Memorandum.

iii.     *Voting*:  Claims in Class 7 are either (i) Unimpaired, in which case the holders of such Claims are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan

or (ii) Impaired and not receiving or retaining any property under the Plan, in which case the holder of such Claims are deemed to have rejected the Plan, and are, therefore, not entitled to vote on the Plan.

**h.     Class 8 – Intercompany Interests**

i.    *Classification*:  Class 8 consists of all Intercompany Interests in the Debtors other than in Ligado, separately classified by Debtor.

ii.   *Treatment*:  On the Effective Date, all Intercompany Interests, if any, will be adjusted, reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Debtors subject to the consent of the Required Consenting Creditors and in accordance with the Restructuring Transactions Memorandum.

iii.  *Voting*:  Interests in Class 8 are either (i) Unimpaired, in which case the holders of such Interests are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan or (ii) Impaired and not receiving or retaining any property under the Plan, in which case the holders of such Interests are deemed to have rejected the Plan, and are, therefore, not entitled to vote on the Plan.

**i.     Class 9 – Existing Series A-0 Preferred Units**

i.    *Classification*:  Class 9 consists of all Allowed Existing Series A-0 Preferred Units.

ii.   *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A-0 Preferred Units shall retain its Existing Series A-0 Preferred Units, as amended by the Second Amended and Restated Operating Agreement, in the form of the New Series B-0 Preferred Units.

iii.  *Voting*:  Class 9 is Impaired under the Plan.  Therefore, holders of Allowed Existing Series A-0 Preferred Units are entitled to vote to accept or reject the Plan.

**j.     Class 10 – Existing Series A-1 Preferred Units**

i.    *Classification*:  Class 10 consists of all Allowed Existing Series A-1 Preferred Units.

ii.   *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A-1 Preferred Units shall retain its Existing Series A-1 Preferred Units, as

amended by the Second Amended and Restated Operating Agreement, in the form of the New Series B-1 Preferred Units.

iii.    *Voting*: Class 10 is Impaired under the Plan. Therefore, holders of Allowed Existing Series A-1 Preferred Units are entitled to vote to accept or reject the Plan.

**k.    Class 11 – Existing Series A-2 Preferred Units**

i.    *Classification*: Class 11 consists of all Allowed Existing Series A-2 Preferred Units.

ii.    *Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A-2 Preferred Units shall retain its Existing Series A-2 Preferred Units in the form of the New Series B-2 Preferred Units.

iii.    *Voting*: Class 11 is Unimpaired under the Plan. Holders of Allowed Existing Series A-2 Preferred Units are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**l.    Class 12 – Existing Series B Preferred Units**

i.    *Classification*: Class 12 consists of all Allowed Existing Series B Preferred Units.

ii.    *Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series B Preferred Units shall retain its Existing Series B Preferred Units in the form of the New Series C Preferred Units.

iii.    *Voting*: Class 12 is Unimpaired under the Plan. Holders of Allowed Existing Series B Preferred Units are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

**m.    Class 13 – Existing Series C Preferred Units**

i.    *Classification*: Class 13 consists of all Allowed Existing Series C Preferred Units.

ii.    *Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series C Preferred Units shall retain its Existing Series C Preferred Units in the form of the New Series D Preferred Units.

      iii.    *Voting*: Class 13 is Unimpaired under the Plan. Holders of Allowed Existing Series C Preferred Units are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### n.    Class 14 – Existing Series A Common Units

      i.    Classification: Class 14 consists of all Allowed Existing Series A Common Units.

      ii.    *Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series A Common Units shall retain its current Existing Series A Common Units.

      iii.    *Voting*: Class 14 is Unimpaired under the Plan. Holders of Allowed Existing Series A Common Units are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### o.    Class 15 – Existing Series B Common Units

      i.    *Classification*: Class 15 consists of all Allowed Existing Series B Common Units.

      ii.    *Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of Allowed Existing Series B Common Units shall retain its Existing Series B Common Units.

      iii.    *Voting*: Class 15 is Unimpaired under the Plan. Holders of Allowed Existing Series B Common Units are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### 3.    Special Provision Governing Unimpaired Claims, Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, nothing under the Plan shall impair, prevent or otherwise adversely affect, the Debtors' or Reorganized Debtors' rights and defenses in respect of any Unimpaired Claims, Executory Contracts, and/or Unexpired Leases including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, and Causes of Action against any such Unimpaired Claims, Executory Contracts, and/or Unexpired Leases.

4.      **Intercompany Interests**

To the extent reinstated under this Plan, (i) distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New Preferred Interests, and in exchange for the Debtors' and the Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims, and (ii) other than as described in the Restructuring Transactions Memorandum, all Intercompany Interests shall be owned on and after the Effective Date by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

C.      *Acceptance or Rejection of the Plan*

1.      **Voting Classes**

Holders of Claims or Interests in Classes 3, 4, 5, 9, and 10 as of the Voting Record Date are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (1) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (2) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

An Impaired Class of Interests shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, holders of at least two-thirds in amount of the Allowed Interests held by holders who actually voted in such Class have voted to accept the Plan.  For any Debtor that does not otherwise have an Impaired Class of Claims, the votes of a Class of Claims that is Impaired under the joint Plan to accept the Plan shall be deemed an acceptance of the Plan by an Impaired Class of Claims with respect to such Debtor.

2.      **Presumed Acceptance of the Plan**

Classes 1, 2, 6, 7, 8, 11, 12, 13, 14, and 15 are Unimpaired under the Plan.  Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.      **Confirmation Pursuant to Section 1129(a)(10) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or

Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and Bankruptcy Rules.

### 4. Elimination of Vacant Classes

Any Class that does not have a Claim or an Interest as of the date of the Confirmation hearing shall be deemed eliminated from the Plan for all purposes.

### 5. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### D. *Means for Implementation of the Plan*

### 1. General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan. All distributions made to holders of Allowed Claims and Interests in any Class in accordance with the Plan are intended to be, and shall be, final and indefeasible.

### 2. Restructuring Transactions

Prior to, on, or after the Effective Date, subject to and consistent with the terms of their obligations under the Plan and the Restructuring Support Agreement, and subject to the consent of the Required Consenting Creditors and to the extent applicable, the consent rights of AST, the Debtors shall be authorized to enter into such transactions and take such other actions (which, for the avoidance of doubt, shall in each case be in form, substance, and structure acceptable to the Required Consenting Creditors, and, to the extent applicable the consent rights of AST as set forth in the Restructuring Support Agreement) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, and as set forth in and consistent with the Restructuring Transactions Memorandum, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, and other applicable Definitive Documents, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement, and other applicable Definitive Documents; (3) the filing of appropriate certificates of incorporation, merger,

migration, consolidation, or other organizational documents with the appropriate governmental authorities pursuant to applicable law; (4) the execution and delivery of the New Organizational Documents and the issuance, distribution, reservation, or dilution, as applicable, of the New Preferred Units, as set forth herein and in the Second Amended and Restated Operating Agreement; (5) the execution and delivery of the Exit First Lien Facility Documents; (6) execution, delivery, and/or performance of any applicable obligations or requirements of the Debtors' and/or Reorganized Debtors in connection with the AST Transaction and as set forth in the AST Definitive Agreements and the AST Definitive Agreements Order; and (7) all other actions that the Reorganized Debtors determine are necessary or appropriate; provided that such other actions are consistent with the terms of the Plan, the Restructuring Support Agreement, and the other applicable Definitive Documents (collectively, the "Restructuring Transactions").

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

3.     **Sources of Consideration for Plan Distributions**

a.     **Cash**

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan required to be paid in Cash, if any, with Cash on hand, including Cash from operations and any Cash received on the Effective Date, the proceeds under the DIP Facility, the proceeds under the Exit First Lien Facility, and any proceeds received in connection with the AST Transaction.

b.     **Exit First Lien Facility**

On the Effective Date, the Reorganized Debtors shall incur the Exit First Lien Facility as provided in the Exit First Lien Facility Documents in an aggregate amount equal to a cashless conversion of all outstanding DIP Loans as of the Effective Date (or an amount otherwise agreed to by the Debtors and the Required Consenting Creditors).

Confirmation shall be deemed approval of the Exit First Lien Facility and the Exit First Lien Facility Documents, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith) and the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to incur the Exit First Lien Facility, including the Exit First Lien Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as the Reorganized Debtors and the Exit Debt Parties may mutually agree to be necessary to consummate the Exit First Lien Facility.

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit First Lien Facility Documents, as applicable, (including any Liens and security interests granted on the Debtors' assets) shall (i) be valid, binding, perfected, enforceable liens and security interests in the property described in the Exit First Lien Facility Documents, with the

priorities established in respect thereof under applicable non-bankruptcy law and any applicable intercreditor agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the persons granted Liens and security interests under the Exit First Lien Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### c.    The AST Transaction

On or before the Effective Date, the Debtors and/or the Reorganized Debtors, as applicable, and AST shall continue to perform in accordance with the AST Definitive Agreements, and in compliance with the AST Definitive Agreements Order, and take all steps required thereunder in connection with the AST Transaction, including the provision by AST of all payment obligations provided for in the AST Definitive Agreements. For the avoidance of doubt, and notwithstanding anything else herein, the terms of the AST Definitive Agreements Order shall survive entry of the Confirmation Order, and in the event of a conflict between the AST Definitive Agreements Order, on the one hand, and the Plan, Confirmation Order, or any other documents related thereto, on the other hand, the terms of the AST Definitive Agreements Order shall control.

### d.    New Preferred Units

The Reorganized Debtors shall be authorized to issue a certain number of New Preferred Units pursuant to the New Organizational Documents. The issuance of the New Preferred Units shall be authorized without the need for any further corporate action. On the Effective Date, the New Preferred Units shall be issued and distributed as provided for the Restructuring Transactions Memorandum pursuant to, and in accordance with, this Plan.

All of the shares of the New Preferred Units issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of the New Preferred Units shall be deemed as its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Organizational Documents will provide preemptive rights only to the New Series A-1 Preferred Units, which shall apply with respect to all issuances of Units or debt (subject to customary carveouts). For the avoidance of doubt, any and all preemptive rights currently provided for in the Existing Operating Agreement will be waived and not apply with respect to any transactions in connection with the Plan and/or Restructuring.

4. **Corporate Existence**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, including the Restructuring Transactions Memorandum, each of the Reorganized Debtors and their direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise (including with respect to the Second Amended and Restated Operating Agreement), and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval of the Bankruptcy Court, the Canadian Court (to the extent permitted by Canadian law), or any other Entity (other than any requisite filings required under applicable law).

5. **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, including the Restructuring Transactions Memorandum, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each Estate, all Causes of Action (including, without limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), and any property acquired by the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court, the Canadian Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code.

The Plan shall be conclusively deemed to be adequate notice that Liens, Claims, charges, or other encumbrances are being extinguished.

6. **Cancellation of Loans, Securities, and Agreements**

Except as otherwise provided in the Plan (including with respect to Unimpaired Claims or the Exit First Lien Facility), on the Effective Date:  (1)  the First Lien Claims, the 1.5 Lien Term Loan Claims, the Second Lien Notes Claims, the DIP Claims, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Debtors that are reinstated pursuant to the Plan), shall be deemed cancelled, surrendered, and discharged as to the Debtors without any need for further action or approval of the Bankruptcy Court, the Canadian

Court, or any holder thereof or any other person or entity, and the Reorganized Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically reinstated pursuant to the Plan) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court, the Canadian Court, or any holder thereof or any other person or entity.

Notwithstanding Confirmation or the occurrence of the Effective Date of the Plan, each of the DIP Documents, First Lien Loan Documents, First Lien Notes Documents and 1.5 Lien Term Loan Documents, and the Second Lien Notes Documents shall remain in effect solely for the purposes of (a) allowing the holders of DIP Claims, First Lien Claims, 1.5 Lien Term Loan Claims, or Second Lien Notes Claims to receive distributions under the Plan; and (b) allowing and preserving the rights of the Agents/Trustee and the DIP Agent to (i) make distributions on account of such Claims; (ii) maintain, enforce, and exercise its liens, including, without limitation, First Lien Trustee and Second Lien Trustee charging liens against any money or property distributed or allocable on account of such Claims; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (iv) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that each of the Agents/Trustee and DIP Agent may have under the Plan or the applicable the DIP Documents, First Lien Loan Documents, First Lien Notes Documents, 1.5 Lien Term Loan Documents, and the Second Lien Notes Documents; (v) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable the DIP Documents, First Lien Loan Documents, First Lien Notes Documents, 1.5 Lien Term Loan Documents, and the Second Lien Term Loan Documents; and (vi) take any action and execute any documents necessary to terminate, cancel, extinguish, and/or evidence the release of any and all Liens and other security interests with respect to the DIP Claims, First Lien Claims, 1.5 Lien Term Loan Claims, or Second Lien Notes Claims including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the applicable Agents/Trustee or DIP Agent, of any and all documents necessary to terminate, satisfy, or release any Liens and other security interests held by the applicable Agents/Trustee or DIP Agent, including UCC-3 termination statements.

Moreover, on and after the Effective Date of the Plan, all duties, responsibilities or obligations of the applicable Agents/Trustee or DIP Agent under the DIP Documents, First Lien Loan Documents, First Lien Notes Documents, 1.5 Lien Term Loan Documents, and Second Lien Notes Documents shall be fully discharged and shall have no rights or obligations arising from or related to such agreements or documentation, or the cancellation thereof, except for the rights provided or reserved under the Plan.

Notwithstanding the foregoing, all Existing Common Units shall remain in full force and effect, shall not be deemed cancelled, surrendered, or discharged, and shall be governed by the

terms of the applicable New Organizational Documents, including the Second Amended and Restated Operating Agreement.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

7.      **Corporate and Other Entity Action**

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including, as applicable:  (1) appointment of the New Boards pursuant to Article V.K. of the Plan and any other managers, directors, or officers for the Reorganized Debtors identified in the Plan Supplement; (2) the issuance and distribution of the New Preferred Units by the Reorganized Parent; (3) entry into the New Organizational Documents (including the Second Amended and Restated Operating Agreement); (4) entry into the Exit First Lien Facility Documents; (5) implementation of the Restructuring Transactions; (6) the assumption, assumption and assignment, or rejection (to the extent applicable), as applicable, of Executory Contracts and Unexpired Leases; and (7) all other actions contemplated under or required to consummate the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate or other Entity structure of the Debtors or the Reorganized Debtors, and any corporate or other Entity action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action or approval by the security holders, managers, or officers of the Debtors or the Reorganized Debtors.  Prior to, on, or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the security holders, directors, officers, managers, members, or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the security holders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions, or consents of any Person or Entity.  The authorizations and approvals contemplated by Article V.G of the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

8.      **New Organizational Documents**

On the Effective Date, Reorganized Parent shall enter into the New Organizational Documents, including the Second Amended and Restated Operating Agreement, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity.  On or prior to the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors shall, if so required under applicable state law, file their New Organizational

Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court or the Canadian Court.

Each holder of New Preferred Units and Existing Common Units shall be deemed to be a party to and bound to the terms of the Second Amended and Restated Operating Agreement from and after the Effective Date, even if not a signatory thereto.

9.  **Directors and Officers of Reorganized Debtors**

As of the Effective Date, unless otherwise stated herein, in the Plan Supplement, or the applicable New Organizational Documents, the terms of the current members of the boards of directors or managers (as applicable) of the Debtors shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each Reorganized Debtor entity shall be appointed in accordance with the respective New Organizational Documents. The members of the New Boards will be identified in the Plan Supplement to the extent known. Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

a.  **Reorganized Parent Board**

The initial Reorganized Parent Board shall be appointed on the Effective Date in accordance with the Restructuring Support Agreement and the Second Amended and Restated Operating Agreement. The initial Reorganized Parent Board shall be disclosed in the Plan Supplement to the extent known.

### b.     Officers of Reorganized Debtors

Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

### c.     New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

### 10.    Exemption from Securities Laws

The offer, issuance, and distribution under the Plan of the New Preferred Units shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  Subject to any transfer provisions and other applicable provisions set forth in the New Organizational Documents, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, subject to any transfer provisions and other applicable provisions set forth in the New Organizational Documents, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

To the extent section 1145 of the Bankruptcy Code is not available, the New Preferred Units may be issued to holders that are "accredited investors" of the type described in Rule 501(a)(1), (2), (3) or (7) promulgated under the Securities Act or a "qualified institutional buyer" (a "QIB") as defined in Rule 144A under the Securities Act, or section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S promulgated under the Securities Act (and in each case, on equivalent state law registration exemptions).

### 11.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Debtors, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

12. **Section 1146 Exemption**

Pursuant to and to the extent provided in section 1146 of the Bankruptcy Code, (1) the issuance, transfer, or exchange of any securities, instruments, or documents, (2) the creation of any lien, mortgage, deed of trust, or other security interest, (3) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (4) the grant of collateral under the Exit First Lien Facility Documents, and (5) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, ISED filing or recording fee, other regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

13. **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released pursuant to the AST Definitive Agreements Order or released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise),

or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, Filing, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, except to the extent otherwise required by Federal Rule of Civil Procedure 23.1(c) pursuant to Bankruptcy Rule 7023.1. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article V.O of the Plan include any Claim or Cause of Action with respect to, or against, a Released Party or Exculpated Party.

14.    **Procedures for Treating Disputed Claims and Interests Under the Plan**

    a.    **Allowance of Claims**

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors shall have any and all rights and defenses that the applicable Debtor(s) had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under the Plan. Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, shall be disallowed and expunged without any further notice to any Entity or action, order or approval of the Bankruptcy Court.

    b.    **Prosecution of Objections to Claims or Interests**

        i.    Time to File Objections to Claims or Interests

Any objections to Disputed Claims or Disputed Interests shall be Filed on or before the later of (1) the Claims Objection Bar Date and (2) such later date as may be specifically fixed by the Bankruptcy Court. For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Disputed Claims and Disputed Interests.

        ii.    Authority to Prosecute and Settle Objections to Claims and Interests

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (i) file, withdraw or litigate to judgment, objections to Claims and Interests (except for those Allowed pursuant to the Plan or the Confirmation Order); (ii) settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order or approval by the Bankruptcy

Court; and (iii) direct the Claims and Noticing Agent to adjust the claims register to reflect all resolutions of Disputed Claims without any further notice to or action, order or approval by the Bankruptcy Court. Notwithstanding the foregoing, nothing contained in the Plan shall affect the rights of any party in interest to object to any fee application.

### iii.    Authority to Amend Schedules

The Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, shall have the authority to amend the Schedules with respect to any Claim (other than any Claim Allowed or released hereunder or otherwise by a Final Order) and to make Distributions based on such amended Schedules (if no Proof of Claim is timely filed in response to such amendment) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim that was previously scheduled as undisputed, liquidated and not contingent, the Debtors or the Reorganized Debtors, as applicable, shall provide the holder of such Claim with notice of such amendment and the opportunity to file a Proof of Claim.

### iv.    Adjustment to Claims Without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or deemed disallowed without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

### c.    Estimation of Claims and Interests

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Disputed Interest pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim or Interest at any time during litigation concerning any objection to any Claim or Interest, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Disputed Interest, the amount so estimated shall constitute either the Allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Interest, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim or Interest. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d.    Disallowance of Claims

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under

section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims shall not receive any distributions on account of such Claims until such time as all Causes of Action against that Entity under any of the foregoing provisions of the Bankruptcy Code have been settled resolved by a Final Order and the full amount of such recoverable property has been paid or turned over to the Debtors or the Reorganized Debtors, as applicable.

