**Exhibit D**

**Liquidation Analysis**

**Ligado Networks LLC,** *et. al.*

**Liquidation Analysis**

*Introduction*

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Allowed Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. To demonstrate that the Plan satisfies this standard, the Debtors, in consultation with their legal and financial advisors, have prepared the Liquidation Analysis, which (a) estimates the realizable value of the Debtors under a hypothetical Chapter 7 liquidation (under such hypothetical, the "**Chapter 7 Debtors**," and such analysis, the "**Liquidation Analysis**") and (b) estimates the distribution to creditors resulting from the liquidation.

The Liquidation Analysis is a hypothetical exercise based on several estimates and assumptions that are subject to significant uncertainties and contingencies. Proceeds generated in a hypothetical Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale. Further, Allowed Claims against the Chapter 7 Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis. Accordingly, while the information contained in the Liquidation Analysis is presented with numerical specificity, the Debtors make no assurances that the asset values and Claim amounts presented in the Liquidation Analysis would not vary materially from actual amounts in the event of an actual Chapter 7 liquidation.

Following is a summary of certain assumptions used in the Liquidation Analysis. The notes to the Liquidation Analysis provide additional assumptions and should be read in conjunction with the Liquidation Analysis. Additional factors not enumerated herein were also considered in connection with the formulation of the Liquidation Analysis.

*General Assumptions*

The Liquidation Analysis assumes that the Debtors' Chapter 11 cases are converted to liquidation cases under Chapter 7 of the Bankruptcy Code effective June 30, 2025. The Bankruptcy Court-appointed Chapter 7 trustee would, as soon as possible, proceed to liquidate all assets of the Debtors in both the high-recovery and low-recovery scenarios. The assets to be sold consist primarily of the Debtors' existing mobile satellite business together with valuable licenses and authorizations for the use of spectrum in the United States and Canada on a terrestrial and satellite basis. In the high-recovery scenario, the assets are assumed to be liquidated

over a twelve-month liquidation period, and the Chapter 7 cases are assumed to conclude in June 2026. The assumed twelve-month wind-down period reflects the requirement for regulatory approvals for a sale transaction involving spectrum licenses and authorizations and additional time to market the assets in an orderly liquidation process. In the low-recovery scenario, assets are assumed to be liquidated over a eighteen-month liquidation period, and the Chapter 7 cases are assumed to conclude in December 2026. A twelve-month liquidation period is estimated based on the assumption that it could take additional time to secure the required regulatory approvals leading to a longer sales process.

**This Liquidation Analysis incorporates, *inter alia*, (a) information included in the Debtors' Plan, (b) amounts presented in the Debtors' books and records and (c) analyses performed by the Debtors.**

The Liquidation Analysis reflects the possibility that the applicable liquidation period may not provide enough time to maximize value during the sale of assets of the Chapter 7 Debtors and that the Chapter 7 Debtors' negotiation position will be challenging.  The assets would likely be valued and, if sold, sold at distressed price levels given the uncertainty of selling and transferring spectrum assets in a liquidation. Liquidation values were derived by estimating proceeds from a distressed sale of assets that a Chapter 7 trustee might achieve.

The Liquidation Analysis assumes that liquidation proceeds (net of the expenses incurred by the Chapter 7 trustee and professionals) will be distributed in accordance with the absolute priority rule (i.e., Senior Creditors will receive recoveries before junior creditors).

Upon conversion of the cases to Chapter 7 cases, it is assumed that the Chapter 7 trustee will be permitted to use Cash Collateral available at the time of conversion to a Chapter 7 in June 30, 2025.  It is also assumed that there's an issuance of a trustee in possession loan (a "TIP Loan") to finance the wind down costs as defined below and sale proceeds solely for the purposes of managing a wind-down and liquidation of assets, however, there is no guarantee that funding beyond the cash collateral at the time of conversion to Chapter 7 will be available, to use as cash collateral.

