**<u>EXHIBIT 2</u>**

**Blackline of Solicitation Version Disclosure Statement**

Solicitation Version

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |

~~THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. VOTES TO ACCEPT OR REJECT THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.~~

## DISCLOSURE STATEMENT FOR THE
## JOINT CHAPTER 11 PLAN OF LIGADO NETWORKS LLC
## AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

**MILBANK LLP**

Dennis F. Dunne, Esq. (*pro hac vice*)
Matthew L. Brod, Esq. (*pro hac vice*)
Lauren C. Doyle, Esq. (*pro hac vice*)

55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219

Andrew M. Leblanc (*pro hac vice*)

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins, Esq. (Bar No. 2981)
Michael J. Merchant, Esq. (Bar No. 3854)
Amanda R. Steele, Esq. (Bar No. 5530)

920 North King Street
Wilmington, DE 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

1850 K Street, NW, Suite 1100
Washington, DC 20006
Telephone:    (202) 835-7500
Facsimile:    (202) 263-7586

*Counsel for Debtors in Possession*              *Co-Counsel for Debtors in Possession*

Dated: June 1324, 2025

THIS SOLICITATION IS BEING CONDUCTED BY LIGADO NETWORKS LLC; ATC TECHNOLOGIES, LLC; LIGADO NETWORKS (CANADA) INC.; LIGADO NETWORKS BUILD LLC; LIGADO NETWORKS CORP.; LIGADO NETWORKS FINANCE LLC; LIGADO NETWORKS HOLDINGS (CANADA) INC.; LIGADO NETWORKS INC. OF VIRGINIA; LIGADO NETWORKS SUBSIDIARY LLC; ONE DOT SIX LLC; AND ONE DOT SIX TVCC LLC TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT CHAPTER 11 PLAN.

EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY THE COMPANY, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE CLASS 3, CLASS 4, AND CLASS 5 CLAIMS, AND THE CLASS 9 AND CLASS 10 INTERESTS IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), INCLUDING SECTION 4(A)(2) THEREOF, AND APPLICABLE UNITED STATES STATE SECURITIES LAWS AND SIMILAR LAWS OF ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE.

---

### DELIVERY OF BALLOTS

For your vote to be counted, Ballots (as defined herein) reflecting your vote must be actually received by the Voting Agent (as defined herein) before **4:00p.m. (prevailing Eastern Time), on July 24, 2025** (the "Voting Deadline") unless extended by the Company.  You should refer to the enclosed Ballot(s) for instructions on how to vote on the Plan.

---

PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES.  IN THE CASE OF ANY INCONSISTENCY BETWEEN THE SUMMARY IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, THE PLAN WILL GOVERN.

A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS EXHIBIT A.

### IMPORTANT INFORMATION FOR YOU TO READ

UNDER THE PLAN, HOLDERS OF "GENERAL UNSECURED CLAIMS" (AS DEFINED IN THE PLAN) ARE ANTICIPATED TO BE PAID IN FULL, SUBJECT TO BANKRUPTCY COURT APPROVAL, ON THE EFFECTIVE DATE OF THE PLAN (OR AS SOON AS REASONABLY PRACTICABLE THEREAFTER) OR THEREAFTER IN ACCORDANCE WITH THEIR TERMS, OR TO RECEIVE SUCH OTHER TREATMENT TO RENDER HOLDERS OF SUCH CLAIMS UNIMPAIRED UNDER THE BANKRUPTCY CODE.

*MILBANK DRAFT 3/21/2025*
*PRIVILEGED & CONFIDENTIAL*
*SUBJECT TO FRE 408 AND ITS EQUIVALENTS*

## TABLE OF CONTENTS

SECTION I. INTRODUCTION AND OVERVIEW ............................................... 4

    A.    Overview of Proposed Restructuring ........................................... 5
    B.    Summary of Classification and Estimated Recoveries of Claims and
        Interests Under Plan ........................................................ 8
    C.    Plan Solicitation ........................................................... 12
    D.    Anticipated Timetable ...................................................... 13

SECTION II. HISTORICAL INFORMATION .................................................. 14

    A.    Overview of the Debtors' Business ........................................... 18
    B.    Corporate and Capital Structure ............................................. 26
    C.    Events Leading to Commencement of Chapter 11 Cases ........................ 36

SECTION III. MATERIAL DEVELOPMENTS AND ANTICIPATED
DEVELOPMENTS OF THE CHAPTER 11 CASES ...................................... ~~49~~50

    A.    Overview of Chapter 11 ..................................................... ~~49~~50
    B.    Summary of Key Developments in the Chapter 11 Cases ....................... 50
    C.    First-Day Relief and Other Case Matters ..................................... 51
    D.    DIP Financing .............................................................. 53
    E.    AST Break-Up Fee Motion .................................................. ~~53~~54
    F.    Other Procedural and Administrative Motions ................................. ~~53~~54
    G.    Schedules And Statements ................................................... ~~54~~55
    H.    Cooperation Agreement Litigation ........................................... ~~54~~55
    I.    Inmarsat Motion to Compel Payment ......................................... 55

SECTION IV. SUMMARY OF JOINT CHAPTER 11 PLAN .................................. ~~56~~58

    A.    Administrative Claims and Other Unclassified Claims ......................... ~~56~~58
    B.    Classification and Treatment of Claims and Interests ......................... ~~59~~61
    C.    Acceptance or Rejection of the Plan .......................................... ~~67~~69
    D.    Means for Implementation of the Plan ........................................ ~~68~~70
    E.    Provisions Governing Distributions ........................................... ~~79~~81
    F.    Settlement, Release, Injunction and Related Provisions ....................... ~~84~~89
    G.    Conditions to the Effective Date ............................................. ~~90~~95
    H.    Retention of Jurisdiction .................................................... ~~92~~97

SECTION V. VOTING PROCEDURES AND REQUIREMENTS ............................ ~~95~~99

    A.    Voting Deadline ........................................................... ~~95~~100
    B.    Voting Record Date ........................................................ ~~96~~100
    C.    Parties Entitled to Vote ..................................................... ~~96~~100
    D.    Ballots .................................................................... ~~96~~101
    E.    Agreements upon Furnishing Ballots .......................................... ~~97~~101

~~#4919-1731-8224v1~~

F.      Withdrawal or Change of Votes on Plan .................................................. 97102
G.      Fiduciaries and Other Representatives ..................................................... 98102
H.      Waivers of Defects, Irregularities, etc. ................................................... 98102
I.      Further Information, Additional Copies .................................................. 98103
J.      Requirements for Acceptance by Impaired Class of Claims or Interests .... 99103

SECTION VI. CONFIRMATION OF PLAN .................................................................. 99103

A.      Confirmation Hearing ............................................................................ 99103
B.      Requirements for Confirmation of Plan – Consensual Confirmation ........ 99104
C.      Requirements for Confirmation of Plan – Non-Consensual Confirmation . 101106

SECTION VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ..................................................................................................... 102107

A.      Certain United States Federal Income Tax Consequences of Plan to the
Company .............................................................................................. 104109
B.      Certain United States Federal Income Tax Consequences to Holders of
Claims and Holders of Equity Interests under the Plan ........................... 105110

SECTION VIII. CERTAIN FEDERAL AND STATE SECURITIES LAW
CONSIDERATIONS .............................................................................. 110115

A.      Section 1145 of the Bankruptcy Code .................................................... 110115
B.      Private Placement Securities .................................................................. 112116

SECTION IX. RISK FACTORS .................................................................................... 114119

A.      Certain Bankruptcy Law Considerations ................................................ 115119
B.      Risks Associated with the Company's Existing MSS Business and the
Business Contemplated by the AST Transaction ..................................... 120125
C.      Risks Associated with Regulatory, Legislative matters, and Litigation .... 131135
D.      Risk Factors Associated with the Deployment of ATC ........................... 140144
E.      Risk Factors to the 1670-1675 MHz Spectrum Bnd business ................. 142147
F.      Risks Related to the Collateral and Existing First Lien Notes, First Lien
Loan, 1.5 Lien Loan, and Existing Second Lien Loans (collectively, the
"Secured Debt") .................................................................................... 143148
G.      Risks Related to the New Preferred Units .............................................. 144149
H.      Other Risks .......................................................................................... 146151

SECTION X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
PLAN ..................................................................................................... 148153

A.      Liquidation Under Chapter 7 or Chapter 11 .......................................... 148153
B.      Alternative Plans of Reorganization ....................................................... 149154

#4919-1731-8224v1

SECTION XI. CONCLUSION AND RECOMMENDATION ..................... ~~150~~**154**

EXHIBIT A          Joint Chapter 11 Plan

~~EXHIBIT B~~**EXHIBIT B**          Corporate Organizational Chart

EXHIBIT C          Projections

EXHIBIT D          Liquidation Analysis

#4919-1731-8224v1

## SECTION I.
## INTRODUCTION AND OVERVIEW

Ligado Networks LLC; ATC Technologies, LLC; Ligado Networks (Canada) Inc.; Ligado Networks Build LLC; Ligado Networks Corp.; Ligado Networks Finance LLC; Ligado Networks Holdings (Canada) Inc.; Ligado Networks Inc. of Virginia; Ligado Networks Subsidiary LLC; One Dot Six LLC; and One Dot Six TVCC LLC, as debtors and debtors in possession (collectively, the "Company," "Ligado," or the "Debtors") submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") for use in the solicitation of votes on the *Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession* [Docket No. [●]], as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"). A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference. In the event of any inconsistency between the terms of the Plan and the description of such terms in this Disclosure Statement, the terms of the Plan shall control.

