# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- o

|  |  |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC, *et al.*,[1] | Case No. 25-10006 (TMH) |
|  | (Jointly Administered) |
| Debtors. | **Re:  D.I. 349 & 350** |
|  | **Hearing Date: May 7, 2025, at 10:00 a.m.** |
|  | **Obj. Deadline: Apr. 18, 2025, at 4:00 p.m.** |
|  | **(extended for U.S. Trustee to Apr. 25)** |

------------------------------------------------------------- o

**OBJECTION OF THE UNITED STATES TRUSTEE**
**TO APPROVAL OF DISCLOSURE STATEMENT**

    Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), by and through his undersigned counsel, objects to *Motion of Debtors for Entry of Order (I) Approving Proposed Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation, and (V) Granting Related Relief* [D.I. 350] (the "Motion") and in support thereof respectfully states:

**PRELIMINARY STATEMENT**

    1.    The Court should deny the Motion because the plan is patently unconfirmable.  First, the plan is not feasible.  It hinges on the outcome of speculative litigation, and the debtors have not shown that their go-forward business is viable.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

2.      Second, the plan does not satisfy section 1129(a)(9).  It has an indefinite, contingent effective date that could occur almost <u>three years</u> after confirmation.  During that time, administrative and priority creditors would effectively subsidize the plan by bearing the risk of non-payment.

3.      Third, the plan has non-consensual third-party releases.  The debtors seek to impose third-party releases based on a failure to opt out.  But those releases may cause people to release <u>future</u> claims that arise months or years after the plan vote.  Because the plan's releases would be facilitated through the solicitation procedures, review of the scope and consensual nature of the releases is ripe now.

4.      This case is a chapter 22.  It should not be a prelude to a chapter 33.  The Court should not authorize the Debtors to solicit votes on a Plan that is patently unconfirmable.

5.      The U.S. Trustee has sent informal comments about the plan and disclosure statement to debtors' counsel and will try to resolve as many issues as possible.  The U.S. Trustee reserves all of his confirmation objections.

## JURISDICTION AND STANDING

6.      Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine the Motion and this objection.

7.      Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District.  Such oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and

interpreted by the courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").[2]

8.    Specifically, in accordance with 28 U.S.C. § 586(a)(3) and, more specifically, 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee is charged with the duties and obligations to supervise the administration of cases and trustees in chapter 11 cases, monitoring plans and disclosure statements filed in chapter 11 cases, and filing with the Court comments with respect to such plans and disclosure statements in connection with hearings under sections 1125 and 1128.

9.    Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Motion, the disclosure statement, and the issues raised in this objection. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest).

## BACKGROUND

10.    On January 5, 2025, the above-captioned debtors (the "Debtors") filed chapter 11 petitions in this Court.

11.    The Debtors are a mobile communications company that operates a satellite network in North America. *See Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 2] (the "Smith Decl.") ¶ 5.

---

[2]  *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 88 (1977) (United States Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena.").

12.     The Debtors' predecessors filed for chapter 11 bankruptcy in 2012 and confirmed a plan in 2015.  *See In re LightSquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y.).  *See also* Smith Decl. ¶¶ 85 & 93, *and Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Milbank LLP as Counsel for the Debtors and Debtors in Possession Effective as of the Petition Date* [D.I. 177] ¶ 13.

13.     The U.S. Trustee has not appointed a creditors' committee in these cases. *See* D.I. 123.  The Official Form 204 filed with the petition shows five unsecured creditors.

14.     On March 22, 2025, the Debtors filed the *Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession* [D.I. 348] (the "Plan") and the *Disclosure Statement for the Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession* [D.I. 349] (the "Disclosure Statement").

15.     Article I.A.167 of the Plan defines "Releasing Parties" to include: "(viii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but do not opt out of granting the releases set forth in Article VIIID.2, and (ix) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth in Article VIIID.2 but did not timely opt out."

16.     Article VIII.D.2 of the Plan seeks to impose third-party releases on the Releasing Parties.  The releases would apply, to the fullest extent permitted by law, to "any and all Claims and Causes of Action whatsoever, . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors . . . based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before Effective Date."

