## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC *et al.*,[1] | Case No. 25-10006 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Proposed Obj. Deadline: August 21, 2025 at 4:00 p.m. (ET)** |
| | **Proposed Hearing Date: August 27, 2025 at 11:00 am (ET)** |

### DEBTORS' MOTION FOR AN ORDER (I) ENFORCING THE AST ORDER AND MEDIATED AGREEMENT AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors") respectfully state the following in support of this motion (the "Motion"):

### PRELIMINARY STATEMENT

1.     Inmarsat Global Limited ("Inmarsat") must comply with the AST Order and the Mediated Agreement approved therein.[2]     As this Court is well aware, following Inmarsat's objection to the AST Transaction (as defined below), the Debtors, Inmarsat and AST & Science, LLC ("AST") engaged in months of vigorous negotiations to reach a comprehensive settlement that resolved all issues between the Debtors and Inmarsat.     Now, on the eve of the hearing on confirmation of the Plan,[3] Inmarsat is refusing to abide by the clear terms of the Mediated

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

[2]     *Order (I) Authorizing the Debtors to Enter Into the AST Definitive Documents and (II) Granting Related Relief* [Docket No. 692] (the "AST Order") and Exhibit 1 thereto (the "Mediated Agreement").

[3]     *Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession* [Docket No. 696] (the "Plan").

Agreement in an attempt to secure a more advantageous deal for itself.  By going back on the explicit promises it made during mediation, even after the outrageous position it now asserts was rejected time and again in the discussions among principals and advisors, Inmarsat deliberately misinterprets the Mediated Agreement approved by this Court and ignores the clear negotiating history.  Inmarsat's audacious behavior threatens to upend confirmation of the Plan and success of these chapter 11 cases.

2.      Specifically, the Debtors, AST, and Inmarsat agreed as part of the Mediated Agreement, *inter alia*, that Inmarsat would affirmatively support Ligado and AST's **initial** applications to the Federal Communications Commission (the "FCC") and Innovation, Science and Economic Development Canada (the "ISED") for the proposed non-geostationary orbit satellite to be operated in the L-Band[4] in North America (the "Proposed NGSO System") contemplated by the AST Transaction (as defined below) so long as such **initial** applications expressly state that use of the L-Band by the Proposed NGSO System will (a) be consistent with the terms of the Inmarsat Cooperation Agreement and (b) limited to Ligado's geographic coverage areas in North America specified in Exhibit L of the Inmarsat Cooperation Agreement.[5]  Inmarsat is not bound to support any further or different applications that Ligado or AST may submit to separately obtain rights to operate in the L-Band outside of North America, and Ligado and AST are not prohibited from submitting such applications.  The parties also agreed to enter into an Amended Inmarsat Cooperation Agreement (as defined below) incorporating these provisions as set forth in Sections 2 through 4 of the Mediated Agreement.

---

[4]   The FCC has granted Ligado licenses authorizing it to use electromagnetic spectrum between 1525 - 1559 and 1626.5-1660.5 MHz (the "L-Band Spectrum" or "L-Band").

[5]   "Inmarsat Cooperation Agreement" means the Amended and Restated Cooperation Agreement by and among Lightsquared LP, Skyterra (Canada) Inc., Lightsquared Inc. and Inmarsat Global Limited, dated August 6, 2010, as amended through December 31, 2024.

3.      Yet, with only days before the scheduled confirmation hearing and after Inmarsat's counsel publicly acknowledged its settler's remorse by stating that he "feel[s] like [he] gave up too much at this mediation," Inmarsat makes the extraordinary assertion that under the Mediated Agreement, AST—without actually saying so—completely foreclosed for itself every opportunity to seek separate rights to operate in the L-Band outside of the United States and Canada, thereby permanently restricting the L-Band operations of its proposed NGSO system to only the confines of North America.  This absurd assertion would dramatically impair the underlying economics for AST's investment in the proposed NGSO system and undermine AST's commercial objectives. Not only were those limitations not included in the Mediated Agreement, but a request from Inmarsat to add these very terms was flatly rejected by Ligado and AST during the negotiations that led to the final Mediated Agreement.  Inmarsat's position is therefore not credible.

4.      Faced with the plain terms of the Mediated Agreement, Inmarsat attempts to foist the rejected limitations upon AST by seeking to insert them into the Amended Inmarsat Cooperation Agreement and the direct agreement between it and AST contemplated by footnote 5 of the Mediated Agreement.  But Inmarsat's insistence on imposing an extraordinary and dramatic limitation on AST's business has no basis whatsoever in the Inmarsat Cooperation Agreement and should not be added thereto.  The Inmarsat Cooperation Agreement sets forth the terms by which Inmarsat and Ligado coordinate their use of the shared L-Band Spectrum within certain areas of International Telecommunication Union's ("ITU") Region 2 ("ITU Region 2").  ITU Region 2 encompasses primarily the Americas.[6]  ITU Regions 1 and 3 are mentioned only once throughout the dozens of pages of the agreement.  Indeed, to Ligado's knowledge, since the Inmarsat

---

[6]    There are three ITU Regions.  Generally speaking, ITU Region 1 encompasses Europe, Africa and the Middle East west of the Persian Gulf and ITU Region 3 encompasses Asia east of and including Iran and most of Oceania. *See Frequency Bands Allocated to Terrestrial Broadcasting Services*, INT'L TELECOMM. UNION, https://www.itu.int/en/ITU-R/terrestrial/broadcast/Pages/Bands.aspx (last visited Aug. 13, 2025).

Cooperation Agreement was executed in 2007, Inmarsat has never made the claim to Ligado, regulators, investors, or otherwise, that Ligado is excluded by the Inmarsat Cooperation Agreement from operating in the L-Band outside of ITU Region 2. No such limitation exists.

5.     In any event, even if such a limitation existed in the Inmarsat Cooperation Agreement—it does not—it would be wholly irrelevant because AST, without question, is not taking an assignment of the Inmarsat Cooperation Agreement and did not agree to any such limitation. Instead, the AST Transaction merely permits AST to access certain of Ligado's spectrum usage rights in the United States and Canada. AST never agreed to drastically restrict its use of the L-Band in exchange for access to Ligado's rights. If such an extraordinary *quid pro quo* had been negotiated by the parties, Inmarsat would have disclosed such material advantage to its investors, Inmarsat and Ligado would have disclosed this critical term to the Court, and the Mediated Agreement would clearly and unambiguously memorialize such a monumental compromise. But none of that happened.

