**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| LIGADO NETWORKS LLC, *et al.*,[1] | ) Case No. 25-10006 (TMH) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) |

**DEBTORS' MEMORANDUM OF LAW
IN SUPPORT OF CONFIRMATION OF JOINT
CHAPTER 11 PLAN OF LIGADO NETWORKS LLC
AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).  The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

# TABLE OF CONTENTS

**Page**

Preliminary Statement..................................................................................................... 1

Argument ......................................................................................................................... 5

I.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE
BANKRUPTCY CODE.............................................................................................. 5

    A.    The Plan Complies with the Applicable Provisions of Section 1129(a)(1)
of the Bankruptcy Code. ................................................................................. 5

        1.    The Plan Satisfies the Classification Requirements of Section 1122
of the Bankruptcy Code. ...................................................................... 6

        2.    The Plan Satisfies Section 1123(a) of the Bankruptcy Code..................... 7

            i.    Designation of Classes of Claims and Interests
(§ 1123(a)(1))........................................................................... 7

            ii.    Specification of Unimpaired Classes (§ 1123(a)(2)) ...................... 7

            iii.    Treatment of Impaired Classes (§ 1123(a)(3))................................ 7

            iv.    Equal Treatment Within Classes (§ 1123(a)(4))............................. 8

            v.    Means for Implementation (§ 1123(a)(5)) ..................................... 8

            vi.    Issuance of Non-Voting Equity Securities (§ 1123(a)(6))............... 8

            vii.    Directors and Officers (§ 1123(a)(7)) ............................................ 9

        3.    The Plan Complies with the Discretionary Provisions of Section
1123(b) of the Bankruptcy Code.......................................................... 9

    B.    The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code. ............... 10

        1.    The Debtors Complied with Section 1125 of the Bankruptcy Code. ....... 10

        2.    The Debtors Complied with Section 1126 of the Bankruptcy Code. ....... 11

    C.    The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code. ............... 12

    D.    The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code. ............... 14

    E.    The Plan Complies with Section 1129(a)(5) of the Bankruptcy Code. ............... 14

    F.    Section 1129(a)(6) of the Bankruptcy Code Does Not Apply to the Plan............ 15

    G.    The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code. ............... 15

    H.    The Plan Satisfies Section 1129(a)(8) of the Bankruptcy Code. .......................... 17

    I.    The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code. ............... 17

    J.    The Plan Complies with Section 1129(a)(10) of the Bankruptcy Code. .............. 18

    K.    The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code. .............. 19

L.  The Plan Provides for the Payment of Statutory Fees Pursuant to Section 1129(a)(12) of the Bankruptcy Code. ................................... 21

M.  Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Inapplicable. ................ 22

N.  The Plan Complies with Section 1129(c) Because the Plan Is the Only Plan Filed in These Chapter 11 Cases. ................................................. 22

O.  The Plan Complies with the Other Applicable Provisions of Section 1129. ........ 22

II.   THE PLAN'S RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS ARE CONSISTENT WITH SECTION 1123(b) OF THE BANKRUPTCY CODE. ................................................................................................................. 22

A.  The Debtor Releases Are Appropriate. ................................................. 23

B.  The Third-Party Releases Are Appropriate. ......................................... 27

C.  The Exculpation Provision Is Appropriate. ......................................... 30

D.  The Injunction Provision Is Appropriate. ........................................... 31

III.  THE PLAN AS MODIFIED SATISFIES THE APPLICABLE REQUIREMENTS. ................................................................................... 31

IV.  THE UST OBJECTION SHOULD BE OVERRULED. ................................... 32

A.  The Plan Is Feasible. ....................................................................... 33

B.  A Potentially Extended Period Between Confirmation and the Effective Date Does Not Preclude Confirmation of the Plan. ................................. 37

C.  The Third-Party Releases Are Consensual and Comply with Applicable Law. ............................................................................................... 41

1.  Federal Law, Rather Than State Contract Law, Governs Whether Third-Party Releases in a Chapter 11 Plan Are Consensual. ................... 41

2.  Opt-Outs Continue to Be Valid, and the Third-Party Releases Are Consensual. ................................................................................ 46

3.  The Third-Party Releases Are Not "Prospective." ................................. 48

D.  The Injunction Provision Is Necessary and Customary. ........................ 48

V.   RESERVATION OF RIGHTS WITH RESPECT TO CONFIRMATION OBJECTIONS. ................................................................................... 49

VI.  CONCLUSION. ................................................................................ 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................42

*In re Affiliated Foods, Inc.*,
    249 B.R. 770 (Bankr. W.D. Mo. 2000) ..............................................................16

*In re Aleris Int'l, Inc.*,
    No. 09–10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ........6, 24

*In re Am. Cap. Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012) ..........................................................................19, 35

*In re Ambac Fin. Grp., Inc.*,
    No. 10-15973 (SCC) (Bankr. S.D.N.Y. May 1, 2013) [Docket No. 1308] ............38

*In re AMR Corp.*,
    No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 12, 2013) [Docket No. 10205] ........38

*In re Armstrong World Indus., Inc.*,
    348 B.R. 136 (D. Del. 2006) ..............................................................................6

*Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*,
    No. 19-11589 (JTD), 2020 WL 5409002 (D. Del. Sept. 9, 2020) ..........................13

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) ........................................................................................16

*In re Basic Fun, Inc.*,
    No. 24-11432 (CTG) (Bankr. D. Del. Sept. 24, 2024) [Docket No. 218] ..............45

*In re CareMax, Inc.*,
    No. 24-80093 (MVL) (Bankr. N.D. Tex. Jan. 28, 2025) [Docket No. 572] ............28

*Como v. Com. Oil Co.*,
    607 F. Supp. 335 (S.D.N.Y. 1985) ......................................................................42

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ....................................................................25

*In re Cumulus Media Inc.*,
    No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) [Docket No. 769] ............39

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ................................................................16

*In re Diamond Sports Grp., LLC*,
    No. 23-90116 (CML) (Bankr. S.D. Tex. Oct. 8, 2024) [Docket No. 2515] ..........................45

*In re Digit. Media Sols., Inc.*,
    No. 24-90468 (ARP) (Bankr. S.D. Tex. Jan. 15, 2025) [Docket No. 663]..........................28

*Ellis v. Westinghouse Elec. Co.*,
    11 F.4th 221 (3d Cir. 2021) ......................................................................39

*In re Extraction Oil & Gas, Inc.*,
    No. 20-11548 (CSS) (Bankr. D. Del. Dec. 22, 2020) [Docket No. 1534]..........................43

*In re Fisker, Inc.*,
    No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) [Docket No. 706]..............28, 46, 47, 49

*In re Frontier Commc'ns Corp.*,
    No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 648] ..........................39

*In re FTX Trading Ltd.*,
    No. 22-11068 (JTD) (Bankr. D. Del. Aug. 23, 2024) [Docket No. 23610]..........................45

*In re G-1 Holdings Inc.*,
    420 B.R. 216 (Bankr. D.N.J. 2009) .................................................................5

*In re GigaMonster Networks, LLC*,
    No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024) [Docket No. 888]..........................28, 48

*In re GOL Linhas Aéreas Inteligentes S.A.*,
    __ B.R. __, 2025 WL 1466055 (Bankr. S.D.N.Y. May 22, 2025) ...................................28, 43

*In re GTT Commc'ns, Inc.*,
    No. 21-11880 (MEW) (Bankr. S.D.N.Y. Oct. 31, 2021) [Docket No. 20]..........................39

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024).................................................................. *passim*

*In re iHeartMedia, Inc.*,
    No. 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) [Docket No. 2525]..........................39, 40

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ........................................................ *passim*

*In re Intelsat S.A.*,
    No. 20-32299 (KLP) (Bankr. E.D. Va. Aug. 24, 2021) [Docket No. 2693]..........................39

*In re Inter Urb. Broad. of Cincinnati, Inc.*,
    Nos. 94-2382, 94-2383, 1994 WL 646176 (E.D. La. Nov. 16, 1994) .....................................38

*In re J. Register Co.*,
    407 B.R. 520 (Bankr. S.D.N.Y 2009) ....................................................................................20

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) .......................................................................................5

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 636 (2d Cir. 1988) ....................................................................................................19

*In re Krueger*,
    66 B.R. 463 (Bankr. S.D. Fla. 1986) ........................................................................................41

*In re LaVie Care Ctrs., LLC*,
    No. 24-55507 (PMB), 2024 WL 4988600 (Bankr. N.D. Ga. Dec. 5, 2024) ...............28, 44, 45

*In re LBI Media, Inc.*,
    No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) [Docket No. 839] ..................................38

*In re Ligado Networks LLC*,
    No 25-10006 (TMH) (Bankr. D. Del. June 23, 2025) [Docket No. 712] ...................37, 38, 39

*In re LightSquared Inc.*,
    No. 12-12080 (SCC) (Bankr. S.D.N.Y Mar. 27, 2015) [Docket No. 2276] .....................39, 40

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) .........................................................................................42

*In re Number Holdings, Inc.*,
    No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) [Docket No. 1733] ...........................28, 49

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) ...........................................................................................5

*In re OneWeb Glob. Ltd.*,
    No. 20-22437 (RDD) (Bankr. S.D.N.Y. Sept. 1, 2020) [Docket No. 534]..............................39

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)....................................................................................................29, 42

*In re Potomac Iron Works, Inc.*,
    217 B.R. 170 (Bankr. D. Md. 1997) .........................................................................................41

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D. Del. 1998) .........................................................................................13

*In re Premiere Network Servs., Inc.*,
   No. 04-33402-HDH-11, 2005 WL 6443624 (Bankr. N.D. Tex. July 1, 2005)......................41

*In re Presperse Corp.*,
   No. 24-18921 (MBK) (Bankr. D.N.J. Sept. 25, 2024) [Docket No. 66]................................45

*In re PRM Family Holding Co.*,
   No. 13-09026 (BKM) (Bankr. D. Ariz. Mar. 18, 2016) [Docket No. 1573] ..........................38

*In re Prudential Energy Co.*,
   58 B.R. 857 (Bankr. S.D.N.Y. 1986)......................................................................................20

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)......................................................................................24, 30, 31

*In re Robertshaw US Holding Corp.*,
   662 B.R. 300 (Bankr. S.D. Tex. 2024) ...................................................................................28

*In re S B Bldg. Assocs. Ltd. P'ship*,
   621 B.R. 330 (Bankr. D.N.J. 2020) ........................................................................................21

*In re Seaplane Debtor 1 Inc.*,
   No. 24-10703 (CTG) (Bankr. D. Del. Oct. 28, 2024) [Docket No. 581]................................45

*In re Sears Holdings Corp.*,
   No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2019) [Docket No. 5395] ...........................37

*In re Smallhold, Inc.*,
   665 B.R. 704 (Bankr. D. Del. 2024) ..................................................................................47, 48

*In re Spirit Airlines, Inc.*,
   668 B.R 689 (Bankr. S.D.N.Y. 2025) .....................................................................................28

*In re Steward Health Care Sys., LLC*,
   No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) [Docket No. 5724] .........................37

*In re Sunpower Corp.*,
   No. 24-11649 (CTG) (Bankr. D. Del. Oct. 15, 2024) [Docket No. 787]................................45

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ..........................................................................5, 34, 35

*In re Teligent, Inc.*,
   282 B.R. 765 (Bankr. S.D.N.Y. 2002).....................................................................................42

*In re The Container Store Grp., Inc.*,
   No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) [Docket No. 181]............................28

*In re Trenton Ridge Invs., LLC*,
    461 B.R. 440 (Bankr. S.D. Ohio 2011) ................................................................33

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *modified*, 464 B.R. 208 (Bankr. D. Del.
    2011) ......................................................................................19, 23, 34, 35

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*,
    426 B.R. 114 (Bankr. D. Del. 2010) ..............................................23, 24, 27

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ......................................................................19

*In re W.R. Grace & Co.*,
    No. 01-01139 (KJC) (Bankr. D. Del. Feb. 13, 2014) [Docket No. 31732] ...........................38

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .........................................23, 24, 27

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015) ..........................................................41, 42, 47, 48

*In re Wesco Aircraft Holdings, Inc.*,
    No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024) [Docket No. 2502] .............43, 45

*In re Wheel Pros, LLC*,
    No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) [Docket No. 257]...............28, 49

*In re Windstream Holdings, Inc.*,
    No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 14, 2020) [Docket No. 1813] .............39

*In re Yates Dev., Inc.*,
    258 B.R. 36 (Bankr. M.D. Fla. 2000) ......................................................41

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ............................................13, 25, 27

