IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| LIGADO NETWORKS LLC, *et al.*,[1] | ) Case No. 25-10006 (TMH) |
| Debtors. | ) (Jointly Administered) |

## DECLARATION OF
## DOUGLAS SMITH IN SUPPORT OF CONFIRMATION
## OF THE JOINT CHAPTER 11 PLAN OF LIGADO NETWORKS LLC
## AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

Under 28 U.S.C. § 1746, I, Douglas Smith, declare as follows under penalty of perjury:

1. I am the Chief Executive Officer of Ligado Networks LLC ("<u>Ligado</u>" and, together with its affiliated debtors and debtors in possession, the "<u>Debtors</u>"). I have been employed in this and other capacities by the Debtors since 2010. Accordingly, I am familiar with the Debtors' business, financial affairs, day-to-day operations, and books and records.

2. I submit this declaration in support of the Debtors' request for the confirmation of the *Joint Chapter 11 Plan of Ligado Networks LLC and its Affiliated Debtors and Debtors in Possession*, filed on June 24, 2025 [Docket No. 696] (as it may be amended or modified, the "<u>Plan</u>").[2]

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A). The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

[2] Capitalized terms not otherwise defined herein have the respective meanings ascribed to them in the Plan.

3. I have previously submitted the Declaration of Douglas Smith, Chief Executive Officer of Ligado Networks LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 2] (the "First Day Declaration") containing information regarding, among other things, my background and experience, the Debtors' business and operations, and the events leading to the filing of the Debtor' chapter 11 cases. I confirm that the information (to the extent applicable) contained in the First Day Declaration remains true and correct to the best of my knowledge, information and belief, and hereby incorporate the First Day Declaration herein by reference.

4. Together with the other members of the Debtors' senior management team and the Debtors' advisors, I have reviewed, and I am generally familiar with, the terms of the Plan, the Disclosure Statement, the Plan Supplement, and the requirements for confirmation of the Plan under section 1129 of title 11 of the United States Code (as amended, the "Bankruptcy Code") as have been explained to me by the Debtors' advisors. I also have read the objections to the confirmation of the Plan, including the UST Objection.

5. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' advisors, and my review of the relevant documents. My opinions are based upon my experience, knowledge and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**I.  The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation**

6. I have been advised of the applicable standards under which a plan of reorganization may be confirmed under chapter 11 of the Bankruptcy Code. For the reasons detailed below, and based on my understanding of the Bankruptcy Code, as explained to me by Debtors' counsel, I believe the Plan satisfies all applicable requirements for confirmation. I have

2

set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, or the related documents, or where it will be the subject of other testimony or evidence introduced at the Confirmation Hearing.

7. <u>Section 1129 (a)(1).</u> I understand that section 1129(a)(1) of the Bankruptcy Code requires a chapter 11 plan to comply with all applicable provisions of the Bankruptcy Code. As set forth below, I believe that the Plan satisfies section 1129(a)(1) of the Bankruptcy Code.

8. <u>Section 1122.</u> It is my understanding that section 1122 of the Bankruptcy Code requires that a plan place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. Based on my familiarity with the Debtors' capital structure, (a) business, legal, and factual reasons justify separate classification of Claims and Interests into the Classes created under the Plan and (b) each of the Claims and Interests assigned to a particular Class is substantially similar to the other Claims or Interests, as applicable, in such Class. It is my understanding that the classification scheme used by the Plan is based on the similar nature of the Claims or Interests contained in each Class and this classification satisfies section 1122(a) of the Bankruptcy Code.

9. <u>Section 1123(a).</u> I understand that the Plan satisfies the applicable requirements set forth in section 1123(a) of the Bankruptcy Code because:

- Article III of the Plan designates Classes of Claims and Interests;

- Article III of the Plan identifies Unimpaired Classes of Claims and Interests;

- Article III of the Plan specifies treatment of Impaired Classes of Claims and Interests;

- Article III of the Plan provides the same treatment for each Claim or Interest of a particular Class, unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of such particular Claim or Interest;

- Article V of the Plan provides adequate means for its implementation, including by providing for, among other things –

- o   the general settlement of Claims and Interests;

- o   the restructuring of the Debtors' balance sheet;

- o   satisfaction or settlement of all Allowed Claims and Interests;

- o   the implementation of the AST Transaction and the other Restructuring Transactions;

- o   the incurrence of the Exit First Lien Facility by the Reorganized Debtors;

- o   the vesting of the assets of the Estates in the Reorganized Debtors; and

- o   the execution, delivery, filing, or recording of all necessary contracts, instruments, releases, and other agreements or documents.

