**Exhibit A**

**Revised Proposed DIP Amendment Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC *et al.*,[1] | Case No. 25-10006 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. __** |

**ORDER AUTHORIZING THE DEBTORS
TO (I) AMEND THE DIP CREDIT AGREEMENT AND (II) ENTER INTO THE
LETTER AGREEMENT AND AST POWER OF ATTORNEY**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned Debtors for entry of an order

authorizing the Debtors to amend the DIP Credit Agreement, enter into the Letter Agreement, and

for related relief; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent

with Article III of the U.S. Constitution; and this Court having found that venue in this district is

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the notice of the

Motion was appropriate under the circumstances and that no other notice need be provided; and

this Court having reviewed the Motion; and this Court having determined that the legal and factual

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).  The Debtors' headquarters is located at: 10802 Parkridge Boulevard, Reston, Virginia 20191.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, this Court makes the following findings of fact and conclusions of law:

A.    The financing available under the DIP Loan Documents, as amended by the DIP Amendment, represents the best and only available financing option for the Debtors under the circumstances.  The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders.

B.    The terms of the DIP Amendment are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

C.    The terms of the DIP Amendment have been negotiated in good faith and at arm's length between the Debtors and the DIP Lenders.

D.    Section 9 of the Mediated Agreement (attached as <u>Exhibit 1</u> to the AST Definitive Documents Order) provided that "AST shall be granted a power of attorney in connection with the Backstop Commitment and shall be entitled to exercise the power of attorney to submit a draw request under the DIP Facility on behalf of the Debtors in the amount of the Refund Amount and direct such payment to be made directly to AST in satisfaction of Ligado's obligation to pay the Refund Amount to AST."

E.    By consenting to the entry of this Order, each Backstop Incremental Lender (as defined in the DIP Amendment) has acknowledged and agreed that: (1) AST is and, for so long as the Backstop Commitments remain outstanding, shall be a third-party beneficiary of the DIP Amendment and a party in interest in these cases; (2) if a Backstop Incremental Lender fails to fund Backstop Incremental Loans as and when such Backstop Incremental Lender is required to

2

do so under the terms of the DIP Amendment or this Order, then AST may commence an action in this Court or intervene in an action commenced by the Debtors in this Court against such Backstop Incremental Lender, on a several and not joint basis, to enforce this Order and the DIP Amendment for the purpose of compelling such Backstop Incremental Lender to fund such Backstop Incremental Loans in accordance with the DIP Amendment or obtaining damages against such Backstop Incremental Lender for its failure to fund such Backstop Incremental Loans in accordance with the DIP Amendment; and (3) it shall not contend or assert in any action commenced before this Court that AST is not a proper party to bring a claim under the DIP Amendment or against the Backstop Incremental Lender (or otherwise intervene in any action commenced by the Debtors with respect to the DIP Amendment) and that it has waived the right to advance such contention or assertion.

Based on the foregoing, it is **HEREBY ORDERED THAT**:

1.      The Motion is GRANTED as set forth herein.

2.      The DIP Amendment attached hereto as **<u>Exhibit 1</u>** is approved.

3.      The Letter Agreement attached hereto as **<u>Exhibit 2</u>** is approved.

4.      All parties' obligations and indebtedness arising under, in respect of, or in connection with the DIP Amendment shall be deemed to have been extended by the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lenders (and the successors and assigns thereof, solely in their capacity as such) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Orders, this Order or any provision thereof and hereof is vacated, reversed, or modified, on appeal or otherwise.

5.      Except as otherwise expressly provided herein or in the DIP Amendment, each provision of the DIP Orders and the DIP Loan Documents shall remain unchanged and in full force and effect.  All liens, priorities, and other rights, remedies, benefits, privileges, releases, and protections provided to the DIP Secured Parties in the DIP Orders and the DIP Loan Documents shall apply with equal force and effect with respect to the DIP Amendment, the Backstop Funding Commitments, and all rights and obligations in connection therewith or related thereto.

6.      Notwithstanding anything to the contrary in the DIP Amendment, the effectiveness of each provision of this Order, the DIP Amendment, and the Letter Agreement, and the obligations of the parties therein, shall be conditioned upon entry of the Confirmation Order confirming an Acceptable Plan (as such term is defined in the DIP Loan Agreement).

7.      The Debtors are authorized to take any and all actions necessary or appropriate to effectuate the relief granted in this Order.

8.      Notwithstanding anything in the Bankruptcy Rules to the contrary, this Order is immediately effective and enforceable upon its entry.

9.      For so long as the Backstop Commitments shall remain outstanding, this Court shall retain sole and exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

10.      This Court shall retain jurisdiction to hear and determine any claim that may be asserted at any time based on the alleged failure of a Backstop Incremental Lender to fund Backstop Incremental Loans as and when such Backstop Incremental Lender is required under the terms of the DIP Amendment or this Order.

11.      AST is and, for so long as the Backstop Commitments remain outstanding, shall be a third-party beneficiary of the DIP Amendment and a party in interest in these cases.

12.     If a Backstop Incremental Lender fails to fund Backstop Incremental Loans as and when such Backstop Incremental Lender is required to do so under the terms of the DIP Amendment or this Order, then AST may commence an action in this Court or intervene in an action commenced by the Debtors in this Court against such Backstop Incremental Lender, on a several and not joint basis, to enforce this Order and the DIP Amendment for the purpose of compelling such Backstop Incremental Lender to fund such Backstop Incremental Loans in accordance with the DIP Amendment or obtaining damages against such Backstop Incremental Lender for its failure to fund such Backstop Incremental Loans in accordance with the DIP Amendment.

13.     Each Backstop Incremental Lender has waived its right to assert in any action commenced before this Court with respect to the DIP Amendment that AST is not a proper party to bring a claim under the DIP Amendment or against the Backstop Incremental Lender (or otherwise intervene in any action commenced by the Debtors with respect to the DIP Amendment).

14.     Any claim of the AST Parties (as defined in the Letter Agreement) in respect of the Refund Amount shall have the status of an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b)(1) and 507(a)(2) of the Bankruptcy Code, without further order of this Court.

15.     The provisions of this Order control and take precedence over the DIP Amendment and the related documents.

16.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the payment of the Refund Amount and the implementation, interpretation and enforcement of the Letter Agreement.

RLF1 33801831v.1

**<u>Exhibit 1</u>**

**DIP Amendment**

## AMENDMENT NO. 1
## TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

This AMENDMENT NO. 1, dated as of September 17, 2025 (this "**Amendment**") amends that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of January 5, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Existing Loan Agreement**", and as further amended by this Amendment, the "**Amended Loan Agreement**"), among Ligado Networks LLC, a Delaware limited liability company, as borrower (the "**Borrower**"), the Subsidiary Guarantors, each as a Guarantor thereunder and a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. Bank Trust Company, National Association ("**U.S. Bank**"), as administrative agent for the Lenders (including its successors and assigns, in such capacities, the "**Administrative Agent**"). Capitalized terms used but not defined herein shall have the meanings given to such terms in the Amended Loan Agreement.

WHEREAS, pursuant to Section 2.18 of the Existing Loan Agreement, the Borrower has requested, and the Lenders identified on Schedule 1 hereto (each, a "**Backstop Incremental Lender**") have agreed to provide, subject to the terms and conditions set forth herein, additional Commitments on the date hereof in an amount equal to the aggregate Commitments set forth on Schedule 1 hereto (the "**Backstop Incremental Commitments**", and the Loans in respect thereof, the "**Backstop Incremental Loans**"); and

WHEREAS, the Borrower has requested, and the Lenders have agreed to make, certain other amendments to the Existing Loan Agreement as set forth herein, subject to the terms and conditions set forth herein.

NOW THEREFORE, each Backstop Incremental Lender, the other Lenders party hereto (collectively constituting the Required Lenders and the Required Ad Hoc Holders), the Borrower and the Administrative Agent hereby agree as follows:

Section 1.    <u>Incremental Loan Facility</u>.

(a)    Subject to the terms and conditions hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, each Backstop Incremental Lender severally, and not jointly, agrees to (x) provide the Backstop Incremental Commitments on the First Amendment Effective Date (as defined below) and (y) fund Backstop Incremental Loans denominated in Dollars to the Borrower on the Backstop Incremental Funding Date (as defined below) in an aggregate principal amount not to exceed its Backstop Incremental Commitments. Backstop Incremental Loans borrowed and repaid or prepaid may not be reborrowed.

(b)    Upon the occurrence of the First Amendment Effective Date, the Backstop Incremental Commitments shall constitute "Incremental Commitments" for all purposes of the Amended Loan Agreement and the Loan Documents, the Backstop Incremental Lenders shall constitute "Incremental Loan Lenders" for all purposes of the Amended Loan Agreement and the Loan Documents, and the Backstop Incremental Roll-Up Loans shall constitute "DIP Roll-Up Loans" for all purposes of the Amended Loan Agreement, including, for the avoidance or doubt, the calculation of each Lender's Commitments for Roll-Up. The Backstop Incremental Roll-Up Loans shall have the same terms as the DIP Roll-Up Loans outstanding prior to the First Amendment Effective Date and the Backstop Incremental Funded Loans if and when funded shall have the same terms as the DIP New Money Loans

outstanding prior to the First Amendment Effective Date, in each case, except as expressly set forth in this Amendment or in Annex A hereto.

(c)    The Backstop Incremental Commitments shall remain available for the Borrower until the earliest to occur of (i) the date that is forty (40) months after the Effective Date (as defined in that certain Strategic Collaboration and Spectrum Usage Agreement dated March 22, 2025, by and between the Borrower and Spectrum USA I, LLC, a Delaware limited liability company (as in effect on the date hereof, the "**Collaboration Agreement**") (provided, that such date may be extended by the Backstop Incremental Lenders in writing in their sole discretion (including via e-mail)), (ii) the date upon which the Approval Condition (as defined in that certain Framework Agreement by and among AST Spacemobile Inc., AST, Spectrum UCA I, LLC and the Borrower dated as of March 22, 2025 (as in effect as of the date hereof, the "**Framework Agreement**")) has been satisfied in accordance with the terms thereof, (iii) the date upon which the Debtors file a "Notice of Occurrence of Plan Effective Date" on the Bankruptcy Court docket in respect of the Cases (the "**Plan Effective Date**"), (provided, that the Plan Effective Date shall have occurred together with the satisfaction of the Approval Condition (as defined in the Framework Agreement) or otherwise with the written consent of AST (including via e-mail)), (iv) the failure by AST to make any required payment to the Borrower under the Framework Agreement (subject to the applicable cure periods set forth in the Framework Agreement), (v) the termination of the Framework Agreement by the Borrower pursuant to Section 7.1(g) thereof and (vi) for the avoidance of doubt, the Backstop Incremental Funding Date (after giving effect to the funding and any fees or Roll-Up).  Upon the occurrence of any of the foregoing, the Backstop Incremental Commitments shall immediately and automatically be reduced to zero.

(d)    The Borrower shall draw the Backstop Incremental Commitments in one draw on the Backstop Incremental Funding Date (as defined below) in an amount not to exceed the permitted use of proceeds.  Proceeds of the Backstop Incremental Loans shall be utilized by the Borrower solely to pay the Refund Amount (as defined in the Framework Agreement), solely to the extent (and up to the amount) required thereunder.

Section 2.    Amendments to Existing Loan Agreement. Effective as of the First Amendment Effective Date:

(a)    The Existing Loan Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: **double-underlined text**) as set forth in the Amended Loan Agreement attached hereto as Annex A;

(b)    Schedule 2.01 of the Existing Loan Agreement is hereby amended by annexing thereto the information set forth on Schedule 1 attached hereto;

(c)    The Required Ad Hoc Holders and the Required Lenders hereby consent to this Amendment, which shall constitute an Increase Joinder in accordance with Section 2.18(b)(vii) of the Amended Loan Agreement;

Section 3.    Representations and Warranties of the Loan Parties. Each Loan Party hereby represents and warrants that:

(a)    Each Company is duly organized and validly existing under the laws of the jurisdiction of its organization.

(b)    This Amendment constitutes, and each other Loan Document to which any Loan Party is

to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of each Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(c)     The funding of the Backstop Incremental Loans (a) does not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which would not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any material Requirement of Law, (d) will not violate or result in a default or require any consent or approval that has not been obtained under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company (other than (i) with respect to the Prepetition Facilities that are stayed as a result of the Cases and (ii) violations arising solely and directly as a result of the commencement of the Cases and Recognition Proceedings and except as otherwise excused by the Bankruptcy Court), and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

(d)     Except for the filing of the Cases and as set forth in Schedule 3.08 to the Existing Loan Agreement, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company as to which, in any case, there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect of the type described in clause (b) of the definition thereof.

(e)     No part of the proceeds of the Backstop Incremental Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors, including Regulation T, U or X.

(f)     The Borrower will use the proceeds of the Backstop Incremental Loans solely to pay the Refund Amount (as defined in the Framework Agreement), solely to the extent required under the Framework Agreement.

(g)     The Loan Security Agreement, taken together with the Interim DIP Order and/or the Final DIP Order, is effective to create in favor of the Collateral Agent, for the benefit of the Backstop Incremental Lenders and the other Secured Parties, legal, valid, and enforceable continuing First Priority Liens on, and automatically perfected security interests in, the Collateral pledged hereunder or thereunder, in each case, subject to no Liens other than Permitted Liens, the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge. Pursuant to the terms of the Final DIP Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Final DIP Order, the Obligations of the Loan Parties under this Amendment will constitute allowed super-priority administrative expense claims in the Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject only to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge. Notwithstanding anything to the contrary herein, the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge shall be

senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Collateral Agent and the other Secured Parties.  The provisions of the Loan Security Documents create legal and valid Liens on all the Collateral in favor of Collateral Agent, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.

(h)    The Canadian Security Agreement, taken together with the Final DIP Recognition Order, is effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Canadian Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate dated the Closing Date and (ii) upon the taking of possession or control by the Collateral Agent of the Canadian Collateral with respect to which a security interest may be perfected by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Loan Security Document), the Liens created by the Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Canadian Collateral (other than such Canadian Collateral in which a security interest cannot be perfected under the PPSA as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Liens, including the Administration Charge.

(i)    Each Loan Security Document delivered pursuant to Sections 5.11 and 5.12 of the Amended Loan Agreement will, upon execution and delivery thereof and taken together with the Final DIP Order, and the DIP Recognition Orders, be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder, and such Loan Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens, including the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.

(j)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, employees, brokers or agents of such Loan Party, such Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws, or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(k)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, employees, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person or (ii) has violated or is in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(l)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none

of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of Anti-Terrorism Laws or other applicable laws, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(m)    The Cases were commenced on the Petition Date, duly authorized in accordance with applicable laws, and proper notice thereof has been given of (i) the motion seeking approval of the Loan Documents, the entry of the Interim DIP Order and the Final DIP Order, and (ii) the hearing for the entry of the Final DIP Order. Proper notices of the motions for entry of the Interim DIP Order and the hearings thereon were given.

(n)    The Initial CCAA Recognition Order and Interim DIP Recognition Order were obtained within five (5) Business Days of the entry of the Interim DIP Order and proper notice thereof under the circumstances was given of (i) the application seeking the issuance of each of the Interim DIP Recognition Order and Final DIP Recognition Order, and (ii) the motion seeking the issuance of the Interim DIP Recognition Order and Final DIP Recognition Order.

(o)    With respect to each Loan Party that is a Debtor, the Loan Security Agreement and the other Loan Security Documents are legally binding on such Loan Party, and the Collateral is subject to a legal, valid, enforceable and perfected security interest and Liens in favor of the Collateral Agent for the benefit of the Secured Parties with the priority set forth in the DIP Orders (or DIP Recognition Orders as the case may be), to the fullest extent permissible under applicable law.

(p)    Each of the Final DIP Order, and solely with respect to the Canadian Collateral, the Final DIP Recognition Order, is in full force and effect, is a Final Order and has not been modified, amended, vacated or stayed other than as acceptable to the Required Lenders (pursuant to a consent executed by them).

(q)    From and after the entry of the Interim DIP Order, and solely with respect to the Canadian Collateral upon issuance of the Interim DIP Recognition Order, pursuant to and to the extent permitted in the Interim DIP Order or Interim DIP Recognition Order and applicable law, the Obligations (i) will constitute allowed joint and several superpriority claims and (ii) will be secured by a valid, binding, continuing, enforceable, fully perfected Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, subject only to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge and the priorities set forth in the DIP Orders and, solely in relation to the Canadian Collateral, the DIP Recognition Orders.

(r)    The entry of the Final DIP Order and, solely in relation to the Canadian Collateral, the Final DIP Recognition Order, is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, the DIP Superiority Claims and Liens described in Section 2.19 of the Amended Loan Agreement, without the necessity of the execution (or recordation or filing) of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents, to the extent permissible under applicable law.

Section 4.    <u>Conditions to First Amendment Effective Date</u>. Notwithstanding anything to the contrary set forth in Section 2.18 of the Existing Loan Agreement, the obligations of the Backstop Incremental Lenders to provide the Backstop Incremental Commitments and the effectiveness of the amendments set forth in Section 2 shall be effective upon the date that the following conditions are

satisfied (or waived by the Backstop Incremental Lenders and the Required Ad Hoc Holders) (the "**First Amendment Effective Date**"):

(a)     each Backstop Incremental Lender shall have received, prior to or substantially concurrently with the First Amendment Effective Date, (i) all documentation and other information about any Loan Party reasonably requested by such Backstop Incremental Lender with respect to any Loan Party or AST, which documentation or other information is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (ii) if the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, beneficial ownership certificates in relation to the Borrower pursuant to the requirements thereof, in each case, to the extent reasonably requested in writing by such Backstop Incremental Lender prior to or substantially concurrently with the First Amendment Effective Date;

(b)     prior to or substantially concurrently with the First Amendment Effective Date, the Administrative Agent and/or each Backstop Incremental Lender (as applicable) shall have received all reasonable and documented out-of-pocket expenses to be paid by the Borrower to the Administrative Agent or the Backstop Incremental Lenders, as applicable, on the First Amendment Effective Date for which invoices have been delivered to the Borrower prior to the First Amendment Effective Date, in each case, on or before the First Amendment Effective Date (and which, in the case of the Administrative Agent, the Borrower acknowledges shall include all outstanding and previously unbilled fees and expenses of counsel to the Administrative Agent incurred on or prior to the First Amendment Effective Date pursuant to or in connection with the Existing Loan Agreement (and the administration thereof) and the negotiation, execution and delivery of this Amendment);

(c)     the Backstop Incremental Lenders shall have received, with respect to this Amendment and other Loan Documents and any other matters as the Backstop Incremental Lenders shall reasonably request:

(i) a certificate of the secretary or assistant secretary of each Loan Party dated the First Amendment Effective Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (in the case of a Loan Party that is not a Foreign Subsidiary) as of a recent date by the Secretary of State of the jurisdiction of organization of the applicable Loan Party, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of this Amendment and any other Loan Document to which such Person is a party and, in the case of the Borrower, the borrowings contemplated hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing this Amendment and any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer or a director (or if there is no such other officer or director of such Loan Party, an officer or director of the general partner, sole member or majority shareholder of such Loan Party) as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (c));

(ii) a certificate as to the good standing of each Loan Party as of a recent date, from the Secretary of State of the jurisdiction of organization of the applicable Loan Party (or other applicable Governmental Authority);

(d)     there shall have been delivered to the Backstop Incremental Lenders executed counterparts of this Amendment by each of the Loan Parties, each of the Backstop Incremental Lenders, the Required Ad Hoc Holders and the Required Lenders;

(e)      the Backstop Incremental Lenders shall have received evidence in form and substance reasonably satisfactory to the Backstop Incremental Lenders and the Required Lenders of the Bankruptcy Court's (i) entry of an order approving the Debtor's entry into this Amendment substantially in the form attached hereto as Annex B; and (ii) confirmation of an Acceptable Plan;

(f)      As of the date hereof, the representations and warranties of such Loan Party set forth in Article 3 of the Amended Loan Agreement and in the other Loan Documents are true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects) on and as of such date with the same effect as though such representations and warranties had been made on and as of such date; provided, that to the extent that any representation or warranty expressly relates to a given date or period, it is true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects) as of such date or for such period;

(g)      As of the date hereof, the representations and warranties set forth in Section 3 hereof shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects) on and as of such date with the same effect as though such representations and warranties had been made on and as of such date; provided, that to the extent that any representation or warranty expressly relates to a given date or period, it is true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects) as of such date or for such period;

(h)      No Default or Event of Default shall have occurred and be continuing or would result from giving effect to the Backstop Incremental Commitments and the other transactions contemplated by this Amendment on the First Amendment Effective Date;

(i)      The execution, delivery and performance of this Amendment and each other agreement or instrument contemplated hereby are within such Loan Party's corporate or other organizational power and have been duly authorized by all necessary action on the part of such Loan Party; and

(j)      The Administrative Agent shall have received a certificate, dated the First Amendment Effective Date and signed by a Responsible Officer of the Borrower, attesting to the matters set forth in this Section 4 clauses (f), (g), (h) and (i).

Section 5.      Conditions to Backstop Incremental Funding Date. The obligations of the Backstop Incremental Lenders to fund the Backstop Incremental Loans to the Borrower shall be effective upon the first Business Day upon which the following conditions have been satisfied (or waived by the Required Ad Hoc Holders) (the "**Backstop Incremental Funding Date**"):

(a)      the Administrative Agent shall have received a Borrowing Request in accordance with Section 2.18(a) of the Amended Loan Agreement, which Borrowing Request shall provide direction to fund the proceeds of the Backstop Incremental Loans directly to AST (or a subsidiary thereof to the extent designated in writing in such Borrowing Request); provided that, any Person designated to receive such proceeds shall have provided (i) all documentation and other information reasonably requested by the Administrative Agent (or any Backstop Incremental Lender), which documentation or other information is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and (ii) if such Person qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, beneficial ownership certificates in relation to such Person pursuant to the requirements thereof, in each case, to the extent reasonably requested in writing by the Administrative Agent (or any Backstop Incremental Lender);

(b)     the Refund Amount (as defined in the Framework Agreement) shall be due and owing to AST in accordance with the terms of the Framework Agreement as in effect on the date hereof;

(c)     as of the Backstop Incremental Funding Date, no Material Adverse Effect (pursuant to clause (b) of the definition thereof) shall have occurred and be continuing or shall immediately occur upon giving effect to the Backstop Incremental Loans;

(d)     As of the Backstop Incremental Funding Date, the representations and warranties set forth in Section 3 hereof shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects) on and as of such date with the same effect as though such representations and warranties had been made on and as of such date; provided, that to the extent that any representation or warranty expressly relates to a given date or period, it is true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" is true and correct in all respects) as of such date or for such period;

(e)     No Event of Default shall have occurred and be continuing or shall immediately occur upon giving effect to the Backstop Incremental Loans, in each case, as a result of the occurrence of any of the following (collectively, the "**Backstop Limited Events of Default**"):

(i)     any Guarantee of a Subsidiary ceases to be in full force and effect (except as contemplated by the terms thereof), in each case, subject to customary challenge periods consistent with the Final DIP Order which Guarantees, solely to the extent such Guarantees arise from the Incremental Loan Facility, shall be subject to the challenge provisions described in paragraph 27 of the Final DIP Order; provided that merely the denial or disaffirmation, filing or assertion of invalidity of a Guarantee will not cause this condition to be satisfied;

(ii)     following the entry of the Final DIP Order, any security interest and Lien created or purported to be created by any Loan Security Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Loan Secured Parties, the Liens, rights, powers and privileges created or purported to be created and granted under such Loan Security Document (including a perfected Lien with the priority set forth in the Final DIP Order) on all of the Collateral thereunder (except as otherwise expressly provided in such Loan Security Document and, solely with respect to priority, other than Permitted Liens (including the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge) which by operation of law are senior) in favor of the Collateral Agent, or shall be asserted by the Borrower or any Guarantor not to be a valid, perfected, Lien with the priority set forth in the Final DIP Order (except as otherwise expressly provided in this Amendment or such Loan Security Document) on the Collateral covered thereby;

(iii)     any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by the Borrower or any Guarantor or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), provided that any Liens arising pursuant to any Loan Document or any Loan Security Agreement shall be subject to the challenge provisions described in paragraph 27 of the Final DIP Order, solely as such Liens arise on account of the Incremental Loan Facility; provided, further, that merely the denial or disaffirmation, filing or assertion of invalidity of a Loan Document or any material provision thereof will not cause this condition to fail to be satisfied;

(iv)     actual invalidity or impairment of any Loan Document (including the failure of

any Liens purported to be created by any Loan Security Document or the DIP Orders or the DIP Recognition Orders on any material portion of the Collateral to remain or otherwise become perfected), <u>provided</u> that any Liens arising pursuant to any Loan Document or any Loan Security Agreement shall be subject to the challenge provisions described in paragraph 27 of the Final DIP Order, solely as such Liens arise on account of the Incremental Loan Facility; <u>provided</u>, further, that merely the denial or disaffirmation, filing or assertion of invalidity of a Loan Document will not cause this condition to fail to be satisfied;

(v)       dismissal of any of the Cases or dismissal of the Recognition Proceedings, or the filing of a motion or other pleading seeking such dismissal of the Cases or dismissal of the Recognition Proceedings;

(vi)      entry of an order without the prior consent of Required Lenders amending, supplementing or otherwise modifying any DIP Order or DIP Recognition Order or any Loan Document, in each case in a manner adverse to any of the Agents or Lenders;

(vii)     reversal, vacation or stay of the effectiveness of any DIP Order or DIP Recognition Order;

(viii)    the Loan Parties' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with the Lenders' claims under the Loan Documents, the Prepetition Debt Documents and the transactions contemplated thereby; <u>provided</u> that (x) the Required Lenders shall have opposed such filing in respect of a superpriority claim or Lien and (y) such filing shall not have been dismissed for a period of 90 days or more; and/or

(ix)      cessation of the Liens or the DIP Superpriority Claims to be valid, perfected and enforceable in all respects.

Section 6.      <u>Amendment Limited; No Waiver</u>. This Amendment is limited as specified herein and shall not, other than as expressly set forth herein, constitute a modification, acceptance or waiver of any other provision of the Existing Loan Agreement. The terms and conditions of the Amended Loan Agreement, as amended or supplemented by this Amendment, constitute the entire agreement and understanding of the parties hereto with respect to its subject matter and supersede all oral communications and prior writings with respect thereto. This Amendment, the making of the Backstop Incremental Commitments and/or the funding of any Backstop Incremental Loans shall not constitute or be deemed to be, by implication or otherwise  a waiver of or otherwise affect the rights and remedies of the Lenders or the Secured Parties under the Existing Loan Agreement, the Amended Loan Agreement or any other Loan Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Existing Loan Agreement, the Amended Loan Agreement or any other Loan Document or any other provision of the Existing Loan Agreement, the Amended Loan Agreement or any other Loan Document, including the Maturity Date, all of which are ratified and affirmed in all respects and shall continue in full force and effect.

Section 7.      <u>Confirmation of Guarantees and Security Interests; No Novation</u>. By signing this Amendment, each Loan Party hereby confirms that (a) the obligations of the Loan Parties under the Amended Loan Agreement (including with respect to the Backstop Incremental Loans contemplated by this Amendment) and the other Loan Documents (i) are entitled to the benefits of the guarantees and the security interests set forth or created in the Loan Documents, (ii) constitute "Obligations" as such term is defined in the Amended Loan Agreement, "Secured Obligations" as such term is defined in the Loan Security Agreement and "Secured Obligations" as such term is defined in the Canadian Security Agreement, in each case, subject to the qualifications and exceptions described therein, (iii)

notwithstanding the effectiveness of the terms hereof, the Loan Documents are, and shall continue to be, in full force and effect and are hereby ratified and confirmed in all respects (except as amended or waived hereby) and (b) each Backstop Incremental Lender shall be a "Loan Secured Party" and a "Lender" for all purposes of the Amended Loan Agreement and the other Loan Documents. Each Loan Party ratifies and confirms that all Liens granted, conveyed, or assigned to the Administrative Agent by such person pursuant to any Loan Document to which it is a party remain in full force and effect, are not released or reduced, and continue to secure full payment and performance of the Secured Obligations (as defined in the Loan Security Agreement or the Canadian Security Agreement, as applicable) as increased hereby, as contemplated by this Amendment. Notwithstanding the foregoing, the Administrative Agent and each Backstop Incremental Lender hereby agree with the Canadian Loan Parties that in no event will the Obligations of the Canadian Loan Parties under the Amended Loan Agreement and the other Loan Documents, including under any guarantee provided by such Loan Party pursuant to the terms of the Amended Loan Agreement, extend to any "interest" (as such term is defined in the Criminal Code (Canada)) provided for in excess of the "criminal rate" (as such term is defined in the Criminal Code (Canada) and to the extent necessary any guarantee provided by any Canadian Loan Party is hereby deemed amended to so limit the Obligations guaranteed by the Canadian Loan Parties and the Canadian Security Agreement is hereby deemed amended to so limit the Secured Obligations (as such term is defined in the Canadian Security Agreement). To the extent necessary the parties hereto agree to adjust the "interest" (as defined in the Criminal Code (Canada)) in accordance with Section 2.06(f) of the Amended Loan Agreement. This Amendment is not intended to constitute and shall not constitute a novation of (x) the Existing Loan Agreement, the Amended Loan Agreement or any other Loan Document, (y) the Obligations or Secured Obligations under the Existing Loan Agreement or the Amended Loan Agreement or (z) the Liens on the Collateral in favor of the Secured Parties securing the Secured Obligations.

      Section 8.    <u>Loan Document</u>. This Amendment shall be a Loan Document.

      Section 9.    <u>GOVERNING LAW</u>. THIS AMENDMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

      Section 10.    <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall constitute an original for all purposes, but all such counterparts taken together shall constitute but one and the same instrument. Any signature delivered by a party by facsimile, pdf electronic transmission or any other electronic means that reproduces an image of the actual executed signature page shall be deemed to be an original signature thereto. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Amendment and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

      Section 11.    <u>Directions to the Administrative Agent</u>. The Lenders party hereto, constituting the Required Lenders and the Required Ad Hoc Holders, by their signature hereto, direct the Administrative Agent to enter into this Amendment and any and all other documents, certificates, instruments or agreements required to consummate the transactions contemplated pursuant to this Amendment.

      Section 12.    <u>Submission to Jurisdiction of the Bankruptcy Court</u>. Each Lender party hereto,

by execution hereof, hereby consents to submit (or reaffirm its submission) to the jurisdiction of the Bankruptcy Court, and any applicable Order approving the provision of the Backstop Incremental Commitments, the making of the Backstop Incremental Loans and the other transactions contemplated by this Amendment, and acknowledges and agrees that the Bankruptcy Court retains exclusive jurisdiction over any disputes concerning payment of the Backstop Incremental Loans as contemplated by this Amendment.

Section 13.    <u>The Cases</u>.  Each Lender party hereto, by execution hereof, hereby (A) agrees that such Lender (i) shall not seek, request, or support, directly or indirectly, a dismissal of the Cases or join in, consent to, or otherwise support any motion, pleading, or request by any Person seeking a dismissal of the Cases and (ii) shall use commercially reasonable efforts to affirmatively oppose any such motion, pleading, or request for any such dismissal of the Cases by any Person on or after the date hereof, including, without limitation, by filing an objection or statement in opposition thereto and (B) directs the Administrative Agent to take any such action contemplated in the foregoing clause (A)(ii) on behalf of the Required Lenders, subject to the Administrative Agent's receipt of security or indemnity reasonably satisfactory to it against any and all liability or expense which may be incurred by it by reason of taking or continuing to take such action.  Notwithstanding anything to the contrary herein, any breach by a Lender of the terms of this Section 13 shall not result in a failure of the conditions in clauses (e)(v) and (e)(viii) of Section 5 to be satisfied.

Section 15.    <u>Sufficiency of Funds</u>. Each Backstop Incremental Lender party hereto severally represents and warrants, as of the date hereof, that it has access to sufficient capital to fulfill its obligations to provide its Backstop Incremental Commitments and to fund any Backstop Incremental Loans in the amount and at the time required hereunder and under the Amended Loan Agreement.

[***Signature Pages Follow***]

IN WITNESS WHEREOF, the undersigned has caused this Amendment to be duly executed and delivered by its duly authorized officer as of the date first above written.

<strong><u>BORROWER</u>:</strong>

**LIGADO NETWORKS LLC**

By: _____
Name:
Title:

<strong><u>SUBSIDIARY GUARANTORS:</u></strong>

**ATC TECHNOLOGIES, LLC,**
**LIGADO NETWORKS INC. OF VIRGINIA,**
**LIGADO NETWORKS BUILD LLC,**
**LIGADO NETWORKS FINANCE LLC,**
**LIGADO NETWORKS SUBSIDIARY LLC,**
**ONE DOT SIX LLC,**
**ONE DOT SIX TVCC LLC,**
**LIGADO NETWORKS CORP.,**
**LIGADO NETWORKS (CANADA) INC.,**
**LIGADO NETWORKS HOLDINGS (CANADA)**
**INC.,**

By: _____
Name:
Title:

**[    ]**,
as a Backstop Incremental Lender

By: _____
Name:
Title:

**[     ],**
as a Lender


By: _____
Name:
Title:

**U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,**
as Administrative Agent


By: _____
Name:
Title:

ANNEX A

**Amended Loan Agreement**

[Attached.]

# SENIOR SECURED SUPER-PRIORITY
# DEBTOR-IN-POSSESSION
# LOAN AGREEMENT

**among**

## LIGADO NETWORKS LLC,
**as the Borrower and as a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,**

**and**

## THE GUARANTORS PARTY HERETO,
**as Guarantors, Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code,**

## THE LENDERS PARTY HERETO,

**and**

## U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
**as Administrative Agent**

## TABLE OF CONTENTS

<strong><u>Page</u></strong>

### ARTICLE 1
### DEFINITIONS

Section 1.01   Defined Terms ....................................................................................................2
Section 1.02   Terms Generally.................................................................................................52
Section 1.03   Accounting Terms; GAAP.................................................................................52
Section 1.04   Resolution of Drafting Ambiguities...................................................................52
Section 1.05   Permitted Liens .................................................................................................52
Section 1.06   Divisions ...........................................................................................................52
Section 1.07   Discretion ..........................................................................................................53

### ARTICLE 2
### THE LOANS

Section 2.01   Commitments.....................................................................................................53
Section 2.02   Loans..................................................................................................................60
Section 2.03   Borrowing Procedure ........................................................................................60
Section 2.04   Evidence of Debt; Repayment of Loans ............................................................61
Section 2.05   Fees; Additional Payment .................................................................................62
Section 2.06   Interest on Loans................................................................................................64
Section 2.07   [Reserved] .........................................................................................................66
Section 2.08   [Reserved] .........................................................................................................66
Section 2.09   Repayment of Loans ..........................................................................................66
Section 2.10   Optional and Mandatory Prepayments of Loans ...............................................66
Section 2.11   [Reserved] .........................................................................................................67
Section 2.12   Yield Protection ................................................................................................67
Section 2.13   [Reserved] .........................................................................................................68
Section 2.14   Payments Generally; Pro Rata Treatment; Sharing of Setoffs............................69
Section 2.15   Taxes .................................................................................................................70
Section 2.16   Mitigation Obligations ......................................................................................75
Section 2.17   Currency Indemnity ..........................................................................................75
Section 2.18   Incremental Loan Facilities...............................................................................76
Section 2.19   Certain Bankruptcy Matters ..............................................................................78

### ARTICLE 3
### REPRESENTATIONS AND WARRANTIES

Section 3.01   Organization; Powers.........................................................................................80
Section 3.02   Authorization; Enforceability ...........................................................................80
Section 3.03   No Conflicts.......................................................................................................80
Section 3.04   Financial Statements; Projections......................................................................81
Section 3.05   Properties ..........................................................................................................81
Section 3.06   Intellectual Property...........................................................................................83
Section 3.07   Equity Interests and Subsidiaries ......................................................................83
Section 3.08   Litigation; Compliance with Laws.....................................................................84

Section 3.09    Agreements ..................................................................................84
Section 3.10    Federal Reserve Regulations..........................................................85
Section 3.11    Investment Company Act ...............................................................85
Section 3.12    Use of Proceeds..............................................................................85
Section 3.13    Taxes ...............................................................................................86
Section 3.14    No Material Misstatements..............................................................86
Section 3.15    Labor Matters..................................................................................86
Section 3.16    [Reserved].......................................................................................87
Section 3.17    Employee Benefit Plans..................................................................87
Section 3.18    Environmental Matters....................................................................88
Section 3.19    Insurance .........................................................................................90
Section 3.20    Loan Security Documents ...............................................................90
Section 3.21    Intercompany Indebtedness; Affiliate Indebtedness.......................92
Section 3.22    Anti-Terrorism Laws; Anti-Corruption Laws.................................92
Section 3.23    Communications Licenses and Regulatory Matters .........................93
Section 3.24    License Subsidiaries; Other Subsidiaries .......................................93
Section 3.25    Cases; Orders ..................................................................................94

### ARTICLE 4
### CONDITIONS

Section 4.01    Conditions to Effectiveness ............................................................95
Section 4.02    Conditions to the DIP First Funding Date .......................................97
Section 4.03    Conditions to Each DIP DDTL Funding Date................................101

### ARTICLE 5
### AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements, Reports, etc .................................................105
Section 5.02    Litigation and Other Notices.........................................................106
Section 5.03    Existence; Businesses and Properties ...........................................107
Section 5.04    Insurance .......................................................................................108
Section 5.05    Obligations and Taxes...................................................................109
Section 5.06    Employee Benefits ........................................................................109
Section 5.07    Maintaining Records; Access to Properties and Inspections; Meetings ..............110
Section 5.08    [Reserved]......................................................................................110
Section 5.09    Compliance with Laws; Compliance with Environmental Laws;
                Environmental Reports ..................................................................111
Section 5.10    Communications Licenses .............................................................111
Section 5.11    Additional Collateral; Additional Guarantors................................111
Section 5.12    Security Interests; Further Assurances...........................................112
Section 5.13    Information Regarding Collateral ...................................................112
Section 5.14    Post-Closing Collateral Matters ....................................................113
Section 5.15    License Subsidiaries; Other Subsidiaries.......................................113
Section 5.16    Certain Case Milestones ...............................................................113
Section 5.17    Certain Bankruptcy Matters..........................................................114
Section 5.18    Prepetition First Out Obligations Payoff Letter.............................115
Section 5.19    Bankruptcy Notices.......................................................................115
Section 5.20    Reorganization Efforts...................................................................115

Section 5.21    Interim DIP Order Entry Date..................................................116
Section 5.22    Prepetition First Out Obligations Refinancing ................................116

**ARTICLE 6**
**NEGATIVE COVENANTS**

Section 6.01    Indebtedness.........................................................................116
Section 6.02    Liens...................................................................................118
Section 6.03    Sale and Leaseback Transactions...............................................118
Section 6.04    Viasat Proceedings................................................................118
Section 6.05    Mergers and Consolidations ....................................................118
Section 6.06    Asset Sales ..........................................................................119
Section 6.07    Restricted Payments...............................................................119
Section 6.08    Transactions with Affiliates .....................................................119
Section 6.09    Use of Proceeds.....................................................................120
Section 6.10    Limitation on Certain Restrictions on Subsidiaries ..........................120
Section 6.11    Limitation on Issuance of Capital Stock.......................................121
Section 6.12    Business ..............................................................................121
Section 6.13    Budget Variance....................................................................121
Section 6.14    Communications Licenses........................................................121
Section 6.15    Deposit Accounts; DIP Loan Proceeds Account .............................121
Section 6.16    No Non-Loan Party Subsidiaries ...............................................122
Section 6.17    Additional Bankruptcy Matters.................................................122
Section 6.18    Compliance with Budget..........................................................124
Section 6.19    Use of Collateral ...................................................................124
Section 6.20    Use of Property; Rejection and Assumption of Contracts; Post-Filing
                Pleadings..............................................................................125
Section 6.21    Restructuring Support Agreement ..............................................125

**ARTICLE 7**
**GUARANTEE**

Section 7.01    The Guarantee......................................................................125
Section 7.02    Obligations Unconditional.......................................................126
Section 7.03    Reinstatement.......................................................................127
Section 7.04    Subrogation; Subordination ....................................................127
Section 7.05    Remedies.............................................................................127
Section 7.06    Instrument for the Payment of Money .........................................127
Section 7.07    Continuing Guarantee ............................................................128
Section 7.08    General Limitation on Guarantee Obligations................................128
Section 7.09    Release of Guarantors ............................................................128
Section 7.10    Right of Contribution .............................................................128
Section 7.11    Post-Petition Savings Clause ....................................................129

**ARTICLE 8**
**EVENTS OF DEFAULT**

Section 8.01    Events of Default ..................................................................129
Section 8.02    Application of Proceeds...........................................................135
Section 8.03    Government Approval .............................................................136

## ARTICLE 9
## THE ADMINISTRATIVE AGENT

Section 9.01 Appointment and Authority ...................................................................137
Section 9.02 Rights of a Lender.............................................................................137
Section 9.03 Exculpatory Provisions .....................................................................137
Section 9.04 Reliance by Agent............................................................................139
Section 9.05 Delegation of Duties .........................................................................139
Section 9.06 Resignation of the Agent ...................................................................139
Section 9.07 Non-Reliance on Agent and Other Lenders........................................140
Section 9.08 Agent May File Proofs of Claim ........................................................140
Section 9.09 Collateral and Guarantee Matters .......................................................141
Section 9.10 Not Partners or Co-Venturers; Administrative Agent as Representative of
the Secured Parties...........................................................................142
Section 9.11 Erroneous Payments..........................................................................142

## ARTICLE 10
## MISCELLANEOUS

Section 10.01 Notices ...........................................................................................143
Section 10.02 Waivers; Amendment ........................................................................146
Section 10.03 Expenses; Indemnity; Damage Waiver................................................148
Section 10.04 Successors and Assigns......................................................................150
Section 10.05 Survival of Agreement .......................................................................156
Section 10.06 Counterparts; Integration; Effectiveness...............................................157
Section 10.07 Severability......................................................................................157
Section 10.08 Right of Setoff..................................................................................157
Section 10.09 Governing Law; Jurisdiction; Consent to Service of Process...................158
Section 10.10 Waiver of Jury Trial..........................................................................158
Section 10.11 Headings .........................................................................................159
Section 10.12 Treatment of Certain Information; Confidentiality...................................159
Section 10.13 Material Non-Public Information .........................................................159
Section 10.14 Authorization to Distribute Certain Materials to Public-Siders.................160
Section 10.15 USA PATRIOT Act Notice and Customer Verification...........................161
Section 10.16 Interest Rate Limitation .....................................................................161
Section 10.17 Obligations Absolute .........................................................................161
Section 10.18 AML Legislation...............................................................................162
Section 10.19 [Reserved] .......................................................................................162
Section 10.20 Acknowledgement and Consent to Bail-In of Affected Financial
Institutions......................................................................................163
Section 10.21 Acknowledgement Regarding Any Supported QFCs .............................163
Section 10.22 DIP Secured Party Advisors ...............................................................164
Section 10.23 Validity of Loan Documents ...............................................................164
Section 10.24 Acceptable Plan ...............................................................................165
Section 10.25 Financial Accommodation Acknowledgement........................................165

SCHEDULES

| | |
|---|---|
| Schedule 1.01(b) | Subsidiary Guarantors |
| Schedule 1.01(c) | Investments |
| Schedule 1.01(d) | Liens |
| Schedule 2.01 | Commitments |
| Schedule 3.03 | Governmental Approvals; Compliance with Laws |
| Schedule 3.06(c) | Violations or Proceedings |
| Schedule 3.07(c) | Organizational Chart |
| Schedule 3.08 | Litigation and Government Proceedings |
| Schedule 3.09 | Material Agreements |
| Schedule 3.18 | Environmental Matters |
| Schedule 3.19 | Insurance |
| Schedule 3.23(a) | Communications Licenses |
| Schedule 3.23(b) | FCC Proceedings |
| Schedule 3.24(a) | Assets and Liabilities of One Dot Six LLC and Ligado Networks Inc. of Virginia |
| Schedule 5.14 | Post-Closing Matters |
| Schedule 6.01(b) | Indebtedness |
| Schedule 6.08(d) | Transactions with Affiliates |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B-1 | Form of Assignment and Assumption |
| Exhibit C | [Reserved] |
| Exhibit D | Form of Joinder Agreement |
| Exhibit E | Form of Note |
| Exhibit F-1 | Form of Perfection Certificate |
| Exhibit F-2 | Form of Perfection Certificate Supplement |
| Exhibit G | Form of Borrowing Request |
| Exhibit H-1 | Form of Tax Compliance Certificate |
| Exhibit H-2 | Form of Tax Compliance Certificate |
| Exhibit H-3 | Form of Tax Compliance Certificate |
| Exhibit H-4 | Form of Tax Compliance Certificate |
| Exhibit I | [Reserved] |
| Exhibit J | Form of Initial Budget |
| Exhibit K | Form of Election Joinder |
| Exhibit L | Form of Cash Flow Certificate |
| Exhibit M | Form of Canadian Security Agreement |
| Exhibit N | Form of Intercompany Note |
| Exhibit O | Form of Loan Security Agreement |
| Exhibit P | Form of Reaffirmation Agreement |

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT

This SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "**Agreement**"), dated as of January 5, 2025, among Ligado Networks LLC, a Delaware limited liability company, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), the Subsidiary Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in Article 1), each as a Guarantor hereunder and a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code, the Lenders from time to time party hereto and U.S. Bank Trust Company, National Association ("**U.S. Bank**"), as administrative agent for the Lenders (including its successors and assigns, in such capacities, the "**Administrative Agent**").

### WITNESSETH:

WHEREAS, the Borrower and the Subsidiary Guarantors (each, a "**Debtor**" and collectively, the "**Debtors**") intend to file voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Case**" and collectively, the "**Cases**") and continued to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code (the date upon which the Cases are filed, the "**Petition Date**");

WHEREAS**,** prior to the Closing Date, the Lenders party hereto (or Affiliates thereof) provided secured financing to the Borrower pursuant to the Prepetition Debt Documents (in such capacity, the "**Prepetition Lenders and Holders**"), which secured financing was guaranteed by each of the Subsidiary Guarantors;

WHEREAS, Ligado Networks LLC, in its capacity as foreign representative of the Debtors, intends to seek recognition of the Cases under Part IV of the *Companies Creditors Arrangement Act* (Canada) (the "**CCAA**") from the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**");

WHEREAS, the Borrower has requested that the Lenders provide a senior secured super-priority debtor-in-possession term loan credit facility in an aggregate initial principal amount of up to $939,151,166 (together with any applicable Capitalized Amount and Roll-Up Loans) (the "**DIP Facility**") comprised of: (i) a new money term loan facility in an aggregate initial principal amount of up to $441,999,891 (together with any applicable Capitalized Amount and Roll-Up Loans) and (ii) the roll up of the Prepetition Roll-Up Indebtedness into Roll-Up Loans on the Final Order Entry Date hereunder in an aggregate minimum initial principal amount of $497,151,275 (together with any applicable Capitalized Amount), and, with all of the Borrower's Obligations under the DIP Facility to be guaranteed by each Guarantor and all of the Borrower's and the Guarantors' Obligations under the DIP Facility to be secured by the Collateral,

WHEREAS, the Lenders are willing to make available to Borrower the DIP Facility (and U.S. Bank is willing to serve as Administrative Agent and Collateral Agent in respect of the DIP

Facility) on the terms and subject to the conditions set forth herein, in the other Loan Documents and in the DIP Orders;

WHEREAS, the relative priority of the DIP Facility with respect to the Collateral granted as security for the payment and performance of the Obligations shall be as set forth in the Interim DIP Order and the Final DIP Order, and solely with respect to the Canadian Collateral, shall be as set forth in the Interim DIP Recognition Order and Final DIP Recognition Order, in each case, upon entry thereof by the Bankruptcy Court or CCAA Court (as applicable) and in the Loan Security Documents;

WHEREAS, all of the claims and the Liens granted under the DIP Orders, DIP Recognition Orders and the Loan Documents to the Collateral Agent, the Lenders and the other Secured Parties in respect of the DIP Facility shall be subject to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge; and

WHEREAS, the Borrower and the Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the extensions of credit to the Borrower under this Agreement.

NOW, THEREFORE, subject to the satisfaction of the conditions set forth herein, the parties hereto agree as follows:

# ARTICLE 1
# DEFINITIONS

Section 1.01   <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"**1L Loan Agreement**" means the First Lien Loan Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto, the lenders party thereto and U.S. Bank Trust Company, National Association, as administrative agent (as successor in interest to U.S. Bank National Association) (the "**1L Loan Administrative Agent**").

"**1L Loan Security Agreement**" means the First Lien Security Agreement, dated as of December 23, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank Trust Company, National Association, as collateral agent (as successor in interest to U.S. Bank National Association).

"**1L Notes Indenture**" means the Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank National Association, as trustee, governing the first lien Notes (as defined therein).

"**1L Notes Security Agreement**" means the First Lien Security Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise

modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank National Association, as collateral trustee.

"**1.5L Loan Agreement**" means the 1.5 Lien Loan Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto, the lenders party thereto, and Jefferies Finance LLC, as administrative agent.

"**1.5L Loan Security Agreement**" means the Security Agreement, dated as of May 27, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and Jefferies Finance LLC, as collateral agent.

"**2L Notes Indenture**" means the Indenture, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and Wilmington Savings Fund Society, FSB, as trustee (as successor in interest to U.S. Bank National Association), governing the second lien Notes (as defined therein).

"**2L Notes Security Agreement**" means the Second Lien Security Agreement, dated as of October 23, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Closing Date), by and among the Borrower, the guarantors party thereto and U.S. Bank National Association, as collateral trustee.

"**Acceptable Plan**" means a Plan that is satisfactory to the Required Ad Hoc Holders in their sole discretion, containing, among other things, (i) a release in favor of the Administrative Agent and the Lenders, as well as their respective Affiliates, representatives, counsel, and advisors (including in connection with the Obligations and any Prepetition Secured Obligations), and (ii) provisions with respect to the settlement or discharge of all claims and other debts and liabilities, as such Plan may be modified, altered, amended, or otherwise changed or supplemented with the prior written consent of the Required Ad Hoc Holders (which consent the Required Ad Hoc Holders may direct the Agent to communicate).

"**Acceptable Plan Definitive Documentation**" means any definitive documentation, that is in form and substance satisfactory to the Required Ad Hoc Holders, which effectuates an Acceptable Plan.

"**Account Control Agreements**" has the meaning assigned to such term in the Loan Security Agreement.

"**Acquired Indebtedness**" means, with respect to any specified Person:

(1)      Indebtedness of any other Person existing at the time such other Person is merged with or into or becomes a consolidated Subsidiary of such specified Person, and

(2)      Indebtedness secured by a Lien encumbering any asset acquired by such specified Person in each case, other than Indebtedness incurred as consideration in, in contemplation of, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction

or series of related transactions pursuant to which such consolidated Subsidiary became a consolidated Subsidiary or was otherwise acquired by such Person, or such asset was acquired by such Person, as applicable.

"**Ad Hoc Cross-Holder Group**" means that certain ad hoc group of Lenders hereunder and Prepetition Lenders and Holders, including certain Fortress Entities and Cerberus Entities, and other holders of the Borrower's debt and equity, in each case, represented by Kirkland & Ellis LLP.

"**Ad Hoc First Lien Group**" means that certain ad hoc group of Lenders hereunder and Prepetition Lenders and Holders represented by Sidley Austin LLP.

"**Administration Charge**" means the superpriority charge over Canadian Collateral granted by the CCAA Court to secure payment of the fees and disbursements of Canadian counsel to the Debtors, the Information Officer and the Information Officer's counsel, the quantum of which shall be satisfactory to the Administrative Agent.

"**Administrative Agent**" has the meaning assigned to such term in the recitals hereto and includes each other Person appointed as a successor pursuant to Article 10.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit A or such other form as may be supplied from time to time by the Administrative Agent.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that notwithstanding the foregoing, in no event shall any Cerberus Entity, Fortress Entity or any of their affiliated funds or accounts be deemed to be an Affiliate of the Loan Parties for any purpose. Notwithstanding the foregoing, Mubadala and members of the Mubadala Group shall not be deemed Affiliates of Fortress Credit Corp. or of its Affiliates.

"**Affiliate Lender**" means each Lender that is an Affiliate of the Borrower. For the avoidance of doubt, in no event shall any Cerberus Entity, any Fortress Entity, or any of their affiliated funds or accounts be deemed to be an Affiliate of the Loan Parties for any purpose.

"**Agent**" means each of Administrative Agent and Collateral Agent and any other Person appointed under the Loan Documents to serve in an agent or similar capacity for the benefit of the Secured Parties.

"**Agent Parties**" has the meaning assigned to such term in Section 10.01(d)(ii).

"**Agreement**" has the meaning assigned to such term in the recitals hereto.

"**AML Legislation**" has the meaning assigned to such term in Section 10.18.

"**Anti-Terrorism Laws**" means any Requirement of Law related to terrorism financing, money laundering or economic sanctions, including, but not limited to, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("**USA PATRIOT Act**") of 2001 (Title III of Pub. L. 107-56), The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended), the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-1706, as amended), the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and Executive Order 13224 (effective September 24, 2001). This definition also includes Canadian Requirements of Law related to terrorism financing, money laundering or economic sanctions, including, but not limited to: Part II.1 of the Criminal Code, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act, the Special Economic Measures Act (Canada), the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations.

"**Applicable Margin**" means a rate per annum equal to 17.5%; *provided* that, with respect to any Interest Period for which the Borrower has made a Cash Interest Election in accordance with clause (i) of the proviso to Section 2.06(c), the Applicable Margin for interest accruing during such Interest Period, so long as on the applicable Interest Payment Date no Default or Event of Default has occurred or is continuing, shall be deemed to have been a rate per annum equal to 15.5% upon (but not before) the cash payment of such interest on the applicable Interest Payment Date.

"**Applicable Percentage**" means, with respect to any Lender at any time, the percentage represented by the ratio of the amount of such Lender's Loans to the aggregate Loans of all Lenders outstanding at such time.

"**Approved Bankruptcy Court Order**" means (a) each of the DIP Orders and DIP Recognition Orders, as such orders are amended and in effect from time to time in accordance with this Agreement, (b) any other order entered by the Bankruptcy Court or CCAA Court regarding, relating to or in any way impacting (i) any rights or remedies of any Secured Party, (ii) the Loan Documents (including the Loan Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any superpriority claims (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or superpriority claims), (iv) use of Cash Collateral, (v) debtor-in-possession financing, (vi) adequate protection or otherwise relating to any Prepetition Secured Obligations (vii) any chapter 11 plan, or (viii) any disclosure statement, in the case of each of the foregoing clauses (i) through (viii), that (x) is in form and substance satisfactory to the Administrative Agent and the Required Lenders, (y) has not been vacated, reversed or stayed and (z) has not been amended or modified in a manner adverse to the rights of the Administrative Agent or the Lenders except as agreed in writing by the Administrative Agent and the Required Lenders in their sole discretion, and (c) any other order entered by the Bankruptcy Court or CCAA Court that (i) is in form and substance satisfactory to the Administrative Agent and the Required

Lenders, (ii) has not been vacated, reversed or stayed and (iii) has not been amended or modified except in a manner satisfactory to the Administrative Agent and the Required Lenders.

"**Approved Fund**" means, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor; *provided*, that, none of the Borrower, its Subsidiaries or any Affiliate of the Borrower shall be considered an "Approved Fund".

"**Asset Sale**" means:

(1)     any one or a series of conveyance, sale, lease, sublease, assignment, exchange, transfer or other disposition (including by way of exclusive license (as licensor or sub-licensor), merger or consolidation and including any Sale and Leaseback Transaction) of any property (whether real, personal or mixed, and whether tangible or intangible including rights under the Inmarsat Agreement), but excluding (x) leases (and subleases) of capacity on any satellite in the ordinary course of business (including under the AST Transaction (as defined in the Restructuring Support Agreement)) and (y) dispositions of cash and Cash Equivalents in the ordinary course of business and, in each case of the foregoing clauses (x) and (y), in accordance with the Budget, by the Borrower or any of its Subsidiaries (each referred to in this definition as a "disposition"); or

(2)     the issuance or sale of Equity Interests (other than directors' qualifying shares or shares or interests required to be held by foreign nationals) of any Guarantor (other than to the Borrower or another Guarantor) or any Subsidiary that is not a Guarantor (other than to a Loan Party or another Subsidiary of the Borrower) (whether in a single transaction or a series of related transactions),

in each case other than:

(i)     a disposition of Cash Equivalents or Investment Grade Securities;

(ii)     a disposition of used, worn out, obsolete or surplus tangible personal property (other than any satellite) by the Borrower or any of its Subsidiaries in the ordinary course of business and the abandonment or other disposition of intellectual property that is, in each case, in the reasonable judgment of the Borrower, no longer economically practicable to maintain or useful in the conduct of the business or potential business of the Borrower and its Subsidiaries taken as a whole;

(iii)     [reserved];

(iv)     any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 6.07; and

(v)     any disposition of property or assets or the issuance of securities by a Guarantor to the Borrower or by the Borrower (solely with respect to a disposition of property or assets) or a Guarantor to a Guarantor.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B-1, or any other form approved by the Administrative Agent.

"**Assumed Commitment**" has the meaning assigned to such term in Section 2.01(f)(iii)(A).

"**AST**" means AST & Science, LLC.

"**AST Break-Up Fee**" means the "Break-Up Fee" as defined in the Restructuring Support Agreement, pursuant to Section 15 thereof, which fee is subject to Bankruptcy Court approval in the Break-Up Fee Order (as defined in the Restructuring Support Agreement), and, if and when payable and subject to the Restructuring Support Agreement and such Break-Up Fee Order, shall have the status of an allowed superpriority administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expense claims of the kind specified in section 503(b) of the Bankruptcy Code, subject only to the Carve-Out.

"**AST Transaction Milestone**" has the meaning assigned to such term in Section 5.16(h).

"**Attributable Indebtedness**" means, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction; *provided* that if a Sale and Leaseback Transaction results in a Capital Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capital Lease Obligations".

"**Backstop Fee**" has the meaning assigned to such term in Section 2.05(b).

"**Backstop Incremental Upfront Fee**" has the meaning assigned to such term in Section 2.05(h).

"**Backstop Incremental Commitments**" means (a) in the case of each Lender that is a Backstop Incremental Lender on the First Amendment Effective Date, the amount set forth opposite such Lender's name on Schedule 1 of the First Amendment under the caption "Backstop Incremental Commitment – Net Funded Amount," and (b) in the case of any Lender that becomes a Backstop Incremental Lender after the First Amendment Effective Date, the amount specified as such Lender's "Backstop Incremental Commitment" in the Assignment and Assumption pursuant to which such Lender assumed a portion of the Backstop Incremental Commitment, in each case as the same may be amended from time to time pursuant to the terms hereof. As of the First Amendment Effective Date, the total amount of the Backstop Incremental Commitments is $547,368,421.05.

"**Backstop Incremental Unused Commitment Fee**" has the meaning assigned to such term in Section 2.05(j).

"**Backstop Incremental Funded Loans**" means any Borrowing hereunder of Loans in respect of the Backstop Incremental Commitments.

"**Backstop Incremental Funding Date**" has the meaning set forth in the First Amendment.

"**Backstop Incremental Lender**" means any Lender that holds a Backstop Incremental Commitment outstanding hereunder.

"**Backstop Incremental Loans**" means any Backstop Incremental Funded Loans and/or Backstop Incremental Roll-Up Loans, as the context requires.

"**Backstop Incremental Roll-Up Loans**" means the Roll-Up Loans deemed funded under Section 2.01(d)(ii)(C) and Section 2.01(d)(ii)(D) on the First Amendment Effective Date and the Backstop Incremental Funding Date respectively.

"**Backstop Incremental OID**" has the meaning assigned to such term in Section 2.05(i)

"**Backstop Incremental Ticking Fee**" has the meaning assigned to such term in Section 2.05(j).

"**Backstop Lenders**" has the meaning assigned to such term in Section 2.01(f)(i).

"**Backstop Limited Events of Default**" has the meaning assigned to such term in the First Amendment.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**"  means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"**Beneficial Ownership Regulation**" has the meaning assigned to such term in Section 10.15.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" means, with respect to any Person, (i) in the case of any corporation, the board of directors of such Person, (ii) in the case of any limited liability company, the board of managers of such Person, (iii) in the case of any partnership, the Board of Directors of the general partner of such Person, (iv) in any other case, the functional equivalent of the foregoing and (v) any committee of any such board duly authorized to act on behalf of such board.

"**Boeing**" means Boeing Satellite Systems, Inc.

"**Boeing Agreement**" means the Amended and Restated Contract (for the MSV L-band Space-Based Network) between certain Loan Parties and Boeing as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"**Borrower**" has the meaning assigned to such term in the recitals hereto.

"**Borrowing**" means a borrowing hereunder of Loans of the same Class on the same date (it being understood and agreed that any interest that is Paid In Kind shall not constitute a Borrowing).

"**Borrowing Request**" means a request by the Borrower in accordance with the terms of Section 2.03, and substantially in the form of Exhibit G, or such other form as shall be approved by the Administrative Agent.

"**Budget**" means the Initial Budget, as amended, supplemented, replaced or otherwise modified by any Cash Flow Forecast delivered in accordance with Section 5.01(f)(i).

"**Business Day**" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City.

"**Canadian Collateral**" means collateral of the Debtors located or situate in Canada, including any intangibles located or deemed located in Canada pursuant to applicable law;

"**Canadian Income Tax Act**" means the *Income Tax Act* (Canada), and the regulations thereunder, as amended from time to time.

"**Canadian Law**" means the federal laws and regulations of Canada or the laws and regulations of any province or territory thereof.

"**Canadian Loan Party**" means any Loan Party that is organized or existing under the laws of Canada or any province or territory thereof.

"**Canadian Pension Plan**" means a "**registered pension plan**", as that term is defined in subsection 248(1) of the Canadian Income Tax Act, which is or was sponsored, administered or contributed to, or required to be contributed to by, any Loan Party or under which any Loan Party has any actual or potential liability.

"**Canadian Radiocommunication Act**" means the *Radiocommunication Act*, R.S.C. 1985, c. R-2, as amended.

"**Canadian Security Agreement**" means the Senior Secured Super-Priority Debtor-in-Possession Canadian Security Agreement, dated as of the Interim DIP Order Entry Date, among the Canadian Subsidiaries party thereto and the Collateral Agent for the benefit of the Secured Parties, and as amended, supplemented or otherwise modified from time to time, which Canadian Security Agreement shall originally be in the form attached hereto as Exhibit M (with such changes as the Required Lenders consent to in writing).

"**Canadian Security Documents**" means (a) the Canadian Security Agreement and (b) each security agreement, pledge agreement, account control agreement, landlord access agreement, mortgage and each other document, agreement or instrument governed by Canadian Law delivered to the Collateral Agent for the purpose of granting a valid Lien on or security interest in any property as collateral to secure any Obligations, and each PPSA and other financing statement or instrument of perfection and any other document, agreement or instrument governed by Canadian Law filed or to be filed in respect of the Liens on and security interests in property or fixtures created or purported to be created pursuant thereto and any other document, agreement or instrument governed by Canadian Law utilized to pledge or grant or purport to pledge or grant a Lien on or security interest in any property as collateral to secure any Obligations, in each case as amended, restated, amended and restated, extended, renewed, replaced, converted, supplemented or otherwise modified from time to time in accordance with its terms.

"**Canadian Subsidiary**" means any Subsidiary that is organized or existing under the laws of Canada or any province or territory thereof.

"**Canadian Telecommunications Act**" means the *Telecommunications Act*, S.C. 1993, c. 38, as amended.

"**Capex and Other Non-Operating Disbursement Line Items**" means, collectively, each Disbursement Line Item in respect of capital expenditures and other non-operating disbursements (without duplication) in the Budget, excluding any Professional Fee Disbursement Line Items. For avoidance of doubt, the Initial Budget contains one Capex and Other Non-Operating Disbursement Line Item, which is titled "Capex & Other Non-Operating Disbursements".

"**Capital Asset**s" means, with respect to any Person, any equipment, fixed assets and Real Property or improvements of such Person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP have been or should be reflected as additions to property, plant or equipment on the balance sheet of such Person.

"**Capital Expenditures**" means, for any period, without duplication, all expenditures made directly or indirectly by the Borrower and its Subsidiaries during such period for Capital Assets (in each case, whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability).

"**Capital Lease Obligations**" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of

such obligations shall be the capitalized amount thereof determined in accordance with GAAP, in each case, as in effect prior to December 31, 2018.

"**Capital Stock**" means:

(1)     in the case of a corporation or a company, corporate stock or shares;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Capitalized Amount**" has the meaning assigned to it in the definition of "Paid in Kind".

"**Carve-Out**" has the meaning assigned to it in the Interim DIP Order or the Final DIP Order, as applicable.

"**Cases**" has the meaning assigned to such term in the recitals hereto.

"**Cash Collateral**" shall have the meaning assigned to such term in section 363(a) of the Bankruptcy Code.

"**Cash Equivalents**" means, as to any Person, (a) securities issued, or fully guaranteed or insured, by the United States or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia having, capital and surplus aggregating in excess of $500.0 million and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such Person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by Standard & Poor's Ratings Group or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such Person; and (e) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (a) through (d) above.

"**Cash Interest Election**" has the meaning assigned to such term in Section 2.06(c).

"**Cash Management Order**" means an order of the Bankruptcy Court, in form and substance acceptable to the Required Lenders, (i) approving and authorizing, on an interim or final basis, the Loan Parties to use their existing cash management system, (ii) authorizing and directing banks and financial institutions to honor and process checks and transfers, (iii) authorizing continued use of intercompany transactions, (iv) waiving requirements of Section 345(b) of the Bankruptcy Code and (v) authorizing the Loan Parties to use existing bank accounts and existing business forms.

"**Cash Flow Certificate**" means a certificate in the form of Exhibit L accompanying each Cash Flow Forecast, pursuant to which a Responsible Officer of the Borrower shall certify that such Cash Flow Forecast is based on good faith estimates and assumptions made by the management of Borrower believed to be reasonable and attainable over the periods shown therein.

"**Cash Flow Forecast**" means a cash flow forecast for the upcoming thirteen-week period, which shall include the Projected Information on a line-by-line (and aggregate) basis for each week therein that is consistent in form with the Initial Budget and otherwise in a form and substance satisfactory to the Administrative Agent and the Required Lenders.

"**Casualty Event**" means any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower or any of its Subsidiaries. "**Casualty Event**" shall include but not be limited to any taking of all or any part of any Real Property of any Person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any Person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CCAA**" has the meaning assigned to such term in the recitals hereto.

"**CCAA Court**" has the meaning assigned to such term in the recitals hereto.

"**Cerberus Entities**" means Cerberus Capital Management, L.P. and funds and/or accounts managed by Cerberus Capital Management, L.P. or any of its Affiliates that directly or indirectly own Equity Interests of the Borrower; and "**Cerberus Entity**" means any one of them.

"**Cerberus Lender**" means each Cerberus Entity that is a Lender.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq. and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(1)     at any time a change of control occurs under any Material Indebtedness;

(2)     a plan relating to the liquidation or dissolution of the Borrower is adopted;

(3)     any "Person" or "group" (within the meaning of Section 13(d) and 14(d) under the Exchange Act) other than any (x) Permitted Holders or (y) group consisting of Permitted Holders,

becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act) of Voting Stock of the Borrower representing a majority of the voting power of the total outstanding Voting Stock of the Borrower.

For purposes of this definition, a Person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" has the meaning assigned to such term in Section 10.16.

"**CIPO**" means the Canadian Intellectual Property Office.

"**Class**" when used with respect to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing are DIP First Funding Loans, DIP Second Funding Loans, DIP Delayed Draw Term Loans, Roll-Up Loans or Incremental Loans, (b) any Commitment, refers to whether such Commitment is a DIP First Funding Commitment, a DIP Second Funding Commitment, a DIP DDTL Commitment or an Incremental Commitment and (c) any Lender, refers to whether such Lender has a Loan or Commitment of a particular Class; *provided* that once funded (or, with respect to any amounts Paid In Kind, once capitalized as Loans), (x) the DIP First Funding Loans, the DIP Second Funding Loans and the DIP Delayed Draw Term Loans shall all be deemed to be part of the same Class of Loans for all purposes under this Agreement, (y) Incremental Loans (other than the Backstop Incremental Roll-Up Loans) shall be deemed to be of the same Class of Loans as the DIP First Funding Loans, the DIP Second Funding Loans and the DIP Delayed Draw Term Loans to the extent so specified in the applicable Increase Joinder and (z) the Roll-Up Loans (including the Backstop Incremental Roll-Up Loans) shall be deemed to be a separate Class of Loans from any Class of DIP New Money Loans for all purposes under this Agreement.

"**Closing Date**" means the first date on which the conditions precedent set forth in Section 4.01 have been satisfied or waived, which for the avoidance of doubt shall be January 5, 2025.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means all assets over which a Lien is granted in favor of any Secured Party to secure the Obligations, whether pursuant to the Interim DIP Order, Final DIP Order, any Loan

Security Document (including the "Pledged Collateral" as set forth in the applicable Loan Security Document), any Loan Document or any other agreement or order.

"**Collateral Agent**" has the meaning set forth in the Loan Security Agreement.

"**Commitment Assigning Lender**" has the meaning assigned to such term in Section 2.01(f)(iii)(A).

"**Commitment Fee**" has the meaning assigned to such term in Section 2.05(c).

"**Commitments**" means the DIP First Funding Commitments, the DIP Second Funding Commitments, the DIP DDTL Commitments, the Backstop Incremental Commitments and/or the Incremental Commitments (if any), as the context requires. The aggregate amount of the Lenders' Commitments on the Closing Date is $441,999,891.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"**Communications**" has the meaning assigned to such term in Section 10.01(d)(ii).

"**Communications Act**" means the Communications Act of 1934, as amended, and any successor federal statute, and the rules and regulations, orders and published policies of the FCC thereunder, all as the same may be in effect from time to time.

"**Communications Laws**" means the Communications Act, the Canadian Telecommunications Act, the Canadian Radiocommunication Act, and all other laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions or notices issued, promulgated or entered into by any Governmental Authority that are designed or intended to regulate the communications or telecommunications industry with respect to the use of radio frequencies and/or the provision of communications or telecommunications services applicable to the Companies.

"**Communications License**" means any authorization, license, permit, certificate, approval, registration, order and franchise and similar forms of authority issued to or conferred upon any Company, in each case by any Governmental Authority (including, without limitation, the FCC, ISED and the CRTC) with respect to the use of radio frequencies and/or the provision of communications or telecommunications services, as in effect from time to time.

"**Companies**" means the Borrower and its Subsidiaries; and "Company" means any one of them.

"**Confirmation Order**" means an order by the Bankruptcy Court confirming an Acceptable Plan.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" means, as to any Person, any obligation, agreement, understanding or arrangement of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or any product warranties.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" have meanings correlative thereto.  Without limiting the generality of the foregoing, for purposes of Section 6.08, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the Voting Stock of such other Person.

"**Covered Party**" has the meaning assigned to such term in Section 10.21(a).

"**CRTC**" means the Canadian Radio-television and Telecommunications Commission, or any successor agency administering, among other things, the Canadian Telecommunications Act, including its staff acting under delegated authority.

"**Cumulative Testing Disbursement Line Item**" means each Disbursement Line Item, other than Capex and Other Non-Operating Disbursement Line Items and Professional Fee Disbursement Line Items.

"**Currency Due**" has the meaning assigned to such term in Section 2.17.

"**Debtor**" or "**Debtors**" has the meaning assigned to such term in the recitals hereto.

"**Debtor Relief Laws**" means the Bankruptcy Code, the CCAA and all other liquidation, conservatorship, bankruptcy, judicial management, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief

statute, law, ordinance, rule or regulation from time to time in effect in the United States of America, any State thereof, the District of Columbia, Canada, any province or territory thereof or any other applicable jurisdiction in which the Borrower or any Subsidiary thereof may be organized, hold assets or conduct business.

"**Declining Lender**" as defined in Section 2.01(f)(i).

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Default Rate**" as defined in Section 2.06(b).

"**Designated Roll-Up Beneficiary**" as defined in the definition of "Roll-Up Designation Notice".

"**DIP Charge**" means the superpriority charge on Canadian Collateral only, granted by the CCAA Court in favor of the Administrative Agent and Lenders pursuant to the Interim DIP Recognition Order which DIP Charge shall be subordinate to the Administration Charge.

"**DIP DDTL Commitments**" means with respect to each Lender, the commitment of such Lender to make DIP Delayed Draw Term Loans on any DIP DDTL Funding Date, in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the heading "DIP DDTL Commitment", as such commitment may be (a) terminated pursuant to Article 8 or the DIP Order, (b) terminated pursuant to Section 2.01(c) or (c) modified from time to time to reflect any assignments permitted by Section 10.04.  The aggregate amount of the DIP DDTL Commitments on the Closing Date is $103,000,000.

"**DIP DDTL Commitment Lender**" means, at any time and for any period, any Lender that has a DIP DDTL Commitment at such time or at any point during such period.

"**DIP DDTL Funding Discount Fee**" has the meaning assigned to such term in Section 2.05(f).

"**DIP DDTL Funding Date**" means each date on which the conditions set forth in Section 4.03 are satisfied (or waived in accordance with Section 10.02) and a Borrowing of DIP Delayed Draw Term Loans is extended to the Borrower hereunder.

"**DIP Delayed Draw Term Loan**" means any Borrowing hereunder of Loans in respect of the DIP DDTL Commitments or any fees thereon being Paid in Kind (it being understood that the DIP Delayed Draw Term Loans shall include any Capitalized Amount in respect thereof).

"**DIP Facility**" has the meaning assigned to such term in the recitals hereto.

"**DIP First Funding Commitments**" means with respect to each Lender, the commitment of such Lender to make the DIP First Funding Loans on the DIP First Funding Date, in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the heading "DIP First Funding Commitment", as such commitment may be (a) terminated pursuant to Section 8.01 or the DIP Order, (b) terminated pursuant to Section

2.01(c) or (c) modified from time to time to reflect any assignments permitted by Section 10.04. The aggregate amount of the DIP First Funding Commitments on the DIP First Funding Date (immediately prior to the Borrowing of the DIP First Funding Loans on such date) is $12,000,000.

"**DIP First Funding Date**" means the first date on which the conditions set forth in Section 4.02 are satisfied (or waived in accordance with Section 10.02).

"**DIP First Funding Discount Fee**" has the meaning assigned to such term in Section 2.05(d).

"**DIP First Funding Loans**" means any Borrowing hereunder of Loans in respect of the DIP First Funding Commitments or any fees thereon being Paid in Kind (it being understood that the DIP First Funding Loans shall include any Capitalized Amount in respect thereof).

"**DIP Liens**" has the meaning given to such term in the DIP Orders.

"**DIP Loan Proceeds Account**" means a deposit account of the Borrower that is reasonably acceptable to the Administrative Agent and that is subject to an Account Control Agreement entered into in accordance with Section 5.14.

"**DIP New Money Loans**" means DIP First Funding Loans, DIP Second Funding Loans, DIP Delayed Draw Term Loans, the Backstop Incremental Funded Loans and/or other Incremental Loans (but not the Backstop Incremental Roll-Up Loans), as the context requires.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Portion**" has the meaning assigned to such term in Section 2.01(f)(i).

"**DIP Pro Rata Allocation Amount**" means, with respect to any Lender, Syndication Eligible Prepetition Lender or Electing Lender, the amount equal to the result of (1) the proportion of (A) the Prepetition First Lien Secured Obligations (other than Prepetition First Out Obligations) under each of the 1L Loan Agreement and the 1L Notes Indenture owed to such Lender, Syndication Eligible Prepetition Lender or Electing Lender (or, in each case, Affiliate thereof to the extent also not a Lender, Syndication Eligible Prepetition Lender or Electing Lender, as applicable), as applicable, as of the Petition Date to (B) all Prepetition First Lien Secured Obligations (other than Prepetition First Out Obligations) outstanding as of the Petition Date (this clause (1), with respect to any Lender, Syndication Eligible Prepetition Lender or Electing Lender, its "**DIP Pro Rata Allocation Percentage**") *multiplied by* (2) the aggregate amount of Loans and/or Commitments hereunder, excluding any Capitalized Amounts as a result of any interest, fee or other amount that was Paid in Kind pursuant to the terms of this Agreement.  For the avoidance of doubt, (x) such principal Prepetition First Lien Secured Obligations shall be calculated to include accrued and unpaid interest and fees and any amounts thereon that were actually paid-in-kind as of the applicable calculation date and (y) to the extent multiple Lenders have the same Affiliate (that is not a Lender) that holds applicable Prepetition First Lien Secured Obligations, such Lenders shall allocate such Affiliate's holdings of Prepetition First Lien Secured Obligations amongst themselves pursuant to written notice to the Administrative Agent.  Notwithstanding anything herein to the contrary LSQ Acquisition Co (Series XI) LLC's DIP Pro Rata Allocation Amount (and DIP Pro Rata Allocation Percentage) shall be based on the Prepetition First Lien

Secured Obligations (other than Prepetition First Out Obligations) that are held by LSQ Acquisition Co (Series VIII) LLC, LSQ Acquisition Co (Series IX) LLC, LSQ Acquisition Co (Series XI) LLC, Fortress Vintage Securities Fund L.P., CF L2 Holdings LLC, LSQ Acquisition Co (Series VI) LLC and any other holder of such Prepetition First Lien Secured Obligations that is a Fortress Entity.

"**DIP Pro Rata Allocation Percentage**" has the meaning assigned to such term in the definition of "DIP Pro Rata Allocation Amount".

"**DIP Recognition Orders**" means, collectively, the Interim DIP Recognition Order and Final DIP Recognition Order.

"**DIP Second Funding Commitment Lender**" means, at any time and for any period, any Lender that has a DIP Second Funding Commitment at such time or at any point during such period.

"**DIP Second Funding Commitments**" means with respect to each Lender, the commitment of such Lender to make the DIP Second Funding Loans on the DIP Second Funding Date, in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 hereto under the heading "DIP Second Funding Commitment", as such commitment may be (a) terminated pursuant to Section 8.01 or the DIP Order, (b) terminated pursuant to Section 2.01(b) or (c) modified from time to time to reflect any assignments permitted by Section 2.01(f) or 10.04. The aggregate amount of the DIP Second Funding Commitments on the Closing Date is $326,999,891.

"**DIP Second Funding Discount Fee**" has the meaning assigned to such term in Section 2.05(e).

"**DIP Second Funding Loans**" means any Borrowing hereunder of Loans in respect of the DIP Second Funding Commitments or any fees thereon being Paid in Kind (it being understood that the DIP Second Funding Loans shall include any Capitalized Amount in respect thereof).

"**DIP Second Funding Date**" means the third (3rd) Business Day after the Final DIP Order Entry Date.

"**DIP Second Funding Lender**" means any Lender that holds a DIP Second Funding Commitment and/or a DIP Second Funding Loan outstanding hereunder.

"**DIP Secured Party Advisors**" means, with respect to the Agent, Foley & Lardner LLP, and with respect to the Lenders, (a) Kirkland & Ellis LLP, as counsel to the Ad Hoc Cross-Holder Group (in such capacity, the "**Ad Hoc Cross-Holder Group Primary Advisors**"), (b) Sidley Austin LLP, as counsel to the Ad Hoc First Lien Group (in such capacity, the "**Ad Hoc First Lien Group Primary Advisors**"), (c) Guggenheim Securities, LLC, as financial advisor to the Ad Hoc First Lien Group, (d) Foley & Lardner LLP, as counsel to the Administrative Agent, (e) Wiley Rein LLP, as regulatory counsel, (f) local counsel in each material relevant jurisdiction (which may be a single counsel for multiple jurisdictions), including, for the avoidance of doubt, Blake, Cassels & Graydon LLP, (*provided* that in the case of an actual or perceived conflict of interest, such expense reimbursement shall include the reasonable, actual and documented fees and

expenses of an additional outside counsel, an additional regulatory counsel and an additional local counsel in each material relevant jurisdiction (which may be a single counsel for multiple jurisdictions) for each group of similarly situated Lenders), and (g) tax, accounting, and other professionals and advisors retained by the Lenders.

"**DIP Superpriority Claims**" has the meaning specified in the Interim DIP Order or the Final DIP Order, as applicable.

"**DIP Unused Commitment Fee**" has the meaning assigned to such term in Section 2.05(g).

"**DIP Unused Commitment Fee Payment Date**" means (x) the last Business Day of each calendar month, commencing on January 31, 2025 and (y) the Maturity Date.

"**DIP Unused Commitment Fee Period**" means (x) initially the period commencing on the Closing Date and ending on the immediately succeeding DIP Unused Commitment Fee Payment Date and (y) thereafter, each period commencing on a DIP Unused Commitment Fee Payment Date and ending on the immediately succeeding DIP Unused Commitment Fee Payment Date.

"**Disbursement Line Items**" means, collectively, each disbursement line item (without duplication) in the Budget, including "Employee", "Network", "General & Administrative", "Capex & Other Non-Operating Disbursements", and "Total Professional Fees" (or words of like import).

"**Disqualified Capital Stock**" means any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is 180 days after the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the date that is 180 days after the Maturity Date or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided*, *however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests are convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the date that is 180 days after the Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Disqualified Company**" means any Person that is a competitor of the Borrower identified to the Administrative Agent in writing on or prior to the First Amendment Effective Date and Affiliates of such Person; *provided*, that the identities of Disqualified Companies may be disclosed to assignees prior to entering into an Assignment and Assumption.

19

"**Dividend**" with respect to any Person means that such Person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property or cash (in each case, other than any such dividend, distribution, payment or delivery of property consisting of Qualified Capital Stock of such Person, and excluding, for the avoidance of doubt, consent fees or payments) to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration (other than Qualified Capital Stock of such Person) any of the outstanding Equity Interests of such Person (or any options or warrants issued by such Person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration (other than outstanding Qualified Capital Stock of such Person) any of the outstanding Equity Interests of such Person (or any options or warrants issued by such person with respect to its Equity Interests). "Dividends" with respect to any Person shall also include all payments made by such Person with respect to any stock appreciation rights or equity incentive plans or setting aside of any funds for the foregoing purposes, but, for the avoidance of doubt, (x) any payments under cash incentive and bonus plans and (y) any dividend, distribution, payment or delivery of property consisting solely of Qualified Capital Stock of such Person, in each case, shall not be considered a "Dividend".

"**dollars**" or "**$**" means lawful money of the United States.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electing Lenders**" has the meaning assigned to such term in Section 2.01(f)(i).

"**Election Joinder**" as defined in Section 2.01(f)(i).

"**Electronic Signature**" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"**Electronic System**" means any electronic system, including e-mail, e-fax, Intralinks®, ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent and any of its respective Affiliates or any other Person, providing for access to data protected by passcodes or other security system.

"**Eligible Assignee**" means (a) any Lender, any Affiliate of a Lender and any Approved Fund or (b) any commercial bank, insurance company, investment or mutual fund or other entity that extends credit or buys loans or debt securities in the ordinary course of its business; *provided* that "Eligible Assignee" shall not include (i) any natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural Person), (ii) any Affiliate of the Borrower, (iii) the Borrower or any of its Subsidiaries or (iv) any Person which is not party to, or has not agreed in writing to be bound by the terms and obligations of, (or substantially concurrently with becoming a Lender hereunder will not become party to, or will not agree in writing to be bound by the terms and obligations of) the Restructuring Support Agreement; *provided*, that any Person described in the foregoing clause (iv) may be an Eligible Assignee if the Required Ad Hoc Holders provide their written consent to such Person becoming an Eligible Assignee.

"**Embargoed Person**" means any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons," or any other sanctions list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), or is owned 50 percent or more, directly or indirectly, by one or more party included on any such list, (ii) resides, is organized or chartered, or has a place of business in a country or territory that is the subject of OFAC sanctions or embargo programs, or (iii) is otherwise the target of U.S. economic sanctions.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA but excluding Canadian Pension Plans) which is sponsored, maintained or contributed to by, or required to be contributed to by, the Borrower or any Company or with respect to which, the Borrower or any Company has or could reasonably be expected to have liability, contingent or otherwise.

"**Environment**" means ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" means any claim, notice, demand, order, action, suit, proceeding or other communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and in the case of each of (i) and (ii) shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" means any and all applicable present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health, safety or the Environment, the Release or threatened Release of any Hazardous Material, natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" means any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equity Interest**" means, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the Closing Date or issued thereafter, but excluding debt securities convertible or exchangeable into such equity.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, the regulations promulgated thereunder and any successor statute.

"**ERISA Affiliate**" means, with respect to any Person, any trade or business (whether or not incorporated) that, together with such Person, is treated as a single employer under Section 414 of the Code.  For the avoidance of doubt, when any provision of this Agreement relates to a past event or period of time, the term "ERISA Affiliate" includes any Person who was, as to the time of such past event or period of time, an "ERISA Affiliate" within the meaning of the preceding sentence.

"**ERISA Event**" means the occurrence of any one or more of the following:  (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Single Employer Plan (other than an event for which the 30-day notice period is waived by regulation); (b) any failure by a Single Employer Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Single Employer Plan; (d) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability under Title IV of ERISA (other than any required contributions to any Employee Benefit Plans and non-delinquent premiums payable to the PBGC under Sections 4006 and 4007 of ERISA); (e) the receipt by the Borrower, any Company or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Single Employer Plan or to appoint a trustee to administer any Single Employer Plan; (f) the incurrence by the Borrower, any Company or any of their respective ERISA Affiliates of any liability with respect to the withdrawal from any Single Employer Plan or Multiemployer Plan; (g) the receipt by the Borrower, any Company or any of their ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (i) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (j) the imposition of a lien pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Single Employer Plan; (k) the cessation of operations at a facility of the Companies or any of their respective ERISA Affiliates in the circumstances described in Section 4062(e) of ERISA; or (l)

22

any other event or condition with respect to a Single Employer Plan or Multiemployer Plan that would result in liability of the Companies.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Event of Default**" has the meaning assigned to such term in Section 8.01.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property or (c) any other Casualty Event.

"**Excess DIP Second Funding Loans Proceeds**" as defined in Section 2.02(b).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Property**" means any intent-to-use trademark application to the extent and for so long as creation by a pledgor of a security interest therein would result in the loss by such pledgor of any material rights therein.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower or any Subsidiary Guarantor hereunder, (a) Taxes imposed on or measured by its net income or profits (however denominated), franchise taxes imposed on it (in lieu of net income taxes), and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of the recipient being organized under the laws of or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, United States federal withholding Taxes imposed on payments pursuant to any Requirements of Law that are in effect on the date on which (i) such Lender becomes a party hereto, except to the extent that such Lender's assignor, if any, was entitled, immediately prior to such assignment, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15; *provided* that this subclause (b)(i) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender acquired pursuant to Section 2.16(b), or (ii) such Lender designates a new lending office, except to the extent that such Lender was entitled, immediately prior to such change in lending office, to receive additional amounts or indemnity payments from the Borrower with respect to such withholding Tax pursuant to Section 2.15, (c) any withholding Tax that is attributable to such Lender's failure to comply with Section 2.15(e), (d) any U.S. federal withholding Taxes imposed under FATCA, or (e) Canadian withholding Taxes payable under Part XIII of the Canadian Income Tax Act which arise as a result of such Administrative Agent, Lender or other recipient (i) not dealing at arm's length with the Borrower, any partner of the Borrower or the Guarantors or (ii) the Administrative Agent, Lender or other recipient being, or not dealing at arm's length for the purposes of the Canadian Income Tax Act with, a "specified shareholder" (as defined in subsection 18(5) of the Canadian Income Tax Act) of any direct or indirect partner of the Borrower or Guarantors (other than, in the case of

(i) and (ii) arising as a result of such person having executed, delivered, become party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement).

"**Extraordinary Receipts**" means any cash received by the Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.10(a), (b), (c),  (d) or (f) hereof), including, without limitation, (a) foreign, United States, state or local Tax refunds, (b) Employee Benefit Plan or Canadian Pension Plan reversions, (c) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (including, without limitation, proceeds of any avoidance action, infringement proceeds, breach of contract claims, damages (including treble damages), settlement amounts and other payments) received by the Borrower or any of its Subsidiaries, (d) condemnation awards (and payments in lieu thereof), (e) indemnity payments not received in the ordinary course of business, and (f) any purchase price adjustment received in connection with any purchase agreement entered into in connection with the acquisition by a Loan Party of (i) any Capital Stock of another Person or (ii) all or substantially all of the assets of another Person.

"**Fair Market Value**" means, with respect to any asset or property, the price which could be negotiated in an arm's-length, free market transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction, which, in the case of an Asset Sale, shall be determined either at the time of the Asset Sale or as of the date of the definitive agreement with respect to such Asset Sale.  Unless otherwise specified, any determination of Fair Market Value shall be made by the Borrower in good faith.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any applicable intergovernmental agreements between a non-U.S. jurisdiction and the United States with respect thereto and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**FCC**" means the U.S. Federal Communications Commission, or any successor agency of the federal government administering the Communications Act, including its staff acting under delegated authority.

"**Federal Funds Effective Rate**" means, for any day, the rate calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depositary institutions, as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time, and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the effective federal funds rate, *provided* that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**Financial Officer**" of any Person means the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"**Financial Statements**" means the financial statements to be furnished pursuant to Section 5.01(a) or (b).

"**Final DIP Order**" means, collectively, (i) a Final Order of the Bankruptcy Court in substantially the form of the Interim DIP Order, with only such modifications thereto as are reasonably necessary to convert the Interim DIP Order to a Final Order and such other modifications as are satisfactory in form and substance to the Administrative Agent and the Required Lenders and (ii) a Final Order of the Bankruptcy Court authorizing and approving the First Amendment, the establishment of the 2025 Incremental Commitments, the borrowing of the 2025 Incremental Loans, the payment of fees and expenses and the other transactions contemplated thereby.

"**Final DIP Order Entry Date**" means the date on which the Bankruptcy Court enters the Final DIP Order in the Cases.

"**Final DIP Recognition Order**" means an order of the CCAA Court in form and substance satisfactory to the Administrative Agent and the Required Lenders recognizing the Final DIP Order and giving it full force and effect in Canada.

"**Final Order**" means an order, ruling, or judgment of the Bankruptcy Court or CCAA Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; *provided*, *however*, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

"**FIRREA**" means the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Amendment**" means that certain Amendment No. 1 to Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of the First Amendment Effective Date, by and among the Borrower, the Guarantors party thereto, the Lenders party thereto and the Administrative Agent.

"**First Amendment Effective Date**" shall have the meaning assigned to such term in the First Amendment.

"**First DIP DDTL Borrowing**" means the initial Borrowing of DIP Delayed Draw Term Loans.

"**First Round Electing Lender**" as defined in Section 2.01(f)(i).

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Loan Security Document, that such Lien is senior in priority to any other Lien to which such Collateral is subject, other than the Carve-Out, the AST Break-Up Fee (if any), the Administration Charge and Prepetition Permitted Prior Liens applicable to such Collateral which as a matter of law have priority over the respective Liens on such Collateral created pursuant to the relevant Loan Security Document.

"**Fitch**" means Fitch Ratings Inc. or any successor to the rating agency business thereof.

"**Flood Insurance Requirements**" means, in order to comply with the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors), the following documents:  (A) a completed standard "life of loan" flood hazard determination form, (B) if any improvements to the applicable real property are located in a special flood hazard area, a notification to the Borrower (the "**Borrower Notice**") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("**NFIP**") is not available because the community does not participate in the NFIP, (C) documentation evidencing the Borrower's receipt of the Borrower Notice, and (D) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of one of the following:  the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance reasonably satisfactory to the Administrative Agent.

"**Foreign Lender**" means any Lender that is not, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more U.S. Persons have the authority to control all substantial decisions of such trust.  In addition, solely for purposes of clauses (b) and (c) of the definition of Excluded Taxes (for the avoidance of doubt, excluding for purposes of Section 2.15(e)(ii)(C)), a Foreign Lender shall include a partnership or other entity treated as a partnership created or organized in or under the laws of the United States, or any political subdivision thereof but only to the extent the partners of such partnership (including indirect partners if the direct partners are partnerships or other entities treated as partnerships for U.S. federal income tax purposes created or organized in or under the laws of the United States or any political subdivision thereof) are treated as Foreign Lenders under the preceding sentence (in which event, the determination of whether a U.S. federal withholding Tax on payments was imposed pursuant to any Requirements of Law in effect at the time such Foreign Lender became a party hereto will be made by reference to the time when the applicable direct or indirect partner became a direct or indirect partner of such Foreign Lender, but only if such date is later than the date on which such Foreign Lender became a party hereto).

"**Foreign Plan**" means any employee benefit plan, program, policy, arrangement or agreement (other than a Canadian Pension Plan) sponsored, maintained or contributed to or required to be contributed to by any Company or with respect to which any Company has or could reasonably be expected to have liability, contingent or otherwise, with respect to employees employed outside the United States (including for greater certainty any employee benefit plan, program policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed in Canada, other than a Canadian Pension Plan).

"**Foreign Subsidiary**" means a Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof or the District of Columbia.

"**Fortress Entities**" means funds and/or accounts managed by Fortress Credit Opportunities Advisors LLC, Drawbridge Special Opportunities Advisors LLC or any of their respective Affiliates that directly or indirectly own Equity Interests of the Borrower as of the Closing Date, including LSQ Acquisition LLC; and "**Fortress Entity**" means any one of them.

"**Fortress Lender**" means each Fortress Entity that is a Lender.

"**Framework Agreement**" has the meaning set forth in the First Amendment.

"**Funding Date**" means, with respect to any Loan, the date on which such Loan is made.

"**GAAP**" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Closing Date.

"**Governmental Authority**" means the government of the United States, Canada or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency (including the FCC, ISED and the CRTC), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union, the European Central Bank or the Organisation for Economic Co-operation and Development).

"**Governmental Real Property Disclosure Requirements**" means any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, from, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 7.01.

"**Guarantees**" means the guarantees issued pursuant to Article 7 by the Subsidiary Guarantors.

"**Guarantors**" means the Subsidiary Guarantors.

"**Harbinger**" means Harbinger Capital Partners, LLC.

"**Harbinger Entity**" means Harbinger and any Affiliate thereof.

"**Harbinger Proxy**" has the meaning assigned thereto and be subject to the restrictions set forth in the Operating Agreement.

"**Hazardous Materials**" means the following:  hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or hazardous or toxic chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Requirement of Law pertaining to the Environment.

"**Hedging Agreement**" means any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" means obligations under or with respect to Hedging Agreements.

"**Incentive Payments**" means the orbital performance incentives and liquidated damages that may become due and payable under the Boeing Agreement.

"**Incur**" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be incurred by such Person at the time it becomes a Subsidiary.

"**Increase Effective Date**" has the meaning assigned to such term in Section 2.18(b).

"**Increase Joinder**" has the meaning assigned to such term in Section 2.18(a).

"**Incremental Commitments**" has the meaning assigned to such term in Section 2.18(a).

"**Incremental Loan Facility**" has the meaning assigned to such term in Section 2.18(a).

"**Incremental Loan Lender**" any Lender that holds an Incremental Commitment and/or an Incremental Loan outstanding hereunder.

"**Incremental Loans**" has the meaning assigned to such term in Section 2.18(c) (it being understood that the Incremental Loans shall include any Capitalized Amount in respect thereof).

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person; (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all Indebtedness of others secured by any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, but limited to the lesser of the fair market value of such property and the amount of the obligation so secured; (f) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such Person; (g) all Hedging Obligations to the extent required to be reflected on a balance sheet of such Person; (h) all Attributable Indebtedness

of such Person; (i) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; and (j) all Contingent Obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such Person is not liable therefor.  For the avoidance of doubt the Incentive Payments shall not be considered Indebtedness.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitee**" has the meaning assigned to such term in Section 10.03(b).

"**Information**" has the meaning assigned to such term in Section 10.12.

"**Information Officer**" means the licensed insolvency trustee appointed by the CCAA Court to act as information officer in the Recognition Proceedings.

"**Initial Assumed DIP Portions**" as defined in Section 2.01(f)(i).

"**Initial Budget**" shall mean a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, including the line item details for and anticipated weekly uses of the proceeds of the Loans for such period (and draws under this Agreement), which shall include, among other things, operating receipts, available cash, cash flow, trade payables and ordinary course expenses, employment related expenses, capital expenditures and other non-operating disbursements, fees and expenses relating to this Agreement, fees and expenses related to the Cases (including professional fees), working capital and other general corporate needs and proposed Borrowings (subject to the satisfaction (or waiver) of the applicable conditions precedent in Article 4) under the DIP Facility, which forecast shall be in form and substance satisfactory to the Required Ad Hoc Holders.  Such Initial Budget shall be in the form set forth in Exhibit J hereto and also attached as an exhibit to the Interim DIP Order.  Until supplemented, replaced or modified pursuant to Section 5.01(f) and approved by the Required Ad Hoc Holders in accordance hereof, the Initial Budget shall constitute the Budget.

"**Initial CCAA Recognition Order**" means an order of the CCAA Court recognizing the Cases of the Debtors.

"**Initial Election Deadline**" means 5:00 p.m. New York City time on January 13, 2025 (or such other date to the extent consented to in writing by the Required Ad Hoc Holders).

"**Initial Test Date**" has the meaning assigned to such term in the definition of "**Testing Period**".

"**Inmarsat**" means Inmarsat Global Limited.

"**Inmarsat Agreement**" means the Amended and Restated Cooperation Agreement, dated as of August 6, 2010, by and among the Borrower, Ligado Networks (Canada) Inc. and Inmarsat (and its successor or assignee from time to time), as amended, supplemented or otherwise modified from time to time to the extent permitted thereunder and hereunder.

"**Intellectual Property**" has the meaning assigned to such term in Section 3.06(a).

"**Intercompany Note**" means that certain Second Amended and Restated Intercompany Note, dated as of the Interim DIP Order Entry Date, between the Borrower and all of its Subsidiaries, as amended, restated, amended and restated, supplemented or otherwise modified, in each case reasonably acceptable in form and substance to the Collateral Agent and the Required Lenders and which contains or is otherwise subordinated to the Obligations pursuant to subordination provisions reasonably acceptable in form and substance to the Collateral Agent and the Required Lenders, which Intercompany Note shall originally be in the form attached hereto as Exhibit M (with such changes as the Required Lenders consent to in writing).

"**Interest Payment Date**" means (x) the last Business Day of each calendar month, commencing on January 31, 2025 (including, for the avoidance of doubt, after any Maturity Date to the extent any payment Obligations are still outstanding) and (y) the Maturity Date.

"**Interest Period**" means (x) initially the period commencing on the Interim DIP Order Entry Date and ending on the immediately succeeding Interest Payment Date and (y) thereafter, each period commencing on an Interest Payment Date and ending on the immediately succeeding Interest Payment Date.

"**Interim DIP Order**" means the interim order entered by the Bankruptcy Court in the Cases (as the same may be amended, supplemented, or modified form time to time after entry thereof in a manner satisfactory to the Required Lenders in their sole discretion) authorizing and approving, among other things, the DIP Facility, use of Cash Collateral, prepayment of the Prepetition First Out Obligations from the proceeds of the DIP Second Funding Loans and the Transactions, which interim order is in form and substance satisfactory to the Required Lenders in their sole discretion.

"**Interim DIP Order Entry Date**" means the date on which the Bankruptcy Court enters the Interim DIP Order in the Cases.

"**Interim DIP Recognition Order**" means an order of the CCAA Court in form and substance satisfactory to the Agent and the Required Lenders recognizing the Interim DIP Order and giving it full force and effect in Canada and granting the DIP Charge, which order for greater certainty may be the supplemental recognition order granted by the CCAA Court concurrently with the Initial CCAA Recognition Order.

"**Investments**" means, with respect to any Person, directly or indirectly, (i) lending money or credit (by way of guarantee or otherwise) or making advances to any Person (other than to customers in the ordinary course of business), or purchasing or acquiring any Equity Interests, bonds, notes, debentures, guarantees or other obligations or securities of, or any other interest in, or making any capital contribution to, any other Person, or purchasing or owning a futures contract or otherwise becoming liable for the purchase or sale of currency or other commodities at a future

date in the nature of a futures contract, or (ii) purchasing or acquiring (in one transaction or a series of transactions) any other assets not set forth in clause (i) above.

"**Investment Grade Rating**" means a rating equal to or higher Baa3 (or equivalent) by Moody's, or BBB- (or equivalent) by S&P or Fitch, or an equivalent rating by any other rating agency.

"**Investment Grade Securities**" means:

(1)      securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)      securities that have an Investment Grade Rating, but excluding any debt securities or loans or advances between and among the Borrower and its Subsidiaries,

(3)      investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/ or distribution, and

(4)      corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"**ISED**" means the Canadian federal government Department of Innovation, Science and Economic Development or any successor department or agency administering the Canadian Radiocommunication Act, among other statutes, including its staff acting under delegated authority.

"**Joinder Agreement**" means a joinder agreement substantially in the form of Exhibit D.

"**Joint Venture**" means any Person, other than an individual or a Subsidiary of the Borrower, (i) in which the Borrower or a Guarantor holds or acquires an ownership interest (whether by way of Capital Stock or otherwise) and (ii) which is engaged in a Similar Business.

"**Judgment Currency**" has the meaning assigned to such term in Section 2.17.

"**Junior Indebtedness**" means, collectively, (i) Indebtedness for borrowed money which is (x) unsecured or (y) Subordinated Indebtedness or (z) secured only by Collateral on a junior lien basis to the Liens securing the Obligations, and (ii) Prepetition Indebtedness.

"**Leases**" means any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lenders**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that has or holds Loans and/or Commitments and becomes a party hereto

pursuant to an Assignment and Assumption, other than, in each case, any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"**License Subsidiary**" means each single purpose Wholly Owned Subsidiary of the Borrower that is not a Foreign Subsidiary and that is created solely to hold or lease Communications Licenses issued by the FCC for one or more of its businesses (for the avoidance of doubt, License Subsidiary shall not include One Dot Six LLC or Ligado Networks Inc. of Virginia).

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest, hypothecation, deemed trust or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any other agreement to give a security interest and any filing of or agreement to give any financing statement (or equivalent document) under the UCC or PPSA (or equivalent statutes) of any jurisdiction); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"**Loan Assigning Lender**" as defined in Section 2.01(f)(iii)(B).

"**Loan Documents**" means this Agreement, including all related exhibits and schedules, the Promissory Notes (if any), the Loan Security Documents, the U.S. Bank Fee Letter and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"**Loan Parties**" means the Borrower and the Guarantors.

"**Loan Secured Parties**" means the Lenders, the Administrative Agent, the Collateral Agent and any Indemnitee; and "**Loan Secured Party**" means any one of them.

"**Loan Security Agreement**" means the Senior Secured Super-Priority Debtor-in-Possession Security Agreement, dated as of the Interim DIP Order Entry Date, among the Loan Parties party thereto and the Collateral Agent for the benefit of the Loan Secured Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, which Loan Security Agreement shall originally be in the form attached hereto as Exhibit O (with such changes as the Required Lenders consent to in writing).

"**Loan Security Documents**" means (a) each Canadian Security Document, (b) the Loan Security Agreement, (c) the DIP Orders and DIP Recognition Orders (to the extent related to the granting of Liens over any assets or guaranties of the Obligations) and (d) each other security agreement, pledge agreement, account control agreement, landlord access agreement, mortgage and each other document, agreement or instrument governed by applicable local, state, provincial, territorial or federal law delivered to the Collateral Agent for the purpose of granting a valid Lien on or security interest in any property as collateral to secure any Obligations, and each UCC, PPSA and other financing statement or instrument of perfection and any other document, agreement or instrument governed by applicable local, state, provincial, territorial or federal law filed or to be filed in respect of the Liens on and security interests in property or fixtures created or purported to be created pursuant thereto and any other document, agreement or instrument governed by local, state, provincial, territorial or federal law utilized to pledge or grant or purport to pledge or grant

a Lien on or security interest in any property as collateral to secure any Obligations, in each case as amended, restated, amended and restated, extended, renewed, replaced, converted, supplemented or otherwise modified from time to time in accordance with its terms.

"**Loans**" means the DIP First Funding Loans, the DIP Second Funding Loans, the DIP Delayed Draw Term Loans, the Roll-Up Loans, the Backstop Incremental Loans and/or the Incremental Loans (if any), as the context requires (it being understood that the Loans shall include any Capitalized Amount in respect thereof).

"**Margin Stock**" has the meaning assigned to such term in Regulation U of the Board of Governors.

"**Material Adverse Effect**" means the occurrence of any event, effect, change, circumstance, condition or matter which has, or could reasonably be expected to have, a material adverse effect on (a) the business, assets, property, operations or condition, financial or otherwise, of the Borrower and its Subsidiaries, taken as a whole; (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the Interim DIP Order, the Final DIP Order, the Interim DIP Recognition Order or the Final DIP Recognition Order, or on the rights and remedies of the Administrative Agent or the Lenders hereunder or thereunder; or (c) the ability of the Loan Parties to perform their obligations under the Loan Documents, taken as a whole; *provided* that "Material Adverse Effect" shall expressly exclude (i) the effect of the filing of the Cases and the Recognition Proceedings and (ii) any action required to be taken under the Loan Documents or the DIP Orders or the DIP Recognition Orders.

"**Material Contract**" means (a) each Material Lease, (b) the Boeing Agreement, (c) the Restructuring Support Agreement and (d) each other agreement entered into by the Borrower or any Subsidiary after the Closing Date (other than any agreement in respect of Indebtedness for borrowed money) with respect to which the Companies will, in the aggregate, pay or receive more than $10,000,000 thereunder in any fiscal year; *provided*, that, the Required Ad Hoc Holders may remove any of the foregoing as a "Material Contract" by providing written notice of such removal to the Administrative Agent and the Borrower.

"**Material Indebtedness**" means any Indebtedness (other than the Loans) or Hedging Obligations of the Borrower or any of its Subsidiaries in an aggregate outstanding principal amount exceeding $10,000,000. For purposes of determining Material Indebtedness, the "**principal amount**" in respect of any Hedging Obligations of the Borrower or any Subsidiary at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Subsidiary would be required to pay if the related Hedging Agreement were terminated at such time.

"**Material Lease**" means each of (a) the One Dot Six Lease, (b) the Inmarsat Agreement and (c) each other lease requiring an aggregate payment of more than $10,000,000 by the Companies in total in any fiscal year.

"**Material License**" means, at any time, a Communications License that either individually or in the aggregate is material to the business of the Companies.

"**Material Regulatory Request**" means any or all of the following:  (a) collectively, those certain applications filed by the Borrower and/or certain of the Guarantors with the FCC on or about December 31, 2015, seeking to modify various of the Communications Licenses and any amendments, orders, and petitions related thereto; and (b) the pending petition for rulemaking in RM-11681.

"**Maturity Date**" means the earliest to occur of (a) the date that is 160 days after the Petition Date (the "**Initial Stated Maturity Date**"); *provided* that the Maturity Date may be extended by five additional consecutive periods of 112 days (any such additional period (if it occurs in accordance with this proviso), a "**Maturity Date Extension Period**") following delivery by the Borrower of a written request for such applicable additional period to the Required Lenders (with a copy to the Administrative Agent), subject to the prior written consent of the Required Ad Hoc Holders (delivered in writing to the Borrower and the Administrative Agent) to such additional period (such written consent, a "**Maturity Date Extension Approval**") which may be given, conditioned or withheld in their sole discretion (and shall only be in respect of the single applicable 112 day period then requested by the Borrower); *provided further* that, upon entry of the Confirmation Order, the Maturity Date Extension Period then in effect shall automatically be extended to the effective date of an Acceptable Plan so long as such automatic extension does not extend after the Outside Date (as defined in the Restructuring Support Agreement); (b) the date on which all the Loans shall become due and payable in full hereunder, whether by acceleration or otherwise in accordance with Article 8 or the applicable DIP Order; (c) if applicable, the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (d) the date a sale of all or substantially all of the Debtors' assets is consummated under Section 363 of the Bankruptcy Code; and (e) the date on which the Bankruptcy Court orders any Case dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

"**Maximum Rate**" has the meaning assigned to such term in Section 10.16.

"**Milestones**" has the meaning assigned to such term in Section 5.16.

"**Moody's**" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"**Mubadala**" means Mubadala Investment Company.

"**Mubadala Group**" means any Person controlling, controlled by or under common control with Mubadala or any other owner of Fortress Investment Group LLC, that is not also controlled by Fortress Investment Group LLC and is not Softbank or a member of the Softbank Group.  For purposes of this definition, "control" means the power, through ownership of securities, contract or otherwise, to direct the policies of the applicable person or entity.

"**Multiemployer Plan**" means a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA to which any of the Companies or any of their respective ERISA Affiliates has, or at any time has ever had, an obligation to contribute.

"**Net Cash Flow**" means, with respect to any Testing Period, an amount equal to (a) the aggregate cash receipts of the Loan Parties during such period (excluding proceeds of any Loans) less (b) the aggregate cash disbursements of the Loan Parties during such Testing Period (other than any repayments of Loans).

"**Net Cash Flow Line Items**" means the net cash flow line item in the Budget under the heading "Net Cash Flow" (or words of like import).

"**Net Cash Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making an Asset Sale, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss, net of: (a) in the event of an Asset Sale (i) the direct costs relating to such Asset Sale excluding amounts payable to any Loan Party or any Affiliate or Subsidiary thereof, (ii) sales, use or other transaction Taxes paid or payable as a result thereof (including a reasonable reserve for income taxes payable as a result of such Asset Sale) (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), (iii) [reserved] and (iv) any deduction of appropriate amounts to be provided by the Borrower as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Borrower after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction and (b) in the event of an Event of Loss, (i) any actual and reasonable costs incurred by Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Borrower or such Subsidiary in respect thereof and (ii) any bona fide direct costs and expenses incurred by Borrower or any of its Subsidiaries in connection with the collection of such proceeds, award or other payments. After netting out items in clauses (a) and (b) of the foregoing definition, if the amount of Net Cash Proceeds would be less than zero, such amount shall be deemed to equal zero.

"**Net Issuance Proceeds**" means, in respect of any issuance or incurrence of Indebtedness, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such issuance), net of customary underwriting discounts and out-of-pocket costs and expenses paid or incurred, in each case, in cash, in connection therewith, in each case, in favor of any Person that is not a Loan Party or an Affiliate or Subsidiary thereof.

"**Network**" means the terrestrial wireless broadband network being developed by the Companies as of the Closing Date, which network is intended to provide terrestrial wireless services in the contiguous United States.

"**Obligations**" means all debts, liabilities and obligations (whether now existing or hereafter arising, absolute or contingent, joint, several or independent) of every nature of Borrower, each other Loan Party and/or its Subsidiaries from time to time owed to the Agents (including former Agents), the Lenders, any Indemnitee or any of them, under any Loan Document or the DIP Orders and DIP Recognition Orders, including in respect of the principal or any Loan, premium, interest (including interest and premium which, but for the filing of a petition in bankruptcy with respect to such Loan Party, would have accrued on any Obligation, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy

proceeding), fees, expenses, indemnification or otherwise, and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance) and any such obligations that arise after the filing of a petition by or against any Loan Party under the Bankruptcy Code or under Debtor Relief Laws, regardless of whether allowed as a claim in the resulting proceeding, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 (or under any other Debtor Relief Laws) or otherwise.

"**OFAC**" has the meaning assigned to such term in the definition of "**Embargoed Person**."

"**Officer's Certificate**" means a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer, the president, one of the Financial Officers, or, in the case of a Canadian Subsidiary, the secretary or assistant secretary, each in his or her official (and not individual) capacity.

"**One Dot Six Lease**" means the Amended and Restated Long-Term De Facto Transfer Lease Agreement entered into as of December 2, 2022 between OP LLC and One Dot Six LLC as amended, supplemented or otherwise modified from time to time to the extent permitted thereunder and hereunder.

"**One Dot Six Lease Authorization**" means the FCC consent to the One Dot Six Lease reflected in the FCC's records under Lease ID L000017865, or another FCC consent substantially replicating that consent without the imposition of material adverse conditions on any Company.

"**One Dot Six License**" means the license initially granted on October 1, 2003 by the FCC under FCC Registration Number 0008617136 for certain nationwide spectrum rights for 5 MHz in the 1670-1675 MHz band under call sign WPYQ831, a renewal or extension of that license, or another FCC license substantially replicating that initial license without the imposition of any new conditions that are material and adverse to any Company.

"**Operating Agreement**" means the amended and restated operating agreement of the Borrower dated October 23, 2020, as such agreement may be further amended, amended and restated, supplemented or otherwise modified from time to time.

"**Operating Receipts Line Items**" means the operating receipts line item in the Budget under the heading "Receipts" (or words of like import).

"**Organizational Documents**" means, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation, articles and by-laws (or similar documents) and any shareholder(s) agreements (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person, (e) in the case of the Borrower, the Operating Agreement and any other ancillary or supplemental document in relation thereto and (f) in any other case, the functional equivalent of the foregoing.

"**Other Connection Taxes**" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower

or any Subsidiary Guarantor hereunder, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp or documentary Taxes or any other excise, property, filing or similar Taxes, charges or levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.16).

"**Paid in Kind**" means, with respect to any applicable accrued and unpaid (or otherwise due) interest, fee or other amount, that such interest, fee or other amount (rounded up to the nearest $1.00) is added to the unpaid principal amount of the applicable Loans on the applicable Interest Payment Date or other applicable date of payment required pursuant to this Agreement (whereupon from and after such date such interest, fee or other amount shall be treated as part of the principal of the applicable Loans for all purposes of this Agreement and constitute Obligations). Any interest, fee or other amount that is Paid in Kind is referred to herein as a "**Capitalized Amount**" and the obligation of the Borrower to pay all Capitalized Amounts shall be automatically evidenced by this Agreement, and, if applicable, any applicable Promissory Notes.

"**Parent**" means, with respect to any Person, any other Person of which such Person is a direct or indirect Subsidiary.

"**Participant**" has the meaning assigned to such term in Section 10.04(c).

"**Participant Register**" has the meaning assigned to such term in Section 10.04(c).

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor statute).

"**Perfection Certificate**" means a certificate in the form of Exhibit F-1 or any other form approved by the Administrative Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" means a certificate supplement in the form of Exhibit F-2 or any other form approved by the Administrative Agent.

"**Permitted Business**" means any business, service or activity that is the same as, not substantially different from, or reasonably related, incidental, ancillary, complementary or similar to, or that is a reasonable extension or development of, any of the businesses, services or activities in which the Borrower or the Guarantors are engaged, or proposed to be in engaged, on the Closing Date.

"**Permitted Debt**" has the meaning assigned to such term in Section 6.01.

"**Permitted Holders**" means any Cerberus Entity, any Fortress Entity, any Harbinger Entity (so long as all Equity Interests in the Borrower that are held by any Harbinger Entity are subject to the Harbinger Proxy pursuant to the terms of the Operating Agreement as in effect on the Closing Date), Credit Markets Investment Corporation and any Person that is an equityholder of Credit Markets Investment Corporation as of the Closing Date, any Affiliates of any of the foregoing (other than the Borrower and its Subsidiaries and subject to the other limitations described herein).

"**Permitted Investments**" means:

(1)    [reserved];

(2)    Investments existing on the Closing Date to the extent set forth on Schedule 1.01(c) hereto;

(3)    Investments made by the Borrower and its Subsidiaries involving (i) the acquisition and holding of accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) the investment in, acquisition of and holding of cash and Cash Equivalents, (iii) the prepayment of expenses and endorsement of negotiable instruments held for collection in the ordinary course of business or (iv) the making of lease, utility and other similar deposits in the ordinary course of business;

(4)    Investments made by the Borrower in any Guarantor and by any Subsidiary in any Guarantor; *provided* that if such Investment constitutes Indebtedness, such Investment is subject to the Intercompany Note and pledged by such Person as Collateral pursuant to the Loan Security Documents;

(5)    [reserved];

(6)    Investments in securities or obligations of trade creditors or customers in the ordinary course of business received in settlement of debts, satisfaction of judgments or upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers;

(7)    [reserved];

(8)    Investments resulting from the receipt of non-cash consideration in a sale of assets or property that does not constitute an Asset Sale;

(9)    to the extent constituting Investments in Collateral, Capital Expenditures made in accordance with the Budget by the Borrower or any Subsidiary in the ordinary course of business;

(10)    purchases and other acquisitions of inventory, materials, equipment and other property in the ordinary course of business or as required by Governmental Authorities, including in order to maintain or renew Communication Licenses, in each case, in accordance with the Budget;

(11)    [reserved];

(12)    the Specified Investments;

(13)    [reserved];

(14)    Investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business and are in accordance with the Budget;

(15)    [reserved];

(16)    other Investments in an aggregate amount not to exceed $5.0 million at any time outstanding, in each case, solely to the extent made (and maintained) as expressly set forth in the Budget;

(17)    other Investments explicitly consented to in writing by the Required Ad Hoc Holders;

(18)    any Investment in Cash Equivalents or Investment Grade Securities;

(19)    [reserved]; and

(20)    guarantees of the Obligations and other guarantees expressly permitted by Section 6.01(g); *provided* that the proceeds of the Indebtedness being guaranteed would be applied in a manner that would otherwise be permitted by this Agreement.

"**Permitted Liens**" means, with respect to any Person:

(1)    inchoate Liens for taxes (including Taxes), assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes (including Taxes), assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP and the nonpayment of which is permitted or required by the Bankruptcy Code, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(2)    Liens in respect of property of the Borrower or any Subsidiary imposed by Requirements of Law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP and the nonpayment of which is permitted or required by the Bankruptcy Code, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(3)    any Lien in existence on the Closing Date to the extent set forth on Schedule 1.01(d) hereto;

(4)    easements, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Borrower or its Subsidiaries at such Real Property;

(5)    Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which the Borrower or its Subsidiaries shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings;

(6)    Liens (other than any Lien imposed by ERISA) (x) imposed by Requirements of Law, or deposits made in connection therewith, in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) [reserved] or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that with respect to clauses (x), (y) and (z) of this paragraph (6), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP and the nonpayment of which is permitted or required by the Bankruptcy Code;

(7)    leases and subleases of Real Property of the Borrower or any Subsidiary granted by the Borrower or such Subsidiary, as applicable, to third parties that do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of the Borrower or its Subsidiaries or (ii) materially impair the use (for its intended purposes) or the value of the Real Property subject thereto;

(8)    [reserved];

(9)    Liens securing Indebtedness incurred pursuant to Section 6.01(e); *provided* such Liens do not extend beyond the assets being financed or refinanced in connection with such Purchase Money Obligations and Capital Lease Obligations;

(10)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(11)     (a) Liens securing Indebtedness permitted by Section 6.01(g) (to the extent the Indebtedness underlying such Contingent Obligation is secured by a Permitted Lien), and (b) Liens securing Indebtedness permitted by Section 6.01(f);

(12)     non-exclusive licenses of intellectual property granted by the Borrower or any Subsidiary in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Borrower and its Subsidiaries;

(13)     the filing of UCC and PPSA financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(14)     [reserved];

(15)     other Liens so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $5.0 million at any time outstanding and does not secure Indebtedness for borrowed money;

(16)     Liens securing the Prepetition Secured Obligations (other than the Prepetition Roll-Up Indebtedness after giving effect to the Roll-Up), subject to the DIP Orders and the subordination set forth therein;

(17)     the Administration Charge;

(18)     Liens securing the Carve-Out; and

(19)     Liens securing the AST Break-Up Fee (if any).

"**Potential DIP Portion**" as defined in Section 2.01(f)(i).

"**Permitted Variance**" means a Variance from the Budget for the applicable Testing Period, which Variance is not (i) with respect to the Operating Receipts Line Item, more than 20.0% less than the amount in the Budget for such Operating Receipts Line Item for such Testing Period,  (ii) with respect to the Net Cash Flow Line Item, more than 10.0% less than the amount in the Budget for such Net Cash Flow Line Item for such Testing Period, (iii) with respect to all Cumulative Testing Disbursement Line Items, on a cumulative basis for all such Cumulative Testing Disbursement Line Items for such Testing Period, more than 10.0% greater than the amount in the Budget for such Cumulative Testing Disbursement Like Items (on a cumulative basis) for such Testing Period, as applicable, (iv) with respect to all Capex and Other Non-Operating Disbursement Line Items, on a cumulative basis to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items, more than 10.0% greater than the amount in the Budget for such Capex and Other Non-Operating Disbursement Line Items (on a cumulative basis to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items) for such Testing Period, as applicable, and (v) with respect to any Professional Fee Disbursement Line Item, on an individual line item basis, more than 15.0% greater than the amount in the Budget for each such Professional Fee Disbursement Line Item for such Testing Period, as applicable.

"**Person**" means any individual, corporation, partnership, limited liability company, unlimited liability company, limited company, Joint Venture, association, joint-stock company,

trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**Petition Date**" has the meaning assigned to such term in the recitals hereto.

"**Plan**" means of a plan of reorganization or plan of liquidation under Chapter 11 of the Bankruptcy Code of the Debtors (including all related schedules, supplements, exhibits and orders, as applicable).

"**PPSA**" means the Personal Property Security Act (Ontario), as amended from time to time, together with all regulations made thereunder; *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (i) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario, or (ii) the Civil Code of Quebec, "**PPSA**" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"**Prepetition Facilities**" means, collectively, the loan and notes facilities provided under the Prepetition Debt Documents.

"**Prepetition Lenders and Holders**" has the meaning assigned to such term in the recitals hereto.

"**Prepetition Debt Documents**" means, collectively, the 1L Loan Agreement, 1L Notes Indenture, 1.5L Loan Agreement and 2L Notes Indenture.

"**Prepetition First Lien Secured Obligations**" means, collectively, the "Obligations" under and as defined in each of the 1L Loan Agreement and the 1L Notes Indenture.

"**Prepetition First Out Obligations**" as defined in Section 3.12(b).

"**Prepetition Indebtedness**" means the extensions of credit outstanding under the Prepetition Debt Documents as of the Petition Date.

"**Prepetition Permitted Prior Liens**" has the meaning given to such term in the DIP Orders.

"**Prepetition Roll-Up Indebtedness**" means, with respect to any Lender on the Final DIP Order Entry Date, the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable, Prepetition First Lien Secured Obligations (other than Prepetition First Out Obligations) under the applicable Prepetition Debt Documents owing to such Lender (or, if elected by such Lender, its Affiliates and/or Approved Funds) (x) on the Final DIP Order Entry Date, calculated based on the aggregate principal amount of Loans and unused Commitments of such Lender hereunder on the Final DIP Order Entry Date and (y) on the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable,  calculated based on the aggregate principal amount of Backstop Incremental Commitments of such Lender on the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable, in each case, in the

applicable amount set forth in Section 2.01(d)(ii); *provided* that (x) if such Lender is owed Prepetition First Lien Secured Obligations under multiple facilities, the allocation of Prepetition Roll-Up Indebtedness among facilities shall be determined by the applicable Lender pursuant to a written notice delivered to the Administrative Agent (and absent such notice, shall be pro rata across such facilities) and (y) to the extent the foregoing amount exceeds such aggregate Prepetition First Lien Secured Obligations of such Lender (or its Affiliate and/or Approved Fund), then the applicable Prepetition Roll-Up Indebtedness shall be comprised first of accrued and unpaid interest and fees that constitute Prepetition First Lien Secured Obligations, second of outstanding principal loans or notes, as applicable, and third all other outstanding Prepetition First Lien Secured Obligations.   Notwithstanding anything to the contrary set forth herein, the Prepetition First Out Obligations shall not be Prepetition Roll-Up Indebtedness.

"**Prepetition Secured Obligations**" means, collectively, the "Obligations" under and as defined in each of the Prepetition Debt Documents.

"**Prepetition Secured Parties**" means, collectively, the "Secured Parties" under and as defined in each of the Prepetition Debt Documents.

"**Prepetition Security Agreements**" means, collectively, the 1L Loan Security Agreement, 1L Notes Security Agreement, 1.5L Loan Security Agreement and 2L Notes Security Agreement.

"**Primary Obligations**" has the meaning assigned to such term in the definition of "Contingent Obligations".

"**Primary Obligor**" has the meaning assigned to such term in the definition of "Contingent Obligations".

"**Professional Fee Disbursement Line Items**" means, collectively, each Disbursement Line Item in respect of professional, advisor, consultant or investment banking fees and expenses (without duplication) in the Budget, including for the avoidance of doubt in respect of fees and expenses of counsel and restructuring and financial advisors.   For the avoidance of doubt, the Initial Budget contains one Professional Fee Disbursement Line Item, which is titled "Total Professional Fees".

"**Projected Information**" means (i) the projected weekly operating cash receipts for each week, (ii) the projected weekly disbursements for each week, (iii) the projected net weekly cash flow for each week, (iv) the projected weekly cash balance, (v) the projected professional fees and expenses for each week, and (vi) such other information that the Required Ad Hoc Holders may request from time to time.

"**Promissory Notes**" means any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit E.

"**Property**" means any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"**Public-Sider**" means any representative of a Lender that does not want to receive material non-public information with the meaning of the federal and state securities laws.

"**Purchase Money Obligation**" means, for any Person, the obligations of such Person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of, or the cost of installation, lease or construction of, any improvements or additions to the Network; *provided*, *however*, that (i) such Indebtedness is incurred substantially contemporaneously with such acquisition, installation, lease or construction of such improvements or additions by such Person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, lease, or construction, as the case may be.

"**Purchased Interest and Fees**" as defined in Section 2.01(f)(iii)(C).

"**Purchased Loans**" as defined in Section 2.01(f)(iii)(B).

"**Purchased Obligations**" as defined in Section 2.01(f)(iii)(C).

"**QFC Credit Support**" has the meaning assigned to such term in Section 10.21.

"**Qualified Capital Stock**" of any Person means any Equity Interests of such Person that are not Disqualified Capital Stock.

"**Reaffirmation Agreement**" means a reaffirmation of this Agreement, the Obligations arising hereunder and the Guarantees hereunder, dated as of the Interim DIP Order Entry Date, by the Loan Parties party thereto for the benefit of the Loan Secured Parties, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, which Reaffirmation Agreement shall originally be in the form attached hereto as Exhibit P (with such changes as the Required Ad Hoc Holders consent to in writing).

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof, but excluding, for the avoidance of doubt, any spectrum-related assets.

"**Recognition Proceedings**" means the proceedings commenced before the CCAA Court recognizing the Cases of the Debtors in Canada under Part IV of the CCAA.

"**Refund Amount**" has the meaning assigned to such term in the Framework Agreement.

"**Register**" has the meaning assigned to such term in Section 10.04(b)(iv).

"**Regulation D**" means Regulation D of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" means Regulation S-X promulgated under the Securities Act.

"**Regulation T**" means Regulation T of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board of Governors as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, counsel and advisors of such Person and of such Person's Affiliates.

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Remaining Subscription Amounts**" as defined in Section 2.01(f)(i).

"**Required Ad Hoc Holders**" means, at any time, collectively, (a) members of the Ad Hoc First Lien Group holding more than 50% of the then-outstanding principal amount of Loans held by the Ad Hoc First Lien Group in the aggregate, (b) all members (including their funds and/or accounts managed by such funds and any Affiliates) of the Ad Hoc First Lien Group holding more than $100,000,000 in then-outstanding aggregate principal amount of Prepetition First Lien Secured Obligations, Loans and/or unused Commitments, (c) each Fortress Lender and each Cerberus Lender and (d) members of the Ad Hoc Crossholder Group (including the Fortress Lenders and the Cerberus Lenders) holding more than 50% of the then-outstanding principal amount of Loans and unused Commitments held by the Ad Hoc Crossholder Group in the aggregate; *provided* that, for purposes of any covenant, term or other provision herein in respect of which any written approval or written consent of the Required Ad Hoc Holders is required, any of the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors may provide any such approval or consent via email on behalf of the portion of the Required Ad Hoc Holders that they represent.

"**Required Lenders**" means, at any time, collectively, (i) the Required Ad Hoc Holders and (ii) Lenders (including the Required Ad Hoc Holders) having Loans or unused Commitments representing more than fifty per cent (50%) of the sum of all Loans and unused Commitments outstanding at such time; *provided* that, without limiting the provisions of Section 10.04 prohibiting assignments of Loans or Commitments to the Borrower, any Subsidiary or any Affiliate of the Borrower, Loans held or deemed to be held by an Affiliate Lender shall be excluded from both the numerator and the denominator for purposes of making a determination of Required Lenders.

"**Requirements of Law**" means, collectively, any and all applicable requirements of any Governmental Authority including any and all laws (including common law), codes, ordinances, treaties, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes or

case law (including, for the avoidance of doubt, FATCA); the singular of which, "**Requirement of Law**".

"**Resignation Effective Date**" has the meaning assigned to such term in Section 9.06.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Response**" means (a) "**response**" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any Person means any executive officer or Financial Officer of such Person and any other officer or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of January 5, 2025, by and among, inter alios, the Debtors and the Consenting Stakeholders (as defined therein) party thereto from time to time, and AST, as may be amended, restated, amended and restated, supplemented and/or otherwise modified with the written consent of the Required Ad Hoc Holders.

"**Roll-Up**" as defined in Section 2.01(d).

"**Roll-Up Designation Notice**" means a written notice delivered by a Lender or a Backstop Incremental Lender, as applicable, to the Administrative Agent, which written notice shall (a) designate an Affiliate or Approved Fund of such Lender that is a Prepetition Lender and Holder under the 1L Loan Agreement and/or 1L Notes Indenture to be the beneficiary of the amount of Roll-Up Loans specified therein (a "**Designated Roll-Up Beneficiary**") (for the avoidance of doubt, not to exceed the aggregate amount of Roll-Up Loans to which such Lender is entitled as of the Final DIP Order Entry Date, the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable, pursuant to Section 2.01(d)) and (b) if such Designated Roll-Up Beneficiary is not already a Lender hereunder, attach a signature page to this Agreement duly executed by such Designated Roll-Up Beneficiary (which the Administrative Agent may thereafter affix to this Agreement upon the consummation of the Roll-Up without any further action by any other party hereto) and upon the consummation of the Roll-Up such Designated Roll-Up Beneficiary shall be a Lender hereunder holding outstanding Roll-Up Loans. Notwithstanding anything in this Agreement to the contrary, LSQ Acquisition Co (Series XI) LLC has delivered a Roll-Up Designation Notice on or about the Closing Date designating each of LSQ Acquisition Co (Series VIII) LLC, LSQ Acquisition Co (Series IX) LLC, LSQ Acquisition Co (Series XI) LLC, Fortress Vintage Securities Fund L.P., CF L2 Holdings LLC and LSQ Acquisition Co (Series VI) LLC to be its Designated Roll-Up Beneficiaries (with allocations among them separately communicated in writing to the Administrative Agent by LSQ Acquisition

Co (Series XI) LLC), and each such Designated Roll-Up Beneficiary's signature page attached to this Agreement shall become effective on (but not before) the consummation of the Roll-Up (it being understood that each such Designated Roll-Up Beneficiary shall not be considered party to this Agreement as a Lender until such consummation).

"**Roll-Up Loans**" as defined in Section 2.01(d) (including any Backstop Incremental Roll-Up Loans, it being understood that the Roll-Up Loans shall include any Capitalized Amount in respect thereof).

"**S&P**" means Standard & Poor's Ratings Services or any successor to the rating agency business thereof.

"**Sale and Leaseback Transaction**" has the meaning assigned to such term in Section 6.03.

"**Satellite**" means any satellite owned by the Borrower or any Guarantor and any satellite purchased by the Borrower or any Guarantor pursuant to the terms of a Satellite Purchase Agreement, whether such satellite is in the process of manufacture, has been delivered for launch or is in orbit (whether or not in operational service).

"**Satellite Manufacturer**" means, with respect to any Satellite, the prime contractor and manufacturer of such Satellite.

"**Satellite Purchase Agreement**" means, with respect to any Satellite, the agreement between the applicable Satellite Purchaser and the applicable Satellite Manufacturer relating to the manufacture, testing and delivery of such Satellite.

"**Satellite Purchaser**" means the Borrower or Guarantor that is a party to a Satellite Purchase Agreement.

"**Second DIP DDTL Borrowing**" means the second Borrowing of DIP Delayed Draw Term Loans.

"**Second Round Electing Lender**" as defined in Section 2.01(f)(i).

"**Second Satellite**" means the Boeing-GEM-F2 (Serial #7984010-103-002) satellite, together with the related ground-based beam formers and related calibration equipment.

"**Secured Parties**" means the Loan Secured Parties; and "**Secured Party**" means any one of them.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Selling Lender**" as defined in Section 2.01(f)(iii)(B).

"**Similar Business**" means any business or activity of the Borrower or any of its Subsidiaries currently conducted or proposed as of the Closing Date, or any business or activity

that is reasonably similar thereto or a reasonable extension, development or expansion thereof, or is complementary, incidental, ancillary or related thereto.

"**Single Employer Plan**" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) that is covered by Section 4021 of ERISA, and in respect of which the Borrower, any of the Borrower's Subsidiaries or any of their respective ERISA Affiliates is or, if such plan were terminated, would under Section 4069 of ERISA would be, deemed to be an "employer" as defined in Section 3(5) of ERISA.

"**Skyterra-1**" means that certain satellite known as Skyterra-1.

"**Skyterra-2**" means that certain satellite known as Skyterra-2.

"**Specified Investments**" means, to the extent construed as "Investments," (i) the expenditure or contribution of funds to facilitate (A) the acquisition of spectrum rights in the 1675-1680 MHz band and the relocation of current users to clear the spectrum, (B) the relocation of facilities from the 1675-1680 MHz band as necessary to satisfy any FCC condition in connection with relief granted to the Borrower or a Subsidiary in response to a Material Regulatory Request or substantially similar or related request, including but not limited to expenditures or contributions to facilitate required trials and purchases of equipment necessary for testing or conducting same or (C) the acquisition of a Communications License with respect to the use of spectrum at 1670-1675 MHz pursuant to the Borrower's purchase option under the One Dot Six Lease; and (ii) in connection with any Material Regulatory Request or substantially similar or related request, any action, transaction or series of related actions or transactions in connection with the Borrower's or any Guarantor's voluntary relinquishment of spectrum rights or consent to restrictions, in each case, imposed by the FCC on its Communications Licenses.

"**Stated Maturity**" means, with respect to any loan or security, the date specified in such loan or security as the fixed date on which the final payment of principal of such loan or security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such loan or security at the option of the holder or lender thereof upon the happening of any contingency beyond the control of the issuer or borrower, as applicable, unless such contingency has occurred).

"**Subordinated Indebtedness**" means (a) with respect to the Borrower, any Indebtedness of the Borrower which is by its terms subordinated in right of payment to the Loans and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to its Guarantee.

"**Subsequent Assumed DIP Portion**" as defined in Section 2.01(f)(i).

"**Subsequent Election Deadline**" means 5:00 p.m. New York City time on January 17, 2025 (or such other date as may be consented to in writing by the Required Ad Hoc Holders).

"**Subsidiary**" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is

at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof, (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any consolidated Subsidiary of such Person is a controlling general partner or otherwise controls such entity and (3) any Person that is consolidated in the consolidated financial statements of the specified Person in accordance with GAAP.  Unless the context requires otherwise, "**Subsidiary**" refers to a Subsidiary of the Borrower.

"**Subsidiary Guarantor**" means each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that guarantees the Obligations, grants a Lien over its assets to secure the Obligations and becomes a party to this Agreement pursuant to Section 5.11(b) unless and until such Subsidiary has been released from its Guaranteed Obligations in accordance with this Agreement.

"**Supported QFC**" has the meaning assigned to such term in Section 10.21.

"**Syndication Consummation Date**" as defined in Section 2.01(f)(iii).

"**Syndication DIP First Funding Loans**" as defined in Section 2.01(f)(i).

"**Syndication Eligible Prepetition Lenders**" as defined in Section 2.01(f)(i).

"**Syndication Transactions**" as defined in Section 2.01(f)(iii).

"**Tax Return**" means all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Testing Period**" means, (a) initially, the period commencing (and including) the Petition Date and ending on the third Sunday thereafter (the "**Initial Test Date**") and (b) thereafter, each consecutive four-week period ending on each second Sunday after the Initial Test Date.

"**Third DIP DDTL Borrowing**" means the third Borrowing of DIP Delayed Draw Term Loans.

"**Title Company**" means any title insurance company as shall be retained by the Borrower and reasonably acceptable to the Administrative Agent.

"**Transactions**" means the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the creation of the Liens provided for in the Loan

Security Documents and, in the case of the Borrower, the borrowing of Loans and the use of the proceeds thereof and the payment of interest, fees and expenses in connection therewith.

"**Transfer**" of, or with respect to, Loans, means, (i) any change in the direct or indirect beneficial ownership of Loans, whether or not for value and whether voluntary, involuntary, by operation of law or otherwise and (ii) any direct or indirect sale, assignment, transfer, exchange, issuing of participation rights, or other disposition of voting or economic rights in such Loans.  For the avoidance of doubt, all Transfers of Loans (and rights therein) must be made in accordance with, and subject to the limitations of, Section 10.04.

"**Transferred Guarantor**" has the meaning assigned to such term in Section 7.09.

"**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**United States**" means the United States of America.

"**U.S. Bank Fee Letter**" means that certain U.S. Bank Fee Proposal (DIP Agent), dated as of January 5, 2025, by and between the Borrower and the Administrative Agent.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**USA PATRIOT Act**" has the meaning assigned to such term in the definition of "**Anti-Terrorism Laws**".

"**Variance**" means a difference in the amount contained in the Budget with respect to any of the Loan Parties' (x) Operating Receipts Line Item, Capex and Other Non-Operating Disbursement Line Item (to the extent there is only one Capex and Other Non-Operating Disbursement Line Item) or Net Cash Flow Line Item, on a line item basis, compared to the Loan Parties' actual corresponding Operating Receipts Line Item, Capex and Other Non-Operating Disbursement Line Item (to the extent there is only one Capex and Other Non-Operating Disbursement Line Item) or Net Cash Flow Line Item, as applicable, for the applicable Testing Period, (y) Cumulative Testing Disbursement Line Items or Capex and Other Non-Operating Disbursement Line Items (to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items), on a cumulative basis, compared to the Loan Parties' actual corresponding Cumulative Disbursement Line Items or Capex and Other Non-Operating

Disbursement Line Items (to the extent there are multiple Capex and Other Non-Operating Disbursement Line Items), on a cumulative basis, for the applicable Testing Period or (z) Professional Fee Disbursement Line Items, on a line item basis, compared to any of the Loan Parties' actual corresponding Professional Fee Disbursement Line Items, on a line item basis, for the applicable Testing Period.

"**Variance Report**" means a detailed variance report, in form and substance reasonably satisfactory to the Required Lenders, that (i) reconciles the Loan Parties' actual performance for the applicable Testing Period with the Loan Parties' projected performance for such Testing Period pursuant to the Budget, which report shall include, without limitation, a detailed calculation of the variances (including Variances), on a line-item and aggregate basis, between the actual amount set forth for such Testing Period as compared to the Budget for such Testing Period and (ii) includes a report from the Loan Parties' management setting forth detailed explanations for variances in actual results (on a line by line basis) as compared to forecasted performance for such Testing Period under the Budget to the extent in excess of 10.0% with respect to receipts, disbursements and Net Cash Flow projections (on a line by line basis), including any Variance that is not a Permitted Variance.

"**Viasat**" means Viasat, Inc., a Delaware corporation.

"**Voting Stock**" means, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to vote in elections for the Board of Directors of such Person.

"**Wholly Owned Subsidiary**" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares or interests required to be held by foreign nationals) shall at the time be owned by such Person and/or by one or more Wholly Owned Subsidiaries of such Person and one or more Wholly Owned Subsidiaries of such Person.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a "complete withdrawal" or "partial withdrawal" from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument, plan, court order or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights (and for the avoidance of doubt any reference solely to "Real Property" shall not include Communications Licenses).

Section 1.03    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time (without giving effect to the application of ASC 852 and ASC 810) and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP (without giving effect to the application of ASC 852 and ASC 810), as in effect on the Closing Date unless otherwise agreed to by the Borrower and the Required Lenders.

Section 1.04    Resolution of Drafting Ambiguities.  Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

Section 1.05    Permitted Liens.  Any reference in this Agreement or any of the other Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by this Agreement or any of the other Loan Documents to any Permitted Lien.

Section 1.06    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.07    Discretion.  For the avoidance of doubt any reference in this Agreement to the "consent", "discretion", "satisfaction", "agreement" or "approval" of any Lender, the Required Lenders, Required Ad Hoc Holders, any Fortress Lender, any Cerberus Lender or all Lenders shall be deemed to mean (i) that such consent, agreement, satisfaction or approval may be given, conditioned or withheld in their respective sole discretion, unless the applicable provision is explicitly qualified by a reasonableness standard in the text thereof, and (ii) that they are not required to exercise any standard of reasonableness in exercising their discretion, unless the applicable provision is explicitly qualified by a reasonableness standard in the text thereof.

## ARTICLE 2
## THE LOANS

Section 2.01    Commitments.

(a)    *DIP First Funding Loans*.  Subject to the terms and conditions hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, each Lender with a DIP First Funding Commitment severally, and not jointly, agrees to make DIP First Funding Loans denominated in Dollars to the Borrower on the DIP First Funding Date in an aggregate principal amount not to exceed its DIP First Funding Commitments.  The DIP First Funding Commitments of the Lenders shall automatically and permanently terminate upon the making of the DIP First Funding Loans on the DIP First Funding Date (or, if earlier, on the Maturity Date).  DIP First Funding Loans borrowed and repaid or prepaid may not be reborrowed.

(b)    *DIP Second Funding Loans*.  Subject to the terms and conditions hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, each Lender with a DIP Second Funding Commitment severally, and not jointly, agrees to make DIP Second Funding Loans denominated in Dollars to the Borrower on the DIP Second Funding Date in an aggregate principal amount not to exceed its DIP Second Funding Commitments.  The DIP Second Funding Commitments of the Lenders shall automatically and permanently terminate upon the making of the DIP Second Funding Loans on the DIP Second Funding Date (or, if earlier, on the Maturity Date).  DIP Second Funding Loans borrowed and repaid or prepaid may not be reborrowed.

(c)    *DIP Delayed Draw Term Loans*.  Subject to the terms and conditions hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, each Lender with a DIP DDTL Commitment severally, and not jointly, agrees to make DIP Delayed Draw Term Loans denominated in Dollars to the Borrower from time to time (but in no more than three (3) Borrowings) on any DIP DDTL Funding Date in an aggregate principal amount not to exceed its DIP DDTL Commitments.  The DIP DDTL Commitments of each Lender shall automatically and permanently terminate on a dollar for dollar basis upon the making of any DIP Delayed Draw Term Loans by such Lender; *provided* that any unused DIP DDTL Commitments shall automatically terminate on the Maturity Date.  DIP Delayed Draw Term Loans borrowed and repaid or prepaid may not be reborrowed.

(d)     *Roll-Up Loans*.

(i)     Subject to the terms hereof and of the DIP Orders and DIP Recognition Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders, on the Final DIP Order Entry Date (or, solely in the case of the "roll-up" in connection with the incurrence of the Backstop Incremental Commitments and Backstop Incremental Loans, on the First Amendment Effective Date or the Backstop Incremental Funding Date, respectively) and notwithstanding anything to the contrary contained in the applicable Prepetition Debt Documents (including in respect of pro rata sharing, sharing of payment or any waterfall), each Lender (as of the Final DIP Order Entry Date) or Backstop Incremental Lender (as of the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable) (or, in each case, its Designated Roll-Up Beneficiary, as applicable) shall automatically, and without further action or order of the Bankruptcy Court, CCAA Court or any other Person, be deemed on such date to have "rolled-up" and refinanced on a cashless basis the Prepetition Roll-Up Indebtedness held by such Lender (or its Designated Roll-Up Beneficiary, as applicable) immediately prior to the Final DIP Order Entry Date (or, solely in the case of the "roll-up" in connection with the incurrence of the Backstop Incremental Commitments and Backstop Incremental Loans, on the First Amendment Effective Date or the Backstop Incremental Funding Date, respectively) for an aggregate amount of loans under the DIP Facility calculated in accordance with Section 2.01(d)(ii) (such loans, the "**Roll-Up Loans**"; the refinancing of the Prepetition Roll-Up Indebtedness with Roll-Up Loans on the Final DIP Order Entry Date, the First Amendment Effective Date or the Backstop Incremental Funding Date, each a "**Roll-Up**" and collectively, the "**Roll-Up**"), and for the avoidance of doubt, such Roll-Up Loans shall constitute "Obligations" and "Loans" outstanding hereunder on the Final DIP Order Entry Date, the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable.  Roll-Up Loans borrowed and repaid or prepaid may not be reborrowed.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, (i) there shall be no conditions precedent to the automatic issuance of the Roll-Up Loans hereunder, (ii) the amount of Prepetition Secured Obligations outstanding under the Prepetition Debt Documents after giving effect to the Roll-Up shall not be reduced by any Capitalized Amount and (iii) the Prepetition Secured Obligations outstanding under the Prepetition Debt Documents after giving effect to the Roll-Up shall continue to remain outstanding in accordance with the terms thereof upon the issuance of the Roll-Up Loans hereunder.

(ii)     Each applicable Lender's Roll-Up amount shall be calculated as follows:

(A)     For each $1.00 of Loans and/or Commitments held by such Lender as of the Final DIP Order Entry Date, excluding any Capitalized Amounts as a result of any interest, fee or other amount that was Paid in Kind pursuant to the terms of this Agreement, in an aggregate amount not to exceed such Lender's DIP Pro Rata Allocation Amount, such Lender (or

its Designated Roll-Up Beneficiary, as applicable) shall be entitled to, and deemed to have funded in accordance with Section 2.01(d)(i), $1.00 of Roll-Up Loans; and

(B)    For each $1.00 of Loans and/or Commitments held by such Lender as of the Final DIP Order Entry Date, excluding any Capitalized Amounts as a result of any interest, fee or other amount that was Paid in Kind pursuant to the terms of this Agreement, in excess of such Lender's DIP Pro Rata Allocation Amount, such Lender (or its Designated Roll-Up Beneficiary, as applicable) shall be entitled to, and deemed to have funded in accordance with Section 2.01(d)(i), $2.00 of Roll-Up Loans.

(C)    For each $2.00 of Backstop Incremental Commitments held by any Backstop Incremental Lender on the First Amendment Effective Date, such Lender (or its Designated Roll-Up Beneficiary, as applicable) shall be entitled to, and deemed to have funded in accordance with Section 2.01(d)(i), $1.00 of Roll-Up Loans; and

(D)    For each $2.00 of Backstop Incremental Funded Loans funded by any Backstop Incremental Lender on the Backstop Incremental Funding Date, such Lender (or its Designated Roll-Up Beneficiary, as applicable) shall be entitled to, and deemed to have funded in accordance with Section 2.01(d)(i), $1.00 of Roll-Up Loans.

(iii)    Notwithstanding anything to the contrary in Section 10.02, the Required Lenders may, following the funding of any Roll-Up Loans in accordance with this Section 2.01(d), revise Schedule 2.01 in consultation with the Borrower and the Administrative Agent to reflect the Roll-Up Loans held by each Lender on the Final Order Entry Date, the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable, upon consummation of the applicable Roll-Up, without further action by any other party hereto.

(e)    *Incremental Commitments*.  Subject to the terms and conditions hereof (including, without limitation, prior written approval from Required Lenders) and of the DIP Orders and DIP Recognition Orders (and any other applicable order of the Bankruptcy Court or CCAA Court), and in reliance upon the representations and warranties of the Loan Parties contained herein and the stipulations of Borrower in the DIP Orders (and any other applicable order for the Bankruptcy Court), each Lender that becomes an Incremental Loan Lender pursuant to an Increase Joinder agrees to extend credit to the Borrower in the form of Incremental Loans on each applicable Funding Date in the principal amount set forth opposite such Incremental Loan Lender's name in the applicable Increase Joinder with respect to such Funding Date with respect to the Incremental Commitments.  The Borrower shall also be deemed to borrow additional Incremental Loans in an amount equal to the applicable fees to be Paid In Kind or taken as original issue discount as set forth in the applicable Increase Joinder (and in accordance with Section 2.05 as revised for such Increase Joinder).  Incremental Loans borrowed and repaid or prepaid may not be reborrowed.

(f)        *Syndication*.

(i)        Each Lender as of the Closing Date (collectively, the "**Backstop Lenders**") and the Borrower hereby acknowledge and agree that each Prepetition Lender and Holder under the 1L Loan Agreement and/or the 1L Notes Indenture as of the Petition Date that is an Eligible Assignee, does not exclusively hold Prepetition First Out Obligations and is not a Backstop Lender (or an Affiliate or Approved Fund of a Backstop Lender) (collectively, the "**Syndication Eligible Prepetition Lenders**") may participate to provide (via assignment) its DIP Pro Rata Allocation Amount of the DIP First Funding Loans (other than DIP First Funding Loans that represent the Backstop Fee that was Paid In Kind on the DIP First Funding Date) (the "**Syndication DIP First Funding Loans**"), the DIP Second Funding Commitments and the DIP DDTL Commitments (such Syndication Eligible Prepetition Lenders' DIP Pro Rata Allocation Amount of any such Class, its "**Potential DIP Portion**") in accordance with this clause (f), in each case, by delivering (x) an executed election joinder in the form of Exhibit K (an "**Election Joinder**") in respect thereof to the Administrative Agent by no later than the Initial Election Deadline and (y) a joinder agreement (or acknowledgement and acceptance) to the Restructuring Support Agreement (pursuant to which such Syndication Eligible Prepetition Lender shall become party thereto, or otherwise agrees to be bound by the terms and obligations thereof), in form and substance reasonably acceptable to the Required Ad Hoc Holders (any such Syndication Eligible Prepetition Lender that so delivers an Election Joinder in respect thereof and such joinder agreement or acknowledgment and acceptance to the Restructuring Support Agreement, a "**First Round Electing Lender**"; any such Syndication Eligible Prepetition Lender that does not so deliver an Election Joinder and such joinder agreement or acknowledgement and acceptance to the Restructuring Support Agreement, a "**Declining Lender**"; the Potential DIP Portions of the First Round Electing Lenders, the "**Initial Assumed DIP Portions**").  To the extent that not all Syndication Eligible Prepetition Lenders submit Election Joinders in respect of their Potential DIP Portion on or prior to the Initial Election Deadline, the Administrative Agent (in consultation with the Required Ad Hoc Holders) shall deliver written notice on the Business Day immediately following the Initial Election Deadline to each First Round Electing Lender and each Backstop Lender of the aggregate amount of Potential DIP Portions of the Syndication DIP First Funding Loans, the DIP Second Funding Commitments and the DIP DDTL Commitments of the Declining Lenders (such amounts, the "**Remaining Subscription Amounts**") and each Backstop Lender and each First Round Electing Lender may elect to participate to provide (via assignment) all or any portion of the Remaining Subscription Amount in accordance with this clause (f), in each case, by delivering an Election Joinder in respect thereof to the Administrative Agent by no later than the Subsequent Election Deadline (any Backstop Lender or First Round Electing Lender that so delivers such Election Joinder in respect of the Remaining Subscription Amounts on or prior to the Subsequent Election Deadline, a "**Second Round Electing Lender**", and together with any First Round Electing Lender, the "**Electing Lenders**"; the portion of the Remaining Subscription Amount elected to be

provided by any Second Round Electing Lender (subject to the proviso below), such Second Round Electing Lender's "**Subsequent Assumed DIP Portion**"; any Electing Lender's Initial Assumed DIP Portion and Subsequent Assumed DIP Portion is collectively referred to as such Electing Lender's "**DIP Portion**"); *provided*, that, (x) such election in respect of Remaining Subscription Amounts must be for an equal percentage of each Class of the DIP Facility comprising the Remaining Subscription Amount and (y) to the extent the aggregate amount of elections in respect of the Remaining Subscription Amount exceeds the aggregate Remaining Subscription Amount, such Remaining Subscription Amount shall be allocated among the Second Round Electing Lenders on a pro rata basis based on their DIP Pro Rata Allocation Percentage.

(ii)      [Reserved].

(iii)      Subject to the satisfaction of the conditions and terms set forth in the following subclauses (iv), (v) and (vi) and delivery of the applicable Election Joinders in accordance with subclause (i) and the making (for the benefit of the Selling Lenders and the Administrative Agent) of the representations and warranties set forth therein, on January 24, 2025 (or such other date as may be consented to in writing by the Required Ad Hoc Holders) (the "**Syndication Consummation Date**") (each of the following transactions, the "**Syndication Transactions**"):

(A)      each Electing Lender shall assume its DIP Portion of each of the DIP Second Funding Commitments and the DIP DDTL Commitments as of the Syndication Consummation Date, with such assumption being effectuated by an automatic assignment, by each existing Lender (as of such date) of such Class (each a "**Commitment Assigning Lender**") of unused Commitments of such Class in an individual amount equal to (x) the applicable DIP Portion of such Class of such Electing Lender multiplied by (y)(1) the aggregate amount of unused Commitments of such Class held by such Commitment Assigning Lender as of such date divided by (2) the aggregate amount of unused Commitments of such Class as of such date (each such Commitment assigned and assumed, an "**Assumed Commitment**");

(B)      each Electing Lender shall purchase its applicable DIP Portion of the Syndication DIP First Funding Loans as of the Syndication Consummation Date, with such purchase being effectuated by an automatic assignment, by each existing Lender (as of such date) of such Class (each a "**Loan Assigning Lender**", and together with each Commitment Assigning Lender, a "**Selling Lender**"), of outstanding Syndication DIP First Funding Loans in an individual amount equal to (x) the applicable DIP Portion of the Syndication DIP First Funding Loans of such Electing Lender multiplied by (y)(1) the aggregate amount of outstanding Syndication DIP First Funding Loans held by such Loan Assigning Lender as of such date divided by (2) the aggregate amount of outstanding Syndication DIP First

Funding Loans as of such date (each such purchased Loan, a "**Purchased Loan**"); and

(C)    each Electing Lender shall purchase, and each applicable Selling Lender shall sell, (x) all accrued and unpaid DIP Unused Commitment Fees on the applicable Assumed Commitments (it being understood that no DIP Unused Commitment Fees that have been Paid in Kind shall be considered unpaid for purposes of this subclause (x)) and (y) all accrued and unpaid interest on the Purchased Loans (it being understood that no interest that has been Paid in Kind shall be considered unpaid for purposes of this subclause (y)) (such purchased interest and DIP Unused Commitment Fees, "**Purchased Interest and Fees**", and together with the Purchased Loans and Assumed Commitments, the "**Purchased Obligations**").

(iv)    No consideration (other than the opportunity to participate in the syndication provided by this clause (f)) shall be payable by any party in connection with the assignment and assumption of the Assumed Commitments. The purchase price payable by each Electing Lender to the Administrative Agent for the benefit of each Loan Assigning Lender in respect of the Purchased Loans shall equal (A) the amount of Purchased Loans of the applicable Loan Assigning Lender sold to such Electing Lender, <u>minus</u> (B) the amount of such Purchased Loans that represents the Commitment Fee and/or the DIP First Funding Discount Fee that was Paid In Kind on the Interim DIP Order Entry Date or DIP First Funding Date, as applicable. The purchase price payable by each Electing Lender to the Administrative Agent for the benefit of each Selling Lender in respect of the Purchased Interest and Fees shall equal the amount of Purchased Interest and Fees sold by such Selling Lender. The calculation of the foregoing consideration (as well as the amounts of the applicable Purchased Obligations) shall be determined by the Administrative Agent no later than three (3) Business Days prior to the Syndication Consummation Date and shall control in the absence of manifest error (it being understood and agreed that the Administrative Agent shall deliver notice to the Electing Lenders and Selling Lenders of such amounts no later than two (2) Business Days prior to the Syndication Consummation Date).

(v)    Each Electing Lender shall make available to the Administrative Agent, for the account of the applicable Selling Lenders, in Dollars and immediately available funds, the consideration set forth in clause (iv) in respect of the Purchased Obligations of the Selling Lenders no later than one (1) Business Day prior to the Syndication Consummation Date, and the Administrative Agent shall transfer such consideration to each applicable Selling Lender on the Syndication Consummation Date pursuant to the wire instructions most recently provided by such Selling Lender to the Administrative Agent.

(vi)    Each Electing Lender (that is not an existing Lender at such time) shall make available to the Administrative Agent, concurrently with the delivery of

its Election Joinder, a completed Administrative Questionnaire and any applicable tax forms.

(vii)    Subject to the satisfaction of the conditions and terms set forth in the foregoing subclauses (iv), (v) and (vi) and delivery of the applicable Election Joinder in accordance with subclause (i) and making (for the benefit of the Selling Lenders and the Administrative Agent) of the representations and warranties set forth therein, and notwithstanding anything to the contrary contained in Section 10.04, the Syndication Transactions shall automatically and without any further action by any party occur on the Syndication Consummation Date.

(viii)    Each Electing Lender hereby acknowledges and agrees that the sale, assignment and assumption of the Purchased Obligations are without any representation or warranty by any Selling Lender, and no Electing Lender shall have any recourse against any Selling Lender in connection with the Syndication Transactions.

(ix)    Notwithstanding anything to the contrary contained in Section 10.02, (A) the Required Lenders (in consultation with the Administrative Agent, the Borrower and the applicable Selling Lender) may modify Schedule 2.01, and direct the Administrative Agent to update the Register, to evidence the consummation of the Syndication Transactions on the Syndication Consummation Date, and (B) the Required Lenders and the Administrative Agent may modify this clause (f) (other than the following subclause (x) hereof) without the consent of the Borrower.

(x)    From the period commencing with the Closing Date and ending on the Syndication Consummation Date, the Borrower shall use commercially reasonable efforts to facilitate the syndication contemplated by this clause (f), including (A) obtaining a true and correct copy of the Register (including holding amounts and contact information) for the 1L Loan Agreement and the 1L Notes Indenture and (B) to the extent requested in writing by the Required Lenders, instructing its financial advisor to assist in such syndication, preparing customary marketing materials in respect thereof and directing any prepetition agent or trustee in respect of the 1L Loan Agreement and/or 1L Notes Indenture; *provided* that the foregoing shall not require any officer or director of the Borrower to violate any applicable fiduciary duty.

(xi)    For the avoidance of doubt, each Backstop Lender agrees to consummate the transactions pursuant to this Section 2.01(f).

(g)    Payment in Kind of Certain Fees.  In addition to the Borrowings set forth in clauses (a), (b), (c), (d) and (e) of this Section 2.01, the Borrower shall also be deemed to Borrow additional Loans (of the applicable Class) in an amount equal to the Backstop Fee, Commitment Fee, DIP First Funding Discount Fee, DIP Second Funding Discount Fee, DIP DDTL Funding Discount Fee and DIP Unused Commitment Fee, as applicable, in accordance with Section 2.05.

Section 2.02    <u>Loans</u>.

(a)    The failure of any applicable Lender to make any DIP First Funding Loan, DIP Second Funding Loan, DIP Delayed Draw Term Loan and/or Incremental Loan required to be made by it pursuant to Section 2.01, as applicable, shall not relieve any other Lender of its obligation to make any DIP First Funding Loan, DIP Second Funding Loan, DIP Delayed Draw Term Loan and/or Incremental Loan required to be made by it pursuant to Section 2.01, as applicable.  Each Lender shall be responsible solely to the extent of its applicable Commitments and no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made hereunder by such other Lender.

(b)    Each Lender shall make any Loans (other than Roll-Up Loans or fees being Paid In Kind) required to be made by it hereunder on the applicable Funding Date by wire transfer of immediately available funds, in an amount equal to the principal amount of such Loan, as applicable, with respect to such Loan, to such account as the Administrative Agent may designate by not later than 1:00 p.m., New York City time on each such Funding Date, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by the Borrower in the Borrowing Request maintained with the Administrative Agent; *provided* that, if any applicable Lender funds its pro rata portion of the requested Class of Loans prior to the conditions precedent being met for any applicable Funding Date and a borrowing of such requested Class of Loans shall not occur on such Funding Date because such conditions precedent have not been met, the Administrative Agent shall promptly return the amounts so received to the respective Lenders; *provided*, further, that the Administrative Agent shall promptly apply the amounts received in respect of the DIP Second Funding Loans to repay in full in cash all Prepetition First Out Obligations pursuant to written instructions provided by the 1L Loan Administrative Agent in consultation with the Required Ad Hoc Group and the Borrower (and if any excess amounts in respect of the DIP Second Funding Loans remain after the repayment of the Prepetition First Out Obligations (such excess, the "**Excess DIP Second Funding Loans Proceeds**"), the Administrative Agent shall promptly return such Excess DIP Second Funding Loans Proceeds to the DIP Second Funding Lenders on a pro rata basis, with such return being deemed to have been a prepayment by the Borrower of DIP Second Funding Loans on the DIP Second Funding Date in an amount equal to such Excess DIP Second Funding Loans Proceeds (and with any interest on such deemed prepaid DIP Second Funding Loans automatically cancelled)).  For the avoidance of doubt, the Borrower may not borrow any DIP Delayed Draw Term Loans (other than the First DIP DDTL Borrowing) or Incremental Loans unless such Borrowing is approved by the Required Lenders in writing, in their sole discretion.

(c)    For the avoidance of doubt, once funded, the DIP First Funding Loans, DIP Second Funding Loans and the DIP Delayed Draw Term Loans (and any applicable Incremental Loans) shall be deemed to be part of the same Class of Loans for all purposes under this Agreement.

Section 2.03    <u>Borrowing Procedure</u>.  To request Loans of any Class from the applicable Lenders, the Borrower shall deliver, by electronic transmission, a duly completed and executed Borrowing Request to the Administrative Agent not later than 1:00 p.m., New York City time, three (3) Business Days before the date of the proposed Borrowing (or such shorter period as may be acceptable to Administrative Agent); *provided*, that with (i) respect to the DIP First Funding

Loans, such Borrowing Request may be delivered one (1) Business Day prior to the DIP First Funding Date and (ii) the Borrower shall not be required to deliver a Borrowing Request in respect of the DIP Second Funding Loans or the Roll-Up Loans and by its execution and delivery of (I) this Agreement it shall have requested (x) that the Lenders with a DIP Second Funding Commitment on the DIP Second Funding Date make DIP Second Funding Loans on the DIP Second Funding Date pursuant to Section 2.01(b) and (y) the deemed issuance of the Roll-Up Loans hereunder on the Final DIP Order Entry Date pursuant to Section 2.01(d) and (II) the First Amendment, it shall have requested the deemed issuance of the Roll-Up Loans hereunder on the First Amendment Effective Date or the Backstop Incremental Funding Date, as applicable, pursuant to Section 2.01(d). The Borrowing Request shall specify the following information:

      (a)     the aggregate amount and Class of such Borrowing;

      (b)     the date of such Borrowing, which shall be a Business Day; and

      (c)     the location and number of Borrower's account to which funds are to be disbursed, which for any Borrowing of DIP Delayed Draw Term Loans or Incremental Loans (other than the Backstop Incremental Funded Loans) shall be the DIP Loan Proceeds Account.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each applicable Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing. In addition, promptly upon the occurrence of the Final DIP Order Entry Date, the Administrative Agent shall advise each applicable Lender of the occurrence thereof and of the amount of such Lender's Loan to be made as part of the requested borrowing of the DIP Second Funding Loans set forth in the second proviso of the first paragraph of this Section 2.03.

Section 2.04   Evidence of Debt; Repayment of Loans.

      (a)     *Promise to Repay*. The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the principal amount of each Loan of such Lender as provided in Section 2.09.

      (b)     *Lender and Administrative Agent Records*. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal (including Capitalized Amount) and interest payable and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain records including (i) the amount of each Loan made hereunder; (ii) the amount of any principal (including Capitalized Amount) or interest due and payable or to become due and payable from the Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries in the records maintained by the Administrative Agent and each Lender pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such records or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms. In the event of any conflict between the records maintained by any Lender and

the records of the Administrative Agent in respect of such matters, the records of the Administrative Agent shall control in the absence of manifest error.

(c)    *Promissory Notes*.  Any Lender by written notice to the Borrower (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a Promissory Note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns in the form of Exhibit E.  Thereafter, the Loans evidenced by such Promissory Note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more Promissory Notes in such form payable to such payee and its registered assigns and the Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations to such Promissory Note of, among other things, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to, the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the records referenced above, be conclusive and binding on each Loan Party absent manifest error; *provided* that the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Loan Party.

Section 2.05    Fees; Additional Payment.

(a)    The Borrower agrees to pay to the Administrative Agent, for its own account, the administrative and other fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)    The Borrower agrees to pay, on the earlier of the Interim DIP Order Entry Date and the Maturity Date, to the Administrative Agent, for the account of each Lender on the Closing Date, a nonrefundable backstop fee (the "**Backstop Fee**") in an amount equal to 12.5% of the aggregate amount of Commitments of such Lender on the Closing Date (for the avoidance of doubt prior to the Borrowing of any Loans), which Backstop Fee (x) will be fully earned, due and payable on the earlier of the Interim DIP Order Entry Date and the Maturity Date and (y) for the avoidance of doubt, shall be Paid in Kind on the such date by capitalizing on the outstanding principal amount of Loans then held by such Lender on such date (or, if such Lender does not have any outstanding Loans on such date then such Backstop Fee shall be Paid In Kind pursuant to a deemed issuance on such date of DIP First Funding Loans owing to such lender); *provided*, that if such Backstop Fee is due and payable on (or after) the Maturity Date such Backstop Fee shall be paid in cash.

(c)    The Borrower agrees to pay, on the Interim DIP Order Entry Date, to the Administrative Agent, for the account of each Lender on the Closing Date, a nonrefundable commitment fee (the "**Commitment Fee**") in an amount equal to 5.0% of the aggregate amount of Commitments of such Lender on the Closing Date (for the avoidance of doubt prior to the Borrowing of any Loans), which Commitment Fee (x) will be fully earned, due and payable on the earlier of the Interim DIP Order Entry Date and the Maturity Date and (y) for the avoidance of doubt, shall be Paid in Kind on such date by capitalizing on the outstanding principal amount of Loans then held by such Lender on such date (or, if such Lender does not have any outstanding Loans on such date then such Commitment Fee shall be Paid In Kind pursuant to a deemed issuance on such date of DIP First Funding Loans owing to such lender); *provided*, that if such

Commitment Fee is due and payable on (or after) the Maturity Date such Commitment Fee shall be paid in cash.

(d)     The Borrower agrees to pay, on the DIP First Funding Date, to the Administrative Agent, for the account of each Lender with a DIP First Funding Commitment on the DIP First Funding Date, a nonrefundable funding fee (the "**DIP First Funding Discount Fee**") in an amount equal to 5.0% of the aggregate amount of DIP First Funding Loans made by such Lender on the DIP First Funding Date, which DIP First Funding Discount Fee (x) will be fully earned, due and payable on the DIP First Funding Date and (y) for the avoidance of doubt, shall be Paid in Kind on the DIP First Funding Date by capitalizing on the outstanding principal amount of Loans then held by such Lender immediately after the funding of the DIP First Funding Loans on the DIP First Funding Date.

(e)     The Borrower agrees to pay, on the DIP Second Funding Date, to the Administrative Agent, for the account of each Lender with a DIP Second Funding Commitment on the DIP Second Funding Date, a nonrefundable funding fee (the "**DIP Second Funding Discount Fee**") in an amount equal to 5.0% of the aggregate amount of DIP Second Funding Loans (other than Excess DIP Second Funding Loans Proceeds to the extent returned to such Lender on the DIP Second Funding Date) made by such Lender on the DIP Second Funding Date, which DIP Second Funding Discount Fee (x) will be fully earned, due and payable on the DIP Second Funding Date and (y) for the avoidance of doubt, shall be Paid in Kind on the DIP Second Funding Date by capitalizing on the outstanding principal amount of DIP Second Funding Loans then held by such Lender immediately after the funding of the DIP Second Funding Loans on the DIP Second Funding Date.

(f)     The Borrower agrees to pay, on each DIP DDTL Funding Date, to the Administrative Agent, for the account of each Lender with a DIP DDTL Commitment on such DIP DDTL Funding Date, a nonrefundable funding fee (each, a "**DIP DDTL Funding Discount Fee**") in an amount equal to 5.0% of the aggregate amount of DIP Delayed Draw Term Loans made by such Lender on such DIP DDTL Funding Date, which DIP DDTL Funding Discount Fee (x) will be fully earned, due and payable on the applicable DIP DDTL Funding Date and (y) for the avoidance of doubt, shall be Paid in Kind by capitalizing such DIP DDTL Fee on the outstanding principal amount of Loans then held by such Lender immediately after the funding of the DIP Delayed Draw Term Loans on the applicable DIP DDTL Funding Date.

(g)     The Borrower agrees to pay on each DIP Unused Commitment Fee Payment Date, an unused commitment fee to each DIP DDTL Commitment Lender and each DIP Second Funding Commitment Lender in an amount equal to the average daily balance of the unused DIP DDTL Commitments of such DIP DDTL Commitment Lender and unused DIP Second Funding Commitments of such DIP Second Funding Commitment Lender, as applicable, during the applicable DIP Unused Commitment Fee Period, multiplied by 3.0% *per annum* (the "**DIP Unused Commitment Fee**").  The DIP Unused Commitment Fee shall accrue at all times from and after the Closing Date, shall be calculated in accordance with Section 2.06(d) and shall (x) be Paid in Kind by capitalizing on the outstanding principal amount of Loans then held by such Lender (or if such Lender does not have any Loans of such date shall be Paid In Kind pursuant to a deemed issuance of Loans owing to such Lender).  For the avoidance of doubt, all DIP Unused

Commitment Fees that are paid in cash shall be paid to the Administrative Agent for the account of the applicable Lender.

(h)    The Borrower agrees to pay, to the Administrative Agent for the account of each Backstop Incremental Lender, an upfront fee (allocated pro rata based on each Backstop Incremental Lender's respective Backstop Incremental Commitment) in an amount equal to 20.0% of the aggregate amount of the Backstop Incremental Commitments provided by such Backstop Incremental Lender on the First Amendment Effective Date (the "**Backstop Incremental Upfront Fee**"), which Backstop Incremental Upfront Fee (x) will be fully earned, due and payable on the First Amendment Effective Date and (y) for the avoidance of doubt, shall be Paid in Kind on the First Amendment Effective Date by capitalizing such fee as outstanding principal amount of Backstop Incremental Funded Loans held by such Backstop Incremental Lender on the First Amendment Effective Date (or if such Backstop Incremental Lender does not have any Backstop Incremental Funded Loans as of such date shall be Paid in Kind pursuant to a deemed issuance of Backstop Incremental Funded Loans owing to such Backstop Incremental Lender). Such additional Backstop Incremental Funded Loans shall be Backstop Incremental Funded Loans for all purposes of this Agreement and the other Loan Documents.

(i)    The Borrower agrees to pay, to the Administrative Agent for the account of each Backstop Incremental Lender, a closing fee (allocated pro rata based on each Backstop Incremental Lender's respective Backstop Incremental Commitment) in an amount equal to 5.0% of the aggregate principal amount of the Backstop Incremental Loans actually funded by such Backstop Incremental Lender on the Backstop Incremental Funding Date, in each case calculated before adding such closing fee on the Backstop Incremental Payment Date, which fee shall be (i) due and payable on the 2025 Incremental Funding Date and (ii) structured as original issue discount (the "**Backstop Incremental OID**").

(j)    The Borrower agrees to pay, to the Administrative Agent for the account of each Backstop Incremental Lender, on each DIP Unused Commitment Fee Payment Date, commencing with the first such date occurring after the First Amendment Effective Date, an unused commitment fee in an amount equal to the average daily balance of the unused Backstop Incremental Commitments of such Backstop Incremental Lender, multiplied by 8.75% *per annum* (the "**Backstop Incremental Unused Commitment Fee**"). The Backstop Incremental Unused Commitment Fee shall accrue at all times from and after the First Amendment Effective Date, shall be calculated in accordance with Section 2.06(d) and shall be Paid in Kind by capitalizing on the outstanding principal amount of Backstop Incremental Funded Loans then held by such Lender (or if such Lender does not have any Backstop Incremental Funded Loans as of such date shall be Paid in Kind pursuant to a deemed issuance of Backstop Incremental Funded Loans owing to such Lender).

Section 2.06    Interest on Loans.

(a)    *Interest*.  Subject to the provisions of Section 2.06(b), the Loans shall bear interest on the outstanding principal amount thereof (including, for the avoidance of doubt, any Capitalized Amount) at the Applicable Margin.

(b)     *Default Rate*.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, or if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, then the outstanding principal amount of the Loans hereunder, and any overdue interest, fees and other amounts, shall automatically (unless the Required Lenders provide written notice to the contrary), to the fullest extent permitted by applicable law, after as well as before judgment, bear interest at a rate per annum equal to 19.5% (the "**Default Rate**").

(c)     *Interest Payment Dates*.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan (and at such other times as may be specified herein) and shall be Paid In Kind; *provided* that (i) the Borrower may elect with respect to any Interest Period ending prior to the Maturity Date to pay the interest accrued during such Interest Period in cash by delivering to the Administrative Agent irrevocable written notice of the election thereof, which written election must be received by the Administrative Agent no earlier than five (5) Business Days, and not later than three (3) Business Days, prior to the applicable Interest Payment Date (such election, a "**Cash Interest Election**"; it being understood and agreed that upon delivery of such Cash Interest Election the Borrower shall be obligated to pay such interest in cash on such Interest Payment Date), (ii) interest accruing at the Default Rate pursuant to Section 2.06(b), or otherwise while an Event of Default has occurred and is continuing, shall be due and payable upon demand and shall be payable in cash, (iii) interest (and all other amounts hereunder) due on the Maturity Date shall be payable in cash and (iv) in the event of any repayment or prepayment, whether voluntary or mandatory (including as a result of an acceleration), of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and shall be payable in cash in dollars.

(d)     *Interest, DIP Unused Commitment Fee and Backstop Incremental Unused Commitment Fee Calculations*.  All interest, DIP Unused Commitment Fees and Backstop Incremental Unused Commitment Fees hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)     *Interest Act (Canada)*.  For the purposes of the *Interest Act* (Canada) and disclosure thereunder, in any case in which an interest or fee rate is stated in this Agreement to be calculated on the basis of a number of days that is other than the number in a calendar year, the yearly rate to which such interest or fee rate is equivalent is equal to such interest or fee rate multiplied by the actual number of days in the year in which the relevant interest or fee payment accrues and divided by the number of days used as the basis for such calculation; *provided* that this clause (e) shall not modify the interest owed by the Borrower pursuant to clauses (a) or (b) above.

(f)     *No Criminal Rate of Interest*.  If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Secured Party in an amount or calculated at a rate which would be prohibited by any applicable law or would result in a receipt by that Secured Party of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted (solely with respect to the Obligations of such Canadian Loan Party) with retroactive effect to the maximum amount or rate of interest,

as the case may be, as would not be so prohibited by applicable law or so result in a receipt by that Secured Party of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

> (i)     first, by reducing the amount or rate of interest required to be paid to the affected Secured Party; and

> (ii)    thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

Section 2.07    [Reserved]

Section 2.08    [Reserved]

Section 2.09    Repayment of Loans.  To the extent not previously paid, the Borrower shall pay to the Administrative Agent, in cash, for the account of the Lenders, on the Maturity Date, the entire principal amount of the Loans then outstanding, together with accrued and unpaid interest thereon and all fees, expenses and other amounts payable under the terms of the Loan Documents or the DIP Orders, and all other Obligations (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted).

Section 2.10    Optional and Mandatory Prepayments of Loans.

(a)     *Optional Prepayments*.  The Borrower shall have the right at any time (and from time to time) to prepay the Loans, in whole or in part in cash, subject to the requirements of Sections 2.10(g) and (h); *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 or, if less, the outstanding principal amount of the Loans*; provided further* that no prepayment of Roll-Up Loans may be made pursuant to this Section 2.10(a) prior to the payment in full in cash of the DIP New Money Loans.

(b)     *Incurrence of Debt*.  Concurrently upon the incurrence or the issuance by any Loan Party or any Subsidiary of any Loan Party of Indebtedness (other than Net Issuance Proceeds from the incurrence of Indebtedness permitted under Section 6.01), the Borrower shall prepay the Loans in an aggregate amount equal to the Net Issuance Proceeds of such Indebtedness in accordance with Section 2.10(h).  Nothing in this Section 2.10(b) shall be construed to permit or waive any Default or Event of Default arising from any incurrence or issuance of Indebtedness not permitted under the terms of this Agreement.

(c)     *Asset Sales; Events of Loss*.  No later than the first Business Day following the date of receipt by Borrower or any of its Subsidiaries of any Net Cash Proceeds of any Asset Sale or Event of Loss, Borrower shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of such Net Cash Proceeds, in accordance with Section 2.10(h); *provided*, that Borrower shall not be required to make any such prepayment with the first $100,000 of such Net Cash Proceeds (in aggregate) received after the Closing Date.  Nothing in this Section 2.10(c) shall be construed to permit or waive any Default or Event of Default arising from any Asset Sale not permitted under the terms of this Agreement.

(d)    *Change in Control*.  Immediately following any Change in Control, the Borrower shall prepay the outstanding Loans in an amount equal to 100% of the principal amount thereof (plus accrued and unpaid interest thereon, if any) in accordance with Section 2.10(h). Nothing in this Section 2.10(d) shall be construed to permit or waive any Default or Event of Default arising from the occurrence of any Change in Control.

(e)    *Extraordinary Receipts*.  On the date of receipt by the Borrower or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay on such date the outstanding Loans in the amount of such Extraordinary Receipts.

(f)    *Issuance of Equity Securities*.  On the date of receipt by the Borrower of any cash proceeds from a capital contribution to, or the issuance of any Capital Stock of, the Borrower or, without limiting Section 6.11, any of its Subsidiaries, the Borrower shall prepay on such date the outstanding Loans in the aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable and documented and actually paid cash costs and cash expenses associated therewith, in each case, paid to non-Affiliates.

(g)    *Notice of Prepayment*.  The Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., New York City time, three (3) Business Days before the date of prepayment.  Each such notice shall be irrevocable; *provided* that a notice of prepayment so delivered, if delivered with respect to the entire outstanding principal amount of the Obligations, may state that such notice is conditioned upon the effectiveness of another credit facility or the closing of a securities offering, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to 2:00 p.m., New York City time on the specified prepayment date) if such condition is not satisfied. Each such notice shall specify the prepayment date, the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.

(h)    *Application of Payments*.  Each prepayment of Loans pursuant to this Section 2.10 shall be allocated first, ratably among the DIP New Money Loans (treated, for the avoidance of doubt, as a single Class) based on the outstanding principal amounts thereof and thereafter to the Roll-Up Loans; *provided* that, solely for the purpose of the calculation of purchase price in connection with Section 2.01(f)(iv) in respect of Purchased Loans, prepayments shall be applied first to the portion of Loans comprised of principal not arising from any interest, fees or other amounts that were Paid In Kind.  Prepayments shall be accompanied by accrued interest as more fully set forth in Section 2.06.

(i)    *Voluntary Termination of Commitments*.  For the avoidance of doubt, the Borrower shall not be permitted to voluntarily terminate any Commitments hereunder.

Section 2.11    [Reserved]

Section 2.12    Yield Protection.

(a)    *Increased Costs Generally*.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge, liquidity or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender; or

(ii)      subject any Lender to any Taxes of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (in each case, except for (i) Indemnified Taxes indemnifiable under Section 2.15, (ii) Taxes described in clauses (b) through (e) of the definition of Excluded Taxes payable by such Lender and (iii) Connection Income Taxes);

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting into, continuing or maintaining any Loans or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, the Borrower will pay, without duplication, to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)      *Capital Requirements*.  If any Lender reasonably determines in good faith that any Change in Law affecting such Lender or any lending office of such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or its holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its holding company for any such reduction suffered.

(c)      *Certificates for Reimbursement*.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)      *Delay in Requests*.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.13     [Reserved]

68

Section 2.14    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)    *Payments Generally*.  The Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, premium or fees, or of amounts payable under Sections 2.12, 2.15 or 10.03, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices, except that payments pursuant to Sections 2.12, 2.15 or 10.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest (and/or in respect of a commitment and/or unused fee), interest thereon (and/or additional commitment and/or unused fee) shall be payable for the period of such extension.  All payments under each Loan Document (including repayments and prepayments of the Loans and payments of any interest, fees, indemnification amounts or expense reimbursements) shall be made in dollars.

(b)    *Pro Rata Treatment*.

(i)    Except as provided in Section 2.12(b), each payment by the Borrower of interest, fees, premiums, and other payments in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders pro rata according to the respective amounts then due and owing to the Lenders.

(ii)    Except as provided in Section 2.12(b), each payment on account of principal of the Loans shall be allocated among the Lenders pro rata based on the principal amount of the Loans held by the Lenders.

(c)    *Insufficient Funds*.  Subject to Section 8.02, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premium and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal and premium then due hereunder, ratably in accordance with Section 2.10(h) (as if such payment was a prepayment) among the parties entitled thereto in accordance with the amounts of principal and premium then due to such parties.

(d)    *Sharing of Set-Off*.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans (including all amounts Paid in Kind that have been added to the

principal amount) and accrued interest thereon or other Obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) make adjustments as shall be equitable with the consent of the Required Lenders, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal (including all amounts Paid in Kind that have been added to the principal amount) of and accrued interest on their respective Loans and other amounts owing them, *provided* that the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for any Transfer of its Loans to an Eligible Assignee.

Each Loan Party agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation. If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(d) to share in the benefits of the recovery of such secured claim.

(e) *The Borrower Default*. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.15   Taxes.

(a) *Payments Free of Taxes*. Any and all payments by or at the direction of (or on behalf of) the Loan Parties on account of any obligation hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes, unless required by applicable Requirements of Law. Subject to Section 2.15(i), if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct or withhold any Taxes from such payments, then (i) if such Taxes are Indemnified Taxes, the sum payable shall be increased by the Loan Parties as necessary so that after all required deductions have been made (including deductions applicable to additional sums payable under this Section 2.15) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such

deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)     *Payment of Other Taxes by Loan Parties*.  Without limiting the provisions of paragraph (a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)     *Indemnification by Loan Parties*.  The Loan Parties shall, jointly and severally, indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable by, paid by, or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis and computation of such payment or liability, shall be conclusive absent manifest error; *provided* that, upon the Borrower's timely written request, the Administrative Agent or Lender may, in its sole discretion, after consultation with the Borrower, and at the Borrower's expense, contest the validity, applicability or amount of such Taxes by (i) resisting payment thereof, (ii) not paying the same except under protest, if protest is necessary and proper, or (iii) if payment is made, using reasonable efforts to obtain a refund thereof in appropriate administrative and judicial proceedings; *provided* that (y) the Administrative Agent or such Lender will not be required to take any action or continue to pursue an action (or inaction) hereunder which, in its sole discretion, could cause the Administrative Agent or such Lender to suffer any disadvantage, and (z) on written demand from the Administrative Agent or the Lender, as the case may be, the Borrower agrees to pay, and shall timely pay, to the Administrative Agent or such Lender all reasonable costs and expenses that the Administrative Agent or such Lender actually incurs in connection with and reasonably allocable to contesting such claim (including reasonable legal and accounting fees, penalties, interest, and additions to Tax) and any Indemnified Taxes that are paid by the Administrative Agent or the Lender.

(d)     *Evidence of Payments*.  As soon as practicable after any payment of Indemnified Taxes (or any Taxes otherwise withheld or deducted from any payments to the Administrative Agent, the Lenders, or any other recipient under the Loan Documents) by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     *Status of Lenders*.  Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to the Borrower and to the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or

at a reduced rate of withholding (including any withholding under FATCA). In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the above two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(C) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any unreimbursed cost or expense or would be disadvantageous to such Lender in any material respect.

(i)    Without limiting the generality of the foregoing,

(A)    any Foreign Lender shall, to the extent it may lawfully do so deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(1)    duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any applicable successor forms of either), as applicable, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(2)    duly completed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit H-1, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Loan Documents are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) duly completed copies of Internal Revenue Service Form W-8BEN or Form W-8BEN-E (or any successor forms), as applicable,

(4)    to the extent a Foreign Lender is not the beneficial owner executed originals of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E (or any successor forms), as applicable, a certificate in substantially the

form of Exhibit H-2 or Exhibit H-3, Form W-9 (or any successor form), and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate, in substantially the form of Exhibit H-4, on behalf of such direct and indirect partner or

(5)     any other form prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as a basis for claiming exemption from or a reduction in United States federal withholding Tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

(B)     Each Foreign Lender shall, to the extent it is legally entitled to do so, from time to time after the initial delivery by such Foreign Lender of the forms described above, whenever a lapse in time or change in such Foreign Lender's circumstances renders such forms, certificates or other evidence so delivered obsolete or inaccurate, promptly (1) deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) renewals, amendments or additional or successor forms, properly completed and duly executed by such Foreign Lender, together with any other certificate or statement of exemption required in order to confirm or establish such Foreign Lender's status or that such Foreign Lender is entitled to an exemption from or reduction in withholding Tax or (2) notify Administrative Agent and the Borrower of its legal inability to deliver any such forms, certificates or other evidence.

(C)     Any Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable law or upon the reasonable request of the Borrower or the Administrative Agent), duly executed and properly completed copies of Internal Revenue Service Form W-9 (or any successor form) certifying that it is not subject to U.S. federal backup withholding.

(D)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by

law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)     *Treatment of Certain Refunds*. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.15, it shall pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.15 with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person. Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to a Loan Party if such payment would place the Administrative Agent or such Lender in a less favorable net after-tax position than the Administrative Agent or such Lender would have been in if the Indemnified Taxes giving rise to such refund had never been imposed in the first instance and the indemnification payments or additional amounts with respect to the Indemnified Taxes had never been paid.

(g)     *Payments*. For purposes of this Section 2.15, (i) any payments by the Administrative Agent to a Lender of any amounts received by the Administrative Agent from the Borrower on behalf of such Lender shall be treated as a payment from the Borrower to such Lender and (ii) if a Lender is treated as a partnership for United States federal income tax purposes, any withholding or payment of such United States federal income tax that is an Indemnified Tax by the Lender in respect of any of such Lender's partners shall be considered a withholding or payment of such Indemnified Tax by the Borrower.

(h)     *Survival*. Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the

74

replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction, or discharge of all obligations under any Loan Document.

(i)     *Tax Treatment*.  For U.S. federal income tax purposes, the Borrower and the Lenders intend that (i) the DIP Facility is treated as debt and (ii) the Backstop Fee shall not be treated as a fee (collectively, the "**Intended Tax Treatment**").  Each of the Borrower and the Lenders agree not to file any tax return, report or declaration inconsistent with the Intended Tax Treatment, except as otherwise required due to a determination within the meaning of Section 1313(a) of the Code or due to a change in applicable law after the date hereof.

Section 2.16   <u>Mitigation Obligations</u>.  If any Lender requests compensation under Section 2.12, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.  A certificate setting forth such costs and expenses submitted by such Lender to the Borrower shall be conclusive absent manifest error.

Section 2.17   <u>Currency Indemnity</u>.  If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement or any other Loan Document, it becomes necessary to convert into a particular currency (the "**Judgment Currency**") any amount due under this Agreement or under any other Loan Document in any currency other than the Judgment Currency (the "**Currency Due**"), then conversion shall be made at the rate of exchange prevailing on the Business Day before the day on which judgment is given.  For this purpose "rate of exchange" means the rate at which the Administrative Agent is able, on the relevant date, to purchase the Currency Due with the Judgment Currency in accordance with its normal practice at its head office.  In the event that there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given and the date of receipt by the Administrative Agent of the amount due, the Borrower will, on the date of receipt by the Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by the Administrative Agent on such date is the amount in the Judgment Currency which when converted at the rate of exchange prevailing on the date of receipt by the Administrative Agent is the amount then due under this Agreement or such other Loan Document in the Currency Due.  If the amount of the Currency Due which the Administrative Agent is so able to purchase is less than the amount of the Currency Due originally due to it, the Borrower shall indemnify and save the Administrative Agent and the Lenders harmless from and against all loss or damage arising as a result of such deficiency.  This indemnity shall constitute a secured obligation separate and independent from the other obligations contained in this Agreement and the other Loan Documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Administrative Agent from time to time and shall continue in full force and effect

notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement or any other Loan Document or under any judgment or order.

Section 2.18    Incremental Loan Facilities.

(a)    *Borrower Request.*  Subject to obtaining prior approval from the Required Lenders in writing (in their sole discretion) for the applicable Incremental Loan Facility, the Borrower may, by written notice to the Administrative Agent at any time and from time to time, elect to incur additional Loans or request the establishment of one or more new term loan facilities (the "**Incremental Loan Facility**"; the commitments in respect thereof, the "**Incremental Commitments**"), in an aggregate original principal amount for all Incremental Loan Facilities that may be agreed in writing by the Required Lenders; *provided* that the Borrower (and no other Loan Party) shall only be entitled to request or borrow under the Incremental Loan Facility if the Required Lenders have consented in writing in their sole discretion to the request for or borrowing under such Incremental Loan Facility.  Such notice shall specify (A) the amount of Incremental Loans being requested and (B) the date on which the Borrower proposes as the applicable Funding Date(s) on which the Borrower proposes that the Incremental Loan Facility shall be available to be funded.  For the avoidance of doubt, the Required Lenders shall not be obligated to consent to the Incremental Loan Facility and may withhold consent for any reason.

Any Incremental Loan Facility shall be effected by a joinder agreement in form and substance acceptable to the Required Lenders (an "**Increase Joinder**") executed by the Borrower, the Administrative Agent and each Lender providing the Incremental Loan Facility.

(b)    *Conditions.*  The Incremental Commitments shall become effective as of the Business Day upon which each of the conditions precedent set forth below is satisfied (or waived by the Required Ad Hoc Holders in their sole discretion) (each such date, an "**Increase Effective Date**"):

(i)    Each of the representations and warranties made by any Loan Party set forth in Article 3 hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the applicable Increase Effective Date, except to the extent such representations and warranties expressly relate to an earlier date;

(ii)    The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after the Increase Effective Date, no Default or Event of Default shall have occurred and be continuing or would immediately result from such Borrowing on such date;

(iii)    Each of the Material Contracts shall be in full force and effect and shall not have been terminated;

(iv)    The Administrative Agent shall have received, with respect to the Increase Joinder and other Loan Documents and any other matters as the

Administrative Agent shall reasonably request, certificates and documents substantially equivalent to those required under Section 4.01(b)(i) and (b)(ii);

(v)     The Administrative Agent shall have received a certificate, dated the Increase Effective Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in Sections 2.18(b)(i) through 2.18(b)(iv) as of such Increase Effective Date;

(vi)     The Administrative Agent shall have received evidence in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders of the Bankruptcy Court's approval of such Incremental Loan Facility;

(vii)     The Required Lenders shall have consented to the Borrower's incurrence of the Incremental Commitments under such Increase Joinder; and

(viii)     Without limiting the foregoing requirement to receive the written consent of the Required Lenders, the satisfaction of each other condition required by the Required Lenders in respect thereof.

(c)     *Terms of New Loans and Commitments*.  The terms and conditions of the Loans made pursuant to the Incremental Loan Facility ("**Incremental Loans**"), shall be as mutually agreed between the Borrower, the Administrative Agent, the Required Lenders, and each Lender providing the Incremental Loan Facility; *provided* that:

(i)     the Incremental Loan Facility will rank *pari passu* in right of payment and *pari passu* with respect to security with the then existing Loans, shall not be secured by any assets that do not constitute Collateral, shall be incurred by the Borrower and shall not be guaranteed by any Person that is not a Loan Party;

(ii)     [reserved]; and

(iii)     except as otherwise agreed with the Required Lenders, (A) the Incremental Loan Facility will be subject to the same terms and conditions as the Loans except those conditions to borrowing explicitly set forth in this Section 2.18, (B) the Incremental Loans, once funded, shall be considered a part of the same Class as all other Loans outstanding at such time (unless otherwise specified in the applicable Increase Joinder), (C) the final maturity of any Incremental Loan Facility will be the Maturity Date and (D) no Incremental Loan Facility shall amortize or have mandatory prepayments other than those applicable to the existing Loans.

(d)     *Equal and Ratable Benefit*.  The Loans and Commitments established pursuant to this Section 2.18 shall constitute Loans and Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guarantees and the security interests created by the Loan Security Documents.  The Loan Parties shall take any actions reasonably required by the Administrative Agent to ensure and/or demonstrate that the Lien and security interests granted by the Loan Security Documents continue to be perfected under the UCC, the

PPSA or otherwise after giving effect to the establishment of any such Loans or any such new Commitments.

(e)     This Section 2.18 shall supersede any provisions in Section 2.14 or Section 10.02 to the contrary.

(f)     For the avoidance of doubt, notwithstanding anything in this Section 2.18 to the contrary, (A) the Backstop Incremental Loans and the Backstop Incremental Commitments are "Incremental Loans" and "Incremental Commitments" on the terms set forth in this Agreement (as modified by the First Amendment) and the First Amendment and (B) the First Amendment is an "Increase Joinder" on the terms set forth in this Agreement (as amended by the First Amendment) and therein.

Section 2.19   Certain Bankruptcy Matters.

(a)     The Loan Parties hereby agree that, subject only to the Carve-Out, the AST Break-Up Fee (if any) and Administration Charge, the Obligations shall (i) constitute DIP Superpriority Claims with priority over all administrative expense claims and any and all other claims against the Borrower and the other Loan Parties now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final DIP Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provisions of the Bankruptcy Code and all superpriority administrative expense claims granted to any other Person, the establishment of which superpriority shall have been approved and authorized by the Bankruptcy Court and (ii) be secured as provided in, and be deemed valid and perfected by entry of any of, the DIP Orders pursuant to the applicable provisions of the Bankruptcy Code.

(b)     In the event of a conflict between, or inconsistency among, the Interim DIP Order or the Final DIP Order, on the one hand, and any other Loan Document, on the other hand, the Interim DIP Order or the Final DIP Order, as the case may be, shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     No Agent or Lender shall be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the DIP Orders, the DIP Recognition Orders or any other Loan Document.  If the Collateral Agent (at the Required Lenders' direction, which shall be in their sole discretion), from time to time elects to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the Collateral Agent's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim DIP Order

is entered, and (B) shall not negate or impair the validity or effectiveness of this Section 2.22(c) or of the perfection of any other Liens in favor of the Collateral Agent, for the benefit of the Lenders and the other Secured Parties, on the Collateral.

(ii)    Except as otherwise expressly agreed to by each of the Secured Parties in writing, the Liens, Lien priorities, DIP Superpriority Claims and other rights and remedies granted to the Collateral Agent, the Lenders and the other Secured Parties pursuant to this Agreement, the DIP Orders, the DIP Recognition Orders or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any of the Cases, or by any other act or omission whatsoever.

(d)    Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    subject only to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge, no costs or expenses of administration which have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Secured Party or any Agent against the Borrower or any other Loan Parties in respect of any Obligations;

(ii)    the Collateral Agent's Liens on the Collateral shall constitute valid, enforceable and perfected First Priority Liens, and, other than as expressly provided in the DIP Orders, DIP Recognition Orders or the Loan Documents, shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

(iii)    the Collateral Agent's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for any Agent or any other Secured Party to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the Collateral Agent's Liens under applicable non-bankruptcy law.

In connection with any Asset Sale or other disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Collateral Agent, in accordance with applicable law and, with respect to any credit bid, section 363(k) of the

Bankruptcy Code, the Borrower and each other Loan Party hereby gives the Collateral Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and each of the Lenders that:

Section 3.01   Organization; Powers.  Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority (x) to carry on its business as now conducted, subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, and (y) to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  There is no existing default under any Organizational Document of any Company or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder.

Section 3.02   Authorization; Enforceability.  Subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, the Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party.  This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03   No Conflicts.  Except as set forth on Schedule 3.03 and subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents and (iii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which would not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any material Requirement of Law, (d) will not violate or result in a default or require any consent or approval that has not been obtained under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company (other than (i) with respect to the Prepetition Facilities that are stayed as a result of the Cases and (ii) violations arising solely and directly as a result of the commencement

80

of the Cases and Recognition Proceedings and except as otherwise excused by the Bankruptcy Court), and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

Section 3.04    Financial Statements; Projections.

(a)    *Historical Balance Sheets; Forecasted Cash Flows*.  The Borrower has heretofore delivered to the Administrative Agent and the Lenders (i) an unaudited consolidated balance sheet as of and for the fiscal quarter ending September 30, 2024, and (ii) the audited financial statements of the Borrower as of and for the year ending December 31, 2023.  The financial statements delivered pursuant to Sections 5.01(a) and (b) have been prepared in accordance with GAAP with the exception of the application of ASC 810 and ASC 852, herein considered a "contractual basis of accounting", and present fairly and accurately the financial condition and, if applicable, the results of operations and cash flows, of the Borrower as of the dates and for the periods to which they relate.

(b)    *No Liabilities; No Material Adverse Effect*.  Except as set forth in the financial statements referred to in Section 3.04(a) (or, after the Closing Date, as set forth in the financial statements referred to in Section 5.01(a)), there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which would reasonably be expected to result in a Material Adverse Effect.  Since the Petition Date, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to result in a Material Adverse Effect.

(c)    *Budget*.  A true and complete copy of the Initial Budget, as agreed to with the Required Lenders as of the Closing Date, is attached as Exhibit J hereto.  The Initial Budget and each Cash Flow Forecast delivered thereafter pursuant to Section 5.01(f) hereof are based on good faith estimates and assumptions made by the management of the Borrower and believed by such management to be reasonable and attainable as of the date delivered to the Administrative Agent (it being understood that any projections contained therein are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material).

Section 3.05    Properties.

(a)    *Generally*.  Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for, in the case of Collateral, Permitted Liens and, in the case of all other material property, Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose.  The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)    *Real Property*.  Schedules 7(a) and 7(b) to the Perfection Certificate dated the Closing Date contain a true and complete list of each interest in Real Property, other than Real

Property located in Canada, and each interest in Real Property located in Canada material to the business, assets, property, operations or condition of the Borrower or any Loan Party, in each case (i) owned by the Borrower or any of its Subsidiaries as of the date hereof and describes the type of interest therein held and whether such owned Real Property is leased and if leased whether the underlying Lease contains any option to purchase all or any portion of such Real Property or any interest therein or contains any right of first refusal relating to any sale of such Real Property or any portion thereof or interest therein and (ii) leased, subleased or otherwise occupied or utilized by the Borrower or any of its Subsidiaries, as lessee, sublessee, franchisee or licensee, as of the date hereof and describes the type of interest therein held by such Company and, in each of the cases described in clauses (i) and (ii) of this Section 3.05(b), whether any Lease requires the consent of the landlord or tenant thereunder, or other party thereto, to the Transactions.

(c)     *No Casualty Event*.  Except in respect of Skyterra-1 and Skyterra-2 as described in Schedule 3.08, no Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any material portion of its property.  No mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.04.

(d)     *Collateral*.  Subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, each Loan Party owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Loan Party's business as currently conducted.  The use by each Loan Party of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any Person other than such infringement which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(e)     *Material Contracts*.  Each Material Contract and Material Lease is in full force and effect and no defaults giving any party thereto the right to terminate such Material Contract or Material Lease currently exist thereunder (other than as a result of the Cases or the Recognition Proceedings).  Each Material Contract and Material Lease is a legal, valid and binding obligation of the Borrower and its Subsidiaries party thereto and, to the knowledge of the Borrower, each other party thereto, is enforceable in accordance with its terms and is in full force and effect, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights (including the Cases) and to general equity principles.  Neither the Borrower nor its Subsidiaries, nor to the knowledge of the Responsible Officers of the Borrower or its Subsidiaries, any other party to any Material Contract or Material Lease, is or was in material breach or default, under the terms of any Material Contract or Material Lease, and no condition existed or exists which, with the giving of notice or the lapse of time or both, could constitute a material breach or default by the Borrower or any of its Subsidiaries thereunder (in each case, other than as a result of the Cases or the Recognition Proceedings).  Each Company enjoys peaceful and undisturbed possession under each Material

Lease to which it is a party (in each case, other than as a result of the Cases or the Recognition Proceedings).

Section 3.06    Intellectual Property.

(a)    *Ownership/No Claims*.  Each Company owns, or is licensed to use, all patents, industrial designs, trademarks, trade names, service marks, copyrights (and all registrations and applications for registration of any of the foregoing), technology, trade secrets, proprietary information, domain names, know-how and processes (collectively, the "**Intellectual Property**") material to the conduct of its business as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof).  No claim has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property or alleging that any Company is infringing, misappropriating or otherwise violating the Intellectual Property rights of any Person, nor does any Company know of any valid basis for any such claim that in each case would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  The conduct of the business of each Company as currently conducted and as planned to be conducted (as reflected in each Company's written public statements made prior to the date hereof) does not and will not infringe, misappropriate or otherwise violate the Intellectual Property rights of any Person, except as will not have a Material Adverse Effect.

(b)    *Registrations*.  Except pursuant to licenses and other user agreements entered into by the Borrower and its Subsidiaries in the ordinary course of business that are listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date, on and as of the date hereof (i) the Borrower or its Subsidiaries, as indicated in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date, owns and possesses the right to use, and has not licensed any other Person to use, any copyright, patent, trademark or service mark (or any application for registration of any of the foregoing listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date) and (ii) to each Loan Party's knowledge, all registrations listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date are valid and in full force and effect.

(c)    *No Violations or Proceedings*.  To each Loan Party's knowledge, on and as of the date hereof, there is no material violation by others of any right of the Borrower or its Subsidiaries with respect to any copyright, patent, industrial design, trademark or service mark listed in Schedule 11(a) or 11(b) to the Perfection Certificate dated the Closing Date, pledged by it under the name of such Loan Party except as may be set forth on Schedule 3.06(c).

Section 3.07    Equity Interests and Subsidiaries.

(a)    *Equity Interests*.  Schedules 1(a) and 9(a) to the Perfection Certificate dated the Closing Date set forth a list of (i) each Subsidiary of the Borrower and its jurisdiction of organization as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date.  All Equity Interests of each Company are duly and validly issued and are fully paid and

non-assessable, and, other than the Equity Interests of the Borrower, are owned by the Borrower, directly or indirectly through Wholly Owned Subsidiaries.  Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Loan Security Agreement or the Canadian Security Agreement, as applicable, free of any and all Liens, rights or claims of other Persons, except the security interest created by the Loan Security Agreement, the Canadian Security Agreement or the Prepetition Security Agreements, as applicable.  As of the Closing Date, there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)        *No Consent of Third Parties Required*.  Subject, in the case of the Borrower and each Subsidiary that is a Debtor, to the entry of the DIP Orders and DIP Recognition Orders, no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or priority status of the security interest of the Administrative Agent in any Equity Interests pledged to the Administrative Agent for the benefit of the Secured Parties under the Loan Security Agreement or the Canadian Security Agreement, as applicable, or the exercise by the Administrative Agent of the voting or other rights provided for in the Loan Security Agreement or the Canadian Security Agreement, or the exercise of remedies in respect thereof, except for such FCC, ISED or CRTC consents as may be required under the Communications Laws in connection with the exercise of such remedies.

(c)        *Organizational Chart*.  An accurate organizational chart, showing the ownership structure of the Borrower and each Subsidiary on the Closing Date, and after giving effect to the Transactions, is set forth on Schedule 3.07(c).

Section 3.08   <u>Litigation; Compliance with Laws</u>.  Except for the Cases and as set forth in Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company as to which, in any case, there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  No Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

Section 3.09   <u>Agreements</u>.  As of the Petition Date, no Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or would reasonably be expected to result in a Material Adverse Effect.  No Company is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound (other than the Prepetition Facilities that are stayed as a result of the Cases), where such default would reasonably be expected to result in a Material

Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default. Schedule 3.09 accurately and completely lists all material agreements (other than leases of Real Property set forth on Schedule 7(a) or 7(b) to the Perfection Certificate dated the Closing Date) to which any Company is a party which are in effect on the date hereof in connection with the operation of the business conducted thereby and the Borrower has delivered to the Administrative Agent complete and correct copies of all such material agreements, including any amendments, supplements or modifications with respect thereto, and all such agreements are in full force and effect.

Section 3.10    Federal Reserve Regulations.  No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.  No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors, including Regulation T, U or X.  The pledge of the Securities Collateral (as defined in the Loan Security Agreement) pursuant to the Loan Security Agreement does not violate such regulations.

Section 3.11    Investment Company Act.  No Company is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12    Use of Proceeds.  Subject to the Budget and any additional restrictions on the use of proceeds provided herein and in accordance with the DIP Orders and DIP Recognition Orders, the Borrower will use the proceeds of the Loans hereunder for the following purposes:

(a)    With respect to Loans other than the DIP Second Funding Loans, (i) for working capital and general corporate purposes as approved in the Budget; (ii) to consummate the Roll-Up in accordance with Section 2.02; (iii) to pay professional fees in connection with the Cases and for other post-petition general corporate purposes, in each case, as approved in the Budget; (iv) to make adequate protection payments to the Prepetition Secured Parties as set forth in the DIP Orders; (v) to fund the Carve-Out and amounts secured by the Administration Charge; (v) to pay interest, fees and expenses due hereunder; and (vi) as otherwise agreed in writing between the Borrower and the Required Lenders;

(b)    With respect to the DIP Second Funding Loans, to repay in full in cash all outstanding Obligations (as defined in the 1L Loan Agreement) in respect of the First Out Loans (as defined in the 1L Loan Agreement) (such Obligations, the "**Prepetition First Out Obligations**"); and

(c)    With respect to the Backstop Incremental Funded Loans, solely to fund the Refund Amount directly to AST (or a subsidiary thereof to the extent designated in writing in such Borrowing Request), solely to the extent due and payable in accordance with the terms of the Framework Agreement and to pay each relevant Backstop Incremental Lender its Backstop Incremental OID;

*provided* that, except as otherwise set forth hereunder, in no event shall the proceeds of the Loans be used to make payments in regards to the Debtors' obligations under the Prepetition Facilities (other than pursuant to the Roll-Up or, in the case of the DIP Second Funding Loans, the Prepetition First Out Obligations) or to fund expenses or other amounts not otherwise set forth in this Section 3.12.  No portion of the proceeds of any Loan shall be used in any manner that causes or might cause such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

Section 3.13   Taxes.  Each Company has (a) timely filed or caused to be timely filed all material federal Tax Returns and all material state, provincial, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves (after the Closing Date, in accordance with GAAP), (ii) which would not, individually or in the aggregate, have a Material Adverse Effect or (iii) to the extent payment of such Tax is excluded by, or is otherwise prohibited by, the provisions of the Bankruptcy Code or order of the Bankruptcy Court and (c) satisfied all of its withholding tax obligations except for failures that would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  Each Company has made adequate provision (after the Closing Date, in accordance with GAAP) for all material Taxes not yet due and payable.  Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that would be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.  Except as would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect, no Company has ever "**participated**" in a "**listed transaction**" within the meaning of Treasury Regulation Section 1.6011-4.

Section 3.14   No Material Misstatements.  No information, reports, financial statements, certificates, Borrowing Requests, exhibits or schedules furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

Section 3.15   Labor Matters.  There are no strikes, stoppages, lockouts, slowdowns or other labor disputes against any Company pending or, to the knowledge of any Company, threatened except as would not individually or in the aggregate be expected to result in a Material Adverse Effect, (i) the hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, the Canada Labour Code, as amended, or any other applicable Requirements of Law dealing with such matters and

(ii) all payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company (except to the extent such payments have been stayed by the commencement of the Cases and, where applicable, the recognition thereof by the CCAA Court).  The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

Section 3.16    [Reserved].

Section 3.17    Employee Benefit Plans.  With respect to each Employee Benefit Plan, Single Employer Plan and Multiemployer Plan, each Company and its ERISA Affiliates is in compliance in all material respects with the applicable Requirements of Law, including all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder, except where noncompliance would not, either individually, or taken together with all other exceptions to the representations set forth in this Section 3.17 reasonably be expected to result in a Material Adverse Effect.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service indicating that such Employee Benefit Plan is so qualified and to the knowledge of each Company, nothing has occurred subsequent to the issuance of such determination letter which would cause such Employee Benefit Plan to lose its qualified status.  No liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan, Single Employer Plan or Multiemployer Plan (other than in the ordinary course) or any trust established under Title IV of ERISA has been or is expected to be incurred by any Company or any of its ERISA Affiliates with respect to any Employee Benefit Plan, Single Employer Plan or Multiemployer Plan, except where such liability, either individually, or taken together with all other exceptions to the representations set forth in this Section 3.17, would not reasonably be expected to result in a Material Adverse Effect.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, would reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any of the property of any Company or any of its ERISA Affiliates.  The present value of all accrued benefits under each Single Employer Plan or similar Foreign Plan (based on those assumptions used to fund such plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such plan allocable to such accrued benefit by a material amount.  As of the most recent valuation date for each Multiemployer Plan, the potential liability of each Company and its ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is not material.  The Companies and their respective ERISA Affiliates have complied with the requirements of Section 515 of ERISA in all material respects with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.  Neither any Company nor any of its ERISA Affiliates has any contingent liability with respect to any post-retirement welfare benefit under an Employee Benefit Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA or other applicable law, except where such liability, either individually, or taken together with all other exceptions to the representations set forth in this Section 3.17, would not reasonably be expected to result in a Material Adverse Effect.

To the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable Requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities. No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan. Except as would not reasonably be expected to result in a Material Adverse Effect, the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is fully or partially funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan by any material amount, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued and reported.

No Foreign Plan that is not a Canadian Pension Plan is subject to federal or provincial pension standards legislation.

The Canadian Pension Plans are duly registered under the Canadian Income Tax Act and any other applicable laws which require registration, have been administered in all material respects in accordance with the Canadian Income Tax Act and such other applicable laws, and no event has occurred and no condition exists that has resulted in or which would reasonably be expected to cause the loss of such registered status, except to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect. The Canadian Pension Plans are in substantial compliance with all Requirements of Law applicable thereto, and, without limiting the generality of the foregoing, all material obligations of each of the Loan Parties (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis, except to the extent that any failure to do so would not reasonably be expected to have a Material Adverse Effect. All contributions or premiums required to be made or paid by each of the Loan Parties to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans, their funding agreements and all applicable laws. There have been no material improper withdrawals or applications of the assets of the Canadian Pension Plans. None of the Canadian Pension Plans contain or have ever contained a "defined benefit provision", as that term is defined in subsection 147.1(1) of the Canadian Income Tax Act. No Canadian Pension Plan is a "multi-employer pension plan" as defined under the *Pension Benefits Standards Act*, 1985 (Canada) or under similar provincial pension standards legislation. No event has occurred and no condition exists that would reasonably be expected to result in an order to terminate any Canadian Pension Plan in whole or in part. No Person has ordered or given notice of the termination or wind up of a Canadian Pension Plan in whole or in part.

Section 3.18    Environmental Matters.

(a)    Except as set forth in Schedule 3.18 and except as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect:

(i)    The Companies and their businesses, operations and Real Property have been and are in compliance with, and the Companies have no liability under, any applicable Environmental Law; and under the business plan of the Companies,

no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws during the next five years;

(ii)     The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, under the business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

(iii)     To the knowledge of the Loan Parties, there has been no Release or threatened Release of Hazardous Material on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest that would result in liability of or by the Companies under any applicable Environmental Law;

(iv)     There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that would reasonably form the basis of such an Environmental Claim; and

(v)     No Person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)     Except as set forth in Schedule 3.18:

(i)     No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)     No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)     No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of the Companies;

(iv)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(v)    The Companies have made available to the Lenders all material records and files in the possession, custody or control of the Companies concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

Section 3.19    Insurance.  Schedule 3.19 sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date.  All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, no Company has received notice of violation or cancellation thereof, the premises, and the use, occupancy and operation thereof, comply in all material respects with all insurance requirements, and there exists no default under any insurance requirement.  Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

Section 3.20    Loan Security Documents.

(a)    *Loan Security Agreement*.  The Loan Security Agreement, taken together with the Interim DIP Order and/or the Final DIP Order, is effective to create in favor of the Collateral Agent, for the benefit of the Lenders and the other Secured Parties, legal, valid, and enforceable continuing First Priority Liens on, and automatically perfected security interests in, the Collateral pledged hereunder or thereunder, in each case, subject to no Liens other than Permitted Liens, the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.  Pursuant to the terms of the Interim DIP Order and/or Final DIP Order, no filing or other action will be necessary to perfect or protect such Liens and security interests.  Pursuant to and to the extent provided in the Interim DIP Order and/or the Final DIP Order, the Obligations of the Loan Parties under this Agreement will constitute allowed super-priority administrative expense claims in the Cases under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject only to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.  Notwithstanding anything to the contrary herein, the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge shall be senior to all Liens and claims (including administrative and superpriority claims) securing the Obligations, the Loan Parties' pre-petition obligations, adequate protection Liens, and all other Liens or claims (including administrative claims and DIP Superpriority Claims), including all other forms of adequate protection, Liens, or claims (including administrative claims and DIP Superpriority Claims) securing the Obligations and pre-petition obligations granted or recognized as valid, including the Liens, security interests, and claims (including administrative claims and DIP Superpriority Claims) granted to the Collateral Agent and the other Secured Parties.  The

90

provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of Collateral Agent, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.

(b)     *Canadian Security Agreement*.  The Canadian Security Agreement, taken together with the Interim DIP Recognition Order and Final DIP Recognition Order, are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Canadian Collateral and, when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate dated the Closing Date and (ii) upon the taking of possession or control by the Collateral Agent of the Canadian Collateral with respect to which a security interest may be perfected by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by each Loan Security Document), the Liens created by the Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors in the Canadian Collateral (other than such Canadian Collateral in which a security interest cannot be perfected under the PPSA as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Permitted Liens, including the Administration Charge.

(c)     *Intellectual Property*.  When the financing statements referred to in Section 3.20(b) (i) have been filed, the Liens created by such Canadian Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in Patents, Copyrights and Trademarks (as each such term is defined in the Canadian Security Agreement) registered or applied for with CIPO, in each case subject to no Liens other than Permitted Liens, including the Administration Charge.

(d)     *Copyright Office Filing*.  When the Loan Security Agreement or a short form thereof is filed in the United States Copyright Office, the Liens created by such Loan Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder in all Copyrights (as defined in the Loan Security Agreement) registered or applied for with the United States Copyright Office, subject to no Liens other than Permitted Liens.

(e)     *Unencumbered Assets*.  (i) The Collateral constitutes all of the material assets of the Companies (for the avoidance of doubt, excluding the Second Satellite until such time as the Companies take title to the Second Satellite), and (ii) no Company has granted a Lien on Collateral in respect of Indebtedness permitted under Section 6.01(l) which has not been granted to secure the Obligations.

(f)     *Valid Liens*.  Each Loan Security Document delivered pursuant to Sections 5.11 and 5.12 will, upon execution and delivery thereof and taken together with the Interim DIP Order and/or the Final DIP Order, and the DIP Recognition Orders, be effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral

thereunder, and such Loan Security Document will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case subject to no Liens other than the applicable Permitted Liens, including the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge.

Section 3.21    Intercompany Indebtedness; Affiliate Indebtedness.

(a)    Except for Indebtedness owed by any Canadian Subsidiary to the Borrower the proceeds of which were used to fund operations in the ordinary course of business, no Company has outstanding any Indebtedness owing to an Affiliate of such Company (except Indebtedness that is permitted under Section 6.01).

(b)    Neither the Borrower nor any of its Subsidiaries is party to or otherwise bound by any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets (except for Indebtedness permitted under Section 6.01, so long as such Indebtedness does not prohibit Liens on the Collateral in favor of the Collateral Agent and the Lenders), or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary.

Section 3.22    Anti-Terrorism Laws; Anti-Corruption Laws.

(a)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, employees, brokers or agents of such Loan Party, such Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws, or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, employees, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person or (ii) has violated or is in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(c)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person in violation of Anti-Terrorism Laws or other applicable laws, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.23    <u>Communications Licenses and Regulatory Matters</u>.

(a)    Schedule 3.23(a) accurately and completely lists all Communications Licenses, including a separate designation of Communications Licenses deemed to be Material Licenses as of the date hereof.  The Companies hold, or have applied for (and have no reason to believe that any such application will not be granted), all authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises and similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases required in connection with the conduct of the businesses of the Companies as presently conducted.  All Material Licenses identified on Schedule 3.23(a) are validly held and in full force and effect and, except for the One Dot Six License, are duly issued in the name of, or validly assigned to, the applicable Company.

(b)    The Companies are in compliance in all material respects with all Communications Laws.  No Company has knowledge of any investigation, notice of apparent liability, violation, forfeiture or other order or complaint issued by or filed with or before any Governmental Authority, with respect to any Company (other than proceedings relating to the wireless communications industry generally, FCC proceedings described in Schedule 3.23(b), or proceedings that cannot reasonably be expected to have a Material Adverse Effect).  Except as described in Schedule 3.23(b), no event has occurred that has resulted in, or after notice or lapse of time or both would be reasonably expected to result in, revocation, suspension, adverse modifications, impairment, restriction or termination of, or order of forfeiture with respect to, any Communications License or the One Dot Six Lease, except as would not, individually or in the aggregate, have a Material Adverse Effect.

(c)    Each Company and each of its Subsidiaries has duly filed any and all material filings, reports, applications, documents, instruments and information required to be filed by it under the Communications Laws and the terms and conditions of its Communications Licenses and the One Dot Six Lease, including substantial service showings and renewal applications, and all such filings were when made, and (to the extent the Communications Laws impose upon any Company a duty to update) remain, true, correct and complete in all material respects.

(d)    Except as described in Schedule 3.23(a), no material consent, approval, or authorization of, or filing with, any Governmental Authority is required under any Communications Laws in connection with the execution or consummation of the Transactions.

(e)    Except as provided in Schedule 3.23(b), *provided* that network facilities sufficient to support substantial service in a manner consistent with each Communications License are constructed, no Loan Party knows of any reason why any of the Communications Licenses should not be renewed or otherwise extended, or the rights thereunder substantially replicated, in the ordinary course without any materially adverse conditions, or the One Dot Six Lease should not be renewed in the ordinary course without any materially adverse conditions.

Section 3.24    <u>License Subsidiaries; Other Subsidiaries</u>.

(a)    No License Subsidiary holds any significant assets (other than the Communications Licenses held by it) or has incurred any liabilities (other than any Contingent Obligations incurred under the Loan Documents or the Prepetition Debt Documents to which it is a party, and other *de minimis* liabilities).  Neither One Dot Six LLC nor Ligado Networks Inc. of Virginia holds any significant assets (other than the Communications Licenses held by it or as otherwise described on Schedule 3.24(a)) or has incurred any liabilities (other than Contingent Obligations incurred under the Loan Documents or the Prepetition Debt Documents, as otherwise described on Schedule 3.24(a) or other *de minimis* liabilities).  Other than the License Subsidiaries, One Dot Six LLC, and Ligado Networks Inc. of Virginia, none of the Companies holds any U.S. authorizations, licenses, permits, certificates, approvals, registrations, orders and franchises or similar forms of authority with respect to the use of radio frequencies and/or the provision of communications or telecommunications services and spectrum leases.  As of the Closing Date, Ligado Networks Subsidiary LLC is the only License Subsidiary.

(b)    Except as set forth on Schedule 3.09 and 3.23(a), other than the Loan Parties, no Subsidiary of the Borrower has any claim to, ownership of, right to or interest in any Material Lease, Material License, Intellectual Property or satellites of the Companies.

Section 3.25    Cases; Orders.

(a)    The Cases were (or with respect to any making of this representation prior to the Petition Date, will be) commenced on the Petition Date, duly authorized in accordance with applicable laws, and proper notice thereof has been or will be given of (i) the motion seeking approval of the Loan Documents, the entry of the Interim DIP Order and the Final DIP Order, and (ii) the hearing for the entry of the Final DIP Order.  Proper notices of the motions for entry of the Interim DIP Order and the hearings thereon were given.

(b)    The Initial CCAA Recognition Order and Interim DIP Recognition Order will be obtained within five (5) Business Days of the entry of the Interim DIP Order and proper notice thereof under the circumstances will be given of (i) the application seeking the issuance of each of the Interim DIP Recognition Order and Final DIP Recognition Order, and (ii) the motion seeking the issuance of the Interim DIP Recognition Order and Final DIP Recognition Order.

(c)    With respect to each Loan Party that is a Debtor, subject to and upon entry of the Interim DIP Order, and solely with respect to any Canadian Collateral upon issuance of the Interim DIP Recognition Order and the Final DIP Recognition Order, as the case may be, the Loan Security Agreement and the other Loan Security Documents are legally binding on such Loan Party, and the Collateral shall be subject to a legal, valid, enforceable and perfected security interest and Liens in favor of the Collateral Agent for the benefit of the Secured Parties with the priority set forth in the DIP Orders (or DIP Recognition Orders as the case may be), to the fullest extent permissible under applicable law.

(d)    The Loan Parties are in compliance in all material respects with the terms and conditions of the DIP Orders and DIP Recognition Orders.  Each of the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) and the Final DIP Order (from and after the date on which the Final DIP Order is entered), and solely with respect to the Canadian Collateral, each of the Interim DIP Recognition Order and Final DIP Recognition Order, is in full

force and effect, is a Final Order and has not been modified, amended, vacated or stayed other than as acceptable to the Required Lenders (pursuant to a consent executed by them).

(e)     From and after the entry of the Interim DIP Order, and solely with respect to the Canadian Collateral upon issuance of the Interim DIP Recognition Order, pursuant to and to the extent permitted in the Interim DIP Order or Interim DIP Recognition Order and applicable law, the Obligations (i) will constitute allowed joint and several superpriority claims and (ii) will be secured by a valid, binding, continuing, enforceable, fully perfected Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, subject only to the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge and the priorities set forth in the DIP Orders and, solely in relation to the Canadian Collateral, the DIP Recognition Orders.

(f)     The entry of the Interim DIP Order (and, when applicable, the Final DIP Order and DIP Recognition Orders solely in relation to the Canadian Collateral) is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, the DIP Superpriority Claims and Liens described in Section 2.19, without the necessity of the execution (or recordation or filing) of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents, to the extent permissible under applicable law.

## ARTICLE 4
## CONDITIONS

Section 4.01   <u>Conditions to Effectiveness</u>.  This Agreement shall be effective on the date on which each of the conditions precedent set forth below is satisfied or waived (by the Required Ad Hoc Holders in their sole discretion).

(a)     *Loan Documents*.  There shall have been delivered to the Administrative Agent executed counterparts (from each of the Loan Parties) to each of the following Loan Documents:

(i)     this Agreement; and

(ii)     the Perfection Certificate.

(b)     *Corporate Documents*.  The Administrative Agent shall have received:

(i)     a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (in the case of a Loan Party that is not a Foreign Subsidiary) as of a recent date by the Secretary of State of the jurisdiction of organization of the applicable Loan Party, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and the filing of the Cases, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in

connection herewith on behalf of such Loan Party (together with a certificate of another officer or a director (or if there is no such other officer or director of such Loan Party, an officer or director of the general partner, sole member or majority shareholder of such Loan Party) as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i)); and

(ii)     a certificate as to the good standing of each Loan Party as of a recent date, from the Secretary of State of the jurisdiction of organization of the applicable Loan Party (or other applicable Governmental Authority).

(c)     *Officer's Certificate*.   The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, attesting to the satisfaction of the conditions precedent set forth in this Section 4.01.

(d)     *Requirements of Law*.   The Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulations T, U and X of the Board of Governors.

(e)     *USA PATRIOT Act; Beneficial Ownership Certification*.   The Administrative Agent shall have received the information required under Section 10.15 (including, to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, a customary certification for the Borrower regarding beneficial ownership in relation to the Borrower, in form and substance satisfactory to Administrative Agent and the Lenders), in each case, prior to the Closing Date provided and to the extent that such information is requested prior to the Closing Date.

(f)     *License Subsidiaries*.   All Communications Licenses issued by the FCC to the Borrower or its Subsidiaries shall be held in one or more License Subsidiaries, except that the One Dot Six Lease Authorization and the other Communications Licenses issued by the FCC to the Borrower or its Subsidiaries authorizing the use of the 1670-1675 MHz band may be held in One Dot Six LLC.

(g)     *Spectrum Leases*.   All Material Leases to which any Loan Party is a party shall be in full force and effect and shall not (i) have been terminated or (ii) be currently subject to termination.

(h)     *No Default or Event of Default*.   The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document on its part to be observed or performed, and, at the time of and immediately after the Closing Date, no Default or Event of Default shall have occurred and be continuing on such date.

(i)     *Representations and Warranties*.   Each of the representations and warranties made by any Loan Party herein or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified by "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the Closing Date, except to the extent such representations and warranties expressly relate to an

earlier date (in which case such representations and warranties shall be true and correct as of such date).

(j)    *Expenses*.  The Borrower shall have paid all expenses payable pursuant to Section 10.03 (or otherwise pursuant to this Agreement) to the extent invoiced at least one (1) Business Day prior to the Closing Date, including, for the avoidance of doubt, those of (i) each Agent (including fees, costs, disbursements and expenses of their outside counsel and their regulatory counsel), including for avoidance of doubt, pursuant to the U.S. Bank Fee Letter, and (ii) the Lenders (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors).

(k)    *Other Agreements*.  Each of the Material Contracts shall be in full force and effect and shall not have been terminated.

(l)    *Consents*.  Other than the DIP Recognition Orders, all necessary approval and consents of any Governmental Authority or any third party necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Required Lenders) and shall remain in effect; and no law or regulation shall be applicable that restrains, prevents, or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

Section 4.02    <u>Conditions to the DIP First Funding Date</u>.  The obligation of each Lender to make the DIP First Funding Loans on the DIP First Funding Date, shall be subject to the satisfaction or waiver (by the Required Ad Hoc Holders in their sole discretion) of each of the conditions precedent set forth below.

(a)    *Loan Documents*.  There shall have been delivered to the Administrative Agent executed counterparts (from each of the Loan Parties) to each of the following Loan Documents:

(i)    the Loan Security Agreement;

(ii)    the Canadian Security Agreement;

(iii)    the Intercompany Note, accompanied by appropriate instruments of transfer undated and endorsed in blank; and

(iv)    the Reaffirmation Agreement;

(b)    *Borrowing Request*.  The Administrative Agent shall have received a fully completed and duly executed Borrowing Request from the Borrower with respect to the DIP First Funding Loans in accordance with the terms of Section 2.03, and such proposed Borrowing of DIP First Funding Loans shall not occur on a date prior to the second (2nd) Business Day following entry of the Interim DIP Order in accordance with the terms of this Agreement.

(c)    *Officer's Certificate*.  The Administrative Agent shall have received a certificate, dated the DIP First Funding Date and signed by a Responsible Officer of the Borrower,

which certificate shall (i) attest to the satisfaction of the conditions precedent set forth in this Section 4.02, (ii) certify that the Organizational Documents and resolutions delivered to the Administrative Agent pursuant to Section 4.01(b)(i), in each case, have not been modified, rescinded or amended and are in full force and effect as of the DIP First Funding Date and (iii) certify that the disclosures set forth in the Perfection Certificate delivered to the Administrative Agent pursuant to Section 4.01(a)(ii) remain complete and accurate as of the DIP First Funding Date.

(d)      *Requirements of Law.*   The Borrower and its Subsidiaries and the Transactions shall be in full compliance with all material Requirements of Law, including Regulations T, U and X of the Board of Governors.

(e)      *Material Adverse Effect.*   Since the Closing Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(f)      *Collateral.*   The Administrative Agent shall have received:

(i)      to the extent not already in the possession of the Collateral Agent (including in its capacity as collateral agent under the 1L Loan Security Agreement and/or collateral trustee under the 1L Notes Security Agreement), except as specified on Schedule 5.14, all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers undated and endorsed in blank;

(ii)      UCC and PPSA financing statements in appropriate form for filing under the UCC and PPSA, as applicable, and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Collateral Agent, desirable to perfect the Liens created, or purported to be created, by the Loan Security Documents;

(iii)      certified copies of UCC, PPSA, Bank Act (Canada), United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches, execution searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party or Subsidiary as debtor and that are filed in those federal, state, provincial, territorial and county jurisdictions in which any Loan Party or Subsidiary is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate or that the Collateral Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Loan Security Documents (other than Permitted Liens, Liens released on or prior to the Petition Date or any other Liens acceptable to the Collateral Agent), or in the case of PPSA filings, any asset of any Canadian Subsidiary; and

(iv)    evidence acceptable to the Collateral Agent of payment or arrangements for payment by the Loan Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Loan Security Documents.

(g)    *No Litigation*.  Other than the Cases and the Recognition Proceedings (and any litigation filed directly in response to the filing of the Cases or the Recognition Proceedings), there shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, singly or in the aggregate, could have a Material Adverse Effect on, or that restrains, prevents or purports (in a non-frivolous and good faith manner) to affect materially adversely the legality, validity or enforceability of the Loan Documents or the consummation of the transactions contemplated hereby or thereby.

(h)    *License Subsidiaries*.  All Communications Licenses issued by the FCC to the Borrower or its Subsidiaries shall be held in one or more License Subsidiaries, except that the One Dot Six Lease Authorization and the other Communications Licenses issued by the FCC to the Borrower or its Subsidiaries authorizing the use of the 1670-1675 MHz band may be held in One Dot Six LLC.

(i)    *Spectrum Leases*.  All Material Leases to which any Loan Party is a party shall be in full force and effect and shall not (i) have been terminated or (ii) be currently subject to termination.

(j)    *No Default or Event of Default*.  The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document and the Interim DIP Order on its part to be observed or performed, and, at the time of and immediately after the DIP First Funding Date, no Default or Event of Default shall have occurred and be continuing on such date.

(k)    *Representations and Warranties; DIP Order Stipulations*.  (i) Each of the representations and warranties made by any Loan Party herein or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified by "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the DIP First Funding Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct as of such date) and (ii) each of the stipulations of the Loan Parties in each of the DIP Orders shall be true, complete and correct in all material respects on and as of the DIP First Funding Date.

(l)    *No Conflict*.  (i) The making of the DIP First Funding Loans shall not violate any requirement of law, after giving effect to the Interim DIP Order, and shall not be enjoined, temporarily, preliminarily or permanently and (ii) the Loan Parties shall be in compliance with the Interim DIP Order.

(m)    *No Legal Bar*.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it.  No

injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(n)     *Consents*.   All necessary approval and consents of any Governmental Authority or any third party necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Required Lenders) and shall remain in effect; and no law or regulation shall be applicable that restrains, prevents, or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

(o)     *Other Agreements*.   Each of the Material Contracts shall be in full force and effect and shall not have been terminated (other than as a direct result of the filing of the Cases or the Recognition Proceedings).

(p)     *Motions and Documents*.   All material motions, orders, and other material documents to be filed with and submitted to the Bankruptcy Court (including the "first day" orders) and other documents to be filed with or submitted to the Bankruptcy Court on the Petition Date shall be in form and substance satisfactory to the Required Ad Hoc Holders (which satisfaction may be communicated via an email direction of the Required Ad Hoc Holders)

(q)     *First Day Orders*.   All orders entered by the Bankruptcy Court relating to the relief sought in the motions described in Section 4.02(p) hereof shall not, without the Required Ad Hoc Holders' prior written consent, (i) authorize any Loan Party to (A) use any of the material properties or assets of the Loan Parties outside of the ordinary course of business (except as contemplated by the DIP Orders), (B) satisfy prepetition claims of the Loan Parties or (C) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Budget), (ii) reject or assume any contract, agreement, lease or other agreement to which any Loan Party is a party, or (iii) otherwise be inconsistent with this Agreement, the Interim DIP Order, or the Budget.

(r)     *Interim DIP Order*.   The Bankruptcy Court shall have entered the Interim DIP Order within five (5) days following the Petition Date, which Interim DIP Order shall include, without limitation, copies of this Agreement and the Initial Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the Required Ad Hoc Holders, (i) authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the super priority claim status, security interests and priming liens, and the payment of all fees, referred to herein and therein; (ii) authorizing the lifting or modification of the automatic stay to permit the Borrowers and the Guarantors to perform their obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of Cash Collateral and providing for adequate protection in favor of the Prepetition Lenders and Holders, as and to the extent provided herein and therein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Required Lenders and the Loan Parties, in their respective discretion in each case, which Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(s)    *No Trustee*.  No trustee or examiner with expanded powers shall have been appointed with respect to any Loan Party or any of the Loan Parties' respective properties pursuant to sections 1104, 1106(a)(3) and (4) of the Bankruptcy Code.

(t)    *Liens*.  The Interim DIP Order shall provide that the Collateral Agent, for the benefit of the Secured Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(u)    *Budget*.  Administrative Agent shall have received the Initial Budget, which shall be in form and substance satisfactory to the Required Ad Hoc Holders.  The funding of the DIP First Funding Loans shall be in compliance with the Initial Budget.

(v)    *Amount*.  The making of the DIP First Funding Loans (x) shall be on or before the second Business Day after the Interim DIP Order Entry Date and (b) shall not result in the aggregate principal amount of the Loans outstanding hereunder to exceed the amount of loans authorized by the Interim DIP Order to be funded on the DIP First Funding Date.

(w)    *Cases*.  The Cases of any of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(x)    *Cash Management Order*.  The Cash Management Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Required Ad Hoc Holders.

(y)    *Fees and Expenses*.  The Borrower shall have paid (or substantially concurrently will pay) to each Agent the fees payable on or before the DIP First Funding Date referred to in Section 2.05 (or otherwise pursuant to this Agreement) and all expenses payable pursuant to Section 10.03 (or otherwise pursuant to this Agreement) to the extent invoiced at least two (2) Business Days prior to the DIP First Funding Date, including, for the avoidance of doubt, those of (i) each Agent (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors) and (ii) the Lenders (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors).

(z)    *Waiver of the Equities*.  The Lenders shall have received (i) a waiver of any "equities of the case" under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code (it being understood and agreed by the Borrower, on behalf of itself and its Subsidiaries, that in no event shall any of the Lenders be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral).

Section 4.03   Conditions to Each DIP DDTL Funding Date.  The obligation of each DIP DDTL Commitment Lender to make DIP Delayed Draw Term Loans on any DIP DDTL Funding Date shall be subject to the satisfaction or waiver (by the Required Ad Hoc Holders in their sole discretion) of each of the conditions precedent set forth below on such DIP DDTL Funding Date.

(a)    *Closing Date; DIP First Funding Date; Prior Borrowings*.  Each of the Closing Date and the DIP First Funding Date shall have occurred and the DIP First Funding Loans,

Roll-Up Loans (to the extent required to be made prior to such date) and the DIP Second Funding Loans shall have been made.

(b)    *Final DIP Order*.  The Final DIP Order, which shall be consistent with the Interim DIP Order and otherwise in form and substance satisfactory to the Required Ad Hoc Holders, shall have been entered within thirty-five (35) days after the Petition Date and shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect (to the extent applicable as of the date of such Borrowing).

(c)    *Borrowing Request*.  The Administrative Agent shall have received a fully completed and duly executed Borrowing Request from the Borrower with respect to such DIP Delayed Draw Term Loans in accordance with the terms of Section 2.03, which Borrowing Request shall have been submitted no earlier than the Final DIP Order Entry Date.

(d)    *Representations and Warranties; DIP Orders*.  (i) Each of the representations and warranties made by any Loan Party herein or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified by "materiality" or "Material Adverse Effect"  shall be true and correct in all respects) on and as of such DIP DDTL Funding Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct as of such date) and (ii) each of the stipulations of the Loan Parties in each of the DIP Orders shall be true, complete and correct in all material respects on and as of such DIP DDTL Funding Date.

(e)    *Officer's Certificate*.  The Administrative Agent shall have received a certificate, dated the DIP DDTL Funding Date and signed by a Responsible Officer of the Borrower, which certificate shall (i) attest to the satisfaction of the conditions precedent set forth in this Section 4.03, (ii) certify that the Organizational Documents and resolutions delivered to the Administrative Agent pursuant to Section 4.01(b)(i), in each case, have not been modified, rescinded or amended and are in full force and effect as of such DIP DDTL Funding Date and (iii) certify that the disclosures set forth in the Perfection Certificate delivered to the Administrative Agent pursuant to Section 4.01(a)(ii) remain complete and accurate as of such DIP DDTL Funding Date.

(f)    *Fees and Expenses*.  The Borrower shall have paid (or substantially concurrently will pay) to each Agent the fees payable on or before the applicable DIP DDTL Funding Date referred to in Section 2.05 (or otherwise pursuant to this Agreement) and all expenses payable pursuant to Section 10.03 (or otherwise pursuant to this Agreement) to the extent invoiced at least two (2) Business Days prior to the DIP DDTL Funding Date, including, for the avoidance of doubt, those of (i) each Agent (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors) and (ii) the Lenders (including fees, costs, disbursements and expenses of their DIP Secured Party Advisors).

(g)    *Material Adverse Effect*.  Since the Closing Date, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

(h)     *Default or Event of Default*.  The Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan Document and the Final DIP Order on its part to be observed or performed, and, at the time of and immediately after the DIP DDTL Funding Date, no Default or Event of Default shall have occurred and be continuing on such date.

(i)     *No Litigation*.  Other than the Cases and the Recognition Proceedings (and any litigation filed directly in response to the filing of the Cases or the Recognition Proceedings), there shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Authority that, singly or in the aggregate, could have a Material Adverse Effect or that restrains, prevents or purports (in a non-frivolous and good faith manner) to affect materially adversely the legality, validity or enforceability of the Loan Documents or the consummation of the transactions contemplated hereby or thereby.

(j)     *No Trustee*.  No trustee or examiner with expanded powers shall have been appointed with respect to any Loan Party or any of the Loan Parties' respective properties pursuant to sections 1106(a)(3) and (4) of the Bankruptcy Code.

(k)     *Cases*.  The Cases of any of the Debtors shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

(l)     *Orders*.  No motion, pleading or application seeking relief affecting the provision of the financing contemplated hereunder in a manner that is adverse to the Lenders, in their capacities as such, shall have been filed in the Bankruptcy Court by any Loan Party without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders).

(m)     *Budget*.  The funding of such DIP Delayed Draw Term Loans shall be in compliance with the Budget.

(n)     *No Conflict*.  (i) The making of such DIP Delayed Draw Term Loans shall not violate any requirement of law, after giving effect to the Final DIP Order, and shall not be enjoined, temporarily, preliminarily or permanently and (ii) the Loan Parties shall be in compliance with the Final DIP Order.

(o)     *Amount*.  (i) The making, and deemed making, of such DIP Delayed Draw Term Loans shall not result in the aggregate principal amount of Loans outstanding hereunder to exceed the amount of Loans authorized by the Final DIP Order and (ii)(x) in the case of the First DIP DDTL Borrowing, shall be in an amount that is equal to or less than $23,000,000, and (y) in the case of any other Borrowing of DIP Delayed Draw Term Loans, shall not be in excess of the applicable amount set forth in the Budget for the applicable Borrowing.

(p)     *Milestones*.  The Borrower shall be in compliance with the Milestones set forth in Section 5.16 as of the date of such Borrowing.

(q)     *Liens*.  The Final DIP Order shall provide that the Collateral Agent, for the benefit of the Secured Parties, shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth herein.

(r)     *Cash Management Order*.  The Cash Management Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(s)     *Cadence*.  There shall have been no more than two (2) prior Borrowings of DIP Delayed Draw Term Loans.

(t)     *Borrowing Periods*.  (i) In the case of the First DIP DDTL Borrowing, such Borrowing shall occur during the period commencing on the Final DIP Order Entry Date and ending on the date immediately preceding the Initial Stated Maturity Date and (ii) in the case of the Second DIP DDTL Borrowing and the Third DIP DDTL Borrowing, (x) such Borrowing shall occur during a Maturity Date Extension Period, (y) a Maturity Date Extension Approval shall have been given in respect of such Maturity Date Extension Period prior to the date of Borrowing and (z) no other Borrowing shall have occurred during the applicable Maturity Date Extension Period in which the applicable Borrowing will occur.

(u)     *Approved Budget.*  The Agent and the Required Lenders shall have received and approved the applicable Budget pursuant to section 5.01(f) hereof.

(v)     *Required Ad Hoc Holder Consent*.  Except in the case of the First DIP DDTL Borrowing, the Required Ad Hoc Holders shall have provided their prior written consent to such Borrowing of DIP Delayed Draw Term Loans, in their sole discretion.

(w)     *Certain Additional Conditions.*  The conditions precedent set forth in Sections 4.02(d), (h), (i), (m), (n), (o), (p), (q), (r) and (s) shall be true and correct as of such DIP DDTL Funding Date.

Each of the delivery of a Borrowing Request and the acceptance by Borrower of the proceeds of any DIP Delayed Draw Term Loans shall constitute a representation and warranty by Borrower and each other Loan Party that on such date of Borrowing (both immediately before and after giving effect to such Borrowing and the application of the proceeds thereof) the conditions contained in Sections 4.03(d), 4.03(g), and 4.03(h) through (and including) 4.03(r) will be satisfied on such date of Borrowing.

Notwithstanding the foregoing, if the Required Ad Hoc Holders determine in their sole discretion that the Borrower has failed to satisfy any of the conditions precedent set forth in this Section 4.03 and so advise the Administrative Agent in writing, the Administrative Agent shall decline to fund such DIP Delayed Draw Term Loans.

Section 4.04   Conditions to Backstop Incremental Funding Date.  The obligations of the Backstop Incremental Lenders to fund the Backstop Incremental Loans to AST (or a subsidiary thereof to the extent designated in writing in such Borrowing Request) on the Backstop

Incremental Funding Date shall be subject to the conditions set forth in Section 5 of the First Amendment.

# ARTICLE 5
# AFFIRMATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, it will, and will cause each of its Subsidiaries to:

Section 5.01   Financial Statements, Reports, etc. Furnish to the Administrative Agent for distribution to each Lender:

(a)   *Annual Reports*.  As soon as available and in any event within (i) 122 days after the end of the fiscal year ending December 31, 2024 and (ii) 90 days after the end of each fiscal year (other than the fiscal year ending December 31, 2024), beginning with the fiscal year ending December 31, 2024, the consolidated balance sheet, consolidated income statement and consolidated cash flow of the Borrower and its Subsidiaries as of and for the fiscal year then ended, setting forth in each case in comparative form the corresponding figures from the corresponding period from the previous fiscal year, and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" substantially equivalent to that which would be required to be included in an Annual Report on Form 10-K of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act. The filing by the Borrower of its Form 10-K or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal year reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such year;

(b)   *Quarterly Reports*.  As soon as available and in any event within (i) 66 days after the end of the fiscal quarter ending March 31, 2025 and (ii) 45 days after the end of each of the first three fiscal quarters of each fiscal year (other than the fiscal quarter ending March 31, 2025), beginning with the fiscal quarter ending March 31, 2025, the consolidated balance sheet, consolidated income statement and consolidated cash flow of the Borrower and its Subsidiaries as of and for the fiscal quarter (and for the portion of the fiscal year) then ended, setting forth in each case in comparative form the corresponding figures from the corresponding period from the previous fiscal year, and a "Management's Discussion and Analysis of Financial Condition and Results of Operations" substantially equivalent to that which would be required to be included in a Quarterly Report on Form 10-Q of the Borrower if the Borrower were to be subject to an obligation to file such a report under the Exchange Act.  The filing by the Borrower of its Form 10-Q or any successor or comparable forms with the Securities and Exchange Commission as at the end of and for any fiscal quarter reported on as aforesaid shall be deemed to satisfy the obligations of this paragraph with respect to such quarter;

(c)   *Financial Officer's Certificate*.  Concurrently with any delivery of financial statements under Section 5.01(a) above, beginning with the fiscal year ending December 31, 2024, (i) in the case of the fiscal year ending December 31, 2024, a report of the accounting firm opining

on or certifying such financial statements (which shall be unqualified as to scope of audit and shall state that such financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP) and (ii) in the case of each fiscal year ending thereafter, a report of the accounting firm opining on or certifying such financial statements (which shall be unqualified as to scope of audit and shall state that such financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP, with the exception of the application of ASC 810 and ASC 852, herein considered a "contractual basis of accounting", with the intent of the use of the report by the Lenders and holders of the Company's Equity Interests for their respective purposes;

(d)    *Management Letters*.  Promptly after the receipt thereof by any Company, a copy of any "management letter" received by any such Person from its certified public accountants and the management's responses thereto; and

(e)    *Public Reports*.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange.

(f)    *Budget and Variance Reporting*.

(i)    On the third Thursday following the Petition Date and on every other Thursday thereafter, (a) a Cash Flow Forecast for the upcoming thirteen week period and (b) a Cash Flow Certificate, each in form satisfactory to the Required Lenders.  The most recently delivered (in accordance with the previous sentence) Cash Flow Forecast shall become the "Budget" for the purposes of the DIP Facility upon the Required Ad Hoc Holders' written acknowledgement (delivered to the Administrative Agent) that the Cash Flow Forecast is in form and substance satisfactory to the Required Ad Hoc Holders and is consistent with the form of the Initial Budget; *provided* that, until a new Budget has been approved by the Required Ad Hoc Holders, the most recently approved (in accordance with this Section 5.01(f)(i)) Budget (or if no such approved Budget exists, the Initial Budget) shall govern; and

(ii)    Commencing on the third Thursday following the Petition Date and on every other Thursday thereafter, a Variance Report in respect of the most recently ended Testing Period, in form satisfactory to the Required Lenders, together with a certification from a Responsible Officer of the Borrower as to the accuracy and completeness thereof.

Section 5.02    Litigation and Other Notices.  Furnish to the Administrative Agent and each Lender written notice of any of the following promptly (and, in any event (subject to Section 5.02(h)), within three (3) Business Days of knowledge of a Responsible Officer of the Borrower) thereof):

(a)    the filing or commencement of, or any threat or written notice of intention of any Person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that would reasonably be expected to be materially adverse to such Company or Affiliate or (ii) with respect to any Loan Document;

(b)    the occurrence of a Casualty Event;

(c)    the receipt by any Loan Party of notice of (i) the commencement of any proceedings by or before any Governmental Authority seeking cancelation, termination (including by means of non-renewal), revocation, limitation, adverse modification or adverse conditioning of any Material License or other material consent or authorization issued by a Governmental Authority, including the One Dot Six Lease Authorization and the Inmarsat Agreement, (ii) any actual or threatened suspension, limitation or revocation of, failure to renew, or imposition of any restraining order, escrow or impoundment of funds in connection with the One Dot Six Lease and/or the Inmarsat Agreement, (iii) any default, event of default, termination or material breach of contract with respect to any Material Contract, or any amendment, restatement, modification, waiver or consent thereunder (it being understood and agreed that such notice shall attach a true and complete copy of such amendment, restatement, modification, waiver or consent), (iv) any filing before or notice from any Governmental Authority asserting any failure by the Loan Parties or any Subsidiary to be in compliance with Communications Laws in any material respect (together with a copy of such notice) and any notice from the FCC, ISED, the CRTC or any other Governmental Authority denying, postponing or revoking any application filed by any Company or (v) any material written correspondence with the FCC or ISED; *provided* that in relation to the notices required to be delivered under this Section 5.02(c), the Administrative Agent and the Lenders acknowledge that they have received notice of the matters listed on Schedule 3.23(b) attached hereto (but not of any change in the status thereof);

(d)    any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(e)    any default (other than directly as a result of the commencement of the Cases and the Recognition Proceedings) under any Indebtedness of a Loan Party in excess of $12,000,000, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(f)    any development that has resulted in, or would reasonably be expected to result in a Material Adverse Effect; or

(g)    the occurrence of a Change in Control.

Section 5.03    Existence; Businesses and Properties.

(a)    Do or cause to be done all things reasonably necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  Notwithstanding anything to the contrary contained in this Section 5.03,

any of the Borrower and the Subsidiary Guarantors may change its partnership, corporate or other existence to another form of existence so long as the perfection and priority of the Liens of the Administrative Agent created by the Loan Security Documents are not adversely affected.

(b)     Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks, service marks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Loan Documents, except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; and at all times maintain, preserve and protect all property material to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this Section 5.03(b) shall prevent (i) sales of property, consolidations, amalgamations or mergers by or involving any Company in accordance with Section 6.05 or Section 6.06; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; (iii) the abandonment by any Company of any rights, franchises, licenses (other than the One Dot Six Lease or any Material License, unless as contemplated by Schedule 6.06(g)), trademarks, trade names, copyrights or patents that such Person reasonably determines are not useful to its business or no longer commercially desirable, or (iv) the relinquishment of spectrum rights as contemplated by Schedule 6.06(g).

(c)     Do or cause to be done all things reasonably necessary to obtain, preserve, renew, extend and keep in full force and effect all Material Licenses (or the substantive rights conferred upon the Companies thereunder), the One Dot Six Lease and the Inmarsat Agreement; *provided* that the Borrower may enter into transactions as contemplated by Schedule 6.06(g) and take actions required in furtherance of the objective underlying any Material Regulatory Request.

(d)     From and after the Interim DIP Order Entry Date (but subject to Section 5.14), the Borrower shall ensure that the DIP Loan Proceeds Account shall be subject to an Account Control Agreement.

Section 5.04    Insurance.    The Borrower and each of its Subsidiaries shall keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to properties material to the business of the Borrower and its Subsidiaries against such casualties and contingencies and of such types and in such amounts with such

deductibles as is customary in the case of similar businesses operating in the same or similar locations.

Section 5.05    Obligations and Taxes.

(a)    *Payment of Obligations*.  Subject to the Bankruptcy Code, the terms of the applicable DIP Order and the DIP Recognition Order and any required approval by the Bankruptcy Court or the CCAA Court, but without limiting any other restriction or obligation herein, pay its material obligations (other than Indebtedness) promptly and in accordance with their terms, and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien.

(b)    *Filing of Returns*.  Subject to the limitations and exceptions set forth in the introductory paragraph to this Article 5, the Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that it will, and will cause each of its Subsidiaries to: (i) timely and correctly file all material Tax Returns required to be filed by it and (ii) withhold, collect and remit all material Taxes that it is required to collect, withhold or remit.

Section 5.06    Employee Benefits.

(a)    Comply in all material respects with the applicable provisions of ERISA and the Code (and any Requirements of Law applicable to any Foreign Plan or Canadian Pension Plan) and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within 15 days after any Company or any of its ERISA Affiliates knows or has reason to know that, (i) any ERISA Event, or any similar event with respect to a Foreign Plan or Canadian Pension Plan has occurred, (ii) the imposition of a Lien with respect to any Employee Benefit Plan, a Single Employer Plan, Canadian Pension Plan, or a Multiemployer Plan other than statutory liens arising in the ordinary course of business, (iii) the adoption of any new Single Employer Plan or Canadian Pension Plan, or the entering into of any obligation to contribute to any Multiemployer Plan by any Companies or its ERISA Affiliates, (iv) the adoption of an amendment to a Single Employer Plan, Multiemployer Plan (or agreement pursuant to which any Company or its ERISA Affiliates contributes to a Multiemployer Plan), Foreign Plan or Canadian Pension Plan if such amendment results in a material increase in benefits or unfunded liabilities, or (v) the commencement of contributions by any Company or any of its ERISA Affiliates to a Multiemployer Plan, Single Employer Plan, Foreign Plan or Canadian Pension Plan, a statement of a Financial Officer of the Borrower setting forth details as to such ERISA Event or any similar event with respect to a Foreign Plan or Canadian Pension Plan and the action, if any, that the Companies propose to take with respect thereto; (y) as soon as practicable following any request by the Administrative Agent, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any of its ERISA Affiliates with the Internal Revenue Service with respect to

109

each Single Employer Plan or each annual information report for any Canadian Pension Plan and Foreign Plan; (ii) the most recent actuarial valuation report for each Employee Benefit Plan, Canadian Pension Plan, Single Employer Plan, Foreign Plan and Multiemployer Plan; (iii) all notices received by any Company or any of its ERISA Affiliate from a Canadian Pension Plan or Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event or Canadian Pension Plan; (iv) the aggregate amount of payments made under any employee welfare benefit plan (as defined in Section 3(l) of ERISA) to any retired employees of any Company or any of its Affiliates (or any dependents thereof) during the most recently completed fiscal year; and (v) such other documents or governmental reports or filings relating to any Employee Benefit Plan, Single Employer Plan, Multiemployer Plan, Foreign Plan or Canadian Pension Plan (or employee benefit plan sponsored or contributed to by any Company or its ERISA Affiliates) as the Administrative Agent shall reasonably request and (z) as soon as practicable following any request therefor, copies of (i) any documents described in Section 101(k) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1) of ERISA that any Company or its ERISA Affiliates may request with respect to any Multiemployer Plan; *provided* that, with respect to the notices described in (i) and (ii) above, if any Company or any of its ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, such Company or such ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

Section 5.07    <u>Maintaining Records; Access to Properties and Inspections; Meetings</u>.

(a)    Keep proper books of record and account in which full, true and correct entries in conformity with GAAP (without giving effect to the application of ASC 852 and ASC 810) and all Requirements of Law are made of all dealings and transactions in relation to its business and activities.  The Borrower and each of its Subsidiaries will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the property of such Company at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants).

(b)    Upon the request of the Administrative Agent or the Required Lenders, participate in a telephonic meeting of the Administrative Agent and the Lenders no more frequently than once during each week (unless a Default or an Event of Default has occurred and is continuing, in which case, such calls shall be held more frequently if so requested by the Administrative Agent or the Required Lenders) at such time as may be agreed to by Borrower and Required Lenders regarding, without limitation, a comprehensive update on the Cases (including negotiations with any reluctant stakeholder), variances with respect to the Budget, and any other material information relating to the business, condition (financial or otherwise), operation, performance, properties or prospects of any of the Loan Parties or their Subsidiaries and any other information that may be requested by the Administrative Agent or any Lender.

Section 5.08    [Reserved].

Section 5.09   <u>Compliance with Laws; Compliance with Environmental Laws; Environmental Reports</u>.

(a)    Comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; *provided* that the Loan Parties and their Subsidiaries shall comply at all times with all orders related to the Cases, including the Cash Management Order and the DIP Orders.

(b)    Comply, and undertake all commercially reasonable efforts to cause all of its employees occupying Real Property owned, operated or leased by the Borrower or any of its Subsidiaries to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws, in each case, except where the failure to comply, undertake, obtain, renew or conduct individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; *provided* that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 5.10   <u>Communications Licenses</u>.  Neither the Borrower nor any Subsidiary shall operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease, except for instances of non-compliance that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Borrower and its Subsidiaries and their businesses.

Section 5.11   <u>Additional Collateral; Additional Guarantors</u>.

(a)    Subject to this Section 5.11, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Loan Security Documents but is not so subject (including, for the avoidance of doubt, Communications Licenses acquired after the Closing Date to the maximum extent permitted by law and any proceeds and right to receive proceeds from such Communications Licenses), promptly (and in any event within 30 days after the acquisition thereof) (i) execute and deliver to the Collateral Agent such amendments or supplements to the relevant Loan Security Documents or such other documents as the Collateral Agent shall deem necessary or advisable to grant the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than Permitted Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Loan Security Document in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Collateral Agent.  The Borrower shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Collateral Agent shall require to confirm the validity, perfection and priority of the Lien of the Loan Security Documents on such after-acquired properties.

111

(b)      With respect to any Person that is or becomes a Subsidiary after the Closing Date, promptly (and in any event within 30 days after such Person becomes a Subsidiary) (i) deliver to the Collateral Agent the certificates, if any, representing all of the Equity Interests of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to the Borrower or any Subsidiary Guarantor together with instruments of transfer executed and delivered in blank by a duly authorized officer of the Borrower or such Subsidiary Guarantor and (ii) cause such new Subsidiary (A) to execute a Joinder Agreement or such comparable documentation to become a Subsidiary Guarantor and a joinder agreement to the Loan Security Agreement or the Canadian Security Agreement, as applicable, substantially in the form annexed thereto, and (B) to take all actions necessary or advisable in the opinion of the Administrative Agent to cause the Lien created by the Loan Security Agreement or the Canadian Security Agreement, as applicable, to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent.

Section 5.12    Security Interests; Further Assurances.    Promptly, upon the reasonable request of the Administrative Agent or any Lender, at the Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument (including, without limitation, mortgages) supplemental to or confirmatory of the Loan Security Documents or otherwise deemed by the Required Lenders reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except as permitted by the applicable Loan Security Document, or obtain any consents or waivers as may be necessary or appropriate in connection therewith.  Deliver or cause to be delivered to the Administrative Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Required Lenders as the Required Lenders shall reasonably deem necessary to perfect or maintain the Liens on the Collateral pursuant to the Loan Security Documents.  Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may reasonably require.  If the Administrative Agent or the Required Lenders determine that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of the Borrower or any Subsidiary Guarantor constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA or otherwise in form and substance satisfactory to the Required Lenders.

Section 5.13    Information Regarding Collateral.    Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, amalgamating, reorganizing, dissolving, liquidating, reorganizing or organizing in any other

jurisdiction), until (A) it shall have given the Administrative Agent and Collateral Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Required Lenders to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Loan Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent and Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

Section 5.14    <u>Post-Closing Collateral Matters</u>.  Execute and deliver the documents and complete the tasks set forth on Schedule 5.14, in each case within the time limits specified on such schedule.

Section 5.15    <u>License Subsidiaries; Other Subsidiaries</u>.  Hold and retain, or cause to be held or retained, as applicable, (i) all Material Licenses (other than the One Dot Six Lease Authorization and other Communications Licenses issued by the FCC authorizing the use of the 1670-1675 MHz band) issued by the FCC to any Company in one or more License Subsidiaries; and (ii) the One Dot Six Lease Authorization and the other Communications Licenses authorizing the use of the 1670-1675 MHz band issued by the FCC to any Company in One Dot Six LLC.

Section 5.16    <u>Certain Case Milestones</u>.  Ensure that each of the milestones set forth below (the "**Milestones**"), each of which may be extended or waived in writing (with email from counsel being sufficient) by the Required Ad Hoc Holders (in their sole discretion), is achieved in accordance with the applicable timing referred to below:

(a)    the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court no later than 11:59 p.m. New York City time on the Petition Date, which shall be no later than 11:59 p.m. New York City time on January 5, 2025;

(b)    no later than one (1) day after the Petition Date, the Company (x) shall have filed the Break-Up Fee Motion (as defined in the Restructuring Support Agreement), in form and substance acceptable to the Required Ad Hoc Holders, and (2) will seek to have the Break Up Fee Motion heard no later than twenty one (21) days after the Petition Date;

(c)    no later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order in form and substance acceptable to the Required Ad Hoc Holders;

(d)    no later than ten (10) Business Days after the Petition Date, the CCAA Court shall have issued the Initial CCAA Recognition Order and Interim DIP Recognition Order;

(e)    no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Required Ad Hoc Holders, granting the relief requested in the Break-Up Fee Motion;

(f)      no later than thirty-five (35) days after the Petition Date (and no earlier than the Syndication Consummation Date), the Bankruptcy Court shall have entered the Final DIP Order, in form and substance acceptable to the Required Ad Hoc Holders;

(g)      no later than ten (10) Business Days after entry of the Final DIP Order, the CCAA Court shall have issued the Final DIP Recognition Order, in form and substance acceptable to the Required Ad Hoc Holders;

(h)      no later than seventy-five (75) days after the Petition Date, the Company shall have executed the AST Definitive Agreements (as defined in the Restructuring Support Agreement);

(i)      no later than seventy-five (75) days after the Petition Date, the Company shall have filed the AST Definitive Agreements Motion (as defined in the Restructuring Support Agreement);

(j)      no later than seventy-five (75) days after the Petition Date, the Company shall have filed (x) an Acceptable Plan, (y) the Disclosure Statement, and the motion seeking approval of the Solicitation Materials (each term in the foregoing subclause (y), as defined in the Restructuring Support Agreement and in form and substance satisfactory to the Required Ad Hoc Holders);

(k)      no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order (as defined in the Restructuring Support Agreement);

(l)      no later than one hundred and ten (110) days after the Petition Date, the Bankruptcy Court shall have entered the AST Definitive Agreements Order (as defined in the Restructuring Support Agreement);

(m)      no later than one hundred and forty-five (145) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order;

(n)      no later than ten (10) days after the entry of the Confirmation Order, the CCAA Court shall have issued an order recognizing the Confirmation Order;

(o)      no later than forty (40) months after the Petition Date, the effective date of the Acceptable Plan shall have occurred.

Section 5.17   Certain Bankruptcy Matters.  Comply in all material respects (a) after entry thereof, with each order of the type referred to in clause (b) of the definition of "Approved Bankruptcy Court Order", as each such order is amended and in effect in accordance with this Agreement (including, for the avoidance of doubt, the requirements set forth in clause (b) of the definition of "Approved Bankruptcy Court Order"); *provided* that any actions taken to enforce any rights or remedies arising from a breach of this Section 5.17 shall be subject to any requirements in the DIP Orders or DIP Recognition Orders, as applicable, requiring a ruling or entry of an order of the Bankruptcy Court or CCAA Court, as applicable and (b) with their obligations and

responsibilities as debtors in possession under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Final DIP Order, and any other order of the Bankruptcy Court.

Section 5.18   Prepetition First Out Obligations Payoff Letter.  On or prior to the Final DIP Order Entry Date, furnish to the Administrative Agent, for distribution to the Lenders, a customary payoff letter in respect of the Prepetition First Out Obligations to be prepaid on the DIP Second Funding Loans that has been validly executed and delivered by the 1L Loan Administrative Agent and is in form and substance reasonably satisfactory to the Fortress Lenders and Cerberus Lenders.

Section 5.19   Bankruptcy Notices.

(a)   Furnish to the Administrative Agent, the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors, to the extent reasonably practicable (or, if impracticable, as soon as reasonably practicable prior to such filing), at least three (3) Business Days prior to filing with the Bankruptcy Court or CCAA Court, as applicable, notice and copies of the Final DIP Order, Final DIP Recognition Order, and any motion in respect of an order that would constitute an "Approved Bankruptcy Court Order" and all other proposed orders, pleadings and other documents related to the Loans and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, having a value in excess of $200,000, cash management, adequate protection, any chapter 11 plan and/or any disclosure statement or supplemental document related thereto, which shall, in each case, have been prepared in good faith.

(b)   Furnish to the Administrative Agent, the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors, to the extent reasonably practicable, no later than three (3) Business Days (or such shorter period as Administrative Agent, at the direction of the Required Lenders, may agree) prior to filing with the Bankruptcy Court or CCAA Court all other filings, motions, pleadings, other papers or material notices to be filed with the Bankruptcy Court or CCAA relating to any request (x) to approve any compromise and settlement of claims whether under Rule 9019 of the Federal Rules of Bankruptcy Procedure or otherwise, or (y) for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code.

Section 5.20   Reorganization Efforts.   The Borrower shall promptly provide the Administrative Agent and the Lenders, upon request by the Administrative Agent or any Lender, with updates of any material developments in connection with the Loan Parties' reorganization efforts under the Cases, whether in connection with the sale of all or substantially all of the Borrower's or any of the Loan Parties' assets, the marketing of any Loan Parties' assets outside the ordinary course, the formulation of bidding procedures, and auction plan, or documents related thereto, any negotiations with respect to the Prepetition Facilities, or otherwise.  Without limiting the foregoing, promptly upon request and upon any such information becoming available to the Loan Parties, each Loan Party shall provide the Administrative Agent and the Lenders with copies of any informational packages provided to any potential bidders, a status report (upon request of the Administrative Agent, a Lender or the advisors to the Lenders) and updated information relating to any sale of assets, and copies of all drafts of proposed sale documentation, any such bids and any updates, modifications or supplements to such information and materials.

Section 5.21    Interim DIP Order Entry Date.  On the Interim DIP Order Entry Date, each Loan Party (or, in the case of the Canadian Security Agreement, each Canadian Subsidiaries) shall (i) execute and deliver to the Administrative Agent and/or the Collateral Agent (as applicable) the Canadian Security Agreement, the Intercompany Note, the Loan Security Agreement and the Reaffirmation Agreement and (ii) cause to be delivered to the Administrative Agent each of the items set forth in Section 4.02(f).

Section 5.22    Prepetition First Out Obligations Refinancing.  The Borrower shall cause all outstanding Prepetition First Out Obligations to be repaid in full by no later than the third (3rd) Business Day after the Final DIP Order Entry Date.

# ARTICLE 6
# NEGATIVE COVENANTS

The Borrower and each Subsidiary Guarantor warrants, covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan and all fees and all other expenses or amounts payable under any Loan Document have been paid in full in cash, it will not, nor will it cause or permit any Subsidiaries to:

Section 6.01    Indebtedness.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness), except (as set forth below, the "**Permitted Debt**"):

(a)    Indebtedness under the Prepetition Facilities as in effect on the Closing Date (other than the Prepetition Roll-Up Indebtedness after giving effect to the Roll-Up);

(b)    Indebtedness of the Borrower or any Subsidiary outstanding on the Closing Date to the extent set forth on Schedule 6.01(b) hereto;

(c)    Unsecured Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary; *provided* such Indebtedness is subject to an Intercompany Note and pledged by such party as Collateral pursuant to the Loan Security Documents;

(d)    [reserved];

(e)    Indebtedness of the Borrower or any Subsidiary in respect of Purchase Money Obligations and Capital Lease Obligations in a combined aggregate principal amount not to exceed $10.0 million;

(f)    Indebtedness and obligations of the Borrower or any Subsidiary in respect of letters of credit, bank guarantees and cash management obligations, including without limitation, letters of credit in respect of bid, performance or surety bonds, workers' compensation claims, health, disability or other benefits to former employees or their families or property, casualty or liability or self-insurance obligations and completion guarantees and bankers acceptances issued for the account of the Borrower or any Subsidiary in the ordinary course of

business, provided that the aggregate principal amount of Indebtedness pursuant to this Section 6.01(f) outstanding at any time shall not exceed $5.0 million;

(g)     Contingent Obligations of (A) the Borrower or any Guarantor in respect of Indebtedness of the Borrower or any Subsidiary Guarantor, or (B) any Subsidiary that is not a Guarantor in respect of Indebtedness of any Subsidiary that is not a Guarantor, in each case so long as such Indebtedness is otherwise permitted under this covenant; *provided*, that if the applicable primary obligations are unsecured and/or subordinated to the Obligations, the applicable Contingent Obligations shall be unsecured and/or subordinated, as applicable, to the Obligations;

(h)     Indebtedness of the Borrower or any Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

(i)     Indebtedness of the Borrower or any Subsidiary representing the financing of installments of insurance premiums in the ordinary course of business, *provided* that the amount of such Indebtedness shall not exceed the amount of the unpaid cost of such insurance; and

(j)     Indebtedness of the Borrower or any Subsidiary arising in connection with endorsement of instruments for deposit in the ordinary course of business.

For purposes of determining compliance with this Section 6.01, in the event that an item of Indebtedness (including, for the avoidance of doubt, any portion thereof) meets the criteria of one or more of the categories of Permitted Debt described in Section 6.01(c) through 6.01(j), the Borrower may not divide, classify or reclassify or later divide, classify or reclassify (as if Incurred at such later time), such item of Indebtedness (including, for the avoidance of doubt, any portion thereof) in any manner. Accrual of interest, the accretion of accreted value, amortization of original issue discount, the payment of a paid-in-kind fee in connection with any Incurrences of Indebtedness under this Agreement, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an Incurrence of Indebtedness for purposes of this Section 6.01. Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 6.01.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar equivalent), in the case of revolving credit debt; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange

rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this Section 6.01, the maximum amount of Indebtedness that the Borrower and the Guarantors may Incur pursuant to this Section 6.01 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies.

Section 6.02    Liens.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), create, Incur, assume or permit or suffer to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except for Permitted Liens.

Section 6.03    Sale and Leaseback Transactions.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

Section 6.04    Viasat Proceedings.  Without the prior written consent of the Required Ad Hoc Holders (in their sole discretion), file or commence any action, suit, litigation or proceeding, or make any material filing or take any material action in respect of (or during the pendency of) the foregoing (including any settlement in respect thereof), whether at law or in equity by or before any Governmental Authority, or otherwise pursuant to the Cases, against Viasat or any Affiliate thereof; *provided* that, without limiting the foregoing, it is understood and agreed that, for purposes of this Section 6.04, (i) the Required Ad Hoc Holders have consented to the filing by the Borrower of a civil complaint against Viasat, which complaint shall be substantially in the form of the draft complaint delivered by the Borrower to the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors on January 2, 2025 and (ii) the Borrower shall share drafts of material pleadings in respect of the litigation relating to such civil complaint with the Ad Hoc Cross-Holder Group Primary Advisors and the Ad Hoc First Lien Group Primary Advisors prior to the filing thereof and shall afford them a reasonable opportunity under the circumstances to comment on such pleadings and shall incorporate such reasonable comments in good faith.

Section 6.05    Mergers and Consolidations.  (x) With respect to the Borrower, wind up, liquidate or dissolve its affairs (or suffer any liquidation or dissolution), directly or indirectly sell all or substantially all of its assets and the Subsidiary Guarantors' assets (on a consolidated basis) or enter into any transaction of merger, amalgamation or consolidation or (y) with respect to any Subsidiary of the Borrower, wind up, liquidate or dissolve its affairs (or suffer any liquidation or dissolution), sell all or substantially all of its assets or enter into any transaction of merger, amalgamation or consolidation, except that the following shall be permitted subject to any provisions of the Bankruptcy Code and any orders of the Bankruptcy Court:

(a)    [reserved];

(b)    any Guarantor may merge, amalgamate or consolidate with or into, or sell all or substantially all of its assets to, the Borrower or any Guarantor (as long as the Borrower is the Surviving Person in the case of any such merger, consolidation or sale involving the Borrower and otherwise a Guarantor is the Surviving Person);

(c)    any Subsidiary may dissolve, liquidate or wind up its affairs at any time; *provided* that such dissolution, liquidation or winding up, as applicable, would not reasonably be expected to have a Material Adverse Effect and such Subsidiary contributes all of its assets (but not debts) to a Loan Party; and

(d)    any Subsidiary that is not a Guarantor may amalgamate, merge or consolidate with or into, or sell all or substantially all of its assets to, the Borrower, any Guarantor, or any Subsidiary that is not a Guarantor so long as the Borrower or applicable Guarantor, in the case of a merger or consolidation with or into a Loan Party, is the surviving Person (and no debt is sold, assumed or otherwise Incurred by any Loan Party in connection therewith).

Section 6.06    Asset Sales.    Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), neither the Borrower nor any Subsidiary shall cause or make an Asset Sale.

Section 6.07    Restricted Payments.    Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), (x) authorize, make, declare or pay, directly or indirectly, any Dividends with respect to the Borrower or any of its Subsidiaries, (y) make any payment of principal on or redemption or acquisition for value of, or any payment of principal or redemption as a result of any asset sale, change of control or similar event of, any Junior Indebtedness (other than the Roll-Up or the prepayment of the Prepetition First Out Obligations from the proceeds of the DIP Second Funding Loans), or (z) make any Restricted Investment (all such payments and other actions set forth in Section 6.07(x) through 6.07(z) above being collectively referred to as "**Restricted Payments**"), except those Restricted Payments of the type described in the foregoing clause (y) consisting of adequate protection payments in respect of the Prepetition Secured Obligations that are expressly permitted pursuant to the DIP Orders, except that dividends by any Subsidiary to the Borrower or any Wholly Owned Subsidiary of the Borrower that is a Loan Party shall be permitted.

Section 6.08    Transactions with Affiliates.    Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with or for the benefit of, any Affiliate of the Borrower (each of the foregoing, an "**Affiliate Transaction**"), involving aggregate consideration in excess of $100,000; *provided* that the foregoing restrictions shall not apply to:

(i)    Affiliate Transactions on fair and reasonable terms that are not materially less favorable to the Borrower or the relevant Subsidiary than those that would have been

obtained in a comparable transaction by the Borrower or such Subsidiary with a Person that is not an Affiliate;

(ii)    transactions between or among the Borrower and/or any Guarantor (or, for the avoidance of doubt, an entity that becomes a Guarantor as a result of such transaction);

(iii)    (x) Restricted Payments permitted by Section 6.07 and (y) Investments in Subsidiaries that are not Loan Parties permitted by the definition of "Permitted Investments";

(iv)    the payment of reasonable and customary fees and reimbursements of expenses paid to, and indemnity provided on behalf of, officers, directors, employees or consultants of the Borrower or any Subsidiary or any Parent of the Borrower to the extent in accordance with the Budget as approved by the Bankruptcy Court;

(v)    any agreement existing on the Closing Date to the extent set forth on Schedule 6.08(d) hereto;

(vi)    payments or loans (or cancellation of loans) to officers, directors, employees or consultants that are (x) approved by a majority of the Board of Directors of the Borrower in good faith, (y) approved by an order of the Bankruptcy Court and (z) in accordance with the Budget;

(vii)    the issuance of Equity Interests (other than Disqualified Capital Stock) of the Borrower to any Person that is a Loan Party;

(viii)    the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans (x) approved by the Board of Directors of the Borrower or any Parent of the Borrower or of a Guarantor, as appropriate, in good faith, (y) approved by an order of the Bankruptcy Court and (z) in accordance with the Budget;

(ix)    any contribution to the capital of the Borrower;

(x)    transactions permitted by, and complying with, the provisions of Section 6.05; and

(xi)    any customary employment agreements entered into by the Borrower or any Guarantor in the ordinary course of business and consistent with the Budget.

Section 6.09    <u>Use of Proceeds</u>.  Directly or indirectly, use the proceeds of any Loan in a manner that would not comply with Section 3.12 or any other provision of this Agreement.

Section 6.10    <u>Limitation on Certain Restrictions on Subsidiaries</u>.  Directly or indirectly, create or otherwise cause or suffer to exist or become effective any contractual encumbrance or contractual restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its Capital Stock or any other interest or participation in its profits owned by the

Borrower or any Subsidiary, or pay any Indebtedness owed to the Borrower or a Subsidiary, (b) make loans or advances to the Borrower or any Subsidiary or (c) transfer any of its properties to the Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement, the Loan Documents, and the Prepetition Debt Documents as in effect on the Closing Date and to the extent rendered ineffective as a result of the Cases; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any commercial agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted under this Agreement restricting the transfer of the property subject thereto; (vi) [reserved]; (vii) [reserved]; (viii) [reserved]; or (ix) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business.

Section 6.11    <u>Limitation on Issuance of Capital Stock</u>.    Issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest in any Subsidiary.  This Section 6.11 shall not prohibit:

(a)    issuances of Equity Interests for stock splits, stock dividends, and additional issuances of Equity Interests that do not decrease the percentage ownership of the Borrower or any of its Subsidiaries in any class of the Equity Interests of such Subsidiary;

(b)    issuances of Equity Interests by Subsidiaries of the Borrower formed or that become Subsidiaries after the Closing Date in accordance with this Agreement (including Section 6.06 and Section 6.05) to the Borrower or any Subsidiary of the Borrower that is to own such Equity Interests;

(c)    [reserved]; and

(d)    issuances of Equity Interests to the Borrower or any of its Guarantors.

Section 6.12    <u>Business</u>.  With respect to the Borrower and the Subsidiaries, engage in any business other than a Permitted Business.

Section 6.13    <u>Budget Variance</u>.  In any Testing Period, permit (or otherwise allow to exist) any Variance that is not a Permitted Variance.

Section 6.14    <u>Communications Licenses</u>.  Operate its businesses other than in accordance with Communications Laws and the terms and conditions of the Communications Licenses and the One Dot Six Lease, except for instances of non-compliance that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the Borrower and its Subsidiaries and their businesses.

Section 6.15    <u>Deposit Accounts; DIP Loan Proceeds Account</u>.  Establish or maintain a Deposit Account or Securities Account in contravention of the Cash Management Orders, or hold any proceeds of the Loans in any account other than the DIP Loan Proceeds Account, pending application thereof in accordance with this agreement.

Section 6.16   <u>No Non-Loan Party Subsidiaries</u>.   Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), form, acquire or otherwise permit to exist any Subsidiary that is not a Subsidiary Guarantor.

Section 6.17   <u>Additional Bankruptcy Matters</u>.

(a)   assert, join, support or prosecute any claim or cause of action against any of the Lenders or other Secured Parties in their capacities as such, unless such claim or cause of action is in connection with the enforcement of explicit rights under this Agreement;

(b)   object to, contest, delay, prevent or interfere with in any manner the exercise of rights and remedies by the Agents or the Lenders with respect to the Collateral following the occurrence, and during the continuance, of an Event of Default; *provided*, that any Loan Party may contest or dispute whether an Event of Default has occurred in accordance with the terms of the DIP Orders;

(c)   until payment in full in cash of the Obligations under this Agreement (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted), except for and to the extent permitted under the Carve-Out, the AST Break-Up Fee (if any) or the Administration Charge, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be, of the Collateral Agent and the other Secured Parties against the Loan Parties hereunder or under the DIP Orders or DIP Recognition Orders, or apply to the Bankruptcy Court or CCAA Court for authority to do so;

(d)   directly or indirectly (i) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim DIP Order or the Final DIP Order or the Cash Management Order or the DIP Recognition Orders except for any modifications and amendments agreed to in writing by the Required Lenders in their sole discretion, (ii) apply to (or support, directly or indirectly, any application by any other party to) the Bankruptcy Court or CCAA Court for authority to take any action prohibited by this Section 6.17 (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the Required Lenders and such consent is provided) or (iii) seek authorization for or permit the existence of, any claims other than that of the Lenders entitled to a superpriority claim under Section 364(c)(1) of the Bankruptcy Code that is senior or pari passu with the Lenders' Section 364(c)(1) claim;

(e)   make or commit to make payments to holders of "claims" (as defined in section 101(5) of the Bankruptcy Code) against a Loan Party in respect of prepetition amounts in excess of the line item amount for such claims included in the Approved Budget (within Permitted Variances), other than the Roll-Up, adequate protection, and payments of such claims that are approved in writing by the Required Lenders;

(f)   return any inventory or other property to any vendor pursuant to section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with section 546(g) of the Bankruptcy Code upon prior notice to the Administrative Agent or unless otherwise consented to by the Required Lenders;

(g)        (i) make payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court after notice and hearing, (B) are expressly permitted by the terms of the Loan Documents and in accordance with the Budget, and (C) as approved in writing by the Administrative Agent or otherwise consented to by the Required Lenders, and/or (ii)(A) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (B) pay or cause to be paid any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business and in accordance with the Budget or otherwise permitted or consented to in accordance with the terms of the Loan Documents;

(h)        propose to the Bankruptcy Court a sale of all or substantially all of the Collateral, without the prior written consent of the Required Lenders;

(i)        assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(i)        avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders or DIP Recognition Orders), disallowing, or otherwise challenging (under sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, the Obligations, the Liens granted under any Loan Document, the Prepetition Secured Obligations or the Prepetition Debt Documents; or reversing, modifying, amending, staying or vacating the DIP Orders or DIP Recognition Orders, without the prior written consent of the Required Lenders;

(ii)        granting priority for any administrative expense, secured claim or unsecured claim against Borrower or any of the Guarantors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of Administrative Agent and the Lenders in respect of the Obligations, except as provided under the Carve-Out, the AST Break-Up Fee (if any) or the Administration Charge or to the extent expressly permitted under the DIP Orders or DIP Recognition Orders; or

(iii)    permitting the use of cash collateral as defined in section 363 of the Bankruptcy Code, except as expressly permitted by the (x) DIP Orders, (y) the Budget or (z) this Agreement; or

(j)    without the prior written consent of the Required Lenders, seek or consent to any order (i) dismissing the Cases under sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (ii) converting the Cases to a case under chapter 7 of the Bankruptcy Code; (iii) appointing a chapter 11 trustee in the Case; (iv) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in the Cases; or (v) granting a change of venue with respect to the Cases or any related adversary proceeding.

Section 6.18    <u>Compliance with Budget</u>.  Unless explicitly consented to by the Required Ad Hoc Holders in writing (delivered to the Borrower and the Administrative Agent), (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Orders and the Budget (subject to the Permitted Variance), (ii) permit a disbursement causing any Variance other than a Permitted Variance without the prior written consent of the Required Ad Hoc Holders, (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or Indebtedness arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and consented to by the Required Ad Hoc Holders or (iv) incur any expense or make any disbursement, in each case other than as set forth in the Budget.

Section 6.19    <u>Use of Collateral</u>.  Use Collateral, proceeds of Loans, any portion of the Carve-Out or any other amounts directly or indirectly:

(a)    to seek authorization to obtain Liens or security interests that are senior to, or on a parity with, the Liens granted under the Loan Documents or the DIP Superpriority Claims other than in connection with any replacement debtor-in-possession financing that will pay the Obligations in "full" in cash;

(b)    to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, against any Agent, the Lenders, the other Secured Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any avoidance actions or causes of action under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Superpriority Claims, the Liens granted under the Loan Documents, the Loan Documents, the Prepetition Debt Documents, the Prepetition Secured Obligations or the Liens securing, or guarantees in respect of, the Prepetition Secured Obligations; (iv) any action seeking to invalidate, modify, reduce, expunge, disallow, set aside, avoid or subordinate, in whole or in part, the Obligations or the Prepetition Secured Obligations; (v) any action seeking to modify any

of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) any Agent or the Lenders hereunder or under any of the other Loan Documents or (B) the Prepetition Lenders and Holders (in each case, as applicable, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of their respective assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the DIP Orders and DIP Recognition Order); or (vi) objecting to, contesting, or interfering with, in any way, any Agent's and the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; or

(c)      in any manner that causes or might cause any Borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

Section 6.20    Use of Property; Rejection and Assumption of Contracts; Post-Filing Pleadings.  On or after the Petition Date, without the Required Ad Hoc Holders' prior written consent, file any motions or pleadings with the Bankruptcy Court (a) seeking authority for any Loan Party to (i) use any of the material properties or assets of the Loan Parties outside the ordinary course of business, (ii) satisfy prepetition claims of the Loan Parties or (iii) incur material administrative costs, in each case, to the extent such relief is inconsistent with this Agreement (including the Budget, subject to Permitted Variances), (b) seeking to reject or assume any contract, agreement, lease or other agreement to which any Loan Party is a party, or (c) seeking relief that is otherwise inconsistent with this Agreement or the DIP Orders or the DIP Recognition Orders.

Section 6.21    Restructuring Support Agreement.  Without the prior written consent of the Required Ad Hoc Holders, (i) amend, restate, amend and restate or otherwise modify the Restructuring Support Agreement, (ii) waive any of its rights thereunder or (iii) consent to any deviation from the terms thereof.

## ARTICLE 7
## GUARANTEE

Section 7.01    The Guarantee.  The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Loan Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of any Debtor Relief Law after the filing of the Cases or any other bankruptcy or insolvency petition under such Debtor Relief Law) the Loans made by the Lenders to, and the Promissory Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Loan Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will

be promptly paid in full when due (whether at extended maturity, by required prepayment, declaration, demand, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 7.02    <u>Obligations Unconditional</u>.    The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Agreement, the Promissory Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full in cash).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to any Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Promissory Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)    the release of any other Guarantor pursuant to Section 7.09.

The Guarantors hereby, to the fullest extent permitted by applicable Requirements of Law, expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Loan Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Promissory Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Loan Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively

126

be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Loan Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Loan Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Loan Secured Parties or any other Person at any time of any right or remedy against the Borrower or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto and each Guarantor hereby expressly renounces all benefit of division or discussion. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

Section 7.03    Reinstatement.  The obligations of the Guarantors under this Article 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of the Cases or any other proceedings in bankruptcy or reorganization or otherwise.

Section 7.04    Subrogation; Subordination.  Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  Any Indebtedness of any Loan Party permitted pursuant to Section 6.01(c) shall be subordinated to such Loan Party's Obligations in the manner set forth in the Intercompany Note.

Section 7.05    Remedies.  The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Promissory Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

Section 7.06    Instrument for the Payment of Money.  Each Guarantor hereby acknowledges that the guarantee in this Article 7 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a

127

dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 7.07    <u>Continuing Guarantee</u>.  The guarantee in this Article 7 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 7.08    <u>General Limitation on Guarantee Obligations</u>.  In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, the Cases or any other federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 7.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.  Without limiting the generality of the foregoing, to the extent that Section 2.06(f) or Section 10.16 shall operate to adjust any amount or rate payable by any Canadian Loan Party to any Secured Party to the maximum permissible amount or rate, as the case may be, to ensure that the Obligations of the Canadian Loan Parties do not include any amount or rate that would result in a receipt by such Secured Party of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), the Guaranteed Obligations of such Canadian Loan Party shall be deemed to be automatically limited and reduced with retroactive effect by a corresponding amount or rate, as the case may be, equal to such adjustment.

Section 7.09    <u>Release of Guarantors</u>.  If, in compliance with the terms and provisions of the Loan Documents and the DIP Orders, all or substantially all of the Equity Interests of any Subsidiary Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a Person or Persons, none of which is the Borrower or a Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.03 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Loan Security Document and the pledge of such Equity Interests to the Administrative Agent pursuant to the Loan Security Agreement or the Canadian Security Agreement, as applicable, shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are necessary to effect each release described in this Section 7.09 in accordance with the relevant provisions of the Loan Security Documents.

Section 7.10    <u>Right of Contribution</u>.  Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment.  Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04.  The provisions of this Section 7.10 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent and the

Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

Section 7.11    Post-Petition Savings Clause.    Notwithstanding anything herein to the contrary, to the extent the guaranty of the Guaranteed Obligations set forth in this Article 7 is interpreted in any Case to solely be a prepetition obligation, then such guaranty shall automatically be deemed to have been given on the Petition Date immediately after the filing of the applicable Cases.

## ARTICLE 8
## EVENTS OF DEFAULT

Section 8.01    Events of Default.    Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)    the Borrower defaults in the payment of (i) principal or premium, if any, of any Loan when due at its Stated Maturity, upon optional prepayment, upon required repayment, upon declaration of acceleration or otherwise or (ii) interest on any Loan or any fee or any other amount due hereunder or due and payable pursuant to the DIP Orders when the same becomes due and payable;

(b)    any Loan Party shall fail to perform or comply with any term or condition contained in Section 5.01, Section 5.02, Section 5.03, Section 5.07, Section 5.11, Section 5.12, Section 5.14, Section 5.16, Section 5.17, Section 5.18, Section 5.19, Section 5.20, Section 5.21, Article 6 or Section 10.03 and in the case of the failure to perform or comply with any term or condition contained in Section 5.07, such failure shall continue for a period of five (5) calendar days;

(c)    the Borrower or any Guarantor shall fail to perform or comply with any term or condition contained herein or in any Loan Document or the Restructuring Support Agreement or any DIP Order or DIP Recognition Order (other than (x) those referred to in clauses (a) or (b) above and (y) the New MIP Milestone (as defined in the Restructuring Support Agreement)) beyond any applicable cure period provided therein, and such failure shall continue unremedied for a period of five (5) Business Days after the earlier of (i) receipt by the Borrower of notice from the Administrative Agent of such default and (ii) knowledge of a Responsible Officer of any Loan Party of such default;

(d)    the Borrower or any Guarantor shall (i) fail to pay any principal or interest due in respect of any Indebtedness (other than the Obligations), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this Section 8.01(d)(ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its Stated Maturity or become subject to a mandatory offer purchase by the obligor; *provided* that it shall not constitute an Event of Default pursuant to this Section 8.01(d) unless the aggregate amount of all payments on such Indebtedness

referred to in clause (i) and the aggregate amount of Indebtedness referred to in clause (ii) exceeds $10 million at any one time; *provided* that, notwithstanding the foregoing, this clause (b) shall not apply to any Prepetition Indebtedness that is stayed as a result of the Cases;

(e)    Any representation, warranty, stipulation, certification or other statement made or deemed made by any Loan Party (or Responsible Officer thereof) in any Loan Document or any DIP Order or any statement, report or certificate delivered in connection with any Loan Document or any DIP Order shall be false in any material respects (except that such materiality qualifier shall not be applicable to any representation, warranty, stipulation, certification or other statement that is already qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof);

(f)    except for any order fixing the amount of any claim in the Cases, one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of $15.0 million shall be rendered against the Borrower or any Guarantor or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of the Borrower or any Guarantor to enforce any such judgment;

(g)    any Guarantee of a Subsidiary ceases to be in full force and effect (except as contemplated by the terms thereof) or any Guarantor that qualifies as a Subsidiary denies or disaffirms its obligations under this Agreement or any Guarantee;

(h)    following the entry of the Interim DIP Order or the Final DIP Order, as applicable, any security interest and Lien created or purported to be created by any Loan Security Document shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Loan Secured Parties, the Liens, rights, powers and privileges created or purported to be created and granted under such Loan Security Document (including a perfected Lien with the priority set forth in the Interim DIP Order or Final DIP Order (as applicable)) on all of the Collateral thereunder (except as otherwise expressly provided in such Loan Security Document and, solely with respect to priority, other than Permitted Liens (including the Carve-Out, the AST Break-Up Fee (if any) and the Administration Charge) which by operation of law are senior) in favor of the Collateral Agent, or shall be asserted by the Borrower or any Guarantor not to be a valid, perfected, Lien with the priority set forth in the Interim DIP Order or Final DIP Order (as applicable) (except as otherwise expressly provided in this Agreement or such Loan Security Document) on the Collateral covered thereby;

(i)    any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by the Borrower or any Guarantor or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or the Borrower or any Guarantor shall repudiate or deny any portion of its liability or obligation for the Obligations;

(j)    commencement of ancillary insolvency proceedings, other than the Recognition Proceedings, in applicable foreign jurisdictions with respect to any Loan Party and

the entry of applicable recognition, administrative, and substantive orders by the applicable court, in each case without prior consent of the Required Lenders or on terms not satisfactory to the Required Lenders; *provided* that no Event of Default shall occur under this Section 8.01(j) if such proceeding would not reasonably be expected to have a Material Adverse Effect or cause a material delay of the Cases;

(k)    actual or asserted (by any Loan Party) invalidity or impairment of any Loan Document (including the failure of any Liens purported to be created by any Loan Security Document or the DIP Orders or the DIP Recognition Orders on any material portion of the Collateral to remain or otherwise become perfected);

(l)    any of the following shall occur:

(i)    any of the Loan Parties shall file a pleading seeking to stay, reverse, amend, supplement, vacate or otherwise modify any of the DIP Orders or DIP Recognition Orders, unless otherwise consented to by the Required Lenders;

(ii)    the entry of an order by the Bankruptcy Court appointing an interim or permanent Chapter 11 trustee or a receiver or an examiner with enlarged powers (other than a fee or other similar examiner) or any similar or analogous order granted by the CCAA Court or any Loan Party (or any Subsidiary thereof) applies for, consents to or fails to contest in any such appointment or the Bankruptcy Court or CCAA Court shall have entered an order providing for such appointment;

(iii)    dismissal of any of the Cases or conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or dismissal of the Recognition Proceedings, or the filing of a motion or other pleading seeking such dismissal or conversion of the Cases or dismissal of the Recognition Proceedings;

(iv)    appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of any Loan Party or any Loan Party (or any Subsidiary thereof) applies for, consents to or fails to contest in any such appointment or the Bankruptcy Court or CCAA Court shall have entered an order providing for such appointment;

(v)    the entry of an order in any of the Cases denying or terminating use of Cash Collateral by the Loan Parties or imposing any additional conditions thereon;

(vi)    filing of a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay in the Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any Loan Party in excess of $250,000 in the aggregate, or to permit other actions that would have a Material Adverse Effect on the Debtors and their estates or any similar or analogous relief being sought or obtained in the Recognition Proceedings;

(vii)   the failure by the Debtors to object to any administrative claim filed in the Cases over $750,000, or the settlement by the Debtors of any claim in any amount over $100,000, without the prior written consent of the Required Ad Hoc Holders;

(viii)   entry of an order without the prior consent of Required Lenders amending, supplementing or otherwise modifying any DIP Order or DIP Recognition Order or any Loan Document, in each case in a manner adverse to any of the Agents or Lenders;

(ix)   reversal, vacation or stay of the effectiveness of any DIP Order or DIP Recognition Order;

(x)   [reserved];

(xi)   the entry of an order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders;

(xii)   the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the lenders under the Prepetition Facilities, the Agents, the Lenders or their respective rights and remedies under or related to the DIP Facility or the Prepetition Facilities in any of the Cases or inconsistent with the Loan Documents;

(xiii)   without the prior written consent of the Required Lenders, the entry of an order in any of the Cases seeking authority to use Cash Collateral or to obtain financing under Section 364 of the Bankruptcy Code;

(xiv)   [reserved];

(xv)   the consummation of any sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code, or the use of cash collateral under Section 363(c) of the Bankruptcy Code, in each case unless otherwise consented to by the Required Lenders;

(xvi)   the Loan Parties' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with the Lenders' claims under the Loan Documents, the Prepetition Debt Documents and the transactions contemplated thereby;

(xvii)   payment of or granting adequate protection with respect to prepetition debt, other than as expressly set forth in the Budget;

(xviii)   except as otherwise provided in the Interim DIP Order or the Final DIP Order, any of the Loan Parties seek or if there is entered, an order under Section

132

365 of the Bankruptcy Code rejecting a material lease (i) to which any Loan Party is a party, and (ii) that is part of (or whose premises contain any of) the Collateral;

(xix)    cessation of the Liens or the DIP Superpriority Claims to be valid, perfected and enforceable in all respects;

(xx)    the filing of any Plan, or any amendment, modification or supplement to such Plan, by any Debtor, other than an Acceptable Plan;

(xxi)    the termination or expiration of Borrower's exclusive right to file and solicit acceptances of a Plan;

(xxii)    the entry of an order confirming a Plan other than an Acceptable Plan;

(xxiii)    any Loan Party or any of its Subsidiaries shall file, seek, support (including by filing a pleading seeking or in support thereof), or otherwise consent to, or fail to contest in good faith any of the matters set forth in clauses (i) through (xxi) above; or

(xxiv)    a Change of Control shall occur;

(m)    any of the Loan Parties shall (i) use Cash Collateral or Loans for any item other than those set forth in, and in accordance with, the Budget or prepay any pre-petition debt (other than to the extent explicitly permitted herein or with the express prior written consent of the Required Ad Hoc Holders), (ii) assert any right of subrogation or contribution against any other Loan Party prior to the payment in full in cash of the Obligations and the Prepetition Secured Obligations, or (iii) permit (or otherwise allow to exist) any Variance in any Testing Period that is not a Permitted Variances (other than as approved in writing by the Required Lenders);

(n)    failure to pay, when due, any adequate protection payments to the Prepetition Lenders and Holders, to the extent approved by the Bankruptcy Court;

(o)    if a Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole;

(p)    the Loan Parties or any of their Subsidiaries shall fail to comply with the terms of the Interim DIP Order or the Final DIP Order or Interim DIP Recognition Order or Final DIP Recognition Order or any "Event of Default" thereunder shall have occurred and be continuing;

(q)    the Borrower shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Loan Parties (unless (i) in connection with an Acceptable Plan to the extent explicitly provided for in such Acceptable Plan or (ii) such sale would result in the repayment in full in cash of all Obligations and all Prepetition Secured Obligations upon consummation thereof, except as otherwise agreed to by the Required Lenders);

133

(r)    any of the following shall occur with respect to any Property of any Loan Party or any of their respective Subsidiaries with a fair market value in excess of $15.0 million in aggregate: (a) any loss, destruction or damage of such Property or (b) any actual condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property; or

(s)    the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Loan Security Documents and the Collateral (other than as may be provided for in the Recognition Proceedings);

then, and in every such event and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times:  (i) terminate forthwith the Commitments (provided, that notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, the Backstop Commitments may only be so terminated during the continuance of a Backstop Limited Event of Default) and (ii) declare the Loans and other Obligations then outstanding to be forthwith due and payable in whole or in part, whereupon the principal amount of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees, and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower and the Guarantors, notwithstanding anything contained herein or in any other Loan Document or in the DIP Orders or DIP Recognition Orders to the contrary.

Without further notice, application or order of the Bankruptcy Court, and unless otherwise ordered by the Bankruptcy Court, upon the occurrence and during the continuance of an Event of Default, and after providing not less than two (2) Business Days' advance written notice thereof, which notice may be by electronic mail, to counsel to the Debtors, the U.S. Trustee, counsel to the Information Officer, and counsel to any official committee of unsecured creditors appointed in the Cases pursuant to section 1102 of the Bankruptcy Code (the "**Committee**"), the Collateral Agent (at the direction of the Required Lenders) for the benefit of itself and the Lenders shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim DIP Order, the Final DIP Order, the DIP Recognition Orders, this Agreement or any other Loan Document, or applicable law as the Collateral Agent (at the direction of the Required Lenders) may deem appropriate in their sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of the Debtors' estates upon which the Collateral Agent, for the benefit of itself and the Lenders, has been or may hereafter be granted liens or security interests to obtain the payment in full of the Obligations.

Neither the Loan Parties, the Committee, nor any other party-in-interest shall have the right to contest the enforcement of remedies set forth in the DIP Orders, DIP Recognition Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents.  The Loan Parties shall cooperate fully with the Agents and the Lenders in their exercise of rights and remedies, whether against the Collateral or otherwise.  The Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such

relief would restrict or impair the rights and remedies of the Agents and the Lenders set forth in the DIP Orders, DIP Recognition Orders and in the Loan Documents.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other Loan Document shall have been breached by any Loan Party, then the Agents or any Lender may proceed to protect and enforce the Lenders' rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other Loan Document.  Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof.  The Agents and any Lender acting pursuant to this paragraph shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses) in accordance with Section 10.03.

Notwithstanding the foregoing, the Required Ad Hoc Holders in their sole discretion may waive (in writing) the occurrence and continuance of any Event of Default on a retroactive basis, including interest accruing at the Default Rate.

Section 8.02    Application of Proceeds.  The proceeds received by the Administrative Agent or Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent or Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Administrative Agent or Collateral Agent pursuant to this Agreement, promptly by the Administrative Agent or Collateral Agent as follows:

(a)    First, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent and the Collateral Agent and their respective agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent or the Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent are entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)    Second, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Loan Secured Parties and their agents and counsel (including Kirkland & Ellis LLP, Sidley Austin LLP, Blake, Cassels & Graydon LLP, Foley & Lardner LLP and Wiley Rein LLP) and all costs, liabilities and advances made or incurred by the other Loan Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)    Third, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, pro rata, of interest and other amounts constituting Obligations (other than principal), in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

135

(d)      *Fourth*, to the indefeasible payment in full in cash, pro rata, of the amount of the Obligations constituting principal on the Loans; *provided*, that such prepayment shall be allocated between the DIP New Money Loans and the Roll-Up Loans in accordance with Section 2.10(h) (as if such payment was a prepayment); and

(e)      *Fifth*, the balance, if any, to the Person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 8.02, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

Section 8.03    Government Approval.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, any foreclosure on, sale, transfer or other disposition of any Collateral or any other action taken or proposed to be taken hereunder that would affect the operational, voting, or other control of any Loan Party or affect the ownership of the Communications Licenses, the One Dot Six Lease or any company holding the Communications Licenses or the One Dot Six Lease shall be pursuant to the Communications Laws and, if and to the extent required thereby, subject to the prior consent of the FCC, ISED, the CRTC or any other applicable Governmental Authority.  Notwithstanding anything to the contrary contained herein, the Administrative Agent and the Lenders shall not take any action pursuant hereto or under any other Loan Document that would constitute or result in any assignment of the Communications Licenses or the One Dot Six Lease or transfer of control or voting rights of any Loan Party or any company holding the Communications Licenses or One Dot Six Lease if such assignment or transfer of control or voting rights would require, under then-existing law (including Communications Laws), the prior approval of the FCC, ISED, the CRTC or any other applicable Governmental Authority, without first obtaining such approval of the FCC, ISED, the CRTC or such other Governmental Authority.  Each Loan Party agrees to take any lawful action which the Administrative Agent may request in order to obtain and enjoy the full rights and benefits granted to the Administrative Agent and the Loan Secured Parties by this Agreement, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Loan Party's best efforts to assist in obtaining any approval of the FCC, ISED, the CRTC and any other Governmental Authority that is then required under Communications Laws or under any other law for any action or transaction contemplated by this Agreement or the other Loan Documents, including, without limitation, the sale or transfer of Collateral.  Such efforts shall include, to the extent permitted by the Communications Laws, sharing with Administrative Agent any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system, as well as any account numbers, user names and passwords for ISED's Spectrum Management System and for the CRTC's Industry Data Collection System, and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC, ISED, the CRTC or any other applicable Governmental Authority any portion of any application or applications for consent to the assignment of the Communications Licenses or transfer of control of any Loan Party required to be filed under Communications Laws for approval of any sale or transfer of Collateral and/or the Communications Licenses.

## ARTICLE 9
## THE ADMINISTRATIVE AGENT

Section 9.01    Appointment and Authority.  Each Lender hereby irrevocably appoints the Administrative Agent and Collateral Agent (together, for purposes of this Article 9, the "**Agent**") its agent, and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Interim DIP Order and the Final DIP Order (so long as such Interim DIP Order and Final DIP Order have been approved in writing (which approval may be via email) by the Required Lenders (or their counsel(s) on their behalf) as of the applicable date), each to be negotiated between the Loan Parties, the Agent, the Lenders, certain other parties and the statutory committees appointed pursuant to sections 327 and 1103 of the Bankruptcy Code.  The provisions of this Article 9 are solely for the benefit of the Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have any rights as a third-party beneficiary of any such provisions.  In performing its functions and duties hereunder, the Agent shall act solely as an agent of Lenders (or applicable Secured Party) and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Loan Party.  It is understood and agreed that the use of the term "Agent" or "agent" herein or in any other Loan Documents (or any other similar term) with reference to an Agent, is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between the contracting parties.  Without limiting the generality of the foregoing, the Agent is hereby expressly authorized to (a) execute any and all documents (including releases) with respect to the Collateral and the rights of the Loan Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Loan Security Documents and (b) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

Section 9.02    Rights of a Lender.  The institution serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender, and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder.   The Lenders acknowledge that, pursuant to such activities, any Agent (acting in capacities other than as Agent) or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent (acting in capacities other than as Agent) shall be under any obligation to provide such information to them.

Section 9.03    Exculpatory Provisions.  The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be solely administrative in nature.  Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of

Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is instructed in writing to exercise as directed in writing by the Required Lenders or the Required Ad Hoc Holders, as applicable (or such other number, percentage or composition of the Lenders as shall be necessary under the circumstances as provided in Section 10.02), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of any automatic stay under any Debtor Relief Law or any other aspect of any applicable Debtor Relief Law and (c) except as expressly set forth in the Loan Documents, the Agent shall not have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity.  The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders, or such other number or percentage of the Lenders as shall be necessary or as such Agent shall in good faith believe to be necessary under the circumstances as provided in Section 10.02, or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender in accordance with Section 10.01 hereof, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, recital, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection, or priority of Liens on the Collateral or the existence of the Collateral (for the avoidance of doubt, other than inquiries as to Collateral in an Agent's possession), or (vi) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.  The Agent will not be responsible or liable for any action taken or omitted to be taken by it hereunder or under any Loan Document, except for its own gross negligence or willful misconduct, in ease case as determined by a final, non-appealable order by a court of competent jurisdiction.  Without limiting the foregoing, except for action expressly required of the Agent hereunder or under any Loan Document, the Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless it shall receive indemnity and security satisfactory to it against any and all liability or expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake in act or law, or for anything which it may do or refrain from doing in connection herewith, in each case except for its own gross negligence or willful misconduct.  The Agent will not be required to take any action (including any action at the direction of the Required Lenders), to advance or expend any funds or otherwise incur any financial liability in the performance of its duties or the exercise of its power or rights hereunder unless it has been provided with security or indemnity reasonably satisfactory to it against any and all liability or expense which may be incurred by it by reason of taking or continuing to take such action.  For purposes of clarity, and without limiting

any rights, protections, immunities or indemnities afforded to either Agent hereunder (including without limitation this Article 9), phrases such as "satisfactory to the Agent," "approved by the Agent," "acceptable to the Agent," "as determined by the Agent," "in the Agent's discretion," "selected by the Agent," "elected by the Agent," "requested by the Agent," and phrases of similar import that authorize and permit an Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to such Agent receiving written direction from the Required Lenders or the Required Ad Hoc Holders, as applicable (or such other number, percentage or composition of the Lenders as expressly required hereunder or under the other Loan Documents) to take such action or to exercise such rights.

Section 9.04    Reliance by Agent.  The Agent shall be entitled to seek and rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Whenever in the administration of this Agreement, the Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Agent may conclusively rely upon instructions from the Required Lenders.

The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders or the Required Ad Hoc Holders, as applicable (or such greater number or different composition of Lenders as may be expressly required hereby in any instance).

Section 9.05    Delegation of Duties.  The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more subagents, attorneys, accountants, appraisers or other experts or advisors selected by it in good faith as it may reasonably require and will not be responsible for any misconduct or gross negligence on the part of any of them.  The Agent and any such subagent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such subagent and to the Related Parties of each Agent and any such subagent, and shall apply to their respective activities in connection with the syndication of the facilities hereunder as well as activities as Agent.  Notwithstanding anything herein to the contrary, with respect to each sub agent appointed by an Agent, such sub agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary.

Section 9.06    Resignation of the Agent.  Subject to the appointment and acceptance of a successor Agent as provided below, the Agent may resign at any time by notifying the Lenders

and the Borrower, and the Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and the Agent and signed by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation or receives notice of its removal, (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent which shall be a bank (or another Person (other than the Loan Parties or any Affiliate thereof) that in its ordinary course of business serves as administrative agent and collateral agent for credit facilities of this type) with an office in New York, New York, or an Affiliate of any such bank. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the Resignation Effective Date, such Agent's resignation or removal shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent, as the case may be. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The Administrative Agent fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation or removal hereunder, the provisions of this Article 9 and Section 10.03 shall continue in effect for the benefit of such retiring Agent, its subagents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Section 9.07   <u>Non-Reliance on Agent and Other Lenders</u>. Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Section 9.08   <u>Agent May File Proofs of Claim</u>.

(a)   In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any of the Debtors, the Agent (irrespective of whether the principal of any Loan or Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(i)   to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(ii)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agent and their respective agents and counsel and all other amounts due the Lenders and the Agent under Sections 2.05 and 10.03) allowed in such judicial proceeding; and

(iii)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, in the event that the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 2.05 and 10.03.    To the extent that the payment of any such compensation, expenses, disbursements and advances of the Agent and its respective agents and counsel, and any other amounts due to Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or any plan of reorganization or arrangement or otherwise.

(b)     Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding (unless such Lender explicitly directs in writing the Administrative Agent to so vote its claim).

Section 9.09    Collateral and Guarantee Matters.

(a)     The Lenders irrevocably authorize the Agent, at its option and in its sole discretion:

(i)     to release any Lien on any property granted to, or held by, the Agent under any Loan Document (x) on or after the date that the Obligations (other than contingent indemnity and expense reimbursement obligations as to which no claim has been made) have been indefeasibly paid in full in cash and the Commitments have been terminated, (y) with respect to any property that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents and the DIP Orders or (z), if approved, authorized or ratified in writing by the Required Lenders (or such other number of Lenders as shall be required hereunder); and

(ii)    to release any Subsidiary from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents and the DIP Orders.

(b)    Upon request by the Agent at any time, the Required Lenders will confirm in writing, the Agent's authority to release its interest in particular types or items of property, or to release any Subsidiary from its obligations under the Loan Documents pursuant to this Section 9.09.

(c)    The Agent shall not be responsible for, or have a duty to, ascertain or inquire into any representation or warranty regarding the existence, value or collectability of any Collateral, the existence, priority or perfection of the Collateral or the Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Section 9.10    Not Partners or Co-Venturers; Administrative Agent as Representative of the Secured Parties.

(a)    The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Administrative Agent) authorized to act for, any other Lender.  In its capacity, the Administrative Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the New York Uniform Commercial Code. Each Lender authorizes the Administrative Agent to enter into each of the Collateral Documents to which it is a party and to take all action contemplated by such documents.  To the extent there is an Administrative Agent and a Collateral Agent at such time, each Lender agrees that no Secured Party (other than the Administrative Agent and the Collateral Agent) shall have the right individually to seek to realize upon the security granted by any Collateral Document, it being understood and agreed that such rights and remedies may be exercised solely by the Administrative Agent and the Collateral Agent for the benefit of the Secured Parties upon the terms herein and the other applicable Loan Documents; *provided*, that the Administrative Agent and the Collateral Agent shall follow the written direction of the Required Lenders in respect of such rights and remedies.  In the event that any Collateral is hereafter pledged by any Person as collateral security for the Secured Obligations, the Collateral Agent is hereby authorized to execute and deliver for the benefit of the Secured Parties any Loan Documents necessary or appropriate to grant and perfect a Lien on such Collateral in favor of the Collateral Agent for the benefit of the Secured Parties.

Section 9.11    Erroneous Payments.

(a)    If the Administrative Agent notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient, a "**Payment Recipient**") that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution

or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof) (provided that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a) with respect to an Erroneous Payment unless such demand is made within five Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including such second Business Day until the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by any Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from or on behalf of any Borrower or any other Loan Party (including from the proceeds of any Collateral) for the purpose of making such Erroneous Payment.

## ARTICLE 10
## MISCELLANEOUS

Section 10.01  Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)     if to the Borrower, to it at Ligado Networks LLC, 10802 Parkridge Boulevard, Reston, VA 20191, Attention of General Counsel (E-mail: legal@ligado.com), with a copy (which shall not constitute notice) to Milbank LLP, 55 Hudson Yards, New York, NY, 10001-2163, Attention of Maya Grant and Matt Brod (E-mail: mgrant@milbank.com; mbrod@milbank.com);

(ii)     if to the Administrative Agent or Collateral Agent, to U.S. Bank Trust Company, National Association, to it at its address: U.S. Bank Trust Company, National Association Charlotte DCS Office, 214 N Tryon Street, Attn Loan Agency – 27th Floor, Charlotte, NC 28202-1078; with a copy (which shall not constitute notice) to:

(A)     the Ad Hoc Cross-Holder Group Primary Advisors;

(B)     Foley & Lardner LLP, 90 Park Avenue, 35th Floor, New York, NY 10016, Attention of Matthew An (E-mail: Matthew.an@foley.com); and

(C)     Foley & Lardner LLP, 500 Woodward Avenue, Suite 2700, Detroit, MI 48226, Attention of Jake Gordon (E-mail: jake.gordon@foley.com),

(iii)    if to the Ad Hoc Cross-Holder Group Primary Advisors to:

(A)     Kirkland & Ellis LLP, 4550 Travis Street, Dallas, TX 75205, Attention of David M. Nemecek, P.C. and H.T. Flanagan, P.C. (E-mail: david.nemecek@kirkland.com; ht.flanagan@kirkland.com),

(B)     Kirkland & Ellis LLP, 333 W. Wolf Point Plaza, Chicago, IL, 60654, Attention of Patrick J. Nash, Jr., P.C. (E-mail: patrick.nash@kirkland.com),

(C)     Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY, 10022, Attention of Brian Schartz, P.C., Derek Hunter and Alan McCormick (E-mail: brian.schartz@kirkland.com; derek.hunter@kirkland.com; alan.mccormick@kirkland.com), and

(D)     Kirkland & Ellis LLP, 555 California Street, San Francisco, CA 94104, Attention of Katie Taylor (E-mail: katie.taylor@kirkland.com),

(iv)    if to the Ad Hoc First Lien Group Primary Advisors to:

(A)     Sidley & Austin LLP, 787 Seventh Avenue, New York, NY 10019, Attention of Mark Adler (E-mail: mark.adler.com),

(B)     Sidley & Austin LLP, One South Dearborn, Chicago, IL 60603, Attention of Dennis M Twomey and Jason L. Hufendick (E-mail: dtwomey@sidley.com; jhufendick@sidley.com), and

(C)     Sidley & Austin LLP, 1999 Avenue of the Stars, 17th Floor, Los Angeles, CA 90067, Attention of Shayona Schiely (E-mail: sschiely@sidley.com),

(v)     if to Fortress Lender or Cerberus Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire, with a copy (which shall not constitute notice) to:

(A)     Kirkland & Ellis LLP, 4550 Travis Street, Dallas, TX 75205, Attention of David M. Nemecek, P.C. and H.T. Flanagan, P.C. (E-mail: david.nemecek@kirkland.com; ht.flanagan@kirkland.com),

(B)    Kirkland & Ellis LLP, 333 W. Wolf Point Plaza, Chicago, IL, 60654, Attention of Patrick J. Nash, Jr., P.C. (E-mail: patrick.nash@kirkland.com),

(C)    Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY, 10022, Attention of Brian Schartz, P.C., Derek Hunter, and Alan McCormick         (E-mail:         brian.schartz@kirkland.com; derek.hunter@kirkland.com; alan.mccormick@kirkland.com), and

(D)    Kirkland & Ellis LLP, 555 California Street, San Francisco, CA 94104, Attention of Katie Taylor (E-mail: katie.taylor@kirkland.com),

(vi)    if to any other Lender, to it at its address (or telecopy number) set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through Electronic Systems, to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by using Electronic Systems pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices pursuant to Article 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; *provided* that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d)    *Electronic Systems*.

(i)    The Borrower agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System.

(ii)    Any Electronic System used by the Administrative Agent is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "**Agent Parties**") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through an Electronic System.  "**Communications**" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System.

Section 10.02  Waivers; Amendment.

(a)    *Generally*.  No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(b)    *Required Consents*.  Subject to Sections 2.01(d)(iii), 2.01(f)(ix), 10.02(c), (d) and (e), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Guarantors and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party

or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall be effective if the effect thereof would:

(i)     extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase or extension in the Commitment of any Lender);

(ii)     except as set forth in Section 2.06(f), reduce the principal amount or premium, if any, of any Loan or reduce the rate of interest thereon (other than reduction of Default Rate pursuant to Section 2.06(b)), or reduce any fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby;

(iii)     (A) change the scheduled final maturity of any Loan (other than as set forth in the definition of "Maturity Date"), (B) postpone the date for payment or capitalization of any interest, premium or fees payable hereunder or (C) reduce the amount of, waive or excuse any such payment or accrual (other than waiver of any increase in the interest rate pursuant to Section 2.06(b)), in any case, without the written consent of each Lender directly affected thereby; *provided* that waiving or excusing, in whole or in part, any prepayment or repayment pursuant to Section 2.10(c) shall not be subject to this clause (iii);

(iv)     permit the assignment or delegation by the Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender (such consent not to be unreasonably withheld, conditioned or delayed);

(v)     [reserved];

(vi)     change Sections 2.10(h), 2.14(b), (c) or (d) or 8.02 in a manner that would alter the pro rata sharing of payments or setoffs or application of proceeds required thereby or any other provision in a manner that would alter the pro rata allocation or application of proceeds among the Lenders of payments in respect of the Loans, without the written consent of each Lender;

(vii)     change any provision of this Section 10.02(b) or Section 10.02(c) or (d) or any of the defined terms used in such Sections in a manner that would have the effect of changing the provisions of such Sections, without the written consent of each Lender directly affected thereby;

(viii)     change the percentage or any exclusion or restriction set forth in (x)(A) the definition of "Required Lenders" without the written consent of each Lender, (B) the definition of "Required Ad Hoc Holders" without the written consent of the Ad Hoc First Lien Group and the Ad Hoc Cross-Holder Group, (C) the definition of "Cerberus Lenders" without the written consent of all Cerberus Lenders (but no other Person), (D) the definition of "Fortress Lenders" without the written consent of all Fortress Lenders (but no other Person) or (y) any other

147

provision of any Loan Document (including this Section) specifying the number or percentage of Lenders (including without limitation the Required Lenders and the Required Ad Hoc Holders) required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender;

(ix)　　[reserved];

(x)　　[reserved];

(xi)　　modify Section 2.10(g) or (h), without the written consent of each Lender adversely affected thereunder;

(xii)　　change or waive any provision of Article 9 as the same applies to the Administrative Agent, or any other provision hereof as the same applies to the rights or obligations of the Administrative Agent, in each case without the written consent of the Administrative Agent; or

(xiii)　　change or waive the definition of Permitted Holders, without the written consent of each Permitted Holder that is a party hereto.

Notwithstanding anything to the contrary herein, any Loan Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by the Borrower and the Administrative Agent (without the consent of any Lender) solely to cure any manifest mistake, defect or error or to grant a new Lien for the benefit of the Loan Secured Parties or extend an existing Lien over additional property.

(c)　　*Collateral*.  Without the consent of any other Person, the applicable Loan Party or Loan Parties, the Administrative Agent and/or the Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Loan Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Loan Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)　　*Incremental Amendments.*  Notwithstanding anything in this Agreement or any other Loan Document to the contrary (including, without limitation, the foregoing provisions of this Section 10.02), with the written consent of the Required Lenders this Agreement and the other Loan Documents may be amended to effect an Increase Joinder (and the corresponding Incremental Facility) pursuant to Section 2.18 (and the Required Lenders and the Borrower may effect such amendments to this Agreement and the other Loan Documents without the consent of any other party, as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the terms of any such Increase Joinder (and the corresponding Incremental Facility)).

Section 10.03  Expenses; Indemnity; Damage Waiver.

(a)     The Borrower and each Guarantor agrees to jointly and severally pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Collateral Agent and/or any Lenders (including for any DIP Secured Party Advisors) in connection with (i) the negotiation, preparation, execution, delivery and administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made, (ii) the creation, perfection or protection of the Liens under the Loan Documents (including all reasonable search, filings and recording fees, expenses, stamp, documentary or similar taxes, and title insurance premiums) and (iii) the Cases and any other legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the Loan Documents.  The Borrower shall pay all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and the Collateral Agent and the Lenders in connection with the enforcement or protection of its rights in connection with this Agreement, including enforcement of this Section 10.03, and the Loans hereunder, including all reasonable and documented out-of-pocket expenses incurred by each of the Administrative Agent, the Collateral Agent and the Lenders during any workout, restructuring or negotiations in respect of such Loans in connection with such enforcement or protection of rights (but excluding fees and expenses of financial advisors and other similar professionals); *provided* that the reimbursement of any fees, charges or disbursements of counsel shall be limited to one counsel to the Administrative Agent, one counsel to the Collateral Agent and no more than two firms of counsel to the Lenders (which counsel shall be designated by the Administrative Agent or the Required Lenders, as applicable (and in the case of the Lenders shall initially be Kirkland & Ellis LLP and Sidley Austin LLP)) (and (x) appropriate local counsel in applicable local jurisdictions, but limited to one local counsel for the Administrative Agent, one local counsel for the Collateral Agent and one counsel to the Lenders, in each such jurisdiction (which counsel shall be designated by the Administrative Agent or the Required Lenders, as applicable), (y) regulatory counsel, limited to one local counsel for the Administrative Agent, one local counsel for the Collateral Agent and one counsel to the Lenders, in each such jurisdiction (which counsel shall be designated by the Administrative Agent or the Required Lenders, as applicable) and (z) solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction or regulatory counsel for the Administrative Agent and one additional counsel in each relevant jurisdiction or regulatory counsel for each group of similarly situated Lenders).

(b)     The Borrower and each Guarantor shall jointly and severally indemnify the Administrative Agent, Collateral Agent and each Lender, each Backstop Lender (including, other than in the case of subclause (v) below, as a Prepetition Lender and Holder) and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all actual losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of one counsel for all Indemnitees, taken as a whole (which counsel shall be designated by Indemnitees holding a majority of the aggregate principal amount of Loans held by all Indemnitees) (and one additional counsel for each of the Administrative Agent and the Collateral Agent) (and solely in the case of a conflict of interest, one additional counsel for all similarly situated Indemnitees, taken as a whole (which counsel shall be selected by similarly situated Indemnitees holding a majority of the aggregate principal amount of Loans held by all similarly situated Indemnitees)), incurred by or asserted

against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, including enforcement of this Section 10.03, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on, at, in or from any property owned, leased, licensed or operated by the Borrower or any of its Subsidiaries, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto or (v) the Cases, the Recognition Proceedings, or any related cases in any other jurisdiction; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith, willful misconduct or a material breach of the obligations under Section 2.01 or Section 2.02 by such Indemnitee and (y) to the extent arising from any dispute solely among Indemnitees other than (i) any claims against the Administrative Agent and/or the Collateral Agent acting in such capacity or in fulfilling such role or any similar role under this Agreement and (ii) any claims arising out of any act or omission on the part of the Borrower or its Subsidiaries. This Section 10.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims or damages arising from any non-Tax claim.

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or Collateral Agent, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or Collateral Agent in its capacity as such.

(d)    To the extent permitted by applicable law, no party hereto shall assert, and each such party hereby waives, any claim against any other party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof; *provided* that, nothing in this clause (d) shall relieve the Borrower of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(e)    All amounts due under this Section 10.03 shall be payable promptly after written demand therefor.

Section 10.04 <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its

rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower or any other Loan Party without such consent shall be null and void) and (ii) no Lender may consummate any Transfer of Loans or any of its rights or obligations hereunder except in accordance with this Section 10.04. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)  Subject to the conditions set forth in Section 10.04(b)(ii), any Lender may assign to a Lender, an Affiliate of a Lender, a Participant or any other Person that is an Eligible Assignee (and any attempted assignment or transfer to a Person that is not an Eligible Assignee shall be null and void) all or a portion of its rights and obligations under this Agreement as a Lender (including all or a portion of its Commitments and Loans at the time owing to it), in each case (other than any assignment consummated pursuant to the Syndication Transactions), with the prior written consent of:

(A)    solely in respect of assignments or transfers of Backstop Incremental Commitments,

(1)    to the extent such assignment is to an Affiliate and/or Approved Fund of a Backstop Incremental Lender (which Affiliate or Approved Fund is not a Backstop Incremental Lender), the Borrower (such consent not to be unreasonably withheld, conditioned or delayed, it being acknowledged and agreed that the only basis for the Borrower to reasonably withhold, condition or delay consent is if the Borrower reasonably and in good faith has concerns about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental Funding Date); provided that no consent shall be required from the Borrower pursuant to this Section 10.04(b)(i)(A)(1) (x) to the extent that the applicable assignor of Backstop Incremental Commitments agrees in writing in the applicable Assignment and Assumption to remain jointly and severally liable to fulfill its obligations to provide its Backstop Incremental Commitments and to fund its Backstop Incremental Loans in the amount and at the time required under this Agreement or (y) upon the occurrence and during the continuation of a Backstop Limited Event of Default; provided, further, that the Borrower shall be deemed to have consented thereto unless it shall have expressed to the Administrative Agent in writing that it is reasonably withholding, conditioning or delaying its consent to such assignment (it being acknowledged and agreed that the only basis for the Borrower to reasonably withhold, condition or delay consent is if the Borrower reasonably and in good faith has concerns about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental

Funding Date) within ten (10) Business Days after having received notice thereof; and

(2)     to the extent such assignment is to a Person other than a Backstop Incremental Lender and/or an Affiliate and/or Approved Fund of a Backstop Incremental Lender, the Borrower (such consent not to be unreasonably withheld, conditioned or delayed, it being acknowledged and agreed that the only basis for the Borrower to reasonably withhold, condition or delay consent is if the Borrower reasonably and in good faith has concerns about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental Funding Date); provided that no consent shall be required from the Borrower pursuant to this Section 10.04(b)(i)(A)(2) (x) to the extent that the applicable assignee has an Investment Grade Rating for its long-term unsecured and non-credit-enhanced debt obligations as of the effective date of the applicable Assignment and Assumption or (y) upon the occurrence and during the continuation of a Backstop Limited Event of Default; provided, further, that the Borrower shall be deemed to have consented thereto unless it shall have expressed to the Administrative Agent in writing that it is reasonably withholding, conditioning or delaying its consent to such assignment (it being acknowledged and agreed that the only basis for the Borrower to reasonably withhold, condition or delay consent is if the Borrower reasonably and in good faith has concerns about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental Funding Date) within ten (10) Business Days after having received notice thereof; and

(3)     to the extent such assignment is to a Disqualified Company, the Borrower; provided that no consent shall be required from the Borrower pursuant to this Section 10.04(b)(i)(A)(3) upon the occurrence and during the continuation of a Backstop Limited Event of Default; and

(B)     the Administrative Agent, which consent shall not be unreasonably withheld, conditioned or delayed; provided that with respect to any assignment by a Lender to an Affiliate of such Lender or an Approved Fund of such Lender, such consent shall be deemed given so long as both parties to the assignment have complied with the other provisions set forth herein and the Administrative Agent has completed "know-your-customer" and other verifications required by law with respect to the assignee.

(ii)     Any such assignments (which, for the avoidance of doubt, shall not include any assignment consummated pursuant to the Syndication Transactions) shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's applicable Commitment or Loans, the amount of the applicable Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000; *provided* that simultaneous assignments by, or to, two or more Approved Funds shall be combined for purposes of determining whether the minimum assignment requirement is met;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall (A) execute and deliver to the Administrative Agent and the Borrower an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, in each case, together with a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent);

(D)     the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and the Borrower an Administrative Questionnaire in which the assignee designates one or more contacts (as defined in the Administrative Questionnaire) to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws and all applicable tax forms;

(E)     the Assignment and Assumption will include a representation from the assignee thereunder that such assignee is an Eligible Assignee;

(F)     no assignment may be made prior to the DIP Second Funding Date other than an assignment by a Lender to an Affiliate of such Lender or an Approved Fund of such Lender unless waived by the Required Ad Hoc Holders in their sole discretion;

153

(G)     [reserved]; and

(H)     for the avoidance of doubt, no Loans or Commitments may be assigned to the Borrower or any of its Subsidiaries, any Affiliate of the Borrower, or to any natural Person (or a holding company, investment vehicle or trust for, owned and operated for the primary benefit of a natural Person).

Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender or any Participant or potential Participant is an Eligible Assignee, the Administrative Agent shall have no liability with respect to any assignment made to a Person that is not an Eligible Assignee and the Administrative Agent shall have no responsibility or obligation with respect to provisions concerning Affiliate Lenders, including without limitation Section 10.04(b)(ii)(F).  Any assigning Lender shall, in connection with any potential assignment, provide to the Borrower a copy of its request (including the name of the prospective assignee) concurrently with its delivery of the same request to the Administrative Agent irrespective of whether or not an Event of Default has occurred and is continuing.

(iii)     Subject to acceptance and recording thereof pursuant to Section 10.04(b)(iv), from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.12, Section 2.15 and Section 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Any assignment or transfer by a Lender of rights or obligations under this Agreement as a Lender that does not comply with this Section 10.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.04(c), to the extent such participation is permitted by Section 10.04(c).

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in Section 10.04(b) and any written consent to such assignment required by Section 10.04(b) and any applicable tax forms, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; *provided* that if either the assigning Lender or the assignee shall have failed to make any payment required to be made by it pursuant to, Section 2.02(b), Section 2.14(d) or Section 10.03(c), the Administrative Agent shall have no obligation to accept such Assignment and Assumption and record the information therein in the Register unless and until such payment shall have been made in full, together with all accrued interest thereon; *provided*, further, that in the case of any assignment consummated pursuant to the Syndication Transactions the Administrative Agent shall accept such assignments, and record the applicable information in respect thereof, upon the consummation thereof in accordance with Section 2.01(f).  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     Any Lender may sell participations to one or more banks or other entities that are Eligible Assignees and not the Borrower, Subsidiaries or other Affiliates of the Borrower (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement with respect to Loans and/or related Commitments; (B) such Lender's obligations under this Agreement shall remain unchanged; (C) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; (D) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement; and (E) no participations may be sold or otherwise transferred to any Person that is not an Eligible Assignee.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement, in each case, to the extent provided for herein; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant (such consent not to be unreasonably withheld, conditioned or delayed), agree to any amendment, modification or waiver (1) described in clause (i), (ii), (iii) or (v) of the first proviso to Section 10.02(b) and (2) that directly affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Section 2.12 and Section 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; *provided* that such Participant (A) agrees to be subject to the provisions of Section 2.16 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 2.12 or Section 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.16 with respect to any

155

Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.14(d) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the Proposed United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to any Person (other than a natural Person) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.04 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     Without limiting the prohibitions in this Agreement on the Borrower, Subsidiaries or Affiliates of a Borrower becoming a Lender hereunder, Affiliate Lenders shall be excluded from (a) attending (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any Lender and (b) receiving any information or material prepared by Administrative Agent or any Lender or any communication by or among the Administrative Agent and/or one or more Lenders.

Section 10.05  <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of (including all amounts Paid in Kind that have been added to the principal amount) or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 2.12, Section 2.15 and Section 10.03 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.06  <u>Counterparts; Integration; Effectiveness</u>.

(a)    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)    Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf.  or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.07  <u>Severability</u>.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08  <u>Right of Setoff</u>.

Subject to the DIP Orders and solely with respect to the Canadian Collateral, the DIP Recognition Orders, if an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any

such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.09  Governing Law; Jurisdiction; Consent to Service of Process.

(a)     This Agreement shall be construed in accordance with and governed by the law of the State of New York and, to the extent applicable, the Bankruptcy Code, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)     The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, the Supreme Court of the State of New York sitting in New York County, Borough of Manhattan, and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against the Borrower or its properties in the courts of any jurisdiction.

The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     Each party to this Agreement irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document in the manner provided for notices in Section 10.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.10  Waiver of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN

INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11 <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.12 <u>Treatment of Certain Information; Confidentiality</u>.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' current and prospective investors, directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, or otherwise relating to the Cases, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of, or any prospective assignee of, any of its rights or obligations under this Agreement (and in each case such assignees' or prospective assignees' (and their respective Affiliates') current and prospective investors) or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower or (i) on a confidential basis to (x) any rating agency in connection with rating the Borrower or its Subsidiaries or the Loans hereunder or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the facilities or any market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent in connection with the administration, settlement and management of this Agreement and the Loan Documents.  For the purposes of this Section, "**Information**" means all information received from the Borrower or any of its Subsidiaries, the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any of its Subsidiaries; *provided* that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 10.13 <u>Material Non-Public Information</u>.

(a)     EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 10.12 FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE

BORROWER AND ITS RELATED PARTIES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(b)     ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW.

Section 10.14  Authorization to Distribute Certain Materials to Public-Siders.

(a)     None of the Loan Parties currently has any publicly traded securities outstanding (including, but not limited to, 144A Securities, commercial paper notes or American Depositary Receipts); *provided* that the Borrower agrees that if any of the Loan Parties issues any publicly traded securities at a future date, any of the information in the Loan Documents and the Financial Statements to be furnished pursuant to Section 5.01(a) or (b), to the extent then material, will be publicly disclosed or set forth in the related prospectus or other offering document for such issuance.

(b)     The Borrower hereby authorizes the Administrative Agent to distribute the execution versions of the Loan Documents to the Lenders and Financial Statements to all Lenders, including their Public-Siders who indicate that they would not wish to receive information that would be deemed to be material non-public information within the meaning of the United States federal and state securities laws if the Companies had publicly-traded securities outstanding.

(c)     If the Borrower issues any 144A Securities during the term of this Agreement and its Financial Statements are not filed with the Securities and Exchange Commission, the Borrower (i) agrees to deliver to the Administrative Agent, and authorizes their posting by the Administrative Agent to the public-side view site of any applicable agency website, the Financial Statements and (ii) represents, warrants and agrees that the Financial Statements will not constitute information that, upon disclosure to Public-Siders, would restrict them or their firms from purchasing or selling any of the 144A Securities under United States federal and state securities laws. The Borrower further agrees to clearly label such Financial Statements with a notice stating: "Confidential Financial Statements provided to 144A Holders" before delivering them to the Administrative Agent.

(d)     The Borrower acknowledges its understanding that Public-Siders and their firms may be trading in any of the Loan Parties' respective securities while in possession of the

materials, documents and information distributed to them pursuant to the authorizations made herein.

Section 10.15 <u>USA PATRIOT Act Notice and Customer Verification</u>.  Each Lender that is subject to the requirements of the USA PATRIOT Act and the Administrative Agent hereby notifies the Borrower that pursuant to the requirements of the Act and/or the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide (a) to the extent the Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), a customary certification for the Borrower regarding beneficial ownership in relation to the Borrower, in form and substance satisfactory to Administrative Agent and the Lenders and (b) all other documentation and other information that the Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 10.16 <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, subject to sections 2.06(f) and 7.08, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.17 <u>Obligations Absolute</u>.  To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)    any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)    any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)     any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)     any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

Section 10.18  <u>AML Legislation</u>.

(a)     The Borrower acknowledges that, pursuant to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" laws, whether within Canada or else-where (collectively, including any guidelines or orders thereunder, "**AML Legislation**"), the Loan Secured Parties or any future assignee of a Loan Secured Party may be required, now or hereafter, to obtain, verify and record information regarding the Borrower, its directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Borrower, and the transactions contemplated hereby.  The Borrower shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Loan Secured Party or the Administrative Agent, or any prospective or future assign or participant of a Loan Secured Party, in order to comply with any applicable AML Legislation, whether now or hereafter in existence.

(b)     If the Administrative Agent has ascertained the identity of the Borrower or any authorized signatories of the Borrower for the purposes of applicable AML Legislation, then the Administrative Agent:

(i)     shall be deemed to have done so as an agent for each Loan Secured Party (or any future assignee of a Loan Secured Party), and this Agreement shall constitute a "written agreement" in such regard between each Loan Secured Party (or any future assignee of a Loan Secured Party) and the Administrative Agent within the meaning of applicable AML Legislation; and

(ii)     shall provide to each Loan Secured Party (or any future assignee of a Loan Secured Party) copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness.

Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Loan Secured Parties agrees that the Administrative Agent has no obligation to ascertain the identity of the Borrower or any authorized signatories of the Borrower on behalf of any Loan Secured Party or any future assignee of a Loan Secured Party, or to confirm the completeness or accuracy of any information it obtains from the Borrower or any such authorized signatory in doing so.

Section 10.19  <u>[Reserved]</u>.

Section 10.20 <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 10.21 <u>Acknowledgement Regarding Any Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for hedge agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and

rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a defaulting lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)     As used in this Section 10.21, the following terms have the following meanings:

(i)     "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

(ii)     "Covered Entity" means any of the following:

(A)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(B)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(C)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(iii)     "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(iv)     "QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

Section 10.22 <u>DIP Secured Party Advisors</u>.  The Loan Parties acknowledge and agree that (i) Administrative Agent and the Lenders shall each be entitled to retain or continue to retain the DIP Secured Party Advisors and (ii) the Loan Parties shall pay all reasonable and documented fees and expenses of such DIP Secured Party Advisors and all such fees and expenses shall constitute Obligations and be secured by the Collateral.

Section 10.23 <u>Validity of Loan Documents</u>.  The provisions of this Agreement, the other Loan Documents, and all Liens and DIP Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in any Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Administrative

Agent and the Lenders and their respective assigns, transferees and endorsees. The Liens and DIP Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens or DIP Liens under applicable law.

Section 10.24 <u>Acceptable Plan</u>. Notwithstanding anything to the contrary herein (including in Section 10.02), (i) no Lender shall object to the treatment of their Obligations upon emergence by the Loan Parties from the Cases to the extent such treatment is in accordance with an Acceptable Plan and each Lender hereby agrees to accept such treatment and (ii) each Lender shall execute and deliver (and direct the Administrative Agent and Collateral Agent to execute and deliver) any applicable Acceptable Plan Definitive Documentation in accordance with the applicable Acceptable Plan.

Section 10.25 <u>Financial Accommodation Acknowledgement</u>. The Borrower and each other Loan Party hereby acknowledges and agrees that this Agreement, the other Loan Documents and any certificate, document or other agreement delivered in connection therewith, constitute "financial accommodations" (as such term is used in Section 365(c) of the Bankruptcy Code) to or for the benefit of the Loan Parties as debtors in possession.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

LIGADO NETWORKS LLC,
as Borrower

By: _____
     Name:
     Title:

<u>SUBSIDIARY GUARANTORS</u>

ATC TECHNOLOGIES, LLC,
LIGADO NETWORKS INC.  OF VIRGINIA,
LIGADO NETWORKS BUILD LLC,
LIGADO NETWORKS SUBSIDIARY LLC,
ONE DOT SIX LLC,
ONE DOT SIX TVCC LLC,
LIGADO NETWORKS FINANCE LLC
LIGADO NETWORKS CORP.,
LIGADO NETWORKS (CANADA) INC.,
LIGADO NETWORKS HOLDINGS (CANADA) INC.,
each as a Subsidiary Guarantor

By: _____
     Name:
     Title:

<u>ADMINISTRATIVE AGENT</u>

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,
as Administrative Agent

By: _____
     Name:
     Title:

LENDERS

[●]

By: _____
     Name:
     Title:

ANNEX B

**<u>Approval Order</u>**

[Attached.]

**Exhibit 2**

**Letter Agreement**

**Ligado Networks LLC**
**10802 Parkridge Blvd.**
**Reston, VA 20191**

September 17, 2025

AST & Science, LLC
Midland Intl. Air & Space Port
2901 Enterprise Lane
Midland, TX 79706

<u>Re: Letter Agreement and AST Power of Attorney</u>

Ladies and Gentlemen:

**WHEREAS, FIRST**, reference is made to (i) the *Order (I) Authorizing the Debtors to Enter Into the AST Definitive Documents and (II) Granting Related Relief*, dated June 23, 2025 (Dkt. No. 692 of Bankr. D. Del. Case No. 25-10006 (TMH)) (the "<u>AST Definitive Documents Order</u>"), which authorized the entry by the Ligado Parties (as defined below) into the commercial agreements (collectively, the "<u>AST Definitive Documents</u>") executed by Ligado Networks LLC, a Delaware limited liability company ("<u>Ligado</u>") and  Ligado Networks (Canada) Inc., an Ontario corporation ("<u>Ligado Canada</u>", and together with Ligado, the "<u>Ligado Parties</u>" and each a "<u>Ligado Party</u>") and AST SpaceMobile, Inc. ("<u>AST Parent</u>"), AST & Science, LLC ("<u>AST</u>") and Spectrum USA I, LLC ("<u>SpectrumCo</u>", together with AST Parent and AST, the "<u>AST Parties</u>" and, the AST Parties together with the Ligado Parties, the "<u>Parties</u>"); (ii) that certain mediated agreement approved by the U.S. Bankruptcy Court on June 23, 2025 and annexed as **<u>Exhibit 1</u>** to the AST Definitive Documents Order, between, among others, the Ligado Parties and the AST Parties (the "<u>Mediated Agreement</u>"); and (iii) that certain Amendment No. 1 to Senior Secured Super-Priority Debtor-in-Possession Loan Agreement (the "<u>Backstop Facility Amendment</u>") dated as of September 17, 2025 with respect to that certain Senior Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of January 5, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "<u>Existing Loan Agreement</u>", and as further amended by the Backstop Facility Amendment, the "<u>Amended Loan Agreement</u>"), among Ligado, the Subsidiary Guarantors, each as a Guarantor thereunder and a debtor and a debtor in possession under Chapter 11 of the Bankruptcy Code, the Lenders party thereto from time to time and U.S. Bank Trust Company, National Association, as administrative agent for the Lenders (including its successors and assigns, in such capacities, the "<u>Administrative Agent</u>"). Capitalized terms used herein but not defined herein shall have the meanings given to such terms in the Backstop Facility Amendment (including the Amended Loan Agreement attached thereto).

**WHEREAS, SECOND**, pursuant to the AST Definitive Documents and the Mediated Agreement, the Ligado Parties are required to grant to the AST Parties a power of attorney in

connection with the Backstop Commitment evidenced by the Backstop Facility Amendment, which power of attorney shall provide, among other things, that, upon an Approval Condition Failure (as defined in the Strategic Collaboration and Spectrum Usage Agreement between certain of the Parties) and the subsequent failure of Ligado to submit a Borrowing Request in accordance with the Backstop Facility Amendment (a "Funding Request Failure"), AST shall be entitled to exercise the power of attorney to submit a draw request under the Amended Loan Agreement on behalf of the Ligado Parties and direct such payment to be made directly to AST in satisfaction of Ligado's obligation to pay the Refund Amount to AST.

**WHEREAS, THIRD**, Section 9 of the Mediated Agreement provides that if an Approval Condition Failure shall occur, then:

(a)    The Ligado Parties shall automatically, and without the necessity of any further act or instrument or notice, be obligated to pay AST immediately the Refund Amount.

(b)    The Ligado Parties shall immediately submit a draw request under the Amended Loan Agreement in an amount equal to the Refund Amount and direct such payment to be made directly to AST; and if the Ligado Parties shall fail to do so, then AST shall be entitled to exercise its rights under a power of attorney in connection with the Amended Loan Agreement and shall be entitled to exercise the power of attorney to submit a draw request under the Amended Loan Agreement on behalf of the Ligado Parties in the amount of the Refund Amount and direct such payment to be made directly to AST in satisfaction of the Ligado Parties' obligation to pay the Refund Amount to AST.

(c)    Provided that the conditions for draw under the Amended Loan Agreement are satisfied, the Backstop Incremental Lenders shall fund the draw request, the proceeds of which shall be immediately and solely used to pay AST the Refund Amount

**WHEREAS, FOURTH**, the Parties agree that any amounts recovered by AST in connection herewith shall be for the sole and exclusive benefit of AST and shall be retained by AST.

For and in consideration of the mutual promises made herein and under the AST Definitive Documents and the Mediated Agreement, and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties, intending to be legally bound, agree as follows:

1.    Power of Attorney Concerning Borrowing Request. Ligado hereby grants AST an irrevocable power of attorney coupled with an interest and irrevocably appoints AST (or any wholly-owned subsidiary of AST designated in writing by AST on or after the date hereof) as Ligado's attorney-in-fact, with full authority in the place and stead of Ligado and in the name of Ligado or otherwise, in its discretion, to take any action upon the occurrence of a Funding Request Failure and to execute any agreements, contracts, documents, instruments or other records that

AST (or any such subsidiary) may deem necessary or advisable upon the occurrence of a Funding Request Failure to cause the funding of the Backstop Incremental Loans pursuant to the Backstop Facility Amendment, including, without limitation to submit to the Administrative Agent a Borrowing Request, which Borrowing Request shall provide direction to fund the proceeds of the Backstop Incremental Loans directly to AST (or a subsidiary thereof to the extent designated in writing in such Borrowing Request and in compliance with the Backstop Facility Amendment), and any other documentation or agreement as may be required to satisfy the conditions to funding under the Backstop Facility Amendment.

2.  <u>Acknowledgement of Administrative Expense Claim</u>. Ligado hereby acknowledges and agrees that any claim of the AST Parties in respect of the Refund Amount shall have the status of an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b) and 507(b) of title 11 of the United States Code.

3.  <u>Agreements Regarding Consent to Assignment of Backstop Incremental Commitments</u>. Ligado hereby acknowledges and agrees that:

(a)  Ligado shall notify AST within one (1) Business Day of Ligado's receipt of a request for consent by a Backstop Incremental Lender to transfer or assign all or a portion of its Backstop Incremental Commitments in accordance with Section 10.04(b)(i)(A) of the Amended Loan Agreement;

(b)  with respect to any requests for consent received by Ligado pursuant to Sections 10.04(b)(i)(A)(1) or (2) of the Amended Loan Agreement, (i) Ligado shall not consent to any such request for consent without AST's prior written consent (not to be unreasonably withheld, conditioned or delayed, it being acknowledged and agreed that the only reasonable basis for AST to withhold, condition or delay its consent is AST's good faith concern about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental Funding Date); <u>provided</u>, that AST shall be deemed to have consented (in writing where applicable) thereto unless it shall have expressed to Ligado in writing that it is reasonably withholding, conditioning or delaying its consent to such assignment (it being acknowledged and agreed that the only reasonable basis for AST to withhold, condition or delay its consent is AST's good faith concern about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental Funding Date) within eight (8) Business Days after having received notice thereof; (ii) Ligado shall affirmatively reject any such request for consent within ten (10) Business Days of Ligado's receipt of any such request for consent in accordance with Section 10.04(b)(i)(A)(1) or (2) of the Amended Loan Agreement upon AST's reasonable written instruction  (it being acknowledged and agreed that the only basis for AST to reasonably instruct Ligado to reject such consent is AST's good faith concern about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental Funding Date) to reject such request within eight (8) Business Days after AST received notice thereof and (iii) in no event shall Ligado consent to a request for consent under Sections 10.04(b)(i)(A)(1) or (2) of the Amended Loan Agreement contrary to (or without) written instructions (or deemed consent) from AST unless Ligado reasonably and in good faith believes that the basis for AST's withholding, conditioning or

delaying of its consent is not premised on AST's reasonable and good faith concern about the ability or willingness of the proposed assignee to fund the Backstop Incremental Commitments on the Backstop Incremental Funding Date;

(c)     with respect to any requests for consent received by Ligado pursuant to Section 10.04(b)(i)(A)(3) of the Amended Loan Agreement, (i) in no event shall Ligado consent to any such request for consent without AST's prior written consent and (ii) Ligado shall affirmatively reject any such request for consent upon AST's written instruction; and

(d)     all notices and other communications provided for in this Section 3 shall be delivered in writing (e-mail sufficing) to AST and Ligado at the address set forth on Exhibit A hereto.

Miscellaneous

4.     This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

5.     This Agreement may not be amended, waived, discharged or terminated, unless such amendment, waiver, discharge, or termination is in writing and signed by each Party.

6.     Each Party hereby agrees that any debt financing sources of AST or any of its subsidiaries are express and intended third party beneficiaries of this Agreement, entitled to enforce the provisions of this Agreement in their own name.

7.     A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

8.     If any provision of this Agreement, or the application thereof to any party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any jurisdiction), the remaining terms of this Agreement, modified by the deletion of the unenforceable, invalid or illegal portion (in any relevant jurisdiction), will continue in full force and effect, and such unenforceability, invalidity, or illegality will not otherwise affect the enforceability, validity or legality of the remaining terms of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the deletion of such portion of this Agreement will not substantially impair the respective expectations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.

9.     This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by electronic transmission), each of which will be deemed an original.

10.     This Agreement and the rights and obligations of the Parties hereunder shall be

governed by, and construed and interpreted in accordance with, the laws of the State of New York.

       11.     The Parties agree that AST's obligation to pay the amounts contemplated in Section 4 of the Mediated Agreement is contingent upon the approval of this Agreement by the Bankruptcy Court.

[<em>remainder of page intentionally left blank</em>]

Very truly yours,

**LIGADO NETWORKS LLC**

By:_____
Name:
Title:

**ATC TECHNOLOGIES, LLC,**
**LIGADO NETWORKS INC. OF VIRGINIA,**
**LIGADO NETWORKS BUILD LLC,**
**LIGADO NETWORKS FINANCE LLC,**
**LIGADO NETWORKS SUBSIDIARY LLC,**
**ONE DOT SIX LLC,**
**ONE DOT SIX TVCC LLC,**
**LIGADO NETWORKS CORP.,**
**LIGADO NETWORKS (CANADA) INC.,**
**LIGADO NETWORKS HOLDINGS**
**(CANADA) INC.,**

By:_____
Name:
Title:

[*Signature Page to Letter Agreement and AST Power of Attorney*]

Agreed and Accepted:

**AST & SCIENCE, LLC**

By:_____
    Name:
    Title:

*[Signature Page to Letter Agreement and AST Power of Attorney]*

<u>Exhibit A – Address for Notices</u>

If to AST:

AST & Science, LLC
Midland Intl. Air & Space Port
2901 Enterprise Lane
Midland, TX 79706
Attn: Andrew M. Johnson (e-mail: andrew.johnson@ast-science.com)

With a copy (which shall not constitute notice) to:

Freshfields US LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Attn:
Madlyn Primoff (e-mail: madlyn.primoff@freshfields.com);
Kyle Lakin (e-mail: kyle.lakin@freshfields.com);
Alexander Rich (e-mail: alexander.rich@freshfields.com);
Nora McDonnell (e-mail: nora.mcdonnell@freshfields.com); and
Jordan Phelan (e-mail: jordan.phelan@freshfields.com).

If to Ligado:

Ligado Networks LLC
10802 Parkridge Boulevard
Reston, VA 20191
Attention of General Counsel
E-mail: legal@ligado.com; vicky@ligado.com; eric@ligado.com

With a copy (which shall not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention of Maya Grant and Matt Brod
E-mail: mgrant@milbank.com; mbrod@milbank.com; tperetz@milbank.com;
ngonski@milbank.com; LigadoMilbankFinance@milbank.com;
LigadoMilbankFRG@milbank.com