**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LIGADO NETWORKS LLC, *et al.*[1] | Case No. 25-10006-TMH |
| Debtors. | Jointly Administered |

**INMARSAT GLOBAL LIMITED'S OBJECTION TO DEBTORS' MOTION FOR
ENTRY OF AN ORDER (I) TEMPORARILY DELAYING LIGADO'S PERFORMANCE
UNDER THE MEDIATED AGREEMENT AND (II) GRANTING RELATED RELIEF**

---

[1]The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Ligado Networks LLC (3801); ATC Technologies, LLC (N/A); Ligado Networks (Canada) Inc. (N/A); Ligado Networks Build LLC (N/A); Ligado Networks Corp. (N/A); Ligado Networks Finance LLC (N/A); Ligado Networks Holdings (Canada) Inc. (N/A); Ligado Networks Inc. of Virginia (9725); Ligado Networks Subsidiary LLC (N/A); One Dot Six LLC (8763); and One Dot Six TVCC LLC (N/A).

**TABLE OF CONTENTS**

<b><u>Page</u></b>

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.   RELEVANT FACTUAL BACKGROUND.......................................................... 4

    A.    The AST Transaction And Resulting Settlement Term Sheet ................................. 4

    B.    A Dispute Derails Negotiations ................................................................. 6

    C.    Ligado's FCC Application and Inmarsat's New York Complaint .......................... 7

    D.    Ligado And AST Move This Court To Dismiss Inmarsat's New York Complaint............................................................................................. 8

    E.    Appeals Of This Court's Enforcement Order ............................................. 9

    F.    Additional Developments With The FCC Application......................................... 10

    G.    The Present Motion................................................................................. 12

III.   OBJECTION ..................................................................................................... 13

    A.    The Cooperation Agreement Does Not Authorize A Payment Delay ................... 13

    B.    The Court Lacks "Equitable Power" To Rewrite The Cooperation Agreement............................................................................................. 17

    C.    Even If The Equities Were Relevant, They Do Not Favor Rewriting The Cooperation Agreement........................................................................ 20

    D.    Additional Grounds Require The Motion Be Denied ........................................ 24

IV.   CONCLUSION.................................................................................................. 26

Inmarsat Global Limited ("Inmarsat") hereby objects to the Motion of the Debtors (collectively "Ligado"), D.I. 1508 (the "Motion" or "Mot."), joined by AST & Science LLC ("AST"), D.I. 1525, for entry of an Order indefinitely delaying the $100 million cure payment due to Inmarsat on March 31, 2026, and for related relief.

## I.   PRELIMINARY STATEMENT

1.   With an indefeasible $100 million payment coming due, Ligado and AST want this Court to order that they can hold onto that payment indefinitely (without even the accrual of interest), solely because they "*may*" assert some hypothetical future claims *if* the FCC, an independent federal agency, ultimately denies Ligado's license application *and* they can prove Inmarsat is legally responsible for the FCC's decision. This extraordinary request is baseless, and the Motion should be flatly denied.

2.   To begin, Ligado and AST concede that the requested relief is not provided for under the Cooperation Agreement. That is why they must argue that the Court should modify the Agreement for their benefit and why, instead of justifying the requested relief in terms of any contract interpretation or contract law principles, they protest that it would be "simply unfair" to enforce the Cooperation Agreement as written, D.I. 1525 ¶ 4—as if the Court sits as the umpire of "fairness" empowered to add and delete contract terms as it sees fit. The Third Circuit rejected that approach *less than thirty days ago in this very case*: "Sympathy aside, it is axiomatic that a court may not rewrite the clear provisions of a contract to make it more reasonable or to protect a party against an unwelcome result." *In re Ligado Networks, LLC*, 2026 WL 611177, at *3 (3d Cir. Mar. 2, 2026) (quoting *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 290 (3d Cir. 2005)).

3.   The relief sought here would undo a commercial trade-off that was made deliberately and expressed plainly. When Ligado first sought approval to move forward with the AST Transaction, it wanted to delay paying Inmarsat anything towards the $500 million-plus (and

growing) cure balance, unless and until the proposed AST satellite network was approved by regulators. Inmarsat, supported by the Bankruptcy Code, refused to go along. The negotiated resolution was that Inmarsat would be paid specific indefeasible amounts on dates certain (including the $100 million coming due on March 31) in exchange for taking a significant, *$101 million* discount on the amounts then owing under the pre-petition contract. The resulting Term Sheet reflects this compromise: the money coming due is not conditioned on *anything* relating to the regulatory process. It is due on March 31, 2026. Period.

4.      Ligado nonetheless argues that this Court has an overriding "equitable power" to alter the terms of a post-petition contract, apparently whenever the Court finds it suitable to do so. It does not. And Ligado knows it. Strikingly missing from Ligado's brief is *any* citation to *any* court (bankruptcy or otherwise) providing relief remotely similar to what it seeks here: this Court essentially rewriting the parties' contract to attach considerable strings to an unconditional and unambiguous payment obligation. That is not how contracts, or the Bankruptcy Code, work. Not surprisingly, courts squarely reject the notion that "equity" provides a ground to re-write the terms of a freely negotiated contract. *In re Penn Cent. Transp. Co*., 831 F.2d 1221, 1228 (3d Cir. 1987) ("[I]t is well-settled that an equity court may not refuse to enforce terms of a contract, absent a showing of fraud, accident or mistake.").

5.      Even if there were a basis to engage in an analysis of the "equities"—and to be clear, there is not—the equities do not favor rewriting the parties' bargain. Ligado and AST are sophisticated parties that could have obtained at the bargaining table the terms that they now improperly seek to obtain at the courthouse. The deal the parties struck is that Inmarsat agreed to relinquish $101 million in cure payments in exchange for $520 million in unconditional payments due on dates certain, including the $100 million at issue in the Motion. The parties chose to make

only one, separate payment of $15 million conditioned on FCC approval, further confirming that the other payments are not tied to the regulatory process. Moreover, the primary equitable consideration supposedly justifying the proposed rewriting of the Cooperation Agreement—that Ligado or AST "*may*" have substantial claims against Inmarsat—is exceptionally speculative:

- First, Ligado and AST must establish that Inmarsat breached the Cooperation Agreement and failed to timely cure. Inmarsat is appealing the Court's finding regarding Inmarsat's support obligation but, in all events, effectuated a timely cure.

