## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| INMARSAT GLOBAL LIMITED,<br><br>        Appellant,<br><br>v.<br><br>AST & SCIENCE, LLC, and LIGADO<br>NETWORKS, LLC,<br><br>        Appellees. | Civ. No. 26-cv-118<br><br>Bankruptcy Case No. 25-10006 (TMH) |

## EMERGENCY MOTION FOR STAY PENDING APPEAL

Appellant Inmarsat Global Limited ("Inmarsat") hereby files this emergency motion, pursuant to Federal Rules of Bankruptcy Procedure 8007 and 8013(d), to stay pending appeal to this Court the Bankruptcy Court's January 30, 2026 order (the "Order"),[1] which requires Inmarsat to make false representations to the Federal Communications Commission (the "FCC") by no later than March 2, 2026.

### I.      PRELIMINARY STATEMENT

This case cries out for a stay pending appeal. Without taking any evidence and with minimal explanation, the Bankruptcy Court ordered Inmarsat both to make false representations to the FCC about Appellees' pending license application and to dismiss *with prejudice* a pending suit in another court. Those actions are irreversible, and, without a stay, effectively insulated from appellate review.

---

[1]   *See* Ex. A. Citations in the form "Ex. [letter]" and "Ex. [number]" refer to the exhibits to the accompanying Declaration of Kate Scherling and Declaration of John P. Janka, respectively.

That review is very likely to result in a reversal for multiple independent reasons. Most clearly, the Order violated Federal Rule of Bankruptcy Procedure 7001(g), which requires an adversary proceeding before a court may award "an injunction or other equitable relief[.]" *See In re Mansaray-Ruffin*, 530 F.3d 230, 234 n.2 (3d Cir. 2008). The Bankruptcy Court ordered injunctive relief and specific performance without an adversary hearing, based solely on Appellees' motions and a non-evidentiary hearing held a mere twelve days after filing.

Separately, the Bankruptcy Court erroneously held that Inmarsat violated the automatic stay, 11 U.S.C. § 362, by filing suit for breach of a post-petition contract in New York state court. But that is precisely what the court instructed Inmarsat to do under the terms of an exclusive-venue provision in the post-petition contracts the Bankruptcy Court approved. Those fundamental errors, and others, give Inmarsat an exceptionally high chance of success if effective appellate review is preserved.

Absent a stay pending appeal, Inmarsat faces two forms of immediate, irreparable harm. First, it will have to dismiss the New York action *with prejudice*—a disposition that may permanently foreclose Inmarsat from raising its claims in any court by operation of res judicata. Second, the Bankruptcy Court ordered Inmarsat to "support" an FCC application filed by Ligado, but doing so would require Inmarsat to concur with the false statement that Appellees' proposed satellite system has been coordinated with Inmarsat's operations.

On the other side of the balance, Appellees face no real risk of harm while this Court considers the appeal. Inmarsat will stay the New York action pending the appeal process. And Appellees could readily ask the FCC to defer processing Ligado's application, extend the comment period, or even withdraw the application without prejudice to refiling.

Finally, it goes without saying that the public interest is ill-served by enforcing a court order compelling a party to convey false information to a federal agency about the coordination of satellites—a matter critical to the safety of ships and airplanes worldwide.

The Court should  grant a stay pending appeal and forgo any bond for the reasons stated below.

## II.  BACKGROUND AND PROCEDURAL HISTORY

### A.  Spectrum Coordination and the Cooperation Agreement

Satellites operate via electromagnetic radio frequencies. Janka Decl. ¶ 4. A range of frequencies is referred to as "spectrum." *Id.* This case concerns the highly valuable "L-band" spectrum. *Id.* "Coordination" refers to satellite operators making detailed technical and operational arrangements to ensure they can operate in overlapping or adjacent spectrum without interference. *Id.* ¶ 7.

In 2007, Inmarsat and Ligado's predecessors signed a 100-year "Cooperation Agreement" that resolved coordination disputes between the parties and provided Ligado access to greater spectrum over North America in return for both a series of cash payments and certain commitments from Ligado regarding Inmarsat's spectrum rights in the rest of the world. *Id.* ¶ 9. Because at the time Inmarsat and Ligado had deployed only geostationary ("GSO") satellites, the Cooperation Agreement coordinated only GSO operations. *Id.* ¶ 13.

### B.  Ligado's Bankruptcy

On January 5, 2025, Ligado filed for Chapter 11 relief in the Bankruptcy Court for the District of Delaware (Horan, J.).

