**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20544**

| | | |
|---|---|---|
| In the Matter of | ) ) | ICFS File No. SAT-MOD- |
| | ) | 20251206-00374 |
| Application for Modification of Space | ) | |
| Station License of | ) | Call Sign: S2358 |
| Ligado Networks Subsidiary LLC | ) | |
| | ) | |

**CONSOLIDATED OPPOSITION TO PETITION AND RESPONSE TO COMMENTS**
**OF LIGADO NETWORKS SUBSIDIARY LLC**

Vernon Ross
Vice President, Legal and Regulatory Affairs

LIGADO NETWORKS LLC
10802 Parkridge Blvd.
Reston, VA 20191
(877) 678-2920

Gerard J. Waldron
Corey Walker
John D. Bowers
Rosalie A. Moss
COVINGTON & BURLING LLP
850 10th St NW
Washington, DC 20001

*Counsel to Ligado Networks LLC*

March 17, 2026

## SUMMARY

As part of its forward-leaning approach to the space economy, the Federal Communications Commission has taken up two great challenges facing the American satellite industry. First is the development of a robust space economy and the market for direct-to-device ("D2D") non-geostationary orbit ("NGSO") mobile broadband systems that will close connectivity gaps, provide transformative new opportunities for rural communities, and revolutionize public safety. Second, and related, is the promotion of efficient use of existing commercial spectrum to serve fast-evolving forms of connectivity. The pending Modification Application filed by Ligado Networks Subsidiary LLC ("Ligado") will enable the Commission to deliver on both goals. Specifically, in collaboration with AST & Science, LLC ("AST SpaceMobile"), Ligado proposes to use its vital L-band spectrum and AST SpaceMobile's cutting-edge satellite technology to make space-based, low-latency mobile 5G services available to U.S. consumers' devices in the near term. D2D combines two areas in which the U.S. has led for decades, and this proposal will contribute to the nation maintaining a leadership role in this next-generation technology.

Under the proposed approach, Ligado will work with AST SpaceMobile to place an L-band payload—called "SkyTerra Next"—aboard NGSO satellites that AST SpaceMobile is deploying into low Earth orbit ("LEO"). SkyTerra Next will operate as a complement to Ligado's existing geostationary ("GSO") SkyTerra-1 satellite. This approach will deliver a transformative technological upgrade to Ligado's coordinated L-band spectrum, enabling Ligado to partner with AST SpaceMobile to deliver a competitive D2D LEO mobile broadband offering that would not be possible using a wholly GSO-based system. And critically, SkyTerra Next will accomplish this purpose while remaining within the bounds of Ligado's existing L-band coordination agreements and the FCC rules to which its license is subject. The important

technological upgrade described in the Modification Application will not introduce any new risks of harmful interference to other in-band or adjacent-band operations—rather, SkyTerra Next is designed to enable Ligado to intensify L-band spectrum utilization without affecting its spectrum neighborhood.

None of the comments or the lone petition to deny filed in response to the Modification Application seriously dispute the enormous public interest benefits that SkyTerra Next could bring to the connectivity marketplace.  Rather, those critical of the Modification Application have technical questions about Ligado's proposal, each of which is addressed herein.  And Iridium Communications Inc. ("Iridium") throws up baseless arguments, some of which are simply irrelevant or perpetuate a naked claim to Ligado's coordinated spectrum.  As explained in detail below, not one of these critiques provides a basis for delaying a swift and straightforward grant of the Modification Application.

The L-band is unique in its existing and carefully developed coordination, and Ligado has spent more than two decades (and billions of dollars) coordinating this spectrum with Inmarsat Global Ltd. ("Inmarsat") to rationalize the L-band for modern use.  That effort is reflected in a longstanding Amended Cooperation Agreement between Ligado and Inmarsat (a wholly owned subsidiary of Viasat, Inc. ("Viasat")).  Consistent with the Amended Cooperation Agreement, Inmarsat has provided its affirmative support for approval of the Modification Application.

In addition to being coordinated within the L-band, SkyTerra Next also is designed to protect adjacent-band services, including Global Positioning System ("GPS") and aeronautical mobile telemetry ("AMT") operations.  Ligado is committed to working with GPS and AMT stakeholders to ensure their systems are protected.  To that end, Ligado has attached to this Opposition an analysis produced by qualified independent consultant RKF Engineering Solutions

demonstrating that, even under extremely conservative assumptions—and disregarding numerous features that will mitigate unwanted emissions—SkyTerra Next's operations will not result in harmful interference to GPS or AMT operations. While some commenters request levels of protection that simply are not grounded in FCC rules, the actual question for the Commission is what is required by applicable rules and regulations—and Ligado's proposal fits well within those requirements.

As Ligado explained in its Modification Application, the fact that SkyTerra Next will only use spectrum to which Ligado already has coordinated access means that the Commission should not initiate a processing round under applicable precedents. And even if a processing round was required—as Iridium alone suggests, in a clear effort to swoop in and seize spectrum Ligado has spent enormous amounts of time and money coordinating—the public interest would demand that any such requirement be waived. A processing round would necessitate completely reworking the coordination arrangements among the operators in the L-band and leave valuable spectrum stranded and segmented into narrowband slivers, undermining prior investments and adding a decade or more of delay before the spectrum could be utilized. Furthermore, requiring a processing round would be bad spectrum policy, essentially penalizing a licensee for attempting to make more intensive and efficient use of its spectrum by updating its licenses to use the latest and most innovative technology.

Finally, the Commission should dismiss Iridium's fallacious arguments that the arrangements between Ligado and AST SpaceMobile constitute a transfer of control of Ligado's license to AST SpaceMobile. The agreements between the parties ensure that Ligado always retains control over and responsibility for SkyTerra Next and its L-band spectrum. Iridium relies on a distorted and fact-free description of the relationship between Ligado and AST

SpaceMobile—two sophisticated satellite operators who have entered into an arms-length commercial agreement to deliver a cutting-edge service. Equally unavailing is Iridium's effort to suggest that this proposal is incompatible with Ligado's Ancillary Terrestrial Component ("ATC") authority. That argument fails on many fronts because it misconstrues both the instant Modification Application, the ATC rules, and the Commission's April 2020 Order modifying Ligado's ATC authority.

The record provides ample support for the Commission to approve this important proposal to introduce a highly sophisticated and capable new offering to the marketplace for NGSO mobile broadband services. The Modification Application proposes an important technological upgrade that will transform the market for D2D services in the United States by introducing higher capacity and increased coverage. By quickly granting it, the Commission will take a critical step towards bolstering American satellite leadership.

**TABLE OF CONTENTS**

SUMMARY ........................................................................................................................... i

I.  THE PROPOSED SKYTERRA NEXT OPERATIONS ARE FULLY
    CONSISTENT WITH FCC RULES AND EXISTING COORDINATION
    AGREEMENTS. ........................................................................................................ 4

II. GPS AND OTHER ADJACENT-BAND SERVICES ARE FULLY
    PROTECTED. ............................................................................................................ 6

    A.  SkyTerra Next Will Not Cause Harmful Interference to GPS. ............................. 6

    B.  SkyTerra Next Will Not Cause Harmful Interference to AMT Operations. .......... 10

III. A PROCESSING ROUND IS NOT WARRANTED, WOULD BE CONTRARY
     TO THE PUBLIC INTEREST, AND WOULD CONSTITUTE MISGUIDED
     SPECTRUM POLICY. ............................................................................................... 11

    A.  A Processing Round Is Not Warranted Because the Modification
        Application Raises No New Significant Interference Concerns. .......................... 13

    B.  In the Alternative, the Commission Should Grant a Waiver of Processing
        Round Rules. .................................................................................................. 16

IV. LIGADO WILL CONTROL SKYTERRA NEXT. .......................................................... 17

    A.  Ligado's Ongoing Control Over Its License Is Ensured by Its Arms-
        Length Commercial Relationship with AST SpaceMobile. ................................ 18

    B.  Iridium's Control Arguments Misconstrue Provisions of the Ligado-AST
        Agreement and Commission Precedent. ............................................................ 21

V.  LIGADO'S MODIFICATION APPLICATION IN NO WAY IMPLICATES
    THE *2020 ATC ORDER*. ......................................................................................... 23

    A.  Ligado's Proposal is an *MSS-Only* Proposal. ................................................. 24

    B.  Iridium Mischaracterizes the *2020 ATC Order*'s Conditions. ........................ 26

CONCLUSION ..................................................................................................................... 29

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20544**

|  |  |  |
|---|---|---|
| In the Matter of | ) | ICFS File No. SAT-MOD-20251206-00374 |
| | ) | |
| Application for Modification of Space | ) | |
| Station License of | ) | Call Sign: S2358 |
| Ligado Networks Subsidiary LLC | ) | |
| | ) | |

**CONSOLIDATED OPPOSITION TO PETITION AND RESPONSE TO COMMENTS OF LIGADO NETWORKS SUBSIDIARY LLC**

Ligado Networks Subsidiary LLC's ("Ligado") Modification Application advances one of the Commission's most critical and longstanding objectives—to ensure that scarce spectrum resources are used in an efficient manner that provides maximal benefit to U.S. consumers.[1] Grant of the Modification Application would permit Ligado to deploy SkyTerra Next aboard AST & Science, LLC's ("AST SpaceMobile") next-generation NGSO system. The purpose of the Modification Application is to update the satellite technology used to take maximum advantage of Ligado's existing licensed and fully coordinated L-band spectrum by leveraging AST SpaceMobile's cutting-edge satellite platform. Permitting this technological upgrade would promote competition in the rapidly growing direct-to-device ("D2D") marketplace and would be enhanced by AST SpaceMobile's partnerships with carriers to bring broadband services to customers throughout the country.[2]

---

[1] Application For Modification of Space Station License of Ligado Networks Subsidiary LLC, Debtor-in-Possession, Narrative, ICFS File No. SAT-MOD-20251206-00374 (filed Dec. 8, 2025) (the "Modification Application").

[2] *See* Comments of the Mobile Satellite Services Association at 2, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026) ("MSSA Comments") ("Ligado's proposal would make good use of MSS frequency bands within existing ITU allocations that enable D2D and other (continued…)

The Modification Application will enable deployment of broadband D2D technology without the need to reallocate spectrum and without causing new interference, and the Commission should dismiss baseless suggestions to the contrary. Iridium Communications Inc. ("Iridium"), the only party that filed a petition to deny, has spent decades opposing everything related to Ligado and continues that effort here.[3] To that end, Iridium's filing does not focus on its interference concerns (because it has none) or public interest concerns (because it can muster none, aside from "we could do it better"), but rather on baseless legal claims and a processing round request it concedes would go against Commission precedent.[4] To be clear, and as it has expressly stated in this proceeding, Iridium's sole interest is to claim Ligado's carefully coordinated spectrum for itself: "Iridium has an interest in the questions raised by Ligado's request because it intends to file an application seeking access to these bands."[5]

Comments from Global Positioning System ("GPS") and aviation industry stakeholders request more information about the radiofrequency characteristics of SkyTerra Next. Ligado addresses those concerns by submitting as an attachment to this filing a detailed study by independent technical consultant RKF Engineering Solutions ("RKF") that provides additional

---

advanced NTN services consistent with established regulatory frameworks that have worked well for decades. Therefore, it is important for the FCC to encourage and foster innovation and investment when MSS operators propose to leverage these bands for next generation services.").

[3] *See* Petition to Deny of Iridium Communications Inc., File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026) ("Iridium Petition").

[4] Iridium Petition at 26 n.77 ("While Iridium recognizes that the Commission has applied the *Teledesic* decision to certain NGSO applications, which Iridium believes is a misapplication of that precedent, it certainly does not apply to MSS spectrum assigned on an exclusive basis."). Ligado notes that Iridium lacks any meaningful interest under 47 C.F.R. § 25.154(a)(4) and has failed to provide the required affidavit establishing it is a genuine party of interest.