All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and disallowed as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and disallowed as of the Effective Date to the extent the Reorganized Debtors elect to assume or otherwise honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Reorganized Debtors in their sole discretion, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Claim has been deemed timely Filed by a Final Order, unless the Holders of such Claims received prior written authorization of, as applicable, the Bankruptcy Court or the applicable Debtor or Reorganized Debtor for filing such Proofs of Claim.

### e.      Distributions to Holders of Disputed Claims

Notwithstanding anything to the contrary herein, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan, less any previous distribution, if any, that was made on account of the undisputed portion of such Claim.  As soon as practicable after the date that the order or judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

### E.      *Provisions Governing Insurance Policies*

### 1.      Insurance Policies

Except as otherwise explicitly provided with respect to an Insurance Policy Notwithstanding anything to the contrary in the Disclosure Statement, Plan, the Definitive Documents, the Confirmation Order, any bar date order or notice, any claim objection or notice of satisfaction of claims, or any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be

preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

    a.     on the Effective Date, all Insurance Policies shall be assumed in their entireties, unaltered, by the Reorganized Debtors pursuant to sections 105 and 365 of the Bankruptcy Code and shall continue in full force and effect thereafter in accordance with their respective terms and conditions;

    b.     the Reorganized Debtors shall be liable in full for all of their and all of the Debtors' obligations under the Insurance Policies in accordance with and subject to the terms and conditions of the Insurance Policies, regardless of whether any such obligations arise or become due before, on, or after the Effective Date, and without the need or requirement for an Insurer to file or serve any objection to a notice of proposed cure amount (or lack of such notice) or file or serve a request, motion, or application for payment of or Proof of Claim, cure amount, or Administrative Claim;

    c.     nothing shall permit or otherwise effectuate a sale, assignment or other transfer of the Insurance Policies, any portion thereof, and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to the Insurance Policies without the prior express written consent of the applicable Insurer; and

    d.     from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (1) (A) claimants with valid workers' compensation claims, (B) claimants with claims against non-Debtors that may be entitled to coverage under Insurance Policies with respect to such claims, or (C) direct action claims against any of the Insurers under applicable non-bankruptcy law to proceed with their claims; (2) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims against non-Debtors who may be entitled to coverage under the Insurance Policies with respect to such claims, (C) claims where a claimant asserts a direct claim against any of the Insurers under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay and/or the injunctions set forth in Article VIII of the Plan to proceed with its claim, and (D) all costs in relation to each of the foregoing; (3) the Insurers to draw on or against, use or apply any or all of the collateral or security provided by or on behalf of the Debtors (and the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the Insurance Policies in such order as the Insurer may determine; and (4) the Insurers to cancel any Insurance Policies and take other actions relating to the Insurance Policies (including effectuating a setoff and/or asserting any recoupment or subrogation rights or claims) to the extent permitted by such Insurance Policy and/or applicable non-bankruptcy law.

    2.    **Directors and Officers Insurance Policies**

    On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the D&O Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need

for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no proof of Claim need be Filed.  The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or prior to the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Policies, which shall not be altered.

F.      *Provisions Governing Distributions*

1.      **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

2.      **Disbursing Agent**

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date.  If the Disbursing Agent is one or more of the Reorganized Debtors or any of the Agents/Trustees, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

3.      **Rights and Powers of Disbursing Agent**

a.      **Powers of the Disbursing Agent**

Without further order of the Bankruptcy Court or the Canadian Court, the Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other

documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### b.   Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent (including any of the Agents/Trustees acting as Disbursing Agent) on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.  For the avoidance of doubt, the payment of such fees and expenses shall not override the Reorganized Debtors' independent obligation under the DIP Documents, First Lien Loan Documents, First Lien Notes Documents,1.5 Lien Term Loan Documents, Second Lien Notes Documents, the Final DIP Order and the Plan to pay any fees and expenses incurred by the Agents/Trustee and DIP Agent.

### 4.   Delivery of Distributions and Undeliverable or Unclaimed Distributions

### a.   Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of Reorganized Debtors.

### b.   Delivery of Distributions to First Lien Trustee

The First Lien Trustee shall be deemed to be the holder of all applicable Allowed Class 3 First Lien Notes Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the First Lien Trustee for further distribution, as soon as practicable following the Effective Date, to or on behalf of the applicable holders of Allowed Class 3 First Lien Notes Claims in accordance with the terms of the applicable First Lien Notes Documents and the Plan, subject to the rights of the First Lien Trustee to exercise its charging lien against such distribution in accordance with the First Lien Notes Documents regardless of whether such distribution is made by the First Lien Trustee or at its direction.  If the record holder of the First Lien Notes is DTC or its nominee or another securities depository or custodian thereof, and such First Lien Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such First Lien Note shall be deemed to have surrendered such First Lien Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan or to the extent resulting from its gross negligence or willful misconduct, the First Lien Trustee shall not have any liability to any Entity with respect to

distributions made or directed to be made by the First Lien Trustee, nor shall the First Lien Trustee have any obligation to make any distribution that is not delivered to it in a form that is distributable through the facilities of DTC.  The First Lien Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

### c.      Delivery of Distributions to Second Lien Trustee

The Second Lien Trustee shall be deemed to be the holder of all applicable Allowed Class 5 Second Lien Notes Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the Second Lien Trustee for further distribution, as soon as practicable following the Effective Date, to or on behalf of the applicable holders of Allowed Class 5 Second Lien Notes Claims in accordance with the terms of the applicable Second Lien Notes Documents and the Plan, subject to the rights of the Second Lien Trustee to exercise its charging lien against such distributions in accordance with the Second Lien Notes Documents regardless of whether such distribution is made by the Second Lien Trustee or at its direction.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, or to the extent resulting from its gross negligence or willful misconduct, the Second Lien Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the Second Lien Trustee, nor shall the Second Lien Trustee have any obligation to make any distribution that is not delivered to it in a form that is distributable through the facilities of DTC.  The Second Lien Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

### d.      Delivery of Distributions to First Lien Agent

Distributions on account of Allowed Class 3 First Lien Term Loan Claims shall be made by the Debtors or Reorganized Debtors, as applicable, to the First Lien Agent for redistribution to the holders of Allowed Class 3 First Lien Term Loan Claims.  As soon as practicable following compliance with the requirements set forth in Article VII of the Plan, the First Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the holders of Allowed Class 3 First Lien Term Loan Claims in accordance with the terms of the First Lien Loan Documents and the Plan.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan or to the extent resulting from its gross negligence or willful misconduct, the First Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Agent, and the First Lien Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

### e.      Delivery of Distributions to 1.5 Lien Agent

Distributions on account of Allowed Class 4 1.5 Lien Term Loan Claims shall be made by the Debtors or Reorganized Debtors, as applicable, to the 1.5 Lien Agent for redistribution to the holders of Allowed Class 4 1.5 Lien Term Loan Claims.  As soon as practicable following compliance with the requirements set forth in Article VII of the Plan, the 1.5 Lien Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the holders of Allowed Class 4 1.5 Lien Term Loan Claims in accordance with the terms of the 1.5 Lien Loan Documents and the Plan.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan or to the extent resulting from its gross

negligence or willful misconduct, the 1.5 Lien Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the 1.5 Lien Agent, and the 1.5 Lien Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

### f.   Delivery of Distributions on DIP Claims

The DIP Agent shall be deemed to be the holder of all applicable DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent. As soon as practicable following the Effective Date, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the applicable holders of DIP Claims in accordance with the terms of the DIP Documents, subject to any modifications to such distributions in accordance with the terms of the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan or to the extent resulting from its gross negligence or willful misconduct, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent, and the DIP Agent shall be deemed a "Disbursing Agent" for purposes of the Plan.

### g.   Minimum Distributions

No fractional New Preferred Units shall be distributed, and no Cash shall be distributed with respect to such fractional amounts. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New Preferred Units that is not a whole number, the actual distribution of New Preferred Units shall be rounded as follows: (i) fractions of greater than one-half (½) shall be rounded to the next higher whole number, and (ii) fractions of one-half (½) or less shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Preferred Units to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

### h.   Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such distribution was attempted to be made; *provided further*, that the Debtors or Reorganized Debtors, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court or the Canadian Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred.

### 5.   Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on

them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances. Any Person entitled to receive any property as an issuance or distribution under this Plan shall deliver to the applicable Disbursing Agent or, if different, the applicable withholding agent, a properly completed and duly executed IRS Form W-9 or (if the payee is a foreign Person) an appropriate IRS Form W-8 (including any supporting documentation) (as applicable).

6.    **No Postpetition Interest on Claims and Interests**

Unless otherwise specifically provided for in the Restructuring Support Agreement, Plan, Confirmation Order, the DIP Facility, the DIP Orders, or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

7.    **Setoffs and Recoupment**

Except for Claims that are expressly Allowed hereunder, the Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest; *provided*, that neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest.

Notwithstanding anything else herein, in the event the Inmarsat Cooperation Agreement is not assumed pursuant to AST Definitive Agreements Order, Inmarsat's rights are fully reserved as to whether or not the Debtors may set off or recoup claims that the Debtors assert against amounts owed to Inmarsat under the Inmarsat Cooperation Agreement.

8.    **Claims Paid or Payable by Third Parties**

a.    **Claims Paid by Third Parties**

The Debtors or Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court or the Canadian Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor or Reorganized Debtors; *provided*, *however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of

competent jurisdiction) to the party that is not a Debtor or Reorganized Debtor, and such holder in fact repays all or a portion of the Claim to such third party, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.  To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

### b.　　Claims Payable by Third Parties

To the extent that one or more of the Debtors' Insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' satisfaction, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court or the Canadian Court; *provided, however*, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to an Insurer, and such holder in fact repays all or a portion of the Claim to such Insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.

### c.　　Applicability of Insurance Policies

Except as otherwise provided in the Plan, payments to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including any holders of Claims, may hold against any other Entity, including Insurers or any insured party, under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

### 9.　　Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

G.      *Settlement, Release, Injunction and Related Provisions*

1.      **Compromise and Settlement**

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors, their Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to applicable bankruptcy law. In addition, the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Debtors and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan. The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto. Nothing in the Plan shall compromise or settle, in any way whatsoever, any Causes of Action that the Debtors or Reorganized Debtors, as applicable, may have against any Entity that is not a Released Party.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court or the Canadian Court, after the Effective Date, the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Debtors not previously Allowed (if any) and (2) claims (including Causes of Action) against other Entities.

2.      **Discharge of Claims and Termination of Interests**

Except as otherwise provided in the Plan, effective as of the Effective Date: (1) the distributions, rights, and treatment that are provided in the Plan for all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, whether known or unknown, against or in the Debtors or any of their assets, property, or Estates, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date and any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date; (2) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under sections 502(g), 502(h), or 502(i) of the Bankruptcy Code; and (4) all entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date. Notwithstanding the foregoing, all Existing Common Units shall remain in full force and effect and shall be governed by the terms of the applicable New Organizational Documents, including the Second Amended and Restated Operating Agreement. The Confirmation Order shall

be a judicial determination, subject to the Effective Date occurring, of the discharge of all Claims and Interests except as otherwise expressly provided in the Plan.

3.      **Release of Liens**

**Except as otherwise expressly provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the Exit First Lien Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the Exit First Lien Facility Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall automatically revert to the Reorganized Debtors and each of their successors and assigns, and the Agents/Trustees and the DIP Agent shall be authorized to release any such mortgages, deeds of trust, Liens, pledges, or other security interests held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, or other security interests, including the execution, delivery, and filing or recording of any related releases or discharges as may be requested by the Reorganized Debtors or may be required in order to effectuate the foregoing.**

4.      **Releases of Released Parties**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to applicable bankruptcy law, of the releases described in Article VIII.D of the Plan and shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by Article VIII.D of the Plan; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity (including the Debtors) asserting any claim or Cause of Action released pursuant to Article VIII.D of the Plan.**

a.      **Releases by the Debtors**

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Restructuring or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, to the fullest extent permitted by law, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by and on behalf of each Debtor, each Reorganized Debtors, and each Estate, in each case, on behalf of itself and its respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action, whether prepetition or postpetition, derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of the Debtors (including any of the Debtors' predecessors), the Reorganized Debtors, or the Estates), whether liquidated or**

unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, by statute, violations of federal or state securities laws, or otherwise that the Debtors (including any of the Debtors' predecessors), the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including any of the Debtors' predecessors), the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring, the DIP Orders, any Canadian Court Recognition Order, the DIP Documents, the Disclosure Statement, the Exit First Lien Facility, the Definitive Documents, the Plan Supplement, and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) any Causes of Action that the Debtors or Reorganized Debtors, as applicable, may have in connection with the Ligado Takings Case, (iii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or Agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit First Lien Facility Documents, or any Claim or obligation arising under the Plan, and (iv) the liability of any Released Party that is the result of any act or omission determined in a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct.

b.      **Releases by Holders of Claims or Interests**

As of the Effective Date, except for (i) the rights that remain in effect from and after the Effective Date to enforce the Plan, the Definitive Documents, and the obligations contemplated by the Restructuring, (ii) the liability of any Released Party that is the result of any act or omission determined in a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct, (iii) the rights provided or reserved for under the AST Definitive Agreements Order, or (iv) as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, to the fullest extent permitted by law, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, to the maximum extent permitted by law, by the Releasing Parties, in each case, from any and all Claims and Causes of Action whatsoever, whether prepetition or postpetition (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of the Debtors (including any of the Debtors' predecessors), the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity,

whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including any of the Debtors' predecessors), the Reorganized Debtors, or the Estates, the Chapter 11 Cases the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors (including any of the Debtors' predecessors) or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors (including any of the Debtors' predecessors) and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring, the DIP Orders, any Canadian Court Recognition Order, the DIP Documents, the Disclosure Statement, the Exit First Lien Facility, the Definitive Documents, the Plan Supplement, and the Plan and related agreements, instruments, and other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before Effective Date.

Entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute the Bankruptcy Court's approval of the releases contained in the Plan and a finding that each release described is (i) in exchange for the good and valuable consideration provided by the Released Parties, including without limitation, the Released Parties' contributions to implementing the Plan; (ii) a good-faith settlement and compromise of the Claims released by the holders of Claims and Interests, (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a sound exercise of the Debtors' business judgment.

Nothing in the Plan prohibits, precludes, or enjoins any Governmental Unit from asserting or filing a proof of Claim on or before the Governmental Bar Date.[24]

5.      Exculpation

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action based on any act or omission occurring from the Petition Date through the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Restructuring, the DIP

---

[24]      "Governmental Bar Date" shall have the meaning set forth in the *Order Establishing (I) Various Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving Notices of Bar Dates, and (IV) Granting Related Relief* [Docket No. 340].

**Facility, the DIP Orders, the DIP Documents, any Canadian Court Recognition Order, the Disclosure Statement, the Exit First Lien Facility, the Definitive Documents, the Plan Supplement, and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), or the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes gross negligence, intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code and have participated in good faith with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

6.      **Injunction**

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests or Causes of Action or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities released or settled pursuant to the Plan.**

7.     **Definitions related to the Settlement, Release, Injunction and Related Provisions include:**

"*Cause of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, action, remedy, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" also includes:  (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, including, but not limited to, Avoidance Actions; (d) any counterclaim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer or similar claim.

"*Exculpated Parties*" means, collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, and (iii) with respect to each of the foregoing Persons in clauses (i) through (ii), such Persons' current and former officers and directors, principals, members, partners, managers, and Professionals, each in their respective capacities as such who served as of the Petition Date or during these Chapter 11 Cases.

"Released Parties" means, collectively, and in each case in their capacity as such,  (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) each of the Agents/Trustees, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Debt Parties, (vii) AST, (viii) Viasat (subject to the AST Definitive Agreements Order), and (ix) each current and former affiliate of each entity in clause (i) through (viii), each of such party's current and former predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees; provided, however, that any holder of a Claim or Interest that (x) files an objection to the Plan or (y) opts out of the releases set forth in Article VIII.D.2 of the Plan, as applicable, shall not be a "Released Party."

"Releasing Parties" means, collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the Agents/Trustees, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Debt Parties, (vii) AST, (viii) Viasat (subject to the AST Definitive Agreements Order), (ix) with respect to each of the foregoing Persons in clauses (i) through (viii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates (including affiliates of any predecessors), current and former officers and directors, principals, equity holders (including equity holders of any predecessors), members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, (x) the holders

94

of all Claims or Interests whose vote to accept or reject the Plan is solicited but do not opt out of granting the releases set forth in Article VIII.D.2 of the Plan, and (xi) the holders of all Claims and Interests who were given notice of the opportunity and served with a provided form to opt out of granting the releases set forth in Article VIII.D.2 of the Plan but did not timely opt out.

H.   *Conditions to the Effective Date*

1.   **The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article IX.B of the Plan:**

   1.   the Restructuring Support Agreement shall not have been terminated and remains in full force and effect;

   2.   the Bankruptcy Court shall have entered an order approving the Disclosure Statement, and such order shall not have been reversed, stayed, modified, or vacated on appeal;

   3.   the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order and such order shall not have been reversed, stayed, modified, or vacated on appeal;

   4.   the Definitive Documents and the Restructuring Transactions Memorandum shall be consistent with the Restructuring Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement and the AST Definitive Agreements Order (as applicable);

   5.   all actions, documents, and agreements necessary to implement and consummate the Plan (including any Plan Supplement) shall have been effected and executed;

   6.   the Debtors shall have otherwise substantially consummated the Restructuring Transactions (subject to the consent of the Required Consenting Creditors and, as applicable, the consent rights of AST), and all transactions contemplated by this Plan and in the Definitive Documents, in a manner consistent in all respects with this Plan, unless waived by the Required Consenting Creditors and with respect to the transactions over which AST has consent rights, AST;

   7.   the Bankruptcy Court shall have entered the DIP Orders and the Final DIP Order shall be in full force and effect;

   8.   all Exit First Lien Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived;

9.      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed;

10.     all conditions precedent to the issuance of the New Preferred Units, other than the occurrence of the Effective Date, shall have occurred;

11.     the New Organizational Documents for Reorganized Parent shall have been adopted on terms consistent with the Restructuring Support Agreement;

12.     the Professional Fee Escrow Account shall have been established and funded as provided herein;

13.     all fees, expenses, and premiums payable pursuant to the Restructuring Support Agreement, the Plan, and other Definitive Documents, or pursuant to any order of the Bankruptcy Court shall have been paid by the Debtors or the Reorganized Debtors, as applicable, and all Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall have been paid in full in Cash by the Debtors or the Reorganized Debtors, as applicable;

14.     none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed;

15.     no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors;

16.     the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with the terms of the Plan as confirmed by the Confirmation Order;

17.     the Approval Condition (as defined in the Framework Agreement) shall have occurred, and all governmental and third-party approvals and consents, including FCC and ISED approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

18.     the AST Definitive Agreements Order shall have been entered and remain in full force and effect and the AST Definitive Agreements shall not have been terminated in accordance with any applicable terms and no default giving any party thereto the right to terminate any of the AST Definitive Agreements shall exist thereunder.

2. **Waiver of Conditions**

The conditions to Confirmation and the Effective Date set forth in Article IX of the Plan may be waived by the Debtors upon the prior written consent of each of the Required Consenting Creditors and AST (to the extent consent rights over such conditions are set forth in the Restructuring Support Agreement), without notice, leave, or order of the Bankruptcy Court or the Canadian Court; provided that the Debtors may not waive the conditions set forth in Article IX.A.2 and IX.A.3 of the Plan. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

I. *Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Claims and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.H.1 of the Plan;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or final decree concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including

disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under VIII of the Plan, regardless of whether such termination occurred before or after the Effective Date;

22.    determine whether and in what amount a Claim is Allowed;

23.    recover all assets of the Debtors and property of the Estates, wherever located;

24.    resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, any bar date established in the Chapter 11 Case, or any deadline for responding or objecting to the amount of a cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

25.    hear and determine any rights, claims, or Causes of Action held by, or accruing to, the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

26.    adjudicate any maritime claims or liens, to the extent permitted by law;

27.    enforce all orders previously entered by the Bankruptcy Court; and

28.    hear any other matter as to which the Bankruptcy Court has jurisdiction.