While the Liquidation Analysis assumes liquidation over a twelve- to eighteen-month period due to the time required to obtain regulatory approvals required for the transfer of licenses, it is possible that the disposition and recovery from certain assets could take longer and cost more to realize. The potential impact of litigation and actions by other creditors could increase the amount of time required to realize recoveries assumed in this analysis. Such events, including if the

2

Chapter 7 trustee were not granted consensual use of Cash Collateral and could not obtain alternate financing for costs incurred to realize on assets, could add costs to the liquidation in the form of higher legal and professional fees to resolve these potential events or shorten the time available to realize on the assets. The table herein summarizes the estimated proceeds that would be available for distribution to the Debtors' creditors in a hypothetical liquidation of the Chapter 7 Debtors' estates under Chapter 7 of the Bankruptcy Code. Additional assumptions with respect to the Liquidation Analysis are provided below.

**Table 1: Recovery Plan vs. Liquidation Analysis**

| Recovery Table | | Plan | Liquidation Analysis | |
|---|---|---|---|---|
| **Class** | **Claims or Interests** | | **Low** | **High** |
| Unclassified | Superpriority Professional Fee Carveout Claim | N/A | 100% | 100% |
| Unclassified | TIP | N/A | 100% | 100% |
| Unclassified | DIP | 100% | 66% | 91% |
| 1 | Priority Non-Tax Claims | 100% | N/A | N/A |
| 2 | Other Secured Claims | 100% | N/A | N/A |
| 3 | First Lien Claims | $1,000 New Series A-1 Preferred Units w/ 1.25x liquidation preference per $1,000 in First Lien Claims | 0% | 0% |
| 4 | 1.5 Lien Claims | $1,000 New Series A-2 Preferred Units per $1,000 in First Lien Claims | 0% | 0% |
| 5 | Second Lien Notes Claims | $1,000 New Series A-3 Preferred Units per $1,000 in First Lien Claims | 0% | 0% |
| 6 | General Unsecured Claims | 100% | 0% | 0% |
| 7 | Intercompany Claims | 0% to 100% | 0% | 0% |
| 8 | Intercompany Interests | 0% to 100% | 0% | 0% |
| 9 | Existing Series A-0 Preferred Units | 100% | 0% | 0% |
| 10 | Existing Series A-1 Preferred Units | 100% | 0% | 0% |
| 11 | Existing Series A-2 Preferred Units | 100% | 0% | 0% |
| 12 | Existing Series B Preferred Units | 100% | 0% | 0% |
| 13 | Existing Series C Preferred Units | 100% | 0% | 0% |
| 14 | Existing Series A Common Units | 100% | 0% | 0% |
| 15 | Existing Series B Common Units | 100% | 0% | 0% |

Table 2: Net Estimated Proceeds - $ in millions

| $ in millions | | | Hypothetical Recovery Percentage | | Estimated Liquidation Value | |
|---|---|---|---|---|---|---|
| **Gross Estimated Liquidation Proceeds** | Notes | Book Value As of February '25 | Low | High | Low | High |
| Cash & Equivalents at Conversion | [1] | $ 33.3 | 100% | 100% | $ 33.3 | $ 33.3 |
| Investment Securities | [2] | - | 0% | 0% | - | - |
| Accounts Receivable | [3] | 0.6 | 70% | 80% | 0.4 | 0.5 |
| Inventory | [4] | 1.3 | 20% | 30% | 0.3 | 0.4 |
| Prepaid Expenses and Other Current Assets | [5] | 52.0 | 0% | 0% | - | - |
| PP&E- Satellite | [8] | 49.2 | Incl. in spectrum | | | |
| PP&E- Other | [6] | 0.0 | 20% | 30% | 0.0 | 0.0 |
| System Under Construction | [9] | 201.6 | Incl. in spectrum | | | |
| Spectrum[*] | [10] | 1,579.9 | 41% | 55% | 744.5 | 997.8 |
| Other Non-Current Assets | [7] | 620.7 | 0% | 0% | - | - |
| **Gross Estimated Liquidation Proceeds for Distribution** | | **$ 2,538.5** | | | **$ 778.5** | **$ 1,031.9** |
| Costs Associated with Liquidation: | [11] | | | | | |
| Chapter 7 Trustee Fees | | | 3.00% | 3.00% | 23.4 | 31.0 |
| Chapter 7 Professional Fees | | | 1.00% | 1.00% | 7.8 | 10.3 |
| Wind-down Costs (Funded by TIP) | | | | | 43.0 | 28.9 |
| Total Wind-down Costs | | | | | 74.2 | 70.2 |
| **Proceeds Available after Wind-down Costs** | | | | | **$ 704.3** | **$ 961.7** |

NOTE [*]: the Hypothetical Recovery Percentage on Spectrum includes the net book value of both PP&E – Satellite and System Under Construction. In total the net book value of the Spectrum assets is $1,831 million.