This Disclosure Statement is part of the "Solicitation Package" distributed to all Holders of Claims and Interests in the voting Classes, and contains the following:

- this Disclosure Statement and all attachments hereto, and

- if you are entitled to vote to accept or reject the Plan, one or more ballots (each, a "Ballot"), as applicable, which shall include instructions describing the two acceptable methods to submit your Ballot (via Omni Agent Solutions, Inc.'s online "E-Ballot" portal or via first class mail, overnight courier, or hand delivery) along with a postage-paid, pre-addressed return envelope to be used by voters who opt to submit their Ballot to Omni Agent Solutions, Inc. by mail.

If you are a holder of a Claim or Interest entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact Omni Agent Solutions ("Omni" or the "Voting Agent") by e-mail at ligadoinquiries@omniagnt.com or by phone at (866) 956-2139 (US Toll-Free) or (747) 288-6137 (International).

For your vote to be counted, your Ballot(s) reflecting your vote must be **actually received** by the Voting Agent no later than 4:00 p.m., prevailing Eastern Time, on July 24, 2025. To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered to the Voting Agent in accordance with the instructions set forth on the applicable Ballot such that it is actually received by the Voting Agent before the Voting Deadline.

Copies, faxes, and e-mails will not be accepted or counted as votes. Each Ballot has been coded to reflect the Class of the Claim(s) or Interest(s) it represents. Accordingly, in voting to

- ***Existing Series A-2 Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series A-2 Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series A-2 Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series B-2 Preferred Units and shall remain outstanding in this form;

- ***Existing Series B Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series B Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series B Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series C Preferred Units and shall remain outstanding in this form;

- ***Existing Series C Preferred Units***.  Except to the extent that a holder of an Allowed Existing Series C Preferred Units agrees to less favorable treatment, all holders of Allowed Existing Series C Preferred Units shall, in full and final satisfaction of their Interests, be reclassified as New Series D Preferred Units and shall remain outstanding in this form;

- ***Existing Series A Common Units***.  Except to the extent that a holder of an Allowed Existing Series A Common Unit agrees to less favorable treatment, all holders of Allowed Existing Series A Common Units shall, in full and final satisfaction of their Interests, retain its Existing Series A Common Unit;

- ***Existing Series B Common Units***.  Except to the extent that a holder of an Allowed Existing Series B Common Unit agrees to less favorable treatment, all holders of Allowed Existing Series B Common Units shall, in full and final satisfaction of their Interests, retain its Existing Series B Common Unit; and

- all other Allowed Claims, including all Allowed General Unsecured Claims and all Allowed Other Secured Claims, will be paid in full or otherwise rendered Unimpaired.

The Plan contemplates an Exit First Lien Facility to be governed by the Exit First Lien Facility Documents consisting of a cashless roll-up of the DIP New Money Loans and the Roll-Up Loans,  in an amount of approximately $2.7 billion (or an amount otherwise agreed to by the Debtors and the Required Ad Hoc Holders) based on the Outside Date.[3]

The Company, with the support of the Consenting Stakeholders, believes that consummation of the proposed Restructuring under the Plan will provide the Company with the capital structure and liquidity necessary to continue operating as a going concern—an outcome that benefits all of its stakeholders.  The Company currently is significantly overleveraged and facing severe liquidity constraints.  The proposed Restructuring addresses these problems

---

[3] **"Outside Date" shall have the meaning ascribed to such term in the Restructuring Support Agreement.**

#4919-1731-8224v1

If you have any questions about the procedure for voting your Claim(s) or Interest(s), the packet of materials that you have received, or the amount of your Claim(s) or Interest(s), or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its exhibits, please contact the Voting Agent, by e-mail at ligadoinquiries@omniagnt.com or by phone at (866) 956-2139 (US Toll-Free) or (747) 288-6375 (International).

D.      *Anticipated Timetable*

The Company anticipates scheduling a hearing (the "Confirmation Hearing") to consider confirmation of the Plan.  The Company expects that notice of the Confirmation Hearing will be published in the *New York Times* and *USA Today*, and will be mailed to all known holders of Claims and Interests as soon as practicable after entry of an order approving the Disclosure Statement, but in no event more than five (5) business days thereafter.  **For additional information regarding the Confirmation Hearing, please refer to Section VI.A herein, entitled "Confirmation Hearing."**

To the extent the Plan is confirmed within the expected timeframe, the Company currently intends to consummate the Plan as soon as practicable thereafter.  **For additional information regarding the Chapter 11 Cases, please refer to Section III herein, entitled "Material Developments and Anticipated Developments of the Chapter 11 cases."**

**SECTION II.**
**HISTORICAL INFORMATION**

The Debtors are a mobile communications company that operates a satellite network in North America that has been providing mobile satellite services ("MSS")[34] to government and commercial customers for over 25 years.  In the near term, Ligado is planning to evolve its satellite services to easily integrate with terrestrial networks and to communicate directly to standard mobile devices.  In addition, Ligado has the authority to develop terrestrial-based solutions for both Fifth Generation ("5G") public and private networks using its coordinated licensed and leased spectrum[45] in the "L-Band," located in the highly attractive one- to two-gigahertz ("GHz") spectrum category, known as the lower mid-band.  Ligado is licensed as an MSS operator in the L-Band in the U.S. and Canadian parts of ITU Region 2.  Ligado has fully coordinated its satellite system with all other North American Region 2 L-band operators and maintains access to over 40-megahertz ("MHz") of MSS spectrum in the United States and Canada.

---

[34] "Mobile Satellite Service" or "MSS" is:
A radiocommunication service:
– between mobile earth stations and one or more space stations, or between space stations used by this service; or
– between mobile earth stations by means of one or more space stations.
Int'l Telecomm. Union [ITU], Radio Regulations:  Articles, art. 1.25 (2016) (emphasis removed).

[45] "Spectrum" refers to the radio spectrum, which is the part of the electromagnetic spectrum with frequencies from 30 hertz to 300 GHz, and whose radio waves are widely used in modern technology, particularly in telecommunication.

The Debtors spent years working to develop and obtain approval from the United States Federal Communications Commission ("FCC") to operate an ancillary terrestrial component ("ATC")[56] to their MSS licenses and have invested billions of dollars in connection therewith. In April 2020, the commissioners for the FCC issued a unanimous and bipartisan order granting the Debtors an exclusive nationwide ATC authorization for 30 MHz of their MSS licensed L-Band spectrum. The Debtors also have access to five MHz of spectrum at 1670-1675 MHz.[67] In total, the Debtors have access to 35 MHz of terrestrial spectrum in the United States.

Despite the FCC's approval of the Debtors' L-Band spectrum plan, the Debtors' efforts to develop nationwide terrestrial wireless services to complement their existing satellite infrastructure have been thwarted by the actions of the United States government, acting through the Department of Defense ("DOD"), the Department of Commerce ("DOC"), the National Telecommunications and Information Administration ("NTIA")—an agency within DOC[78]—and the United States Congress (collectively, the "U.S. Government").