17.     The Debtors are requesting a confirmation hearing June 10, 2025.  The

effective date milestone is 40 months after the petition date, which would be May 2028.  *See*

*DIP Loan Agreement* [D.I. 4] Ex. 1 § 5.16(o).

18.     The Plan's gatekeeping injunction would apply "[i]mmediately upon entry

of the Confirmation Order."  Plan § VIII.F.[3]

19.     The Debtors "expect[] to continue to incur net losses for the foreseeable

future."  Disclosure Statement at 119.

## ARGUMENT

20.     The Court should deny the Motion because the Plan is patently

unconfirmable.

21.     Section 1125 of title 11 of the United States Code (the "Bankruptcy

Code") provides that a disclosure statement must contain "adequate information" describing a

confirmable plan.  *See In re Quigley Co., Inc.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).  The

solicitation of plan votes is prohibited before the Court, after notice and a hearing, has

approved a written disclosure statement containing "adequate information."  *See* 11 U.S.C. §

1125(b).

22.     The Bankruptcy Code defines "adequate information" as

information of a kind, and in sufficient detail, as far as is reasonably
practicable in light of the nature and history of the debtor and the
condition of the debtor's books and records, including a discussion
of the potential material Federal tax consequences of the plan to the
debtor, any successor to the debtor, and a hypothetical investor
typical of  the holders of claims or interests in the case, that would
enable such a hypothetical investor of the relevant class to make an
informed judgment about the plan, but adequate information need

---

[3] The U.S. Trustee has informally raised concerns with the Debtors about the gatekeeping injunction.
Undersigned counsel anticipates those concerns will be resolved through agreed changes to the Plan.
Subject to a review of the redline Plan, the U.S. Trustee reserves his objection to the gatekeeping
injunction if such changes are not made.

not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

11 U.S.C. § 1125(a)(1); *see also Momentum Mfg. Corp. v. Employee Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

23.     Adequate information is "determined by the facts and circumstances of each case." *Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight, Inc.*), 848 F.2d 414, 417 (3d Cir. 1988) (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is intended to help creditors in their negotiations with a debtor over a plan. *See Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988). The disclosure statement requirement of section 1125 is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)). Section 1129(a)(2) conditions confirmation upon compliance with applicable Bankruptcy Code provisions. The disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

24.     If a plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied. *See In re Quigley Co.*, 377 B.R. at 115 (citing *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); *In re 266 Washington Assocs.*,

141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*,

116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

25.     "A plan is patently unconfirmable where (1) confirmation 'defects

[cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon

which all material facts are not in dispute or have been fully developed at the disclosure

statement hearing.'" *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154-55 (3d Cir. 2012) (citation

omitted).

26.     "The debtor has the burden of proving that a disclosure statement is

adequate, including showing that the plan is confirmable or that defects might be cured or

involve material facts in dispute." *Id.* at 155.

27.     Here, the Plan is patently unconfirmable for three reasons. *First*, the Plan

is not feasible under section 1129(a)(11). *Second*, the Plan does not satisfy section 1129(a)(9).

*Third*, the Plan proposes non-consensual third-party releases that are not authorized under the

Bankruptcy Code.

### A. *Plan Is Not Feasible Under Section 1129(a)(11)*

28.     The Court should deny the Motion because the Plan is not feasible.

29.     Section 1129(a)(11) of the Bankruptcy Code provides that a plan shall be

confirmed only if confirmation "is not likely to be followed by the liquidation, or the need for

further financial reorganization, of the debtor or any successor to the debtor under the plan,

unless such liquidation or reorganization is proposed in the plan." A plan must be "reasonably

likely to succeed on its own terms without a need for further reorganization on the debtor's

part." *In re Am. Cap. Equip.*, 688 F.3d at 156 (citations, brackets omitted).

30.     The plan proponent must show feasibility by a preponderance of the

evidence. *See In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012) (citing cases). A

"debtor's own unsupported sincerity and belief that its plan is feasible is insufficient to satisfy the inquiry." *Id.* at 115.

31.     When considering a plan, the Court has "an affirmative obligation to scrutinize the plan and determine whether it is feasible." *In re Young Broadcasting Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010). The Court has this duty "regardless of whether there is any objection raised by a party in interest." *In re Mid-State Raceway, Inc.*, 2006 WL 4050809 at *19 (Bankr. N.D.N.Y. Feb. 10, 2006). Similarly, the Court must determine feasibility even if the plan has received overwhelming creditor support. *See In re Las Vegas Monorail Co.*, 462 B.R. 795, 803-04 (Bankr. D. Nev. 2011).