6.     In reality, Inmarsat **tried** to negotiate such limiting language, but AST and Ligado flatly and repeatedly rejected these attempts. During negotiations, Inmarsat proposed to include a limitation on AST's global operations in the L-Band in the Mediated Agreement twice. Given the global nature of its business, AST rejected this language in each iteration of the draft Mediated Agreement and any time it was raised in calls among the parties. The parties then agreed on the terms of the Mediated Agreement that was presented to the Court: Inmarsat would be obligated to support only AST and Ligado's initial applications to the FCC and ISED for the L-Band operations in North America if those applications state that AST and Ligado would operate the Proposed NGSO System consistent with the terms of the Inmarsat Cooperation Agreement. **Never** did the parties agree that AST would be precluded from ever operating in the L-Band outside of

the United States and Canada.  If this were true, the Mediated Agreement would have stated so expressly, but it does not.  Inmarsat's position is entirely inconsistent with the meticulous negotiation process that the Debtors undertook in good faith, the final deal reflected in the Mediated Agreement, and the Inmarsat Cooperation Agreement.

7.    Inmarsat's absurd position seeks to rewrite the carefully negotiated deal that is foundational to the Debtors' go-forward business and at the heart of their restructuring.  Inmarsat's position poses an existential threat both to the viability of the AST Transaction and the feasibility of the Plan.  The Court can resolve this dispute by requiring the parties to adhere to the plain language in the Mediated Agreement and AST Order.  Indeed, by simply including the exact wording of Sections 2 through 4 of the Mediated Agreement in the Amended Inmarsat Cooperation Agreement, the parties and the Court would be faithful to the terms of the Mediated Agreement (*see* footnote 6 thereof) and the AST Order.  Accordingly, the Court should enforce the AST Order and the Mediated Agreement by granting the Motion and entering the proposed Order.

## BACKGROUND

### I.    The Chapter 11 Cases

8.    On January 5, 2025, the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  The Debtors are authorized to continue operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these cases, and no committees have been appointed or designated.[7]

---

[7]    Further information regarding the Debtors' business, capital structure, and the facts and circumstances leading to the commencement of the chapter 11 cases is set forth in the *Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, In Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "First Day Declaration").

9.     As described in the First Day Declaration, the Debtors and the holders of their prepetition funded debt were able to successfully negotiate a balance sheet restructuring for the Debtors, as documented in the restructuring support agreement executed on January 5, 2025, which is attached as Exhibit B to the First Day Declaration (the "RSA").

## II.    The AST Transaction

10.     A critical component of the RSA and the restructuring contemplated thereby is a long-term commercial transaction between the Debtors and AST (the "AST Transaction").  The initial terms of the AST Transaction were set forth in a binding term sheet (the "AST Term Sheet"), attached as Exhibit B to the RSA.  The RSA required the Debtors and AST to work expeditiously to reach a final agreement on the definitive documentation with respect to the AST Transaction and secure its approval.  After months of careful negotiation, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Enter into the AST Definitive Documents and (II) Granting Related Relief* [Docket Nos. 352, 359] (the "AST Motion"), seeking Court approval of the AST Transaction and the related definitive documentation (the "AST Definitive Documents").

11.     Pursuant to the AST Transaction, the Debtors will, among other things, provide AST with usage rights with respect to certain of the Debtors' L-Band Spectrum rights and related assets and collaborate with AST to commercialize these L-Band Spectrum rights.  *See* First Day Decl. ¶ 15.  As set forth in the AST Definitive Documents, Ligado agreed to provide AST with such usage rights, subject to the measures and actions deemed necessary by Ligado to comply with its L-Band Licenses and, to the extent set forth in Exhibit 6 in the Collaboration Agreement (in the AST Definitive Documents), the operational and technical requirements necessary to ensure Ligado remains in compliance with, among other things, the Inmarsat Cooperation Agreement.

*See, e.g.,* AST Motion at Exhibit B, Section 2.1.  In exchange, AST will compensate Ligado, including by: (i) contributing certain warrants, convertible notes, and/or cash to the Debtors, (ii) making certain annual usage-right payments to the Debtors designed to cover the Debtors' costs under the Inmarsat Cooperation Agreement, and (iii) paying the Debtors a certain percentage of revenues derived from AST's use of the Debtors' spectrum rights.  *See id.*

12.     The AST Transaction provides the best available means to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Among other things, the AST Transaction provides (even as originally contemplated) a mechanism for the payment of the Debtors' obligations to Inmarsat under the Inmarsat Cooperation Agreement.  Accordingly, one would have expected Inmarsat to be in favor of the AST Transaction, but instead of embracing a transaction that provides only upside, on April 25, 2025, Inmarsat filed *Inmarsat Global Limited's Objection to Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into the AST Definitive Documents* [Docket No. 462] (the "Inmarsat Objection"), the sole objection to the AST Motion seeking to block the Debtors' only available path forward.

## III.    The Mediation

13.     Pursuant to the Court's March 31, 2025 order appointing a mediator [Docket No. 384], the Mediation Parties[8] engaged in mediation before Judge Robert Drain (Ret.) of all disputes related to the Inmarsat Cooperation Agreement, including the AST Motion and Inmarsat Objection.

14.     After months of hard-fought negotiations, the Mediation Parties reached a comprehensive resolution of all issues between the Debtors and Inmarsat.  Pursuant to the

---

[8]     The "Mediation Parties" are the Debtors, the Ad Hoc First Lien Group, the Ad Hoc Crossholder Group, AST, Inmarsat, and Viasat, Inc. ("Viasat").

Mediated Agreement, each Mediation Party—including Inmarsat—agreed to support the AST Transaction, including the Debtors' efforts to obtain Court approval of the AST Transaction.