**Statutes**

11 U.S.C. § 1122(a) .............................................................................6

11 U.S.C. § 1123(a) ........................................................................7, 8, 9

11 U.S.C. § 1123(b) ......................................................................9, 10, 22

11 U.S.C. § 1125 ......................................................................10, 11, 42

11 U.S.C. § 1126 ............................................................................11, 12

11 U.S.C. § 1127(a) ...................................................................................................31, 32

11 U.S.C. § 1129(a)(1) .................................................................................................5, 10

11 U.S.C. § 1129(a)(2) ...............................................................................................10, 12

11 U.S.C. § 1129(a)(3) ...............................................................................................12, 13

11 U.S.C. § 1129(a)(4) .....................................................................................................14

11 U.S.C. § 1129(a)(5) ...............................................................................................14, 15

11 U.S.C. § 1129(a)(6) .....................................................................................................15

11 U.S.C. § 1129(a)(7) .........................................................................................15, 16, 17

11 U.S.C. § 1129(a)(8) .....................................................................................................17

11 U.S.C. § 1129(a)(9) .........................................................................................17, 18, 33, 37

11 U.S.C. § 1129(a)(10) .............................................................................................18, 19

11 U.S.C. § 1129(a)(11) .................................................................................19, 20, 21, 33

11 U.S.C. § 1129(a)(12) .............................................................................................21, 22

11 U.S.C. § 1129(a)(13) .....................................................................................................22

11 U.S.C. § 1129(a)(13)-(16) .............................................................................................22

11 U.S.C. § 1129(c) ...........................................................................................................22

11 U.S.C. § 1129(d) ...........................................................................................................22

47 U.S.C. § 405(a) .............................................................................................................35

**Other Authorities**

U.S. Const., art. I, § 8, cl. 4............................................................................................43

Fed. R. Bankr. P. 3017(d) ...............................................................................................42

Fed. R. Bankr. P. 3019(a) ...............................................................................................32

Fed. R. Civ. P. 12(h), 55(a) ............................................................................................42

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. (1977) .............................................5, 10, 43

S. Rep. No. 95-989, 95th Cong. 2nd Sess. (1978) ............................................................5

The above-captioned debtors and debtors in possession (the "Debtors") submit this memorandum of law in support of confirmation of the *Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession*, filed on June 24, 2025 [Docket No. 696] (as modified, amended, or supplemented from time to time, the "Plan").[1]  In further support of the confirmation of the Plan, the Debtors rely upon, and incorporate herein by reference, the following declarations filed contemporaneously herewith, (i) the *Declaration of Douglas Smith in Support of Confirmation of the Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession* (the "Smith Declaration"), (ii) the *Declaration of Michael Healy in Support of Confirmation of the Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession*, and (iii) the *Declaration of Jeriad R. Paul Regarding the Solicitation and Tabulation of Votes on, and Elections to Opt Out of the Third Party Release Contained in, the Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession* (the "Voting Declaration"), and respectfully represent as follows:

### Preliminary Statement

1.     The Plan is the culmination of months of significant efforts and hard fought, arms'-length negotiations amongst the Debtors, the parties to the Restructuring Support Agreement, and other key parties in interest to implement a value-maximizing transaction with AST, which is the cornerstone of the Plan.  The AST Transaction allows the Debtors to capitalize on the value of their L-band Mobile Satellite Services ("MSS") spectrum and related assets—maximizing value for all of its stakeholders—while enabling a space-based broadband network for direct-to-device and Internet of Things services with the potential to expand mobile connectivity across the United

---

[1]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the *Disclosure Statement for the Joint Chapter 11 Plan of Ligado Networks LLC and Its Affiliated Debtors and Debtors in Possession* [Docket No. 697] (the "Disclosure Statement"), or the order approving the Disclosure Statement [Docket No. 694] (the "Disclosure Statement Order"), as applicable.

States and Canada.  The Plan enjoys the widespread support of the Debtors' creditors and equity holders.  Importantly, every Impaired Class voted to accept the Plan. *See* Voting Decl., Ex. A.

2.      This widespread support for the Plan is unsurprising, given the significant value to be achieved through the AST Transaction and the Consenting Stakeholders' (who are party to the Restructuring Support Agreement) support therefor.  To ensure the successful outcome of these Chapter 11 Cases and the AST Transaction, the Consenting Stakeholders have provided the DIP Loans, which will be converted into the Exit First Lien Loans upon the Effective Date, and negotiated a Plan that provides that holders of General Unsecured Claims will be paid in full and holders of junior preferred and common equity retain their Interests.  This unique Plan structure maximizes recoveries to all of the Debtors' stakeholders and will enhance the financial viability of the Debtors post-emergence.  In addition, over the last seven months, the Debtors and the Consenting Stakeholders have worked with other parties in interest to resolve contentious disputes ensuring the success of the Plan and setting the stage for regulatory approval of the AST Transaction and the future success of the Company.  The value and benefits provided to the Debtors' stakeholders through the implementation of the Plan and the AST Transaction are incontrovertible and bolstered by the fact that not a single economic stakeholder has formally objected to the Plan.

3.      The Debtors filed their initial plan and related disclosure statement [Docket Nos. 348, 349], as well as a motion seeking approval of the Disclosure Statement and of the proposed solicitation procedures [Docket No. 350] (the "Disclosure Statement Motion") on March 22, 2025.  On June 13, 2025, the Debtors filed a revised plan and disclosure statement [Docket Nos. 652, 653].  On June 24, 2025, the Court entered the Disclosure Statement Order [Docket No. 694], which, among other things, approved the adequacy of the Disclosure Statement and set

certain dates and deadlines related to the confirmation of the Plan.  Shortly thereafter, the Debtors filed the solicitation version of the Plan and the Disclosure Statement [Docket Nos. 696, 697].

4.      Following entry of the Disclosure Statement Order, the Debtors directed their voting agent, Omni Agent Solutions, Inc. ("Omni") to commence solicitation of votes on the Plan. Omni distributed copies of the Confirmation Hearing Notice and links to access the Plan, the Disclosure Statement, the Disclosure Statement Order, the applicable Ballots, and related materials (collectively, the "Solicitation Package") to the holders of Claims in Classes 3 (First Lien Claims), 4 (1.5 Lien Term Loan Claims), 5 (Second Lien Notes Claims), 9 (Existing Series A-0 Preferred Units), and 10 (Existing Series A-1 Preferred Units) (collectively, the "Voting Classes") and a copy of the Notice of Non-Voting Status to the holders of Claims in other Classes (the "Non-Voting Classes").  *See Affidavit of Service* [Docket No. 736] (the "Solicitation Affidavit").  Omni also had the Publication Notice published in *The New York Times* and in *USA Today* on June 27, 2025.  *See Proof of Publication* [Docket No. 728] (the "Publication Affidavit").  The Voting Deadline was July 24, 2025, at 4:00 p.m. (prevailing Eastern Time), as was the deadline to file objections to confirmation of the Plan (the "Voting Deadline"), unless extended by the Debtors in accordance with the Disclosure Statement Order.

5.      The Voting Declaration shows the following voting results:

| | Accept | | Reject | |
|---|---|---|---|---|
| | **Number (% of Number)** | **Amount (% of Amount)** | **Number (% of Number)** | **Amount (% of Amount)** |
| **Class 3 – First Lien Claims** | 236 *(99.578%)* | $5,496,239,925.56 *(99.996%)* | 1 *(.422%)* | $203,227.00 *(0.004%)* |
| **Class 4 – 1.5 Lien Term Loan Claims** | 113 *(100%)* | $528,406,470.34 *(100%)* | 0 *(0%)* | $0.00 *(0%)* |

| | Accept | | Reject | |
|---|---|---|---|---|
| | **Number**<br>*(% of*<br>*Number)* | **Amount**<br>*(% of Amount)* | **Number**<br>*(% of*<br>*Number)* | **Amount**<br>*(% of*<br>*Amount)* |
| **Class 5 – Second Lien Note Claims** | 132<br>*(100%)* | $2,040,981,762.00<br>*(100%)* | 0<br>*(0%)* | $0.00<br>*(0%)* |
| **Class 9 – Series A-0 Preferred Units** | 31<br>*(100%)* | $19,197,292.25<br>*(100%)* | 0<br>*(0%)* | $0.00<br>*(0%)* |
| **Class 10 – Series A-1 Preferred Units** | 14<br>*(100%)* | $13,359,803.04<br>*(100%)* | 0<br>*(0%)* | $0.00<br>*(0%)* |

6.     The hearing to consider confirmation of the Plan is currently scheduled for September 3, 2025, at 3:00 p.m. (prevailing Eastern Time) (the "Confirmation Hearing"). Concurrently with the filing of this memorandum, the Debtors have submitted a proposed order confirming the Plan (the "Confirmation Order").

7.     The Debtors received a number of formal and informal objections, responses, and reservations of rights with respect to the Plan.  As of the date hereof, the Debtors have resolved all but one objection, including through certain modifications of the Plan and/or the inclusion of additional language in the proposed Confirmation Order.  A further amended Plan and proposed form of Confirmation Order will be filed contemporaneously herewith reflecting such modifications.  The only outstanding objection is that of the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") [Docket No. 760] (the "UST Objection").[2]  The Debtors' response to the UST Objection is set forth below.

---

[2]    The only other objection that was filed was the *Objection by the United States of America to the Debtors' Joint Chapter 11 Plan of Ligado Networks, LLC* [Docket No. 762].  The Debtors understand that this objection has been consensually resolved through the inclusion of additional language in the proposed Confirmation Order.

8.      Given the widespread support for the Plan by its economic stakeholders and because the Plan satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law, the Debtors respectfully request that the Court overrule the UST Objection and confirm the Plan.

<u>**Argument**</u>

**I.      THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.**

**A.      The Plan Complies with the Applicable Provisions of Section 1129(a)(1) of the Bankruptcy Code.**

9.      Bankruptcy Code section 1129(a)(1) requires that a chapter 11 plan must "compl[y] with the applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this requirement refers primarily to sections 1122 and 1123(a) of the Bankruptcy Code, which govern, respectively, the classification of claims and interests and the contents of a chapter 11 plan. *See* S. Rep. No. 95-989, 95th Cong. 2nd Sess. at 126 (1978); H.R. Rep. No. 95-595, 95th Cong. 1st Sess. at 412 (1977); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("As confirmed by legislative history, 11 U.S.C. § 1129(a)(1), which provides that the plan must 'compl[y] with the applicable provisions of this title,' requires that a plan comply with 11 U.S.C. §§ 1122 and 1123."); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 132 (Bankr. D.N.J. 2010) ("The legislative history reflects that 'the applicable provisions of chapter 11 [refers to] . . . section 1122 and 1123, governing classification and contents of plan.'"); *In re G-1 Holdings Inc.*, 420 B.R. 216, 258 (Bankr. D.N.J. 2009) (reviewing a plan to determine whether it "complies with other applicable provisions of § 1129(a)(1), including §§ 1122 and 1123"); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (stating that "[o]bjections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of § 1122(a) or § 1123"), *aff'd in part, rev'd in*

*part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom.*, *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636 (2d Cir. 1988).  As demonstrated below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code.

           1.     *The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.*

10.      Section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 136, 160 (D. Del. 2006) (holding that section 1122(a) of the Bankruptcy Code was satisfied where similar claims were classified together); *In re Aleris Int'l, Inc.*, No. 09–10478 (BLS), 2010 WL 3492664, at *12 (Bankr. D. Del. May 13, 2010) (same and further noting that section 1122(a) is satisfied where a plan "does not propose a classification scheme to create an impaired consenting class or to manipulate class voting").  Thus, for the Plan to satisfy section 1122 of the Bankruptcy Code, Claims and Interests placed in each Class must be substantially similar to the other Claims and Interests, as applicable, in such Class.

11.      In accordance with this requirement, Claims and Interests are placed in fifteen Classes in the Plan based upon their legal nature and entitlements and taking into account their relative priority.  *See* Plan, Art. III.  Each Class consists of substantially similar Claims or Interests, as applicable.  To the extent that the Plan places similar Claims and Interests in different classes, valid business, legal, and/or factual reasons justify such separate classification.  Accordingly, the Plan classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code.