- I understand that Article V.H. of the Plan provides that the organizational documents of the Reorganized Debtors will prohibit the issuance of any non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the applicable governance documents as permitted by applicable law, and that the Plan therefore satisfies section 1123(a)(6);

- Article V of the Plan and the New Organizational Documents contain provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the officers, directors, or managers of the Debtors (as applicable) and the Debtors will disclose, or have disclosed as part of the Plan Supplement, to the extent known, the members of the New Boards.

10.   The Debtors reviewed their contracts and leases to determine which to assume or reject. The Debtors' conducted this analysis to reach a determination as to the value of such contracts and leases in light of future operations, costs, rejection damages, and available alternatives. Article VI of the Plan provides that the Debtors will cure defaults in accordance with the provisions thereof, with respect to Executory Contracts and Unexpired Leases assumed under the Plan and that all cure costs will be satisfied at the time of such assumption, consistent with section 1123(d) of the Bankruptcy Code.

11.   <u>Section 1129(a)(2)</u>. Based on my review of information provided by the Debtors and their advisors, I believe that the Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126,

and 1128, and Bankruptcy Rules 3017, 3018, and 3019, as required by section 1129(a)(2) of the Bankruptcy Code.

14. Section 1129(a)(3). I believe that the Debtors have proposed the Plan, the Restructuring Transactions (and all documents necessary to effectuate the Plan) in good faith and not by any means forbidden by Law. The Plan was proposed with the legitimate purpose of allowing the Debtors to maximize the value of their Estates and to effectuate a successful restructuring.

13. The Plan is the result of extensive negotiations conducted at arm's length among the Debtors, their key stakeholders, and certain other parties in interest. The Plan will enable the Reorganized Debtors to emerge with a deleveraged capital structure and sufficient liquidity that, I believe, will enable the Debtors to execute their business plan. As such, I believe that the Plan will achieve a result consistent with the objectives and purpose of section 1129(a)(3) of the Bankruptcy Code.

14. Section 1129(a)(4). I believe payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court. Further, Article II of the Plan contains procedures for filing applications for final allowance of Professional Fee Claims and procedures for the payment of such Professional Fee Claims upon approval by the Bankruptcy Court. Similarly, the Debtors' ordinary course professionals will be paid in the ordinary course as holders of Allowed Administrative Expense Claims consistent with the *Order (I) Authorizing Employment and Payment of Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 176].

15. <u>Section 1129(a)(5)</u>. As mentioned above, to the extent known and determined, the Debtors will disclose the identity of all individuals proposed to serve as the members of the New Boards.

16. <u>Section 1129(a)(6).</u> No regulatory commission needs to approve any rate changes provided for in the Plan. Thus, I believe that section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases.

17. <u>Section 1129(a)(7).</u> It is my understanding that the Liquidation Analysis attached as Exhibit D to the Disclosure Statement establishes that either (a) each impaired Class of Claims or Interests has accepted the Plan or (b) each member of each such Class will recover as much or more value under the Plan on account of its Claim or Interest, as applicable, as the value such member would have received if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. As a result, the Plan is in the best interests of the Debtors' stakeholders.

18. <u>Section 1129(a)(9)</u>. Based on my own understanding, as well as discussions with the Debtors' advisors, I believe that the Plan complies with section 1129(a)(9) of the Bankruptcy Code because the Plan generally provides for the full payment of Allowed General Administrative Claims as soon as reasonably practicable after the Effective Date (if not already satisfied). Further, the Plan generally provides for the full payment of Allowed Priority Tax Claims on the Effective Date or as soon as practicable thereafter. The Plan also provides for the full payment of all Priority Non-Tax Claims.