- Second, Ligado and AST must rest any claim on the FCC denying the pending application or granting it with harmful conditions. But Ligado told the Third Circuit that "Ligado and AST have no doubt they will prevail before" the FCC, regardless of whether Inmarsat's Petition to Deny were withdrawn. Ex. H, at 4. And Ligado candidly admits that the "effect of Inmarsat's actions is unknowable until the FCC makes a final decision on the Application." Mot. ¶ 35.

- Third, Ligado and AST would have to prove that Inmarsat's alleged "breach" caused the negative outcome. But the FCC is an independent regulatory agency that will make its determination in the public interest, based on a record that includes Inmarsat's affirmative support, multiple objections asserted by independent stakeholders on grounds never asserted by Inmarsat, and where Inmarsat's withdrawn opposition filing is now, according to Ligado, a "nullity." Ex. Q, at 6 n.14.

6.      Like countless other parties who believe that they "may" have valuable, future claims, Ligado and AST must wait until those claims ripen. And even if they ripen, Ligado and AST may only recover if and when those claims are proven and reduced to a judgment.

3

7.       Finally, while the animating grievance behind this Motion appears to be that Inmarsat petitioned to deny the FCC application, Inmarsat's filing was made fairly, equitably, and in good faith. It was made consistent with the then-governing District Court Order staying this Court's original Order mandating that Inmarsat support the FCC application. *See In re Spier Aircraft Corp.*, 137 F.2d 736, 738 n.3 (3d Cir. 1943) (mere pendency of appeal, without a stay, does not operate to stay proceedings). And the Petition conveyed what Inmarsat believed to be critically important and time-sensitive concerns to the FCC. After the Third Circuit decision, Inmarsat immediately withdrew the Petition and unreservedly supported the application. As Ligado itself argued to the FCC, the withdrawn Petition "obviously . . . is not part of the record" and is a "nullity" that the FCC cannot rely upon. Ex. Q, at 5-6 nn. 12, 14. Thus, it is highly unlikely that the withdrawn Petition will give rise to any future claim. Nor would it matter even if Ligado and AST could predict the future. If and when the FCC acts in a way that gives rise to claim, Ligado and AST will have exactly the recourse they bargained for in the Cooperation Agreement—no more and no less. Ligado and AST repeatedly urged the Court to enforce the Cooperation Agreement "as written," D.I. 1220 ¶¶ 39, 46; D.I. 1220-1 ¶ 3; D.I. 1260 ¶ 19, and according to its "plain meaning," D.I. 1221 ¶ 38, which led to the Court ordering Inmarsat to support the application. Holding Ligado and AST to the terms of that same agreement is not inequitable in the slightest.

8.       For these and other reasons detailed below, the Motion should be denied.

## II.      RELEVANT FACTUAL BACKGROUND

### A.      The AST Transaction And Resulting Settlement Term Sheet

9.       In April 2025, Ligado moved for Court approval of the "AST Transaction" that was the centerpiece of its pre-planned reorganization. D.I. 352. The AST Transaction is premised on

4

AST having access to spectrum that is made available to Ligado under the Cooperation Agreement and that AST aspires to use for a large network of non-geostationary ("NGSO") satellites.

10. Inmarsat objected on several grounds. D.I. 462. Most relevant here, Inmarsat was due over $500 million (and growing) in cure payments, but Ligado and AST were proposing to defer any decision on whether to assume the Cooperation Agreement and its associated spectrum rights—and to defer any associated cure payment—unless and until the FCC approved AST's new, proposed NGSO system. D.I. 462 ¶¶ 17-20. Having this enormous cure payment be contingent on FCC approval was highly objectionable to Inmarsat, and even more so given Ligado's recognition that the regulatory process was uncertain and could take up to three years. By that point, the cure amount would be in the range of $1 billion—an amount that neither Ligado nor AST had shown they could pay. *Id*. ¶ 6.

11. The Court encouraged mediation and the parties obliged. After mediation, Inmarsat, Ligado, and AST executed a binding "Term Sheet" that the Court approved in June 2025. D.I. 692. As the Court determined, the Term Sheet was "a valid, binding contract, it was negotiated at arm's length through mediation under Judge Drain, and all the parties of course, having signed onto the mediated agreement, urged this Court to approve it…." Jan. 27, 2026 Hr'g Tr. 21:9-13.

12. The Term Sheet reflected a compromise on the payment terms:  Inmarsat would receive $520 million in cure payments in two installments on dates certain ($420 million on October 31, 2025, and $100 million on March 31, 2026), but would waive $101 million in cure payments that would otherwise have been due. Inmarsat agreed to support the FCC application if it complied with the Term Sheet—and agreed to detailed remedial procedures if Ligado believed the support was insufficient (discussed more fully below, *infra* ¶¶ 39 - 45). But the cure payments themselves are "indefeasible" and not at all contingent on Ligado's satisfaction with Inmarsat's

level of support or on the outcome of the regulatory process. D.I. 692-1 §§ 2, 4. Nor are the ongoing quarterly payments due under the Cooperation Agreement (roughly $15 million, escalating over time) contingent on the regulatory process. *Id.* § 4. There is only *one* payment—a flat, $15 million "Emergence Payment"—that comes due only if the FCC approves the application. *Id*. In short, Inmarsat agreed to take less money in exchange for certainty with respect to virtually all past and future payment obligations. Ligado cannot now upset the contractual tradeoff whereby Inmarsat relinquished over $100 million in cure payments in return for indefeasible payments on dates certain.

13.    Apart from the payment terms, the Term Sheet set out certain other, high-level obligations the parties would codify in two definitive contracts: an "Amended Inmarsat Cooperation Agreement" and an "Inmarsat-AST Agreement" (the "Post-Petition Contracts"). D.I. 692, Ex. 1, at 1. It also provided that all disputes (other than one inapplicable exception) be adjudicated in New York (the "Exclusive Forum Provision"). *Id.* at 5-6 and n.12.

### B.    A Dispute Derails Negotiations

14.    From that point forward, the parties negotiated amendments to coordinate the operation of AST's NGSO satellites. Engineers and regulatory personnel held multiple conference calls to address relevant technical, geographic, and operational parameters from the unique circumstances and new interference environment presented by the combined operation of all the NGSO satellites in AST's contemplated system. Jan. 27, 2026 Hr'g Tr. 10:1-8. Inmarsat believed that these discussions were part and parcel of the Term Sheet obligations.