In connection with that filing, Ligado contracted with Appellee AST—a company that aspires to build a network of *non*-geostationary ("NSGO") satellites—through which AST would

essentially sublease Ligado's spectrum usage rights under the Cooperation Agreement. *Id.* ¶ 11. Inmarsat objected to that agreement.

After a mediation, Inmarsat, Ligado, and AST executed a binding "Term Sheet" that the court approved in June 2025. Ex. 3. That Term Sheet set out high-level obligations the parties would codify in two definitive contracts: an "Amended Inmarsat Cooperation Agreement" and an "Inmarsat-AST Agreement" (together, the "Post-Petition Contracts"). *Id.*, Ex. 1 at 1. It also provided that all disputes (other than one inapplicable exception) be adjudicated in New York. *Id.* at 5-6 n.12.

As relevant here, the Amended Inmarsat Cooperation Agreement would coordinate the operation of potentially hundreds of AST's NGSO satellites. That was necessary because, as noted above, the Cooperation Agreement coordinated the operation of only GSO satellites, which sit in fixed orbital positions relative to Earth. And in fact, only a single operational Ligado GSO satellite is currently coordinated. But AST seeks to operate in the L band at least ***ninety-six*** NGSO satellites that constantly speed around the Earth. Janka Decl. ¶ 13. Those NGSO operations raise complex coordination issues that were not addressed in the original Cooperation Agreement. Once that coordination was completed, the Term Sheet contemplated that Ligado and AST would apply for FCC approval of operations over AST's proposed system with Inmarsat's support. Ex. 3, Ex. 1 § 2.

The parties began discussing an Amended Cooperation Agreement to address NGSO operations before the Term Sheet was finalized. Janka Decl. ¶ 15. In May 2025, Ligado circulated a draft containing 46 uses of the term "NGSO"; the Cooperation Agreement, as amended to date, has none. *Id.* Ligado's draft recognized that both Exhibit I (list of coordinated satellites) and Exhibit L (the Coordination Plan) needed to be amended, along with a new exhibit setting forth "NGSO Operational Requirements." Ex. 4:

**INDEX OF EXHIBITS**
**[WILL BE UPDATED]**

| Exhibit | Subject | Status |
|---|---|---|
| A | Definitions | Attached to Agreement |
| B | The Spectrum Plan | Attached to Agreement |
| C | Default Spectrum Plan | Attached to Agreement |
| D | Ligado Coverage Footprint / Exclusive Spectrum Use Region | Attached to Agreement. Additional details will be in Exhibit L. |
| E-H | Intentionally Omitted | |
| I | Coordinated Satellites | To be updated. Combine old Exs I and J; and add NGSO Network |
| J | Intentionally Omitted | |
| K | Technical Information about Satellites | Remains same |
| L | L-Band Coordination Plan | Working. Needs to be updated as it is tied to various spectrum Plans. |
| M | NGSO Operational Requirements | To be provided by Ligado – consistent with Exhibits 4 and 6 to the Collaboration Agreement and the Coop Agreement. |

From that point forward, the parties negotiated amendments to coordinate the operation of AST's NGSO satellites. Janka Decl. ¶ 17. Engineers and regulatory personnel held multiple conference calls to address technical parameters. *Id*. In July 2025, the parties exchanged several drafts of documents bearing on NGSO coordination. *Id.* ¶ 18.

Those negotiations proceeded smoothly until July 29, 2025, when AST proposed a fundamental change to Exhibit L that derailed discussions. *Id.* ¶ 19. The original Exhibit L has, for over 18 years, given Inmarsat "Exclusive Use" of all L-Band spectrum outside North America. AST proposed language that would vitiate that right.

Unable to resolve that disagreement, Inmarsat and Ligado filed competing motions asking the Bankruptcy Court to enforce the Term Sheet. Exs. F, G.

The Bankruptcy Court held a hearing in August 2025. Ex. 11. The court denied both motions and directed the parties to incorporate the Term Sheet language into the definitive agreements. *Id.* at 30:8-9. If issues arose later, the court noted, the Term Sheet "provides where you go" and "you can deal with it there." Ex. 11 at 30:12-14. In other words, the court deferred resolution of the parties' disagreement about the Term Sheet to the parties' chosen forum—New York. Notably, the Bankruptcy Court stated it lacked a basis to interpret the Term Sheet's meaning. *Id*. at 6:24-7:16.