[5] Letter from Kara Leibin Azocar, Vice President, Regulatory & Public Policy, Iridium Communications Inc., to Marlene H. Dortch, Secretary, FCC, at 1 ICFS File No. SAT-MOD-20251206-00374 (filed Dec. 19, 2025) ("December Iridium Letter").

technical analysis of SkyTerra Next.  As the record affirms,[6] Ligado remains committed to working with its spectrum neighbors to ensure coexistence consistent with the Commission's long-standing rules on MSS, and SkyTerra Next will not adversely impact the interference environment.  Finally, some commenters suggest the Commission use the Modification Application to change its MSS rules rather than advance the space economy and enable America to continue its leadership role.  The Commission must reject that proposal.[7]

On the strength of the record in this proceeding and the public interest benefits associated with Ligado's proposal,[8] the Commission should move quickly to grant Ligado's Modification Application and permit the deployment of SkyTerra Next to foster competition in the D2D mobile broadband marketplace.  As detailed below, the single petition to deny lacks merit and should not delay approval of this exciting new system that will yield transformative public interest benefits in the United States.  And to the extent that some parties requested additional technical information, this filing addresses those requests with a robust technical analysis.

---

[6] Comments of Trimble Inc. at 3, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026) ("Trimble has already engaged in constructive discussions with Ligado and AST.") ("Trimble Comments").

[7] Some note that the Commission has not established specific technical rules for joint GSO-NGSO operations in the L-band.  *See* Trimble Comments at 8; Comments of the GPS Innovation Alliance at 23-25, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026) ("GPSIA Comments").  Suggesting that this proceeding should address that issue is procedurally improper and actually misses the key point that SkyTerra Next will operate strictly within Ligado's *already coordinated spectrum*.  As such, any GSO-NGSO interference would arise between Ligado's own systems, and the company can manage any self-coordination issues.

[8] *See, e.g.*, MSSA Comments at 2 ("MSS spectrum offers the potential to deliver D2D and other advanced NTN services to areas where terrestrial infrastructure deployment is economically challenging.  NTN services also can provide backup connectivity during network outages or disasters.  This complementary attribute, especially when delivered in a standards-based, interoperable way consistent with the current spectrum allocation, is key to achieving ubiquitous connectivity across the entire nation.").

## I. THE PROPOSED SKYTERRA NEXT OPERATIONS ARE FULLY CONSISTENT WITH FCC RULES AND EXISTING COORDINATION AGREEMENTS.

As a threshold matter, the use of Ligado's licensed MSS spectrum to operate SkyTerra Next is consistent with the Commission's rules and Ligado's existing L-band coordination agreements, including its recently amended agreement with Inmarsat.[9] Ligado, which has been operating an L-band MSS system for decades, does not seek a waiver of any spectrum rule to add this NGSO-based capacity to its license. In addition to being compliant with the Commission's rules, the proposed system also will remain within the technical, geographic, and other limitations of these existing—and longstanding—coordination agreements. Thus, grant of the Modification Application will enable next-generation NGSO services in the United States without any new allocation of spectrum, since Ligado will use its existing spectrum, and will not introduce new harmful interference risks.[10] From the day that the Modification Application is granted, Ligado will be subject to—and respect—the same coordinated operating conditions under which it operates today, but its use of its licensed and coordinated L-band spectrum will receive a significant technological upgrade.[11]

Ligado and Inmarsat have been engaged for over two decades to rationalize the L-band and make it more efficient and effective for modern use. This monumental effort has been memorialized in the Cooperation Agreement between Ligado and Inmarsat (a wholly-owned subsidiary of Viasat) and various amendments thereto (collectively, the "Amended Cooperation

---

[9] *See* Modification Application at 11-12.

[10] *See id.* at 17.

[11] The Modification Application will therefore advance the Commission's longstanding objective of "permit[ting] licensees to modify satellite systems, when possible, to make design improvements," and "allow[ing] the licensee to take advantage of the latest technology in providing service to the public." *See, e.g.*, *In re Sirius Satellite Radio, Inc.*, Order and Authorization, 16 FCC Rcd 5419 ¶¶ 4-5 (IB 2001) ("*Sirius Order*").

Agreement") to facilitate use of the band.  In addition, Ligado has paid billions of dollars to

Inmarsat to advance this coordination, and most recently Inmarsat received $420 million in

connection with the Amended Cooperation Agreement in anticipation of the deployment of

SkyTerra Next, the specific use case proposed in the Modification Application.  Consistent with

the Amended Cooperation Agreement, Ligado welcomes Inmarsat's affirmative support for

approval of the Modification Application.[12]  Considering the coordination history between

Ligado and Inmarsat, Ligado painstakingly and intentionally negotiated terms with AST

---

[12] *See* Letter from Alfred M. Mamlet, Counsel for Inmarsat, to Marlene H. Dortch, Secretary, Federal Communications Commission, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026).  The Commission is aware that a premature filing was made in this proceeding by Viasat, and we here address that point.  On February 27, Viasat filed a petition stating that SkyTerra Next was not coordinated, which it withdrew on March 2 and replaced with a letter of support.  *See* Letter from Jarrett S. Taubman, VP & Deputy Chief Government Affairs and Regulatory Officer, Viasat, Inc., to Marlene H. Dortch, Secretary, Federal Communications Commission, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026).  Obviously, any withdrawn document is not part of the record and thus cannot be relied upon by the Commission or other filers.  In this case, that is true on procedural and substantive grounds.

The fact that Ligado and Inmarsat are coordinated with respect to SkyTerra Next is evident from discussions between the parties and a recent holding of the U.S. Court of Appeals for the Third Circuit.  In September 2025, Ligado and Inmarsat agreed to another amendment to the existing decades-old Ligado-Inmarsat Cooperation Agreement (the "Amended Cooperation Agreement"), which incorporates, *inter alia,* specific provisions and procedures concerning coordination negotiated among Ligado, Inmarsat, and AST SpaceMobile that were approved by the bankruptcy court in June 2025.  The Third Circuit on March 2, 2026 reviewed the Amended Cooperation Agreement and related documents and concluded:  "The plain language of the Amended Inmarsat Cooperation Agreement and the Inmarsat-AST Agreement committed Ligado and AST SpaceMobile to ensure the operations of the Proposed NGSO System comply with those terms, *regardless of whether the satellites are GSO or NGSO." In re Ligado Networks*, Nos. 26-1444 & 26-1445 at 7 (3d Cir. Mar. 4, 2026) (emphasis added).  As Ligado has explained, Iridium's attempt to dismiss this clear finding of the Third Circuit is unavailing.  Indeed, reliance on the withdrawn Viasat petition leaves Iridium's entire filing procedurally and substantively deficient.  *See* Letter from Gerard J. Waldron, Counsel to Ligado, to Marlene H. Dortch, Secretary, Federal Communications Commission, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 6, 2026).

SpaceMobile to avoid introducing new interference risks.[13]  Thus, the record reflects that SkyTerra Next is fully coordinated with respect to Inmarsat, and Ligado and AST SpaceMobile have agreed that it will remain so.[14]

## II.    GPS AND OTHER ADJACENT-BAND SERVICES ARE FULLY PROTECTED.

SkyTerra Next will not cause harmful interference to GPS or other adjacent-band services.  As discussed in Ligado's Modification Application and the technical materials accompanying it, SkyTerra Next will comply with all applicable FCC requirements and regulations for the operation of MSS services in the L-band in the United States and is specifically designed to protect GPS and other adjacent-band services.

### A.    SkyTerra Next Will Not Cause Harmful Interference to GPS.

Ligado has met with GPS stakeholders to explain its technology and commercial arrangements and address concerns raised and will continue to do so in a collaborative manner.[15]

---

[13] These terms are consistent with what Inmarsat had stated before the bankruptcy court overseeing Ligado's reorganization:  "The existing limits . . . in the Cooperation Agreement do not need to change or be interpreted.  Indeed, the parties expressly agreed in the Mediated Agreement that the technical and geographic requirements 'will not change.'"  *In re Ligado Networks LLC*, No. 25-10006-TMH, Docket No. 895 ¶ 4 (Bankr. D. Del. Sept. 9, 2025) (quoting a Settlement Term Sheet adopted by the parties and incorporated into the Amended Cooperation Agreement).  Inmarsat's position in front of the bankruptcy court was that nothing needed to "change" *because* the Mediated Agreement bound Ligado, AST SpaceMobile and Inmarsat "to honor the existing geographic and other limits of the Cooperation Agreement."  To quote the Third Circuit, "there is nothing within the Mediated Agreement, or anywhere in the documents that have been referred to, indicating a further coordination agreement needed to be reached."  *In re Ligado Networks LLC*, Nos. 26-1444 & 26-1445 at 7 (3d Cir. Mar. 4, 2026).

[14] *See* Modification Application at 12.  Again, citations to the withdrawn petition by Iridium and the Satellite Safety Alliance ("SSA"), which have no knowledge of the Inmarsat-Ligado operations and also no standing on the coordination issue, should be dismissed because they are legally and factually lacking.  And it is axiomatic that the Commission should not rely on filings that are a nullity.

[15] *Id*. at 12-13; *see also* Comments of Deere & Company, Inc., ICFS File No. SAT-MOD-20251206-00374 at 5 (filed Mar. 2, 2026) ("Deere Comments") ("These statements are laudable (continued…)

Ligado has worked diligently with the GPS community over many years and will continue to work to be a good spectrum neighbor.

The Modification Application does not present any new harmful interference concerns to adjacent-band operations because the proposed operations comply fully with the Commission's long-standing MSS rules.  This compliance was demonstrated in the Modification Application, but we recognize that some commenters have requested additional technical information.[16]  To address those requests, we submit herewith a comprehensive technical analysis performed by RKF that specifically addresses the proposed operations and shows the substantial measure of protection for GPS receivers, including aviation GPS receivers.[17]  Using highly conservative assumptions, the analysis confirms that a margin of more than 19 dB is available to ensure compliance with ITU interference protection criteria with respect to all categories of GPS receivers.  Thus, the maximum interference power received by GPS receivers *will be approximately 80 times lower* than the ITU threshold in the worst case.[18]

---

and demonstrate that Ligado is interested in complying with the Commission's rules, working with interested stakeholders, and not interfering with GPS or other adjacent band services.").

[16] *See, e.g., id.* at 7-8; GPSIA Comments at 5.

[17] *See* Technical Exhibit.

[18] *See id*.

**Aggregate GPS Interference Levels Relative to ITU Thresholds for Various GPS Classes**



The RKF analysis amply demonstrates that GPS receivers will have a substantial level of protection from the proposed operations.

This technical analysis was conducted under conservative assumptions, and the proposed system includes many specific protection measures implemented to further ensure that GPS is protected. These include, for example, sharp-cutoff filtering, dynamic power controls, dynamic beam shaping and steering, and real-time network management techniques.[19]

Some commenters use this proceeding to repeat their long-held view that the Commission should change its rules and afford GPS receivers protection not provided for in the Commission's rules by mandating arbitrary degradation methods that are not related to whether

---

[19] This technical analysis, along with the information provided in the Modification Application and its accompanying Technical Supplement and Schedule S, the information contained in this Opposition, and Ligado's discussions with the GPS community, demonstrates that SkyTerra Next's operational characteristics will not cause harmful interference to GPS receivers.

those receivers will experience harmful interference.[20]  Notwithstanding that there is no basis for

permitting GPS stakeholders to unilaterally determine emissions thresholds for adjacent-band

operators, the Commission has addressed this issue before and held, "for purposes of protecting

GPS devices from potential harmful interference . . . evaluation of the receiver test data" should

not rely on changes in the carrier-to-noise ratio or other metrics that are "not directly correlated

with harmful interference."[21]  As the accompanying RKF analysis reflects, SkyTerra Next will

not come close to exceeding the thresholds for harmful interference established by the applicable

ITU standards.  In addition, the suggestion that so-called hybrid MSS/GNSS receivers will suffer

receiver overload is similarly unavailing—the SkyTerra Next MSS signal will comply with all

MSS requirements under the FCC's rules, so a reasonably designed receiver will not experience

harmful interference.[22]  Accordingly, SkyTerra Next will comply with the Commission's rules

and should be approved.