*provided*, *however*, that documents contained in the Plan Supplement shall be governed in accordance with applicable jurisdictional, forum selection, or dispute resolution clauses in such documents.

## SECTION V.
## VOTING PROCEDURES AND REQUIREMENTS

This Section describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan. If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims or Interests. If you are entitled to vote and did not receive a Ballot, received a damaged Ballot, or lost your Ballot please contact the Voting Agent by e-mail at ligadoinquiries@omniagnt.com or by phone at (866) 956-2139 (US Toll-Free) or (747) 288-6375 (International).

**Before voting to accept or reject the Plan, each eligible holder of a Claim or Interest should carefully review the Plan attached hereto as <u>Exhibit A</u> and described in Section IV herein entitled, "Summary of Joint Chapter 11 Plan."**

A.    *Voting Deadline*

To be considered for purposes of accepting or rejecting the Plan, all Ballots must be **actually received** by the Voting Agent no later than the Voting Deadline of **4:00 pm, prevailing Eastern Time, on July 24, 2025**, unless the Company extends the Voting Deadline. **The Company expressly reserves the absolute right to extend, by oral or written notice to the Voting Agent, the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, until the necessary Ballots have been received. The Company will not have any obligation to publish, advertise, or otherwise communicate any such extension, other than by filing a notice of such extension with the Bankruptcy Court docket and posting a notice on the website of the Company's notice and Voting Agent at https://omniagentsolutions.com/ligado. There can be no assurance that the Company will exercise any right to extend the solicitation period and deadline for the receipt of Ballots.**

Except to the extent requested by the Company, in its sole discretion, or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, Ballots received by the Voting Agent after the Voting Deadline will not be counted or otherwise used in connection with the Company's request for confirmation of the Plan (or any permitted modification thereof).

You must complete and return your Ballot(s) in accordance with the instructions set forth on your applicable Ballot(s). Votes may not be transmitted orally, by facsimile, or by electronic mail. Accordingly, you are urged to return your signed and completed Ballot(s) promptly.

B.    *Voting Record Date*

Consistent with the provisions of Bankruptcy Rule 3018(b), the Company has fixed June 20, 2025, as the "<u>Voting Record Date</u>" for the determination of holders of record of Claims or Interests entitled to vote to accept or reject the Plan. Only holders of record are entitled to vote to accept or reject the Plan.

C.    *Parties Entitled to Vote*

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not Impaired by a plan are deemed to accept the plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "<u>Impaired</u>" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Creditors and equity interest holders whose claims or interests are Impaired by a plan, but who will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.

As mentioned above, the Company is soliciting votes on the Plan from the holders of Allowed Claims and Interests, as applicable, in Classes 3 (First Lien Claims), 4 (1.5 Lien Term Loan Claims), 5 (Second Lien Notes Claims), 9 (Existing Series A-0 Preferred Units), and 10 (Existing Series A-1 Preferred Units), which Classes are deemed to be Impaired.

Holders of Claims and Interests that are entitled to vote should receive Ballots with their Solicitation Package, which Ballots should be used to submit their vote.

D.    *Ballots*

Each Ballot enclosed with this Disclosure Statement is marked with the Class into which the Claim or Interest has been placed under the Plan.  All votes to accept or reject the Plan with respect to any Class of Claims or Interests must be cast by properly submitting the duly completed and executed Ballot designated for such Class in accordance with the instructions set forth on the applicable Ballot.  Holders of Claims or Interests voting on the Plan should complete and sign their Ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "ACCEPT (VOTE FOR) THE PLAN" or "REJECT (VOTE AGAINST) THE PLAN."  Any executed Ballot that does not indicate either acceptance or rejection of the Plan, or that indicates both acceptance and rejection of the Plan, will not be counted.

To the extent a holder of Claims or Interests holds multiple Claims or Interests within a particular Class, the Company may, in its discretion, instruct the Voting Agent to aggregate, to the extent possible, such holder's Claims or Interests (as applicable) for purposes of counting votes.

Ballots must be delivered to the Voting Agent in accordance with the instructions set forth on the applicable Ballot and **<u>actually received</u>** by the Voting Deadline.

IF AN ELIGIBLE HOLDER MUST RETURN ITS BALLOT TO ITS NOMINEE, SUCH ELIGIBLE HOLDER MUST RETURN ITS BALLOT TO THE NOMINEE IN SUFFICIENT TIME FOR THE NOMINEE TO PROCESS IT AND RETURN THE MASTER BALLOT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER.  If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Voting Agent by e-mail at ligadoinquiries@omniagnt.com or by phone at (866) 956-2139 (US Toll-Free) or (747) 288-6375 (International).

E.    *Agreements upon Furnishing Ballots*

The delivery of a Ballot to the Voting Agent by a holder of a Claim or an Interest voting to accept the Plan will constitute the agreement of such holder to accept (i) all of the terms of, and

conditions to, the solicitation and (ii) the terms of the Plan; provided, however, that all parties-in-interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code in accordance with any applicable order of the Bankruptcy Court.

In addition, a vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

F.       *Withdrawal or Change of Votes on Plan*

Except as may be provided in the Restructuring Support Agreement with respect to the votes of the Consenting Stakeholders, after the Voting Deadline, no vote may be withdrawn without the prior consent of the Company.

Any holder who has submitted a properly completed Ballot to the Voting Agent prior to the Voting Deadline may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.  If more than one timely, properly-completed Ballot is received with respect to the same Claim or Interest, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the Ballot that the Voting Agent determines in its sole discretion was the last to be received.

G.       *Fiduciaries and Other Representatives*

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Entity acting in a fiduciary or representative capacity, such Entity should indicate such capacity when signing and, if requested by the Company, will be required to submit proper evidence satisfactory to the Company of authority to so act.  Authorized signatories should submit the separate Ballot of each holder for whom they are voting.

UNLESS THE BALLOT BEING FURNISHED IS **ACTUALLY RECEIVED** BY THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE COMPANY RESERVES THE RIGHT TO ACCEPT AND COUNT ANY SUCH LATE BALLOT.  IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE VOTING AGENT.

H.       *Waivers of Defects, Irregularities, etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Company in its sole discretion, which determination will be final and binding. As indicated above, effective withdrawals of Ballots must be delivered to the Voting Agent prior to the Voting Deadline.  The Company reserves the absolute right to contest the validity of any such withdrawal.  The Company also reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Company or its counsel, be unlawful. The Company further reserves the right to waive any defects or irregularities or conditions of

delivery as to any particular Ballot. The interpretation (including the Ballot and the applicable instructions thereto) by the Company, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Company (or the Bankruptcy Court) determines. Neither the Company nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

I.      *Further Information, Additional Copies*

If you have any questions or require further information about the voting procedure for voting your Claim or Interest or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by of Bankruptcy Rule 3017(d)), please contact the Voting Agent by e-mail at ligadoinquiries@omniagnt.com or by phone at (866) 956-2139 (US Toll-Free) or (747) 288-6375 (International).

J.      *Requirements for Acceptance by Impaired Class of Claims or Interests*

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

An Impaired Class of Interests shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, holders of at least two-thirds in amount of the Allowed Interests held by holders who actually voted in such Class have voted to accept the Plan.

## SECTION VI.
## CONFIRMATION OF PLAN

A.      *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing. The Company will request that the Bankruptcy Court approve the Plan at the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors and equity interest holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must (1) be in writing,

(2) conform to the Bankruptcy Rules, (3) set forth the name of the objecting party, the nature of Claims or Interests held or asserted by the objecting party, (4) state with particularity the legal and factual basis for the objection, and (5) be filed with the Bankruptcy Court, together with proof of service thereof, and served so as to be received no later than the date and time designated in the notice of the Confirmation Hearing.

The procedures for filing objections to confirmation of the Plan shall be determined by the Bankruptcy Court after the Chapter 11 Cases are commenced.

B.      *Requirements for Confirmation of Plan – Consensual Confirmation*

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.   Among the requirements for confirmation are that the Plan is (i) feasible and (ii) in the "best interests" of holders of Claims and Interests Impaired under the Plan.

1.      **Feasibility**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Company or any successors to the Company under the Plan.   This condition is often referred to as the "feasibility" of the Plan.   The Company believes that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, the Company, in consultation with its financial advisors, has analyzed its ability to meet its obligations incurred under the Plan.   As part of that analysis, the Company has prepared consolidated projected financial results (the "Projections").   These Projections, and the assumptions on which they are based, are attached hereto as **Exhibit C**.

The Company prepared the Projections based upon certain assumptions and upon the assessments of certain market experts that it believes to be reasonable at the time of preparation. Those assumptions the Company considered to be significant are described in the Projections.   The Projections have not been examined or compiled by independent accountants.   Many of the assumptions on which the Projections are based are subject to significant uncertainties.   Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results.   Therefore, the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material.   All holders of Claims and Interests that are entitled to vote to accept or reject the Plan are urged to carefully examine all of the assumptions on which the Projections are based in evaluating the feasibility of the Plan.

2.      **Best Interests Test**

Unless each Impaired Class of Claims or Interests under the Plan unanimously accepts the Plan, section 1129 of the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the best interests of all holders of Claims and Interests in such Classes.   This "best interests" test must show that each holder of Impaired Claims or Interests receives property with a

value not less than the amount such holder would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code. The Company believes that under the Plan, holders of Impaired Claims and Interests will receive property with a value equal to or in excess of the value such holders would receive in a chapter 7 liquidation.

To estimate the potential recoveries to holders of Claims and Interests in a Chapter 7 liquidation, the Company determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code.

The amount of liquidation value available to holders of unsecured Claims against the Company would be reduced by, first, the Claims of secured creditors to the extent of the value of their collateral and, second, the administrative expenses and priority claims allowed in chapter 7, including the costs and expenses of liquidation. Costs and other administrative expenses of a chapter 7 liquidation would include the compensation of a trustee, as well as counsel and other professionals retained by the trustee, asset disposition expenses, applicable taxes, litigation costs, and all unpaid administrative expenses incurred by the Company in the Chapter 11 Cases that are allowed in the chapter 7 cases, such as compensation of counsel and other professionals retained by the Company and Claims arising from the Company's operations during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the original course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of General Unsecured Claims.

In a chapter 7 liquidation, no junior Class of Claims or Interests may be paid unless all Classes of Claims or Interests senior to such junior Class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no Class of Claims or Interests that is contractually subordinated to another Class would receive any payment on account of its Claims or Interests, unless and until such senior Class was paid in full.

Once the Bankruptcy Court ascertains the liquidation recoveries to the Company's secured and priority creditors in chapter 7, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. The Company believes that the Liquidation Analysis attached hereto as **Exhibit D**. demonstrates that each holder in a Class of Impaired Claims or Interests will receive at least as much, if not more, under the Plan as such holder would receive if the Company were liquidated pursuant to chapter 7. Therefore, the Company believes that the Plan satisfies the requirements of the "best interests" test.

C.    *Requirements for Confirmation of Plan – Non-Consensual Confirmation*

To the extent there is any Impaired Class of Claims or Interests that votes to reject the Plan, the Company will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to that Class.  The Bankruptcy Code permits the Bankruptcy Court to confirm the Plan over the dissent of any impaired class of claims or interests as long as the remaining standards in section 1129(a) and section 1129(b) are met.  This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the chapter 11 process.  It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection by any impaired class of claims or interests if, among other requirements, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### 1.    **Unfair Discrimination**

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, the Plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.  This test only applies to classes that reject or are deemed to reject the Plan.

### 2.    **Fair and Equitable Test**

A chapter 11 plan is only fair and equitable with respect to a dissenting class if no class senior to such dissenting class receives more than it is entitled to on account of such senior claims or interests.  The "fair and equitable" test also imposes certain requirements that depend on the type of claims or interests in the dissenting class.

To be fair and equitable with respect to a dissenting class of impaired secured creditors, a chapter 11 plan must provide that each holder in such class either (a) retains its liens on the property subject to such liens (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of consummation of the chapter 11 plan, of at least such allowed amount or (b) receives the "indubitable equivalent" of its secured claim.

To be fair and equitable with respect to a dissenting class of impaired unsecured creditors, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the allowed amount of its unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the chapter 11 plan.

To be fair and equitable with respect to a dissenting class of impaired equity interest holders, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its interest and (ii) the value of its interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the chapter 11 plan.

# SECTION VII.
# CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a discussion of certain United States federal income tax consequences of the Plan to the Company and certain holders of Claims and certain holders of Equity Interests (as defined below) that receive consideration from the Company pursuant to the Plan.  This discussion does not address the United States federal income tax consequences to holders of Claims or holders of Equity Interests who are Unimpaired or holders who are not entitled to vote because they are deemed to reject the Plan, and, except as specifically provided below, does not apply to claims respecting the DIP Facility.  Further, this discussion does not address the Canadian federal or provincial income or transactional tax considerations of the Plan (if any) to the holders of Claims and holders of Equity Interests.  Holders to whom Canadian tax rules may be relevant should consult their own tax advisors.

**ALL HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

This discussion is based on the Internal Revenue Code of 1986 (as amended, the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty exists with respect to some of the tax consequences described below.  No opinion of counsel has been obtained, and the Company does not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan, including those items discussed below.  The characterization of the Plan set forth in this discussion will not be binding on the IRS or the United States courts.  Therefore, there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan or that such characterization will be sustained by a United States court if so challenged.  Except as otherwise specifically provided, this discussion applies solely to holders that are U.S. Holders (defined below), and does not apply to holders of Claims or holders of Equity Interests that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, expatriates, or partnerships or other pass-through entities (and partners or members in such entities)).  Furthermore, this discussion does not address any holder of Claims who also holds Equity Interests.  The following discussion assumes that holders of Claims and holders of Equity Interests hold such Claims and Equity Interests as "capital assets" within the meaning of section 1221 of

the Tax Code.  Moreover, this discussion does not purport to cover all aspects of United States federal income taxation that may apply to the Company and holders of Claims or holders of Equity Interests based upon their particular circumstances.  Additionally, this discussion does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law and does not address the United States "Medicare" tax on certain net investment income.

THE FOLLOWING DISCUSSION OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE SPECIFIC CIRCUMSTANCES OF A HOLDER OF A CLAIM OR A HOLDER OF AN INTEREST.  ALL HOLDERS OF CLAIMS AND ALL HOLDERS OF EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE UNITED STATES FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### Characterization of the Prepetition First Lien Notes, Prepetition First Lien Loan Facility, Prepetition 1.5 Lien Facility and Prepetition Second Lien Notes

The classification of the Prepetition First Lien Notes, Prepetition First Lien Loan Facility, Prepetition 1.5 Lien Facility and Prepetition Second Lien Notes for U.S. federal income tax purposes is not clear.  Based on its view of the facts at the time of their respective issuances, the Company has treated and continues to treat the Prepetition First Lien Notes, Prepetition First Lien Loan Facility (except to the extent attributable to the Prepetition First Lien Senior Pari Term Loans), Prepetition 1.5 Lien Facility (except to the extent attributable to the Incremental 1.5 Lien Loans) and Prepetition Second Lien Notes as indebtedness for U.S. federal income tax purposes and the Prepetition First Lien Senior Pari Term Loans and Incremental 1.5 Lien Loans as equity interests in the Company for U.S. federal income tax purposes.  No ruling or other determination regarding these characterizations has been sought or received by the Company, however, and there can be no assurance that the IRS will agree with the foregoing treatment or that a court would not hold to the contrary.  In the event that any of the Prepetition First Lien Notes, Prepetition First Lien Loan Facility, Prepetition 1.5 Lien Facility or Prepetition Second Lien Notes were recharacterized for U.S. federal income tax purposes, the U.S. federal income tax consequences to holders of Claims attributable to the Prepetition First Lien Notes, Prepetition First Lien Loan Facility, Prepetition 1.5 Lien Facility or Prepetition Second Lien Notes could be materially different than discussed below.  The remainder of this discussion assumes that the aforementioned characterizations are correct and any reference to an Allowed First Lien Claims, Allowed 1.5 Lien Claims, Prepetition First Lien Loan Facility, or Prepetition 1.5 Lien Loan Facility does not include any such Claims to the extent that they are attributable to the Prepetition First Lien Senior Pari Term Loans or Incremental 1.5 Lien Loans, as applicable, which the Company has historically treated as equity for U.S. federal income tax purposes. Holders should consult with their advisors regarding the potential consequences of the Plan if the characterization of the Prepetition First Lien Notes, Prepetition First Lien Loan Facility, Prepetition 1.5 Lien Facility or Prepetition Second Lien Notes for U.S. federal income tax purposes was different than as described above.

A.    *Certain United States Federal Income Tax Consequences of Plan to the Company*

### 1.    Tax Attributes

Ligado is treated as a partnership for United States federal income tax purposes.  Each of the other Debtors is an entity disregarded as separate from its owner for United States federal income tax purposes, other than Ligado Networks Inc. of Virginia, which is treated as a corporation for United States federal income tax purposes but does not have material assets or liabilities for such purposes, and Ligado Networks Holdings (Canada) Inc. and Ligado Networks (Canada) Inc., which are Canadian entities treated as a corporation and an entity disregarded from its owner, respectively, for United States federal income tax purposes.  Because the domestic Debtors (other than Ligado Networks Inc. of Virginia) are a partnership and entities disregarded as separate from such partnership for United States federal income tax purposes, such entities will generally not be subject to United States federal income tax.  Instead, the United States federal income tax consequences of the Plan with respect to Ligado should be borne by the holders of Equity Interests, as described below.

Ligado Networks Inc. of Virginia, Ligado Networks Holdings (Canada) Inc., and Ligado Networks (Canada) Inc. do not have material United States federal income tax attributes, such as net operating loss carryforwards.  Any United States federal income tax attributes that these entities do have may become subject to limitations on use following the implementation of the Plan if the transactions undertaken pursuant to the Plan constitute an "ownership change" of those entities within the meaning of section 382 of the Tax Code.  Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-change loss carryforwards that may be utilized to offset future taxable income is subject to an annual limitation.

### 2.    Cancellation of Debt Income

In general, absent an exception, a debtor will realize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness issued in satisfaction of such existing indebtedness, and (iii) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.

Under the Plan, (i) holders of Allowed First Lien Claims will receive New Series A-1 Preferred Units, (ii) holders of Allowed 1.5 Lien Claims will receive New Series A-2 Preferred Units, and (iii) holders of Allowed Second Lien Claims will receive New Series A-3 Preferred Units, in each case, in full satisfaction of their respective Claims.  Ligado would realize COD Income to the sum of the extent that the adjusted issue price of each of the Prepetition First Lien Notes, Prepetition First Lien Loan Facility, Prepetition 1.5 Lien Facility and Second Lien Term Loan Facility exceeds the fair market value of the New Series A-1 Preferred Units, New Series A-2 Preferred Units or New Series A-3 Preferred Units exchanged therefor, as applicable.  Because Ligado is treated as a partnership for United States federal income tax purposes, any COD Income should not be taxable to Ligado and instead should be allocated to holders of Equity Interests in accordance with applicable tax rules.  Each holder of Equity Interests that is allocated COD Income

will generally be required to include such COD Income in its taxable income unless the holder is eligible for an exemption from tax with respect to COD Income.  Ligado and its advisors will determine the fair market value of the New Series A-1 Preferred Units, New Series A-2 Preferred Units and New Series A-3 Preferred Units and, accordingly, whether and to the extent there is COD Income.  Holders of Equity Interests should consult their own tax advisors to determine the tax consequences to the holder in connection with any COD Income allocated to the holder.