5

**Table 3: Net Estimated Proceeds by Legal Entity - $ in millions**

| $ in millions | Notes | Ligado Networks LLC | | One Dot Six LLC | | Ligado Networks Corp. | | Consolidated Ligado | |
|---|---|---|---|---|---|---|---|---|---|
| | | Low Recovery Value | High Recovery Value | Low Recovery Value | High Recovery Value | Low Recovery Value | High Recovery Value | Low Recovery Value | High Recovery Value |
| **Gross Estimated Liquidation Proceeds** | | | | | | | | | |
| Cash & Equivalents at Conversion | [1] | $ 32.5 | $ 32.5 | $ 0.1 | $ 0.1 | $ 0.7 | $ 0.7 | $ 33.3 | $ 33.3 |
| Investment Securities | [2] | - | - | - | - | - | - | - | - |
| Accounts Receivable | [3] | 0.3 | 0.3 | - | - | 0.1 | 0.1 | 0.4 | 0.5 |
| Inventory | [4] | 0.3 | 0.4 | - | - | - | - | 0.3 | 0.4 |
| Prepaid Expenses and Other Current Assets | [5] | - | - | - | - | - | - | - | - |
| PP&E- Satellite | [8] | - | - | - | - | - | - | - | - |
| PP&E- Other | [6] | | | | | | | | |
| System Under Construction | [9] | - | - | - | - | - | - | - | - |
| Spectrum | [10] | 619.2 | 780.6 | 125.4 | 217.2 | - | - | 744.5 | 997.8 |
| Other Non-Current Assets | [7] | - | - | - | - | - | - | - | - |
| **Gross Estimated Liquidation Proceeds for Distribution** | | **$ 652.2** | **$ 813.8** | **$ 125.5** | **$ 217.3** | **$ 0.8** | **$ 0.8** | **$ 778.5** | **$ 1,031.9** |
| **Costs Associated with Liquidation:** | [11] | | | | | | | | |
| Chapter 7 Trustee Fees | | $ 19.6 | $ 24.4 | $ 3.8 | $ 6.5 | $ 0.0 | $ 0.0 | $ 23.4 | $ 31.0 |
| Chapter 7 Professional Fees | | 6.5 | 8.1 | 1.3 | 2.2 | 0.0 | 0.0 | 7.8 | 10.3 |
| Wind-down Costs (Funded by TIP) | | 36.1 | 22.8 | 6.9 | 6.1 | 0.0 | 0.0 | 43.0 | 28.9 |
| **Total Wind-down Costs** | | **$ 62.1** | **$ 55.3** | **$ 12.0** | **$ 14.8** | **$ 0.1** | **$ 0.1** | **$ 74.2** | **$ 70.2** |
| **Net Estimated Proceeds Available for Distribution** | | **$ 590.1** | **$ 758.5** | **$ 113.5** | **$ 202.5** | **$ 0.7** | **$ 0.8** | **$ 704.3** | **$ 961.7** |

*Note on Book Values*

Unless otherwise stated, the book values used in the Liquidation Analysis are the unaudited net book values of the Debtors as of February 28, 2025. The book values have not been subject to any review, compilation or audit by an independent accounting firm.

6

**Liquidation Analysis Footnotes**

1. *Cash and Equivalents*

The "Cash and Equivalents" balances are the projected unrestricted Debtor cash balances as of Feb 28, 2025, based on the Debtors' consolidated cash forecast. Cash balances at each entity are projected based on allocation of the consolidated cash balance projected at Feb 28, 2025 and expected cash needs for wind-down and other administrative expenses. It is assumed that the Chapter 7 Debtors maintain the existing cash management system currently in place. The Liquidation Analysis assumes that, to the extent necessary to fund operations, the Debtors will first use cash currently reflected on the Debtors' books. Restricted cash includes cash held by third parties, including approximately $70,000 that would not be available in funding the Chapter 7.

2. *Investment Securities*

Investment Securities do not exist and have no book value as of Feb 28, 2025.