These governmental actors have unlawfully prevented the Debtors from using or otherwise operating within the portion of spectrum that the FCC exclusively licensed to the Debtors for terrestrial communications services. Indeed, DOD has gone further: it has taken the Debtors' spectrum for the agency's *own* use, operating previously undisclosed systems that use or depend on the Debtors' allocated spectrum without compensating the Debtors. To facilitate and cover up its previously undisclosed use of the Debtors' property and prevent the Debtors from using their spectrum and FCC license for terrestrial services, DOD (with DOC's assistance) made unfounded claims—to the FCC, Congress, the White House, other federal agencies, and the public—about the effects of the Debtors' proposed 5G terrestrial services. Because of this, and as further described below, the Debtors commenced a lawsuit on October 12, 2023 against the United States of America, DOD, DOC, and NTIA in the United States Court of Federal Claims seeking, among other things, compensation for the U.S. Government's physical, categorical, regulatory, and legislative takings—which, as of the date of this filing, have deprived the Debtors of tens of billions of dollars in lost revenues.[89] On November 18, 2024, the Court of Federal Claims denied the U.S. Government's motion to dismiss in substantial part, ruling that Ligado has alleged a physical, regulatory, categorical, but not a legislative taking. The Court of Federal Claims found that a property interest does exist in Ligado's FCC license vis-à-vis the Department of Defense but not vis-à-vis the FCC.

---

[56] An "ancillary terrestrial component" or "ATC" system consists of terrestrial base stations and mobile terminals licensed to the operator of an MSS system, which allows an MSS licensee to integrate terrestrial capabilities into its MSS networks for purposes of filling in gaps in its MSS coverage area, particularly in urban areas and inside buildings.

[67] From July 2007 to the present, the Debtors, through their wholly owned subsidiary One Dot Six LLC, have leased five MHz of spectrum in the 1670-1675 MHz spectrum band through agreements with Crown Castle MM Holding LLC and OP LLC, the entity which holds the underlying United States nationwide spectrum license.

[78] Unless stated otherwise, references to DOC include NTIA.

[89] *See* Complaint, *Ligado Networks LLC v. United States*, No. 23-1797-L (Fed. Cl. Oct. 12, 2023).

15

On January 16, 2025, the Government filed a motion seeking certification of an interlocutory appeal of the Court's order denying the Government's Motion to Dismiss and a stay of all discovery pending resolution of the government's request for interlocutory appeal and, if granted, the Federal Circuit's decision on that appeal. Ligado filed an opposition to the Government's motion on January 30, 2025. The Government's reply to Ligado's opposition was filed on February 12, 2025. On February 28, 2025, the Court issued an order (1) granting the U.S. Government's motion to certify its November Opinion and Order for interlocutory appeal, and (2) staying the case pending this appeal to Federal Circuit Court of Appeals. In granting the motion, the Court found that the November Opinion and Order "involves a controlling question of law with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." The Government applied to the Federal Circuit for leave to appeal on March 10, 2025[910] and the Company filed its opposition and conditional cross petition on March 20, 2025.[1011]   The Government filed an answer to the Company's opposition and conditional cross petition on March 27, 2025.  On May 20, 2025, the Federal Circuit Court of Appeals granted the Government's petition to appeal and denied the Company's cross-petition.

The actions of the U.S. Government have prevented the Debtors' full use of their L-Band license, costing the Debtors significant time and billions of dollars in sunk costs and lost profits. Further, these actions continue to harm the Debtors' future revenue potential by creating substantial uncertainties and pressure on the Debtors' business model and prospects to timely implement their business plans and, ultimately, the value of the Debtors' L-Band spectrum. As a result, the Debtors do not yet generate adequate cash flows from operations to fund their operating expenses and capital expenditures.

Separately, the Debtors' capital structure is premised on a business that is entitled to the full benefits of the Cooperation Agreement with Inmarsat (each, as defined below) whereby Inmarsat and Ligado (together with its predecessor entities) agreed to cooperatively coordinate their licensed spectrum in the L-band into contiguous spectrum blocks within the spectrum and at the power levels agreed upon by the parties and set forth in the Cooperation Agreement. The Debtors are obligated to pay Inmarsat under the Cooperation Agreement for these coordinated spectrum rights. Over the course of the year prior to these Chapter 11 Cases, the Debtors engaged in extensive discussions with Viasat (which, as described below, acquired Inmarsat in 2023) and Inmarsat around a comprehensive resolution of the Cooperation Agreement to restructure the Debtors' significant payment obligations thereunder. Viasat, however, raised a purported tax issue while the parties were working to finalize the contours of a commercial agreement, which suddenly upended the entire framework the parties had been discussing.

After the breakdown in negotiations on account of the purported tax issue, Viasat expressed to the Debtors that it was focused on receiving payments under the Cooperation

---

[910]   *See Petition for Permission to Appeal an Interlocutory Order of the Court of Federal Claims Dated November 18, 2024, in Case No. 23-CV-1797, Pursuant to 28 U.S.C. § 1292(D)*, No. 25-120 (Fed. Cir. Mar. 11, 2025).

[1011]   *See Ligado Networks LLC's Opposition to Petition for Leave to Appeal and Conditional Cross-Petition for Leave to Appeal Pursuant to 28 U.S.C. § 1292(D)*, No. 25-120 (Fed. Cir. Mar. 20, 2025).

benefits all stakeholders. Consenting stakeholders who executed the RSA prior to the commencement of these Chapter 11 Cases included:

| Obligation | % of Support for RSA |
|---|---|
| *Funded Debt Obligations* | |
| Prepetition First Out Term Loans | 93.3% |
| Prepetition First Lien Notes | 86.9% |
| Prepetition First Lien Senior Pari Term Loans | 99.5% |
| Prepetition 1.5 Lien Facility | 96.9% |
| Prepetition Second Lien Notes | 85.1% |
| *Preferred Equity* | |
| Series A-0 Preferred Units | 87.3% |
| Series A-1 Preferred Units | 9.7% |
| Series A-2 Preferred Units | 56.8% |
| Series B Preferred Units | 68.6% |
| Series C Preferred Units | 43.8% |
| *Common Equity* | |
| Series A Common Units | 35.4% |
| Series B Common Units | -% |

The Debtors filed these Chapter 11 Cases to take advantage of the breathing spell afforded by chapter 11 to (i) pursue their lawsuit against the U.S. Government to obtain just compensation for the taking of the spectrum that the FCC granted exclusively to them for terrestrial use, (ii) vigorously prosecute their rights against Inmarsat, (iii) continue their efforts to develop the technology and commercial ecosystem necessary to fully deploy their spectrum assets, and (iv) execute definitive documentation for and consummate the AST Transaction.

A.   *Overview of the Debtors' Business*

The Debtors currently support a range of MSS products and services in the United States, Canada, and Mexico on their MSS network. The Debtors are developing technical and commercial plans to enhance their current MSS network. They also have been planning to deploy 35 MHz of their coordinated licensed and leased spectrum in the L-Band[11][12] for new and innovative communication services. To support this, the Debtors are developing a technology ecosystem for their MSS spectrum and their coordinated licensed and leased spectrum for communication services. Direct-to-device satellite communications and terrestrial 5G private

---

[11][12]   This 35 MHz is inclusive of the 5 MHz of spectrum licensed for terrestrial use in the 1670-1675 MHz spectrum band that the Debtors lease pursuant to the One Dot Six Lease.

#4919-1731-8224v1



The Debtors' spectrum holdings are subject to the following additional licenses and authorizations granted by the FCC or ISED to Ligado Networks Subsidiary LLC or Ligado Networks (Canada) Inc., respectively, each a wholly owned direct or indirect subsidiary of Ligado:

- a license to operate SkyTerra-1, a second-generation L-Band MSS satellite, which operates at the 101.3 West Longitude orbital position;

- licenses to launch and operate SkyTerra-2, a second-generation L-Band MSS satellite which will be operational at the 107.5 West Longitude orbital position, which have an ISED launch milestone of March 31, 2029, and an International Telecommunications Union[13] "Bring Into Use" ("BIU") date of March 28, 2030;

- an ITU filing for a satellite at 106.5 West Longitude to be BIU prior to February 19, 2031; and

- multiple spectrum licenses and authorizations to make use of the 12.75-13.25 GHz (Uplink) and 10.7-10.95, 11.2-11.45 GHz (Downlink) Ku-band FSS spectrum for feeder links in the provision of MSS in Canada and the United States via the SkyTerra-1 and SkyTerra-2 satellites.