32.     In assessing feasibility, the Court must assess the possible impact of the debtor's ongoing civil litigation. "A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *In re Am. Cap. Equip.*, 688 F.3d at 156 (citations omitted); *accord In re WR Grace & Co.*, 729 F.3d 332, 348-49 (3d Cir. 2013).

33.     Here, the Plan is not feasible because it hinges on the FCC not revoking the Debtors' license(s). The Debtors hold licenses from the FCC and Innovation, Science & Economic Development Canada to operate mobile satellites using lower mid-band spectrum. *See* Smith Decl. ¶ 20. The Debtors state they obtained FCC approval in April 2020 "to use their ATC authority to provide 5G terrestrial communication services (the 'FCC Order')." *Id.* ¶ 85. However, according to the Debtors, "eight parties . . . filed petitions for reconsideration with the FCC seeking reversal of virtually every conclusion in the FCC Order." *Id.* ¶ 110. "The Debtors do not know when, or how, the FCC will rule on any of the pending petitions for reconsideration." *Id.* Per the Disclosure Statement, "any full or partial reversal of the FCC

8

Order could limit or prohibit general commercial terrestrial use of [Ligado's] spectrum, which would materially and adversely affect its business, prospects, financial condition, and results of operations.  Moreover, any reversal of the FCC Order could negatively impact our legal claims and the value of the just compensation awarded in a judgment or a settlement of the USG Lawsuit."  Disclosure Statement at 133.  *See also* Plan § IX.A.1 (conditions to effective date include "the Restructuring Support Agreement shall not have been terminated and remains in full force and effect") *and* Smith Decl. Ex. B §§ 10.01(v) & 10.02(v) (authorizing required 1L and crossholder creditors to terminate Restructuring Support Agreement if the FCC "takes any action that would revoke, limit, impair, stay, or otherwise negatively impact any of the Company's existing licenses").  The Debtors do not dispute that "the FCC can modify or revoke any license that it has granted and that, if it does so, a takings claim does not lie." *Opinion and Order*, *Ligado Networks LLC v. United States*, 23-cv-1797 (EJD) (Fed. Cl. Nov. 18, 2024) D.I. 31 at 12.  Plan feasibility depends on the FCC denying the petitions for reconsideration, and not otherwise modifying or revoking the Debtors' FCC license(s).

34.    The Debtors have not shown that a favorable outcome in the FCC litigation is reasonably likely versus merely possible.  *Cf. In re Am. Cap. Equip.*, 688 F.3d at 155-56 ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.").  The Debtors believe a reversal of the FCC Order is "unlikely."  Disclosure Statement at 133.  But a "debtor's own unsupported sincerity and belief that its plan is feasible is insufficient to satisfy the inquiry."  *In re W.R. Grace & Co.*, 475 B.R. at 115.

35.    Separately, the Plan is not feasible because the Debtors have not shown their go-forward business is viable.  The Debtors have two main business lines: mobile satellite

services ("MSS") and terrestrial.  As to the MSS business, Debtors' counsel indicated at the

first-day hearing that the MSS business is not self-sustaining.  The "Company expects to

continue to incur net losses for the foreseeable future."  Disclosure Statement at 119.  Although

the Debtors have a long-term transaction pending with AST & Science, LLC involving the

MSS business, that transaction only "partially offset[s]" the Debtors' projected net losses.  *Id.*

The Debtors have two satellites for their MSS business: the SkyTerra-1 and the SkyTerra-2.

"Each satellite has a limited useful life."  *Id.* at 124.  The first satellite, which is in orbit,

suffered an "anomaly" in April 2023 that led to a "degradation in performance."  Smith Decl. ¶

38.  The first satellite is no longer insured.  *See* Disclosure Statement at 125-26.  The second

satellite has been in storage the past 14 years and has a launch milestone of 2029.  *See* Smith

Decl. ¶¶ 21 & 37.  The Debtors have not shown that their MSS business is viable, even with

the AST transaction.