15.     Of particular relevance to this dispute, during negotiations of the Mediated Agreement, Ligado and AST repeatedly rejected Inmarsat's efforts to limit AST's ability to obtain separate rights to operate in the L-Band outside of the United States and Canada.  Indeed, on May 21, 2025, Inmarsat proposed to insert a footnote into the Mediated Agreement that stated: "[t]he Proposed NGSO System will operate in L-Band only in North America, and only within Ligado's Spectrum assignments in any then-operative Spectrum Plan."  *See* Excerpts of Mediated Agreement Redlines, attached hereto as Exhibit B.  The next day, Ligado struck the entire footnote. *Id.*

16.     On May 23, 2025, Inmarsat tried again, reinserting a footnote that provided that "the Proposed NGSO System will be limited to North America."  *Id*.  Ligado revised the proposed language to provide that the "[u]se of the L-Band by the Proposed NGSO System **in North America** will be consistent with the Amended Inmarsat Cooperation Agreement and use of the Proposed NGSO System outside of North America will be subject to coordination with the other parties and regulators."  *Id*. (emphasis added).

17.     Following multiple conference calls among the parties, where AST explained in no uncertain terms why Inmarsat's language was unacceptable, the Mediation Parties agreed that, if the initial applications for regulatory approval in the United States and Canada meet certain criteria, Inmarsat will affirmatively support the requisite regulatory applications seeking authority to operate the Proposed NGSO System within the L-Band in North America.  In light of this concern, the Mediation Parties agreed to the following language within the section entitled, "Inmarsat Regulatory Support":

Solely with respect to the initial FCC and ISED applications for the Proposed NGSO System, such applications shall: (a) consistent with Inmarsat's exclusive rights vis-à-vis Ligado under the existing Inmarsat Cooperation Agreement, state that use of the L-Band by the Proposed NGSO System will comply with the Amended Inmarsat Cooperation Agreement, (b) with respect to the L-Band, be limited to Ligado's geographic coverage areas in North America specified in Exhibit L and Ligado's Spectrum assignments in the then-operative Spectrum Plan, (c) not include any S-band operations in the coverage area of the Inmarsat S-band network over Europe and North Africa, (d) not include service links or feeder links in the Ku-band or the Ka-band, and (e) provide that AST/Ligado and Inmarsat/Viasat will coordinate the Proposed NGSO System feeder links with any Inmarsat or Viasat NGSO system, provided that such Proposed NGSO System feeder links are in the same frequency band as Inmarsat/Viasat feeder links.  For the avoidance of doubt, the foregoing does not prohibit the initial FCC and ISED applications from requesting authority for other MSS, IMT-terrestrial or feeder link frequency bands or international operations and provision of service in those other bands.

Mediated Agreement at 2 n.7.

18.     In the Mediated Agreement, the Debtors and Inmarsat agreed to amend the Inmarsat Cooperation Agreement (the "Amended Inmarsat Cooperation Agreement") to incorporate sections 2 (providing for regulatory support of the Proposed NGSO System from Inmarsat), 3 (providing for a process resolving disputes about compliance with the technical, geographic or other limitations, or any claims of interference under the Amended Inmarsat Cooperation Agreement), and 4 (providing a cure payment schedule for amounts due under the Inmarsat Cooperation Agreement to Inmarsat) of the Mediated Agreement.  *See* Mediated Agreement at 2-7.  The Mediation Parties agreed that "Sections 2-4 [of the Mediated Agreement were] to be incorporated in the Amended Inmarsat Cooperation Agreement."  *See* Mediated Agreement at 2 n.6.

19.     The Mediated Agreement was submitted to the Court as Exhibit 1 to the revised proposed order granting the AST Motion [Docket No. 651].  On June 23, 2025, the Court held a hearing on the AST Motion and the Mediated Agreement at which Inmarsat's counsel urged the

Court to enter the AST Order, which the Mediated Agreement attached. Following the hearing, the Court issued an order granting the AST Motion, approving the Mediated Agreement, approving the AST Definitive Documents, and authorizing the Debtors to enter into and perform all obligations contemplated by the AST Definitive Documents. The AST Order expressly provides that "[t]he Mediated Agreement is approved in its entirety and the parties agree to perform in accordance with and be bound by the terms set forth therein." AST Order ¶ 6. It further provides that "[t]he Debtors and Inmarsat are authorized to enter into an amendment to the Inmarsat Cooperation Agreement on terms consistent with the term of this Order (including, for the avoidance of doubt, [the Mediated Agreement] attached hereto)." *Id*. ¶ 7.

20.    In addition, the AST Order authorizes the Debtors "to take all actions that are reasonably necessary or appropriate to effectuate the relief granted in [the AST] Order." *Id*. ¶ 12. Finally, the AST Order states that this Court "retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order, including enforcement of the Mediated Agreement." *Id*. ¶ 13.

21.    Following entry of the AST Order, the Debtors continued moving towards confirmation of the Plan. A hearing on confirmation of the Plan (the "Confirmation Hearing") was scheduled for August 7, 2025.

**IV.    Dispute Over the AST Order and Mediated Agreement**

22.    Suddenly, days before the Confirmation Hearing, Inmarsat made an outrageous demand—previously repeatedly rejected by AST and Ligado—to seize more than it had bargained for in the Mediated Agreement, threatening to upend the Debtors' restructuring efforts. On July 28, 2025, while negotiating the language to be used in the Amended Inmarsat Cooperation Agreement to incorporate Section 3 of the Mediated Agreement, Inmarsat took the position that

Ligado agreed to Inmarsat's exclusive use of the L-Band Spectrum globally outside of North America as between the parties in Inmarsat Cooperation Agreement, and AST, by extension, cannot seek to obtain separate rights, including through an agreement with another company, to operate in the L-Band outside of North America, meaning AST is forever prohibited from competing with Inmarsat in the L-Band outside of North America. *See Declaration of Douglas Smith in Support of the Debtors' Motion for An Order (I) Enforcing the AST Order and Mediated Agreement and (II) Granting Related Relief*, filed contemporaneously herewith (the "Smith Decl.") ¶ 13.