2.    *The Plan Satisfies Section 1123(a) of the Bankruptcy Code.*

i.    Designation of Classes of Claims and Interests (§ 1123(a)(1))

12.    Section 1123(a)(1) of the Bankruptcy Code provides that a chapter 11 plan must "designate . . . classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests."   11 U.S.C. § 1123(a)(1).   In compliance with this requirement, the Plan designates Classes of Claims (other than Claims that do not need to be classified, such as Administrative Claims, Priority Tax Claims, and DIP Claims) and Interests.  *See* Plan, Art. III.

ii.    Specification of Unimpaired Classes (§ 1123(a)(2))

13.    Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(1).  The Plan satisfies this requirement by identifying Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims) (if reinstated), Class 8 (Intercompany Interests) (if reinstated), Class 11 (Existing Series A-2 Preferred Units), Class 12 (Existing Series B Preferred Units), Class 13 (Existing Series C Preferred Units), Class 14 (Existing Series A Common Units), and Class 15 (Existing Series B Common Units) as Unimpaired under the Plan.  *See* Plan, Art. III.B.

iii.    Treatment of Impaired Classes (§ 1123(a)(3))

14.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C. § 1123(a)(3).  The Plan meets this requirement by specifying the treatment of the Impaired Classes of Claims and Interests: Class 3 (First Lien Claims), Class 4 (1.5 Lien Term Loan Claims), Class 5 (Second Lien Notes Claims), Class 9 (Existing Series A-0 Preferred Units), and Class 10 (Existing Series A-1 Preferred Units).  *See* Plan, Art. III.B.

iv.    Equal Treatment Within Classes (§ 1123(a)(4))

15.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  The Plan satisfies this requirement because each Allowed Claim and Allowed Interest, as applicable, in the same Class will receive the same treatment as all other Allowed Claims and Allowed Interests, as applicable, in that Class, except to the extent any holder has agreed to a different treatment.  *See* Plan, Art. III.B.

v.    Means for Implementation (§ 1123(a)(5))

16.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.  11 U.S.C. § 1123(a)(5).  The Plan satisfies this requirement by setting forth adequate means for its implementation, including, among others, (i) effecting a general settlement of Claims and Interests, (ii) authorizing the Debtors to consummate the Restructuring Transactions, (iii) setting forth the sources of consideration to be distributed under the Plan, (iv) providing for the cancellation of certain prepetition loans, liens, securities, and other instruments and obligations, and (v) setting forth the terms of the governance of the Reorganized Debtors and the manner of selection of their officers, managers, and directors.  *See* Plan, Art. V.  The Plan thus satisfies section 1123(a)(5) of the Bankruptcy Code.

vi.    Issuance of Non-Voting Equity Securities (§ 1123(a)(6))

17.    Section 1123(a)(6) of the Bankruptcy Code requires that a reorganized debtor's constituent documents prohibit the issuance of non-voting equity securities.  11 U.S.C. § 1123(a)(6).  Article V.H of the Plan provides that the organizational documents of the Reorganized Debtors will prohibit the issuance of any non-voting equity securities to the extent

required by section 1123(a)(6) of the Bankruptcy Code.  Accordingly, the Plan satisfies this section of the Bankruptcy Code.

### vii.    Directors and Officers (§ 1123(a)(7))

18.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."  11 U.S.C. § 1123(a)(7).  The Plan provides that, on the Effective Date, all managers and directors of the Debtors will be deemed to have resigned.  Plan, Art. V.I.  The members of the Reorganized Parent Board will be appointed in accordance with the Restructuring Support Agreement and the Second Amended and Restated Operating Agreement (*id.* at Art. V.I.1), and the members of the New Subsidiary Boards will be appointed in accordance with the applicable New Organizational Documents or as set forth in the Plan Supplement (*id.* at Art. V.I.3).  Additionally, the officers for each Reorganized Debtor will be appointed in accordance with the respective New Organizational Documents.  *Id.* at Art. V.I.  The Plan thus satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 3.    *The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.*

19.    Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a chapter 11 plan, provided they are "not inconsistent" with any applicable provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 1123(b)(6).  Among other things, section 1123(b) provides that a plan may: (i) impair or leave unimpaired any class of claims or interests, (ii) provide for the assumption or rejection of executory contracts and unexpired leases, and (iii) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates.  *See* 11 U.S.C. § 1123(b)(1)–(3).

20.     As permitted by section 1123(b), the Plan provides for (i) the impairment or unimpairment of Classes of Claims and Interests (*see* Plan, Art. III), (ii) the assumption and rejection of Executory Contracts and Unexpired Leases (*see id.* at Art. VI), and (iii) the compromise and settlement of all Claims, Interests, disputes, and controversies relating to the rights of holders of Claims and Interests (*see id.* at Art. VIII).  As discussed in greater detail in Section II below, the Plan also contains certain release, exculpation, and injunction provisions that are consistent with the Bankruptcy Code and applicable caselaw.

21.     Accordingly, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code (as well as with the other applicable provisions of the Bankruptcy Code) and thus satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.      The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code.**

22.     Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a chapter 11 plan comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  The legislative history of section 1129(a)(2) indicates that its principal purpose is to ensure that the proponent complies with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 ("[Section 1129(a)(2)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").  As discussed below, the Debtors, as the proponents of the Plan, have complied with the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.

1.     *The Debtors Complied with Section 1125 of the Bankruptcy Code.*

23.     Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of

> or before such solicitation, there is transmitted to such holder the plan or a
> summary of the plan, and a written disclosure statement approved, after
> notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

24.    As evidenced by the Disclosure Statement Order, the Court has determined that the

Disclosure Statement contains "adequate information" within contemplation of section 1125(b) of

the Bankruptcy Code.  As set forth in the Solicitation Affidavit, in compliance with the Disclosure

Statement Order, the Debtors caused Omni to distribute the Solicitation Packages, including the

Disclosure Statement, to the holders of Claims in the Voting Classes.   And as set forth in the

Publication Affidavit, the Publication Notice was published in *The New York Times* and *USA

Today*.   The Solicitation Affidavit demonstrates that (i) the Solicitation Packages and related

notices were served in accordance with the Disclosure Statement Order and (ii) the Debtors

solicited votes on the Plan only following approval and transmittal of the Disclosure Statement.

Based on the foregoing, the Debtors submit that they have complied in all respects with the

disclosure requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement

Order.

2.    *The Debtors Complied with Section 1126 of the Bankruptcy Code.*

25.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a chapter 11 plan.  Pursuant to section 1126, only holders of claims and interests that are impaired

and will receive or retain property under a plan on account of such claims or interests (to the extent

allowed) may vote to accept or reject a plan.  *See* 11 U.S.C. § 1126.  Holders of claims or interests

in classes that are not impaired are conclusively presumed to have accepted the plan, and

solicitation of votes from the holders of claims or interests in such classes is not required.  *See*

11 U.S.C. § 1126(f).  Furthermore, if the plan provides that the holders of claims or interests in an

impaired class will not receive or retain any property under the plan on account of such claims or

interests, such class is deemed to have rejected a plan, and solicitation of votes from the holders

of claims or interests in such classes is likewise not required.  *See* 11 U.S.C. § 1126(g).  A class of

claims has accepted a plan if accepted by creditors "that hold at least two-thirds in amount and

more than one-half in number of the allowed claims of such class held by [voting] creditors," and

a class of interests has accepted a plan if accepted by interest holders vote "that hold at least two-

thirds in amount of the allowed interests of such class held by [voting] holders of such interests."

11 U.S.C. § 1126(c), (d).

26.     As set forth in the Solicitation Affidavit, in compliance with section 1126, the

Debtors solicited acceptances or rejections of the Plan from the members of the Voting Classes,

the only Impaired Classes entitled to vote under the Plan.   In accordance with the Disclosure

Statement Order, the Solicitation Packages with Ballots were distributed to all holders of Claims

and Interests in the Voting Classes as of the Voting Record Date.   In addition, the Confirmation

Hearing Notice was served on the parties required pursuant to Bankruptcy Rule 2002.  *See*

Solicitation Aff.   The Debtors did not solicit votes from the holders of Claims and Interests, as

applicable, in Classes 1, 2, 6, 7, 8, 11, 12, 13, 14, and 15 because the holders of such Claims or

Interests, as applicable, are presumed to have accepted the Plan.

27.     As set forth in the Voting Declaration, the Plan has been accepted by at least two-

thirds in amount and one-half in number of Claims held by creditors that voted in each Voting

Class and has been accepted by the holders of at least two-thirds in amount of Interests that voted

in each Voting Class.   Accordingly, the Plan complies with the requirements of section 1129(a)(2)

of the Bankruptcy Code.

**C.     The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code.**

28.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  In the

Third Circuit, the "good faith" requirement means that a "plan be 'proposed with honesty, good intentions, and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (*quoting In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988)); *see also In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) ("[C]ourts have held a plan is to be considered in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'"), *aff'd sub nom.*, *Solow v. PPI Enters.(U.S.) (In re PPI Enters.(U.S.))*, 324 F.3d 197 (3d Cir. 2003). Courts in this Circuit also consider the totality of the circumstances surrounding a plan to determine if it has been proposed in good faith. *See Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*, No. 19-11589 (JTD), 2020 WL 5409002, at *6 (D. Del. Sept. 9, 2020) ("[G]ood faith [under section 1129(a)(3)] is to be determined by the totality of the circumstances.") (internal citations omitted).

29.     The Debtors have proposed the Plan in good faith, in consultation with their legal and financial advisors, as well as key constituencies. The Plan is the result of extensive, arms'-length negotiations with the Consenting Stakeholders and AST, as memorialized in the Restructuring Support Agreement. The Debtors believe the Plan represents the best and, indeed, the only available option for their restructuring and emergence from bankruptcy protection and thus was proposed with the legitimate purposes of maximizing both the value of the estates and distributions to the holders of Allowed Claims in accordance with the priority scheme established by the Bankruptcy Code. Accordingly, the Plan has been proposed in good faith and not by any means forbidden by law, thus satisfying section 1129(a)(3).

**D.    The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code.**

30.    Under section 1129(a)(4) of the Bankruptcy Code, the Court must find that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case" be approved by the Court or subject to the Court's approval, as reasonable.  11 U.S.C. § 1129(a)(4).

31.    The only category of Claims that falls within the ambit of section 1129(a)(4) in these Chapter 11 Cases is the Professional Fee Claims.  All Professional Fee Claims will only be paid after they have been approved by this Court, and Professionals must file their final requests for payment of their Professional Fee Claims no later than forty-five (45) days after the Effective Date with objections due within twenty-one (21) days after the filing of the final fee application, thereby providing an adequate period of time for interested parties to review and, if necessary, object to the Professional Fee Claims.  *See* Plan, Art. II.B.1.  Article II.B.2 of the Plan provides that as soon as practicable following the Confirmation Date, the Debtors shall fund the Professional Fee Escrow Account in an amount equal to the Professional Fee Escrow Amount.  *See id.* at Art. II.B.2.  The Debtors' ordinary course professionals will be paid in the ordinary course as holders of Allowed Administrative Expense Claims consistent with the *Order (I) Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 176].  Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(4).

**E.    The Plan Complies with Section 1129(a)(5) of the Bankruptcy Code.**

32.    Section 1129(a)(5) of the Bankruptcy Code requires that: (i) the proponent of a plan disclose the identity and affiliations of the proposed directors, officers, or voting trustees of the debtors, an affiliate of a debtor participating in a joint plan with a debtor, or a successor to the debtor under the plan; (ii) the appointment or continuance of such individuals be consistent with

the interests of creditors and equity security holders and with public policy; and (iii) the identity and nature of the compensation of any insiders to be retained or employed by the reorganized debtors be disclosed.  11 U.S.C. § 1129(a)(5).

33.     The Plan Supplement will identify the members of the Reorganized Parent Board. The Plan Supplement also discloses that the existing officers of the Debtors and the existing directors of the Debtors other than Ligado Networks LLC, as of the Effective Date, will remain in such capacities on and immediately after the Effective Date, subject to the terms of the New Organizational Documents and any applicable law or agreements and shall receive compensation consistent with any applicable employment agreements or programs and the Debtors' current practices.  Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.     Section 1129(a)(6) of the Bankruptcy Code Does Not Apply to the Plan.**

34.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  11 U.S.C. § 1129(a)(6).  This section is not applicable to the Plan.