19. <u>Section 1129(a)(10)</u>. Classes 3, 4, 5, 9, and 10 are Impaired and each voted to accept the Plan, without taking into account the votes of any insider(s). It is my understanding that this

satisfies Section 1129(a)(10), as at least one class of claims that is impaired under the Plan has accepted the Plan with respect to all Debtors that have a class of impaired claims.

20. <u>Section 1129(a)(11)</u>.  I believe that the Plan is feasible in that it not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or Reorganized Debtors.  The Debtors and their advisors have thoroughly analyzed the Reorganized Debtors' ability to meet their post-emergence obligations under the Plan and to continue as a going-concern without the need for further financial restructuring.

21. I believe that the Reorganized Debtors will be well-positioned to execute their business plan and to meet their obligations as they come due in the ordinary course of business. The Plan will deleverage the Debtors' balance sheet, eliminating all existing funded indebtedness other than the Exit First Lien Facility, which will position the Reorganized Debtors for success. In further support of feasibility and the distributions set forth in the Plan, and pursuant to the terms of the AST Transaction, in exchange for certain usage rights with respect to the Debtors' L-band MSS spectrum and related assets, AST has and/or will (a) contribute certain warrants, convertible notes and/or cash to the Debtors, (b) make certain annual usage-right payments to the Reorganized Debtors and (c) pay the Reorganized Debtors a certain percentage of revenues derived from AST's use of the L-band MSS spectrum and related assets. This value will help to ensure that Plan distributions are made in accordance with the terms of the Plan.

22. Additionally, the Debtors, with the assistance of their advisors, have prepared financial projections for fiscal years 2025 through 2029, which are set forth in Exhibit C to the Disclosure Statement (the "<u>Financial Projections</u>").  The Debtors and their advisors have carefully evaluated the projected cash flows to ensure that the Plan provides the Reorganized Debtors with a reasonable assurance of commercial viability upon emergence.

23. As shown by the Financial Projections, the Reorganized Debtors will begin to generate substantial net cashflow by the end of the projection period. Although the Reorganized Debtors' revenues from operations are expected to be less than the cost of operations during portions of the projection period, the Reorganize Debtors expect to have sufficient liquidity to fund operations due to payments made by AST pursuant to the AST Transaction together with borrowing under the DIP Facility that are expected to offset these costs. This value, along with the DIP Facility which will convert into the Exit First Lien Facility, will help to ensure satisfaction of distributions pursuant to the Plan. Based on the Debtors' latest financial projections, I expect that once the SpectrumCo NGSO System (as defined in the AST Definitive Agreements) is launched, the revenue share component of the AST Transaction will allow the Reorganized Debtors to have positive net cash flow by fiscal year 2029.

24. I believe that the process for developing and preparing the Financial Projections was robust and that the Financial Projections are reasonable. I have reviewed the material assumptions underlying the Financial Projections, and I believe that such assumptions are reasonable and appropriate to provide the proper foundation for the Financial Projections.

25. <u>Section 1129(d)</u>. The Debtors filed the Plan to efficiently and responsibly reorganize their capital structure, preserve their businesses as a going concern, and provide recoveries to their stakeholders. The Plan was not filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended.

**II.    The Discretionary Contents of the Plan Are Appropriate and Should Be Approved**

26. In addition to these obligatory elements, it is my understanding that the Plan includes certain discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code. For example, the Plan impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, and mechanics

for Plan distributions. In addition, the Plan contains certain releases and exculpations, and permanently enjoins certain causes of action.

27. I believe these provisions of the Plan are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are fair and equitable and in the best interests of the Debtors, these Estates, and their stakeholders, and (d) are consistent with the relevant provisions of the Bankruptcy Code. Accordingly, I believe that these provisions satisfy the requirements of section 1123(b).

**Consensual Debtor and Third-Party Releases and Exculpation Provisions Are Appropriate**

28. The Plan includes a Debtor Release and a Third-Party Release (each as defined below), an exculpation provision, and an injunction provision. As noted above, I believe these discretionary provisions are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and the other case constituents, are given for valuable consideration, are integral components of the Plan, and, as I have been advised, are consistent with applicable precedent.