15.    After months of negotiations, talks broke down over whether AST would be required to abide by the longstanding term governing Inmarsat's rights to use L-band spectrum outside North America—contractual terms Ligado first agreed to in 2007 as part of the consideration underlying the Cooperation Agreement (and that remain unchanged ever since).

6

Notably, the contract provides that Inmarsat alone has the right to operate in the L-band spectrum outside North America given Inmarsat's significant spectrum-related concessions to Ligado over North America. In August 2025, Inmarsat and Ligado filed competing motions asking this Court to enforce what each side believed were the obligations in the Term Sheet. Jan. 27, 2026 Hr'g Tr. 10:9-14.

16.    On September 2, 2025, the Court issued an Order that, in effect, abstained from deciding whether AST's satellite operations outside of North America were subject to the terms of the Cooperation Agreement. Instead, the Court directed the parties "to incorporate the specific language of the Settlement Term Sheet" into the Post-Petition Contracts, D.I. 940 ¶ 3, leaving the geography dispute for another day. Thereafter, pursuant to the Court's Order, the parties executed the Post-Petition Contracts, including an Amendment No. 22 to the Cooperation Agreement that attached, and incorporated by reference, the Term Sheet (collectively, with the original agreement and all amendments, the "Cooperation Agreement"). Jan. 27, 2026 Hr'g Tr. 10:19-11:2; D.I. 1250-12; D.I. 1250-13.

C.    **Ligado's FCC Application and Inmarsat's New York Complaint**

17.    In November 2025, Inmarsat invited Ligado to resume the NGSO coordination efforts that had been sidetracked by the dispute over geography. D.I. 1252-10, at 1-3. In December 2025, Ligado—without responding to Inmarsat's open invitation for NGSO coordination—filed its FCC application. D.I. 1220-2. The application represents that the Proposed NGSO System (referred to as "SkyTerra Next") is coordinated under the Cooperation Agreement. *Id*. at 12.

18.    On December 19, 2025, Inmarsat filed an action in New York alleging that Ligado and AST breached their contractual obligation to coordinate the new NGSO operations ***before*** filing an FCC application and alleging that, unless that coordination were completed, Inmarsat

intended to "petition the FCC to deny the application." D.I. 1252-1 ¶ 59. The case was filed in New York based on the Exclusive Forum Provision in the Post-Petition Contracts.

19.     That same day, Ligado's application received its first public comment. Iridium Communications, Inc. ("Iridium") argued that Ligado was proposing drastic changes—going "from one GSO satellite to nearly 100 NGSO satellites"—that would inevitably "affect the interference environment" and that Ligado "still remains subject to ITU coordination and notification for its conversion to an operational NGSO system." Ex. A, at 4-5. Hence, Iridium argued, the application could not be adjudicated as a mere "modification" of a previous license but required a full-blown process open to others interested in sharing the same spectrum as Ligado (referred to as a "processing round"). *Id.* at 4.[2]

**D.     Ligado And AST Move This Court To Dismiss Inmarsat's New York Complaint**

20.     On January 2, 2026, Ligado and AST filed motions before this Court that sought to force Inmarsat to dismiss its New York complaint with prejudice, which they argued was filed in violation of the automatic stay, and to compel Inmarsat to support the FCC application. D.I. 1220, 1221. The Court held a hearing on January 14, 2026, and issued its oral ruling on January 27, 2026, confirmed by a written Order, dated January 30, 2026. D.I. 1304.

21.     The Court ruled that Inmarsat's prosecution of the New York action violated the automatic stay because it "constitutes an attempt to exercise control over property of the estate" under 11 U.S.C. § 362(a)(3). Jan. 27, 2026 Hr'g Tr. 15:2-5. On the merits, the court interpreted the Cooperation Agreement not to impose any "additional coordination process beyond" what was set

---

[2] Iridium's letter was filed 36 minutes after Inmarsat's New York state complaint was filed, but it is apparent that the filing was made without any awareness of that complaint. Ex. A, at 5 (Iridium letter raising coordination issues but noting that "Ligado may have privately completed coordination with at least one other operator" (i.e., Inmarsat)).

forth in the Term Sheet. *Id.* at 18:20-23. The Court directed Inmarsat to support the FCC application and dismiss the New York action "with prejudice." *Id*. at 23:5-11; D.I. 1304 ¶ 3.

22.     The FCC accepted Ligado's application on January 30, 2026. Comments in response to the application were due within thirty days: March 2, 2026. 47 C.F.R. § 25.154(a)(2).

### E.     Appeals Of This Court's Enforcement Order

23.     Inmarsat timely appealed this Court's January Order, D.I. 1324, to the United States District Court for the District of Delaware, *see* Case No. 26-cv-00118-GBW, and moved for a stay pending appeal. Ex. B.

24.     On February 27, 2026, after full briefing, the District Court granted the stay. Exs. C, D. The District Court found that Inmarsat demonstrated a reasonable probability of success on its argument that "the parties were required to coordinate the operations of the Proposed NGSO System *before* the FCC application was filed" and that Inmarsat faced irreparable harm from being compelled to support an application it believed to contain falsehoods. Ex. C, at 10-12 (emphasis in original). There was no comparable harm to Ligado or AST, the District Court found, because any negative FCC decision would result from the "independent experts at the FCC, taking into account all information," concluding "that approval is not in the public interest." *Id*. at 13. The District Court thus stayed, pending the outcome of Inmarsat's appeal, this Court's January 30 order (the "<u>Stay Order</u>"). Ex. D ¶ 3.

25.     A few hours later, Inmarsat filed its Petition to Deny with the FCC. Ex. E. Ligado's mischaracterization of the filing as an effort to "nullify the Third Circuit's review," Mot. ¶ 32, is patently false. Inmarsat had drafted and was preparing to file the Petition on February 27 before Ligado or AST even noticed an appeal. Exs. F, G. At the time Inmarsat filed its Petition, neither Ligado nor AST had alerted Inmarsat to any contemplated emergency motion practice, nor had they moved the District Court for a stay (preemptively or otherwise), as required by the Federal

Rules of Appellate Procedure. Fed. R. App. P. 8(a)(1) (stating that parties "must ordinarily move first in the district court" for a stay). In short, Inmarsat did not know when it submitted its Petition that a motion for emergency relief would even be filed, let alone briefed over the weekend and decided ahead of the looming FCC deadline.[3]

26.     The day after Inmarsat filed its Petition, on Saturday, February 28, Ligado and AST filed motions to vacate the Stay Order with the Third Circuit. *See* Case No. 26-01444, D.I. 6. Ligado and AST asserted that, although they had "no doubt they will prevail before the agency," they had "paid hundreds of millions of dollars" for Inmarsat's support in the process. Ex. H, at 4.