On September 2, 2025, the Bankruptcy Court issued an order directing the parties "to incorporate the specific language of the Settlement Term Sheet" into the definitive agreements. Ex. 10 ¶ 3. Thus, the Term Sheet—an incomplete document containing only the general terms of the parties' agreement—would be converted directly into the two Post-Petition Contracts, with no other terms added. The parties complied. The order provided that "[a]ll parties' rights are reserved with respect to the terms and provisions" of the agreements, "including . . . the matters presented to the [Bankruptcy] Court in connection with the Motions to Enforce." *Id.* ¶ 5.

On September 29, 2025, the Bankruptcy Court confirmed Ligado's Chapter 11 plan. The Plan does not provide for the Bankruptcy Court's retention of jurisdiction over the Post-Petition Contracts. Ex. H, Art. XI.

### C. Appellees' Failure to Coordinate with Inmarsat

In September 2025, Ligado circulated a draft FCC application. Ex. 14 at 10. Inmarsat's counsel responded that the draft did not comply with the agreements. *Id.* at 8-9. In November 2025, Inmarsat's counsel made clear that: (i) the Proposed NGSO System was not coordinated with Inmarsat; (ii) Ligado should resume the coordination process; and (iii) Ligado should not falsely representat to the FCC that the system was coordinated. *Id.* at 1-3:

> 2. The draft application repeatedly asserts that "SkyTerra Next" has been coordinated with Inmarsat and specifically asserts "that the operations of the SkyTerra Next have been coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement. . ." Those assertions are not accurate. To be sure, the Term Sheet contemplated that the Proposed NGSO System **would be** coordinated subject to the terms of the Amended Inmarsat Cooperation Agreement. In fact, the parties' actions confirm this requirement to coordinate the Proposed NGSO System. Once the Term Sheet was concluded the parties exchanged multiple drafts of the Amended Inmarsat Cooperation Agreement that included amendments to the current Article 3 (Article 2 in the drafts) and Exhibit L to expand the L-band coordination to include NGSO systems, and amendments to Exhibit I to include the Proposed NGSO System on the list "Coordinated Satellites." While completing those amendments would have coordinated the Proposed NGSO System, none of those amendments was adopted. Nothing in Amendment 22 of the Cooperation Agreement, the Inmarsat-AST Agreement or Judge Horan's order coordinated the Proposed NGSO System. Accordingly, the Proposed NGSO System has simply not been coordinated with Inmarsat.
>
> Inmarsat is prepared to work with AST and Ligado to coordinate the Proposed NGSO System. Until that happens, neither AST nor Ligado should assert that the Proposed NGSO System has been coordinated with Inmarsat. In the meantime, Inmarsat continues to reserve all rights.
>
> Best regards,
>
> **Alfred M. Mamlet**

Inmarsat also reiterated the absence of coordination directly to the FCC in filings dated September 9, 2025 and November 21, 2025, Ex.15, 17. Ligado and AST replied to these filings and did not contend their NGSO operations were coordinated. Exs. 16, 18.

In December 2025, Ligado—ignoring Inmarsat's invitation to coordinate—unilaterally filed its FCC application. Ex. 19. The application falsely represents (under penalty of perjury) that the Proposed NGSO System (referred to as "SkyTerra Next") is coordinated under the Cooperation Agreement. *Id.* at 8, 12.

Less than two weeks later, Inmarsat filed an action in New York alleging that Ligado and AST breached their contractual obligation to coordinate the new NGSO operations before filing an FCC application and that the application falsely states coordination is complete. Ex. 20. Inmarsat sought a judicial declaration that the proposed NGSO system was not coordinated. *Id.* at 22-23.

**D.  Proceedings Below**

On January 2, 2026, Ligado and AST filed the motions giving rise to this appeal. Exs. C, D. Appellees claimed Inmarsat violated bankruptcy's automatic stay, and sought an injunction

prohibiting Inmarsat "from pursuing [its] Complaint and any other actions outside of this Court." Ex. C, Ex. A ¶ 2. AST further sought an injunction requiring Inmarsat to, among other things, "voluntarily dismiss the NY State Action, with prejudice." Ex. D, Ex. F ¶ 5.

Inmarsat opposed the motions both on the merits and because the Bankruptcy Rules do not allow a party to obtain an injunction by motion—only through an adversary proceeding. Ex. E. The Bankruptcy Court scheduled the hearing for January 14, 2026, a mere twelve days later. The hearing was non-evidentiary; no discovery was taken, no witness testimony was adduced, and no party submitted any evidence.