It bears mention that the Commission is actively focusing on the resilience of GPS

devices and the GPS service more broadly, and that effort is commendable given the role that

---

[20] *See* Comments of Aviation Spectrum Resources, Inc. (ASRI) at 2, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026); GPSIA Comments at 22.

[21] *Ligado Amendment to License Modification Applications*, Order and Authorization, 35 FCC Rcd 3772, 3779 ¶ 47 (2020) ("*2020 ATC Order*"); *see also id.* at 3803 ¶ 53 (noting "$C/N_0$ estimator inaccuracies from an examination of the available raw data collected in the NASCTN Report, which strongly suggest that *the $C/N_0$ estimators are generally not capable of accurate and reliable detection of a 1 dB change in the noise power component of the $C/N_0$*") (citing National Advanced Spectrum and Communications Test Network (NASCTN) Report, "LTE Impacts on GPS, Final Report" (February 2017) at 146, § 6, Fig. 6.25, NIST Technical Note 1952, *available at* https://nvlpubs.nist.gov/nistpubs/TechnicalNotes/NIST.TN.1952.pdf) (emphasis added); *see also*  National Academies of Sciences, Engineering, and Medicine, *Analysis of Potential Interference Issues Related to FCC Order 20-48* at 60 (2023) (stating that the $C/N_0$ metric is "self-reported from the device, and the measurement is non-standardized in concept and in hardware implementation, make it a problematic metric.").

[22] GPSIA Comments at 3; Trimble Comments at 4.

GPS plays in the economy.[23]  In that regard, the Commission should take notice of how GPS receivers have become increasingly resilient over the years.[24]

In sum, the RKF analysis demonstrates that SkyTerra Next will operate within applicable FCC and ITU protection limits under both worst-case and statistically representative scenarios, and that such operations will not cause harmful interference to GPS receivers.  SkyTerra Next will adhere to the emission limits prescribed by the FCC and thus provide ample protection to GPS receivers.

### B.    SkyTerra Next Will Not Cause Harmful Interference to AMT Operations.

Ligado has engaged with the Aerospace and Flight Test Radio Coordinating Council, Inc. ("AFTRCC") to address concerns regarding any potential impact on adjacent band AMT operations below 1525 MHz and will continue to do so.  As noted above, Ligado has been, and will remain, a good spectrum neighbor.

As noted above, the Modification Application does not present any harmful interference concerns to adjacent-band operations as the proposed operations not only comply fully with the Commission's longstanding MSS rules, but also utilize state-of-the-art techniques, such as dynamic power control and dynamic beam shaping and steering, that help to further minimize the impact to any adjacent-band operations.  The attached comprehensive technical analysis from

---

[23] *See Promoting the Development of Positioning, Navigation, and Timing Technologies and Solutions*, Notice of Inquiry, 40 FCC Rcd 2641 (2025).

[24] Five years ago, the National Academies of Sciences, Engineering, and Medicine observed that GPS receivers are becoming increasingly resilient over time and sophisticated GPS companies have assuredly continued their efforts since then.  *See* National Academies of Sciences, Engineering, and Medicine, *Analysis of Potential Interference Issues Related to FCC Order 20-48* at 57 (2023) (stating "[b]ased on the results of tests conducted to inform the Ligado proceeding, most commercially produced general navigation, timing, cellular, or certified aviation GPS receivers will not experience significant harmful interference from Ligado emissions as authorized by the FCC.").

RKF demonstrates the substantial measure of protection for AMT operations in the adjacent band.  Using conservative assumptions, the analysis confirms that a margin is available to ensure compliance with interference protection criteria set forth in ITU-R M.1459 for all the analyzed AMT sites.  The analysis further demonstrates robust protection for AMT systems, as shown in the chart below summarizing aggregate OOB I/N at each analyzed AMT location.

**Aggregate AMT Interference Levels Relative to ITU M.1459 Threshold**



In summary, Ligado's proposed SkyTerra Next operations will provide ample protection to AMT operations in the adjacent band.

### III.   A PROCESSING ROUND IS NOT WARRANTED, WOULD BE CONTRARY TO THE PUBLIC INTEREST, AND WOULD CONSTITUTE MISGUIDED SPECTRUM POLICY.

Only one commenter—Iridium—argues that the Modification Application should trigger a processing round.  The Commission should reject Iridium's request for a processing round and grant the Modification Application expeditiously, in keeping with its policy "to permit licensees to modify satellite systems, when possible, to make design improvements" and "allow the

11

licensee to take advantage of the latest technology in providing service to the public."[25] Iridium's arguments misread the Commission's rules, fail to meaningfully grapple with relevant precedent, and call for the establishment of an anti-innovation doctrine.[26] A processing round is unnecessary because SkyTerra Next will only use Ligado's already-authorized spectrum subject to existing operating rules and coordination agreements.[27] It is well-established Commission practice to grant modification requests without applying processing round procedures when the requests do not create any new significant interference concerns.[28] Such is the case here.

If the Commission contravenes precedent and decides processing round procedures should apply, Ligado respectfully requests a waiver of the Commission's rules concerning processing rounds, including Sections 25.156(d) and 25.157.[29] A waiver would be consistent with Commission practice because, again, SkyTerra Next would use previously authorized spectrum and would not create new interference conflicts with other operators.[30] Further, requiring a processing round in this scenario would not only deviate from precedent; it would

---

[25] *Sirius Order* ¶¶ 4-5.

[26] Iridium filed letters prior to the public notice accepting the Modification Application for filing. *See* December Iridium Letter; Letter from Kara Leibin Azocar, Vice President, Regulatory & Public Policy, Iridium Communications Inc., to Marlene H. Dortch, Secretary, FCC, ICFS File No. SAT-MOD-20251206-00374 (filed Jan. 23, 2026) ("January Iridium Letter"). Ligado responded to these letters and hereby incorporates those responses into this Opposition by reference. *See* Letter from Gerard J. Waldron, Counsel to Ligado Networks LLC, to Marlene H. Dortch, Secretary, FCC, ICFS File No. SAT-MOD-20251206-00374 (filed Dec. 29, 2025); Letter from Gerard J. Waldron, Counsel to Ligado Networks LLC, to Marlene H. Dortch, Secretary, FCC, ICFS File No. SAT-MOD-20251206-00374 (filed Feb. 11, 2026).

[27] *See* Modification Application at 10-13; *see also supra*, Section II.

[28] *See, e.g., In re Teledesic LLC*, Order and Authorization, 14 FCC Rcd 2261 ¶ 5 (IB 1999); *In re Space Expl. Holdings, LLC*, Order and Authorization, 36 FCC Rcd 7995 ¶ 16 (2021).

[29] 47 C.F.R. §§ 25.156(d), 25.157.

[30] *See, e.g., In re Mobile Satellite Ventures Subsidiary LLC*, 20 FCC Rcd 479 ¶ 8 (2005); *In re Boeing Co.*, Order and Authorization, 36 FCC Rcd 16067 ¶¶ 20-22 (2021); *In re Space Expl. Holdings, LLC*, Order and Authorization, 39 FCC Rcd 2159 ¶¶ 12-13 (Mar. 8, 2024), at 5; *In re Audacy Corp.,* Order and Authorization, 33 FCC Rcd 5554 ¶¶ 27-28 (2018).

also create bad spectrum policy.  A processing round would discourage other satellite providers from looking to use the latest technology to better utilize their spectrum and serve their customers.  Additionally, given the unique licensing and coordination framework in the L-band and the decades of work and substantial sums of money it has taken to rationalize the band, instituting a processing round would negate those efforts and expenditures and slow down D2D deployment for *all* parties, thereby hurting consumers.

> **A.      A Processing Round Is Not Warranted Because the Modification Application Raises No New Significant Interference Concerns.**

The Commission has long held that processing round procedures do not apply to requested modifications that raise no new significant interference concerns.[31]  The Commission's rules do not contemplate the use of a processing round for a modification request that serves the public interest and does not seek to relocate a GSO satellite, add a frequency band to the authorization, or increase the authorized bandwidth of a satellite, and Ligado's Modification Application satisfies those criteria.[32]  As the *Teledesic Order* establishes, only "if the modification application were to present significant interference problems" would the Commission "treat the modification as a newly filed application and . . . consider the modification application in a subsequent satellite processing round."[33]  The Commission approvingly cited that precedent in the 2021 SpaceX Order, noting that under "the *Teledesic Order*, if a modification would present significant interference problems, grant of the modification would not be in the public interest, and . . . the application should instead be treated

---

[31] *See supra* note 28.

[32] *See* 47 C.F.R. § 25.117(d)(2)(ii)-(iv).

[33] *In re Teledesic LLC*, Order and Authorization, 14 FCC Rcd 2261 ¶ 5 (IB 1999).

as a newly-filed application for processing round purposes."[34]  The Commission has even foregone a processing round and granted a modification application (filed by Sirius Satellite Radio) that requested additional spectrum and authorization to operate three NGSO satellites instead of two previously-authorized GEOs.[35]  The Commission granted Sirius' application in part because it did not raise any additional interference issues.[36]  The *Teledesic* standard is particularly unhelpful for Iridium.  Indeed, the only time Iridium attempts to deal with *Teledesic* in its petition to deny is in a footnote where Iridium tells the Commission that it has wrongly applied the precedent in recent proceedings.[37]

Eschewing precedent, Iridium attempts to raise "facts" it contends counsel in favor of a processing round.  For example, Iridium is correct that the Modification Application proposes "NGSO-like" satellite operations,[38] but that fact alone does not require a processing round, especially when the modification raises no new significant interference concerns.  Iridium speculates that SkyTerra Next "cannot plausibly [operate] under the same technical parameters."[39]  That speculation is wrong, since as stated in the Modification Application and reiterated above, "SkyTerra Next will operate within the parameters defined by [Ligado's]

---

[34] *In re Space Expl. Holdings, LLC*, Order and Authorization, 36 FCC Rcd 7995 ¶ 16 (2021) (internal quotations omitted).  The Space Bureau has cited *Teledesic* as recently as this year, albeit in a narrower context than the original *Teledesic* Order, related to modifications to authorized NGSO systems that were originally subject to modified processing round procedures. *See Space Expl. Holdings, LLC*, Authorization and Order, DA 26-36 ¶ 15 n.51 (SB Jan. 9, 2026).

[35] *Sirius Order* ¶ 5.

[36] *Id.*

[37] Iridium Petition at 26 n.77, stating that "[w]hile Iridium recognizes that the Commission has applied the *Teledesic* decision to certain NGSO applications, which Iridium believes is a misapplication of that precedent, it certainly does not apply to MSS spectrum assigned on an exclusive basis."

[38] December Iridium Letter at 3-4.

[39] *Id.* at 4.

existing – and longstanding – coordination agreements, such that other L-band stakeholders will not be exposed to new risks of harmful interference."[40]  The Modification Application does not present "significant interference problems," and thus a processing round is not appropriate under Commission precedent.[41]

Precedential support for Ligado's position aside, requiring processing rounds for technological upgrades would penalize licensees for pursuing innovative new uses of their spectrum.  This is especially true in the L-band, where Ligado spent substantial time and resources coordinating use with other licensees and governmental stakeholders, and where new entrants would upset the carefully constructed interference environment.  Triggering processing rounds for upgrades like SkyTerra Next would disincentivize licensees from pursuing important technology like LEOs and D2D, especially at a time when foreign rivals steamroll ahead.[42]  The Commission should continue its longstanding policy of permitting license modifications that "allow the licensee to take advantage of the latest technology in providing service to the public."[43]

---

[40] Modification Application at 11; *see also supra*, Section II.