B.  *Certain United States Federal Income Tax Consequences to Holders of Claims and Holders of Equity Interests under the Plan*

As used in this section of the Disclosure Statement, the term "U.S. Holder" means a beneficial owner of Claims or Equity Interests that is for United States federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for United States federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to United States federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more United States persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

If a partnership or other entity taxable as a partnership for United States federal income tax purposes holds Claims or Equity Interests, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.

1.  **Consequences to Holders of Allowed First Lien Claims, Allowed 1.5 Lien Claims, and Allowed Second Lien Claims**

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed First Lien Claim, on the Effective Date, and except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment, each such holder of an Allowed First Lien Claim will receive its Pro Rata share of 100% of the New Series A-1 Preferred Units.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed 1.5 Lien Claim, on the Effective Date, and except to the extent that a holder of an Allowed 1.5 Lien Claim agrees to less favorable treatment, each such holder of an Allowed 1.5 Lien Claim will receive its Pro Rata share of 100% of the New Series A-2 Preferred Units.  In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Second Lien Claim, on the Effective Date, and except to the extent that a holder of an Allowed Second Lien

Claim agrees to less favorable treatment, each such holder of an Allowed Second Lien Claim will receive its Pro Rata share of 100% of the New Series A-3 Preferred Units.

Any U.S. Holder of an Allowed First Lien Claim, Allowed 1.5 Lien Claim or Allowed Second Lien Claim should be treated as contributing its Claim to Ligado in exchange for New Series A-1 Preferred Units, New Series A-2 Preferred Units or New Series A-3 Preferred Units, as applicable.  Generally, except as provided for below with respect to any portion of the New Series A-1 Preferred Units, New Series A-2 Preferred Units or New Series A-3 Preferred Units, as applicable, that are treated as received in satisfaction of accrued interest, under section 721 of the Tax Code, a U.S. Holder would not recognize gain or loss for United States federal income tax purposes on such contribution.  Subject to the discussion below regarding holders of more than one class of equity interests in the Company, a U.S. Holder's tax basis in the New Series A-1 Preferred Units, New Series A-2 Preferred Units or New Series A-3 Preferred Units, other than with respect to accrued interest, should generally equal such holder's tax basis in its Claims exchanged therefor (assuming the U.S. Holder is not contributing other assets or receiving other consideration)

A U.S. Holder's holding period for New Series A-1 Preferred Units, New Series A-2 Preferred Units or New Series A-3 Preferred Units received in satisfaction of its Claim, other than with respect to accrued interest, should include its holding period for any Claims that are treated as capital assets and exchanged for New Series A-1 Preferred Units, New Series A-2 Preferred Units or New Series A-3 Preferred Units.

### a.    Accrued but Untaxed Interest

A portion of the consideration received by a holder of a Claim may be attributable to accrued but unpaid interest on such Claim.  Any amounts treated as received for accrued interest should be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for United States federal income tax purposes.  If the fair value of the consideration received by a holder of a Claim is not sufficient to fully satisfy all principal and interest on such claim, the extent to which the consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to a holder of an Allowed First Lien Claim, Allowed 1.5 Lien Claim, or Allowed Second Lien Claim will be allocated to the principal amount of the holder's Claim, with any excess allocated to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes.  The IRS could take the position, however, that the consideration received by such a Claim holder should be allocated in some way other than as provided in the Plan.  A holder of such a Claim should generally recognize a deductible loss to the extent the holder previously included accrued interest in its gross income and such interest is not paid in full.  A holder of such a Claim that receives property other than cash in satisfaction of accrued interest should generally have a tax basis in such property that equals the fair market value of the property on the Effective Date and the holder's holding period for such property should begin on the day following the Effective Date.  Holders of Allowed First Lien Claims, Allowed 1.5 Lien Claims, or Allowed Second Lien Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

2.      **Consequences to Holders of Equity Interests**

The United States federal income tax consequences associated with a change in the terms of partnership interests are not entirely clear.  As a general matter, if the new or modified Equity Interests (defined below) following the implementation of the Plan have a right to share in existing value that is equal to the right to share in existing value of the unmodified Equity Interest prior to the implementation of the Plan, certain authority would support treating such exchange as a non-taxable transaction.  The remaining discussions assumes such treatment applies with respect to the modifications of Equity Interests.  However, the IRS could disagree with such treatment and argue that the modifications are a taxable event for holders, in which case a holder of Equity Interests may realize gain or loss depending on whether the difference between such holder's tax basis in its Equity Interest and the consideration received therefor is positive or negative.  Holders of Equity Interests should consult their own tax advisors regarding the tax consequences of the Plan and potential alternative treatments to those assumed for purposes of this disclosure (including whether in the case where the holder realizes a loss, whether that loss may be recognized or deferred).

a.      **Generally**

Under the Plan, holders of any Allowed Interests and the portions of the Allowed First Lien Claims or Allowed 1.5 Lien Claims attributable to the Prepetition First Lien Senior Pari Term loans or Incremental 1.5 Lien Loans, as applicable, which are treated as equity interest in Ligado for U.S. federal income tax purposes (collectively, the "Equity Interests") will retain their Equity Interests in the Company, which may with respect to certain classes of Equity Interests be reclassified or further subordinated to other interests in the right to distributions from the Company.  Although not free from doubt, any revision to a U.S. Holder's Equity Interests should be treated as a non-taxable transaction.  In that case, each U.S. Holder of Equity Interests would generally not recognize gain or loss as a result of the implementation of the Plan, would, subject to the discussion below regarding holders of more than one class of Interests, have a tax basis in the Ligado equity interests it receives equal to its tax basis in the Equity Interests, and would have a holding period for its Ligado equity interests that includes its holding period for Equity Interests.

b.      **Certain Consequences to Interest Holders from Debt Reductions or Reallocations and Revaluations**

As described above, pursuant to the Plan, Ligado will eliminate a significant amount of its funded debt obligations.  As an entity treated as a partnership for United States federal income tax purposes, Ligado's liabilities are allocated among its equity holders under the principles of section 752 of the Tax Code.  Under those principles, if the amount of Ligado's liabilities that are allocated to a holder of Equity Interests is reduced (through repayment, through allocation to different equity holders or otherwise), the reduction is treated the same as a cash distribution to that holder.  Such a distribution is generally not taxable, except to the extent the distribution exceeds the holder's basis in its Equity Interests immediately before the distribution.  To the extent the amount of a cash distribution to an Equity Interest holder (or deemed cash distribution resulting from a decrease in share of Ligado's liabilities allocated to an Equity Interest holder) exceeds the holder's tax basis in its Equity Interests, which basis may be increased by any COD Income allocated to such holder, the excess will give rise to gain on a deemed sale of the Equity Interests.  Gain from the sale (or deemed sale) of an Equity Interest is generally treated as a capital gain unless, and to the extent,

the gain relates to so-called "hot assets," in which case such gain will be treated as ordinary income. Holders of Equity Interests should consult with their own tax advisors regarding the potential application of the deemed distribution rules in connection with the transactions contemplated by the Plan. Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of Equity Interests held for more than one (1) year may be eligible for reduced rates of taxation.

If Ligado revalues its assets for purposes of section 704(b) of the Code in connection with the Plan, the Equity Interest holders' capital account balances should equal their economic entitlements as of the Effective Date. While any such revaluation may not have an immediate United States federal income tax effect, it may result in adjustments to the amount of taxable income or loss allocated to individual holders over time in connection with their Ligado Equity Interests.

### c.      Holders of More than One Class of Equity Interests in the Company

A holder of more than one class of equity interests in the Company will generally have a "unified" basis in its equity interests rather than a separate basis in the separate classes of equity interests for United States federal income tax purposes. Holders of more than one class of equity interests in the Company should consult their tax advisors regarding the consequences of holding more than one class of equity interests.

### 3.      Consequences of Holding New Equity Interests

### a.      Ownership of New Equity Interests

The Company is expected to continue to be treated as a partnership for United States federal income tax purposes and not as a publicly traded partnership taxed as a corporation. However, despite protections in the Amended and Restated Operating Agreement, it is possible that the Company may be or become a publicly traded partnership taxable as a corporation in which case the tax consequences would be materially different from those described herein. Assuming the Company is taxed as a partnership, it will generally not be subject to United States federal income tax. Instead, its taxable income or loss will be allocated to holders of equity interests based on United States federal income tax rules. Allocation of taxable income to a holder of new equity interests in the Company ("New Equity Interests") may result in such holder being required to pay tax on such income in advance of its receipt of cash distributions from the Company. In that case, a holder would be required to fund any such taxes from other sources.

In addition, to the extent a U.S. Holder of New Equity Interests that have a preference over other New Equity Interests are or will be entitled to a payment that is determined without regard to income, such U.S. Holder may be treated as receiving guaranteed payments under section 707(c) of the Tax Code. A U.S. Holder would generally have ordinary income to the extent of any guaranteed payment received (or deemed received as it accrues) with respect to such a New Equity Interest.

U.S. Holders will be allocated interest deductions on interest accrued under the Exit First Lien Facility. Under section 163(j) of the Tax Code there are substantial limitations on an equity

holder's ability to use interest deductions generated by an entity taxed as a partnership, which are calculated in part based on the entity's taxable income. Thus, holders of New Equity Interests may be limited in their ability to reduce all or part of the income allocated to them from the Company with interest deductions allocated to them from the Company. Furthermore, New Equity Interest holders would also be limited in their ability to use interest deductions allocated to them from the Company against their unrelated income.

### b.    Sale or Exchange of New Equity Interests

For United States federal income tax purposes, a holder generally will recognize gain or loss on the sale, exchange, or other taxable disposition of any of its New Equity Interests in an amount equal to the difference, if any, between the amount realized for the New Equity Interests and the holder's adjusted tax basis in such New Equity Interests. All or a portion of any such gain or loss may be ordinary in character if it relates to certain so-called "hot assets" of the Company under section 751 of the Code. Capital gains of non-corporate holders of New Equity Interests derived with respect to a sale, exchange, or other disposition of New Equity Interests held for more than one (1) year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### c.    Non-U.S. Holders of New Equity Interests

While this discussion generally does not address the tax consequences to a person other than a U.S. Holder, a holder of New Equity Interests that is not a U.S. Holder may, as a result of owning an interest in a United States partnership, be attributed income effectively connected with a United States trade or business and, accordingly, be subject to United States tax and tax filing requirements with respect to its share of income from such trade or business as if it were a U.S. Holder. Income attributed to such holder may be subject to withholding, regardless of whether the Company distributes cash to the holder. Such a holder may also be subject to United States federal income tax on any gain arising in connection with a disposition (or deemed disposition) of New Equity Interests. A holder of equity interests in the Company that is not a U.S. Holder should contact its own tax advisor regarding the potential implications of holding or selling New Equity Interests.

### 4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a holder of a Claim or Equity Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that its taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.   THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND HOLDERS OF INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## SECTION VIII.
## CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS

A.      *Section 1145 of the Bankruptcy Code*

The offer, issuance, and distribution under the Plan of each series of New Preferred Units (the "1145 Securities") will be exempt from registration under section 5 of the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code (to the extent available).

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in exchange for such claim or interest and "partly" for cash or property.

In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities generally may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim against, or interest in, a debtor with a view to distribution of any security to be received in exchange for the claim or interest, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution and under an agreement in connection with the plan, with the consummation of the plan or with the offer or sale of securities

under the plan, or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, to the extent that parties, including any "controlling person", who receive Section 1145 Securities pursuant to the Plan are deemed to be underwriters would not be exempt from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Parties deemed underwriters may be able to sell securities without registration under the Securities Act pursuant to the resale limitations of Rule 144 or another available exemption pursuant to and in accordance with the Securities Act. In addition, such parties will also be entitled to resell their Section 1145 Securities in transactions registered under the Securities Act following the effectiveness of a registration statement if one is filed with the SEC and becomes effective. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

As noted above, holders of Section 1145 Securities who are deemed underwriters may resell Section 1145 Securities pursuant to the limited safe harbor resale provision under Rule 144 of the Securities Act, which are more fully described below in the Section entitled "Section VIII.B Certain Federal and State Securities Law Considerations – Private Placement Securities".

Whether or not any particular person would be deemed to be an underwriter with respect to the Section 1145 Securities or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving Section 1145 Securities or other securities under the Plan would be an underwriter with respect to such Section 1145 Securities or other securities, whether such person may freely resell such securities or the circumstances under which they may resell such securities. Notwithstanding the foregoing, the Section 1145 Securities will also be subject to any applicable transfer restrictions in the New Organizational Documents.

B.    *Private Placement Securities*

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act.

The Debtors believe that the shares of New Preferred Units to be issued in accordance with the Plan to underwriters (as defined for purposes of section 1145(b) (collectively, the "4(a)(2)

Securities"), are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act, including potentially pursuant to the safe harbor provided by Regulation D promulgated under the Securities Act, and/or other applicable exemptions. Each of the holders of the Debtors' outstanding notes is required to represent that it is an "accredited investor" within the meaning of Rule 501(a) of Regulation D of the Securities Act, or a "qualified institutional buyer" (as defined under Rule 144A under the Securities Act).

The 4(a)(2) Securities will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

The 4(a)(2) Securities will be deemed "restricted securities" (as defined by Rule 144 of the Securities Act); will bear customary legends and transfer restrictions; and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available and in each case subject to the limitations in the applicable governance documents.

Rule 144 provides a limited safe harbor for the resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the ninety (90) days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer. It is currently anticipated that none of the Debtors will be subject to the reporting requirements of the Exchange Act after the Effective Date.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144, or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the effective date of the Plan. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

Each certificate representing, or issued in exchange for or upon the transfer, sale, or assignment of, any 4(a)(2) Security and to the extent certificated or issued by way of direct registration on the records of the Reorganized Debtors' transfer agent, each certificate evidencing the New Preferred Units held by holders of 10% or more of the outstanding New Preferred Units, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserves the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell, or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In addition to the foregoing, all transfers of New Preferred Units will be subject to the transfer provisions and other applicable provisions set forth in the applicable New Organizational Documents, including the Second Amended and Restated Operating Agreement.

Recipients of securities issued under or in connection with the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS

FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT WITH THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## SECTION IX.
## RISK FACTORS

The implementation of the Plan and the issuance and distribution of the New Preferred Units are subject to a number of material risks, including those summarized below.  However, this summary of risks and considerations is not exhaustive.  Prior to deciding whether and how to vote on the Plan, holders of Claims or Interests entitled to vote should read and carefully consider all of the information in the Plan and this Disclosure Statement, as well as all other information referenced or incorporated by reference into this Disclosure Statement.

These risk factors contain certain statements that are "forward-looking statements."  These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the Company, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, the effect of the reorganization on customers, suppliers, and vendors, and risks regarding the operation of the Company's business and associated with regulatory matters regarding its business.  Holders of Claims and Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance.  Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements.  No party, including, without limitation, the Company, or the Reorganized Debtors, undertakes an obligation to update any such statements.

A.    *Certain Bankruptcy Law Considerations*

***The chapter 11 cases may have a material adverse impact on the Company's business, financial position, and results of operations. The Company cannot predict the amount of time needed in chapter 11 to implement the Plan, and lengthy chapter 11 cases could disrupt its businesses, as well as impair prospects for reorganization on terms contained in the Plan and possibly provide an opportunity for other plans to be proposed.***

On January 5, 2025, the Company entered into the Restructuring Support Agreement with the Consenting Stakeholders and voluntarily commenced the Chapter 11 Cases to implement the Restructuring through the Plan. Given the requirements for confirmation of the Plan and the required regulatory approvals for the implementation of the proposed Restructuring, the duration of the Chapter 11 Cases is uncertain, and therefore could unduly disrupt the Company's businesses. It is impossible to predict with certainty the amount of time it may be necessary for the Company

119

to remain in bankruptcy, and the Company cannot be certain that the definitive agreements with AST will be implemented or that the Plan will be confirmed. Moreover, while the Debtors currently have the exclusive right to propose a plan pursuant to the Bankruptcy Code, if such right is terminated, other parties will be able to propose and file their own plan(s).

Lengthy Chapter 11 Cases would also involve additional expenses and divert the attention of management from operation of the businesses, as well as create concerns for personnel, vendors, suppliers, service providers, and customers. In addition, the AST Transaction is conditioned on a satisfactory conclusion of the Chapter 11 Cases. The impact that a lengthy stay under bankruptcy protection would inflict upon the Company's businesses would increase with the length of time needed to complete the Restructuring, and the severity of that disruption may depend upon the attractiveness and feasibility of the Plan from the perspective of the parties in interest, including suppliers, service providers, vendors, personnel, and customers. Lengthy Chapter 11 Cases may also (i) delay implementation of, or Ligado obtaining certain rights or benefits provided for, in the AST Transaction; and (ii) result in the termination of the Restructuring Support Agreement and/or Events of Default under the DIP Facility due to the Company's failure to abide by certain milestones, other termination events, or other applicable events of default, to the extent the Company is unable to obtain waivers or amendments from the relevant Consenting Stakeholders, as applicable.

If the Company is unable to obtain confirmation of the Plan on a timely basis for any reason, the Company may be forced to operate in chapter 11 for an extended period while trying to develop a different chapter 11 plan that can be confirmed. Protracted Chapter 11 Cases would increase both the probability and the magnitude of the adverse effects described above.

### *There could be continued risk upon confirmation of the Plan.*

Even if the Plan is confirmed, the Company will continue to face a number of risks, including certain risks that are beyond its control, such as a protracted USG Lawsuit as described herein, further deterioration or other changes in economic conditions, changes in the industry, changes in the regulatory environment, changes in interest rates, potential revaluing of its assets due to chapter 11 proceedings, changes in demand for the Company's services, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization on the terms set forth in the Plan will achieve the Company's stated goals. In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Company with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Company's ability to achieve confirmation of the Plan or the Debtors' stated goals.

Furthermore, even if the Company's debts are reduced and/or discharged through the Plan, the Company, or the reorganized Company, as applicable, may need to raise additional funds through public or private debt or equity financing or other various means to fund its businesses after confirmation of the Plan or the completion of the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

***The Company may be unable to obtain confirmation of the Plan.***

Although the Company believes that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that sufficient votes accepting the Plan will be obtained. Moreover, there can be no assurance that modifications to the Plan will not be required or that such modifications will not be sufficiently material as to necessitate the re-solicitation of votes on the Plan. The Company may not be able to obtain confirmation of the Plan in a timely manner.

If the Plan is not confirmed, the Company may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

Moreover, if the Plan is not confirmed, there can be no assurance the Chapter 11 Cases will continue rather than be converted into liquidation cases under chapter 7 of the Bankruptcy Code or that any alternative chapter 11 plan or plans would be on terms as favorable to the holders of Allowed Claims and Interests as the terms of the Plan. If a liquidation or protracted reorganization were to occur, there is a substantial risk that the Company's going-concern value would be substantially eroded to the detriment of all stakeholders.

***The Effective Date may not occur.***

Given the nature of the Plan and the required regulatory approvals for implementation, the Effective Date of the Plan is not likely to occur shortly after the Confirmation Date, and there can be no assurance as to the actual timing of the Effective Date. The occurrence of the Effective Date is subject to certain conditions precedent set forth in Article IX of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.  If the Effective Date does not occur, the Plan will be null and void in all respects, and nothing contained in the Plan or this Disclosure Statement will:  (i) constitute a waiver or release of any claims by the Company, any holders of Claims or Interests, or any other Entity; (ii) prejudice in any manner the rights of the Company, any holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Company, any holders of Claims or Interests, or any other Entity.