3. *Accounts Receivable*

The "Accounts Receivable" balance represents outstanding amounts due for the sale of service and equipment to the Debtors' customers. Customers include wholesalers, which resell mobile satellite voice and data services. Customers generally pay net 30–45 days. Recoverable value for Accounts Receivable is likely to be 70–80%.

4. *Inventory*

The Debtors' "Inventory" consists primarily of finished goods such as satellite handsets, antennas, phone components, and equipment typically sold through wholesalers to end users. Inventory equipment is only compatible with the Ligado mobile satellite network. Recoverable value for Inventory is likely to be 20–30%.

5. *Prepaid Expenses and Other Current Assets*

Prepaid and other current assets consist mainly of the net book value related to Inmarsat pre-paid amounts, prepaid rent, prepaid insurance, advances to suppliers, and security deposits. The Liquidation Analysis assumes these assets will either be consumed during the liquidation period or are not realizable and therefore no proceeds will be realized from prepaid expenses and other assets.

6. *Property, Plant & Equipment (Other)*

The Debtors' property, plant & equipment (excluding satellites and related ground-network systems) include office furniture and equipment, office network equipment, and leasehold improvements. It is assumed to achieve recoveries of 20–30%.

7. *Other Non-Current Assets*

Prepaid and other current assets consist mainly of the long-term portion of the book amount to Inmarsat, prepayments of executory contracts, taxes, and rent. The Liquidation Analysis assumes these assets will either be consumed during the liquidation period or are not realizable and therefore no proceeds will be realized from Other Non-Current Assets.

8. *Existing Satellite System (PP&E-Satellite)*

The Debtors own and operate one satellite, SkyTerra-1, and related ground-network systems to provide mobile satellite communications in North America. The SkyTerra-1 satellite, which was launched in November 2010, is a next-generation satellite that has been designed to provide high performance and advanced beam forming. In the coming years, the SkyTerra-1 satellite performance is approaching the end of its design life.

On April 20, 2023, the SkyTerra-1 satellite experienced an L-band reflector anomaly with small shifts in elevation and azimuth. The Company's insurance policy contained certain provisions that cover the SkyTerra-1 satellite's unique capabilities using very specific metrics to account for any degradation in performance. Based on the year-long analysis that Ligado conducted with Boeing, the Company established that the satellite's overall performance was at a level sufficient to trigger an insurance claim per the metrics in our policy. As a result, on May 10, 2024, the Company filed an insurance claim on the SkyTerra-1 satellite. The length of the claims process and any potential insurance proceeds that may be recoverable are unknown.

9. *System Under Construction*

The "System Under Construction" represents the cost of the Debtors' SkyTerra-2 satellite (currently in storage at a Boeing facility) and the related ground-network systems. The net book value of the "System Under Construction" also includes prepaid performance incentive payments to the satellite manufacturer and capitalized interest and labor associated with the construction of the satellite.

The Liquidation Analysis assumes that the Existing Satellite System and System Under Construction assets are included with the sale of the spectrum and are sold together as a pool of assets at distressed values. See the "Spectrum Rights" section below for discussion of the estimated gross proceeds.

10. *Spectrum*

The Debtors hold licenses from the United States Federal Communications Commission ("FCC") and Innovation, Science & Economic Development Canada ("ISED") to operate satellites using lower mid-band spectrum that supports mobile satellite service ("MSS") throughout North America. More specifically, the Debtors are authorized to provide MSS in the L-band which is defined as: 1,525-1,559 MHz for downlink transmissions (from MSS satellites to mobile earth stations), and 1,626.5-1,660.5 for uplink transmissions (from mobile earth stations to MSS satellites) subject to coordination with other L-band operators. The Debtors also hold licenses and authorizations for the launch and operation of their satellites and for the use of feeder links necessary for the provision of their MSS services.

The Debtors have coordinated use of and maintain access to approximately 40 MHz of L-band spectrum for their exclusive use in the US and Canada: As part of the cooperation agreement with Inmarsat, Ligado is obligated to pay Inmarsat certain quarterly payments, including certain catch-up payment amounts. On March 19, 2025, certain of the Debtors commenced the Cooperation Agreement Litigation against Inmarsat. The ultimate amount Ligado will be required to pay under

the cooperation agreement may be determined in connection with the Cooperation Agreement Litigation. In case of non-payment of such amounts to Inmarsat, the Debtors' coordinated spectrum position in the Recovery Plan scenario is approximately 28 MHz, with smaller contiguous spectrum blocks (the "Alternate Spectrum Plan").