### a.    Multilateral Spectrum Coordination.

The Debtors' use of their licensed L-Band spectrum is subject to United States and Canadian treaty commitments to the ITU and the terms of multilateral and bilateral coordination agreements entered into pursuant to the ITU Radio Regulations. Five national administrations (i.e., the United States, Canada, the United Kingdom, Russia, and Mexico) are party to the

---

[13]    The International Telecommunication Union ("ITU") is the United Nations specialized agency for information and communication technologies that allocates global radio spectrum and satellite orbits and develops the technical standards to ensure networks and technologies seamlessly interconnect.

#4919-1731-8224v1

Memorandum of Understanding for Intersystem Coordination of Certain Geostationary Mobile Satellite Systems Operating in the Bands 1525-1544/1545-1559 MHz and 1626.5-1645.5/1646.5-1660.5 MHz, agreed to in Mexico City (the "Mexico City MoU"), a coordination framework agreement developed in 1996 for satellites that were operational or soon-to-be-launched, providing for their shared use of MSS L-Band in ITU Region 2, which covers North America pursuant to the ITU Radio Regulations.  The Mexico City MoU established terms for coexistence among the administrations by providing for annual assignments of spectrum to each of their operators for specified beams based on coordination and demonstrated need.

### b.      5 MHz One Dot Six Lease.

From July 2007 to the present, the Debtors, through their wholly owned subsidiary One Dot Six LLC, have leased 5 MHz of spectrum in the 1670-1675 MHz spectrum band through agreements with Crown Castle MM Holding LLC and OP LLC, the entity which holds the underlying U.S. nationwide spectrum license (such agreements collectively, the "One Dot Six Lease").  In December 2022, the One Dot Six Lease was amended to provide the Debtors the option to purchase the spectrum license from OP LLC on January 1, 2025 for a purchase price of $196.1 million and thereafter every two years at an increased purchase price based on an agreed upon CPI inflation formula.

The FCC granted a ten-year license renewal for the 1670-1675 MHz spectrum in April 2024 for an additional term through October 1, 2033.  The One Dot Six Lease is effective through October 1, 2033, and subject to FCC approvals and grants, will be renewed for a further term through December 31, 2034.  The December 2022 amendment harmonized the balance of payments due under the initial term, and the Debtors paid $3.6 million upon executing the amendment, an additional $3.6 million on December 31, 2022, and made a final payment of $7.2 million on April 1, 2023, for the balance of the initial term.  In October 2023, the Debtors paid an additional $3.6 million for the remainder of 2023.  Then, beginning in 2024, the Debtors began making annual payments of $14.9 million, subject to a 4% increase each year of the renewal term, in two equal installments on January 1 and July 1.  The Debtors will also continue to incur additional operating and maintenance costs associated with the operation of a DVB-H (Digital Video Broadcasting-Handheld) network in this spectrum band.

### c.      Inmarsat Cooperation Agreement.

In 2007, the Debtors and Inmarsat Global Limited ("Inmarsat"), which was acquired by Viasat Inc. ("Viasat") on May 30, 2023, entered into a cooperation agreement, and they entered into an Amended and Restated Cooperation Agreement on August 6, 2010 (as further amended and restated from time to time, the "Cooperation Agreement").  The Cooperation Agreement has been amended numerous times and addresses a number of regulatory, technological and spectrum coordination matters involving L-band spectrum and its use over North America.  The purpose of the Cooperation Agreement was to coordinate the MSS L-Band spectrum to provide the Debtors with sufficient contiguous spectrum blocks free from interference to help the Debtors' obtain the ability to provide mobile services to the North American market consisting of an MSS network and a terrestrial wireless service (i.e., an ATC).[13][14]  To that end, the

---

[13][14]      Historically, Inmarsat and the Debtors' predecessors in interest each held the rights to thin slivers of MSS L-Band spectrum.  Inmarsat used that spectrum to provide MSS, including aeronautical and maritime

agreement involves Inmarsat moving its operations and reallocating its customers' use from identified portions of its coordinated spectrum in the MSS L-Band and upgrading some of its equipment so that the spectrum could be delivered to the Debtors without the possibility of interference to or from Inmarsat's customers' satellite terminals. The term of the Cooperation Agreement runs until December 31, 2107, and the agreement requires the Debtors to pay Inmarsat substantial sums for this spectrum over a period of 99 years.[1415] As of the Petition Date, the Debtors have paid Inmarsat over $1.7 billion.

In return, Inmarsat is required to facilitate the necessary FCC license authorization. The parties understood that FCC approval of the Debtors' license application was critical to achieving the purpose of the Cooperation Agreement, and both parties pledged to use their best commercial efforts to support approval from the relevant regulatory authorities, including the FCC specifically, and to remedy the situation in the event of any indication of objection or disapproval.

In addition, Inmarsat is required to implement the so-called "Spectrum Plans" contemplated in the Cooperation Agreement to create sufficient contiguous spectrum blocks and use its best commercial efforts to ensure that Ligado received the full anticipated benefit of the spectrum, including in or near airports and waterways. Inmarsat has taken steps to create the contiguous spectrum blocks, but it has failed to perform other obligations. Specifically, in addition to creating contiguous spectrum blocks the Cooperation Agreement requires Inmarsat to address interference that might arise in the particular use case of Inmarsat satellite terminals operating on Inmarsat's system on airplanes and water vessels and the Debtors' planned ATC services. Inmarsat's resolution of these terminal interference issues was contractually bargained and paid for by the Debtors. Specifically, aviation and maritime customers of Inmarsat use systems provided by Inmarsat for communications and operate near to the spectrum the Cooperation Agreement specifies is for the Debtors' use for their terrestrial communication and MSS services. The potential for interference between Inmarsat's customers' terminals in or near airports and waterways and the Debtors' communication services in the vicinity of same should have been remedied by Inmarsat through replacement of the Inmarsat terminals or through modification (with the use of filters or otherwise) of the Inmarsat terminals. This is known as "terminal resilience." Achieving this terminal resilience so that Ligado could operate anywhere in the country (including in or near airports and waterways) was a material obligation of Inmarsat to provide the Debtors under the Cooperation Agreement.

To address the terminal resilience issues in those specific geographic areas, Inmarsat and the Debtors agreed on the need to develop a plan to replace or modify those terminals. Because those terminals were Inmarsat terminals provided to Inmarsat customers to enable them to receive signals over the Inmarsat system, the parties' understanding, as reflected in the Cooperation Agreement and the parties' course of conduct, was that Inmarsat would be

---

L-Band spectrum. Inmarsat used that spectrum to provide MSS, including aeronautical and maritime communications and navigation services. The Debtors used that spectrum to provide MSS to government and commercial customers for emergency response, remote monitoring, and numerous other mission-critical applications.

[1415]   Approximately 83 years remain under the current term of the Cooperation Agreement.

responsible for ensuring the design, development, approval, manufacture, distribution, and installation of the equipment needed to achieve terminal resilience, *and* all costs in connection with that transition.   Inmarsat was also responsible for implementing that plan through modifications in all contracts and relationships with its customers.  These terms were agreed to by the parties and are clearly set out in technical exhibits to the Cooperation Agreement.

To resolve the terminal interference issues, the Cooperation Agreement requires that "appropriate modifications" be made to "***all*** terminals operating on the Inmarsat system" that might receive or cause interference, or that Inmarsat, in its discretion, could otherwise address such interference by discontinuance or replacement of any affected service or terminal.[~~15~~16]   In part to offset the costs of that transition, the Debtors paid Inmarsat a $250.0 million transition payment.  To date, Inmarsat has still not completed the required work to effect the required terminal resilience as required under the Cooperation Agreement.

Over the years, the Cooperation Agreement has been amended twenty-one times to address issues relating to plans for the delivery of spectrum and payments due thereunder, to alter certain transition options and notifications relating to them, to delay and defer payments during the Debtors' prior bankruptcy, to meet coordination obligations with the other North American L-Band operator, Telecomunicaciones de Mexico, to allow for a large prepayment of the future annual payment obligations, and to reduce the amount of the overall payment obligations going forward.   In the wake of the FCC's April 2020 Order authorizing ATC deployment and in connection with the recapitalization, in 2020, the Debtors made a lump sum payment of $700.0 million to Inmarsat in two installments of approximately $35.5 million on October 13, 2020, and $664.5 million on October 23, 2020 (collectively, the "Inmarsat 2020 Prepayment"), which prepaid 60% of all future payment obligations.  The Debtors have the right until October 15, 2025, to exercise a further call option to prepay the remainder of the payment obligations on certain terms and conditions described in the Cooperation Agreement.