      36.     The Debtors have not shown that their terrestrial business is viable, either.

The Debtors have asserted that the 2021 National Defense Authorization Act prohibited the

Department of Defense "from contracting with any entity using the Debtors' spectrum for

commercial terrestrial operations without the Secretary of Defense first certifying to the

Congressional Defense Committees that these operations do not cause harmful interference to

DOD GPS devices."  Smith Decl. ¶ 111.  The Debtors assert that "DOD's refusal to cooperate

with Ligado to address spectrum interference concerns, as contemplated by the FCC Order,

began upon the Order's issuance and continues through the present.  That refusal has prevented

Ligado from commencing ATC operations."  *Id.* ¶ 123.  The Debtors have averred that "not a

single company has agreed to work with Ligado since the NDAA."  *Opinion and Order*,

*Ligado Networks LLC v. United States*, 23-cv-1797 (EJD) (Fed. Cl. Nov. 18, 2024) D.I. 31 at

11.  The Debtors have not shown that they can generate any terrestrial business.

37.     For the above reasons, the Debtors have not shown that the Plan is

feasible.  The Plan hinges on the outcome of speculative litigation, and the Debtors expect "to

continue to incur net losses for the foreseeable future."  Disclosure Statement at 119  In short,

the Debtors have not demonstrated that the Plan is "reasonably likely to succeed on its own

terms without a need for further reorganization on the debtor's part."  *In re Am. Cap. Equip.*,

688 F.3d at 156 (citations, brackets omitted).  The Court should not authorize the Debtors to

solicit votes on a Plan that is not feasible.

### B.  *Plan Does Not Satisfy Section 1129(a)(9)*

38.     The Court should deny the Motion because the Plan does not satisfy

section 1129(a)(9).

39.     A plan is confirmable only if, among other requirements, all allowed

administrative claims are paid in full on the effective date.  Section 1129(a)(9)(A).  Priority

non-tax claimants must receive (a) deferred cash payments of a value equal to the allowed

amount of their claims if the class accepts the plan, or (b) payment in full on the effective date

if the class does not accept the plan.  Section 1129(a)(9)(B).

40.     The Bankruptcy Code does not define "effective date," but the term

generally refers to the date when plan distributions begin.  *See In re Yates Development, Inc.*,

258 B.R. 36, 42 (Bankr. M.D. Fla. 2000).

41.     A plan's effective date "plays an important role in valuation and should

therefore be set forth in the plan with specificity."  *In re Potomac Iron Works, Inc.*, 217 B.R.

170, 173 (Bankr. D. Md. 1997).  An effective date "cannot be indefinite or distant."  *In re*

*Wonder Corp. of America*, 70 B.R. 1018, 1020 (Bankr. D. Conn. 1987).  Courts have denied confirmation of plans whose effective dates were too far in the future or otherwise uncertain. *See*, *e.g.*, *In re Potomac Iron Works, Inc.*, 217 B.R. at 173 (confirmation denied where debtor proposed effective date of one year after confirmation in order to buy time to collect accounts receivable; court rejected debtor's position that effective date should be date on which debtor would have enough money to pay administrative claims in full); *In re Krueger*, 66 B.R. 463, 465 (Bankr. S.D. Fla. 1986) (confirmation denied where chapter 11 debtor's only asset was a commercial building, and plan's effective date of four months after confirmation defeated purpose of statutory requirement that taxing authorities who reject plan receive equivalent of immediate payment in full.  "The debtor's proposal requires the taxing authorities to partially subsidize the debtor's plan.  An effective date deferred beyond the interval essential for liquidation (not more than 45 days in this instance) is unreasonable."); *In re Yates Development, Inc.*, 258 B.R. at 42-43 (plan's effective date is of "paramount concern" to creditors; effective date that would occur only if debtor successfully appealed judgment in favor of counterparty to option agreement was unreasonable); *In re Premiere Network Services, Inc.*, 2005 WL 6443624 at *5-6 (Bankr. N.D. Tex. July 1, 2005) (plan not feasible where debtor's ability to satisfy obligations under plan was so contingent on things beyond debtor's control—including collecting enough money to pay administrative expenses—as to make completion unlikely.  "Courts are typically reluctant to confirm a plan that shifts risk to the claimants. . . . [E]xtending and creating uncertainty as to the effective date forces these priority claimants to subsidize the proposed joint Plan and bear the risks of failure.").