23.    Inmarsat's position is at best disingenuous. As Inmarsat is well aware, and as is provided in the Mediated Agreement, the applications Inmarsat is required to support must state that use of the L-Band Spectrum by the Proposed NGSO System in North America will comply with the Inmarsat Cooperation Agreement. But the fact that Ligado granted AST certain rights it had to operate in the L-Band within North America does not mean that AST is now prohibited from otherwise seeking rights outside of the Inmarsat Cooperation Agreement to operate in the L-Band outside of North America. The language of the Mediated Agreement is clear and lacks the anti-competitive prohibition Inmarsat now seeks to inject.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference of the United States District Court for the District of Delaware, dated as of February 29, 2012 and paragraph 13 of the AST Order ("[t]his Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order, including enforcement of the Mediated Agreement"). Indeed, the Court has authority to enforce its own orders. *See* 11 U.S.C. § 105(a)

and *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150 (2009) ("[W]here the plain terms of a court order unambiguously apply, as they do here, they are entitled to their effect.").

25.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

26.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

27.     The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.

## RELIEF REQUESTED

28.     By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (i) enforcing the AST Order and Mediated Agreement, (ii) prohibiting Inmarsat from inserting into the Amended Inmarsat Cooperation Agreement any terms or limitations not set forth in the Mediated Agreement; (iii) ordering Inmarsat to comply with its obligations under the AST Order and Mediated Agreement, including by entering into an Amended Inmarsat Cooperation Agreement that incorporates Sections 2-4 of the Mediated Agreement, and (iv) granting such other relief as the Court deems appropriate under the circumstances.

## ARGUMENT

**I.      Delaware Law Applies to the Present Dispute**

29.     Neither the AST Order nor the Mediated Agreement contain a choice of law provision.  Consequently, because the AST Order was entered in Delaware, the Court must look to Delaware's choice of law rules.  *See In re PHP Healthcare*, 128 Fed. Appx. 839, 843 (3d Cir.

2005) (applying the choice of law rules of state in which the bankruptcy court sits); *In re Old BPSUSH Inc.*, 589 B.R. 524, 531 (Bankr. D. Del. 2018) ("When choosing which state law governs a matter, a federal court must apply to choice-of-law rules of the forum state."). The first step for courts following Delaware choice of law rules is to compare the laws of the competing jurisdictions to determine "whether the laws actually conflict on a relevant point." *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773 (Del. Ch. 2014). If the "application of the competing laws would yield the same result, then no genuine conflict exists" and a court will decline to conduct a choice of law analysis. *Id.* The two relevant jurisdictions here are Delaware, where the AST Order was entered, and New York, where the mediation occurred and whose law governs the Inmarsat Cooperation Agreement. When examining issues relating to the interpretation of contracts, courts in Delaware and New York both follow the "four corners" rule. *Compare Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch.) (the court "will give priority to the parties' intentions as reflected in the four corners of the agreement construing the agreement as a whole and giving effect to all its provisions") *with Donohue v. Cuomo,* 164 N.Y.S.3d 39, 45 (2022) (noting that New York courts will generally not consider "[e]vidence outside the four corners of the document" and "'[t]he best evidence of what parties to a written agreement intend is what they say in their writing'"). Accordingly, because no genuine conflict of law exists, Delaware law applies to this conflict. *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising LLC*, 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010) ("[B]ecause the laws of the several interested states . . . would produce the same decision no matter which state's law is applied, there is no real conflict and a choice of law analysis would be superfluous. Thus, I analyze [the] claims under Delaware law").

30.     Under Delaware law, courts interpreting a contract will "read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).  "Absent ambiguity, the court 'will give priority to the parties' intentions as reflected in the four corners of the agreement construing the agreement as a whole and giving effect to all its provisions.'" *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch.).  A contract is ambiguous if it is "susceptible to more than one reasonable interpretation." *Manti Holdings,* 261 A.3d at 1208*.*  "An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'" *Id.* (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010)).  If parties disagree over interpretation of a contract, this alone does not render the contract ambiguous.  *Id.*

## II.     Neither the Mediated Agreement Nor the AST Order Precludes AST's Ability to Obtain Separate Rights to Operate the Proposed NGSO System in the L-Band Outside of North America

31.     Inmarsat must comply with the AST Order and the Mediated Agreement.  The plain language of the Mediated Agreement is unambiguous:  AST is not precluded from separately obtaining the right to operate the proposed NGSO system in the L-Band outside of North America.  When incorporating sections 2 through 4 of the Mediated Agreement into the Amended Inmarsat Cooperation Agreement, Inmarsat cannot insert words or concepts that are not in the Mediated Agreement and to which AST and Ligado did not, and do not, agree.  Inmarsat's position that the underlying Inmarsat Cooperation Agreement prohibits AST entirely from seeking to operate in the L-Band outside of North America is nothing more than a malicious attempt to manufacture a better deal for itself.  Neither the Mediated Agreement nor the Inmarsat Cooperation Agreement contain any such limitation on AST.  Inmarsat must abide by and perform its obligations under the AST Order and Mediated Agreement.

32.     Nothing in the AST Order or the Mediated Agreement limits AST's ability to separately seek rights to use the L-Band outside of the United States and Canada.  In relevant part, the Mediated Agreement requires Inmarsat to provide its cooperation and support in connection only with Ligado and AST's ***initial*** applications to the FCC and ISED for the Proposed NGSO System.  With respect to those initial applications, Ligado and AST agreed to provide Inmarsat and its outside regulatory counsel with redacted and unredacted copies, respectively, of the applications at the time they are filed.  As to those ***initial*** applications that Inmarsat is ***required*** to support, the Mediated Agreement includes a footnote that reads:

> ***Solely with respect to the initial FCC and ISED applications*** for the Proposed NGSO System, such applications shall: (a) consistent with Inmarsat's exclusive rights vis-à-vis Ligado under the existing Inmarsat Cooperation Agreement, state that use of the L-Band by the Proposed NGSO System will comply with the Amended Inmarsat Cooperation Agreement, (b) with respect to the L-Band, be limited to Ligado's geographic coverage areas in North America specified in Exhibit L and Ligado's Spectrum assignments in the then-operative Spectrum Plan[.]

Mediated Agreement at 2 n.7.

33.     Critically, the Mediated Agreement is clear that any geographic restrictions on the Proposed NGSO System to which Ligado and AST agreed is limited "***solely*** with respect to the ***initial*** FCC and ISED applications for the Proposed NGSO System" because those are the only applications Inmarsat is required to support and the only applications that are subject to any limitations provided for in the Mediated Agreement.  *See* Mediated Agreement at 2 (Inmarsat Regulatory Support) n.7 (emphasis added).  The parties' purpose in drafting footnote 7 was to set out the contours of the initial FCC and ISED applications that Inmarsat is required to support.