**G.     The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code.**

35.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests of creditors test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
> (A) each holder of a claim or interest of such class—
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

11 U.S.C. § 1129(a)(7).

36.     The best interests of creditors test is usually satisfied by the filing of a liquidation analysis that compares the estimated recoveries by stakeholders under the proposed plan with recoveries the same stakeholders would receive in a hypothetical chapter 7 liquidation of that debtor's estate on the effective date of the plan. *See In re Affiliated Foods, Inc.*, 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000) ("Under the best interests of creditors test, a Chapter 11 plan can be confirmed over the objection of a holder of a claim or interest that is impaired by the plan only if the holder of the impaired claim or interest 'will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.'").  The best interests of creditors test must be applied to each holder of an Impaired Claim or Interest that voted to reject the Plan, regardless of whether the Class in which such Claim or Interest is placed, as a whole, accepts the Plan.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

37.     As demonstrated in the liquidation analysis attached to the Disclosure Statement as Exhibit D (the "Liquidation Analysis"), subject to the assumptions and limitations described therein, the Plan provides all holders of Impaired Claims and Interests with a recovery (if any) that is not less than they would have received in a chapter 7 liquidation.  As demonstrated by the Liquidation Analysis, after all Administrative Claims, Priority Non-Tax Claims, and Other

Secured Claims have been satisfied, DIP Claims would not be satisfied in full, and, accordingly, there would be no value left to satisfy *any* Claims or Interests junior to the DIP Claims. *See* Liquidation Analysis. Accordingly, the Debtors submit that section 1129(a)(7) of the Bankruptcy Code is satisfied.

### H.     The Plan Satisfies Section 1129(a)(8) of the Bankruptcy Code.

38.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accepts the plan or is otherwise unimpaired. 11 U.S.C. § 1129(a)(8). As set forth in the Voting Declaration, each Impaired Voting Class overwhelmingly voted in favor of accepting the Plan. *See* Voting Decl., Ex. A. Thus, section 1129(a)(8) is satisfied.

### I.     The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code.

39.     Section 1129(a)(9) of the Bankruptcy Code requires that, "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim," a plan must provide that (i) all holders of allowed administrative expense claims will be paid in full in cash on the effective date of the plan and (ii) all holders of allowed priority claims will be paid in full in cash either on the effective date of the plan or (depending on the specific type of claim) over time with interest. 11 U.S.C. § 1129(a)(9).

40.     The Plan provides that each holder of an Allowed General Administrative Expense Claim will be paid in full in Cash on the Effective Date (or, if payment is not then due, when such payment otherwise becomes due in the applicable Reorganized Debtor's ordinary course of business) or as soon as practicable thereafter or receive other treatment consistent with the provisions of section 1129(a)(9), except to the extent already paid or otherwise agreed by the holder of such Claim and the applicable Debtor. *See* Plan, Art. II.A. The Plan also provides that, except to the extent a holder has agreed to alternative treatment, on the Effective Date, each Allowed DIP Claim will be converted on a dollar-for-dollar basis into an Exit First Lien Loan. *See*

17

*id.* at Art. II.C.  Additionally, the Plan provides that each holder of an Allowed Priority Tax Claim will be paid in full in Cash on the Effective Date or as soon as practicable thereafter or receive other treatment consistent with the provisions of sections 511 and 1129(a)(9) of the Bankruptcy Code, except to the extent a holder of such Claim agrees to less favorable treatment.  *See id.* at Art. II.D.  The Plan also provides that each holder of an Allowed Priority Non-Tax Claim will "(i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter," except to the extent a holder of such Claim agrees to less favorable treatment.  *See id.* at Art. III.B.1.  In each case, section 1129(a)(9) will be satisfied.

### J.      The Plan Complies with Section 1129(a)(10) of the Bankruptcy Code.

41.     Section 1129(a)(10) of the Bankruptcy Code requires that, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).

42.     As set forth in the Voting Declaration, each of the Voting Classes (Class 3, Class 4, Class 5, Class 9, and Class 10) accepted the Plan by the requisite amount and number of votes, without counting votes of any insider.  *See* Voting Decl., Ex. A.  Additionally, Debtor Ligado Networks Finance LLC does not have any creditors.  Accordingly, section 1129(a)(10) is inapplicable because this Debtor does not have an impaired class of claims under the Plan

*whatsoever*.[3] Thus, section 1129(a)(10) of the Bankruptcy Code is satisfied with respect to each

Debtor, except with respect to Ligado Networks Finance LLC, to which this section is inapplicable.

### K.   The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code.

43.   Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that

the Plan is feasible.  Specifically, section 1129(a)(11) of the Bankruptcy Code requires a finding

that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for

further financial reorganization, of the debtor or any successor to the debtor under the plan, unless

such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

44.   This "feasibility" requirement is satisfied where, as here, a chapter 11 plan "offers

a reasonable assurance of success."  *Johns-Manville*, 843 F.2d at 649.  "Success need not be

guaranteed" for a plan to satisfy the feasibility requirement of section 1129(a)(11) of the

Bankruptcy Code; rather, the appropriate inquiry is whether a plan offers a reasonable probability

of success.  *Id.*; *see also In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (explaining

that section 1129(a)(11) does not require "a plan's success to be guaranteed," but does require a

"realistic and workable framework"); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012)

("[T]he bankruptcy court need not require a guarantee of success, but rather only must find that

'the plan presents a workable scheme of organization and operation from which there may be

reasonable expectation of success.'").

45.   In assessing feasibility, courts have identified the following non-exclusive

probative factors:

---

[3]   Even if section 1129(a)(10) were applicable to Ligado Networks Finance LLC, at least one court in this District
has held that an impaired class that does not receive *any* votes may supply the "necessary 'consent' [in] a proposed
'per plan' scheme" under section 1129(a)(10).  *In re Tribune Co.*, 464 B.R. 126, 184 (Bankr. D. Del. 2011),
*modified*, 464 B.R. 208 (Bankr. D. Del. 2011).  Applying similar reasoning, the necessary "consent" requirement
is satisfied where there is no impaired class for a particular debtor.

> [i] the prospective earnings of the business or its earning power; [ii] the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation; [iii] the prospective availability of credit; [iv] whether the debtor will have the ability to meet its requirements for capital expenditures; [v] economic and market conditions; [vi] the ability of management, and the likelihood that the same management will continue; and [vii] any other related factors which would materially reflect on the company's ability to operate successfully and implement its plan.

*In re Prudential Energy Co.*, 58 B.R. 857, 862–63 (Bankr. S.D.N.Y. 1986); *see also In re J. Register Co.*, 407 B.R. 520, 539 (Bankr. S.D.N.Y 2009) (explaining that the feasibility test amounts to "whether the things which are to be done after confirmation can be done as a practical matter under the facts"). As discussed below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

46. The Reorganized Debtors will be well-positioned to execute their business plan and to meet their obligations as they come due in the ordinary course of business. Smith Decl. ¶ 21. The Plan will deleverage the Debtors' balance sheet, eliminating all existing funded indebtedness other than the Exit First Lien Facility, which will position the Reorganized Debtors for success. *Id.* The Debtors, with the assistance of their advisors, have prepared financial projections for fiscal years 2025 through 2029, which are set forth in Exhibit C to the Disclosure Statement (the "Financial Projections"). The Debtors and their advisors have carefully evaluated the projected cash flows to ensure that the Plan provides the Reorganized Debtors with a reasonable assurance of commercial viability upon emergence. Smith Decl. ¶ 22.

47. As shown by the Financial Projections, the Reorganized Debtors will begin to generate substantial net cashflow by the end of the projection period. *See* Financial Projections. Although the Reorganized Debtors' revenues from operations are expected to be less than the cost of operations during portions of the projection period, the Reorganized Debtors expect to have sufficient liquidity. Smith Decl. ¶ 23. In further support of the feasibility of the Plan, pursuant to

the terms of the AST Transaction, in exchange for certain usage rights with respect to the Debtors'
L-band MSS spectrum and related assets, AST has and/or will (i) contribute certain warrants,
convertible notes, and/or cash to the Debtors, (ii) make certain annual usage-right payments to the
Debtors, and (iii) pay the Debtors a certain percentage of revenues derived from AST's use of the
L-band MSS spectrum and related assets.  *Id.* at 21.  This value, along with the DIP Facility which
will convert into the Exit First Lien Facility, will help to ensure satisfaction of distributions
pursuant to the Plan.  *Id.* at 23.  Further, based on their latest financial projections, the Debtors
expect that, once the SpectrumCo NGSO System (as defined in the AST Definitive Agreements)
is launched, the revenue share component of the AST Transaction will allow the Reorganized
Debtors to have positive net cash flow by fiscal year 2029.  *Id.*

48.     Further, the economic stakeholders' overwhelming support of the Debtors' Plan is
clear indication of feasibility.  *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D.
Del. 2013) ("The first, best indicator of feasibility is the position of the creditors whose economic
interests are at stake."); *see also In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 360 (Bankr.
D.N.J. 2020) (finding that overwhelming creditor support "is the best evidence of a Plan's
feasibility").  Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of
the Bankruptcy Code.

> **L.     The Plan Provides for the Payment of Statutory Fees Pursuant to Section 1129(a)(12) of the Bankruptcy Code.**

49.     Section 1129(a)(12) of the Bankruptcy Code requires that, as a condition precedent
to the confirmation of a chapter 11 plan, "[a]ll fees payable under section 1930 of title 28, as
determined by the court at the hearing on confirmation of the plan, have been paid or the plan
provides for the payment of all such fees on the effective date of the plan."  11 U.S.C.
§ 1129(a)(12).  Article XII.C. of the Plan provides that all Statutory Fees will be paid in full in

Cash on the Effective Date.   Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.**   **Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Inapplicable.**

50.   Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).  The Debtors have no obligations to pay such "retiree benefits" and, accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.  Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code are inapplicable because none of the Debtors is an "individual" or a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

**N.**   **The Plan Complies with Section 1129(c) Because the Plan Is the Only Plan Filed in These Chapter 11 Cases.**

51.   Section 1129(c) of the Bankruptcy Code provides that a bankruptcy court may confirm only one plan.  11 U.S.C. § 1129(c).  The Plan is the only plan that has been filed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

**O.**   **The Plan Complies with the Other Applicable Provisions of Section 1129.**

52.   The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act. *See* 11 U.S.C. § 1129(d).  No governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.

**II.**   **THE PLAN'S RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS ARE CONSISTENT WITH SECTION 1123(b) OF THE BANKRUPTCY CODE.**

53.   Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).  A debtor may release claims under section 1123(b)(3)(A) "if the

release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"). A court's evaluation of the propriety of a debtor's release "is often dictated by the specific facts of the case." *In re Wash. Mut.*, 442 B.R. at 345; *In re Tribune*, 464 B.R. at 186 (same); *In re Indianapolis Downs*, 486 B.R. at 303 (stating that courts evaluating a debtor's releases weigh "the equities of the particular case after a fact-specific review").

54.    As demonstrated below, the Plan's release, exculpation, and injunction provisions are fair, reasonable, and in the best interests of the Debtors and their Estates, and appropriate under the circumstances of the Chapter 11 Cases.

### A.    The Debtor Releases Are Appropriate.

55.    Article VIII.D.1 of the Plan provides for releases by the Debtors (the "Debtor Releases") of Claims and Causes of Action against the Released Parties.[4]  Courts in this district consider the following factors to determine whether a debtor's release of claims against a non-debtor in a chapter 11 plan is appropriate: (i) whether there is an identity of interest between the debtor and the released party, such that a suit against the released non-debtor is, in essence, a

---

[4]   "Released Parties" are defined in the Plan to mean "collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) each of the Agents/Trustees, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Debt Parties, (vii) AST, (viii) Viasat (subject to the AST Definitive Agreements Order), and (ix) each current and former affiliate of each entity in clause (i) through (viii), each of such party's current and former predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees; provided, however, that any holder of a Claim or Interest that (x) files an objection to the Plan or (y) opts out of the releases set forth in Article VIIID.2, as applicable, shall not be a 'Released Party.'"

suit against the debtor or will otherwise deplete estate assets; (ii) whether the released party has made a substantial contribution; (iii) whether the release is essential to the plan (*i.e.*, whether without the release the likelihood of success diminishes); (iv) whether a substantial majority of creditors supports the plan, particularly the impacted class or classes; and (v) whether the plan provides for payment of all or substantially all claims in the affected class or classes. *See In re Indianapolis Downs*, 486 B.R. at 303 (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110); *see also In re Spansion*, 426 B.R. at 143 n.47. Importantly, a court need not find that all of these factors apply to approve a debtor's release of claims against non-debtors. *See, e.g.*, *In re Wash. Mut.*, 442 B.R. at 346. Rather, such factors are "helpful in weighing the equities of the particular case after a fact-specific review." *In re Indianapolis Downs*, 486 B.R. at 303.

56.     Further, courts in the Third Circuit have held that, where a debtor's release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan." *In re Aleris Int'l*, 2010 WL 3492664, at *20; *see also In re PWS Holding Corp.*, 228 F.3d 224, 238–39, 242 (3d Cir. 2000) (affirming debtor's release of claims against the equity sponsor in connection with a privatization transaction where the released claims were not likely to produce recoveries to the estate and were costly to pursue). The identified factors weigh in favor of approving the Debtor Releases here.