29. In support of the release, exculpation, and injunction provisions, the Released Parties have made substantial contributions to the Debtors throughout the Chapter 11 Cases, and it is my opinion that the Released Parties would not have provided such consideration in the absence of the Debtor Release and Third-Party Release. Specifically, the various Released Parties, among other things: (a) negotiated the Restructuring Support Agreement, the AST Definitive Agreements, and the Plan, (b) provided the necessary consents to implement the AST Transaction, (c) entered into significant settlements with, and provided considerable contributions and concessions to, the Debtors, (d) provided financial support to the Debtors to facilitate these Chapter 11 Cases and the success of the Plan in the form of (i) consenting to the Debtors' use of

cash collateral, (ii) funding the DIP Facility and agreeing to convert their DIP Claims into the Exit First Lien Loans, and (iii) committing to the Backstop Commitment (as such term is defined in the AST Definitive Agreements), (e) extended milestones and provided consents under the DIP Facility and Restructuring Support Agreement as needed to allow the Debtors to engage with other stakeholders and consensually resolve matters, and (f) consented to the treatment set forth in the Plan with respect to the First Lien Claims, 1.5 Lien Term Loan Claims, and Second Lien Note Claims, facilitating the satisfaction of all General Unsecured Claims in full and providing for junior preferred and common equity interest holder to retain their interests in the Reorganized Debtors. The Released Parties went to great lengths to assure the Debtors' reorganization.

### i. Debtor Release

30. Article VIII.D.1 of the Plan provides for certain releases by the Debtors, the Reorganized Debtors, and their Estates of Claims and Causes of Actions against each of the Released Parties (the "<u>Debtor Release</u>"). The Debtor Release is an integral part of the Restructuring Support Agreement and Plan, and a vital component of the comprehensive settlement implemented under the Plan. The Debtor Release is the result of a hard fought and arm's-length negotiation process conducted in good faith. It is my belief that the Released Parties would not have made the considerable contributions and concessions in the Chapter 11 Cases without the assurance of receiving the Debtor Release.

31. Each of the Released Parties have supported the Debtors' restructuring by providing, among other things, the benefits outlined in paragraph 29 above. Additionally, the officers and directors of the Debtors and Reorganized Debtors have indemnification rights against the Debtors, and thus, any Claims against the officers and directors would be a claim against the Debtors. I believe that each of the Released Parties has an interest, shared with the Debtors, to see the Plan implemented, including the AST Transaction and the other agreements memorialized

thereby.  In my view, the Debtors' or Reorganized Debtors' pursuit of any released Claims or Causes of Action against the Released Parties would not be in the best interests of the Estates and that the probability of success in litigation with respect to such Claims and Causes of Action, when weighed against the costs involved, supports the Debtor Release and I believe that any value that could be achieved from preserving such Claims and Causes of Action are outweighed significantly by the value and benefits provided by the Plan and the transactions contemplated therein.  Therefore, the Debtors' Releases are necessary to effectuate the Plan.

### ii. Release by Holders of Claims and Interests

32.     I further believe that the release by the Releasing Parties of certain non-Debtors set forth in Article VIII.D.2 of the Plan (the "Third-Party Release") is an essential component of the Plan and is supported by, among other reasons, those noted in paragraph 29 above.  The Third-Party Release is: (a) consensual; (b) given in exchange for good and valuable consideration provided by the Released Parties; (c) a good faith settlement and compromise of the released Claims and Causes of Action; (d) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, and is important to the overall objectives of the Plan; (e) fair, equitable, and reasonable; and (f) given and made after due notice and opportunity for hearing. Like the Debtor Release, the Third-Party Release facilitated participation of the key parties in interest in both the chapter 11 process generally and the formulation of the largely consensual Plan. The Third-Party Release was critical in incentivizing parties to support the Plan and preventing significant and time-consuming litigation regarding the various rights and interests.  I believe the Third-Party Release was a core negotiation point in connection with the Plan and instrumental in developing the Plan that maximizes value for all stakeholders.  As such, the Third-Party Release appropriately offers certain protections to parties who constructively participated in the Debtors' restructuring process by, among other things, funding these chapter 11 cases, both by providing