27.     On March 2, 2026, the Third Circuit vacated the Stay Order, with a non-precedential opinion that was subsequently issued on March 4, 2026. D.I. 1508-4, 1508-5.

28.     Upon issuance of the Third Circuit's order on March 2, 2026, Inmarsat submitted two filings with the FCC.[4] The first withdrew the Petition to Deny and the second wrote "to convey affirmative support for [Ligado's] application." Exs. I, J. That support letter was substantially similar to the form of letter that, before the District Court's Stay Order, Inmarsat, Ligado and AST had negotiated for Inmarsat to file.

**F.      Additional Developments With The FCC Application**

29.     On March 2, 2026, Iridium petitioned to deny Ligado's FCC Application. Ex. K. Its petition echoed the coordination arguments it had made previously (which are entirely unrelated to Inmarsat) and expanded on other issues it had first raised in December 2025, including the materially changed interference environment. While the Iridium Petition also repeated coordination

---

[3] In the oral argument snippet Ligado quotes, Mot. ¶ 32, Inmarsat's counsel explained the justifiable concern that an ***administrative*** stay would cause Inmarsat to forever forfeit its right to timely file the Petition before the Third Circuit could consider any appeal on its merits.

[4] Ligado's suggestion that Inmarsat made these filings "at Ligado's and AST's insistence in light of the impending FCC deadline," Mot. ¶ 5, is false.

concerns from Inmarsat's (by then withdrawn) Petition to Deny, Iridium sought denial on three grounds not even mentioned in Inmarsat's Petition. Iridium's lead argument, for example, is that the application should be denied because the proposed transaction would improperly transfer control of the critical L-band license from Ligado to AST. *Id*. 4-18.

30.     A group called the Satellite Safety Alliance ("SSA") filed a comment letter reflecting concerns that overlap with those expressed by Iridium. Ex. L. SSA represents GPS users that "provide critical national security and safety-of-life services" and expressed skepticism of Ligado's claim that it "will now operate space stations on AST's 96 satellites that will not have a materially different impact on the interference environment in contrast with a single GSO satellite." *Id*. at 1, 6. SSA claims that "Ligado ha[d] failed to substantiate this non-intuitive claim," *id*. at 6, and asks that the FCC require Ligado to provide a comprehensive aggregated interference analysis for the Proposed NGSO System. SSA added that the stakes for these issues could not be higher because "losing mission-critical and safety-of-life services that rely on GPS—even momentarily—can prove catastrophic." *Id*. at 3.

31.     SSA was not alone. Other stakeholders similarly expressed concern that Ligado's application did not adequately explain how the change from one GSO satellite to 96 NGSO satellites could be accomplished without risking harmful interference:

- **Aviation Spectrum Resources, Inc.**: "[A]ny consideration of interference risks presented by the SkyTerra Next proposal to other L-Band users must take into account the much more dynamic potential interference environment created by the proposed 96 satellite low-earth orbit NGSO system operating on 96 orbital planes in contrast with the single geo-stationary satellite Ligado is currently authorized to operate. The Application completely glosses over this . . . ." Ex. M, at 3.

- **Aerospace and Flight Test Radio Coordinating Council, Inc.**: "[T]he Application makes no meaningful effort to discuss interference concerns with any L-Band users in the same or adjacent spectrum . . . . SkyTerra-1, as a GSO satellite, is stationary in the sky from any point on the ground. By contrast, the

11

AST Space Mobile constellation of 96 non-GSO satellites occupies 96 different orbital planes." Ex. N, at 6-7.

- **Deere & Company, Inc.**: "Deere feels that the SkyTerra Next services proposed by Ligado in its request to modify its license need to demonstrate that they can operate without interfering with GPS operations. Unfortunately, the technical information submitted by Ligado is very limited and does not allow for those potentially affected, such as Deere, to assess the potential impact of the service on GPS operations." Ex. O, at 7-8.

- **GPS Innovation Alliance**: "As Ligado notes, it currently operates a single GSO satellite in the L-band, which is approximately 36,000 kilometers (22,500 miles) above Earth . . . . Ligado, however, now proposes to operate an LEO [low Earth orbit] system that is comprised of payloads to be deployed aboard 96 NGSO satellites at approximately 690 kilometers (429 miles) above Earth. Although Ligado contends that '[m]anagement of the GSO and NGSO on a coordinated and dynamic basis will be accomplished using a Spectrum Management System, thus assuring operation that is free of in-system interference,' no details with respect to this system are provided in its application." Ex. P, at 24-25.

32.     On March 17, 2026, Ligado opposed Iridium's Petition and, in doing so, argued that the FCC cannot rely on Inmarsat's swiftly withdrawn Petition to Deny or to allow other stakeholders to do so: "Obviously, any withdrawn document is not part of the record and thus cannot be relied upon by the Commission or other filers." Ex. Q, at 5 n.12. Ligado added: "it is axiomatic that the Commission should not rely on filings that are a nullity." *Id*. at 6 n.14.

33.     On March 23, 2026, Inmarsat submitted reply comments that reflected feedback from Ligado on an interim draft and that expressed further support for the applications. Ex. R. The reply comments address arguments from both Iridium and SSA. *Id*.

34.     The FCC application remains pending.

**G.      The Present Motion**

35.     Ligado and AST now move the Court for an Order that they are "equitably relieved from making" the March 31, 2026 payment due Inmarsat, and, further, that they be allowed to hold the payment in escrow—with no interest—until the FCC either approves the application or until the completion of hypothetical litigation "Ligado anticipates that it may be forced to commence"

over Inmarsat's alleged failure to sufficiently support the FCC application. Mot. ¶¶ 5-6, 29; *see also* D.I. 1525 (AST joinder to motion).