Thirteen days later, the Bankruptcy Court issued an oral ruling, later codified in the January 30 Order. Ex. A.  It held that Inmarsat's prosecution of the New York action violates the automatic stay because it "constitutes an attempt to exercise control over property of the estate" under 11 U.S.C. § 362(a)(3).  Ex. I at 15:2-5. The court also rejected Inmarsat's procedural objection that an adversary proceeding was required, holding that "under Rule 7001(g) an adversary proceeding isn't required where the relief sought is provided in a Chapter 11 plan." *Id.* at 18:2-7. On the merits, the court interpreted the Term Sheet not to impose any *substantive* coordination obligation, but only to require that Ligado's FCC application include "a statement that coordination exists"—even if that statement is false. *Id.* at 18:20-23. The Court directed Inmarsat to support the FCC application and dismiss the New York action "with prejudice" *Id.* at 23:5-11. The court summarily denied Inmarsat's motion for a stay pending appeal. Ex. A ¶ 4. Inmarsat timely appealed.

The FCC accepted Ligado's application on January 30. Ex. 21. Comments must be filed within thirty days. 47 C.F.R. § 25.154(a)(2). If the Bankruptcy Court's Order is not stayed, therefore, Inmarsat must file a comment in support of Ligado's application by March 2, 2026.

### III. LEGAL STANDARD

Four factors govern whether to stay the Order pending appeal: (1) whether the appellant has made a strong showing it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether a stay will substantially injure the other parties; and (4) where the public interest lies. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015). The first two are the "most critical." *See id.*

### IV. ARGUMENT

#### A. Inmarsat Faces Imminent, Irreparable Harm Absent a Stay.

A "quintessential" form of irreparable harm arises when events during the pendency of an appeal can moot or render useless the relief the appellant seeks. *In re Country Squire Associates of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996) (granting stay pending appeal); *see also In re Los Angeles Dodgers LLC*, 465 B.R. 18, 35-36 (D. Del. 2011). Those are precisely the circumstances here.

*First*, if the Order is not stayed, Inmarsat will imminently be forced to take a position before its primary U.S. regulator that it believes to be false and that relates to a matter of importance to Inmarsat's business and customers. Janka Decl. ¶¶ 28-31.

The comment period for Ligado's FCC application closes in 27 days. Under the Order, Inmarsat must "support[] the Debtors' FCC application," Ex. A ¶ 3, which means Inmarsat must "fil[e] Comments and Reply Comments in support of the application[]" and "refrain[] from taking any public or private action contrary" to that support. Ex. 3, Ex. 1 § 2. That puts Inmarsat in an impossible bind, because Inmarsat believes that the FCC application has serious omissions that it must address. In particular, Ligado's FCC application represents that the proposed NGSO satellite system has been "coordinated under the cooperation arrangement between Ligado and Inmarsat,"

Ex. 19 at 8, when, in Inmarsat's view, that is flatly untrue—as Inmarsat told the FCC as recently as November 21, 2025, Ex. 17.

If Inmarsat is compelled to express the opposite view now, a victory on appeal would come too late because the comment deadline is March 2, 2026. 47 C.F.R. § 25.154(a)(2). At any point after the comment period closes, the FCC may grant the application, risking AST and Ligado operating over the NGSO system in ways that could disrupt Inmarsat's business, including its critical emergency communications services for ships and planes in distress. Moreover, forcing Inmarsat to endorse Ligado's erroneous contentions would require Inmarsat to violate its obligation under U.S. law not to make "incorrect" statements to the FCC or "intentionally omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading." 47 C.F.R. § 1.17(a), (b)(2). That would impose an irreversible stain on Inmarsat's reputation and standing before the FCC—particularly if the lack of coordination resulted in serious problems in the future.

*Second*, the Bankruptcy Court's command to "dismiss the [New York] Complaint with prejudice" would also produce irreparable harm. Ex. A ¶ 2. Generally speaking, a "dismissal that is specifically rendered 'with prejudice' qualifies as an adjudication on the merits," precluding "successive suits against the same defendant based on same underlying events." *Gimenez v. Mogan Stanley DW, Inc.*, 202 F. App'x 583, 584 (3d Cir. 2006). If Inmarsat prevails on appeal, a prior dismissal of the New York complaint "with prejudice" risks Inmarsat being forever precluded from pursing its claims in any court—again rendering any appellate victory hollow. That is classic irreparable harm. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 81 (2d Cir. 2024); *Weinhold v. Carolina Pres. Partners*, 2019 WL 13245886, at *2 (M.D. Fla. Dec. 20, 2019).

**B.      The Merits Strongly Favor Inmarsat.**

For multiple, independent reasons, discussed below, Inmarsat's appeal is likely to succeed.