[41] Iridium likewise fails to engage with the 2001 *Sirius* Order, which is noted above.  Iridium implies—without basis—that the operation of SkyTerra Next while SkyTerra-1 is in orbit requires a processing round and calls the Modification Application an "end-run" and "gamesmanship" because Ligado seeks "to deploy a new NGSO system under its GSO license." *See* January Iridium Letter at 1-2.  The Commission should reject this position since at bottom it is an argument against innovation in the satellite industry; it also ignores the Commission's long-standing position in favor of deploying new technologies that do not create new significant interference issues.  *See supra* note 28; *see also Sirius Order* ¶ 5.  Once again, Iridium ignores precedent, this time *Sirius*, which granted authority to operate three NGSO satellites instead of two previously-authorized GEOs.  *See id.* ¶ 5.

[42] *See, e.g.,* Andrew Jones, *China Files ITU Paperwork for Megaconstellations Totaling Nearly 200,000 Satellites*, SpaceNews (Jan. 12, 2026), https://spacenews.com/china-files-itu-paperwork-for-megaconstellations-totaling-nearly-200000-satellites/.

[43] *Sirius Order* ¶¶ 4-5 (emphasis added).

### B.    In the Alternative, the Commission Should Grant a Waiver of Processing Round Rules.

Commission precedent clearly dictates that a processing round is not required, but in the alternative Ligado respectfully requests a waiver of Sections 25.156(d) and 25.157, as well as any other rules the Commission deems necessary.  Commission rules may be waived for good cause shown,[44] and waiver of the Commission's rules is appropriate where (i) special circumstances warrant a deviation from the general rule, and (ii) such deviation will serve the public interest.[45]

The Commission has waived processing round requirements when requested operations would use previously authorized spectrum or would not create new spectrum conflicts with other operators, including for Ligado's predecessor in interest in the L-band, MSV.[46]   In that instance, the Commission held: "NGSO-like applications that seek to use the same frequencies for which that applicant is already licensed [will be] process[ed] . . . immediately without instituting a modified processing round."[47]   As discussed above, the Modification Application similarly would only use L-band spectrum to which Ligado already has coordinated access and will not pose new harmful interference risks to other operators, so a waiver would be warranted if necessary.

Special circumstances weigh in favor of a waiver given that the unique manner in which the MSS L-band is licensed requires substantial coordination between MSS L-band operators and

---

[44] 47 C.F.R. § 1.3; *see also Northeast Cellular Telephone Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (holding that the Commission may exercise its discretion to waive a rule where relevant facts and circumstances make strict compliance inconsistent with the public interest.).

[45] *NetworkIP, LLC v. FCC*, 548 F.3d 116, 125-28 (D.C. Cir. 2008); *Northeast Cellular*, 897 F.2d at 1166.

[46] *See, e.g.*, *supra* note 30.

[47] *In re Mobile Satellite Ventures Subsidiary LLC*, 20 FCC Rcd 479 ¶ 8 (2005).

government administrations.  Ligado has spent decades and billions of dollars on coordination and has positioned itself uniquely to rapidly operationalize its coordinated MSS L-band spectrum.  A processing round would erase these efforts, fragment the L-band into "slivers" of spectrum, and substantially delay effective use of the MSS L-band.[48]  Ignoring this reality, Iridium makes the baseless claim that granting a waiver to unlock SkyTerra Next's innovative services would "be contrary to the public interest."[49]  Granting a waiver may be contrary to Iridium's *self*-interest, but it clearly would be in the *public* interest.  As noted above, permitting the rapid operationalization of SkyTerra Next would enable Ligado and AST SpaceMobile to provide a competitive option in the market for NGSO D2D mobile broadband services as that market is just beginning to emerge.[50]  SkyTerra Next is uniquely positioned to operationalize D2D services from the L-band and would use the same frequencies for which Ligado is already licensed.  While a waiver is not necessary in light of Commission precedent, Ligado respectfully requests the Commission grant one if necessary.

## IV.    LIGADO WILL CONTROL SKYTERRA NEXT.

Iridium devotes a substantial portion of its petition to deny to the baseless premise that the arms-length commercial arrangement between Ligado and AST SpaceMobile has somehow

---

[48] Modification Application, Waiver Requests at 2-3 ("Ligado spent over a decade negotiating coordination agreements with other administrations (namely Canada, Mexico, the United Kingdom, and Russia) and other L-band operators (Inmarsat) and is uniquely positioned to rapidly operationalize the L-band spectrum to which it already has coordinated access.  Any new applicant for an L-band license would need to go through this same years-long process to have access to any portion of L-band spectrum, during which time productive use of the band would likely be difficult or impossible.  As such, requiring a processing round would create unnecessary delay and stifle the innovative new technology that Ligado's Modification Application would enable.").

[49] December Iridium Letter at 5.

[50] *See* SpaceX, The Future of Starlink Direct to Cell (Sept. 8, 2025), https://www.spacex.com/updates#dtc-gen2-spectrum.

17

resulted in Ligado relinquishing control over its L-band license.  However, the basic facts of the Modification Application and Ligado's contractual arrangements with AST SpaceMobile ensure that Ligado will retain control over its L-band license.  Iridium's claims to the contrary should be dismissed.

### A. Ligado's Ongoing Control Over Its License Is Ensured by Its Arms-Length Commercial Relationship with AST SpaceMobile.

Ligado's proposed SkyTerra Next system is the product of an ongoing, arms-length commercial relationship with AST SpaceMobile.  Ligado will have a payload designed to utilize Ligado's L-band spectrum placed on AST SpaceMobile's NGSO satellites which are in the process of being deployed.  This payload will be used to quickly provide consumers with a competitive broadband D2D service using the L-band spectrum.  Under the terms of the commercial agreements between the parties, Ligado will sell MSS capacity available on SkyTerra Next to AST SpaceMobile for use in providing services to AST SpaceMobile's customers including AT&T, Verizon Wireless, and FirstNet in the United States.  Consistent with Commission precedent,[51] Ligado has contracted for AST SpaceMobile to provide operational support for the SkyTerra Next payload, subject to Ligado's ongoing oversight and direction.  In all circumstances, Ligado will retain responsibility for and control over the L-band payload, up to and including the ability to shut down transmissions completely (*e.g.*, to prevent harmful interference).  Additionally, Ligado may in some instances maintain or enter into new commercial agreements to use its L-band spectrum to provide services to parties other than AST SpaceMobile.[52]

---

[51] *See* Modification Application at n.6 and accompanying text.

[52] This includes the express reservation of Ligado's right to deploy Ancillary Terrestrial Component ("ATC") services, which Iridium improperly attacks.  *See infra* Section V.  This is a (continued…)

In its Modification Application, Ligado explains that "AST SpaceMobile will provide feeder link and TT&C operations for SkyTerra Next while Ligado, consistent with FCC precedent, will maintain operational control of the SkyTerra Next payload.  Ligado will have ultimate control over the use of its L-band spectrum over North America, including the ability to execute a shutoff function for any of its transmissions in its spectrum."[53]  Likewise, the Strategic Collaboration and Spectrum Usage Rights Agreement, which Iridium misconstrues again and again, states that "*Ligado shall at all times retain ownership and ultimate control of*" its L-band spectrum, assets, and authorizations, and authorizes Ligado to take "all such measures deemed reasonably necessary to preserve" such L-band spectrum, assets, and authorizations.[54] Additionally, Ligado is permitted to terminate the agreement for several stipulated reasons, including non-payment.[55]  Any inquiry regarding the actual party in control of Ligado's spectrum authority, now and following approval of SkyTerra Next, should stop here.

Moreover, to further implement Ligado's control of SkyTerra Next operations under the Ligado-AST Agreement, the parties are finalizing an additional agreement to confirm that AST SpaceMobile will support operations of SkyTerra Next at the *direction* of Ligado, including that Ligado will have the ability to, at its sole discretion, shut off SkyTerra Next's L-band

---

right Ligado could not have if, as Iridium suggests, it "will lack the ability to direct how any of [its] spectrum will be used."  Iridium Petition at 28.

[53] Modification Application at i.

[54] AST SpaceMobile, Inc. Form 8-K, Ex. 10.2, Strategic Collaboration and Spectrum Usage Rights Agreement § 2.1.1(a), https://www.sec.gov/Archives/edgar/data/1780312/000164117225000330/ex10-2.htm (the "Ligado-AST Agreement").

[55] Ligado-AST Agreement § 7.2.3 ("Ligado may terminate this Agreement immediately upon written notice to SpectrumCo if SpectrumCo fails to timely pay any SpectrumCo Usage Right Payment or SpectrumCo Contribution within forty-five (45) days after the applicable due date . . . .").

transmissions.  The agreement also will confirm that Ligado will remain responsible for the hiring and management of its own staff and for all regulatory strategy related to SkyTerra Next. The agreement also will stipulate a range of additional rights, including access to information about the health and performance of AST SpaceMobile's constellation—to enable Ligado to direct the operation of SkyTerra Next and satisfy its regulatory responsibilities.

Iridium suggests that the Commission should ignore clear—and legally binding— provisions ensuring Ligado's responsibility for and control over its license and spectrum because the Commission "will not rely on statements in contracts asserting that control remains with the licensee."[56]  Iridium rests this claim on the Commission's decision in *Northstar Wireless*, a case in which the Commission considered a contract between DISH and two small businesses that DISH—in the words of Commissioner O'Rielly—"created solely for the purpose of obtaining licenses at a discount."[57]  The circumstances surrounding that unique case are categorically different than the clear facts here:  Ligado has been in the satellite business for decades, it has an ongoing satellite business using its GSO system which will continue to exist after SkyTerra Next commences operations; and AST SpaceMobile and Ligado negotiated their D2D collaboration at arms-length as two sophisticated companies with their own boards and management.  Moreover, the provisions described above—and others like them—ensuring Ligado's control over its license are not mere "assertions" or recitals.  They provide Ligado with enforceable rights to dictate whether and how its spectrum is used.

---

[56] Iridium Petition at 6.

[57] *See In re Northstar Wireless, LLC*, Memorandum Opinion and Order, 30 FCC Rcd 8887 (2015) (statement of Commissioner Michael O'Rielly).

**B.**  **Iridium's Control Arguments Misconstrue Provisions of the Ligado-AST Agreement and Commission Precedent.**

Logic and basic principles of contract law defeat any suggestion that the Ligado-AST Agreement stands for a transfer of control.  Provisions in the agreement require good-faith negotiation of terms for AST SpaceMobile's potential future acquisition of Ligado's spectrum authority.[58]  That language rebuts Iridium's idle speculation by clearly stating that any potential future transaction is dependent upon the outcome of future negotiations.

After asking the Commission to ignore the structure of the Ligado-AST collaboration and Ligado's core rights under its agreements with AST SpaceMobile, Iridium takes aim at SkyTerra Next's "payload" approach.  It argues that SkyTerra Next is unlike other payloads previously approved by the Commission and makes claims that Ligado "will have essentially nothing to do with the operations or use of the payload"[59] and that it "does not have the right or ability to shut off transmissions using its licensed frequencies."[60]  Wrong, and wrong.  Ligado retains responsibility for and control over the operations of SkyTerra Next, including with respect to all regulatory requirements, and holds the customary rights and duties related to such operations under its agreements with AST SpaceMobile.  Furthermore, as noted above, Ligado and AST SpaceMobile have formally agreed that Ligado's control over SkyTerra Next will include the ability to shut off L-band transmissions at its sole discretion.