***If the Company is not able to obtain confirmation of a Chapter 11 plan of reorganization, or if current liquidity is insufficient or exit financing is not available, the Company could be required to liquidate under Chapter 7 of the Bankruptcy Code.***

In order to successfully emerge from Chapter 11 bankruptcy protection, the Company must obtain confirmation of a Chapter 11 plan of reorganization by the Bankruptcy Court. If confirmation does not occur, the Company could be forced to liquidate under Chapter 7 of the Bankruptcy Code.

There can be no assurance that the Company's current cash position and amounts of cash from future operations will be sufficient to fund operations. In the event that the Company does not have sufficient cash to meet its liquidity requirements or exit financing is not available, the Company may be required to seek additional financing. There can be no assurance that such

additional financing would be available, or, if available, would be available on acceptable terms. Failure to secure any necessary exit financing or additional financing would have a material adverse effect on the Company's operations and ability to continue as a going concern.

If the Bankruptcy Court finds that it would be in the best interest of the Debtors and/or their creditors, the Bankruptcy Court may convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code. In such event, a Chapter 7 trustee would be appointed or elected to liquidate the assets and distribute the proceeds in accordance with the priorities established by Chapter 7 of the Bankruptcy Code. The Company believes that liquidation under Chapter 7 would result in significantly smaller distributions to its creditors than those provided for in a plan of reorganization because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a distressed fashion over a short period of time rather than in a controlled manner and as a going concern, (ii) additional administrative expenses involved in the appointment of a Chapter 7 trustee, and (iii) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of operations.

### *There may be risks related to nonconsensual confirmation.*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request under section 1129(b) of the Bankruptcy Code if at least one impaired class of claims has accepted the plan (with such acceptance being determined without including the vote of any "insider"), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses relating to litigation and attendant increased professional compensation.

### *The releases, injunctions, and exculpations provisions may not be approved.*

The Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases of certain claims that may otherwise be asserted against Released Parties. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the third-party releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release, exculpation, and injunction provisions. The Plan's release, exculpation, and injunction provisions are an inextricable component of the Restructuring Support Agreement, the Plan, and the significant deleveraging and financial benefits that they embody.

### *Risk of Termination of the Restructuring Support Agreement.*

The Restructuring Support Agreement contains certain provisions that give the Consenting Stakeholders and AST the ability to terminate the Restructuring Support Agreement if certain events occur or fail to occur. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Company's relationships with, among others, vendors, suppliers, employees, and major customers.

### *Risks Related to Possible Objections to the Plan.*

There is a risk that certain parties could object to either the entirety of the Plan or specific provisions of the Plan. Although the Company believes that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### *The terms of the debtor-in-possession financing and exit financing may restrict our future operations, particularly our ability to respond to changes in our business or to take certain actions.*

In connection with the Restructuring Support Agreement, certain Consenting Stakeholders agreed to provide debtor in possession financing to the Debtors. If the Plan is confirmed, the Debtors anticipate that the reorganized Company will have indebtedness in the form of the Exit First Lien Facility of approximately $2.7 billion after emergence, based on the Outside Date, which includes a cashless roll-up of the DIP Obligations and potential new money financing. The terms of the Exit First Lien Facility may contain, and the terms of any of other future indebtedness would likely contain, a number of restrictive covenants that impose certain operating and other restrictions.

The DIP Facility includes, and the Exit First Lien Facility may include covenants that, among other things, restrict our ability to:

- incur additional debt;

- repurchase our indebtedness;

- pay dividends, redeem stock, or make other distributions;

- make other restricted payments and investments;

- create liens;

- enter into sale and leaseback transactions;

- merge, consolidate or transfer or dispose of substantially all of our assets; and

- enter into certain types of transactions with affiliates.

The operating and financial restrictions and covenants in the DIP Facility, Exit First Lien Facility, and any other future financing agreements may adversely affect the Company's and the reorganized Company's, as applicable, ability to finance operations or capital needs or to engage in other business activities.

***Upon emergence from bankruptcy, the Company expects to have substantial debt obligations that could impair its liquidity and financial condition.***

The Company is highly leveraged with significant amounts of short-term debt and plans to make additional cash investments in capital items and ongoing operating expenses. If the Plan is confirmed, the Debtors expect that the reorganized Company will have indebtedness of approximately $2.7 billion upon emergence from the Chapter 11 Cases based on the Outside Date.

While the Company's proposed Plan is intended to significantly deleverage its balance sheet, the Company's or reorganized Company's, as applicable, substantial current and future indebtedness could have important consequences, including the following:

- limiting its ability to borrow money or sell equity to fund working capital, capital expenditures, operating expenses, debt service requirements or other purposes;

- increasing its vulnerability to general economic and industry conditions;

- adversely affecting its ability to negotiate with potential spectrum partners and customers, potentially reducing the value of the Company's spectrum and its business;

- limiting its flexibility in planning for, or reacting to, changes in the Company's business or the industry;

- reducing the amount of cash available for other purposes by requiring it to dedicate a substantial portion of the reorganized Company's cash flow from operations to the repayment of indebtedness; and

- placing it at a competitive disadvantage to competitors who are less leveraged.

A significant portion of any future additional financing may consist of debt securities or loans. As a result, the reorganized Company may be highly leveraged. If additional funds are raised through the incurrence of indebtedness, the reorganized Company may incur significant transaction and interest charges and become subject to various restrictions and covenants that could further limit its ability to respond to market conditions, provide for unanticipated capital investments or take advantage of business opportunities.

***Projections, Estimates, and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.***

Certain of the information contained in this Disclosure Statement contains estimates and assumptions that might ultimately prove to be incorrect and contains projections which may be materially different from actual future events. There are uncertainties associated with any

projections and estimates, including but not limited to, the aggregate amounts of Allowed Claims or Interests in certain Classes, and such projections and estimates should not be considered assurances or guarantees of the amount of assets that will ultimately be available for distribution on the Effective Date. If the actual amount of Allowed Claims or Interests are greater than the Company's estimates, the Company may be unable to pay or otherwise satisfy those Claims or Interests.

B.    *Risks Associated with the Company's Existing MSS Business and the Business Contemplated by the AST Transaction*

*As regulators at the FCC and ISED evaluate proposals to facilitate the integration of satellite and terrestrial networks and additional spectrum becomes available for satellite services, the value of MSS spectrum licenses like ours may be impacted.*

In the FCC's March 2024 Open Meeting, the FCC adopted an Order finalizing rules for a new regulatory framework for Supplemental Coverage from Space ("SCS"). These rules add a mobile satellite service allocation on a secondary basis to certain terrestrial flexible-use bands, and in doing so, enable satellite operators to collaborate with terrestrial service providers to provide supplemental coverage. In addition, the FCC noted that it will still consider waivers for supplemental coverage outside of the bands and framework established in this Order on a case-by-case basis. The 1670-75 MHz band, which Ligado has access to through a long-term lease, with OP LLC (a subsidiary of Crown Castle) was not included in the FCC's SCS Order. Therefore, it is uncertain whether the FCC will authorize this band for SCS services through a waiver.

In February 2025, ISED added a secondary mobile satellite service allocation in designated mobile terrestrial bands for purposes of enabling a Supplemental Mobile Coverage by Satellite ("SMCS") on a no-interference, no protection basis and subject to an ongoing obligation to mitigate harmful interference to other licensed radiocommunication systems. Approval of additional terrestrial commercial mobile frequency bands for SMCS not identified in ISED's decision will be preceded by a public consultation process.

In addition, there are new bands being proposed for MSS at the ITU and these bands may also become available over time in the U.S. and/or in Canada.

Any increase in the amount of licensed spectrum available for MSS, whether in the U.S. or Canada, could negatively affect the value of the Company's L-band spectrum and may make it more difficult to deploy its MSS spectrum in collaboration with mobile network operators or other parties.

*The Company's right to use its allocated L-band spectrum is subject to the Cooperation Agreement and Ligado making payments to Inmarsat under the Cooperation Agreement.*

In exchange for Inmarsat and the Company agreeing to cooperatively allocate their licensed spectrum in the L-band into contiguous spectrum blocks so that the Company could more effectively use its allocated spectrum, the Company made substantial payments to Inmarsat in the past and has agreed to make significant future payments. Under the Cooperation Agreement, a one-time payment of approximately $525 million by the Company was scheduled to come due on January 13, 2025 (after the applicable grace period) and represents a prepetition claim. In addition,

the Company owes Inmarsat quarterly payments of approximately $15.9 million which are due at the end of each calendar quarter and are scheduled to grow at 3% per year. As set forth in the AST Definitive Agreements Order, the Company and Inmarsat have negotiated a resolution of the outstanding amounts owed, in exchange for, subject to certain conditions: (i) payment of $420 million on October 31, 2025; (ii) payment of $100 million on March 31, 2026; (iii) the resumption of quarterly payment beginning on September 30, 2025; and (iv) payment of $15 million on the Plan Effective Date (following satisfaction of the Approval Condition).  The AST Transaction contemplates that the AST Usage Rights Payments and DUO Payments will cover Ligado's payment obligations to Inmarsat under the Cooperation Agreement. Prior to AST obtaining FCC approval for the Proposed NGSO System and certain other conditions to the AST Transaction being met, payment of the DUO Payments is subject to the backstop agreement to be negotiated between the parties and Ligado's stakeholders.  If Ligado was unable to meet its payment obligations to Inmarsat, it would have a material adverse impact on Ligado's business. See also discussion under the heading "Risks Associated with General Regulatory, Legislative Matters, and Litigation."

***The Company has not historically earned significant revenues from its service and product offerings, and it expects to continue to realize significant net losses for the foreseeable future.***

The Company currently generates satellite revenue from fixed, land-mobile, and maritime terminals supporting voice and push-to-talk services for government and enterprise customers. Additional revenue is earned from supporting satellite positioning services for agriculture, surveying, and trucking fleet management, and from weather monitoring services for utility and critical infrastructure industry customers. By contrast, the Company generates little-to-no revenue from the emerging market for narrowband D2D and IoT satellite services. To advance these market opportunities, the Company has agreed to definitive agreements with AST to collaborate with AST on the deployment of its MSS spectrum. In the near term, if Ligado were unable to consummate the AST Transaction or alternatively, AST were not to perform pursuant to such agreements, it may not be able to generate the cash flow required to operate its business and satisfy its contractual obligations. In addition, the Company cannot anticipate with certainty what its earnings, if any, will be in any future period. However, the Company expects to continue to incur net losses for the foreseeable future. For that reason, the Company has negotiated certain terms under the proposed AST Transaction to partially offset these net losses. In addition, the Company will need to make continuing investments in its business before it expects cash flow from operations to adequately cover its anticipated costs. In addition, at this stage of its development, the Company is subject to the following risks:

- it may be unable to deploy its MSS spectrum for future D2D and IoT satellite services using some combination of Ligado's geostationary satellite system ("GSO") and the Proposed NGSO System, or grow its business profitably;

- the costs required to support and maintain any required satellites and related infrastructure for Ligado's GSO system are significant and could be significantly higher than its current estimates;

- the Company may experience delays related to (i) regulatory authorization to deploy its MSS spectrum on the Proposed NGSO System and (ii) the launch of satellites on Ligado's GSO system, which could affect the ability of the Company and AST to successfully implement the combined business strategy, including the ability to attract commercial partners;

- the Company's right to use its MSS spectrum is subject to the Company meeting certain deployment milestones and complying with other conditions in its FCC and ISED licenses, and its licenses could be revoked, suspended, or materially modified if the Company fails to meet such milestones or comply with such conditions which could impact its ability to generate revenue; and

- the Company's and AST's limited operating history in the market for D2D and IoT satellite services, may make it difficult to predict accurately its key operating and performance metrics utilized in budgeting and operational decisions.

*The consummation of the AST Transaction is subject to obtaining FCC approval of the Proposed NGSO System, satisfactory resolution of the Chapter 11 Cases, and satisfaction of certain other conditions. A failure by the Company to consummate the AST Transaction as a result of it or AST not being able to satisfy the applicable conditions could have an adverse impact on the Company's business.*

The AST Transaction, if consummated, will result in the Company or Reorganized Company, as applicable, receiving the AST Usage Rights Consideration.  The Company cannot guarantee that it will be able to achieve the benefits contemplated by the AST Transaction due to various financial, technical, regulatory, legal, and other conditions and risks associated with the AST Transaction, including:

- The Company and AST failing to obtain FCC and ISED approval to utilize Ligado's L-band MSS spectrum for the Proposed NGSO System within the twenty-four month period following submission of the relevant regulatory applications (as provided for in the AST Definitive Agreements), or obtaining such approval with conditions that do not allow for successful operation of the Proposed NGSO System;

- AST facing difficulties in its ability to procure, launch or operate satellites for the Proposed NGSO System given (i) the technical complexity of NGSO systems and (ii) the substantial costs AST must incur relating to the design, assembly, integration, testing and launch of the Proposed NGSO System;

- A failure by AST to successfully implement its business plan;

- A potential decrease in the value of the AST warrants that have been issued as part of the AST Transaction based on general market volatility and conditions;

- The Company and AST failing to obtain a waiver from the FCC to allow AST to use Ligado's lease rights from 1670-1675 MHz for SCS, which is required for such use because the FCC did not include the 1670-1675 MHz spectrum in the SCS Order; if

AST were to terminate its agreement with Ligado relating to the 1670-1675 MHz spectrum, then Ligado's funding requirements would increase;

- A failure by the Company to obtain or consummate a backstop commitment in connection with its payment obligations to Inmarsat under the Cooperation Agreement if FCC approval of the Proposed NGSO System is not obtained and certain other conditions are not met, including as a result of its inability to use the 1670-1675 MHz spectrum as collateral for such backstop for any reason;

- AST breaching the technical requirements of the Cooperation Agreement; and

- AST not meeting its obligation to pay the AST Usage Rights Consideration to the Company pursuant to the terms of the AST Definitive Agreements.

The Company cannot assure that the foregoing risks will not materialize and, if any such risks do materialize, the Company's financial condition, results of operations, business and prospects may be materially and adversely affected.

### *The Company may fail to consummate the AST Transaction due to a failure to achieve certain conditions for the AST Transaction, which could have an adverse impact on the Company's business.*

The AST Transaction, if consummated, will result in the Company receiving the AST Usage Rights Consideration. If the Company fails to consummate the AST Transaction for any reason, the Company's ability to successfully implement its business strategy for D2D and IoT satellite services may be adversely affected. Additionally, the failure by the Company to realize the benefits to the Company contemplated by the AST Transaction would have a material adverse effect on the Company's financial condition, results of operations, business and prospects, including as a result of it potentially not being able to meet its payment obligations to Inmarsat under the Cooperation Agreement.

### *D2D and IoT satellite services will require the launch of NGSO and expanded geostationary satellite systems.*

Initial D2D services are planned to be offered via existing satellites and authorizations that have been coordinated across the L-band and within the Company's coverage. Future D2D services are expected to require the addition of numerous NGSO satellites in low earth orbit ("LEO") on a global basis, and expanded geostationary satellite systems to support lower latency applications and to improve uplink performance in order to realize the full market potential of D2D and IOT satellite services, which may take years, if ever, following the consummation of the AST Transaction to materialize. Such launches require a substantial outlay of capital, and there can be no assurances, particularly at this stage of the Company's collaboration with AST, that the Company or AST will be able to access such financing on acceptable terms or if at all. Design, assembly and launch of satellite systems are highly complex and historically have been subject to frequent delays and cost over-runs. Development of the D2D services, which is utilizing new technology, may suffer from delays or increased costs due to many factors that may be beyond the

Company's and AST's control and hinder their ability to commercialize the L-Band MSS Spectrum as planned.

***Ligado's MSS spectrum is not currently authorized by government regulators for NGSO satellites in North America and the AST Transaction requires NGSO regulatory approval.***

The operation of NGSO satellites is not within the scope of Ligado's current licenses. Ligado views deployment and use of the NGSO satellites as consistent with its coordination agreements but other parties may have a different view. The deployment of an NGSO constellation using Ligado's L-band MSS Spectrum in North America would require regulatory approvals from the FCC and ISED and potentially from regulatory authorities in other jurisdictions, and such approvals may or may not be granted for all or a portion of the L-band, by the FCC, ISED or other applicable regulatory authorities, or alternatively, may be delayed or granted with conditions that inhibit or materially restrict the deployment of an NGSO system on Ligado's spectrum. In addition, the timing for receiving regulatory authorization for any new satellite systems is uncertain but it is a regulatory condition for consummation of the AST Transaction and the Company's emergence from bankruptcy by the Outside Date.

Opponents of the Company, the AST Transaction or the Proposed NGSO System would have an opportunity to provide comments during the regulatory process to contest the approval. These objections could lead to an extended regulatory process or the denial of the application, which would have a material adverse impact on the Company because it would not receive the full economic benefits of the AST Transaction. In addition, third parties are seeking to gain access to the L-band. These efforts are independent of the regulatory process to seek approval for the Proposed NGSO System and could negatively affect the Company's spectrum rights and/or the AST Transaction.

Additionally, the timing of the requisite regulatory approvals will influence the speed at which AST can bring L-band services to market and could adversely affect their ability to go to market and to capture market share in the emerging D2D and IoT services market.

***Some portions of the Ligado L-band MSS spectrum may remain only authorized and coordinated for geostationary satellite use thereby requiring Ligado to maintain geostationary satellite operations and expenses for a sustained period of time.***

Ligado cannot assure that the FCC and ISED will not require a continued geostationary satellite system as a condition for its L-band license. As a result, the Company could continue to incur significant annual costs related to the operation of a geostationary satellite network as well as capital expenditures associated with future geostationary satellites.

***Region 2 L-band mobile satellite operators have not fully coordinated MSS spectrum for NGSO satellite systems.***

Ligado cannot assure that use of its MSS spectrum on an NGSO system will not be challenged or objected to by other Region 2 coordination parties. Even if Region 2 L-band operators do fully coordinate the L-band spectrum for NGSO system use, Ligado cannot assure that such coordination will result in the ideal power levels and coverage footprint or that Ligado will be able to avoid delays in reaching Region 2 inter-operator agreements.

***Successful commercialization of L-band spectrum for D2D and IoT satellite services requires support of the frequency band by major chipset, infrastructure, and device manufacturers, and there is no assurance that manufacturers will provide sufficient timely support.***

Like any new frequency band, successful commercial adoption of the Company's L-band spectrum for D2D and IoT satellite services requires a complex technology ecosystem formed through support by major chipset, device, and infrastructure manufacturers to enable operation of the Company's L-band spectrum. The Company, working with AST, may not be successful in its efforts to cause these manufacturers to develop chipsets, infrastructure, and devices that would enable end users to utilize its spectrum. Because of the level of resources required to build out the ecosystem supporting the Company's spectrum, ecosystem vendors may, among other things, assess the Company's commercial D2D partnerships, as well as regulatory or legal risk, before they invest those resources. The Company can offer no assurance that it or AST will develop such commercial D2D partnerships or that the major chipset, device, and infrastructure manufacturers will invest their resources in the ecosystem supporting the Company's spectrum absent such commercial partnerships, or if they do so whether such resources will be deployed in a timely or sufficient manner. Without the development of such an ecosystem for its licensed spectrum, the L-band spectrum may not be successfully adopted for D2D services on the timeline it expects or at all.