In April 2020, the FCC approved Ligado's license modification applications to authorize the use of 30 MHz of its MSS spectrum to also provide an ancillary terrestrial component ("ATC") for advanced wireless services.  In October 2023, Ligado sued the U.S. government for its unlawful taking of Ligado's exclusively licensed ATC spectrum seeking just compensation for the U.S. Government's physical, categorical, regulatory and legislative takings of Ligado's property which has effectively blocked the Company from deploying its L-band spectrum for terrestrial services (the "Takings Litigation"). This suit is pending in the United States Court of Federal Claims.

*MSS Rights to Use L-band Spectrum in the U.S. and Canada: 1525-1559 MHz (Downlink), 1626.5–1660.5 MHz (Uplink) Liquidation Value*:
Since the Debtors' rights to the coordinated 40 MHz of spectrum for MSS is contingent upon compliance with the current payment terms of the cooperation agreement with Inmarsat (subject to Ligado's current litigation against Inmarsat), the Liquidation Analysis assumes the availability of the Alternate Spectrum Plan, which can support a combination of MSS services, including Direct-to-Device ("D2D") communications.

To estimate the value of the Company's assets under the Alternate Spectrum Plan, the Comparable Transactions Method was employed. Specifically, the 2022 Globalstar–Apple strategic partnership was used as the primary comparable. This transaction was selected due to its recent timing, involvement of similar spectrum bands (13.7 MHz in the L and S bands), and its focus on D2D services.

To derive the underlying value of the MSS spectrum rights in the Globalstar–Apple transaction, 75% of the payments were assumed to be attributable to spectrum rights. The Net Present Value (NPV) was calculated by projecting these payments into perpetuity, with growth rates aligned with inflation. The resulting value was then divided by the combined population of the territories included in the agreement—adjusted for Average Revenue Per User (ARPU) and iPhone market share in each country—and by the bandwidth of Globalstar's MSS spectrum. This yielded a benchmark value of approximately $0.15 per MHz-POP.

To reflect the distressed nature of a liquidation scenario, discounts of 50% and 60% were applied to the benchmark for the high and low cases, respectively. This resulted in a per MHz-POP valuation range of $0.06 to $0.07. The final value was calculated by multiplying this per MHz-POP range by the combined covered population of the U.S. and Canada and by the total bandwidth under the Alternate Spectrum Plan. The resulting estimated value of the MSS spectrum rights under this plan ranges from $632 million to $790 million in the Liquidation Analysis.

The obligations associated with the MSS spectrum include regulatory requirements, operational expenses, and ongoing maintenance of satellite and ground infrastructure during the liquidation period. These costs are estimated to range from $10 million to $13 million, depending on the duration of the liquidation process. The resulting liquidation value of the Debtors' MSS spectrum rights ranges between $619 million and $780 million.

US L-band ATC rights (Terrestrial Spectrum Use): For purposes of this Liquidation Analysis, due to the ongoing Takings Litigation, the FCC's ATC authorization for the use of 30 MHz of Ligado's MSS spectrum is excluded from the estimates of value as of the Valuation Date.

9

*U.S. Flexible Use 1,670–1,675 MHz Spectrum Liquidation Value*:
The Debtors also have rights to access 5 MHz of spectrum for terrestrial use in the 1670–1675 MHz band under a lease agreement with Crown Castle. This flexible-use license allows for fixed or wireless communications via terrestrial wireless networks employing LTE, 5G-NR, and successor technologies. This 5 MHz of spectrum, due to limited channel size less likely to be deployed in carrier networks, and therefore is better suited for narrowband private network IoT applications.

With respect to the first comparable, we used the valuation of the 900 MHz band (897.5–900.5 / 936.5–939.5 MHz), which is primarily owned in the U.S. by Anterix and either leased or sold to utility companies. The value estimate was based on Anterix's enterprise value as of March 26, 2025, divided by the 6 MHz of spectrum currently owned by Anterix and the U.S. population, as this spectrum is the company's main asset and source of value.