On December 20, 2022, the Debtors and Inmarsat amended the Cooperation Agreement ("Amendment No. 7") to extend a portion of the approximately $395.8 million payment to Inmarsat under the Cooperation Agreement (the "Inmarsat 2023 Payment") that was coming due in January 2023.  Under this amendment, the Debtors paid $30.0 million on December 28, 2022, with proceeds from the Prepetition First Lien Loan Facility (as defined below), and agreed to pay the remaining balance on April 6, 2023, after the expiration of the grace period, with interest.  As part of that amendment, Inmarsat agreed to dismiss its complaint alleging an anticipatory breach of the Inmarsat 2023 Payment, which was filed on December 15, 2022, in the Supreme Court of the State of New York, County of New York, against Ligado and its affiliate, Ligado Networks (Canada) Inc.  The complaint was dismissed without prejudice on December 29, 2022.

The Debtors and Inmarsat further amended the Cooperation Agreement five more times in 2023 and nine more times in 2024 to, among other things, delay payment of additional amounts owed by the Debtors to Inmarsat thereunder.  As part of the twenty-first and latest amendment to the Cooperation Agreement, Inmarsat agreed to defer payment until January 13, 2025 (after the applicable grace period) of (i) a $16.7 million quarterly payment originally due in

---

[~~15~~16]    Cooperation Agreement § 3.2(g).

developing technology and partnerships that will serve the growing demand for Direct-to-Device satellite connectivity.

B.    *Corporate and Capital Structure*

    1.    **The Debtors' Corporate Structure**

Ligado owns, directly or indirectly, ten domestic and foreign subsidiaries in two jurisdictions in the United States (Delaware and Virginia) and two jurisdictions in Canada (Ontario and Nova Scotia).  Ligado and all of its U.S. and Canadian subsidiaries are the Debtors in these Chapter 11 Cases.  A corporate organization chart is attached hereto as **Exhibit B**.

    2.    **The Debtors' Capital Structure**

Set forth below is a summary of the Debtors' capital structure as of the Petition Date.

| Obligation | Maturity / Redemption | Approximate Principal Amount Outstanding / Liquidation Preference |
|---|---|---|
| *Funded Debt Obligations*[16][17] | | |
| Prepetition First Out Term Loans | November 1, 2023[17][18] | $319.5 |
| Prepetition First Lien Notes | November 1, 2023 | $5,491.8 |
| Prepetition First Lien Senior Pari Term Loans | November 1, 2023 | $122.3 |
| Prepetition 1.5 Lien Facility | February 2, 2024 | $591.5 |
| Prepetition Second Lien Notes | May 1, 2024 | $2,050.0 |
| *Preferred Equity* | | |
| Series A-0 Preferred Units | N/A | $6,230,714,260 |
| Series A-1 Preferred Units | N/A | $1,672,843,762 |
| Series A-2 Preferred Units | N/A | $326,915,279 |
| Series B Preferred Units | N/A | $294,170,575 |
| Series C Preferred Units | N/A | $658,128,799 |
| *Common Equity* | | |
| Series A Common Units | N/A | N/A |
| Series B Common Units | N/A | N/A |

---

[16][17]    Amounts reflected in millions of dollars.

[17][18]    All loans issued after this date pursuant to the Prepetition First Out Term Loans are payable on demand.

#4919-1731-8224v1

- Fourth, (x) 35% to all holders of outstanding Series A-0 Preferred Units (such distribution to be made *pro rata* in proportion to the Series A-0 Preferred Units held by each such holder) and (y) 65% to all holders of outstanding Series A-1 Preferred Units, Series A-2 Preferred Units, Series B Preferred Units, and Series C Preferred Units (such distribution to be made (A) as to each such series of Preferred Units, based on the Sharing Percentage[18][19] of such series of Preferred Units and (B) as to each holder within each such series of Preferred Units, *pro rata* in proportion to the Preferred Units of such series held by each such holder), until certain distributed amount valuation thresholds are met.

- Fifth, 100% to holders of Common Units and vested Incentive Rights (as defined in the Operating Agreement).

Once the holders of Preferred Units have received all distributions to which they are entitled in accordance with the Operating Agreement, such holders will no longer have the right to participate in any future distributions, and the Preferred Units will be considered fully redeemed.

C.    *Events Leading to Commencement of Chapter 11 Cases*

For approximately 20 years, the Debtors have been working to develop terrestrial wireless capabilities that would augment their satellite network. The Debtors finally obtained FCC approval in April 2020 to use their ATC authority to provide 5G terrestrial communication services (the "FCC Order"). For approximately 10 years prior to the issuance of the FCC Order, however, the Debtors were mired in a contentious, protracted regulatory process that prevented them from utilizing their ATC authorizations. This process not only compelled the Debtors to take on massive amounts of debt (to make payments to Inmarsat and to meet the FCC's initial build-out requirements discussed below), but also drained their liquidity as they were not able to deploy and commercialize their ATC by providing terrestrial communication services, which caused them to file for chapter 11 protection in 2012 and consummate an out-of-court recapitalization and restructuring in October 2020.

In direct reliance on the FCC Order, in October 2020 the Debtors recapitalized their capital structure (i) to make the $700.0 million Inmarsat 2020 Prepayment and (ii) to begin developing the technological and commercial ecosystem as well as the partnerships necessary to fully deploy their coordinated licensed and leased spectrum. Notwithstanding the issuance of the FCC Order, however, the Debtors' ability to fully develop and implement their business plans continues to be hampered by the U.S. Government's use of the Debtors' spectrum and continued opposition to the FCC Order. Because of such actions, the Debtors do not yet generate sufficient

---

[18][19]    "Sharing Percentage" means, as to each of the Series A-1 Preferred Units, Series A-2 Preferred Units, Series B Preferred Units, and Series C Preferred Units, as of any date of determination, a percentage equal to (a) the amount of the liquidation preference for such series of Preferred Units as of such date, *divided by* (b) the sum total of the liquidation preferences of the Series A-1 Preferred Units, Series A-2 Preferred Units, Series B Preferred Units, and Series C Preferred Units as of such date.

"Order").[1920]  In doing so, the FCC explicitly rejected DOD and DOC's assertions about harmful interference to GPS.

The FCC Order approved the proposed power level of 9.8 dBW for the 1526-1536 MHz downlink band and allows the Debtors to use 30 MHz of their licensed MSS spectrum in the L-Band to provide 5G terrestrial communication services.  This decision added 30 MHz of terrestrial (ATC) spectrum to the 5 MHz of spectrum that the Debtors lease pursuant to the One Dot Six Lease, which is already fully authorized for use on a terrestrial basis.  Based on the extensive record before it, the FCC concluded that the Omnibus Filing and related technical documents addressed the GPS industry's harmful interference concerns, and that "it is in the public interest to grant the modification applications to facilitate the deployment of a low power terrestrial-based network in [their] licensed MSS spectrum."[2021]

Under the FCC Order's conditions, the Debtors are required to take various precautions and actions to ensure that their operations will not cause harmful interference to nearby spectrum users.  Specifically, the FCC Order requires the Debtors to, among other things:  not engage in terrestrial communication services in the 1536-1559 MHz band, thus creating a 23-MHz guard band for GPS; adhere to the reduced power levels and emissions limits consistent with the Debtors' commitments in the Omnibus Filing as amended and in supporting documents filed in the FCC record; monitor the power levels of their base stations; provide notice to federal agency GPS users and GPS device manufacturers of their base station locations' technical operating parameters prior to launching operations; provide prompt responses to credible reports of harmful interference; work directly with any federal agency with concerns about the potential for harmful interference to their GPS devices; develop and maintain a database of base station information for use by the aviation community; conduct drive testing to ensure compliance with power prescribed limits; and repair or replace any U.S. Government device shown to be susceptible to harmful interference.

### 6.    Continued Opposition to FCC Order

Since the release of the FCC Order, several non-government and government entities, including DOD and DOC, have publicly stated their ongoing opposition to the FCC's decision.  In addition, eight parties, including NTIA, filed petitions for reconsideration with the FCC seeking reversal of virtually every conclusion in the FCC Order.  NTIA also asked the FCC for a stay of the effectiveness of the FCC Order.  The Debtors filed answers to those petitions, and the petitioners filed replies.  The FCC issued an order denying NTIA's position to stay the FCC Order on January 19, 2021.  The Debtors do not know when, or how, the FCC will rule on any of the pending petitions for reconsideration.  The FCC Order continues to be in full force and effect, and the Debtors remain confident that the science and the technology are sound and that the unanimous FCC Order protects GPS from harmful interference from the Debtors' terrestrial communication services.