42.     Here, the Plan's effective date is indefinite and uncertain.  The Debtors acknowledge that "***The Company cannot predict the amount of time needed in chapter 11 to***

*implement the Plan*" and that "Given the nature of the Plan and the required regulatory approvals for implementation, the Effective Date of the Plan is not likely to occur shortly after the Confirmation Date, and there can be no assurance as to the actual timing of the Effective Date." Disclosure Statement at 112 & 114 (emphasis in original). Under the DIP financing milestones, the effective date could occur <u>40 months</u> after the petition date. *See* D.I. 4 Ex. 1 § 5.16(o). During that time, taxing authorities and other administrative claimants would be partially subsidizing the Plan, while simultaneously being subject to the Plan's gatekeeping injunction.[4] *See* Plan § VIII.F (injunction effective "[i]mmediately upon entry of the Confirmation Order"). The effective date requires that "all governmental and third-party approvals and consents, including FCC and ISED approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect[.]" Plan § IX.A.17. *Cf.* Plan § IX.A.1 (conditions to effective date include "the Restructuring Support Agreement shall not have been terminated and remains in full force and effect") *and* Smith Decl. Ex. B §§ 10.01(v) & 10.02(v) (authorizing required 1L and crossholder creditors to terminate Restructuring Support Agreement if the FCC "takes any action that would revoke, limit, impair, stay, or otherwise negatively impact any of the Company's existing licenses"). Thus, it appears the effective date may not occur if the FCC grants the pending petition(s) for reconsideration of the FCC Order, or otherwise revokes or modifies the Debtors' FCC license(s). "The Debtors do not know when, or how, the FCC will rule on any of the pending petitions for reconsideration." Smith Decl. ¶ 110. The Court should not approve solicitation in 2025 of a plan that may not go effective, if at all, until 2028.

---

[4] Assuming the gatekeeping injunction is not removed.

43.     Plan voting will not cure the above issues, because plan voting will not, for example, generate future profits or accelerate the occurrence of the effective date.  Nor does the Disclosure Statement appear to dispute the above aspects and risks of the Plan.  Therefore, the Plan is patently unconfirmable.

**C.  *The Plan Proposes Unauthorized, Non-Consensual Third-Party Releases***

44.     The Court should deny the Motion because the Plan contains non-consensual third-party releases.  *See* Plan §§ I.A.167, VIII.D & VIII.F.

45.     "Releasing Parties" includes: "(viii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but do not opt out of granting the releases set forth in Article VIIID.2, and (ix) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth in Article VIIID.2 but did not timely opt out."  Plan § I.A.167.

**i.  State Contract Law Applies, Not Federal Law**

46.     Non-consensual third-party releases are not authorized under the Bankruptcy Code.  *See Harrington v. Purdue Pharma L.P.*, 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024).  The Supreme Court in *Purdue* did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order.

47.     The foundation of a consensual release is an agreement between the parties.  Whether parties have reached an agreement—including an agreement to release one's claims against another (*i.e.*, not to sue)—is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law in some specific context.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or

authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

48.     No such exception applies here.  The Bankruptcy Code does not define a "consensual release."  It contains no provision that addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor.  And no Bankruptcy Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not otherwise be found to exist as a matter of state law.  Nor does 11 U.S.C. § 105(a) itself confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted).  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Accordingly, any authority to include third-party releases in a plan must derive from some other source of law.  Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.[5]

---

[5]   Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").  That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

49.     As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state law contract principles serve as controlling authority when considering whether a release is consensual.  *See*, *e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (requiring "some sort of affirmative expression of consent that would be sufficient as a matter of contract law"); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "'nothing in the bankruptcy code contemplates (much less authorizes it)' … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be governed instead by state law."  *Id.*

50.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will affirmatively agree to release their property rights in a manner sufficient to demonstrate consent under state law.