34.     With respect to the initial FCC and ISED applications, clause (a) of footnote 7 reads as follows:  "consistent with Inmarsat's exclusive rights vis-à-vis Ligado under the existing Inmarsat Cooperation Agreement, [the initial FCC and ISED applications for the Proposed NGSO

System shall] state that use of the L-Band by the Proposed NGSO System will comply with the Amended Inmarsat Cooperation Agreement[.]"  Mediated Agreement at 2 n.7.  This clause requires the *initial* application to state that the Proposed NGSO System will comply with the Inmarsat Cooperation Agreement.  Clause (b) of footnote 7 requires that the *initial* FCC and ISED applications for the Proposed NGSO System must, "with respect to the L-Band, be limited to Ligado's geographic coverage areas in North America specified in Exhibit L and Ligado's Spectrum assignments in the then-operative Spectrum Plan[.]"  This clause provides only that the *initial* FCC and ISED applications will be limited to seeking L-Band authorization in North America.

35.     Read together, the clauses of footnote 7 require only that the *initial* FCC and ISED applications state that use of the L-Band by the Proposed NGSO System (i) will be limited to North America and (ii) will comply with the Inmarsat Cooperation Agreement.  Nowhere does footnote 7 say what Inmarsat claims:  that AST agrees never to file other applications seeking authorization outside the scope of the Inmarsat Cooperation Agreement to operate a proposed NGSO system in the L-Band Spectrum outside of North America.

36.     As provided for in the Mediated Agreement, the regulatory applications filed by AST and Ligado will state that use of the L-Band Spectrum by the Proposed NGSO System will comply with the Inmarsat Cooperation Agreement.  But that in no way means that AST is prohibited from operating the proposed NGSO system in the L-Band outside of the United States and Canada if AST procures such L-Band rights from regulators or through other commercial agreements or transactions.   In reality, Inmarsat is seeking to rewrite the deal it agreed to.  *See* June 23, 2025 Hr'g Tr. [Docket No. 712] at 39:10-14 ("Your Honor, you heard Mr. Leblanc note that the stock price of AST has gone up after this transaction was noticed; publicly, Your Honor.

That only makes me feel like I gave up too much at this mediation since they are my economic counterparty.").  But unfortunately for Inmarsat, the Mediated Agreement must be enforced as written.

### III.    The Inmarsat Cooperation Agreement Does Not Preclude Ligado Nor AST From Operating in the L-Band in All Geographic Areas Outside of North America

#### A.    The Inmarsat Cooperation Agreement Governs Ligado and Inmarsat's Shared Use of L-Band Spectrum in ITU Region 2, Not Globally

37.    Inmarsat's position that both Ligado and AST are forever precluded from seeking L-Band rights anywhere on the globe outside of the United States and Canada is both disingenuous and extreme.  There is no basis for that position in the Mediated Agreement nor in the Inmarsat Cooperation Agreement.

38.    Both Ligado and Inmarsat hold licenses to use spectrum in the L-Band in ITU Region 2.  By its terms, the Inmarsat Cooperation Agreement governs how Inmarsat and Ligado coordinate to exercise and monetize those respective rights to operate in the L-Band spectrum in ITU Region 2.  Pursuant to the Inmarsat Cooperation Agreement, and Exhibit L thereto, Inmarsat and Ligado agreed that Ligado has certain rights to L-Band spectrum in Ligado Regions A and B, and Inmarsat has certain rights to the same spectrum in Inmarsat Regions A, A1 and B.  ████ ████████████████████████████████████████████[9]  In addition, Exhibit L to the Inmarsat Cooperation Agreement includes the following map, ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████[10]

---

[9]    Inmarsat Cooperation Agreement at Exhibit A.

[10]    Inmarsat Cooperation Agreement, Exhibit L, Appendix B (emphasis added).



39.     Importantly, the map above, which is consistent with the remainder of the Inmarsat Cooperation Agreement, displays **only** ITU Region 2 and ***does not*** show the other ITU Regions around the rest of the globe.  Indeed, Exhibit L is the representation of the L-Band Coordination Plan, which Ligado and Inmarsat "jointly developed" to "make more efficient use of the L-band spectrum and orbital resource in ITU Region 2."[11]  Compare the Exhibit L map with the image below, which is not from the Inmarsat Cooperation Agreement and shows all three ITU Regions.[12]  Accordingly, there can be no question that the Inmarsat Cooperation Agreement, including Exhibit L, is limited to ITU Region 2.



---

[11]   Inmarsat Cooperation Agreement § 3.3(a)(i).

[12]   *Frequency Bands Allocated to Terrestrial Broadcasting Services*, INT'L TELECOMM. UNION, https://www.itu.int/en/ITU-R/terrestrial/broadcast/Pages/Bands.aspx (last visited Aug. 13, 2025).

**B.    The Inmarsat Cooperation Agreement Does Not Preclude Ligado (Nor AST) From Obtaining Separate Rights to Operate in the L-Band Outside of ITU Region 2**

40.     It is not surprising that Exhibit L addresses only Region 2 given that the core operative provisions of the Inmarsat Cooperation Agreement regarding coordination between the parties include the following:

- The Parties' coordination of the operation of their respective L- band systems includes: (i) the use of spectrum by the [Ligado] Parties and Inmarsat *with respect to their North American operations* as set forth in [various spectrum plans]… (ii) ongoing agreement and coordination between the Parties relating to the development and maintenance of spectrum coordination, loan, re-use, assignment and/or other mechanisms to make available third party L-band spectrum or space segment capacity *in **ITU Region 2***… (iii) agreement on a comprehensive L-band Coordination Plan (as set out in … Exhibit L) that incorporates the Spectrum Plans … and specific parameters to which the Parties have already agreed; and (iv) agreement on the terms for operation of ATC *in **ITU Region 2***.[13]

- The Parties shall take all actions in support of (and none against) the *utilization of the L-band in **ITU Region 2*** as may be required pursuant to the terms of this Agreement or as may reasonably be requested by any Party in order to implement such terms.[14]

- Promptly following the Signing Date, the Parties agree to take all actions necessary to complete the transition of their respective agreed spectrum usage to the spectrum designations shown in the Phase 0 Spectrum Plan, *so that the L-band spectrum in ITU Region 2 will be made available for the Parties' respective use* in accordance with the Phase 0 Spectrum Plan.[15]

- Following the making of all payments up to and upon the Phase 1 Completion Date… each of the Parties shall maintain its respective rights of *use to spectrum in **ITU Region 2*** in accordance with the Phase 1 Spectrum Plan…or the Phase 1A Spectrum Plan…for so

---

[13]    *See* Section 3.1(a) of the Inmarsat Cooperation Agreement (emphasis added).