57.     *First*, there is an identity of interest between the Debtors and the Released Parties. For example, the officers and directors of the Debtors and Reorganized Debtors have indemnification rights against the Debtors, and thus, any claim brought against an officer or director would be a claim against the Debtors. Similarly, many of the other Released Parties have indemnification rights under their prepetition and postpetition loan facilities. Accordingly, to the

extent any such Claims are asserted against these Released Parties, such Claims would result in additional Claims against the Debtors or Reorganized Debtors, as applicable, in a case where unsecured creditors are unimpaired.  Additionally, an identity of interest exists where the released party assists in formulating the chapter 11 plan, funds the plan, and/or shares the debtor's interest "in seeing that the [p]lan succeed and the company reorganize."  *In re Zenith*, 241 B.R. at 110 (finding that the "funder of the Plan[] and the Bondholders' Committee, who were instrumental in formulating the Plan, share an identity of interest with Zenith"); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) ("[T]he largest creditors and preferred shareholders . . . share a common goal of achieving a reorganization of the Debtors.").  Whether through entering into the Restructuring Support Agreement and assisting in formulating the Plan, negotiating resolutions of critical issues and transactions that form the basis for the Plan and the Debtors' restructuring, or providing the funding necessary to administer these Chapter 11 Cases and to facilitate the distributions under the Plan, each of the Released Parties shares the common goal with the Debtors of seeing the Plan and the Reorganized Debtors succeed and thus has an identity of interest with the Debtors.

58. *Second*, the Released Parties went to great lengths to assure the Debtors' reorganization.  The Released Parties have made substantial contributions to the Chapter 11 Cases and would not have made such contributions without the Debtor Releases.  Specifically, the various Released Parties, among other things, (i) negotiated the Restructuring Support Agreement, the AST Definitive Agreements, and the Plan, (ii) provided the necessary consents to implement the AST Transaction, (iii) entered into settlements with, and provided significant concessions to, the Debtors, (iv) provided financial support to the Debtors to facilitate these Chapter 11 Cases and the success of the Plan in the form of (a) consenting to the Debtors' use of cash collateral,

(b) funding the DIP Facility and agreeing to convert DIP Claims into an Exit First Lien Loan, and (c) committing to the Backstop Commitment (as such term is defined in the AST Definitive Agreements), (v) extended milestones and provided consents under the DIP Facility and Restructuring Support Agreement as needed to allow the Debtors to engage with other stakeholders and consensually resolve matters, and (vi) consented to the treatment set forth in the Plan with respect to the First Lien Claims, 1.5 Lien Term Loan Claims, and Second Lien Note Claims, facilitating the satisfaction of all General Unsecured Claims in full and allowing junior preferred and common equity Interest holders to retain interests in the Reorganized Debtors.

59.     *Third*, the Debtor Releases are essential to the Debtors' emergence from chapter 11. The Debtor Releases are a critical component of the Restructuring Support Agreement and the Plan.  Indeed, the Restructuring Support Agreement requires releases to be in form and substance acceptable to the Consenting Stakeholders.  *See* Restructuring Support Agreement § 4.01(a)(ii)(B). The Released Parties may not have made the considerable contributions and concessions in the Chapter 11 Cases without the assurance of receiving the Debtor Releases.  *See* Smith Decl. ¶ 30.

60.     *Fourth*, the holders of Claims in all Voting Classes have overwhelmingly voted in favor of the Plan, including the Debtor Releases.  *See* Voting Decl., Ex. A.

61.     *Finally*, the Debtor Releases, like all elements of the Plan, were negotiated by sophisticated parties represented by able counsel and are the result of arms'-length negotiations. The Debtor Releases provide the Released Parties with a level of finality that is key to consummating the Plan and the Debtors' emergence from chapter 11, a result which would be impossible without the contributions and significant concessions of the Released Parties. Accordingly, the Debtor Releases are fair and equitable, in the best interest of the Estates, and should be approved.

**B.      The Third-Party Releases Are Appropriate.**

62.      Article VIII.D.2 of the Plan contains releases of the Released Parties by the Releasing Parties[5] (the "Third-Party Releases").  Courts in the Third Circuit have long recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.  *See In re Spansion*, 426 B.R. at 144 (stating that "a third party release may be included in a plan if the release is consensual"); *In re Wash. Mut.*, 442 B.R. at 352 (noting that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (approving releases by creditors that voted in favor of the plan).  The determination as to whether a third-party release is consensual depends on the particular circumstances of the particular case. *See In re Indianapolis Downs*, 486 B.R. at 306.[6]

63.      In the Third Circuit, a third-party release is consensual where the releasing parties have received conspicuous and detailed notice (including an explanation of the consequences of granting the release), had the opportunity to opt out of the release, and failed to do so.  *See In re Indianapolis Downs*, 486 B.R. at 306 (approving consensual third party releases by "impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not

---

5    "Releasing Parties" are defined in the Plan to mean "collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) the Agents/Trustees, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Debt Parties, (vii) AST, (viii) Viasat (subject to the AST Definitive Agreements Order), (ix) with respect to each of the foregoing Persons in clauses (i) through (viii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates (including affiliates of any predecessors), current and former officers and directors, principals, equity holders (including equity holders of any predecessors), members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, (x) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but do not opt out of granting the releases set forth in Article VIIID.2, and (xi) the holders of all Claims and Interests who were given notice of the opportunity and served with a provided form to opt out of granting the releases set forth in Article VIIID.2 but did not timely opt out."

6    While the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.* precludes nonconsensual third-party releases, it does not go beyond this.  *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024).  Nor does it opine in any way on what constitutes a consensual release, and instead expressly declines to do so.  *Id.* at 226 ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a [chapter 11] plan . . . [n]or do we have occasion today to express a view on what qualifies as a consensual release.") (emphasis in original).

otherwise opt out of the releases" and who "were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots"). In fact, numerous other courts have continued to approve third-party releases in chapter 11 plans where consent was obtained through an opt-out mechanism in cases decided after *Purdue*.[7]

64. This Court has made its view clear that "there is no prohibition on the use of opt-out releases, and that . . . whether an opt-out is appropriate is subject to a case-by-case analysis." *See* Hr'g Tr. 44:17–25, 45: 1–18, *In re Fisker, Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) [Docket No. 706] (approving the use of an opt-out mechanism to ascertain the consent of unsecured creditors to a third-party release). This view is consistent with the majority view that an opt-out mechanism—which requires an affirmative act, and where a failure to act has clearly defined consequences—is sufficient for garnering consent to third-party releases.[8] This mechanism is consistent with other examples in American jurisprudence where a failure to act constitutes consent. For example, the Supreme Court has found that an opt out mechanism, when

---

[7]    *See, e.g.*, *In re GOL Linhas Aéreas Inteligentes S.A.*, __ B.R. __, 2025 WL 1466055, at *25–26 (Bankr. S.D.N.Y. May 22, 2025) (overruling U.S. Trustee's objection to the opt-out structure and confirming the plan); *In re Spirit Airlines, Inc.*, 668 B.R 689, 721 (Bankr. S.D.N.Y. 2025) (approving third-party releases as consensual where parties could opt out); *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 322–23 (Bankr. S.D. Tex. 2024) (approving opt-out releases for voting classes, and noting that "what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this District"); *see also* Hr'g Tr. 93:17–23, *In re CareMax, Inc.*, No. 24-80093 (MVL) (Bankr. N.D. Tex. Jan. 28, 2025) [Docket No. 572] (explaining ballots and opt-outs were designed to admonish recipients of "a duty to act"); Hr'g Tr. 27:15–16, *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) [Docket No. 1733] (holding opt-out releases were consensual); Hr'g Tr. 43:3–7, *In re The Container Store Grp., Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) [Docket No. 181] (same); Hr'g Tr. 20:17–21, *In re Digit. Media Sols., Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Jan. 15, 2025) [Docket No. 663] (same); Hr'g Tr. 64:19–22, *In re GigaMonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024) [Docket No. 888] ("[T]he Supreme Court declined to express a view on what constitutes a consensual release or the procedural mechanism to obtain a consensual release."); Hr'g Tr. 27:20–28:13, *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) [Docket No. 257] (approving opt-out releases).

[8]    *See, e.g.*, *In re LaVie Care Ctrs., LLC*, No. 24-55507 (PMB), 2024 WL 4988600, at *15 (Bankr. N.D. Ga. Dec. 5, 2024) ("[I]f a creditor gets materials in a bankruptcy case, and the materials say if you do not take an action, you will be bound by the consensual release, you must do something. You cannot simply ignore it. If you do, you may be 'deemed' to consent to the release. Or you may have waived those rights. Or you may be estopped from enforcing them.").

accompanied by sufficient notice, procures the consent of parties to a state court's exercise of jurisdiction over claims in a class action lawsuit. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813–14 (1985) (rejecting contention that plaintiffs could only give consent by affirmatively opting into the class). There is no reason such a principle should not also apply in the context of a chapter 11 plan.

65.     Here, creditors who submitted a Ballot were provided the option to check the opt-out box thereon to opt out from granting the Third-Party Releases, regardless of whether they voted to accept or reject the Plan. *See* Disclosure Statement Order, Ex. 2. Additionally, the members of the Non-Voting Classes were given a similar opportunity to opt out of the Third-Party Releases via a form attached to the Notices of Non-Voting Status. *See* Disclosure Statement Order, Ex. 3. All parties from whom Third-Party Releases were sought received either a Ballot or a Notice of Non-Voting Status, which gave them timely, appropriate, conspicuous, and adequate notice of the Third-Party Releases, including the explanation that such creditors would be granting such releases if they failed to opt out by checking the opt-out box. *See* Disclosure Statement Order, Exs. 2, 3. The text of the Third-Party Releases was printed in bold type in the Disclosure Statement, the Plan, the Ballots, and the Notices of Non-Voting Status. Thus, the Third-Party Releases are fully consensual and consistent with the law in this Circuit.

66.     Moreover, the Third-Party Releases are an integral and necessary part of the Plan. As described above, the Released Parties provided significant contribution and support to the Debtors and the Chapter 11 Cases, including by negotiating and executing the Restructuring Support Agreement and the AST Definitive Agreements, providing their consent and commitment to effectuate the AST Transaction, providing significant financial support to the Debtors to facilitate the success of these Chapter 11 Cases and the implementation of the AST Transaction

(including the DIP Facility), and facilitating, through their treatment under the Plan, the satisfaction of all Allowed General Unsecured Claims in full and retention of Interests, without which such holders may not be entitled to any recovery under a plan.  Crucially, the Third-Party Releases are narrowly tailored and do not provide a blanket immunity, containing a carve-out for acts or omissions that constitute gross negligence, intentional fraud, or willful misconduct.  *See* Plan, Art. VIII.D.2.

67.    Accordingly, the Third-Party Releases are consensual, appropriate, and narrowly tailored to the circumstances of the Chapter 11 Cases, and should therefore be approved.

### C.    The Exculpation Provision Is Appropriate.

68.    Article VIII.E of the Plan provides exculpation to the Exculpated Parties[9] from liability in connection with the administration of the Chapter 11 Cases and related transactions, except for liability resulting from an act or omission that is a criminal act or constitutes gross negligence, intentional fraud, or willful misconduct as determined by a Final Order (the "Exculpation Provision").

69.    The Third Circuit assesses the appropriateness of exculpation provisions in light of the particular circumstances of each case.  *See In re PWS Holding Corp.*, 228 F.3d at 247 (rejecting any "per se rule barring any provision in a [chapter 11] plan limiting the liability of third parties[,]" including exculpation).  Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of the Exculpated Parties *per se*, but rather establishes a standard of care in any hypothetical future litigation against the Exculpated Parties for acts arising out of the Chapter 11

---

[9]    "Exculpated Parties" are defined in the Plan to mean "collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, and (iii) with respect to each of the foregoing Persons in clauses (i) through (ii), such Persons' current and former officers and directors, principals, members, partners, managers and Professionals, each in their respective capacities as such who served as of the Petition Date or during these Chapter 11 Cases."

Cases. *See id.* at 245 (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

70.     *First*, the Exculpation Provision is appropriate because the Exculpated Parties have participated in the Chapter 11 Cases in good faith, made substantial contributions to the Debtors' efforts to maximize value of their Estates, and are essential to the successful implementation of the Plan. *Second*, all Exculpated Parties are estate fiduciaries. *Third*, the Exculpation Provision is narrowly tailored to protect the Exculpated Parties only from litigation related to acts or omissions in connection with the administration of the Chapter 11 Cases and related transactions and does not protect them from actions determined by a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct. For these reasons, the Exculpation Provision is appropriate and should be approved.