financing under the DIP Facility and the Exit First Lien Loans and facilitating a Plan that satisfies all General Unsecured Claims in full, and the retention of preferred and common equity interests and relative priority amongst current equity holders.  Furthermore, it is my understanding that the Releasing Parties were provided with notice and an opportunity to opt-out of the Third-Party Releases and of the consequences of failing to opt out of granting same.  It is also my understanding that the scope of the Third-Party Release is appropriately tailored under the facts and circumstances of these cases and contains exclusions for liability that is the result of any act or omission that is the result of gross negligence, intentional fraud or willful misconduct.

### iii. Exculpation Provision

33.     I understand that the exculpation provision in Article VIII.E of the Plan (the "Exculpation") was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope.  The Exculpation Provision is appropriate because the Exculpated Parties have participated in the Chapter 11 Cases in good faith, made substantial contributions to the Debtors' efforts to maximize value of their Estates, and are essential to the successful implementation of the Plan.  Additionally, all Exculpated Parties are estate fiduciaries.  Finally, the Exculpation Provision is narrowly tailored to protect the Exculpated Parties only from litigation related to acts or omissions in connection with the administration of the Chapter 11 Cases and related transactions and does not protect them from actions determined by a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct.

### iv. Injunction Provision

34.     I understand that Article VIII.F of the Plan provides for a permanent injunction preventing all Entities from bringing any action that is released under the Plan (the "Injunction").  I believe the Injunction is necessary to effectuate the Plan's releases and exculpation and to protect

the Released and Exculpated Parties from the risk of barred litigation as they implement the provisions of the Plan following the Effective Date.

**III.    Modifications to the Plan do not Require Re-solicitation**

35.    I understand that section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  I further understand that Bankruptcy Rule 3019 provides that modifications made after a plan has been accepted will be deemed accepted by all creditors and equity holders who have previously accepted the plan if the court finds that the proposed modifications do not materially and adversely change the treatment of the claim of any creditor or the interest of any equity holder.

36.    The Debtors made certain modifications to the Plan after the voting deadline, such modifications are technical clarifications, and resolve certain formal and informal comments to the Plan received from parties in interest.  These modifications do not materially and adversely change the treatment of any Claim or Interest.  I understand that the Consenting Stakeholders support these modifications.

**IV.    FCC Motions for Reconsideration Have No Bearing on the Plan and Feasibility**

37.    The Plan is feasible and is not subject to the Federal Communications Commission's (the "FCC") decisions on any pending petitions for reconsideration.

38.    In April 2020, the FCC issued an order (the "April 2020 Order") that authorizes the Debtors to utilize the power levels necessary for Ancillary Terrestrial Components ("ATC") operations on their L-Band Spectrum.

39.    In or around May 2020, certain parties filed petitions with the FCC seeking reconsideration of the April 2020 Order.  Ligado Networks, LLC filed responses to those petitions, and the petitioners filed replies.

40. Reconsideration requests are administrative requests routinely filed with the FCC by interested parties, with no timeline for FCC action. It is commonplace for the FCC to not act on reconsideration petitions.

41. The outstanding reconsideration requests have been pending for over five years and Ligado expects the requests will remain unaddressed.

42. Even if the FCC decides to grant the reconsideration petitions, the Plan will remain feasible.

43. The April 2020 FCC Order that is the subject of the reconsideration petitions concerns only the ATC portion of Ligado's business. The Debtors do not presently operate ATC in the L-Band Spectrum and the AST Transaction does not require ATC use of the L-Band Spectrum. The reconsideration petitions have no bearing on the Debtors' Mobile Satellite Services ("MSS") operations, which is the subject of the AST Transaction. Therefore, any action by the FCC related to the reconsideration petitions has no bearing on the feasibility of the Plan. There are no known challenges to the Debtors' operations on an MSS basis.

44. In addition, the reconsideration petitions have no bearing on any of the forthcoming regulatory applications, such as the application for approval of the SpectrumCo NGSO System.