### III.   **OBJECTION**

#### A.   **The Cooperation Agreement Does Not Authorize A Payment Delay**

36.     Start with what is undisputed: Ligado and AST are *not* seeking relief authorized by the Cooperation Agreement.[5] They are instead asking this Court to unilaterally change material post-petition contract terms for their benefit. The Cooperation Agreement (as amended by Amendment No. 22, which attached and incorporated by reference the Term Sheet) could not be clearer that in order to cure its pre-petition defaults, Ligado and AST are obligated to make a "lump sum indefeasible payment to Inmarsat in the amount of $100 million" on March 31, 2026. D.I. 1250-12, at Ex. 1 § 4. This cure payment is ***not*** conditioned on Inmarsat supporting the FCC application or on the FCC's approval. As AST admitted to the District Court, "[i]f the AST Transaction does not receive regulatory approval, Inmarsat is not obligated to return the 'indefeasible' payments it receives under the Mediated Agreement to Ligado or AST." Ex. S, at 16. "Indefeasible" means "not capable or being annulled or voided or undone,"[6] but, Ligado and AST seek to indefinitely "undo" the payment obligation—in other words, to achieve the ***opposite*** of what the parties agreed.

---

[5] Ligado and AST repeatedly refer to the "Mediated Agreement" but, as Inmarsat has noted before, after this Court's September 2, 2025, Order directing the parties to incorporate the terms of the Mediated Agreement into the Post-Petition Contracts, the relevant contracts are Amendment No. 22 to the Cooperation Agreement and the Inmarsat-AST Agreement. For instance, it is undisputed that the Upcoming Cure Payment is not due under the parties' binding term sheet (i.e., the "Mediated Agreement"); it is due under Amendment No. 22 to the Cooperation Agreement.

[6] Indefeasible, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/indefeasible (last visited Mar. 23, 2026).

37.     The Cooperation Agreement's payment terms were the result of a hard-fought tradeoff. When Ligado first moved for approval of the "AST Transaction," Ligado was obligated under its agreement with AST to contest any cure payments being made to Inmarsat unless and until all regulatory approvals were achieved. D.I. 359-3 § 5.6 (Framework Agreement). Inmarsat objected to the AST Transaction on precisely this ground. As Inmarsat explained last year, it was contrary to the Bankruptcy Code to "force Inmarsat to provide [Ligado] a free option . . . to decide whether to assume or reject the Cooperation Agreement," especially because the regulatory process was projected to take up to three years. D.I. 462 ¶¶ 17-20. Inmarsat gave Ligado a ***$101 million discount*** on its cure payments in exchange for guaranteed payments without any regulatory strings attached. Accordingly, the Cooperation Agreement now provides:

> Inmarsat is waiving accrued claims under the Inmarsat Cooperation Agreement in the amount of approximately $101 million ("**Inmarsat Waived Claims**"). Inmarsat agrees that the foregoing payments shall be sufficient to cure any defaults under the Inmarsat Cooperation Agreement under Section 365 of the Bankruptcy Code and no other amounts shall be due and owing in connection with the valid assumption of the Amended Inmarsat Cooperation Agreement.

D.I. 1250-12, at Ex. 1 § 4. The "forgoing payments" that Inmarsat agreed would be sufficient to cure the Cooperation Agreement include the $100 million due March 31, 2026. *Id.*

38.     Further, only one payment was contingent on success at the FCC; a $15 million "Emergence Payment." *Id*. This reinforces that the parties knew how to link the regulatory process with the payment schedule but, for both indefeasible cure payments, chose not to do so.

39.     Put simply, the plain language of the Cooperation Agreement disproves Ligado's and AST's repeated suggestion that they agreed to pay the cure funds "in exchange for" Inmarsat's "agreement to affirmatively support" the FCC application. Mot. ¶ 1; *see also* 1525 ¶ 2. The Cooperation Agreement does not provide that the cure funds were due if and only if Inmarsat supported the FCC application; nor does it provide for a refund of the cure payments if the support

14

obligation was breached or if the application were denied. Instead, if Ligado believes there has been a breach of Inmarsat's regulatory support obligations, the parties specified a three-step process, described below, which may lead to various remedies—none of which involve a delay or return of the March 31, 2026 payment. D.I. 1250-12, at Ex. 1 § 5.

40.     **Step 1: Notice-And-Cure**. The first step, once "Ligado is aware of an Inmarsat action (or inaction) that it believes breaches Inmarsat's regulatory support obligations" is for Ligado to "provide notice of the alleged breach within ten (10) days of becoming aware of such action (or inaction)," after which "Inmarsat shall have ten (10) days to cure the alleged breach." *Id*.

41.     **Step 2: Claim Based Only On "Inmarsat-Caused Non-Approval."** Only if "the alleged breach is not cured within ten (10) days," may Ligado "file a claim that Inmarsat has breached its Section 2 obligation." *Id*. The claim must be premised on—and must be filed no later than 30 days after—an "Inmarsat-Caused FCC Non-Approval," defined as the FCC either denying Ligado's application, or imposing "limitations or conditions," "in either case caused by Inmarsat's actual breach of its regulatory support obligations." *Id*. & n.13.

42.     **Step 3: Election of Remedies**. At the time Ligado files its claim, it must make an irrevocable election between two "sole and exclusive remed[ies]": it can *either* (1) pursue "contractual remedies for [Inmarsat] breaching the regulatory support provisions," or (2) revive the complaint it originally filed in January 2025 as an adversary proceeding claiming that Inmarsat was obliged to make its customer terminals fully "resilient" to interference from Ligado's anticipated operations. *Id*. Importantly, if Ligado chooses the second option, then Inmarsat can revive its own claims for the additional $101 million cure amount. *Id*. §§ 2, 5 (defining the "Void Ab Initio Provision").

43.     This Motion flouts these detailed, agreed contractual procedures. When Inmarsat filed its Petition to Deny on February 27, 2026, Ligado provided the required notice to cure. Ex. T. *Critically, Inmarsat timely cured*. On March 2, 2026, after the Third Circuit vacated the stay, Inmarsat immediately withdrew its petition and filed a letter of support with the FCC that same day. Exs. I, J. By nonetheless filing this Motion, Ligado and AST entirely ignore that even if Inmarsat breached, it has already cured (Step 1).