### 1.      The Bankruptcy Court Violated Rule 7001(g) by Ordering Injunctive Relief and Specific Performance Without an Adversary Proceeding.

The Bankruptcy Rules distinguish between "contested matters," which "are more informal than adversary proceedings, are initiated by motion (not by a complaint), and, unless the court directs otherwise, do not require a responsive pleading," and "adversary proceedings," which are "essentially [] self-contained trial[s] ... in which a panoply of additional procedures apply." *Mansaray-Ruffin*, 530 F.3d at 234, 237. As pertinent here, Rule 7001(g) specifies that an adversary proceeding is required for "a proceeding to obtain an injunction or other equitable relief—except when the relief is provided in a Chapter 9, 11, 12, or 13 plan." Fed. R. Bankr. P. 7001(g); *see also In re Rynda*, 2010 WL 1495180, at *1 (Bankr. N.D. Ca. Apr. 14, 2010) (specific performance). The Third Circuit has thus held that "where the Rules require an adversary proceeding," such as for injunctive relief and specific performance, "a creditor has the due process right not to have that issue resolved without one." *Mansaray-Ruffin*, 530 F.3d at 242.

The Bankruptcy Court violated that rule by allowing Appellees' demand for mandatory injunctive relief and specific performance to proceed as a contested matter, without the procedural protections or evidentiary submissions that attend an adversary proceeding.

A violation of Rule 7001(g)'s plain text alone warrants vacatur. *See Matter of Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990). And the due process implications make vacatur imperative. On twelve days' notice, with no evidence admitted, the Bankruptcy Court made factual findings with no evidence interpreting the Post-Petition Contracts—essentially a broadly worded Term Sheet that left key terms and obligations undefined—and ordered the New York action dismissed with

prejudice, an "extraordinary remedy [to] be employed only in the most unusual case," *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

The Bankruptcy Court stated that Rule 7001(g) did not require an adversary proceeding because "the relief that would be enforced here was enforced under a plan." Ex. I at 18:4-7. That reasoning is flawed. The exception to Rule 7001(g) for relief under a plan applies only where the plan specifically provides for injunctive relief—*e.g.*, discharge injunctions or channeling injunctions expressly set forth in plan provisions. *See In re Kalikow*, 602 F.3d 82, 93 (2d Cir. 2010) (exception applies where "the relief sought ... was meant to correct the alleged violation of the existing injunction" provided for under a plan); *In re Continental Airlines, Inc.*, 236 B.R. 318, 327 (Bankr. D. Del. 1999) ("Continental is not seeking an injunction, it is merely seeking to enforce an injunction already in place.").

There is no relevant "pre-existing" injunction in Ligado's plan. *Kalikow*, 602 F.3d at 93. Nor do any prior court orders qualify as such an injunction. Mere approval of the Post-Petition Contracts (as was required for contracts outside the ordinary course, *see* 11 U.S.C. §§ 363, 365) is entirely distinct from ordering specific performance under those agreements. *See In re Almarc Corp.*, 94 B.R. 361, 366 (Bankr. E.D. Pa. 1988) ("While it is true that this [bankruptcy] court approved the agreement, that alone would not confer jurisdiction to resolve all subsequent disputes.").

Finally, even if a full-blown adversary hearing was not required, it was still reversible error for the Bankruptcy Court to resolve highly contested fact issues without an evidentiary hearing. Under Rule 9014, governing contested matters, if a "motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing *must be held* at which testimony of witnesses is taken . . . " Fed. R. Bankr. P. 9014, advisory committee notes (emphasis added). For

example, the Bankruptcy Court found that "[t]he FCC application accurately states that operations will be consistent with and remain within the technical, geographic, or other limitations of the amended Inmarsat cooperation agreement[.]" Ex. I at 20:1-4.

### 2. The Bankruptcy Court's Order Conflicts With Its Own Prior Rulings and the Automatic Stay Does Not Apply.

The Bankruptcy Court's Order also conflicts with the Post-Petition Contracts' venue provision and the court's own rulings directing the parties to resolve disputes in New York courts. As explained above, in August 2025, the Bankruptcy Court declined to resolve the parties' dispute about the Term Sheet and instead instructed them to codify the Term Sheet verbatim in the Post-Petition Contracts and resolve any future disputes in accordance with the Term Sheet's venue provision. *See* Ex. 11 at 30:7-14 ("It provides where you go if you have a disagreement and you can deal with it there."). Yet in the Order below, the court did an about-face, holding that Inmarsat violated the automatic stay by doing precisely what the court previously instructed it to do.