Finally, Iridium misconstrues the *Intermountain Microwave* factors and relies on cases plainly not applicable to support its assertions.  In addition to the unique circumstances of the *Northstar Wireless* case discussed above, Iridium cites *Baker Creek Communications*, a 1998

---

[58] Ligado-AST Agreement § 2.3.

[59] Iridium Petition at 7.

[60] *Id.* at 8.

bureau-level order in which the applicant partnership's ability to perform basic commercial functions was subject to control by its limited partner,[61] and *Marc Sobel*, a case in which a putative land mobile radio service licensee merely served as a maintenance contractor to the party actually in control of the licenses, and played virtually no role in obtaining or operating the licenses.[62]   The situations at play in those cases bear absolutely no resemblance to the arms-length commercial relationship between Ligado and AST SpaceMobile.   The fact that Iridium could not find an *Intermountain* case with even remotely similar facts is telling.[63]

Even more telling is that Iridium essentially ignores the Commission's precedent that speaks directly to control in the satellite and payload context.   Payload precedents like those cited in Ligado's Modification Application make clear that a licensee can retain control of its licensed operations even where the spacecraft is owned and operated (with respect to spectrum other than the licensee's) by a third party.[64]   Outside of the payload context (where control

---

[61] *In re Baker Creek*, Memorandum Opinion and Order, 13 FCC Rcd 18709 (PS, PWD 1998).

[62] *In re Marc Sobel*, Decision, 17 FCC Rcd 1872 (ALJ 2002).

[63] Iridium's application of the *Intermountain* factors ignores or misstates critical facts.  Those critical facts include:  (a) AST SpaceMobile will support the day-to-day operation of SkyTerra Next *at Ligado's direction*; (b) Ligado will hire and manage the personnel responsible for providing this direction and exercise control over SkyTerra Next; (c) Ligado will have the ability to shut down SkyTerra Next's transmissions for purposes including to prevent harmful interference; (d) The commercial agreements between Ligado and AST SpaceMobile implement a "netting" mechanism for agreed-upon payments whereby costs of operating the SkyTerra Next will essentially be divided between the parties; (e) Ligado will receive a negotiated share of revenues derived from SkyTerra Next capacity that it makes available to AST SpaceMobile; and (f) Ligado retains complete authority over regulatory decisions related to SkyTerra Next.

[64] *See* Modification Application at 3 n.9.  Iridium also neglects to mention that it previously sought and received Commission authority for hosted payloads.  *See In re Iridium Constellation LLC*, Order and Authorization, DA 16-875 (IB, OET Aug. 1, 2016).  Notably, Iridium did not even bother to identify the administration outside the U.S. that would authorize one of these hosted payloads, which resulted in a grant of conditional authority because the Commission's bureaus "[l]ack[ed] any additional information on the status of any [applicable] authorizing authority, or on the status of any application . . . ."  *Id.* at 10 ¶ 26.  It cannot be that hosted payload arrangements warrant heightened scrutiny when presented by Ligado but not by Iridium.

questions are necessarily limited to the payload itself) the Commission has even authorized

arrangements where the licensee for an *entire satellite* entered into agreements whereby a third

party would construct, launch, and own the satellite, manage TT&C and day-to-day operations at

the direction of the licensee, control a significant portion of the licensee's capacity, assume

responsibility for costs, and manage billing, collection, and accounting (among other things).[65]

In conclusion, the collaboration between Ligado and AST SpaceMobile represents an

arms-length agreement under which Ligado will make L-band capacity available to AST

SpaceMobile for use in serving its customers, while retaining control over and responsibility for

its license.  Iridium's unfounded claims should be set aside so that this L-band spectrum can be

used to introduce meaningful competition into the direct-to-device marketplace.

## V.    LIGADO'S MODIFICATION APPLICATION IN NO WAY IMPLICATES THE *2020 ATC ORDER.*

Contrary to Iridium's vague and speculative claims, Ligado's D2D proposal has no

bearing on its compliance with the Commission's *2020 ATC Order*.[66]  Ligado's GSO MSS

system currently supports several million D2D users, and the Modification Application will

enable Ligado to complement this offering with the service provided by SkyTerra Next.

Equally baseless is the suggestion that the Modification Application would violate

aspects of the Commission's waiver of the *ATC-related* "integrated service" rule.  The claim is

wide of the mark because that rule was adopted to ensure that MSS/ATC-authorized operators

---

[65] *See, e.g.*, *In re Volunteers in Technical Assistance*, Order and Authorization, 11 FCC Rcd 1358 ¶ 22 (IB 1995); *In re Volunteers in Technical Assistance,* Order, 12 FCC Rcd 3094 ¶ 23 (IB 1997).

[66] *See generally* Iridium Petition at 27-30 (citing *2020 ATC Order*).  The Satellite Safety Alliance ("SSA") repeats almost verbatim the same point, and Ligado addresses both assertions together. *See* Comments of Satellite Safety Alliance, ICFS File No. SAT-MOD-20251206-00374 (filed Mar. 2, 2026) ("SSA Comments").

continue to provide *satellite service.* Yet, in response to Ligado's proposal to provide additional *satellite* services, Iridium now complains that Ligado's *terrestrial* condition would be implicated. As explained below, this argument is confused at best.

### A.   Ligado's Proposal is an *MSS-Only* Proposal.

As Ligado has made clear many times, its collaboration with AST SpaceMobile is exclusively satellite-focused and is designed to enable Ligado's L-band spectrum to be used to provide satellite-based mobile broadband service to consumers. Iridium cites to language in the Ligado-AST Agreement that it argues means there is "no sense in which Ligado will be providing MSS to any party."[67] But Iridium ignores that Ligado's GSO satellite is being used today to provide service to several million users. More fundamentally, Iridium's claim also ignores that pursuant to Ligado's and AST SpaceMobile's collaboration and the underlying agreements, AST SpaceMobile is Ligado's customer. AST SpaceMobile will use the capacity Ligado will make available through SkyTerra Next to provide services to AST SpaceMobile's customers, but that is possible because *AST SpaceMobile itself will be a Ligado customer.*[68]

---

[67] *See* Iridium Petition at 29.

[68] This is evident from the concept of "Uncommitted Capacity" in Section 2.1 of the Ligado-AST Agreement. Ligado-AST Agreement § 2.1.1 ("Ligado shall grant to SpectrumCo the exclusive right to use any or all of the Uncommitted Capacity . . . ."); *id.* § 1.2 ("'Uncommitted Capacity' shall mean the Ligado GEO Capacity that has not been committed to a Third Party under a Commercial Agreement from time to time."). AST SpaceMobile's "exclusive right to use the Ligado L-band MSS Spectrum" through the services and capacity provided by SkyTerra Next (discussed in § 2.1.2) therefore necessarily reflects a services and capacity arrangement. Because Ligado's GSO satellite, SkyTerra-1, will remain operational, AST SpaceMobile will have access to all otherwise uncommitted capacity across Ligado's hybrid GSO and NGSO satellite network.

Ligado does not dispute that it has an obligation to continue providing MSS, and Ligado is meeting that obligation in part by its arrangement with AST SpaceMobile.

Iridium's suggestion that this Modification Application will undermine the connection between Ligado's satellite and possible terrestrial services is also misplaced.[69] *First*, the agreement expressly reserves Ligado's right to deploy ATC using its spectrum.[70] Ligado is currently prevented from using its spectrum for ATC[71] and is intensely focused on the pending Modification Application, but if circumstances change and ATC usage someday becomes viable, Ligado's rights are clear that it can use this spectrum to provide ATC service. *Second*, Iridium fails to mention that the agreement includes a set of general commercial terms similar to those that apply to spectrum services agreements outside the satellite context. AST SpaceMobile will be Ligado's largest customer and AST SpaceMobile will be able to use SkyTerra Next to serve AST SpaceMobile's customers (*e.g.*, major cellphone carriers). However, Ligado has control over its spectrum.[72] This fact is addressed above and in the Ligado-AST Agreement. The fact that AST SpaceMobile has normal commercial rights does not eviscerate the right of Ligado to control its spectrum.[73]

---

[69] Iridium Petition at 28.

[70] *See* Ligado-AST Agreement §§ 1.1, 5.1 (discussing Ligado's "ATC Deployment Right," which is "Ligado's right to engage in ATC Deployment on its own or together with Ligado's future partners").

[71] *See infra* note 80.

[72] AST SpaceMobile's receipt of and use of the services and capacity Ligado will provide is subject to Ligado "at all times retain[ing] ownership and ultimate control of the Ligado GEO Satellites, Ligado L-band MSS Spectrum, Ligado GEO Capacity, Ligado L-band MSS Assets, and Ligado L-band Licenses . . . ." LigadoAST Agreement § 2.1.1.

[73] *See supra* Section IV.

Finally, there is no spectrum lease at issue here as Iridium alleges.[74] Ligado will be providing AST SpaceMobile access to spectrum that AST SpaceMobile will use to provide services to end users.[75] Simply because the customers of "carrier's carriers" are resellers does not mean that these carriers do not have any customers, nor does it mean that they are not actively marketing services or maintaining their own networks. The same will be true for Ligado when SkyTerra Next is operational.

B.      Iridium Mischaracterizes the *2020 ATC Order*'s Conditions.

As stated earlier, Ligado currently is being prevented from deploying ATC[76] but is in full compliance with the *April 2020 Order*. Iridium mistakenly ties the ATC conditions to the instant Modification Application. The conditions in the ATC Order are about ensuring, *inter alia,* that the L-band spectrum is used to provide satellite service. They are not, as Iridium suggests, intended to regulate how Ligado goes about offering satellite service and how Ligado maximizes the use of the spectrum.[77] Iridium gets particularly confused around the Commission's waiver of the ATC "integrated service" rule, which is a component of the Commission's gating criteria that

---

[74] *See* Iridium Petition at 30. The better analogy is to telecommunications carriers that sell services to "reseller" entities that incorporate those purchased telecommunications into their own offerings.

[75] In fact, this is the same relationship a Ligado predecessor had with its customers. *See In re TMI Communications and Company, L.P.*, Order and Authorization, FCC 99-344 at 21 ¶ 44 (1999) (recognizing TMI's clarification that it would "not be offering service directly to end-users but will be operating as a 'carrier's carrier'").

[76] *See infra* note 80.

[77] *See* Iridium Petition at 28 ("The clear intent of these conditions is to ensure that Ligado itself – not a third party – will continue to provide commercial MSS and not abandon its satellite services in pursuit of terrestrial service opportunities.").

"an MSS operator must demonstrate it will satisfy to obtain ATC authority."[78]  Ligado has been, and remains, in compliance with these conditions.[79]

All this effort by Iridium (and, to a lesser extent, SSA) is puzzling because it has no bearing on the Modification Application currently before the Commission.  This is because the conditions Iridium and SSA cite are for the provision of ATC services, which, as explained above, Ligado currently is not providing and is not in any way part of the SkyTerra Next proposal.[80]  Nevertheless, Iridium suggests that the conditions related to the integrated service rule apply in reverse—*i.e.*, because Ligado has ATC authority, it is prohibited from using its MSS spectrum for certain MSS-related purposes.  This is not only backwards, but also contrary to the Commission's rules and decisions going back many years.  As Iridium itself admits,[81] the Commission's rules ensure that ATC licensees do *not* cease providing MSS.  Given the pending

---

[78] *See 2020 ATC Order*, 35 FCC Rcd at 3830 ¶ 120.  The conditions cited by Iridium were adopted pursuant to the "integrated service" rule.  *See id.* at 3840 ¶ 150 ("We adopt several conditions attendant to our waiver of the integrated service rule.").  Iridium quotes the subheadings that precede the conditions but misleadingly fails to mention the section, titled "Integrated Service Rule Waiver," in which they appear.