***The size of the emerging market for D2D and IoT satellite services is uncertain and may not achieve the projected size expected by certain industry participants over the coming decade.***

Satellite D2D and IoT services are expected to be primarily sold through existing mobile network operators ("MNO") and thus will be positioned to end-users as extended coverage or redundant coverage to the network services supported today by the MNO. The willingness of customers to pay for extended coverage in the retail consumer market is unknown and the willingness to pay for redundant coverage in the enterprise market varies considerably based on the end user application. Economics between the MNO distribution partner and the D2D satellite network service provider may vary substantially based on the suite of services supported by any given MNO, ranging from emergency services to the suite of voice, text, and data services. Device OEMs will also influence the adoption of satellite capabilities into new smartphone models. These factors will significantly influence the timing and size of the D2D and IoT satellite services market.

***The Company and AST face competition from other mobile satellite network operators and service providers, which may adversely impact its market opportunity for D2D and IoT satellite services.***

Several competitors are developing or have announced plans to develop D2D and IoT satellite services. Existing and future competitors include Globalstar, Echostar, Viasat/Inmarsat, Iridium, SpaceX (Starlink), and Amazon's Kuiper. The Company expects to face substantial competition from several existing global MSS providers in addition to future MSS provider entrants, including those potentially providing service under an SCS framework. Although the Company believes that its MSS spectrum position and existing SkyTerra GSO MSS network operations in North America in combination with the Proposed NGSO System would favorably position Ligado and AST for these emerging market opportunities, the Company expects to be

subject to significant competition which may negatively impact the amount of revenue that Ligado is able to generate through its collaboration with AST.

**The Company expects the Proposed NGSO System to use some combination of Ligado's L-band spectrum and terrestrial spectrum bands that have been authorized for secondary satellite use. AST's allocation of spectrum between the L-band and other bands is unknown and may potentially impact revenue share payments that Ligado ultimately receives from AST for D2D and IoT services.**

AST revenue share payments to Ligado are to be made at different percentages depending on the allocation of AST traffic using Ligado's L-band spectrum versus other secondary mobile satellite spectrum used by the Proposed NGSO System. To the extent AST has access to a deep pool of secondary mobile satellite spectrum from MNO customers or alternative sources of MSS spectrum beyond Ligado's L-band spectrum, that would adversely impact the amount of traffic put on Ligado's L-band spectrum and, therefore, would negatively impact AST revenue share payments to Ligado.

**Ligado may not receive any NGSO revenue share payments under the proposed AST Transaction in the near term.**

Under the AST Transaction, Ligado expects to receive a revenue share from AST, related to NGSO revenue generated in North America. The revenue share payments that AST is expected to pay to Ligado will be based on net revenue which takes into account certain system operating, distribution, and spectrum-related costs. Until and unless NGSO retail revenue exceeds these costs, Ligado will not receive any payments through its revenue share agreement with AST.

**The Company's SkyTerra-1 satellite is subject to operational risks while in orbit, which, if they were to materialize, could adversely affect Ligado's revenues, profitability, liquidity, and its ability to maintain its spectrum licenses.**

During and after their launch, all satellites are subject to the risk of equipment failures and malfunctions, commonly referred to as "anomalies," which may occur on Ligado's SkyTerra-1 satellite and the satellites of other operators as a result of equipment failures and/or space weather events due to the harsh environment of space to which satellites are exposed. Although Ligado intends to work closely with satellite manufacturers and others to determine and eliminate the cause of anomalies when designing and building new satellites, with the inclusion of redundancy for all critical components, the risk of anomalies will never be completely eliminated. For example, the SkyTerra-1 satellite experienced an anomaly on April 20, 2023. Follow-up and interim corrective actions were implemented, and customer services and beam coverage, although impacted by the anomaly, have been stable since these corrective actions. Although these corrective actions have stabilized performance, the performance has not been fully restored to prior levels. If the SkyTerra-1 satellite were to experience another anomaly, or to otherwise fail prematurely, it likely would adversely affect the quality of its MSS services, substantially interrupt the continuation of the Company's MSS services and harm its business and could negatively impact its licenses or lead to the loss of its licenses. This negative impact on the Company's business could continue until the Company builds and launches additional satellites.

***Satellites have a limited useful life and premature failure of the Company's satellites could damage its MSS business and jeopardize compliance with its licenses.***

Ligado's ability to generate revenue and maintain its authority to provide service depends on the lives of its SkyTerra satellites and any future alternative satellite. Each satellite has a stated limited useful life. Ligado's SkyTerra-1 satellite was launched in November 2010 and is fully operational, but the satellite did experience an anomaly on April 20, 2023. In addition, in November 2020 and June 2024 respectively, the Company's MSAT-1 satellite and the MSAT-2 satellite were de-orbited and decommissioned after they experienced anomalies and Ligado determined that it was prudent to de-orbit the satellites. Based on the fact that Ligado had to de-orbit MSAT-2, the Company's SkyTerra-2 satellite currently in storage or an alternative satellite option would need to be launched within three years of the de-orbiting to preserve the Company's current international coordination priorities at 107.3W orbital slot. The costs associated with launching another satellite could have a significant negative impact on the Company's financial condition and projected funding runway in the event future costs were to exceed the Company's planned expenses. The Company potentially bears additional costs related to SkyTerra-2 due to certain challenges created by the manufacturer, Boeing. The satellite authorizations and certain satellite network operational requirements are a condition of the Company's licenses. Should the SkyTerra-1 satellite fail and have to be deorbited, under ITU rules the Company would have to replace it within three years in order to retain its orbital slot at 101.3W. FCC rules do terminate a space station authorization if a satellite is rendered not operational for more than 90 days, unless specific authority to replace the satellite is requested. If a satellite operator requests specific authority within the 90 days showing minimal disruption to customers (by migrating to an alternative service) and a specific plan for replacing the satellite, then FCC precedent provides for a "replacement expectancy," allowing substantially more time – in some cases over two years – to replace the satellite and continue operating under the existing license. In this circumstance, the Company cannot guarantee the FCC will grant a request for specific authority. An FCC denial of such a request would, absent grant of a new satellite authorization, significantly put at risk the Company's ability to provide service, maintain its spectrum rights, and achieve its business goals.

A number of factors could decrease the useful lives of the Company's satellites to less than what is currently expected, including, without limitation:

- defects in manufacturing;

- faster than expected degradation of solar panels;

- durability of component parts;

- loss of fuel on board;

- higher than anticipated use of fuel to maintain the satellite's orbital location or higher than anticipated use of fuel during orbit raising following launch;

- random failure of satellite components that are not protected by back-up units;

- electromagnetic storms; and

- collisions with other objects (including other satellites) in space.

The loss, damage, or destruction of any of Ligado's satellites, including as a result of collision with micrometeoroids or space debris and the impact of solar activity, malfunction or other events could have a material adverse effect on its business, financial condition, and results of operations.

***The Company does not insure its SkyTerra-1 satellite. The Company may be unable to obtain and maintain insurance for its future satellites, and any insurance it does obtain may not cover all losses it experiences. Even if the Company's insurance was sufficient, delays in launching a replacement satellite could adversely affect revenues, profitability, liquidity, and potentially the Company's licenses.***

The price of space insurance has fluctuated significantly since the Company began offering commercial satellite services and has increased over the past several years due to several high value claims. The cost of obtaining space insurance can vary as a result of the insured spacecraft's health or overall space insurance market conditions.

The Company decided to no longer insure the SkyTerra-1 satellite after the expiration of the prior policy on November 15, 2024 due to the insurance claim submitted under the policy in May 2024. This decision was made in consultation with the Company's insurance broker, after exploring the potential cost, policy limitations, and likely exclusions of coverage. Discontinuing in-orbit insurance after such a claim is standard market practice.  While this decision was consistent with market practices, it still presents a risk to have an uninsured satellite in orbit.

Additionally, there are factors that will make obtaining adequate and reasonably priced launch and in-orbit insurance for the SkyTerra-2 satellite challenging if the Company is able to move forward with refurbishing and launching the SkyTerra-2 satellite. These factors include the anomalies experienced on the SkyTerra-1 satellite (including the claim) and the length of time the SkyTerra-2 satellite has been in storage. General space insurance market conditions may also impact the insurability of the spacecraft.  If the Company launches a replacement satellite other than the SkyTerra-2 satellite that may mitigate some of these risks, but the market conditions will still be a factor in connection with the availability and pricing of this insurance.

Based on the exclusions included in our prior in-orbit insurance for SkyTerra-1, the Company's loss history and the general insurance market conditions, future policies may contain specified exclusions and material change limitations customary in the industry at the time the policy is written. These exclusions typically relate to losses resulting from acts of war, insurrection or military action, or government confiscation, as well as lasers, directed energy beams, nuclear or anti-satellite devices or radioactive contamination.

In addition, the insurance would not protect the Company against lost or delayed revenue, business interruption or lost business opportunities resulting from delayed manufacturing or launch of a replacement satellite.

***New or proposed satellites are subject to construction and launch delay and launch failures, including a launch that fails to deliver a satellite to its designated orbital location after***

*launch, or other satellite damage or destruction during launch, which could result in a total or partial satellite loss, the occurrence of which could have an adverse effect on the Company's business, financial condition, and results of operations.*

The construction and launch of satellites require significant capital expenditure and is subject to the risk of delay and other problems. Ligado may experience delays in the construction of satellites and launch vehicles, the periodic unavailability of reliable launch opportunities, possible delays in obtaining regulatory approvals and launch failures and/or reduced global launch vehicle options. For example, each of the following factors could lead to increased expense and/or delay related to the launch of the SkyTerra-2 satellite: challenges related to equipment procurement and reconditioning; the time required for Boeing to refurbish the SkyTerra-2 satellite for launch due to the prolonged storage period, aged out parts and removed parts for an unrelated program, and developments with certain suppliers to the SkyTerra-2 program; and the cost associated with and the time required to test and launch the satellite as well as current sanctions against Russia due to the war in Ukraine, the impact of which precludes the Company from using any Russian launch vehicle or site. As the Company considers pursuing a path to refurbish the SkyTerra-2 satellite, it will have to pay for the storage of the SkyTerra-2 satellite, while receiving no operational benefits. The cost of that storage during the pendency of the Boeing Litigation is unknown and may exceed budgeted amounts.

Expected delays in the launch of the SkyTerra-2 satellite or an alternative satellite could result in the Company missing its ISED launch date of March 31, 2029 or its ITU Bring Into Use date of March 28, 2030 which could result in the Company losing certain of its satellite and ATC spectrum licenses or authorization, to the extent the Company does not have agreements with the relevant regulatory bodies to address such delays. A delay in the launch of any of its satellites could also adversely affect its ability to comply with its obligations under the Company's customer contracts, which could impact its operations and revenues, and could result in higher than expected capital expenditures. A delay caused by a launch failure may also preclude Ligado from achieving its expected L-band spectrum utilization and undermine its ability to implement the Company's business strategy. Launch vehicles may also underperform, in which case the satellite may still come into service by using on-board propulsion systems to reach the desired orbital location, but this would result in a material reduction in the satellite's service life based on reduced fuel levels. The failure to implement its satellite deployment plan on schedule, and in particular the failure to launch the SkyTerra-2 satellite or an alternative satellite on schedule, could have a material adverse effect on Ligado's business, financial condition, and results of operations. The Company is currently working with relevant regulatory authorities to avoid or minimize the risks associated with a potential delay in the launch of the SkyTerra-2 satellite or an alternative satellite to any of its satellite licenses and spectrum and on its ability to implement its business strategy.

*Ground networks are subject to significant operational risks, including IT-related risks, which, if they were to occur, could adversely affect Company revenues, profitability, and liquidity.*

Ligado's satellite ground control infrastructure includes a network of Telemetry, Tracking and Command ("TT&C") stations located in Allen Park, Ontario, Canada and Mt. Jackson, Virginia, USA. The TT&C network is designed for redundancy but the simultaneous failure of two

stations serving the same satellite may limit the Company's ability to operate its satellites effectively, which could adversely affect its revenues, profitability, or liquidity.

The resilience of Ligado's IT systems, voice and data networks and associated infrastructure is essential to the operation of its satellite networks. The Company faces a variety of hazards that could cause significant interruptions to the delivery of its services, including component or telecom failure, physical attack, fire, explosion, extreme weather, natural disasters, and other occurrences. These could lead to an interruption of the Company's services, which could affect its ability to process orders and invoices, leading to reduced user traffic and reduced revenue. Such reductions could affect the Company's business operations, customer satisfaction, revenues, financial position, and its brand reputation. Any of the foregoing could have a material adverse effect on the Company's business, financial condition, and results of operations.

The Company's proposed hybrid satellite network will also include AST's planned NGSO network. AST's planned NGSO constellation and associated ground network also will have typical operational issues that may have an impact on the Company's revenues, profitability, and liquidity.

***The Company's networks and information technology systems, and those of its distribution partners, are increasingly at risk of cybersecurity attacks, cybercrime, and fraud. Any disruption of the Company's business operations due to a cyber-attack, even for a limited amount of time, could have a material adverse effect on its competitive position, reputation, financial condition, and results of operations.***

Ligado's network is and will be subject to security risks from a broad range of threat actors including foreign states, criminals, competitors, computer hackers, cyber terrorists and politically motivated groups or individuals. The risks include physical or electronic break-ins, security breaches from inadvertent or intentional actions by Ligado employees, contractors, consultants, distribution partners, and/or other third parties, or from cyber-attacks by malicious third parties. Breaches that compromise Ligado's network or information can cause interruptions, delays, or operational malfunctions, which in turn could have an adverse effect on its revenues, profitability, reputation, and liquidity. Ligado can provide no assurance that its current networks and information technology systems, or those of its distribution partners or other third parties upon which it relies, are fully protected against cybersecurity threats or that they are able to anticipate and respond to evolving techniques to access or sabotage systems. Customers as well as potential customers may be discouraged from using Ligado's services if it is unable to demonstrate that it is reliable and meets certain cybersecurity requirements. Ligado may be required to expend substantial resources to recover from a significant security breach and to alleviate any resultant damage. Furthermore, the potential costs associated with any such cyber-attacks could be greater than the insurance coverage that the Company maintains. Each of the foregoing could have a material adverse effect on Ligado's competitive position, reputation, financial condition, and results of operations.

C.     *Risks Associated with General Regulatory, Legislative Matters, and Litigation*

***The Company is subject to significant United States and Canadian regulations.***

Ligado's ownership and operation of satellite and wireless communication networks are subject to: (1) regulation by the FCC in the United States and, in Canada, ISED and the Canadian Radio-television and Telecommunications Commission (the "CRTC"); and (2) United States and Canadian treaty commitments to the ITU.

The United States and Canada are signatories to the Constitution and Convention of the ITU, which, along with its Radio Regulations, establish an international framework for the use of spectrum and associated orbital locations by satellite networks to provide communications services. The use of spectrum and associated orbital resources by Ligado and other satellite operators with networks located adjacent to or near Ligado's satellites must be coordinated pursuant to that framework in order to avoid harmful interference among their respective networks. Such coordination may require that Ligado modify its operations to accommodate use of spectrum by other satellite operators. The Company has ongoing discussions with the Region-2 satellite operators to comply with its coordination obligations. Ligado's ability to offer its services is dependent upon ongoing coordination with these operators, and the Company does not know if these operators will adopt a position adverse to the Company. Further, the ITU may change or re-interpret its rules regarding a variety of matters that could, directly or indirectly, adversely affect Ligado's operations and/or increase the cost and efficacy of providing satellite and terrestrial network services.

In general, national laws, policies, and regulations affecting the satellite and wireless communications industries are subject to change in response to industry developments, new technology, and/or policy, legal, regulatory, and national security considerations. Legislators or regulatory authorities in the United States and Canada are considering or may consider, or may in the future adopt, new laws, policies and regulations, or changes to existing laws and regulations. The FCC and ISED have pending or may open proceedings on a number of topics of general applicability that could affect Ligado's business, including those related to spectrum policies, national security, unlicensed spectrum, data roaming, universal service, license fees and survivability of networks. For example, if any of these regulatory bodies ruled that all or any portion of Ligado's radiofrequency spectrum ("spectrum") was not available for general commercial use, it would render that spectrum virtually worthless. Violations of laws or regulations may result in various sanctions, including fines, loss of the Company's authorizations, revocation, or modification of existing licenses and/or the denial of applications it may file, such as for the renewal of its existing authorizations, or for new authorizations that it may seek.

Specifically, these national bodies regulate, among other things, the operation of satellites, the use of spectrum allocated to satellites, the licensing of earth stations, the provision of satellite services, spectrum used for terrestrial transmissions and related facilities and devices. FCC and ISED authorizations to provide wireless communication services are necessary for a network that utilizes Ligado's spectrum in the United States and Canada. In the United States, the Company is authorized to operate the SkyTerra-1 satellite from a US orbital location. The SkyTerra-1 satellite license issued by the FCC is due for renewal no later than January 2026. Although the health and status of the satellite is sufficient to warrant license renewal, the FCC could determine that the license does not satisfy the conditions for renewal. An adverse decision on the Company's space station renewal will significantly put at risk the Company's ability to provide service, maintain its spectrum rights, and achieve its business goals. In Canada, the Company is authorized to provide mobile satellite service using the SkyTerra-1 satellite and the Company holds spectrum licenses to

launch SkyTerra class satellites from two Canadian ITU authorized orbital locations. If the Company complies with the conditions of its FCC and ISED licenses and remains current in the payment of all associated fees, its right to use its L-band spectrum to provide mobile satellite services should span the lives of the existing satellite as well as the next-generation satellites that have been authorized for launch and use.

Any of these regulatory bodies has the authority to make decisions and issue orders that could adversely affect Ligado's business. Ligado's ability to offer its mobile satellite service to mobile earth station terminals is dependent upon ongoing approval by these regulatory bodies, and the Company does not know if these regulatory bodies will adopt a position adverse to Ligado. Furthermore, a change in the FCC leadership may result in the FCC being more willing to consider vacating, modifying, or suspending Ligado's authority, revising the FCC Order, or placing restrictive conditions on the use of Ligado's spectrum and/or ability to operate a network. Any such FCC actions may have a material and adverse effect on Ligado's business. Likewise, a change in ISED leadership may result in ISED being less willing to consider further modifications to or waivers of the Company's regulatory obligations. See also discussion under the heading "Risks Associated with the Company's Existing MSS Business and the Business Contemplated by the AST Transaction."

***The Company must adhere to certain operational conditions to maintain its FCC ATC authorization.***

On April 22, 2020, the FCC issued the FCC Order which approved Ligado's license modification applications filed on December 31, 2015 (together with supplemental filings in relation and in addition thereto). The FCC Order was unanimously approved by all five FCC Commissioners. The FCC Order allows Ligado to use 30 MHz of spectrum in the 1526-1536 MHz, 1627.5-1637.5 MHz, and 1647.5-1657.5 MHz bands ("L-band spectrum" or "L-band") on a terrestrial basis at the power level and out-of-band-emission levels Ligado requested in its license modification applications and associated filings, including the power level of 9.8 dBW for the channel at 1526-1536 MHZ (the "lower downlink channel").