Notably, Anterix's spectrum typically requires clearing or relocation of existing users in specific markets before it can be fully utilized. Such encumbrances may lead to additional hurdles—costs and delays—that are implicitly reflected in Anterix's enterprise value. To adjust for the impact of these encumbrances, the benchmark was grossed up by an assumed 30% discount. The resulting value is approximately $0.51 per MHz-POP.

This benchmark is derived from the value of the entire spectrum portfolio controlled by Anterix, as reflected in its enterprise value, rather than from individual transactions between Anterix and utility companies as individual transaction values have varied by geography and price per MHz-POP, and are not indicative of the value of the full 6 MHz on a nationwide basis.

While the 900 MHz band offers advantages over the 1,670–1,675 MHz band in terms of propagation characteristics, the latter's configuration—5 MHz of flexible use compared to 3x3 MHz FDD—may offer greater throughput and flexibility for IoT deployments. Both bands have been included in recent 3GPP releases and are suitable for LTE and 5G deployment, designated as Bands 106 and 54, respectively. These factors make the 900 MHz and 1,670–1,675 MHz bands comparable in value; therefore, no discount or premium was applied based on propagation characteristics or ecosystem support. To account for the distressed nature of a potential transaction, the benchmark value was further adjusted by applying distressed sale discounts of 50% and 60% for the high and low scenarios, respectively, resulting in a valuation range of $0.20–$0.25 per MHz-POP. The estimated liquidation value of the 1,670–1,675 MHz spectrum—before lease obligations—is projected to be between $347 million and $433 million.

The net present value of the lease obligations to Crown Castle is estimated to range between $208 million and $211 million, based on expected buyout costs at the time of sale. Additional obligations associated with these spectrum licenses arise from the requirement to comply with build-out mandates by maintaining the DVB-H network, which are estimated to range from $8 million to $10 million. As a result, the liquidation value of the Debtors' spectrum rights for the terrestrial 1,670–1,675 MHz band is estimated to range between $126 million and $217 million.

*Other Spectrum liquidation value*:
No liquidation value was assigned to L-band spectrum in Mexico, and Ku spectrum.

*Liquidation Value of All Spectrum Assets Net of License obligations:*
The resulting total liquidation value of the Debtors' spectrum rights ranges between $745 million and $998 million, representing 41% to 55% of net book value, respectively.

10

*Takings Litigation:*

This Liquidation Analysis does not ascribe any value to the Debtors' pending Takings Litigation against the U.S. government for its unlawful taking of the Debtors' licensed property given the uncertain timing and predictability of potential recovery for just compensation amounts from such litigation.

11. *Costs Associated with Liquidation*

Estimated amounts for corporate payroll and other operating costs during the twelve to eighteen months liquidation period are based upon the assumption that certain corporate functions including the payment of leases to Crown Castle and operating costs associated with the satellites, the network operating centers (NOCs) and the ground stations would be maintained during the liquidation period. The Company would also retain reduced staff to complete other financial and administrative functions.

Chapter 7 trustee fees of 3.0% of distributable assets include those fees associated with the appointment of a Chapter 7 trustee in accordance with section 326 of the Bankruptcy Code.

Chapter 7 professional fees of 1.00% of distributable assets includes fees and expenses associated with professionals to be incurred during the liquidation period.

**Other Items for Consideration**

*Carveout for Professional Fees*

The estimated amount of the carveout for professional fees of $7.0 million represents: (i) estimated accrued and unpaid professional fees associated with the Chapter 11 Cases as of June 30, 2025, (ii) estimated US Trustee fees owing as of June 30, 2025, and (iii) up to $2.0 million professional fees and expenses incurred after June 30, 2025.

*Secured Claims*

The Debtors' Secured Claims of ~$9,544 million are comprised of amounts owed to DIP lenders, 1L lenders, 1.5L lenders, and 2L lenders.

*General Unsecured Claims*

For purposes of the Liquidation Analysis, the Debtor's management has assumed that unsecured claims will consist of estimated General Unsecured Claims as defined in the Plan. It should be noted that the Liquidation Analysis does not assume any recovery to the General Unsecured Claims creditor class.

Additionally, potential litigation claims relating to filing Chapter 7 and liquidating the assets of the Company have not been considered in the analysis.