---

[1920]    *See* Order and Authorization, *In re LightSquared Technical Working Group Report*, FCC, IB Docket No. 11-109 (Released April 22, 2020).

[2021]    *See id.*

In addition, some members of the U.S. House of Representatives and Senate have publicly stated their opposition to the FCC Order. This opposition was orchestrated by DOD's efforts to continue its unlawful use of the Debtors' exclusively licensed spectrum. As a result of DOD's efforts, the 2021 National Defense Authorization Act (the "2021 NDAA") included several provisions targeting the Debtors, including prohibiting DOD from contracting with any entity using the Debtors' spectrum for commercial terrestrial operations without the Secretary of Defense first certifying to the Congressional Defense Committees that these operations do not cause harmful interference to DOD GPS devices. The 2021 NDAA also included a provision directing the National Academy of Sciences ("NAS") to conduct an independent technical review of the FCC Order. NAS began its review in September 2021 and released its report on September 9, 2022.[21][22]

Importantly, the NAS report did not assess the legal or technical conclusions in the FCC Order. The NAS report makes clear that the NAS panel did not undertake a review of whether the FCC Order was correct in light of applicable FCC spectrum rules and the requirements of the Administrative Procedures Act. Instead, the NAS panel took an academic approach and set aside established FCC rules and the agency's definition of "Harmful Interference" and used their own metric to assess the relationship between GPS devices and the proposed spectrum use. The NAS panel's methodology caused confusion about the import of the report to the FCC Order, which DOD and DOC sought to exploit by issuing press releases stating that the NAS report confirmed their view that the FCC erred in entering the FCC Order. This behavior prompted NAS to issue an unusual addendum on November 8, 2022: *"As detailed in the committee's report and in the comments made verbally during the public briefing at which this slide deck was used, the committee makes an explicit distinction between the FCC-defined regulatory term 'Harmful Interference' and the committee's use of the term 'harmful interference' in describing its task and in its conclusions. To avoid any confusion that might come from only looking at the slide deck and not having access to the verbal delivery, these slides have been annotated to clearly indicate which term is being used in each circumstance."*

The 2022 National Defense Authorization Act (the "2022 NDAA") includes a provision requiring a briefing on potential harmful interference to GPS, MSS, or other tactical or strategic systems of DOD from commercial terrestrial operations and MSS no later than thirty days after

---

[21][22] Section 1663 of the 2021 NDAA mandates that DOD engage NAS within thirty days of the enactment of the 2021 NDAA and that NAS return a report 270 days after that. If DOD had acted in a timely manner, the full report would have been submitted to Congress by the end of October 2021. Instead, NAS did not hold its first meeting of the study team until September 20, 2021, merely five weeks before Congress asked for the study to be completed. Because of DOD's delay, the NAS report was not published until September 9, 2022, nearly a year after the timeline Congress established.

Section 1664 requires DOD to estimate and certify the costs of complying with the FCC Order before taking any steps to implement it. DOD has not yet issued that certification and has provided no indication that it plans to do so. Most tellingly, DOD has refused the Debtors' attempts to assist in identifying potentially affected GPS receivers. In fact, neither DOD nor DOC has ever provided even a single example of a GPS receiver that would be harmed by the Debtors' terrestrial services, even though Section 1661 explicitly provides that DOD may spend funds to "conduct [] technical or information exchanges with" the Debtors regarding harmful interference to GPS devices. Given that DOD studied the impacts of the Debtors' proposals for more than twenty years, the agency's failure to develop a cost estimate more than two years after the FCC Order is inexcusable.

44

hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.

B.    *Summary of Key Developments in the Chapter 11 Cases*

As the Company proceeded with the initiatives described above, it became evident that a restructuring though chapter 11 would best position Ligado for long-term success.  To ensure that the Debtors' Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation, the Debtors committed to certain case milestones under the RSA and the DIP Facility. Subject to Court approval, the Debtors intend to solicit votes to accept or reject the Plan and proceed in accordance with the following timeline.

| Event | Date |
|-------|------|
| Voting record Date | **[June 20], 2025** |
| Solicitation Mailing Deadline | **[As soon as practicable after entry of the Order, but in no event more than three (3) business days thereafter]** |
| Publication Deadline | **[As soon as practicable after entry of the Order, but in no event more than three (3) business days thereafter]** |
| Plan Supplement Filing Deadline | **[The date that is seven (7) days before the Voting Deadline (expected to be July 17, 2025)]** |
| Voting Deadline | **[July 24, 2025 at 4:00 p.m. (prevailing Eastern Time)]** |
| Plan Objection Deadline | **[July 24, 2025 at 4:00 p.m. (prevailing Eastern Time)]** |
| Deadline to file Voting Report | **[Three business-days prior to the confirmation hearing, at 4:00 p.m. (prevailing Eastern Time)]** |
| Confirmation Hearing Date | **[August 7, 2025, at [2]:00 [p].m2:00 p.m. (prevailing Eastern Time), subject to the Court's availability]** |

C.    *First-Day Relief and Other Case Matters*

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in

52

support thereof is set forth in the First Day Declaration.  At a hearing on January 7, 2025, (the "First Day Hearing") the Bankruptcy Court granted certain of the relief initially requested in the First Day Motions on an interim and final basis, as applicable.  As of the date hereof, the Bankruptcy Court has granted all of the First Day Motions on a final basis, as specified below.[22][23]

- **Joint Administration Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 89] approving the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 3] on a final basis.

- **Cash Management Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 90] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Utilize Their Credit Cards, and (C) Engage in Intercompany Transactions, (II) Granting a Waiver of the Requirements of Section 345(B) of the Bankruptcy Code and U.S. Trustee Guidelines, and (III) Granting Related Relief* [Docket No. 7] (the "Cash Management Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Cash Management Motion on a final basis on February 3, 2025 [Docket No. 161].

- **Taxes Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 91] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 11] (the "Taxes Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Taxes Motion on a final basis on January 31, 2025 [Docket No. 156].

- **Utilities Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 92] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Proposed Adequate Assurance of Payment for Future Utility Services and Related Procedures, (II) Prohibiting Utility Companies to Alter, Refuse, or Discontinue Services, and (III) Granting Related Relief* [Docket No. 13] (the "Utilities Motion") on an interim basis.  The Bankruptcy Court entered an order approving the Utilities Motion on a final basis on February 3, 2025 [Docket No. 162].

- **Insurance Motion**:  On January 7, 2025, the Bankruptcy Court entered an order [Docket No. 93] approving the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Policies and Surety Bond Program and Honor Obligations Thereunder, and (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies and Surety Bonds, and (II)*

---

[22][23]    The First Day Motions, and all orders for relief entered in the Chapter 11 Cases, can be viewed free of charge on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/ligado.

Delaware Bankruptcy Court. On April 21, 2025, the Debtors moved to remand the action to New York state court and filed a Brief in Opposition to the Motion to Transfer on April 30, 2025. On May 9, 2025, Inmarsat filed a combined brief both in opposition to Ligado's motion to remand and in further support of its motion to transfer. Ligado filed its reply brief in further support of its motion to remand on May 21, 2025. Both the motion to remand and the motion to transfer have been fully briefed and are pending before the United States Bankruptcy Court for the Southern District of New York. As provided in the proposed revised form of order granting the AST Approval Motion, the parties have agreed to the tolling of the Cooperation Agreement Litigation.

I.      *Inmarsat Motion to Compel Payment*

On February 6, 2025, Inmarsat filed a motion, captioned *Inmarsat Global Limited's Motion to Compel Ligado Networks LLC and Ligado Networks (Canada)'s Compliance with 11 U.S.C. §§ 365(d)(5) and 503(b)* (the "Inmarsat Motion to Compel") [Docket No. 193], seeking entry of an order (i) compelling the Debtors to pay to Inmarsat all amounts arising on and after March 7, 2025 under the Cooperation Agreement, or, in the alternative, (ii) compelling such payments as and when they come due as administrative expenses in the same amount. On February 20, 2025, the Debtors filed the *Debtors' Objection to Inmarsat's Motion to Compel* [Docket No. 257]. On February 27, 2025, Inmarsat filed the *Inmarsat Global Limited's Reply in Further Support of Motion to Compel Ligado Networks LLC and Ligado Networks (Canada)'s Compliance with 11 U.S.C. §§ 365(d)(5) and 503(b)* [Docket No. 274]. On March 4, 2024, the Bankruptcy Court held a hearing on the Inmarsat Motion to Compel at the conclusion of which the Bankruptcy Court took the matter under advisement.