16

ii.     **Under State Law, Silence Is Not Acceptance**

51.     The "general rule of contracts is that silence cannot manifest consent."

*Patterson*, 636 B.R. at 686 *see also*, *e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90

(1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not

constitute acceptance of the offer").  Moreover, "[o]rdinarily an offeror does not have power to

cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF

CONTRACTS § 69 cmt. a (1981); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on

Contracts § 6:67 (4th ed.); *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022)

("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance.").  Instead,

under state law, an agreement to release claims—like any other contract—generally requires a

manifestation of assent to that agreement.  *See*, *e.g.*, RESTATEMENT (SECOND) OF CONTRACTS §

17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of

mutual assent to the exchange and a consideration.").  Consent cannot be imputed or "deemed"

based on a party's failure to object—rather, consent must be affirmatively shown to exist.  *See*,

*e.g.*, *id*.; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

52.     There are only very limited exceptions to that principle. "[T]he

exceptional cases where silence is acceptance fall into two main classes: those where the

offeree silently takes offered benefits, and those where one party relies on the other party's

manifestation of intention that silence may operate as acceptance.  Even in those cases the

contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF

CONTRACTS § 69 cmt. a (1981).

53.     But absent such extraordinary circumstances, "[t]he mere receipt of an

unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him

17

any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c (1981); *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

54.      Delaware common law, as a point of reference, is in accord. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)). Absent limited exceptions not triggered here, silence and inaction are not assent to an offer. *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out). For the reasons discussed below, none of those exceptions apply here.

### iii.      Opt-Outs Cannot Be Imposed Based on a Procedural Default Theory

55.      Applicable state contract law cannot be disregarded on a default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so. *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 665 B.R. at 717-720; *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts had reasoned that so long as the creditors received

notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 709 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

56.     After *Purdue*, however, it is now clear that imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue*, 144 S. Ct. at 2082-88 & n.1; *see also Smallhold, Inc.*, 665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold, Inc.*, 665 B.R. at 719-20.

57.     As explained in *Smallhold*, the Supreme Court's *Purdue* decision rejected a fundamental premise of the decisions which had imputed consent for non-debtor releases on a procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *Smallhold, Inc.*, 665 B.R. at 708 ("The *possibility* that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id*. at 709. As the *Smallhold* court explained, however, under the

default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

58.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation" that is actually contested. *Id*. at 709; *see also id*. at 722 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."). "[After *Purdue*], that is no longer the case in the context of a third-party release." *Id*. at 722. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection. It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*. at 709. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. The *Smallhold* court provided an illustration that makes obvious why, even with clear notice, a mere failure to object or opt out of a proposed release does not constitute the manifestation of assent necessary to constitute consent under state law:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor. Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a

> legally enforceable obligation to make the $100 contribution. But
> none of the cases that authorizes the opt-out third-party release
> provides any limiting principle that would distinguish the third-party
> release from the college education fund plan. And after *Purdue
> Pharma*, there is none.

*Id*. at 710.

59.    Because *Purdue* establishes that a *non*consensual third-party release is

"*per se* unlawful," it follows that a third-party release "is not the kind of provision that would

be imposed on a creditor on account of that creditor's default." *Id*. at 709. Rather, absent an

affirmative showing of consent, a court lacks any power to approve the non-debtor release.

And besides the now-discredited default theory, there is "no other justification for treating the

failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*.

Because a chapter 11 plan cannot permissibly impose non-debtor releases without the

affirmative consent of the releasing parties, a release cannot be imposed based on their mere

failure to respond regarding the non-debtor release. Rather, an "*affirmative expression of

consent* that would be sufficient as a matter of contract law" is required. *Id*. at 720 (emphasis

added).[6]

###    iv.    Failing to Opt Out Does Not Provide the Required Affirmative Consent

60.    Here, the Plan forces third-party releases on entities who are eligible to

vote on the Plan, or who otherwise have notice of the Plan's releases, and do not opt out. *See*

Plan § I.A.167.

61.    But people who fail to opt out of the Plan's releases are not affirmatively

consenting to the release. An affirmative agreement — something more than the failure to opt

---

[6] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*,
which had relied on the procedural default theory. *See id*. at 716 ("On the central question
presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

out — is required for a non-debtor release to be consensual.  *See In re Tonawanda Coke Corp.,* 662 B.R. at 222-23; *Patterson*, 636 B.R. at 686.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt out.  *Patterson*, 636 B.R. at 686.  "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent."  *Id.* at 688.