[14]    *See* Section 3.1(d) of the Inmarsat Cooperation Agreement (emphasis added).

[15]    *See* Section 3.2(a)(iv) of the Inmarsat Cooperation Agreement (emphasis added).

long as such Party (or its successor in interest) is an L-band MSS operator *in ITU Region 2*.[16]

41.     The Inmarsat Cooperation Agreement is replete with references to the parties' coordination of spectrum in ITU Region 2, and no provision in the Inmarsat Cooperation Agreement sets forth how the parties would divide or coordinate spectrum in other ITU Regions.[17] In fact, the only mention of global operations is to note that: ███████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████[18] Neither this provision nor anything else in the Inmarsat Cooperation Agreement in any way suggests that Ligado's ability to seek spectrum rights outside of ITU Region 2 would be affected in any way.

42.     Historically, Ligado's business using the L-Band Spectrum has been limited to North America, which is included in ITU Region 2.  Accordingly, the Inmarsat Cooperation Agreement established a mutually agreed upon spectrum plan under which Ligado and Inmarsat were each assigned their respective L-Band frequencies to the North American portions of ITU Region 2.  Ligado, however, was never *precluded* from operating in the L-Band outside of ITU Region 2 under the Inmarsat Cooperation Agreement or otherwise.

43.     Between execution of the original Inmarsat Cooperation Agreement in 2007 through last week, Inmarsat never took the position, to Ligado's knowledge, that the Inmarsat

---

[16]     *See* Section 3.2(b)(ii)(B) of the Inmarsat Cooperation Agreement (emphasis added).

[17]     ITU Regions 1 and 3 are mentioned only once in the entire Inmarsat Cooperation Agreement to state that the parties' cooperative efforts would also support "Inmarsat's efforts in ITU Region 1 and ITU Region 3."  *See* Section 5.5(f) of the Inmarsat Cooperation Agreement.

[18]     *See* Inmarsat Cooperation Agreement at Exhibit L, Section 1.1(c)(iv) (emphasis added).

Cooperation Agreement restricted Ligado's activities in the L-Band Spectrum in ITU Regions 1 and/or 3.  *See* Smith Decl. ¶ 6.[19]

44.     By way of example, in 2016, Inmarsat was aware of Ligado's discussions with third parties (coincidentally, including Viasat, which was then a separate company and a competitor of Inmarsat) to operate in the L-Band outside of Region 2.  *See* Smith Decl. ¶ 7-9.  Specifically, in August 2016, Ligado entered into an agreement (the "Ligado-Avanti Agreement") with a U.K.-based satellite operator, Avanti Communications ("Avanti").  *Id*.  The agreement with Avanti contemplated moving Ligado's mobile satellite ("MSAT") to an Avanti orbital slot to secure L-Band MSS spectrum for Ligado and Avanti's collective use in the L-Band ITU Regions 1 and 3. *Id*.

45.     Ligado specifically discussed the Ligado-Avanti Agreement and the anticipated benefits of the move contemplated by the agreement with Inmarsat.  *Id.* ¶ 9.  Inmarsat expressed to Ligado that Inmarsat believed it would be better-positioned in terms of spectrum access in an upcoming Operator Review Meeting without the Ligado-Avanti Agreement.  *Id.* ¶ 10.  Inmarsat inquired whether Ligado could terminate its commitments to Avanti.  *Id*.  Ligado agreed to do so with the understanding that Inmarsat would assist Ligado in securing global roaming for North American aviation customers and with various Ligado regulatory matters.  *Id*. ¶ 10, 11.

46.     Inmarsat never suggested, at any other time until now, that Ligado was precluded by the Inmarsat Cooperation Agreement from operating outside ITU Region 2.  Instead, Inmarsat asked Ligado not to move forward with this specific transaction and agreed to provide a benefit to

---

[19]   This understanding is further consistent with representations Inmarsat made at the time of entry into the Inmarsat Cooperation Agreement.    *See, e.g.*, Inmarsat Holdings Limited, Form 20-F, Apr. 29, 2008, https://www.sec.gov/Archives/edgar/data/1309689/000119312508095043/d20f.htm at 12 (Inmarsat reporting it had entered into the Inmarsat Cooperation Agreement to coordinate use of "L-band spectrum across the ***Americas***") (emphasis added) and at 18 (noting that "*[i]n Region 2*, Inmarsat has recently achieved coordination of its satellites covering that region with [Ligado].") (emphasis added).

Ligado for doing so.  If Inmarsat believed that Ligado was prohibited from operating in the L-Band outside of ITU Region 2, surely, it would have said so and would not have to provide consideration to Ligado to halt the discussions with Avanti.  It is only now, in the hopes of handicapping a global competitor and getting something it did not get at the negotiating table, that Inmarsat asserts that the Inmarsat Cooperation Agreement limits Ligado's ability to obtain separate rights to operate in the L-Band globally and that, therefore, the proposed NGSO system's L-Band operations are forever confined to North America.

47.     Effectively, through this tortured reading of the Inmarsat Cooperation Agreement, Inmarsat is seeking to squeeze an elephant through a mousehole.  At best—and even this should not be sanctioned for the reasons stated elsewhere in this Motion—if the Court were to accept Inmarsat's stretched interpretation of the Inmarsat Cooperation Agreement, Ligado and AST's agreement to be bound by the geographic limits in the Inmarsat Cooperation Agreement could potentially be read as limiting Ligado and AST's rights to obtain separate rights to operate in the L-Band in any portion of ITU Region 2.  The Inmarsat Cooperation Agreement cannot be read to set an outrageously broad restriction on Ligado and AST's ability to obtain separate rights to operate in the L-Band, particularly in the circumstances when this was requested and rejected.