## D.     The Injunction Provision Is Appropriate.

71.     Article VIII.F of the Plan enjoins various parties from taking any action on account of claims or interests that have been released under the Plan (the "Injunction Provision"). The Injunction Provision is a key provision of the Plan because it enforces the Debtor Releases, Third-Party Releases, and Exculpation Provision by enjoining actions against the Released Parties and the Exculpated Parties. Therefore, to the extent the Court finds that the releases and Exculpation Provision are appropriate, the Injunction Provision is also appropriate and should be approved.

## III.     THE PLAN AS MODIFIED SATISFIES THE APPLICABLE REQUIREMENTS.

72.     Pursuant to section 1127(a) of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the modification complies with section 1125 of the Bankruptcy Code. *See* 11 U.S.C § 1127(a). In addition, with respect to

modifications made after acceptance but prior to confirmation of the plan, Bankruptcy Rule 3019

provides, in relevant part:

> [A]fter a plan has been accepted and before confirmation, the plan proponent may file a modification. For [creditors and equity security holders] who have not accepted [the modification] in writing but have accepted the plan, the modification is considered accepted if, after notice and a hearing, the court finds that it does not adversely change the treatment of [] claims or interests.

Fed. R. Bankr. P. 3019(a).

73.     The Debtors have made certain modifications to the Plan since filing its solicitation

version to, among other things, address certain informal comments received from various parties

in interest. As discussed above, the Plan, as modified, complies with sections 1122 and 1123 of

the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code

in soliciting votes. Thus, the Plan modifications comply with section 1127(a) of the Bankruptcy

Code. Further, given that the Plan modifications made after soliciting votes thereon do not

"adversely change the treatment of [] claims or interests," the Plan should be deemed accepted by

all creditors and equity security holders who have accepted the Plan before the modifications were

made. *See* Fed. R. Bankr. P. 3019(a).

## IV.     THE UST OBJECTION SHOULD BE OVERRULED.

74.     The objection of the U.S. Trustee, who is not an economic stakeholder in these

Chapter 11 Cases, is the only remaining objection to confirmation of the Plan. The Debtors request

that the UST Objection be overruled. The U.S. Trustee had previously filed the *Objection of the*

*United States Trustee to Approval of Disclosure Statement* [Docket No. 463] (the "Disclosure

Statement Objection") and attached the Disclosure Statement Objection as Exhibit A to the UST

Objection, providing no new arguments against confirmation. The Debtors filed the *Debtors'*

*Reply to the U.S. Trustee's Objection to the Disclosure Statement Motion and in Further Support*

*Thereof* [Docket No. 560] (the "Disclosure Statement Reply") in response to the Disclosure

Statement Objection.  As the UST Objection provides no new argument against confirmation, all arguments set forth in the Disclosure Statement Reply are incorporated by reference herein.

75.     The U.S. Trustee raised three objections to confirmation, alleging that: (i) the Plan is not feasible; (ii) section 1129(a)(9) of the Bankruptcy Code is not satisfied because of the potential length of the period between Confirmation and the Effective Date; and (iii) the Third-Party Releases are not consensual, and the Third-Party Releases and related Injunction Provision are not authorized by the Bankruptcy Code.  The reasons why each of these arguments fail are addressed in turn.

**A.     The Plan Is Feasible.**

76.     The U.S. Trustee asserts that the Plan is not feasible because it is dependent on uncertain outcomes of pending petitions for reconsideration of the FCC Order.  *See* UST Obj., Ex. A ¶ 33.  This is not so.

77.     As discussed in Section I.K above addressing the Plan's feasibility, section 1129(a)(11) of the Bankruptcy Code requires only that a plan is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor."  11 U.S.C. § 1129(a)(11).  A "relatively low threshold of proof will satisfy § 1129(a)(11)."  *In re Trenton Ridge Invs., LLC*, 461 B.R. 440, 479 (Bankr. S.D. Ohio 2011) (stating that "[t]he [Bankruptcy] Code does not require the debtor to prove that success is inevitable").  Moreover, the debtor must only demonstrate a reasonable probability of success; success need not be guaranteed.  *See supra* § I.K.

78.     It goes without saying that economic stakeholders are the best judges of the reorganized debtor's prospects post-emergence.  *See, e.g.*, *In re Indianapolis Downs*, 486 B.R. at 299 (confirming a plan that required gaming commission approvals for effectiveness and finding

it "almost inconceivable that . . . stakeholders . . . would have headed down this path unless they were confident" that such approvals would be forthcoming). The *Indianapolis Downs* court recognized that "[t]he first, best indicator of feasibility is the position of the creditors whose economic interests are at stake. The support or opposition of creditors with skin in the game and an opportunity to study a debtor's proposal is more illuminating to the Court than any expert report or accountant's projections." *Id.* at 298; *see also supra* § I.K. Notably, no economic stakeholder has expressed a concern that the Plan may be undone by these pending petitions.

79.    But even apart from the creditors' overwhelming support for the Plan, the feasibility objection must fail because the U.S. Trustee offers nothing but speculation to allege that the Plan is not feasible. And speculation is not sufficient as a matter of law. *See, e.g.*, *In re Tribune Co.*, 464 B.R. at 185 (rejecting feasibility objections based on "nothing more than speculation" about future regulatory hurdles); *In re TCI 2 Holdings*, 428 B.R. at 148 ("[M]ere potential for failure of the plan is insufficient to disprove feasibility.").

80.    The petitions for reconsideration of the FCC Order that the U.S. Trustee points to as a basis for concern are entirely irrelevant for the Plan's feasibility. The FCC Order provides authorization for the Debtors to use the L-band spectrum for Ancillary Terrestrial Components ("ATC"), but the ATC authorizations are the subject of the Takings Litigation and not actively used by the Debtors. *See* Disclosure Statement § IX.D. Any action by the FCC related to these petitions would not impact the Debtors' license for MSS use of the L-band spectrum or its utilization contemplated by the AST Transaction—the cornerstone of the Plan. Nor would any FCC action have any bearing on any of the forthcoming regulatory applications, such as the application for the SpectrumCo NGSO System approval. Moreover, the reconsideration petitions

were filed in 2020, and the FCC has never acted on them. There is no question that, notwithstanding such petitions, the FCC Order continues to have full effect.

81.     As discussed in the Disclosure Statement Reply, these pending petitions for reconsideration are merely administrative requests—routinely filed by interested parties, with no timeline for FCC action one way or another—and, critically, with no effect on the Debtors' rights. The Communications Act explicitly provides that filing petitions for reconsideration does not "operate in any manner to stay or postpone the enforcement" of existing orders. 47 U.S.C. § 405(a). As in *Tribune*, the U.S. Trustee's concerns amount to "nothing more than speculation." *See In re Tribune*, 464 B.R. at 185. Under the U.S. Trustee's flawed standard, virtually no holder of an FCC license, routinely subject to petitions for reconsideration, could ever satisfy section 1129(a)(11)'s "relatively low threshold of proof." *See In re TCI 2 Holdings*, 428 B.R. at 148. The U.S. Trustee's position effectively demands a level of certainty that exceeds the "reasonable assurance" standard established in *Tribune*. *See In re Tribune*, 464 B.R. at 185. Far from relying on "speculative litigation proceeds," the Plan relies on existing and effective FCC authorization. *See In re Am. Cap. Equip.*, 688 F.3d at 156.

82.     The U.S. Trustee also contends that the Debtors have not demonstrated the viability of either their MSS or ATC businesses. *See* UST Obj., Ex. A ¶ 35. As detailed in the Disclosure Statement Reply, while the Debtors acknowledge current limitations on their ability to deploy ATC operations in their L-band spectrum subject to the outcome of the Takings Litigation, these limitations are similarly irrelevant to the feasibility of the Plan, as the Plan does not depend upon a specific outcome of the Takings Litigation or the Debtors' ability to use the ATC operations in the L-band spectrum. Indeed, the Plan relies on the commercialization of the Debtors' L-band MSS spectrum via the AST Transaction.

83.     With respect to the viability of the MSS business, the Consenting Stakeholders, who are the major economic stakeholders in these cases, overwhelmingly support the Plan, expressing their belief that the MSS business contemplated by the Plan is viable and will be profitable.  While the Debtors acknowledge that they are expected to incur net losses and generate negative cash flow for certain periods in the near term, the Debtors believe they currently have all the funding that is required to emerge from these Chapter 11 Cases, and the Reorganized Debtors' business is projected to begin generating significant positive cash flow beginning in 2029 as the Reorganized Debtors begin to benefit in a material way from the revenue sharing aspect of the AST Transaction.  If the U.S. Trustee's contentions were to be countenanced, no start-up business could ever reorganize without the certainty of future success—a near impossibility.

84.     The U.S. Trustee also raises a question of the status of the Debtors' two satellite assets—SkyTerra-1 and SkyTerra-2.  The risks alleged by the U.S. Trustee are typical of and inherent in owning and operating satellites and do not impact the feasibility of the Plan.  None of the risks alleged in the UST Objection are unique or outside of the scope of those one would typically see with respect to an MSS-based business.  As in *Indianapolis Downs*, it would be "almost inconceivable" that sophisticated stakeholders like AST, Inmarsat, and the Consenting Stakeholders would support the Plan without confidence in its feasibility.  *In re Indianapolis Downs*, 486 B.R. at 299.  As discussed above, such informed stakeholder support provides far more persuasive evidence of feasibility than speculative concerns raised by a party with zero economic interest.

85.     Based on all of the foregoing, the Plan is feasible, and the U.S. Trustee's feasibility objection should be overruled.

**B.    A Potentially Extended Period Between Confirmation and the Effective Date Does Not Preclude Confirmation of the Plan.**

86.    The U.S. Trustee also alleges that the Plan does not satisfy section 1129(a)(9) of the Bankruptcy Code and cannot be confirmed because the timing of the Effective Date is uncertain.  *See* UST Obj., Ex. A ¶¶ 38, 42.  Section 1129(a)(9) of the Bankruptcy Code requires that certain payments be made on the effective date.  *See* 11 U.S.C. § 1129(a)(9).  However, the U.S. Trustee attempts to establish a *per se* rule that a plan does not satisfy section 1129(a)(9) and cannot be confirmed where it contemplates an effective date that does not occur soon after confirmation.  But nothing in the Bankruptcy Code requires this.  *See* Hr'g Tr. 52:7–9, *In re Ligado Networks LLC*, No 25-10006 (TMH) (Bankr. D. Del. June 23, 2025) [Docket No. 712] ("I don't think the [Bankruptcy Code] tells me that I have to limit a plan in any respect when it has to become effective."); Hr'g Tr. 31:14–15, *In re Steward Health Care Sys., LLC*, No. 24-90213 (CML) (Bankr. S.D. Tex. July 16, 2025) [Docket No. 5724] ("There's nothing in the Code that says when the effective date must occur."); Hr'g Tr. 247:3–5, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2019) [Docket No. 5395] ("As far as [section 1129](a)(9) is concerned, there's nothing in the [Bankruptcy Code] or the case law that says that a plan has to go effective by a date certain, some specific date.").

87.    Instead, the length of time between confirmation and the effective date should be considered in the context of whether "the extra time [is] necessary and will it benefit the estate and creditors."  Hr'g Tr. 32:11–13, *In re Steward Health Care Sys., LLC*, No. 24-90213 (Bankr. S.D. Tex. July 16, 2025) [Docket No. 5724]; *see also id.* at 40:4–6 ("You can have an effective date that's far out when there's a need to do it.  The Code doesn't say when you have to have one, but there's flexibility within the Code.").  In practice, courts often confirm chapter 11 plans where the effective date is not expected to occur for some time.  *See, e.g.*, *In re Sears Holdings Corp.*, No. 18-

23538 (SHL) (Bankr. S.D.N.Y. Oct. 31, 2022) [Docket No. 10693] (over three (3) years between confirmation and effective date); *In re W.R. Grace & Co.*, No. 01-01139 (KJC) (Bankr. D. Del. Feb. 13, 2014) [Docket No. 31732] (approximately three (3) years between confirmation and effective date); *In re PRM Family Holding Co.*, No. 13-09026 (BKM) (Bankr. D. Ariz. Mar. 18, 2016) [Docket No. 1573] (over fourteen (14) months between confirmation and effective date); *In re Ambac Fin. Grp., Inc.*, No. 10-15973 (SCC) (Bankr. S.D.N.Y. May 1, 2013) [Docket No. 1308] (approximately fourteen (14) months between confirmation and effective date).