45. Based on the foregoing, and for the reasons discussed in ¶¶ 29 – 32, I believe that the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

V.  **The Debtors Have Sufficient Capital to Satisfy Feasibility**

46. As discussed in paragraph 20 above as well as in the preceding section IV, I believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

47. It is my belief that the Debtors will have the ability to make all payments required by the Plan due to the funding under the DIP Facility and the proceeds of the AST Transaction. Additionally, as part of the AST Transaction, AST provided Ligado nearly five million penny

warrants, which Ligado can exercise as of March 2026. As of the close of trading on August 27, 2025, the AST warrants were valued at approximately $227.46 million.

48. Further, as set forth the Financial Projections, the Reorganized Debtors will generate substantial cashflow by the end of the projection period. In particular, the Reorganized Debtors are expected to have positive net cash flow of approximately $149 million during fiscal year 2029.

49. Accordingly, I believe that for the reasons noted above, the Plan is feasible.

## VI. Confirming the Plan Now and Seeking Regulatory Approval Before Going Effective Benefits the Estate

50. The Debtors operate in a highly regulated industry and the nature of the transactions contemplated by the Plan requires certain regulatory approvals. Specifically, I understand that the satisfaction of the Approval Condition and obtaining all governmental and third-party approvals and consents, including those of the FCC and ISED, are conditions precedent to the effectiveness of the Plan.

51. I understand that there is no definitive timeline for when these approvals and consents may be obtained. I also understand that, as a condition of entering into the Restructuring Support Agreement and the AST Transaction, the Consenting Stakeholders and AST, respectively, required that the Debtors seek confirmation of the Plan prior to obtaining these regulatory approvals and consents. The Milestones (as such term is defined in the Restructuring Support Agreement) negotiated by the Consenting Stakeholders and AST provide for the same.

52. I believe that the forty-month Outside Date (as defined in the Restructuring Support Agreement) provides a significant benefit to the Debtors and their stakeholders because it ensures that the signatories to the Restructuring Support Agreement remain bound by its terms while regulatory approvals are being sought, rather than remaining free to abandon the contemplated

restructuring earlier if the necessary approvals have not yet been obtained. I believe that the extended Outside Date increases the feasibility of the Plan.

53. I believe that the forty-month Outside Date is a significant benefit to the Debtors and their stakeholders because it ensures that the signatories to the Restructuring Support Agreement remain bound by its terms while regulatory approvals are being sought, rather than remaining free to abandon the contemplated restructuring earlier if the necessary approvals have not yet been obtained. I believe that the extended Outside Date increases the feasibility of the Plan.

54. I also understand that confirming the Plan now, prior to obtaining the applicable regulatory approvals, would automatically extend the maturity of the DIP Facility.

55. Based on the foregoing, I believe that it is in the best interests of the Debtors and the estate to seek confirmation of the Plan prior to obtaining the necessary regulatory approvals.

**VII.    The Plan Does Not Depend on the Result of the Takings Litigation**

56. The Debtors are currently unable to deploy ATC operations in the L-Band Spectrum. While Ligado believes it will prevail on the merits of the Takings Litigation, the Plan does not depend upon a successful outcome in the Takings Litigation nor does the Reorganized Debtors' business rely on the ability to deploy ATC operations in the L-Band Spectrum. The cornerstone of the Plan and the Reorganized Debtors' go-forward business is MSS use of the L-Band Spectrum.

57. The Reorganized Debtors expect to begin generating significant positive cash flow starting in 2029 when it will begin to materially benefit from operation of the MSS portion of the business and the revenue sharing provisions provided for in the AST Transaction.

58. Based on the foregoing, and for the reasons discussed in ¶¶ 29 – 32, I believe that the Plan is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.

**Conclusion**

59. Accordingly, I believe that the Plan satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, and other applicable non-bankruptcy laws, as they have been explained to me, and should be confirmed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 28th day of August, 2025.

By: /s/*Douglas Smith*
Name: Douglas Smith
Title: Chief Executive Officer
Ligado Networks LLC
10802 Parkridge Blvd
Reston, VA  20191