44.     Ligado and AST further ignore that a necessary predicate to any claim—an "Inmarsat-Caused FCC Non-Approval"—has yet to occur and may never occur (Step 2). Ligado told the Third Circuit that "Ligado and AST have no doubt they will prevail before the agency," Ex. H, at 4, even had Inmarsat's petition to deny not been withdrawn and rendered a "nullity," Ex. Q, at 6 n.14. If Ligado's statement to the Third Circuit was true, it means *there will never be a basis for a claim against Inmarsat*. At best, Ligado candidly recognizes it is "unknowable until the FCC makes a final decision on the Application" whether there will be a negative outcome at all, let alone whether that outcome can be legally blamed on Inmarsat. Mot. ¶ 35; *see also infra*, ¶¶ 58 - 61.

45.     Still further, the agreed procedure in the Cooperation Agreement requires Ligado to elect one of two "*sole and exclusive*" remedies (ordinary contract damages, or revival of its previously dismissed adversary complaint over the terminal "resilience" issue) (Step 3). But Ligado and AST seek here to pursue a new, bespoke option which is contrary to the bargain they made— namely, an indefinite delay of the impending cure payment. That is contrary to established New York law that enforces parties' negotiated remedy provisions:

> It is well settled that courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities. Contract terms providing for a

sole remedy are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction . . . especially when entered into at arm's length by sophisticated contracting parties.

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 106 N.E.3d 1176, 1184 (N.Y. 2018) (internal citations and quotations omitted).

**B.      The Court Lacks "Equitable Power" To Rewrite The Cooperation Agreement**

46.      Recognizing that the Cooperation Agreement as written does not authorize any delay in the forthcoming cure payment, Ligado and AST urge the Court instead to "use its equitable powers" to "modify" the Cooperation Agreement. Mot. ¶¶ 36, 38-40, 42. But the fundamental, pervasive flaw in Ligado's Motion (and AST's joinder) is that the claimed equitable powers to rewrite the Cooperation Agreement do not exist. The Supreme Court has squarely held that a bankruptcy court's "equitable powers" may "only be exercised within the confines of the Bankruptcy Code," *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988), which means that, absent authority from a specific Code provision, bankruptcy courts lack "equitable powers to modify contracts," *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F. 2d 1351, 1361 (7th Cir. 1990).

47.      The Third Circuit's decision in *In re Penn Central Transportation Co.*, 831 F.2d 1221 (3d Cir. 1987), is instructive. The U.S. government and Penn Central signed a series of contracts to provide over $200 million in funding to keep Penn Central operating during its bankruptcy, and the government sought a refund of $22 million because the contracts expressly provided "that funds paid to Penn Central in excess of allowable costs were to be returned to the government." *Id*. at 1226-27. The bankruptcy court ruled that enforcing the refund provisions as written would "frustrate the intention" of the parties because the "excess" funds were still spent to further the overall goal of ensuring Penn Central's continued operations through the bankruptcy.

*Id*. at 1224. In other words, the court concluded it was a good idea to make "alterations [to] the agreements." *Id.* at 1226.

48.     The Third Circuit reversed, and, in doing so, rejected Penn Central's argument—virtually identical to what Ligado argues here—"that a bankruptcy court may exercise equitable powers to change the terms of the contract[]." *Id*. at 1228. As the Third Circuit explained, "it is well-settled that an equity court may not refuse to enforce terms of a contract, absent a showing of fraud, accident or mistake." *Id*.; *see also In re Tel. Warehouse, Inc.*, 124 F. App'x 724, 728 (3d Cir. 2005) (rejecting argument that "that the Bankruptcy Court could use its equitable power" to excuse a missed option deadline and holding that any claimed "equitable power cannot be invoked to avoid the agreement's otherwise enforceable terms"); *In re WorldCorp, Inc*., 252 B.R. 890, 897 (Bankr. D. Del. 2000) (holding that a "party to a fully integrated, unambiguous, executed contract" cannot claim an "equitable remedy" to "rewrite the contract to include terms that a party wishes he had bargained for, but did not").

49.     Here, there is no Code provision authorizing the Court to rewrite the Cooperation Agreement. Ligado cites only to section 105(a), which allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But that provision does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." *In re Combustion Eng'g, Inc*., 391 F.3d 190, 236 (3d Cir. 2004) (citation omitted). Rather, any "exercise of section 105 power" must "be tied to another Bankruptcy Code section" that provides ***substantive*** rights that may be vindicated through section 105. 2 Collier on Bankruptcy ¶ 105.01 (16th ed. 2025). Ligado cites no substantive Code provision authorizing its

18

proposed rewrite of the Cooperation Agreement. Nor does it cite any case applying section 105 to alter the terms of a contract.

50.    Veering outside bankruptcy law, Ligado also wrongly relies on two out-of-Circuit cases for the proposition that "courts may generally modify a settlement agreement [1] when a party has materially breached the agreement or [2] when it is otherwise equitable to do so." Mot. ¶ 38 (citing *Wolf v. Wolf*, 59 F. App'x 403, 406 (2d Cir. 2003) and *Scharf v. Levittown Pub. Schs.*, 970 F. Supp. 122, 129 (E.D.N.Y. 1997) (alterations added)). The second prong of Ligado's assertion is a hallucination; neither case mentions "equity" or says anything about courts having "equitable" authority to rewrite contracts.

51.    Nor is it accurate to suggest that a material breach opens the door to rewriting a contract. Rather, it is hornbook law that when one contracting party believes there has been a material breach—which, here, Inmarsat disputes—that party has only "two options": it can (1) cease performance and sue for "total breach"; or it can (2) continue performance "while suing in partial breach." *ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991) (New York law); *see also Williams Cos., Inc. v. Energy Transfer LP*, 2020 WL 3581095, at *14 (Del. Ch. July 2, 2020) (same "two options" under Delaware law). Ligado cites no case, and Inmarsat has found none, providing a third option whereby a Court can unilaterally adjust contract terms to favor the party speculating that it may someday file a breach claim.

52.    Ligado's two cases do not fill the gap. *Scharf* appeared to be rooted in the contract doctrine of impracticability, which is inapplicable here. 970 F. Supp. At 129 A school secretary settled her employment discrimination case on terms that required her to be restored to her prior position, but, when she repeatedly breached her obligations in ways that caused her relationship with her boss to "deteriorate[]" and that made it not "feasible" to stay in her prior position, the

court authorized transferring her to another school. *Id*. *Scharf* has no bearing here, where there is nothing infeasible about holding Ligado to the terms to which it agreed.