The Bankruptcy Court was right the first time. The Post-Petition Contracts approved by the Bankruptcy Court channeled all disputes to New York courts, Ex. 10, and it is well-settled law that obligations under such contracts "are not subject to the automatic stay." *In re Chester*, 2025 WL 2816599, at *7 (Bankr. D.N.J. Oct. 2, 2025) (quoting *Matter of M. Frenville Co., Inc.*, 744 F.2d 332, 335 (3d Cir. 1984)); *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) (alleged post-assumption, post-confirmation breaches were "properly now the subject of a state court proceeding").

The Bankruptcy Court relied on Section 362(a)(3) of the Bankruptcy Code—which stays actions to "obtain possession" or "control" estate property—but that analysis "rests on the false premise that [Inmarsat's New York action] took something from [Ligado], or exercised dominion over property that belonged to [Ligado]." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995).

Inmarsat does not seek to obtain or control Ligado's FCC license; it seeks to ensure Ligado complies with its contractual obligations. Even assuming that doing so might "interfere" with Ligado's application to modify its FCC license, the "Supreme Court has repeatedly held that actions that interfere with the debtor's property do not necessarily violate the automatic stay." *In re Windstream Holdings, Inc.*, 105 F.4th 488, 498 (2d Cir. 2024); *see also Larami Ltd. v. Yes! Ent. Corp.*, 244 B.R. 56, 59-60 (D.N.J. 2000).

The Bankruptcy Court further erred by ignoring the effect of 28 U.S.C. § 959—which provides that debtors in possession "may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property." Both the Bankruptcy Court and Ligado conceded that the New York action could "critically affect the Debtors' go-forward business." Ex. C ¶ 36; Ex. I at 16:16-21. Thus, Inmarsat's suit falls squarely within Section 959. *See Haberern v. Lehigh & N. E. Ry. Co.*, 554 F.2d 581, 585 (3d Cir. 1977).

### 3. Even Assuming a Stay Violation, the Relief Imposed Was Legally Improper.

Even if Inmarsat violated the stay (it did not), it was reversible error to order "dismissal with prejudice" of the New York action "given the stay violation." Ex. I at 23:5-11; Ex. A ¶ 3. The consequence of a stay violation is that the offending action is void *ab initio*—that is, "without effect." *Maritime Elec. Co. v. United Jersey Ban*k, 959 F.2d 1194, 1206 (3d Cir. 1991) (quoting *In re Ward,* 837 F.2d 124, 126 (3d Cir. 1988)). This is fundamentally incompatible with dismissal "with prejudice," which gives the dismissed action claim-preclusive effect. *See, e.g.*, *Hearst Mags. v. Stephen L. Geller, Inc.*, 2009 WL 812039, at *2 (S.D.N.Y. Mar. 25, 2009) (case filed in violation of automatic stay was "void from its commencement" and so should be "dismissed without prejudice").

4934-2605-9917.1 42241.00001

14

In addition, directing Inmarsat to falsely represent to the FCC that AST's NGSO operations have been coordinated was, at minimum, an abuse of the Bankruptcy Court's equitable discretion, and it likely violated the First Amendment by compelling false speech.

### 4. Inmarsat Is Likely to Prevail on the Merits of the Contract Dispute.

Finally, the Bankruptcy Court erred in holding that Inmarsat had a duty under the Post-Petition Contracts to support Ligado's FCC application in the present circumstances.

The Amended Inmarsat Cooperation Agreement requires the FCC application to state that operations "have been coordinated" subject to the agreements. Ex. 3, Ex.1 § 2. The only reasonable construction of that language is that the parties were required to coordinate the NGSO system *before* the FCC application was filed. The contrary view—that the Amended Cooperation Agreement allows the FCC application (which must be filed under oath) to falsely state that coordination of the NGSO system had occurred, and thereby force Inmarsat to endorse that falsehood (in contravention of federal law)—is not reasonable. *See McCutcheon v. Colgate-Palmolive Co.*, 62 F.4th 674, 696–97 (2d Cir. 2023) (contracts should not be interpreted to render them illegal and unenforceable). And that view is totally inconsistent with the undisputed fact that the parties spent months engaged in NGSO coordination discussions *after* signing the Term Sheet. Exs. 4-9.

The Bankruptcy Court expressly acknowledged that the original Cooperation Agreement does not address NGSO satellites, and further acknowledged, consistent with Inmarsat's position, that the parties made extensive efforts to adapt the coordination terms accordingly after signing the Term Sheet. Ex. I at 6:7-12; 10:1-8. But the court ruled—again, without taking any evidence—that the pre-existing GSO coordination terms sufficed under the Term Sheet to provide "protections against harmful interference," irrespective of "whether the satellites are GSO or NGSO." *Id.* 19:18-25. The Bankruptcy Court had no basis whatsoever for that conclusion.