[79] Iridium wrongly suggests Ligado has not complied with these conditions.  *See* Iridium Petition at 27 n.84.  Ligado's compliance with this requirement has been a matter of public record for almost sixteen months.  *See* Letter from Vernon Ross, VP, Legal and Regulatory Affairs, Ligado Networks LLC, to Marlene H. Dortch, Secretary, FCC, IB Docket Nos. 11-109 and 12-340 (filed Oct. 22, 2024).  Ligado has remained in full compliance with the regular reporting requirements related to this condition and the others in the April 2020 Order.  *See, e.g.*, Letter from Vernon Ross, VP, Legal and Regulatory Affairs, Ligado Networks LLC, to Marlene H. Dortch, Secretary, FCC, IB Docket Nos. 11-109 and 12-340 (filed Nov. 17, 2025).

[80] As Iridium well knows, Ligado notified the Commission and all interested parties almost three-and-a-half years ago that it was not moving forward with planned trial deployments related to its ATC authority.  *See* Letter from Gerard J. Waldron, Counsel to Ligado Networks LLC, to Marlene H. Dortch, Secretary, FCC, IB Docket Nos. 11-109 and 12-340 (filed Sept. 12, 2022).

[81] *See* Iridium Petition at 28 (ATC conditions "help to ensure that Ligado, as a satellite licensee, actually is providing satellite service.") (citing *2020 ATC Order*, 35 FCC Rcd at 3840).

27

Modification Application is solely about MSS, the ATC rules are inapplicable because their purpose is to ensure that "MSS remains first and foremost a satellite service."[82]

Iridium's disapproval of the *2020 ATC Order* is well known.  But the reality is that the Modification Application currently before the Commission has nothing to do with that order, or Ligado's ATC authority more broadly, and this effort to confuse the record concerning Ligado's *MSS-only* proposal should be rejected.

Additionally, Iridium's opposition has *nothing* to do with a claim that Ligado's operations will interfere with Iridium's licensed service.[83]  Iridium does not even *attempt* to argue that SkyTerra Next could expose Iridium's services to harmful interference—nor could it.  Equally hollow is Iridium's claim that SkyTerra Next would not create competition in the "MSS market"—because it plainly will create competition in the MSS market—and that apparently is what Iridium fears.  Rather, as it has expressly stated, "Iridium has an interest in the questions raised by Ligado's request because it intends to file an application seeking access to these bands."[84]  Thus, Iridium's effort to manufacture a transfer issue where none exists is part of its decade-long effort to stymie Ligado's effort to ensure this L-band spectrum can provide mobile broadband service to the public and to claim this carefully coordinated spectrum.

---

[82] *In re Flexibility for Delivery of Communications by Mobile Satellite Service Providers in the 2 GHz Band, the L-Band, and the 1.6/2.4 GHz Bands*, Report and Order and Notice of Proposed Rulemaking, FCC 03-15 at 4–5 (2003).

[83] Iridium Petition at 2.

[84] December Iridium Letter at 1.

**CONCLUSION**

Grant of Ligado's Modification Application will advance development of a robust and competitive market for D2D services in the United States. The one petition to deny and the comments in the record do not contest those immense public interest benefits and rely on erroneous arguments as explained above. As such, the Commission should promptly complete its review of the Modification Application and grant Ligado authority to proceed with deployment of this important proposal.

Respectfully submitted,

*/s/ Gerard J. Waldron*

Vernon Ross
Vice President, Legal and Regulatory Affairs

LIGADO NETWORKS LLC
10802 Parkridge Blvd.
Reston, VA 20191
(877) 678-2920

Gerard J. Waldron
Corey Walker
John D. Bowers
Rosalie A. Moss

COVINGTON & BURLING LLP
850 10th St NW
Washington, DC 20001

*Counsel to Ligado Networks LLC*

March 17, 2026

Enclosure

29

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2026, a true and correct copy of the foregoing Consolidated Opposition to Petition and Response to Comments of Ligado Networks Subsidiary LLC was served by hand delivery to the following:

Kara Leibin Azocar
Vice President, Regulatory & Public Policy
IRIDIUM COMMUNICATIONS INC.
1750 Tysons Boulevard, Suite 1400
McLean, VA 22102

Robert M. McDowell
Counsel to Iridium Communications Inc.
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400

Theresa Rollins
SATELLITE SAFETY ALLIANCE
1800 M Street NW 800N
Washington, D.C. 20036

Jarrett S. Taubman
VP & Deputy Chief Government Affairs and
Regulatory Officer
VIASAT, INC.
901 K Street NW, Suite 400
Washington, DC 20001

Alfred M. Mamlet
Counsel for Inmarsat Global Ltd.
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795

I hereby certify that on March 17, 2026, a true and correct copy of the foregoing Consolidated Opposition to Petition and Response to Comments of Ligado Networks Subsidiary LLC was served by electronic mail to the following:

Jennifer A. Manner
Senior Vice President, Regulatory Affairs
and International Strategy
AST & SCIENCE, LLC
2901 Enterprise Lane Midland, TX 79706
jennifer.manner@ast-science.com

Kara R. Curtis
President
AEROSPACE AND FLIGHT TEST RADIO
COORDINATION COUNCIL, INC.
616 E. 34th Street North
Wichita, KS 67219
kara.r.curtis@l3harris.com

Jennifer Wainwright
Counsel to Aviation Spectrum
Resources, Inc.
KELLEY DRYE & WARREN LLP
670 Maine Avenue SW, Suite 600
Washington, D.C. 2002
jwainwright@kelleydrye.com

John M. Gifft, Jr.
Assistant General Counsel, Product
DEERE & COMPANY, INC.
801 17th Street, NW Suite 200
Washington, DC 20006
gifftjohn@johndeere.com

Lisa Dyer
Executive Director
GPS INNOVATION ALLIANCE
1800 M Street NW, Suite 800N
Washington, DC 20036
ldyer@gpsalliance.org

Michele Lawrie-Munro
Executive Director
MOBILE SATELLITE SERVICES ASSOCIATION
5000 Executive Parkway, Suite 302
San Ramon, CA 94583
help@mss-association.org

John Eagle Miles
Counsel to Trimble Inc.
MINTZ LEVIN P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004

*/s/ John D. Bowers*
John D. Bowers

## Technical Exhibit

## SkyTerra Next - Interference Analysis to Adjacent Band Operations

### I. Introduction

Ligado Networks Subsidiary LLC, Debtor-in-Possession (Ligado), is seeking authority to modify its current satellite license to deploy and operate an L-band mobile satellite system providing service in the United States aboard AST & Science, LLC's (together with its subsidiaries, "AST SpaceMobile") constellation of NGSO satellites in low Earth orbit ("LEO"). Under the proposed approach, Ligado will place an L-band payload (referred to herein as SkyTerra Next) on AST SpaceMobile's LEO constellation.

Ligado provides this Technical Exhibit as a supplemental attachment to its Opposition to Petition and Response to Comments. While Schedule S and the Technical Supplement to Ligado's application seeking authority to operate SkyTerra Next contains the technical and operational parameters for the system, this exhibit provides detailed interference analysis, with particular emphasis on protection of these adjacent band operations:

1. Global Positioning System (GPS) receivers on the ground and aeronautical GPS;

2. Aeronautical Mobile Telemetry (AMT) Operations.

These independent, comprehensive technical analyses were performed by RKF Engineering Solutions, LLC (RKF). The RKF analyses quantify potential interference mechanisms, evaluate compatibility under applicable FCC and ITU limits, and confirm compliance with relevant protection criteria.

### II. System Description

#### A. L-Band Space Station Configuration

The SkyTerra Next Space Station will operate in:
- Transmit: 1525–1544 MHz and 1545-1559 MHz (space-to-Earth)
- Receive: 1626.5–1645.5 MHz and 1646.5-1660.5 MHz (Earth-to-space)

The SkyTerra Next system supports dynamic beam shaping, beam steering, and variable power control to avoid harmful interference.

#### B. Constellation Characteristics

SkyTerra Next, will consist of 96 Space Station payloads installed on AST SpaceMobile satellites, operating in the L-band in a "bent-pipe" architecture. The AST SpaceMobile satellites will operate in a LEO constellation at an altitude of 690 km, one satellite per orbital plane, 53 degrees inclination, with an orbital period of 1 hour and 38 minutes. The orbital planes' Right Ascension of the Ascending Node spacing will be 3.75 degrees. The

SkyTerra Next sub-system will consist of a direct radiating user link phased array, channelizer, and antennas.

## III. Interference Protection Analysis

### A. GPS Receivers on the Ground and Aeronautical GPS

1. Interference Risk Profile

    a. GPS L1 signals are centered at 1575.42 MHz, between SkyTerra Next's downlink band (1525–1544 MHz and 1545–1559 MHz) and uplink band (1626.5–1645.5 MHz and 1646.5–1660.5 MHz). Potential interference mechanisms include:

        i. Out-of-band emissions (OOBE) from the Space Station's downlink into the GPS L1 band.

        ii. Intermodulation products (intermods) from satellite transmissions.

2. Protection Measures

    a. Space Station transmit chains will employ digital linearizers to linearize the Solid State Power Amplifiers (SSPAs) in the phased array antenna to achieve excellent Adjacent Channel Leakage Ratio (ACLR) and sharp-cutoff filtering to ensure OOBE meets or exceeds the attenuation requirements in FCC §25.202(f)[1] and ITU-R SM.1541-7[2]/1542-0[3].

    b. Dynamic power control will be employed as needed to reduce carrier EIRP in beams.

    c. In the highly unlikely circumstance that harmful interference is observed, real-time network management will permit muting of specific beams.

3. Analysis Reference

    a. The GPS Compatibility Analysis (Addendum A) evaluates aggregate unwanted emissions power flux density (PFD) at the Earth's surface and confirms more than 19 dB of margin is available to ensure compliance with the interference protection criteria.

---

[1] 47 C.F.R. § 25.202 (f) (2024).

[2] ITU-R Recommendation SM.1541-7— *Unwanted emissions in the out-of-band domain* (2024).

[3] ITU-R Recommendation SM.1542-0— *The protection of passive services from unwanted emissions* (2001).

**B. Aeronautical Mobile Telemetry (AMT) Operations**

1.  Interference Risk Profile

    a.  The Department of Defense, the National Aeronautics and Space Administration, and the Department of Energy operate aeronautical mobile telemetry systems in the band 1435-1525 MHz. The aeronautical mobile telemetry systems are used for flight testing of manned and unmanned aircraft, missiles, and space vehicles, and associated communications such as range safety, chase aircraft, and weather data.
    b.  The proximity to the L-band downlink band at 1525 MHz creates potential for adjacent-band interference to AMT receivers.

2.  Protection Measures

    a.  Ligado will coordinate with the Aerospace and Flight Test Radio Coordinating Council (AFTRCC) or another FCC-designated AMT coordinator for an updated geolocation database of such sites.

    b.  Guard-band filtering and waveform shaping will attenuate emissions below the AMT adjacent-band limits specified in ITU-R M.1459.[4]

3.  Analysis Reference

    a.  The AMT Compatibility Analysis (Addendum B) models worst-case main-beam and sidelobe coupling to AMT facilities, incorporating antenna discrimination. Although SkyTerra Next will not operate co-channel to AMT operations, results confirm compliance with the ITU interference protection criteria at all analyzed sites.

---

[4] ITU-R Recommendation M.1459-0— *Protection criteria for telemetry systems in the aeronautical mobile service and mitigation techniques to facilitate sharing with geostationary broadcasting-satellite and mobile-satellite services in the frequency bands 1 452-1 525 MHz and 2 310-2 360 MHz* (2000).