The FCC Order includes several conditions, which are generally consistent with proposals Ligado put forward during the course of the FCC's proceeding. Those conditions, *inter alia*, require the Company to take various precautions and actions to ensure that its operations will not cause "harmful interference" to GPS devices, since that is the standard for interference in the FCC's rules and the standard used by the FCC applied in assessing the Company's license modification applications. These conditions include:

- refraining from operating using its ATC authority in its MSS downlink spectrum from 1545-1555 MHz, thus creating a 23 MHz guard band for GPS;

- adhering to the power levels and emissions limits identified in its December 2015 license modification applications, the May 2018 amended application, and supporting documents filed in the FCC record;

- ensuring that no base stations operating in the 1526-1536 MHz band are located nearer than 250 feet laterally or less than 30 feet below an obstacle clearance surface established by the FAA;

- maintaining a 24x7 network operations center and continuously monitoring the power levels of its base stations;

- providing notice to federal agency GPS users and GPS device manufacturers of its base station locations and technical operating parameters prior to launching operations;

- maintaining a toll-free telephone number for the public to report apparent incidences of interference from the Company's operations to GPS;

- providing prompt responses to credible reports of harmful interference;

- maintaining "kill switch" capability such that it can cease transmissions of all base station transmitters within fifteen minutes of an FCC request;

- working directly with any federal agency with concerns about the potential for harmful interference to their GPS devices to resolve those concerns;

- developing and maintaining a database of base station information for use by the aviation community;

- conducting drive testing to ensure compliance with prescribed power limits;

- filing various operations and compliance reports with the FCC;

- repairing or replacing any U.S. Government GPS device shown to be susceptible to harmful interference; and

- negotiating with affected government agencies to determine acceptable power levels for operations near military installations with GPS receivers that are incapable of being fully tested or replaced.

The Company's failure to meet and continue to comply with any of these operating conditions could result in remedial actions, monetary forfeitures, or other FCC sanctions, including proposed license suspension or license revocation. Additionally, the requirement to coordinate with government agencies on acceptable power levels for Company operations near military installations could adversely affect the scope of coverage of the Company's network and the value of its spectrum. The Company's failure to comply with the requirements to maintain its FCC ATC authorization could also negatively impact our legal claims and the value of the just compensation awarded in a judgment or a settlement of the USG Lawsuit.

*Failure to comply with the FCC's ATC gating criteria and the conditions for the waiver of the integrated service rule could result in revocation of the Company's ATC license.*

The FCC's rules establish certain gating criteria for ATC operations that are intended to ensure that spectrum allocated for mobile satellite services continues to be used for satellite services. These criteria include:

- maintaining satellite coverage of all fifty states of the United States, Puerto Rico, and the United States Virgin Islands;

- having a ground or in-orbit spare satellite within one year of commencing ATC operations;

- reporting any satellite failures, malfunctions, or outages that may require satellite replacement within ten days of their occurrence;

- ensuring market availability of substantial mobile satellite services; and

- complying with the L-band Quadrilateral Coordination Agreement between and among Inmarsat, Ligado U.S., Ligado Canada, and TdM.

Additionally, the FCC's "integrated service rule" generally requires that ATC licensees offer integrated satellite and terrestrial services. However, the FCC Order partially waives this rule subject to the Company's compliance with certain criteria. These criteria include:

- continuing to make available and actively market a commercially competitive satellite service;

- continuing to dedicate at least 6 MHz of MSS L-band spectrum, nationwide, exclusively to satellite service;

- continuing to ensure that the Company's satellites are capable of operating across the entirety of its MSS L-band spectrum;

- continuing to ensure that satellite-capable devices (both integrated MSS/ATC devices and satellite-only devices) using the Company's MSS L-band spectrum are capable of operating across the entirety of its MSS L-band spectrum;

- offering commercial satellite access agreements to terrestrial network operators on competitive pricing terms to enable integrated satellite and terrestrial service offerings for IoT;

- ensuring that dual-mode MSS/ATC-capable L-band IoT devices are available in the marketplace no later than September 30, 2024;

- working to standardize satellite IoT technology in 3GPP to enable incorporation of satellite connectivity into chipsets consistent with the Company's commitments to operate a satellite IoT network using such standards-based technology and to facilitate market participation through network access agreements for satellite IoT;

- ensuring that the Company has the network capability to support MSS/ATC IoT devices and services using such standards-based technology; and

- refraining from offering preferential terms for the use of Company spectrum for terrestrial-only service, or otherwise discouraging the availability or use of combined MSS/ATC services in addition to terrestrial-only services.

The Company's failure to meet and ensure continued compliance with all of the ATC gating criteria and the conditions of the waiver of the integrated service rule could result in adverse FCC action, including monetary forfeitures, orders to comply, license suspension or revocation. The Company's failure to comply with the requirements to maintain its FCC ATC authorization could also negatively impact our legal claims and the value of the just compensation awarded in a judgment or a settlement of the USG Lawsuit.

***Pending administrative actions could affect the Company's FCC Order, the Company's ATC authorization and the USG Lawsuit.***

In response to the release of the FCC Order granting Ligado's license modification applications, sector entities and government stakeholders, including the DoD, publicly stated their opposition to the FCC Order. The DoD has publicly maintained its position on GPS interference. In addition to this public opposition, eight parties, including the NTIA and Iridium, filed petitions for reconsideration with the FCC seeking reversal of virtually every conclusion in the FCC Order. The NTIA separately filed a petition asking the FCC to stay the effectiveness of the FCC Order. The Company filed answers to those petitions, the petitioners filed replies, and all of those pleadings have been pending before the FCC since June 2020. On January 19, 2021, the FCC on a 3-2 vote denied the NTIA's petition to stay the FCC Order. Ligado does not know when the FCC will rule on any of the pending petitions for reconsideration, and how the Commission will rule. The Commission is not required to rule on petitions for reconsideration or provide any advance notice if it does decide to rule on any such petition. Any changes the FCC makes to its April 22, 2020 Order could adversely affect the Company. An FCC decision on the pending petitions for reconsideration may be appealed by an aggrieved party to the United States Circuit Court of Appeals for the District of Columbia Circuit. An affected party at any time could file a new stay request with the FCC to stay the FCC Order, which the FCC may or may not grant, and the party seeking a stay could appeal a denial to the U.S. Circuit Court of Appeals for the District of Columbia Circuit.

The value of Ligado's spectrum depends, in part, on the authority granted by the FCC Order, since Ligado's plans to deploy its mid-band spectrum and provide next-generation 5G services on a terrestrial basis require that it have authority to use its spectrum for general commercial terrestrial service. While Ligado believes it is unlikely, any full or partial reversal of the FCC Order could limit or prohibit general commercial terrestrial use of its spectrum, which would materially and adversely affect its business, prospects, financial condition, and results of operations. Moreover, any reversal of the FCC Order could negatively impact our legal claims and the value of the just compensation awarded in a judgment or a settlement of the USG Lawsuit.

***Legislative actions could affect the value of the Company's spectrum and its business.***

The Company has been the subject of Congressional legislative actions since the approval of the FCC Order.

The 2021 NDAA and the 2022 NDAA included legislative language relating to its terrestrial spectrum authorization.

The 2021 NDAA prohibits the DoD from "enter[ing] into a contract or extend[ing] or renew[ing] a contract, with an entity that engages in commercial terrestrial operations using the 1525–1559 MHz band or the 1625.5–1660.5 MHz band unless the [Secretary of Defense] has certified to the congressional defense committees that such operations do not cause harmful interference to a [GPS] device of the [DoD]." This prohibition could materially reduce the value of the Company's spectrum, impair its business, and adversely affect plans to deploy its mid-band spectrum and provide next-generation 5G terrestrial services.

The 2021 NDAA also stated that the DoD may not obligate or expend any funds appropriated by the 2021 NDAA or otherwise made available for fiscal year 2021 "to comply with the [FCC Order]" until after the Secretary of Defense has prepared an estimate of "the extent of covered costs and the range of eligible reimbursement costs associated with harmful interference resulting from [the FCC Order]" to DoD GPS. There is no deadline for this estimate. The 2021 NDAA also prohibits the DoD from expending or obligating any appropriated funds "to retrofit any [GPS] device or system, or network that uses [GPS], in order to mitigate harmful interference from commercial terrestrial operations using the 1526–1536 MHz band, the 1627.5–1637.5 MHz band, or the 1646.5–1656.5 MHz band." The development of a program to repair or replace Government GPS devices is an existing condition of the Company's FCC spectrum license, and the Company has launched that program and continues to take steps to make key government stakeholders aware of the program.

The 2021 NDAA also directed the NAS to conduct an independent technical review of the FCC Order. The NAS began its review in September 2021 and released its report on September 9, 2022.

The 2022 NDAA required the Secretary of Defense to brief the National Security Council, the Secretary of Commerce, and the FCC Commissioners regarding DoD's assessment of harmful interference to GPS, mobile satellite services, or other tactical or strategic systems of the DoD. The briefing was specified to include "potential operational impacts that have been studied within the megahertz bands specified in such subsection; and impacts that could be mitigated, if any, including how such mitigations could be implemented." The language also required the Secretary of Defense to brief the relevant Congressional Committees regardless of whether the independent technical review conducted pursuant to the 2021 NDAA had been completed.

The 2022 NDAA also added clarifying language to allow the DoD, in any subsequent fiscal year, to work with any licensee of the Company's spectrum "to seek recovery of costs incurred by the [DoD] as a result of the effect of such order and authorization." The Secretary of Defense is required in the language to develop a program to repair or replace government GPS devices and "not later than 90 days after the date on which the Secretary establishes the repair and replace process must submit to the Congressional defense committees a report on such process."

Ligado does not know the extent to which DoD has complied with the several provisions in the NDAA relating to its terrestrial spectrum, and Ligado does not know if those provisions will be preserved in the next legislative cycle or further modified during the legislative process. Other legislative proposals adversely impacting the Company and the potential outcome of USG Lawsuit may be considered by the House or Senate, either in the current session or in future sessions of Congress.

***Prior regulatory approval is required for any future changes in control of Ligado Networks LLC, Ligado Canada and Ligado Networks Corp. or a lease, transfer, or assignment of the Company's license.***

The FCC must grant prior approval to any investment in Ligado Networks LLC or its subsidiaries that hold various FCC licenses and authorizations that could result in either a de jure or de facto change of control or material change of ownership of those subsidiaries must be subject to prior FCC approval. A request for FCC approval of any such transfer of control may involve a lengthy public review period prior to consummation of any change of control transaction, and that review may involve an analysis of national security and law enforcement issues potentially raised by the transfer by the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (sometimes referred to as "Team Telecom"). Similarly, any investment that results in a material change in the ownership or control of Ligado Canada or Ligado Networks Corp. would be subject to prior approval by ISED and possibly other Canadian regulatory authorities. The Company may be unable to obtain the necessary regulatory approvals in a reasonably timely fashion, and the FCC, ISED or other Canadian regulatory authorities could impose new or additional license or other conditions as part of such a review. Such limitations may prevent the Company from entering into business engagements or other transactions that might otherwise be beneficial to the Company and its stakeholders, and therefore, adversely impact the value of the Company's spectrum and its business prospects.

Ligado's spectrum licenses, like all spectrum licenses issued by the FCC or ISED, cannot be transferred or assigned without prior approval pursuant to an administrative process. The Company cannot be certain as to whether FCC or ISED approval would be forthcoming or how long the review process would take. Moreover, the process for obtaining FCC approval of a license transfer is public.

Under existing FCC and ISED rules, Ligado has the ability to make available or sublicense some or all of its spectrum to one or more parties while still retaining control of the license. These transactions may be subject to review by the FCC or ISED. The Company cannot be certain as to whether regulatory approval of such arrangements would be forthcoming or how long the review process would take. In the case of the FCC, an application for approval of a leasing arrangement may give rise to opportunities for public comment, which could delay the approval process.

***The USG Lawsuit may not result in a material judgment or settlement of the Company's claims against the U.S. Government.***

October 12, 2023, Ligado filed the USG Lawsuit against the Government, seeking just compensation for the U.S. Government's physical, categorical, regulatory, and legislative takings of Ligado's property. The Government filed a motion to dismiss on January 25, 2024. On February

9, 2024, Iridium Communications, Inc., Aireon LLC, the Air Line Pilots Association, International, Airlines for America, and the International Air Transport Association filed a motion for leave to file a brief as *amici curiae* in support of the Government's motion to dismiss (the "Amicus Motion"). The Company filed an opposition to the Amicus Motion on February 23, 2024. The court granted the Amicus Motion on April 24, 2024, and ordered the U.S. Government and the Company to file briefs responding to a limited question concerning judicial reviewability of FCC orders, raised in the Amicus Motion. The parties filed those briefs on May 1, 2024 as ordered by the Court. The Company filed its opposition to the Government's motion to dismiss on March 25, 2024, and the DOJ filed its reply in support of the motion to dismiss on May 6, 2024. On July 29, 2024, the court ordered the parties to file supplemental briefs in response to the court's questions. The parties' filed Supplemental Brief responses on September 9, 2024. On November 18, 2024, the Court denied the Government's Motion to Dismiss as to the majority of Ligado's claims, ruling that Ligado had properly alleged that the United States Government engaged in physical, regulatory, and categorical takings of Ligado's exclusively licensed spectrum without just compensation in violation of the Fifth Amendment and ruled further that Ligado was entitled to pursue its claims before the Court under the Tucker Act.  On February 3, 2025, the Government filed its Answer to Ligado's complaint.

On January 16, 2025, the Government filed a motion seeking certification of an interlocutory appeal of the Court's order denying the Government's Motion to Dismiss and a stay of all discovery pending resolution of the government's request for interlocutory appeal and, if granted, the Federal Circuit's decision on that appeal. In order to justify certification of an interlocutory appeal under 28 U.S.C. § 1292(d), the Court must find that its decision on the Motion to Dismiss involves a controlling question of law, as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the litigation.  Even if those prerequisites are met, the decision regarding certification is committed to the discretion of the trial judge.  Ligado filed an opposition to the Government's motion on January 30, 2025. The Government's reply to Ligado's opposition was filed on February 12, 2025. On February 28, 2025, the Court issued an order (1) granting the U.S. Government's motion to certify its November Opinion and Order for interlocutory appeal, and (2) staying the case pending this appeal to Federal Circuit Court of Appeals. In granting the motion, the Court found that the November Opinion and Order "involves a controlling question of law with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  The Government applied to the Federal Circuit for leave to appeal on March 10, 2025 and the Company filed its opposition and conditional cross petition on March 20, 2025.  The Government filed an answer to the Company's opposition and conditional cross petition on March 27, 2025.  On May 20, 2025, the Federal Circuit Court of Appeals granted the Government's petition to appeal and denied the Company's cross-petition.

The Company must maintain its ATC authorization and ownership of its property interest in order to receive the maximum value of its claims for just compensation in the USG Lawsuit. The Company may not ultimately prevail in the USG Lawsuit, or if it does prevail, it may not receive the full amount of its claim for just compensation. If the Company does prevail and receives a favorable judgment or agrees to a settlement of the USG Lawsuit, any deal, including the AST Transaction could result in a reduction in the amount of the just compensation the Company would otherwise be able to recover. Even if the Company is successful in this litigation,

the legal proceedings are likely to be lengthy, lasting years until final judgment, as well as being expensive and disruptive to business operations. The USG Lawsuit could also result in diversion of management's time and attention away from business operations, which could harm the Company's business.

**The Boeing Litigation may not result in a material judgment or settlement of the Company's claims against Boeing and L3 Harris.**

On June 13, 2025, the Company filed the Boeing Litigation against Boeing and L3Harris asserting several causes of action against Boeing and its subcontractor, L3Harris Technologies, in connection with failures to honor and fulfill contractual obligations concerning the SkyTerra-2 Satellite under the Boeing Agreement.

The Company may not ultimately prevail in the Boeing Litigation, or if it does prevail, it may not receive an order requiring Boeing and L3Harris to specifically perform their contractual obligations or the full amount of damages to compensate the Company for losses associated with the inability to refurbish the SkyTerra-2 Satellite on the Company's planned timelines.  Even if the Company is successful in this litigation, the legal proceedings are likely to be lengthy, lasting years until final judgment, as well as being expensive and disruptive to business operations. The Boeing Litigation could also result in diversion of management's time and attention away from business operations, which could harm the Company's business.  In addition, there is a risk that this litigation could have a negative impact on the Company's regulatory licenses.  Any change to the Company's regulatory licenses will affect the Company's future business plans, including and not limited to its proposed collaboration with AST.

D.     *Risk Factors Associated with the Deployment of ATC*

**The Company has been unable to deploy terrestrial services of its licensed L-band spectrum.**

Since the FCC Order in 2020, other actors in the U.S. government have taken actions to block implementation of the FCC Order and to thwart Ligado's use of its licensed L-band spectrum for terrestrial 5G services. Because of this opposition, the Company has been unable to deploy terrestrial services in its licensed L-band spectrum. On October 12, 2023, the Company sued the U.S. Government for its unlawful taking of Ligado's, exclusively licensed spectrum without compensation, seeking just compensation for the U.S. Government's physical, categorical, regulatory and legislative takings of Ligado's property. The Company may not ultimately prevail in the USG Lawsuit, or if it does prevail, it may not receive the full amount of its claim for just compensation. See also discussion under the heading "Risks Associated with General Regulatory, Legislative Matters, and Litigation."

**The Company's satellite must meet specific criteria to deploy ATC, which the failure to meet could adversely affect its revenues, profitability, and liquidity.**

The Company's terrestrial spectrum rights are contingent upon its operation of a spacecraft that meets the ATC gating criteria discussed above.  Pursuant to the FCC ATC rules, within one year of commencing ATC operations the Company must also maintain a ground spare satellite and launch that ground spare in the next viable commercial launch window in the event of a satellite

failure. To the extent the Company is unable to launch a spare satellite and has no available in-orbit spare that can enable it to meet its ATC gating obligations at the time of such failure, the Company may seek an FCC waiver to continue the provision of terrestrial 5G service until an alternative spare satellite and launch window becomes available. While favorable treatment of such a waiver is likely, competitors may seek to deny or dismiss the waiver. Denial of the Company's waiver, under those circumstances, could negatively impact its licenses, including potentially, among other things, the loss of its ATC authority. The Company's failure to comply with the requirements to maintain its FCC ATC authorization could also negatively impact the value of the just compensation awarded in a judgment or a settlement of the USG Lawsuit. See also discussion under the heading "Risks Associated with General Regulatory, Legislative Matters, and Litigation."

***Costs associated with compliance with the FCC Order regarding the terrestrial use of the Company's spectrum, including its obligations to repair or replace impacted U.S. Government devices, are currently unknown and could impact its liquidity position and overall operating results.***

The FCC imposed a number of conditions in the FCC Order approving the use of Ligado's spectrum for terrestrial deployment in an effort to address the potential for interference with the spectrum bands used for GPS. These conditions include imposing limitations on the power levels at which Ligado's spectrum may be used, a minimum site spacing for L-band spectrum deployment, pre-deployment coordination requirements with various federal government entities, providing GPS device manufacturers with notice prior to activating L-band base stations, maintaining a hotline to receive and evaluate complaints of interference and creating an emergency shut-off switch on Ligado's spectrum. The costs associated with implementing and maintaining these safeguards may be significant. Moreover, potential partners may have concerns with the complexity and costs of complying with these guidelines in addition to any other limitations they must abide by with respect to their existing spectrum, which may limit Ligado's ability to attract and retain potential partners.

Additionally, if the use of Ligado's spectrum causes or could cause harmful interference to GPS devices operated by the U.S. Government, the Company is obligated under the FCC Order to repair or replace those devices. The costs and complexities associated with complying with these requirements are unknown and may be significant. In particular, Ligado may be exposed to a significant amount of liability in connection with its obligation to repair or replace U.S. Government GPS devices, and it may be unable to meet those obligations. Moreover, the FCC-imposed power limitations and requirement that the Company maintain an emergency shut-off switch on its spectrum, may negatively affect the market's valuation of the Company's spectrum, and may make it more difficult to find partners that value the Company's spectrum at the level it currently expects. This may, in turn, negatively affect its ability to generate revenue. The Company's failure to comply with the requirements to maintain its FCC ATC authorization could also negatively impact the value of the just compensation awarded in a judgment or a settlement of the USG Lawsuit. See also discussion under the heading "Risks Associated with General Regulatory, Legislative Matters, and Litigation."