J.      *Bar Date Order*

On March 10, 2025, the Debtors filed *Debtors' Motion for an Order Establishing (I) Various Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving Notices of Bar Dates, and (IV) Granting Related Relief,* [Docket No. 324]. On March 19, 2025, the Court entered the *Order Establishing (I) Various Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving Notices of Bar Dates, and (IV) Granting Related Relief* [Docket No. 340] (the "Bar Date Order"). As further set forth therein, the Bar Date Order establishes several bar dates including a General Bar Date of April 17, 2025, and a Governmental Bar Date of July 7, 2025.

K.      *AST Definitive Agreements Motion*

On March 22, 2025, the Debtors filed the AST Approval Motion under seal. A redacted version of the AST Approval Motion was filed on March 26, 2025 [Docket No. 359]. On April 25, 2025, Inmarsat filed *Inmarsat Global Limited's Objection to Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the AST Definitive Documents* (the "Inmarsat AST Transaction Objection") [Docket No. 462]. On June 13, 2025, the Debtors filed a *Notice of Revised Form of An Order (I) Authorizing the Debtors to Enter Into the AST Definitive Documents and (II) Granting Related Relief* (the "*Noticed of Revised Form of AST Approval Order*"). On [•]June 23, 2025, the Court granted the AST Approval Motion and entered the

*Order Authorizing the Debtors to Enter Into the AST Definitive Documents and (II) Granting Related Relief* (including the Mediated Agreement, attached as Exhibit 1 thereto, the "AST Definitive Agreements Order") [Docket No. [•**692**].]

L.    *Mediation*

On March 31, 2025, the Debtors filed the *Certification of Counsel Regarding Agreement to Mediate and Order (I) Appointing a Mediator and (II) Granting Related Relief* [Docket No. 383]. On March 31, 2025, the Court entered *Order (I) Appointing a Mediator and (II) Granting Related Relief* [Docket No. 384]. On April 1, 2025, the Court entered an *Order Assigning Adversary Proceeding to Mediation and Setting Mediation Deadlines* [Docket No. 391]. The Debtors, the Ad Hoc First Lien Group, the Ad Hoc Crossholder Group, AST & Science, LLC, and Inmarsat Global Limited (collectively, the "Mediation Parties") actively engaged in mediation with respect to the issues to be addressed in the Mediation. On June 13, the Debtors filed the Noticed of Revised Form of AST Approval Order which included the principle terms of the mediated resolution.

M.    *KEIP Order*

On April 11, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Implementation of a Key Employee Incentive Program* [Docket No. 422]. On April 29, 2025, the Court entered the *Order Authorizing the Implementation of a Key Employee Incentive Program* [Docket No. 473].

N.    *Motion to Extend Period to Assume or Reject Unexpired Leases of Non-Residential real Property*

On May 2, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 504]. On May 19, 2025, the Court entered the *Order (I) Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 557] extending the applicable the time by which the Debtors may assume or reject any Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code through and including the earlier of (i) August 4, 2025, and (ii) the date of entry of an order confirming the Debtors' chapter 11 plan.

O.    *Exclusivity Extension Motion*

On May 5, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 509]. On May 19, 2025, the Court entered the *Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 558] extending the Exclusive Filing Period through and including August 4, 2025, and the Exclusive Solicitation Period through and including October 2, 2025.

P.      *Boeing Motion to Compel Assumption or Rejection*

On June 4, 2025, Boeing filed a *Motion to Compel the Debtors to Make a Final Determination Whether to Assume or Reject the SkyTerra Contract* [Docket No. 627] (the "Boeing Motion").  Th Boeing Motion seeks to compel the Debtors to make a final and irrevocable determination as of the plan supplement filing date with respect to whether the Debtors will assume, assume and assign, or reject the SkyTerra Contract (as defined in the Boeing Motion) and, if a decision to assume such contract is made, seeks to require a deposit of the alleged cure amounts within five days of entry of an order confirming the Plan.  ~~The~~**On June 16, 2025, the** Debtors ~~intend to object to the relief sought in~~**filed an objection to the Boeing Motion [Docket No. 659].  At a hearing on** the Boeing Motion **held on June 23, 2025, the Court determined to continue the Boeing Motion to the Confirmation Hearing**.

Q.      *Boeing and L3 Harris Litigation*

On June 13, 2025, certain of the Debtors filed a complaint against Boeing and L3Harris Technologies, Inc. ("L3 Harris"), in the Supreme Court of the State of New York under case number ~~[●]~~**653593/2025** (the "Boeing Litigation").  In the Boeing Litigation, Ligado Networks LLC, asserts several causes of action against Boeing and its subcontractor, L3Harris, in connection with failures to honor and fulfill contractual obligations concerning the SkyTerra-2 Satellite under the Boeing Agreement.

#4919-1731-8224v1

Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and Bankruptcy Rules.

### 4.    Elimination of Vacant Classes

Any Class that does not have a Claim or an Interest as of the date of the Confirmation hearing shall be deemed eliminated from the Plan for all purposes.

### 5.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

D.    *Means for Implementation of the Plan*

### 1.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.  All distributions made to holders of Allowed Claims and Interests in any Class in accordance with the Plan are intended to be, and shall be, final and indefeasible.

### 2.    Restructuring Transactions

Prior to, on, or after the Effective Date, subject to and consistent with the terms of their obligations under the Plan and the Restructuring Support Agreement, and subject to the consent of the Required Consenting Creditors and to the extent applicable, the consent rights of AST, the Debtors shall be authorized to enter into such transactions and take such other actions (which, for the avoidance of doubt, shall in each case be in form, substance, and structure acceptable to the Required Consenting Creditors, and, to the extent applicable the consent rights of AST as ~~provided~~**set forth** in the Restructuring Support Agreement) as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, and as set forth in and consistent with the Restructuring Transactions Memorandum, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, and other applicable Definitive Documents, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate

72

for any approvals, authorizations, actions, or consents of any Person or Entity. The authorizations and approvals contemplated by Article V.G of the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

### 8. New Organizational Documents

On the Effective Date, Reorganized Parent shall enter into the New Organizational Documents, including the Second Amended and Restated Operating Agreement, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity. On or prior to the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors shall, if so required under applicable state law, file their New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court or the Canadian Court.

Each holder of New Preferred Units and Existing Common Units shall be deemed to be a party to and bound to the terms of the Second Amended and Restated Operating Agreement from and after the Effective Date, even if not a signatory thereto.

### 9. Directors and Officers of Reorganized Debtors

As of the Effective Date, unless otherwise stated herein, in the Plan Supplement, or the applicable New Organizational Documents, the terms of the current members of the boards of directors or managers (as applicable) of the Debtors shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each Reorganized Debtor entity shall be appointed in accordance with the respective New Organizational Documents. The members of the New Boards will be identified in the Plan Supplement to the extent known, which may, to the extent set forth therein, also provide for the appointment of any such members as of the Confirmation Date (or any other date prior to the Effective Date). Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be

#4919-1731-8224v1

### b.      Prosecution of Objections to Claims or Interests

#### i.      Time to File Objections to Claims or Interests

Any objections to Disputed Claims or Disputed Interests shall be Filed on or before the later of (1) the Claims Objection Bar Date and (2) such later date as may be specifically fixed by the Bankruptcy Court.  For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Disputed Claims and Disputed Interests.

#### ii.      Authority to Prosecute and Settle Objections to Claims and Interests

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and, after the Effective Date, the Reorganized Debtors shall have the sole authority to: (i) file, withdraw or litigate to judgment, objections to Claims and Interests (except for those Allowed pursuant to the Plan or the Confirmation Order); (ii) settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) direct the Claims and Noticing Agent to adjust the claims register to reflect all resolutions of Disputed Claims without any further notice to or action, order or approval by the Bankruptcy Court.  Notwithstanding the foregoing, nothing contained in the Plan shall affect the rights of any **party** in interest to object to any fee application.