62.    The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282.  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*.  It also stated that opting out would not affect the warranty coverage.  *See id*.  The customer did not take any steps to opt out.  *See id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *See id*. at 1282-83.

63.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer.  Samsung is not a signatory."  845 F.3d at 1290.  That is even more true in the context of a chapter 11 plan.  Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors.  As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators."  *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

64.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate.  Unsurprisingly — because there was no applicable federal law — the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  845 F.3d at 1284 (quotation marks omitted); *accord Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969).  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement."  *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no

reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and citation omitted).

65.     The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond or when the offeree retains the offered benefits—but held neither exception applied. *See Norcia*, 845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

66.     Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.  Voting for a plan without checking an opt-out box or not responding to a solicitation package does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

67.     Merely voting to approve a plan is not an expression of consent to a non-debtor release. *See*, *e.g.*, *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. at 507 (reaching same conclusion).  As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it. *Id.* at 507 (emphasis in original).  There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release.  Instead, the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the

bankruptcy court's confirmation order." *Id.* (citation and alterations omitted).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law. *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

68.  Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to an offer to release claims against non-debtors.  Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

69.  Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  The only benefits received by the creditors are distributions from the debtor's chapter 11 plan.  Thus, "[e]ssentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.*, 662 B.R. at 222.  Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the non-debtor releases, consent to the non-debtor release cannot be inferred from mere acceptance of the benefits of the debtor's plan. *See Norcia*, 845 F.3d at 1286 (explaining that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit).  Further, non-debtors have no right to prevent a

debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co*., 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

70.     Nor does being eligible to vote on a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

71.     And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty.  *See Norcia*, 845 F.3d at 1285-86.  Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  A claimant's vote in favor of a plan while remaining silent regarding a non-debtor

release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

72.    Here, the Plan's releases would, to the fullest extent permitted by law, apply to "any and all Claims and Causes of Action whatsoever . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors . . . based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before Effective Date."  Plan § VIII.D.2.  "Cause of Action" is defined to include "any . . . claim, . . . right, . . . remedy, . . . judgment, . . . [or] defense, . . . of any kind or character whatsoever, . . . arising before, on, or after the Petition Date . . . [and includes] . . . any counterclaim or defense, including . . . recoupment[.]"  *Id.* § I.A.33.  An accompanying gatekeeper injunction to enforce the releases would be effective upon entry of the confirmation order.  *See id.* § VIII.F.  And the Debtors and reorganized Debtors would benefit as Released Parties.  *See id.* § I.A.166.

73.    The Plan's releases and injunction are problematic for several reasons. First, they are non-consensual.  For the reasons stated above, silence or inaction by parties in interest does not equal consent to release their claims against third parties.  This is especially true for unclassified claimants, who would not receive opt-out forms but who could fit within the broad definition of "Releasing Parties" (part (ix) of definition of Releasing Parties includes "the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth in Article VIIID.2 but did not timely opt out.").  Second, the releases and accompanying injunction are prospective.  The claims being released would accrue up to the effective date, which could occur as late as May 2028.  *See* Plan §§ VIII.D.2 & VIII.F.  The Court should not release claims that arise months or years in the *future*, based solely on a failure to opt out today.  Third, the releases and injunction have no exceptions for

willful misconduct or gross negligence.  This could immunize estate fiduciaries from liability for gross negligence or willful misconduct occurring between confirmation and the effective date, thereby impermissibly expanding the Plan's exculpation.[7]

74.     For the above reasons, the Plan's third-party releases render it unconfirmable.  The Court should not authorize the Debtors to solicit votes unless the third-party release mechanism is changed to opt-in.  An opt-in is appropriate because these cases do not have an extensive general unsecured creditor body: the Official Form 204 filed with the Debtors' petition shows five unsecured creditors.  In addition, five of seven classes of equity interests are unimpaired and are not voting on the Plan.  *See* Plan § III.A.  The third-party releases should not be extended to cover all entities who received notice of the confirmation hearing and failed to opt-out.  That is a nebulous and potentially large group of entities.