### C.     The Exclusive Use Definition Does Not Create A Broad Agreement by Ligado (or AST) Not to Compete Outside of North America

48.     The Inmarsat Cooperation Agreement is just that:  an agreement to cooperate regarding the use of L-Band spectrum in ITU Region 2, because both Ligado and Inmarsat hold valid regulatory licenses to operate in such specified spectrum.  But now, because Inmarsat wishes in retrospect that the language of the Mediated Agreement was different, Inmarsat suggests that the definition of "Exclusive Use" in the Inmarsat Cooperation Agreement precludes Ligado (and

by extension, AST) from operating *any* satellites or serving *any* customers *anywhere* outside of North America in the L-Band.  That is a farcical and overly broad reading of the definition.

49.    Inmarsat Cooperation Agreement Exhibit L provides 

The Inmarsat Cooperation Agreement provides

.  To monetize the duly and dually licensed spectrum, Inmarsat and Ligado agreed to give each other clear, uninterrupted, and *Exclusive Use*, of certain portions of the shared spectrum.  The definition must be read in the context of the Inmarsat Cooperation Agreement: two parties agreeing to coordinate spectrum usage in specific regions in their designated frequency blocks in the L-Band.

50.    Inmarsat cannot credibly argue that the parties instead agreed to a broad non-compete.  For example, if a third party had valid rights to operate in the L-Band spectrum in Europe, Inmarsat cannot credibly argue that Ligado (or AST) would be prevented from acquiring such third party rights and thus obtaining the rights to operate in the L-Band Spectrum in Europe.  Accordingly, the Inmarsat Cooperation Agreement cannot and does not limit a party from obtaining rights to use spectrum anywhere in the world, including in other specific blocks of the L-Band, to the extent those rights are procured pursuant to some other agreement or arrangement and not in reliance on the Inmarsat Cooperation Agreement. Indeed, nothing in the Inmarsat Cooperation Agreement supports the notion that the Exclusive Use definition was intended to extend beyond the Inmarsat Cooperation Agreement itself.  Therefore, the Exclusive Use

definition is not an exceptionally broad non-compete agreement, but rather an allocation of rights for exclusive use of specific shared L-Band Spectrum in Region 2, without regard to any other agreements into which either party may enter.[20]

## IV.    Inmarsat's Assertion Is Inconsistent with the Parties' Mediated Agreement

51.    Regardless of how the geographic limitations in the Inmarsat Cooperation Agreement are interpreted, the parties' specific negotiations leading to the final Mediated Agreement made Ligado's and AST's position entirely clear:  neither Ligado nor AST would agree to limit L-Band operation of the Proposed NGSO System to North America.  Inmarsat repeatedly proposed limiting AST's global operations in the L-Band to North America, and Ligado and AST expressly rejected this proposal.  It was flatly rejected during conference calls among principals and advisors and it was flatly rejected each time Ligado and AST commented on Inmarsat's proposed language for the Mediated Agreement.  Indeed, the final language of the Mediated Agreement unequivocally reflects Ligado's and AST's consistent position, and Inmarsat cannot now argue otherwise. [21]

---

[20]    Even if the Exclusive Use definition within Exhibit L is read to transform the Inmarsat Cooperation Agreement into a non-compete agreement (which it should not), such a non-compete agreement would not apply beyond ITU Region 2.  The Inmarsat Cooperation Agreement between Ligado and Inmarsat governs only the L-Band usage in ITU Region 2.  ITU Region 2 and North America are routinely referenced throughout the agreement.  For example, the recitals provide that "the Parties wish to provide for greater certainty with respect to satellite coordination of the L-band *for North American operations* . . . ."  Inmarsat Cooperation Agreement at Recitals (emphasis added).

[21]    Ligado notes the drafting history to permit the Court to interpret and enforce the binding Mediated Agreement and for no other purpose.  Such is the normal course for contract interpretation and Ligado should not be precluded from enforcing the binding agreement.  *See Reynolds v. Knox Cnty. Gov't*, 2019 WL 13334792 (E.D. Tenn. Mar. 28, 2019) (plaintiff's use of evidence related to parties' mediation in their first lawsuit was not barred by Rule 408, because evidence was not proffered to establish liability, but to interpret parties' Rule 68 judgment).  Indeed, Federal Rule of Evidence 408 only prohibits the introduction of evidence of compromise offers or negotiations made during the course of mediation "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  Fed. R. Evid. 408; *see also Coakley & Williams Const., Inc. v. Structural Concrete Equip., Inc.*, 973 F.2d 349, 353 (4th Cir. 1992) ("settlement offers are only inadmissible when offered to prove liability or damages."); *Gestetner Holdings, PLC v. Nashua Corp.*, 784 F. Supp. 78, 83 n.4 (S.D.N.Y. 1992) (admitting parties' interpretation of contract prior to litigation because settlement discussions only evidenced practical, pre-litigation understanding of contract).  Delaware Rule 9019-5 serves the same

52.     As detailed above, footnote 7 states that Inmarsat will affirmatively support the required initial regulatory applications to enable the Proposed NGSO System within the L-Band in North America.  Inmarsat sought to include language in that footnote that would have limited AST and the proposed NGSO system's operations to the L-Band within North America *only*, even outside the context of the initial FCC/ISED applications that Inmarsat would be required to support.  AST rejected this extreme position given AST's interest to obtain separate rights to operate in the L-Band outside of North America in the future.

53.     Specifically:

- **May 22, 2025:**  As shown below, Ligado **deletes** entirely a proposed footnote that stated, "[t]he Proposed NGSO System will operate in L-Band only in North America, and only within Ligado's Spectrum assignments in any then-operative Spectrum Plan.."

  ~~6  The Proposed NGSO System will operate in L-Band only in North America, and only within Ligado's Spectrum assignments in any then-operative Spectrum Plan.  The Proposed NGSO System feeder links will not be in the Ku-band or the Ka-band.  AST will coordinate the Proposed NGSO System feeder links with any Inmarsat or Viasat NGSO system.~~

- **May 23, 2025:**  Inmarsat once again added a new footnote, this time providing that: "The L-band operations of the Proposed NGSO System will be limited to North America . . . ."