88.    The U.S. Trustee's proposed *per se* rule would doom any regulated entity from having a confirmable plan because no one can predict how long the applicable regulators will take to grant the necessary regulatory approvals.  But courts "frequently confirm plans that are based upon some sort of regulatory approval" because debtors "need the deal in place so that [they] can bring it to the regulators."  Hr'g Tr. 52:21–24, *In re Ligado Networks LLC*, No. 25-10006 (TMH) (Bankr. D. Del. June 23, 2025) [Docket No. 712]; *see also In re Indianapolis Downs*, 486 B.R. at 298 ("It is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals."); *In re Inter Urb. Broad. of Cincinnati, Inc.*, Nos. 94-2382, 94-2383, 1994 WL 646176, at *3 (E.D. La. Nov. 16, 1994) (affirming a confirmation order with an effective date subject to FCC approval of a transfer of a license); Hr'g Tr. 27:20–22, 32:15–18, *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 12, 2013) [Docket No. 10205] ("[I]t is not uncommon for plans of reorganization to be approved in large Chapter 11 cases, where effectiveness is contingent on regulatory approval. . . . [F]ailure of the effective date and the withdrawal of the confirmation order will leave creditors no worse off than if the confirmation order never had been entered."); *In re LBI Media, Inc.*, No. 18-

12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) [Docket No. 839] (confirming chapter 11 plan despite the debtors having not obtained certain regulatory approvals necessary for the plan to become effective); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) [Docket No. 2525] (same); *In re Cumulus Media Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) [Docket No. 769] (same); *In re LightSquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y Mar. 27, 2015) [Docket No. 2276] (same).

89.    Extended periods between plan confirmation and the effective date are a frequent feature of complex chapter 11 restructurings and commonplace in cases where the plan requires approval of the FCC or another regulatory agency for its effectiveness.  *See, e.g.*, *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 227 (3d Cir. 2021) ("Although plans usually become effective shortly after confirmation, there can be a delay of months or longer in cases where, for example, the debtor must wait for regulators to approve the plan or investors to finalize financing.").  Such extended effective dates based on regulatory approvals depend on "the facts and circumstances."  Hr'g Tr. 53:15–16, *In re Ligado Networks LLC*, No. 25-10006 (TMH) (Bankr. D. Del. June 23, 2025) [Docket No. 712].

90.    In cases with delayed effective dates, it is sufficient that appropriate disclosures are made regarding the fact that receipt of regulatory approval is a condition to the effectiveness of the plan, and the parties voting on the plan are informed of the risks associated with the need for such approval, including the delay in the plan's effectiveness that may occur as a result.[10]  And

---

[10]    *See, e.g.*, *In re GTT Commc'ns, Inc.*, No. 21-11880 (MEW) (Bankr. S.D.N.Y. Oct. 31, 2021) [Docket No. 20] ("The Debtors can provide no assurance that the required regulatory and government consents [will be obtained] in connection with the [transactions contemplated under the plan]," nor assurance as to the terms, conditions, and timing of the approvals or clearances.); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. Aug. 24, 2021) [Docket No. 2693] (same); *In re OneWeb Glob. Ltd.*, No. 20-22437 (RDD) (Bankr. S.D.N.Y. Sept. 1, 2020) [Docket No. 534] (same); *In re Frontier Commc'ns Corp.*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 648] ("[T]here can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur, including due to those risks outlined as part of the regulatory process."); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 14, 2020) [Docket No. 1813] ("The Debtors can provide no

this is exactly what the Debtors have done here.  *See* Disclosure Statement, Art. IX.A. ("*The Effective Date may not occur.  Given the nature of the Plan and the required regulatory approvals for implementation, the Effective Date of the Plan is not likely to occur shortly after the Confirmation Date.*").

91.     The Debtors submit that the extra time is needed to obtain the requisite regulatory approvals for the AST Transaction and that such approvals will benefit their estates and creditors. Additionally, seeking confirmation of the Plan now, prior to receiving FCC approvals, is what the Consenting Stakeholders and AST agreed to under the Restructuring Support Agreement.  Not only do these parties benefit from the certainty provided by a confirmed Plan, but the Debtors also benefit from the certainty that these parties will be bound by their commitments without the risk of having to renegotiate in the future based on changed market conditions.  Indeed, waiting for regulatory approval before confirming the Plan would cause a default under the Restructuring Support Agreement and the DIP Facility, triggering the Consenting Stakeholders' and AST's respective termination rights, thus jeopardizing the broadly supported Plan.  By contrast, confirming the Plan now, prior to obtaining the FCC approval, complies with the Restructuring Support Agreement and would automatically extend the maturity of the DIP Facility,[11] thus avoiding the litany of defaults the U.S. Trustee's preferred approach would immediately create. Clearly the proposed course of action results in a more feasible chapter 11 plan than one which

---

assurance that the required regulatory and government consents will be obtained in connection with the Restructuring Transactions."); *In re iHeartMedia Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Sept. 20, 2018) [Docket No. 1484] ("No assurances can be made . . . that certain conditions precedent to the Effective Date (including receipt of FCC Approval or any required private letter ruling from the [IRS]) will have occurred by the outside date under the Restructuring Support Agreement."); *In re LightSquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y. Jan. 20, 2015) [Docket No. 2035] ("There is no guaranty that such [regulatory] approvals would be obtained in a timely manner or, possibly, at all.").

[11]     *See* Final DIP Order ¶ 25 ("Notwithstanding anything to the contrary in the DIP Loan Agreement: (a) upon entry of the Confirmation Order, the Maturity Date Extension Period then in effect shall automatically be extended to the effective date of an Acceptable Plan . . . .").

sets an unrealistically short period for obtaining necessary regulatory approval, which presumably

the U.S. Trustee would prefer.

92.      Thus, the Plan should proceed on the agreed upon timeline, and the Court should

not countenance the U.S. Trustee's extreme position.[12]

**C.      The Third-Party Releases Are Consensual and Comply with Applicable Law.**

93.      The U.S. Trustee objects to the proposed Third-Party Releases.  *See* UST Obj.,

Ex. A ¶ 44.  For the reasons discussed in Section II.B above, in the Disclosure Statement Reply,

and below, this objection should be overruled.

1.      *Federal Law, Rather Than State Contract Law, Governs Whether Third-Party Releases in a Chapter 11 Plan Are Consensual.*

94.      Contrary to the U.S. Trustee's argument, federal law, not state law, generally

governs the repercussions of inaction in bankruptcy proceedings, including the failure to respond

to notice given in a bankruptcy case.

95.      The Supreme Court has evaluated whether a party has consented to "non-core"

matters adjudicated by a bankruptcy court by looking to federal law and held that inaction has

consequences—a party waives its right to have "non-core" claims heard by an Article III court

when it fails to object.  *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683 (2015)

---

[12]  The cases cited in the UST Objection are distinguishable, and none involve circumstances where the occurrence of the effective dates depended on ensuring sufficient time to obtain necessary regulatory approvals.  *See In re Potomac Iron Works, Inc.*, 217 B.R. 170, 174–75 (Bankr. D. Md. 1997) (plan setting effective date one year from confirmation to allow additional time to collect accounts receivable); *In re Krueger*, 66 B.R. 463, 465 (Bankr. S.D. Fla. 1986) (plan setting effective date four-months post-confirmation to allow individual debtor to continue trying to sell property at a higher price); *In re Yates Dev., Inc.*, 258 B.R. 36, 42–43 (Bankr. M.D. Fla. 2000) (making effective date contingent on a future appellate ruling reducing claim amount); *In re Premiere Network Servs., Inc.*, No. 04-33402-HDH-11, 2005 WL 6443624, at *6 (Bankr. N.D. Tex. July 1, 2005) (occurrence of the effective date depended upon sufficient funds existing to allow the debtor to pay administrative claims).  Here, the Debtors are not trying to "buy time" to obtain sufficient funds to pay administrative claims or to comply with other provisions of section 1129 of the Bankruptcy Code.  Obtaining regulatory approvals is plainly unavoidable. Due to the Debtors' operation in a highly regulated industry and the nature of the transactions contemplated by the Plan, the Debtors have no choice but to wait until they receive the necessary regulatory approvals and need to ensure the Plan contemplates sufficient time to obtain those approvals prior to substantial consummation of the Plan.

("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express."). The Supreme Court noted that, consistent with its own prior rulings, "implied" consent—rather than only "express" consent—accords with constitutional standards. *Id.* at 684 (agreeing that a constitutional right "'is substantially honored' by permitting waiver based on 'actions rather than words'" (quoting *Roell v. Withrow*, 538 U.S. 580, 589–90 (2003) (consent to proceedings before a magistrate judge need not be express and may be inferred from conduct during litigation))); *see also* Fed. R. Civ. P. 12(h), 55(a) (If the defendant fails to timely raise certain defenses, it may be deemed to waive them; if the defendant files nothing, the court may enter a default judgment for the plaintiff.); *Como v. Com. Oil Co.*, 607 F. Supp. 335, 342 n.3 (S.D.N.Y. 1985) (explaining that "if a party fails to raise a venue objection promptly, he waives it").[13]

96.     Federal courts also look to federal law when evaluating whether an opt-out mechanism, when accompanied by sufficient notice, results in consent. *See, e.g.*, *Phillips Petroleum*, 472 U.S. at 813–14 (absent class members consented to a state court adjudicating their claims by failing to opt out). After consideration under federal law and rules of federal procedure,

---

[13] The same is true for chapter 11 plans. Creditors must be served with a solicitation package containing adequate information to enable them to evaluate the proposed plan. *See* 11 U.S.C. § 1125; Fed. R. Bankr. P. 3017(d). Upon adequate service, creditors are obligated to act based on the solicitation materials or risk consequences: the court may confirm the plan in a creditor's absence, and a creditor may be deemed to waive any objection to the plan. *See In re Teligent, Inc.*, 282 B.R. 765, 772 (Bankr. S.D.N.Y. 2002) (discussing failure to object to treatment of administrative claims and observing that "one's general right to remain silent in the face of an offer should be subject to question and reconsideration where passivity will threaten the fundamental goals of bankruptcy— rehabilitation, saving jobs and equality of distribution"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 259–63 (Bankr. S.D.N.Y. 2007) (classes where no creditors voted could be deemed to accept the plan where the plan expressly so provides). Failure to act may extinguish a creditor's claim or may reduce the amount the creditor will recover on its claim. Similarly, failure to act may release debtor-related claims the creditor might hold against third parties where the creditor is given the opportunity to opt-out of granting such a release. *See, e.g.*, *In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022) (approving opt-out mechanism for a third-party release, explaining that "[w]ithin the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim. Additionally, if a claim objection is filed and the claimant fails to respond, the claim is disallowed. There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization.").

the Supreme Court held that the Due Process Clause of the Fourteenth Amendment was satisfied

by appropriate notice of the proceedings and the ability to opt out.  *See id.*  There is no reason that

a different standard should apply in the bankruptcy context, particularly as bankruptcy implicates

uniquely federal interests that make application of federal law all the more appropriate.

97.     Perhaps chief among these federal interests is the equal treatment of similarly

situated creditors.  *See* H.R. Rep. No. 95-595, at 177–78 (acknowledging "the prime bankruptcy

policy of equality of distribution among creditors of the debtor").  This interest is best served by

evaluating consent under federal law.  The purpose of the uniform federal bankruptcy laws is to

apply a single set of rules to diverse creditors.[14]  Requiring analysis under state law necessarily

introduces divergent rules, which at least one bankruptcy court has recognized as a serious

challenge: "[S]ome states might permit [opt-out consent], some states might not permit it.  Where

does that leave the bankruptcy court?  I don't know."  Hr'g Tr. 105:16–18, *In re Wesco Aircraft*

*Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024) [Docket No. 2502]; *see also*

*id.* at 101:10–13 (approving third-party releases with opt-out mechanism subject to the "limitation

. . . [that the] confirmation order make clear that we're not overriding the due process clause").

98.     Thus, it is not surprising that both before and after *Purdue*, bankruptcy courts have

evaluated consent to third-party releases under federal law.[15]  The decisions cited by the U.S.

---

[14]  *See* U.S. Const., art. I, § 8, cl. 4 ("The Congress shall have power . . . [t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States . . . .").