53. The Second Circuit's unpublished, summary order in *Wolf* is even less helpful to Ligado because it found "problematic"—and vacated—a District Court order that went "beyond the plain provisions of [a] Settlement Agreement and modifie[d] its terms." 59 F. App'x at 406. The case was remanded to the District Court to reconsider the grounds for its order, and, citing *Scharf*, the court suggested that a finding of a material breach could bear on the issues. But *Wolf* did not purport to hold, as Ligado suggests, that courts may "red pencil" contracts simply because one party claims the other is in breach or claims that a revision may be "equitable." Mot. ¶ 38; *Wolf*, 59 F. App'x at 406.

### C. Even If The Equities Were Relevant, They Do Not Favor Rewriting The Cooperation Agreement

54. Even if this Court had some free-floating ability to alter the Cooperation Agreement under equitable principles—and it does not—the equities do not favor doing so. The thrust of Ligado's and AST's argument on this point is that they "***may have***" substantial claims against Inmarsat, and so they should not have to pay Inmarsat in the meantime amounts that "very well ***may be*** offset" by the hypothetical damages associated with these as-yet unasserted claims. Mot. ¶ 40 (emphasis added). The weakness in this logic is myriad and profound.

55. To start, Ligado and AST are sophisticated parties represented by capable counsel. If they wanted the right to hold back the cure payments under circumstances like these, they should have bargained for that right. Instead, they bargained for only the final $15 million Emergence Payment to be contingent on the FCC licensing.

20

56. Further, Ligado and AST are seeking, in effect, a prejudgment attachment of Inmarsat's contractual right to payment before even filing a claim, but without meeting the stringent standards, such as proof that Inmarsat "has disposed or is about to dispose of any property in order to frustrate a potential judgment, or to flee the jurisdiction of the Court." *Gen. Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1074 (S.D.N.Y. 1994). In other words, Ligado and AST sit in the same position as countless other would-be litigants who may think they have strong claims but who are not entitled to recovery unless and until they prove actual losses in court and obtain a judgment.

57. The fact that Ligado and AST believe they ***may*** have future claims does not give them a self-help right to withhold the payment due: "there is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable." *Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 164 N.Y.S.3d 108, 121 (App. Div. 1st Dep't 2022).

58. In all events, the notion that there will eventually be recoverable losses here is, at best, speculation. The Cooperation Agreement premises any claim on the FCC denying the application or imposing harmful conditions or limitations, in either case only when "***caused by Inmarsat's actual breach*** of its regulatory support obligations." D.I. 1250-12, at Ex. 1 § 5 & n.13 (emphasis added). Ligado and AST provide no evidence that the FCC will take such actions, or that they will be able to prove that Inmarsat's alleged breaches will have been the cause. If the FCC approves Ligado's application without adverse conditions, for example, there will be no losses whatsoever.

59. In suggesting otherwise, Ligado makes much of the fact that another satellite firm, Iridium, has cited Inmarsat's now-withdrawn petition to the FCC. Mot. ¶ 34. But Ligado was going to have to contend with Iridium's petition to deny regardless. Ligado fails to tell the Court that

21

Iridium first expressed its own concerns about Ligado's application (including significant interference concerns and coordination matters) before any awareness of Inmarsat's own coordination objection. As discussed, in December 2025, Iridium filed a letter with the FCC complaining about Ligado going "from one GSO satellite to nearly 100 NGSO satellites," noted that doing so would inevitably "affect the interference environment," and asserted that Ligado "still *remains subject to ITU coordination* and notification for its conversion to an operational NGSO system." Ex. A, at 4-5 (emphasis added). Iridium's later-filed Petition to Deny echoed similar concerns and also raised several other arguments wholly distinct from anything Inmarsat has contended, including that the proposal effectuates an improper "transfer of control" of Ligado's FCC license to AST. Ex. K, at 4-15.

60.     Further, as mentioned, a wide range of other stakeholders have independently raised interference concerns with the application. Exs. M-P. Put simply, interference issues, and other potential impediments to the application, were inevitably going to be before the FCC irrespective of Inmarsat's actions.

61.     In all events, Ligado itself has argued to the FCC that it would be "[o]bviously" improper for the FCC or other filers to rely on "any withdrawn document that is not part of the record" Ex. Q, at 5-6 nn.12, 14. Taking Ligado at its word about the obvious impropriety of anyone relying on Inmarsat's withdrawn filing, that filing should have no effect whatsoever on the FCC's decision-making.[7]

---

[7] AST suggests a payment delay is appropriate because Inmarsat's "Petition to Deny can still be accessed on the FCC website." D.I. 1525 ¶ 4. That position is laughable. AST well knows that parties can withdraw filings with the FCC that they no longer wish to pursue, but there is no mechanism for those outside the FCC to delete entries from the online docket. Inmarsat formally withdrew the Petition, and Ligado considers that Inmarsat's having done so renders the Petition a "nullity." Ex. Q, at 6 n.14. Furthermore, Inmarsat

62.    Finally, contrary to Ligado's suggestions otherwise, Mot. ¶ 32, Inmarsat's filing of its Petition to Deny promptly after the District Court's ruling was done in good faith. Inmarsat declared in its New York Complaint that it intended to file such a Petition, 1250-1 ¶ 59, and, at the time it did so, this Court's Order mandating Inmarsat's support had been stayed. The fact that Ligado and AST had filed a notice of appeal—after Inmarsat had finalized and was about to file its Petition—did not itself impact the District Court's Stay Order. *Hovey v. McDonald*, 109 U.S. 150, 161 (1883) ("it is quite certain that neither an injunction nor a decree dissolving an injunction passed in a circuit court is reversed or nullified by an appeal or writ of error before the cause is heard in this court….") (citation modified); *In re Spier Aircraft Corp.*, 137 F.2d at 738 n. 3 ("The appeal to [the Third Circuit] did not operate as a stay of proceedings"). And it is undisputed that neither Ligado nor AST gave Inmarsat prior notice of their intent to file for emergency relief or even suggested that Inmarsat should refrain from exercising its right to file the Petition pending any such motion. Inmarsat's good faith in submitting the Petition to Deny is even more obvious when considering the importance of the issues to Inmarsat and others. As detailed in the SSA comments, L-band spectrum users like Inmarsat "provide critical national security and safety-of-life services" that, if disrupted by harmful interference or uncoordinated operations, could result in catastrophic loss of life. Ex. L, at 1, 3. Inmarsat in good faith believed it was raising important issues that urgently needed to be considered by the FCC. *See* Ex. C, at 14 (District Court Stay Order recognizing "the need to provide a federal agency with complete and truthful information to evaluate an important issue that necessarily affects the public.").