### C. The Public Interest and Balance of Equities Favor a Stay.

The public interest heavily favors a stay. A stay will ensure the FCC evaluates Ligado's application with complete information and makes an informed judgment about the absence of coordination.

The powerful public interest at stake—the free flow of truthful information to government agencies—is reflected in the FCC's statutory authority. The FCC may grant only grant a license to use spectrum after "notice and an opportunity for public comment" and to the extent the FCC finds doing so "would be in the public interest" and "not result in harmful interference among users." 47 U.S.C. § 303(y)(2). This public-notice-and-comment process ensures the "agency will have before it the facts and information relevant to a particular administrative problem." *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1140-41 (D.C. Cir. 1995). In point of fact, federal law expressly prohibits parties holding or applying for FCC authorization from providing incorrect information or omitting material information in statements to the FCC. *See, e.g.*, 47 C.F.R. § 1.17(a), (b)(2).

Consistent with these principles, courts are exceedingly wary of enforcing contractual obligations that would prohibit the public's engagement with government agencies. *See, e.g.*, *Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 172 (2d Cir. 2012) (citing public interest concerns in invalidating contract that would "muzzle" a party from challenging patent's validity); *McKesson Corp. v. Grisham*, 2015 WL 9238962, at *10 (W.D. Ark. Dec. 17, 2015) (emphasizing "public policy commitment" to "open flow of information between the government and the public" for purposes of contract prohibition on communicating with EPA without prior consent). It is antithetical to the public interest to compel Inmarsat to make representations it believes are false, leaving the FCC to proceed under the incomplete and inaccurate record Appellees seek to present, and allowing AST to operate under terms not adapted to the NGSO satellites it seeks to operate.

For similar reasons, Appellees face little cognizable harm from a stay. Janka Decl. ¶¶ 32-33. A stay will merely permit the FCC to consider the application with the full benefit of complete information and Inmarsat's honest concerns. Moreover, Appellees could ask the FCC to defer processing the application, extend the comment period, or even withdraw the application without prejudice to refiling. They also, of course, retain the ability to reply to any objection Inmarsat files with the FCC. At bottom, any harm that would result to Ligado and AST would be the result of their own making (including their decision to file the application when they did, knowing Inmarsat's position and despite Inmarsat's invitation to continue coordination efforts), or from the FCC's independent decision-making authority regarding the factual matter at issue.

The Bankruptcy Court concluded that Ligado and AST faced irreparable harm if "regulatory approval is denied or substantially delayed because of Inmarsat's opposition," adding that potential "loss of the AST transaction" would be especially harmful because the transaction "represents [Ligado's] only viable path to emergence from Chapter 11." Ex. I at 22:6-16. But if the application is not granted as requested or resolution is deferred until coordination is completed, that is because the independent experts at the FCC, taking into account all information, including the fact that there has been no coordination of the NGSO system, conclude that approval is not in the public interest. That is not the sort of "harm" that entitles a party to injunctive relief.

Finally, Ligado and AST argued below that Inmarsat's position deprives them of what they paid $420 million under the Post-Petition Contracts to obtain. Ex. B at 23:8-23; 30:2-12. Not so. The $420 million represents a heavily discounted cure payment for amounts years past due. Ex. 3, Ex. 1 § 4. To be sure, Inmarsat agreed to support the FCC application, but only after NGSO operations were properly coordinated. Indeed, Viasat had already represented to the FCC that Ligado and AST had not met their coordination obligations on September 9, 2025—*prior* to

Ligado's payment on October 31, 2025. Ex. 15. Holding Ligado and AST to their bargain is not a "harm."

### D. No Bond Is Required.

The Court should not impose any bond. Although courts "may" condition a stay on filing a bond, Fed. R. Bankr. P. 8007, doing so lies "in the discretion" of the Court, *In re Revel AC, Inc.*, 2015 WL 567015, at *6 (D.N.J. Feb. 10, 2015). A bond protects the prevailing party from loss resulting from the stay, and so no bond is necessary where "no substantial harm will come to the Debtors as a result of th[e] stay." *In re Finova Grp., Inc.*, 2007 WL 3238764, at *2 (D. Del. Oct. 31, 2007).