## IV. Compliance with Domestic and International Regulations

The system will adhere to:

- FCC Part 25[5] technical limits and coordination requirements for adjacent band operations.

- Relevant ITU Radio Regulations, including Article 9 coordination procedures and Article 5 footnotes applicable to the 1525–1544 MHz and 1545–1559 MHz and 1626.5–1645.5 MHz and 1646.5–1660.5 MHz bands.

- Existing quadrilateral coordination agreements with Canada, Mexico, and Inmarsat governing L-band MSS operations.

## V. Conclusion

The proposed L-band system represents a technically robust and regulatory-compliant expansion of MSS capabilities into the emerging direct-to-device market. The proposed system has been carefully engineered to operate within the 1525–1544 MHz and 1545-1559 MHz (satellite transmit) and 1626.5–1645.5 MHz and 1646.5-1660.5 MHz (satellite receive) bands while providing rigorous protection to other incumbent services in adjacent bands, including GPS receivers and Aeronautical Mobile Telemetry (AMT) earth stations.

Comprehensive interference analyses confirm that the aggregate power flux densities (PFDs), out-of-band emissions (OOBE), and intermodulation products generated by the system are within applicable FCC and ITU protection limits under both worst-case and statistically representative scenarios. Specifically:

- For GPS, unwanted emissions into the 1559–1610 MHz band is shown to be well below the interference thresholds.

- For AMT earth stations, modeling of antenna discrimination, propagation, and operational scenarios demonstrates that even under coherent intermodulation assumptions the protection criteria of ITU-R M.1459 is met.

The system design further incorporates advanced interference management features, including real-time beam steering, adaptive power allocation, digital predistortion linearization of high-power amplifiers, and steep out-of-band filtering. These capabilities enable both proactive and reactive interference control, ensuring that transmissions can be modified, suppressed, or terminated instantly in the highly unlikely circumstance that harmful interference is observed as determined by 47 CFR 25.274.

Taken together, the combination of rigorous engineering safeguards, demonstrated analytical compliance, and operational coordination commitments establishes that Ligado

---

[5] 47 C.F.R. § 25 (2024).

will operate well within domestic and international regulatory frameworks. This approach not only ensures robust protection of critical services such as GPS and AMT, but also advances the policy objectives of enabling innovative D2D MSS offerings without adverse impact on incumbent systems. The proposed operations therefore meet all relevant FCC Part 25 requirements and international obligations under the ITU Radio Regulations.

## VI. Analysis Approach

As discussed above, RKF assesses the potential interference from the Space Station satellite downlink transmissions (in 1525-1544 MHz and 1545-1559 MHz) to the following adjacent band systems:

1.  GPS receivers on the ground and aeronautical GPS in 1559-1610 MHz

2.  AMT operations in 1435-1525 MHz

Both analyses characterize the adjacent channel interference into these bands from SkyTerra Next system. Furthermore, RKF does the analysis over the Continental United States (CONUS) to take into account operational characteristics of SkyTerra Next system.

This section outlines the approach that is common to above analyses, where first, an in-band analysis is done to determine the in-band power level of each beam, next, the in-band results are used to calculate the OOBE levels.

Next, Addendums A and B detail any deviation from this baseline approach, the GPS or AMT receiver characteristics and the results for the two interference scenarios above.

### In-band Analysis

The analysis first simulates the L-Band Space Station constellation with 96 satellites at specified altitude Next, it randomly chooses one of the satellite constellation time instances. These satellite constellation time instances determine the location of the satellites in view of CONUS (as shown in Figure 1 below). In Figure 1, there are 7 satellites (the smaller red dots) in view of CONUS that are used in the analysis. The location of the other satellites in the orbit at that time instance are shown as well (hollow yellow circles).



**Figure 1: Location of satellites at the baseline satellite constellation time instance on the map (red=satellites in view of CONUS).**

Next, the beams covering CONUS are assigned to each of the 7 satellites with the max number of beams per satellite and the total radiated power per satellite while utilizing maximizing capacity with 10MHz beams. In the beam assignment to satellites, beams within 300 km of the nine AMT analyzed (as detailed in the corresponding sections below) and other incumbents (e.g. SARSAT LUT sites) are assigned to the satellite with the highest elevation angle and next, other beams over CONUS are assigned to the satellite with the highest elevation angle – all while utilizing all of satellite's capacity. In addition, a minimum elevation angle to satellite of 15° is maintained. These assumptions result in analyzing interference from fully-loaded satellites with the majority of beams around the victim receivers for conservativeness.

Each satellite uses an active direct radiating array with thousands of actively controlled radiating elements. Each beam is assumed to have a 10 MHz bandwidth.

Each beam serves a coverage cell with a diameter of 24 km on the ground.  Each satellite has a nominal Total Radiated Power (TRP) of 36 dBW in linear operation that ensures 45 dB[6] Adjacent Channel Leakage Ratio (ACLR) for using LTE/5G waveforms. For each satellite beam, the transmit power that achieves the targeted 20 dB nominal Carrier-to-Noise Ratio

---

[6] As explained in the Out-of-Band Analysis Methodology section, the out-of-band analysis assumed 43.7 dB ACLR that is more conservative.

(C/N) on the ground is determined. Each satellite beam has a minimum of 15 dB transmit power control range for operation and interference management if needed.

The assumptions of Clear Sky and free of obstruction Line of Sight and First Fresnel ellipsoid are used for conservativeness.

Each active satellite beam tracks a given coverage cell on the ground while passing the coverage area.  The satellite signal is received by the MSS User Equipment (UE) with 0 dBi antenna gain and system noise temperature of 2367 Kelvin.

The C/N is computed using the equation below:

C/N = EIRP – FSPL + UE Rx Gain – 10*log10(kTB),

Where

- EIRP (dBW) = TRP + Transmit Gain (obtained from beamforming)
- FSPL is the Free Space Path Loss (dB) = 92.45 + 20*log10(frequency in GHz) + 20*log10(range in km)
- UE Rx Gain = 0 dBi
- k = Boltzmann's constant = $1.380649 \times 10^{-23}$ m$^2$ kg s$^{-2}$ K$^{-1}$
- T = UE System Noise Temperature = 2367 K
- B = UE Rx Bandwidth = 10 MHz

Once the beams are assigned the power levels required for in-band operation, the out-of-band emissions are determined as follows.

### Out-of-Band Analysis Methodology

The out-of-band analysis uses the results from the in-band analysis - particularly, the list of beams assigned to each satellite, transmit power per beam and the beam weights for the several thousand Higher Power Amplifiers (HPA) on the satellite. The aggregate out-of-band PFD at each point on the ground is calculated from the satellites' HPA intermodulation products (IM) power levels[7] that are within the adjacent channels. In this analysis, the adjacent channels are the 10 MHz bands above and below the edge of the analyzed band. For the non-adjacent channels, the unwanted emissions levels will be lower than the ones in the adjacent channels due to the nature of intermodulation products even without considering any out-of-band rejection from the output filters implemented in the phased array antenna on each satellite.

The analysis consists of two parts: the first part assumes that all intermodulation power generated in each HPA of each satellite is incoherent; the second part of the analysis utilizes a practical quantification of spatial coherency effects to add to the incoherent IM levels to

---

[7] The methodology employed is based upon same underlying concepts as those employed in *Mandell, M., and Berman, A., "Intermodulation Scattering Communications Satellite System Analysis," AIAA 16th International Communications Systems Conference and Exhibit, Feb. 25-29,1996.*

subsequently arrive at the intermodulation power at each point in the far field.  Note that since the intermodulation power is dominated by 3rd order effects, this analysis quantifies the 3rd order intermodulation for both the incoherent and coherent effects.

In the first part of the analysis, the intermodulation power radiated from each satellite is calculated as follows. Each satellite has a maximum TRP of 36 dBW.  Furthermore, at maximum TRP, the HPA's, each of which is linearized by Digital Pre-Distortion (DPD), are operated at a minimum 8 dB, nominal 9 dB output backoff.  Analysis of the HPAs used when bandlimited Gaussian noise is passed through the HPA and an output backoff of 9 dB, gives a signal to intermodulation power ratio of 43.7 dB. The system utilizes a technology that actively distributes power to form each beam among different HPA's in the system and effectively maintains each HPA operating at the same signal to IM ratio.  The HPA output backoff is computed by using the actual satellite output power, and the 36 dBW TRP corresponding to 9 dB output backoff.  Next, the signal to IM power ratio is calculated by comparing the actual output backoff to 9 dB and modifying the 43.7 dB value as changing by 2 dB per dB change in output backoff. This is then used to compute the intermodulation power at the satellite output. This intermodulation power is transmitted from the satellite using the pattern of a single antenna element which is assumed to have a peak gain of 4 dBi with a cosine roll-off.

Note that the intermodulation energy distribution varies over the geography of the cell created by the satellite beam. As such, the second part of the analysis adds this spatial coherency to the incoherent results to arrive at the intermodulation power at each point in the far field.  This calculation is performed for each satellite, and subsequently, the IM levels from each satellite are aggregated to obtain the IM level at each point in the far field.

At a single point on the ground, the PFD ($dBW/m^2$) is calculated assuming Free Space Path Loss from the satellite to the point on the ground.  Finally, the occupied bandwidth of all signals in the HPA is used to convert the PFD value to Spectral PFD ($dBW/m^2/Hz$).  Note that IM power is distributed over a larger bandwidth than the signals input to the HPA. As such, using the in-band bandwidth is conservative in that it overestimates the spectral density of IM power. This analysis is performed for each satellite, and the Spectral PFD values (in $dBW/m^2/Hz$) are aggregated for the assumed receiver locations on the ground over CONUS. The total Spectral PFD level at each receiver location is then compared to the corresponding interference threshold to determine whether the OOB emissions meet the interference limit.

Operationally, not all the Physical Resource Blocks (PRBs) would be used simultaneously in all time slots and channels in every cell. Instead, the eNodeB /gNodeB dynamically assigns the PRBs to ensure there is no interference among the adjacent cells by using different PRBs in both frequency and time domains. On average, this results in about 20% average loading in each cell. Note that this analysis assumes 100% loading conservatively.

## Addendum A: GPS Compatibility Study

Since GPS operates in 1559-1610 MHz, which is adjacent to L-band downlink, the potential Out of Band (OOB) interference from the L-Band Space Station satellite transmissions into GPS receivers on the ground and aeronautical GPS is analyzed.

In this analysis, the aggregate OOB Spectral PFD levels, over all L-Band Space Station satellites in view, are calculated at 345,351 points separated by 0.05 degrees in latitude and longitude over CONUS, assuming that the GPS receiver can be anywhere in CONUS. As such, the number of GPS locations analyzed is more than 15.7 times the 21,934 potential AST cells (per Figure 2).



**Figure 2 – Orange cells are the potential SkyTerra Next cells over CONUS**

In addition, the OOB power levels are reduced by the 20 dB rejection provided by the filters after the HPA on the satellites over the GPS band.

Next, the aggregate OOB Spectral PFD levels are converted to I/N levels, assuming the GPS receiver noise characteristics per Table 1 below using the Eqn. 1 below:

$$\text{Aggregate OOB I/N (dB)} = \text{SPFD} + 10*\log10(A_{\text{eff}}) - \text{Noise PSD} \qquad \text{(Eqn. 1)}$$

, where

- SPFD (dBW/m$^2$/Hz) – Aggregate OOB interference Spectral PFD
- $A_{eff}$ (m$^2$) – Receiver antenna effective aperture area per Table 1
- N (dBW/Hz) – Noise power spectral density per Table 1

From ITU-R Rec. M.1903-1 Table 2, and in line with the GPS receivers analyzed by NTIA[8] and Department of Transportation[9], the following GPS receivers on the ground were analyzed: A-RNSS, General Purpose No. 1, and High Precision. For the aeronautical GPS, GBAS Cat II/III Type 1 and Air-navigation precision approach receiver were analyzed. The GPS receiver characteristics used from ITU-R M.1903 are summarized in Table 1. Note that although all the GPS receiver types analyzed (except for the A-RNSS) have hemispheric antenna patterns, for simplicity and conservatively, the analysis assumes an omnidirectional pattern with the max receiver gain in ITU-R M.1903.