*A portion of the Company's spectrum band is coordinated pursuant to the Inmarsat Cooperation Agreement, subjecting the Company to risks related to Inmarsat's compliance with the Inmarsat Cooperation Agreement.*

Under the Inmarsat Cooperation Agreement, Ligado and Inmarsat have coordinated contiguous blocks of spectrum for their respective use, and Inmarsat has represented that as of December 31, 2021, it has delivered all of the spectrum it is required to pursuant to the 30MHz plan in the agreement. To complete this process, Inmarsat was required to replace or modify its receivers that might receive interference from or cause interference to Ligado's systems operating in accordance with the Inmarsat Cooperation Agreement and did not do so. Ligado filed the Cooperation Agreement Litigation because of Inmarsat's breach of this obligation and has agreed to stay that action as part of AST Definitive Agreements Order. If the modification or replacement of receivers is not completed, Ligado's terrestrial operations in the L-band could be adversely affected until Ligado and Inmarsat agree to a process to replace or modify these receivers if Ligado is able to deploy ATC. See also discussion under the heading "Risks Associated with General Regulatory, Legislative Matters, and Litigation."

*Inmarsat has obligations under the Inmarsat Cooperation Agreement to address the potential for interference with Ligado operations and the Company's use of such spectrum will be subject to certain restrictions if such obligations are not satisfied.*

As part of operating its MSS network, Inmarsat has receivers in commercial and military ships and aircraft that may be susceptible to interference with operations in the 10 MHz lower downlink of the Company's 30 MHz licensed spectrum coordinated under the Inmarsat Cooperation Agreement. To address the potential for interference, Ligado must comply with emission limits around airports and navigable waterways, until it obtains a waiver from the FCC. A waiver may only be granted after the Inmarsat receivers have been upgraded by Inmarsat. While the Company believes the Inmarsat Cooperation Agreement obligates Inmarsat to resolve these interference issues and to pay the costs associated with upgrading its customers' receivers, Inmarsat has a different view and has stated that the upgrades will take time. Impacts to network coverage would likely reduce the number of people and businesses that can be served by the 10 MHz lower downlink, potentially decreasing the attractiveness of the Company's spectrum to companies with whom it hopes to partner as part of the business strategy to deploy its spectrum.

The adaptations to Inmarsat's receivers necessary to avoid the potential for interference discussed above and the resultant restrictions are still in various stages of development. Such upgrades will also need to satisfy tests or performance metrics established by regulators and end users of the receivers, and there are significant challenges associated with the installation of upgraded receivers or filters in the ships and aircraft that have Inmarsat's existing MSS receivers installed. Upgrading the receivers requires the cooperation of multiple parties, such as airlines, ship operators and governments, which are not party to any agreements with the Company and may be time-consuming and expensive. For example, an upgrade to an aircraft's receiver is subject to an airline's operational regime, which may cause delays in installing such upgrades across an entire fleet of aircraft. Moreover, the costs associated with developing, deploying, and installing filters or upgraded receivers across all the assets of these third parties may be significant. Because the operators of the aircraft and ships that contain the affected receivers are not in privity of contract with the Company, the Company has no direct method of causing them to upgrade those

receivers and is reliant on Inmarsat or another party to cause them to do so. If the deployment of the upgraded receivers is delayed or not completed, it may reduce the network coverage that can be supported by the 10 MHz lower downlink band around airports and navigable waterways and may have an adverse effect on the Company's ability to attract and retain partners. See also discussion under the heading "Risks Associated with General Regulatory, Legislative Matters, and Litigation."

E.       *Risk Factors to the 1670-1675 MHz Spectrum Band Business*

   ***There is no guarantee the FCC will renew or extend the underlying license for the 1670-1675 MHz spectrum upon which the Company's One Dot Six Lease is contingent.***

   In the United States, the Company leases 5 MHz of spectrum at 1670-1675 MHz from Crown Castle pursuant to the One Dot Six Lease and has FCC authorization to use this spectrum on a terrestrial basis. The FCC granted the ten-year license renewal for the 1670-1675 MHz spectrum in April 2024 for an additional term through October 1, 2033. The One Dot Six Lease term is effective through October 1, 2033. As part of any future renewal process, the Company may need to demonstrate that it has consistently provided "substantial service" within this spectrum to Crown Castle which then must certify this obligation has been met to the FCC. The Company may incur additional costs to ensure the renewal of the license rights if either Crown Castle or the FCC determine that it has not met the "substantial service" requirement. If the FCC does not renew the license because it is not satisfied with the "substantial service" showing, or if the Company faces delays in meeting that standard, it could effectively reduce the amount of its spectrum that can be deployed for this 5 MHz band. This result may have a material and adverse effect on the Company's business and its operations. If the FCC does not renew the license, it will have a material and adverse effect on the Company's business and operations. The Company would have the right to terminate the One Dot Six Lease according to the terms of the agreement, but that could result in a default under its security agreements.

   ***Mobile terrestrial private networks using licensed spectrum in the Utilities and Critical Infrastructure Industry (UCII) sector is a nascent market and the generation of material revenues for sub-leasing licensed spectrum is unproven.***

   Mobile terrestrial private networks as they currently exist do not operate on the Company's leased 1670-1675 MHz spectrum. Although the Company believes its spectrum is an attractive option for deployment of private networks, the Company's plan to sublease spectrum on a local and regional geographic basis to the UCII sector: (i) may not result in the expected benefits, or may result in such benefits not being achieved in a timely manner; and (ii) may not gain market acceptance.

   Additionally, there can be no assurance that the development of the necessary telecommunications infrastructure for 1670-1675 MHz spectrum will proceed according to anticipated schedules or cost estimates, or that the level of demand for the subleasing of spectrum on a local or regional geographic basis will justify the cost of setting up and providing such new services.

***The Company and AST may not be successful in obtaining SCS authority from the FCC for use of the 1670-1675 MHz spectrum.***

The Company and AST plan to seek SCS authority from the FCC for use of the 1670-1675 MHz spectrum. To the extent SCS authority has not been obtained within 18 months of the Bankruptcy Court's approval of the AST Transactions, then AST has the ability to terminate its agreement with the Company relating to the 1670-1675 MHz spectrum. If AST terminates this agreement, the Company's funding requirements would increase.

***The Company may not be successful in its efforts to have the FCC authorize the 1675-1680 MHz band for shared commercial use. The Company may also not be successful at acquiring this 5 MHz if the FCC were to authorize the band for shared commercial use.***

The Company supports an FCC proposal to reallocate spectrum in 1675-1680 MHz for non-federal terrestrial mobile use on a shared basis with federal users as part of the FCC's plan to authorize additional mid-band spectrum. The Company is interested in acquiring this additional 5 MHz of spectrum in the 1675-1680 MHz band in the United States on a shared basis with the current user, NOAA, if it becomes available for use. If the Company were to successfully acquire this 5 MHz of spectrum, it would result in the Company having a contiguous 10 MHz block of spectrum in this band for terrestrial use. However, there can be no assurance that the FCC will move forward, or if the FCC will have authority from Congress to conduct an auction of this band, and this 5 MHz of spectrum may not become available for shared commercial use. Moreover, even if the FCC approves the non-federal terrestrial use of this band of spectrum and conducts an auction, another entity could acquire this spectrum. The acquisition of this band, if it is authorized by the FCC for shared commercial use, will likely be determined by auction, at which the highest bidder will be awarded the license to the band of spectrum. The Company may not have the available capital to purchase this band of spectrum if and when it does become available.

F.    *Risks Related to the Collateral and Existing First Lien Notes, First Lien Loan, 1.5 Lien Loan, and Existing Second Lien Loans (collectively, the "*Secured Debt*")*

In this Section IX.F, unless otherwise indicated or the context otherwise requires, the term "Existing 1L Notes" refers to the "Existing First Lien Notes," and the term "Existing 2L Loans" refers to the "Existing Second Lien Notes," each as defined in the Plan.

***It may be difficult to realize the value of the collateral securing any secured indebtedness.***

The value of the collateral securing any indebtedness at any time will depend on market and other economic conditions, including the availability of suitable buyers. By their nature, some or all of the pledged assets may be illiquid and may have no readily ascertainable market value. The Company cannot assure its investors that the fair market value of the collateral will exceed the principal amount of its secured debt. The value of the assets pledged as collateral for the secured debt could be impaired in the future as a result of changing economic or other macro global conditions, changing regulatory circumstances, the Company's failure to implement its business strategy, competition, unforeseen liabilities, lack of success in its litigation against the U.S. Government, and other future events. Accordingly, there may not be sufficient collateral to satisfy all or any of the amounts due on such obligations. Any claim for the difference between the

amount, if any, realized by holders of the secured debt from the sale of their respective collateral and the applicable secured obligations will rank equally in right of payment with all of its other unsecured unsubordinated indebtedness and other obligations, including trade payables.

> ***If the Plan is approved, certain holders of the Secured Debt that are expected to receive New Preferred Units thereunder may be subject to greater risks than the risks to which holders of existing debt obligations are currently or may be in the future as creditors.***

If the Plan is confirmed, certain holders of Secured Debt are expected to receive preferred equity interests in the reorganized Company, and there are important differences in the treatment of debt and equity interests. For example, the rights with respect to the New Preferred Equity will be junior to the reorganized Company's indebtedness. If the Plan is confirmed and the Effective Date occurs, the Company will still have a significant amount of indebtedness with approximately $2.7 billion of debt at emergence based on the Outside Date.

G.    *Risks Related to the New Preferred Units*

> ***Eligible holders who receive New Preferred Units as a result of the restructuring may be subject to greater risks than the risks to which holders of existing debt obligations are currently or may in the future be subject as holders of indebtedness.***

If the Plan is confirmed and you receive New Preferred Units, you will hold preferred equity of the Company, and there are important differences in the treatment of debt and equity securities. For example, the rights of tendering eligible holders with respect to the New Preferred Equity provided as a result of the restructuring will be junior to the Company's existing and future indebtedness and other obligations.

> ***An active trading market for the New Preferred Units may not develop, which could reduce their value.***

Each series of New Preferred Units is a new issue of securities for which there is currently no market. Although the New Preferred Units will carry priority return rights, the Company cannot predict whether an active trading market for any such New Preferred Units will develop or be sustained. No market in any series of New Preferred Units may develop, and any market that develops may not last. To the extent that an active trading market does not develop, the price at which you may be able to sell any New Preferred Units may be less than the consideration you received in the Restructuring.

> ***A future issuance of additional New Preferred Units may adversely affect the rights of equity holders.***

In the event the Company issues additional preferred units, the holders of such preferred units may be entitled to receive dividends and distributions prior to their receipt by the holders of other series of New Preferred Units. Therefore, holders of the New Preferred Units could be entitled to less than the amount of dividends and/or distributions to which they would otherwise be entitled had the new preferred units not been issued.

The FCC could consider certain holders of New Preferred Units as uninsulated under the FCC's rules, which could result in the Company being not compliant with license conditions and time-consuming filings by such holders.

If the Plan is confirmed, you may be entitled to receive New Preferred Units that will enable you to participate in certain management decisions of the Company if they are deemed U.S. persons under applicable FCC rules and thus can be "uninsulated" from management decisions pursuant to FCC regulations. The other holders of New Preferred Units will be "insulated" such that they will have only limited negative control rights and investor protection provisions of the type generally found in similar agreements. However, these investor protection provisions have not been formally approved by the FCC and there is some risk the FCC will conclude that those provisions give the other holders of New Preferred Units the ability to participate in important management decisions, which could cause the Company to be noncompliant with FCC ownership requirements and could result in those holders of New Preferred Units needing to request from the FCC specific approval to hold a cognizable, uninsulated interest in the Company. The impact of such a determination on the Company's licenses, and the timing and ultimate outcome of any necessary filings, are uncertain.

### *The New Preferred Units may be subject to restrictions on transfers.*

Any New Preferred Unit issued to an entity that is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In addition, the New Preferred Units will not be freely tradable if, at the time of a transfer, the holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of the transfer. "Affiliate" holders will be permitted to sell New Preferred Units without registration only if they comply with an exemption from registration, such as Rule 144 under the Securities Act.

The New Preferred Units will not be registered under the Securities Act or any other securities laws, and the Debtors make no representation regarding the right of any holder to freely resell securities.

The terms of the applicable New Organizational Documents, including the Second Amended and Restated Operating Agreement, may contain prohibitions on the transfer of the New Common Equity, to the extent such transfer would subject the Reorganized Debtors to the registration and reporting requirements of the Securities Act and the Securities Exchange Act. Furthermore, the terms of the New Organizational Documents may contain additional transfer restrictions. These terms will be binding on all recipients of New Preferred Units under the Plan, including any recipients who do not vote to accept the Plan or affirmatively consent to the New Organizational Documents.

### *Any valuation that may be implied by the Plan does not represent trading value or fundamental value of the New Preferred Units.*

The valuations implied by the terms of the Plan are not intended to represent the trading value of the New Preferred Units in public or private markets or the fundamental value of the Reorganized Debtors, all of which are difficult to predict. Actual market prices of the Reorganized Debtors' securities will depend upon, among other things, (a) prevailing interest rates, (b) conditions in the financial markets, (c) the anticipated initial securities holdings of prepetition creditors and equity holders, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and (d) other factors that generally influence the prices of securities. The actual market prices of the New Preferred Units, if any such market exists, are likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance, could cause the market prices of the New Preferred Units to rise and fall. Accordingly, any values implied by the Plan do not necessarily reflect, and should not be construed as reflecting, values that will be attained for these securities in the public or private markets.

H.    *Other Risks*

**The Company's Projections and other financial information are based on assumptions that may prove incorrect.**

The Projections and certain other financial information contained herein reflect numerous assumptions concerning the anticipated future performance of the reorganized Company, some of which may not materialize.

The financial information contained in this Disclosure Statement has not been audited except as otherwise stated herein. In preparing this Disclosure Statement, the Company has relied on financial data derived from its books and records that was available at the time of such preparation. Although the Company has exercised its reasonable business judgment to ensure the accuracy of the financial information provided herein, and while the Company believes that such financial information fairly reflects the anticipated financial results, the Company is unable to warrant or represent that the financial information contained herein is without inaccuracies.

Projections are, by their nature, forward-looking, and necessarily based on certain significant assumptions or estimates that are beyond the Company's control and may ultimately prove to be incorrect. The actual future financial results of the reorganized Company may turn out to be materially different from the Projections. As discussed above, the Company's industry is competitive, the Company's business is subject to significant regulatory requirements and the Company's operations are subject to inherent uncertainties and risks, all of which make accurate forecasting very difficult. There can be no assurances that such prospective assessments will ultimately prove to be accurate.

**The implementation of the Plan may have significant United States federal income tax consequences for holders of Allowed Claims and holders of Allowed Interests.**

The implementation of the Plan may have significant United States federal income tax consequences for holders of Allowed Claims and Allowed Interests. For a general discussion of the United States federal income tax treatment for the Plan see **Section VII**. Holders of Claims and Interests should consult with their tax advisors to determine the United States federal income tax consequences of the Plan in light of each holder's specific circumstances.

***Ligado may be required to withhold based on allocations of income to certain Interest holders in amounts that exceed the distributions to such holders.***

Because Ligado is a partnership for United States federal income tax purposes, Ligado reports its United States federal income tax items to its Interest holders, who bear the United States federal income tax consequences. Ligado is obligated to withhold on income allocated to Interest holders that are not U.S. Holders regardless of whether Ligado makes cash distributions to such holders and even if cash is not available for distribution. Furthermore, Ligado may need to withhold on distributions (and potentially deemed distributions) to an Interest holder that is not a U.S. Holder if Ligado determines that such distributions exceed such holder's tax basis in its Interest. The obligation to withhold on allocations of income and distributions to Interest holders that are not U.S. Holders could affect Ligado's cash available for payment of its expenses or to make distributions.

***Historical financial information will not be comparable.***

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Company's historical financial statements.

***The Company could withdraw the Plan.***

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Company.

***The Company has no duty to update.***

The statements contained in the Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Company has no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

***No representations outside the Disclosure Statement are authorized.***

No representations concerning or related to the Company, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement. Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

***No legal or tax advice is provided by the Disclosure Statement.***

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant

as to legal, tax, and other matters concerning their Claim or Interest.  The Disclosure Statement is not legal advice to you.  The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### *No admission made.*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Company or holders of Claims or Interests.

### SECTION X.
### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

If the Plan is not confirmed, the alternatives include (a) liquidation of the Company under chapter 7 or chapter 11 of the Bankruptcy Code and (b) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization.  Each of these possibilities is discussed in turn below.

A.      *Liquidation Under Chapter 7 or Chapter 11*

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.  In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Company.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims or Interests, the Company believes that in a chapter 7 liquidation, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors and equity interest holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Company's operations and the failure to realize the greater going concern value of the Company's assets.

The Company could also be liquidated pursuant to the provisions of a chapter 11 plan.  In a liquidation under chapter 11, the Company's assets could be sold in a more orderly fashion over a longer period of time than in a chapter 7 liquidation.  Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs.  Because a trustee is not required in a chapter 11 liquidation, expenses for professional fees could be lower than in a chapter 7 liquidation, in which a trustee must be appointed.  However, the drafting and pursuit of a liquidation plan and its balloting and tabulation would result in additional administrative costs. Any distributions to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

It is highly unlikely that Interest holders would receive any distribution in a liquidation under either chapter 7 or chapter 11.

Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Company believes that any liquidation is a much less attractive alternative for creditors and equity interest holders than the Plan because of the greater recoveries the Company anticipates will be provided by the Plan. THE COMPANY BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS AND INTERESTS THAN WOULD LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by the Company with its financial advisors, is premised upon a chapter 7 liquidation and is attached hereto as **Exhibit D**. In the Liquidation Analysis, the Company has taken into account the nature, status, and underlying value of the assets of the Company, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests. Based on this analysis, it is likely that a liquidation of the Company's assets would produce less value for distribution to creditors and equity interest holders than that recoverable in each instance under the Plan.

B.      *Alternative Plans of Reorganization*

If the Company remained in chapter 11, the Company could continue to operate its businesses and manage its properties as debtors-in-possession, but it would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether the Company could continue as a viable going-concern in protracted Chapter 11 Cases. The Company could have difficulty operating with the high operating and financing costs if the Company remained in chapter 11 for a prolonged period. It likely would be very difficult for the Company to find alternative bank financing or financing from other sources if the DIP Facility were terminated. If the Company were unable to obtain financing and continue as a viable going-concern, the Company (or other parties in interest) could ultimately propose another plan or attempt to liquidate the Company under chapter 7 or chapter 11. Such alternative plans might involve either a reorganization or continuation of the Company's businesses or an orderly liquidation of its assets, or a combination of both.

**SECTION XI.**
**CONCLUSION AND RECOMMENDATION**

The Company, with the support of the Consenting Stakeholders, believes that confirmation and implementation of the Plan is in the best interests of the holders of Claims and Interests because it provides the greatest distributions and opportunity for distributions to such holders. In addition, any alternative to confirmation of the Plan could result in extensive delays and substantially increased administrative expenses.

Accordingly, the Company, with the support of the Consenting Stakeholders, urges all holders of Claims and Interests who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be **actually received** by the Voting Agent no later than **4:00 p.m., prevailing Eastern Time, on July 24, 2025**.

[*Remainder of page intentionally left blank*]

Dated:  June 24, 2025

Respectfully submitted,

By:    /s/ Douglas Smith
       Name: Douglas Smith
       Title:   Chief Executive Officer