#### iii.      Authority to Amend Schedules

The Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, shall have the authority to amend the Schedules with respect to any Claim (other than any Claim Allowed or released hereunder or otherwise by a Final Order) and to make Distributions based on such amended Schedules (if no Proof of Claim is timely filed in response to such amendment) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim that was previously scheduled as undisputed, liquidated and not contingent, the Debtors or the Reorganized Debtors, as applicable, shall provide the holder of such Claim with notice of such amendment and the opportunity to file a Proof of Claim.

#### iv.      Adjustment to Claims Without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or deemed disallowed without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

### c.      Estimation of Claims and Interests

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim or Disputed Interest pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim or Interest at any time during litigation

#4919-1731-8224v1

Court, (A) workers' compensation claims, (B) claims against non-Debtors who may be entitled to coverage under the Insurance Policies with respect to such claims, (C) claims where a claimant asserts a direct claim against any of the Insurers under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay and/or the injunctions set forth in Article VIII of the Plan to proceed with its claim, and (D) all costs in relation to each of the foregoing; (3) the Insurers to draw on or against, use or apply any or all of the collateral or security provided by or on behalf of the Debtors (and the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the Insurance Policies in such order as the Insurer may determine; and (4) the Insurers to cancel any Insurance Policies and take other actions relating to the Insurance Policies (including effectuating a setoff and/or asserting any recoupment or subrogation rights or claims) to the extent permitted by such Insurance Policy and/or applicable non-bankruptcy law.

2.    **Directors and Officers Insurance ~~Polices~~Policies**

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the D&O Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court.  Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no proof of Claim need be Filed.  The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement such D&O Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary.  For the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or prior to the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Policies, which shall not be altered.

F.    *Provisions Governing Distributions*

1.    **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed

85

distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of Reorganized Debtors.

**b.      Delivery of Distributions to First Lien Trustee**

The First Lien Trustee shall be deemed to be the holder of all applicable Allowed Class 3 First Lien Notes Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the First Lien Trustee for further distribution, as soon as practicable following the Effective Date, to or on behalf of the applicable holders of Allowed Class 3 First Lien Notes Claims in accordance with the terms of the applicable First Lien Notes Documents and the Plan, subject to the rights of the First Lien Trustee to exercise its charging lien against such distribution in accordance with the First Lien Notes Documents regardless of whether such distribution is made by the First Lien Trustee or at its direction.  If the record holder of the First Lien Notes is DTC or its nominee or another securities depository or custodian thereof, and such First Lien Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such First Lien Note shall be deemed to have surrendered such First Lien Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan or to the extent resulting from its gross negligence or ~~will~~**willful** misconduct, the First Lien Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the First Lien Trustee, nor shall the First Lien Trustee have any obligation to make any distribution that is not delivered to it in a form that is distributable through the facilities of DTC.  The First Lien Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

**c.      Delivery of Distributions to Second Lien Trustee**

The Second Lien Trustee shall be deemed to be the holder of all applicable Allowed Class 5 Second Lien Notes Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to or at the direction of the Second Lien Trustee for further distribution, as soon as practicable following the Effective Date, to or on behalf of the applicable holders of Allowed Class 5 Second Lien Notes Claims in accordance with the terms of the applicable Second Lien Notes Documents and the Plan, subject to the rights of the Second Lien Trustee to exercise its charging lien against such distributions in accordance with the Second Lien Notes Documents regardless of whether such distribution is made by the Second Lien Trustee or at its direction.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, or to the extent resulting from its gross negligence or willful misconduct, the Second Lien Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the Second Lien Trustee, nor shall the Second Lien Trustee have any obligation to make any distribution that is not delivered to it in a form that is distributable through the facilities of DTC. The Second Lien Trustee shall be deemed a "Disbursing Agent" for purposes of the Plan.

#4919-1731-8224v1

votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before Effective Date.

Entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute the Bankruptcy Court's approval of the releases contained in the Plan and a finding that each release described is (i) in exchange for the good and valuable consideration provided by the Released Parties, including without limitation, the Released Parties' contributions to implementing the Plan; (ii) a good-faith settlement and compromise of the Claims released by the holders of Claims and Interests, (iii) in the best interests of the Debtors and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a sound exercise of the Debtors' business judgment.

Nothing in the Plan prohibits, precludes, or enjoins any Governmental Unit from asserting or filing a proof of Claim on or before the Governmental Bar Date.[2324]

5.    **Exculpation**

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action based on any act or omission occurring from the Petition Date through the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Restructuring, the DIP Facility, the DIP Orders, the DIP Documents, any Canadian Court Recognition Order, the Disclosure Statement, the Exit First Lien Facility, the Definitive Documents, the Plan Supplement, and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), or the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes gross negligence, intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code and have participated in good faith with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other

---

[2324] "Governmental Bar Date" shall have the meaning set forth in the *Order Establishing (I) Various Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Filing Proofs of Claim, (III) Approving Notices of Bar Dates, and (IV) Granting Related Relief* [Docket No. 340].

#4919-1731-8224v1

recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer or similar claim.

"*Exculpated Parties*" means, collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, and (iii) with respect to each of the foregoing Persons in clauses (i) through (ii), such Persons' current and former officers and directors, principals, members, partners, managers, and Professionals, each in their respective capacities as such who served as of the Petition Date or during these Chapter 11 Cases.

"Released Parties" means, collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) each of the Agents/Trustees, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Debt Parties, (vii) AST, (viii) Viasat (subject to the AST Definitive Agreements Order), and (ix) each current and former affiliate of each entity in clause (i) through (viii), each of such party's current and former predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees; provided, however, that any holder of a Claim or Interest that (x) files an objection to the Plan or (y) opts out of the releases set forth in ~~Article VIIID.2~~**Article VIII.D.2 of the Plan**, as applicable, shall not be a "Released Party."

"Releasing Parties" means, collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the Agents/Trustees, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Debt Parties, (vii) AST, (viii) Viasat (subject to the AST Definitive Agreements Order), ~~and~~ (~~vii~~**ix**) with respect to each of the foregoing Persons in clauses (i) through (viii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates (including affiliates of any predecessors), current and former officers and directors, principals, equity holders (including equity holders of any predecessors), members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, (~~viii~~**x**) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but do not opt out of granting the releases set forth in ~~Article VIIID.2~~**Article VIII.D.2 of the Plan**, and (~~ix~~**xi**) the holders of all Claims and Interests who were given notice of the opportunity and served with a provided form to opt out of granting the releases set forth in ~~Article VIIID.2~~**Article VIII.D.2 of the Plan** but did not timely opt out.

H.   *Conditions to the Effective Date*

1.   **The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article IX.B of the Plan:**

1.   the Restructuring Support Agreement shall not have been terminated and remains in full force and effect;

97

13.    all fees, expenses, and premiums payable pursuant to the Restructuring Support Agreement, the Plan, and other Definitive Documents, or pursuant to any order of the Bankruptcy Court shall have been paid by the Debtors or the Reorganized Debtors, as applicable, and all Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall have been paid in full in Cash **by the Debtors or the Reorganized Debtors, as applicable**;

14.    none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed;

15.    no Bankruptcy Court order appointing a trustee or examiner with expanded powers shall have been entered and remain in effect under any chapter of the Bankruptcy Code with respect to the Debtors;

16.    the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with the terms of the Plan as confirmed by the Confirmation Order;

17.    the Approval Condition (as defined in the Framework Agreement) shall have occurred, and all governmental and third-party approvals and consents, including FCC and ISED approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

18.    the AST Definitive Agreements Order shall have been entered and remain in full force and effect and the AST Definitive Agreements shall not have been terminated in accordance with any applicable terms and no default giving any party thereto the right to terminate any of the AST Definitive Agreements shall exist thereunder.

2.    **Waiver of Conditions**

The conditions to Confirmation and the Effective Date set forth in Article IX of the Plan may be waived by the Debtors upon the prior written consent of **each of** the Required Consenting Creditors and AST (to the extent consent rights over such ~~condition are consistent with the rights provided to AST~~**conditions are set forth** in the Restructuring Support Agreement), without notice, leave, or order of the Bankruptcy Court or the Canadian Court; provided that the Debtors may not waive the conditions set forth in Article IX.A.2 and IX.A.3 of the Plan. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

99

Dated:  June ~~13~~**24**, 2025

                                      Respectfully submitted,


By:        DRAFT                     
            Name: **Douglas Smith**
            Title:  **Chief Executive Officer**

**Exhibit A**

**Plan**

**Exhibit B**

**Corporate Organizational Chart**

#4919-1731-8224v1

**<u>Exhibit C</u>**
**Projections**