**D.  *The Plan Cannot Be Confirmed Because There Is No Authority for the Injunction Against Bringing Claims Against Non-Debtors***

75.     The Court should deny the Motion because the Plan's discharge injunction would impose a bar on claims among non-debtor third parties.  The discharge injunction includes a gatekeeping injunction proposed to be effective immediately upon entry of the confirmation order.  *See* Plan § VIII.F.

76.     Under *Purdue*, non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code.  *See Purdue Pharma L.P.*, 144 S. Ct. at 2088.  As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies,

---

[7] The U.S. Trustee has raised other informal concerns about the scope or effect of the Plan's release and injunction provisions.  Undersigned counsel anticipates these concerns will be resolved through agreed changes to the Plan.  Subject to a review of the redline Plan, the U.S. Trustee reserves his objection to the release and injunction provisions if such changes are not made.

and these cases are not seeking a Section 524(g) channeling injunction. *See id.* at 2085 (citing 11 U.S.C. § 524(e)).

77.     Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief. Parties seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Purdue Pharma*, 144 S. Ct. at 2085 (noting that an injunction is an "extraordinary remedy"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1119 (3d Cir. 1989) ("We have long followed the principle that equitable remedies are available once legal remedies are found to be inadequate.") (citing *Weinberger*).

78.     Similarly, there is no statutory authority in the Bankruptcy Code that justifies an injunction to enforce an exculpation, and the Debtors have shown no need for an injunction to prevent "irreparable harm" to either the estates or the released parties.

79.     The Debtors have not shown that any of the factors supporting injunctive relief are met.  Nor likely could they.  If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the

released parties.  A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

### **RESERVATION OF RIGHTS**

80.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies, and obligations to, among other things, (i) complement, supplement, augment, alter, modify, amend, or withdraw this objection, (ii) file any appropriate motion, or conduct any and all discovery, and (iii) assert such other grounds as may become apparent upon further factual discovery.  The U.S. Trustee reserves the right to object to confirmation of the Plan on any and all grounds.

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court deny the Motion and grant such other and further relief as the Court deems just and equitable.

Dated:  April 25, 2025
        Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**Regions 3 and 9**

By: */s/ Benjamin Hackman*
Benjamin A. Hackman
Trial Attorney
Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
benjamin.a.hackman@usdoj.gov

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ o

In re:

LIGADO NETWORKS LLC, *et al.*,[1]

                Debtors.

------------------------------------------------------------ o

: Chapter 11

: Case No. 25-10006 (TMH)
: (Jointly Administered)

: **Re:  D.I. 349 & 350**
: **Hearing Date: May 7, 2025, at 10:00 a.m.**
: **Obj. Deadline: Apr. 18, 2025, at 4:00 p.m.**
: **(extended for U.S. Trustee to Apr. 25)**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 25, 2025, I caused to be served a copy of the *Objection of the United States Trustee to Approval of Disclosure Statement* in the above-entitled action through the CM/ECF notification system, with courtesy copies upon the following via e-mail:

Debtors
Ligado Networks LLC
10802 Parkridge Boulevard
Reston, VA 20191
Attn: Vicky McPherson
Email: vicky@ligado.com

Counsel to the Debtors
Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn: Dennis F. Dunne
Matthew L. Brod
Lauren C. Doyle
Email: ddune@milbank.com

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

mbrod@milbank.com
ldoyle@milbank.com

Co-Counsel to the Debtors
Richards, Layton, & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins
Michael J. Merchant
Amanda R. Steele
Email: collins@rlf.com
merchant@rlf.com
steele@rlf.com

Counsel to the Ad Hoc Crossholder Group
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn: Brian Schartz, P.C.
Derek I. Hunter
Email: brian.schartz@kirkland.com
derek.hunter@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Attn: Patrick J. Nash, Jr., P.C.
Alan McCormick
Email: patrick.nash@kirkland.com
alan.mccormick@kirkland.com

Counsel to the Ad Hoc First Lien Group
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Attn: Jason L. Hufendick
Dennis Twomey
Email: jhufendick@sidley.com
dtwomey@sidley.com

Dated: April 25, 2025
Wilmington, Delaware

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By:  */s/ Benjamin A. Hackman*

Benjamin A. Hackman
Trial Attorney
Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
benjamin.a.hackman@usdoj.gov