- **May 24 and 25, 2025:**  Ligado revised the proposed footnote to state that "[u]se of the L-Band by the Proposed NGSO System in North America will comply with the Amended Inmarsat Cooperation Agreement, *and use of the Proposed NGSO System outside of North America* will be subject to AST entering into voluntary commercial and/or coordination agreements with existing operators.  . . ."

- **May 27, 2025:**  Inmarsat revised the footnote to state: "Consistent with Inmarsat's exclusive rights vis-à-vis Ligado under the existing Inmarsat Cooperation, use of the L-Band by the Proposed NGSO System will comply

purpose to encourage resolution and protect parties in the event of an unsuccessful mediation from having their statements used against them in connection with the underlying dispute.  Mediation privilege cannot be used to prevent the ordinary and usual application of basic principles of contractual interpretation where there is a dispute between parties about what was agreed to in a contact negotiation that happened to take place in the context of a mediation.  Settlement contracts should not be less amenable to enforcement against a breaching party than any other form of contract because the negotiations were in mediation.  Accepting that interpretation of the mediation privilege would make mediation less valuable, not more.

with the Amended Inmarsat Cooperation Agreement, and will be limited to Ligado's geographic coverage areas in North America specified in Exhibit L and Ligado's Spectrum assignments in the then-operative Spectrum Plan. . . .."

- **May 27, 2025 and FINAL version**: Ligado revised the footnote to state: "Solely with respect to the initial FCC and ISED applications for the Proposed NGSO System, such applications shall: (a) consistent with Inmarsat's exclusive rights vis-à-vis Ligado under the existing Inmarsat Cooperation Agreement, state that use of the L-Band by the Proposed NGSO System will comply with the Amended Inmarsat Cooperation Agreement, (b) with respect to the L-Band, be limited to Ligado's geographic coverage areas in North America specified in Exhibit L and Ligado's Spectrum assignments in the then-operative Spectrum Plan, . . .."

54.     Between May 28, 2025, and June 9, 2025, no further changes were made to the footnote.  On June 10, 2025, Inmarsat made the final edit, by adding the words "in those bands" to the last sentence.

55.     It is apparent from the history of these negotiations that Inmarsat sought to restrict AST from operating the proposed NGSO system in the L-Band outside North America, and Ligado and AST *consistently and emphatically* declined to be bound in such a manner.  The fact that Inmarsat sought to add this limiting language makes several conclusions crystal clear:  (a) Inmarsat knew that the Inmarsat Cooperation Agreement did not impose this broad geographic limitation on Ligado, otherwise it would not have to be added; (b) Inmarsat tried to get AST to agree to be bound by this broad geographic limitation but failed to get it in the negotiations; and (c) Inmarsat's new contention, that the extreme geographic limitation should somehow be implied from other terms of the Mediated Agreement, is simply wrong.  The parties clearly did not alter the fundamental aspect of AST's global business in the Mediated Agreement.  Inmarsat, grasping for a better deal, now attempts to abandon the careful balance struck in the Mediated Agreement to further its anticompetitive goals.  This Court should see Inmarsat's actions for what they are: a last-ditch attempt to obtain more than what it bargained for.

## NO PRIOR REQUEST

56.     No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

57.     The Debtors will provide notice of this Motion to:  (i) the Office of the U.S. Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iii) Foley & Lardner LLP, as counsel to U.S. Bank National Association, in its capacities as Prepetition First Lien Notes Trustee, Prepetition First Lien Notes Collateral Trustee, First Lien Collateral Trustee, First Lien Representative, Prepetition First Lien Loan Administrative Agent, Prepetition First Lien Loan Collateral Agent, Prepetition 1.5 Lien Administrative Agent, Prepetition 1.5 Lien Collateral Agent, Initial Additional Pari Collateral Agent, Initial Additional Authorized Representative for the Notes Secured Parties, Senior Collateral Trustee, Junior Lien Representative, Junior Collateral Trustee, and DIP Agent; (iv) Seward & Kissel LLP, as counsel to Wilmington Savings Fund Society, in its capacity as Prepetition Second Lien Trustee and Prepetition Second Lien Collateral Trustee; (v) Sidley Austin LLP, as counsel to the Ad Hoc First Lien Group; (vi) Kirkland & Ellis LLP, as counsel to an Ad Hoc Cross-Holder Group; (vii) the Federal Communication Commission; (viii) the United States Securities and Exchange Commission; (ix) the Internal Revenue Service; (x) the state attorneys general for all states in which the Debtors conduct business; (xi) the U.S. Trustee; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that that the motion notice requirements have been satisfied, and that no further notice is required under the circumstances

## <u>CONCLUSION</u>

58.     For the foregoing reasons, the Court should enter an order substantially in the form attached hereto as Exhibit A, (i) enforcing the AST Order and Mediated Agreement, (ii) prohibiting Inmarsat from inserting into the Amended Inmarsat Cooperation Agreement any terms or limitations not set forth in the Mediated Agreement; (iii) ordering Inmarsat to perform its obligations  under the AST Order and Mediated Agreement, including entering into an Amended Inmarsat Cooperation Agreement that incorporates Sections 2-4 of the Mediated Agreement, and (iv) granting such other relief as the Court deems appropriate under the circumstances.

Dated: August 14, 2025                 */s/ Michael J. Merchant*
Wilmington, Delaware               Mark D. Collins, Esq. (Bar No. 2981)
Michael J. Merchant, Esq. (Bar No. 3854)
Amanda R. Steele, Esq. (Bar No. 5530)
Emily R. Mathews, Esq. (Bar No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701
Email:       collins@rlf.com
              merchant@rlf.com
              steele@rlf.com
              mathews@rlf.com

-and-

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Matthew L. Brod, Esq. (admitted *pro hac vice*)
Lauren C. Doyle, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:   (212) 530-5000
Facsimile:   (212) 530-5219
Email:       ddunne@milbank.com
              mbrod@milbank.com
              ldoyle@milbank.com

Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
Melanie Westover Yanez, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
1101 New York Avenue, NW
Washington DC 20005
Telephone:   (202) 835-7500
Facsimile:   (202) 263-7586
Email:       aleblanc@milbank.com
              mwyanez@milbank.com

*Co-Counsel for Debtors in Possession*