[15]  *See, e.g.*, *In re GOL Linhas Aéreas Inteligentes*, 2025 WL 1466055, at *17 (ruling that federal law controls when third-party releases "validly comprise parts of plans pursuant to section 1123(b)(6) of the Code, even after *Purdue*"); Hr'g Tr. 80:21–25; 81:1–7, *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Dec. 22, 2020) [Docket No. 1534] ("I have repeatedly ruled that you can imply consent by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for a release.  I don't believe this is necessarily a contractual point . . . as much as it is a point of notice under the Bankruptcy Code and the Bankruptcy Rules, because it's the plan that serves as the mechanism to have the release take effect, and, thus, it's really the rules, the Federal Rules of Bankruptcy Procedure that figure out whether someone has achieved proper notice and has, by not responding, given their implied consent."); Hr'g Tr. 105:4–12, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024) [Docket No. 2502] ("A sues B.  B gets served.  B doesn't respond. B is ordered to pay money to A.  That's what courts do.  Here the obligation to opt out was sent out.  It was sent

Trustee to the contrary are, accordingly, misguided.  In these cases, courts have found that granting a third-party release is akin to the formation of a contract between non-debtors and conclude that whether such a contract has been validly formed should be evaluated under state law.  But it is not at all apparent (nor do courts unanimously find) that the effectiveness of a third-party release hinges on whether an enforceable contract has been formed.  *See In re LaVie Care Ctrs.*, 2024 WL 4988600, at *14 ("[T]he basis for the enforcement of consensual releases has not . . . been described anywhere as a 'contract' for them.").

99.     Looking to state law raises more issues than it settles.   There is no satisfying answer to a number of questions—for example, which state law should apply; how fully must that law be incorporated into the analysis of whether consent has been obtained (for example, whether consideration must  be exchanged in connection with granting a release); and whether the releasing parties in fact receive an "offer" from the non-debtor parties being released that they may determine whether to accept?   *See id.* (while recognizing certain objections to the application of federal law, noting that "assessing [such releases] based on state contract law is no better").   Indeed, the difficulty in identifying which state law should apply has led advocates of this position to rely,

---

out to everybody.  Those that it didn't get sent to appropriately will be excluded because [of] the due process clause.  There's simply nothing forbidden or inconsistent about that.  Do we need to comply with state law?  There's no requirement we comply with state law.  Federal law can allow for consequences as a result of default.") (approving opt-out third-party release structure).

instead of on any particular state's law, on principles set out in the Restatement of Contracts[16]—which "itself is not the law anywhere." *Id.*[17] State law, accordingly, should not apply.

100.   The cases that look to state contract law fail to recognize the critical distinction between a private contract and one bearing the imprimatur of the federal government.   Chapter 11 plans are creatures of federal law, designed to solve the collective action problem inherent in a multi-party reorganization or liquidation process.   A chapter 11 plan is not a series of individual contracts, but rather an integrated package of bargained-for consideration of which third-party releases form an essential piece.   Chapter 11 plans reflect a policy of the U.S. Congress to encourage rehabilitation of debtors and the efficient administration of insolvency proceedings. A chapter 11 plan has the force of a federal court order because it has been closely evaluated and approved by a bankruptcy court under well-defined statutory standards; once confirmed and consummated, it is a document invested with federal power.

101.   There are other clear distinctions between a contract and a chapter 11 plan.   When forming a contract, parties are free to engage with other parties or to refrain from doing so without consequence.   That is neither the case in bankruptcy generally, nor with respect to a chapter 11 plan in particular—where creditors are forced into the bankruptcy proceeding that restructures

---

[16]   *See, e.g.*, UST Obj., Ex. A ¶¶ 51–54, 61, 66, 69–70; *In re LaVie*, 2024 WL 4988600, at *8 (noting that the U.S. Trustee's objection made "numerous cites to the *Restatement of Contracts*"); U.S. Trustee's Obj. to Disclosure Statement and Chapter 11 Plan 16–18, *In re Basic Fun, Inc.*, No. 24-11432 (CTG) (Bankr. D. Del. Sept. 24, 2024) [Docket No. 218]; U.S. Trustee's Obj. to Confirmation 16–17, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Aug. 23, 2024) [Docket No. 23610]; U.S. Trustee's Obj. to Confirmation 11–12, 17–20, *In re Seaplane Debtor 1 Inc.*, No. 24-10703 (CTG) (Bankr. D. Del. Oct. 28, 2024) [Docket No. 581]; U.S. Trustee's Obj. to Debtor's Disclosure Statement 16, 18, *In re Presperse Corp.*, No. 24-18921 (MBK) (Bankr. D.N.J. Sept. 25, 2024) [Docket No. 66]; U.S. Trustee's Obj. to Debtors' Disclosure Statement 12, 14–15, 19–20, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Oct. 8, 2024) [Docket No. 2515]; U.S. Trustee's Obj. to Confirmation 19–21, *In re Sunpower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Oct. 15, 2024) [Docket No. 787].

[17]   *See also* Hr'g Tr. 105:10–11, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024) [Docket No. 2502] ("Do we need to comply with state law?   There's no requirement we comply with state law.") (approving opt-out mechanism for third-party release).

their rights, with or without their consent. The bankruptcy court determines whether all congressionally mandated confirmation requirements are met and then orders the appropriate relief. *See Purdue,* 603 U.S. at 214 ("Under Chapter 11, the debtor can work with its creditors to develop a reorganization plan governing the distribution of the estate's assets; it must then present that plan to the bankruptcy court and win its approval." (citing 11 U.S.C. §§ 1121, 1123, 1129, 1141)). Although a plan may provide for individual creditor choices—as is the case with opt-out third-party releases—it is not an individualized contract but rather part of an integrated deal that is collectively accepted or rejected.

102. Based on the foregoing, application of federal law to the question of whether a third-party release in a chapter 11 plan is consensual is both consistent with longstanding precedent and enables the uniform application of bankruptcy laws that the U.S. Constitution requires.

2. *Opt-Outs Continue to Be Valid, and the Third-Party Releases Are Consensual.*

103. Contrary to the sweeping assertions made in the UST Objection, *Purdue* does not change the permissibility of a consensual third-party release, as has been recognized by this Court and many others. *See Purdue*, 603 U.S. at 226 (drawing attention to the fact that it was not opining on "what qualifies as a consensual release"); *see also supra* § II.B. Instead, as widely applied by judges in this District "whether an opt-out is appropriate is subject to a case-by-case analysis." *See* Hr'g Tr. 44:17–25, 45: 1–18, *In re Fisker, Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) [Docket No. 706].

104. Despite the U.S. Trustee's assertions to the contrary, the Third-Party Releases are consensual and well within the ambit of what courts in this District have routinely determined to be appropriate. *See supra* § II.B. All Releasing Parties received comprehensive and detailed notice of the Third-Party Releases and an opportunity to opt out or otherwise object. The Disclosure

Statement, the Plan, the Ballots, and the Notices of Non-Voting Status all clearly and prominently detailed the terms of the Third-Party Releases in bold font.  Further, each of the fifteen Classes of Claims and Interests whose holders are being asked to grant the Third-Party Releases or opt out is receiving consideration under the Plan.

105.    Notwithstanding this and the multitude of post-*Purdue* decisions which have held that opt-out releases are permissible, the U.S. Trustee focuses on the handful of decisions declining to approve opt-out releases and, in particular, on *In re Smallhold, Inc.*, 665 B.R. 704 (Bankr. D. Del. 2024).  *See* UST Obj., Ex. A ¶¶ 55–59.  In *Smallhold*, the court refused to accept opt-out releases that were not supported by an affirmative action, stating that after *Purdue*, "the third-party release is no longer a potentially permissible plan provision" and "such releases cannot be described as 'consensual' on the ground that the creditor's failure to assert an objection effectively allowed the release to be imposed . . . .  [I]n the absence of some sort of affirmative expression of consent . . . the creditor's silence in the face of a plan and form of ballot [is not] sufficient."  *In re Smallhold*, 665 B.R. at 719–20.

106.    However, *Smallhold* overreads the ruling in *Purdue*.  As the *Purdue* Court itself noted, "[n]othing in what we have said should be construed to call into question *consensual* third-party releases offering in connection with a bankruptcy reorganization plan."  *Purdue*, 503 U.S. at 226.  And as this Court determined in *Fisker*, "in light of *Purdue* there is no prohibition on the use of opt-out releases."  *See* Hr'g Tr. 44:20–21, *In re Fisker, Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) [Docket No. 706].  Additionally, the *Smallhold* decision assumed that express consent is required in chapter 11 cases and failed to consider the acceptance and endorsement of the "implied consent" concept under federal law in bankruptcy cases like *Sharif*, where the Supreme Court found that a party waives its right to have non-core claims heard by an Article III

court when it fails to object.  *Sharif*, 575 U.S. at 683–84 (determining that that in bankruptcy, "implied" consent—rather than only "express" consent—accords with constitutional standards). Further, *Smallhold* fails to recognize the additional safeguards around consensual third-party releases that are present when evaluating an integrated plan, including all of the criteria explored in Section II.B above.  The concerns of the *Smallhold* court about the lack of a limiting principle on consensual third-party releases are entirely absent here.

### 3. The Third-Party Releases Are Not "Prospective."

107.    The U.S. Trustee argues that the Third-Party Releases (and related Injunction) are "prospective."  UST Obj., Ex. A ¶ 73.  However, the determination to grant a release is always made by a claimholder as of the voting deadline but becomes effective as of the effective date. Indeed, this is a feature of nearly every chapter 11 plan that contains releases.  The Third-Party Releases are not unique, and the U.S. Trustee does not provide any examples to the contrary.  To the extent any party was concerned about what could occur during the time between the Voting Deadline and the Effective Date, such party could have opted out of the Third-Party Releases.

### D.    The Injunction Provision Is Necessary and Customary.

108.    As discussed above and in the Disclosure Statement Reply, the Injunction Provision enforcing the Debtor Releases, Third-Party Releases, and Exculpation Provision merely provides practical support for these appropriate and necessary Plan provisions.  To the extent the releases and exculpations are appropriate, the injunction simply enforces the protections granted thereby.

109.    In *GigaMonster*, for example, where the U.S. Trustee raised a nearly identical objection, the court, in approving the injunction, noted that in the event the third-party release is deemed to be valid and consensual, the injunction is a form of "belts and suspenders" and merely provides practical support for the release.  *See* Hr'g Tr. 38:12–14, 67:12–15, *In re GigaMonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024) [Docket No. 888] ("With

respect to the injunction, as proposed the injunction provision simply reinforces the third-party release.  So, I will overrule the United States Trustees' objection.").  In other recent cases, courts have reached the same conclusion and approved chapter 11 plans with similar injunction provisions over objections from the U.S. Trustee.  *See, e.g.*, Hr'g Tr. 27:16–20, *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) [Docket No. 1756] ("And I also will overrule the United States Trustee's objection with respect to the injunction argument, as the injunction being consistent with the release provisions.  I see that as a belt-and-suspenders, so to speak."); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) [Docket No. 255] (approving plan containing injunction preventing actions against "Released Parties" over the objection of the U.S. Trustee); *In re Fisker, Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Oct. 16, 2024) [Docket No. 722] (same).  Likewise, the Court here should overrule this objection and approve the Injunction Provision.

## V.   RESERVATION OF RIGHTS WITH RESPECT TO CONFIRMATION OBJECTIONS

110.   The omission of a response in this memorandum to an objection should not be taken as a waiver of the Debtors' arguments in opposition of any such objection.  The Debtors reserve the right to supplement the memorandum with arguments at the Confirmation Hearing.

*[Remainder of page intentionally left blank]*

## VI.      CONCLUSION

111.      For the reasons set forth herein, the Debtors respectfully request that the Court (i) overrule the UST Objection, (ii) confirm the Plan, and (iii) grant such other and further relief as is just and proper.

Dated August 28, 2025
Wilmington, Delaware

/s/ Michael J. Merchant
Mark D. Collins, Esq. (Bar No. 2981)
Michael J. Merchant, Esq. (Bar No. 3854)
Amanda R. Steele, Esq. (Bar No. 5530)
Emily R. Mathews, Esq. (Bar No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone:      (302) 651-7700
Facsimile:      (302) 651-7701
Email:           collins@rlf.com
                 merchant@rlf.com
                 steele@rlf.com
                 mathews@rlf.com

-and-

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Matthew L. Brod, Esq. (admitted *pro hac vice*)
Lauren C. Doyle, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:      (212) 530-5000
Facsimile:      (212) 530-5219
Email:           ddunne@milbank.com
                 mbrod@milbank.com
                 ldoyle@milbank.com

Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
1101 New York Avenue, NW
Washington, DC 20005
Telephone:      (202) 835-7500
Facsimile:      (202) 263-7586
Email:           aleblanc@milbank.com

*Co-Counsel for Debtors in Possession*