---

withdrew the Petition in a submission that was separate from its filing of affirmative support, precisely as Ligado requested.

### D.    Additional Grounds Require The Motion Be Denied

63.    ***Equitable Relief Requires an Adversary Proceeding***. Ligado's Motion expressly seeks "equitable relief" in violation of Federal Rule of Bankruptcy Procedure 7001. That rule provides that any "proceeding to obtain" exactly what Ligado seeks here, namely "an injunction or other equitable relief," must be pursued pursuant to an adversary proceeding. Fed. R. Bankr. P. 7001(g); *see also In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) (noting that an adversary proceeding "commenced by motion rather than by complaint will be dismissed" and that any order entered in such an "action commenced by motion will be vacated."); *In re Prehired, LLC*, 2025 WL 2661765, at *4 (D. Del. Sept. 17, 2025) (holding bankruptcy court "properly denied the Motion as procedurally improper because it sought [injunctive] relief that the Bankruptcy Court may not grant by motion.").

64.    When the Court enjoined Inmarsat to support the FCC application, it held that "an adversary proceeding isn't required where the relief sought is provided in a Chapter 11 plan." Jan. 27, 2026 Hr'g Tr. 18:3-4. The Court's reasoning—which Inmarsat disagrees with and is subject to appeal—was that the Plan provided for the survival of the Court's Order approving the Term Sheet and, thus, the relief granted by the Court was "enforced under a plan" within the Rule 7001(g) exception. *Id.* at 18:4-7.

65.    The Court's prior reasoning, however, requires denying the Motion here. If an adversary proceeding were not necessary to enforce the terms of the Cooperation Agreement against Inmarsat because the Plan incorporated the terms of the Term Sheet (later incorporated into the Cooperation Agreement), it cannot be that the Plan also provides the basis to impose remedies that are ***inconsistent*** with that same agreement. Put simply, the Plan cannot be the basis to both enforce the contract terms against Inmarsat and to re-write those same terms. The equitable relief

24

requested by Ligado requires an adversary proceeding and for this additional reason the Motion should be denied.

66.    ***The Court Should Not Exercise Jurisdiction Over The Cooperation Agreement***. A still further reason to deny the motion is that the Post-Petition Contracts' Exclusive Forum Provision directs the parties to resolve disputes solely in the New York courts.

67.    The Third Circuit has repeatedly instructed that forum selection clauses are generally binding upon bankruptcy courts, just as they are binding upon other federal courts. *In re Diaz Contracting, Inc.*, 817 F.2d 1047, 1054 (3d Cir. 1987) (reversing district court's affirmance of bankruptcy court's refusal to enforce a forum selection clause and noting that "enforcement is *mandated* absent a strong showing of unreasonableness and injustice") (emphasis in original)[8]; *Coastal Steel v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 204 (3d Cir. 1983) (enforcing forum selection clause and rejecting as "improper" district court's reliance on "the fact that under a plan of reorganization, now confirmed, [debtor's] creditors have an interest in any sums which may be recovered from [defendant]").

68.    Any party asking a bankruptcy court to exercise jurisdiction in contravention of an exclusive forum provision is subject to a "heavy burden of proving unreasonableness and injustice" and must "meet a strict standard of proof." *Diaz Contracting*, 817 F.2d at 1051-53. Ligado and AST certainly have not even tried to carry this heavy burden.

69.    Exercising jurisdiction notwithstanding the Exclusive Forum Provision would be particularly inappropriate given Ligado's chapter 11 plan has already been confirmed. Indeed, "forum selection clauses have even more force after confirmation . . . ." *In re Almarc Corp.*, 94 B.R. 361, 366 (Bankr. E.D. Pa. 1988). That is because, post-confirmation, bankruptcy court

---

[8]   Overruled on other grounds by *Lauro Lines v. Chasser*, 490 U.S. 495 (1989).

jurisdiction is lessened. *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 165, 168 (3d Cir. 2004) ("At the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred . . . . [thus,] the jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan").

70.     Moreover, while it is true that bankruptcy courts cannot write their own jurisdictional ticket in any event, *id.*, here Ligado did not even attempt to do so. The Plan purports to retain jurisdiction over no less than twenty-eight (28) enumerated items, but that exhaustive list does not include the Cooperation Agreement—nor would that make any sense given the Exclusive Forum Provision. D.I. 1004, at 62-64. Moreover, the Plan itself provides that the Term Sheet, which contains the Exclusive Forum Provision, "shall control" in the event of any conflict with the Plan. *Id.* at 33.

71.     Additionally, "while it is true that [the Bankruptcy Court] approved the agreement, that alone would not confer jurisdiction to resolve all subsequent disputes regardless of their connection to the bankruptcy case." *Almarc*, 94 B.R. at 366. In bankruptcy, "[a]doption of the agreement in the plan [or otherwise] does not result in the Court's retaining jurisdiction over post confirmation controversies relating to that agreement." *In re J.T. Gerken Trucking, Inc.*, 10 B.R. 203, 205 (Bankr. N.D. Ohio 1981).

## IV.     CONCLUSION

WHEREFORE, for the foregoing reasons, Inmarsat respectfully requests that this Court deny the Motion.

26

Dated: March 23, 2026
Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
        tcairns@pszjlaw.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin Finestone
Matthew Scheck
Kate Scherling
295 5th Avenue
New York, NY  10016
Telephone: (212) 849-7000
Email:
benjaminfinestone@quinnemanuel.com
        matthewscheck@quinnemanuel.com
        katescherling@quinnemanuel.com

-and-

**STEPTOE LLP**
Charles Michael
1114 Avenue of the Americas
New York, NY  10036
Telephone: (212) 506-3900
Email: cmichael@steptoe.com

Alfred M. Mamlet
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone: (202) 429-3000
Email: amamlet@steptoe.com

*Counsel to Inmarsat Global Limited*

27