Here, no bond is appropriate because any hypothetical harm to Ligado or AST would result from the FCC's independent judgment—not from Inmarsat's expression of its views. Under fundamental causation principles, where a party's claimed loss results from the "decision of an independent intermediary," that "sever[s] the chain of causation." *Egervary v. Young*, 366 F.3d 238, 246-47 (3d Cir. 2004); *see also Barr Labs'ys., Inc. v. Quantum Pharmics*, Inc., 827 F. Supp. 111, 116 (E.D.N.Y. 1993) (no recovery where "losses depend on the intervening actions of the FDA," which "had discretion in deciding whether or not to issue the licenses"). Ligado and AST cannot credibly claim a need for security from Inmarsat for hypothetical losses caused by the FCC's decision-making.

## V.   CONCLUSION

WHEREFORE, for the foregoing reasons Inmarsat respectfully requests that the Court grant the Motion and such other or further relief as is just and reasonable.

STEPTOE LLP

By: */s/ Alfred M. Mamlet*
    Alfred M. Mamlet (admitted *pro hac vice*)
    1330 Connecticut Ave NW
    Washington, DC 20036
    (202) 429-3000
    amamlet@steptoe.com

    Charles Michael (admitted *pro hac vice*)
    1114 Avenue of the Americas
    New York, New York 10036
    (212) 506-3900
    cmichael@steptoe.com

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Laura Davis Jones*
    Laura Davis Jones (DE Bar No. 2436)
    Timothy P. Cairns (DE Bar No. 4228)
    919 N. Market Street, 17th Floor
    P.O. Box 8705
    Wilmington, DE 19899-8705
    (302) 652-4100
    ljones@pszjlaw.com
    tcairns@pszjlaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Benjamin Finestone*
    Benjamin Finestone
    Kate Scherling
    295 5th Avenue
    New York, NY 10016
    (212) 849-7000
    benjaminfinestone@quinnemanuel.com
    katescherling@quinnemanuel.com

    John Bash
    Jacob C. Beach
    300 West 6th St., Suite 2010
    Austin, TX 78701
    (737) 667-6100
    johnbash@quinnemanuel.com
    jacobbeach@quinnemanuel.com

*Counsel for Inmarsat Global Limited*

4934-2605-9917.1 42241.00001

**STATEMENT PURSUANT TO LOCAL RULE 7.1.1**

Pursuant to District of Delaware Local Rule 7.1.1, Appellant's undersigned Delaware counsel certifies that they have made a reasonable effort to confer and reach agreement with Appellees' counsel on the relief sought by this Motion. Counsel for Appellees have indicated that Appellees do not consent to the relief sought in this Motion.

**CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8015(h)**

The undersigned certifies that the *Emergency Motion for Stay Pending Appeal* filed by Appellant Inmarsat Global Limited does not exceed 5,200 words in accordance with Federal Rules of Bankruptcy Procedure 8013(f)(3)(A) and 8015(h).

Dated: February 3, 2026                                    PACHULSKI STANG ZIEHL & JONES LLP

                                                                    By:    */s/ Laura Davis Jones*

4934-2605-9917.1 42241.00001                    20

## EXHIBIT A

## PROPOSED ORDER

4934-2605-9917.1 42241.00001

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| INMARSAT GLOBAL LIMITED, | |
| Appellant, | |
| v. | Civ. No. 26-cv-118 |
| | Bankruptcy Case No. 25-10006 (TMH) |
| AST & SCIENCE, LLC, and LIGADO NETWORKS, LLC, | |
| Appellees. | |

## [PROPOSED] ORDER GRANTING INMARSAT GLOBAL LIMITED'S EMERGENCY MOTION FOR STAY PENDING APPEAL

Upon the emergency motion (the "Motion") of Inmarsat Global Limited ("Appellant") for entry of an order, pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedures, granting a stay pending Appellant's appeal of the Bankruptcy Court's *Order Granting (A) Debtors' Motion for an Order (I) Enforcing the Automatic Stay, (II) Enforcing the Mediated Agreement, and (III) Granting Related Relief and (B) Emergency Motion by AST & Science LLC for Entry of an Order Enforcing the Mediated Agreement and Related Orders of This Court Against Inmarsat Global Limited*, dated January 30, 2026 [Docket No.  1304] (the "Order"), all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 158 and 1334; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein, IT IS HEREBY ORDERED THAT:

4934-2605-9917.1 42241.00001                           1

1.      The Motion is granted to the extent set forth herein.

2.      The effectiveness of the Order and enforcement thereof, including any matters

attendant thereto, are stayed pending resolution of Appellant's pending appeal of the Order.