In addition, to simplify the analysis, the ground GPS were assumed at a single height of 4500[10] meters (15,000 feet) Above Mean Sea Level (AMSL) as this is the highest elevation over CONUS (per the noted reference). The aeronautical GPS receivers were analyzed at 30,000 feet (9144 meters) AMSL height.

---

[8] NTIA, "Impact of L-band MSS 'Direct-to-Device' Operations on GPS," Table 2
https://www.federalregister.gov/documents/2024/12/27/2024-30760/impact-of-l-band-mss-direct-to-device-operations-on-gps
[9] DoT, "United States Department of Transportation Global Positioning System (GPS) Adjacent Band Compatibility Assessment,"
https://www.transportation.gov/sites/dot.gov/files/docs/subdoc/186/dot-gps-adjacent-band-final-report.pdf

[10] 4500 meters was chosen since the highest elevation over CONUS is 4,421 meters at Mount Whitney in California.

**Table 1 - GPS Receiver Characteristics (Based on ITU-R M.1903-1 Table 2)**

| Parameter | GBAS Cat II/III Type 1 | Air-Navigation Precision Approach Receiver | A-RNSS | General Purpose No. 1 | High Precision |
|---|---|---|---|---|---|
| Receiver Antenna Gain[11] (dBi) | 3 | 7 | 0 | 6 | 3 |
| Receiver Antenna Effective Aperture Area[12] (m²) | 0.00575 | 0.01404 | 0.00288 | 0.01147 | 0.00575 |
| System Noise Temperature (K)[13] | 513 | 400 | 513 | 645 | 513 |
| Noise Power Spectral Density [14](dBW/MHz) | -141.5 | -142.6 | -141.5 | -140.5 | -141.5 |
| Acquisition mode threshold power density level of aggregate wideband interference at the passive antenna output (dBW/MHz) | -146.6 | -146 | -146.9 | -142 | -147.4 |
| **Additional Safety Margin[15]** | **6.0** | **6.0** | **-** | **-** | **-** |
| **I/N threshold[16] (dB)** | **-11.10** | **-9.42** | **-5.40** | **-1.50** | **-5.90** |

Finally, for each analyzed GPS location, the aggregate OOB I/N is compared to the I/N threshold in Table 1.

Figure 3 below shows the CCDF of the aggregate OOB I/N levels for all 345,351 points on the ground and 345,351 points at 30,000 feet analyzed. As indicated in Table 2, the max aggregate I/N is at least 19 dB below the corresponding I/N threshold.

---

[11] Max receiver gain in the upper hemisphere in ITU-R M.1903-1, Table 2.

[12] Receiver antenna effective aperture area (m²) = $10^{(\text{Peak Gain}/10)} * \lambda^2/(4*\pi)$ where $\lambda$ = wavelength in meters.

[13] Receiver system noise temperature (K) in ITU-R M.1903-1 Table 2.

[14] Noise Power Spectral Density (dBW/MHz) = 10*log10(k * System Noise Temperature * B), where k (Boltzmann's constant) = $1.380649 \times 10^{-23}$ m² kg s$^{-2}$ K$^{-1}$ and B (Bandwidth) = 1,000,000 Hz.

[15] Per ITU-R M.1903-1 Annex 1

[16] The I/N threshold for the two aeronautical GPS receivers (GBAS Cat II/III Type 1 and Air navigation precision approach receiver) include an additional 6 dB for safety margin per ITU-R M.1903.



**Figure 3 – Distribution of Aggregate OOB I/N over 345,351 GPS Locations vs the corresponding I/N threshold (dashed lines) for the 5 ground or aeronautical GPS receiver types.**

**Table 2 – Maximum aggregate OOB I/N relative to the I/N threshold for each of the GPS receiver types**

| GPS Receiver Type | Max I/N – I/N threshold (dB) |
|---|---|
| A-RNSS | -31.12 |
| General Purpose No. 1 | -30.01 |
| High Precision | -27.62 |
| GBAS Cat II/III Type 1 | -22.42 |
| Air Navigation Precision Approach | -19.15 |

## Addendum B: AMT Compatibility Study

Since the AMT downlink operates in 1435-1525 MHz, which is adjacent to L-band downlink, the OOB interference from the L-Band Space Station satellite transmissions into AMT earth stations on the ground is analyzed.

The NTIA's report[17] provides the following description of, the AMT earth stations locations in CONUS:

---

[17] https://www.ntia.gov/files/ntia/publications/compendium/1435.00-1525.00_01MAR14.pdf.

"While these assignments are distributed throughout the country, the majority of assignments are concentrated in California, Maryland, Florida, Nevada, and New Mexico. All of the assignments in Maryland are located at the Patuxent River Naval Air Station. Likewise, all of the assignments in New Mexico are to stations located at the White Sands Missile Range. Similarly, all the New Jersey assignments are to stations located at one location, Lakehurst. The majority of the assignments in Nevada are for operations at the Nevada Test and Training Range."

As such, the AMT earth stations at these locations – per Table 3– were selected to be analyzed.

**Table 3 – Location of L-band AMT Earth Stations Analyzed**

| State | Location |
|---|---|
| California | China Lake Naval Air Warfare Center |
| California | Point Mugu Naval Air Warfare Center |
| California | Edwards Air Force Base (412th Test Wing) |
| California | Vandenberg Air Force Base (Space Launch Delta 30) |
| Maryland | Patuxent River Naval Air Station |
| Florida | Eglin Air Force Base (96th Test Wing) |
| Nevada | Nevada Test and Training Range |
| New Mexico | White Sands Missile Range |
| New Jersey | Lakehurst Maxfield Field |

## AMT Earth Stations Characteristics

In this analysis, to model the AMT earth stations pointing directions, the AMT earth stations are assumed to track an aircraft travelling at 650 km/hour at an altitude of 15 km on an ellipse, centered at each AMT earth station, with a semi-major axis of 320 km and semi-minor axis of 5 km[18]. Based on above, the AMT earth station elevation angle ranges from 2.68° (=atan(15/32)) to 71.56° (=atan(15/5)). In addition, it is assumed that there is a 90% probability that the elevation angle is less than 20°.

Note that the AMT earth stations operating in L-band are assigned a frequency channel over the following center frequencies 1444.5, 1453.5, 1501.5, 1515.5 and 1524.5 MHz[19].

In this study, for conservativeness, each AMT earth station is assigned the top three frequency channels, per Table 4, closest to the L-band downlink. The highest possible bandwidth was chosen for conservativeness.

---

[18] Per the US Radiocommunications Sector contribution to ITU-R WP4C on Agenda Item 1.13.
[19] "MANUAL OF REGULATIONS AND PROCEDURES FOR FEDERAL RADIO FREQUENCY MANAGEMENT," January 2023 Revision of the January 2021 Edition.

**Table 4 – AMT Earth Station Frequency Channels**

| Center Frequency (MHz) | Bandwidth (MHz) | Start Frequency (MHz) | End Frequency (MHz) |
|---|---|---|---|
| 1501.5 | 11 | 1496 | 1507 |
| 1515.5 | 17 | 1507 | 1524 |
| 1524.5 | 1 | 1524 | 1525 |

Table 5 below shows the AMT earth station receiver's remaining characteristics used in this analysis. Note that per ITU-R Rec, M.1459-0, the assumed antenna pattern is conservative as it is a composite pattern developed on this basis for antenna gains from 29 dBi to 41.2 dBi while the peak gain can be as low as 20 dBi.

**Table 5 - AMT Earth Station Characteristics**

| Parameter | Value | Source |
|---|---|---|
| Antenna Pattern | M.1459-0 | Per ITU-R Rec. M.1459-0 Section 2.1 of Annex 1 |
| Antenna Peak Gain (dBi) | 41.2 | |
| System Noise Temperature (K) | 250 | ITU-R Rec. M.1459-0 |
| Noise Power Spectral Density (dBW/Hz) | -204.6 | = 10*log10(k * System Noise Temperature) <br><br> k (Boltzmann's constant) = $1.380649 \times 10^{-23}$ m$^2$ kg s$^{-2}$ K$^{-1}$ |
| Protection Criteria | Aggregate I/N cannot exceed -4.15 dB more than 0.5% of the time | Per ITU-R Rec. M.1459-0 Annex 1 |

## Results

In this analysis, the aggregate OOB I/N levels, over all L-Band Space Station satellites in view, are calculated at each of the 9 AMT earth stations in Table 3, where the I/N is calculated per Eqn. 2 below.

$$\text{Aggregate OOB I/N (dB) = Interference PSD – Noise PSD} \qquad \text{(Eqn. 2)}$$

, where

- Interference PSD (dBW/Hz) – Aggregate of the OOB interference power spectral density (over all satellites) as calculated per below:

- - PSD (dBW/Hz) per satellite = satellite's 3rd order IM power density (dBW/Hz) + satellite Gain towards the AMT earth station (dBi) - FSPL (dB) + AMT earth station Gain towards the satellite (dBi)
  - FSPL (Free Space Path Loss) (dB) = 92.45 + 20*log10(frequency in GHz) + 20*log10(range in km)
- Noise PSD (dBW/Hz) – Noise power spectral density per Table 5

The analysis is done with 99,999 simulation iterations where, for each AMT earth station, a pointing direction is selected randomly from the distribution and one of the three AMT frequency channels (with equal probability) is assigned. As such, each AMT earth station is assigned one of the three frequency channels in 1/3 of the iterations. The resulting aggregate OOB I/N in each AMT frequency channel is:

Adjusted Aggregate OOB I/N (dB) = Aggregate OOB I/N in Eqn. 2 + 10*log10(% of 3rd order Intermodulation Power in the AMT channel per Table 4)

Figure 4 below shows the CCDF of the aggregate OOB I/N levels (over all satellites) at each of the 9 AMT earth stations over 99,999 simulation iterations. As indicated in Figure 4 and Table 6, the I/N threshold of -4.15 dB is not exceeded for more than 0.5% of the time (per ITU-R Rec. M.1459-0) at any of the analyzed AMT earth stations.



**Figure 4 – Distribution of Aggregate OOB I/N at analyzed AMT Earth Stations Relative to ITU M.1459 Threshold**

**Table 6 – Percentage of Time Exceedance of -4.15 dB I/N at  analyzed AMT Earth Stations**

| ID | State | Location | % exceedance of -4.15 dB I/N |
|----|-------|----------|------------------------------|
| 1 | California | China Lake Naval Air Warfare Center | 0.40% |
| 2 | California | Point Mugu Naval Air Warfare Center | 0.04% |
| 3 | California | Edwards Air Force Base (412th Test Wing) | 0.13% |
| 4 | California | Vandenberg Air Force Base (Space Launch Delta 30) | 0.06% |
| 5 | Maryland | Patuxent River Naval Air Station | 0.17% |
| 6 | Florida | Eglin Air Force Base (96th Test Wing) | 0.30% |
| 7 | Nevada | Nevada Test and Training Range | 0.33% |
| 8 | New Mexico | White Sands Missile Range | 0.22% |
| 9 | New Jersey | Lakehurst Maxfield Field | 0.12% |

This comprehensive and conservative analysis confirms that SkyTerra Next will not cause harmful interference to GPS or AMT operations in the adjacent band.